*/4*

United States District Court
Southern District of Texas
FILED

MAY 0 7 2003

Michael N. Milby
Clerk of Court

Civil Action No. 003-047

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

**San Benito Consolidated
Independent School District**
*Plaintiff*

v.

**Companion Life Insurance Company,
Managed Benefits Administrator and Insurance
Consultants, Inc., J. Allan Hall & Associates, Inc.
And MBA of Wyoming, Inc.**
*Defendants*

## DEFENDANT J. ALLAN HALL & ASSOCIATES, INC.'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED BRIEF IN SUPPORT

Roberta J. Hegland
State Bar No. 09375000
Federal I.D. No. 6842
Joseph A. Stallone
State Bar No. 00797485
Federal I.D. No. 22343
**BRACEWELL & PATTERSON, L.L.P.**
2000 One Shoreline Plaza - South Tower
800 North Shoreline Blvd.
Corpus Christi, Texas 78401-3700
Telephone No.: (361) 882-6644
Telecopier No.: (361) 903-7000
**ATTORNEYS FOR DEFENDANT
J. ALLAN HALL & ASSOCIATES, INC.**

OF COUNSEL:

Albert George
55 Monument Circle, Suite 1115
Indianapolis, IN 46204
Telephone No.: (317) 264-0020
Facsimile No.: (317) 264-9038



# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ...................................................................................... i

TABLE OF CITATIONS ................................................................................... iii

I. STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ........................................ 1

II. STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT ............................................. 2

III. BACKGROUND .......................................................................................... 4

    A.    The Concept of Reinsurance Generally ......................................................... 4
    B.    Case Law Regarding Reinsurance ................................................................ 5

IV. THE UNCONTRAVERTED FACTS, SAN BENITO'S COMPLAINT, AND THE ALLEGATIONS
LODGED ...................................................................................................... 7

    A.    The Uncontraverted Facts and San Benito's Complaint ................................ 7
    B.    San Benito's Allegations Against Hall, the Agent for the Reinsurer ......... 10
            1.  Violations of TEX. INS. CODE Art. 21.21 §§ 4(1), (11)(a),(b),(c): ......... 10
            2.  Negligent Misrepresentation: ................................................................. 10

V. SUMMARY OF THE ARGUMENTS ................................................................... 10

    A.    The Insurance Code Mandates that in the Reinsurance Context Only
            Contract Claims can be Pursued, and Only Against the Reinsurer ........... 11
    B.    No Private Right of Action ....................................................................... 11
    C.    Hall, as the Agent, Cannot Be Held Liable Under the Principal's Contract;
            Hall further Had No Authority to Adjust and Settle the Claims at Issue and
            Cannot Be Held Responsible for the Handling of San Benito's Claims .... 11

VI. THE SUMMARY JUDGMENT STANDARD ........................................................ 12

VII. THE TEXAS INSURANCE CODE ................................................................. 13

    A.    The Texas Insurance Code Governs Both the Reinsurer Companion and Its
            Agent Hall; Only Companion Can Be Sued, and Only in Contract ........... 13
    B.    No Private Right of Action is Available for San Benito's Allegations
            Against Hall ............................................................................................. 15

VIII. GENERAL AGENCY AND CONTRACT PRINCIPLES PRECLUDE SAN BENITO'S CAUSES
OF ACTION AGAINST HALL ......................................................................... 16

# TABLE OF CONTENTS (CONT.)

**Page**

IX. SAN BENITO HAS MADE JUDICIAL ADMISSIONS IN DIRECT CONTRAVENTION OF ITS CLAIMS ......................................................................................... 18

CONCLUSION ............................................................................................................. 19

CERTIFICATE OF SERVICE ...................................................................................... 21

## TABLE OF CITATIONS

**Cases**

*Affiliated Food Stores, Inc. v. Group Benefit Trust*,
    134 B.R. 215 (Bank. N.D. Tex. 1991) .......................................................................... 5

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ................................................ 12

*Board of Ins. Com'rs v. Texas Employees Ass'n*,
    189 S.W.2d 47 (Tex. Civ. App. 1945), *aff'd*, 192 SW.2d 149 (Tex. 1946) .............. 5, 6

*Bonhiver v. Affiliated Cos. of Am.*, 447 F.2d 108, n. 1 (5th Cir. 1971) ............................. 5

*Bricklayers Local No. 1 Welfare Fund v. Louisiana Health Ins. Ass'n*,
    771 F. Supp. 771 (E.D. La. 1991) ................................................................................ 5

*Brown v. Granatelli*, 897 F.2d 1351 (5th Cir. 1990),
    *cert. denied*, 498 U.S. 848, 111 S.Ct. 137 (1990) ..................................................... 5, 7

*Capital Mercury Shirt Corp. v. Employers Reinsurance Corp.*,
    749 F.Supp. 926 (W.D. Ark. 1990) ............................................................................. 5

*Celotex Corp. v. Catrett*, 477 U.S. 317
    106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ...................................................................... 12

*Consumer Benefit Ass'n v. Lexington Ins. Co.*,
    731 F.Supp. 1510 (M.D. Ala. 1990) ......................................................................... 5, 7

*Cuttle v. Federal Employees Metal Trades Council*,
    623 F.Supp. 1154 (D.C. Me., 1985) ............................................................................ 5

*Friend Bros., Inc. v. Seaboard Surety Co.*,
    56 N.E.2d 6 (Mass. 1944) ............................................................................................ 5

*Griggs v. State Farm Lloyds*, 181 F.3d 694 (5th Cir.1999) ............................................. 16

*Health Application Sys., Inc. v. Hartford Life & Accid. Ins. Co.*,
    381 S.2d 294 (Fla.App. 1980) .................................................................................. 5, 6

*Hewlett Packard v. Barnes*, 571 F.2d 502 (9th Cir. 1979),
    *cert. denied*, 439 U.S. 831 (1979) .............................................................................. 5

*Horizon/CMS Health Care Corp. v. Auld,*
   34 S.W.3d 887 (Tex. 2000) ................................................................ 18

*Independent Servs. Corp. v. Tousant,*
   149 F.2d 204 (1st Cir. 1945 ............................................................... 5

*Martinez v. Bally's Louisiana, Inc.,*
   244 F.3d 474 (5th Cir.2001) ............................................................. 19

*Moore v. Provident Life & Accident Ins. Co.,*
   786 F.2d 922 (9th Cir. 1986) ........................................................... 5, 7

*Potomac Ins. Co. v. Jayhawk Med. Acceptance Corp.,*
   198 F.3d 548 (5th Cir.2000) ............................................................. 13

*Prudential Ins. Co. of Great Britain v. Associated Employers Lloyds,*
   250 S.W.2d 477 (Tex.Civ.App.—Fort Worth 1952, no writ) ...................... 6

*S&W Enters., L.L.C. v. South Trust Bank of Alabama, NA,*
   315 F.3d 533 (5th Cir. 2003) ........................................................... 13

*Salve Regina College v. Russell,* 499 U.S. 225, 111 S.Ct. 1217,
   113 L.Ed.2d 190 (1991) .................................................................. 13

*State & County Mut. Fire Ins. Co. v. Miller,*
   52 S.W.3d 693 (Tex. 2001) .......................................................... 7, 15

*Stradley v. Southwestern Life Ins. Co.,*
   341 S.W.2d 195 (Tex.Civ.App.—Dallas 1960, writ ref'd n.r.e.) .................. 6

*Thompson v. Talquin Bldg. Products Co.,* 928 F.2d 649 (4th Cir. 1991) ...................... 5, 6

*Travelers Cas. & Sur. Co. of Am. v. Baptist Health Sys.,*
   313 F.3d 295 (5th Cir. 2002) ........................................................... 13

*United Food & Commercial Workers & Employers Arizona Health & Welfare Trust v.*
   *Pacyga,* 801 F.2d 1157, 1161-62 (9th Cir. 1986) ................................. 5, 7

*United States v. Wainright,* U.S. Dist. LEXIS 1340, *21 (E.D. La. 1990) ...................... 5

*Vargas v. State Farm Lloyds,* 216 F.Supp.2d 643 (S.D.Tex. 2002) .................. 16

*Westmoreland v. Sadoux*, 299 F.3d 462 (5th Cir. 2002),
   *cert. denied*, 123 S.Ct. 1354, 155 L. Ed. 2d 196 (2003) ............................................ 3, 16

*Wyatt v. Hunt Plywood Co., Inc.*,
   297 F.3d 405 (5th Cir. 2002) .................................................................................. 19

**Other Authorities**

RESTATEMENT (SECOND) OF AGENCY § 320 (1958) ................................................... 3, 16

**Statutes and Rules**

FED. R. CIV. P. 56 ........................................................................................................ 1, 4

FED. R. CIV. P. 56(b) ....................................................................................................... 13

FED. R. CIV. P. 56(c) ....................................................................................................... 12

TEX. ADMIN. CODE Art. 26.02, Subch. O ........................................................................... 5

TEX. INS. CODE ANN. Art. 3.10(h) (Vernon Supp. 2003) ......................................... 2, 7, 14

TEX. INS. CODE ANN. Art. 5.75-1(g) (Vernon Supp. 2003) ............................................... 7

TEX. INS. CODE Art. 21.07-7 § 2(6) (Vernon Supp. 2003) ......................................... 2, 13

TEX. INS. CODE Art. 21.07-7 § 2(9) (Vernon Supp. 2003) ................................................. 7

TEX. INS. CODE Art. 21.07-7 § 3(e) (Vernon Supp. 2003) ......................................... 2, 16

TEX. INS. CODE Art. 21.07-7 § 6(p) (Vernon Supp. 2003) ................................... 2, 14, 15

TEX. INS. CODE Art. 21.21 ........................................................................................ 10, 15

TEX. INS. CODE Art. 21.21 §  (11)(a) .............................................................................. 10

TEX. INS. CODE Art. 21.21 § (11)(b) .............................................................................. 10

TEX. INS. CODE Art. 21.21 § (11)(c) .............................................................................. 10

TEX. INS. CODE Art. 21.21 §§ 4(1), .............................................................................. 10

TEX. INS. CODE Art. 5.75-1(g) ...................................................................................... 15

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| SAN BENITO CONSOLIDATED | § | |
| INDEPENDENT SCHOOL DISTRICT | § | |
| | § | |
| VS. | § | **CIVIL ACTION NO. 003-047** |
| | § | |
| COMPANION LIFE INSURANCE | § | |
| COMPANY, MANAGED BENEFITS | § | |
| ADMINISTRATOR AND INSURANCE | § | |
| CONSULTANTS, INC., J. ALLAN | § | |
| HALL & ASSOCIATES, INC., | § | |
| AND MBA OF WYOMING, INC. | § | |

**DEFENDANT J. ALLAN HALL & ASSOCIATES, INC.'S MOTION FOR
SUMMARY JUDGMENT AND INCORPORATED BRIEF IN SUPPORT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW J. Allan Hall & Associates, Inc. ("Hall"), one of the Defendants in

the above-styled cause, and files this its Motion for Summary Judgment pursuant to **FED.**

**R. CIV. P.** 56, and in support would show:

**I.**
**STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING**

1.    The dispute in this case arises from a contract of reinsurance, also known as "stop

loss coverage," obtained by San Benito Consolidated Independent School District ("San

Benito") from named defendant Companion Life Insurance Company ("Companion").

At base, San Benito alleges that health care expenses incurred by its self-insured Plan,

above San Benito's self-retention limit, should have been reimbursed by Companion.

Companion asserts that, as part of its contract, San Benito was required to pay the

expenses during the coverage period before they could be reimbursed under the contract; because this condition precedent was not met, Companion was under no obligation to reimburse San Benito.

2.    San Benito originally filed suit in state district court in Cameron County, Texas on November 21, 2002. After Plaintiff non-suited the sole defendant depriving the dispute of diversity jurisdiction, the case was removed to this Honorable Court on February 28, 2003. The initial pretrial conference is set to be held on May 12, 2003.

## II.
## STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT

3.    The Texas Insurance Code mandates that only contract claims can be pursued against a reinsurer. Further, the acts of the reinsurer's agent are deemed to be the acts of the reinsurer. Is San Benito thus precluded from pursuing its Insurance Code Art. 21.21 allegation that Hall, the agent of reinsurer Companion, misrepresented the terms of the reinsurance contract at issue in this case? **TEX. INS. CODE ANN.** Art. 3.10(h), Art. 21.07-7 §2(6), §6(p) (Vernon Supp. 2003).[1]

4.    The Texas Insurance Code also provides that there is no private right of action available against the agent of a reinsurer for allegations that the agent misrepresented the terms of the reinsurance contract. **TEX. INS. CODE** Art. 21.07-7 § 3(e) (Vernon Supp. 2003). In that event, can San Benito file a civil suit against Hall alleging that Hall made misrepresentations regarding the terms of the reinsurance contract?

---

[1]    Attached hereto and incorporated herein by reference as if set out in full as Exhibit "E" please find **TEX. INS. CODE ANN.** Art. 3.10, *et seq.* (Vernon Supp. 2003), and as Exhibit "F" **TEX. INS. CODE** Art. 21.07-7, *et seq.* (Vernon Supp. 2003).

5.    Texas law dictates that agents are not generally independently liable under the contracts they execute for their principals. ***Westmoreland v. Sadoux***, 299 F.3d 462, 466 (5th Cir. 2002), *cert. denied*, 123 S.Ct. 1354, 155 L. Ed. 2d 196 (2003) (citing **RESTATEMENT (SECOND) OF AGENCY** § 320 (1958)).    Can Hall therefore be held responsible for Companion's refusal to reimburse San Benito's excess loss claims under the terms of the reinsurance contract?

6.    Pursuant to the General Manager's Agreement between Hall and Companion, Hall had no authority to adjust and settle claims in excess of $100,000.  The claims San Benito alleges Companion refused to reimburse exceed $800,000 and thus Hall had no authority to handle them.  Can San Benito pursue a claim against Hall when Hall had no authority to reimburse the claims?

7.    San Benito's pleadings directly contravert its allegations in this suit:  San Benito states unequivocally that the $800,000 in claims at issue, which it contends should have been reimbursed by Companion, **did not accrue until the Fall of 2001, <u>after</u> the Companion policy expired on August 31, 2001**.  Because such claims accrued outside the policy period, they could not have been reimbursed under the contract.  Therefore, San Benito has not been damaged by any act or omission on the part of Companion or its agent Hall.  There existing no legal basis for a claim arising after the reinsurance contract expired, San Benito has made a critical admission against its interest which necessitates a judgment that it take nothing by its claims against Hall.

8.    San Benito's Insurance Code violation and negligent misrepresentation claims against Hall are precluded by statute, case authority, and its own admission as a matter of

law.  Accordingly, there are no genuine issues of material fact that would preclude the entry of judgment in Hall's favor on all of San Benito's alleged causes of action. **FED. R. CIV. P.** 56.

### III.
### BACKGROUND

#### A.    The Concept of Reinsurance Generally

9.    Reinsurance is designed not to insure, but to *reinsure* an employer's self-insured[2] health and welfare Plans for health care expenses that exceed a specific amount the employer chooses to self-insure.[3]  That self-insured amount depends upon the number of employees and, of course, the financial strength of the employer.   The Plan is the "original insurer" of its employees and their covered dependents, who are the "original insureds" or "direct insureds."

10.    Upon receipt of satisfactory proof of loss, the reinsurance company reimburses the employer's Plan for payments made in excess of the self-insured retention.   The reinsurance coverage may also provide for additional reimbursement for amounts that exceed an "aggregate deductible" for all such claims paid within the policy year.  Thus, the reinsurance carrier (here Companion) is insuring the employer's medical Plan—not the individual employee claimant —and reimburses the employer Plan only *after it has paid* the medical expenses.  Thus, it is reinsurance, as it "reinsures" the losses of the self-insured Plan.

---

[2]    Also called "self-funded."

[3]    Variously called "specific deductible," "self-insured retention of risk," "SIR," or simply "deductible."

11.    This reinsurance coverage is also often referred to as "stop-loss," "excess loss insurance," and "medical reinsurance."

### B.    Case Law Regarding Reinsurance

12.    Courts are uniform in holding that "stop-loss" coverage and reinsurance are synonymous.[4] Reinsurance is *not* accident and health insurance; it does not insure the individual patient-claimant.[5] Nor is reinsurance group insurance.[6] It is not merely excess insurance either (such as, for example, an auto or homeowners umbrella policy). *Wainright*, U.S. Dist. LEXIS 1340 at *21.

---

[4]    *Bonhiver v. Affiliated Cos. of Am.*, 447 F.2d 108, 109, n. 1 (5th Cir. 1971); *Independent Servs. Corp. v. Tousant*, 149 F.2d 204, 209 (1st Cir. 1945); *In re Affiliated Food Stores, Inc. v. Group Benefit Trust*, 134 B.R. 215, 216 (Bank. N.D. Tex. 1991); *United States v. Wainright*, U.S. Dist. LEXIS 1340, *21 (E.D. La. 1990); *Consumer Benefit Ass'n v. Lexington Ins. Co.*, 731 F.Supp. 1510, 1513 (M.D. Ala. 1990); *Health Application Sys., Inc. v. Hartford Life & Accid. Ins. Co.*, 381 S.2d 294, 295, 297, 298 (Fla.App. 1980); *Capital Mercury Shirt Corp. v. Employers Reinsurance Corp.*, 749 F.Supp. 926, 931 (W.D. Ark. 1990); *Board of Ins. Com'rs v. Texas Employees Ass'n*, 189 S.W.2d 47, 54 (Tex. Civ. App. 1945), *aff'd*, 192 SW.2d 149 (Tex. 1946); *Friend Bros., Inc. v. Seaboard Surety Co.*, 56 N.E.2d 6, 8 (Mass. 1944).

[5]    *Brown v. Granatelli*, 897 F.2d 1351, 1354 (5th Cir. 1990), *cert. denied*, 498 U.S. 848, 111 S.Ct. 137 (1990) (holding that stop-loss coverage purchased by a plan to protect itself against catastrophic loss was not "accident and sickness" insurance, nor an "individual policy" or "group policy," since it did not benefit the individual participants, but covered only the plan itself); *Thompson v. Talquin Bldg. Products Co.*, 928 F.2d 649, 652-53 (4th Cir. 1991); *United Food & Commercial Workers & Employers Arizona Health & Welfare Trust v. Pacyga*, 801 F.2d 1157, 1161-62 (9th Cir. 1986); *Moore v. Provident Life & Accident Ins. Co.*, 786 F.2d 922, 927 (9th Cir. 1986); *see generally Hewlett Packard v. Barnes*, 571 F.2d 502 (9th Cir. 1979), *cert. denied*, 439 U.S. 831 (1979); *Bricklayers Local No. 1 Welfare Fund v. Louisiana Health Ins. Ass'n*, 771 F. Supp. 771, 774 (E.D. La. 1991); *see also* TEX. ADMIN. CODE Art. 26.02, Subch. O, defining "health benefit plan" as **not** to include "reinsurance contracts issued on a stop-loss, quota-share, or similar basis."

[6]    *Brown*, 897 F.2d at 1354; *Pacyga*, 801 F.2d at 1161; *Cuttle v. Federal Employees Metal Trades Council*, 623 F.Supp. 1154, 1157 (D.C. Me., 1985).

13.    Texas cases defining the concept of reinsurance are legion.  Reinsurance has been historically defined as:

> a **contract** whereby, for a consideration, one agrees to **indemnify** another, wholly or in part, against loss or liability by reason of a risk the latter has assumed under a separate and original contract with a third party . . . .

*Stradley v. Southwestern Life Ins. Co.*, 341 S.W.2d 195, 198 (Tex.Civ.App.—Dallas 1960, writ ref'd n.r.e.) (emphasis added); *Prudential Ins. Co. of Great Britain v. Associated Employers Lloyds*, 250 S.W.2d 477, 480 (Tex.Civ.App.—Fort Worth 1952, no writ).    Reinsurance contracts are neither policies of insurance nor contracts of insurance in the generally understood sense, but rather are creatures of contract which **"do not insure** property, but only engage to **indemnify against liability** upon policies or contracts issued to owners of property."  *Stradley*, 341 S.W.2d at 198 (emphasis added).

> It is obvious and conclusive, we think, that any **reinsurance** is in effect a **stop-loss plan**, so far as the original carrier is concerned.  While the original carrier is, of course, liable upon his contract for all losses sustained thereunder, when by reinsurance contract or agreement he passes on to another insurer a part of the risk, or the loss, over and above a fixed amount; [sic] and **should such excess loss occur** and have to be paid by him, **he is reimbursed by the reinsurer to the extent of such excess liability** assumed by the reinsurer.  Hence the loss of the original carrier is necessarily stopped at the point, or in the sum, beyond which the reinsurer assumes the risk and agrees to pay it.

*Board of Ins. Commissioners*, 189 S.W.2d at 54 (note also that "original carrier" was a self-funded workers' compensation plan); *Thompson*, 928 F.2d at 652-53 ("Instead of covering employees directly, the stop-loss insurance covers the plan itself."); *see also Health Application Sys.*, 381 S.2d at 295, 297, 298 (holding, "The general rule applicable to reinsurance agreements is that, in the absence of provisions to the contrary, a reinsurance agreement operates solely as between the reinsurer and the reinsured.").

In sum, the holding in *Pacyga* is analogous to the facts of this case:

The type of stop-loss insurance carried by the Plan herein cannot be termed health insurance, nor can it be said that the Plan is providing an insurance contract to its participants. The stop-loss coverage provides for payment to the Plan of up to $1.5 million to reimburse the Plan in the event that it must pay out more than a certain amount in claims in a given year. **The stop-loss insurance does not pay benefits directly to participants**, nor does the insurance company take over administration of the Plan at the point when the aggregate amount is reached. Thus, **no insurance is provided to the participants** . . . .

*Pacyga*, 801 F.2d 1157, 1161, 1162 (emphasis added) (citing *Moore v. Provident Life & Accident Co.*, 786 F.2d 922 (9th Cir. 1986)).

14.     Accordingly, important to the concept of reinsurance is the principle that the insured policyholders – here, the San Benito employees and their dependents – cannot bring direct claims against the reinsuring entity – here, Companion. *Brown,* 897 F.2d at 1354; *State & County Mut. Fire Ins. Co. v. Miller*, 52 S.W.3d 693, 697 (Tex. 2001); TEX. INS. CODE Art. 21.07-7 § 2(9) (Vernon Supp. 2003) ("Reinsurance" "does **not** mean a contract for the…assumption of direct insurance policy liability to the **insureds**.") (emphasis added). "A person does not have any rights against a reinsurer that are not specifically set forth in the contract of reinsurance or in a specific agreement between the reinsurer and the person." TEX. INS. CODE ANN. Arts. 3.10(h), 5.75-1(g) (Vernon Supp. 2003); *accord Consumer Benefit Ass'n*, 731 F.Supp. at 1513.

## IV.
### THE UNCONTRAVERTED FACTS, SAN BENITO'S COMPLAINT, AND THE ALLEGATIONS LODGED

### A.     The Uncontraverted Facts and San Benito's Complaint

15.     As stated, San Benito is self-insured, as it alleges in its Complaint. (See Exh. A

attached hereto, "Plaintiff's Original Petition", p. 3, ¶ IV)  San Benito further avers that in order to protect it from large claims each year, it purchased a contract of reinsurance. (*Id.*)  Indeed, for the 2000-2001 school year, San Benito purchased reinsurance from Companion with the following terms: after San Benito paid the first $75,000 in covered health insurance benefits per person to an employee or dependent, "any additional sums spent by the School District for additional medical expenses would be **reimbursed** by Companion, up to a per person policy limit of [$1 million]." (Exh. A, Pet. pp. 3-4, ¶ V (emphasis added); *see* Exh. B attached hereto and incorporated by reference as if set forth in full, "Companion Life Insurance Policy Providing Excess Loss Insurance" at p. 2 ¶ 7(c), p. 3 ¶ 7(f), p. 9 ¶¶ IV 1, 2, p. 10 ¶ VI. 1; and Exh. C, attached hereto and incorporated by reference as if set forth in full, "Application to Companion Life Insurance Company for Aggregate and Specific Excess Loss Insurance," p. 4 ¶ 11(i))[7]

16.     Consistent with the purpose of reinsurance, the contract between San Benito and Companion specifically stated that Companion had "neither the right nor the obligation under this Contract to directly pay any Covered Person [or provider of professional or medical services] . . . ."  (Exh. B, reinsurance contract, at p. 10 ¶ VI. 1.)  All monies were paid by Companion directly to the San Benito Plan and not to any "covered person." (*Id.*)

17.     San Benito contends that Hall "acted as the agent and representative of Companion with respect to providing this [contract] of reinsurance to the School

---

[7]     Please see attached Affidavit of W. Larry Blagg, Custodian of Records for J. Allan Hall & Associates, authenticating the Exhibits "B", "C" and "D" attached to this Motion.

District." (Exh. A, Pet. p. 4 ¶ VI; see Exh. D, "General Manager's Agreement," attached hereto and incorporated by reference as if set forth in full, at p.1 ¶ 1)

18.     San Benito further alleges Hall represented to its Plan that covered heath care expenses incurred above the $75,000 self-retention "would be reimbursed by Companion . . . even if the School District had not yet issued a check for the incurred expenses." (Exh. A, Pet. p. 4, ¶ VII)

19.     However, the very wording of the Application for reinsurance completed by San Benito, just above the signature line, expressly provides to the contrary: "Applicant [San Benito] acknowledges that the Contract which is the subject of this Application is a reimbursement Contract.  **Applicant must first pay claims before submitting them for reimbursement**." (*See* Exh. C, Application for reinsurance contract, at p. 4, ¶ 11(i)) (emphasis added)[8]  The Application then states, in the next provision, "Oral statements not expressly incorporated herein are not part of this Contract.  Only the President or Executive Officer of **the Company** [Companion] may make changes to the Contract Form or Addenda on behalf of the Company." (*Id.* at ¶ 11(j)) (emphasis added)

20.     San Benito asserts that its Plan covered $800,000 in claims on behalf of its employees and their dependents which Companion improvidently did not reimburse, for the stated reason that the payments were not made within the period required by the

---

[8]     Similarly, the contract of reinsurance specifically provides, "Upon Presentation of Proof of Loss to the Company for Aggregate [or Specific] Benefits, [San Benito] warrants that all monies necessary to pay for services and supplies **have been paid** to the respective providers of medical services or supplies to which the claim for reimbursement relates." (reinsurance contract at p. 9, ¶ IV. 2) (emphasis added)

reinsurance contract. (Exh. A, Pet. pp. 4-5, ¶ VII; see Exh. B, reinsurance contract, at

p. 2: aggregate benefit must be paid on or before 8/31/01)

21.    However, San Benito simultaneously asserts that the Companion contract expired

**prior to** incurring these claims.  (Exh. A, Pet. at p. 5 ¶ VIII)

    **B.**    **San Benito's Allegations Against Hall, the Agent for the Reinsurer**

22.    San Benito asserts the following causes of action against Companion's agent Hall,

all stemming from the assertion that Hall represented to San Benito that it would not have

to pay excess health benefits to its employees before they would be eligible for

reimbursement by Companion under the reinsurance contract:

    **1.**    **Violations of TEX. INS. CODE Art. 21.21 §§ 4(1), (11)(a),(b),(c):**

- Misrepresenting the terms of the reinsurance agreement
- Misrepresenting material facts and provisions relating to coverage
- Making untrue statements of a material fact
- Failing to state a material fact necessary to make other statements made not misleading
- Making a statement in such a manner as to mislead a reasonably prudent person to a false conclusion of material fact
- Knowingly violating **TEX. INS. CODE** Art. 21.21.

    **2.**    **Negligent Misrepresentation:**

    "All of the Defendants negligently misrepresented that certain sums of money

would be reinsured by Companion, when in fact they were not."

(Pet. p. 6, ¶¶ IX, X)

**V.**
**SUMMARY OF THE ARGUMENTS**

23.    There are three grounds for summary judgment here, based upon indisputable

facts. For the reasons stated herein, San Benito cannot pursue any of its claims against Hall, as they are (1) statutorily prohibited; (2) precluded under basic principles of agency and contract; and (3) directly contraverted by judicial admissions made by San Benito.

### A. The Insurance Code Mandates that in the Reinsurance Context Only Contract Claims can be Pursued, and Only Against the Reinsurer

24. The Texas Insurance Code, which governs both reinsuring entities and their intermediaries, mandates that only contract claims can be brought against a reinsurer. The Code further provides that the acts of the agent of a reinsurer are deemed to be the acts of the reinsurer. If the reinsurer is liable for the acts of the agent, and the reinsurer can only be sued in contract, there can be no cause of action against the agent of the reinsurer under the Texas Insurance Code.

### B. No Private Right of Action

25. The Insurance Code mandates that there is no private right of action available against a reinsurer's agent for an allegation that the agent misrepresented the terms of the reinsurance contract – the very allegation San Benito proffers here.

### C. Hall, as the Agent, Cannot Be Held Liable Under the Principal's Contract; Hall further Had No Authority to Adjust and Settle the Claims at Issue and Cannot Be Held Responsible for the Handling of San Benito's Claims

26. In Texas, agents are not liable for the contracts of their principals. Further, Hall, the agent, had no authority to adjust and settle the claims at issue in this case, and thus it cannot be held in any way responsible for Companion's ultimate decision with respect to the handling of San Benito's claims.

### D. San Benito Has Undermined its Own Causes of Action

27.    San Benito avers in its Petition that the $800,000 in claims at issue in this case accrued "in the Fall of 2001," and "would have been covered by the reinsurance [to be supplied by a new company, BCS Insurance Company] had it already been purchased" and "properly and timely renewed for the 2001-2002 school year." (Exh. A, Pet. at p. 5, ¶ VIII)  This judicial admission confirms Companion's position:  that San Benito failed to pay the health benefits at issue during the term of the Companion contract, thus precluding San Benito's entitlement to reimbursement under the reinsurance contract.  If the expenses are not covered by the contract of reinsurance, then San Benito can have suffered no harm by Companion's proper refusal to reimburse it.  Hall, as Companion's agent, is likewise absolved of any alleged liability.

## VI.
## THE SUMMARY JUDGMENT STANDARD

28.    Summary Judgment is proper when the pleadings and discovery on file, as well as the affidavits attached to the motion (if any) "show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The burden then shifts to the nonmovant to show that the motion for summary judgment should not be granted; the allegations in the pleadings cannot alone be relied upon, but rather evidence must be adduced showing the existence of a genuine issue for trial. *Id.*, 477 U.S. at 321-25, 106 S.Ct. at 2551-54; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-57, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986); *S&W*

*Enters., L.L.C. v. South Trust Bank of Alabama, NA*, 315 F.3d 533, 537 (5th Cir. 2003).

All evidence and the reasonable inferences to be drawn from them are viewed in the light

most favorable to the non-movant. *S&W Enters.,* 315 F.3d at 537.

29.    A party against whom a claim is lodged may, "at any time," move with or without

supporting affidavits for summary judgment in that party's favor as to the entirety of the

claim or any part thereof. **FED. R. CIV. P.** 56(b) (emphasis added).   When the basis for

the motion is a law question, such as the interpretation of a statute, summary judgment is

appropriate. *See **Travelers Cas. & Sur. Co. of Am. v. Baptist Health Sys.***, 313 F.3d 295,

297 (5th Cir. 2002).   This Court's determination of state law, or its interpretation of a

contract, will be reviewed *de novo* by the court of appeals. ***Travelers***, 313 F.3d at 297

(citing ***Salve Regina College v. Russell***, 499 U.S. 225, 239, 111 S.Ct. 1217, 113 L.Ed.2d

190 (1991); ***Potomac Ins. Co. v. Jayhawk Med. Acceptance Corp.***, 198 F.3d 548, 550

(5th Cir.2000)).

## VII.
## THE TEXAS INSURANCE CODE

### A.    The Texas Insurance Code Governs Both the Reinsurer Companion and Its Agent Hall; Only Companion Can Be Sued, and Only in Contract

30.    The Texas Insurance Code governs both reinsurers and their "Intermediaries."

Under the Code, Hall is a "Manager" for Companion; a "Manager" is "a person who has

authority to bind reinsurance and who manages all or part of the reinsurance business of

an insurer . . . and who acts as an agent for that insurer." "Intermediaries for Reinsurance

Companies," **TEX. INS. CODE** Art. 21.07-7 § 2(6) (Vernon Supp. 2003) (see also Exh. D,

General Manager's Agreement, at p. 1, ¶ 1 [Hall expressly designated "Manager"])

31.   The Contract by and between Hall and Companion provides Hall with the authority to: (1) collect premiums; (2) adjust and settle claims up to $100,000; (3) issue proposals and rate quotations and "exercise underwriting judgment"; (4) bind reinsurance on behalf of Companion; (5) underwrite and issue the subject agreements; and (6) manage part of Companion's reinsurance business. (Exhibit D, p.1, Art. III § 1; p.3, Art. IV §§1-4; pp. 4-5, Art. V, §§1-2; p. 5, Art. V § 3; p. 6, Art. VI, § 5; p.6, Art. VI, §§3-4 and p. 7 Art. VII § 2, respectively)

32.   It should be noted that San Benito itself alleges that Hall is the agent for Companion. (Exh. A, Pet. p. 4, ¶ VI)

33.   Commensurate with the authority placed in the reinsuring company's Manager, the Insurance Code provides that "The acts of the manager shall be considered the acts of the insurer on whose behalf the manager is acting." TEX. INS. CODE Art. 21.07-7 § 6(p) (Vernon Supp. 2003).

34.   With the relationship between the reinsurer and the intermediary Manager defined as that of principal and agent, the inquiry then becomes whether any cause of action can be pursued against the agent.  The answer is plain: no cause of action is available as against the agent.

35.   First, "A person does not have any rights against a reinsurer that are not specifically set forth in the contract of reinsurance or in a specific agreement between the reinsurer and the person." TEX. INS. CODE Art. 3.10(h) (reinsurance exclusivity provision for Life, Health and Accident reinsurers) (emphasis added); *see generally State*

*& County Mut. Fire Ins. Co. v. Miller*, 52 S.W.3d at 697 (in automobile reinsurance case, citing TEX. INS. CODE Art. 5.75-1(g), identical exclusivity provision to Art. 3.10(h) but for all other insurance carriers).

36.    Thus, the Texas Legislature, through its promulgation of Insurance Code Arts. 3.10(h) and 5.75-1(g), has deemed reinsurance to be a creature of contract.  Any conflict regarding the contract of reinsurance falls expressly outside the Insurance Code and sounds solely in breach of contract.

37.    Clearly, only the parties to the contract can be parties to the dispute.  No contract exists between Hall and San Benito.  Therefore, no cause of action in contract is available to San Benito as against Hall.

38.    Second, because under the Insurance Code the acts of the Manager/agent are considered those of the reinsurer, the Manager stands in the shoes of the reinsurer.  TEX. INS. CODE. Art. 21.07-7 § 6(p).  Accordingly, if Companion cannot be sued under TEX. INS. CODE Art. 21.21, neither can its agent Hall.

39.    Because Plaintiff is limited to contract claims as against Companion, inasmuch as Plaintiff has no negligence claim against Companion, it likewise has no negligence claim against Hall. There is no cause of action available against a reinsurer's manager/agent for negligence.

###    B.    No Private Right of Action is Available for San Benito's Allegations Against Hall

40.    Furthermore, the Texas Insurance Code does not provide a private right of action against the Manager/agent of a reinsurer if it is alleged, as here, that the reinsurance

intermediary "materially misrepresented the terms or effect of any contract of insurance or reinsurance, or engaged in any fraudulent transaction." **TEX. INS. CODE** Art. 21.07-7 § 3(e) (Vernon Supp. 2003) (providing for administrative remedies through the Texas Department of Insurance). Section 10 of Art. 21.07-7 continues, "This section does not limit or restrict the rights of the policyholder, claimants, creditors, or other third parties **or confer any additional rights on those persons.**" *Id.* at § 10(d) (emphasis added).

41.    Thus, there is no private right of action available to San Benito for its allegation that Hall misrepresented the terms of the reinsurance contract at issue. Any remedy is purely administrative. The Insurance Code confers no additional rights to San Benito other than those articulated in this motion. San Benito's claims against Hall must fail.

## VIII.
## GENERAL AGENCY AND CONTRACT PRINCIPLES PRECLUDE SAN BENITO'S CAUSES OF ACTION AGAINST HALL

42.    "An agent is not ordinarily liable under the contract he executes on behalf of his principal . . . ." *See Westmoreland v. Sadoux*, 299 F.3d 462, 466 (5th Cir. 2002), *cert. denied*, 123 SCt. 1354, 155 L. Ed. 2d 196 (2003) (citing **RESTATEMENT (SECOND) OF AGENCY** § 320 (1958)). "It is well settled under Texas law that an insurance agent cannot be held liable for breach of contract or breach of duty of good faith and fair dealing absent a contract giving rise to a 'special relationship' with the insured." *Vargas v. State Farm Lloyds*, 216 F.Supp.2d 643, 647-48 (S.D.Tex. 2002) (citing *Griggs v. State Farm Lloyds*, 181 F.3d 694, 700 (5th Cir.1999)). The fact that the agreement at issue here is one for re̲insurance – which the Legislature has deemed to be a creature of contract - reinforces these principles.

43.     San Benito's contract for reimbursement of excess losses was with Companion. As a matter of law and under general principles of contract and agency as stated herein, Hall, as the agent, cannot be held liable under the principal Companion's reinsurance contract with San Benito.

44.     Further, San Benito alleges that it has sustained damages at the hands of Hall because Companion refused to reimburse it for claims of over $800,000 in medical expenses incurred in excess of the $75,000 per employee self-insured retention. (Exh. A, Pet. at pp. 4-5, ¶ VII, p. 6 ¶ X)

45.     The General Manager's Contract between Companion and Hall provides:

> Manager is authorized to adjust and settle all specific and aggregate medical claims arising out of insurance policies issued under this Agreement **in the amount of $100,000.00 or less per person per calendar year**; provided, however, that all claims in excess of that amount shall be furnished to Insurer  . . . and Manager will cooperate with Insurer in the adjustment and settlement thereof.

(Exh. D, General Manager's Contract, at p. 3 Art. IV ¶ 1) (emphasis added).  Further,

> "Manager shall have no authority to make any settlement or agreement regarding settlement of any claim or claims that may be made against Insurer unless specifically so authorized in writing, nor shall the Manager . . . have any authority to incur any expense or obligations of any kind or nature in the name or on behalf of the Insurer without express written authority in each instance; nor shall the Manager . . . have any authority to alter or discharge any policy contract or waive any policy provision or condition.

(Exh. D at p. 3 Art. IV, ¶ 4).

46.     By the very terms of the relationship between the reinsurer Companion and its manager Hall, Hall had no authority to adjust and settle the claims at issue here.  Thus, Hall can in no way be held responsible for the decision, which could only have been

made by the reinsurer, to deny reimbursement pursuant to the terms of the reinsurance contract.

## IX.
## SAN BENITO HAS MADE JUDICIAL ADMISSIONS IN DIRECT CONTRAVENTION OF ITS CLAIMS

47.   San Benito alleges that **after the Companion policy expired on August 31, 2001**, reinsurance was to be obtained from another reinsurance carrier, BCS Insurance Company. (Exh. A, Pet. at p. 5 ¶ VIII.) San Benito then judicially admits in its Complaint,

> **Late in the Fall of 2001**, . . . it became apparent that **there were a number of claims** which would have been covered by the [BCS] reinsurance had it already been purchased. * * * These sums, **totaling in excess of $800,000, would have been reimbursed** to the School District **[by BCS] had the reinsurance been properly and timely renewed** for the 2001-2002 school year."

(*Id.*) (emphasis added).

48.   The $800,000 in claims referred to in the above allegations are the very claims at issue in this case. San Benito has now judicially admitted that the claims it alleges should have been reimbursed by Companion were in actuality to be reimbursed by a **subsequent** carrier, **BCS**. San Benito alleges **BCS** should have covered the claims because they were incurred **in the fall of 2001, after** the Companion policy expired on August 31, 2001.

49.   A judicial admission is a "clear and unequivocal assertion of fact." *See*, ***Horizon/CMS Health Care Corp. v. Auld***, 34 S.W.3d 887, 905 (Tex. 2000). It is a party's formal concession in the pleadings and is binding on the party making it. A judicial admission "has the effect of withdrawing a fact from contention," and it is

"conclusive" *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 416 (5th Cir. 2002) (quoting *Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 476 (5th Cir.2001)).

50.    The claims at issue here could not have been reimbursed by Companion, and thus San Benito can have no cause of action against it under the contract of reinsurance. San Benito cannot have been damaged by any act or omission on the part of Companion or, correspondingly, its agent Hall. San Benito has made a critical admission against its interest which necessitates a judgment that it take nothing by its claims as against Hall.

## CONCLUSION

51.    The Texas Insurance Code provides that a reinsurer can only be sued in contract; thus, Art. 21.21 and negligence claims cannot be asserted against either the insurer or its agent.

52.    There is further no private right of action against a reinsurer's agent for allegations that it materially misrepresented the terms or effect of the reinsurance contract as San Benito alleges here.

53.    Hall cannot be held liable under Companion's contract of reinsurance with San Benito. Hall further had no authority, under its own contract with Companion, to adjust and settle the claims made the basis of this suit. And, Hall had no contract directly with San Benito.

54.    Finally, San Benito has judicially admitted that it is not entitled to reimbursement from Companion of the claims in dispute.

55.    J. Allan Hall's Motion for Summary Judgment, seeking judgment that Plaintiff San Benito take nothing by its Insurance Code and common law negligence claims, should in all things be granted and Hall should be dismissed from this case.  Hall further prays for all other relief, general and special, at law and in equity, to which it is entitled.

Dated:  May 6 , 2003

Respectfully submitted,

BRACEWELL & PATTERSON, L.L.P.

Roberta J. Hegland
State Bar No. 09375000
Federal I.D. No. 6842
Joseph A. Stallone
State Bar No. 00797485
Federal I.D. No. 22343
2000 One Shoreline Plaza - South Tower
800 North Shoreline Blvd.
Corpus Christi, Texas  78401-3700
Telephone No.:  (361) 882-6644
Telecopier No.:  (361) 903-7000
**ATTORNEYS FOR DEFENDANT
J. ALLAN HALL & ASSOCIATES, INC.**

OF COUNSEL:

Albert George
55 Monument Circle, Suite 1115
Indianapolis, IN  46204
Telephone No.:  (317) 264-0020
Facsimile No.:  (317) 264-9038

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been forwarded to the parties listed below on this the 6th day of May, 2003:

Celeste Guerra
**LAW OFFICES OF RENE RAMIREZ**
1906 Tesoro
Pharr, Texas  78577

Stephen E. Walraven
Otto S. Good
**SHADDOX, COMPERE, WALRAVEN & GOOD, P.C.**
1250 N. E. Loop 410, Suite 725
San Antonio, Texas  78209

Cindy A. Garcia
Lesslie L. Eanes
**THE GARCIA LAW FIRM, P.C.**
201 North First Street
Harlingen, Texas  78550

Shelby J. Bush
**PIPER RUDNICK, L.L.P.**
1717 Main Street, Suite 4600
Dallas, Texas  75201

Roberta J. Hegland
Joseph A. Stallone

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SAN BENITO CONSOLIDATED | § | |
| INDEPENDENT SCHOOL DISTRICT | § | |
| | § | |
| VS. | § | **CIVIL ACTION NO. 003-047** |
| | § | |
| COMPANION LIFE INSURANCE | § | |
| COMPANY, MANAGED BENEFITS | § | |
| ADMINISTRATOR AND | § | |
| INSURANCE CONSULTANTS, INC., | § | |
| J. ALLAN HALL & ASSOCIATES, INC., | § | |
| AND MBA OF WYOMING, INC. | § | |

### AFFIDAVIT OF W. LARRY BLAGG

| | |
|---|---|
| STATE OF INDIANA | § |
| | § |
| COUNTY OF MARION | § |

BEFORE ME, the undersigned authority, personally appeared W. Larry Blagg who, being by me duly sworn, deposed as follows:

1. "My name is W. Larry Blagg. I am of sound mind, capable of making this affidavit and have personal knowledge of the facts stated herein, which are true and correct:

2. "I am the Vice President and Chief Operating Officer of J. Allan Hall & Associates.

3. "I am the custodian of the business records of J. Allan Hall & Associates. Attached hereto are:

| | |
|---|---|
| Exhibit "B" | Companion Life Insurance Policy Providing Excess Loss Insurance |
| Exhibit "C" | Application to Companion Life Insurance Company for Aggregate and Specific Excess Loss Insurance |
| Exhibit "D" | General Manager's Agreement |

4. Exhibits "B", "C", and "D" are records from the claim and underwriting files kept by the Claim and Underwriting Departments of J. Allan Hall & Associates. These records are kept by J. Allan Hall & Associates in the regular course of business, and it was the regular course of business of J. Allan Hall & Associates for an employee or representative of J. Allan Hall & Associates, with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter.  The records attached hereto as Exhibits "B", "C" and "D" are the original or exact duplicates of the original.

"Further, Affiant sayeth not."

W. Larry Blagg

SWORN TO AND SUBSCRIBED BEFORE ME on this the _24th_ day of _April_____, 2003.

Notary Public in and for the State of Indiana



Exhibit "A"

AURORA DE LA GARZA, DIST. CLERK

NOV 21 2002

DISTRICT COURT OF CAMERON COUNTY, TEXAS
RICK M. CORNEJO DEPUTY

NO. 2002-11-4661-B

| | | |
|---|---|---|
| SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT | § | IN THE DISTRICT COURT |
| VS. | § | 138th JUDICIAL DISTRICT |
| COMPANION LIFE INSURANCE COMPANY, MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS, INC., MICHAEL M. SWETNAM, JR., J. ALLAN HALL & ASSOCIATES, INC., and MBA OF WYOMING, INC. | § | CAMERON COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Plaintiff, **SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT,** and files this its Original Petition, complaining of **COMPANION LIFE INSURANCE COMPANY, MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS, INC., MICHAEL M. SWETNAM, JR., J. ALLAN HALL & ASSOCIATES, INC., and MBA OF WYOMING, INC.,** and for its claims, would show unto the Court as follows:

### Discovery Level

### I.

Because of the nature and complexity of this case, Plaintiff intends to file a Motion with the Court to conduct discovery under Level 3 of Rule 190, TEXAS RULES OF CIVIL PROCEDURE.

### Jurisdiction and Venue

### II.

This Court has jurisdiction of this case as the amount in controversy exceeds the minimum jurisdictional limits of this Court.

Venue of this lawsuit is proper in Cameron County, Texas pursuant to Section 15.002 of the TEXAS CIVIL PRACTICES & REMEDIES CODE because this is the county in which all or a substantial part of the events or omissions giving rise to the claims occurred.

RECEIVED
DEC - 4 2002
JAH

Venue is further proper in Cameron County, Texas as to Defendant, **MICHAEL M. SWETNAM, JR.**, pursuant to Section 15.002(2) of the TEXAS CIVIL PRACTICES & REMEDIES CODE because this is the county of this Defendant's residence. Venue is proper as to the remaining Defendants pursuant to Section 15.005 of the TEXAS CIVIL PRACTICES & REMEDIES CODE since venue is proper in Cameron County, Texas, as to Defendant, **MICHAEL M. SWETNAM, JR.**

### Parties

### III.

Plaintiff, **SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT** ("San Benito CISD" and/or the "School District") is a school district residing in Cameron County, Texas.

Defendant, **COMPANION LIFE INSURANCE COMPANY** ("Companion Life"), of Columbia South Carolina, is an insurance company licensed to do business in the State of Texas, and doing business in Texas, and may be served with process through its agent for service, Aldean E. Kainz, at 100 Congress Avenue, Suite 1100, Austin, Travis County, Texas 78701-4099.

Defendant, **MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS, INC.** ("MBAICI"), is a foreign corporation, with its principal place of business in Salt Lake City, Utah. It is not authorized to do business in the State of Texas but is doing business in this State. Defendant has not designated an agent in this State on whom service of citation may be made, and therefore, should be served with process by serving the Secretary of State of Texas, pursuant to Tex. Civ. Prac. & Rem. Code Ann. §§ 17.044 and 17.045 (Vernon 1986), commonly known as the Long-Arm Statute, to be forwarded to said Defendant's registered agent in Utah as follows: Mr. Don W. Merrill, Registered Agent, Managed Benefits Administrator and Insurance Consultants, Inc., 3625 S. West Temple, Suite 200, Salt Lake City, UT 84115. This address is also the home office



address for this Defendant.

Defendant, **MICHAEL M. SWETNAM, JR., ("Swetnam"),** is an individual residing in San Benito, Cameron County, Texas and may be served with process by serving him at his place of business, 148 N. Sam Houston Boulevard, Suite 1A, San Benito, Texas 78586-1008.

Defendant, **J. ALLAN HALL & ASSOCIATES, INC.** ("J. Allan Hall"), is a foreign corporation licensed to do business in the State of Texas and doing business in Texas, and may be served with process by serving its agent for service, C T Corporation System, 350 N. St. Paul, Dallas, Dallas County, Texas.

Defendant, **MBA OF WYOMING, INC.** ("MBA"), is a foreign corporation authorized to do business in the State of Texas and is doing business in Texas, and may be served with process by serving its registered agent for service, The Commissioner of Insurance, 333 Guadalupe Street, Austin, Texas 78701-3938, for forwarding to said Defendant as follows: Don W. Merrill, Utah registered agent for MBA of Wyoming, Inc., 3625 S. West Temple, Salt Lake City, Utah 84115-4409.

## Background Facts

### IV.

Since the mid-to-late 1990s, the San Benito CISD has been self-insured with respect to the health insurance benefits which it provides to its employees, and their dependents. However, to protect the School District from large claims each year, it purchased a policy of reinsurance. The reinsurance was purchased by the School District for its sole benefit and the reinsurance in no way affected the benefits owed or paid to the School District's employees and their dependents.

### V.

During the 2000-2001 school year, the School District purchased reinsurance from Companion Life. Under the terms of the policy of reinsurance issued by Companion Life,

DEC - 2002

the School District would pay out of its own funds the first $75,000 incurred by any of its employees or their dependents for covered medical expenses. After expending the sum of $75,000 for any one employee or that employee's dependent, any additional sums spent by the School District for additional medical expenses would be reimbursed by Companion Life, up to a per person policy limit of One Million Dollars.

### VI.

The policy of insurance referred to above with Companion Life was procured through Swetnam as the resident agent in Texas and through MBAICI. J. Allan Hall acted as the agent and representative of Companion Life with respect to providing this policy of reinsurance to the School District. Plaintiff alleges that MBAICI operated as a unified economic entity with MBA, and MBA is therefore jointly and severally liable for the conduct of MBAICI.

### VII.

MBAICI and Swetnam advised the San Benito CISD that specific inquiry had been made to J. Allan Hall and Companion Life concerning their practices and procedures concerning the payment of benefits and the advance funding of benefits owed under the policy at the time the reinsurance was purchased. It was represented to the School District by J. Allan Hall, MBAICI, and Swetnam that if medical benefits were incurred during the policy period by an employee and/or an employee's dependent in excess of the self-insured retention of $75,000, such expenses would be reimbursed by Companion Life to the School District, even if the School District had not yet issued a check for the incurred expenses.

Contrary to these representations, in excess of $800,000 of payments made by the School District on behalf of its employees and their dependents were not reimbursed by Companion Life. Contrary to these representations, Companion Life asserted that although the medical expenses had been incurred during the policy period, because checks had not

DEC - 2002

been written by the School District during the policy period (and had not been deposited in the mail during the policy period), Companion Life refused to provide reimbursement to the School District for a sum in excess of $800,000. MBAICI has assured the School District that the actions taken by Companion Life was contrary to the representations made by J. Allan Hall on behalf of Companion Life.

**VIII.**

The Companion Life policy period ended on August 31, 2001. Shortly before this date, MBAICI undertook to place new reinsurance for the 2001-2002 school year. MBAICI prepared the paperwork to solicit proposals for reinsurance, and obtained quotations from both Companion Life, and another entity known as BCS Insurance Company. The application and other appropriate documents were completed in August, 2001. The proposal from Companion Life was approximately $500,000 higher than the proposal from BCS, and MBAICI recommended that the School District accept the BCS proposal.

Unfortunately, the paperwork submitted to BCS by MBAICI was inadequate and incomplete. Although MBAICI continued to reassure the School District that it had purchased reinsurance from BCS, BCS had declined to provide the reinsurance. Late in the Fall of 2001, when the application paperwork had been corrected, and BCS had obtained the proper disclosures, it became apparent that there were a number of claims which would have been covered by the reinsurance had it already been purchased. BCS declined to provide the reinsurance for benefits already paid by the School District and severely limited the amount it would pay for other named employees and their dependents. These sums, totaling in excess of $800,000, would have been reimbursed to the School District had the reinsurance been properly and timely renewed for the 2001-2002 school year.

DEC - 2002

## Causes of Action

### First Cause of Action - Violations of Tex. Ins. Code Art. 21.21

### IX.

All Defendants have violated the provisions of TEX. INS. CODE Art. 21.21, including, but not limited to, the following:

1.    Misrepresenting the terms of the policy issued by Companion Life.

2.    In misrepresenting to Plaintiff material facts and policy provisions relating to coverages at issue.

3.    In making untrue statements of material fact.

4.    In failing to state a material fact that is necessary to make other statements made not misleading, considering the circumstances under which the statements were made.

5.    In making a statement in such a manner as to mislead a reasonably prudent person to a false conclude of a material fact.

Such violations were a producing cause of Plaintiff's damages as hereinafter set forth.

### Second Cause of Action - Negligent Misrepresentation

### X.

All of the Defendants negligently misrepresented that certain sums of money would be reinsured by Companion Life, when in fact they were not, as described above. Such negligence was a proximate cause of damages to the Plaintiff has hereinafter set forth.

### Third Cause of Action - Negligence

### XI.

MBAICI was negligent in its handling of the renewal of the reinsurance for the 2001-2002 school year. Moreover, MBAICI was negligent in the manner and means it prepared the applications, disclosures and other required paperwork, and therefore negligent in causing a delay in the renewal of the policy. This negligence was a proximate cause of damages to Plaintiff as hereinafter set forth. In addition, MBA is jointly and severally liable

DEC - 2002

for the conduct of MBAICI because the two entities are a single business enterprise.

### Damages

### XII.

Plaintiff's actual damages are in excess of $800,000, which represents the sum of money for which it has not been reimbursed by Companion Life.

### XIII.

As to the First Cause of Action for violations of TEX. INS. CODE Art. 21.21, Plaintiff is entitled to its actual damages, and to the extent that the trier of fact finds that any of the Defendants knowingly committed the acts complained of, Plaintiff seeks additional damages not to exceed three times the amount of actual damages. In addition, Plaintiff is entitled to the reasonable and necessary attorney's fees incurred in prosecuting this lawsuit.

### XIV.

As to the Second Cause of Action for negligent misrepresentation, Plaintiff is entitled to its actual damages as set forth above.

### XV.

As to the Third Cause of Action for negligence, Plaintiff is entitled to its actual damages as set forth above.

WHEREFORE, PREMISES CONSIDERED, Plaintiff, **SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT**, prays that the Defendants be cited to appear and answer herein, and that Plaintiff have judgment of and from the Defendants, for its damages as set forth above, pre-judgment interest, post-judgment

DEC - 2002

interest, attorney's fees, and for such other and further relief to which Plaintiff may be justly entitled.

Respectfully submitted,

LAW OFFICES OF RENE RAMIREZ
Celeste Guerra
1906 Tesoro
Pharr, Texas 78577
Telephone: 956/783-7880
FAX # 956/783-7884

AND

SHADDOX, COMPERE, WALRAVEN
& GOOD, P.C.
1250 N. E. Loop 410, Suite 725
San Antonio, Texas 78209
Telephone: 210/822-2018
FAX: 210/822-4068

By:_____
Stephen E. Walraven
State Bar No. 20796800
Otto S. Good
State Bar No. 08139600
ATTORNEYS FOR PLAINTIFF

DEC - 2002

## JURY DEMAND

Plaintiff, **SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT,**
hereby demands a trial by jury.

Respectfully submitted,

LAW OFFICES OF RENE RAMIREZ
Celeste Guerra
1906 Tesoro
Pharr, Texas 78577
Telephone: 956/783-7880
FAX # 956/783-7884

AND

SHADDOX, COMPERE, WALRAVEN
    & GOOD, P.C.
1250 N. E. Loop 410, Suite 725
San Antonio, Texas 78209
Telephone: 210/822-2018
FAX: 210/822-4068

By: _____
        Stephen E. Walraven
        State Bar No. 20796800
        Otto S. Good
        State Bar No. 08139600
ATTORNEYS FOR PLAINTIFF

DEC - 2002



Exhibit "B"

## COMPANION LIFE INSURANCE

Companion Life Insurance Company, Columbia, South Carolina agrees to pay Excess Loss Insurance benefits under the provisions of this Contract to the Contractholder listed in the Schedule of Excess Loss Insurance.

### READ YOUR CONTRACT CAREFULLY

This Contract is legally binding between the Contractholder and Companion Life Insurance Company ("Company"). The consideration for this Contract includes, but is not limited to, the Application and the payment of premiums as provided hereinafter.

The Company will pay the [Aggregate and Specific Benefits] provided in this Contract.   Payment is subject to the conditions, limitations and exceptions of this Contract.The Contractholder agrees to pay premiums when due and to comply with Contract provisions.The Contractholder understands the liability assumed under the portion of the employee benefit plan which he is self-insuring and further understands that he is exempted from Article 1.14-1 of the Texas Insurance Code only if a qualified employee benefits plan has been filed and meets the requirements of the Employees Retirement Income Security Act.

This is not a policy of workers' compensation insurance. The Contractholder does not become a subscriber to the workers' compensation system by purchasing this policy, and if the Contractholder is a non-subscriber, the Contractholder loses those benefits which would otherwise accrue under the workers' compensation laws. The Contractholder must comply with the workers' compensation law as it pertains to non-subscribers and the required notification that must be filed and posted.

This Contract takes effect on the Effective Date shown in the Schedule, which will be the date of issue, and terminates on the end of the Contract Period shown in the Schedule unless it is renewed.   All periods indicated in the Contract begin and end at 12:01 A.M. standard time at the Contractholder's office.

This Contract Form is governed by the laws of the state of Texas.

The sections set forth on the following pages are a part of this Contract and take effect on the Effective Date.

IN WITNESS WHEREOF Companion Life Insurance Company has caused this Contract to be executed by its President and Secretary at Columbia, South Carolina.

President

Policy Providing Excess Loss Insurance
Nonparticipating

COMPANION LIFE INSURANCE
51 CLEMSON ROAD, SUITE C
Columbia, SC 29223

CLXLPOL(TX)                                    -1-

San Benito v. Companion
JAH 000001

## COMPANION LIFE INSURANCE COMPANY
## SCHEDULE OF EXCESS LOSS INSURANCE

1.  Contract Number: _____ San Benito Consolidated ISD _____

2.  Contractholder: _____ CLI-3044-100100 _____

3.  Address: ___ 240 North Crockett _____

    City: ___ San Benito _____    State: __ TX ___   Zip Code: 78586 ____

4.  Subsidiary or affiliated companies (companies under common control through stock ownership, contract, or otherwise) to be included (list legal name and addresses):
    ___ N/A _____

5.  Name and address of Designated Third Party Administrator
    MBA of Wyoming, Inc. 3625 S. West Temple, Salt Lake City, UT 84115

6.  Effective Date: _____ October 1, 2000 _____

7.  **GENERAL SCHEDULE OPTIONS:**

    (a)  Contract Period __10/01/00_____ to ___10/01/00_____

    (b)  Disabled Persons      [ X ] are      [ ] are not covered.
         Retired Employees     [ X ] are      [ ] are not covered.

    (c)  Aggregate Benefit     [ X ] Yes      [ ] No

         Aggregate __07/01/00__ through _08/31/01____, and
         Paid from __10/01/00__ through ___08/31/01_____.
         Claims incurred prior to the Contract Effective Date are limited to $ __N/A____.

         Aggregate eligible expenses include:
         [ X ] Medical          [ X ] Prescription Card Service
         [ X ] Dental Care      [ ] Weekly (Disability) Income
         [ ] Vision Care        [ ] Other

| | Med /Dental /Drug |
|---|---|
| Aggregate Monthly Factor per single Employee: | $ |
| Family: | $ |
| Composite: | $ 295.65/11.54/39.06 |
| Aggregate Payable Percentage (excess of Deductible): | 100 % |
| Maximum Eligible Claim Expense Per Covered Person: | $ 75,000 |
| Minimum Aggregate Deductible: | $ 4,253,870 |
| Maximum Aggregate Benefit (excess of Deductible): | $ 1,000,000 |

CLXLPOL(TX)                          -2-

San Benito v. Companion
JAH 000002

7. **GENERAL SCHEDULE OPTIONS: (Continued)**

(d) Monthly Aggregate Accommodation       [ ] Yes   [ X ] No

(e) Terminal Liability       [ ] Yes   [ X ] No

(f) Specific Benefit       [ X ] Yes   [ ] No

Specific Contract Basis: Employee Benefit Plan expenses must be
Incurred from __07/01/00__ through __08/31/01__ .
Paid from __10/01/00__ through __8/31/01__ .

Claims Incurred prior to the Contract Effective Date are limited to:    $ __N/A__

Specific Eligible Expense: Medical Only

Specific Deductible (per person):    $ __75,000 *__

\*  **Major human organ transplants subject to plan max. of $150K per individual. Lung cancer limited to $50,000 LTM if smoking for 5 years or more at time of diagnosis**

Specific Payable Percentage (excess of Deductible):    __100__ %

Maximum Specific Benefit (per person in excess of Specific Deductible):    $ __925,000__

8. **PREMIUMS:**

(a) Aggregate Premium
Premium Per Month Per Unit:    $ __1.70__
Minimum Annual Aggregate Premium    $ __N/A__
Monthly Aggregate Accommodation
Premium Per Month Per Unit:    $ __N/A__
    Annual Premium in Advance:    $ __N/A__
Terminal Liability
    Premium Per Month Per Unit:    $ __N/A__
    Annual Premium in Advance:    $ __N/A__

(b) Specific Premium
   Premium Per Month Per Single Employee:    $ __18.45__
                     Family:    $ __44.06__
          Composite:    $
   Minimum Monthly Specific Premium:    $ __N/A__

9. **SPECIAL RISK LIMITATIONS:**

Contract will be based upon the current employee benefits as defined in the Employee Benefit Plan by reference or by attachment, except as noted below:

Specific:    __N/A__

Aggregate:    __N/A__

San Benito v. Companion
JAH 000003

## I.    DEFINITIONS

As used in this Contract, the following definitions shall be applicable:

**Agent,** when referring to the Contractholder, means the Contractholder's representative, including but not limited to its Designated Agent, Broker, or Third Party Administrator.

**Aggregate Benefit** means the amount that the Company agrees to pay the Contractholder after the end of the Contract Period for eligible claims Paid by the Contractholder as set forth in the Schedule and pursuant to the terms, conditions and limitations of the Contract.

**Aggregate Contract Basis** identifies the dates during which Employee Benefit Plan expenses must be incurred and must be paid to be considered eligible for reimbursement as Aggregate Benefits.

**Aggregate Deductible Per Month** means the Aggregate Monthly Factor shown in the Schedule multiplied by the Number of Covered Units.

**Aggregate Deductible** means the sum of each Aggregate Deductible Per Month for each month during the Contract Period or fraction thereof.

**Minimum Aggregate Deductible** means the lowest possible Aggregate Deductible applicable to the Contract Period or fraction thereof.  This amount is set forth in the Schedule.

**Continuation Beneficiary** is a Covered Unit which elects to extend its group health coverage under the Employee Benefit Plan entitled under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA).

**Contract** means the entire agreement between the Contractholder and the Company, specifically including the Contract Application, the Contract Form, the Contract Addenda (if any), and a copy of the Contractholder's Employee Benefit Plan.

**Contract Month** means a period measured from the Effective Date of this Contract, while this Contract is in force.  Each new Contract Month will begin on a day which corresponds to the Effective Date.  If there is no such day in any applicable month, then the last day of the month will be used.

**Contract Period** is stated in the Schedule.

**Contractholder** is named in the Schedule.

**Covered Person** refers to each person, individually, who is a Covered Unit, or, in the case of a dependent, a member of a Covered Unit.  In no event will coverage for a dependent become effective before the Effective Date of Coverage of the plan participant under the EmployeeBenefit Plan.

**Covered Unit,** for purposes of calculation of the premiums and the Aggregate Deductible Per Month, means a plan participant, a plan participant with dependents, or such other defined unit as agreed upon between the Company and the Contractholder, provided such plan participant, dependents or such other defined unit is covered under the Employee Benefit Plan.

San Benito v. Companion
JAH 000004

**I.   DEFINITIONS (Continued)**

**Dependent** means a person who is defined as a dependent under the Employee Benefit Plan.

**Disabled Person** is a plan participant not actively at work or, in the case of a dependent or Continuation Beneficiary, is by disability unable to perform his or her normal functions of a person of like sex and age on the Effective Date of this Contract or the date such person becomes eligible for coverage under the Employee Benefit Plan.

**Eligible Claims Payments** means expenses of the Employee Benefit Plan qualifying for coverage under the terms and conditions of this Contract.

**Employee** means a person who is defined as an employee under the Employee Benefit Plan.

**Employee Benefit Plan** means the master plan document of the Contractholder to provide medical expense benefits to the Contractholder's covered plan participants and dependents of such plan participants in effect on the Effective Date of this Contract, a copy of which is attached to and made a part of this Contract.

**Incurred** refers to the date on which a covered medical service was rendered, the date disability benefit payments become due, or a covered medical purchase was made for a Covered Person under the Employee Benefit Plan.

**Maximum Aggregate Benefit** means the amount set forth in the Schedule as the maximum total Aggregate Benefit payable under the terms, conditions and limitations of this Contract during the Contract Period.

**Maximum Eligible Claim Expense Per Person**, as it relates to aggregate coverage, means the maximum dollar value of claims Paid on any one Covered Person that can apply toward satisfaction of an Aggregate Deductible, or that can apply toward the calculation of the Aggregate Benefit for a Contract Period.

**Maximum Specific Benefit** means the amount set forth in the Schedule that is the maximum total Specific Benefit payable under the terms, conditions and limitations of this Contract during the period an individual is a Covered Person under the Employee Benefit Plan, regardless of the number of years the Covered Person is eligible under the Employee Benefit Plan and regardless of whether expenses for this Covered Person were Incurred and/or Paid during this Contract Period. In the context of the definition of Maximum Specific Benefit, references to "Employee Benefit Plan" include all predecessors and successors of the particular plan in effect on the Contract's Effective Date.

**Number of Covered Units** means the total number of Covered Units existing in any Contract Month.

**Paid** means that funds are actually disbursed by the Contractholder or his Agent. Payment of a claim is the unconditional and direct payment of a claim to a Covered Person or their health care providers. Payment will be deemed made on the date that both (1) the payor directly tenders payment by mailing (or otherwise delivering) a draft or check, and (2) the account upon which the payment is drawn contains, and continues to contain, sufficient funds to permit the check or draft to be honored.

San Benito v. Companion
JAH 000005

## I.   DEFINITIONS (Continued)

Should the account upon which payment is drawn not contain sufficient funds to cover all outstanding checks and drafts on the account, then the Company may consider, in its sole discretion, any particular checks or drafts as not having been paid, but only to the total amount representing the difference between the funds in the account and the total of outstanding checks and drafts.

**Payable Percentage** means the percentage payable as shown in the Schedule.  The calculation of Specific Benefits may be subject to a different Payable Percentage than the calculation of Aggregate Benefits.

**Plan Participant** means an employee, a dependent or any other person who is eligible and who is covered under the Employee Benefit Plan.  No plan participant may be covered by this contract prior to the date his or her coverage is effective under the Employee Benefit Plan or after the date his or her coverage under the Employee Benefit Plan Ends.

**Proof of Loss** is the form authorized by the Company to be used for the submission of claims as well as the supporting documentation reasonably necessary for the Company's independent evaluation of the legitimacy and extent of the claim. Claims for expenses not specifically identified in previously submitted Proofs of Loss must be accompanied by separate Proofs of Loss.

**Schedule** means the Schedule of Excess Loss Insurance.

**Specific Benefit** means the amount the Company will pay to the Contractholder for eligible claims Paid by the Contractholder over and above the Contractholder's Specific Deductible Per Person, and pursuant to the terms, conditions and limitations of the Contract.

**Specific Contract Basis** identifies the dates during which Employee Benefit Plan expenses must be Incurred and must be Paid to be considered eligible for reimbursement as Specific Benefits.

**Specific Deductible** means the per Covered Person deductible as shown in the Schedule.]


## II.   BENEFITS

The Company will pay, subject to the terms, conditions and limitations of the Contract, the following benefits, if shown in the Schedule, to the Contractholder within a reasonable time upon receipt of a fully executed Proof of Loss:

## 1.   Aggregate

The Aggregate Benefit for the Contract Period, or fraction thereof, is the total of the Eligible Claim Payments, on an Incurred and/or Paid basis as shown in the Aggregate Contract Basis of the Schedule:

a.   less the Aggregate Deductible or Minimum Aggregate Deductible, whichever is greater; and
b.   less the amount of the claims Paid by the Contractholder in excess of the Maximum Eligible Claim Expense Per Person as shown in the Schedule; and
c.   less amounts recovered from other sources; and
d.   multiplied by the Aggregate Payable Percentage.


CLXLPOL(TX)                                    -6-

San Benito v. Companion
JAH 000006

## II.    BENEFITS (Continued)

Aggregate Benefits are not payable until after the end of the Paid basis shown in the Aggregate Contract Basis of the Schedule. If this Contract should terminate prior to the end of the Contract Period, the Company shall not be liable for Aggregate Benefits for expenses Incurred or Paid by the Contractholder after the termination date.

In no event will the Aggregate Benefit exceed the Maximum Aggregate Benefit shown in the Schedule.

### 2.    Specific

The Specific Benefit with regard to each Covered Person, is the total of the Eligible Claim Payments, on a Incurred and/or Paid basis as shown in the Specific Contract Basis of the Schedule;

a.    less the Specific Deductible; and

b.    less amounts recovered from other sources;

c.    multiplied by the Specific Payable Percentage.

The Contractholder shall not be entitled to any Specific Benefit unless and until the Contractholder has actually. Paid the full amount of the Specific Deductible as set forth in the Schedule for the Covered Person(s) for which the Specific Benefit is sought.    The Contractholder shall only be entitled to a Specific Benefit up to the amount actually Paid by Contractholder over and above the Specific Deductible.

If this Contract should terminate prior to the end of the Contract Period, the Company shall not be liable for Specific Benefits for expenses Incurred or Paid by the Contractholder after the termination date.

In no event will the Specific Benefit with regard to any Covered Person exceed the Maximum Specific Benefit shown in the Schedule.

## III.    LIMITATIONS

1.    This Contract will not pay the Contractholder for any loss or expense caused by or resulting from any of the following:

   a.    Expenses incurred while the Employee Benefit Plan is not in force with respect to the Covered Person.

   b.    Expenses resulting from weekly (disability) income, dental, vision or any prescription card service, unless shown in the Schedule.

   c.    Liability assumed by the Contractholder under any contract or service agreement other than the Employee Benefit Plan.

   d.    Expenses as the result of extra-contractual damages; compensatory damages; or punitive damages.

San Benito v. Companion
JAH 000007

**III. LIMITATIONS (Continued)**

    e.    Expenses resulting from services which are billed in excess of the general level of charges being made by other providers of services in the locality where the service is rendered.

    f.    Expenses for benefits for accidental bodily injury or sickness arising out of or in the course of any occupation for wage or profit, or for which the Covered Person would be entitled to benefits under any Worker's Compensation, U. S. Longshoremen and Harbor Worker's or other occupational disease legislation or policy, whether or not such policy is actually in force.

    g.    Expenses which (1) are not accepted as standard medical treatment for the illness, disease or injury being treated by physicians practicing the suitable medical specialty; (2) are the subject of scientific or medical research or study to determine the item's effectiveness and safety; (3) have not been granted, at the time services were rendered, any required approval by a federal or state governmental agency, including without limitation, the Federal Department of Health and Human Services, Food and Drug Administration, or any comparable state governmental agency, and the Federal Health Care Finance Administration as approved for reimbursement under Medicare Title XVIII; or (4) are performed subject to the Covered Person's informed consent under a treatment protocol that explains the treatment or procedure as being conducted under a human subject study or experiment.

    h.    Cost of the administration of claim payments or expense of litigation with individual claimants.

    i.    Expenses for benefits to any Covered Person with coverage under any other plan, including Medicare, which, when combined with the benefits payable by such other plan, would cause the total to exceed 100% of the Covered Person's actual expenses.

    j.    Payments under the Employee Benefit Plan arising out of or caused by or contributed to or in consequence of war, hostilities (whether war be declared or not), invasion or civil war.

2.    If the Schedule shows disabled persons are not covered, no benefits will be paid under the Contract for expenses incurred or Paid under the Employee Benefit Plan for a Disabled Person until:

    a.    if a plan participant, he or she returns to active, full-time employment for at least one (1) full working day; or

    b.    if a dependent or Continuation Beneficiary, he or she is able to perform the normal functions of a person of like sex and age.

San Benito v. Companion
JAH 000008

**III.   LIMITATIONS (Continued)**

3.   Newborn children of plan participants who have previously enrolled and continue to cover their eligible dependents under the Employee Benefit Plan will be eligible under the Contract on the date of the child's birth. Employees who have not previously enrolled for dependent coverage will be eligible for newborn child coverage as defined within the Employee Benefit Plan.

4.   Retired plan participants and their dependents, who are eligible under the Employee Benefit Plan, will be eligible for coverage under the Contract only if so indicated in the Schedule.

**IV.   CLAIMS PROVISIONS**

1.   **Payment of Claim:** All benefits as they become payable under this Contract will be paid to the Contractholder. All expenses as they become payable under the Employee Benefit Plan shall be Paid by the Contractholder. The Company shall pay claim within a reasonable time after receiving fully executed Proofs of Loss and the documentation reasonably necessary to evaluate the eligibility and extent of the claim.

2.   **Warranty:** Upon presentation of Proof of Loss to the Company for Aggregate[ or Specific] Benefits, the Contractholder warrants that all monies necessary to pay for services and supplies have been paid to the respective providers of medical services or supplies to which the claim for reimbursement relates.

3.   **Notice of Claim:** The Contractholder shall give written notice of claims to the Company on the Company's customary notice (Proof of Loss form), within thirty (30) days of the date the Contractholder becomes aware of the existence of facts which would reasonably suggest the possibility that benefits will be incurred which are covered by this Contract and which are equal to or exceed fifty percent (50%) of the Specific Deductible.

In addition, the Contractholder shall notify the Company immediately of the expenses of any Covered Person which meet any of the following criteria:

a.   continuous hospitalization for more than one month, or
b.   a claim for any one of the following disabilities: mental disorder requiring hospitalization, brain injury, spinal injury resulting in real or suspected paralysis of the limbs, serious burns involving ten percent (10%) or more of the body with third degree burns or thirty percent (30%) or more of the body with second degree burns, multiple or serious fractures, crushing or massive internal injuries, premature births, Acquired Immune Deficiency Syndrome (AIDS).

The Contractholder shall submit on a timely basis proofs, reports, and supporting documents including, but not limited to, a monthly summary of all Eligible Claims Payments processed by the Contractholder.

San Benito v. Companion
JAH 000009

## V.   CONTRACT TERMINATION

The Contract and all benefits hereunder will terminate upon the earliest of the following dates:

1.   The termination date specified in writing by the Contractholder provided that the Company is notified not less than 31 days in advance of the termination date.

2.   The end of any period for which premiums were paid and subsequent premiums are not paid.

3.   The end of the Contract Period.

4.   The date of termination of the Employee Benefit Plan.

5.   The date of cancellation of the administrative agreement between the Contractholder and the Designated Third Party Administrator, unless the Company has, prior to such cancellation, consented in writing to the Contractholder's designation of a successor Third Party Administrator.

6.   This Contract will automatically terminate if the Contractholder does not pay claims or make available funds to pay claims as required by the Contract.

## VI.   MISCELLANEOUS PROVISIONS

1.   **Liability:**  The Company will have neither the right nor the obligation under this Contract to directly pay any Covered Person [or provider of professional or medical services] for any benefit which the Contractholder has agreed to provide under the terms of the Employee Benefit Plan.  The Company's sole liability hereunder is to the Contractholder, subject to the terms, conditions and limitations of this Contract.   Nothing in this Contract shall be construed to permit a Covered Person to have a direct right of action against the Company.

2.   **Payment of Premiums:**  Each Premium for this Contract is payable on or before its due date as set forth in the Schedule to the Company or to this authorized representative. Payment of a premium will not maintain this Contract in force beyond the period for which such premium is paid, except as otherwise stated in the Grace Period.

   If the Effective Date of this Contract is other than the first day of a calendar month, premiums payable under this Contract are due and payable on the first of each calendar month.

3.   **Grace Period:**  A Grace Period of thirty (30) days will be allowed for the payment of each premium after the first premium.  Should a premium otherwise due not be paid during the Grace Period, this Contract will terminate without further notice retroactive to the date for which premiums were last paid.  The liability of the Company will be limited to claims Paid by the Contractholder prior to the date of termination.   There will be no refund of any premium shown in the Schedule.

CLXLPOL(TX)                                    -10-                          San Benito v. Companion
                                                                                         JAH 000010

## VI.   MISCELLANEOUS PROVISIONS   (Continued)

4. **Entire Contract:**  This Contract Form as issued to the Contractholder, together with the Contractholder's Application, Contract Addenda (if any), and a copy of the Contractholder's Employee Benefit Plan, constitute the entire contract.  The Company has relied upon the underwriting information provided by the Contractholder or the Contractholder's Agent, in the issuance of this Contract.  Should subsequent information become known which, if known prior to issuance of this Contract, would affect the rates, deductibles, terms or conditions for coverage hereunder, the Company will have the right to revise the rates, deductibles, terms or conditions as of the Effective Date of issuance, by providing written notice to the Contractholder.

5. **Concealment, Fraud:**  This entire Contract will be void if, whether before or after a claim or loss, the Contractholder or its Agent has concealed or misrepresented any material fact or circumstance concerning this Contract or the subject thereof, including any claim thereunder or in any case of fraud by the Contractholder or its Agent relating thereto.

6. **Clerical Error:**  Clerical error, whether by the Contractholder or by the Company, in keeping any records pertaining to the coverage, will not invalidate coverage otherwise validly in force nor continue coverage otherwise validly terminated.

7. **Audits:**  The Company will have the right: (1) to inspect and audit all records and procedures of the Contractholder and Designated Third Party Administrator; and (2) to require, upon request, proof of records satisfactory to the Company that payment has been made to the Covered Person or the provider of such services or benefits which are the basis for any claim by the Contractholder hereunder.

8. **Notice of Appeal:**  Any objection, notice of legal action, or complaint received on a claim process by the Contractholder or the Third Party Administrator, and on which it reasonably appears a benefit will be payable to the Contractholder under this Contract shall be brought to the immediate attention of the claims department of the Company.

9. **Changes:**  Only the President or Executive Officer of the Company have the authority to alter this Contract, or to waive any of the Company's rights and then only in writing.  No such alteration of this Contract shall be valid unless endorsed on or attached to this Contract.  No Agent, Broker, or Third Party Administrator has the authority to alter this Contract or to waive any of its provisions.

10. **Notice:**  For the purpose of any notice required from the Company under the provisions of this Contract, notice to the Contractholder's Designated Third Party Administrator shall be considered notice to the Contractholder.

San Benito v. Companion
JAH 000011

**VI.   MISCELLANEOUS PROVISIONS (Continued)**

11. **Amendments to the Employee Benefit Plan:**  The Employee Benefit Plan shall not be changed while this Contract is in force without the prior written consent of   the Company. Notice of any amendment to the Employee Benefit Plan must be given to the Company or its authorized representative at least thirty (30) days prior to the Effective Date of the amendment.   The Company will have the sole option to accept the amendment to the Employee Benefit Plan, and if accepted, the Company reserves the right to revise the rates, deductibles, terms or conditions of the Contract as of the Effective Date of the amendment.  If such amendment is not agreed to in writing, the Company will be liable to pay benefits as if the Employee Benefit Plan was not changed.

12. **Responsibilities   of   the   Contractholder's   Designated   Third   Party   Administrator:** Without waiving any of its rights under this Contract, and without making the Designated Third Party Administrator a party to this Contract, the Company agrees to recognize the Designated Third Party Administrator as respects the normal administration of the Contractholder's Plan subject to:

   a.   The Third Party Administrator being responsible on behalf of the Contractholder for auditing, calculating and processing all claims eligible under the Employee Benefit Plan within a reasonable period of time, preparing periodic reports as required by the Company and maintaining and making available to the Company at all times such information as the Company may reasonably require for proof of payment of the claims(s) by the Contractholder;

   b.   The Third Party Administrator performing such other duties as may be reasonably required by the Company, including but not limited to, maintaining an accurate record of eligible Covered Persons of the Contractholder;

   c.   The Company will not be responsible for any compensation due the Designated Third Party Administrator for functions performed in relation to this Contract; and

   d.   This Contract will not be deemed to make the Company a party to any agreement between the Contractholder and the Designated Third Party Administrator.

13. **Hold Harmless:**

   a.   The Contractholder agrees to indemnify and hold the Company harmless for any legal expenses incurred, reasonable settlements made, or judgment(s) awarded, arising out of any dispute involving a plan participant or former plan participant of the Contractholder's Employee Benefit Plan provided such legal expenses, settlements, or judgments were not incurred as a result of the sole negligence or intentional wrongful acts of the Company.

   The Company, following any notification of its being, or likely to be, named as a defendant on any action concerning the aforementioned dispute will, within a reasonable time, in writing, notify the Contractholder of the dispute. The Company will cooperate with the Contractholder in matters pertaining to the dispute, however, such cooperation with the Contractholder will not waive the right of the Company to solely defend or settle any action in a manner it deems prudent.

San Benito v. Companion
JAH 000012

## VI.    MISCELLANEOUS PROVISIONS (Continued)

b.    The Contractholder shall be responsible for any State premium taxes incurred with respect to funds paid to or by the Contractholder under the Employee Benefit Plan. Taxes incurred with respect to premiums paid for the Contract will be the responsibility of the Company.

14. **Offset:**  The Company will be entitled to offset claim reimbursements to the Contractholder against premiums due and unpaid by the Contractholder.

15. **Assignments:**  The Contractholder shall not assign any of its rights under this Contract without the prior written consent of the Company, and any assignment without prior written consent shall be void.

16. **Subrogation:**   The Contractholder shall prosecute any and all valid claims that the Contractholder may have against third parties arising out of any occurrence resulting in a loss payment by the Contractholder and to account for any amounts recovered. Should the Contractholder fail to prosecute any valid claims against third parties and the Company thereupon becomes liable to make payments to the Contractholder under the terms and conditions of this Contract, then the Company shall assume all the Contractholder's rights to prosecute any valid claims against third parties, and the Contractholder will be responsible for any reasonable legal expenses incurred in the course of the prosecution.

17. **Recoveries:**   The Company shall be entitled to recover first up to its full share of reimbursed claims before the Contractholder shares in any amount so recovered whether by way of subrogation or otherwise.

18. **Arbitration:**  Any controversy or claim arising out of or relating to this Contract, or the breach thereof, shall be settled by Arbitration in accordance with the rules of the American Arbitration Association, with the express stipulation that the arbitrator(s) shall strictly abide by the terms of this Contract and shall strictly apply rules of law applicable thereto. All matters shall be decided by a panel of three (3) arbitrators. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. This provision shall survive the termination or expiration of this Contract. The parties hereto may alter any of the terms of this provision only by express written agreement, although such alteration may be before or after any rights or obligations arise under this provision.

19. **Insolvency:**  The insolvency, bankruptcy, financial impairment, receivership, voluntary plan of arrangement with creditors, or dissolution of the Contractholder or the Contractholder's Designated Third Party Administrator shall not impose upon the Company any liability other than the liability defined in this Contract. In particular, the insolvency of the Contractholder shall not make the Company liable to the creditors of the Contractholder, including Covered Persons.

20. **Severability Clause:**   Any clause deemed void, voidable, invalid, or otherwise unenforceable, whether or not such a provision is contrary to public policy, shall not render any of the remaining provisions of the Contract invalid.

21. **Renewal:** Renewal is not automatic but is available if permitted by the Company. Renewal may be subject to new premium rates, new underwriting terms, and new Contract terms.

San Benito v. Companion
JAH 000013

## VI.   MISCELLANEOUS PROVISIONS (Continued)

22. **Group Specifications - Changes:**  The Company reserves the right to revise rates, deductibles, terms or conditions of the Contract on any of the following dates:

   1.   When the Contractholder adds or deletes a subsidiary or affiliate;

   2.   When there is a change in the geographical area in which the Contractholder is located;

   3.   When there is a change in the nature of business in which the Contractholder is engaged;

   4.   When there is an increase or decrease in the number of Covered Units which exceeds 10% in any one month or 20% over any period of three consecutive months.

CLXLPOL(TX)                            -14-                    San Benito v. Companion
JAH 000014



Exhibit "C"

## APPLICATION TO
## COMPANION LIFE INSURANCE COMPANY
## COLUMBIA, SC 29223
## FOR
## AGGREGATE AND SPECIFIC EXCESS LOSS INSURANCE

Application is hereby made to the Companion Life Insurance Company ("Company") for Excess Loss Insurance. This Application must be accepted and approved by the Company or its authorized representative prior to any Contract being in existence.

1.  Full Legal Name of Applicant:    San Benito Consolidated ISD

2.  Address:   240 North Crockett

    City:  San Benito                                    State:  TX         Zip Code:  78586

3.  If employee benefit plans of subsidiary or affiliated companies (companies under common control through stock ownership, contract, or otherwise) are to be included, list legal name and addresses of such companies.

4.  Enter the full name of your Employee Benefit Plan(s) - (A copy of such Employee Benefit Plan(s) must be attached.

5.  Name and address of Designated Third Party Administrator:

    MBA of Wyoming, Inc. , 3625 S. West Temple, Salt Lake City, Utah  84115

6.  Effective Date:                      October 1, 2000

7.  Estimated Initial Enrollment (will be used as the Number of Covered Units during the first Contract Month):

    1,020 Singles and  294  Families (or)  _____  Composite

8.  **GENERAL SCHEDULE OPTIONS:**

    (a)   Disabled Persons        [X] are  [  ] are not covered.
          Retired Employees       [X] are  [  ] are not covered.

    (b)   Aggregate Benefit       [X] Yes  [  ] No

    Aggregate Contract Basis: Employee Benefit Plan Expenses must be
          Incurred from  07/01/00  through  08/31/01 , and
          Paid from  10/01/00   through  08/31/01 .
          Claims incurred prior to the Contract Effective Date are limited to  $ N/A

RECEIVED
DEC 1 2000

CLXLAPP (TX)                          -1-                          Applicant Initials

San Benito v. Companion
JAH 000015

# APPLICATION TO
## COMPANION LIFE INSURANCE COMPANY
### COLUMBIA, SC 29223
### FOR
## AGGREGATE AND SPECIFIC EXCESS LOSS INSURANCE

Application is hereby made to the Companion Life Insurance Company ("Company") for Excess Loss Insurance. This Application must be accepted and approved by the Company or its authorized representative prior to any Contract being in existence.

1.  Full Legal Name of Applicant:    San Benito Consolidated ISD

2.  Address:   240 North Crockett

    City:   San Benito                                State:   TX        Zip Code:  78586

3.  If employee benefit plans of subsidiary or affiliated companies (companies under common control through stock ownership, contract, or otherwise) are to be included, list legal name and addresses of such companies.

4.  Enter the full name of your Employee Benefit Plan(s) - (A copy of such Employee Benefit Plan(s) must be attached.

5.  Name and address of Designated Third Party Administrator:

6.  Effective Date:                    October 1, 2000

7.  Estimated Initial Enrollment (will be used as the Number of Covered Units during the first Contract Month):

    1,020 Singles and  294   Families (or)            Composite

8.  **GENERAL SCHEDULE OPTIONS:**

    (a)   Disabled Persons           [ X ] are   [   ] are not covered.
          Retired Employees          [ X ] are   [   ] are not covered.

    (b)   Aggregate Benefit          [ X ] Yes   [   ] No

    Aggregate Contract Basis: Employee Benefit Plan Expenses must be
       Incurred from  07/01/00   through   08/31/01     , and
       Paid from    10/01/00    through   08/31/01    .
       Claims Incurred prior to the Contract Effective Date are limited to  $ N/A

RECEIVED
DEC 1 2000

**CLXLAPP (TX)**                              -1-                    Applicant Initials

San Benito v. Companion
JAH 000016

8. **GENERAL SCHEDULE OPTIONS:** (Continued)

Aggregate eligible expenses include:
[ X ] Medical      [ X ] Prescription Card Service
[ X ] Dental Care    [   ] Weekly (Disability) Income
[   ] Vision Care    [   ] Other

Med/Dental/Drug

| | |
|---|---|
| Aggregate Monthly Factor per single Employee: | $ _____ |
| Family: | $ _____ |
| Composite: | $ 295.65/11.54/39.06 |
| Aggregate Payable Percentage (excess of Deductible): | 100 % |
| Maximum Eligible Claim Expense Per Covered Person: | $ 75,000 |
| Minimum Aggregate Deductible: | $ 4,253,870 |
| Maximum Aggregate Benefit (excess of Deductible): | $ 1,000,000 |

(c)    Monthly Aggregate Accommodation        [   ] Yes    [ X ] No

(d)    Terminal Liability                  [   ] Yes    [ X ] No

(e)    Specific Benefit                    [ X ] Yes    [   ] No
Specific Contract Basis: Employee Benefit Plan expenses must be
     Incurred from  07/01/00  through  8/31/01 .
     Paid from  10/01/00  through  8/31/01 .

| | |
|---|---|
| Claims Incurred prior to the Contract Effective Date are limited to: | $ N/A |
| Specific Eligible Expense: Medical Only | |
| Specific Deductible (per person): | $ 75,000 * |

   * **Major human organ transplants subject to plan max. of $150K per individual.**
     **Lung cancer limited to $50,000 LTM if smoking for 5 years or more at time of diagnosis.**

| | |
|---|---|
| Specific Payable Percentage (excess of Deductible): | 100 % |
| Maximum Specific Benefit (per person in excess of Specific Deductible): | $ 925,000 |

9. **PREMIUMS:**

(a)    Aggregate Premium

| | |
|---|---|
| Premium Per Month Per Unit: | $ 1.70 |
| Minimum Annual Aggregate Premium | $ N/A |

Monthly Aggregate Accommodation

| | |
|---|---|
| Premium Per Month Per Unit: | $ N/A |
| Annual Premium in Advance: | $ N/A |

Terminal Liability

| | |
|---|---|
| Premium Per Month Per Unit: | $ N/A |
| Annual Premium in Advance: | $ N/A |

(b)    Specific Premium

| | |
|---|---|
| Premium Per Month Per Single Employee: | $ 18.45 |
| Family: | $ 44.06 |
| Composite: | $ |
| Minimum Monthly Specific Premium: | $ N/A |

**CLXLAPP (TX)**                  -2-                  Applicant Initials

San Benito v. Companion
JAH 000017

**10. SPECIAL RISK LIMITATIONS:**

Contract will be based upon the current employee benefits as defined in the Employee Benefit Plan by reference or by attachment, except as noted below:

Specific: __N/A_____

_____

Aggregate: __N/A_____

_____

**11. IT IS UNDERSTOOD AND AGREED, AS CONDITIONS PRECEDENT TO THE APPROVAL OF THIS APPLICATION, THAT:**

(a)   All documentation requested by the Company must be submitted prior to any approval of this Application and must be received by the Company within ninety (90) days of the requested Effective Date.

(b)   If the Schedule shows disabled persons are not covered, no benefits will be paid under the Contract for expenses incurred or Paid under the Employee Benefit Plan for a disabled person until:

   (1)   if an employee, he or she returns to active, full-time employment for at least one (1) full working day; or

   (2)   if a dependent or Continuation Beneficiary, he or she is able to perform the normal functions of a person of like sex and age.

(c )   Issuance of the Contract is in reliance upon the information provided by the Applicant or its Agent. Should subsequent information become known which, if known prior to issuance of the Contract, would have affected the rates, deductibles, terms or conditions for coverage, the Company will have the right to revise the rates, deductibles, terms or conditions as of the Effective Date of issuance, by providing written notice to the Insured.

(d)   The Contract, if issued, may be void, if whether before or after a claim or loss, any material fact or circumstance was concealed or misrepresented on behalf of the Applicant, or if the Applicant or its Agent, committed fraud.

(e)   Receipt of a premium and its deposit in connection with the Application shall not constitute an acceptance of liability. In the event that Companion Life Insurance Company disapproves this Application, its sole obligation shall be to refund such sum to the Applicant.

(f)   If a Contract is issued and later rescinded, the sum of all benefits paid will be deducted from the sum of all premiums paid. If the result is positive, such amount will be paid by the Company to the Applicant. If the result is negative, such amount will be paid by the Applicant to the Company.

(g)   The initial premium will be paid on or before the Effective Date, and subsequent premiums are due no later than the first day of each calendar month during the Contract Period.

(h)   This Contract contains a binding arbitration provision. In making this Application, the Contractholder both acknowledges and accepts such a provision, and agrees it will be the basis upon which any controversy or claim, arising out of or relating to the Contract, shall be settled.

CLXLAPP (TX)                                    -3-                          Applicant Initials

San Benito v. Companion
JAH 000018

**11. IT IS UNDERSTOOD AND AGREED, AS CONDITIONS PRECEDENT TO THE APPROVAL OF THIS APPLICATION, THAT: (Continued)**

(i)    Applicant acknowledges that the Contract which is the subject of this Application is a reimbursement Contract. Applicant must first pay claims before submitting them for reimbursement.

(j)    Oral Statements not expressly incorporated herein are not part of this Contract. Only the President or Executive Officer of the Company may make changes to the Contract Form or Addenda on behalf of the Company. All changes to this Contract must be in writing and attached to this Contract.

(k)    NEITHER THIS APPLICATION NOR THE TERMS OF THIS APPLICATION MAY BE ALTERED.

In making this Application, the Applicant represents that, to the best of its knowledge and belief, such information accurately reflects the true facts and that the undersigned has authority to bind the Applicant to the proposed Contract. Accordingly, this Application will be a part of the Contract if accepted by the Company or its authorized representative.

Dated at_____ this **21ST** day of **NOVEMBER** , 20 **00**      .

Applicant:        San Benito Consolidated ISD

Tax ID #_____

Witness:_____        By:_____

Signature of Licensed                                         (Officer/Partner)
Resident Agent

Title: **ASST. SUPT. FOR FINANCE & HUMAN RESOUR**


Licensed Resident Agent: _Michael M Surefan Jr_

(Type or Print)

Address: _Box 1008_

City: _San Benito_  State: _TX_  Zip: _78586_

Social Security or Tax ID # _450061456_

## ACCEPTANCE

Accepted on behalf of the Company, this _8th_ day of _January_ , _2001_

By: _____

Title: _____ President

Contract No.: _CLI-3044-100100_        Effective Date:_____ October 1, 2000

**CLXLAPP (TX)**                        -4-                        Applicant Initials



# Exhibit "D"

## GENERAL MANAGER'S AGREEMENT

This Agreement made this 17th day of October, 1998, by and between **Companion Life Insurance Company** (hereinafter referred to as "Insurer) & **J. Allan Hall & Associates,** (hereinafter referred to as "Manager").

### ARTICLE I

### PURPOSES

The purpose of this Agreement is to define and delineate the rights, duties and responsibilities of Insurer and Manager with respect to a policy or group of policies (hereinafter described as the Subject Policy or Policies) issued by Insurer and managed by Manager.

### ARTICLE II

### SUBJECT POLICIES

**Section 1.** Subject Policy or Policies as defined in this Agreement shall mean any and all policies of insurance providing insurance protection for life, accidental death or dismemberment, disability, dental, medical, stop loss products, or policies of insurance produced and underwritten by the insurer shall be covered by the terms of this Agreement.

**SECTION 2.** The term "Stop Loss Products" means Insurer's aggregate excess reinsurance agreements, specific excess accident and sickness reinsurance agreements and its excess loss insurance policies, riders and coverages generally offered to employers who establish self-funded health and welfare plans for employees or other participants.

### ARTICLE III

### PREMIUMS

**SECTION 1.** Manager shall collect all insurance premiums and other charges payable to Insurer or return premiums received from Insurer with respect to the Subject Policy or Policies for and on behalf of the Insurer. All such funds shall be held by the Manager in trust for the benefit of Insurer and shall be deposited promptly in a bank trust account (the "Fiduciary Account") established and maintained by the Manager for the benefit of the Insurer. All insurance premiums shall be remitted to Insurer by the 20th of the month following collection.

Initials:

**SECTION 2.** There shall be no commingling in the Fiduciary Account of funds of Manager or other persons. The Fiduciary Account shall at all times be established and maintained in a bank which is a member of the Federal Reserve System and subject to terms and conditions satisfactory to and approved in writing by the Insurer. The Manager may retain in the Fiduciary Account no more than ninety days estimated claims payments and allocated loss adjustment expenses.

**SECTION 3.** The Manager shall retain copies of all bank account records relating to the Fiduciary Account and shall furnish the Insurer, upon request, with copies thereof.

**SECTION 4.** Withdrawals from the Fiduciary Account shall be made solely for:

    A.    Remittance to Insurer;

    B.    Deposit in an account maintained by and in the name of Insurer;

    C.    Payment to a group policyholder for remittance to the insured entitled thereto, or remittance of return or excess premiums to the person or persons entitled thereto;

    D.    Payment to Manager of its compensation as provided herein, and interest earnings on the Fiduciary Account; or

    E.    Transfer to an interest bearing account or investment instrument, provided that:

        (1)    Such account or instrument is established as a Fiduciary Account or instrument for the benefit of Insurer;

        (2)    Such account is short-term and is approved in writing or is fully insured by insurance approved in writing by Insurer; or

        (3)    Any such investment instrument is a short-term U.S. Treasury security, and is approved in writing by Insurer.

    F.    Remittance to Reinsurer per Insurer's order.

    G.    Transfer to the claims account.

Insurer may at any time, and from time to time, require that Insurer (or its designee) be added as an additional signatory to the Fiduciary Account in order to authorize withdrawals from said account.

Initials:

2

San Benito v. Companion
JAH 002164

SECTION 5. Where Manager collects funds, Manager must identify and state separately in writing to the persons paying to the Manager any charge or premium for insurance coverage, the amount of any such charge or premium specified by Insurer for such insurance coverage.

SECTION 6. Manager agrees that all insurance premium charges collected by Manager shall be at the current rates proposed by Insurer or Reinsurer that the rates quoted by Manager shall have the prior written approval of the Insurer or Reinsurer; and further that Manager shall make adjustments to premium rates from time to time as instructed by Insurer or Reinsurer.

## ARTICLE IV

## CLAIMS

SECTION 1. Manager is authorized to adjust and settle all specific and aggregate medical claims arising out of insurance policies issued under this Agreement in the amount of $100,000.00 or less per person per calendar year; provided, however, that all claims in excess of that amount shall be furnished to Insurer along with all available information on said claim or claims and Manager shall cooperate with Insurer in the adjustment and settlement thereof.

SECTION 2. All claims paid by the Manager from funds collected on behalf of Insurer shall be paid only on drafts of manager as authorized in writing by Insurer.

SECTION 3. Manager shall adjust claims only in accordance with the terms of the various insurance policies issued and in accordance with standards set forth by the Insurer.

SECTION 4. The parties agree that Manager shall have no authority to make any settlement or agreement regarding settlement of any claim or claims that may be made against Insurer unless specifically so authorized in writing; nor shall the Manager or any person appointed by the Manager have any authority to incur any expense or obligations of any kind or nature in the name or on behalf of Insurer without express written authority in each instance; nor shall the Manager or any person appointed by the Manager have any authority to alter or discharge any policy contract or waive any policy provision or condition.

SECTION 5. Manager shall comply with the following provisions regarding claims:

      (a)    All claims must be reported to the Insurer in a timely manner.

Initials:

3

(b) A copy of the claim file must be sent to the Insurer at its request or as soon as it becomes known that the claim:

    (i) has the potential to exceed five thousand dollars or exceeds the limit set by the Insurer, whichever is less;

    (ii) involves a coverage dispute;

    (iii) may exceed the Manager's claims settlement authority;

    (iv) is open for more than six months; or

    (v) is closed by payment of five thousand dollars or an amount set by the Insurer, whichever is less.

(c) All claim files are the property of the Insurer. However, upon an order of liquidation of the Insurer, the Manager must have reasonable access to and the right to copy the files on a timely basis.

(d) Settlement authority granted to the Manager may be terminated for cause upon the Insurer's written notice to the Manager or upon the termination of the contract. The Insurer may suspend the settlement authority during the pendency of a dispute regarding the cause for termination. If this contract is terminated or the Manager's settlement authority is suspended, notification must be given by the Manager, at the Insurer's direction within thirty days of the action to agents or brokers who have placed business with the Manager within the last twelve months.

SECTION 6. Manager shall provide claims work up on all Life and Accidental Death and Dismemberment claims for payment by Insurer. Insurer is responsible for the settlement and payment of all Life and Accelerated Death and Dismemberment claims.

## ARTICLE V

## UNDERWRITING

SECTION 1. All underwriting and other standards pertaining to the Subject Policies by the Insurer shall conform to such standards as are from time to time set forth in writing by the Insurer or Reinsurer, and such adjustments as may be made in writing to such standards from time to time by Insurer, which shall be promptly delivered in writing to Manager in accordance with the notice provisions of this Agreement.

Initials:

4

**SECTION 2.** Manager shall have authority to issue proposals and rate quotations on behalf of Insurer in accordance with the underwriting guidelines and rates in the Manuals, as most recently amended. In applying the underwriting guidelines and rates expressed in the Manuals, Manager shall have authority to exercise underwriting judgment and experience regarding deviations therefrom consistent with Insurer's and Reinsurer's generally accepted underwriting practices as conveyed to Manger. Manager shall not deviate as to those rates or guidelines where Insurer has prohibited deviations.

**SECTION 3.** Manager shall retain copies of all quotations or proposals made on behalf of Insurer and furnish the same to Insurer on request. Quotations or proposals which have expired and have not been accepted may be destroyed at Manager's discretion. Manager shall have authority to bind applications for insurance submitted, provided the same shall substantially comply with the Manuals. Manager will furnish such reports regarding new and renewal business as Insurer may reasonably request.

**SECTION 4.** Manager acknowledges that all classes of business and states where policies can be written require prior written approval by Insurer.

**SECTION 5.** The total gross premium that may be written under this Agreement is $50,000,000.00.

## ARTICLE VI

## DUTIES OF MANAGER

**SECTION 1.** Manager shall maintain all licenses required by applicable state insurance and other statutes and regulations and shall in all other respects comply with same and cause its officers, employees, agents and subagents to so comply. Manager shall, where appropriate, pay commissions to and handle correspondence with officers, employees, agents and subagents of Manager.

**SECTION 2.** The Manager shall file annually with the Insurer not later than May 1 an audited annual financial statement prepared by an independent certified public accountant in a form acceptable to the Insurer.

Initials:

5

San Benito v. Companion
JAH 002167

**SECTION 3.** Manager shall handle on behalf of Insurer all correspondence and general clerical and administrative functions necessary to the satisfactory administration of the Subject Policies and shall maintain files relative thereto. Provided, however, Manager shall promptly forward to Insurer all insurance department complaints and inquiries received by it with regard to the Subject Policies, and shall provide all information from its records which will assist Insurer in its response to such complaints or inquiries, and otherwise cooperate fully with Insurer in connection with any such complaints or inquiries.

**SECTION 4.** Manager shall prepare and mail premium notices to insureds reasonably in advance of the premium due dates; shall collect and receipt for all premiums on all policies covered hereunder; and all earned premiums collected (excluding compensation to Manager) shall be remitted to Insurer by the 20th of the month following such collection.

**SECTION 5.** Manager shall underwrite and issue the Subject Policies for and on behalf of Insurer upon receipt of an appropriate application and such other information as may reasonably be required by Insurer or Manager prior to issuance of policies.

**SECTION 6.** Manager agrees to indemnify and hold Insurer harmless from and against any and all losses, claims, demands, liabilities, costs (including attorney's fees) and damages which Insurer may incur by reason of any error or omission by Manager.

**SECTION 7.** Manager, at its sole expense, shall be responsible for all marketing, printing and billing for all classes of business authorized by this Agreement. Provided, however, that any and all marketing materials, and miscellaneous documents which are made in Insurer's name shall not be disseminated or printed without the prior written approval of the Insurer.

**SECTION 8.** From time to time Manager may desire to and is hereby authorized to work with Third Party Administrators to perform some of the duties of Manager with respect to the billing and collection of premiums of the Subject Policies as described in this Agreement. In such event:

(a)　The Third Party Administrator shall mail premium notices and collect premiums on behalf of Manager and/or Insurer.

(b)　Manager shall inspect and examine such Third Party Administrators' records which pertain to premiums billed or collected on behalf of Insurer;

Initials:

6

San Benito v. Companion
JAH 002168

(c)    Third Party Administrators shall agree to permit Insurer to examine such Third Party Administrators' books and records which pertain to it; and

(d)    Working with Third Party Administrators shall not terminate or limit Manager's duties and responsibilities under the terms and conditions of this Agreement.

**SECTION 9.** Manager will, when required, develop and submit to Insurer proposed policy or reinsurance agreement language for Stop Loss Products covered by this Agreement. Insurer will be responsible for policy and contract revision and filing, where required, for insurance department approval. Manager will use only policy and reinsurance agreements approved and authorized for issue by Insurer.

## ARTICLE VII

## DUTIES OF INSURER

**SECTION 1.** Insurer agrees to indemnify and hold Manager harmless from and against any and all losses, claims, demands, liabilities, costs, damages and expenses (including attorney's fees) which Manager may incur by reason of any error or omission by Insurer.

**SECTION 2.** Any and all correspondence with or notices given to any Insured concerning the Subject Policies shall be effected solely by Manager, unless otherwise directed in writing by Insurer to Manager.

**SECTION 3.** Insurer shall notify Manager of the Insurer's desire to cancel or non-renew the Subject Policies at least 180 days prior to such cancellation or non-renewal. In such event, notification to insureds under the Subject Policies of such cancellation or non-renewal shall be made by Manager. The Insurer shall cooperate fully with Manager in placing the Subject Policy with another insurance company or insurance companies so as to assure the preservation of Manager's agency relationships and continuity of coverage to the Insureds.

**SECTION 4.** Insurer shall use its best efforts to comply with Section 3 immediately above. However, the Insurer retains the right to cancel or not renew a policy of insurance subject to the policy provisions, applicable laws and regulations.

**SECTION 5.** Insurer shall pay all fees for obtaining agents' licenses and/or appointments when and where applicable and where permitted by applicable law.

Initials:

7

San Benito v. Companion
JAH 002169

## ARTICLE VIII

## MAINTENANCE OF RECORDS

**SECTION 1.** The Manager shall maintain for the duration of this Agreement and six years thereafter, adequate books and records of all transactions between itself, the various policyholders, Insurer and individual insureds. These books and records shall be maintained in accordance with prudent standards of insurance record keeping.

**SECTION 2.** Insurer and its representatives may inspect, examine, make copies of and extracts from and/or audit all of the books and records of Manager pertaining to the Subject Policies upon prior written notice to Manager during regular business hours as often as Insurer may deem reasonable, necessary or appropriate, and Manager shall cooperate fully with the Insurer or its representatives in connection therewith. Such audits shall be conducted solely at Insurer's expense.

**SECTION 3.** The commissioner or director of insurance for a given state shall have access to books and records maintained by Manager with respect to the Subject Policies for the purpose of examination, audit and inspection.

**SECTION 4.** Manager shall provide Insurer with all such reports as it might reasonably require, including but not limited to monthly premium reports and quarterly allocations of premiums by state.

**SECTION 5.** It is understood and agreed that all operational materials, books, plans and other records developed or prepared by Manager in any form, including film or electronic media, pertaining to its Subject Policies hereunder including, but not limited to, all individual applications, files and correspondence relating thereto, and all printed material (excluding certificates of coverage and advertising material), are proprietary in nature and are the sole property of Manager.

## ARTICLE IX

## ADVERTISEMENTS

**SECTION 1.** Manager shall prepare, print and properly mail or otherwise distribute descriptive brochures and other advertising and promotional materials relating to the Subject Policies. All costs of printing and mailing of such materials shall be borne by Manager.

**SECTION 2.** For the purpose of this Agreement "advertising material" shall include:

Initials: _____

8

San Benito v. Companion
JAH 002170

(a)   Printed and published material, audiovisual material, and descriptive literature used in direct mail, newspapers, magazines, radio scripts, television scripts, billboards and similar displays; and

(b)   descriptive literature and sales aids of all kinds issued by the Insurer, the Manager or by any agent or broker for presentation to members of the insurance buying public, including but not limited to circulars, leaflets, booklets, depictions, illustrations, and form letters; and

(c)   prepared sales talks, presentations and materials for use by agents, brokers and solicitors.

**SECTION 3.**  No such advertising material will be disseminated by the Manager or by anyone acting under the Manager's instructions or with the Manager's knowledge unless such advertising material has been approved in writing by Insurer, and Manager shall make no changes in advertising which has received the Insurer's approval without the Insurer's approval of such change.

**SECTION 4.**  In those jurisdictions where prior approval of advertising material by an insurance department is required by statute or regulation or by the exercise of an insurance department's discretionary authority, the Manager shall not distribute or permit others to distribute such advertising material until it has received the required insurance department approval. The Insurer shall use its best efforts to obtain prompt approval of such advertising material.

## ARTICLE X

## DELIVERY OF WRITTEN COMMUNICATIONS

Any policies certificates, booklets, cancellation or non-renewal notices or other written communications with the Insured with respect to the Subject Policies, whether produced by the Insurer or by the Manager upon Insurer's direction, shall be delivered by Manager to policyholders promptly after receipt of written instructions from the Insurer.  Insurer shall bear the cost of printing such materials.

Initials:

9

San Benito v. Companion
JAH 002171

## ARTICLE XI

### MANAGER'S INSURANCE

**SECTION 1.** Manager agrees to obtain and maintain in full force and effect, at its own expense, throughout the term of this Agreement, blanket fidelity insurance and errors and omissions insurance, satisfactory to and approved by Insurer in writing, providing coverage of not less than $500,000.00. Manager shall provide Insurer with at least 15 days written notice prior to cancellation of such coverage or any material change in such coverage. Insurer shall have the right to require Manager to increase the amount of insurance coverage as justified by increases in the amount of premium received by Manager.

**SECTION 2.** Manager agrees to furnish copies of such insurance policies to Insurer and thereby warrants that such copies are true and accurate copies of the policies which they represent.

## ARTICLE XII

### COMPENSATION

**SECTION 1.** In consideration of the performance of the services rendered herein in connection with the Subject Policies, Manager shall be compensated in accordance with the schedule of compensation attached to this Agreement and incorporated herein by this reference.

**SECTION 2.** The Insurer shall have and is hereby given a valid first lien on, and security interest in, to the fullest extent permitted by the Uniform Commercial Code, all compensation payable under this Agreement as security for the payment of any and all debts or claims due or to become due from Manager In the event of default of any debt or claim due or to become due to the Insurer from Manager, the Insurer is authorized without notice and without any judicial action to credit any and all of such compensation accrued or to accrue towards the reduction of the debt or claim. The lien created hereby shall not be extinguished by termination of this Agreement.

**SECTION 3.** Manager hereby grants Insurer security interest, to the fullest extent permitted by the Uniform Commercial Code, in all funds from time to time held by Manager for the benefit of the Insurer.

**SECTION 4.** Manager hereby agrees, upon request from Insurer, to take any and all actions and to execute such further documents as may be requested by Insurer in order to perfect more fully the security interests granted by Manager to Insurer hereunder.

Initials:

10

## ARTICLE XIII

## TERMINATION

**SECTION 1.** This Agreement shall terminate upon notice of termination given by Insurer or Manager in accordance with the notice provisions of this Agreement at least 180 days before the date of termination fixed in such notice.

**SECTION 2.** The Agreement may be terminated by the Insurer or Manager, at any time, if one or the other becomes unable or incapable of performing its obligations hereunder in substantial respects or commits a material breach hereof, and such is not cured or rectified within 60 days or is not capable of being so cured or rectified within 60 days after the complaining party shall have given notice thereof to the other party; provided, however, that such notice to terminate shall be given in accordance with this Agreement and shall reference this section and set forth the specific nature of the breach or inability to perform of the defaulting party.

**SECTION 3.** Notwithstanding any other provision of this Agreement to the contrary, this Agreement may be terminated immediately upon written notice given in accordance with this Agreement upon the happening of one or more of the following events;

     (1)    Bankruptcy, receivership or insolvency of Manager or Insurer;

     (2)    Fraud or embezzlement on the part of Manager, its employees, officers, agents or other representatives;

     (3)    Insurer's or Manager's failure to comply with an applicable state's licensing requirements;

     (4)    Termination of the reinsurance agreement applicable to the Subject Policies under this Agreement for any reason whatsoever;

     (5)    If Manager shall make any assignment for the benefit of creditors without the prior written consent of Insurer;

     (6)    If the assets or business of Manager shall be at any time seized or taken in execution or in attachment by a creditor of Manager.

Initials:

11

San Benito v. Companion
JAH 002173

**SECTION 4.** The termination of this Agreement shall not affect the validity, provisions or term of any policies issued under this Agreement, in force or coverage bound at the time of such termination, as such policies and binders shall continue to be effective as written and previously approved until the renewal date thereof.

**SECTION 5.** The termination of this Agreement shall not affect the continued operation of the indemnity provisions contained in Article VI, Section 6 and in Article VII, Section 1 of this Agreement, which shall remain in full force and effect.

**SECTION 6.** Upon any termination of this Agreement, Manager will cooperate with and assist Insurer in making available to Insurer records or copies of all records, and in notifying insureds, producing agents, regulators and other interested parties where such notification is necessary or appropriate.

**SECTION 7.** The termination of this agreement shall not affect the compensation provisions contained in Article XII, Section 1 and those provisions shall remain in full force and effect for the duration of the policies written under this agreement.

## ARTICLE XIV

### NOTICES

**SECTION 1.** Notices or demands required or permitted pursuant to this Agreement shall be in writing and shall be delivered by commercial courier providing overnight service and written proof of delivery, if to the Insurer, addressed to Scott Hinton, Vice President Finance, Companion Life Insurance Company, 51 Clemson Rd., Suite C, Columbia, SC 29223; if to Manager addressed to J. Allen Hall, President, J. Allan Hall & Associates, Circle Tower, 55 Monument Circle, Suite 1115, Indianapolis, IN 46204. Each party may change the place of notice to it by delivering appropriate notice to such effect pursuant to this section.

**SECTION 2.** Insurer and Manager shall promptly give notice to the other of any fact, event or circumstance of which it becomes aware that is material to the subject matter of this Agreement.

Initials:

12

## ARTICLE XV

### MISCELLANEOUS PROVISIONS

**SECTION 1.** Manager's relationship with Insurer shall be that of independent contractor and nothing in this Agreement shall be construed as creating the relationship of employer and employee between Insurer and officers, employees or agents of Manager or the relationship of a partnership or joint venture between the parties. Manager's power or authority shall extend no further than is expressly stated in this Agreement and no power or authority shall be implied from the granting or denial of powers specifically mentioned herein. The Insurer shall exercise no control whatsoever over the hours, office location, rentals, staff or employees or manner of performance of duties hereunder except insofar as herein provided. It is expressly understood that no obligation, duty or right of the Manager under this contract may be assigned to any other firm or person without the written authorization of the insurer.

**SECTION 2.** This Agreement, including the schedules of compensation, attached hereto, constitute the entire Agreement of the parties with respect to the Subject Policies. No amendment or modification hereof shall be binding unless the same is identified as an amendment to this Agreement and is in writing and signed by the parties hereto. Notwithstanding the foregoing, the parties agree at all times to cooperate fully with and act reasonably and in good faith toward one another in connection with the subject matter of this Agreement, and this Agreement shall be construed and enforced in accordance with the foregoing understandings.

**SECTION 3.** The rights of either party hereto to enforce any provision hereof shall not be affected by its prior failure to require performance of that provision or any other provision by the other party, nor shall any right be deemed to have been waived unless the waiver thereof be in writing and signed by the party making such waiver.

**SECTION 4.** In the event of any litigation to enforce or to interpret the provisions of this Agreement, the prevailing party in such action shall be entitled to its reasonable attorney's fees and costs.

**SECTION 5.** This Agreement shall be governed in all respects and be interpreted by and under the laws of the State of South Carolina. If any provision hereof is found to be invalid by any court of competent jurisdiction, the invalidity of such provision shall not effect the validity of the remaining provisions hereof.

Initials:

13

SECTION 6.  Communications and transmittals between Manager and the Insurer shall, when necessary or appropriate for the proper performance of this Agreement, be made by a commercial courier providing overnight service, or by facsimile transmission or similar electronic means to the addresses specified in Article XIV or to such other location as may be designated by any of the parties from time to time.

SECTION 7.  This is not an exclusive General Manager's Agreement, and Manager has no exclusive territory.

SECTION 8.  The Manager may not:

    (a)    bind assumed reinsurance or retrocession on behalf of the Insurer, except the MGA may bind facultative reinsurance contracts pursuant to obligatory facultative agreements if the contract with the Insurer contains reinsurance underwriting guidelines, including, for reinsurance assumed and ceded, a list of reinsurers with which the automatic agreements are in effect, the coverages and amounts or percentages that may be reinsured, the commission schedules;

    (b)    commit the Insurer to participate in insurance or reinsurance syndicates;

    (c)    without prior approval of the Insurer, pay or commit the Insurer to pay a claim over five thousand dollars, net of reinsurance, or one percent of the insurer's policyholder's surplus as of December 31 of the last completed calendar year, whichever is less;

    (d)    collect payment from a reinsurer or commit the Insurer to a claim settlement with a reinsurer, without prior approval of the Insurer. If prior approval is given, a report must be forward promptly to the Insurer;

    (e)    permit its agent to serve on the Insurer's board of directors;

    (f)    jointly employ an individual who is employed with the insurer;

    (g)    appoint a sub-manager.

Initials:

14

San Benito v. Companion
JAH 002176

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers.

WITNESS:

J. Allan Hall & Associates

BY: _____
    J. Allan Hall

TITLE: PRESIDENT

DATE: Dec. 14, 1998

WITNESS:

COMPANION LIFE INSURANCE COMPANY

BY: _____
    DONALD H. DASHIELL

TITLE: EXECUTIVE VICE PRESIDENT

DATE: 12/28/98

San Benito v. Companion
JAH 002177

Schedule of Compensation

This Schedule, effective June 1, 1998, is to be attached to and form a part of the General Manager's Agreement between J. Allan Hall & Associates and Companion Life Insurance Company.

Schedule - Insurer agrees to pay to Manager on the earned premium in each 12 month period commencing June 1, 1998, the following fees from the sale of Subject Policy or Policies through TPA's, agents, brokers and/or other producers appointed and/or contracted with Insurer through the direct efforts of Manager under this Agreement (the "producers"):

Specific and Aggregate Medical up to 35% of gross premium. This fee allowance shall cover the following:

| | |
|---|---|
| Issuing Fee | 5% |
| Premium Tax | 2 ½% |
| Manager's Fees and Expenses | 27 ½% |

Group Life and Accidental Death and Dismemberment up to 25% of gross premium.

Except as stated herein, nothing contained herein shall be construed to alter or affect any of the provisions of the Agreement to which it is attached.

WITNESS:                                    J. Allan Hall & Associates

BY: _____
            J. Allan Hall

TITLE    PRESIDENT

DATE: _ Dec. 1st, 1998


WITNESS:                                    COMPANION LIFE INSURANCE COMPANY

BY: _____
            Donald H. Dashiell

TITLE: _EXECUTIVE VICE PRESIDENT

DATE: __12/28/98_

16

Word/h:Sch/Roy/NGMA TIU

San Benito v. Companion
JAH 002178

# VERNON'S ANNOTATED

# REVISED CIVIL STATUTES

### OF THE

# STATE OF TEXAS

**Volume 14**

### Insurance Code

### Articles 1.01 to 3.74

**[Including Articles 3.75 to 3.96–10]**

## 2003
## Cumulative Annual Pocket Part

Replacing 2002 pocket part supplementing 1981 main volume

*For Use In 2002–2003*

> **Includes**
> **Laws through the 2001 Regular Session**
> **of the 77th Legislature**
> **Court Constructions through 79 S.W.3d 830**

RECEIVED

DEC 0 6 2002

**THOMSON**

**WEST**

BRACEWELL & PATTERSON LLP
LIBRARY

Mat #40095581

108

THE INSURANCE CODE OF 1951                                  **Art. 3.10**
Title 1

### Repeal

*Acts 2001, 77th Leg., ch. 1419, § 31(a) repeals this article effective June 1, 2003.*

### Notes of Decisions

**8. Review**
  State Bd. of Ins. v. Professional & Business
Men's Ins. Co. (Civ.App. 1962) 359 S.W.2d 312,
[main volume] ref. n.r.e..

## Art. 3.07.   Shall File Annual Statement

Each "domestic" company shall, after the first day of January of each year and before the first day of March following, and before the renewal of its certificate of authority to transact business, prepare, under oath of two of its officers, and deposit in the office of the State Board of Insurance, a statement, accompanied with the prescribed fee for filing annual statements, showing the condition of the company on the thirty-first day of December the next preceding, which shall include a statement in detail showing the character of its assets and liabilities on that date, the amount and character of business transacted, moneys received and how expended during the year, and the number and amount of its policies in force on that date in Texas, and the total amount of its policies in force.

Amended by Acts 1987, 70th Leg., ch. 249, § 2, eff. Aug. 31, 1987.

### Repeal

*Acts 2001, 77th Leg., ch. 1419, § 31(a) repeals this article effective June 1, 2003.*

## Art. 3.08.   Renewal Certificates

Whenever any such company, transacting insurance business in this State, shall have filed its annual statement in accordance with the preceding article, showing a condition which entitles it to transact business in this State in accordance with the provisions of this chapter, the State Board of Insurance shall, upon a receipt of the prescribed fee, issue a renewal certificate of authority to such company for a period of not more than fifteen (15) months, and not extending more than ninety (90) days beyond the last day of February next after the date of its issuance, on which date such certificate shall expire by its terms unless revoked or suspended according to law.

Amended by Acts 1987, 70th Leg., ch. 249, § 2, eff. Aug. 31, 1987.

### Repeal

*Acts 2001, 77th Leg., ch. 1419, § 31(a) repeals this article effective June 1, 2003.*

## Art. 3.09.   Copy of Certificates for Agents

### Repeal

*Acts 2001, 77th Leg., ch. 1419, § 31(a) repeals this article effective June 1, 2003.*

## Art. 3.10.   May Reinsure

(a) Any insurer authorized to do the business of insurance in this state may reinsure in any solvent assuming insurer, any risk or part of a risk which both are authorized to assume; provided, however, no credit for reinsurance, either as an asset or a deduction of liability, may be taken by the ceding insurer except as provided in this article, and, provided further, no insurer operating under Section 2(a) of Article 3.02 shall reinsure any risk or part of a risk with any insurer which is not licensed to engage in the business of insurance in this state. This article applies to all insurers regulated by the State Board of Insurance, including any stock and mutual life, accident, and health insurers, fraternal benefit societies, health maintenance organizations operating under the Texas Health Maintenance Organization Act (Chapter 20A, Vernon's Texas Insurance Code), and nonprofit hospital, medical, or dental service corporations, including companies subject to Chapter 20 of this code.   No such insurer

115

**Art. 3.10**                                   THE INSURANCE CODE OF 1951
Title 1

shall have the power to reinsure its entire outstanding business to an assuming insurer unless the assuming insurer is licensed in this state and until the contract therefor shall be submitted to the Commissioner and approved by him as protecting fully the interests of all policy holders. This article does not apply to ceding insurers domiciled in another state that regulates credit for reinsurance under statutes, rules, or regulations substantially similar in substance or effect to this article. To qualify for this exception, the ceding insurer must provide the Commissioner on request with evidence of the similarity in the form of statutes, rules, or regulations, and an interpretation of the statutes, rules, or regulations and the standards used by the state of domicile. This article is supplementary to and cumulative of other provisions of this code and other insurance laws of this state relating to reinsurance to the extent those provisions are not in conflict with this article.

(b) Credit for reinsurance shall be allowed a ceding insurer as either an asset or a deduction from liability on account of reinsurance ceded only when:

(1) the reinsurance is ceded to an assuming insurer which is licensed to transact insurance or reinsurance in this state; or

(2) the reinsurance is ceded to an assuming insurer which is accredited as a reinsurer in this state. An accredited reinsurer is one which: submits to this state's jurisdiction; submits to this state's authority to examine its books and records; is domiciled and licensed to transact insurance or reinsurance in at least one state, or in the case of a United States branch of an alien assuming insurer is entered through and licensed to transact insurance or reinsurance in at least one state; files annually a copy of its annual statement, filed with the insurance department of its state of domicile, with the State Board of Insurance; and maintains a surplus as regards policy holders in an amount not less than $20 million; or

(3) the reinsurance is ceded to an assuming insurer which maintains a trust fund in a qualified United States financial institution, as defined in Subsection (e)(2), for the payment of the valid claims of its United States policy holders and ceding insurers, their assigns, and successors in interest. The trusteed assuming insurer shall report annually not later than March 1 to the State Board of Insurance information substantially the same as that required to be reported on the NAIC Annual Statement form by licensed insurers to enable the State Board of Insurance to determine the sufficiency of the trust fund. In the case of a single assuming insurer, the trust shall consist of a trusteed account representing the assuming insurer's liabilities attributable to business written in the United States and, in addition, include a trusteed surplus of not less than $20 million. In the case of a group of insurers, which group includes unincorporated individual insurers, the trust shall consist of a trusteed account representing the group's liabilities attributable to business written in the United States and, in addition, include a trusteed surplus of not less than $100 million and the group shall make available to the State Board of Insurance an annual certification by the group's domiciliary regulator and its independent public accountants of the solvency of each underwriter. Such trust shall be established in a form approved by the State Board of Insurance. The trust instrument shall provide that contested claims shall be valid and enforceable upon the final order of any court of competent jurisdiction in the United States. The trust shall vest legal title to its assets in the trustees of the trust for its United States policy holders and ceding insurers, their assigns, and successors in interest. The trust and the assuming insurer shall be subject to examination as determined by the State Board of Insurance. The trust described herein must remain in effect for as long as the assuming insurer shall have outstanding obligations due under the reinsurance agreements subject to the trust. Not later than February 28 of each year the trustees of the trust shall report to the State Board of Insurance in writing setting forth the balance of the trust and listing the trust's investments at the preceding year end and shall certify the date of termination of the trust, if so planned, or certify that the trust shall not expire prior to the next following December 31; or

(4) the reinsurance is ceded to an assuming insurer not meeting the requirements of Subdivision (1), (2), or (3), but only with respect to the insurance of risks located in a jurisdiction where such reinsurance is required by applicable law or regulation of that jurisdiction to be ceded to an assuming insurer that does not meet the requirements of Subdivision (1), (2), or (3) of this subsection.

(c) If the assuming insurer is not licensed or accredited to transact insurance or reinsurance in this state, the credit permitted by Subsection (b)(3) of this article shall not be allowed unless the assuming insurer agrees in the reinsurance agreements:

116

(1) that in the event of the failure of the assuming insurer to perform its obligations under the terms of the reinsurance agreement, the assuming insurer, at the request of the ceding insurer, shall submit to the jurisdiction of any court of competent jurisdiction in any State of the United States, will comply with all requirements necessary to give such court jurisdiction, and will abide by the final decision of such court or of any Appellate Court in the event of an appeal; and

(2) to designate the State Board of Insurance or a designated attorney as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the ceding company. This provision, however, is not intended to conflict with or override the obligation of the parties to a reinsurance agreement to arbitrate their disputes, if such an obligation is created in the agreement.

(d) Any asset or reduction from liability for the reinsurance ceded to an assuming insurer not meeting the requirements of Subsection (b) shall be allowed in an amount not exceeding the liabilities carried by the ceding insurer, and such asset or reduction shall be in the amount of funds held by or on behalf of the ceding insurer, including funds held in trust for the ceding insurer, under a reinsurance contract with such assuming insurer as security for the payment of obligations thereunder, if such security is held in the United States subject to withdrawal solely by and under the exclusive control of the ceding insurer or, in the case of a trust, held in a qualified United States financial institution, as defined in Subsection (e). This security may be in the form of:

(1) cash;

(2) securities readily marketable over a national exchange with a maturity date of not later than one year listed by the Securities Valuation Office of the National Association of Insurance Commissioners and qualifying as admitted assets;

(3) clean, irrevocable, unconditional letters of credit, issued or confirmed by a qualified United States financial institution, as defined in Subsection (e)(1).

Letters of credit meeting applicable standards of issuer acceptability as of the dates of their issuance or confirmation shall, notwithstanding the issuing or confirming institution's subsequent failure to meet applicable standards of issuer acceptability, continue to be acceptable as security until their expiration, extension, renewal, modification, or amendment, whichever first occurs; provided, however, the letter of credit must be replaced within three months after the date of the institution's failure to meet applicable standards of issuer acceptability.

(4) any other form of security acceptable to the Commissioner.

(e) Qualified United States Financial Institutions. (1) For the purposes of Subsection (d)(3), a "qualified United States financial institution" means an institution that:

(A) is organized or, in the case of a United States office of a foreign banking organization, licensed, under the laws of the United States or any state thereof;

(B) is regulated, supervised, and examined by United States federal or state authorities having regulatory authority over banks and trust companies; and

(C) has been determined by either the Commissioner or the Securities Valuation Office of the National Association of Insurance Commissioners to meet such standards of financial condition and standing as are considered necessary and appropriate to regulate the quality of financial institutions whose letters of credit will be acceptable to the Commissioner.

(2) A "qualified United States financial institution" means, for the purposes of those provisions of this law specifying those institutions that are eligible to act as a fiduciary of a trust, an institution that:

(A) is organized, or, in the case of a United States branch or agency office of a foreign banking organization, licensed, under the laws of the United States or any state thereof and has been granted the authority to operate with fiduciary powers; and

(B) is regulated, supervised, and examined by federal or state authorities having regulatory authority over banks and trust companies.

(f) The Board may adopt rules and regulations implementing the provisions of this law.

(g) Subsections (a) through (f) of this article shall apply to all reinsurance agreements having an inception, anniversary, or renewal date not less than four months after the effective date of this statute.

## Art. 3.10

THE INSURANCE CODE OF 1951
Title 1

(h) A person does not have any rights against a reinsurer that are not specifically set forth in the contract of reinsurance or in a specific agreement between the reinsurer and the person.

(i) The State Board of Insurance shall require schedules of reinsurance to be filed by every insurer at the time of making the annual report and at such other times as the Board may direct.

(j) Credit may not be given in the accounting and financial statements, either as an asset or a deduction from liability, unless the reinsurance is payable by the assuming insurer on the basis of the liability of the ceding insurer under the contracts reinsured without diminution because of the insolvency of the ceding insurer and is payable directly to the ceding insurer or to its domiciliary liquidator or receiver.

(k) "Assuming insurer" means the insurer who under a contract of reinsurance incurs to the ceding insurer an obligation of which the performance is contingent on incurring of liability or loss by the ceding insurer under its contract or contracts of insurance made with third persons.

(l) An insurer shall account for reinsurance agreements and shall record those reinsurance agreements in the insurer's financial statement in a manner that accurately reflects the effect of the reinsurance agreements on the financial condition of the company. The State Board of Insurance may adopt reasonable rules relating to the accounting and financial statement requirements of this section and the treatment of reinsurance agreements between insurance companies, including minimum risk transfer standards, asset debits or credits, reinsurance debits or credits, and reserve debits or credits relating to the transfer of all or any part of an insurer's risks or liabilities by reinsurance agreements and any contingencies arising from reinsurance agreements. Rules adopted subsequent to September 1, 1995, shall apply to reinsurance agreements entered into on or after the effective date of such rules, and to reinsurance agreements that are amended on or after the effective date of such rules. A reinsurance agreement may contain a provision that allows the offset of mutual debts and credits between a ceding insurer and the assuming insurer, whether arising out of one or more reinsurance agreements.

(m) The Commissioner may request the filing of financial statements certified and audited by an independent certified public accountant, certified copies of the certificate or letter of authority from the domiciliary jurisdiction, and information on the principals and management of any assuming insurer that does not meet the requirements of Subsection (b) of this article. The failure of an assuming insurer that does not meet the requirements of Subsection (b) of this article to comply with a request for information by the Commissioner may result in the Commissioner issuing a directive prohibiting all licensed insurers from taking credit for business ceded with any such assuming insurer after the effective date of such directive. A nonlicensed insurer that is included in the most recent quarterly listing published by the Non-admitted Insurers Information Office of the National Association of Insurance Commissioners is considered to have complied with a request for information from the Commissioner.

Amended by Acts 1987, 70th Leg., ch. 564, § 1, eff. Aug. 31, 1987; Acts 1989, 71st Leg., ch. 1082, § 7.01, eff. Sept. 1, 1989. Subsecs. (a), (b), (e) amended by and Subsec. (m) added by Acts 1991, 72nd Leg., ch. 242, § 3.01, eff. Sept. 1, 1991; Subsec. (a) amended by Acts 1993, 73rd Leg., ch. 685, § 13.01, eff. Sept. 1, 1993; Subsec. (b) amended by Acts 1993, 73rd Leg., ch. 685, § 13.06, eff. Sept. 1, 1993; Subsec. (l) amended by Acts 1995, 74th Leg., ch. 614, § 2, eff. Sept. 1, 1995.

### Historical and Statutory Notes

Section 18(b) of the 1995 amendatory act provides:

"The commissioner of insurance shall adopt rules as required by the Insurance Code, as amended by this Act, not later than December 31, 1995."

### Cross References

Asset protection act, applicability to reinsurance agreements, see V.A.T.S. Insurance Code, art. 21.39–A.

Reinsurance intermediaries, requirements if not licensed, accredited, or trusteed under this article, see V.A.T.S. Insurance Code, art. 21.07–7, §§ 5, 6.

118

# VERNON'S ANNOTATED

# REVISED CIVIL STATUTES

## OF THE

# STATE OF TEXAS

**Volume 14B**

**Insurance Code**

**Articles 11.01 to 21.21**

2003
Cumulative Annual Pocket Part

Replacing 2002 pocket part supplementing 1981 main volume

*For Use In 2002–2003*

---

**Includes
Laws through the 2001 Regular Session
of the 77th Legislature
Court Constructions through 79 S.W.3d 830**

---

RECEIVED

**THOMSON**
* ⋆ *
**WEST**

DEC 0 6 2002

BRACEWELL
& PATTERSON LLP
LIBRARY

Mat #40095583

110

## Art. 21.07–6
### Note 1

formed his duty was that official's residence for venue purposes and federal judges sitting in Texas were better qualified to construe application of Texas Insurance Code to ERISA question. NGS American, Inc. v. Barnes, E.D.Mich.1992, 782 F.Supp. 1198.

### 2. Premium and contribution collection

California not-for-profit trade association organized to promote general advancement of self-insurance industry met requirements for associational standing in action challenging provisions of Texas Insurance Code imposing tax on contract administrators and requiring contract administrators both to pay application fee for certificate of authority and to pay one percent maintenance tax on fees for services as being in violation of ERISA; members of association were impacted by disputed provisions, employer/plan sponsors and contract administrators providing services were sufficiently within ERISA's zone of interest, and interest that association sought to protect was germane to organization's purpose. Self-Insurance Institute of America, Inc. v. Korioth, C.A.5 (Tex.)1993, 993 F.2d 479, rehearing denied.

### 2.5. Professional services

Whether a third-party administrator, licensed under article 21.07–6 of the Insurance Code, provides a professional service to be determined by a school board for purposes of § 44.031 of the Education Code depends upon whether the service requires predominantly mental or intellectual, rather than physical or manual, skills; whether years of education and service are necessary for a practitioner to attain competence as a third-party administrator, and whether a third-party administrator belongs to a discipline with widely accepted standards of required study or specified attainments in special knowledge as distinguished from mere skill. Op.Atty.Gen. 1996, No. DM–418.

### 3. Preemption

Question of whether ERISA plan administrator also administered non-ERISA governed plans would not preclude summary judgment for administrator on its claim that ERISA preempted Texas statute that imposed regulations, fees, and taxes on self-funded ERISA plans, to extent that statute applied to third-party administrators of ERISA-governed insurance plans in their capacity as third-party administrators of ERISA-governed insurance plans. NGS American, Inc. v. Barnes, C.A.5 (Tex.)1993, 998 F.2d 296.

Texas statute that imposed regulations, fees, and taxes upon self-funded ERISA plans and their administrators was not "regulation of insurance," for purposes of statute exempting from ERISA preemption state statutes that regulate business of insurance; because administrators that Texas sought to regulate performed no risk-bearing function, regulating them did not spread risk among policyholders. NGS American, Inc. v. Barnes, C.A.5 (Tex.)1993, 998 F.2d 296.

### 4. Taxation

Refund order requiring Texas officials to refund wrongfully withheld back taxes to trade association exceeded scope of association's standing to challenge maintenance tax wrongfully withheld from members who administered both ERISA and non-ERISA governed insurance plans, where state had continuing authority to tax non-ERISA administered plans so that each member was required to show extent to which it operated ERISA-governed plans or non-ERISA governed plans before refund amount could be determined. Self-Insurance Institute of America, Inc. v. Korioth, C.A.5 (Tex.)1995, 53 F.3d 694.

Trade association whose members administered ERISA plans was not ERISA participant, beneficiary, or fiduciary within meaning of ERISA attorney fee provision and, therefore, association was not entitled to award of attorneys' fees in association's action to enjoin enforcement of Texas maintenance tax imposed on members. Self-Insurance Institute of America, Inc. v. Korioth, C.A.5 (Tex.)1995, 53 F.3d 694.

Declaratory Judgment Act did not authorize award of attorney fees against Texas officials in trade association's action to enjoin enforcement of Texas maintenance tax wrongfully imposed on members who administered ERISA plans. Self-Insurance Institute of America, Inc. v. Korioth, C.A.5 (Tex.)1995, 53 F.3d 694.

## Art. 21.07–7.  Reinsurance Intermediary Act
### Short Title

Sec. 1.  This article may be cited as the Reinsurance Intermediary Act.

### Definitions

Sec. 2.  In this Act:

(1) "Actuary" means a member in good standing of the American Academy of Actuaries.

(2) "Broker" means a person, other than an officer or employee of an insurer, who solicits, negotiates, or places reinsurance business on behalf of an insurer and who may not exercise the authority to bind reinsurance on behalf of that insurer.

(3) "Commercially domiciled insurer" means a foreign or alien insurer authorized to do business in this state that during its three preceding fiscal years taken together, or any lesser period of time if it has been licensed to transact business in this state only for that lesser period of time, has written an average of more gross premiums in this state than it has

188

written in its state of domicile during the same period with those gross premiums constituting 20 percent or more of its total gross premiums everywhere in the United States for that three-year or lesser period, as reported in its three most recent annual statements.

(4) "Control" has the meaning assigned that term by Section 2(c), Article 21.49–1 of this code.

(5) "Insurer" means a commercially domiciled insurer or other person legally organized in this state to do business as an insurance company, including:

(A) a capital stock company;

(B) a mutual company;

(C) a title insurance company;

(D) a fraternal benefit society;

(E) a local mutual aid association;

(F) a statewide mutual assessment company;

(G) a county mutual insurance company;

(H) a Lloyd's plan company;

(I) a reciprocal or interinsurance exchange;

(J) a stipulated premium insurance company;

(K) a group hospital service company;

(L) a farm mutual insurance company; and

(M) a risk retention group.

(6) "Manager" means a person who has authority to bind reinsurance or who manages all or part of the reinsurance business of an insurer, including the management of a separate division, department, or underwriting office, and who acts as an agent for that insurer. The term does not include:

(A) an employee of the insurer;

(B) a manager of the United States branch of an alien insurer;

(C) an underwriting manager who, under a contract, manages all of the reinsurance operations of an insurer, who is under common control with the insurer under Article 21.49–1 of this code, and whose compensation is not based on the volume of premiums written; or

(D) the manager of a group, association, pool, or other organization of insurers who engages in joint underwriting or joint reinsurance and who is subject to examination by the insurance commissioner or other appropriate officer of the state in which the manager's principal business office is located.

(7) "Person" means an individual, corporation, partnership, association, or other private legal entity.

(8) "Qualified United States financial institution" means an institution that is:

(A) organized or, in the case of a United States office of a foreign banking organization, licensed under the laws of the United States or any state of the United States; and

(B) regulated, supervised, and examined by United States federal or state authorities who have regulatory authority over banks and trust companies.

(9) "Reinsurance" means a written contract that transfers for consideration an insurance risk of loss between insurers and indemnifies a ceding insurer against all or part of the loss that the latter may sustain under an insurance policy it has issued or assumed, but does not mean a contract for the bulk sale, transfer, and assumption of direct insurance policy liability to the insureds.

(10) "Reinsurance intermediary" means a broker or manager.

(11) "Reinsurer" means an insurer with authority to assume reinsurance, including retrocessions. The term includes a retrocessionaire.

### License required;  licensing procedures

Sec. 3.  (a) A person may not act as a broker as defined in Section 2(2) of this article in this state for an insurer engaged in the business of insurance or reinsurance in this state unless the person is appropriately licensed in this state.  A person may not act as a manager

**Art. 21.07-7**                    THE INSURANCE CODE OF 1951
                                                    Title 1

as defined in Section 2(6) of this article for an insurer engaged in the business of insurance or reinsurance in this state unless the person is appropriately licensed in this state.

(b)(1) The commissioner may require a reinsurance intermediary to:

(A) file a bond with the commissioner for the protection of all insurers represented; or

(B) maintain an errors and omissions policy.

(2) The issuer of the bond or the errors and omissions policy must be acceptable to the commissioner and the bond or the policy shall be in an amount determined by the commissioner to be customary and adequate under the circumstances.

(c) The commissioner shall issue a reinsurance intermediary license to a person who has complied with the requirements of this article. A license issued to a firm or association authorizes all of the members of the firm or association and any designated employees to act as reinsurance intermediaries under the license, and all of those persons must be named in the application and any supplements to the application. A license issued to a corporation authorizes all of the officers and any designated employees and directors of the corporation to act as reinsurance intermediaries on behalf of the corporation, and all of those persons must be named in the application and any supplements to the application.

(d) If the applicant for a reinsurance intermediary license is not a resident of this state, the applicant, as a condition precedent to receiving or holding a license, must designate the commissioner as agent for service of process in the manner, and with the same legal effect, as provided by Article 1.36 of this code, for designation of service of process on unauthorized insurers. The applicant must also furnish the commissioner with the name and address of a resident of this state on whom notices or orders of the commissioner or process affecting the nonresident reinsurance intermediary may be served. A license holder who is a nonresident shall notify the commissioner in writing of each change in the license holder's designated agent for service of process not later than the 30th day after the date on which the license holder makes the change. Such a change does not take effect until acknowledged by the commissioner.

(e) The department may discipline a license holder or deny an application under Section 5, Article 21.01-2, of this code if it determines that the applicant for or holder of a license, or any person who would be authorized to act on behalf of the applicant or the license holder under Subsection (c) of this section has:

(1) wilfully violated or participated in the violation of this article or any of the insurance laws of this state;

(2) intentionally made a material misstatement in the license application;

(3) obtained or attempted to obtain the license by fraud or misrepresentation;

(4) misappropriated, converted to his own use, or illegally withheld money required to be held in a fiduciary capacity;

(5) materially misrepresented the terms or effect of any contract of insurance or reinsurance, or engaged in any fraudulent transaction; or

(6) been convicted of a felony or of any misdemeanor of which criminal fraud is an essential element.

(f) The commissioner may establish qualifications for licensing reinsurance intermediaries as reasonably necessary to fulfill the requirements of this article.

(g) An application for a reinsurance intermediary license may not be accepted unless the application shows on its face that the person applying has been engaged for at least three years in the business of insurance or reinsurance.

(h) A person who holds a manager license is not required to obtain a broker license but must meet all the requirements of Section 5 of this article to act as a broker.

(i) Original reinsurance intermediary licenses are valid for two years from the date of issuance and may be renewed for two-year periods. The commissioner may adopt standards for the renewal of reinsurance intermediary licenses that are consistent with the terms of this article.

(j), (k) Repealed by Acts 1993, 73rd Leg., ch. 685, § 12.51(15), eff. Sept. 1, 1993.

190

THE INSURANCE CODE OF 1951
Title 1

**Art. 21.07–7**

### Fees and charges

Sec. 4. (a) The board shall collect a nonrefundable licensing fee from each reinsurance intermediary who applies for an original or renewal license in this state. The fees shall be deposited in the state treasury to the credit of the State Board of Insurance operating fund and shall be used to enforce this article.

(b) The board shall set the fees for original, renewal, and reciprocal licenses in amounts that are reasonable and necessary to cover the costs of the licensing program.

(c) Expenses related to an examination conducted under Section 9 of this article may be charged to the person examined in accordance with Article 1.16 of this code.

### Requirements relating to brokers

Sec. 5. (a) A transaction between a broker and an insurer represented by the broker may be entered into only under a written contract, executed by a responsible officer of both the insurer and the broker, that specifies the responsibilities of each party. At a minimum, the contract must contain the following provisions:

(1) the insurer may terminate the broker's authority in writing at any time;

(2) the broker shall render periodic accounts to the insurer at least quarterly that accurately detail all material transactions, including information necessary to support all commissions, charges, and other fees received by or owing to the broker, and shall remit all funds due to the insurer not later than the 30th day after the date of receipt;

(3) the broker must hold all funds collected in a fiduciary capacity for the insurer's account in a bank that is a qualified United States financial institution;

(4) if premiums or contributions are collected on behalf of or for more than one insurer, the broker shall:

(A) maintain records to identify the ownership interest of each insurer of such funds held in a fiduciary capacity; and

(B) furnish to the insurer on request copies of the records relating to deposits and withdrawals on behalf of or for that insurer;

(5) the requirements of Subdivision (4) of this subsection are in addition to requirements under any other federal or state law;

(6) a statement that the broker will comply with Subsections (c) and (d) of this section;

(7) a statement that the broker will comply with the written standards established by the insurer for the cession or retrocession of risks ceded;

(8) a statement that the broker will disclose to the insurer any relationship with a reinsurer to which business will be ceded or retroceded;

(9) a statement that the broker will provide annually an audited statement of the broker's financial condition, prepared by a certified public accountant, to each insurer with whom the broker transacts business; and

(10) identification of the following:

(A) the name and address of the insurer;

(B) the kinds of insurance to be reinsured or retroceded;

(C) the type of reinsurance or retrocessions;

(D) the limits of coverage; and

(E) the effective date and expiration date of the contract.

(b) In addition to the requirements imposed under Subsection (a) of this section, if a broker places reinsurance on behalf of a licensed ceding insurer with a reinsurer that is not licensed, accredited, or trusteed in this state under Article 3.10 or Article 5.75–1 of this code, unless the ceding insurer releases the broker in writing from the broker's obligations under this subsection, the broker shall exercise due diligence in inquiring into the financial condition of the assuming unauthorized reinsurer and, in connection with that inquiry, disclose the findings to the ceding insurer and make available to the ceding insurer a copy of the current financial statement of the reinsurer.

(c) For at least 10 years after the expiration of each contract of reinsurance transacted by a broker, the broker shall maintain a complete record for each transaction that states:

(1) the type of contract, limits, underwriting restrictions, classes or risks, and territory;

191

(2) the period of coverage, including effective and expiration dates, cancellation provisions, and notice requirements regarding cancellation;

(3) reporting and settlement requirements of balances;

(4) the rate used to compute the reinsurance premium;

(5) the names and addresses of ceding and assuming insurers;

(6) the rates of all reinsurance commissions, including the commissions on any retrocessions handled by the broker;

(7) related correspondence and memoranda;

(8) proof of placement;

(9) details regarding retrocessions handled by the broker, including the identity and addresses of retrocessionaires and the respective percentages of each contract assumed or ceded;

(10) financial records, including premium and loss accounts; and

(11) if the broker procures a reinsurance contract on behalf of a licensed ceding insurer:

(A) written evidence that the assuming insurer has agreed to assume the risk if procured directly from an assuming insurer; or

(B) if placed through a representative of the assuming insurer, other than an employee, written evidence that the reinsurer has delegated binding authority to the representative who has agreed to assume the risk and that the representative is qualified to act as a manager under this article.

(d) Each insurer subject to a contract of reinsurance transacted by a broker is entitled to access to the information maintained by the broker under Subsection (c) of this section and may copy and audit all accounts and records maintained by the broker related to the insurer's business. The broker shall maintain the information in a form usable by the insurer.

(e) A person may not be employed by an insurer and a broker with whom the insurer transacts business unless the broker is under common control with the insurer and is subject to Article 21.49–1 of this code.

### Requirements relating to managers

Sec. 6. (a) A transaction between a manager and an insurer represented by the manager may be entered into only under a written contract, executed by a responsible officer of both the insurer and the manager, that specifies the responsibilities of each party. The contract must be approved by the insurer's board of directors or attorney in fact. Not later than the 30th day before the insurer assumes or cedes business through the manager, a copy of the executed contract must be filed with the commissioner for approval. At a minimum, the contract must incorporate the requirements of this section.

(b) The insurer may terminate the contract for cause on written notice to the manager by certified mail, return receipt requested, and may suspend the authority of the manager to assume or cede business during the pendency of any dispute regarding the cause for termination.

(c) The manager shall render periodic accounts to the insurer at least quarterly that accurately detail all material transactions, including information necessary to support all commissions, charges, and other fees received by or owing to the manager, and shall remit all funds due under the contract to the insurer on a monthly basis or more often.

(d) The manager must hold all funds collected for the insurer's account in a fiduciary capacity in a bank that is a qualified United States financial institution. The manager may not retain more than three months of estimated claims payments and allocated loss adjustment expenses.

(e) In addition to requirements under any other state or federal law, if premiums or contributions are collected on behalf of or for more than one insurer, the manager shall:

(1) keep a separate account for each insurer;

(2) obtain and maintain copies of the records for each account; and

(3) furnish to the insurer, on request, copies of the records relating to deposits and withdrawals on behalf of or for that insurer.

192

(f) For at least 10 years after the expiration of each contract of reinsurance transacted by the manager, the manager shall maintain a complete record for each transaction that states:

(1) the type of contract, limits, underwriting restrictions, classes or risks, and territory;

(2) the period of coverage, including effective and expiration dates, cancellation provisions and notice requirements regarding cancellation, and disposition of outstanding reserves on covered risks;

(3) reporting and settlement requirements of balances;

(4) the rate used to compute the reinsurance premium;

(5) the names and addresses of ceding and assuming insurers;

(6) the rates of all reinsurance commissions, including the commissions on any retrocessions handled by the manager;

(7) related correspondence and memoranda;

(8) proof of placement;

(9) details regarding retrocessions handled by the manager, as permitted by Section 8(c) of this article, including the identity and addresses of retrocessionaires and the respective percentages of each contract assumed;

(10) financial records, including premium and loss accounts; and

(11) if the manager places a reinsurance contract on behalf of a ceding insurer:

(A) written evidence that the assuming insurer has agreed to assume the risk if procured directly from an assuming insurer; or

(B) if placed through a representative of the assuming insurer, other than an employee, written evidence that the reinsurer has delegated binding authority to the representative who has agreed to assume the risk and that the representative is qualified to act as a manager under this article.

(g) The insurer is entitled to access to the information maintained by the manager in a form usable by the insurer and may copy all accounts and records maintained by the manager related to the insurer's business.

(h) The contract may not be assigned in whole or in part by the manager.

(i) The manager shall comply with the written underwriting and rating standards established by the insurer for the acceptance, rejection, or cession of all risks.

(j) The contract must identify the rates, terms, and purposes of commissions, charges, and other fees that the manager may assess the insurer.

(k) If the contract permits the manager to settle claims on behalf of the insurer:

(1) all claims must be reported to the insurer quarterly or more often;

(2) the manager shall send a copy of the claim file to the insurer at the insurer's request or as soon as it is known that the claim:

(A) has the potential to exceed the lesser of an amount determined by the commissioner or the limit set by the insurer;

(B) involves a coverage dispute;

(C) may exceed the manager's claims settlement authority;

(D) is open for more than six months; or

(E) is closed by payment of the lesser of an amount set by the commissioner or an amount set by the insurer;

(3) all claim files are the joint property of the insurer and manager; however, on an order of liquidation of the insurer those files become the sole property of the insurer or the insurer's estate; the manager is entitled to reasonable access to the claim files and may copy the files on a timely basis; and

(4) any settlement authority granted to the manager may be terminated for cause on the insurer's written notice by certified mail, return receipt requested, to the manager or on the termination of the contract; the insurer may suspend the settlement authority during the pendency of the dispute regarding the cause of termination.

(l) If the contract provides for a sharing of interim profits by the manager, interim profits may not be paid until one year after the end of each underwriting period for property business and five years after the end of each underwriting period for casualty business, or the

193

**Art. 21.07–7**                                          **THE INSURANCE CODE OF 1951**
                                                                              **Title 1**

expiration of the period set by the executive director for those or other specified lines of insurance, and not until the adequacy of reserves on remaining claims has been verified under Subsection (q) of this section.

(m) The manager shall provide annually to each insurer and reinsurer with whom the manager transacts business an audited statement of the manager's financial condition that is prepared by an independent certified public accountant.

(n) The insurer shall conduct semiannually or more often an on-site review of the underwriting and claims processing operations of the manager.

(o) The manager shall disclose to the insurer any relationship the manager has with any other insurer before ceding or assuming any business on behalf of the insurer under this contract.

(p) The acts of the manager shall be considered the acts of the insurer on whose behalf the manager is acting.

(q) If a manager establishes loss reserves, the manager shall provide annually, or more frequently as required by law, an opinion from an actuary attesting to the adequacy of the loss reserves established for losses incurred and outstanding on business produced by the manager. The actuary's opinion is in addition to any other required loss reserve certification.

(r) If a manager places reinsurance on behalf of a licensed ceding insurer with a reinsurer that is not licensed, accredited, or trusteed in this state under Article 3.10 or Article 5.75–1 of this code, the manager shall exercise due diligence in inquiring into the financial condition of the assuming unauthorized reinsurer and, in connection with that inquiry, disclose the findings to the ceding insurer and make available to the ceding insurer a copy of the current financial statement of the reinsurer. However, the ceding insurer may assume the obligation under this subsection by releasing the intermediary in writing from the obligations imposed under this subsection.

### Prohibited acts

Sec. 7. (a) A person may not act as a manager or broker on behalf of any insurer without holding a license, if required, under this article.

(b) A reinsurance intermediary acting as a manager may not:

(1) bind retrocessions on behalf of the insurer, except that the manager may bind facultative retrocessions under obligatory retrocessional agreements if the contract with the insurer contains reinsurance underwriting guidelines for those retrocessions that include a list of reinsurers with whom those automatic agreements are in effect and, for each reinsurer, the coverages and amounts or percentages that may be reinsured and commission schedules;

(2) commit the insurer to participate in reinsurance syndicates;

(3) appoint or contract with any broker without assuring that the broker is qualified to act as a manager under this article;

(4) without prior approval of the insurer, pay or commit the insurer to pay a claim that exceeds the lesser of an amount specified by the insurer or one percent of the insurer's policyholders' surplus as of December 31 of the last complete calendar year; or

(5) collect any payment from a retrocessionaire or commit the insurer to any claim settlement with a retrocessionaire without prior approval of the insurer and, if prior approval is given, a report must be forwarded to the reinsurer under the requirements of Section 6(c) of this article.

(c) A person may not be employed by an insurer and a manager with whom the insurer transacts business unless the manager is under common control with the insurer and is subject to Article 21.49–1 of this code.

### Duties of insurers

Sec. 8. (a) Except as otherwise provided by this subsection, an insurer may not engage the services of any person to act as a broker or manager on the insurer's behalf unless the person is licensed if required by Section 3(a) of this article. An insurer, an employee, attorney, or actuary of an insurer, may negotiate and obtain reinsurance for that insurer without holding a license as a broker or a manager or being required to use the services of a broker or manager if that insurer, employee, attorney, or actuary does not otherwise hold

194

1951
itle 1

es of
.nder

i the
1at is

' the

i any
· this

f the

more
f the
y the
ation.

surer
–1 of
on of
? the
rrent
ation
0osed

thout

bind
h the
a list
r, the
Iules;

:o act

that
1rer's

claim
roval
1 6(c)

surer
nd is

1gage
s the
oyee,
surer
s of a
hold

THE INSURANCE CODE OF 1951
Title 1

**Art. 21.07–7**

himself out as a broker or manager or perform the duties or provide the services of a broker or manager.

(b) The insurer annually shall obtain a copy of audited statements of the financial condition of each manager that the insurer engages. The statements must be prepared by an independent certified public accountant and must be in a form acceptable to the commissioner.

(c) Binding authority for all retrocessional contracts or participation in reinsurance syndicates rests with an officer of the insurer. That officer may not be affiliated with the manager acting for the insurer.

(d) Not later than the 30th day after the date of termination by an insurer of a manager's contract, the insurer shall provide written notification of the termination, including the reasons for termination, to the commissioner. The written notification is a privileged communication and is not subject to public disclosure or admission in evidence in any proceeding.

(e) An insurer may not appoint to its board of directors any officer, director, employee, controlling shareholder, or submanager of a manager acting for that insurer. This subsection does not apply to a relationship governed by Article 21.49–1 of this code.

### Examination authority

Sec. 9. (a) A reinsurance intermediary is subject to examination by the commissioner. The commissioner is entitled to access to all books, bank accounts, and records of the reinsurance intermediary, which must be maintained in a form usable to the commissioner.

(b) A manager may be examined as if the manager were an insurer.

(c) A reinsurance intermediary shall submit to an examination of its financial condition and its compliance with the laws of this state affecting the conduct of its business. The commissioner, one or more commissioned examiners, a certified public accountant, or other person qualified to perform the examination shall conduct the examination as the commissioner considers necessary. The expense of the examination shall be paid by the examined reinsurance intermediary and shall be set in an amount the commissioner certifies as just and reasonable.

### Penalties and liabilities

Sec. 10. (a) If, after notice and hearing as provided in this code, the commissioner determines that a reinsurance intermediary, insurer, or reinsurer has violated this article, the commissioner may impose and enforce any sanction authorized by law against the violator, including the penalties imposed under Articles 1.10 and 1.10A of this code. If a nonlicensed reinsurance intermediary violates this article, the commissioner may impose and enforce any sanctions authorized by law against the nonlicensed reinsurance intermediary, including the penalties imposed under Article 1.14–1 of this code.

(b) Appeal from a final decision by the commissioner may be made to a district court in Travis County. Review of the commissioner's decision by the district court is subject to the substantial evidence rule.

(c) This section does not affect the right of the commissioner to impose any other penalties authorized by law.

(d) This article does not limit or restrict the rights of policyholders, claimants, creditors, or other third parties or confer any additional rights on those persons.

### Rules

Sec. 11. The board may adopt reasonable rules as necessary to implement this article.

Added by Acts 1991, 72nd Leg., ch. 242, § 3.03, eff. Sept. 1, 1991. Sec. 3(e) amended by Acts 1993, 73rd Leg., ch. 685, § 12.38, eff. Sept. 1, 1993; Sec. 3(j), (k) repealed by Acts 1993, 73rd Leg., ch. 685, § 12.51(15), eff. Sept. 1, 1993.

### Historical and Statutory Notes

Section 13.03 of Acts 1991, 72nd Leg., ch. 242 provides:

"(a) Except as provided by Subsection (b) of this section, the Reinsurance Intermediary Act (Article