CIVIL ACTION NO. 003-047

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

AUG 1 5 2003

Michael N. Milby
Clerk of Court

San Benito Consolidated Independent School District
*Plaintiff*

v.

Companion Life Insurance Company,
Managed Benefits Administrator and Insurance Consultants, Inc.,
J. Allan Hall & Associates, Inc.,
And MBA of Wyoming, Inc.
*Defendants*

PLAINTIFF SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT'S
RESPONSE TO DEFENDANT J. ALLAN HALL'S MOTION FOR SUMMARY JUDGMENT

Stephen E. Walraven
State Bar No.  20796800
SHADDOX, COMPERE, WALRAVEN & GOOD, P.C.
1250 N.E. Loop 410, Suite 725
San Antonio, Texas 78209
Telephone: 210/822-2018
FAX: 210/822-4068
ATTORNEYS FOR PLAINTIFF

## IDENTITY OF PARTIES AND COUNSEL

**PLAINTIFF:**
San Benito Consolidated
     Independent School District

**ATTORNEYS FOR PLAINTIFF:**
Steven E. Walraven
Otto S. Good
SHADDOX, COMPERE, WALRAVEN &
     GOOD, P.C.

Celeste Guerra
LAW OFFICES OF RENE RAMIREZ

**DEFENDANTS:**
Companion Life Insurance Co.

**ATTORNEYS FOR DEFENDANTS:**
Shelby J. Bush
PIPER RUDNICK, L.L.P.

Managed Benefits Administrator
     and Insurance Consultants, Inc.

Cindy A. Garcia
THE GARCIA LAW FIRM, P.C.

J. Allan Hall & Associates, Inc.

Roberta J. Hegland
Joseph A. Stallone
BRACEWELL & PATTERSON, L.L.P.

MBA of Wyoming, Inc.

Cindy A. Garcia
THE GARCIA LAW FIRM, P.C.

# TABLE OF CONTENTS

Page

I.     STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING . . . . . . . . . . . . . . . . . . . . . 1

II.    SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,3

III.   STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT . . . . . . . . . . . . . . . . . . . . . 3

IV.    SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,4

V.     BACKGROUND FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-6

VI.    ARGUMENTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       A.     Is this Reinsurance? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       B.     Immunity from Tort Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       C.     Hall's Liability in Tort as an Agent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       D.     Judicial Admissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

VII.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

VIII.  CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IX.    EXHIBITS

       Oral Deposition of Don Merrill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit "A"

       *Propath Services, L.L.P. v. Quest Diagnostics Clinical Laboratories, Inc.*
              2002 WL 535056 (N.D.Tex.-April 9, 2002) . . . . . . . . . . . . . . . . . . . Exhibit "B"

## TABLE OF CITATIONS

*Adickes v. S.H. Kress & Co.,*
    398 U.S. 144 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Bank One, Texas, N.A. v. Prudential Ins. Co. of Am.,*
    939 F.Supp.533 (N.D. Tex. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Barrientos v. Reliance Standard Life Ins. Co.,*
    911 F.2d 1115 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Board of Ins. Commissioners v. Texas Employers Ins. Assn.,*
    189 S.W.2d 47 (Tex.Civ.App.–Austin 1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Bonhiver v. Affiliated Companies of America,*
    447 F.2d 108 (5th Cir. 1971), *Affirmed* 192 S.W.2d 149 . . . . . . . . . . . . . . . . . . . . . . . 7

*Borel v. United States Cas. Co.,*
    233 F.2d 385 (5th Cir. 1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Boze v. Branstetter,*
    912 F.2d 801 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*FMC Corp. v. Holliday,*
    498 U.S. 52 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Fontenot v. Upjohn Co.,*
    780 F.2d 1190 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*French v. State Farm Ins. Co.,*
    156 F.R.D. 159 (S.D.Tex. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Griffin v. Superior Ins. Co.,*
    338 S.W.2d 415 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
*Haines v. National Union Fire Ins. Co. of Pittsburgh, Pennsylvania,*
    812 F.Supp. 93 (S.D.Tex. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Heritage Bank v. Redcom Laboratories, Inc.,*
    250 F.3d 319 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Affiliated Food Stores, Inc.,*
    134 B.R. 215 (Bankr.N.D.Tx. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Leonard v. Abbott,*
    366 S.W.2d 925 (Tex. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Light v. Wilson,*
    663 S.W.2d 813 (Tex. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Propath Services, L.L.P. v. Quest Diagnostics Clinical Laboratories, Inc.,*
    2002 WL 535056 (N.D.Tex. - April 9, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*State & County Mut. Fire Ins. Co. v. Miller,*
    52 S.W.3d 693 (Tex. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,8

*State Farm Fire & Casualty Co. v. Gros,*
    818 S.W.2d 908 (Tex.App.–Austin 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Tarrant v. Walker,*
    166 S.W.2d 900 (Tex.1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Thomas v. Ohio Cas. Group of Ins. Cos.,*
    3 F.Supp.2d 764 (S.D.Tex. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States Steel Corp. v. Fiberglass Specialties, Inc.,*
    638 S.W.2d 950 (Tex.App.–Corpus Christi 1982, no writ) . . . . . . . . . . . . . . . . . . . . . . . 9

*White v. Arco/Polymers, Inc.,*
    720 F.2d 1391 (5th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## Statutes

TEX. INS. CODE Art. 21.07-7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

TEX. INS. CODE Art. 21.07-7 Sec. 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

TEX. INS. CODE Art. 21.07-7 Sec. 2(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

TEX. INS. CODE Art. 21.07-7 Sec. 2(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

TEX. INS. CODE Art. 21.07-7 Sec. 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

TEX. INS. CODE Art. 3.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

TEX. INS. CODE Art. 3.10(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

29 U.S.C. §1144(b)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SAN BENITO CONSOLIDATED          §
INDEPENDENT SCHOOL DISTRICT      §
                                 §
VS.                              §          CIVIL ACTION NO. B-03-047
                                 §
COMPANION LIFE INSURANCE COMPANY,§
MANAGED BENEFITS ADMINISTRATOR   §
AND INSURANCE CONSULTANTS, INC., §
J. ALLAN HALL & ASSOCIATES, INC.,§
and MBA OF WYOMING, INC.         §

---

**PLAINTIFF'S RESPONSE TO MOTION FOR
SUMMARY JUDGMENT OF DEFENDANT,
J. ALLAN HALL & ASSOCIATES, INC.**

---

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Plaintiff, **SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL
DISTRICT**, and files this its Response to Defendant, J. Allan Hall & Associates, Inc.'s, Motion for
Summary Judgment, and for its Response, would show unto this Court as follows:

**I.**

**STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS**

San Benito Consolidated Independent School District (hereinafter sometimes referred to as
the "School District"), brings this action seeking to recover benefits under a stop-loss health
insurance policy it purchased from Companion Life Insurance Company. The School District is self-
insured for employees' health care, up to $75,000 per employee per year. The Companion Life
policy provides coverage when an employee's health care costs exceed $75,000. Four of the School
District's employees, or their insured dependents, did incur health care expenses during the 2000-
2001 policy year, in excess of $75,000. Those sums which the School District believes to be covered
under the stop-loss policy total approximately $900,000.

Companion Life Insurance Company is the insurance company named on the policy.
However, virtually all of the functions generally performed by insurance companies are handled by

J. Allan Hall & Associates, Inc., for Companion Life. J. Allan Hall markets the program, accepts applications, performs the underwriting, makes proposals for issuing the policy, receives the premiums, issues the policies and processes and pays the claims. While Companion Life has some oversight role, its participation in the process is fairly minimal.

Companion Life and J. Allan Hall have denied the claims at issue in this case, saying that the procedure for paying the health care providers was too slow or too late. MBA of Wyoming, Inc., and/or Managed Benefits Administrator & Insurance Consultants, Inc. (hereinafter collectively referred to as "MBA"), was both the agent responsible for the purchase of the stop-loss policy from J. Allan Hall and Companion Life, and was also responsible for processing the claims payments to the health care providers. According to Companion Life and J. Allan Hall, they are entitled to deny these claims, based on the mishandling of the payments by MBA. On the other hand, MBA has testified that its handling of the claims was entirely consistent with the promises, representations, and standard course of dealing with J. Allan Hall and Companion Life. The School District would like for whoever is at fault to compensate it for its losses.

This case is currently in the middle of discovery. Documents have been exchanged, interrogatories answers, and most of the depositions of key party witnesses have been taken. Experts have not yet been identified. Discovery is not scheduled to be completed until December 15, 2003; and trial is set for April 5, 2004.

## II.

### SUMMARY JUDGMENT STANDARD

In deciding a motion for summary judgment, the Court must determine whether there is any genuine issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). A genuine factual dispute requires more than a mere scintilla of evidence. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). A factual dispute is material only if it might affect the outcome of the suit under governing law. *Id.* at 247. The moving party has the burden of showing there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1195 (5th Cir. 1986). The evidence is reviewed with all inferences

drawn in favor of the party opposing the motion. *See Boze v. Branstetter,* 912 F.2d 801, 804 (5th Cir.

1990). Once the moving party has met its burden of proof, the party opposing summary judgment

has the burden of setting forth specific facts that establish a genuine issue of material fact remains

for trial. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

## III.

### STATEMENT OF THE ISSUES TO BE RULE UPON

J. Allan Hall asserts four proposition in support of its Motion for Summary Judgment, which

require a ruling by the Court. Those four propositions are as follows:

A.   The stop-loss policy at issue in this case should be considered "reinsurance," as that term is defined and used in the TEXAS INSURANCE CODE.

B.   Parties providing "reinsurance," including insurance companies like Companion Life and managing general agents like J. Allan Hall are immune from all tort liability under the TEXAS INSURANCE CODE.

C.   J. Allan Hall, as the agent for Companion Life, cannot be liable in contract on the stop-loss insurance policy. Only the principal, Companion Life, is liable for any breaches of contract.

D.   The School District has made judicial admissions which negate the validity of a contract claim.

Hall asserts that since it can be liable neither in tort nor in contract, that it is entitled to

summary judgment.

## IV.

### SUMMARY OF THE ARGUMENT

The School District believes that J. Allan Hall is in error on the first two and fourth

propositions set forth above, and while it agrees that the third proposition sets forth an accurate

statement of law, does not believe the proposition has any applicability to the causes of action

against J. Allan Hall in this case. In summary, San Benito Consolidated Independent School District

responds as follows:

A.   Reinsurance is specifically defined in the TEXAS INSURANCE CODE. That definition provides that reinsurance is an agreement between two insurance companies, or businesses organized for the purposes of selling insurance. Since San Benito Consolidated Independent School District is not an insurance company, and has not been organized for the purpose of providing insurance, agreements with the School District do not qualify as reinsurance under the TEXAS INSURANCE

CODE. J. Allan Hall is not an insurance company either.

B.      The TEXAS INSURANCE CODE does not immunize reinsurers from all
        tort liability. Reinsurers, like other insurers, or other businesses,
        individuals, and even the State of Texas itself, has some liability in
        tort. The only case construing a provision similar to the statute relied
        on by Hall (which is Art. 3.10(h) of the TEXAS INSURANCE CODE),
        expressly found that the statute did not bar tort actions for
        misrepresentations, the very claims being brought against J. Allan
        Hall in this case. *State & County Mutual Fire Ins. Co. v. Miller*, 52
        S.W.3d 693 (Tex. 2001) (construing a similarly worded provision of
        the TEXAS INSURANCE CODE relating to automobile insurance.) There
        is no authority that reinsurers can freely commit torts in Texas
        without incurring liability.

C.      The School District agrees that its contract claims on the stop-loss
        insurance are with the named party to the contract, Companion Life.
        Plaintiff is not seeking contract relief from J. Allan Hall. As
        mentioned above, the claims against J. Allan Hall are based on its
        misrepresentations of the insurance policy and the procedures
        required to obtain payments under the policy made by Mr. J. Allan
        Hall, himself, to MBA.

D.      The School District has alleged that MBA was negligent in placing
        stop-loss insurance for the policy year following the insurance policy
        at issue with J. Allan Hall and Companion Life, the 2001-2002 policy
        year. The School District alleges that such negligence has resulted in
        certain claims not being paid, and that had the coverage been properly
        placed it would have been overlapping coverage with the Companion
        Life policy. An allegation that a second policy provides coverage, is
        not an admission that the first policy does not. Two insurance polices
        often are found to cover the same loss or claim. These allegations are
        not any type of admission that there is no contract claim against
        Companion Life, and certainly do not qualify with the required
        specificity as being judicial admissions. Since Plaintiff has requested
        leave to amend, the pleading in which these alleged admissions
        occurred would be a superseded pleading, and allegations in the
        superseded pleading also fail to qualify as judicial admissions.

In summary, San Benito Consolidated Independent School District believes that J. Allan Hall

has mis-characterized its own and Companion Life's status as reinsurers under the TEXAS

INSURANCE CODE, has misconstrued the statute in claiming some grant of absolute tort immunity,

has misrepresented the nature of the claims against it as lying in contract, rather than tort, and has

misapplied the law of judicial admissions. The School District prays that J. Allan Hall's Motion for

Summary Judgment be in all things denied.

## V.

### BACKGROUND FACTS

The School District, like many employers, provides its employees with health care benefits.

Rather than purchasing traditional health care insurance from an insurance company, the School District has, at all relevant times, has provided the first $75,000 in benefits for each employee and dependent from its own funds. To administer this program, the School District retained the services of a business that specializes in providing such services, MBA of Wyoming, Inc.[1] MBA is responsible for receiving the medical bills directly from doctors, hospitals and other health care providers, and writing the checks to pay those bills. MBA provides regular reports to the School District on the amount of checks being written, and the School District is responsible for making sure that the checking account is adequately funded. At all times, the School District has adequately funded the account, and all checks have been honored.

For the larger claims, that is, claims above the $75,000 per employee limit, the School District purchased insurance. In addition to its other services, MBA was responsible for completing applications and obtaining bids from insurance companies for this insurance, and was also responsible for reporting and submitting claims for this insurance. This insurance has been referred to, at various times and by various people, as "stop-loss insurance," "excess insurance," "high-deductible health insurance," and, by the Defendant, J. Allan Hall & Associates, Inc., (hereinafter referred to as "Hall"), and others, as "reinsurance." The insurance company on the risk for this insurance is Companion Life Insurance Company. Hall is its managing general agent or managing general underwriter who performs most of the functions in connection with this insurance. Hall receives applications, performs the underwriting on the policies, makes proposals to insureds, issues the policies, and processes and pays the claims under this insurance policy. Almost all of Hall's business consists of performing these functions on behalf of Companion Life.

This lawsuit arises because Hall and Companion Life have failed to pay approximately $900,000 in claims under this insurance program. MBA has testified that these claims are owed and

---

[1]According to the deposition testimony of Mr. Don Merrill, the Executive Vice President of MBA of Wyoming, Inc., MBA of Wyoming, Inc., is a holding company, which has certain licenses authorizing it to do business. Most of the activities were actually performed by another related corporation, called Managed Benefits Administrator and Consultants, Inc. MBAICI was formed to handle the specific accounts of Mr. Merrill in the Salt Lake City branch office of MBA of Wyoming, Inc. *See Merrill deposition*, p.9, L.13-p.11, L.7. (The deposition of Don Merrill taken on July 21, 2003 is attached hereto as Exhibit "A"). The San Benito School District account is one of the accounts handled by MBAICI. For the purposes of this Response, MBA of Wyoming, Inc., and MBAICI will be collectively referred to as MBA.

payable by Hall and Companion Life. Hall has taken the position that the claims are not owed because of the way the claims were handled and/or mishandled by MBA. The School District seeks the recovery of those sums which it expected would be covered by the insurance program put together by MBA, Hall and Companion Life.

## VI.

### ARGUMENT AND AUTHORITIES

### A. IS THIS REINSURANCE?

Hall traveled far and wide to find a number of courts, in a number of other jurisdictions, which have characterized similar insurance agreements as "reinsurance." None of those cases construe Texas statutes, and in most of them, the characterizations of the agreement as "reinsurance" is irrelevant to the outcome. However, one need not wander nearly so far to find the applicable definition of reinsurance: the TEXAS INSURANCE CODE provides its own definition of reinsurance. The TEXAS INSURANCE CODE, the very statute on which Hall seeks to rely, defines reinsurance. Article 21.07-7 of the TEXAS INSURANCE CODE, contains the following definition:

> "Reinsurance" means a written contract that transfers for consideration an insurance risk of loss between insurers and indemnifies a ceding insurer against all or part of the loss that the latter may sustain under an insurance policy issued or assumed, but does not mean a contract for the bulk sale, transfer, and assumption of direct insurance policy liability to the insureds.

> "Insurer" means a commercially domiciled insurer or other person legally organized in this State to do business as an insurance company,...".

Article 21.07-7, Section 2(9) and (5), TEXAS INSURANCE CODE. Since the School District is not a "commercially domiciled insurer" or "other person legally organized in this State to do business as an insurance company," it does not qualify as an insurer under this statute. Since "reinsurance" is a contract between "insurers," and the School District is not in business as an insurance company, no contract with the School District could be "reinsurance" under this statute. 29 U.S.C. § 1144(b)(2)(b); *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990); *Barrientos v. Reliance Standard Life Ins. Co.*, 911 F.2d 1115, 1118 (5th Cir. 1990, *cert. denied*. Further, since the School District has not issued a policy of insurance to its employees, having Companion Life and Hall pay for health care above $75,000 would also not qualify as "reinsurance" under this statute.

The Texas cases cited by Hall are entirely consistent with the statutory definition of

reinsurance consisting as agreement between two insurance companies; and those cases contradict Hall's assertion to the contrary. In *Bonhiver v. Affiliated Companies of America*, 447 F.2d 108 (5th Cir. 1971), cited by Hall, the dispute was between the receiver for one insurance company, American Allied Insurance Company, and another insurance company, Affiliated. The suit sought to recover unpaid reinsurance premiums for reinsurance coverage never purchased. The party being reinsured was an insurance company, not a school district or other employer with self-funded health insurance claims. *Id.* at 110. A footnote in the decision references "testimony" to the effect that stop-loss insurance is similar to reinsurance, but the court certainly makes no such finding nor holding. *Id.* at 110.

Similarly, in the case of *Board of Insurance Commissioners v. Texas Employers Insurance Assn.*, 189 S.W.2d 47 (Tex.Civ.App.-Austin 1945), *affirmed* 192 S.W.2d 149, the worker's compensation carrier sought to declare void an order of the Insurance Commissioners concerning the regulation of certain types of worker's compensation policies. The only discussion of reinsurance applied to agreements between two insurance companies. *Id.* at 54. There is no holding classifying stop-loss health insurance as reinsurance for the purposes of the TEXAS INSURANCE CODE, but only notes certain similarities. *Id.*

Hall also relies on *In Re Affiliated Food Stores, Inc.*, 134 B.R.215 (Bankr. N.D.Tex 1991), to support its contention. This case also fails to support the proposition for which it is proffered. In that case the Court states that there is no evidence that a particular party involved had purchased reinsurance <u>or</u> excess stop-loss insurance. *Id.* at 216. Such language implies, by the use of this disjunctive term "or", that stop-loss insurance and reinsurance may be different. It certainly does not find them to be synonymous.

Section 6 of Article 21.07-7 also provides for the licensing of reinsurance managers seeking to do business in Texas. There is no summary judgment evidence that Hall has obtained the appropriate license as a reinsurance manager under the Texas statutes. Clearly, under the TEXAS INSURANCE CODE, the agreement at issue in this case does not qualify as "reinsurance."

## B. IMMUNITY FROM TORT LIABILITY

Hall apparently takes the position that it is free to run red lights, leave slippery substances on the floor, and commit any and every other tort in the State of Texas, and remain immune from all liability. Hall asserts that reinsurers and their agents have an immunity from tort liability afforded to no other person or entity in the State of Texas, not even the State itself. This assertion is nonsense.

As the only authority for this assertion, Hall relies on the case of *State & County Mutual Fire Insurance Co. v. Miller*, 52 S.W.3d 693 (Tex. 2001). This case actually reaches the opposite result. The *State & County Mutual* case (dealing with a different but similar provision of the TEXAS INSURANCE CODE, applicable to automobile insurance), primarily focused on the doctrines of *res judicata* and collateral estoppel, and found that those doctrines barred the litigation of certain contract claims.

> In that case, the Supreme Court also noted:
>
> However, Miller has also asserted extra-contractual claims against State & County Mutual that do not directly involve questions of liability under the policy. Rather, these claims concern State & County Mutual's conduct in issuing the policy and handling Millers claim....whatever the policy actually covers has already been determined by the judgment in the *Windsor* suit: Windsor is responsible for and has already tendered the actual amount owed under the policy. But, whether State & County Mutual misrepresented the policy's coverage or made other misrepresentations has not yet been determined. We express no opinion with regard to the merit of these extra-contractual claims: We simply affirm the Court of Appeals' judgment and remand them to the trial court for consideration in light of this opinion.

*Id.* at 697-698. Directly opposite to Hall's assertion, the Supreme Court of Texas did not hold that extra-contractual or tort claims involving misrepresentation were barred by the statute. Instead that court remanded the case to the trial court for the misrepresentation claims to proceed to trial. *Id.* In this case, the School District has brought similar claims of misrepresentation against Hall and Companion Life, and wishes to proceed with those claims in the trial court, just as the Supreme Court instructed in the *State & County Mutual* opinion. Even if this insurance agreement did qualify as reinsurance, Article 3.10 of the TEXAS INSURANCE CODE, applicable to reinsurance agreements, is not a bar to bringing tort claims for misrepresentation against Hall.

Hall also argues, without citing any authority, that Section 10 of Article 21.07-7 provides it with some sort of tort immunity. That section states that:

"This section does not limit or restrict the rights of the policyholder, claimants, creditors, or other third-parties or confer any additional rights on those persons."

Despite the fact that this statute expressly says that it "does not limit or restrict" any rights, Hall asserts that this language also gives it immunity from tort liability. That assertion is expressly contradicted by the language of the statute, and Hall can find no authority to support such an assertion.

Like all other entities doing business in Texas, Hall and Companion Life are liable for their torts and misrepresentations. There is no exemption from such liability found in the TEXAS INSURANCE CODE.

### C. HALL'S LIABILITY IN TORT AS AN AGENT

Hall correctly asserts that under Texas law, an agent is generally not liable for breaches of contract by its principal if the principal is disclosed. Plaintiff's claims in this case against Hall are not based on contract. On the contrary, Plaintiff's claims against Hall are for its misrepresentations made in connection with the policy. As Mr. Merrill testified in his deposition, Mr. Allan Hall, the President of J. Allan Hall & Associates, Inc., expressly represented that this policy would pay these types of claims under the circumstances present in this case.[2]

It is well established in Texas jurisprudence that an agent is personally liable for its own torts. *See Leonard v. Abbott,* 366 S.W.2d 925, 928 (Tex. 1963); *Tarrant v. Walker,* 166 S.W.2d 900 (Tex.1942); *see also Light v. Wilson,* 663 S.W.2d 813, 815 (Tex. 1984) (Spears, J., concurring opinion). Any affirmative misrepresentations by the agent make that agent individually liable. *Thomas v. Ohio Cas. Group of Ins. Cos.,* 3 F.Supp.2d 764, 766 (S.D.Tex. 1988). The agent's own actions, not his status as an agent determine liability. *Light,* 663 S.W.2d at 815. Courts have reasoned that there is no justification to treat agents differently when they violate the DTPA. *See United States Steel Corp. v. Fiberglass Specialties, Inc.,* 638 S.W.2d 950 (Tex.App.–Corpus Christi 1982, no writ). When an insurance agent misrepresents coverage, the misrepresentation makes the agent personally liable. *See French v. State Farm Ins. Co.,* 156 F.R.D. 159, 162 (S.D.Tex. 1994) (holding an insurance agent may be held liable for misrepresentations to an insured); *Haines v.*

---

[2] *See* Don Merrill's deposition (Exhibit "A") at p.61, L.6; p.66, L.5; p.70, L.13 - p.73, L.2; p.75, L.1-4.

*National Union Fire Ins. Co. of Pittsburgh, Pennsylvania,* 812 F.Supp. 93, 96 (S.D.Tex. 1993) (recognizing an agent may also be held liable for misrepresentations to an insured and for certain deceptive trade practices); *State Farm Fire & Casualty Co. v. Gros,* 818 S.W.2d 908, 913 (Tex.App.–Austin 1991) (allowing insured to bring DTPA suit against insurance agent individually).

Texas law clearly states that an agent is personally liable for his own tortuous acts; therefore, Plaintiff is not precluded from bringing its claims against Defendant Hall for misrepresentation in violation of the Texas Insurance Code and for negligent misrepresentation.

### D. JUDICIAL ADMISSIONS

Hall next argues that because Plaintiff has alleged that MBA was negligent in not purchasing a second policy of insurance, which might have paid some or all of these same benefits, that the School District has admitted that the Companion Life policy does not cover those benefits. It is certainly not unusual for more than one insurance policy to be obligated to pay the same claim, and such an allegation is not an admission that another policy did not owe it.

For a statement in a pleading, or otherwise, to qualify as a judicial admission, it must be "deliberate, clear and unequivocal," and it must be "contrary to a fact essential to the theory of recovery." *See Heritage Bank v. Redcom Laboratories, Inc.,* 250 F.3d 319, 329 (5th Cir. 2001), citing *Griffin v. Superior Insurance Co.,* 338 S.W.2d 415, 419 (1960). *See also Propath Services, L.L.P. v. Quest Diagnostics Clinical Laboratories, Inc.,* 2002 WL 535056 (N.D.Tex. - April 9, 2002). The statements in Plaintiff's Original Petition filed in State Court clearly do not satisfy these requirements: They are not clear and unequivocally contrary to the allegation that Companion Life is obligated to provide the policy benefits promised, consistent with the usual and customary course of dealing in the industry. In addition, statements in superseded pleadings also have no effect as judicial admissions, and Plaintiff has moved (without objection from J. Allan Hall) to amend and file its First Amended Complaint, which will supersede the pleading on which Plaintiff relies. *See White v. Arco/Polymers, Inc.,* 720 F.2d 1391, 1396 (5th Cir. 1983); *Borel v. United States Casualty Company,* 233 F.2d 385, 387 (5th Cir. 1956); and *Bank One, Texas, N.A. v. Prudential Insurance Company of America,* 939 F.Supp.533, 541 (N.D.Tex. 1996).

Typically, health insurance services are rendered at one date, billed at a later date, sent to the

paying entity (in this case MBA) at still a third date, and actually paid on a fourth date. Obviously, some of these dates may fall toward the end of one policy period, while the latter dates may fall at the beginning of the next policy period. Different insurance policies have different terms dealing with which claims are owed under which policy. One issue in this case is the trigger of coverage applicable to Companion Life and to Hall.[3] The School District has never admitted, and Hall points to no admission, that Companion Life does not owe the claims. The School District also claims that MBA was negligent in the renewal of the policy, but that is certainly not a clear and unequivocal admission that Hall or Companion Life have no liability.

## VII.

### CONCLUSION

The TEXAS INSURANCE CODE provides its own careful definition of reinsurance, which clearly does not apply to undisputed facts in this case. However, even if the School District was an insurance company, and the policy issued by Companion Life to the School District qualified as reinsurance, reinsurers and their managers have not been immunized by the Texas Legislature from all tort liability. Under Texas law, both insurance companies and their agents and managers are liable for misrepresentations made by managers and others agents. Plaintiff has certainly made no judicial admissions of non-liability in either its original petition filed in State Court, or in its First Amended Complaint in this Court.

Plaintiff, San Benito Consolidated Independent School District, prays that J. Allan Hall's

---

[3]Hall asserts that the triggering date can be no earlier than the date the check is placed in the mail addressed to the health care provider by MBA. On the other hand, MBA asserts that the key date is much earlier, at the time the bill is sent to MBA. Hall admits that some policies do pay benefits as MBA argues, but denies that this policy falls in that category. The resolution of this particular issue is not before the Court in Hall's Summary Judgment Motion, and probably requires trial.

Motion for Summary Judgment be in all things denied.

Respectfully submitted,

LAW OFFICES OF RENE RAMIREZ
Celeste Guerra
1906 Tesoro
Pharr, Texas 78577
Telephone: 956/783-7880
FAX # 956/783-7884
AND
SHADDOX, COMPERE, WALRAVEN
   & GOOD, P.C.
1250 N. E. Loop 410, Suite 725
San Antonio, Texas 78209
Telephone: 210/822-2018
FAX: 210/822-4068

By:                        
      Stephen E. Walraven
      State Bar No. 20796800
      Otto S. Good
      State Bar No. 08139600
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served on counsel listed below on this ___ day of August, 2003.

_____
STEPHEN E. WALRAVEN
OTTO S. GOOD

**ATTORNEYS FOR DEFENDANT**
**COMPANION LIFE INSURANCE COMPANY**
Mr. Shelby J. Bush
PIPER RUDNICK
1717 Main Street, Suite 4600
Dallas, Texas 75201-4605

**ATTORNEYS FOR DEFENDANT**
**J. ALLAN HALL & ASSOCIATES, INC.**
Ms. Roberta J. Hegland
BRACEWELL & PATTERSON, L.L.P.
2000 One Shoreline Plaza, South Tower
800 North Shoreline Boulevard
Corpus Christi, Texas 78401-3700

**ATTORNEYS FOR DEFENDANTS**
**MBA OF WYOMING, INC., AND MANAGED BENEFITS**
**ADMINISTRATOR AND INSURANCE CONSULTANTS, INC.**
Ms. Cindy A. Garcia
THE GARCIA LAW FIRM, P.C.
201 North 1st Street
Harlingen, Texas 78550

# CONDENSED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, )<br><br>  Plaintiffs, )<br><br>  vs. )<br><br>COMPANION LIFE INSURANCE COMPANY, MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS, INC., J. ALLAN HALL & ASSOCIATES, INC., and MBA OF WYOMING, INC., )<br><br>  Defendants. ) | Deposition of:<br><br>**DON WILLIAM MERRILL**<br><br><br><br><br><br><br><br>Civil Action No.:  B-03-047 |

July 21, 2003 - 9:06 a.m.

Location:  Offices of CitiCourt Reporting
50 S. Main, Suite 830
Salt Lake City, Utah

Reporter:  Vicky McDaniel, RMR
Notary Public in and for the State of Utah



San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

---

SHEET 1  PAGE 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SAN BENITO CONSOLIDATED            )
INDEPENDENT SCHOOL DISTRICT,       )   Deposition of:
                                   )
        Plaintiffs,                )   DON WILLIAM MERRILL
                                   )
    vs.                            )
                                   )
COMPANION LIFE INSURANCE           )
COMPANY, MANAGED BENEFITS          )
ADMINISTRATOR AND INSURANCE        )
CONSULTANTS, INC., J. ALLAN        )
HALL & ASSOCIATES, INC., and       )
MBA OF WYOMING, INC.,              )
                                   )   Civil Action No.:  B-03-047
        Defendants.                )

July 21, 2003 - 9:06 a.m.
Location:  Offices of CitiCourt Reporting
50 S. Main, Suite 830
Salt Lake City, Utah
Reporter:  Vicky McDaniel, RMR
Notary Public in and for the State of Utah

---

PAGE 2

Don William Merrill, 7/21/03          2
1      A P P E A R A N C E S
2  FOR THE PLAINTIFF:
3          STEPHEN E. WALRAVEN, ESQ.
           OTTO S. GOOD, ESQ.
4          SHADDOX, COMPERE, WALRAVEN & GOOD, P.C.
           The North Frost Center
5          1250 N.E. Loop 410, Suite 725
           San Antonio, TX  78209
6          (210) 822-2018
7  FOR DEFENDANTS MBA OF WYOMING, INC., AND MANAGED
   BENEFITS ADMINISTRATOR AND INSURANCE
8  CONSULTANTS, INC.:
9          FRED L. SHUCHART, ESQ.
           MASON, COPLEN, SHUCHART, HUTCHINS
10         & BANKS
           7500 San Felipe, Suite 700
11         Houston, TX  77063
           (713) 785-5595
12
   FOR DEFENDANT COMPANION LIFE INSURANCE COMPANY:
13
           SHELBY J. BUSH, ESQ.
14         PIPER RUDNICK
           1717 Main Street, Suite 4600
15         Dallas, TX  75201-4605
           (214) 743-4500
16
   FOR DEFENDANT J. ALLAN HALL & ASSOCIATES:
17
           ROBERTA J. HEGLAND, ESQ.
18         BRACEWELL & PATTERSON L.L.P.
           2000 One Shoreline Plaza, South Tower
19         800 Shoreline Boulevard
           Corpus Christi, TX  78401-3700
20         (361) 866-7226
21         ALBERT GEORGE, ESQ.
           J. ALLAN HALL & ASSOCIATES, INC.
22         55 Monument Circle, 11th floor
           Indianapolis, IN  46204
23
24  ALSO PRESENT:  Phyllis K. Merrill
25
           CitiCourt, LLC
           (801) 532-3441

---

PAGE 3

Don William Merrill, 7/21/03          3
1                I N D E X
2   WITNESS                                    PAGE
3       DON WILLIAM MERRILL
4   Examination by Mr. Walraven                  5
5   Examination by Mr. Bush                     95
6   Examination by Ms. Hegland                 153
7   Further Examination by Mr. Walraven        219
8   Further Examination by Mr. Bush            226
9   Further Examination by Ms. Hegland         233
10
11                E X H I B I T S
12  NUMBER                                     PAGE
13  27   Administrative Service Agreement
          signed 10/95                          32
14
    28   Administrative Service Agreement
15        signed 10/00                          37
16  29   Memo to file from Don Merrill          64
17  30   Plan Document                         115
18  31   Group Administration Manual           116
19  32   Application to Companion Life for
          Aggregate and Specific Excess Loss
20        Insurance                            121
21  33   Companion Life Insurance contract     126
22  34   9/27/99 letter to Lorenzo Sanchez from
          Mr. Merrill with attachments         128
23
24  35   12/12/01 letter to Don Merrill from
25        Mr. Routh with attachments           137

                CitiCourt, LLC
                (801) 532-3441

---

PAGE 4

Don William Merrill, 7/21/03          4
1            E X H I B I T S   (Continued)
2   NUMBER                                     PAGE
3   36   11/16/00 letter to Lorenzo Sanchez from
          Mr. Merrill                          138
4
    37   11/15/01 letter to Randy Scott from
5         Gloria Boyce and other documents     141
6
    38   1/23/01 letter to Janie Gonzalez from
7         Carolyn Gale                         182
8   39   6/3/99 letter to Don Merrill from
          J. Allan Hall with attachment        192
9
    40   6/3/99 letter to Don Merrill from
10        J. Allan Hall with attachments       196
11  41   9/28/01 letter to Don Merrill from
          Sunmbo Adebayo and other documents   207
12
    42   Revised copies of an application and
13        schedule to Janie Gonzalez from BCS  211
14  43   Letter to Joe Gonzalez from Steve
          Rogers, received Dec 17              213
15
16  44   Pre-Existing Conditions Rider         233
17
18
19
20
21
22
23
24
25
                CitiCourt, LLC
                (801) 532-3441

---

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 5

Don William Merrill, 7/21/03                5

1       P R O C E E D I N G S
2              DON WILLIAM MERRILL,
3    having first been duly sworn to tell the truth,
4         was examined and testified as follows:
5                   EXAMINATION
6    BY MR. WALRAVEN:
7       Q.    Please tell us your full name, sir.
8       A.    Don William Merrill.
9       Q.    And your date and place of birth?
10      A.    4 April 1934, Murray, Utah.
11      Q.    Mr. Merrill, have you ever had your
12   deposition taken before?
13      A.    Yes.
14      Q.    About how many times?
15      A.    Probably once.
16      Q.    And you've had a chance to visit with
17   counsel prior to today?
18      A.    Yes.
19      Q.    You understand you're testifying under oath
20   as much as if you were in court in front of a judge and
21   jury?
22      A.    Yes.
23      Q.    I'd like to ask you a couple or three favors
24   that will hopefully help us get a good record today.
25   First and foremost, if you don't quite hear or
                   CitiCourt, LLC
                   (801) 532-3441

PAGE 7

Don William Merrill, 7/21/03                7

1    audibly with a verbal answer --
2       A.    I'll try to do so.
3       Q.    -- that also will help us.
4             MR. SHUCHART:  We'll be proceeding pursuant
5    to the federal rules?
6             MR. WALRAVEN:  That should be appropriate.
7    Thank you.
8             MR. GOOD:  Not sure we could agree to
9    anything else.
10            MR. WALRAVEN:  You can go tell the judge why
11   we're doing something different.  I'm not.
12      Q.    (BY MR. WALRAVEN)  Tell me about the nature
13   and extent of your formal education.
14      A.    College graduate, University of Utah, BYU in
15   business management.
16      Q.    You went to University of Utah and BYU?
17      A.    Yes.
18      Q.    And did you get a degree from the University
19   of Utah?
20      A.    Yes.
21      Q.    And what was the degree?
22      A.    Bachelor's of science in business management
23   from Brigham Young University.
24      Q.    Is Brigham Young different from the
25   University of Utah?
                   CitiCourt, LLC
                   (801) 532-3441

PAGE 6

Don William Merrill, 7/21/03                6

1    understand any of my questions, please stop me and ask
2    me to repeat it or reword it or whatever you need.
3    Will you do that, please?
4       A.    Yes.
5       Q.    Secondly, many times you're going to know
6    what I'm asking you long before I reach of end of my
7    sentence.  In a normal conversation you'd probably go
8    ahead and start answering.  But today that's going to
9    be two of us talking at once, and that makes it a
10   little hard on the court reporter.  So if you'd please
11   let me go ahead and finish before you start your
12   answer, that will help us out.  Will you do that,
13   please?
14      A.    Yes.
15      Q.    The other side that of same coin is, in some
16   of your answers you may pause for a breath or thought
17   and I may think you're finished and start the next
18   question.  And if you have not completed your answer,
19   let me know that there's more to it so that we do get
20   it all.  You will do that, please?
21      A.    I will.
22      Q.    Thank you.  And then lastly, sometimes
23   shrugs of the shoulders, shakes of the head, uh-huh's
24   and huh-uh's and other gestures are a little difficult
25   to interpret on the machine.  So if you'd answer
                   CitiCourt, LLC
                   (801) 532-3441

PAGE 8

Don William Merrill, 7/21/03                8

1       A.    Yes.
2       Q.    And you got a bachelor of science in
3    business management from the University of Utah?
4       A.    Brigham Young University.
5       Q.    Okay.  Did you get a degree from the
6    University of Utah?
7       A.    No.
8       Q.    You got your degree from Brigham Young?
9       A.    That's right.
10      Q.    In what year?
11      A.    Be about 1960 -- 1960.  Perhaps '59.
12      Q.    Any other college?
13      A.    No.
14      Q.    Any other education related to the field of
15   insurance?
16            MR. SHUCHART:  Objection.
17      A.    No.
18      Q.    No seminars or special courses or anything
19   else?
20      A.    Yes, I've been in -- I've taken a lot of
21   courses over the years in insurance which would be from
22   chartered life underwriter to ongoing seminars and
23   requirements of the state for insurance purposes and
24   licensing.
25      Q.    Are you a chartered life underwriter?
                   CitiCourt, LLC
                   (801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 2 PAGE 9
Don William Merrill, 7/21/03                9

1    A.    No.
2    Q.    Do you hold any other certifications or
3  licenses?
4    A.    No.
5    Q.    Have you ever held any licenses or
6  certifications related to the insurance field?
7    A.    No.
8    Q.    But you've taken courses in connection with
9  those classes --
10   A.    Yes.
11   Q.    -- licensing?  Tell me how you're currently
12 employed.
13   A.    I'm self-employed, MBA of Wyoming, Inc. as
14 executive vice president.
15   Q.    And how long have you been executive vice
16 president of the business MBA of Wyoming?
17   A.    Since 1987.
18   Q.    And do you hold any positions with any other
19 entities, business entities related to insurance?
20   A.    A related corporation I do, yes.
21   Q.    And what is this related corporation?
22   A.    In 2001, in order to split the business
23 between my partner and I, we formed another corporation
24 called Managed Benefit Administrators and held that for
25 the group accounts, while my partner's business was

CitiCourt, LLC
(801) 532-3441

PAGE 10
Don William Merrill, 7/21/03                10

1  held under Mountain Benefit Administrators.  But both
2  of us still retained MBA of Wyoming, Inc. for licensing
3  and E&O insurance.  And we retained CDO as an entity
4  for the computer hardware and software, controlling
5  that together.
6    Q.    So prior to 2001, you had a partner whose
7  name was --
8    A.    No, I still have a partner, David Bostrom.
9    Q.    And you and Mr. Bostrom together owned prior
10 to 2001 the business known as MBA of Wyoming?
11   A.    We still own that business together and CDO
12 together.
13   Q.    And who are the other shareholders or -- is
14 it a corporation, MBA?
15   A.    Yes.
16   Q.    Who are the other shareholders of MBA of
17 Wyoming?
18   A.    There are none.
19   Q.    Just the two of you?
20   A.    Yes.
21   Q.    And is Mr. Bostrom the president, then --
22   A.    Yes.
23   Q.    -- of MBA of Wyoming?  Now, in 2001 you were
24 going to split portions of that business, correct?
25   A.    Well, we just elected to split the accounts

CitiCourt, LLC
(801) 532-3441

PAGE 11
Don William Merrill, 7/21/03                11

1  themselves so that at any other time we would have more
2  flexibility.
3    Q.    And after that split, did MBA of Wyoming
4  still have any accounts?
5    A.    Yes.  Well, excuse me.  No.  MBA of Wyoming
6  did not have the accounts, only held the licensing for
7  those accounts.
8    Q.    And some of the accounts went to an entity
9  known as Managed Benefit Administrators and Insurance
10 Consultants, Inc., and others of them went to Mountain
11 Benefits?
12   A.    Under Mr. Bostrom.
13   Q.    Is that right?
14   A.    That's right.
15   Q.    Your nod of the head didn't pick up on the
16 machine too well.  If you'd answer out loud, please,
17 sir.
18         MR. GEORGE:  And at this end of the table
19 you're a little soft.
20   A.    All right.
21   Q.    Was there some basis for dividing the
22 accounts?  Do one type of accounts go one place?
23   A.    No.
24   Q.    Or was it based on -- what?
25   A.    Location.  It was based on location.  The

CitiCourt, LLC
(801) 532-3441

PAGE 12
Don William Merrill, 7/21/03                12

1  other office is in Worland, Wyoming.
2    Q.    And is that where Mr. Bostrom's located?
3    A.    Yes.
4    Q.    And so Mountain Benefits kept all the
5  accounts that were basically being handled out of
6  Worland, Wyoming, whereas Managed Benefit
7  Administrators and Insurance Consultants, Inc. kept all
8  the accounts being handled out of Salt Lake, correct?
9    A.    Correct.
10   Q.    And for how long have you been located in
11 Salt Lake City?
12   A.    Basically all my life.
13   Q.    Now, you mentioned that you kept MBA of
14 Wyoming for the purposes of certain licenses.  What
15 licenses were those?
16   A.    All insurance licenses, and we retained the
17 business together so that we can use our resources
18 together.
19   Q.    What do you mean by that?  What do you mean
20 using your resources together?
21   A.    David's expertise in certain areas and the
22 information that I've had and my background just makes
23 it easier for us to work on that basis.  It also made
24 it easier for us to look at eventually a sale if that
25 became a possibility.

CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 13

Don William Merrill, 7/21/03          13

1    Q.    Has a sale been contemplated?
2    A.    No.
3    Q.    But if he wanted to sell off his half or you
4  wanted to sell off your half, it would be easier to do,
5  and that was some of your thinking, you're telling me?
6    A.    Yes.
7    Q.    Now, you say all your insurance licenses.
8  Give me an idea of what licenses we're talking about.
9    A.    The TPA license, the agency license, and
10 individual license in multiple states.
11   Q.    What states do you have licenses?  Or let me
12 ask that a little more narrowly.  Do you have any
13 licenses in Texas?
14   A.    Yes.
15   Q.    What licenses do you have in Texas?
16   A.    TPA license.
17   Q.    And what else?
18   A.    And I hold a non-resident license.  That's
19 it.
20   Q.    And for somebody unfamiliar with the term,
21 what is a TPA license?  What does TPA mean?
22   A.    TPA means third-party administrator.
23   Q.    And what is a third-party administrator?
24   A.    An organization designated to independently
25 handle administrative services for group benefits.

CitiCourt, LLC
(801) 532-3441

PAGE 14

Don William Merrill, 7/21/03          14

1    Q.    And when you say administrative services, to
2  a layman, what sort of services or functions does a
3  third-party administrator have in connection with a
4  group insurance?
5    A.    Functions of a third-party administrator
6  usually deal with the administration eligibility of
7  employees and the claims processing of the coverages.
8    Q.    For example, if you have health insurance,
9  the third-party administrator takes care of getting
10 everybody signed up?
11   A.    Correct.
12   Q.    And administers the enrollment process and
13 then administers the claim process, correct?
14   A.    Correct.
15   Q.    Now, you say you have a non-resident license
16 in Texas.  Is that a license to sell life and health
17 insurance?
18   A.    Yes.
19   Q.    Any other?
20   MS. HEGLAND:  Excuse me.  Would you clarify,
21 when you say "you," do you mean MBA of Wyoming or Don
22 Merrill?
23   THE WITNESS:  Don Merrill personally.
24 Because I was traveling in and out of Texas.
25   Q.    (BY MR. WALRAVEN)  What other states are you

CitiCourt, LLC
(801) 532-3441

PAGE 15

Don William Merrill, 7/21/03          15

1  licensed?
2    A.    On a personal basis?
3    Q.    Yes.
4    A.    Utah, Idaho, California, Arizona, Nevada.
5  There may be others, but that's what I recall.
6    Q.    And approximately how much of your business
7  is in Texas?
8    A.    Currently a very small amount.
9    Q.    Has that changed over the last five years?
10   A.    Yes.  We used to have more business than we
11 do now.
12   Q.    Approximately how many clients or accounts
13 did you have in Texas, say, five years ago?
14   MR. SHUCHART:  Objection.  Who do you mean
15 by "you"?  Him personally or the entity?
16   Q.    (BY MR. WALRAVEN)  Well, let's ask it both
17 ways.  How many -- let's start with you individually.
18   A.    None.
19   Q.    And let's start with you and the agency,
20 then.
21   A.    MBA of Wyoming was the administrator.  We
22 did not have any business there.  That was really held
23 by the local brokerage houses.  And, for example,
24 Smith-Reagan was the agent for San Benito in Salt Lake,
25 CSI.

CitiCourt, LLC
(801) 532-3441

PAGE 16

Don William Merrill, 7/21/03          16

1    Q.    And MBA of Wyoming was providing TPA
2  services in connection with that account?
3    A.    That's correct.
4    Q.    How many other clients or customers was MBA
5  of Wyoming providing TPA services for in Texas, say,
6  five years ago?
7    A.    Probably only two.
8    Q.    And where would they have been located?
9    A.    In the valley area.
10   Q.    Lower Rio Grande Valley of Texas?
11   A.    Yes.
12   Q.    And who were they?
13   A.    Raymondville ISD.  I can't recall the name
14 of the other account.
15   Q.    Was it also a school district?
16   A.    No.
17   Q.    What sort of account was it?
18   A.    I think it was a small municipality.
19   Q.    And do you or any of the businesses you're
20 affiliated with have any clients in Texas now?
21   A.    Yes.
22   Q.    And who is that?
23   A.    That's a hospital in San Benito.  I can't
24 think of the name of it.
25   Q.    Is that the only one?

CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 3   PAGE 17

Don William Merrill, 7/21/03          17

1   A.   Yes, that's the only one at the present
2   time.
3   Q.   Other than the four clients you've
4   mentioned, have you had any other clients, you or any
5   business you're affiliated with?
6   A.   In Texas?
7   Q.   In Texas, say in the last five years?
8   A.   No.
9   Q.   I'd like to talk a little more about some of
10  these business entities.  I have seen the name in some
11  of the documents of Merrill Bostrom & Associates.  Are
12  you familiar with that business?
13  A.   Yes.  That's a d/b/a name.
14  Q.   And a d/b/a for one of the ones we've
15  already talked about?
16  A.   MBA of Wyoming, Inc. d/b/a Merrill Bostrom
17  Associates.  And originally doing business here in Salt
18  Lake under the Merrill Bostrom Associates.
19  Q.   So Merrill Bostrom never was anything other
20  than a d/b/a of MBA of Wyoming?
21  A.   That's correct.
22  Q.   Another name I have seen in the file is MBA
23  of Salt Lake City, Inc.  Are you familiar with that
24  entity?
25  A.   No.  That isn't a correct -- that's not

CitiCourt, LLC
(801) 532-3441

PAGE 18

Don William Merrill, 7/21/03          18

1   correct at all as an Inc.
2   Q.   Okay.
3   A.   I think MBA was referred to MBA at Salt Lake
4   and MBA of Wyoming, but it is not a corporation nor an
5   LLC.
6   Q.   So it would be just a misnomer?
7   A.   That's correct.
8   Q.   But is it a name under which you or any of
9   your entities have done business?
10  A.   No.
11  Q.   Are there any other businesses, business
12  names, entities or d/b/a's that you or your affiliated
13  businesses have used over the last five years, say?
14  A.   Not for third-party administration, no.
15  Q.   How about any businesses in any way
16  connected to insurance?
17  A.   Yes.
18  Q.   And what are those?
19  A.   We own a company called Critique.
20  Q.   What does it do?
21  A.   It's a hospital utilization review company.
22  Q.   Anything else?
23  A.   No.
24  Q.   And you mentioned the software company
25  earlier today.  Right?

CitiCourt, LLC
(801) 532-3441

PAGE 19

Don William Merrill, 7/21/03          19

1   A.   CDO Technology; yes.
2   Q.   And is that technology also in connection
3   with providing --
4   A.   Yes.
5   Q.   -- benefits for health insurance-related
6   matters?
7   A.   The purpose of that organization, that LLC,
8   is to handle the software and hardware for both the
9   Wyoming location and the Salt Lake location.
10  Q.   Now, as I understand it, the MBA/ICI has
11  basically succeeded to the business clients and
12  functions of the Salt Lake City branch of MBA of
13  Wyoming.  Correct?
14       MR. SHUCHART:  Objection.  Misstates his
15  previous testimony.
16       You can answer.
17  A.   Restate that.
18  Q.   Sure.  As I understand the history you've
19  provided me, there once was a business called MBA of
20  Wyoming that had a Wyoming branch and a Salt Lake City
21  branch.  Correct?
22  A.   Correct.
23  Q.   And at some point, except for the licenses
24  held by MBA of Wyoming, the rest of the business of the
25  Salt Lake branch has been transferred to this new

CitiCourt, LLC
(801) 532-3441

PAGE 20

Don William Merrill, 7/21/03          20

1   entity.  Is that right?
2   A.   No, not specifically like that.
3   Q.   Okay, help me out here.
4   A.   MBA of Wyoming still operates as a business,
5   but the entities were moved -- or the clients from our
6   standpoint and in-house administration were separated
7   into the two entities.
8   Q.   Okay.  What about the employees at Salt
9   Lake?  Do they get a different paycheck from a
10  different entity?  I mean --
11  A.   Up until recently they all received a
12  paycheck under MBA of Wyoming, Inc., and then recently
13  we changed that so that they received a paycheck under
14  Managed Benefit Administrators.
15  Q.   But --
16       MR. SHUCHART:  Excuse me.  Sorry.
17       MR. GEORGE:  I didn't hear the last answer.
18       MS. HEGLAND:  We can't hear down here.
19       MR. BUSH:  I'm not complaining.
20       MR. SHUCHART:  You want to go ahead and read
21  that back?
22       (The record was read as follows: "Up until
23  recently they all received a paycheck under MBA of
24  Wyoming, Inc., and then recently we changed that so
25  that they received a paycheck under Managed Benefit

CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 21

Don William Merrill, 7/21/03          21

1  Administrators.")
2      Q.    (BY MR. WALRAVEN)  And Insurance
3  Consultants, Inc.?
4      A.    Correct.
5      Q.    And I referred to that a minute ago as
6  MBA/ICI, and you understood what I was referring to,
7  correct?
8      A.    I did.
9      Q.    You've got MBA of Wyoming, MBA Salt Lake.
10 I'm getting confused here, so I threw in the ICI.
11 You'll understand what I mean if I do that again,
12 correct?
13     A.    I'll try to, yes.
14     Q.    And if you don't, let me know.
15           Now, what I was trying to clarify in my mind
16 is, the Salt Lake City branch of MBA of Wyoming has for
17 some purposes changed its name, but it's the same
18 people doing the same thing at the same location in the
19 same way, pretty much.  Correct?
20     A.    Yes.
21     Q.    And that the only change other than the name
22 is that -- well, I may be wrong there.  Do you and
23 Mr. Bostrom both, are you both shareholders of MBA/ICI?
24     A.    No.  Of MBA of Wyoming, Inc.
25     Q.    And who are the shareholders of MBA/ICI?

CitiCourt, LLC
(801) 532-3441

PAGE 22

Don William Merrill, 7/21/03          22

1      A.    That's myself and -- I guess it's myself, I
2  think.
3      Q.    Okay.  So you're the only shareholder.  But
4  in any event, the Salt Lake City operation operates
5  pretty much the same way it always has, same people,
6  same bank accounts as before?
7            MR. SHUCHART:  Objection, overly broad.
8            THE WITNESS:  Am I supposed to answer that?
9            MR. SHUCHART:  You can ask for
10 clarification.
11     Q.    (BY MR. WALRAVEN)  Yeah.  I mean, if you
12 don't understand it, let me know.  What is it that's
13 giving you difficulty?
14     A.    Well, it's not giving me difficulty.  The
15 State of Utah's insurance department gave us difficulty
16 because we didn't have the name "insurance" in MBA of
17 Wyoming, Inc., in that name.  And that's what caused
18 the changing of the names, to some degree.
19     Q.    Okay.  But for you and the people that work
20 in the Salt Lake City office, going to work every day,
21 very little has changed except for the name.  Or I
22 guess what I really want to know: have there been other
23 changes we haven't yet talked about?
24     A.    Well, there are a lot of changes going on in
25 the group business.  But in a general sense, I think to

CitiCourt, LLC
(801) 532-3441

PAGE 23

Don William Merrill, 7/21/03          23

1  answer your questions, you're right.  They're basically
2  the same.
3      Q.    Can you be a little more specific as to when
4  in 2001 this transfer took place or this name change
5  or --
6      A.    It made it easy for us in the first part of
7  2001 to change the accounting procedures and the way
8  that was being handled.  Up to that point, all of MBA
9  of Wyoming, Inc., the corporate accounting was handled
10 totally in Salt Lake for both locations.  And this
11 allowed us to divide that up, and they handled the
12 accounting and so on thereafter for Wyoming, and we
13 handled that for Utah.
14     Q.    And can you tell me when in 2001 this
15 happened?
16     A.    I can't.
17     Q.    First quarter?
18     A.    I'd say the first quarter.
19     Q.    I apologize if I already asked you this.  Do
20 you have a position, a title with MBA/ICI?
21     A.    Yes.
22     Q.    And what is that?
23     A.    President.
24     Q.    And has that been true since it was formed?
25     A.    Yes.

CitiCourt, LLC
(801) 532-3441

PAGE 24

Don William Merrill, 7/21/03          24

1      Q.    Are you familiar with a business that goes
2  by the name of J. Allan Hall?
3      A.    I am.
4      Q.    And how long have you been familiar with
5  that business?
6      A.    Somewhere in the neighborhood of ten years,
7  plus or minus.
8      Q.    And have you been doing business with them
9  off and on for ten years?
10           MR. SHUCHART:  Objection.  Can you clarify
11 with who again?
12           MR. WALRAVEN:  J. Allan Hall.
13           MR. SHUCHART:  No, no.  I know J. Allan
14 Hall.  Who, him individually or him Wyoming, or --
15     Q.    (BY MR. WALRAVEN)  The various -- you and
16 various entities you're associated with here in Salt
17 Lake in the field of insurance.
18     A.    For the most part, we dealt with the
19 Consolidated Companies out of California, and they
20 introduced us to J. Allan Hall.
21     Q.    Okay, let's start there.  Where in
22 California are the primary offices of the Consolidated
23 Companies?
24     A.    They were in San Francisco area.  They have
25 in the last two or three years moved and changed their

CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

SHEET 4  PAGE 25

PAGE 25
Don William Merrill, 7/21/03        25

1  entity around.  They currently are located in Reno,
2  Nevada.
3      Q.    And when you say they've changed around,
4  what are you talking about?
5      A.    Well, they've moved locations.
6      Q.    Okay.  And what is the business of the
7  Consolidated Companies?  What do they do?
8      A.    I think they're really a managing
9  underwriter and sales organization.
10     Q.    So are they an MGA?  Do they have an MGA
11 license?
12     A.    I don't know that for sure.
13     Q.    But they do underwriting?
14     A.    Yes, and secure services of MGU's.
15     Q.    What is an MGU?
16     A.    Managing general underwriter or --
17     Q.    And what sort of -- excuse me.
18     A.    Underwriter or MGA, I suspect both.  I don't
19 know.
20     Q.    And what sort of insurance do they deal
21 with?
22     A.    For the most part, stop loss insurance.
23     Q.    Anything else that you're familiar with?
24     A.    Well, I'm aware that they also offer
25 multiple other voluntary and somewhat unique products.
CitiCourt, LLC
(801) 532-3441

PAGE 26
Don William Merrill, 7/21/03        26

1      Q.    In what field?  Group life and health?
2      A.    Group life and health.
3      Q.    Anything else?
4      A.    That's all that I know.
5      Q.    And what sort of unique products?  Can you
6  given me an example?
7      A.    Voluntary products for the purpose of --
8  well, they would design the products and then go to the
9  insurance carriers and have those underwritten.
10     Q.    And for a layman who may hear this testimony
11 later, what is stop loss insurance?
12     A.    That's a contract composed of a specific and
13 aggregate coverages to provide a high deductible
14 benefit for a group medical product.
15     Q.    It's a high deductible group health
16 insurance program?
17     A.    Right.
18     Q.    Right?
19     A.    Yes.
20     Q.    And is triggered or comes into play both
21 with respect to a single individual having a large
22 amount of medical bills as well as an aggregate amount
23 of bills reaching a certain threshold for its trigger?
24     A.    Correct.
25     Q.    And who did you deal with primarily, say
CitiCourt, LLC
(801) 532-3441

PAGE 27
Don William Merrill, 7/21/03        27

1  over the last five years, at the Consolidated
2  Companies?
3      A.    An individual by the name of Doug Routh.
4      Q.    And would you spell his last name for the
5  court reporter, please?
6      A.    R-o-u-t-h.
7      Q.    And how long have you been dealing with
8  Mr. Routh?
9      A.    I've probably dealt with him some 12, 13
10 years.
11     Q.    And are you still doing business with
12 Mr. Routh?
13     A.    No, I'm not.
14     Q.    When did that come to an end?
15     A.    As the organization moved from California to
16 Reno, and I don't know that date.  Two, three years
17 ago.
18     Q.    Have you had any contact with Mr. Routh in
19 this last two- or three-year period?
20     A.    Just a telephone call indicating, asking how
21 we were and letting us know that he was enjoying
22 teaching tennis.
23     Q.    And where is he teaching tennis?
24     A.    In California.
25     Q.    Do you know where in California?
CitiCourt, LLC
(801) 532-3441

PAGE 28
Don William Merrill, 7/21/03        28

1      A.    I don't.
2      Q.    Do you have that somewhere?  Could you look
3  it up if we asked to you?  I'm not necessarily going to
4  do that.  I just --
5      A.    No, but I could find him if I went to
6  Consolidated in Reno.  They might know where he is.
7      Q.    Is he doing anything other than -- not other
8  than teaching tennis, related to the insurance field,
9  that you know of?
10     A.    I do not know.
11     Q.    And are you still doing business with the
12 Consolidated Companies?
13     A.    In the last year we have done none.
14     Q.    And what is the reason for that relationship
15 coming to an end?
16     A.    I think it has to do with really the
17 direction that they were going and not really providing
18 stop loss insurance that we could use effectively.  So
19 they may have been -- they may have been doing some
20 other things.
21     Q.    Since Mr. Routh left, who did you deal with
22 at the Consolidated Companies?
23     A.    Since I haven't dealt with them for a couple
24 of years, I don't know the name off the top of my head.
25     Q.    Okay.
CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 29

Don William Merrill, 7/21/03                    29
1   A.   I could look it up.
2   Q.   Now, you mentioned that it was the
3  Consolidated Companies that introduced you to the
4  business known as J. Allan Hall.
5   A.   Yes.  They suggested that we use J. Allan
6  Hall's services.
7   Q.   And what is the business of J. Allan Hall,
8  as you know it?
9   A.   I understand that they're a managing general
10  underwriter and claims payer.
11   Q.   And what sort of insurance are we talking
12  about here?
13   A.   Primarily stop loss insurance.
14   Q.   Are you aware of any other type of insurance
15  that they deal with besides stop loss?
16   A.   No.
17   Q.   For example, they just don't handle typical,
18  ordinary group health that you're aware of?
19   A.   Not ordinary group health.
20   Q.   What else do they do besides stop loss that
21  you're aware of?
22   A.   They did provide a unique contract for us
23  which was termed an interlocal trust that was developed
24  by the brokers in Texas.  And then whether it was
25  insured or reinsured by them, or at least they accepted
CitiCourt, LLC
(801) 532-3441

PAGE 30

Don William Merrill, 7/21/03                    30
1  premium for that piece.
2   Q.   What was the purpose of this product?
3   A.   Purpose of that product was to allow a way
4  for municipalities and schools in the state of Texas to
5  not be forced to rebid their plans yearly, as that was
6  a very costly situation.
7   Q.   Did the insurance product offered, that is,
8  the benefits under this plan, were they pretty much the
9  same as the stop loss insurance you described for us a
10  few moments ago?
11   A.   Somewhat different in that I think it was a
12  $1 million benefit, in excess of one mill, million
13  dollars.
14   Q.   Go ahead.
15   A.   I was going to say, it was developed by an
16  attorney in Austin and put together through the
17  Smith-Reagan agency, Michael Swetnam.
18   Q.   And would this product be offered to one of
19  these public entities like a school district or
20  municipality for paying claims that would be in excess
21  of the type of stop loss that you've already described?
22   A.   Yes.
23   Q.   So it would be an excess stop loss policy?
24   A.   That's a good way to explain it.
25   Q.   Any other products that you're familiar with
CitiCourt, LLC
(801) 532-3441

PAGE 31

Don William Merrill, 7/21/03                    31
1  being offered by or through J. Allan Hall?
2   A.   No.
3   Q.   Do you still do business with J. Allan Hall?
4   A.   No.
5   Q.   And when did that come to an end?
6   A.   I think it ended coinciding with him or that
7  organization not paying the claims for San Benito
8  School District.
9   Q.   And the insurance offered through J. Allan
10  Hall, was it actually underwritten by another insurance
11  company?
12   A.   Yes.
13   Q.   And what insurance company or companies were
14  involved in the various products or the two types of
15  products that you've mentioned?
16          MS. HEGLAND:  Let me object to form.
17   Q.   Go ahead.
18   A.   I don't recall the carriers.  Those carrier
19  proposals were submitted to us through the Consolidated
20  Company, so Companion Life happened to be one of those.
21   Q.   I saw in there in the file somewhere
22  Clarendon may have offered one.  Does that sound
23  familiar?
24   A.   It does.
25   Q.   Do you recall any others?
CitiCourt, LLC
(801) 532-3441

PAGE 32

Don William Merrill, 7/21/03                    32
1   A.   No.
2   Q.   I would like to change subjects now and talk
3  about the nature or history of your relationship as you
4  and the entities you've been affiliated with with the
5  San Benito School District.  Can you tell me
6  approximately when you first had some sort of business
7  relationship with San Benito?
8   A.   It was 1987.  '97?  Not '87, '97 I guess it
9  would be.  Time goes fast.
10   Q.   The documents I've seen suggested it might
11  have gone back as early as '95, and I will show you a
12  contract here in a minute that has a date like that.
13  But what I'd like to ask you I guess first is, are you
14  aware of any relationship prior to 1995?
15   A.   No.
16       (Exhibit 27 marked.)
17   Q.   Mr. Merrill, I would like to hand you what
18  has been marked as Exhibit 27 to your deposition.
19  Well, let's go off the record a second.
20       (Discussion off the record.)
21       (Recess from 9:55 to 10:02 a.m.)
22   Q.   (BY MR. WALRAVEN)  Back on the record.  I've
23  handed you what has been marked as Exhibit 27 to your
24  deposition, and I would like to ask you if you
25  recognize that document.
CitiCourt, LLC
(801) 532-3441

SHEET 5   PAGE 33

Don William Merrill, 7/21/03                    33

1   A.   Yes.  It looks like one of the documents
2   used.
3       Q.   And tell us for the record what it is.
4       A.   That's an Administrative Service Agreement
5   between MBA and San Benito ISD.
6       Q.   And just generally, what sort of services
7   does that agreement --
8           MS. HEGLAND:  Excuse me.  Before we go
9   there, could we clarify which MBA entity is reflected
10  on Exhibit 27?
11      Q.   It's 1995, so there was only one MBA entity,
12  I think.  Right, MBA of Wyoming?
13      A.   That's correct.  It does show Merrill
14  Bostrom Associates at the top.
15      Q.   Oh.  So it's Merrill Bostrom Associates?
16      A.   But the document itself has the regular MBA
17  of Wyoming, and it says Merrill Bostrom Associates/MBA
18  of Wyoming, Inc.
19      Q.   And what is the date shown on that exhibit?
20      A.   It's 1995.  This shows it was signed on
21  October 3rd, so it more than likely was effective as of
22  9/1.
23      Q.   So it's your understanding it would be
24  related to the '95 --
25      A.   '96.

CitiCourt, LLC
(801) 532-3441

PAGE 34

Don William Merrill, 7/21/03                    34

1       Q.   -- '96 school year, whatever their fiscal
2   year would be?
3       A.   That's correct.
4       Q.   Or I guess to be more precise: it really
5   would relate to whatever the policy year would be?
6       A.   Would relate to the school year.
7       Q.   And going back to my earlier question.  What
8   sort of services does that agreement contemplate?
9           MR. SHUCHART:  Objection.  The document
10  speaks for itself.
11      A.   Go ahead.
12      A.   Standard third-party administrative
13  agreement.
14      Q.   The sort of services provided by third-party
15  administrators that you described for us earlier in
16  connection with that term?
17      A.   That's correct.
18      Q.   Thank you.  Does that agreement have
19  anything to do with stop loss insurance?
20      A.   Exhibit C is an unsigned document, and it
21  probably was just connected to that and not part of the
22  agreement.
23      Q.   Well, are you aware of whether or not in
24  1995 there was an agreement between MBA of Wyoming and
25  the San Benito School District concerning stop loss

CitiCourt, LLC
(801) 532-3441

PAGE 35

Don William Merrill, 7/21/03                    35

1   insurance?
2       A.   I'm aware that there was some stop loss
3   insurance, yes.
4       Q.   And was there an agreement relating stop
5   loss insurance between MBA of Wyoming and San Benito
6   School District?
7           MR. SHUCHART:  Objection, vague.  You can
8   answer.
9       A.   No.
10      Q.   Let me ask it this way.  Was MBA of Wyoming
11  involved in the purchase of the stop loss insurance for
12  the San Benito School District in 1995?
13      A.   Only to move the stop loss quote to the
14  brokerage house in San Benito to Smith-Reagan.
15      Q.   I guess I'm not sure I understand your
16  answer.  What was it that MBA of Wyoming did in
17  connection with the purchase of stop loss insurance in
18  1995?
19      A.   Assisted the brokerage house and sent the
20  information that they had secured from the school
21  district to obtain a quote and sent that to the
22  carriers as agreed with the brokerage house.
23      Q.   And the brokerage house was Smith-Reagan?
24      A.   Smith-Reagan.
25      Q.   And what sort of information was MBA of

CitiCourt, LLC
(801) 532-3441

PAGE 36

Don William Merrill, 7/21/03                    36

1   Wyoming involved in putting together, actually the stop
2   loss insurance?
3       A.   We didn't put it together.  We just took
4   what was prepared from the school district, and it may
5   even have been an RFP at that time, a request for
6   proposal.  The information was prepared by the school
7   district through Smith-Reagan.  They may have gone out
8   themselves for bids.  We just -- we handed this on to
9   some stop loss carriers and just funneled it back and
10  forth.  We weren't the broker, nor were we the ones
11  securing the stop loss insurance.
12      Q.   You were merely passing on information as a
13  delivery service.  Is that what you're describing?
14      A.   That's about it.
15      Q.   Okay.  And what sort of information are we
16  talking about?
17      A.   Well, that would have included all
18  information relative to the school from a census to
19  their current plan to their loss ratios and so on.
20      Q.   Was MBA of Wyoming involved in putting
21  together any of the information concerning claims
22  history or loss ratios or anything like that?
23      A.   No.
24      Q.   And do you know who did put that information
25  together?

CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 37

Don William Merrill, 7/21/03                37

1    A.    Would be the Smith-Reagan agency.
2    Q.    And who did you deal with at the
3  Smith-Reagan agency, primarily?
4    A.    Michael Swetnam, Bill Greer, David Smith,
5  and Joe Reagan, all of them.
6    Q.    And where is the Smith-Reagan agency
7  located?
8    A.    They're located in San Benito.
9    Q.    San Benito, Texas?
10   A.    (Witness nods head.)
11   Q.    Is that a yes?
12   A.    Yes.
13   Q.    The exhibit to -- or the attachment to
14 Exhibit 27 labeled Exhibit C, item No. 10 indicates
15 that MBA of Wyoming would act as, quote, agent of
16 record for group term life/AD&D insurance and group
17 stop loss insurance.  Do you see that?
18   A.    I see the form, but I don't see that that's
19 a signed part of the document.
20   Q.    That was my question.  Is it your memory
21 that MBA of Wyoming did or did not do that?
22   A.    We did not do that.
23   Q.    I just wanted to clarify.  Thank you.
24     (Exhibit 28 marked.)
25        Mr. Merrill, I would now like to hand you
              CitiCourt, LLC
              (801) 532-3441

PAGE 38

Don William Merrill, 7/21/03                38

1  what has been marked as Exhibit 28 to your deposition
2  and ask you to take a look at that.
3    A.    (Witness reviews document.)  Okay.
4    Q.    Do you recognize that document?
5    A.    It looks like another document of MBA of
6  Wyoming, Inc., for 2000 --
7    Q.    Is it another Administrative Service
8  Agreement like Exhibit 27?
9    A.    It is.
10   Q.    And it's dated when?
11   A.    2000, 10/10/2000.
12   Q.    So it would be for the 2000 and 2001 school
13 year?
14   A.    2000-2001 school year.
15   Q.    And does it also have an Exhibit B or C
16 listing other services to be provided?
17   A.    It does.
18   Q.    Is there any reference to stop loss
19 insurance in connection with the services to be
20 provided pursuant to the agreement that we've marked
21 Exhibit 28?
22   A.    I don't think so.
23   Q.    Take a moment and look at it and let me
24 know.
25   A.    Really references administrative services,
              CitiCourt, LLC
              (801) 532-3441

PAGE 39

Don William Merrill, 7/21/03                39

1  HIPAA administration.  As an administrator, a
2  third-party administrator handling reinsurance
3  brokerage fees that went to Smith-Reagan, PPO fees that
4  went to Ethics Southwest at the time, and Lone Star
5  Interlocal excess fee.
6    Q.    And is that the Interlocal trust excess stop
7  loss insurance we talked about earlier?
8    A.    Yes.
9    Q.    And are those the only services contemplated
10 by this agreement that deal with stop loss insurance?
11   A.    Yes.
12   Q.    Let me go back to Exhibit 27 just for a
13 second, show you what's attached to it as Exhibit B.
14 Is that also a list of administrative services to be
15 provided by MBA of Wyoming?
16   A.    It's the general list that could be used,
17 yes.
18   Q.    And depending on how the form is filled out,
19 marked and signed, some, all, or none of those services
20 may actually be included in that agreement.  Correct?
21   A.    That's true.
22   Q.    And with respect to the services listed on
23 that Exhibit B attached to the one to your deposition,
24 were any of those services provided to San Benito
25 School District?
              CitiCourt, LLC
              (801) 532-3441

PAGE 40

Don William Merrill, 7/21/03                40

1    A.    Yes, some of them were.
2    Q.    And is there any way to figure that out from
3  the form, or is that just based on your memory of what
4  you did?
5        MR. SHUCHART:  Objection to the extent the
6  document speaks for itself.  Go ahead.
7    A.    I believe the document speaks for itself.
8        MR. GOOD:  Or maybe it doesn't.
9    Q.    Well, that's what we're trying to clarify
10 here.
11   A.    Well, what would you like to know?
12   Q.    You told me that -- let's go to Exhibit C.
13 You told me that because Exhibit C attached to Exhibit
14 27 did not have a signature, did that mean that none of
15 the services listed on Exhibit C were provided to San
16 Benito?
17       MS. HEGLAND:  In 1995?
18   Q.    In 1995.
19   A.    Well, as a TPA we coordinated with the
20 school under their direction and with the agency.
21   Q.    So some of the services mentioned on Exhibit
22 C to Exhibit 27 to your deposition were provided by
23 MBA?
24   A.    Well, because they are part of the TPA
25 agreement and services.
              CitiCourt, LLC
              (801) 532-3441

SHEET 6 PAGE 41
Don William Merrill, 7/21/03                41

1    Q.   Right. And some of the things listed on
2  here were not, for example?
3    A.   That's true.
4    Q.   Item 10. And there's no way you can tell
5  that by looking at Exhibit C; you have to have other
6  information to be able to tell me which one of those
7  applied?
8    A.   Right.
9         MS. HEGLAND: And we're just talking about
10 1995?
11         MR. WALRAVEN: We're talking about 1995.
12         MR. SHUCHART: Objection. The document
13 speaks for itself and asked and answered.
14    A.   I'm not sure what you're really asking me.
15 Would you specifically --
16    Q.   Let me start over.
17    A.   -- go to one of these and ask me if that is
18 what we did, or we just provided the service or
19 assisted in the services?
20    Q.   Sure. As I understand Exhibit C, it is a
21 list of services that may or may not be included in the
22 contract. Correct?
23    A.   Right.
24         MS. HEGLAND: I hate to keep interrupting,
25 but we're talking about Exhibit C which is part of
                CitiCourt, LLC
                (801) 532-3441

PAGE 42
Don William Merrill, 7/21/03                42

1  Deposition Exhibit No. 27?
2         MR. WALRAVEN: Correct.
3         MR. GOOD: We've been talking about that for
4  ten minutes.
5         MS. HEGLAND: We have two Exhibit C's,
6  though.
7         MR. WALRAVEN: Well, so far we've only
8  talked about one of them.
9    Q.   (BY MR. WALRAVEN) Let me make sure I
10 clarify that. You understand, Mr. Merrill, that we've
11 been talking about the '95 agreement that we've marked
12 as Exhibit 27 to your deposition, correct?
13    A.   I understand that.
14    Q.   Now, Exhibit C is a list of services that
15 may or may not be included, correct?
16    A.   That we may be providing and we could have
17 provided, yes.
18    Q.   Right. And looking at Exhibit 27 will not
19 tell us which one of those services you did or did not
20 provide, will it?
21    A.   I don't think so.
22    Q.   I need to ask you to tell me from your
23 memory which one of those services you did or did not
24 provide, as we've been doing, correct? And you say yes
25 on this one, no on that one, right?
                CitiCourt, LLC
                (801) 532-3441

PAGE 43
Don William Merrill, 7/21/03                43

1    A.   Right.
2    Q.   Okay.
3    A.   Advice --
4    Q.   Excuse me, sir.
5         MR. SHUCHART: Let him ask you a question.
6    A.   Just go down --
7    Q.   I don't need to go down all of them, because
8  some of them I'm not curious about and some of them I
9  am.
10    A.   That would take a long time.
11    Q.   For example, item No. 9. Would you just
12 read that?
13    A.   "Provide competitive bidding of various
14 insured plans."
15    Q.   Was that one of the services provided by MBA
16 of Wyoming?
17    A.   No.
18    Q.   And No. 10, we've already talked about that
19 also, was not one of the services provided, correct?
20    A.   No.
21    Q.   Is that correct?
22    A.   That's correct.
23    Q.   Thank you. Now let's turn to Exhibit 28.
24 Exhibit 28 is the MBA agreement for the 2000-2001
25 school year, correct?
                CitiCourt, LLC
                (801) 532-3441

PAGE 44
Don William Merrill, 7/21/03                44

1         MR. SHUCHART: Answer out loud.
2    A.   Yes.
3    Q.   And it also has in Exhibit C list of
4  services that may or may not be provided?
5    A.   Right.
6    Q.   And again, there's no way in looking at
7  Exhibit 28 to know which one of those services were or
8  were not provided, correct?
9    A.   Correct.
10    Q.   Item 10 on Exhibit C.
11    A.   Act as agent of record following coverage.
12         MR. SHUCHART: Hold on. Let's go off the
13 record for a second, please.
14         MR. WALRAVEN: Sure.
15    (Discussion off the record.)
16         THE WITNESS: Exhibit C says not included.
17    Q.   (BY MR. WALRAVEN) In Exhibit 28 there's
18 also a page labeled Exhibit C which talks about
19 services that are or are not included, correct?
20    A.   (Indicating.)
21    Q.   And at one point it indicates that none of
22 the advisory services to be listed on Exhibit C are
23 being provided pursuant to this agreement, correct?
24    A.   That's what it lists.
25    Q.   Thank you. Now, I asked you about the role
                CitiCourt, LLC
                (801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 45

Don William Merrill, 7/21/03                45

1  of MBA of Wyoming and stop loss insurance in 1995, and
2  you answered me that. What I would like to now ask you
3  is about the role of MBA of Wyoming and any of its
4  affiliated entities since 1995. And I guess maybe the
5  easy way to ask it is, did that role ever change?
6          MR. SHUCHART: I assume we're talking about
7  just with respect to San Benito School District?
8          MR. WALRAVEN: We're talking about San
9  Benito and we're talking about stop loss insurance.
10         A.    Roles stayed the same up until the school
11 elected to drop the brokerage house. I think -- I
12 don't know the date of that, but it was in the 2000
13 area.
14         Q.    Okay. And prior to the 2000 area, did MBA
15 of Wyoming or any of its affiliated entities play any
16 role in providing information or processing claims for
17 benefits under the stop loss insurance?
18         A.    Sounded like you were asking two questions.
19         Q.    I may have. I didn't intend to. But let me
20 try again. Prior to the change in 2000 that you just
21 referenced with respect to the brokerage agency, did
22 MBA of Wyoming or any of its affiliated entities have
23 any role in processing claims with the stop loss
24 insurance?
25         A.    We processed claims for San Benito. We

CitiCourt, LLC
(801) 532-3441

PAGE 46

Don William Merrill, 7/21/03                46

1  didn't process stop loss claims.
2          Q.    So if a claim was covered under the stop
3  loss insurance prior to 2000, MBA of Wyoming had no
4  role in making a claim for benefits under the stop loss
5  insurance. Is that right?
6          A.    In that way we did, yes.
7          Q.    Okay.
8          A.    That question we did.
9          Q.    What was the role of MBA of Wyoming?
10         A.    MBA would accumulate all of the bills that
11 applied to a large claim that could possibly exceed the
12 deductible of the stop loss and would submit that
13 information to the stop loss carrier.
14         Q.    So MBA would keep up with how much of the
15 deductible was being used?
16         A.    Yes.
17         Q.    And when the deductible was reached, would
18 MBA send the claim on to the stop loss insurance
19 carrier asking for payment?
20         A.    Yes.
21         Q.    Any other role of MBA with respect to stop
22 loss insurance prior to 2000?
23         A.    Just assisted the stop loss carrier in
24 obtaining as much information as they would request.
25         Q.    In connection with issuing the policies?

CitiCourt, LLC
(801) 532-3441

PAGE 47

Don William Merrill, 7/21/03                47

1  What sort of information are you talking about?
2          A.    Issuing information relative to a claim
3  submission.
4          Q.    And typically what sort of information would
5  that be?
6          A.    Just the regular -- the medical claims that
7  were incurred for that particular individual.
8          Q.    A list of all the medical bills to show the
9  deductible had been satisfied?
10         MR. SHUCHART: Objection to the extent it
11 requires him to speculate. Why don't you ask him if he
12 had any role in that process.
13         MR. WALRAVEN: Well, I was asking what he
14 meant when he said that's what they did in providing
15 medical claim information, and I'm --
16         THE WITNESS: As a TPA, we just performed
17 those functions relative to submitting the claims as
18 required by the stop loss carriers inasmuch as we were
19 approved TPA for the carriers.
20         Q.    (BY MR. WALRAVEN) So you were approved TPA
21 for the stop loss carrier?
22         MR. SHUCHART: Answer out loud.
23         A.    Yes.
24         Q.    And that would have been with respect to all
25 of San Benito's stop loss insurance from 1995 through

CitiCourt, LLC
(801) 532-3441

PAGE 48

Don William Merrill, 7/21/03                48

1  2001?
2          A.    I think that's the date, yeah.
3          Q.    And what was involved in your firm becoming
4  approved as a TPA for the stop loss insurer?
5          A.    Each carrier would normally send out their
6  requirements in writing and we would submit those, and
7  they would evaluate the capability of MBA. In some
8  instances stop loss carriers will actually come to our
9  office and go through our system that's being used for
10 claims processing. Maybe a multiple of different
11 things, from experience to what we do as a TPA.
12         Q.    Were there any written agreements involved
13 in becoming an approved TPA?
14         A.    In most instances there are.
15         Q.    And what about with respect to the stop loss
16 carriers for San Benito School District? Are there any
17 written agreements with stop loss carriers and your
18 firm as a TPA?
19         A.    The agreement of the stop loss was an
20 agreement between the carrier and San Benito School
21 District or the policyholder, not between MBA and the
22 insurance company.
23         Q.    So there was not a written agreement between
24 your firm as the TPA and the stop loss carrier?
25         A.    No.

CitiCourt, LLC
(801) 532-3441

SHEET 7   PAGE 49
Don William Merrill, 7/21/03          49

1   Q.   Were there any other documents,
2   certifications, letters of approval or any other
3   written material which confirmed that your firm was an
4   approved TPA for any of the stop loss carriers of San
5   Benito?
6          MR. SHUCHART:  Objection, overly broad.
7   A.   I don't recall what documents actually
8   exist.
9   Q.   Do you recall that there are such documents?
10  A.   There are probably documents.
11  Q.   Let me narrow it down a little bit.  Do you
12  recall whether or not there are any such documents with
13  either the Consolidated Companies, J. Allan Hall or
14  Companion Life?
15         MR. SHUCHART:  Objection, overly broad.
16  A.   I don't know that.
17  Q.   You don't know if there are or not?
18  A.   Huh-uh.
19  Q.   Is that a no?
20  A.   No.
21  Q.   Has your business ever been disapproved or
22  had its approval withdrawn or cancelled by any stop
23  loss carrier?
24  A.   No.
25  Q.   Do you need to add something?  Go ahead.
            CitiCourt, LLC
            (801) 532-3441

PAGE 50
Don William Merrill, 7/21/03          50

1   A.   Well, the correct answer would be no, unless
2   the carrier dropped us because we were not writing
3   business, or just discontinued working with us because
4   we weren't writing business with them.  But not
5   disapproved of our administrative services.
6   Q.   That's really what I wanted to know.
7   Thanks.  I appreciate the clarification.
8          Now, you were telling us that sometime
9   around 2000 the role of you and your firm changed with
10  respect to San Benito.  Correct?
11  A.   Our role changed?
12  Q.   In the purchase of stop loss insurance.
13  A.   Lorenzo and Janie asked us to assist them
14  more fully in what they were doing, because they
15  dropped the agency of Smith-Reagan and they dropped
16  Bill Greer as the agent of record.  They did during the
17  2000 year, however, and I don't know the details of
18  this, appoint the brokerage house of Insurance
19  Associates of the Valley to do some work for them.  And
20  what that document and authority was, I don't know.  We
21  were not the agent of record.  They just asked us what
22  we could do to assist them by not paying us more money,
23  nor did we ever receive any commissions for that
24  service.
25  Q.   Well, let me ask that a little more
            CitiCourt, LLC
            (801) 532-3441

PAGE 51
Don William Merrill, 7/21/03          51

1   generally while you brought it up and I'm thinking of
2   it.  Has MBA of Wyoming or any affiliated entity or
3   person received any commission on stop loss insurance?
4          MR. SHUCHART:  Objection, overly broad.
5   Q.   For San Benito.
6   A.   No.  That was for the brokerage house.
7   Q.   Now, you were telling me that sometime about
8   2000 you were asked by some of the people with San
9   Benito School District to provide some additional
10  assistance, correct?
11  A.   Well --
12  Q.   And I'm asking, what else were you asked to
13  do that you hadn't been doing before?
14  A.   We were asked to obtain bids.
15  Q.   Okay, what else?
16  A.   That's about it.
17  Q.   And you're talking about obtaining bids for
18  stop loss insurance?
19  A.   Stop loss insurance, group life insurance.
20  Q.   And did you do so?
21  A.   Yes.
22  Q.   And who at your firm was primarily involved
23  in obtaining these bids for stop loss insurance?
24  A.   I was.
25  Q.   Anyone else have a major role in that?
            CitiCourt, LLC
            (801) 532-3441

PAGE 52
Don William Merrill, 7/21/03          52

1   A.   No.
2   Q.   And from whom did you obtain bids for stop
3   loss insurance at that time?
4   A.   In --
5   Q.   2000?
6   A.   -- 2002 from Consolidated Companies, and
7   they provided us a number of bids.  We may have -- at
8   the time we probably had approval with over 25 stop
9   loss carriers.
10  Q.   And we're talking about the year 2000?
11  A.   The year 2000.
12  Q.   And were all of those stop loss carriers
13  that you were dealing with dealt with through the
14  Consolidated Companies?
15  A.   No.  Many of them had their own sales
16  organizations or MGU's or they were a direct writer,
17  such as Pacific Mutual, Hartford and so on.
18  Q.   Do you recall approximately how many bids
19  for stop loss insurance you obtained in 2000 for San
20  Benito School District?
21  A.   I do not.
22  Q.   But do you recall obtaining more than one or
23  two?
24  A.   Yes.
25  Q.   And did you submit those bids with a
            CitiCourt, LLC
            (801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 53

Don William Merrill, 7/21/03                53
1  comparative analysis to the folks at San Benito?
2     A.    We prepared information that would allow
3  them to look at what we had, yes.
4     Q.    Prepared some summary sheets showing this is
5  this plan A and plan B and that sort of stuff?
6     A.    Actually included the reports that were
7  given to us by the MGU's.
8     Q.    Did you perform any analysis comparing these
9  various proposals?
10    A.    Yes.  We actually took the numbers and
11 looked at the contract types and set those out.  But
12 really gave all that information in a proposal to the
13 school.
14    Q.    And what -- other than the numbers, what
15 were the things that you looked at and thought would be
16 of interest to the school district in comparing these
17 various contracts?
18    A.    The most important piece is, will that
19 carrier pay benefits and follow the procedures that
20 most MGU's followed at that time with claims processing
21 organizations, and where were they located and what was
22 their experience in how fast they could do the
23 turnaround.
24    Q.    And what do you mean by turnaround?
25    A.    Claims turnaround.
CitiCourt, LLC
(801) 532-3441

PAGE 54

Don William Merrill, 7/21/03                54
1     Q.    How long it would take them to pay the
2  claim?
3     A.    Pay the claim.
4     Q.    And --
5     A.    As a firm we monitor turnaround time as we
6  do a lot of other things, PPO turnaround and so on, so
7  forth.
8     Q.    And that was the sort of information you
9  provided to the school district?
10    A.    We gave them our opinion and the
11 information.
12    Q.    The information --
13    A.    Whether they were using another brokerage
14 house to go through that, I assume that they probably
15 were, or they were looking at it themselves because of
16 the background of the individuals in house.
17    Q.    I was just asking about what you did.  And
18 with respect to the various stop loss carriers whose
19 bids you were providing, did you and your firm have
20 experience with all or most of them?
21    A.    Yes.
22    Q.    So you were able to provide the sort of
23 information like turnaround time based on your
24 experience?
25    A.    Based on what we were told by the MGU's.
CitiCourt, LLC
(801) 532-3441

PAGE 55

Don William Merrill, 7/21/03                55
1     Q.    Didn't you just tell me that you were
2  developing --
3     A.    And experience, both.
4     Q.    Were there any significant differences in
5  the contract terms other than the numbers?
6        MR. SHUCHART:  Objection, lack of
7  foundation.
8     Q.    That you recall?
9     A.    I don't recall.
10    Q.    You don't recall any?
11    A.    I don't recall.
12    Q.    Who were the carriers whose bids you were
13 including in the 2000 time period?
14    A.    I don't recall that, either.
15    Q.    Was Companion Life one of them?
16    A.    It must have been.
17    Q.    Do you recall any of the others?
18    A.    No.
19    Q.    Do you recall discussing with anyone at San
20 Benito School District the relative merits of these
21 plans?  I'm asking about verbal communication as
22 compared to written ones.
23    A.    Well, obviously we flew in and out of
24 southern Texas quite often and spent time with them, as
25 we did with the brokerage house, and then tried to
CitiCourt, LLC
(801) 532-3441

PAGE 56

Don William Merrill, 7/21/03                56
1  present to them what we had at that time.
2     Q.    Did -- go ahead.
3     A.    I don't know if this should be off the
4  record or not, but San Benito tried to be their own
5  agency and suggested that maybe they do that at that
6  particular time.
7     Q.    Do you recall being told how it is San
8  Benito came to decide which plan to use?
9        MR. SHUCHART:  I assume we're referring --
10 are you referring specifically to 2000 year?
11       MR. WALRAVEN:  2000 year, stop loss
12 insurance, same thing we've been talking about.
13    A.    No, I don't.
14    Q.    They didn't tell you why we picked plan A
15 over plan B?
16    A.    No.
17    Q.    In your mind, did one of the plans stand out
18 to be better than any of the others?
19    A.    I don't recall.
20    Q.    As you recall, it was the Companion Life
21 plan that was accepted?
22    A.    That was selected.
23    Q.    But as we sit here today, you -- I'm sorry.
24    A.    Well, no.  Sometimes the comments that we
25 made, and just from recollection, may or may not have
CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 8  PAGE 57
Don William Merrill, 7/21/03                57
1  been taken based upon the premium costs. Because this
2  is a case that changed the contract timing and period a
3  number of times under the direction, I guess, of the
4  brokerage house and San Benito. And the contract, at
5  one time we had a contract that was a -- real strange
6  contract. It had both a run-in and a run-out, and we
7  used that contract and it would have seemed to me that
8  we would have continued with a run-out type contract.
9  But their election was, or their advice was from
10  someone else to not to accept that and to go to a
11  run-in only of a 15\12.
12       Q.   Once you started with a run-in type program
13  and you continued with that from year to year to year,
14  you shouldn't have any problems, correct?
15       A.   Well, but you would have to look at and put
16  that on a piece of paper, because the number of -- they
17  changed the time. They wanted the timing changed in
18  those years.
19       Q.   And when you say the timing changed, you're
20  talking about --
21       A.   The dates.
22       Q.   The policy year?
23       A.   The policy years were changed three or four
24  times with this.
25       Q.   Do you have an understanding as to why they
CitiCourt, LLC
(801) 532-3441

PAGE 58
Don William Merrill, 7/21/03                58
1  were trying to change the policy years?
2       A.   Not all of the understanding, no.
3       Q.   Any understanding?
4       A.   It just may have -- they were just trying to
5  follow I guess what they had in mind with their own
6  budget and what they could look at in advance of the
7  school year when the summers are -- nobody's there.
8  And the fact that initially you could write a contract
9  the first part of the year for September. As it's
10  moved on, you can no longer get a quote that will
11  handle that that far in advance.
12       So there were numerous reasons. I don't
13  know all of the reasons why they kept changing this
14  around, and we weren't the deciding factor.
15       Q.   When you were purchasing a stop loss
16  insurance, is the policy generally available at the
17  inception of coverage, or does it sometimes take a
18  while to get a policy out of the carrier?
19       A.   It varies from carrier to carrier how much
20  work they have, I suspect.
21       Q.   In this particular file, I seem to recall
22  seeing that pretty consistently it was several months
23  after the inception of coverage before the policy was
24  provided. Is that usual, in your experience?
25       A.   No.
CitiCourt, LLC
(801) 532-3441

PAGE 59
Don William Merrill, 7/21/03                59
1       Q.   That's uncommon?
2       A.   It's a little more uncommon.
3       Q.   Generally you have the policy at the
4  beginning of the policy year?
5       A.   Sometimes within 30 days.
6       Q.   Do you recall in connection with the
7  Companion Life policies any particular reason for the
8  delay?
9       A.   No.
10       Q.   I want to continue the history of this a
11  little bit further. We've talked about how the role of
12  MBA and its various entities changed in the year 2000,
13  and you were providing additional services, and you
14  described those for me. In the year 2001, did MBA
15  provide same sorts of services with respect to stop
16  loss insurance that you described for us a moment ago
17  in connection with the 2000 year?
18       A.   I don't recall when our services ended, as
19  much as someplace in there San Benito must have gone
20  out to bid. So whether they were using the services of
21  a brokerage house, I don't know.
22       Q.   Well, let me ask it this way. Did the type
23  of services that you provided in connection with
24  getting bids from a variety of stop loss insurers and
25  providing information to San Benito that you say
CitiCourt, LLC
(801) 532-3441

PAGE 60
Don William Merrill, 7/21/03                60
1  started in approximately 2000, did that continue up
2  until the end of your relationship with San Benito?
3       A.   No.
4       Q.   Okay.
5       A.   It ended earlier than that.
6       Q.   Okay. What was the next change in the
7  nature of the services provided?
8       A.   Just didn't provide any additional services.
9  We were just doing the TPA work after the renewal which
10  took place toward the end of the year.
11       Q.   Do you recall what year?
12       A.   I thought that was 2000.
13       Q.   So it's your recollection that your firm
14  provided recommendations and this additional
15  information on stop loss insurance only once?
16       A.   Only for a short time. I don't know the
17  dates.
18       Q.   But can you tell us whether it's one school
19  year or two school years or three school years?
20       A.   No, it's more like one.
21       Q.   And did you continue to provide the TPA
22  services and information in connection with claims for
23  stop loss insurance --
24       A.   Yes.
25       Q.   -- throughout the --
CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 61
Don William Merrill, 7/21/03                61

1   A.   Yes.
2   Q.   -- relationship?  Correct?
3   A.   Correct.
4   Q.   That didn't change?
5   A.   No.
6   Q.   I would like to next talk about a concept
7   that I've seen referred to in the documents as advance
8   funding under stop loss insurance.  Does that phrase
9   mean anything to you?
10  A.   It does.
11  Q.   What does it mean in your business?
12  A.   Stop loss, advance funding and stop loss
13  insurance really refers to a timing in order to not
14  adversely affect the resources of the policyholder and
15  yet allow the carrier to pay the claim without
16  releasing the checks, or concurrently with receiving --
17  with releasing the check and paying the claim, a common
18  practice, an administrative practice of MGU's and some
19  direct writing carriers.
20  Q.   Is it common for stop loss insurance to be
21  handled in this way that you've described under the
22  term "advance funding"?
23       MR. SHUCHART:  I'm sorry, I didn't hear the
24  first part of the question.
25       MR. WALRAVEN:  Is it common.
              CitiCourt, LLC
              (901) 532-3441

PAGE 62
Don William Merrill, 7/21/03                62

1   A.   It's very common.
2   Q.   Is it more common than any other
3   arrangement, in your experience?
4   A.   Yes.
5   Q.   Could you estimate for me the percentage of
6   time, in your experience, that stop loss insurance is
7   provided with this advance funding arrangement?
8   A.   To be truthful, all of the time, because I
9   don't know a carrier out there that doesn't advance the
10  payments of claims and yet never go -- they never go
11  out and look at whether the claim was received by the
12  provider or not.
13  Q.   Other than the matter with Companion Life
14  that we're going to talk about in a minute, have you
15  ever encountered a situation or a discussion with a
16  broker or an MGU or a carrier about whether or not
17  advance funding was or was not going to be provided?
18  A.   Very much so.  This was always a subject
19  with every sales organization we ever talked to.
20  Consolidated continually emphasized the very fact that
21  advance funding existed.
22  Q.   And when you say Consolidated, you're
23  talking about Mr. Douglas Routh?
24  A.   Doug Routh's organization.
25  Q.   And was he specific in his discussion of
              CitiCourt, LLC
              (801) 532-3441

PAGE 63
Don William Merrill, 7/21/03                63

1   this topic with you as far as the situation with J.
2   Allan Hall, Companion Life, and San Benito?
3   A.   Yes.  We actually --
4        MS. HEGLAND:  Object to form.
5   A.   J. Allan Hall actually was coming through
6   the Salt Lake area again to our office.  So we had
7   Mr. Routh in the office.  Doug felt that he should come
8   up.  Phyllis Merrill was in the meeting, Clark Merrill
9   was in the meeting, and we had a discussion relative to
10  the way in which J. Allan Hall handled advance funding.
11  Q.   And who is Clark Merrill?
12  A.   He's my son.
13  Q.   What's his position with the MBA entities?
14  A.   At the time he was in sales.
15  Q.   And --
16  A.   He's no longer with the firm.
17  Q.   But he participated in these conversations?
18  A.   Yes.
19  Q.   And Mr. Hall was here?
20  A.   Mr. Hall was in the office, yes.
21  Q.   Anyone else?
22  A.   No.
23  Q.   And this conversation was specific to
24  Companion Life stop loss coverage for San Benito?
25  A.   Specific to any carrier that J. Allan Hall
              CitiCourt, LLC
              (801) 532-3441

PAGE 64
Don William Merrill, 7/21/03                64

1   handled.
2   Q.   And as best you recall, what was it that
3   Mr. Hall told you on this subject?
4   A.   Mr. Hall assured us that the advance funding
5   method, and I don't recall exactly how they were
6   handling it, would be part of their contract.  And as
7   long as they were paying claims, they would honor that
8   advance funded program.
9   Q.   And did you prepare a memorandum of that
10  conversation?
11  A.   I probably did.
12  (Exhibit 29 marked.)
13  Q.   Let me show you what's been marked as
14  Exhibit 29 to your deposition and ask you to take a
15  look at that and tell me what it is.
16  A.   It's a document that I just put in the file,
17  a memorandum to the file relative to the meeting, which
18  was May 25th, 4 p.m., and just showed who was in
19  attendance and the very fact that we were assured that
20  the checks would be processed and paid if they were
21  shown as paid by our computer, and then the specific
22  would be reimbursed.
23  Q.   So is that a memorandum of the conversation
24  you were just describing for me?
25  A.   Yes.
              CitiCourt, LLC
              (801) 532-3441

CitiCourt, LLC
801.532.3441

SHEET 9  PAGE 65
Don William Merrill, 7/21/03                65

1  Q.    And when was this memorandum prepared?
2  A.    In June of 1999.
3  Q.    In June of '99?
4  A.    That's what it says, To confirm our
5  discussion and questions. We were working with Allan
6  on records.
7  Q.    And the memo reflects that the meeting was
8  in May of 1999, correct?
9  A.    That's the way it looks.
10 Q.    And based on your memory and this document,
11 are you fairly confident that the meeting did take
12 place somewhere about then?
13 A.    Most definitely.
14 Q.    And is there any question in your mind that
15 that discussion would have applied to the Companion
16 Life stop loss coverage issued to San Benito?
17 A.    There's no question in my mind that J. Allan
18 Hall's honesty in following the procedures, along with
19 Consolidated, kept them in line with all other carriers
20 that were doing the same thing.
21 Q.    Yeah. But what I need to know is, you're
22 sure you were talking about a type of insurance that --
23 A.    Yes.
24 Q.    -- included the Companion Life policy for
25 San Benito?
CitiCourt, LLC
(801) 532-3441

PAGE 66
Don William Merrill, 7/21/03                66

1  A.    Yes.
2  Q.    There's no question that you might have --
3  A.    No.
4  Q.    -- been talking about something else?
5  A.    Heavens, no.
6  Q.    Okay. That's what I wanted to clarify.
7  Thank you.
8          Do you recall ever discussing this concept
9  of advance funding with anyone at San Benito?
10 A.    It's possible we did.
11 Q.    Do you recall it?
12 A.    In general terms, probably had a meeting,
13 and it would have been the fall of 2000. The fall
14 of -- I think the superintendent was in -- might have
15 been in the meeting. The superintendent may have left,
16 and so there was only Janie Gonzalez and Mr. Sanchez in
17 the meeting.
18 Q.    Do you recall talking to anybody at the
19 school district about it more than once, or is the only
20 meeting you recall discussing it that one time?
21 A.    Well, if you're in the TPA business, you'll
22 talk about advance funding all the time because it is
23 part of the administrative procedures that is common to
24 TPA business.
25 Q.    Now, do you provide TPA services in
CitiCourt, LLC
(801) 532-3441

PAGE 67
Don William Merrill, 7/21/03                67

1  connection with stop loss insurance that does not
2  provide for this advance funding feature that you've
3  described?
4  A.    No.
5  Q.    In your experience, are there different
6  types of stop loss agreements that address the
7  situation of whether or not advance funding is included
8  in the agreement or not?
9  A.    I'm aware that there are more than -- a lot
10 of old contracts that existed clear back from the
11 property and casualty area which was a true
12 reimbursement only. That's not what is going on at the
13 present time.
14 Q.    And have any of the contracts that were
15 administered as pure reimbursement been anything you've
16 dealt with, say, in the last ten years?
17 A.    I've seen those contracts but would always
18 fall to what we were told by the claims processing
19 entity, such as J. Allan Hall. And if they said there
20 was advance funding by the format or the administrative
21 service agreement or administration procedures that
22 they were following, then we went on their word. And
23 if they said that's what they were doing and we had
24 seen them doing that for multiple years, we believed
25 that their work was valid and that we would follow
CitiCourt, LLC
(801) 532-3441

PAGE 68
Don William Merrill, 7/21/03                68

1  that.
2  Q.    And you say you've been dealing, or began
3  dealing with J. Allan Hall approximately ten years ago?
4  A.    Well, I was aware of him and dealt with him
5  over a period of time. I was aware of his name. Not
6  with San Benito, but --
7  Q.    In '99, 2000 when you were talking to
8  Mr. Hall and when you were talking to San Benito, did
9  you have experience with the way J. Allan Hall
10 processed claims?
11 A.    Yes.
12 Q.    And did you have several years' experience
13 with the way they processed claims?
14 A.    Yes.
15 Q.    And had they always provided advanced
16 funding?
17 A.    That's correct.
18 Q.    And were you aware -- strike that. Had J.
19 Allan Hall been providing stop loss insurance through
20 Companion Life, in your experience, prior to that time?
21 A.    I don't know that.
22 Q.    But for whomever they were processing
23 claims, they always handled them the same way with
24 respect to advance funding?
25 A.    Yes.
CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

---

PAGE 69

Don William Merrill, 7/21/03                69

1  Q.  And that was for more than one carrier?
2  A.  Yes.
3  Q.  And it may or may not have been Companion
4  Life?
5  A.  Correct.
6  Q.  And the problems involved in this lawsuit
7  came up somewhere about the fall of 2001.
8  A.  Right.
9  Q.  Prior to that, did you have experience with
10 J. Allan Hall processing claims for Companion Life and
11 providing advance funding before this problem came up?
12 A.  Well, you've included two things.  Advance
13 funding, yes.  As regard to Companion Life, I don't
14 know.
15 Q.  It's my understanding that from the
16 agreements there was a stop loss policy with Companion
17 Life for the 2000-2001 --
18 A.  2001.
19 Q.  -- policy year, but I think there was also
20 one for the '99-2000 policy year.
21 A.  I don't know if that was with Companion Life
22 or not.
23 Q.  I think it was.
24      MR. BUSH:  Objection to the extent it
25 assumes facts not in evidence.

CitiCourt, LLC
(801) 532-3441

---

PAGE 70

Don William Merrill, 7/21/03                70

1  Q.  Do you know whether or not for the '99-2000
2  school year J. Allan Hall was providing or was paying
3  claims that included advance funding benefits?
4  A.  Yes.  He verified that he was doing advance
5  funding.
6  Q.  And you say -- by "he," you mean Mr. Hall?
7  A.  Mr. Hall.
8      MR. WALRAVEN:  Mr. Merrill, we've been at
9  this a while.  I'd like to take another break.
10     THE WITNESS:  All right
11     (Recess from 10:59 to 11:18 p.m.)
12 Q.  (BY MR. WALRAVEN)  Back on the record.
13 Mr. Merrill, you understand that this is, this
14 lawsuit's over some $900,000 in claims that weren't
15 paid under the Companion Life stop loss policy,
16 correct?
17 A.  Correct.
18 Q.  And do you have an understanding as to what
19 Companion Life's position is as to why those claims
20 weren't paid?
21 A.  In general.
22 Q.  And what is that understanding?
23 A.  To my recollection, it's two, I think.  One,
24 that there wasn't sufficient funds; and the other one
25 is to the claims were not sent to the providers.

CitiCourt, LLC
(801) 532-3441

---

PAGE 71

Don William Merrill, 7/21/03                71

1  Q.  Would the disallowance or the failure to pay
2  these particular claims be directly contrary to what
3  Mr. Paul told you could be expected with respect to the
4  funding of these types of claims under the stop loss
5  insurance?
6  A.  To the second one, yes.  To the first one,
7  there just has to be an understanding that the funds
8  were available at San Benito.
9  Q.  Well, let's talk about the funding issue,
10 then, for a second.  You're familiar with a number of
11 different ways that insureds fund health insurance
12 payments, correct?
13 A.  Yes.
14 Q.  And in fact, in your policy and procedure
15 manual you talk about different programs, and I believe
16 you even mentioned zero balance checking accounts.  You
17 know what that is, don't you?
18 A.  I know what that is.
19 Q.  And if the insured has money available
20 somewhere, whether it's through a credit line or
21 overdraft protection or however, a zero balance
22 checking account associated with a funding, a lending
23 arrangement, are all of those used, in your experience,
24 to pay health insurance claims?
25 A.  They may be.

CitiCourt, LLC
(801) 532-3441

---

PAGE 72

Don William Merrill, 7/21/03                72

1  Q.  Has the use of one or more of those
2  different forms of having the money available ever been
3  a problem in connection with --
4  A.  They could be.
5  Q.  -- administering claims?
6  A.  It could be, I suspect.
7  Q.  Have you ever encountered a problem as a TPA
8  with the way an insured funded their plans, as long as
9  the checks always cleared?
10 A.  Well, that's really a -- I'll have you
11 restate that, because you've mixed up a lot of
12 information of which we believe there are certain
13 methods in which clients should put things together so
14 that payment can be made, and on that basis San Benito
15 did that.
16 Q.  Are you familiar with how San Benito did
17 that?
18 A.  Yes.
19 Q.  Anything wrong with the way they did it?
20 A.  I don't think so.
21 Q.  As far as you know, the checks always
22 cleared?
23 A.  Yes.
24 Q.  And as far as you were concerned, the
25 arrangements San Benito made to fund those checks were

CitiCourt, LLC
(801) 532-3441

---

CitiCourt, LLC
801.532.3441

SHEET 10    PAGE 73
Don William Merrill, 7/21/03                73

1  satisfactory?
2      A.    Yes, because they had reserves.
3      Q.    Have you ever encountered a difficult
4  problem or complaint about anybody doing it the way San
5  Benito did?
6      A.    No.
7      Q.    Did you talk to San Benito and say, hey,
8  you're not doing this right, you need to do it
9  different?
10     A.    No.
11     Q.    As far as you were concerned, they were
12  doing it a perfectly proper way?
13     A.    As far as I know.
14     Q.    If they weren't doing it proper, would you
15  have suggested maybe they needed to do it differently?
16         MR. SHUCHART:  Objection.  Requires
17  speculation.
18     Q.    Would you?
19         MR. SHUCHART:  Same objection.
20     Q.    I need your answer.
21     A.    Someone in the firm probably would.
22     Q.    Someone in your firm?
23     A.    Yes.
24     Q.    And who would that have been?
25     A.    Director of operations.
                CitiCourt, LLC
                (801) 532-3441

PAGE 74
Don William Merrill, 7/21/03                74

1      Q.    Are you aware of the specifics or of any
2  specifics of the complaint Companion Life and/or J.
3  Allan Hall may have had with respect to the way San
4  Benito funded payment of the checks?
5      A.    Only to the respect that the information
6  that I had heard from the auditor that came to our
7  office.
8      Q.    And what did the auditor say?
9      A.    I guess they separated out the reserve from
10  the active account.
11     Q.    And what did the auditor say about the fact
12  that the money was in one account instead of another
13  account, if anything?
14     A.    I don't recall.
15     Q.    Do you recall whether or not the auditor
16  made any investigation as to the arrangements at the
17  bank between the two accounts?
18     A.    Not that I know of.  I don't think they did.
19     Q.    But as far as you know, the arrangements San
20  Benito made were fine?
21     A.    Yes.
22     Q.    Now, the other issue that we were talking
23  about, the timing issue or the advance payment issue,
24  correct?
25     A.    (Witness nods head.)
                CitiCourt, LLC
                (801) 532-3441

PAGE 75
Don William Merrill, 7/21/03                75

1      Q.    I believe you told me a moment ago that that
2  was directly contrary to what Mr. Hall had told you
3  about the way his firm did business.  Correct?
4      A.    That's correct.
5      Q.    And that was what he told you in the meeting
6  referred to in Exhibit 29 to your deposition.  Correct?
7      A.    Right.
8      Q.    After this problem came up, did you ever
9  talk to Mr. Hall and say, hey, what's going on?  We
10  already talked about this?  Ever have any conversations
11  with Mr. Hall on this subject since the problem came
12  up?
13     A.    I tried to and made several calls
14  personally, and he never returned my call.
15     Q.    Since the problem came up, did you ever
16  contact Mr. Doug Routh on this matter?
17     A.    I've spoken to Doug about the matter after
18  that, yes.
19     Q.    And what did Mr. Routh say?
20     A.    I don't recall all of the conversations.
21     Q.    Well, did he tend to confirm your memory of
22  what Mr. Hall had told you?
23     A.    Well, we were all in agreement that advance
24  funding was used by all the carriers that we were
25  using.
                CitiCourt, LLC
                (801) 532-3441

PAGE 76
Don William Merrill, 7/21/03                76

1      Q.    And Mr. Routh confirmed that even after this
2  problem came up?
3      A.    Yes.
4      Q.    And have you also spoken with Clark
5  Merrill --
6      A.    Yes.
7      Q.    -- and asked him what he remembered of your
8  meeting with Mr. Hall?
9      A.    Yes.
10     Q.    And what did he tell you?
11     A.    He understood the same that I did.
12     Q.    And have you also spoken with Phyllis
13  Merrill all about this --
14     A.    Yes.
15     Q.    -- meeting since the problem came up?
16         MR. SHUCHART:  I'm going to object to the
17  extent you're trying to inquire what may be protected
18  by the attorney-client privilege.
19         MR. WALRAVEN:  I'm going to ask the
20  question, and if it's not --
21         MR. SHUCHART:  Well, the question was broad,
22  I mean, as to when did those conversations take place.
23     Q.    (BY MR. WALRAVEN)  Well, let me narrow it
24  down.  Have you spoken with Phyllis Merrill about her
25  memory of what Mr. Hall promised you outside the
                CitiCourt, LLC
                (801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 77

Don William Merrill, 7/21/03          77

1  presence of counsel?
2      A.   No, because I know where she stands.
3      Q.   And outside any communications with counsel,
4  has she also confirmed your memory and understanding of
5  what Mr. Hall promised?
6      A.   I believe so.
7           MR. GEORGE:  I'm sorry, I couldn't hear the
8  answer.
9           MR. SHUCHART:  I believe so.
10     Q.   There's not really any doubt in your mind,
11 is there, where she stands in this?
12     A.   There's no doubt in my mind where everybody
13 stands in this issue.
14          MS. HEGLAND:  Object to responsiveness.
15     Q.   Have you seen stop loss insurance agreements
16 that specifically address either the providing of
17 advance funding or specifically say they're not going
18 to provide advance funding other than the old
19 reimbursement contracts you mentioned were used many
20 years ago?
21          MR. SHUCHART:  Objection.  Overly broad and
22 vague.
23     A.   Contract itself, I may not have.  I have
24 seen quotes from the underwriters that include a
25 self-funded reference or box that's been checked.
                    CitiCourt, LLC
                    (801) 532-3441

PAGE 78

Don William Merrill, 7/21/03          78

1      Q.   And in the quotes, do they quote different
2  prices?  Does it affect the premium?
3      A.   No.
4      Q.   That is, depending on whether there is or is
5  not advance funding --
6      A.   No.
7      Q.   -- that doesn't affect the premiums.  And
8  until this problem came up with San Benito in the fall
9  of 2001, had a similar problem ever come up before, in
10 your experience?
11     A.   No.
12     Q.   Ever had any audits related to this sort of
13 issue before?
14     A.   Advance funding, no.
15     Q.   So would I be correct in assuming that this
16 came as a surprise to you?
17     A.   Yes, inasmuch as we've had discussions with
18 other underwriters under -- of this similar nature, how
19 they handled it.
20     Q.   Have you changed any of the policies and
21 procedures for the way you do business since this
22 problem has come up?
23     A.   That's not my area to be followed.
24     Q.   Well, has your -- any of your businesses had
25 changes?
                    CitiCourt, LLC
                    (801) 532-3441

PAGE 79

Don William Merrill, 7/21/03          79

1      A.   As a TPA we're always interested in
2  advancing and continually moving forward in better
3  methods of handling administration.  So the answer is
4  probably yes.
5      Q.   Are you personally familiar with any changes
6  of any of the MBA entities relating to this problem of
7  advance funding that came up?
8      A.   Yes.  We just need to make sure that we find
9  the right carriers.
10     Q.   And do you now document with them in some
11 way their position on this issue?
12     A.   Sales organizations usually document that
13 for us.
14     Q.   And in the San Benito context, who would be
15 the sales organization that you're talking about?
16     A.   That was originally the Consolidated
17 Companies.
18     Q.   So you would expect them to document this
19 particular issue?
20     A.   Yes.
21     Q.   Now?
22     A.   Yes.
23     Q.   Are you aware of any Consolidated Companies
24 documentation on this issue from the J. Allan Hall
25 Companion Life time frame?
                    CitiCourt, LLC
                    (801) 532-3441

PAGE 80

Don William Merrill, 7/21/03          80

1      A.   No, I don't.
2      Q.   I would like to now turn my attention, our
3  attention to the 2001-2002 renewal.
4      A.   Okay.
5      Q.   What role did the MBA entities play in that
6  renewal of stop loss insurance?
7           MR. SHUCHART:  Objection, overly broad.
8      A.   We were asked by Mr. Sanchez to obtain
9  quotes for his review, so we did that.
10     Q.   Did you obtain a quote from J. Allan Hall or
11 Companion Life?
12     A.   A renewal quote, yes.
13     Q.   And do you know who else you had a quote
14 from?
15     A.   There were numerous carriers, and I don't
16 recall totally.
17     Q.   Do you recall the time frame involved in
18 this process?
19     A.   Can you explain further?
20     Q.   Do you recall whether it was before or after
21 the policy expired on August 31 of 2000?
22     A.   Oh, it had been way before that time, two
23 months before.
24     Q.   And do you recall what you were able to --
25 who you got quotes from other than the opinion on it?
                    CitiCourt, LLC
                    (801) 532-3441

SHEET 11   PAGE 81

Don William Merrill, 7/21/03                    81

1    A.    I answered that no previously.
2    Q.    Okay.
3    A.    Other than BCS, because they were elected to
4    be the next carrier.
5    Q.    And you got quotes from both of them
6    somewhere in the summer of 2001?
7    A.    Late summer, yes.
8    Q.    Prior to the expiration of the Companion
9    Life policy?
10   A.    That's correct.
11   Q.    And was coverage bound with a new carrier at
12   that time?
13   A.    I don't know that.  It would appear that it
14   was, but everything seemed so mixed up after that time
15   and we were taken out of the picture, that I don't know
16   exactly what occurred.
17   Q.    Were the dealings with BCS conducted through
18   your organization?
19   A.    Up to the time of making a decision of who
20   they should go to.
21   Q.    And was that decision made sometime prior to
22   the expiration of the Companion Life policy in August
23   of 2001?
24   A.    I think it was in approximately August.
25   Q.    And you referred to some mix-ups.  Do you
                    CitiCourt, LLC
                    (801) 532-3441

PAGE 82

Don William Merrill, 7/21/03                    82

1    recall whether the mix-ups occurred before or after
2    that?
3    MR. SHUCHART:  Objection, vague.
4    A.    Well, if -- it's pretty hard to understand
5    what went on, because we weren't told what was going on
6    in the background.  Whether there was another agency
7    involved in the decision or if they just elected to
8    terminate, that there was some reasons, obviously, or
9    we wouldn't have been terminated.
10   Q.    Do you know what these mix-ups or problems
11   were?
12   A.    Not in full, no.
13   Q.    In connection with getting quotes to
14   purchase stop loss insurance to go into effect in
15   September of 2001 or August 31st, 2001, whatever the
16   day was, did any of the MBA entities play any role in
17   preparing applications or summaries of claims history
18   or anything?
19   MR. SHUCHART:  Objection, overly broad.
20   A.    That information is available by all TPA's.
21   So TPA information as to a census, what the claims
22   experience was, that was all available as we provide
23   that on an ongoing monthly basis for the client.
24   Q.    Other than providing that information to the
25   school district, did any of the MBA entities play a
                    CitiCourt, LLC
                    (801) 532-3441

PAGE 83

Don William Merrill, 7/21/03                    83

1    direct role in packaging up that information and
2    sending it to any of the stop loss carriers?
3    MR. SHUCHART:  Objection, overly broad.
4    A.    Yes, after approval from San Benito that
5    that was the information.
6    Q.    So you would have the school district
7    approve the -- you'd fill out the application, send it
8    to them, they'd sign it and you'd send it on?  How did
9    that work?
10   A.    Well, part of the putting that information
11   together is the disclosure information, which the
12   school would be required to sign and prepare that, even
13   though all of the information, a lot of information is
14   available at the MBA and we gave that information to
15   San Benito.  And then once that was approved, including
16   the disclosure, then that information was sent out.
17   Q.    Do you recall any problems associated with
18   the BCS application process?
19   A.    Not at the time, because we believe the
20   proposals came in from BCS and J. Allan Hall.  J. Allan
21   Hall seemed to be really late coming to us.  Maybe they
22   were trying to decide as to what the premium should be
23   rather than just a normal increase for any large claims
24   going to pool, I remember just in general that their
25   rate increase was very, very large, huge.
                    CitiCourt, LLC
                    (801) 532-3441

PAGE 84

Don William Merrill, 7/21/03                    84

1    Q.    The J. Allan Hall rate increase?
2    A.    Yes.
3    Q.    Do you recall discussing that with anybody
4    at the Consolidated Companies --
5    A.    Yes.
6    Q.    -- about why they were going up so much?
7    A.    Right.
8    Q.    And what did you learn?
9    A.    I don't recall.
10   Q.    Do you recall whether they provided you any
11   reason at all?
12   A.    Well, it would have to be with the claims.
13   But rather than having anything going to a pool, they
14   were more or less adjusting to what the actual claim
15   was and not being an insurance company but just trying
16   to exchange dollars.
17   Q.    You lost me there.  Could you give me a
18   little more layman's explanation of what you just said?
19   A.    Well, either companies are in the insurance
20   business or not.  So if they're in the insurance
21   business, then they're taking a risk and providing a
22   rate for that risk.  If they are in the business of
23   exchanging dollars, then they could say, well, if
24   you'll give us this many dollars, or we won't cover
25   this because we're going to laser somebody to a higher
                    CitiCourt, LLC
                    (801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill  *  July 21, 2003

PAGE 85

Don William Merrill, 7/21/03                85

1  amount, then it's just exchanging dollars. So it's a
2  frustrating situation when that occurs all of a sudden.
3       Q.   And is that what was occurring with J. Allan
4  Hall, as you recall?
5       A.   I don't know what was occurring with J.
6  Allan Hall, same as I don't know why they were dragging
7  their feet on paying claims. That wasn't what they had
8  done in previous experience.
9       Q.   So your previous experience with J. Allan
10 Hall had been that they were in the insurance business
11 as you just described it, correct?
12      A.   And their turnaround time was excellent.
13 Because we monitor turnaround time of stop loss
14 carriers.
15      Q.   And apparently both those things were
16 changing in the summer of 2001, in your experience?
17      A.   Correct.
18      Q.   Now, do you recall any problems in the
19 application process with BCS?
20      A.   No. That application was signed at San
21 Benito, so initially I wasn't aware of anything.
22      Q.   Okay. Later were you aware of anything?
23      A.   No. We were taken out of the picture, so we
24 had no way of determining what was going on.
25      Q.   Did you provide San Benito with any
                      CitiCourt, LLC
                      (801) 532-3441

PAGE 86

Don William Merrill, 7/21/03                86

1  information about BCS?
2       MR. SHUCHART: I assume we're talking about
3  the 2001-2002 time frame?
4       MR. WALRAVEN: Yes. At that point, talking
5  about stop loss.
6       A.   Rankings and that, that was provided to San
7  Benito.
8       Q.   You provided the same sort of information
9  about BCS that we've talked about you generally
10 provide --
11      A.   Right.
12      Q.   -- in connection with stop loss carriers?
13      A.   Yes. And we have other experience with BCS
14 with no problems whatsoever in paying very, very large
15 claims. So I don't know what was involved.
16      Q.   Prior to that time frame, had there been any
17 lasering of claims or claimants with any of the San
18 Benito policies?
19      A.   I don't remember, because that's not really
20 my area.
21      Q.   Who would know that within your
22 organization?
23      A.   It may be Glade Nixon.
24      Q.   Anyone else?
25      A.   You know, I would have heard it, but I don't
                      CitiCourt, LLC
                      (801) 532-3441

PAGE 87

Don William Merrill, 7/21/03                87

1  recall exactly who was involved in that lasering.
2       Q.   After the summer of 2001, do you recall
3  hearing of any lasering?
4       MR. SHUCHART: I assume you're referring to
5  at the time or as of today?
6       MR. WALRAVEN: Yeah.
7       A.   Yeah, I don't recall what those -- what the
8  names were or the amounts or how that was done.
9       Q.   But apparently the topic came up in
10 connection with your conversations with J. Allan Hall?
11      A.   Not with mine, no.
12      Q.   Did it come up in any of the conversations
13 that anyone was having with J. Allan Hall about
14 renewing?
15      A.   I'm sure they were --
16      MR. SHUCHART: I'll object. Calls for
17 speculation.
18      Q.   Let me ask it a little bit different.
19      A.   Yeah, ask it again and I'll try to --
20      Q.   In connection with the 2001-2002 policy
21 year, did it ever come to your attention that the topic
22 of lasering came up with respect to getting a proposal
23 from J. Allan Hall?
24      MR. SHUCHART: Again, are we talking about
25 as of today or are we talking about at the time? Just
                      CitiCourt, LLC
                      (801) 532-3441

PAGE 88

Don William Merrill, 7/21/03                88

1  want to clarify.
2       Q.   (BY MR. WALRAVEN) Well, let's first of all,
3  at the time.
4       A.   At the time I was aware of it, I'm sure, but
5  I don't recall what that was.
6       Q.   And who would be more knowledgeable about
7  what J. Allan Hall was saying, to your organization?
8       A.   Well, I might be knowledgeable if I went
9  back to the records and researched it, but I don't know
10 at the time.
11      Q.   Who was it that was having those
12 conversations with J. Allan Hall on behalf of your
13 organization?
14      A.   Consolidated.
15      Q.   And who was talking to Consolidated at your
16 organization?
17      A.   Could have been myself.
18      Q.   Or?
19      A.   I'll just say myself.
20      Q.   You don't know of anyone else that was
21 involved --
22      A.   No.
23      Q.   -- with your organization, correct?
24      A.   Right.
25      Q.   And you were talking to who at Consolidated?
                      CitiCourt, LLC
                      (801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 12   PAGE 89

**PAGE 89**

Don William Merrill, 7/21/03                    89

1    A.    Doug Routh.
2    Q.    He was still there?
3    A.    Yes.
4    Q.    And did you have any conversations at that
5  time frame about lasering with anyone directly at J.
6  Allan Hall, or was it all through the Consolidated
7  Companies and Mr. Routh?
8    A.    Any work that we did with MGU's really would
9  be through that sales organization.
10   Q.    So you don't remember Mr. Hall, for example,
11 coming back to Salt Lake City and having another
12 meeting with you --
13   A.    No.
14   Q.    -- during the mid part of 2001?
15   A.    No.
16   Q.    Let me ask similar questions about getting a
17 proposal from BCS.  Do you recall that you were aware
18 of any lasering issues with BCS during the summer of
19 2001?
20   A.    I'm sure they were similar to those of J.
21 Allan Hall's, but I don't know what they were and I
22 don't recall the numbers.
23   Q.    So you have just a general recollection that
24 the BCS proposals from the beginning indicated that
25 certain claims would be lasered.  Is that your best

CitiCourt, LLC
(801) 532-3441

**PAGE 90**

Don William Merrill, 7/21/03                    90

1  memory?
2    A.    Best memory.
3    Q.    Do you recall any conversations you had with
4  anyone at the school district during the summer or fall
5  of 2001 about the lasering issues?
6    A.    I'm sure that would have been discussed with
7  the presentation of the renewal which I think was in
8  August.
9    Q.    Where did that presentation take place?
10   A.    San Benito School.
11   Q.    Who was present?
12   A.    Mr. Sanchez and Ms. Gonzalez.
13   Q.    And you?
14   A.    And Phyllis.
15   Q.    Anyone else there that you recall?
16   A.    I don't think so.
17   Q.    And was that presentation both oral and in
18 writing, that is, you had some written documents
19 describing the various proposals?
20   A.    Position, yes.
21   Q.    And as best you recall, those proposals
22 presented in approximately August of 2001 would have
23 included whatever the lasering issues were?
24   A.    Yes.
25   Q.    And do you recall if you presented more than

CitiCourt, LLC
(801) 532-3441

**PAGE 91**

Don William Merrill, 7/21/03                    91

1  two proposals?
2    A.    I don't recall.
3    Q.    Do you know if you presented any proposals
4  that did not involve the lasering of any claims?
5    A.    I don't recall.
6         MR. GEORGE:  I'm sorry?
7    A.    I do not recall that.
8    Q.    And do you -- well, I'd better ask this
9  first.  Were you and your firm still involved at the
10 time a decision was made to go with BCS?
11   A.    Preliminary decision, not a firm decision,
12 and I don't think a firm decision was necessarily
13 reached, but it may have been.  It was just an awkward
14 time.
15   Q.    And from what you recall of that
16 presentation, what were the reasons expressed as to why
17 the BCS proposal might be more attractive?
18   A.    The main reason would be money.
19   Q.    That is the cost of the program?
20   A.    The premiums were dramatically different.
21   Q.    Any other significant differences between
22 the proposals that you recall discussing with San
23 Benito at that time?
24   A.    Our experience with BCS is that their
25 turnaround time is one of the fastest in the industry

CitiCourt, LLC
(801) 532-3441

**PAGE 92**

Don William Merrill, 7/21/03                    92

1  for advance funding of stop loss claims.
2    Q.    And did you undertake any -- let me back up
3  a step.  Were your contacts with BCS through any
4  intermediaries such as the Consolidated Companies?
5    A.    Initially, yes.
6    Q.    And was it the Consolidated Companies and
7  Mr. Routh?
8    A.    Initially, yes.
9    Q.    Later you dealt with them direct?
10   A.    Yes, because they elected to change their
11 marketing format and allow a direct arrangement through
12 brokers.  And so with that change, they flew out and
13 spent time directly with us.
14   Q.    And as a result of that change, did that
15 result in any commission getting paid to you or your
16 firm?
17   A.    No.
18   Q.    During your conversations with them, either
19 directly or through Mr. Routh, did you undertake to
20 confirm that they would be providing this advance
21 funding of claims?
22   A.    Yes.
23   Q.    And did they provide such confirmation in
24 writing?
25   A.    I don't know.

CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 93

Don William Merrill, 7/21/03                93

1    Q.    Do you recall ever looking at the -- I'm
2    sorry. Did you recall something?
3    A.    Yes.
4    Q.    What did you recall?
5    A.    That we probably have a document that says
6    that.
7    Q.    Okay. And if we were going to talk about
8    that document, what would it be called or what would it
9    say? Would it be a letter? A form?
10   A.    It would be a letter at our request just
11   clarifying their format.
12   Q.    And you believe you do have such a letter?
13   A.    I think so.
14   Q.    Do you recall ever looking at the insurance
15   policy, either BCS or Companion Life, concerning this
16   issue of advance funding?
17         MR. SHUCHART:  Can you clarify the time
18   frame?
19         MR. WALRAVEN:  Anytime.
20         MR. SHUCHART:  Objection, overly broad.
21   A.    It's possible that I reviewed over the
22   contract to look at it, but like I said previously, I
23   believe advance funding is an administrative procedure
24   followed by the paying entity and may not at times be
25   included as part of a contract.
                CitiCourt, LLC
                (801) 532-3441

PAGE 94

Don William Merrill, 7/21/03                94

1    Q.    But as we sit here today, do you actually
2    remember ever sitting down and looking at one of the
3    San Benito policies with respect to this issue?
4    A.    No.
5    Q.    Has your firm been involved in any other
6    litigation in Texas?
7         MR. SHUCHART:  Objection, overly broad.
8    A.    I don't think so. Oh, yes, I recall
9    something, and I don't know what it is but it's a very
10   minor thing and I don't know what that is.
11   Q.    Was it in Texas?
12   A.    There was a Texas law firm involved, so
13   there was something. May have been a complaint by a
14   participant. I don't know what it was.
15   Q.    You don't remember any of the details?
16   A.    I do not remember the details.
17   Q.    Mr. Merrill, I think I've reached the end of
18   my outline. I'm going to pass the witness and let
19   somebody else ask you questions, if anybody else wants
20   to.
21   A.    Thank you.
22         MR. WALRAVEN:  Thank you very much.
23   Appreciate your patience this morning.
24         MR. BUSH:  How about lunch?
25         MR. SHUCHART:  No, let's finish the witness.
                CitiCourt, LLC
                (801) 532-3441

PAGE 95

Don William Merrill, 7/21/03                95

1         MS. HEGLAND:  We're not going to finish.
2         MR. BUSH:  It's going to be at least
3    probably two hours with me.
4         MR. SHUCHART:  Just for you?
5         MR. BUSH:  Uh-huh.
6         MR. SHUCHART:  And how long how long for
7    you? When you say two hours, are you talking about a
8    combination or individually?
9         MS. HEGLAND:  Individually.
10        MR. WALRAVEN:  Let's go off the record.
11        (Recess from 11:54 a.m. to 1:03 p.m.)
12             EXAMINATION
13   BY MR. BUSH:
14   Q.    Mr. Merrill, my name is Shelby Bush. We met
15   before we started today, and I represent Companion Life
16   Insurance Company.
17        Did I understand your testimony correctly
18   earlier when you said that advance funding is very
19   common in the stop loss industry?
20   A.    Correct.
21   Q.    But you still needed to have a meeting with
22   J. Allan Hall here in your office to see if it would be
23   offered on these --
24   A.    No.
25   Q.    -- plans?
                CitiCourt, LLC
                (801) 532-3441

PAGE 96

Don William Merrill, 7/21/03                96

1         MR. SHUCHART:  Objection. Mischaracterizes
2    testimony.
3    Q.    What was the purpose of the meeting with
4    Mr. Hall, if you remember?
5    A.    Mr. Hall was coming through the area and so
6    we thought it would be an ideal time to visit with him
7    about our relationship and how it was going. And Doug
8    Roth flew in, so we met with him. And that's part of
9    the discussion we had relative to that.
10   Q.    Why the need to have that discussion?
11   A.    Why the need?
12   Q.    Yes.
13   A.    Because that's just an important part of
14   being a third-party administrator.
15   Q.    Would you be surprised if Mr. Sanchez and
16   Ms. Gonzalez indicated that advance funding was not a
17   major issue in their decision to enter into a stop loss
18   contract?
19        MR. SHUCHART:  Objection. Mischaracterizes
20   his previous testimony.
21   A.    I don't know how their feelings are.
22   Q.    Would that surprise you, though?
23        MR. SHUCHART:  Same objection.
24   A.    I don't know.
25   Q.    Did you discuss advance funding with San
                CitiCourt, LLC
                (801) 532-3441

SHEET 13   PAGE 97

Don William Merrill, 7/21/03        97

1  Benito Consolidated Independent School District?
2      A.    Yes.
3      Q.    And on how many occasions?
4      A.    At least one.
5      Q.    With whom did you discuss advance funding?
6      A.    As indicated before, I spoke with
7  Mr. Sanchez and Ms. Gonzalez.
8      Q.    And in what context was the discussion
9  regarding advance funding?  Did you bring it up?
10     A.    No.
11     Q.    They brought it up?
12     A.    It was brought up because this was a renewal
13 and we were talking about stop loss insurance.  So I'm
14 sure it was part of the discussion.
15     Q.    Do you recall who brought it up?
16     A.    No.
17     Q.    Would it surprise you if Ms. Gonzalez
18 testified that she did not know what advance funding
19 was?
20     A.    Wouldn't surprise me.
21     Q.    Why is that?
22     A.    Most people have to be around stop loss
23 insurance for a long time before they understand it.
24     Q.    How long is a long time?
25     A.    Who would know?  I don't know.

CitiCourt, LLC
(801) 532-3441

PAGE 98

Don William Merrill, 7/21/03        98

1      Q.    Ten years?
2      A.    No.
3      Q.    Ten years is not a long time?
4      A.    That's a long time.
5      Q.    Would you think someone who had been
6  handling self-insured plans for an entity for ten years
7  to know what stop loss -- or advance funding is?
8              MR. SHUCHART:  Objection.
9              MR. WALRAVEN:  Objection to form of the
10 question.
11             MR. SHUCHART:  Requires speculation.
12             MR. WALRAVEN:  And vague.
13             THE WITNESS:  Repeat it.
14     Q.    (BY MR. BUSH)  Would you expect someone who
15 had been in charge of a stop loss insurance or a
16 self-insured benefit plan for an entity for ten years
17 to know what advance funding is?
18     A.    You would expect that, yes.
19             MR. WALRAVEN:  Same objection.
20     Q.    Do you know whether or not on August 31st,
21 2001 the San Benito Consolidated Independent School
22 District, which I'll refer to as the District --
23     A.    Okay.
24     Q.    -- do you know if their employee health
25 benefits account had enough money in it to cover

CitiCourt, LLC
(801) 532-3441

PAGE 99

Don William Merrill, 7/21/03        99

1  approximately $900,000 in claims?
2      A.    I believe it did.
3      Q.    Did you ever see a document, whether it's a
4  bank statement or anything else?
5      A.    No.
6      Q.    So what is the basis for your belief that it
7  has enough money in it?
8      A.    From what we heard -- actually we saw the
9  one bank account on a monthly basis, so I reviewed the
10 fund accounting in that account on a monthly basis.
11 But I did not know the reserve account and how much was
12 in there or how much interest had accrued to that
13 account.
14     Q.    Okay.  And when you referred to the fund
15 account, is that the account out of which checks to
16 providers were written?
17     A.    Yes.
18     Q.    And you're telling me there's another
19 account that you referred to as a reserve account --
20     A.    Yes.
21     Q.    -- correct?  Do you know how the District
22 handled those two accounts?
23     A.    I do not.
24     Q.    You only knew how much was in the account on
25 a month-to-month basis?

CitiCourt, LLC
(801) 532-3441

PAGE 100

Don William Merrill, 7/21/03        100

1              MR. SHUCHART:  Objection, vague.  First of
2  all, when you say "you," are you talking about him
3  personally?
4              MR. BUSH:  I'm referring to the TPA, whether
5  it's MBA of Wyoming or -- I think we discovered this
6  morning that MBA of Wyoming --
7              MR. SHUCHART:  I mean, the entities, not --
8              MR. BUSH:  Yes.  I'm not talking about Don
9  individually.
10     A.    We know on a monthly basis and also kept
11 track every time.  We made a claims run, we would know
12 approximately what that would -- what effect that would
13 have on the balance.  So almost on a daily basis we
14 would know the account.
15     Q.    And what is a claims run?
16     A.    A paid claims run?
17     Q.    Uh-huh.  Would you explain that, please?
18     A.    It's just a computer run based upon the
19 claims and the dollar amounts of those claims for the
20 period.
21     Q.    Is it an itemization of claims paid per
22 plaintiff participant?
23     A.    Correct.
24     Q.    And does it list the check number?
25     A.    Probably does, yes.

CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 101

Don William Merrill, 7/21/03          101

1   Q.   Does it list the provider or the payee of
2   the check?
3   A.   Depends on how you run the computer run.
4   Q.   How automated was your claims payment
5   process? Did you provide software?
6   A.   No. We've been on the RIMS system of
7   Chicago for since inception.
8   Q.   RIMS standing for --
9   A.   Research Information Management Systems,
10  Naperville, Illinois.
11  Q.   So are you a licensee of that software
12  system, "you" being MBA?
13  A.   I think that's what you call them, yes.
14  Q.   That's a system that you utilized when you
15  were processing claims for the District between October
16  1st, 2000 and August 31st, 2001?
17  A.   Yes.
18  Q.   And when I refer to the contract year, let's
19  just be clear that I'm referring to the contract in
20  question, being the stop loss contract purchased by the
21  District from Companion Life Insurance Company covering
22  claims paid between October 1st, 2000 and August 31st,
23  2001. Is that your understanding of the contract
24  that's at issue in this lawsuit?
25  A.   Yes.

CitiCourt, LLC
(801) 532-3441

PAGE 102

Don William Merrill, 7/21/03          102

1   Q.   Okay. Was there any kind of administrative
2   charge to the District for the use of this RIMS
3   software?
4   A.   No.
5   Q.   It was built into your services that you
6   provided?
7   A.   That's correct.
8   Q.   Do you have any knowledge as to the annual
9   revenue that the District's benefit plan provided to
10  MBA of Wyoming for the year --
11  A.   No.
12  Q.   No idea?
13  A.   No general idea without reviewing documents.
14  Q.   Would you think it would be over $100,000?
15  A.   If I took a moment with this document, I
16  could --
17  Q.   Sure, go ahead.
18  A.   Yes, it could be.
19  Q.   Do you have any idea now as to a rough
20  amount?
21  A.   Well, it's a multiple, I don't have a
22  calculator, of $12.60 times the number of employees
23  times 12 months. And if they had 1,300 employees, you
24  could calculate that quite easily.
25  Q.   Twelve dollars times 1,300 times 12?

CitiCourt, LLC
(801) 532-3441

PAGE 103

Don William Merrill, 7/21/03          103

1   A.   Right.
2   Q.   Okay. So it's no small sum of money. Do
3   you agree with me?
4   A.   I agree that we processed a very large
5   number of claims for the school district.
6   Q.   Was it one of your larger accounts?
7   A.   Yes.
8   Q.   Okay. So back to one of my questions I
9   started with. You understood there to be enough money
10  in the fund account to cover the approximate $900,000
11  that this lawsuit is about?
12  A.   Between the fund account and the reserve
13  account for the purposes of the employee benefits, yes.
14  Q.   So why were checks being held?
15  A.   Because we were told to. We had no
16  authority to disburse the checks until they told us to.
17  Q.   "They" being --
18  A.   The school district.
19  Q.   And who told you to hold checks?
20  A.   Mr. Sanchez.
21  Q.   Was that by way of a written communication
22  or an oral communication?
23  A.   To my knowledge, oral communications,
24  because of his interest in, as any other school
25  district, in accumulating interest to the monies.

CitiCourt, LLC
(801) 532-3441

PAGE 104

Don William Merrill, 7/21/03          104

1   Q.   Accumulating interest to the monies?
2   A.   To the fund account, so to the reserve
3   account.
4   Q.   So was this a common practice?
5   MR. SHUCHART: Objection to form, vague.
6   Q.   I asked about holding checks for the 8/31/01
7   time period. You answered multiple communications, or
8   you used the word "communications" plural. We can read
9   the record if you'd like.
10  A.   Right.
11  Q.   Was there or was there not more than one
12  communication from Mr. Sanchez for you, the TPA, to
13  hold checks?
14  A.   It's pretty hard for a TPA and MBA to
15  release checks unless we're told to release checks from
16  any account, because we don't have that discretionary
17  ability to do that.
18  Q.   Objection, non-responsive. Did Mr. Sanchez
19  inform or instruct MBA on more than one occasion to
20  hold checks, not send them to providers?
21  A.   I would say yes.
22  Q.   Approximately how many times did that
23  happen?
24  A.   I didn't count them. I just knew that was
25  an ongoing directive that we had.

CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 14   PAGE 105

Don William Merrill, 7/21/03        105

1   Q.      And do you recall when it might have
2   started?
3        A.    Let me answer it this way.  We have, you
4   know, we have -- no, I don't know when it started.  So
5   I'll just do it that way.
6        Q.    Was it that way throughout the whole
7   administration of that contract, the Companion Life
8   stop loss contract?
9             MR. SHUCHART:  Are we just talking about
10  this 2000-2001 year?
11            MR. WALRAVEN:  Yes.
12            THE WITNESS:  Ask the question again,
13  because --
14       Q.    (BY MR. BUSH)  Were you instructed
15  throughout the entire Companion Life stop loss contract
16  year to hold checks on a frequent basis?
17       A.    Yeah, we're not -- it's not to hold checks,
18  but not to disburse the checks until we were told to
19  release them.  In other words, if we sent a claims run
20  to the District, then they would tell us when to
21  release that run.
22       Q.    So are you telling me there's a difference
23  between an affirmative statement to hold checks --
24       A.    No, I'm not.
25       Q.    -- in silence and being able to release

CitiCourt, LLC
(801) 532-3441

PAGE 106

Don William Merrill, 7/21/03        106

1   checks?  Is that what you're telling me?
2        A.    I think I was pretty clear in my
3   explanation.
4        Q.    Do you agree with my statement?
5        A.    I'm not sure what you said.
6        Q.    Okay.  Do you agree with me that these two
7   situations have the same result: situation number one,
8   the District telling you to hold checks; situation
9   number two, you not being able to release checks until
10  you're told to release checks, the same result being
11  checks don't get sent out of this office to a provider?
12       A.    I agree.
13       Q.    You're telling me the situation with the
14  District is, or was during this time period that you
15  had to wait for their authority to release checks?
16       A.    Yes.  It may only be that just the knowledge
17  of knowing how much the release was for them to say go
18  ahead.
19       Q.    And what's the reason for knowing how much?
20       A.    Interest-bearing dollars in the reserve or
21  in the account.
22       Q.    Would a better way of answering that be that
23  the District wanted to maintain as much money in their
24  account as possible so they could earn interest on that
25  money?

CitiCourt, LLC
(801) 532-3441

PAGE 107

Don William Merrill, 7/21/03        107

1        A.    That's definitely so.
2        Q.    And was there a set amount on an average
3   basis per month of checks that were authorized to be
4   released?
5        A.    May have been.  I don't know.
6        Q.    You don't know.  Who would know?
7        A.    Mr. Sanchez.
8        Q.    No one in this organization, this
9   organization being MBA, no one would know the answer to
10  that question?
11       A.    Let me say it this way.  It would be much
12  easier if we had full authority to release claims every
13  time we -- and release checks every time we had a
14  claim, because our interest is to turn them around as
15  fast as possible.  Otherwise, we're going to take
16  telephone calls.  So we have no interest of holding the
17  checks.
18       Q.    What document can you point me to that
19  restricts your authority to release checks?
20       A.    I'm not sure we'd need a document, because
21  any client would terminate our administrative contract
22  if we weren't following their direction.
23       Q.    Okay.  We have an administrative -- an
24  agreement between you and the District, and that
25  contract controls your obligations, your rights and

CitiCourt, LLC
(801) 532-3441

PAGE 108

Don William Merrill, 7/21/03        108

1   obligations.  Would you agree with that?
2             MR. SHUCHART:  Objection.  Calls for a legal
3   conclusion.
4        A.    Yeah.
5        Q.    Is there anything beyond that document
6   that --
7        A.    The wishes of the client.
8             MR. SHUCHART:  Same objection.
9        Q.    Do you handle other plans in the same
10  manner?
11       A.    Yes.
12       Q.    You have other plans that will either tell
13  you to hold checks or will not give you the authority
14  to release checks?
15       A.    The latter comment would be correct.
16       Q.    So you have other plans that don't give you
17  authority to release checks?
18       A.    That's correct.
19       Q.    Can you give me the names of any of those
20  plans?
21       A.    No.
22       Q.    Because you don't know them?
23       A.    I don't want to reveal them.
24       Q.    Well, I have the right to know who they are,
25  so you're here under oath today to answer my questions,

CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 109

Don William Merrill, 7/21/03                109

1  and that's one of the questions.
2      A.    Saunders Brothers Construction.
3      Q.    Now, where are they located?
4      A.    In Utah.
5      Q.    What city?
6      A.    Sandy.
7      Q.    Sandy?
8      A.    S-a-n-d-y.
9      Q.    Do you have a contact person there?
10     A.    Mr. Saunders.
11     Q.    Are you aware of what Mr. Saunders'
12 reasoning is for withholding authority to release
13 checks?
14     A.    Corporations just follow their cash flow
15 requirements, and so they may release it from one time
16 to another.  That's their decision.
17     Q.    How many employees does Saunders Brothers
18 Construction have?  Do you know?
19     A.    Currently about 30.
20     Q.    Are you aware of Department of Labor
21 regulations regarding payment of claims under ERISA
22 plans?
23     A.    I don't -- I'm not sure what you're
24 referring to, and specifically I probably do not know.
25     Q.    Okay.  What other plans do you have telling

CitiCourt, LLC
(801) 532-3441

PAGE 110

Don William Merrill, 7/21/03                110

1  you or not giving you the authority to release checks?
2      A.    I'm not sure I'd know right off the top of
3  my head, because as a TPA we're doing many more things
4  than that, and you're probably aware of that.  But the
5  truth is we set up a billing system based upon the
6  underwritten rate levels that take to the maximum
7  liability.  And those numbers are then utilized to set
8  up sufficient monies to put into the plan for release
9  of claims.  But nevertheless, owners of businesses like
10 to have control of those dollars and the flow of them
11 just on a daily basis throughout their months.
12     Q.    Do you have any kind of account that you use
13 from MBA's perspective that would cover any claims from
14 various plans?
15     A.    No.
16     Q.    You can't think of any other plans besides
17 Saunders Brothers Construction?
18     A.    No.
19     Q.    What stop loss carrier is involved in that
20 plan?
21     A.    Could be Novia, a small account.
22     Q.    And does that plan, does Novia provide
23 advance funding?
24     A.    Yes.
25     Q.    You know that for a fact?

CitiCourt, LLC
(801) 532-3441

PAGE 111

Don William Merrill, 7/21/03                111

1      A.    Yes.
2      Q.    Is it in their stop loss contract that they
3  will provide advance funding?
4      A.    I don't know that off the top of my head.
5      Q.    You talked about the -- I think you called
6  it interlocal pool, government pool?
7      A.    Government trust.
8      Q.    Intergovernment -- intragovernmental risk
9  pool?  In any event, we talked about this morning about that
10 being an excess, excess coverage.  In other words, it
11 covered claims over a million dollars.
12     A.    Yes.
13     Q.    Is it the District's position that because
14 they have this excess $1 million coverage that they
15 don't have to rebid their stop loss coverage under a
16 million dollars?
17          MR. SHUCHART:  Objection.
18          MR. WALRAVEN:  Objection to form.
19          MR. SHUCHART:  Requires speculation.
20          MR. BUSH:  If he knows.
21     A.    No, I don't know.
22     Q.    Who's the Austin lawyer?
23     A.    I don't know.
24     Q.    You just know it was set up by an Austin
25 lawyer?

CitiCourt, LLC
(801) 532-3441

PAGE 112

Don William Merrill, 7/21/03                112

1      A.    Uh-huh.
2      Q.    Who told you that?
3      A.    Smith-Reagan agency.
4      Q.    This memo was marked as Exhibit No. 29
5  earlier today, and it does not have a date.  This
6  apparently was prepared by you.  When was that
7  prepared?
8      A.    I can't tell from the way that is.  I noted
9  that when I looked at it earlier.  It could be pulled
10 up on the word processor, and I don't know.
11     Q.    So the creation date on your word processor
12 would --
13     A.    Would have been right after the meeting with
14 Mr. Hall.
15     Q.    Do you frequently document in this manner?
16     A.    I do, because I was in the military for a
17 number of years.
18     Q.    What does that have to do with your drafting
19 memos to the file?
20          MR. SHUCHART:  Objection, argumentative.
21     A.    Just a wise thing to do.  It's a procedure
22 used in the military.
23     Q.    How long were you in the military?
24     A.    Approximately three and a half years on
25 active duty.

CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 15   PAGE 113

Don William Merrill, 7/21/03   113

1   Q.   What branch?
2   A.   Air Force.
3   Q.   Where were you stationed?
4   A.   Headquarters mass, Belleville, Illinois; and
5   49th TAC fighter in Germany.
6   Q.   And what years was that?
7   A.   From 19 -- somewhere around 1959 through
8   '62, '63.
9   Q.   Was that after graduation from college?
10   A.   Yes.
11   Q.   So you would have -- confused this morning
12   by when you got your degree from BYU. That must have
13   been in '59, then?
14   A.   Correct.
15   Q.   Is that right?
16   A.   Yes.
17   Q.   There's some confusion as to who would be
18   signing the application when the District was applying
19   for stop loss coverage with Companion Life. Do you
20   recall any events around that time regarding Michael
21   Swetnam?
22   MR. SHUCHART: Objection, form.
23   A.   Briefly I do.
24   Q.   Okay. What do you recall about what was
25   going on with Mr. Swetnam and the District?

CitiCourt, LLC
(801) 532-3441

---

PAGE 114

Don William Merrill, 7/21/03   114

1   A.   I think the District asked who should sign
2   the contract, and I indicated that I should have a
3   qualified brokerage or broker house sign it. And
4   therefore they called Mr. Swetnam on the phone and
5   asked if he would sign that contract.
6   Q.   What's the significance of having a
7   qualified brokerage house sign it?
8   A.   Just the licensing.
9   Q.   Was he in fact the agent of record for the
10   District at the time he signed that application?
11   A.   No, he was not.
12   Q.   Did they have an agent of record?
13   A.   I don't believe so. I don't know that for
14   sure.
15   Q.   What do you know about why he was -- or his
16   services were no longer needed? You mentioned this
17   morning that they were trying to be an agent for
18   themself, "they" being the District.
19   A.   That had nothing to do with -- Swetnam was
20   part of the Smith-Reagan agency, and they had been on
21   the account for five years.
22   Q.   Their dismissal or termination had nothing
23   to do with the District seeking to be its own agent?
24   A.   It may have been.
25   MR. SHUCHART: Objection. Requires

CitiCourt, LLC
(801) 532-3441

---

PAGE 115

Don William Merrill, 7/21/03   115

1   speculation.
2   Q.   Do you know whether it did or not?
3   A.   I don't know that.
4   Q.   You don't know anything about any further
5   differences between Mr. Swetnam and the District?
6   A.   I don't know if there was differences or not
7   or if there was just relationships that go on in
8   changing of the guard at the school districts where
9   they can appoint.
10   Q.   Do you know whether Mr. Swetnam received any
11   kind of commission?
12   A.   He did not.
13   Q.   Did not, okay. Would you recognize the San
14   Benito Employee Health Benefit Plan document if you saw
15   it?
16   A.   Would I recognize it?
17   Q.   Yes.
18   A.   Yes, I would.
19   (Exhibit 30 marked.)
20   Q.   I'll show you what we've marked as Exhibit
21   No. 30.
22   A.   Looks like a booklet.
23   Q.   Looks like one in book form has been copied
24   and --
25   A.   It does.

CitiCourt, LLC
(801) 532-3441

---

PAGE 116

Don William Merrill, 7/21/03   116

1   Q.   In a landscape type format. Does that
2   appear to be the plan document that was in effect from
3   October 1st, 2000 to August 31st, 2001?
4   A.   It appears to be that.
5   (Exhibit 31 marked.)
6   Q.   And I'll show you Exhibit No. 31 and ask if
7   you recognize that document.
8   A.   I do.
9   Q.   And could you identify it for the record,
10   please.
11   A.   That may have been an original group
12   administration manual that was prepared. May not be
13   updated, but it's what it is.
14   Q.   And it was prepared by whom?
15   A.   Our office.
16   Q.   And it says Merrill Bostrom & Associates at
17   the top. Correct?
18   A.   It does say that.
19   Q.   Is there any way if you looked in there you
20   could tell whether -- when it was prepared, whether
21   it's been updated?
22   A.   Looks like it's missing the front pages.
23   That doesn't show any date, so -- it may have been a
24   sample administrative manual given to them right at the
25   beginning and may not have been an updated one, too.

CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 117

Don William Merrill, 7/21/03          117

1  So therefore there would be no date on it.
2      Q.    "Them" being the District?
3      A.    The District, yes.
4      Q.    Okay.  So do you know whether it was
5  prepared specifically for the District?
6      A.    Doesn't show that.  Maybe it does.  That
7  page does appear that it is.  It doesn't show a date.
8      Q.    Was it Merrill Bostrom & Associates, or
9  Merrill Bostrom Associates' common practice to prepare
10 such a voluminous manual?
11     A.    Administrative documents?
12     Q.    Yes.
13     A.    Yes.
14     Q.    Such as this?
15     A.    Yes.
16     Q.    And was it prepared as a marketing tool or
17 was it prepared after you already signed someone up?
18     A.    Prepared after we signed someone up to
19 assist.
20     Q.    All right.  It has a section in here on
21 reinsurance.  Would you agree with me?
22     MR. SHUCHART:  Objection.  Document speaks
23 for itself.
24     A.    Looks like there's a section there.
25     Q.    Okay.  Does that --
                  CitiCourt, LLC
                  (801) 532-3441

PAGE 118

Don William Merrill, 7/21/03          118

1      A.    Not a date.
2      Q.    Do you have any idea what time period this
3  might have been prepared and presented to the District?
4      A.    No, I don't.
5      Q.    Does that section on reinsurance mention
6  anything about advance funding?
7      MR. SHUCHART:  Objection.  Document speaks
8  for itself.
9      A.    I'm looking at a page that does have a
10 comment relative to that under C.  What page?
11     MR. SHUCHART:  Just identify it by the
12 numbers at the bottom.
13     THE WITNESS:  SB-00338.
14     Q.    (BY MR. BUSH)  And does it reference that it
15 might be a separate agreement anytime advance funding
16 is provided?
17     A.    This is talking about an aggregate advance,
18 not a specific advance.  I don't know.
19     Q.    Is there a difference in the advance funding
20 realm, whether it's going to be aggregate or specific
21 and whether it needs to be in a contract?
22     MR. SHUCHART:  Objection, compound.
23     A.    It would be nice if it was in a contract,
24 that's true.
25     Q.    Okay.  What are the differences between
                  CitiCourt, LLC
                  (801) 532-3441

PAGE 119

Don William Merrill, 7/21/03          119

1  aggregate advance funding and specific advance funding?
2      A.    On aggregate advance funding you pay a
3  premium for that piece which allows an advance by the
4  carrier based upon the cash flow of claims if it
5  exceeds the amount of the aggregate factors year to
6  date.  A specific is based upon an individual specific
7  claim.
8      Q.    And is it your testimony here today that in
9  order for -- strike that.  Is it your testimony here
10 today that a plan can obtain advance funding on a
11 specific basis and not have to pay a higher premium for
12 it?
13     A.    We've never been told that there's a higher
14 premium for that.
15     Q.    How long have you been in the business?
16     A.    In the insurance business over 30 years.
17     Q.    How about the self-funded stop loss side of
18 the insurance business?
19     A.    Over 30 years.
20     Q.    Thirty years.  And you've never seen a
21 situation where specific advance funding affected the
22 premium paid for the stop loss coverage?
23     A.    No, I haven't seen where that's been
24 indicated in writing.
25     Q.    Well, objection, non-responsiveness.  Have
                  CitiCourt, LLC
                  (801) 532-3441

PAGE 120

Don William Merrill, 7/21/03          120

1  you ever seen a situation where it has affected the
2  premium payment?
3      A.    No.
4      Q.    Whether it's in writing or not?
5      A.    No.
6      Q.    Can you explain the difference why you would
7  have to pay a premium for aggregate and not have to pay
8  it for specific?
9      A.    It's just been established that way from the
10 carriers, to my understanding.
11     Q.    But is it -- you just indicated that it
12 would be nice if it were in the contract.
13     A.    Right.  If they would indicate it and say
14 you could go with advance funding or not advance
15 funding, that would be great.  But I've never seen that
16 occur.
17     Q.    On a specific basis?
18     A.    Right.  I've never seen that occur on a
19 specific basis.  It might affect the renewal,
20 obviously, but it's not -- I haven't seen it that way.
21     Q.    Do you know any carriers that don't charge
22 an extra premium for advance funding?
23     MR. SHUCHART:  Objection.  Not specific.
24 Are you talking about an aggregate or stop loss -- I
25 mean, individual?
                  CitiCourt, LLC
                  (801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 16   PAGE 121

Don William Merrill, 7/21/03    121

1    Q.   (BY MR. BUSH) Either. Let's go with
2 aggregates.
3    A.   Oh. The aggregate, all carriers that I have
4 seen charge a premium for the aggregate advance.
5    Q.   Do you know any that don't for the specific?
6    MR. SHUCHART: Objection, asked and
7 answered.
8    A.   I don't know any carrier, nor have I known
9 any carrier that shows a premium in a proposal for an
10 advance funding of a specific.
11    Q.   Objection, non-responsive. Do you normally
12 charge the premium whether they show it or not?
13    A.   I don't know.
14    (Exhibit 32 marked.)
15    Q.   Is there some confusion, do we know who the
16 stop loss carrier was for the year prior to 2000-2001?
17    A.   I don't off the top of my head.
18    Q.   You don't know, okay.
19    MR. SHUCHART: Off the record for a second.
20    (Off the record briefly.)
21    Q.   (BY MR. BUSH) I show you Exhibit No. 32.
22 Do you recognize that application?
23    A.   Looks like a familiar application. I don't
24 know.
25    MR. SHUCHART: Ready for another question?

CitiCourt, LLC
(801) 532-3441

PAGE 122

Don William Merrill, 7/21/03    122

1    MR. BUSH: He's still looking at it.
2    MR. SHUCHART: I thought he answered the
3 question.
4    THE WITNESS: I was trying to figure out who
5 filled it out and who signed the contract.
6    Q.   (BY MR. BUSH) Can you identify the
7 document?
8    A.   Yes.
9    Q.   Okay, what is it?
10    A.   It's Companion Life application for stop
11 loss insurance.
12    Q.   Did you have any role in preparing this?
13    A.   No.
14    Q.   It was signed by William Greer dated
15 November 23rd, 1999.
16    A.   Smith-Reagan agency.
17    Q.   Mr. Greer's with the Smith-Reagan agency?
18    A.   Yes.
19    Q.   Were you the TPA at the time?
20    A.   Yes.
21    Q.   But you didn't have any input into getting
22 this completed?
23    A.   Not that document, no. It was sent to us,
24 or sent directly to Smith-Reagan.
25    Q.   Does this give us any indication as to

CitiCourt, LLC
(801) 532-3441

PAGE 123

Don William Merrill, 7/21/03    123

1 whether Companion Life was the stop loss carrier for
2 the prior year?
3    A.   I don't think so. This just shows for this
4 period of time.
5    Q.   Just because an application was submitted
6 doesn't mean they were the carrier, correct?
7    A.   No. And it appears that most carriers, they
8 are not consistent one with another of how they do
9 renewals or following applications if they have, you
10 know, Companion Life was the carrier prior to that and
11 then this application, they still may have been two
12 separate applications. There had been no indication
13 whether it was a renewal application or not.
14    Q.   Can you look at Exhibit No. 32 and see if
15 there's any mention of advance funding?
16    MR. SHUCHART: Objection. Document speaks
17 for itself.
18    A.   Are you saying toward a specific or
19 aggregate?
20    Q.   Either.
21    A.   The aggregate is shown, monthly aggregate
22 accommodation with signed note. The specific, just
23 can't see it off the top of my -- without reading it
24 word for word.
25    Q.   Could you look at paragraph 11 on the next

CitiCourt, LLC
(801) 532-3441

PAGE 124

Don William Merrill, 7/21/03    124

1 page, subsection -- what is that? Can't read it.
2    A.   I, probably, I, J, K.
3    Q.   Does this paragraph give you any indication
4 as to whether the contract is going to be an advance
5 funding on specific claims?
6    A.   No, it just indicates the type of a contract
7 it is, a reimbursement contract, which in general it
8 shows that it is.
9    Q.   A reimbursement contract meaning --
10    A.   A reimbursement contract.
11    Q.   Meaning what?
12    A.   Stop loss contract that pays when there is a
13 claim.
14    Q.   Is that what your definition of
15 reimbursement contract is?
16    A.   Yes.
17    Q.   Mr. Walraven referred a couple times to
18 these old reimbursement contracts that have been around
19 for 20 years. Would reimbursement mean the claim needs
20 to be paid first before you get reimbursed for it?
21    A.   Not necessarily.
22    Q.   Not necessarily. What does it mean?
23    A.   If you have a claim that exceeds the
24 deductible, you would be reimbursed. If it fell within
25 the previews of the stop loss -- I mean, the master

CitiCourt, LLC
(801) 532-3441

Case 1:03-cv-00047    Document 26    Filed in TXSD on 08/15/2003    Page 52 of 89

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 125

Don William Merrill, 7/21/03          125

1  plan document and was an eligible claim, it should be
2  reimbursed for payment of that.
3      Q.   Reimbursed -- you would get reimbursed for
4  what? After payment, correct?
5      A.   It doesn't say after payment.
6      Q.   It does, if you'll look at the language.
7      A.   Okay. Show it to me.
8      Q.   Okay. "Applicant must first pay claims
9  before submitting them for reimbursement."
10     A.   What does that mean?
11     Q.   You tell me.
12     A.   The contract as we understood it is that the
13  plan or the claim was paid and showed as paid, and then
14  we sent all of the information to the carrier and then
15  they would reimburse it.
16     Q.   Did you read the contract where it defined
17  what paid meant?
18     A.   I don't have that in front of me, no.
19     Q.   Well, I'll get it in front of you in a
20  minute. But did you read it at the time, do you
21  recall?
22     A.   I don't recall that I did.
23     Q.   Okay. Would you expect the contract to
24  define what paid means?
25     A.   Yes, it should.

CitiCourt, LLC
(801) 532-3441

PAGE 126

Don William Merrill, 7/21/03          126

1      (Exhibit 33 marked.)
2      Q.   This is Exhibit 33. Can you identify that
3  contract, please?
4      A.   It says at the top it's a Companion Life
5  insurance.
6      Q.   Take a minute to look at that and let me
7  know whether that's the contract that is at issue in
8  this litigation.
9      A.   Looks like it's the contract that was at
10  issue and signed by San Benito and Mr. Swetnam as the
11  resident agent.
12     MR. SHUCHART: Just for the sake of the
13  record, I think that document contains both contract
14  and the application. So I don't know that he can
15  answer whether you guys consider the application part
16  of the contract or not.
17     MS. HEGLAND: Well, the document speaks for
18  itself.
19     MR. BUSH: It states in there that it is
20  part of the contract.
21     MR. GOOD: While I find this intellectually
22  stimulating, all these documents speak for themselves.
23     Q.   (BY MR. BUSH) When is the last time you
24  reviewed that contract?
25     A.   Five years ago, if I even reviewed it then.

CitiCourt, LLC
(801) 532-3441

PAGE 127

Don William Merrill, 7/21/03          127

1      Q.   Five years ago?
2      A.   Yeah. I have not reviewed that.
3      Q.   If you could look at page 5. At the very
4  bottom there's a definition of what paid is. It refers
5  to checks being forwarded, actually sent out of the
6  office to the provider and enough money in the account
7  to cover them.
8      MR. SHUCHART: Is there a question?
9      MR. BUSH: He's reviewing it.
10     THE WITNESS: Yeah, I've read it.
11     Q.   (BY MR. BUSH) Okay. Is that something
12  you've read before today?
13     A.   I don't know. I suspect I did or I suspect
14  I didn't. I don't remember. It was a long time ago.
15     Q.   Is it your understanding that that issue is
16  central to the denial of the reimbursement request that
17  is at issue in this lawsuit?
18     A.   Yes.
19     Q.   In the amount of approximately $900,000?
20     A.   Yes.
21     Q.   And you told me earlier today that you
22  believed the District had enough money on August 31st,
23  2001 to cover all the claims at issue in this lawsuit.
24  Correct?
25     A.   Correct.

CitiCourt, LLC
(801) 532-3441

PAGE 128

Don William Merrill, 7/21/03          128

1      Q.   And had those checks been physically
2  forwarded to the provider and had money been in the
3  account sufficient to cover those checks, we wouldn't
4  be here today, correct?
5      MR. SHUCHART: Objection, calls for
6  speculation.
7      A.   Yeah, it does.
8      Q.   It does what?
9      A.   It calls for speculation. Because I don't
10  know that that would have been paid on the basis of --
11  you're just giving me the assumptions of what would
12  occur, and I don't know whether it would have occurred
13  or not.
14     Q.   Would that situation be apparent if the
15  checks were mailed and money was in the account to
16  cover the checks?
17     A.   The claims would have been paid.
18     Q.   Right. That's my point.
19     (Exhibit 34 marked.)
20     I show you Exhibit No. 34. Do you recognize
21  that letter?
22     A.   Yes.
23     Q.   And could you identify it for the record,
24  please?
25     A.   It's a letter to Mr. Lorenzo Sanchez, who's

CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 17   PAGE 129

Don William Merrill, 7/21/03   129

1 the human resource risk manager, San Benito School
2 District.
3    Q.   Dated September 27, 1999?
4    A.   Yes.
5    Q.   And I guess on the next page, is your
6 signature apparent on the next page?
7    A.   Should be, yes.
8    Q.   Is there anything in this letter that
9 mentions advance funding?
10    MR. SHUCHART:   Objection. Document speaks
11 for itself.
12    A.   Not that I can see.
13    Q.   Mr. Merrill, the plaintiffs' lawsuit claims
14 that the stop loss contract was procured through
15 Mr. Swetnam. Is that correct?
16    A.   Through the Smith-Reagan agency, I'd say yes
17 to that.
18    Q.   And what was the situation where we had to
19 get Mr. Swetnam to sign it because he was not the agent
20 of record?
21    A.   You'd have to re-ask the question, because
22 what's the time period? Are you talking about the
23 original contract or the 2000?
24    Q.   Talking about the contract that's at issue
25 in this lawsuit.

CitiCourt, LLC
(801) 532-3441

PAGE 130

Don William Merrill, 7/21/03   130

1    A.   This contract here?
2    Q.   It's been alleged that that contract was
3 procured through Mr. Swetnam. Is that true or false?
4    A.   That's false. Mr. Swetnam was not the
5 agent.
6    Q.   Did you represent to the District that
7 claims would be paid regardless of whether checks had
8 actually been cut to pay providers?
9    A.   I don't know if I did exactly like that or
10 not, but I represented the facts that the J. Allan Hall
11 organization was paying advance funding and had
12 followed those procedures for the time that I worked
13 with him, as well as a Consolidated company indicating
14 that they were using self-funding -- I mean, advance
15 funding also.
16    Q.   Are you distinguishing using advance funding
17 versus advance funding being available? Is there a
18 difference between those two statements?
19    A.   Well, it has to be available for you to use
20 it.
21    Q.   Right.
22    A.   So if it's being used, then it must be
23 available.
24    Q.   Right. But is it available in every
25 instance without asking for it and without contracting

CitiCourt, LLC
(801) 532-3441

PAGE 131

Don William Merrill, 7/21/03   131

1 for it?
2    A.   I don't know that. If Consolidated issues a
3 proposal that came from the J. Allan Hall organization
4 and they had indicated that they were using advance
5 funding and that was the administrative procedure that
6 they were using, then I would assume that that's -- my
7 assumption is that that's the way they would do it,
8 because they've always been doing it that way.
9    Q.   You would expect that proposal to say one
10 way or another whether advance funding would be
11 utilized in this instance, correct? Because the
12 proposal is specific to this instance.
13    MR. SHUCHART:   Objection, form.
14    A.   I don't totally agree with that.
15    Q.   You would expect a proposal to be deficient
16 in the terms and conditions of the ultimate contract?
17    MR. SHUCHART:   You say deficient?
18    MR. BUSH:   Deficient, yes.
19    MR. SHUCHART:   Objection, argumentative.
20    A.   I agree that most of those contracts were
21 deficient in that they didn't spell that out. And yet
22 the administrative procedures by the claims
23 participation entity promoted the fact that they were
24 using that format. So it's an administrative procedure
25 and not part of a contract. In claims paying there are

CitiCourt, LLC
(801) 532-3441

PAGE 132

Don William Merrill, 7/21/03   132

1 a lot of administrative procedures that are not part of
2 the contract or plan document.
3    Q.   Let's shift gears a minute. Were you
4 involved in paying claims for the District?
5    A.   No.
6    MR. SHUCHART:   I assume now we're referring
7 to him personally as opposed to --
8    MR. BUSH:   Yes.
9    MR. SHUCHART:   -- the entities?
10    MR. BUSH:   Yes.
11    THE WITNESS:   No.
12    Q.   (BY MR. BUSH)  Do you have any personal
13 knowledge as to whether any of the District's claims
14 were ever paid in advance?
15    A.   I believe they were.
16    Q.   And what knowledge do you have in that
17 regard?
18    A.   I don't have any knowledge, I mean, anything
19 in writing or anything, just that I believe that.
20    Q.   That's just a belief that you had?
21    A.   Yes.
22    Q.   But you don't know personally whether any
23 claims were actually ever paid in advance?
24    A.   Not without researching.
25    MR. GEORGE:   Excuse me. Paid in advance of

CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 133

Don William Merrill, 7/21/03          133

1  the reimbursement fee?
2         MR. BUSH:  Yes, in advance of reimbursement,
3  yes.
4         THE WITNESS:  Yes.
5     Q.   (BY MR. BUSH)  Would it be easy for a TPA to
6  kind of self-implement advance funding?
7         MR. SHUCHART:  Objection, vague.
8     A.   No.
9     Q.   If you presented a check register to an MGU
10 representing that certain claims have been paid?
11        MR. SHUCHART:  Objection, vague.  You need
12 to define the term "paid."
13    A.   Yeah.
14    Q.   In defining the term "paid" in this instance
15 would be checks forwarded to providers.
16    A.   I don't necessarily agree with you.
17    Q.   I'm sorry?
18    A.   I don't necessarily agree with that comment.
19    Q.   Do you know Leo Ramirez?
20    A.   No, I do not.
21    Q.   Do you know or have you ever heard of --
22 have you heard of Leo Ramirez?
23    A.   No, I don't know the name.
24    Q.   Seen his name?
25    A.   No.

CitiCourt, LLC
(801) 532-3441

PAGE 134

Don William Merrill, 7/21/03          134

1     Q.   Do you have any idea what connection he
2  might have or what knowledge of facts related to this
3  lawsuit?
4     A.   I do not.
5     Q.   Okay.  How about Hector Leal?
6     A.   I do not.
7     Q.   How about Manuel Gonzalez?
8         MR. SHUCHART:  Did you say Manuel?
9         MR. BUSH:  Manuel.
10    A.   No.
11    Q.   No?  Mario Silva?
12    A.   No.  I don't recall who they are.
13    Q.   Oscar de la Fuenta?
14    A.   Yes, I recognize that name.
15    Q.   And how do you recognize that name?
16    A.   Just remember that I think he is a board
17 member, or he was a board member of the school
18 district.
19    Q.   Did you ever deal with Mr. de la Fuenta?
20    A.   No.
21    Q.   How about Gilbert Matavo?
22    A.   No.
23    Q.   Joe Gonzalez?
24    A.   There are two Joe Gonzalezes, I understand.
25    Q.   Joe G. Gonzalez.

CitiCourt, LLC
(801) 532-3441

PAGE 135

Don William Merrill, 7/21/03          135

1     A.   Is he the superintendent?
2     Q.   I don't know.
3     A.   One of them is the superintendent.
4     Q.   Right.  Did you ever meet with Mr. Gonzalez?
5  You mentioned earlier you were at a meeting and he
6  left.
7     A.   Yes.
8     Q.   Was that the only time you ever met with
9  him?
10    A.   No.  I've been in at lunch with him and I've
11 been in meetings with him from time to time over those
12 years.
13    Q.   And do you recall discussing the contract at
14 issue in this lawsuit with Mr. Gonzalez?
15    A.   No, I don't.
16    Q.   Would you have done that in the general
17 course of dealings with the District?
18    A.   Usually those discussions were done
19 separately by the agency in San Benito, Smith-Reagan
20 agency.
21    Q.   So you dealt with Smith-Reagan; Smith-Reagan
22 dealt with the District?
23    A.   For the most part, yes.
24    Q.   What were the reasons for you to have a
25 face-to-face meeting with Mr. Gonzalez?

CitiCourt, LLC
(801) 532-3441

PAGE 136

Don William Merrill, 7/21/03          136

1         MR. SHUCHART:  Objection, vague.  When are
2  we talking about?
3     A.   He wanted to know who I was.
4     Q.   Okay.  Is that it?
5         MR. GOOD:  I'm sorry.  What was your answer?
6         THE WITNESS:  He wanted to know who I was.
7     Q.   (BY MR. BUSH)  How many times do you recall
8  meeting with him?
9     A.   Maybe three times.
10    Q.   And do you recall over what period of time?
11    A.   No.
12    Q.   Do you know Mr. Sanchez?
13    A.   Yes.
14    Q.   Was he your principal contact?
15        MR. SHUCHART:  Talking about personally or
16 the entity?
17        MR. BUSH:  Anytime --
18        MR. SHUCHART:  Personally or the entity?
19        MR. BUSH:  Anytime Mr. Merrill dealt with
20 the District.
21    Q.   (BY MR. BUSH)  Who did you deal with?
22    A.   Either Mr. Sanchez or Ms. Gonzalez, Janie .
23 Gonzalez.
24    Q.   Who is Patrick Zunini?
25    A.   I know that name.  He's a new individual

CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

---

SHEET 18   PAGE 137

Don William Merrill, 7/21/03        137

1 that was hired after Doug Routh left the Consolidated
2 Companies and I think joined Consolidated in Reno.
3        Q.    And you continued to get quotes from them or
4 not after Mr. Routh left?
5        A.    I tried to, yes.
6        Q.    Okay.  Did you work with Mr. Zunini?
7        A.    He had somebody else assigned, and I can't
8 remember the name of the individual.
9        Q.    And I'm asking these questions because your
10 attorneys have listed these individuals as persons with
11 knowledge of relative facts, and I'm wanting to know if
12 you know what they know or why they're listed.  Did you
13 deal with anyone at J. Allan Hall other than Mr. Hall?
14        A.    I didn't deal with anyone specifically on --
15 that I recall.  I just --
16        Q.    Have you ever communicated with anyone at
17 Companion Life Insurance Company directly?
18        A.    I don't think I've ever --
19        Q.    And that's either orally or in writing?
20        A.    I don't think so.
21        (Exhibit 35 marked.)
22        Q.    I show you Exhibit No. 35.  Can you identify
23 that letter, please?
24        A.    This is a January 12th, 2001 letter from
25 Consolidated from Doug Routh.
                CitiCourt, LLC
                (801) 532-3441

---

PAGE 138

Don William Merrill, 7/21/03        138

1        Q.    It's a letter from Mr. Routh to you,
2 correct?
3        A.    That's correct.
4        Q.    And is it forwarding the contract that's at
5 issue in this litigation?
6        A.    Looks like it is, yes.  It looks like the
7 same one we just looked at.
8        Q.    Okay.  In the body of the letter it says, if
9 the terms and conditions accurately reflect the result
10 of our negotiation, please forward this to the
11 District.  That's not a quote, but do you agree with me
12 that that's what the letter asks you to do?
13        A.    Yes.
14        Q.    Does it ask you to review it carefully?
15        A.    Yes.
16        Q.    Did you do so?
17        A.    I may not have.
18        Q.    You forwarded it on to the District, though,
19 didn't you?
20        A.    Yes.
21        Q.    And I think that letter is January 12th.  We
22 have a letter here from you which I've marked Exhibit
23 No. 36, actually dealing with only the application.
24        (Exhibit 36 marked.)
25        Identify that, please, for the record.
                CitiCourt, LLC
                (801) 532-3441

---

PAGE 139

Don William Merrill, 7/21/03        139

1        A.    This is a letter to Lorenzo Sanchez,
2 November 16th of 2000.
3        Q.    And is that your signature?
4        A.    Yes.
5        Q.    And you recall seeing that letter?
6        A.    I'm sure I did, yes.
7        Q.    What is the reference, or what is the
8 statement in there, please review --
9        A.    The final application.
10        Q.    "After you have reviewed," it says "(REF
11 #11)."  What is REF #11?
12        A.    Reference No. 11.  I don't know.  Do you
13 have the attachment?
14        Q.    No, but it's one of the exhibits that we've
15 just --
16        A.    Which page?
17        Q.    It's attached to this.
18        MS. HEGLAND:  Attached to Exhibit --
19        Q.    Attached to Exhibit 33, which is the
20 application dealing with the contract at issue in this
21 lawsuit.  I'm curious as to reference 11, if that's the
22 whole paragraph 11, or what you meant.
23        A.    I don't remember, but --
24        Q.    You have no idea?
25        MR. SHUCHART:  Objection, asked and
                CitiCourt, LLC
                (801) 532-3441

---

PAGE 140

Don William Merrill, 7/21/03        140

1 answered.
2        A.    Yeah.  You know, I recognize the letter and
3 what was included, but I just asked them to review it
4 and go through that.  But I'm not sure why I referenced
5 11.  But I asked them to initial each page.
6        Q.    And from a timing standpoint, this is
7 November 16th, 2000, dealing with coverage that was
8 supposed to start October 1st, 2000.  Why the delay in
9 getting the policy in effect, if you can tell me?
10        MR. SHUCHART:  Objection, form.  Assumes
11 facts not in evidence.
12        A.    It would appear that the contract just did
13 not come from Companion Life until then.
14        Q.    This is just the application, correct,
15 November 16, 2000?
16        A.    Right.  But applications in most instances
17 come from the MGU, so it didn't come from the MGU until
18 then.
19        Q.    Do you recall when you first started
20 negotiating with any carrier for coverage starting
21 December -- or October 1st, 2000?
22        MR. SHUCHART:  Objection, assumes facts not
23 in evidence.
24        A.    Those dates would have been earlier than
25 that.
                CitiCourt, LLC
                (801) 532-3441

---

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 141

Don William Merrill, 7/21/03          141

1    Q.    Okay. Is there any dispute from your
2  perspective that the checks that represent the
3  approximate $900,000 as being sought by the District
4  were not mailed to the provider by August 31st, 2001?
5    A.    I don't know that. Have to go back and
6  check.
7          MR. GOOD: I'm sorry. What did you say?
8          THE WITNESS: I said I don't know that.
9    Q.    (BY MR. BUSH) You haven't throughout the
10 course of this litigation confirmed whether the
11 auditor's finding, or even before this litigation
12 whether the auditor's finding was correct or not?
13   A.    Could you tell me what findings that you're
14 talking about?
15   Q.    Well, I'll show you.
16         (Exhibit 37 marked.)
17         I show you Exhibit No. 37. Have you seen
18 this document before?
19         MR. SHUCHART: Just -- I think it's the
20 same --
21         MR. BUSH: Does this have disclosure issues?
22         MR. SHUCHART: Yes. So --
23         MR. BUSH: We'll redact it. We haven't
24 dealt with that today, either, have we?
25         MR. GOOD: Nobody's mentioned any names.

CitiCourt, LLC
(801) 532-3441

PAGE 142

Don William Merrill, 7/21/03          142

1          MR. SHUCHART: Off the record.
2          (Recess from 2:14 to 2:28 p.m.)
3    Q.    (BY MR. BUSH) We're back from break, and
4  before the break I marked Exhibit No. 37. And just so
5  the record is clear: I will be redacting names of
6  beneficiaries, whether they're employees, dependents,
7  whatnot that might be identified in Exhibit No. 37, to
8  maintain the identity and confidentiality of those
9  individuals. I'll either be doing so by whiting out
10 the name on a particular sheet or taking out -- I think
11 this may have some sheets on it that may be mistaken.
12 No, I don't think it does have any census information,
13 so it doesn't have any group of pages that I could take
14 off this exhibit. And I'll go through this and redact
15 it before we leave here today, leave the court reporter
16 with only a redacted version, if that's okay with
17 everyone in attendance.
18         MS. HEGLAND: Yes.
19         MR. WALRAVEN: That's fine.
20         MR. SHUCHART: That's fine.
21   Q.    (BY MR. BUSH) Mr. Merrill, have you seen
22 Exhibit 37 before?
23   A.    I could have.
24   Q.    Sitting here today, you don't recall whether
25 you have or not?

CitiCourt, LLC
(801) 532-3441

PAGE 143

Don William Merrill, 7/21/03          143

1    A.    No, I don't know if I reviewed this report.
2    Q.    Do you recall that an audit was conducted?
3    A.    Yes.
4    Q.    And that was specifically related to at
5  least two claims involved in this litigation. Do you
6  recall that?
7    A.    As part of it, yes.
8    Q.    Were there other claims that were part of
9  the audit?
10   A.    No, not that I know of.
11   Q.    And I'm not going to mention the
12 individuals' names.
13         MR. SHUCHART: Actually, I still have the
14 cheat sheet that --
15         MR. BUSH: Do you?
16         MR. SHUCHART: Yes, I do.
17         MR. BUSH: We've referred to Jane Doe and --
18         MR. SHUCHART: Let's go off the record for a
19 second.
20         (Discussion off the record.)
21   Q.    (BY MR. BUSH) Back on the record. Is it
22 your understanding that one claim involved a female
23 plaintiff participant with a premature baby?
24   A.    I recall that there was a female employee,
25 but that's all.

CitiCourt, LLC
(801) 532-3441

PAGE 144

Don William Merrill, 7/21/03          144

1    Q.    And we have referred to that claim in this
2  lawsuit as the Jane Doe claim. The other claim I'll
3  represent to you involves a male and I believe it was a
4  stroke, and we've referred to that claim as John Doe.
5          MR. BUSH: What was it?
6          MS. HEGLAND: Some debilitating disease.
7    Q.    (BY MR. BUSH) You recall it being an audit,
8  correct?
9    A.    Yes.
10   Q.    Did you meet personally with an auditor in
11 regard --
12   A.    At the close of the section I sat in on it.
13   Q.    At the close of the --
14   A.    The auditor's visit and her exiting
15 interview, I sat in on that.
16   Q.    And where was the audit conducted?
17   A.    In our office.
18   Q.    Do you know what types of items the auditor
19 requested and reviewed?
20   A.    No.
21   Q.    Do you know whether the auditor was
22 concentrating on whether checks had been forwarded
23 prior to August 31st, 2001?
24   A.    Yeah, I do know now that I looked at it.
25   Q.    You didn't know before today?

CitiCourt, LLC
(801) 532-3441

SHEET 19   PAGE 145
Don William Merrill, 7/21/03          145

1   A.   That it had something to do with that and
2   your questioning, I knew that in general that's what it
3   was covering.
4   Q.   Have you authored a memo before today to the
5   file that deals with holding of checks and this whole
6   issue of these checks that weren't sent prior to August
7   31st being the central issue in this lawsuit?
8   A.   I don't think I did.
9   Q.   Is there any kind of memo to the file about
10  instructions from Mr. Sanchez to hold checks?
11  A.   I don't know if there is or not.
12  Q.   Since you did have the office procedure to
13  document items, did you document items when you didn't
14  receive the authority to release checks?
15          MR. SHUCHART:  Objection, vague.
16  Q.   Goes back to what we discussed earlier,
17  whether you were told to hold them or you weren't given
18  the authority to release them.
19  A.   Well, we were told to hold them.
20  Q.   You were told to hold them?
21  A.   And -- just re-ask the question, because we
22  have to go --
23  Q.   This morning you said you weren't told to
24  hold them but you weren't given the authority to
25  release them.  So is it you were told to hold the
                CitiCourt, LLC
                (801) 532-3441

PAGE 146
Don William Merrill, 7/21/03          146

1   checks?
2   A.   The overall procedure had to do with them
3   directing and we not having any authority to release
4   checks unless they told us to.  And we gave them
5   information on a weekly basis as to what checks were
6   available for -- you know, we processed the claims and
7   they were to let us know when they should be released.
8   Q.   And was that called a held check list?
9   A.   It's a good term, yes.
10  Q.   There's no memo in your file regarding the
11  holding of checks and instructions from the District to
12  do so?
13          MR. SHUCHART:  Objection.  The file speaks
14  for itself.
15          MR. BUSH:  I haven't seen the file.
16          THE WITNESS:  I haven't seen the file,
17  either.
18  Q.   (BY MR. BUSH)  You haven't seen your file?
19  A.   No.  I did not review it before coming here.
20  Q.   Contained within Exhibit 37 is a memo
21  drafted by you to Gloria Boyce of the auditing firm.
22  Do you recall drafting that memo?
23  A.   Yes.
24  Q.   And did you -- again, that's undated also.
25  When was it drafted?
                CitiCourt, LLC
                (801) 532-3441

PAGE 147
Don William Merrill, 7/21/03          147

1   A.   I don't know.  I could find out.
2   Q.   Your word processor will have a date created
3   on it?
4   A.   Should have.
5          MR. SHUCHART:  Objection.  Requires him to
6   speculate.
7   Q.   You mentioned earlier that your word
8   processor would probably show when a document was
9   created.  Is that correct?
10  A.   Sure.
11  Q.   Do you have personal knowledge that there is
12  such a record in your computer?
13  A.   No.
14  Q.   Would you agree to have someone check your
15  computer or your assistant's computer as to when this
16  memo was created?
17          MR. SHUCHART:  Objection.  You can ask that
18  through some other request, some other vehicle, not in
19  a deposition.  That's inappropriate.
20          MR. BUSH:  Are you instructing him not to
21  answer that?
22          MR. SHUCHART:  Read back the question.
23          ("Would you agree to have someone --)
24          MR. SHUCHART:  Yes, I'm instructing him not
25  to answer.
                CitiCourt, LLC
                (801) 532-3441

PAGE 148
Don William Merrill, 7/21/03          148

1          THE WITNESS:  On that basis, I won't answer.
2          MR. BUSH:  Are you serious?  You want me to
3   go through the trouble of getting electronic
4   discovery to discover his computer records --
5          MR. SHUCHART:  No, I didn't say that.  Let
6   us check and see --
7          MR. BUSH:  -- which have already been
8   requested?
9          MR. SHUCHART:  My understanding is their
10  computer program has automatic date settings, so it
11  means there's no way to retrieve a created date on it.
12  But let me verify that.
13          MS. HEGLAND:  It's your computer.
14          MR. SHUCHART:  Right.  That's what most
15  programs --
16          MS. HEGLAND:  It will print today's date.
17          MR. SHUCHART:  Right.  That's my
18  understanding that that's what happened.
19          MR. BUSH:  It will have a record of when it
20  was dated and it will have a record of the last edit.
21          MR. SHUCHART:  My understanding, no, it
22  doesn't do that.  That's why let me check.
23          MR. BUSH:  The computer will do it.  Now,
24  the software may not.
25          MR. SHUCHART:  My understanding is no, it
                CitiCourt, LLC
                (801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 149

Don William Merrill, 7/21/03                149

1  won't do that.
2          MR. BUSH: All computers do that, okay? It
3  takes the person with knowledge to find it.
4      Q.    (BY MR. BUSH) Do you recall drafting this
5  memo?
6      A.    Yes.
7      Q.    You don't recall, was it before or after you
8  met with the auditor?
9      A.    Well, as you can -- as it reads there, it
10 was after.
11     Q.    Okay. And was Gloria Boyce who you met
12 with?
13     A.    She's the auditor.
14     Q.    Was that who you met with?
15     A.    I sat in on the last interview, I indicated.
16     Q.    Did you meet with Ms. Boyce?
17     A.    Yes.
18     Q.    And in this memo you indicate that you
19 thought that this contract contained advance funding.
20 Is that correct?
21     A.    From the information given to us by
22 Consolidated and J. Allan Hall company, and the format
23 in which contracts that we dealt with were using
24 self-funding, I mean, advance funding, I believe that
25 that included the advance funding provision,
                      CitiCourt, LLC
                      (801) 532-3441

PAGE 150

Don William Merrill, 7/21/03                150

1  administrative provision that was being handled by J.
2  Allan Hall.
3      Q.    Okay. In the third paragraph of your memo
4  to Gloria Boyce you indicate, "As a result of that
5  meeting, MBA put together a questionnaire (see
6  attached) which required each of the carriers with
7  which MBA did business to affirm the way they did
8  business and handled contracts and claims. As you can
9  see, the form has specific questions relating to the
10 funding of claims."
11         Were you making a reference to advance
12 funding, and if so, where on this questionnaire does
13 it --
14     A.    This is one of the preliminary question
15 writeups, and so at that time we had not expanded that
16 to the extent that it got expanded to.
17     Q.    Meaning what?
18     A.    Well, it didn't include all of the questions
19 that could be asked. We left it up to the contract in
20 the way in which they were administering the claim
21 payments for reimbursements.
22     Q.    So you agree with me that this questionnaire
23 does not say anything about advance funding?
24     A.    Yes, I agree with you.
25     Q.    Is there another questionnaire that was
                      CitiCourt, LLC
                      (801) 532-3441

PAGE 151

Don William Merrill, 7/21/03                151

1  later developed?
2      A.    Everything we have is on an ongoing
3  development stage, really. Keep improving on what
4  you're doing all of the time.
5      Q.    Is there another questionnaire that was
6  later developed that contains an event?
7      A.    Probably is, yes.
8      Q.    What documents did you review, if any,
9  before your deposition today?
10     A.    None.
11     Q.    No documents. Now, it was unclear to me:
12 were you involved in placing the subsequent stop loss
13 coverage with BCS?
14     A.    At the instructions of San Benito, I
15 assisted with putting that information together so that
16 they could see it, yes.
17     Q.    Do you know whether or not they ultimately
18 entered into a stop loss contract, the District and
19 BCS?
20     A.    They signed -- I think they signed an
21 application to go ahead with it, but a final decision
22 had not been reached and I don't -- I don't know if
23 that was accepted by BCS at that time. And then we
24 were let out of the contract and we were not able to
25 assist or even review what was going on.
                      CitiCourt, LLC
                      (801) 532-3441

PAGE 152

Don William Merrill, 7/21/03                152

1      Q.    And what were the circumstances surrounding
2  your being let out of the contract?
3      A.    I don't know that.
4      Q.    You don't know that?
5      A.    No, I do not.
6      Q.    And in what manner were you let out of the
7  contract?
8      A.    We received a letter that just said that our
9  services -- we were notified of a discontinuance of our
10 administrative contract.
11     Q.    Letter from the District?
12     A.    The superintendent.
13     Q.    Mr. Gonzalez?
14     A.    Yes.
15     Q.    And you've had no subsequent communications
16 after that letter?
17     A.    Not with keeping the business in place.
18     Q.    Regarding why the termination, or the
19 contract was terminated?
20     A.    No.
21     Q.    Didn't need to know or didn't want to know
22 why?
23     A.    I did want to know; but if you dealt with a
24 school district with the administration and all the
25 board members, it would -- I'd have to go through a
                      CitiCourt, LLC
                      (801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 20   PAGE 153

Don William Merrill, 7/21/03        153

1  deposition to figure out what was really the reasons
2  and what was going on.
3      Q.   And you had a contract to provide services,
4  and you would get paid under that contract and it was
5  terminated all of a sudden, and --
6      A.   It was terminated early.  That's true.
7      Q.   Right.  And that was okay with you?
8      A.   No.
9      Q.   But you didn't talk to them about it, didn't
10 correspondent with them about it?
11     A.   I remember just talking with Janie Gonzalez
12 in a general sense but not receiving the reasons why
13 that occurred or anything else, no.
14          MR. BUSH:  I'll pass the witness.
15               EXAMINATION
16 BY MS. HEGLAND:
17     Q.   Mr. Merrill, are you doing all right?
18     A.   Yes.
19     Q.   Ready to keep on going?
20     A.   You bet.
21     Q.   Okay.  I just had some questions.  I'm going
22 to have to skip around here because I'm coming last,
23 but if you would be so kind as to indulge me.  I wanted
24 to clarify what licenses you hold today.
25          MR. SHUCHART:  Personally, I assure?

CitiCourt, LLC
(801) 532-3441

PAGE 154

Don William Merrill, 7/21/03        154

1      Q.   You, Mr. Don Merrill, okay?  I believe that
2  you indicated to Mr. Walraven that you, Don Merrill,
3  personally held an agent's license in the state of
4  Texas.  Is that correct?
5      A.   A non-resident agent license.
6      Q.   And what is that?  Would you educate me
7  about that?
8      A.   Well, I hold a resident agent license here
9  in Salt Lake City, in Utah, and I just -- I hold a
10 non-resident license in Texas.
11     Q.   What does that permit you to do in Texas?
12     A.   Basically the same things that I can do here
13 relative to life and disability.
14     Q.   Well, is that --
15     A.   Contracts.
16     Q.   -- like a sales license?
17     A.   Yes, it's a sales license.
18     Q.   So that is not a license that permits you to
19 adjust claims, for instance?
20     A.   No.
21     Q.   Does that license, is it limited to specific
22 types of insurance policies?
23     A.   Yes.  It's life and disability, which
24 includes medical insurance.
25     Q.   It does include medical insurance also?

CitiCourt, LLC
(801) 532-3441

PAGE 155

Don William Merrill, 7/21/03        155

1      A.   Yes, disability by definition.
2      Q.   Do you hold any other licenses or
3  certifications in the state of Texas --
4      A.   No.
5      Q.   -- you, Mr. Merrill?
6      A.   No.
7      Q.   Okay.  Does MBA/ICI hold any certifications
8  or licenses in the state of Texas?
9      A.   MBA of Wyoming, Inc., Merrill Bostrom
10 Associates holds a TPA license in the state of Texas.
11     Q.   Correct.  But my question was whether
12 MBA/ICI holds any certification in the state of Texas.
13     A.   ICI is not included in licensing.
14     Q.   So the answer is no?
15     A.   In the way you put that forth, the answer
16 would be no.
17     Q.   The only one of your entities, your business
18 entities, then, that holds a certification as a TPA in
19 the state of Texas would be MBA of Wyoming?
20     A.   Yes.
21     Q.   Okay.  Now, how long have you worked in the
22 business of being a third-party administrator, TPA?
23     A.   Approximately 15 years.
24     Q.   I think you indicated earlier that you, Don
25 Merrill, have about 30 years of experience in the

CitiCourt, LLC
(801) 532-3441

PAGE 156

Don William Merrill, 7/21/03        156

1  insurance industry?
2      A.   Yes.
3      Q.   Would you mind describing for us what that
4  experience involves?
5      A.   I began directly in the insurance business
6  with New York Life's group department, held six years
7  working there in Salt Lake City as a sales
8  representative.  Spent nine years with the Galbraith &
9  Green organization, a well-known TPA.
10     Q.   What was the name again?  I'm sorry.
11     A.   Galbraith & Green, who later became James
12 Benefits, Fred S. James and Company.  Alta Health
13 Strategies.  That at one time was the largest TPA
14 nationally with over 600,000 employees covered.
15 Offices here in Salt Lake City.
16          I left that organization and --
17     Q.   Excuse me.  Before you leave that
18 organization, what was your job with that company?
19     A.   In sales and assist the president with some
20 larger accounts, Ralston Purina and others.
21     Q.   What kind of assistance did you provide with
22 those larger accounts?
23     A.   Whatever was needed to just service and
24 assist that account.
25     Q.   Can you give me an example of what that

CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 157
Don William Merrill, 7/21/03    157

1 would be?
2    A.    At the time, self-funding was brand new in
3 the whole industry, and self-funding really got started
4 and had a lot to do with the Monsanto case in Missouri,
5 and there was a lot of questions whether that was
6 illegal or not. And it went on and on and on. Before
7 the whole thing ended, just assisting the president of
8 Galbraith & Green, Monsanto went self-funded as did
9 Ralston Purina. But it was just being associated with
10 stop loss insurance and self-funding.
11    Q.    But what sort of assistance when you worked
12 for the Galbraith & Green company were you provided?
13 I'm trying to just get an understanding of what your
14 experience in this industry has been.
15    A.    Mostly in sales and rating of and
16 determining rates for benefits.
17    Q.    Okay. When you say sales --
18    A.    Sales of stop loss, sales of self-funding,
19 sales of group life. But I was -- I really assisted in
20 the sales organization and handled a number of accounts
21 for the Galbraith & Green organization.
22    Q.    When you say you handled a number of
23 accounts, what do you mean?
24    A.    I basically did service work for that
25 account.

CitiCourt, LLC
(801) 532-3441

PAGE 158
Don William Merrill, 7/21/03    158

1    Q.    So Galbraith & Green would be the TPA --
2    A.    Yes.
3    Q.    -- for that account?
4    A.    Uh-huh.
5    Q.    And you on behalf of Galbraith & Green would
6 be like assigned to a specific account?
7    A.    As a service representative.
8    Q.    And as a service representative for the TPA
9 to that account, you would respond to questions that
10 came up or --
11    A.    Basically whatever was asked.
12    Q.    All right, thanks. Now, you were about to
13 tell me after Galbraith & Green you went somewhere
14 else.
15    A.    I held a no-compete contract and therefore
16 needed to get out of the area, basically. So I moved
17 to Denver and in Denver joined another TPA, which that
18 organization was Smith Administrators. I came back
19 here after one year, began working in this local area
20 and assisting them.
21    Q.    Back here in Salt Lake, you mean?
22    A.    In Salt Lake City. And then just felt like
23 I needed to continue on with what I was doing, and so I
24 joined with one of the executive vice presidents of the
25 Galbraith & Green James Benefit organization, and he

CitiCourt, LLC
(801) 532-3441

PAGE 159
Don William Merrill, 7/21/03    159

1 and I began trying to put together a separate TPA. And
2 then we eventually went to work for the Fred S. -- Fred
3 A. Morton Company, and the Fred A. Morton Company named
4 that TPA Morton Benefit Administrators, and that's
5 where the MBA came from.
6    Q.    Now, the MBA acronym seems to follow you
7 with every company.
8    A.    Right. And so two to four years into that
9 situation, the president of Fred A. Morton company,
10 which was a large property and casualty organization,
11 asked if I wanted to buy the balance of the business,
12 and I said yes. So then I went and found a partner
13 with the last name of B, and it became Merrill Bostrom
14 Associates. And at the time we had a lot of paperwork
15 throughout the Intermountain area, most of it school
16 districts in the state of Wyoming. And most of those
17 school districts, 12, 15 are still on the books in
18 Wyoming. And so we just left it as MBA. It's kind of
19 a quick rundown.
20    Q.    When was Merrill -- was Merrill Bostrom
21 Associates then the first of the entities that --
22    A.    No, MBA Wyoming, Inc.
23    Q.    Okay, MBA Wyoming, Inc.
24    A.    We just incorporated in the state of
25 Wyoming.

CitiCourt, LLC
(801) 532-3441

PAGE 160
Don William Merrill, 7/21/03    160

1    Q.    When was that incorporated?
2    A.    Approximately 1987.
3    Q.    And do you recall when Merrill Bostrom &
4 Associates was put together?
5    A.    Well, we just d/b/a'd MBA of Wyoming, Inc.
6 and operated in Utah as Merrill Bostrom Associates as
7 opposed to having a Wyoming name.
8    Q.    Okay. When was that done?
9    A.    Same time that that was --
10    Q.    1987?
11    A.    Yes.
12    Q.    When was Managed Benefit Administrators
13 created?
14    A.    2001.
15    Q.    That was when you split off from Bostrom?
16    A.    Just divided the accounts.
17    Q.    Divided the accounts, okay. And when was
18 Managed Benefit and Insurance Consultants formed?
19    A.    At that time.
20    Q.    The same --
21    A.    2001.
22    Q.    The same time. Why did you need two
23 different entities?
24    A.    Because he had his accounts and we had our
25 accounts.

CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 21   PAGE 161
Don William Merrill, 7/21/03          161

1    Q.    Well --
2    A.    And we did not want to have the common
3  ownership of 50-50.  Therefore, to split that out so
4  that we could sell either block of business, we had to
5  have the separate entities.  Which never happened, but
6  it is possible.
7    Q.    Okay.  So Managed Benefit Administrators,
8  that's Mr. Bostrom's?
9    A.    No, that's a Salt Lake entity.
10   Q.    Okay.
11   A.    Mr. Bostrom's entity is MBA, but it's called
12 Mountain Benefit Administrators.  Mountain Benefit
13 Associates.
14   Q.    (BY MS. HEGLAND)  Then I guess my question
15 is, why did you need to form both Managed Benefit
16 Administrators and Managed Benefit and Insurance
17 Consultants?  I don't understand the different
18 entities.
19   A.    Well, it's just a splitting of the ownership
20 of the accounts.
21       MR. SHUCHART:  I don't think you're
22 listening to her question.  Go ahead and repeat the
23 question.
24   Q.    Is there a difference?
25   A.    Between --
CitiCourt, LLC
(801) 532-3441

PAGE 162
Don William Merrill, 7/21/03          162

1    Q.    I understood there to be two different
2  companies, one called Management Benefit
3  Administrators, which is your --
4    A.    Which is a Salt Lake --
5    Q.    Salt Lake?
6    A.    -- entity for those accounts.
7    Q.    Okay.  And then another company called
8  Managed Benefit and Insurance Consultants.
9    A.    No, no, there isn't.
10   Q.    There is no such entity?
11   A.    No.  It's Mountain Benefit Associates,
12 Mountain Benefit Associates, which is the Wyoming
13 operation that handles those accounts.  But the MBA of
14 Wyoming, Inc. still exists.  So we both own that.  We
15 just divided the ownership of the accounts only, and
16 that was the purpose of it.
17   Q.    Right, I understand that part.  Forgive me,
18 but I thought I had seen documents with the name of
19 Managed Benefit and Insurance Associates on the
20 letterhead, and that's what I was trying to sort out.
21       MR. SHUCHART:  I don't think he said that
22 entity doesn't exist.
23       MS. HEGLAND:  That's what I understood.
24       MR. SHUCHART:  I think it's Managed Benefit
25 Associates, or one you're talking about.
CitiCourt, LLC
(801) 532-3441

PAGE 163
Don William Merrill, 7/21/03          163

1    Q.    (BY MS. HEGLAND)  Sorry.  Did you think of
2  something you might add?  I thought you were about to
3  say something.
4        MR. SHUCHART:  He was appropriately waiting
5  for a question before he started talking.
6        THE WITNESS:  He would?
7        MR. SHUCHART:  Off the record for a second.
8  (Discussion off the record.)
9    Q.    (BY MS. HEGLAND)  So straighten me out.  Are
10 there two different companies, one known as Managed
11 Benefit Administrators and one known as Managed Benefit
12 and Insurance Consultants?
13   A.    No.
14   Q.    Okay.  Which of those two companies is the
15 proper company that you operate out of Salt Lake?
16   A.    There's one name that combines everything
17 that you've said.  Managed Benefits Administrators and
18 Insurance Consultants is the legal name of that entity
19 that controls those accounts.
20   Q.    Okay, thank you.  And that company is
21 located here in Salt Lake?
22   A.    Yes.
23   Q.    And that company was formed in 2001?
24   A.    Right.
25   Q.    How many employees does that company have?
CitiCourt, LLC
(801) 532-3441

PAGE 164
Don William Merrill, 7/21/03          164

1    A.    I'm not sure how to answer that exactly,
2  because I guess it's all of the employees that are in
3  Salt Lake.
4    Q.    How many would that be?
5    A.    Approximately twenty.
6    Q.    I think you told us you are the president.
7    A.    Of that company.
8    Q.    Of that company.  Who are the other officers
9  of the company?
10   A.    There are basically no other officers of the
11 company.
12   Q.    Does that company have a financial officer?
13   A.    Director of operations.
14   Q.    Who would the director of operations be?
15   A.    That's Phyllis Merrill.
16   Q.    How is that company organized as a business?
17       MR. SHUCHART:  Objection, vague.
18   A.    You want to know the specific type, like a C
19 Corp or so on?
20   Q.    Yes.
21   A.    No, I don't know.  I don't know.  Just let
22 me leave it there.
23   Q.    In 2001 when that company was formed,
24 MBA/ICI was formed, what were your -- what was your job
25 as the president?
CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

---

PAGE 165

Don William Merrill, 7/21/03          165

1    A.    Basically I continued with the same job that
2  I held previously under MBA of Wyoming, Inc.  I didn't
3  change the functions, just changed the title.
4    Q.    Were you primarily doing sales, then, still?
5    A.    Yes.
6    Q.    Did you have direct involvement in servicing
7  accounts?
8         MR. SHUCHART:  Objection, vague.
9    A.    In general, yes.
10   Q.    What would the job function be, then, of the
11 director of operations?
12   A.    Basically as a financial officer and
13 controls the entire administrative portion of the
14 corporation with reporting from the different
15 departments.
16   Q.    How many different departments did you have
17 with MBA/ICI?
18   A.    How many do we have?
19   Q.    How many did you have in 2001?
20   A.    Administrative department and claims
21 operation department, basically two.
22   Q.    What did the claims department do?
23   A.    Managed and processed claims.
24   Q.    What did the administrative department do?
25   A.    Administration of eligibilities, billings,
                    CitiCourt, LLC
                    (801) 532-3441

---

PAGE 166

Don William Merrill, 7/21/03          166

1  processing of premiums and handling everything relative
2  to the administration in those areas of insurance.
3    Q.    Now, you, Mr. Merrill, in your position as
4  president and in marketing your company, I guess, did
5  you get involved in negotiating contracts on behalf of
6  clients?
7    A.    I do that sometimes, yes.
8    Q.    And when you do get involved as a TPA for an
9  existing client, do you sometimes then negotiate
10 contracts or -- well, yeah, contracts with stop loss
11 carriers?
12   A.    Partially.  Many times with MGU's.  But it's
13 more or less just receiving their proposals for a
14 particular client rather than negotiating a contract.
15   Q.    Now, in order to receive proposals for a
16 particular client, you first have to, I don't know what
17 you call it in your business, but send out for bids?
18   A.    Sometimes that's possible.  Many times it
19 would be just receiving the RFP through a brokerage
20 house and then sending it to those MGU's or carriers
21 that had a close relationship with us and we felt
22 comfortable about getting a bid for.  So we have bid on
23 numerous large cases, but that's just the way it goes.
24 RFP's come in and we send them out, and then we answer
25 the questions as a TPA back with respect to the RFP.
                    CitiCourt, LLC
                    (801) 532-3441

---

PAGE 167

Don William Merrill, 7/21/03          167

1    Q.    All right.  First let's clarify, what is an
2  RFP?
3    A.    A request for a proposal or an expense
4  occasion.
5    Q.    And the request for proposal comes from who?
6    A.    Usually from a brokerage house or a
7  consulting house or individual consultant.  In the
8  state of Texas there are multiple consultants out
9  there, inasmuch as they receive fairly good income from
10 doing consulting every year.
11   Q.    Well, let's talk about in the year 2000.
12 You were the TPA for San Benito School District,
13 correct?
14   A.    Correct.
15   Q.    When their contract year expires and they
16 come up for renewal or they have to get in place a new
17 contract, what was your role on behalf of your client,
18 San Benito?
19   A.    To provide all of the information from the
20 computer, including the census, the claims experience,
21 and all of that information for them so that they could
22 go to bid.
23   Q.    So you, MBA, whichever entity?
24   A.    Yeah, just say MBA every time --
25   Q.    MBA?
                    CitiCourt, LLC
                    (801) 532-3441

---

PAGE 168

Don William Merrill, 7/21/03          168

1         MR. SHUCHART:  Objection.
2    A.    -- correct.
3    Q.    MBA would put together the census
4  information, the claims experience, the relevant
5  information required, which would allow San Benito to
6  then request bids --
7    A.    Right.
8    Q.    -- for its employee benefit plan?
9    A.    Right.  They came to us on a formal basis
10 from time to time to do that, where we would then take
11 the same information and go out.
12   Q.    With respect to San Benito in the year 2000,
13 for that contract document did you assist San Benito --
14   A.    Yes.
15   Q.    -- in soliciting bids?
16   A.    Yes.
17   Q.    Did you forward the RFP's to specific
18 companies, or did you --
19   A.    Yes.
20   Q.    Okay.  Do you recall the companies that
21 responded to that RFP?
22   A.    I don't recall other than the two, the
23 renewal from J. Allan Hall and BCS insurance.
24       MR. SHUCHART:  She's talking about the 2000,
25 not the 2001.
                    CitiCourt, LLC
                    (801) 532-3441

---

CitiCourt, LLC
801.532.3441

SHEET 22   PAGE 169

Don William Merrill, 7/21/03        169

1  Q.   Yeah, we're on the year 2000.
2  A.   In the year 2000 I don't recall other
3  than -- I went to Consolidated as one organization, and
4  they went to J. Allan Hall.
5  Q.   But you were involved on behalf of the San
6  Benito School District in requesting bids for their
7  plan in the year 2000?
8  A.   To assist them, yes.
9  Q.   And in order to assist them, did you put
10 together the information we talked about, the census,
11 the claims experience?
12 A.   Yes, for them and for us to go to bid.
13 Q.   Now, when bids would come back, would you
14 then present those bids to San Benito for their
15 consideration?
16 A.   Yes.
17 Q.   And would you be involved in explaining to
18 San Benito the differences in the bids and the proposed
19 plans?
20 A.   Yes.
21 Q.   In other words, San Benito was your client,
22 correct?
23 A.   Right.
24 Q.   And San Benito looked to you as their TPA
25 for assistance in understanding and sorting out what

CitiCourt, LLC
(801) 532-3441

PAGE 170

Don William Merrill, 7/21/03        170

1  all these various different insurance bids and
2  proposals meant?
3       MR. SHUCHART:  Objection, form.
4  Q.   Is that correct?
5  A.   That's correct.
6  Q.   Because you were -- you were more
7  knowledgeable about insurance than San Benito?
8       MR. SHUCHART:  Objection.  Requires him to
9  speculate.
10 A.   Well, we could assist them, and they may
11 have used our information to go to other brokers to
12 have that evaluated also, which they probably did.
13      MS. HEGLAND:  Object to responsiveness.
14 Q.   (BY MS. HEGLAND)  Is it fair to say,
15 Mr. Bostrom, that you as a certified TPA with 30 years
16 of experience in the insurance industry would be more
17 knowledgeable in the field of insurance than the San
18 Benito School District?
19      MR. SHUCHART:  Objection.  Requires him to
20 speculate, and he's certainly not Mr. Bostrom.
21 A.   I don't know what the others think of me, so
22 I don't know how to answer that.
23 Q.   Well, wouldn't you think that someone like
24 yourself with 30 years of experience in the insurance
25 industry would be more knowledgeable about the field of

CitiCourt, LLC
(801) 532-3441

PAGE 171

Don William Merrill, 7/21/03        171

1  insurance?
2  A.   I know where the stop loss carriers are, and
3  here they are by name and the underwriters.
4  Q.   Would you agree that you would be more
5  knowledgable --
6       MR. SHUCHART:  Objection.  Same objection.
7  Q.   -- about the insurance industry?
8       MR. SHUCHART:  Same objection.
9  Q.   -- than the San Benito School District?
10      MR. SHUCHART:  Sorry.  Same objection.
11 A.   Possibly.
12 Q.   More likely?
13      MR. SHUCHART:  Same objection.
14 A.   More likely.
15 Q.   You told Mr. Walraven I think earlier that
16 your first contact with the San Benito School District
17 was about 1995, correct?
18 A.   I think I erred and said '96, but I think it
19 was '95.
20 Q.   At that time was the San Benito School
21 District operating as a self-funded employee benefit
22 plan?
23 A.   All I remember is that they were with Blue
24 Cross Blue Shield.  Whether that was self-funded or
25 fully insured, I don't know.

CitiCourt, LLC
(801) 532-3441

PAGE 172

Don William Merrill, 7/21/03        172

1  Q.   Do you know when the San Benito School
2  District did set up a self-funded employee benefit
3  plan?
4       MR. SHUCHART:  You mean for the first time?
5  Q.   Yes.
6  A.   It would have been in the school year of
7  September of that year, '95 or '96.
8  Q.   Were you involved with them in setting that
9  plan up?
10 A.   The agency was.
11 Q.   What agency are we talking?
12 A.   The Smith-Reagan agency.  We don't know how
13 they got our name, but Smith-Reagan agency contacted us
14 by phone, talked to us at length, asked us to send
15 information, flew into Salt Lake, and then began
16 working with us.
17 Q.   So is it your understanding that about 1995
18 was the time that the San Benito School District first
19 set up its self-funded employee benefit plan?
20 A.   As far as I know, even though they may have
21 been self-funded before.
22 Q.   Were you, was MBA the San Benito School
23 District's first TPA?
24 A.   I don't know that.
25 Q.   Do you know whether there had been other

CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 173

Don William Merrill, 7/21/03            173

1 third-party administrators that serviced the San Benito
2 School District?
3    **A.    No.**
4        MR. SHUCHART: Objection. He just said he
5 didn't.
6    **A.    Don't know.**
7    Q.    At that time in 1995, did you personally
8 call on the San Benito School District?
9    **A.    After they signed the contract with us, yes.**
10    Q.    Did San Benito designate a particular person
11 to be their contact with you for purposes of servicing
12 their employee benefit plan?
13        MR. SHUCHART: Again, you're now referring
14 back to MBA as opposed to Mr. Merrill personally?
15        MS. HEGLAND: Right.
16    **A.    We had to contact Mr. Sanchez and**
17 **Mrs. Gonzalez that full time.**
18    Q.    Did you make a memo to the file regarding
19 Ms. Gonzalez and Mr. Sanchez being the designated
20 contacts for the school district?
21    **A.    No.**
22    Q.    But those were the people that you and
23 employees of MBA would deal with at that account?
24    **A.    Yes. They're designated on a group digest.**
25    Q.    On what? I'm sorry.

CitiCourt, LLC
(801) 532-3441

PAGE 174

Don William Merrill, 7/21/03            174

1    **A.    A group digest.**
2    Q.    What is that?
3    **A.    Just indicates that that's the contact.**
4    Q.    Okay. I don't know what the group digest
5 is.
6    **A.    Well, it's something we call -- it's just an**
7 **outline of who the contacts are and everything else,**
8 **and that's a formal document that sits in the files.**
9    Q.    That's a formal document of MBA?
10    **A.    It's an MBA in-house document.**
11    Q.    I just haven't seen that, so I'm not
12 familiar with what you're talking about.
13    **A.    Right.**
14    Q.    Is this group digest something created for
15 each account that you have?
16    **A.    Well, it's logical. It's logical to have**
17 **something that clarifies what's going on with each**
18 **account, and that's all that is.**
19    Q.    I'm not disagreeing with you. I just
20 haven't seen it, so I'm not familiar with what you're
21 talking about. And my question was, is that something
22 that you, MBA, set up for each account --
23    **A.    Yes.**
24    Q.    -- that you service?
25    **A.    That's correct.**

CitiCourt, LLC
**(801) 532-3441**

PAGE 175

Don William Merrill, 7/21/03            175

1    Q.    And is that something that's set up at the
2 inception of each account?
3    **A.    Yes.**
4    Q.    Is it updated on a regular basis?
5    **A.    Yes, and at renewal.**
6    Q.    What do you put into the group digest? What
7 sort of information does that contain?
8    **A.    As much as you can get on two or three**
9 **pages, from names, the dates, effective dates, who the**
10 **carriers might be from group life, vision, dental,**
11 **whatever. Stop loss, rates, factors. Just a quick**
12 **synopsis of what's in that plan and what's being**
13 **administered in that plan.**
14        MS. HEGLAND: That hasn't been produced.
15        MR. BUSH: Don't ask him to do it here.
16 You'll get an objection and an instruction not to
17 answer.
18        MS. HEGLAND: Well, it just seems like
19 something that should have been produced.
20        MR. BUSH: It's pretty relevant.
21    Q.    (BY MS. HEGLAND) Would that be something
22 that would be easy for you to retrieve?
23    **A.    Yes.**
24    Q.    Is this a computer document or is it a paper
25 document?

CitiCourt, LLC
(801) 532-3441

PAGE 176

Don William Merrill, 7/21/03            176

1    **A.    No, currently it's a paper document. It's a**
2 **paper document currently.**
3    Q.    You think that you can bring that with you
4 tomorrow?
5        MR. SHUCHART: What discovery request has
6 requested it?
7        MR. BUSH: The initial disclosures probably
8 required it to be produced.
9        MR. SHUCHART: I would disagree with that.
10        MR. GOOD: How about the one that says
11 produce your entire file? Where is that one?
12        THE WITNESS: Might be hard to produce the
13 original.
14        MR. SHUCHART: If you can point to a
15 discovery request that's been provided that time to
16 respond to is effective, then we'll consider the
17 request.
18        MS. HEGLAND: Well, I think that the
19 eventual disclosure is required.
20        MR. SHUCHART: Well --
21        MR. BUSH: It's either that or pay for a
22 bunch of lawyers to file it in Salt Lake City.
23    Q.    (BY MS. HEGLAND) Now, you have a contract
24 that -- or an agreement that's been produced between
25 MBA and the San Benito School District, correct?

CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 23   PAGE 177
Don William Merrill, 7/21/03    177

1   A.   Yes.
2   Q.   There is no contract between MBA and J.
3   Allan Hall, correct?
4   A.   No.
5   Q.   No, there's no contract?
6   A.   No contract.
7   Q.   Likewise, there is no contract between MBA
8   and Companion Life Insurance, correct?
9   A.   No.
10   Q.   No, there's no contract?
11         MR. SHUCHART:  Why don't you ask the
12   question is there a contract, and we could get the
13   record straight.  Can you rephrase the question,
14   please?
15         MS. HEGLAND:  He's answering the last one.
16         THE WITNESS:  Companion Life may have an
17   approval document for TPA approval.
18   Q.   (BY MS. HEGLAND)  Do you know that for a
19   fact?
20   A.   I don't know that as a fact, but that's a
21   logical --
22   Q.   Well, I would ask you not to speculate --
23         MR. SHUCHART:  Objection.  Do not instruct
24   the witness.
25   Q.   -- but just to answer whether there is any
                CitiCourt, LLC
                (801) 532-3441

PAGE 178
Don William Merrill, 7/21/03    178

1   contract between MBA and --
2   A.   I don't know for sure.
3   Q.   Now, in the year 2000 or the 2000-2001
4   contract between San Benito -- and I think it's already
5   been marked as an exhibit.
6         MR. SHUCHART:  That's the application, isn't
7   it?  Try this one.  Let me make sure it's right here.
8   Okay.
9   Q.   Referring to Exhibit 33.  Did you assist San
10   Benito in preparing the application?
11         MR. SHUCHART:  Objection, vague.
12   A.   I don't know.  Doesn't have our initials on
13   it, so I do not know that.
14   Q.   Well, is it customary in the course of your
15   providing assistance to clients that you, MBA, initial
16   an application?  Or is that the client?
17   A.   That's not our initial on there.  That has
18   to be a client's initial.  And I don't know if we
19   prepared it or Companion Life prepared it.  I don't
20   know that.
21   Q.   The application?
22   A.   It's possible.  Many stop loss carriers do
23   that.  They prepare them and send them out.
24   Q.   With the information provided on it that is
25   sworn to by the client?
                CitiCourt, LLC
                (801) 532-3441

PAGE 179
Don William Merrill, 7/21/03    179

1   A.   That is correct.
2   Q.   What type of carriers do that?
3   A.   Let's see.  There are numerous ones right
4   now that do that.  They won't let you do it.
5   Q.   Who would know whether or not MBA provided
6   assistance to San Benito --
7   A.   There is nothing on there that would
8   identify if we did it or we didn't do it.  There's no
9   way to identify who did the typing on that piece, and
10   there's no initials.
11   Q.   Yes, sir.  I'm just asking, if you know --
12   A.   No.
13   Q.   -- who may have personal knowledge about the
14   preparation of the 2001 application prepared on behalf
15   of San Benito.
16   A.   It could have been prepared by Consolidated,
17   I mean, by Companion Life by Consolidated.  It could
18   have been prepared in our office, the fill-in portion,
19   but not signed by us.  The numbers are always done by
20   the carrier --
21   Q.   What numbers?
22   A.   -- and incentive.  If there's any premiums
23   or factors, that's prepared by the carrier.
24   Q.   Well, my question though, was, and if you
25   don't know, that's all you have to tell me, is who may
                CitiCourt, LLC
                (801) 532-3441

PAGE 180
Don William Merrill, 7/21/03    180

1   know the person that prepared this application for the
2   2000 renewal on behalf of San Benito?
3   A.   I don't know.
4   Q.   Thank you.  Is that something that MBA does
5   from time to time as a service to its clients?
6         MR. SHUCHART:  Objection.  Does what?
7   Q.   Prepares the application.
8   A.   No, that's not one.
9   Q.   Does the application which is part of
10   Exhibit 33, the San Benito application for the contract
11   effective October 1, 2000, does it contain any request
12   for advance funding?
13         MR. SHUCHART:  Objection.  Document speaks
14   for itself.
15   A.   I don't think it does as I have reviewed it.
16   Q.   No?
17   A.   No.
18   Q.   You understand based upon your experience in
19   this industry that all the parties are bound by the
20   contract documents which are put in place to provide
21   stop loss coverage to the employee benefit plan?
22         MR. WALRAVEN:  Objection to form.
23         MR. SHUCHART:  Objection.  Calls for a legal
24   conclusion and is contrary to his previous testimony.
25   Q.   (BY MS. HEGLAND)  Do you understand that,
                CitiCourt, LLC
                (801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 181

Don William Merrill, 7/21/03          181

1  sir?
2          MR. SHUCHART: Same objections.
3      **A.   Yes, I understand it.**
4      Q.   Now, did I understand you earlier to say
5  that although you forwarded Exhibit 33, which is the
6  complete contract for the 2000-2001 year on behalf of
7  San Benito, you forwarded this to your client, correct?
8  You have to answer loud, sir.
9      **A.   Did I forward it to them?**
10     Q.   Yes.
11     **A.   Yes.  There's a covering letter.**
12     Q.   But you yourself did not review it for
13 accuracy?
14         MR. SHUCHART: Objection. Mischaracterizes
15 testimony.
16         MS. HEGLAND: I'm asking him.
17         THE WITNESS: You don't have a covering
18 letter to this going to San Benito?  That's the
19 application for the policy.
20     Q.   (BY MS. HEGLAND)  I believe this is it.
21 It's marked as Exhibit 35 and contains yet another copy
22 of the contract involved.
23         MS. SHUCHART: Well, that's not MBA's
24 letter, which is what he asked for.
25         MR. GEORGE: Excuse me.  What number is that
                   CitiCourt, LLC
                   (801) 532-3441

PAGE 182

Don William Merrill, 7/21/03          182

1  exhibit?
2          MS. HEGLAND: Nine.
3          THE WITNESS: Nine is a letter from
4  Consolidated sending it to MBA.
5          MR. BUSH: That's an exhibit of --
6          MR. SHUCHART: I think that's an exhibit --
7          MR. BUSH: That's an exhibit in one of the
8  other ones.
9          MR. GEORGE: Go off the record for a second.
10         (Discussion off the record.)
11         (Exhibit 38 marked.)
12     Q.   (BY MS. HEGLAND)  Mr. Merrill, we've marked
13 as Exhibit 38 a cover letter dated January 23, 2001
14 from MBA to Janie Gonzalez at the San Benito
15 Independent School District.
16     **A.   That's correct.**
17     Q.   Is that the cover letter you were thinking
18 about earlier?
19     **A.   Yes.**
20     Q.   And in that cover letter did you enclose the
21 same contract that we've discussed which has been
22 marked as Exhibit 35 and Exhibit 33?
23         MR. SHUCHART: Only if you know.
24     **A.   I don't know, but I assume it is.**
25     Q.   And in Exhibit 38, the letter to Janie, you
                   CitiCourt, LLC
                   (801) 532-3441

PAGE 183

Don William Merrill, 7/21/03          183

1  did instruct her to review the contract carefully?
2          MR. SHUCHART: Objection. Who's "you"?
3  Excuse me.  You can't ask the question since the letter
4  is not drafted by him, if "you" means him personally.
5  So who is "you"?
6      Q.   Did MBA --
7          MR. SHUCHART: Thank you.
8      Q.   -- instruct Ms. Gonzalez --
9      **A.   Yes.**
10     Q.   -- to review the contract carefully, sir?
11     **A.   Correct.**
12     Q.   And did you as the TPA for MBA, you,
13 Mr. Merrill, also review the contract carefully on
14 behalf of your client?
15         MR. SHUCHART: Objection, asked and
16 answered.
17     **A.   I don't recall if I did or not.**
18     Q.   Do you ordinarily in the course of your
19 business as a TPA take pains to review the contracts
20 for your clients?
21         MR. SHUCHART: Objection. Again, just for
22 the sake of the record, everybody's been using "you"
23 differently.  Are we talking about MBA or him
24 personally?  Put the question one way or the other.
25         MR. GEORGE: I think she qualified it that
                   CitiCourt, LLC
                   (801) 532-3441

PAGE 184

Don William Merrill, 7/21/03          184

1  time.
2      Q.   (BY HEGLAND)  Mr. Merrill, do you personally
3  in the course of your work as a TPA review the
4  contracts on behalf of your clients?
5      **A.   No.**
6      Q.   And does your company, MBA, as a certified
7  TPA review the contracts on behalf of its clients?
8      **A.   We review all of the rate structure and the**
9  **factors and the rates and the premium rates.  Whether**
10 **we read it word for word, I don't know.**
11     Q.   Is it important as a TPA to be familiar with
12 the contract that you are involved in administering?
13     **A.   That is sent to us by Consolidated, yes, it**
14 **would be.**
15     Q.   It would be important because in the course
16 of administering the contract on behalf of your client,
17 TPA would need to know what is covered by the contract.
18 Isn't that true?
19         MR. SHUCHART: Objection, form.
20     **A.   Yes.**
21     Q.   Just so that we're clear: the contract that
22 has been marked as Exhibit 33 is the entire contract
23 between San Benito and Companion Life for the 2000-2001
24 year, correct?
25         MR. SHUCHART: Objection. It requires
                   CitiCourt, LLC
                   (801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 24   PAGE 185

Don William Merrill, 7/21/03          185

1 speculation.
2      A.   Yeah, I don't know if it's complete. I
3 assume it is.
4      Q.   Please take a look at it.
5      A.   That still wouldn't tell me whether it's
6 total or not.
7      Q.   What else would you need?
8      A.   Well, there's no cover letter to it. It
9 doesn't say that it's the complete contract. It just
10 gives me the pages that are there. So I'm just
11 assuming that it is based upon the fact that you've
12 said it is.
13      Q.   Well, is the cover letter part of the
14 contract?
15           MR. SHUCHART:  Objection. Calls for a legal
16 conclusion.
17      A.   No, it's not.
18      Q.   All right, take a look at Exhibit 33 -- or
19 Exhibit 35, which has a cover letter.
20      A.   How do you know it came with this?
21      Q.   Tell me if Exhibit 35 contains the complete
22 contract.
23      A.   I don't know. It might. I am not here to
24 determine whether it is or not. I don't know.
25      Q.   Can you point me to any provision in Exhibit

CitiCourt, LLC
(801) 532-3441

PAGE 186

Don William Merrill, 7/21/03          186

1 35 which provides for advance funding?
2      A.   There's nothing in there. That's been
3 pointed out earlier.
4      Q.   There's no provision providing advance
5 funding?
6      A.   No.
7           MR. SHUCHART:  Objection, asked and
8 answered.
9      Q.   Now, in the 1999-2000 contract year in which
10 you were the TPA for San Benito, correct?
11      A.   Yes.
12      Q.   Did you review the contract governing the
13 employee benefit plan for that year, sir?
14           MR. SHUCHART:  Objection.
15      A.   I don't know whether I did or not for the
16 1999-2000. I don't know that.
17      Q.   You told us about your meeting with J. Allan
18 Hall and Mr. Routh?
19           MR. SHUCHART:  I believe it's "Roth."
20      Q.   I don't know. It's spelled "Routh," so...
21 Do you pronounce it "Roth"?
22      A.   R-o-u-t-h, Routh.
23      Q.   That was marked -- you marked your memo.
24           MR. SHUCHART:  I think 29.
25      Q.   On the memo which is marked as Exhibit 29,

CitiCourt, LLC
(801) 532-3441

PAGE 187

Don William Merrill, 7/21/03          187

1 you have a parenthetical about it being recorded in
2 your schedule calendar.
3      A.   Right.
4      Q.   Do you typically keep a schedule calendar
5 for your business?
6      A.   Yes.
7      Q.   And do you maintain that calendar after the
8 calendar year?
9      A.   Most of the time, yes.
10      Q.   How far back do you maintain those
11 documents?
12      A.   I might have two years or so.
13      Q.   Do you know whether you would still have --
14      A.   I don't know that.
15      Q.   I guess this is the '99 year?
16      A.   Yeah, I may not have that. I don't know.
17      Q.   Do you keep those documents at your place of
18 business?
19      A.   Yes.
20      Q.   Can you tell me what all was discussed at
21 this meeting with you and Mr. Routh, Mr. --
22      A.   I can't tell you everything that was
23 discussed.
24      Q.   Well, what else was discussed?
25           MR. SHUCHART:  Objection, vague.

CitiCourt, LLC
(801) 532-3441

PAGE 188

Don William Merrill, 7/21/03          188

1      A.   How's your mustache growing. You know,
2 basically we talked about things that I remember is
3 that advance funding and what their administrative
4 procedure was of handling claims. Because we had
5 confidence from and information from the Consolidated
6 Companies that the organization was processing claims
7 on a basis of advance funding. And since our
8 experience with the other carriers had always been that
9 advance funding was included, that that needed to be
10 on that basis, and we were assured that that was -- that
11 they were administering the contract on that basis.
12      Q.   Object to responsiveness. Can you remember
13 anything else that was discussed at this --
14      A.   No, I can't.
15      Q.   -- meeting in 1999?
16      A.   No.
17      Q.   Other than advance funding?
18      A.   Information relative to the value of other
19 things that we might use to do comparisons with besides
20 rates.
21      Q.   Can you give me an example?
22      A.   No, I can't.
23      Q.   How long did this meeting last?
24      A.   Could have lasted a good hour, hour and a
25 half or more.

CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 189

Don William Merrill, 7/21/03          189

1    Q.    Now, you had already been working with J.
2  Allan Hall for what, nine months by this time?
3    A.    I don't know that, how long.  But previous
4  to this time, yes.
5    Q.    Well, if the contract plan went into effect
6  in October of '99, you would have been working together
7  for the better part of a year at the time of this
8  meeting?
9    A.    Yeah.  He was the MGU in the prior year.
10    Q.    So you would have already had experience
11  with the claims handling procedures of J. Allan Hall
12  and Companion Life by then.  Isn't that true?
13          MR. SHUCHART:  Objection, form.  Misstates
14  the evidence.
15    A.    Prior to the year we wouldn't have had
16  Companion Life insurance, not with that account.  And
17  whether we did in previous contracts with other
18  clients, I don't know that, without researching it at
19  great length, I could tell.
20    Q.    So as we sit here today, you don't know
21  whether or not you had any experience with J. Allan
22  Hall and Companion Life at the time of your meeting in
23  1999?
24          MR. SHUCHART:  Objection.  Totally misstates
25  his testimony.  It's argumentative.
              CitiCourt, LLC
              (801) 532-3441

PAGE 190

Don William Merrill, 7/21/03          190

1    A.    Yeah, you've placed two questions in there.
2  You've included both Companion Life and J. Allan Hall
3  in the same question.  And we were aware of J. Allan
4  Hall previously with Consolidated.  Whether it was in
5  connection with Companion Life or not, I don't know.
6  It's possible that at another time, for example, we
7  could have had Companion Life proposed to us by some
8  other MGU or some other underwriter.
9    Q.    Are you saying that the claims handling
10  differs, then, depending upon the stop loss carrier?
11    A.    No.  That's not what I said at all.
12    Q.    Do you know if that's true?
13    A.    I know it's different with some carriers,
14  that's true.
15    Q.    Do you know based upon your experience in
16  the industry who makes the decision whether or not to
17  provide advance funding?
18    A.    I don't know who makes that decision, other
19  than I know who is doing or processing claims on an
20  advanced basis and who provides that.  I would know
21  that.
22    Q.    Do you have any knowledge of the
23  arrangements in place between an MGU, a managing
24  general underwriter, and a stop loss carrier?
25    A.    No, I don't.
              CitiCourt, LLC
              (801) 532-3441

PAGE 191

Don William Merrill, 7/21/03          191

1    Q.    Do you know who makes the ultimate decision
2  regarding whether or not to provide advance funding?
3    A.    No.
4          MR. SHUCHART:  Objection, asked and
5  answered.
6    Q.    Well, if you had been working with J. Allan
7  Hall & Associates for the year 1999, why did you need
8  to have a discussion about how they handle and
9  administer their claims?
10    A.    J. Allan Hall was coming out to visit, to
11  visit and be with us and try to improve his ability to
12  sell more groups with us.  And so he was there to visit
13  with us about that, and it happened that we went
14  through a number of things just to know for sure how it
15  was being handled and how we should follow that funding
16  arrangement.  Because each carrier follows that just a
17  little bit different from one to another.
18    Q.    So your visit with J. Allan Hall and Doug
19  Routh in 1999 was about the potential of expanding
20  business for both of you, I guess?
21    A.    Partially.
22    Q.    So you discussed other options and other
23  possibilities in addition to existing clients.  Is that
24  correct?
25    A.    Correct.
              CitiCourt, LLC
              (901) 532-3441

PAGE 192

Don William Merrill, 7/21/03          192

1    Q.    Is it also correct that Exhibit No. 29 makes
2  no mention of the San Benito Consolidated School
3  District?
4          MR. SHUCHART:  Objection.  The document
5  speaks for itself.
6    A.    It doesn't.
7    Q.    Do you recall Mr. Hall's response to you
8  after the visit of 1999?
9    A.    Would you ask the question again?
10    Q.    Do you recall Mr. Hall's response to you
11  after your inquiry concerning advance funding?
12    A.    No.  He sent me some information, but then
13  he was supposed to send me some additional information,
14  and I don't recall whether we ever received that or
15  not.
16    (Exhibit 39 marked.)
17    Q.    Let me show you what's marked as Exhibit 39,
18  which is a letter from J. Allan Hall & Associates dated
19  June 3, 1999 to you, Mr. Merrill.  Do you recall
20  receiving that?
21    A.    Yes.
22    Q.    And does Mr. Hall's June 3, 1999 letter to
23  you provide a questionnaire which he suggested might be
24  helpful to you?
25    A.    Some of the questions that might be helpful,
              CitiCourt, LLC
              (801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 25    PAGE 193

Don William Merrill, 7/21/03        193

1  yes.
2      Q.    And did some of those questions which he
3  suggested may be helpful to you specifically include
4  advance funding?
5      A.    Oh, I don't know whether it did or not, and
6  I don't know whether this was complete to his format,
7  but it does mention the advance funding provision.
8      Q.    And did Mr. Hall's suggestions to you
9  include a suggestion that you explicitly check whether
10 or not advance funding is sought in connection with a
11 stop loss policy?
12     A.    I don't recall him saying that in that
13 format. I don't know.
14     Q.    I'm asking you to refer to Exhibit 39.
15     MR. SHUCHART:  The document speaks for
16 itself.
17     A.    Yeah. This is a document that had some
18 questions that he had previously used or was aware of.
19 Let me look at it and see. This is not the same
20 document, I don't think. This may be a document that
21 you have here. On the questionnaire that one of our
22 associates has developed -- yeah, that's the one.
23 That's the one he sent to us. But why, the reason I
24 question that is because at the top of there it says
25 MBA stop loss qualification form. If it was his form
                    CitiCourt, LLC
                    (801) 532-3441

PAGE 194

Don William Merrill, 7/21/03        194

1  or somebody else's, some other name would be at the
2  top, not the fact that it's MBA at the top and this is
3  our questionnaire that was used.
4      Q.    Was he suggesting that you might incorporate
5  that into your final documents?
6      MR. SHUCHART:  Objection. Requires him to
7  speculate.
8      Q.    Well, look at his letter, sir.
9      A.    Yes, but there is no evidence that this is
10 the document that he sent here. That would be -- you'd
11 have to verify that, because this looks like a document
12 that we developed from a questionnaire that he sent.
13     Q.    Well, since it's got --
14     A.    Since it's got MBA at the top, it doesn't
15 appear to be somebody else's document.
16     Q.    Well, it's come from the school district, I
17 guess. It's got school district Bates numbering on it.
18     A.    Right, but it was sent to them.
19     Q.    So I'm assuming that --
20     A.    But it looks like somebody tied those two
21 together, and that's not the basis of what came from
22 J. Allan Hall.
23     Q.    Do you still have Mr. Hall's letter in your
24 records, sir?
25     A.    In my where?
                    CitiCourt, LLC
                    (801) 532-3441

PAGE 195

Don William Merrill, 7/21/03        195

1      Q.    In your records.
2      A.    I don't know. But --
3      Q.    Do you want to take a short break?
4      MR. SHUCHART:  That would be fine.
5      A.    No, I want to go back to the question you
6  asked and have you ask it to me again so we can just
7  move on and get through this.
8      Q.    Do you have Mr. Hall's letter and enclosure
9  in your records, sir?
10     A.    I do, probably.
11     Q.    All right.  Would you be able to put your
12 hands on it?
13     A.    I don't know that.
14     MR. GEORGE:  Do you know whether that letter
15 and the attached document were in the production?
16 Save a little time.
17     THE WITNESS:  Yes, right.
18     MS. HEGLAND:  That's why I'd like to take a
19 break.
20     MR. SHUCHART:  I don't.  I don't know off
21 the top.
22     MR. WALRAVEN:  We've been at this a while.
23 I think a brief break is good.
24     MS. HEGLAND, can you give us an estimate of
25 where you are just for planning purposes?  And the
                    CitiCourt, LLC
                    (801) 532-3441

PAGE 196

Don William Merrill, 7/21/03        196

1  answer, maybe no, you can't.
2      MS. HEGLAND:  Hour, maybe.
3      MR. WALRAVEN:  Okay.
4      (Recess from 3:49 to 4:06 p.m.)
5      MR. WALRAVEN:  For the record, we will add
6  26 to all exhibits numbers.
7      MR. SHUCHART:  Which is what I'm doing as we
8  speak.
9      (Discussion off the record.)
10     (Exhibit 40 marked.)
11     Q.    (BY MS. HEGLAND)  Back on the record. Let
12 me show you what's been marked as Exhibit 40,
13 Mr. Merrill. And this is the same correspondence, the
14 June 3, 1999 correspondence from Mr. Hall to you,
15 Mr. Merrill, but this is from your own files. So would
16 you take a look at that and see if that appears to be
17 what you recall receiving from Mr. Hall?
18     A.    Possibly is.
19     Q.    Okay.
20     MR. SHUCHART:  Including all, looks like two
21 set of pages.
22     A.    These pages appear to be ours and not
23 Mr. Hall's, the last two pages.
24     Q.    Do you know that?
25     A.    Yes.
                    CitiCourt, LLC
                    (801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 197

Don William Merrill, 7/21/03    197

1  Q.  How do you know that?
2  A.  I just recall working on it, and it says
3  it's MBA's.
4  Q.  Well, it has MBA on the document, but how do
5  you know that?
6  A.  Take my word.
7  Q.  Well, were you involved in preparing --
8  A.  That document.
9  Q.  -- that document?
10  MR. SHUCHART:  Just for the record, you're
11  talking about the last two pages of Exhibit 40?
12  Q.  Yes.
13  A.  This one and this one is Mr. Hall's,
14  possibly.  This one's possibly his.  But this one and
15  this one is a result of working with some of those
16  questions and some of the others that we have.
17  Q.  So that we have a record that we can
18  understand when we read this, you're suggesting that
19  the pages in Exhibit 40 which have been Bate numbered
20  MBA 00053 and MBA 00054 are documents that you
21  believe --
22  A.  Were prepared in MBA's office.
23  Q.  -- MBA developed as a result of Mr. Hall's
24  suggestions?
25  A.  And other suggestions received from others.

CitiCourt, LLC
(801) 532-3441

PAGE 198

Don William Merrill, 7/21/03    198

1  Q.  And when would you have developed the
2  documents that are marked as Exhibit 40?
3  MR. SHUCHART:  Again, last two pages.
4  A.  We had been working on this idea for some
5  time, so it must have been 1999-2000 year.
6  Q.  Did you ever implement those as a part of
7  your practice in --
8  A.  Yes.
9  Q.  -- representing clients?
10  A.  In determining what TPA's -- I mean,
11  which -- excuse me.  Which underwriters to use.
12  Q.  And do you have any recollection when you
13  would have begun to use those documents that are --
14  A.  Well, we had used some previously, some that
15  weren't as extensive, and then we continued to use them
16  at that time.  So they were used in 1999, 2000.
17  MR. GEORGE:  May I interrupt just a moment?
18  What are the document numbers of the first two pages of
19  that exhibit?
20  MR. SHUCHART:  MBA 51 and 52.
21  MR. GEORGE:  And the numbers again on the
22  last two?
23  MR. SHUCHART:  53 and 54.
24  MR. GEORGE:  So they were produced
25  sequentially.

CitiCourt, LLC
(801) 532-3441

PAGE 199

Don William Merrill, 7/21/03    199

1  THE WITNESS:  Not necessarily.
2  MR. SHUCHART:  Those four pages were in
3  order, correct.
4  Q.  (BY MS. HEGLAND)  In your files at MBA?
5  A.  Right, even though these are undated.  And
6  yet --
7  Q.  So many MBA things appear to be undated.
8  MR. SHUCHART:  Objection, argumentative.
9  Q.  I mean, is that standard practice --
10  MR. SHUCHART:  Objection, argumentative.
11  A.  No.
12  Q.  -- at MBA?
13  A.  No.
14  Q.  Well, as we sit here today, can you direct
15  us to any documents similar to MBA 53 and 54 which are
16  part of Exhibit 40 --
17  A.  It's possible.
18  Q.  -- which were used on behalf of the San
19  Benito School District when you assisted in the renewal
20  of their employee benefit plans?
21  A.  I don't think so.
22  Q.  So it was not used for that account?
23  MR. SHUCHART:  Objection.  Mischaracterizes
24  his answer.
25  Q.  Is that what you're saying?

CitiCourt, LLC
(801) 532-3441

PAGE 200

Don William Merrill, 7/21/03    200

1  MR. SHUCHART:  Same objection.
2  A.  I don't know.
3  Q.  If it would have been used for that account,
4  would you have a record of that?
5  A.  It's possible.
6  Q.  And if you have a record of that, you would
7  have produced that in the course of this litigation,
8  would you not, sir?
9  A.  Yes.
10  MR. SHUCHART:  Objection.
11  Q.  Now, did I understand you correctly earlier
12  that you, Don Merrill, are not really involved in the
13  claims handling aspect --
14  A.  That is correct, I am not.
15  Q.  -- of the TPA?  Okay.  Who would be most
16  involved in the actual claims handling?
17  A.  Our claims manager and claims adjudicators.
18  Q.  And what are their names?
19  MR. SHUCHART:  Are we talking about the
20  specific account or generically?
21  A.  Do you want as many names as I can tell you?
22  Some employees have been -- we have some new employees
23  and so on and so forth.
24  Q.  Let's just talk about in the year 2001.
25  A.  No, I don't know which ones specifically by

CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 26   PAGE 201

Don William Merrill, 7/21/03          201

1  name.
2      Q.   Are your claims handlers or claims
3  administrators assigned to a specific account, or do
4  they just do everything?
5      A.   No, they are assigned.
6      Q.   Do you know what claims handler was assigned
7  to the San Benito account in 2001?
8      A.   No, I do not.
9      Q.   Do you know what claims administrator was
10  assigned to the San Benito account in 2001?
11     A.   The last question relative to an
12  administrator, that would be Carol Frandsen.
13     Q.   Now, what's the difference between an
14  administrator and a claims handler?
15     A.   As explained previously, administration is
16  eligibility area and funding, where claims is claims
17  processing and so on and so forth.  So that's the
18  difference.
19     Q.   So the claims handler, by processing --
20  well, are you familiar with this or should I ask
21  someone else these questions?
22     A.   Well, I perceive that you may not
23  understand, and therefore maybe that needs to be
24  clarified.  But in essence there is administration and
25  claims processing, and those are two separate

CitiCourt, LLC
(801) 532-3441

PAGE 202

Don William Merrill, 7/21/03          202

1  functions.  And I've answered the one question relative
2  to administration, but that's Carol Frandsen.  Those
3  that did the adjudication or product claims processing
4  was someone else, and I don't know what that was at the
5  time or the people who did it.  There were probably
6  more than one.  We have a primary payer, then we had
7  additional payers that would always be there available
8  also.
9      Q.   So the processors are the ones that actually
10  paid the claims?
11     A.   Adjudicate it on the system, yes.
12     Q.   I don't know what that means.
13     A.   They don't manually do it.  They just put it
14  into the computer and make a good judgment as to how
15  that billing came in.
16     Q.   Do you as the TPA receive the claims
17  directly from the health care providers?
18     A.   Normally, yes.
19     Q.   So those would not go to San Benito first?
20     A.   No.
21     Q.   The doctor or the hospital would directly
22  send their bill and the claim to you, MBA, as the
23  third-party administrator for this account?
24     A.   Yes.
25     Q.   And then the claims processor would put that

CitiCourt, LLC
(801) 532-3441

PAGE 203

Don William Merrill, 7/21/03          203

1  into your system and pay the claim --
2      A.   Or --
3      Q.   -- correct?
4      A.   -- at least see if it would pay and how it
5  would pay and proceed with the administration of that
6  or the -- I shouldn't say that word "administration."
7  That confuses the issue.
8      Q.   That's why you've got me confused.
9      A.   Adjudicate the claim according to the
10  document.
11     Q.   Prior to the claims processor actually
12  paying the claim, is there any initial determination or
13  review made to decide whether it meets all the other
14  requirements of the employee benefit plan?
15     A.   Yes.  All of those procedures are handled.
16  I don't do it, but they are handled internally.
17     Q.   And are those handled by someone other than
18  the claims processor?
19     A.   I'm not sure how that was done in 1999.
20     Q.   Well, we're talking 2001 here.
21     A.   In 2001.  Eligibility would be verified and
22  so forth, definitely, before that claim would be
23  adjudicated.
24     Q.   But is it -- is that a determination made by
25  someone other than the claims processor?

CitiCourt, LLC
(801) 532-3441

PAGE 204

Don William Merrill, 7/21/03          204

1      A.   I don't know that.
2      Q.   Who would know that?
3      A.   The claims manager.
4      Q.   And who was the claims --
5      A.   Carolyn Sorensen.
6      Q.   In 2001?
7      A.   I think so, yes.
8      Q.   Is she still with MBA?
9      A.   Yes.  She came to MBA as an auditor from
10  First Health, and still with MBA.
11     Q.   But I take it that that aspect of your
12  business is not something that you, Don Merrill, are
13  normally involved in?
14     A.   On a day-to-day basis, no.
15     Q.   Do you know whether MBA has any special
16  procedures for handling large claims or shock claims?
17     A.   Yes, we do.
18     Q.   What sort of special procedures do you have
19  for those?
20     A.   I wouldn't know those specifically.  But we
21  have that assigned to actual individual in the office
22  who will be -- you have a deposition going with him
23  later on.
24     Q.   And that would be Mr. Nixon?
25     A.   Yes.

CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

Don William Merrill, 7/21/03        205

1    Q.    Now, when MBA is assisting a client in
2  providing information for policy renewals, do you
3  attempt to provide as full and complete and accurate
4  information as possible?
5    A.    Very definitely.
6    Q.    Would you agree that's something very
7  important in --
8    A.    Yes.
9    Q.    -- this industry, that the claims experience
10  is critical for the stop loss providers to evaluate the
11  risk?
12    A.    Yes.
13    Q.    What happens if the stop loss carrier should
14  discover that there has not been full disclosure made
15  by the client?
16        MR. SHUCHART:  Objection as far as
17  speculation, lack of foundation.
18    A.    Well, there could be difficulties if that
19  occurred.  But --
20    Q.    Has that been your experience in the
21  industry?
22    A.    No, I'm just -- I'm fully aware that the
23  disclosure should be effective from the client and with
24  whatever we can provide at the time.
25    Q.    But you do agree that that is important --
        CitiCourt, LLC
        (801) 532-3441

Don William Merrill, 7/21/03        206

1    A.    I have said that, yes.
2        MR. SHUCHART:  Objection.
3    Q.    -- for the TPA to provide full and complete
4  information to -- in the RFP?
5        MR. SHUCHART:  Objection.  Asked and
6  answered and mischaracterizes testimony.
7    A.    That's really not in the RFP, but the answer
8  to the question is yes.
9    Q.    Mr. Merrill, how is MBA paid on renewals?
10    A.    We are not paid on renewals, we're paid on a
11  per-head basis based upon our administrative contract
12  as negotiated with the client.
13    Q.    Does MBA ever receive commissions in
14  connection with renewals of claims?
15    A.    It's possible that's under certain accounts
16  that we may do provided that we disclose that
17  information to the client.  In this case we did not.
18    Q.    "In this case," you mean the San Benito
19  case?
20    A.    Yeah.  There's no commissions involved that
21  we've received.
22    Q.    It's your testimony that MBA did not receive
23  any commissions on the renewal of the San Benito plan?
24    A.    Right.
25    (Exhibit 41 and 42 marked.)
        CitiCourt, LLC
        (801) 532-3441

Don William Merrill, 7/21/03        207

1    Q.    Mr. Merrill, I believe that you've already
2  told us that you were involved in assisting San Benito
3  to place stop loss coverage for the 2001-2002 year,
4  correct?
5    A.    Yes.
6    Q.    Let me show you what we've marked now as
7  Exhibit 41.  And if you can take a look at that, just
8  tell us for the record what that is.
9    A.    This is a letter from BCS to myself,
10  September 28, 2001.  "Thank you for selecting BCS
11  Insurance as the stop loss carrier on the above
12  referenced group."  Then application was included,
13  schedule page.
14    Q.    And did you assist San Benito in putting
15  together the information that was provided to BCS which
16  is referenced in Exhibit 41?
17        MR. SHUCHART:  Again, him personally or MBA?
18    Q.    MBA.
19    A.    MBA assisted, yes.
20    Q.    And did MBA provide BCS with the relevant
21  census and claims experience that you ordinarily do for
22  this kind of account?
23    A.    Yes.
24    Q.    Were you personally involved in that, or did
25  your staff put that together?
        CitiCourt, LLC
        (801) 532-3441

Don William Merrill, 7/21/03        208

1    A.    It may have been the staff besides myself,
2  but I was at least familiar with it.
3    Q.    Well, if you take a look at I guess that
4  page, which is 567 of Exhibit 41, that references
5  forwarding to BCS the --
6        MR. SHUCHART:  I object to the extent it
7  mischaracterizes this document.  In fact, it appears to
8  be from BCS to Don.
9    Q.    Well, I can't read it upside down.  I'm
10  sorry.  Well, as part of Exhibit 41 on page 567, BCS is
11  faxing to you apparently what they have received from
12  San Benito, and that includes page 568.  And I'm
13  wondering if you'd tell me what page 568 is.
14    A.    That's a computerized run off the computer
15  showing the specific analysis based upon 75,000
16  specific, and should have been sent to produce claims
17  exceeding a certain percentage of the stop loss through
18  the policy year 10/1/2000 through 9/31/2001.
19    Q.    And that was what MBA provided to BCS?
20    A.    That's one of the pieces that BCS would have
21  received.  They not only would have received that, but
22  they would have received the prior year's also of the
23  same thing.  So names not shown on this may have
24  appeared on other documents for disclosure information.
25    Q.    Do you see any of that --
        CitiCourt, LLC
        (801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 27   PAGE 209

Don William Merrill, 7/21/03      209

1    A.    No.
2    Q.    -- in Exhibit 41?
3    A.    No, it's not there. It's not included in
4  that piece. But I don't know a carrier out there that
5  will take one year only of experience for the large
6  claims. They want two or three years of the large
7  claims by name and documentation.
8    Q.    Well, does page 568 of Exhibit 41 include
9  all of the large claims for at least that year?
10   A.    I don't know. It wouldn't include those
11 that were lesser amounts.
12   Q.    Would it include --
13   A.    It would not include claims that came in
14 that did not appear as paid in the system to that
15 point. So it represents what it does for the period of
16 time that went through the computer.
17   Q.    What's the date on that?
18   A.    It's for a period of 10/1 of 2000, these are
19 paid amounts, through 9/30/of 2001.
20   Q.    So page 568 would represent --
21   A.    This was produced in August 17th, though.
22   Q.    Would represent all of the --
23   A.    Wouldn't include all of the year, even.
24   Q.    All of the large claims to that date?
25   A.    That were in the computer.

CitiCourt, LLC
(801) 532-3441

PAGE 210

Don William Merrill, 7/21/03      210

1    Q.    Would there be other claims not in your
2  computer?
3    A.    It wouldn't appear here, because the
4  parameters set here were not for the prior year.
5    Q.    Right. I'm not talking about the prior
6  year.
7    A.    Yeah. It should be everything that's in the
8  computer at that point. But you could have a large
9  claim out there that didn't appear in here because it's
10 not recorded and the paid amount has not come in. If
11 you have a large hospital bill, they don't come in
12 immediately, they go through the hospital cycle to come
13 in. So this just represents what it represents on that
14 piece of paper.
15   Q.    Yes, sir. My question was, would there be
16 some reason why a claim would not be in your computer?
17   A.    Yes. I just explained that.
18   MR. SHUCHART: Objection. He just answered
19 that.
20   Q.    You're saying if it hasn't been paid. Is
21 that right?
22   A.    Right, or hadn't been received.
23   Q.    Yes. Is there any other reason that the
24 large claims to be submitted to the new carrier would
25 not be reflected there?

CitiCourt, LLC
(801) 532-3441

PAGE 211

Don William Merrill, 7/21/03      211

1    A.    Yeah, I can't tell just off the top what
2  percentage of the stop loss this represents. That's a
3  specific limit of 75,000. But it doesn't show how it
4  was run. There's a 50 percent level which is the
5  normal requested amount. They may have, you know, if
6  they had requested one at 25 percent of the stop loss,
7  you may have picked up other names in here.
8    Q.    Did you run that computer run?
9    A.    No.
10   Q.    Do you know who did?
11   A.    No.
12   Q.    Please take a look at Exhibit 42. Can you
13 tell us what Exhibit 42 is?
14   A.    This is revised copies of an application and
15 schedule written to Janie Gonzalez from BCS.
16   Q.    And what's the date on that?
17   A.    That date is September 6th of 2001.
18   Q.    Are you aware of what required a revision in
19 this BCS contract?
20   A.    I think we have in mind that we were
21 terminated in December. So...
22   MR. SHUCHART: I'm sorry. You want to ask
23 the question again? She can read it back.
24   (The record was read as follows: "Are you aware of
25 what required a revision in this BCS contract?")

CitiCourt, LLC
(801) 532-3441

PAGE 212

Don William Merrill, 7/21/03      212

1    A.    See, I am not aware of this information,
2  because I don't think I've seen this information
3  previously. So what is the question?
4    Q.    I was asking if you were aware of what may
5  have prompted the revisions necessary between the
6  October contract and the December contract.
7    A.    No. I have not seen this disclosure
8  statement.
9    Q.    Has it been your experience in the industry
10 that when new contracts are being bid, the stop loss
11 carrier will require continuous updating in order to
12 finalize the contract?
13   A.    Most of them do that to a certain point, and
14 then thereafter they're willing to accept the contract
15 based upon what they have received at that point.
16   Q.    And has it also been your experience in this
17 industry that when a new contract is being bid on, it
18 is important to advise the stop loss carriers regarding
19 claims that have been incurred even if they have not
20 yet been paid?
21   A.    Only if you know about them or you can gain
22 that information.
23   Q.    Well, if, for instance, MBA was holding
24 checks on claims ready to be paid, MBA would have
25 knowledge of those claims, certainly?

CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 213

Don William Merrill, 7/21/03    213

1    A.    Almost asking a different question.  But I
2    suppose so.
3    Q.    Well, if you've got a claim that's been
4    presented and if MBA has cut a check for it --
5    A.    Well --
6    Q.    -- MBA would have knowledge of that claim,
7    correct?
8    A.    Yes.
9    Q.    In that situation, would that claim appear
10   in your computer system?
11   A.    No, not -- if it's been processed, it
12   wouldn't have -- depending on how you ran the computer
13   and what you were asking for, you would know whether it
14   was there or not.  You'd run a full list and know the
15   names of everybody that submitted a claim, but it
16   wouldn't appear on an aggregate report, any system.
17   Just wouldn't happen.
18   Q.    Okay.  Mr. Merrill, let me show you what
19   we'll mark as Exhibit 43.
20   (Exhibit 43 marked.)
21         This might help refresh your recollection
22   regarding when you were terminated from this account.
23   A.    (Witness reviews document.)
24         MR. SHUCHART:  What's the question?
25         MS. HEGLAND:  Having him read it first.
CitiCourt, LLC
(801) 532-3441

PAGE 214

Don William Merrill, 7/21/03    214

1    Q.    (BY MS. HEGLAND)  Does it appear from
2    looking at Exhibit 43 that MBA was still involved with
3    the San Benito account in December of 2001?
4    A.    It appears to me from this letter that they
5    were taking, they took the -- anything that we were
6    assisting them with out of our hands.
7    Q.    Well, the date on that is December 17th,
8    correct?
9    A.    I'm just reading what the letter says.
10   Q.    Yes, sir.  It appears to say that your
11   services were terminated January 7th of 2002.  Is that
12   not right?
13         MR. SHUCHART:  Object to the extent --
14   A.    I don't know.  I've never seen this document
15   before.
16   Q.    You're copied on that document, are you not,
17   sir?
18   A.    I don't remember seeing it is what I'm
19   saying.
20   Q.    Are you copied on Exhibit 43, shown as you
21   were a recipient?
22   A.    Yes.  I never received it, though.
23   Q.    Well, do you know why BCS had to send a
24   revised contract to San Benito in December of 2001?
25   A.    No in lots of reasons, but I'll just answer
CitiCourt, LLC
(801) 532-3441

PAGE 215

Don William Merrill, 7/21/03    215

1    no.
2    Q.    With respect to the proposed BCS contract,
3    which we've previously marked as Exhibit 41, which is
4    the October contract, on the application the
5    third-party administrator is shown as Managed Benefits
6    Administrator and Insurance Consultants, Inc.  Is that
7    correct?
8         MR. SHUCHART:  Objection to the extent that
9    it mischaracterizes the document.  There's no policy of
10   insurance on that document at all.
11   Q.    I said on the application.  Is that correct,
12   sir?
13         MR. SHUCHART:  That's the contract.
14   A.    That's what it shows, and it appears to be
15   correct.
16   Q.    Well, has it been your experience that the
17   application is part of the contract for the employee
18   benefit plan?
19         MR. SHUCHART:  Objection.  Misstates the
20   evidence.  Talking about contract for the policy?
21   A.    This was prepared --
22         MR. SHUCHART:  Excuse me, Don.  Talking
23   about the benefit plan or the policy?
24         MS. HEGLAND:  I asked what his experience
25   is.
CitiCourt, LLC
(801) 532-3441

PAGE 216

Don William Merrill, 7/21/03    216

1         MR. SHUCHART:  You're misusing the term
2    "contract," and that's what I'm trying to clarify.  Are
3    you talking about the stop loss agreement or are you
4    talking about the benefit plan?  Those are two
5    different things.
6         MS. HEGLAND:  The contract.
7         MR. SHUCHART:  What contract?
8         MS. HEGLAND:  The application is part of the
9    contract with the stop loss carrier --
10        MR. SHUCHART:  All right.
11        MS. HEGLAND:  -- and expressly incorporated
12   as part of the contract under the terms and conditions
13   of the contract which your client hasn't read.
14        MR. SHUCHART:  As long as we're referring to
15   stop loss program, not the employee benefit contract.
16   Q.    (BY MS. HEGLAND)  Does Exhibit 41 show the
17   third-party administrator for San Benito to be Managed
18   Benefits Administrators & Insurance Consultants, Inc.?
19   A.    It does.
20   Q.    And on Exhibit 42, which is the revised
21   application, does it also show --
22   A.    Yes.
23   Q.    -- the third-party administrator for San
24   Benito to be Managed Benefit Administrators and
25   Insurance Consultants, Inc.?
CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 28   PAGE 217

Don William Merrill, 7/21/03          217

1   A.   It shows that.
2   Q.   Yes?
3   A.   Yes.
4   Q.   Now, did you say that was a mistake?
5   A.   Yes. It should be MBA Wyoming, Inc.
6   Q.   That's not what appears on that document.
7   A.   We did not prepare it.
8   Q.   On either one of those documents.
9   A.   No.
10  Q.   Is MBA/ICI certified to act as a third-party
11  administrator in the state of Texas?
12  A.   By name, no.
13  Q.   Are they certified by any means?
14  A.   MBA of Wyoming is. That's an existing
15  corporation.
16  Q.   You've explained that. That wasn't my
17  question.
18       MR. SHUCHART: Objection, argumentative.
19  Q.   Is MBA/ICI certified to act as a third-party
20  administrator in the state of Texas?
21  A.   No.
22  Q.   You had testified earlier that you had
23  previously given one other deposition.
24  A.   Yes.
25  Q.   What case was that in?

CitiCourt, LLC
(801) 532-3441

PAGE 218

Don William Merrill, 7/21/03          218

1   A.   It was probably a New York Life case, a
2   death claim 30 years ago.
3   Q.   What did it involve? Why were you deposed?
4   A.   Because I was a representative of New York
5   Life.
6   Q.   And why did they need your testimony in that
7   case?
8   A.   I don't know that.
9   Q.   Were there any allegations in that case?
10  A.   No.
11  Q.   Involving you directly?
12  A.   No, not at all.
13  Q.   Do you remember what the allegations in that
14  case were?
15  A.   Yes, I do.
16  Q.   What were they?
17  A.   Had to do with a claim that was a
18  self-inflicted death and then a suicide and whether
19  double indemnity was a payable benefit or not. That's
20  what it had to do with.
21  Q.   Do you know where that was pending?
22  A.   It was in the state of Idaho.
23  Q.   Do you have any idea about when it was?
24  A.   No.
25  Q.   Were you the agent that sold the policy?

CitiCourt, LLC
(801) 532-3441

PAGE 219

Don William Merrill, 7/21/03          219

1   A.   No.
2   Q.   What was your involvement?
3        MR. SHUCHART: Objection, form.
4   A.   I was a group representative for New York
5   Life.
6   Q.   Group representative for --
7   A.   For New York Life.
8   Q.   Doing what?
9   A.   Selling New York Life group products.
10  Q.   Were there some allegations in that case
11  about misrepresentations or --
12  A.   No. It was a clarification so that they
13  could consider the payment of the AD & D or not.
14  Q.   What happened?
15  A.   New York Life, like always, paid everything.
16       MS. HEGLAND: I'll pass the witness.
17       FURTHER EXAMINATION
18  BY MR. WALRAVEN:
19  Q.   Mr. Merrill, do you need a break?
20  A.   No.
21  Q.   Okay. Iron man, pumping up. You sure look
22  good for as long as you've gone.
23       Mr. Merrill, I'll be kind of skipping
24  around, just asking you some follow-up questions that
25  have come up with some areas where I got confused.

CitiCourt, LLC
(801) 532-3441

PAGE 220

Don William Merrill, 7/21/03          220

1        You told us about how when you're
2   considering doing business with an MGU or with a stop
3   loss carrier, you gather information from them, you'll
4   maybe send them a questionnaire, and the question has
5   to do with your filing system. Do you, that is, does
6   somebody at MBA keep a file that says J. Allan Hall or
7   Companion Life or something like that? Do you have
8   such files?
9   A.   In general we do, yes.
10  Q.   Okay. In specific would you have such a
11  file on J. Allan Hall?
12  A.   It's possible. I don't know that.
13  Q.   Would you have one on Companion Life?
14  A.   I doubt that.
15  Q.   Would you have one on the Consolidated
16  Companies?
17  A.   I don't know.
18  Q.   Would you have one on BCS?
19  A.   Yes.
20  Q.   When the problem came up that we're involved
21  in this lawsuit today, that is, the payment of these
22  stop loss claims, are you aware of anything San Benito
23  School District did wrong in connection with those
24  claims or bringing those claims that, as you understand
25  it, got in the way of them getting paid?

CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 221

Don William Merrill, 7/21/03                221

1    A.   They should have allowed us to pay the
2 claims as they came in.
3    Q.   And did anybody on behalf of MBA ever
4 explain to them that a delay in paying claims could
5 have any adverse consequences?
6    A.   I'm not sure I can answer that.  That would
7 have been a normal thing to do, but I can't tell you
8 whether we did that or not.
9    Q.   Okay, that's where I'm confused.
10   A.   That's not my area.
11   Q.   Whose area would it be?
12   A.   Be the claims side, probably.
13   Q.   And in this particular case, can you tell me
14 the individual?
15   A.   Well, we continue to keep them abreast of
16 where they were with the fund and what claims were
17 coming in so that they can go ahead and pay those
18 claims.
19   Q.   Were you personally, were you, Don Merrill,
20 ever involved in conversation with any representative
21 of the school district where the school district told
22 you, don't pay the claim, hold off?
23   A.   Yes.
24   Q.   And who at the school district were you
25 personally talking to?

CitiCourt, LLC
(901) 532-3441

PAGE 222

Don William Merrill, 7/21/03                222

1    A.   Mr. Sanchez.
2    Q.   And in that conversation did you tell
3 Mr. Sanchez that we can't hold off on this claim
4 forever because it could have an adverse effect on the
5 ability to get it reimbursed by the stop loss carrier?
6    A.   That's possible that we did that.
7    Q.   Do you recall ever doing it, you personally?
8    A.   I think the conversation was with regard to
9 that, but I don't remember that personally.
10   Q.   You don't remember doing it or not?
11   A.   No, I don't remember.
12   Q.   And you understood that this contract was
13 being administered in such a way as there would be
14 advance funding?
15   A.   Yes.
16   Q.   So if you understood that there would be
17 advance funding regardless of whether the claim was
18 being paid by the school district, why would you tell
19 the school district they needed to go ahead and fund
20 payment of the claim?
21   A.   Two reasons.  One, if they don't go ahead
22 and pay the claims, then we continue to have to handle
23 all of the objections and the providers asking us
24 what's the matter, how come the claims aren't being
25 paid.  That's difficult for us as an administrator.

CitiCourt, LLC
(801) 532-3441

PAGE 223

Don William Merrill, 7/21/03                223

1 You just can't go on handling that that way.
2       On the other hand, to my understanding, the
3 claims had been processed and paid and showed as such
4 in our computer.  And under the normal advance funding,
5 that should have been then in a simultaneous exchange
6 of information and claims so that the carrier paid the
7 claim as that information, and that went out from the
8 client.  So --
9    Q.   So -- go ahead.
10   A.   No, that's it.
11   Q.   So as you understood the way the stop loss
12 agreement with J. Allan Hall and Companion Life was
13 supposed to work, it would not have mattered whether
14 there was immediate funding of those payments by the
15 school district as long as your computer showed that
16 they were paid, and that information was conveyed to J.
17 Allan Hall, correct?
18   A.   And that there was sufficient monies to pay
19 the claim.
20   Q.   And as you understand it, there always was
21 sufficient monies to pay the claim?
22   A.   Right.
23   Q.   So you would have had no need to tell
24 Mr. Sanchez to do anything else, because, as you
25 understood it, everything that needed to have been done

CitiCourt, LLC
(801) 532-3441

PAGE 224

Don William Merrill, 7/21/03                224

1 had been done to get reimbursement of the stop loss
2 insurance, correct?
3    A.   When that happens, that begins to affect the
4 TPA as it did us.  So it's a lot easier if the claims
5 are just no way we can hold them up, that we could
6 continue to pay them as they came in.
7    Q.   But that doesn't, in your understanding of
8 the way it's supposed to work, have any adverse impact
9 on the reimbursement of stop loss claims?
10   A.   Right, because that's what the stop loss is
11 supposed to do.
12   Q.   So you would have no reason to tell
13 Mr. Sanchez that this could have an adverse affect on
14 his stop loss claims, because you didn't know of any
15 adverse effect on stop loss claims.  Correct?
16   A.   We still may have said, you know, you should
17 be aware that these are the factors relative to this
18 particular situation.  But you're correct in what you
19 said.
20   Q.   Okay.  And can you be a little more
21 specific, had you conveyed to Mr. Sanchez, you need to
22 be aware of these factors, what factors you would have
23 told him about?
24   A.   Regardless, Mr. Sanchez trying to conserve
25 money and gain interest on the accounts may not have

CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 29   PAGE 225
Don William Merrill, 7/21/03        225
1  done what we suggested.
2      Q.   I'm asking you, though, what it is you
3  suggested or what it is you told him --
4      A.   No, I don't recall exactly the conversations
5  that went on.
6      Q.   So you may never have told him anything
7  about reimbursibility under stop loss with respect to
8  these claims?
9      A.   But the likelihood is that we did.
10     Q.   And why do you say that's likely?
11     A.   Because we had a great interest in the fact
12 that they were treated correctly all the way through.
13 If you are employed by someone, that's what you would
14 do.
15     Q.   So even though you weren't aware of any
16 possible adverse consequences regarding stop loss
17 reimbursement, you would have told Mr. Sanchez, hey, be
18 careful, there may be some adverse consequences?
19     A.   It's possible, yes.
20     Q.   Even though you weren't aware of them, you
21 would have told him about it?  I'm confused here.
22          MR. SHUCHART:  That wasn't a question.
23     Q.   You weren't aware of any adverse
24 consequences as you were talking to Mr. Sanchez,
25 correct?
                CitiCourt, LLC
                (801) 532-3441

PAGE 226
Don William Merrill, 7/21/03        226
1          MR. SHUCHART:  Adverse consequences limited
2  solely to reimbursement?
3          MR. WALRAVEN:  Reimbursement of stop loss.
4      A.   That's correct.
5      Q.   So if you weren't aware of them, you
6  wouldn't have told Mr. Sanchez about them, would you?
7      A.   I could have even at that.
8          Do you want to ask another question?
9          MR. WALRAVEN:  I think I'll just pass the
10 witness.  Thank you, Mr. Merrill.
11         FURTHER EXAMINATION
12 BY MR. BUSH:
13     Q.   If I wanted to discuss certain issues with
14 Clark, where could he be reached?
15         MR. SHUCHART:  Can't you just ask what his
16 address is?
17         MR. BUSH:  I'm sorry you don't like the way
18 I phrase questions, but that was the question.
19     A.   His address is 7881 Titian Way.
20     Q.   How is Titian spelled?
21     A.   T-i-t-i-a-n.  Salt Lake City, Utah, 84121.
22     Q.   Does he have a telephone number?
23     A.   Don't know that off the top of my head.
24     Q.   Okay.  What's he do now?
25     A.   He's in the middle currently looking for a
                CitiCourt, LLC
                (801) 532-3441

PAGE 227
Don William Merrill, 7/21/03        227
1  job.  He just came from Brown & Brown out of Seattle.
2      Q.   When did he leave MBA?
3      A.   Approximately three to four years ago.
4      Q.   And during your discussion with counsel, you
5  talked about adjudication of claims.  Is it true or not
6  that MBA with regard to the San Benito employee benefit
7  plan had the discretion to pay a claim or not?
8          MR. SHUCHART:  Objection, form.
9      A.   Yeah, we did not have the discretion of
10 paying the claims without notifying them and having
11 their approval.
12     Q.   You had to get the District's approval
13 before every claim was ever paid?
14     A.   No.
15     Q.   Okay.
16     A.   In general we could pay claims up to with
17 the money that was in the account available.  If we had
18 claims or expenses that exceeded that, we notified San
19 Benito on a weekly basis.
20     Q.   And would you agree with me that, just as
21 you believe and testified here today your actions are
22 governed by the plan document, MGU's actions are
23 governed by the stop loss contract?
24         MR. SHUCHART:  Objection.  Requires
25 speculation, lack of foundation.
                CitiCourt, LLC
                (801) 532-3441

PAGE 228
Don William Merrill, 7/21/03        228
1      Q.   Do you need anything more specific than
2  that?
3      A.   In paying a claim, we're governed by the
4  plan document, the way we pay a claim.  But that
5  doesn't answer the total question you asked, I don't
6  think.
7      Q.   Let's just stop there.  Is the MGU governed
8  by the stop loss contract in reimbursing a paid claim?
9          MR. SHUCHART:  Objection, calls for
10 speculation.
11     A.   Should be.
12     Q.   I'm sorry?
13     A.   They should be.
14     Q.   And in this instance J. Allan Hall is acting
15 as an MGU for Companion Life Insurance Company with
16 regard to the contract in question, correct?
17     A.   Correct.
18     Q.   Can they go outside of the responsibilities
19 set forth in that stop loss contract as to -- let me
20 finish, please -- as to the administration of that
21 contract?
22         MR. SHUCHART:  Objection.  Requires
23 speculation.
24         MR. WALRAVEN:  Objection to form.
25     A.   I don't know that.
                CitiCourt, LLC
                (801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill  *  July 21, 2003

PAGE 229

Don William Merrill, 7/21/03          229

1    Q.    What's your opinion?
2          MR. SHUCHART:  Objection, no foundation.
3    A.    My opinion is that many claims are paid on
4  the basis of an administrative basis the way they
5  handle it.  Because the contract does not spell all of
6  the functions that an MGU participates in, so it's not
7  included in the contract, I don't think.
8    Q.    Our contract in question here does not
9  include what's considered a paid claim?
10   A.    That's not what I said.
11   Q.    No, answer that question.
12         MR. SHUCHART:  Objection, argumentative.
13   A.    It does.
14   Q.    It does define what's considered a paid
15 claim?
16   A.    That's true.
17   Q.    That's the definition that --
18   A.    Is in that contract.
19   Q.    That's the definition that J. Allan Hall is
20 following when reimbursing a request from MBA, correct?
21         MR. SHUCHART:  Objection, speculation.
22   A.    I don't know that, because I don't know all
23 of the facts behind it and the agreements.
24   Q.    So you don't agree with me that, just as
25 you're restricted by the plan document, the MGU is

CitiCourt, LLC
(801) 532-3441

PAGE 230

Don William Merrill, 7/21/03          230

1  restricted by the stop loss contract?
2    A.    One, I didn't agree with you totally that
3  we're restricted by the plan document, because under
4  ERISA the policyholder could request us to pay a claim
5  in a certain format, and so we wouldn't be restricted
6  by that document if the employer instructed us to do it
7  any other way, pay it outside the contract or however.
8    Q.    Does ERISA apply in this case?
9    A.    I believe it does.
10         MR. WALRAVEN:  Objection, form.
11   A.    I believe it does.
12   Q.    I know it's referenced numerous times in
13 your administrative services agreement, but... So is
14 it your testimony that an MGU can pay whatever claims
15 for reimbursement come in and is not limited by any
16 stop loss contract?
17   A.    My testimony is that MGU's administratively
18 may pay in a certain format to accomplish the thing in
19 the purpose of the contract.
20   Q.    What if the purpose of the -- are you
21 referring to the stop loss contract?
22   A.    Sure.
23   Q.    What if the purpose of the stop loss
24 contract says, we only reimburse claims that have been
25 sent to providers and there is enough money in the

CitiCourt, LLC
(801) 532-3441

PAGE 231

Don William Merrill, 7/21/03          231

1  account to cover those claims, okay?  Now, is the MGU
2  prevented from reimbursing someone who has not met that
3  definition of pay?
4    A.    I don't know that.
5    Q.    You don't have an opinion?
6    A.    In one hand that seems logical.  On the
7  other hand, if they tell you that they have an advance
8  funded program and that's what they're going by, then
9  if that's been followed for a long period of time and
10 it's confirmed by others and others are doing that very
11 same thing, why, then, is that not a possibility?  I
12 think it is.
13   Q.    Objection, non-responsiveness.  You said
14 that this advance funding, I don't know what you called
15 it, policy, program was confirmed by others.  What
16 others?
17   A.    Well, Consolidated, for example.
18   Q.    And I haven't seen anything today or in over
19 a thousand, 20,000 pages of documents that confirms
20 anything other than, yeah, we offer advance funding to
21 the extent the stop loss contract provides for it.  Can
22 you point me to any document?
23   A.    No, I can't point to a document.
24   Q.    Can you point me to any person you've
25 discussed this with other than this meeting you had

CitiCourt, LLC
(801) 532-3441

PAGE 232

Don William Merrill, 7/21/03          232

1  with Mr. Hall and Mr. -- is it Routh?
2    A.    Routh.  Meetings that we've had with
3  Consolidated over the years, yes.
4    Q.    And is it -- were the statements made there
5  anything more than, yes, we can provide it?
6    A.    The information that's been provided to us
7  is, yes, the carriers that we deal with provide advance
8  funding.
9    Q.    Okay.
10   A.    Not that we can, but they do.
11   Q.    And is that statement, taken alone, an
12 incorrect statement?
13   A.    I don't know.
14         MR. SHUCHART:  Objection, form.
15   Q.    In other words, do you know whether
16 Companion Life Insurance Company provides advance
17 funding?
18   A.    As a possibility?
19   Q.    Yes.
20   A.    Yes.
21   Q.    Do you know that they do?
22   A.    Yes.
23   Q.    Okay.  If they provide it in one instance
24 with regard to one plan, do they have to provide it in
25 all instances?

CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 30    PAGE 233

Don William Merrill, 7/21/03    233

1    A.    I don't know what the policy is.
2    Q.    Wouldn't it make sense to check the contract
3 in each instance with each plan you're working with to
4 see if that contract --
5    A.    Definitely.
6    Q.    -- has an advance funding component?
7    A.    Yes.
8        MR. BUSH:  Okay, thank you.
9        MS. SHUCHART:  Is that a pass?
10       MR. BUSH:  That's a pass.
11           FURTHER EXAMINATION
12 BY MS. HEGLAND:
13       (Exhibit 44 marked.)
14    Q.    Would you please take a look at Exhibit 44,
15 Mr. Merrill.  Have you ever seen that before?
16    A.    I don't know if I have or not.
17    Q.    If you would turn --
18       MR. WALRAVEN:  For the record, can we have
19 it identified, just what it is?
20    A.    It looks like a preexisting condition rider
21 dated October 1 of 2000.
22       MR. SHUCHART:  It's identified as JAH
23 002210 --
24       MS. HEGLAND:  -- through 2229.
25       MR. SHUCHART:  That is correct.

CitiCourt, LLC
(801) 532-3441

PAGE 234

Don William Merrill, 7/21/03    234

1    Q.    (BY MS. HEGLAND)  I believe that page 2214
2 is captioned Companion Life Insurance Schedule with
3 Excess Loss Insurance.  Do you see that, sir?
4    A.    Page 14?
5    Q.    2214, yes.
6    A.    Oh, okay.  By this number, yes.
7    Q.    Does that appear to be a contract
8 providing -- part of a contract providing stop loss
9 coverage in which MBA of Wyoming is the third-party
10 administrator?
11    A.    I don't know.  The reason I say I don't
12 know, because the contract holder is Crum Electric
13 Supply Company.
14    Q.    Yes, sir.  And in No. 5 where it asks for
15 the name and address of the designated third-party
16 administrator, does it not read MBA of Wyoming?
17    A.    Yes.
18    Q.    Thank you.  And if you turn the page to
19 2215, at the bottom of the page do you see under
20 No. 9 --
21    A.    I do.
22    Q.    -- where it specifically spells out that
23 specific advance funding is included?
24    A.    Yes.
25    Q.    Do you see that?

CitiCourt, LLC
(801) 532-3441

PAGE 235

Don William Merrill, 7/21/03    235

1    A.    Yes.
2    Q.    Were you involved in this contract for this
3 client, Crum Electric?
4    A.    No.
5    Q.    But your company, MBA of Wyoming, was
6 involved in that, apparently?
7    A.    Apparently.
8       MS. HEGLAND:  Thank you, Mr. Merrill.
9 That's all the questions.
10       MR. SHUCHART:  All right.  This concluded,
11 we'll reserve our right for questions at the time of
12 trial.
13       (Deposition was concluded at 5:10 p.m.)
14            * * *
15
16
17
18
19
20
21
22
23
24
25

CitiCourt, LLC
(801) 532-3441

PAGE 236

236

REPORTER'S CERTIFICATE

State of Utah    )
                 )  ss.
County of Utah   )

    I, Vicky McDaniel, a Registered Merit
Reporter and Notary Public in and for the State of
Utah, do hereby certify:

    That on July 21, 2003, prior to being
examined, the witness, Don William Merrill, was duly
sworn by me to tell the truth, the whole truth, and
nothing but the truth;

    That the testimony of said witness was
reported by me in stenotype and thereafter transcribed,
and that a full, true, and correct transcription of
said testimony is set forth in the preceding pages.

    I further certify that I am not of kin or
otherwise associated with any of the parties of said
cause of action and that I am not interested in the
outcome thereof.

    WITNESS MY HAND and OFFICIAL SEAL at Draper,
Utah, this 26th day of July, 2003.


            Vicky McDaniel, RMR
            Utah License No. 87-108580

CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

`Case 1:03-cv-00047   Document 26   Filed in TXSD on 08/15/2003   Page 80 of 89

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

**PAGE 237**

237

1  Case:  San Benito v. Companion Life
   Case No.:  B-03-047
2  Reporter:  Vicky McDaniel
   Date taken:  July 21, 2003
3
                   WITNESS CERTIFICATE
4
     I, Don William Merrill, HEREBY DECLARE:
5
          That I am the witness referred to in the
6  foregoing testimony; that I have read the transcript
   and know the contents thereof; that with these
7  corrections I have noted, this transcript truly and
   accurately reflects my testimony.
8
   PAGE-LINE        CHANGE/CORRECTION        REASON
9
10
11
12
13
14
15
       ____   No corrections were made.
16
         I, Don William Merrill, hereby declare under the
17  penalties of perjury of the laws of the United States
    of America and the laws of the State of Utah that the
18  foregoing is true and correct.
19
                          Don William Merrill
20
       SUBSCRIBED and SWORN to at                    ,
21                , this         day of               ,
22  2003.
23
24
25         ,              Notary Public
                     CitiCourt, LLC
                     (801) 532-3441

Not Reported in F.Supp.2d                                                    Page 1
**(Cite as: 2002 WL 535056 (N.D.Tex.))**

Only the Westlaw citation is currently available.

United States District Court, N.D. Texas, Dallas Division.

PROPATH SERVICES, L.L.P., Plaintiff,
v.
QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC. and QUEST DIAGNOSTICS INCORPORATED, Defendant.

**No. CIV. 3:00-CV-2391-H.**

April 9, 2002.

MEMORANDUM OPINION AND ORDER

SANDERS, Senior J.

*1 Before the Court is Plaintiff's Motion for Partial Summary Judgment, filed October 26, 2001; Defendants' Response thereto, filed November 15, 2001; Plaintiff's Reply, filed November 30, 2001; Defendants' Surreply, filed December 11, 2001; and Plaintiff's Rejoinder, filed December 20, 2001. Also before the Court is Defendants' Motion for Partial Summary Judgment, filed December 17, 2001; Plaintiff's Response thereto, filed January 7, 2002; and Defendants' Reply filed January 22, 2002. The Court has jurisdiction pursuant to 28 U.S.C. § 1332. Upon review of the pleadings, briefs, and relevant authorities, the Court is of the opinion for the reasons stated below that Defendants' Motion for Partial Summary Judgment should be DENIED and Plaintiff's Motion for Partial Summary Judgment should be GRANTED.

I. BACKGROUND

Plaintiff, ProPath Services, Inc., formerly Medical Laboratory Service Dallas d/b/a Medical Laboratory Service Southwest ("MLSS"), is a partnership of physicians licensed to practice medicine in Texas who are either Board Certified or Board eligible and pursuing certification in pathology. (Pl. First Am. Compl. at 2). Defendants, Quest Diagnostics Clinical Laboratories, Inc. and Quest Diagnostics, Inc., formerly SmithKline Beecham Clinical Laboratories, Inc. ("SBCL"), own

and operate or manage clinical laboratories, or provide laboratory services, management support and reference testing to laboratories that perform various tests for the purpose of providing information for the diagnosis, prevention, or treatment of disease or the assessment of medical conditions. (First Am. Compl. at 2).

In 1992, ProPath's predecessor and Defendants' predecessor, entered into an Agreement for Anatomic Pathology Support Services ("1992 Agreement" or "Agreement"), thereby formalizing an eleven year relationship. (First. Am. Compl. at 4). SBCL agreed to provide MLSS with technical and support services to assist in the provision of anatomic pathology testing services [FN1] including marketing, specimen pick-up, supplies, slide preparation and screening, billing, and reporting.

> FN1. Pathology is divided into:
> (i) clinical pathology and (ii) anatomic pathology. Clinical pathology includes the study of chemical components of body fluids, cells, organisms or prions, and counting of various cells. Anatomic pathology includes all diagnostic services based on skilled observation, *e.g.,* looking at organs or biopsies, directly (grossly) or by microscope, electron microscope, or special lighting, stains, or special procedures. Further, anatomic pathology generally is divided into two categories: (a) cytology, which addresses diseases of cells; and (b) histology, which addresses diseases of organs or tissues."
> (First Am. Compl. at 3 n. 1).

On July 28, 2000, Defendants informed Plaintiff that they would terminate the Agreement. [FN2] (First Am. Compl. at 8). Plaintiff alleges that it notified Defendants that it would require the transfer of cytology operations on September 14, 2000 and that Defendants in a subsequent letter refused the transfer. (First Am. Compl. at 8). On March 5, 2001, Plaintiff and Defendants entered into an agreement that resulted in QDCL withdrawing the initial withdrawal notice and Plaintiff withdrawing its demand for transfer of the cytology operations. (First Am. Compl. at 8).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 535056 (N.D.Tex.))

Page 2

FN2. Under Section 6.1, termination is to take place 180 days from the date of the notice.

On May 15, 2001, Defendants notified Plaintiff that they would terminate the agreement again. (First Am. Compl. at 8). On May 21, 2001, Plaintiff notified Defendants that it would require transfer of the cytology operations. (First Am. Compl. at 9). Plaintiff alleges that to date, Defendants have only offered to transfer part of the operations, such as primary equipment, but not the employees. (First Am. Compl. at 9).

*2 Specifically, there are three sections of the Agreement that Plaintiff alleges the Defendants violated. First, and perhaps most significant, Plaintiff alleges that Section 3.2, "Winding Down," provides that after the termination of the Agreement the Defendants are required to transfer all cytology operations [FN3] to Plaintiff upon 30 days notice of the termination of the agreement. Second, Plaintiff contends that Section 1.4, "Marketing," provides that QDCL must continue to market exclusively for ProPath after transfer of the cytology operations and until termination of the 1992 Agreement. Third, Plaintiff alleges that Section 1.5, the "Covenant Not to Compete," provides that the Defendants agreed not to compete with Plaintiff for a period of 6 months after the termination of the Agreement. [FN4] In regard to these claims, Plaintiff seeks declaratory relief and specific performance. It is important to note, however, that this Opinion only addresses the arguments raised in the parties' Motions, *i.e.* what are the parties' obligations under each of the provisions and not whether a breach of these provisions has occurred.

FN3. Plaintiff provides that "cytology operations consist of three main components: (1) the equipment necessary to stain and prepare specimens; (2) the operations of employees, including cytotechnologists, required to review and evaluate such specimens; and (3) the revenue associated with cytology cases reviewed." (First Am. Compl. at 8).

FN4. Plaintiff also alleges that Defendants

have confidential information acquired from ProPath that will benefit the Defendants and Plaintiff's competitors. (First Am. Compl. at 9). In relation to this claim, which is not the subject of the partial summary judgment motions, Plaintiff alleges Breach of Fiduciary Duty and/or Duty of Loyalty, Inducement of Breach of Fiduciary Duty and/or the Duty of Loyalty, Misappropriation of Confidential Information and Trade Secrets, Unfair Competition, Breach of Contract, and Tortious Interference with Business Relations. Defendants also allege in their First Amended Answer and Counterclaims, filed August 3, 2002, that the 1992 Agreement is not binding on Defendant Quest Diagnostics Incorporated. This issue was not raised in the Motions for Summary Judgment.

Defendants launch a multi-prong attack on Plaintiff's contentions. First, with regard to the entire 1992 Agreement, Defendants contend that their March 31, 2001 move to a new laboratory served to terminate the entire agreement. Second, and in the alternative, Defendants assert that a 1994 agreement removed histology and non-gynecologic cytology services from the 1992 Agreement, thereby denying ProPath relief in the areas of histology testing or operations, marketing (Section 1.4), and rendered the scope of the non-compete clause (Section 1.5) ambiguous. Third, Defendants argue that under § 3.2 of the Agreement (1) Plaintiff is not entitled to net revenues derived from relationships and agreements with Managed Care Organizations ("MCOs"); (2) Defendants are not required to terminate cytology employees; and (3) Plaintiff does not own the net revenues derived from cytology operations under the 1992 Agreement. Fourth, Defendants contend that they are not required to market cytology services to ProPath, under Section 1.4, following the transfer of operations. Fifth, Section 1.5, the covenant not to compete, is unenforceable for lack of consideration and is impermissibly broad.

Defendants also assert that a December 10, 1992 Addendum ("Addendum") to the 1992 Agreement served to replace a number of the provisions of the 1992 Agreement that affect the manner of compensation pursuant to Section 1.3 of the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 535056 (N.D.Tex.))

Page 3

Agreement [FN5] and the ownership of revenues. Plaintiff contends that the Addendum was never signed and therefore not valid. Defendants argue that Plaintiff made several judicial admissions in the pleadings that prevent Plaintiff from contesting the Addendum's validity.

> FN5. Section 1.3 provides:
> If requested by MLSS and in consideration for the compensation set forth in Section III below, SBCL shall be responsible for all billing and collection activities on behalf of and in the name of MLSS, with MLSS' provider number, consistent with all applicable third party payor requirements. MLSS shall own all right, title, and interest to the Net Revenues (as defined below) received by SBCL with respect to billings performed in the name of MLSS. SBCL shall not otherwise share in the net revenues.

II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the facts and law as represented in the pleadings, affidavits and other summary judgment evidence show that no reasonable trier of fact could find for the nonmoving party as to any material fact. FED.R.CIV.P. 56; *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888 (1990); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986); *Innovative Database Systs. v. Morales,* 990 F.2d 217 (5th Cir.1993). "The moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, but is not required to negate elements of the nonmoving party's case." *Lynch Properties, Inc. v. Potomac Ins. Co. of Ill.,* 140 F.3d 622, 625 (5th Cir.1998) (citing *Celotex,* 477 U.S. at 322-25). If the movant fails to meet its initial burden, the motion must be denied, regardless of the nonmovant's response. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) .

*3 If the movant does meet its burden, the nonmovant must go beyond the pleadings and designate specific facts showing that a genuine issue

of material fact exists for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Edwards v. Your Credit, Inc.,* 148 F.3d 427, 431 (5th Cir.1998). A party opposing summary judgment may not rest on mere conclusory allegations or denials in its pleadings unsupported by specific facts presented in affidavits opposing the motion for summary judgment. FED. R. CIV. P. 56(e); *Lujan,* 497 U.S. at 888; *Hightower v. Texas Hosp. Assn.,* 65 F.3d 443, 447 (5th Cir.1995).

In determining whether genuine issues of fact exist, "[f]actual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that a controversy exists." *Lynch,* 140 F.3d at 625; *see also Eastman Kodak v. Image Technical Services,* 504 U.S. 451 (1992). However, in the absence of any proof, the Court will not assume that the nonmoving party could or would prove the necessary facts. *Lynch,* 140 F.3d at 625. A party must do more than simply show some "metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. "If the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Friou v. Phillips Petroleum Co.,* 948 F.2d 972, 974 (5th Cir.1991).

III. ANALYSIS

A. Whether the entire 1992 Agreement was terminated as a result of the Defendants' Laboratory Change of Location

As an initial matter, Defendants assert that all of Plaintiff's claims made in its Motion are moot because the 1992 Agreement, on which the claims are based, was terminated when Defendants relocated their laboratory operations located at 8000 Sovereign Row Dallas, Texas and relocated to Irving, Texas on March 31, 2001. Plaintiff disputes Defendants' interpretation of the termination provision of the Agreement, and argues that a mere relocation of laboratory operations did not terminate the Agreement.

The termination provision at issue here, Section 6.2, states "This Agreement will immediately and automatically terminate on and as of the date any of the following occur: ... 6.2-2 *Discontinuance of Operations.* Permanent discontinuance of substantially all the operations of the Laboratory by

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 535056 (N.D.Tex.))

SBCL." Although there is no specific definition section to the Agreement, the third "WHEREAS" clause of the Agreement provides that "SBLC owns a clinical laboratory facility located at 8000 Sovereign Row, Dallas, Texas 75247 ("Laboratory")." Defendants claim that because "Laboratory" is only identified as the Sovereign Row facility, any relocation of operations would terminate the Agreement. Plaintiff contends that the mere relocation of the operations from the Sovereign Row facility to another site does not terminate the Agreement, but rather the complete cessation of the operations associated with the Sovereign Row laboratory would have to cease for termination to occur. (Pl. Reply at 3). Plaintiff states, and Defendants do not contest, that the operations that previously occurred in the Sovereign Row facility continued after the move to Irving.

*4 Plaintiff is correct; the contract is unambiguous. Interpreting an unambiguous contract is a question of law, not fact, and therefore appropriate for summary judgment decision. *See Friou v. Phillips Petroleum Co.,* 948 F.2d 972, 974 (5th Cir.1991). The Court must give the words of an unambiguous contract their "plain, ordinary, and generally accepted meaning." *Cross Timbers Oil Co. v. Exxon Corp.,* 22 S.W.3d 24, 26 (Tex.App.--Amarillo 2000, no pet.). The subject of Section 6.2-2 is "operations," as is the focus of the entire agreement. *See EEOC v. R.J. Gallagher Co.,* 181 F.3d 645, 651 (5th Cir.1999) ("[W]e must interpret a contractual agreement so as to give effect to each and every provision of the contract."). To say, as Defendants contend, that the entire agreement would terminate because of relocation would be to ignore the plain language of the termination provision and the fact that the parties entered into the Agreement for the provision of technical and support services for anatomic pathology testing, regardless of location.

The Court finds that the Agreement was not terminated on March 31, 2001 when the Defendant relocated from the Sovereign Row facility. Defendants' Motion on this ground is DENIED and the Court will proceed with an analysis of the remainder of Defendants' and Plaintiff's contentions.

B. Whether the 1994 transfer of histology services "carved out" all aspects of the 1992 Agreement related to histology and non-gynecologic cytology

Defendants contend that a February 1994 agreement, which allegedly provided that ProPath would take over laboratory services related to histology and non- gynecologic cytology that were previously QDCL's function, denies the Plaintiff all relief under the 1992 Agreement with regard to histology and non- gynecologic operations, specifically under the marketing provision and the covenant not to compete. The parties agree that this transfer took place. (Def. Mot. at 2; Pl. Resp. at 3). Plaintiff asserts, however, that there was no mention of changing the parties' marketing obligations or the rights under the covenant not to compete as part of the 1994 agreement, and that Defendants continued to market histology services exclusively to ProPath after the transfer.

Although Defendants allege that the 1994 agreement amended the parties' rights and obligations under the 1992 Agreement (Defs. Mot. at 2), Defendants do not provide a copy of the 1994 agreement, nor explain its absence. Defendants argue instead that language within a January 14, 1997 letter confirms the effect of the 1994 transfer on the 1992 Agreement. [FN6] Nevertheless, "Texas law requires that we read a contract and its subsequent modification as a whole, giving effect to new provisions and discarding old provisions which are inconsistent with the new terms." *EEOC,* 181 F.3d at 651. Without a copy of the 1994 agreement, the Court cannot construe its effect, if any, on the 1992 Agreement. Therefore, Defendants have not met their burden to show that the 1994 transfer terminated Defendants obligations regarding histology and non- gynecologic cytology under the 1992 Agreement and their Motion on this ground is DENIED. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) ( "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response.").

> FN6. Appendix N to Plaintiff's Motion for Summary Judgment contains a series of Memoranda referring to "on-going plans and discussions" regarding the transition of histology operations; however, the parties do not refer to these Memoranda in support of their argument nor is the Court inclined to construe these as contracts.

C. The Parties' Rights under Section 3.2

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                    Page 5
(Cite as: 2002 WL 535056 (N.D.Tex.))

**\*5** Section 3.2, the "winding-down" provision provides in relevant part that:

> MLSS shall have the right to require SBCL to cease providing cytology technical services under this Agreement or to transfer such operations to MLSS at any time by providing SBCL with at least thirty (30) days prior written notice to that effect, such notice to specify any employees of SBCL that MLSS wishes to employ should MLSS continue such operations. SBCL shall cooperate fully with MLSS in transferring or winding down such operations and shall use its reasonable good faith efforts to mitigate all costs payable to MLSS under this Section 3.2 through continued employment by SBCL of employees involved in such operations or otherwise, to the extent SBCL deems practicable....

Plaintiff moves the Court to declare that Defendants must transfer to it all cytology operations, including employees now working for the Defendants and identified by Plaintiff. Defendant asserts 1) Plaintiff is not entitled to business generated from Defendants' relationships and agreements with Managed Care Organizations; 2) Defendants are not obligated to terminate their cytology employees for employment with Plaintiff; and 3) Plaintiff does not own the Net Revenues generated from Cytology Operations under the 1992 Agreement. Each argument will be addressed below.

1. Whether Plaintiff is entitled to business generated from Defendants' relationships with Managed Care Organizations ("MCO")

Defendants allege that they have arrangements with a number of MCOs to provide laboratory services. With regard to these arrangements, Defendants allege that QDCL would contract with ProPath for professional review of cytology specimens and histology specimens and QDCL would pay ProPath a fee for this work. [FN7] Based upon this arrangement, Defendants allege that Plaintiff was their "subcontractor" and that Defendants own the managed care work, thereby restricting the "transfer" provision in Section 3.2 to non-managed care work. Plaintiff opposes Defendants' contention, arguing that the managed care work is subject to transfer because Plaintiff owns it and, in the alternative, Section 3.2 does not require ownership.

> FN7. Plaintiff contends that this payment was a portion of the capitation fee and not

a fee for services.

Exhibit B-1, Section IV of the Agreement provides that "MLSS will charge SBCL a capitation fee for MLSS' professional component of cytology and surgical pathology services furnished with regard to Sanus HMO and Cigna HMO members ...." Both parties agree as to the validity of this provision [FN8] and that it provides an exception to the Compensation provision in Section 3.1-1 where Plaintiff would pay Defendants for services performed. Turning to Plaintiff's strongest argument--that the ownership of the managed care work is irrelevant to the transfer provisions under Section 3.2--the Court finds Plaintiff's interpretation is correct. The plain language of Section 3.2 governs: "MLSS shall have the right to require SBCL to cease providing cytology technical services under this Agreement or to transfer such operations to MLSS at any time ...." The provision of services and payment therefor with regard to the MCO agreements is clearly "under" the 1992 Agreement and the provision does not provide any requirement for ownership. Without reaching the merits of Defendants' argument that Plaintiff does not own the business related to MCO agreements, the Court hereby DENIES Defendants' Motion on the basis of the plain language of Section 3.2 and finds that the cytology managed care business is subject to the "transfer" under Section 3.2. *See Cross Timbers Oil Co. v. Exxon Corp.,* 22 S.W.3d 24, 26 (Tex.App.--Amarillo 2000, no pet.).

> FN8. The parties also agree that Exhibit B-1 of the 1992 Agreement was amended a number of times when additional agreements with MCOs were reached.

2. Whether Section 3.2 requires the Defendants to transfer their cytology employees to the Plaintiff

**\*6** Plaintiff demands that as part of the "transfer of operations" it is entitled to its choice of Defendants' employees of the cytology operations. Specifically, Plaintiff contends that the phrases "transfer such operations" and "cooperate fully," within Section 3.2, require Defendants to terminate their cytology employees and permit Plaintiff to re-hire them. (Pl. Mot. at 16). Further, Plaintiff notes that the Defendants are only permitted to retain employment

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 535056 (N.D.Tex.))

Page 6

of the cytology employees where it would mitigate Plaintiff's costs. (Pl. Mot. at 16). Plaintiff also asserts that the parties engaged in a transfer of employees as part of the 1994 transfer of histology operations and this transfer is intended to be the same. (Pl. Mot. at 18). Defendants contend that they are not required to terminate their cytology employees or close their positions.

Defendants refer to the same language identified by Plaintiffs and assert that Section 3.2 actually provides for the "continued employment by SBCL of employees involved in such operations." (Defs. Mot. at 13). Defendants also assert that, at the very least, Section 3.2 raises a fact question in that "cytology technical services" is not defined and it is not clear as to whether that phrase refers to "technology and support services," which it claims would include the employees, or simply "technology services." (Defs. Resp. at 12).

Texas law provides that "A court is not at liberty to revise an agreement while professing to construe it." *General American Indemnity Co. v. Pepper,* 161 Tex. 263, 265 (1960). In addition, "we must honor the presumption that parties to a contract intend every clause to have some effect, and attempt to reconcile ambiguous provisions unless they are 'irreconcilable' or 'necessarily repugnant'." *Chapman v. Orang Rice Milling Co.,* 747 F.2d 981, 983 (5th Cir.1984). Here, however, we do not have ambiguous provisions. Section 3.2 clearly provides that Plaintiff may specify cytology employees it wishes to employ during and after the winding down process. The provision also provides that the Defendants would continue to employ cytology employees *only* to the extent that it would mitigate Plaintiff's costs. Therefore, Defendants are not permitted to employ cytology employees if Plaintiff does not need to mitigate its costs. *See Blankenship, et al. v. Highland Insurance Co.,* 594 S.W.2d 147, 150 (Tex.App.--Dallas 1980, writ ref'd n.r.e.) ("[T]he rule of *expressio unius est exclusio alterius* ... is the product of logic and common sense ...."). The contract does not need to expressly state that Defendants must terminate the employees for the language, as it is written, to mean as much. Section 3.2 provides that Defendants must transfer their cytology employees, except to the extent that Plaintiff needs to mitigate its costs. Plaintiff's Motion on this ground is GRANTED and Defendants' Motion is DENIED.

3. Whether the December 10, 1992 Addendum is valid

*7 The parties' remaining arguments regarding their rights under Sections 3.2 and 1.4 [FN9] involve the validity of an unsigned Addendum dated December 10, 1992. Defendant asserts that the Addendum amended the 1992 Agreement, specifically superseding Sections 1.3 and 3.1 limiting the scope of compensation from histology and cytology to histology services alone. (Defs. Mot. at 19, 20). Thus, Defendants assert that Plaintiff does not own the net revenues from cytology operations and cannot obligate Defendants to market cytology operations following the winding down process because of a lack of consideration. Plaintiff contends that the Addendum is not valid, and therefore Plaintiff's rights should be interpreted based upon the 1992 Agreement alone. Defendants assert that Plaintiff made statements as to the validity of the Addendum that constitute judicial admissions, and therefore Plaintiff is barred from contesting the validity of the agreement. Specifically, Defendants identify three alleged judicial admissions. First, Plaintiff states in paragraph 18 of Plaintiff's First Amended Complaint, filed August 24, 2001, "This payment and reimbursement method proved cumbersome, so by amendment dated December 10, 1992, the payment procedure was changed ...." Second, Plaintiff provides in paragraph 12 of its Reply to First Amended Counterclaims, "ProPath admits that, at some point, the parties simplified the payment arrangements, so that instead of QDCL turning over all revenues to ProPath and ProPath then paying QDCL for its support services, the parties determined an amount per case that reflected the average net amount retained by ProPath." Third, in Footnote 14 of its Brief in Support of Preliminary Injunction, filed January 18, 2001, Plaintiff states "In late 1992, the billing process changed by agreement of ProPath and Quest to make it more convenient for Quest."

> FN9. Section 1.4 provides in relevant part: "In consideration for the compensation set forth in Section III below, SBCL shall market anatomic pathology testing services exclusively for MLSS in conjunction with SBCL's own marketing efforts within the 48-county area ...."

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 535056 (N.D.Tex.))

"The question of whether an agreement was reached is generally a fact question where, as here, the existence of the agreement is disputed." *Crest Ridge Construction Group, Inc. v. Newcourt Inc.,* 78 F.3d 146, 153 (5th Cir.1996). Where Plaintiff makes a judicial admission as to the execution of the Addendum, such admission would render moot Plaintiff's arguments disputing the validity of the Addendum. *See Mendoza v. Fidelity and Guaranty Insurance Underwriters,* 606 S.W.2d 692, 694 (Tex.1980) ("A judicial admission is conclusive upon the party making it, and it relieves the opposing party's burden of proving the admitted fact, and bars the admitting party from disputing it."); *see also Gevinson v. Manhattan Construction Co.,* 449 S.W.2d 458, 465 ("A true judicial admission is a formal waiver of proof and is usually found in the pleadings or in a stipulation of the parties."). For a statement to constitute a judicial admission it must 1) be made in a judicial proceeding; 2) be contrary to a fact essential to the theory of recovery; 3) be deliberate, clear, and unequivocal; 4) such that giving it conclusive effect meets with public policy; and 5) about a fact on which judgment for the opposing party can be based. *See Heritage Bank v. Redcom Laboratories, Inc.,* 250 F.3d 319, 329 (5th Cir.2001). The Court finds that although Plaintiff's statement in its First Amended Complaint was careless, especially in light of the arguments presented in its Motion for Summary Judgment and its Response to Defendants' Motion, it does not constitute a judicial admission because prong five of the *Heritage Bank* test is not satisfied. [FN10]

> FN10. Plaintiff's other statements raised by Defendants do not constitute judicial admissions because they are not "deliberate, clear, and unequivocal." *See Heritage Bank,* 250 F.3d at 329. The statement made in the Reply to First Amended Counterclaims does not provide a time period for the simplification of payment arrangements, and therefore, does not conclusively confirm the existence of the agreement on December 10, 1992. Although more specific as to timing, the third statement, made within Footnote 14 of Plaintiff's Brief in Support of Preliminary Injunction, also does not specifically refer to the December 10, 1992 agreement.

*8 Judgment regarding the transfer of operations under Section 3.2 does not turn on the validity of the Addendum. First, the Addendum does not modify Section 3.2. Second, even if the Addendum were valid and altered the ownership of the net revenues, as stated previously in Section C, Part 1, *supra,* the ownership of business under Section 3.2 is irrelevant and not required for transfer under the plain language of this Section. So, even if the Addendum were valid and this Court interpreted it in accordance with Defendants' arguments, the Court would not render judgment based upon the Addendum.

Judgment regarding Section 1.4, the marketing provision, also does not turn on the validity of the Addendum. Plaintiff asserts that because there is no termination provision included in Section 1 .4, Section 1.4 must be governed by the general termination provision in Section 6.1, which provides that if either party should give notice to terminate the Agreement "the Agreement shall terminate on the future date specified in such notice." Plaintiff contends, therefore, that Defendants must market anatomic pathology testing services from the date of transfer of operations to termination. (Pl. Mot. at 16). Defendants contend that because the Addendum amended the compensation scheme under the 1992 Agreement to only provide compensation for histology services, there is no compensation for marketing cytology services and thus, no consideration to support Section 1.4. Defendants conclude that this alleged lack of consideration relieves them of the requirement to market cytology operations. (Defs. Mot. at 20). Defendants also assert as a related argument, that once the winding down process in concluded, QDCL will not receive collections from cytology services and Section 1.4 again fails for want of consideration. (Defs. Mot. at 19). Both of these arguments fail.

Under Texas Law, the Court must presume that sufficient consideration exists within a written contract. *See Tag Resources, Inc. v. Petroleum Well Services, Inc.,* 791 S.W.2d 600, 605 (Tex.App.--Beaumont 1990, no writ). In order for this Court to find insufficient consideration, the consideration must be so "grossly inadequate as to shock the conscience, being tantamount to fraud." *Birdwell v. Birdwell,* 819 S.W.2d 223, 227-28 (Tex.App.--Fort Worth 1991, writ denied). Such is not the case here. "A single consideration is

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                      Page 8
(Cite as: 2002 WL 535056 (N.D.Tex.))

sufficient to support multiple promises bargained for in an agreement." *See id.* Whether compensation for cytology operations was removed from the Agreement or not, is irrelevant. The Addendum does not alter the marketing provision, except that it replaces the last two sentences, neither of which have any bearing on the parties arguments in these Motions. Because Section 1.4 provides that the Defendants must market anatomic pathology services, not simply cytology services, the consideration governing the marketing of histology services constitutes sufficient consideration, were the Addendum to be valid. In addition, the consideration supporting the marketing provision prior to the transfer of operations is sufficient to support marketing after the transfer of operations until termination.

*9 Summarizing, the Court does not need to decide whether the 1992 Addendum is valid. The Court finds that because judgment with regard to whether Plaintiff owns the net revenues and whether there is sufficient consideration to support Section 1.4 is not based on the Addendum's validity, Plaintiff's statements do not constitute judicial admissions. Furthermore, Defendants are obligated to market anatomic-pathology services exclusively for Plaintiff after transfer of cytology operations and until termination of the Agreement. Defendants' Motion on the grounds that Plaintiff does not own the net revenues generated from cytology operations and that Section 1.4 does not obligate QDCL to market cytology services for ProPath after the transfer of operations is DENIED. Plaintiff's Motion on the ground that QDCL must market anatomic pathology services exclusively for ProPath after transfer of operation is GRANTED.

D. Whether Section 1.5 is unenforceable as a matter of law

Section 1.5 provides in relevant part that:

SBCL recognizes that MLSS' entering into this Agreement is induced primarily because of the covenants and assurances made by SBCL herein, that SBCL's covenant not to compete is necessary to insure the continuation of MLSS' business .... Therefore, SBCL agrees that during the term of this Agreement and any renewals thereof and continuing for a period of six (6) months following termination of this Agreement for any reason, SBCL, its affiliates, and agents will not actively solicit, directly or indirectly, any of the

MLSS anatomic pathology business in the 48 Texas counties ....

Plaintiff correctly states that enforceability of a covenant not to compete is a question of law. *See American Express Financial Advisors, Inc. v. Scott,* 955 F.Supp. 688, 691 (N.D.Tex.1996). Plaintiff asserts that the covenant covers the term of the agreement and six months thereafter, covers anatomic pathology testing services (not clinical services), and covers only the areas where Defendants have worked on Plaintiff's behalf. (Pl. Mot. at 20). Defendants assert that the covenant is unenforceable because it is not narrowly tailored nor a reasonable restriction on Defendants. (Defs. Resp. at 21, 22).

In determining the covenant's enforceability, the Court must determine 1) whether there is an otherwise enforceable agreement and 2) whether the covenant restricting competition is ancillary. *See Scott,* 955 F.Supp. at 691. The Court has already determined in most respects that the Agreement is enforceable. Therefore, the Court must turn to the second question of whether the covenant is ancillary. Texas law provides that a covenant is ancillary to an agreement if 1) the consideration given by Plaintiff in the otherwise enforceable agreement must give rise to the Plaintiff's interest in restraining the Defendants from competing; and 2) the covenant must be designed to enforce the Plaintiff's consideration or return promise in the otherwise enforceable agreement. *See Light v. Centel Cellular Co.,* 883 S.W.2d 642, 627 (Tex.1994). Plaintiff provides extensive analysis of its interest in the covenant and return promises supporting the covenant. (Pl. Mot. at 19). The consideration here was clearly the provision of confidential information. Plaintiff states that it had three interests in the covenant: 1) that Defendants not use confidential information to Plaintiff's detriment; 2) in preserving Plaintiff's anatomic pathology business; and 3) that the transfer of the cytology operations would be protected by a contemporaneous non-compete provision. Plaintiff also contends that the return promise was that the Defendants would not disclose Plaintiff's proprietary information and that they would retransfer all cytology operations to Plaintiff upon request. Defendants do not refute any of Plaintiff's analysis, and the Court finds Plaintiff's analysis to be correct. *See Scott,* 955 F.Supp. at 692 ("[C]onfidential information and trade secrets given by Plaintiff to Defendant gave rise to Plaintiff's

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                    Page 9
(Cite as: 2002 WL 535056 (N.D.Tex.))

interest in restraining Defendant from competing. The non-compete covenant, in turn, enforces Defendant's return promise not to use or disclose the confidential information and trade secrets in the context of the otherwise enforceable contract.").

*10 Defendants argue that the term "anatomic pathology services" is impermissibly broad. In support of this contention, Defendants raise again the 1994 transfer of histology services and assert that because this transfer removed histology operations from the 1992 Agreement, the meaning of "anatomic pathology services" is unclear. Because a copy of the 1994 agreement was not provided as summary judgment evidence, the Court, earlier in this Opinion, *see supra* Section B, denied Defendants' Motion that the 1994 transfer "carved out" histology operations from the 1992 Agreement. Accordingly, there is no support for Defendants' argument that it would be unreasonable for Section 1.5 to apply to histology services.

In addition, as Defendants contend, a covenant not to compete is only enforceable where it contains "reasonable limitations as to time, geographical area, and scope of activity to be restrained. a six month restriction on competition, in light of the complexity of the transactions at issue, is not unreasonable." *See Zep Manufacturing Co. v. Harthcock,* 824 S.W.2d 654, 660 (Tex.App.--Dallas 1992, no writ). Here the time restriction is six months following termination and restrictions of longer duration have been upheld in this Circuit. *See, e.g., Meineke Discount Muffler v. Jaynes,* 999 F.2d 120, 123 (5th Cir.1993) (upholding one-year restriction). An reasonable geographic restraint is often thought to be a restraint of the area in which the contesting party worked while under contract. *See Harthcock,* 824 S.W.2d at 660. The geographic restriction to the 48 Texas counties is not unreasonable given that the 48 Texas counties were the geographic region for Defendants' marketing of anatomic pathology services. *See* 1992 Agreement, Section 1.4. Therefore, the Court finds that the covenant is enforceable and not an unreasonable restriction. Defendants' Motion on this basis is DENIED and Plaintiff's Motion is GRANTED.

IV. CONCLUSION

For the reasons stated above, Defendants' Partial Motion for Summary Judgment is DENIED and Plaintiff's Partial Motion for Summary Judgment is

GRANTED. Specifically, this Court finds that the 1992 Agreement was not terminated by Defendants' relocation of its laboratory to Irving; there is insufficient evidence to support a finding that the 1994 agreement amended the 1992 Agreement; cytology managed care business is subject to the "transfer" under Section 3 .2; Defendants are required to transfer cytology employees to Plaintiff; Defendants are required to market anatomic pathology services exclusively for Plaintiff after transfer of operations; and the covenant not to compete is enforceable.

The Parties are DIRECTED to file a Joint Status Report providing a list of the remaining issues in this matter no later than *noon, April 15, 2002.*

The Clerk is Directed to Fax this Order Immediately to Counsel for the Parties.

SO ORDERED.

2002 WL 535056 (N.D.Tex.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works