*27*

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

United States District **Court**
Southern District of **Texas**
FILED

SEP 0 4 200**3**

**Michael N. Milby**
**Clerk of Court**

| | | |
|---|---|---|
| SAN BENITO CONSOLIDATED | § | |
| INDEPENDENT SCHOOL DISTRICT | § | |
| | § | |
| VS. | § | **CIVIL ACTION NO. 003-047** |
| | § | |
| COMPANION LIFE INSURANCE | § | |
| COMPANY, MANAGED BENEFITS | § | |
| ADMINISTRATOR AND INSURANCE | § | |
| CONSULTANTS, INC., J. ALLAN | § | |
| HALL & ASSOCIATES, INC., | § | |
| AND MBA OF WYOMING, INC. | § | |

### DEFENDANT HALL'S REPLY TO RESPONSE TO MOTION FOR SUMMARY JUDGMENT AND INCORPORATED BRIEF IN SUPPORT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Defendant J. Allan Hall ("Hall") and files this Reply to San Benito Independent School District's ("San Benito") Response to Hall's Motion for Summary Judgment filed pursuant to **FED. R. CIV. P.** 56, and Incorporated Brief in Support, and would show:

### ARGUMENTS IN REPLY

**A.    The Policy at Issue in this Case is "Reinsurance" – San Benito Characterized it as Such in its Original Petition**

1.    Throughout its Original Petition, San Benito consistently and unequivocally identified the policy it procured from Companion Life – the policy that forms the basis of its claims in this case -- as "a policy of **reinsurance**." (see Orig. Pet. at p. 3 ¶¶ IV, V; p. 4 ¶¶ VI, VII; p. 5 ¶ VIII; p. 6 ¶¶ X, XI). In its response to Hall's motion for summary judgment, San Benito now asserts that the policy it obtained is **not** reinsurance and that

Corpus Christi\643522.1

Hall has improvidently asked this Court to "consider" it as such. (Resp. at p.3 ¶¶ III.A., IV.A.; p. 4 ¶ IV ["[Hall] has mis-characterized its own and Companion Life's status as reinsurers"]; p.5 ¶ 1 ["the insurance has been referred to, . . . by [Hall] and others, as "reinsurance"]; pp. 6-7 ¶ VI.A.).  San Benito's blatant contradiction of the numerous federal and state courts that have used the terms "stop-loss" and reinsurance interchangeably is but an improvident attempt to avoid the summary disposition of its claims through a retrenchment from its original pleaded position.  San Benito thereby only highlights the strength of Hall's summary judgment motion.  Its  contention that the Companion Life policy is not a contract of reinsurance should be disregarded as moot, as San Benito itself has expressly averred the contrary.

2.    Similarly, San Benito takes issue with whether authorities cited by Hall hold "stop loss" insurance and reinsurance to be synonymous (Resp. at pp. 6-7 ¶ VI.A.).  Given that San Benito has already characterized this contract as one of reinsurance, the entire exercise is unnecessary.  Further, it is legally without merit.  Hall has presented to the Court a long line of cases holding that the terms and characteristics of stop loss insurance and reinsurance are synonymous (Mtn. at p. 5, nn. 4, 5). *Board of Ins. Commissioners v. Texas Employers Ins. Ass'n*, 189 S.W.2d 47, 54 (Tex. Civ. App. – Austin 1945), *aff'd*, 192 S.W.2d 149 (Tex. 1946), on which Hall relies and San Benito erroneously attempts to distinguish, does indeed unambiguously state, "It is obvious and conclusive, we think, that any reinsurance is in effect a stop-loss plan, so far as the original carrier is concerned."  "It follows that reinsurance is in the very nature of things 'stop-loss' insurance . . . ." *Id.*

-2-

3.    In *Bonhiver v. Affiliated Cos. of Am.*, 447 F.2d 108, 110-111 (5th Cir. 1971), just as in San Benito's original petition, the policy of insurance at issue is routinely characterized as "reinsurance."

4.    Further, importantly, *In re Affiliated Food Stores, Inc. Group Benefit Trust*, 134 B.R. 215, 216 (Bankr. N.D. Tex. 1991) involves a "self-funded employee benefit plan;" the court specifically notes the Plan Trust did **not** purchase reinsurance or excess stop-loss coverage with any insurance carrier and infers that the same was permissible. *See also*, *United Food & Commercial Workers & Employers Arizona Health & Welfare Trust v. Pacyga*, 801 F.2d 1157, 1161-62 (9th Cir.) (self-funded employee benefit Plan obtained stop loss insurance "to reimburse the Plan in the event that it must pay out more than a certain amount in claims in a given year.").

5.    Finally, the policy at issue in this case is entitled "Companion Life Insurance Policy Providing Excess Loss Insurance" (See Exh. B to summary judgment motion "Mtn."). As stated in Hall's motion for summary judgment, **and acknowledged in San Benito's Response** (Resp. at p. 5, ¶ 2) excess loss insurance and reinsurance are referred to interchangeably. They are synonymous, as are stop-loss and reinsurance. If A = B and A = C, then B = C. The three terms are interchangeable as numerous courts have held.

6.    San Benito having now deemed the insurance policy at issue to be a stop-loss policy, it has reiterated its prior judicial admissions that this policy is one of reinsurance and it is bound by that position. Its subsequent assertion of a contrary position is improper, as the issue is irreversibly settled, as set forth below.

**B.    San Benito is Bound By the Terms of the Reinsurance Contract, Which Govern the Outcome of this Case**

7.    San Benito ignores entirely the terms of the very reinsurance contract at issue in this case, arguing instead that Companion Life's rationale for refusal to reimburse the claims in dispute, and Hall's position that reimbursement for the claims was not owed, are improper (Resp. at p. 2 ¶ I, p. 6 ¶ 5).  The policy is express: "Payment is subject to the conditions, limitations and exceptions of this Contract.  The contractholder [San Benito] agrees to . . . comply with Contract provisions."  (Exh. B to Mtn., Contract, at p.1 ¶ 3).

8.    The claims at issue are "specific" claims.  (See Exh. B to Mtn. at p. 3, ¶7(f), "Specific Benefit;" p. 7, ¶2, defining a specific claim).  The policy is plainspoken that claims must first be incurred and paid before reimbursement in these provisions; and again within the definition of "Specific Contract Basis" (Exh. B to Mtn. at p. 6); then again upon the application itself (Exh. C to Mtn., Application for Contract, at p. 4 ¶11(i)); and yet again in the Application at p. 1 ¶8(b); p. 2 ¶8(e).  Thus, in at least **four** places, both the application and the policy remind San Benito that its Employee Benefit Plan expenses **must be incurred and must be paid to be considered eligible for reimbursement**.

9.    "Employee Benefit Plan expenses must be incurred from 07/01/00 through 08/31/01" and "Paid from 10/01/00 through 8/31/01." (Exh. B to Mtn. at p. 3 ¶ 7(f); see also Exh. C to Mtn. at p. 2 ¶ 8(e)).

10.    Claims are not "eligible" for reimbursement unless they are first "Paid by the Contractholder." (see Exh. B. to Mtn. at p. 6 definition 6)  "Paid,"

-4-

> means that **funds are actually disbursed** by the Contractholder or his Agent. Payment of a claim is the unconditional and direct payment of a claim to a Covered Person or their health care providers. Payment will be deemed made on the date that both (1) the payor directly tenders payment by mailing (or otherwise delivering) a draft or check, and (2) the account upon which the payment is drawn contains, and continues to contain, sufficient funds to permit the check or draft to be honored.

(*Id.* at p. 5, last definition)(emphasis added).

11.    Claims for reimbursement must further be accompanied by a "fully executed Proof of Loss," defined as a "form authorized by the Company [Companion Life] to be used for the submission of claims as well as the supporting documentation reasonably necessary for the Company's independent evaluation of the legitimacy and extent of the claim." (*Id.* at p. 6, definition 3; see also p. 9 ¶ IV 1.)

12.    Finally, in yet a fifth provision the reinsurance contract for reimbursement includes a "Warranty" that San Benito cannot avoid:

> "Under presentation of Proof of Loss to the Company for Aggregate [ or Specific] Benefits, the Contractholder warrants that all monies necessary to pay for services and supplies **have been paid to the respective providers of medical services or supplies** to which the claim for reimbursement relates."

(*Id.* at p. 9 ¶ IV. 2)(emphasis added) (bracketed language in original contract).

13.    These policy terms define the minimum requirements that must be met before a claim for reimbursement made by San Benito's Plan to Companion Life for reimbursement will be eligible for payment. The "trigger of coverage" under this policy (Resp. at p. 11) is expressly stated. San Benito concedes in both its Amended Complaint and Response that its Third Party Administrator, MBA, did not comply with the terms and conditions of the policy, but argues that "MBA has testified that its handling of the

claims was entirely consistent with the promises, representations, and standard course of dealing with Hall and Companion Life." (Resp. at p. 2 ¶ 1)[1].

14.    Such allegation cannot provide the basis for any claim.  First, "Oral statements not expressly incorporated herein are not part of this Contract. * * *  All changes to this Contract must be in writing and attached to this Contract." (Exh. C to Mtn. at p. 4, ¶ 11(j)).[2]  "No Agent, Broker, or Third Party Administrator has the authority to alter this Contract or to waive any of its provisions."  (Exh. B to Mtn. at p. 11 ¶ VI. 9)

15.    Second, the Contract recognizes that the Third Party Administrator [MBA] is the entity that provides "the normal administration of the Contractholder's Plan" and as such is:

> . . . responsible on behalf of [San Benito] for auditing, calculating and processing all claims eligible under the Employee Benefit Plan . . ., preparing periodic reports as required by the Company and maintaining and making available to the Company at all times such information as the Company may reasonably require for proof of payment of the claims by the Contractholder.

(Exh. B to Mtn. at p. 12 ¶¶ VI. 12, 12(a)).

16.    MBA's attempt to deflect responsibility for its omissions, and San Benito's efforts to make a case against Hall through pure hearsay – which is no evidence – in direct contravention of the reimbursement Contract, cannot succeed and must not be condoned.

---

[1] MBA's related statement that "these claims are owed and payable by Hall and Companion" (Resp. at pp. 5-6 ¶ 2) is unsupported by any evidence.  In any event, such opinions from MBA are utter hearsay, and are in desperation an attempt to cloud pure questions of law with a fog of disputed facts irrelevant to the legal issues raised in Hall's motion for summary judgment.

[2] The "Contract" is defined to include the Contract Application (Exh. B to Mtn. at p. 4 definition 8).

Ultimately, any claim not tendered to Companion Life within the policy period could not, under the Contract of reinsurance, be reimbursed. As a matter of law, no "fault" can be placed upon Hall for the third party administrator's failure to comply with patent terms of the contract (Resp. at p. 2 ¶ 1).

**C.    No Tort Claims Can Be Brought Against Hall; San Benito Misreads the Case Law[3]**

17.    Hall has in no way "misconstrued the statute in claiming some grant of absolute tort immunity" to this reinsurer's agent (Resp. at p. 4 ¶ IV). The Texas Insurance Code clearly limits the cause of action available against a reinsurer to one sounding in breach of contract only: "a person does not have any rights against a reinsurer that are not expressly set forth in the contract of reinsurance or in a specific agreement between the reinsurer and the person." TEX. INS. CODE Art. 3.01(h) (Life, Health and Accident) and Art. 5.75-1(g) (all other insurance carriers). The acts of the reinsurer's agent are then deemed the acts of the reinsurer. TEX. INS. CODE art. 21.07-7 § 6(p).

18.    In its effort to escape these provisions, San Benito misreads the law. *State & County Mutual Fire Ins. Co. v. Miller*, 52 S.W.3d 693 (Tex. 2001) (cited in Hall's motion for summary judgment) does **not,** as San Benito suggests (Resp. at p. 8), stand for the proposition that "a similarly-worded provision of the Texas Insurance Code relating to automobile insurance" [TEX. INS. CODE Art. 5.75-1(g)] permits tort claims against reinsurers and thus such tort claims are appropriate and actionable in this case. Rather, in *Miller*, Walter Miller brought a declaratory judgment action against Windsor Insurance

---

[3] See Resp. at p. 3 ¶ III.B.

Company, and judgment was entered that (1) Windsor was the reinsurer of a policy Miller procured from his insurance company State & County Mutual and (2) only Windsor was liable under the policy. *Id.* at 694. Miller then filed suit against State & County Mutual, alleging among others claims that State & County Mutual misrepresented the terms of his policy. The trial court held that the declaratory judgment in the Windsor litigation precluded Miller's claims against State & County Mutual. The court of appeals reversed. The Texas Supreme Court held that Miller's claims for misrepresentation **against State & County Mutual** remained actionable. *Id.* The case does **not** say, as San Benito asserts, that a misrepresentation claim against **reinsurer Windsor** was actionable.

19.    Correspondingly, not one of the cases cited by San Benito stand for the proposition that Hall is "personally liable for his own tortuous [sic] acts" (Resp. at pp. 9-10 ¶¶ C. 2., 3.) involves the agent of a reinsurer. San Benito provides no authority to contravene the aforementioned Texas Insurance Code statutes that specifically limit a reinsurer's agent's liability.

20.    It is further critical that in its amended petition, San Benito has made a significant change in its allegations: the district now asserts that Hall made some alleged misrepresentation to third party administrator MBA, **not** to San Benito. San Benito alleges that "MBA has advised" that it processed claims in an erroneous manner because "J. Allan Hall represented **to MBA** that Companion Life's reimbursement of sums due under its policy did not depend on first issuing a check for covered medical expenses . . . ." (Am. Complaint at p. 3 ¶ 12; see also p. 6 ¶ 20). San Benito continues:

> J. Allan Hall's representations **to MBA,** and MBA's representations to the School District, contradicted the terms of the policy issued by Companion Life to the School District. **MBA never reviewed the Companion Life policy** during the time it performed the services for the School District, even though **this policy contained terms and conditions concerning** <u>**reimbursement**</u> **of covered expenses** from Companion Life that now forms the basis of Companion Life's denial of the claims made in this lawsuit.

(*Id.* at p. 3 ¶ 13; see also p. 6 ¶¶ 21, 22) (emphasis added). This fresh allegation of disputed facts is irrelevant to disposition on pure questions of law.

21.    However, to address the argument nonetheless, the elements of negligent misrepresentation are: (1) the defendant made a representation in the course of business or a transaction in which the defendant had a pecuniary interest; (2) the defendant supplied false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) **the plaintiff** suffered pecuniary loss **by justifiably relying on the representation.** *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 763 (5th Cir. 2002) (citing *Federal Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex.1991)).

22.    First, plaintiff San Benito now expressly avers that it has relied on no alleged misrepresentation by Hall. Rather, representations, if any, were allegedly made solely to and relied upon exclusively by the third party administrator.

23.    Second, San Benito expressly alleges that MBA did **not** justifiably rely on any purported representations made by Hall. Rather, San Benito asserts that its own third party administrator was negligent in "failing to read the policy and verify that its terms and conditions were consistent with MBA's expectations and J. Allan Hall's

representations," and in "failing to read the . . . policy at issue and pay covered claims so as to obtain reimbursement from Companion Life according to the terms of its policy." (Am. Complaint at p. 6 ¶¶ 21(1) & (2)).

24.    Accordingly, San Benito cannot prevail on any misrepresentation claim it has asserted against Hall for alleged misrepresentations made to a third party, on which San Benito expressly admits MBA did not justifiably rely. *TIG Ins. Co.*, 276 F.2d at 763.

25.    It should also be noted that there is no private right of action available against Hall, as the agent of the reinsurer, for alleged misrepresentation of the terms or effect of any contract of reinsurance. TEX. INS. CODE Art. 21.07-7 § 3(e) (Vernon Supp. 2003). No additional rights, other than those defined by the Insurance Code, are conferred upon any policyholder, claimant, creditor or third party. TEX. INS. CODE Art. 21.07-7 § 10. San Benito's negligence claims are barred for this additional reason.

**D.    Companion Life Had the Sole Authority to Adjust and Settle the Claims for Reimbursement in this Case**

26.    San Benito wrongly asserts, without evidence in support, that Companion Life "has **some** oversight role" in Hall's policy activities, including in particular Hall's processing and paying the claims under the policies it issues, and that Companion Life's "participation in the process is **fairly minimal**." (Resp. at p.2 ¶ I; see also p. 5 ¶ 1 ["Hall . . . processes and pays the claims under this insurance policy."]) (emphasis added).  The General Manager's Agreement establishes the error in this statement:

> Manager [Hall] is authorized to adjust and settle all specific and aggregate medical claims arising out of insurance policies issued under this Agreement **in the amount of $100,000.00 or less** per person per calendar year; . . . all claims in excess of that amount shall be furnished to the

Insurer [Companion] . . . and **Manager will cooperate <u>with Insurer</u>** in the adjustment and settlement thereof.

(Exh. B to Mtn. at p. 3 Art. IV ¶ 1) (emphasis added).

27.    In addition, Mr. Roy Franklin Hutchison, the designated corporate representative of Companion Life, was asked specifically in deposition:

> Q:  As between J. Allan Hall & Associates, and Companion Life Insurance Company, with respect to any claims on policies issued by Companion Life, who has the ultimate authority to approve or disprove payment of claims?
>
> A:  Companion Life.

(See Exhibit 1, a true and correct copy of the deposition of Mr. Roy Franklin Hutchison, attached hereto and incorporated by reference as if set forth in full).

28.    Clearly, contrary to San Benito's assertions otherwise, Hall had no authority to adjust and settle the four individuals' claims here totaling over $900,000 (see Resp. at p. 1 ¶ I). Accordingly, Hall cannot be held responsible for Companion Life's decision to deny reimbursement of the Plan's claims under the terms of the policy of reinsurance.

**E.    San Benito Cannot Escape the Fatal Admissions Against its Interest Made in its Original Petition and Indeed Has Reiterated Them**

29.    San Benito **originally** pleaded that the $900,000 in claims at issue (formerly alleged to have totaled $800,000) were not incurred until **after the Companion Life policy expired.**  (*see* Orig. Pet. at p. 5, ¶ VIII; p. 6 ¶ XI)  San Benito now attempts, erroneously and unsuccessfully, to urge that it made no admission against interest in its original petition that the claims at issue accrued "in the Fall of 2001," and "would have been covered by the [new] reinsurance had it already been purchased." (Orig. Pet. at p. 5 ¶ VIII).

-11-

30.    First, San Benito states in its Response that the Companion policy covered only the 2000-2001 policy year, and MBA was "negligent in placing stop-loss insurance **for the policy year <u>following</u> the insurance policy at issue.**" (Resp. at p. 4 ¶ IV. D) (emphasis added).  San Benito has reiterated its prior judicial admission.  San Benito attempts to negate the admission by stating, "had the coverage been properly placed it would have been overlapping coverage with the Companion Life policy." (Resp. at p. 4 ¶ VI. D.).  San Benito presents absolutely no evidentiary support for this statement, and can neither avoid its fatal judicial admissions nor combat them with such unsupported speculation.  San Benito's prior admissions bar its subsequent assertion of the contrary position; the issue is irreversibly settled, as set forth below.

31.    If it is true that San Benito made no judicial admission in its original petition, then San Benito would have had no need to seek leave to amend (Resp. at p. 4 ¶ IV. D.).  In reality, the statements made in its original petition still would have a deleterious effect upon San Benito.  San Benito's reliance upon *White v. Arco/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983) undermines its position to the contrary.  In *White*, the Fifth Circuit held first that where the defendant raises the argument that the plaintiff's prior judicial admissions "bar[] his subsequent assertion of the contrary position," as here, the defendant has properly preserved the argument that the issue is "irreversibly settled." *Id.* It should be noted that even where the argument is waived by the defendant (not the case here), those admissions "do still operate as adverse evidentiary admissions properly before the district court in its resolution of the factual issue." *Id.*; *see also Bank One, Texas, N.A. v. Prudential Ins. Co. of Am.*, 939 F.Supp. 533, 541 (N.D. Tex. 1996) (cited

by San Benito and relying upon *White*, 720 F.2d at 1396) (in summary judgment case, acknowledging that judicial admissions in superceded pleadings are "evidentiary admissions" and determining they did not raise a genuine issue of material fact).

32.    It is also important to note that where matters in the original petition are restated in the amended pleading, as here, the prior judicial admissions remain intact. *See*, 188 *LLC v. Trinity Industries, Inc.*, 300 F.3d 730, 736 (7th Cir. 2002).

33.    Accordingly, Hall here attaches to its Reply, as further summary judgment evidence to be considered by this Court, San Benito's First Amended Complaint (See Exhibit 2 attached hereto and incorporated by reference, a true and correct copy of Plaintiff's First Amended Complaint). *See*, *Borel v. United States Casualty Co.*, 233 F.2d 385, 387 (5th Cir. 1956) (in case cited by San Benito, prior judicial admissions admissible as properly-considered evidence for consideration).

**F.    San Benito Admits It Is Not Pursuing a Contract Claim Against Hall, Thereby Averring that it Has No Cognizable Claim Against this Defendant**

34.    One of the principal grounds supporting Hall's motion for summary judgment remains that (1) only a contract claim can be pursued against a reinsurer; (2) the acts of the agent are deemed to be the acts of the reinsurer; and thus (3) there can be no cause of action against Hall, which San Benito readily admits is Companion Life's agent, in this case (Mtn. at p. 2 ¶ 3; 11 ¶ 24; 13-15, ¶¶ 30-39).[4]  In its response, San Benito states: "The School District agrees that its contract claims on the stop-loss insurance are with the named party to the contract, Companion Life.  Plaintiff is not seeking contract relief from

---

[4]  Hall has not "misrepresented the nature of the claims against it as lying in contract, rather than tort," as San Benito alleges. (Resp. at p. 4 ¶ IV.)

-13-

Hall." (Resp. at p. 4 ¶ 4.C; see also p. 9 ¶ C.1.). San Benito apparently acknowledges Hall cannot be held liable under the reinsurance contract for reimbursement, either independently or as the agent of a reinsurer. (Mtn. at p. 3 ¶ 5; 11 ¶ 26; 16-18 ¶¶ 42-46). Accordingly, no private cause of action being available, as a matter of law, Judgment must be entered that San Benito take nothing by its claims against Hall.

**G.    San Benito Fails to Support Its Factual Statements with Any Evidence and Has Failed to Raise a Fact Issue to Preclude Summary Judgment**

35.    Finally, it was San Benito's burden, as the non-movant, to present summary judgment evidence to this Court to defeat the grounds for relief asserted in Hall's motion for summary judgment, and to raise a fact issue. **FED. R. CIV. P.** 56(c). It is of note that the majority of San Benito's Response is unsupported by any reference to summary judgment evidence. Indeed, in the entire 11-page Response, San Benito cites to evidence only **twice** (Resp. at p. 5 n. 1; p. 9 n. 2), both times to a single deposition that is attached in its entirety to the Response as Exhibit A. That deposition testimony is from third party administrator MBA's executive vice president and fails to provide any evidence relevant to the legal issues before this Court as discussed herein.

36.    Further, the "Statement of the Nature and Stage of Proceedings" and "Background Facts" portion of the Response, which purport to explain the "facts" at issue in the case (and which do so incorrectly), are pure argumentative testimony from counsel (see Resp. at pp. 1-2 ¶ I and pp. 4-6, respectively). It is of note that while San Benito represents to this Court that certain testimony has been elicited in the discovery in this case, no such testimony is attached to the Response (see Resp. at pp. 5-6, last paragraph). This Court

should disregard substantial portions of the Response as rote argument of counsel devoid of evidentiary support, as discussed herein.

37.    At the conclusion of the Response, footnote 3 at page 11 is pure argument of counsel as well.  While San Benito references purported "assertions" and "facts" that "probably require a trial," not one of these is supported by any pleading or evidentiary proffer from San Benito.  A fact issue for trial cannot be created by mere pontification and surmise set forth in a footnote at the end of a Response to Motion for Summary Judgment.

38.    Having produced no evidence to support any of the "facts" that San Benito contends "probably will require a trial" defeat Hall's Motion for Summary Judgment, Judgment should be entered in favor of Hall on all of San Benito's claims.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant J. Allan Hall prays this Court to Grant its Motion for Summary Judgment and enter Judgment that San Benito Independent School District take nothing by its claims.  Hall further prays for all other relief, at law or in equity, to which it is justly entitled.

Dated:  September 3, 2003                    Respectfully submitted,


BRACEWELL & PATTERSON,                      Roberta J. Hegland
L.L.P.                                      State Bar No. 09375000
                                            Federal I.D. No. 6842
                                            Joseph A. Stallone
                                            State Bar No. 00797485
                                            2000 One Shoreline Plaza - South Tower
                                            800 North Shoreline Blvd.
                                            Corpus Christi, Texas  78401-3700
                                            Telephone No.:   (361) 882-6644
                                            Telecopier No.:   (361) 903-7000
                                            **ATTORNEYS FOR DEFENDANT**
                                            **HALL & ASSOCIATES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been forwarded to the parties listed below on this the 3rd day of September, 2003:

Celeste Guerra
**LAW OFFICES OF RENE RAMIREZ**
1906 Tesoro
Pharr, Texas  78577

Stephen E. Walraven
Otto S. Good
**SHADDOX, COMPERE, WALRAVEN & GOOD, P.C.**
1250 N. E. Loop 410, Suite 725
San Antonio, Texas  78209

Cindy A. Garcia
Lesslie L. Eanes
**THE GARCIA LAW FIRM, P.C.**
201 North First Street
Harlingen, Texas  78550

Shelby J. Bush
**PIPER RUDNICK, L.L.P.**
1717 Main Street, Suite 4600
Dallas, Texas  75201

Roberta J. Hegland
Joseph A. Stallone

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SAN BENITO CONSOLIDATED | § | |
| INDEPENDENT SCHOOL DISTRICT | § | |
| | § | |
| VS. | § | **CIVIL ACTION NO. 003-047** |
| | § | |
| COMPANION LIFE INSURANCE | § | |
| COMPANY, MANAGED BENEFITS | § | |
| ADMINISTRATOR AND | § | |
| INSURANCE CONSULTANTS, INC., | § | |
| J. ALLAN HALL & ASSOCIATES, | § | |
| INC., AND MBA OF WYOMING, INC. | § | |

### AFFIDAVIT OF ROBERTA J. HEGLAND

STATE OF TEXAS          §

COUNTY OF NUECES     §

BEFORE ME the undersigned authority did personally appear ROBERTA J. HEGLAND, who is personally known to me, and first being by me duly sworn did upon her oath state as follows:

"My name is Roberta J. Hegland. I am over 18 years of age, have never been convicted of a crime and am fully competent to make this affidavit. I have personal knowledge of the facts contained herein and they are true and correct.

"I am an attorney licensed to practice law in the State of Texas and a partner with the law firm of Bracewell & Patterson, L.L.P. I am one of the attorneys representing J. Allan Hall & Associates, Inc. in the above-captioned matter.

"The deposition attached as Exhibit 1 to J. Allan Hall & Associates, Inc.'s Reply to Plaintiff's Response to J. Allan Hall & Associates, Inc.'s Motion for Summary Judgment is a true and correct copy of the original.

Corpus Christi\645080.0

Further Affiant sayeth not.

Roberta J. Hegland

SUBSCRIBED AND SWORN TO before me on this 3rd day of September 2003.



Notary Public, Texas of Texas



Exhibit "1"

Page 1

```
1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE SOUTHERN DISTRICT OF TEXAS
2                           BROWNSVILLE DIVISION

3   SAN BENITO CONSOLIDATED    )
    INDEPENDENT SCHOOL DISTRICT )
4                              )
    vs.                        )CIVIL ACTION NO. B-03-047
5                              )
    COMPANION LIFE INSURANCE   )
6   COMPANY, MANAGED BENEFITS  )
    ADMINISTRATOR AND INSURANCE )
7   CONSULTANTS, INC., J. ALLAN )
    HALL & ASSOCIATES, INC., and )
8   MBA OF WYOMING, INC.       )

9             --------------------------

10            ORAL VIDEOTAPED DEPOSITION

11              ROY FRANKLIN HUTCHISON

12                 AUGUST 13, 2003

13            --------------------------

14          ORAL VIDEOTAPED DEPOSITION OF ROY FRANKLIN HUTCHISON,

15   produced as a witness at the instance of the Plaintiff and duly

16   sworn, was taken in the above-styled and numbered cause on the

17   13th day of August, 2003, from 10:03 a.m. to 1:09 p.m., before

18   Carol R. Odle, Certified Shorthand Reporter in and for the

19   State of Texas, reported by computerized stenotype machine at

20   the offices of Piper Rudnick, 1717 Main Street, Suite 4600,

21   City of Dallas, County of Dallas, State of Texas , pursuant to

22   the Federal Rules of Civil Procedure and the provisions stated

23   on the record or attached hereto.

24

25
```

Page 2

```
1                    A P P E A R A N C E S

2

3   MR. STEPHEN E. WALRAVEN

4         SHADDOX, COMPERE, WALRAVEN & GOOD, P.C.
          1250 N.E. LOOP 410, SUITE 725
5         SAN ANTONIO, TEXAS  78209
          (210)822-2018
6         COUNSEL FOR THE PLAINTIFF

7

8   MR. SHELBY J. BUSH

9         PIPER RUDNICK
          1717 MAIN STREET, SUITE 4600
10        DALLAS, TEXAS  75201-4605
          (214)743-4500
11        COUNSEL FOR THE DEFENDANT COMPANION LIFE
          INSURANCE COMPANY
12

13  MS. ROBERTA J. HEGLAND

14        BRACEWELL & PATTERSON, L.L.P.
          2000 ONE SHORELINE PLAZA, SOUTH TOWER
15        800 NORTH SHORELINE BOULEVARD
          CORPUS CHRISTI, TEXAS  78401-3700
16        (361)866-7226
          COUNSEL FOR THE DEFENDANT J. ALLAN HALL & ASSOCIATES
17

18  MR. ROLANDO OLVERA

19        THE GARCIA LAW FIRM, P.C.
          201 NORTH 1ST STREET
20        HARLINGEN, TEXAS  78550
          (956)412-7055
21        COUNSEL FOR THE DEFENDANTS MBA OF WYOMING, INC.,
          AND MANAGED BENEFITS ADMINISTRATOR AND INSURANCE
22        CONSULTANTS, INC.

23

24  ALSO PRESENT: MS. LAURIE L. BURGESS, VIDEOGRAPHER
                  CLTV  (972)304-0291
25
```

Page 3

```
1                          I N D E X

2

3   [1]   THE WITNESS:  ROY FRANKLIN HUTCHISON

4

5   [2]   Examination
          Mr. Walraven................................. 6
6         Examination
          Mr. Olvera..................................117
7         Examination
          Ms. Hegland.................................121

8

9   [3]   EXHIBITS MARKED

10  EXHIBIT                                          PAGE
    NUMBER    DESCRIPTION                            NUMBER
11

12  55        Notice to Take Videotaped Deposition........ 8

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
10:06  1              THE VIDEOGRAPHER:  Going on the record August

       2   the 13th, 2003.  The time is approximately 10:03 a.m.  This is

       3   the videotaped deposition of Roy Hutchison, in the matter of

       4   Civil Action B003-047 styled San Benito Consolidated

10:07  5   Independent School District versus Companion Life Insurance

       6   Company, Managed Benefits Administrator and Insurance

       7   Consultants, Incorporated, J. Allan Hall & Associates,

       8   Incorporated, and MBA of Wyoming, Incorporated, filed in the

       9   United States District Court for the Southern District of

10:07 10   Texas, Brownsville Division.  This deposition is being held in

      11   the offices of Piper Rudnick, 1717 Main Street, Suite 4600,

      12   Dallas, Texas.  Will counsel please state their appearances for

      13   the record?

      14              MR. WALRAVEN:  I'm Stephen Walraven, and I'm

10:07 15   appearing for the plaintiff.

      16              MR. BUSH:  Shelby Bush, here today on behalf of

      17   Companion Life Insurance Company.

      18              MR. OLVERA:  Rolando Olvera on behalf of the Law

      19   Firm of Cindy Garcia for Managed Benefits Administrator and

10:08 20   Insurance Consultants, Inc., and also MBA of Wyoming, Inc.

      21              MS. HEGLAND:  Roberta Hegland appearing for

      22   J. Allan Hall & Associates, Incorporated.

      23              THE VIDEOGRAPHER:  My name is Laurie Burgess.  I

      24   am the videographer in association with Certified Legal Texas

10:08 25   Video.  The court reporter is Carol Odle, and she is in
```

Case 1:03-cv-00047   Document 27   Filed in TXSD on 09/04/2003   Page 22 of 74

Roy F. Hutchison                     Multi-Page                San Benito vs. Companion
8/13/03

Page 5

1    association with Alliance Reporting. Will the court reporter
2    please swear in the witness.
3              (The witness was duly sworn.)
4              THE COURT REPORTER: Do y'all have any
5    agreements you need to make?
6              MR. WALRAVEN: Other than that we are conducting
7    this under the Federal Rules, we have entered into one
8    additional agreement. For the purposes of this case we are
9    numbering the deposition exhibits consecutively and not
10   starting over with each deposition, but we are uncertain where
11   we need to begin today. Our best indication from Mr. Olvera is
12   that the next exhibit is 55, and we're going to start with that
13   and hope it's correct. But we have agreed that in the event we
14   determine that that is incorrect, we will ask the court
15   reporter to go back in the transcript, renumber the exhibits,
16   adding or subtracting one or two, depending on what is needed,
17   and I will undertake responsibility for advising the court
18   reporter in writing with copies to all counsel of any
19   adjustments needed. If that's agreeable with everyone.
20             MS. HEGLAND: That's agreed.
21             MR. OLVERA: Agreed.
22             MR. BUSH: Yes, agreed.
23             MR. WALRAVEN: You ready?
24
25             (No omissions.)

Page 6

1              ROY FRANKLIN HUTCHISON,
2    having been first duly sworn, testified as follows:
3              EXAMINATION
4    BY MR. WALRAVEN
5    Q. Tell us your full name, sir, for the record.
6    A. Full name is Roy Franklin Hutchison.
7    Q. And your date and place of birth?
8    A. Born in Knoxville, Tennessee, 1941.
9    Q. Mr. Hutchison, have you ever given a deposition
10   before?
11   A. Yes.
12   Q. On about how many occasions?
13   A. On one occasion.
14   Q. And from that occasion and perhaps in conversations
15   with your attorney today, do you understand that you're under
16   oath much as if you were testifying in front of a judge and
17   jury?
18   A. Yes.
19   Q. I would like to ask you a couple of favors to help us
20   get a good record. First and foremost, if for any reason you
21   don't quite hear or understand anything I've asked you, would
22   you please let me know so that I can reword it or repeat it or
23   whatever you need. Would you do that, sir?
24   A. Yes, sir.
25   Q. And secondly, would you also please wait 'til I've

Page 7

1    finished my question, you may know exactly what I'm asking
2    before I reach the end of my sentence, but if you start talking
3    while I'm talking it makes it difficult to -- to get a good
4    record, get a good tape, and get a good transcript, if you
5    would do that, please, sir.
6    A. I'll do that.
7    Q. Thank you.
8         Do you understand today that you are appearing
9    as the designated corporate representative of Companion Life?
10   A. Yes.
11   Q. And have you seen a copy of the notice that was sent
12   out in connection with the deposition today?
13        (Exhibit No. 55 marked.)
14   A. Yes.
15   Q. (By Mr. Walraven) I'm going to show you what's been
16   marked as Exhibit -- Deposition Exhibit 55 and ask you if
17   that's a copy of the notice that you saw.
18             MR. BUSH: The notice of the deposition?
19             MR. WALRAVEN: Yeah. Is that the wrong -- did
20   I --
21             MR. BUSH: Responses to --
22             MR. WALRAVEN: -- grab the wrong document?
23             MR. BUSH: -- the production request.
24             MR. WALRAVEN: It's too early in the morning.
25             MR. BUSH: Steve?

Page 8

1              MR. WALRAVEN: My apologies. Huh?
2              MR. BUSH: Is that it right there?
3              MR. WALRAVEN: Let me try again.
4              (Exhibit No. 55 re-marked.)
5    Q. (By Mr. Walraven) Is what we've now marked as
6    Exhibit 55 the notice?
7    A. Yes, I have seen this.
8    Q. And you understand it's the notice for the deposition
9    today, and that you're appearing as the corporate
10   representative pursuant to that notice.
11   A. Yes, sir.
12   Q. And you will see, beginning on the first page toward
13   the bottom, there are some numbered paragraphs?
14   A. Yes.
15   Q. Talking about some subjects that we want to cover
16   today. Are you the person that's been designated by Companion
17   Life to appear on behalf of Companion Life and give testimony
18   this morning?
19   A. Yes.
20   Q. And will there be any other witnesses also designated
21   by Companion Life to give testimony with respect to any of
22   these areas?
23   A. No.
24   Q. And you're here prepared to discuss all of the
25   designated areas.

---

**Page 9**

10:13 1  A. Yes.

2  Q. Thank you.

3     Would you tell me your current address?

4  A. Are you asking about the corporate or personal

10:13 5  address?

6  Q. Why don't you give me both.

7  A. Okay. Personal address is 212 Bithynia Circle, and

8  that's spelled B-I-T-H-Y-N-I-A, Circle, Irmo, I-R-M-O, South

9  Carolina, 29063. And the corporate address is Park Lane Road,

10:14 10  Columbia, South Carolina, 29223.

11  Q. Thank you.

12     How are you currently employed?

13  A. I'm vice-president of Companion Life Insurance

14  Company.

10:14 15  Q. And how long have you been a vice-president of

16  Companion Life?

17  A. I've been a vice-president for approximately three

18  years.

19  Q. And do you have responsibilities for a specific

10:14 20  portion of Companion Life's business?

21  A. Yes, I do.

22  Q. And what are your particular areas of responsibility?

23  A. Particularly my areas of responsibility is the stop

24  loss marketing of the stop loss product for Companion Life and

10:14 25  other specialty-related products.

---

**Page 10**

10:14 1  Q. I didn't quite hear, you say stop loss marketing?

2  A. Stop loss marketing, yes.

3  Q. And you say other related products. Could you

4  explain that a little more or give me some examples?

10:15 5  A. A mini med product, I do special arrangements for the

6  dental product. That about covers it.

7  Q. And what was your employment prior to becoming

8  vice-president for Companion Life three years ago?

9  A. I was a director for Companion Life Insurance Company

10:15 10  commencing August 1 of 1991 -- '92, 1992.

11  Q. And during that period where you were a director for

12  Companion Life, did you have the same duties and

13  responsibilities throughout that time or did they change?

14  A. No, basically the same duties and responsibilities.

10:16 15  Q. And what are those duties and responsibilities?

16  A. Duties and responsibilities were the management of

17  the stop loss product and other related specialty type

18  products.

19  Q. Same products you were describing --

10:16 20  A. Yes.

21  Q. -- a moment ago?

22     And explain for me what you were doing prior to

23  August of 1992.

24  A. August of 1992 I worked briefly for Colonial Life

10:16 25  Insurance Company in Columbia, South Carolina for approximately

---

**Page 11**

10:16 1  one year.

2  Q. And what did you do for them?

3  A. I marketed their TPA products, stop loss product.

4  Q. You marketed their stop loss product to TPAs?

10:17 5  A. No, I actually marketed to brokers, businesses.

6  Basically I was their TPA services I was marketing.

7  Q. Oh, they provided --

8  A. They provided --

9  Q. -- TPAs.

10:17 10  A. -- TPA services, and I was marketing their TPA

11  services, yes.

12  Q. And what were you doing prior to that?

13  A. Prior to that I worked for a MGU in Nashville,

14  Tennessee.

10:17 15  Q. And what sort of products did that --

16  A. Stop loss --

17  Q. -- MGU --

18  A. -- product.

19  Q. I know you know what I'm going to ask you --

10:17 20  A. Oh, I'm sorry.

21  Q. -- but if you'd please just let --

22  A. I'm sorry --

23  Q. -- me finish.

24  A. I apologize.

10:17 25  Q. What sort of products did that MGU offer?

---

**Page 12**

10:17 1  A. The MGU strictly offered stop loss products.

2  Q. And was the name of that MGU?

3  A. American Benefit Administrators.

4  Q. And how long were you associated with American

10:18 5  Benefit Administrators?

6  A. From 1986 through '91, September of '91.

7  Q. And what were your duties there with American Benefit

8  Administrators?

9  A. Duties there were calling on TPAs, primarily in the

10:18 10  western part of the United States, to market our stop loss

11  product.

12  Q. Are most of your stop loss products sold through

13  TPAs?

14  A. Yes.

10:18 15  Q. And what were you doing prior to 1986 when you went

16  to work for American Benefit Administrators?

17  A. Prior to that I worked for a company called Willis

18  now, it was called Willis Coroon at the time. I worked

19  in their TPA department marketing their TPA services to brokers

10:19 20  and businesses.

21  Q. And what sort of policies or insurance coverages did

22  you market -- I'm sorry, I didn't ask that well.

23     The TPA services that you were marketing were

24  associated with what sort of insurance products?

10:19 25  A. Stop loss.

## Page 13

1   Q. And how long were you with Willis Coroon?

2   A. Approximately three years.

3   Q. And what were you doing prior to that?

4   A. I worked for a company in -- by the name of Integon,

5   I-N-T-E-G-O-N, located in Winston-Salem, North Carolina.

6   Q. And what did you do for them?

7   A. I was -- I guess the job description was a group rep

8   for Integon.

9   Q. Was that a sales or marketing type position?

10   A. Marketing type, yes.

11   Q. And what sort of products?

12   A. Basically group term life, dental, Fulia-insured

13   medical products.

14   Q. And how long were you with Integon?

15   A. From '72 until '81.

16   Q. Did you go straight from Integon to Willis?

17   A. That's correct, yes.

18   Q. And I'm -- my arithmetic is failing me here. If you

19   were with American Benefit Administrators starting in '86 and

20   you were with Willis for three years and you left Integon in

21   '81, I may be missing a couple of --

22   A. Well --

23   Q. -- years in there.

24   A. -- okay, let me go back and recount.

25   Q. I'm -- I don't -- I'm not --

## Page 14

1   A. Yeah, so --

2   Q. You know, which year, one year one way or the other

3   doesn't matter, I just want to know if we missed anything.

4   A. No, you haven't missed anything.

5   Q. Okay. Thanks.

6   A. Except my slow memory.

7   Q. No, I just -- or my slow arithmetic.

8        Prior to Integon where were you working?

9   A. I was in the military during Vietnam.

10   Q. Do you have any other employment that we haven't

11   mentioned connected with the insurance industry or business?

12   A. Well, just briefly before going into the military I

13   was with Integon as a trainee, management trainee, employee for

14   approximately one year or two before going into the military.

15   Q. And were your training duties the same type of field

16   as what you did for them later?

17   A. No, they were not.

18   Q. What were you trained for that one year?

19   A. Basically that one year I was training to sell

20   individual life insurance products.

21   Q. Any other employment in the insurance --

22   A. No.

23   Q. -- field?

24        Tell me about your formal education.

25   A. I graduated with a BS in finance and economics from

## Page 15

1   East Tennessee State University in Johnson City, Tennessee.

2   Q. What year?

3   A. 1964.

4   Q. Any other formal education?

5   A. Spent some time working toward a master's degree

6   which I did not complete.

7   Q. And where were you doing that?

8   A. At the same university, East Tennessee State

9   University.

10   Q. Any other formal education?

11   A. No.

12   Q. Do you hold any licenses or certifications related to

13   the field of insurance?

14   A. Yes, I am a CLU, Certified Life Underwriter.

15   Q. Anything else?

16   A. That's it, no.

17   Q. Do you hold any licenses from any states --

18   A. No, I do not.

19   Q. -- affecting -- relating to the sale -- I'm sorry,

20   relating to insurance?

21   A. No, I do not.

22   Q. When did you get your CLU designation?

23   A. In 1976, I want to say, approximately '76.

24   Q. You told me that you became the vice-president in

25   connection with working with the stop loss program

## Page 16

1   approximately three years ago. Could you be a little more

2   precise about that date? And maybe you can't. I'd like to

3   kind -- it's kind of back in the middle of the events that this

4   lawsuit's about and I'd kind of like to get a better handle on

5   your role. So could you tell me the month, for example? I

6   mean, this is --

7   A. No, I cannot.

8   Q. -- summer of '03, would it have been -- can you tell

9   me the season, spring or summer or fall?

10   A. No, I really can't.

11   Q. But sometime in the year 2000?

12   A. Approximately, and I wouldn't guarantee it was the

13   year 2000, it could have been 1998. I'm really not that sure

14   which --

15   Q. Okay.

16   A. -- year it was.

17   Q. So it could have been five years ago.

18   A. It could have been five years ago, yes, it could have

19   been.

20   Q. That leads me to wonder if your job duties changed

21   significantly as you moved from being a director at Companion

22   Life to being vice-president.

23   A. Say, are you asking me that?

24   Q. Yes, I'm asking you that.

25   A. No, they did not.

## Page 17

10:25 1    Q. So basically you were doing the same job with a
2    better title.
3    A. Yes.
4    Q. Did you acquire any additional duties?
10:25 5    A. No.
6    Q. So you've had those responsibilities for the last
7    five, six, seven, eight years or more.
8    A. Yes.
9    Q. Now, can you describe for me just generally the
10:25 10   products offered by Companion Life, other than the products you
11   described for me earlier that you're responsible for?
12         MR. BUSH: Objection. Steve, where is that in
13   this notice and what's the relevance of it?
14         MR. WALRAVEN: Just want to try and get a feel
10:26 15   for who Companion Life is.
16         MR. BUSH: I don't know that you identified that
17   as a subject matter of inquiry as to all the products Companion
18   Life might offer, and I don't know that it's relevant in any
19   respect to the lawsuit.
10:26 20        MR. WALRAVEN: Well, I really just want to know
21   how the stop loss program fits into the overall situation, but
22   the question stands.
23         MR. BUSH: Well, I'll give you some latitude,
24   but we're going to stick to the notice as closely as possible,
10:26 25   and that's what -- that's the purpose of the 30(b)(6) notice,

## Page 18

10:26 1    so just -- that's -- that's my warning.
2         You can answer the question.
3    A. Companion Life offers group term life, group dental,
4    short- and long-term disability, along with the specialty
10:27 5    products that I'm responsible for.
6    Q. (By Mr. Walraven) And what portion of -- of
7    Companion Life's business is -- consists of these specialty
8    products that you're responsible for?
9    A. Are you speaking of in terms of dollar amounts,
10:27 10   percentages?
11   Q. Yeah, let's talk in terms of percentages.
12   A. Well, the stop loss product is a significant part.
13   As it relates to the premium-wise, it's at least 75 percent of
14   our total premium.
10:27 15   Q. And if we add the other specialty products to the
16   stop loss, it would be somewhat higher than that --
17   A. Considerably less.
18   Q. -- percentage?
19   A. I mean -- well, if you added it to, yes.
10:28 20   Q. That is, your responsibilities --
21   A. Yes.
22   Q. -- encompass more than 75 percent of the premium
23   dollars --
24   A. Yes.
10:28 25   Q. -- earned by Companion Life.

## Page 19

10:28 1    A. That's correct.
2    Q. And has that been true for the last five or six
3    years? More or less.
4    A. More or less, yes.
10:28 5    Q. It hasn't been significantly different, and by
6    significant I mean five percent?
7    A. There was a period of time -- obviously our stop loss
8    program has grown over the years, so, you know, there was
9    obviously a period of time when the stop loss program
10:28 10   premium-wise was not as large as it is today.
11   Q. But would it be more -- would the percentage of
12   Companion Life's business that consists of the stop loss
13   program have changed more than five percent over the last five
14   years? And I don't need it to be precise. It's -- it's always
10:29 15   been roughly three-quarters?
16   A. Yes, it's -- it's a large part of Companion Life's
17   business. Okay.
18   Q. And it's been so for the last --
19   A. Five or --
10:29 20   Q. -- five or six years?
21   A. -- six years, that's correct, you're correct.
22   Q. That's all the precision --
23   A. Okay.
24   Q. -- I needed. Thanks.
10:29 25   A. All right.

## Page 20

10:29 1    Q. And what portion of that business does Companion
2    Life -- I'm sorry, and when I say that business I'm referring
3    to the stop loss program.
4    A. Okay.
10:29 5    Q. Okay? What portion of the stop loss program is
6    administered through an MGU?
7    A. All of it is administered through MGUs.
8    Q. And how many MGUs does Companion Life use for that
9    program?
10:30 10   A. Approximately eight.
11   Q. And would you explain the term MGU for the record?
12   A. MGU, the -- is an acronym for managing general
13   underwriter.
14   Q. And what does that mean?
10:30 15   A. It means that we have given them the responsibility
16   to do the underwriting on a specific product for Companion
17   Life.
18   Q. Is another term also used in that field MGA?
19   A. That's correct.
10:30 20   Q. Those two often mean --
21   A. The same.
22   Q. -- the same thing?
23   A. Yes, sir.
24   Q. And other than underwriting services, do the MGUs or
10:30 25   MGAs for the stop loss program of Companion Life also provide

Page 21

1 other services, for example, in connection with claims or any
2 other services in connection with the program?
3    A. Yes, they do. Basically, the MGU administers the
4 program, from paying the claims to doing the underwriting to
5 collecting the funds to issuing contracts.
6    Q. Well, maybe the shorter question would be to ask it
7 the other way. In connection with the stop loss program for
8 Companion Life, what is it that the MGUs do not do?
9    A. They --
10       MR. BUSH: Objection, vague. You can answer.
11    Q. (By Mr. Walraven) Go ahead.
12       MR. BUSH: If you have an answer you can answer.
13    A. Generally, they do not take a significant portion of
14 the risk.
15    Q. (By Mr. Walraven) Do they take any portion of the
16 risk?
17    A. In some instances, yes, but not in all cases.
18    Q. Okay. But in terms of administration of the program,
19 marketing it, obtaining applications, performing underwriting,
20 making proposals, issuing the policies, processing the claims,
21 sending out the notices, the MGUs basically do it all; right?
22    A. That's correct.
23    Q. And that's been true for the last five years.
24    A. Yes, that's correct.
25    Q. Now, is one of these MGUs or MGAs or whatever we're

Page 22

1 going to call them a company known as J. Allan Hall &
2 Associates in Indianapolis?
3    A. That's correct.
4    Q. And how long has Companion Life been associated with
5 J. Allan Hall & Associates?
6    A. Since approximately 1998.
7    Q. And were you involved in the beginnings of that
8 relationship?
9    A. Yes, I was.
10    Q. And is that relationship subject to a written
11 contract?
12    A. Yes, that is.
13    Q. And have there been more than one contract between
14 Companion Life and J. Allan Hall since 1998?
15    A. No, I don't think so.
16    Q. And what portion of the stop loss book of business
17 for Companion Life is administered by J. Allan Hall?
18    A. Approximately 20 percent.
19    Q. And has that percentage gone up or down over the last
20 five years?
21    A. Yes, it has, it has gone up.
22    Q. What was the percentage, say, in the year 2000,
23 approximately?
24       MR. BUSH: Objection, calls for speculation.
25    A. You know, I really don't know.

Page 23

1    Q. (By Mr. Walraven) I guess I'm curious, has it gone
2 up from two percent to 20 or more like 18 percent to 20? I
3 don't -- I'm just curious, if you can give me some idea?
4    A. Well, it started in 1988 -- 98 at a very low level,
5 obviously, and it has grown. In my mind's eye, I can't exactly
6 track how it has grown versus our other business -- I mean --
7    Q. Okay.
8    A. -- the total stop loss business.
9    Q. Okay.
10    A. Okay?
11    Q. If you don't know, that's all you can tell me.
12    A. Yeah.
13    Q. Thank you.
14       And is there any particular market division
15 among the MGAS that you use geographically or by type of
16 customer or in any other fashion?
17    A. No.
18    Q. And does your arrangement or agreement with J. Allan
19 Hall differ from your agreements with your other MGAS?
20       MR. BUSH: Objection, vague.
21    A. Yes, in certain instances, yes.
22    Q. (By Mr. Walraven) Tell me how it's different.
23       MR. BUSH: I'll object to the extent that that
24 may contain confidential and proprietary information. I'm not
25 aware that we have a protective order. Do we have a protective

Page 24

1 order in this case?
2       MS. HEGLAND: I don't think so.
3       MR. WALRAVEN: I don't think so.
4       MR. BUSH: To the extent that Mr. Hutchison
5 believes that that will be disclosing proprietary and
6 confidential information, I would caution him not to answer the
7 question if he has to disclose such information.
8       MR. WALRAVEN: And obviously, if there are
9 confidential proprietary information I will very much willing
10 to enter into a protective order.
11       MR. BUSH: Well, and again, I don't know that
12 that is anything that this witness would have been prepared to
13 discuss today, because it doesn't -- it wasn't identified in
14 the notice --
15       MR. WALRAVEN: Why don't we ask him --
16       MR. BUSH: -- that he would be asked to discuss
17 relationships with any other MGUS or MGAS separate and apart
18 from J. Allan Hall, so I will instruct the witness not to
19 answer that question.
20       MR. WALRAVEN: You're going to instruct him not
21 to answer if J. Allan Hall is treated specially and how?
22       MR. BUSH: That wasn't the question.
23       MR. WALRAVEN: Well, that's where I was
24 heading --
25       MR. BUSH: Well --

---

**Page 25**

```
10:37  1        MR. WALRAVEN: -- and his answer might have --
       2        MR. BUSH: Maybe if you ask that, and if it
       3  doesn't involve confidential or proprietary information.
       4        MR. WALRAVEN: Okay.  Let me try again.
10:37  5     Q.  (By Mr. Walraven)  Tell me how J. Allan Hall is
       6  treated differently.
       7     A.  Well, again, if I -- if I get into that, that's --
       8  that's basically how does he -- how is his expenses and how is
       9  his deal set up differently from our other MGUs.  Basically I
10:37 10  can say this.  The agreement we have with J. Allan Hall is, for
      11  the most part, the agreement that we have with our other
      12  MGUs.  Okay?  It -- the differences relate to matters
      13  pertaining to, you know, that particular MGU's block of
      14  business.  But for the most part, the agreement, and say this
10:38 15  with fair certainty, for the most part, and that's 98 percent
      16  of the agreement that J. Allan Hall has is the same that our
      17  other MGUs have.  Okay?
      18     Q.  Okay.  Are the requirements imposed on J. Allan Hall
      19  in connection with processing claims, stop loss claims,
10:38 20  different from the policies or procedures or requirements
      21  imposed on other MGUs?
      22     A.  No.
      23        MR. WALRAVEN: That's all I wanted.
      24     Q.  (By Mr. Walraven)  To what extent does an MGU for
10:39 25  Companion Life's stop loss products have discretion regarding
```

**Page 26**

```
10:39  1  pricing?
       2     A.  That discretionary ability that the MGU has is laid
       3  out in the underwriting guidelines as provided to the MGU.
       4     Q.  I don't have those underwriting guidelines.  Probably
10:39  5  don't want them.  But I'm curious, can J. Allan Hall, for
       6  example, offer pricing different than what can be offered by
       7  the other MGUs?
       8        MS. HEGLAND: Objection, calls for speculation.
       9     A.  That's --
10:39 10     Q.  (By Mr. Walraven)  I mean, pursuant to the
      11  agreements.
      12        MR. BUSH: Same objection.
      13        MS. HEGLAND: Objection, calls for speculation.
      14        MR. BUSH: Same objection, and irrelevant.
10:40 15     Q.  (By Mr. Walraven)  Okay.  Now, go ahead and answer.
      16        MS. HEGLAND: If you can.
      17     A.  If I can.  There is a relatively narrow framework
      18  with which the MGU can deviate from basic underwriting
      19  guidelines, or every -- it's every guideline -- does every MGU
10:40 20  have the same absolute guidelines that the every other MGU has
      21  of ours, no.
      22     Q.  (By Mr. Walraven)  Well, let me ask it this way:  If
      23  a qualified customer for stop loss insurance went to two
      24  different MGUs and asked for a proposal for stop loss insurance
10:41 25  from Companion Life, would they get exactly the same price, or
```

**Page 27**

```
10:41  1  is there a possibility of some variance of a few percentage
       2  points?
       3        MR. BUSH: Objection --
       4        MS. HEGLAND: Objection --
10:41  5        MR. BUSH: -- vague.
       6        MS. HEGLAND: -- calls for speculation.
       7        MR. BUSH: Calls for speculation.
       8        MS. HEGLAND: And it's an incomplete
       9  hypothetical.
10:41 10        MR. BUSH: And not relevant.
      11     Q.  (By Mr. Walraven)  Go ahead.
      12     A.  Is that a possibility?  Sure.
      13     Q.  Does it happen?
      14        MR. BUSH: Same objections.
10:41 15     A.  Since there's a possibility for it happening, I
      16  would -- I'm speculating.
      17     Q.  (By Mr. Walraven)  Okay.
      18     A.  And that's what I'm doing, I want you to know this.
      19  I would assume that it happens since I'm speculating --
10:41 20     Q.  Okay.
      21     A.  -- that it would happen.
      22     Q.  And you don't know whether it's ever happened or not?
      23     A.  Do I know that it's happened?  Yeah, I know it's
      24  happened.
10:42 25     Q.  Okay.  So it's not speculation, it has happened.
```

**Page 28**

```
10:42  1     A.  Well, I mean --
       2        MR. BUSH: Objection, misstates the witness'
       3  prior testimony.
       4        MS. HEGLAND: Same objection.
10:42  5     Q.  (By Mr. Walraven)  Tell me --
       6        MR. BUSH: The question was --
       7     Q.  (By Mr. Walraven)  -- has it --
       8        MR. BUSH: Question was --
       9     Q.  (By Mr. Walraven)  -- happened or not?
10:42 10        MR. BUSH: -- could it happen.
      11        MR. WALRAVEN: Okay.  And I think he told me it
      12  has happened.  But let me ask.
      13     Q.  (By Mr. Walraven)  Has it happened, to your
      14  knowledge?
10:42 15     A.  Yes.
      16     Q.  Okay.  So it's not speculation.
      17        MS. HEGLAND: Object to sidebar.  And Steve,
      18  just so that we don't keep cluttering up the record, I think
      19  that at the first deposition we had an agreement that an
10:42 20  objection by one attorney was good as to all attorneys so we
      21  don't all need to object.
      22        MR. WALRAVEN: We did have that agreement.  And
      23  as I recall, under the federal rules you need to object to
      24  form, but objections as to substance such as relevance are
10:43 25  generally to be reserved.
```

## Page 29

10:43  1      Well, let's see. Where was I?
 2      Q. (By Mr. Walraven)  Does Companion Life place any
 3  particular requirements on its MGUs concerning licensing?
 4      A. Yes.
10:43  5      Q. And those would apply to J. Allan Hall.
 6      A. Yes, that's correct.
 7      Q. And what are those requirements?
 8      A. They must meet the state requirements for being
 9  licensed.
10:44 10      Q. Being licensed to be an MGA?
11      A. MGA, yes, that's correct.
12      Q. In all the states where they do business.
13      A. In all the states required.
14      Q. Right.  Any other licensing requirements?
10:44 15      A. No.
16      Q. Other than the items set forth in the written
17  agreement with Companion Life, are there other instructions,
18  policies, procedures, guidelines provided to an MGU such as --
19  such as J. Allan Hall?
10:44 20      A. In a particular area, in a particular --
21      Q. With respect to stop loss insurance.
22      A. Well, yes.
23      Q. Okay.  Tell me what other sort of written guidelines,
24  procedures, manuals there -- there are.
10:45 25      A. Well, we have underwriting guidelines.

## Page 30

10:45  1      Q. Okay.  What else?
 2      A. As far as written formal procedures, probably the
 3  underwriting guidelines are the most significant ones, and
 4  probably the only one that's -- that's considered to be
10:45  5  guidelines outside of what you have there as an MGU agreement.
 6      Q. Would these underwriting guidelines have the pricing
 7  guidelines, restrictions, information that you referenced
 8  earlier, or would that be found in another document?
 9      A. I'm not sure.  Sort of.
10:45 10      Q. You said that within certain narrow ranges there is
11  some discretion on the part of an MGU or an MGA --
12      A. Uh-huh.
13      Q. -- in pricing a policy --
14      A. Right.
10:46 15      Q. -- and I wondered if those are in writing, and if so,
16  what the document's called.
17      A. Yes.  The underwriting guidelines, yes.
18      Q. Are there any written materials provided by Companion
19  Life to an MGA or an MGU concerning claims, other than the
10:46 20  general manager's agreement?
21      A. Not that I'm aware of.
22      Q. Would somebody at Companion Life have knowledge on
23  this subject that you do not?
24      A. No.
10:46 25      Q. Does Companion Life play any role in connection with

## Page 31

10:46  1  claims under stop loss insurance policies?
 2          MR. BUSH: Objection, vague.
 3      A. Yeah, I was -- such as?
 4      Q. (By Mr. Walraven)  Such as evaluating a claim,
10:47  5  deciding whether to pay it or not to pay it or investigate it
 6  further, something along those lines.
 7      A. Yes, we -- we do play a part in that.
 8      Q. And is that within your department?
 9      A. Yes.
10:47 10      Q. And to what extent does Companion Life play a part in
11  that?
12      A. Basically, when there is a -- an appeals to a denial,
13  when J. Allan Hall denies a claim and a client appeals that
14  claim, we usually get involved at that time to see the appeals
10:47 15  process and see what the appeal related to and -- and help the
16  MGU formulate a reply to it.
17      Q. Any other circumstance?
18      A. Circumstances probably relating to if they needed to
19  do certain types of investigations, that they may employ an
10:48 20  outside firm to do these investigations, audits, those type
21  things, we would generally approve those.
22      Q. Who pays for such an audit?
23      A. We do.
24      Q. Companion Life does.
10:48 25      A. Yes.

## Page 32

10:48  1      Q. Other than an appeal of a denial or a situation where
 2  some sort of investigation or audit's been recommended, are
 3  there any other situations that people at Companion Life get
 4  involved in handling claims or deciding whether or not to pay a
10:48  5  claim?
 6      A. No.
 7      Q. And that would be true regardless of the dollar value
 8  of a particular claim?
 9      A. Generally in the MGU agreement there is a dollar
10:49 10  value that the -- that we give the MGU authority up to, and
11  when it reaches that authority, when it reaches that level,
12  then they come to us for the authority to pay above that level.
13      Q. And in the normal practice of things, do you get
14  involved or do you just, absent some special circumstance, go
10:49 15  with whatever the MGU says?
16      A. Well, basically we -- unless there were some special
17  circumstances, we would pretty much go with what the MGU would
18  recommend.
19      Q. And so simply the fact that it's some dollars more
10:49 20  than a particular limit would not by itself be a special
21  circumstance that would generate any particular review or
22  analysis on the part of people at Companion Life; is that
23  what --
24          MS. HEGLAND: Objection --
10:50 25      Q. (By Mr. Walraven) -- you're telling me?

Roy F. Hutchison
8/13/03

Case 1:08-cv-00047   Document 27   Filed in TXSD on 09/04/2003   Page 29 of 74   Multi-Page™   San Benito vs. Companion

Page 33

10:50 1      MS. HEGLAND: Objection, broad and vague.
2      MR. BUSH: You can ask him to restate it if you
3   didn't understand it.
4      A. If you'll restate it, I...
10:50 5      Q. (By Mr. Walraven) That won't be the first time that
6   some of my confusing's might be -- my questions might be
7   confusing or my confusing might be questioning, either one.
8   Yeah, let me know if you don't understand it, and I want to
9   make sure you --
10:50 10      A. Okay.
11      Q. -- understand it before you answer it.
12           Other than -- no, let me start over.
13           If the only unusual matter about a claim is the
14   fact that the dollar amount exceeds a certain limit, would that
10:50 15   or would that not typically trigger analysis on the part of
16   people at Companion Life?
17      MR. BUSH: I'm going to object as to being vague
18   because I can't understand it.
19      A. You know, it's somewhat difficult, I guess, to
10:51 20   quantify every situation under which Companion Life would be
21   asked to look at a claim, and they may be a number of
22   interrelated situations that even it's hard for me to even know
23   what they would -- what they would be. If the MGU did not feel
24   particularly comfortable with what he saw or what he thought
10:51 25   was going on or so forth, you know, he may call us and ask us

Page 34

10:51 1   for our opinion, he may ask us to look at the claim.
2      Q. (By Mr. Walraven) And that might happen regardless
3   of the dollar amount --
4      A. It may happen --
10:51 5      Q. -- correct?
6      A. -- regardless of the dollar amount, that's -- that's
7   true.
8      Q. Yeah. No, what I was really just trying to focus on
9   the dollar amount. Let's say the -- the threshold set forth in
10:52 10   the agreement is 100, 100 whatevers.
11      A. Uh-huh.
12      Q. 100. And let's say there are two claims come in for
13   similar treatment to a similar patient, in fact they're pretty
14   much the same, except one comes in at 95 and the other comes in
10:52 15   at 105.
16      A. Uh-huh.
17      Q. How would the people at Companion Life respond
18   differently to the claim that came in at 105 instead of the
19   claim that came in at 95, assuming the small difference in
10:52 20   amounts was justified, the patient had been in the hospital
21   that many more days or something?
22      MR. BUSH: Objection, it's compound, calls for
23   speculation, it assumes facts not in evidence. Feel free to
24   answer if you can.
10:52 25      A. Have -- have you established what the -- Al Hall's

Page 35

10:53 1   claim level authority is, is that what we're talking about?
2      Q. (By Mr. Walraven) The -- the threshold's 100.
3      A. It's 100. Well --
4      Q. And you have one slightly below it and one slightly
10:53 5   above it and there's really no significant differences between
6   the two, and I wonder if there's some procedure at Companion
7   Life that would kick into place because of that small
8   difference in amount.
9      A. No.
10:53 10      Q. So if J. Allan Hall said, treat these two just the
11   same, that would be sufficient, absent any special
12   circumstances, for Companion Life --
13      MR. BUSH: Objection, calls --
14      Q. (By Mr. Walraven) -- as you understand the process?
10:53 15      MR. BUSH: Objection, calls for speculation.
16      MR. HEGLAND: And vague.
17      A. You know, and I could say perhaps, you know,
18   that's -- that's the best I could answer it, perhaps it would
19   call for that.
10:53 20      Q. (By Mr. Walraven) Well, if such a circumstance came
21   in, what sort of investigation typically would be done by
22   people at Companion Life?
23      MR. BUSH: Objection, vague.
24      Q. (By Mr. Walraven) If any.
10:54 25      MR. BUSH: Vague and calls for speculation.

Page 36

10:54 1      A. We would obviously review the claim.
2      Q. (By Mr. Walraven) And what would that involve?
3      A. We typically look at claim files, perhaps, not in
4   every situation, but we may look at the claim file; we may
10:54 5   suggest that they go to an outside vendor to do an audit, we
6   may suggest they go to an outside vendor to do an investigation
7   that's outside the audit. You know, there could be a number of
8   things that we could do. We have a -- you know, a number of
9   things that we can do depending, again, on what the
10:55 10   circumstances are related to that claim. And that's the reason
11   it's hard to be hypothetical, because every claim is not
12   treated the same, depending on the circumstances relating to
13   that claim.
14      Q. Yeah, and that's why I was asking the hypotheticals
10:55 15   that were trying to isolate simply the dollar amount. And --
16   and I realize there are a lot of other things that may need
17   investigation, that there may be other characteristics that
18   would trigger an investigation, whether it was slightly over
19   the threshold or slightly under the threshold, but I was just
10:55 20   wondering what in particular might be triggered simply because
21   of the claim exceeding this threshold we've been discussing.
22      A. No, you were asking the difference between 105,000
23   and 95,000 and how we would treat that, is that --
24      Q. Right.
10:56 25      A. Probably for the most part go with what the MGU would

Page 33 - Page 36

Case 1:03-cv-00047   Document 27   Filed in TXSD on 09/04/2003   Page 30 of 74

Roy F. Hutchison                Multi-Page          San Benito vs. Companion
8/13/03

## Page 37

1  recommend.

2  Q. How are MGUs such as J. Allan Hall compensated? How

3  are they compensated for their services?

4  A. They are compensated out of fees that's -- that

5  Companion pays them.

6  Q. And what are the variables that go into calculating

7  those fees?

8  A. Generally there's pretty much an industry-wide thing

9  or standard or guidelines or what in general MGUs getting as a

10  way of compensation. Okay?

11  Q. For example, I guess what I'm curious about, is part

12  of the compensation to an MGU based on a percentage of the

13  premiums charged for policies issued through the MGU?

14  A. Is that compensation --

15  Q. Is that part of the compensation to an MGU?

16  A. That's how it's arrived at, yes.

17  Q. Okay. Other than a percentage of premium dollars,

18  are they paid any other sums, fees, bonuses that are calculated

19  based on something other than a percentage of premium?

20  A. There are occasions where some MGUs have profit

21  sharing arrangements.

22  Q. And would you just explain generally what that means

23  in this context?

24  A. A certain percentage of the profits relating

25  to this -- to that particular MGU is -- is given back to the

## Page 38

1  MGU.

2  Q. That would be to an extent that the premiums exceed

3  the amounts paid out, there might be a sharing of some of that?

4  A. Roughly, yes.

5  Q. And does J. Allan Hall have such an arrangement with

6  Companion Life?

7  A. Well, is your question do they have it now or is your

8  question did they have it at that time?

9  Q. Well, I guess that's two questions, isn't it? Do

10  they have it now?

11  MR. BUSH: If that's something you consider

12  confidential and proprietary, then -- and you don't feel

13  comfortable responding, then don't respond.

14  A. I -- I'd feel more -- you know, I'm not sure, and I'd

15  have to go back and actually look to see if they had it at that

16  time that you're talking about, during the time that --

17  involved in this claim in the year 2000. And -- and off the

18  top of my head, I cannot recall if they in fact do have a

19  profit sharing. In fact, now that I give some additional

20  thought to it, no, they do not.

21  Q. (By Mr. Walraven) If they did, would that be subject

22  to a written agreement?

23  A. Yes.

24  Q. Would it be part of the general manager's

25  agreement --

## Page 39

1  A. Yes.

2  Q. -- or would it be a separate agreement?

3  A. It generally would be part of the MGA agreement.

4  Q. And after having sat here and thought about it for a

5  minute, is it your best memory that J. Allan Hall does not have

6  such an arrangement? And if you're not sure, just tell me

7  you're not sure.

8  A. I'm trying to give it some thought to see if I can

9  come up with a good -- I mean, the right answer for you. But

10  I'm really not sure off the top of my head.

11  Q. But, in any event, if an MGU like J. Allan Hall did

12  have such an agreement --

13  A. Uh-huh.

14  Q. -- then they would have a financial interest in the

15  denial of claims, would they not?

16  MR. BUSH: Objection --

17  A. No, no, no.

18  MR. BUSH: -- calls for speculation.

19  Q. (By Mr. Walraven) That is, the fewer dollars that

20  are paid out in claims, the greater the profit and the greater

21  their profit sharing payments would be; correct?

22  MR. BUSH: Objection --

23  MS. HEGLAND: Assumes facts not in evidence.

24  MR. BUSH: And calls for speculation.

25  A. I would say the better job of underwriting they did

## Page 40

1  would determine whether or not they would derive a profit

2  sharing arrangement or not.

3  Q. (By Mr. Walraven) But, in addition to underwriting,

4  would not an MGU who was extremely careful and thorough and

5  picky when it came to denying claims make more money, as --

6  MR. BUSH: Object --

7  Q. (By Mr. Walraven) -- you've been describing this

8  profit sharing concept for us?

9  MR. BUSH: Objection, vague, and misstates

10  previous testimony.

11  A. Companion and MGU pays claims based upon the contract

12  that we'd issue.

13  MR. WALRAVEN: I need to object to that as

14  nonresponsive.

15  Q. (By Mr. Walraven) Under the profit sharing

16  arrangements which may or may not apply to J. Allan Hall, we

17  don't know, is a component of the profit sharing that would be

18  paid to the MGU based in part on the amount of claims that are

19  paid out by that MGU, such that the more they pay, the less

20  they receive?

21  MS. HEGLAND: Objection, vague, assumes facts

22  not in evidence, calls for speculation.

23  Q. (By Mr. Walraven) Now, go ahead and answer.

24  A. Yes.

25  Q. Okay. I'm going to change subjects on you, just want

## Page 41

11:02 1 to give you a warning, and we've been at this an hour.  And I
2 just want to let you know, if at any time you need to take a
3 break, go down the hall, stretch your legs, just let us know --
4     A.  All right.
11:02 5     Q.  -- we'll be happy to accommodate you.
6     A.  Appreciate that.  Thanks.
7     Q.  Including right now.  Are you ready to proceed or do
8 you want to take a quick break, either way?
9          MR. BUSH:  Let's take a quick break, I need some
11:03 10 coffee.
11          THE VIDEOGRAPHER:  Off the record, 11:00 a.m.
12               (Recess from 11:00 a.m. to 11:12 a.m.)
13          THE VIDEOGRAPHER:  Back on the record,
14 11:12 a.m.
11:15 15     Q.  (By Mr. Walraven)  Mr. Hutchison, just to help better
16 understand the relationship between J. Allan Hall and Companion
17 Life, I would like for you to explain to us how the money
18 flows.  Starting with the -- I guess the premium coming in is
19 the first economic part of any policy; correct?
11:15 20     A.  Yes.
21     Q.  And the premium will come in to J. Allan Hall;
22 correct?
23     A.  That's correct.
24     Q.  And what will J. Allan Hall do with it?
11:16 25     A.  J. Allan Hall will use that premium to pay claims,

## Page 42

11:16 1 then he sends it on to us.
2     Q.  Will that premium be used to pay claims only for the
3 insured that paid the premium --
4     A.  No.
11:16 5     Q.  -- or it will just be put into a general fund?
6     A.  Yes.
7     Q.  And when -- or how do they know to send it on and
8 that there won't be other claims that they'll need it?  Do they
9 keep a particular amount?
11:16 10     A.  There's a claim fund established, yes.
11     Q.  And does it have a target balance?
12     A.  Yes, it does.
13     Q.  Is that how it works?
14     A.  Yes.
11:17 15     Q.  And any time the balance exceeds the target, the
16 surplus is sent on to Companion Life.
17     A.  Yes.  But, you know, at some point it's sent on to
18 Companion Life.
19     Q.  It's --
11:17 20     A.  I mean --
21     Q.  -- something that's just reviewed on like a quarterly
22 or annual basis or something?
23     A.  Right.
24     Q.  What is the basis?
11:17 25     A.  Basically, the fund is maintained throughout the

## Page 43

11:17 1 period of our contract with J. Allan Hall.  In other words, we
2 do look at it on a -- on an annual basis to see that it's
3 adequate, do we need to increase it, so forth.
4     Q.  And what other uses does the money in this account go
11:17 5 for besides the payment of claims, if anything?
6     A.  Oh, they could go for doing audits.
7     Q.  Are they used to compensate the MGU?
8     A.  The claims in the claim fund?
9     Q.  The premium comes in and goes into an account, you
11:18 10 explained it.
11     A.  Yes.
12     Q.  Are commissions taken out of that?
13     A.  Yes.
14     Q.  Is it used for payment to third-party contractors who
11:18 15 may be processing claims?
16     A.  If there was a third-party contractor involved, yes,
17 it would be.
18     Q.  Is it used to purchase reinsurance?
19     A.  I don't think so, no.  I'm not sure I understand
11:18 20 exactly that term, purchase reinsurance.
21     Q.  Is Companion Life reinsured for its stop loss
22 program?
23     A.  Yes, it is.
24     Q.  How much of the risk does Companion Life keep?
11:19 25          MR. BUSH:  Objection, vague.

## Page 44

11:19 1     A.  Companion Life actually has 100 percent of the risk.
2     Q.  (By Mr. Walraven)  And what percentage is reinsured?
3     A.  We reinsure anywhere from 80 to -- 75 to 80 percent.
4     Q.  And is this reinsurance purchased by this account at
11:19 5 J. Allan Hall?
6     A.  I don't think so.  And the reason I say I don't think
7 so because I really don't understand the question.
8     Q.  Well, you have to pay premiums for reinsurance, don't
9 you?
11:19 10     A.  Yes.
11     Q.  And you have to send a check to the -- to the
12 reinsurance company; right?
13          MR. HEDLAND:  Objection.  Who is you?
14 Objection, vague.
11:20 15     Q.  (By Mr. Walraven)  Somebody has to send a check to
16 the reinsurance company.
17     A.  Correct.
18     Q.  Okay.  And I'm wondering if that's one of the
19 functions that J. Allan Hall takes care of.
11:20 20     A.  No.
21     Q.  That's a function that's performed --
22     A.  Companion takes care --
23     Q.  -- by whom?  Okay.
24     A.  Companion.
11:20 25     Q.  And it's paid for out of, I guess, the funds that are

Case 1:03-cv-00047    Document 27    Filed in TXSD on 09/04/2003    Page 32 of 74

Roy F. Hutchison                    Multi-Page™                    San Benito vs. Companion
8/13/03

## Page 45

11:20 1    sent on to Companion by J. Allan Hall --

2    A. Correct.

3    Q. -- for example.

4        Are there any other uses for these funds on

11:20 5   deposit at J. Allan Hall?

6        MR. BUSH: Objection, vague, calls for

7    speculation.

8    A. And I don't want to speculate on that.

9    Q. (By Mr. Walraven) I mean, are there categories of

11:20 10  bills that generally get paid out of this that we haven't

11   talked about yet, or have we talked about most of them?

12       MR. BUSH: Same objection.

13   Q. (By Mr. Walraven) I mean, if you don't know of any

14   others, tell me you don't know of any others.

11:21 15  A. I don't know of any others.

16   Q. Okay. We used a phrase earlier today when we were

17   talking about your background, the initials TPA.

18   A. Uh-huh.

19   Q. Can you tell us what that stands for?

11:21 20  A. Third-party administrator.

21   Q. And in the context of stop loss insurance, what is a

22   third-party administrator?

23   A. Third-party administrator is the entity that the

24   employer retains to administer their self-funded plan.

11:21 25  Q. And by that, it's the company that gets the medical

## Page 46

11:22 1    bills and handles them, gets them paid or whatever; correct?

2    A. Correct.

3    Q. But what is the role of the TPA in connection with

4    stop loss insurance, as you understand it, generally?

11:22 5   A. I'm not sure -- I'm not sure exactly what you're

6    asking there.

7    Q. Okay. Does a TPA have a role in connection with stop

8    loss insurance?

9    A. Yes.

11:22 10  Q. Okay. And what is that role?

11   A. Pays the employer's claims.

12   Q. Okay. Do they do anything else?

13   A. Yes, they will generally do the administration,

14   what's involved in administration of the employer's health

11:22 15  plan, that's what a TPA does.

16   Q. Okay. Does a TPA typically have a role in the

17   purchase of stop loss insurance?

18   A. No.

19   Q. The TPA typically isn't involved in perhaps preparing

11:22 20  applications for stop loss insurance, or dealing with brokers

21   who provide stop loss insurance; is that common or uncommon in

22   your experience?

23   A. I'm not sure exactly what you're asking me now.

24   Q. In addition to processing the medical bills --

11:23 25  A. Uh-huh.

## Page 47

11:20 1    Q. -- does a TPA typically get involved in the purchase

2    of stop loss coverage?

3    A. Yes.

4    Q. And typically, what does a TPA do?

11:23 5       MR. BUSH: Objection, vague, calls for

6    speculation

7    Q. (By Mr. Walraven) Go ahead.

8    A. Some TPAs, not all, will actually send information to

9    the carrier or the MGU to request a quote for stop loss.

11:24 10  Q. When a TPA is involved in requesting a quote and the

11   coverage quoted is -- is actually bound, is the TPA typically

12   paid a commission?

13   A. There is -- yes, there is commission usually involved

14   in -- in -- for the TPA.

11:24 15  Q. And in connection with self-funded plans and stop

16   loss insurance, in your experience is a TPA involved in the

17   purchase of the stop loss insurance more often than not?

18       MR. BUSH: Objection, vague, calls for

19   speculation.

11:24 20  A. In my experience, yes, it has been.

21   Q. (By Mr. Walraven) So in -- in your role as -- as a

22   person responsible for the marketing of Companion Life's stop

23   loss insurance, do you have any efforts focused on the TPA

24   section of the market?

11:25 25  A. No.

## Page 48

11:25 1    Q. Does anyone on behalf of Companion Life do that, that

2    you know of?

3        MR. BUSH: Objection. Mr. Walraven, where in

4    this notice would that question fall, what subject area?

11:25 5       MR. WALRAVEN: I don't know, I'm asking the

6    question. If he has an answer, he can tell me.

7        MR. BUSH: Do you have any subject area in which

8    that question falls? Because if you don't --

9        MR. WALRAVEN: Well, we're dealing with the

11:25 10  relationship between the parties to this lawsuit.

11       MR. BUSH: Okay. Are you asking --

12       MR. WALRAVEN: And whether it's standard --

13       MR. BUSH: -- the question specific --

14       MR. WALRAVEN: -- or unusual --

11:25 15       MR. BUSH: -- to these parties?

16       MR. WALRAVEN: Well, I'm asking the question

17   generally, yes.

18       MR. BUSH: Well, would you ask a specific

19   question that falls within one of these subject areas?

11:25 20       MR. WALRAVEN: I have.

21       MR. BUSH: No, you have not, and he will not

22   answer it.

23       MR. WALRAVEN: Are you instructing him not to

24   answer?

11:25 25       MR. BUSH: Yes, I am.

Page 49

11:25 1    Q. (By Mr. Walraven) Are you going to follow your
2    lawyer's instructions?
3    A. Yes.
4    Q. Mr. Hutchison, one of your duties, you explained to
11:26 5    us, is the marketing of Companion Life products; correct?
6    A. Right.
7    Q. And in that role, to what ex -- how is the marketing
8    of stop loss products divided in terms of responsibility
9    between Companion Life and an MGU such as J. Allan Hall?
11:27 10    A. Basically, the MGU does the marketing for Companion.
11    Q. Are written materials prepared in connection with
12    that?
13        MR. BUSH: Objection, vague.
14    A. In some instances, in some -- with some MGUs, yes,
11:27 15    and some MGUs, no.
16    Q. (By Mr. Walraven) And in connection with J. Allan
17    Hall, are there written materials used for marketing?
18    A. I don't think so.
19    Q. When it comes to marketing efforts to TPAs such as
11:27 20    MBA of Wyoming or Managed Benefit Administrators and Insurance
21    Consultants, Incorporated, does Companion Life play any role in
22    conducting those marketing efforts?
23    A. No.
24    Q. So in a -- well, let me define a term for you. There
11:28 25    are a couple of -- of entities, businesses in this lawsuit, MBA

Page 50

11:28 1    of Wyoming, and a business known as Managed Benefit
2    Administrators and Insurance Consultants, Inc. Had you ever
3    heard of them prior to this particular matter coming up?
4    A. No.
11:28 5    Q. Have you ever had any dealings with any of them?
6    A. No.
7    Q. They, as I understand it, involve some of same people
8    and the same locations, and for the purposes of some of my
9    questions I'm going to collectively refer to them as MBA; okay?
11:28 10    A. Okay.
11    Q. You understand what I'm talking about, those -- those
12    two entities in Salt Lake City? I mean, you do understand that
13    there are a couple of entities out there in Salt Lake City who
14    were involved with this situation that we're involved in the
11:29 15    lawsuit about?
16        MR. BUSH: If you don't, you don't.
17    A. I don't think I'm totally aware of the Salt Lake City
18    connection.
19    Q. (By Mr. Walraven) Okay. Then I'm going to ask you
11:29 20    to just assume that the TPA for the school district on --
21    involved in this situation is one or the two entities I just
22    named located in Salt Lake City.
23    A. Okay.
24    Q. And I'm going to refer to them as MBA.
11:29 25    A. Okay.

Page 51

11:29 1    Q. And -- and you'll understand that they're the TPA
2    involved here in this matter. Okay?
3    A. Okay.
4    Q. Just assume that.
11:29 5    A. All right.
6    Q. And if you have no information on it, that's --
7    that's fine.
8        Now, as I recall, I was asking you about
9    marketing efforts to someone such as this TPA, and you, I
11:30 10    believe, told me that -- that people at Companion Life would
11    not have been involved --
12    A. No.
13    Q. -- correct?
14    A. That's correct.
11:30 15    Q. As you understand your relationship with J. Allan
16    Hall, whatever marketing would have been done would have been
17    done by J. Allan Hall.
18        MS. HEGLAND: Object, calls for speculation.
19    A. I don't know that J. Allan Hall did any marketing.
11:30 20    Q. (By Mr. Walraven) I understand that. Would there
21    have been anybody else involved, is really what I'm trying to
22    get at?
23    A. I can't speculate on that, now.
24    Q. Well, then can you tell me generally, does J. Allan
11:30 25    Hall use outside vendors with respect to its marketing?

Page 52

11:30 1        MS. HEGLAND: Objection, calls for speculation.
2    A. Not that I'm aware of.
3    Q. (By Mr. Walraven) As part of your agreement with
4    J. Allan Hall, their marketing efforts and materials need the
11:30 5    approval of Companion Life; correct?
6    A. Correct.
7        MS. HEGLAND: Objection, the contract speaks for
8    itself.
9    Q. (By Mr. Walraven) And you would be the person at
11:31 10    Companion Life who would know of any such efforts that required
11    Companion Life's approval; correct?
12    A. Correct.
13    Q. So you would know if there was anything.
14    A. Correct.
11:31 15    Q. And you're not aware of anything.
16    A. I'm not aware of any.
17    Q. Are you aware of any unwritten guidelines,
18    suggestions, comments, information provided to J. Allan Hall
19    concerning the marketing of the stop loss program?
11:31 20        MR. BUSH: Objection, compound question, vague.
21    A. Not that I'm aware of, no.
22    Q. (By Mr. Walraven) For example, Companion Life
23    doesn't have any seminars or videos that they send out saying,
24    this is a good way to market these products, or anything like
11:32 25    that?

Case 1:03-cv-00047    Document 27    Filed in TXSD on 09/04/2003    Page 34 of 74

Roy F. Hutchison                    Multi-Page                    San Benito vs. Companion
8/13/03

## Page 53

1    A. No.

2    Q. Are you aware of any such materials that have been

3 prepared by J. Allan Hall?

4    A. No.

5    Q. Okay. Now, you understand that we're here today, and

6 I represent the school district which was an insured under

7 Companion Life's stop loss policy; correct?

8    A. Yes.

9    Q. As far as the -- well, let's -- let's go back a step.

10        Has Companion Life, prior to the dispute

11 arising, had any direct involvement with the school district,

12 that is, anybody who actually was employed by Companion Life

13 had any kind of contact with the school district that you know

14 of?

15    A. Not that I know of.

16    Q. And you know that this was -- program was handled by

17 J. Allan Hall; correct?

18        MS. HEGLAND: Objection, vague.

19        MR. BUSH: What do you mean by program?

20    Q. (By Mr. Walraven) This policy was underwritten, all

21 the things that you've told me the MGU does, J. Allan Hall did

22 in this case; right? You understand that.

23        MS. HEGLAND: Objection, vague.

24    Q. (By Mr. Walraven) Where I want to go with this is,

25 do you know of anybody else involved? I'm trying to get a list

## Page 54

1 of the people that were involved in the issuing and handling of

2 this policy that you know of.

3    A. I'm not aware of anyone else.

4    Q. That's -- that's all.

5    A. Okay.

6    Q. For example, there were brokers and agents involved

7 between J. Allan Hall and the school district. Do you have any

8 information as to who they were or what they did?

9    A. The only broker that I'm aware of is Consolidated.

10    Q. Okay. And who is Consolidated?

11    A. I'm not sure I know the full name of the firm,

12 Consolidated -- and I'm not sure I know the full name of the

13 firm, but I take it that they were the broker on this account.

14    Q. And what was their involvement on this account?

15    A. I can't speculate to that, because I don't --

16    Q. Well, what does a broker do typically?

17    A. Well, they do different things. I mean, brokers do

18 different things related to stop loss, and what -- what these

19 particular brokers did, I don't know.

20    Q. Okay. Are you familiar with the business,

21 Consolidated? Have you had dealings with them in the past?

22    A. No, not on -- no.

23    Q. Other than seeing their name in connection with this

24 matter, do you know who they are, what they do?

25    A. No.

## Page 55

1    Q. Ever met anybody with them?

2    A. Not that I'm aware of, no. Maybe -- no.

3    Q. Haven't ever talked to any of the people with

4 Consolidated that -- that you know of?

5    A. Is Doug Roth part of Consolidated?

6    Q. Yes.

7    A. Then -- then I have met Doug Roth.

8    Q. Okay. And in what context did you meet Mr. Roth?

9    A. I really don't remember.

10    Q. Can you tell me approximately when it was?

11    A. No.

12    Q. Was it before the year 2000?

13    A. No, no.

14    Q. Has it been in the last couple of years?

15    A. Yes.

16    Q. Was he at Consolidated when you met him?

17    A. I can't -- I don't know that.

18    Q. Did it have anything to do or were there any

19 discussions with Mr. Roth about the claim that we're here on

20 today?

21    A. No.

22    Q. Where did that meeting take place?

23    A. I think I said I don't know.

24    Q. Okay.

25    A. I don't recall. I really -- I don't recall.

## Page 56

1    Q. I just wondered if you met him at a conference

2 or at --

3    A. That's a possible -- that's the reason it's so vague

4 in my mind, I really don't know.

5    Q. Okay. We're just having trouble locating Mr. Roth,

6 and so any information you had would be helpful.

7        MR. HEGLAND: He's teaching tennis.

8        MR. WALRAVEN: Somewhere.

9        MR. BUSH: That's what Merrills told us, isn't

10 it?

11        MR. WALRAVEN: Yeah. But apparently that hasn't

12 gotten me to his doorstep.

13    Q. (By Mr. Walraven) Do you know if anybody on behalf

14 of Companion Life has talked to Mr. Roth about any of the

15 matters at issue in this case?

16    A. Not to my knowledge, no.

17    Q. Ever talked to anybody else at Consolidated?

18    A. There was an individual at Consolidated one time by

19 the name of Jim Furman. I did have conversations with him and

20 do know Jim Furman.

21    Q. Is he still with Consolidated?

22    A. No.

23    Q. Can you tell me whether or not your conversations --

24 your last conversation with him was before or after 2000?

25    A. Well, it's been after 2000 because I have ongoing

---

**Page 57**

11:37 1  dealings with Jim Furman.

2      Q. Any of those dealings have anything to do with stop

3  loss insurance --

4      A. No.

11:37 5      Q. -- for San Benito School District?

6      A. No. None.

7      Q. Anybody else at Consolidated you've dealt with?

8      A. No.

9      Q. Are you aware of any other business or individual

11:37 10  involved in the sale of the stop loss insurance to the

11  San Benito School District?

12      A. No.

13          MR. BUSH: Talking about for this stop loss

14  contract at issue in this lawsuit?

11:38 15          MR. WALRAVEN: Yes.

16          MR. BUSH: Not just generally?

17      Q. (By Mr. Walraven) Well, any stop loss insurance for

18  the San Benito School District.

19      A. Yes, sir.

11:38 20          MR. BUSH: For the --

21          MR. WALRAVEN: They sold two --

22          MR. BUSH: -- school year 2000 --

23          MR. WALRAVEN: -- policy, and there was --

24          MR. BUSH: -- and 2001?

11:38 25      Q. (By Mr. Walraven) Well, they've sold it for '99-2000

---

**Page 58**

11:38 1  and for 2000-2001, and they made a proposal that was not

2  accepted for the 2001-2002 policy year, and I meant to include

3  all of that in my question.

4      A. I know of no one.

11:39 5      Q. Then you -- you've never met or talked to Mr. Don

6  Merrill, to your knowledge?

7      A. No.

8      Q. Or Ms. Phyllis Merrill?

9      A. No.

11:39 10      Q. Or Ms. -- Mr. Clark Merrill?

11      A. No.

12      Q. Or Mr. Glade Nixon?

13      A. No.

14      Q. Now, as I understand it, sometime prior to 2001

11:39 15  J. Allan Hall outsourced its claims handling functions. Are

16  you aware of that?

17      A. Yes.

18      Q. What role did Companion Life play in signing up or

19  approving the use of the outside provider?

11:39 20      A. We approved them outsourcing the claims to that

21  provider.

22      Q. And I understand from some other testimony in this

23  case that some problems arose with that vendor in the year

24  2001. Are you aware of any problems --

11:40 25          MR. BUSH: Objection, vague.

---

**Page 59**

11:40 1      Q. (By Mr. Walraven) -- at that time frame with that

2  vendor?

3      A. Can you -- can you be more specific, I mean, to type

4  of problems, or, I mean, are you -- what are you relating to?

11:40 5      Q. Well, that -- I was going to ask you, what problems

6  if any are you aware of in connection with that vendor?

7      A. Well, in that, I -- the only problems that I'm aware

8  of is the problem of J. Allan Hall's business growing faster

9  than the vendor ability to service J. Allan Hall in the -- in

11:40 10  the manner in which it should have been.

11      Q. Just couldn't keep up with the work, as you

12  understand it?

13      A. That's my understanding, yes.

14      Q. And where did you get that understanding?

11:41 15      A. From J. Allan Hall.

16      Q. And were you involved in any of the efforts to deal

17  with that situation?

18          MR. BUSH: Objection, vague.

19      A. Not on a specific basis, no.

11:41 20      Q. (By Mr. Walraven) Were you asked or was anyone at

21  Companion Life asked to approve alternative arrangements for

22  dealing with the functions that were not being performed

23  satisfactorily?

24      A. Not that I'm aware of.

11:41 25      Q. Are you aware of what changes were made?

---

**Page 60**

11:41 1          MR. BUSH: Objection, vague.

2      A. I mean, can you --

3      Q. (By Mr. Walraven) Yeah.

4      A. -- give me a hint of what you -- what you have in

11:42 5  mind there?

6      Q. Do you know the name of this vendor that was

7  performing those functions?

8      A. North Shore.

9      Q. Did they continue to perform those functions?

11:42 10      A. I think they continued for a period of time. I'm

11  not --

12      Q. I mean, if they weren't keeping up, did you hire

13  somebody else to do it who was bigger, did you hire

14  supplemental, did you fire them? What do you know about what

11:42 15  was done to deal with the situation as you understand it?

16          MR. BUSH: Objection to the extent it

17  mischaracterizes any previous testimony. He's testified that

18  Companion Life did not handle that.

19          MR. WALRAVEN: I'm just asking what he knows

11:42 20  about it.

21          MR. BUSH: Well, ask him then, rather than --

22          MR. WALRAVEN: I did ask him.

23          MR. BUSH: -- making this statement that, did

24  you do this, did you do that.

11:42 25          MR. WALRAVEN: Well, he asked me for --

Case 1:03-cv-00047    Document 27    Filed in TXSD on 09/04/2003    Page 36 of 74

## Page 61

11:42  1    MR. BUSH: He's already testified that he didn't
2    do anything.
3        MR. WALRAVEN: He asked me for an example
4        MS HEGLAND: Objection, compound.
11:42  5    A. Would you restate your question, please?
6    Q. (By Mr. Walraven) Sure. What do you know about what
7    was done to deal with the situation that you just described
8    with North Shore?
9    A. I know that J. Allan Hall made efforts to improve the
11:43 10   situation.
11   Q. Do you know specifically what they did?
12   A. They had meetings with the vendor.
13   Q. Did anyone from Companion Life participate in those
14   meetings?
11:43 15   A. No.
16   Q. And do you know of any other steps taken to improve
17   the situation other than meeting with the vendor?
18   A. No.
19   Q. Do you know if the vendor was replaced?
11:43 20   A. Eventually, yes.
21   Q. And do you know by whom?
22   A. Yes.
23   Q. Who replaced them?
24   A. J. Allan Hall.
11:43 25   Q. Were you asked to approve that?

## Page 62

11:43  1    A. Yes.
2    Q. And I assume you did then?
3    A. Yes.
4    Q. Are you aware of any other problems with the claims
11:44  5    processing during the year 2000?
6    A. No.
7    Q. In your business are you familiar with the term
8    "turnaround time"?
9    A. Yes.
11:44 10   Q. What does that refer to?
11   A. Time it takes to turn something around.
12   Q. What does that mean in connection with stop loss
13   insurance?
14   A. Well, could be the time it takes to turn around a
11:44 15   quote, could be the time it takes to turn around a claim, it
16   could be time it takes to -- to turn around the issuing of
17   certs and contracts.
18   Q. I have heard the term used in particular with the
19   time it takes to pay a claim, that is, the time between
11:45 20   receiving a request for payment and issuing a check. In that
21   context or that use, is it important to your customers how long
22   the turnaround time is?
23       MR. BUSH: Objection, it's vague and calls for
24   speculation. And let me -- just so I'm clear, are you talking
11:45 25   about a reimbursement request from the TPA to the MGU when you

## Page 63

11:45  1    refer to a payment of a claim, and not --
2        MR. WALRAVEN: Yes.
3        MR. BUSH: not a payment of a -- of claim
4    received by the TPA from a provider?
11:45  5        MR. WALRAVEN: Right, not a claim -- not a
6    payment to a provider.
7    A. But a reimbursement.
8    Q. (By Mr. Walraven) Payment under a stop loss policy.
9    A. And your question again?
11:45 10   Q. Is turnaround time -- I mean, I've heard it's
11   important, I heard people calculate it, that people advertise
12   our turnaround time is X days. Is that your experience?
13   A. Is turnaround time important? Yes.
14   Q. Are you aware of any delays or lengthening of the
11:46 15   turnaround time at J. Allan Hall sometime in the year 2000?
16   A. Am I aware? No.
17   Q. Are you aware of any circumstances that might
18   contribute to such a problem or have contributed to such a
19   problem at J. Allan Hall during that time period?
11:46 20       MR. BUSH: Objection, calls for speculation.
21   And is vague.
22   Q. (By Mr. Walraven) I mean, are you aware of any other
23   glitches in the process --
24   A. I'm not aware of any --
11:46 25   Q. -- at the time?

## Page 64

11:46  1    A. -- no.
2    Q. For example, are there times when the bank account at
3    J. Allan Hall may be insufficient to pay claims?
4        MS. HEGLAND: Objection, calls for speculation.
11:47  5    Q. (By Mr. Walraven) We were talking about earlier they
6    maintain an account to play -- pay claims; right?
7    A. That's correct.
8    Q. Does it ever happen that sometimes the incoming
9    premiums and the balance in that account are inadequate and
11:47 10   funds are provided by Companion Life back to J. Allan Hall to
11   pay claims with?
12       MS. HEGLAND: Objection, calls for speculation
13   again.
14   Q. (By Mr. Walraven) I mean, does that ever happen, has
11:47 15   it happened?
16       MR. BUSH: Same objection.
17   A. Yeah, it calls for speculation on my part. That's --
18   Q. (By Mr. Walraven) Do you know --
19   A. I'd just as soon not speculate.
11:47 20   Q. I'm not asking you to speculate. Let me ask you, do
21   you know if it's ever happened?
22   A. Yes.
23   Q. And really what I want to know, are -- I mean --
24   well, let me ask this: Does it happen with any frequency?
11:48 25   A. That's a poor question, let me start over.

Page 65

11:48 1      Can you tell me with what frequency it happens?

2      MR. BUSH: Objection, vague, calls for

3 speculation.

4    A. I'd as soon not speculate on that, because that does

11:48 5 calls for speculation.

6    Q. (By Mr. Walraven) I mean, is it once a year, once

7 every ten years, once a week, I mean, can you give me some

8 rough idea?

9    A. No.

11:48 10    Q. Okay. Are you aware of any need for such payments

11 from Companion Life and delay in making such payments that

12 occurred during the year 2000?

13      MR. BUSH: With regard to this plan?

14      MR. WALRAVEN: Yes.

11:48 15    Q. (By Mr. Walraven) That would have affected J. Allan

16 Hall's ability to fund claims.

17    A. I'm not aware of it.

18    Q. For example, if a reinsurer became insolvent, that

19 can affect an insurance company's ability to pay. I'm just --

11:49 20 you know, I don't know what happened, I'm just asking, is --

21 are you aware of anything that happened that -- during that

22 time frame that could have had an impact or did have an impact

23 on J. Allan Hall's ability to pay stop loss claims during that

24 period?

11:49 25      MR. BUSH: Objection, asked and answered. He

Page 66

11:49 1 just said he wasn't aware of any.

2      MR. WALRAVEN: Well, I think I asked a narrower

3 question, I want to ask the broader question.

4    Q. (By Mr. Walraven) Are you aware of anything?

11:49 5    A. Not that I'm aware of, no.

6    Q. I would like -- next like to discuss with you the

7 particular claim or claims that are involved in -- in this

8 lawsuit. Okay? And I guess I'd first like to ask you what

9 role you personally had, if any, in connection with the

11:50 10 payment, nonpayment, denial of the claims that are at issue in

11 this lawsuit. Were you involved?

12    A. Was I personally involved?

13    Q. Yes.

14    A. Not that I recall.

11:50 15    Q. And who at Companion Life would have been involved --

16 or, no, let me ask a different question. Who at Companion

17 Life, to your knowledge, was involved in this, the denial of

18 the payments to the San Benito School District?

19    A. No one that I'm aware of.

11:51 20    Q. To your knowledge, was anyone at all consulted?

21      MR. BUSH: Objection, vague.

22      MS. HEGLAND: Objection, calls for speculation.

23    A. I don't remember.

24    Q. (By Mr. Walraven) You told me earlier that when

11:51 25 there is an appeal from the denial of a claim, that typically

Page 67

11:51 1 someone at Companion Life might have been involved. Who at

2 Companion Life?

3    A. It would have been me.

4    Q. Okay. Do you know whether or not there was an appeal

11:51 5 from the denial of these claims by the school district?

6    A. I do not know.

7    Q. But typically had there been a claim, it would have

8 come to you.

9      MR. BUSH: Objection --

11:52 10    Q. (By Mr. Walraven) Or you would have been aware of

11 it.

12      MR. BUSH: Objection, that mischaracterizes his

13 testimony. Did you mean to say had there been an appeal?

14      MR. WALRAVEN: Yes.

11:52 15    Q. Okay. You said claim.

16    Q. (By Mr. Walraven) Let me start over. I probably

17 messed that up.

18      Typically if there had been an appeal by the

19 school district of these claims, that would have come to your

11:52 20 attention.

21    A. Yes, it would.

22    Q. And it would have been brought to your attention by

23 J. Allan Hall, if anyone.

24    A. That's correct.

11:52 25    Q. And you don't recall being made aware of such an

Page 68

11:52 1 appeal; is that correct?

2    A. I don't recall.

3    Q. Do you know Mr. Randy Scott?

4    A. Yes, I do.

11:52 5    Q. And who is he?

6    A. He's the director of claims for J. Allan Hall.

7    Q. And do you recall discussing any of these matters

8 with him at the time it came up? Before I go there, let me ask

9 a different question.

11:53 10      Is there a similar position at J. Allan Hall --

11 I'm sorry. Start over again.

12      Is there a similar position at Companion Life

13 with respect to stop loss claims?

14    A. No.

11:53 15    Q. You don't have a claims department or a claims

16 manager?

17    A. We do have a claims department, yes, we do.

18    Q. That deal with stop loss claim --

19    A. No, it does not deal with stop loss.

11:53 20    Q. So if there is an issue involving a claim on stop

21 loss insurance, it comes to you.

22    A. Correct.

23    Q. Do you know a man by the name of David Wythe?

24    A. Yes, that's correct.

11:53 25    Q. And who is he?

Page 69

1　A. David Wythe is director of our compliance department.

2　Q. And what does that mean, what does the compliance

3　department do?

4　A. Make sure that we're in compliance with the laws of

5　the state.

6　Q. Licensing requirements and filing requirements and

7　that sort of thing?

8　A. That's correct.

9　Q. Does he have any role in connection with appeals of

10　claims?

11　A. Yes, he does.

12　Q. And what is his role?

13　A. He serves as a advisor to myself in looking at claims

14　appeals.

15　Q. And do you have any understanding as to whether he --

16　he was involved in connection with the San Benito School

17　District claims?

18　A. I do not know.

19　Q. Do you have an understanding as to why the

20　San Benito's claims were denied?

21　A. Yes.

22　Q. And why, what is the reason or reasons claims were

23　denied?

24　A. One, they were filed outside of the contract period;

25　and two, there was not sufficient funds in the bank account to

Page 70

1　cover the checks written. Basically, the claims were not paid

2　within the time frame laid out in the contract and under the

3　terms of the contract.

4　Q. And do you know who made the decision to deny?

5　A. Well --

6　Q. Was it J. Allan Hall who made the decision, was it

7　Companion Life who made the decision, some combination of --

8　A. I would say it was a combination of the two.

9　Q. And who at Companion Life was involved in this

10　decision?

11　A. It could very well have been David Wythe, the

12　compliance person, it could have been me.

13　Q. Okay. Well, I don't want you to speculate at this

14　moment. Do you -- do you know whether or not Mr. Wythe was

15　involved?

16　A. I do not know for certain, no.

17　Q. Do you remember whether or not you were --

18　A. No.

19　Q. -- involved?

20　A. No, I do not.

21　Q. So you don't know whether anyone at Companion Life

22　was involved or not; correct?

23　A. I'd have -- it is only speculation.

24　Q. Okay. Now let me ask you the -- that other question,

25　and that is, typically how would that process work, who would

Page 71

1　be involved, you and Mr. Wythe?

2　A. Yes.

3　Q. Most often, if there is an appeal that's brought to

4　the attention of Companion Life, you and Mr. Wythe would be the

5　people involved.

6　A. Yes, that's correct.

7　Q. And you mentioned two -- two issues in connection

8　with the denial; correct?

9　A. Yes, that's correct.

10　Q. And one of the issues had to do with the date a check

11　was placed in the mail to the health care provider; correct?

12　　MR. BUSH: Objection to the extent it

13　mischaracterizes his testimony.

14　A. I believe I said that the claim was not paid in

15　accordance with our contract.

16　Q. (By Mr. Walraven) Okay. And what was the

17　requirement of the contract that you don't believe was

18　satisfied?

19　A. That the checks were actually mailed to the provider,

20　and that there were funds in the account to cover the checks.

21　Q. Okay. I thought that's what you said. And there

22　are -- there are two things there, and one of them had to do

23　with the date the checks were mailed; correct?

24　A. Yes.

25　Q. Okay. And the other one had to do with the bank

Page 72

1　balance; right?

2　A. Uh-huh.

3　Q. Okay.

4　A. Correct.

5　Q. I just want to ask a couple of questions about these

6　two general areas.

7　　What is your understanding of the proper claims

8　handling procedure -- well, no, that's not what I want to ask.

9　　What should have been done to ensure coverage

10　under the stop loss policy with respect to the issue of putting

11　the check in the mail?

12　　MR. BUSH: Objection --

13　　MS. HEGLAND: Objection, vague.

14　　MR. BUSH: -- vague, calls for speculation.

15　Q. (By Mr. Walraven) Well, let me ask this: As I

16　understand it, and tell me if I'm right, the policy provides a

17　date by which the check has to be placed in the mail; correct?

18　　MS. HEGLAND: Objection, vague. By whom?

19　　MR. WALRAVEN: We'll get there.

20　　MS. HEGLAND: Well, it's unclear who --

21　　MR. WALRAVEN: Well, if I ask --

22　　MS. HEGLAND: -- we're talking about.

23　　MR. WALRAVEN: -- three -- too many things I'll

24　get an objection that it's compound, so I'm --

25　　MR. BUSH: To the --

Page 73

11:59 1    MR. WALRAVEN: -- trying to ask it one piece at
2 a time.
3        MR. BUSH: To the extent you're -- you're
4 questioning the witness about the contract at issue, I would
11:59 5 ask that you give him a copy of it and let him review it, or at
6 least establish whether he has knowledge of that subject matter
7 within the contract, to which I will object, because the
8 contract speaks for itself, but...
9        MR. WALRAVEN: You're a big help, Mr. Bush.
11:59 10    Q. (By Mr. Walraven) We were talking about getting
11 checks in the mail to providers. Do you recall that, before we
12 got interrupted?
13    A. Correct.
14    Q. And you said that claim was denied because it wasn't
11:59 15 handled in accordance with the contract; right?
16    A. Correct.
17    Q. Tell me your understanding of what wasn't done that
18 should have been done or should have been done different. And
19 if you'd like to look at the contract to answer that, let me
12:00 20 know.
21        MR. BUSH: Objection, asked and answered.
22        MS. HEGLAND: And objection --
23        MR. WALRAVEN: Well, I tried to ask it, but --
24        MR. BUSH: Well, he told you that --
12:00 25        MR. WALRAVEN: -- but he hasn't ever had a

Page 74

12:00 1 chance to answer it.
2        MR. BUSH: -- they weren't mailed and there
3 wasn't money in the account. Do you want -- are you looking
4 for something in addition to that?
12:00 5        MR. WALRAVEN: Yeah, I am, because I don't think
6 that's really what he means to tell me, and it's certainly not
7 what happened. The checks were mailed. But I think it has to
8 do with when they were mailed.
9        MR. BUSH: Well, I'll object to the sidebar
12:00 10 comment, and to the extent --
11        MR. WALRAVEN: Well, I'll object --
12        MR. BUSH: -- that there's no --
13        MR. WALRAVEN: -- to your sidebar.
14        MR. BUSH: -- there's no mis -- there's no
12:00 15 testimony -- it assumes facts not in evidence, and it totally
16 mischaracterizes the testimony that -- that has been provided
17 in all the depositions thus far.
18        MS. HEGLAND: And I would still object that it's
19 still vague, because it's unclear as to who is being referred
12:00 20 to.
21    Q. (By Mr. Walraven) Now that everybody's had their
22 say, let's go back to the question. What is it about putting
23 the checks in the mail to the provider that gave a reason for
24 the denial of the claim, as you --
12:01 25        MR. BUSH: Objection --

Page 75

12:01 1    Q. (By Mr. Walraven) -- understand it?
2        MR. BUSH: Objection, vague. And to the extent
3 you need to refer to the contract, then you're welcome to ask
4 him to show you a copy of the contract.
12:01 5    A. I was just going to simply refer to the contract. It
6 did not meet the terms of the contract.
7    Q. Is it your understanding that the
8 checks were never mailed to the providers?
9    A. I'm not sure I -- it's that -- I'm not sure I'm aware
12:01 10 of one way or the other that. Never's -- I mean, I'm not sure
11 if I knew that.
12    Q. If a check was never mailed, then would that make a
13 difference in terms of the administration of the stop loss
14 program, as you understand it?
12:01 15        MR. BUSH: Objection, the contract speaks for
16 itself.
17        MS. HEGLAND: Objection, vague.
18    Q. (By Mr. Walraven) Just trying to find out what the
19 problems are here. And if somebody thinks a check wasn't
12:02 20 mailed and we can show it was mailed, maybe we can solve the
21 problem. I'm trying to have you identify for me the problems
22 that you're aware of.
23    A. Problems that I'm aware of is that the claim was not
24 handled in accordance with procedures outlined in our contract.
12:02 25        MR. WALRAVEN: Objection, nonresponsive.

Page 76

12:02 1    Q. (By Mr. Walraven) Can you tell me in what way the
2 handling of these claims was outside the requirements of the
3 stop loss policy?
4        MR. BUSH: Objection, asked and answered.
12:02 5    A. It's my understanding the checks were not mailed in a
6 timely fashion.
7    Q. (By Mr. Walraven) So it had to do with the timing of
8 the -- of the mailing; is that one of issues?
9    A. Had to do with the definition of a paid claim.
12:02 10        MR. WALRAVEN: Objection, nonresponsive.
11    Q. (By Mr. Walraven) Was the timing of the mailing an
12 issue, as you understand it?
13    A. Yes.
14    Q. And what should have been done different with respect
12:02 15 to the timing of the mailing?
16        MS. HEGLAND: Objection, vague.
17    A. The claim should have been paid within the contract
18 period.
19    Q. (By Mr. Walraven) And that's not exactly what I
12:02 20 asked. Are you telling me the check should have been mailed by
21 the date specified in the contract?
22    A. I said the claim should have been paid.
23    Q. Is one of the issues the fact that the check should
24 have been mailed?
12:03 25    A. That's part of an issue.

Case 1:03-cv-00047    Document 27    Filed in TXSD on 09/04/2003    Page 40 of 74

Roy F. Hutchison                     Multi-Page™              San Benito vs. Companion
8/13/03

Page 77

1  Q. Okay. I'm just trying to do it part by part.
2  A. Okay.
3  Q. That's one of the issues. And then you mentioned the
4  funds on the account, and we'll get to that in a second. Other
5  than those two issues, that is, the date of mailing and the
6  amount in the account, are you aware of any other problems?
7  A. I'm not aware.
8  Q. Okay. That's fine. Now let's talk about funds in
9  the account. Are you aware of the specific banking
10 arrangements involved -- involving the dealing with these
11 checks?
12        MS. HEGLAND: Objection, vague.
13 A. No.
14 Q. (By Mr. Walraven) Are -- you're generally aware that
15 there are a number of different arrangements that a company can
16 have with its bank with respect to the funding of checks?
17        MS. HEGLAND: Objection --
18        MR. BUSH: Objection --
19        MS. HEGLAND: -- vague.
20        MR. BUSH: -- calls for speculation.
21        MR. WALRAVEN: I didn't ask him to speculate, I
22 asked him what he's aware of.
23 Q. (By Mr. Walraven) Are you aware that some checking
24 accounts have overdraft protection?
25 A. Yes.

Page 78

1  Q. Are you aware of what a zero balance checking account
2  is associated with a credit line?
3  A. Yes.
4  Q. Are you aware of automatic transfers between accounts
5  that can be set up with banks?
6  A. Yes.
7  Q. If the San Benito School District had set up one of
8  these arrangements to ensure that each and every single check
9  was honored the day it hit the bank or the next banking day,
10 whatever the banking rules require, would that have satisfied
11 the requirements of the agreement as you understand it?
12        MR. BUSH: Objection, it calls for speculation.
13        MS. HEGLAND: And objection, it assumes facts
14 not in evidence.
15 Q. (By Mr. Walraven) Okay. Now answer the question,
16 please.
17        MR. BUSH: But you're not to speculate.
18 A. The claims were denied because they did not meet the
19 terms of the contract.
20 Q. (By Mr. Walraven) I didn't ask that. I didn't ask
21 that. If there is an appeal of a claim, it comes to you;
22 right? You told us that.
23 A. Uh-huh.
24 Q. Right?
25 A. Yes.

Page 79

1  Q. And if a claim was denied because of a -- the nature
2  of the banking setup for funding checks and whether or not that
3  was a good funding arrangement or not, would that issue go to
4  you?
5        MR. BUSH: Objection, it calls for speculation.
6  A. I don't know.
7  Q. (By Mr. Walraven) Has that issue ever come up
8  before?
9  A. No.
10 Q. If such an issue comes -- if such an issue were to
11 come to you, and that was the only issue in determining whether
12 or not a claim should be paid, do you have an understanding
13 as -- as to what's required?
14        MR. BUSH: Objection, calls --
15 A. I don't want to speculate --
16        MR. BUSH: -- vague, and it calls for
17 speculation.
18 A. I don't want to speculate on that at all.
19 Q. (By Mr. Walraven) So as we sit here today, you don't
20 know what banking arrangements are satisfactory and what are
21 not --
22        MR. BUSH: Objection --
23 Q. (By Mr. Walraven) -- in terms of what you would do
24 with respect to stop loss claims?
25 A. Well, the --

Page 80

1        MR. BUSH: Objection, vague, calls for
2  speculation, and asked and answered.
3  A. Other than what's stated in our contract.
4  Q. (By Mr. Walraven) Does your contract talk about
5  alternative banking relations --
6  A. No.
7  Q. -- arrangements?
8  A. No.
9  Q. In your mind, does your contract answer the question
10 as to whether or not one of these alternative banking
11 arrangements is satisfactory or not?
12        MR. BUSH: Objection, the contract speaks for
13 itself.
14 A. Contract, yeah, speaks for itself.
15 Q. (By Mr. Walraven) Well, does it? Does it answer
16 these questions or not?
17 A. No, it does not.
18 Q. Okay. So somebody would have to make a call on these
19 issues that aren't answered in the contract; right?
20 A. No. No. The contract is very specific on how the
21 funding is to be done as far as what constitutes a paid claim.
22 Q. So, in your mind, the contract does provide you with
23 an answer as to what you would do if this question came to you;
24 is that what you're telling me?
25        MR. BUSH: Objection, calls for speculation.

Page 81

12:09 1    Q. (By Mr. Walraven)  I'm not asking you to speculate, I
2    just want you to explain your prior answer.
3    A. I go back and say the contract is very specific on
4    how and what constitutes a paid claim.  I would make the
12:09 5    decision based on what the contract language calls for.
6    Q. Do you recall that contract language?
7    A. I don't have it in front of me.
8    Q. I'm going to find it for you, if you like.  But if
9    you recall it, that might speed things up.  Do you recall it?
12:09 10    A. I would like to see it.
11    Q. Sure.
12        MR. WALRAVEN: Since the contract at issue in
13    this case is a marked exhibit I'm not going to attach another
14    one, with agreement of counsel.  And since I don't know --
12:09 15        MR. HEGLAND: It would be Exhibit 8.
16        MR. WALRAVEN: Is it?
17        MS. HEGLAND: Yes.
18        MR. WALRAVEN: Thank you very much.
19    Q. (By Mr. Walraven) I'm going to refer you what's been
12:10 20    previously marked as Exhibit 8, which on this particular
21    document also has the designation MBA00148 at the bottom, and
22    ask you if the definition of paid down at the bottom of that is
23    the language you were thinking of.
24        MS. HEGLAND: It's a different Bate number in
12:10 25    the exhibit.  Do you want to look at it?

Page 82

12:10 1        MR. WALRAVEN: I don't know.  Do you have any
2    concern?  Well...
3    Q. (By Mr. Walraven)  Just for the record I'm going to
4    show you what's been marked as the third page of what we've
12:10 5    marked as exhibit -- no, it's not the third page.  One, two,
6    three, four, fifth page of Exhibit 8, which has a number at the
7    bottom CL0068.  Do you see that?
8    A. Yes.
9    Q. Same page?
12:11 10    A. Yes.
11    Q. Is that the language you were thinking of?
12    A. Yes.
13    Q. Is there any other language in the contract that you
14    would go to to answer these questions concerning banking
12:11 15    arrangements?
16    A. No.
17    Q. And feel free to look at any of these documents in
18    front of you.  From looking at these documents, can you tell me
19    what you would do if there was an appeal of a claim concerning
12:11 20    the denial of the claim based on banking arrangements?
21        MR. BUSH: Objection, calls for speculation.
22        MS. HEGLAND: And objection, assumes facts not
23    in evidence.
24    A. I'm not sure what you're really asking either.
12:11 25    Q. (By Mr. Walraven)  I'm asking, do you have enough

Page 83

12:12 1    information now to answer a question like that, now that you
2    have the language in front of you?
3        MR. BUSH: And I would caution the witness not
4    to speculate.
12:12 5    A. I don't want to speculate on this.
6    Q. (By Mr. Walraven)  I'm not asking you to speculate.
7    A minute ago you told me that to deal with this question you'd
8    want to look at the contract.
9    A. Right.
12:12 10    Q. And I've shown you the contract.
11    A. Uh-huh.
12    Q. And I'm asking you if you now have enough to deal
13    with this question, or is there something else you need --
14        MR. BUSH: And it --
12:12 15    Q. (By Mr. Walraven) -- or would like to have?
16        MR. BUSH: And it requires speculation on the
17    witness' part to answer such a hypothetical that is not in
18    evidence in this case as to any type of banking arrangement the
19    district may have, nor -- nor has it been admitted into
12:12 20    evidence that that was any basis for denying the claim.
21        MR. WALRAVEN: I thought he just testified it
22    was a basis for denying the claim, but perhaps I'm mistaken.
23    Q. (By Mr. Walraven) Did the banking situation for the
24    San Benito School District have anything to do with the denial
12:13 25    of this claim?

Page 84

12:13 1        MR. BUSH: Objection, vague.
2    Q. (By Mr. Walraven)  To your knowledge?
3    A. Not to my knowledge.
4    Q. So this claim wasn't denied because of the school
12:13 5    district's monies and in what account they were located?
6    A. No.
7    Q. So we're back to the fact that this claim was denied
8    because of the dates the checks were placed in the mail; right?
9    A. The claim was denied based upon the wording in our
12:13 10    contract that constitutes a paid claim.
11    Q. Okay.  And -- and read for me the words that set
12    forth the requirements that you do not believe were satisfied,
13    and leave out those words that you believe were satisfied.
14    A. Okay.  I'm going to quote from our contract.
12:14 15    Q. I want you to read the specific words from the
16    contract that you believe were not satisfied in this case.
17    A. And what I'm going to do is read the full section of
18    the contract that -- that deals with this.
19    Q. Well, I've already asked you about some of that, and
12:14 20    there were checks and they were placed in the mail; right?
21        MR. BUSH: Objection --
22        MS. HEGLAND: Objection --
23        MR. BUSH: -- assumes facts not in evidence.
24        MS. HEGLAND: And calls for speculation.
12:14 25    A. I'm not aware.

Case 1:03-cv-00047    Document 27    Filed in TXSD on 09/04/2003    Page 42 of 74

Roy F. Hutchison                          Multi-Page                San Benito vs. Companion
8/13/03

Page 85

1  Q. (By Mr. Walraven) Have you seen the audit that was
2  done on this matter?
3  A. Yes.
4  Q. You know there was an audit?
5  A. Yes.
6  Q. You know the audit looked at bank records?
7  A. Yes.
8  Q. You know the audit shows dates the checks were placed
9  in the mail?
10  A. Well, you're asking me did I recall that? I don't
11  necessarily recall that specific item, but if you say --
12  Q. I mean --
13  A. -- it states that --
14  Q. -- I'm just trying to narrow this down to what this
15  lawsuit's really about.
16  A. Okay.
17  Q. And my understanding is there's not a question that
18  the checks were placed in the mail, it has to do with when they
19  were placed in the mail, but if there's a problem that I'm
20  missing I'd like to hear about it.
21  A. It says --
22  Q. And that's what I'm asking.
23  A. Well, let's look at this. Said, "Payment will be
24  deemed made on the date that both, one, the payor directly
25  tenders payment by mailing or otherwise delivering a draft or

Page 86

1  check; and, two, the account upon which payment is drawn
2  contains and continues to contain sufficient funds to permit
3  the check or draft to be honored."
4  Q. Okay. And what part of those requirements were not
5  met, as you understand it?
6  A. I don't understand any of them were met.
7  Q. So you don't know if checks were mailed, you don't
8  know when they were mailed, you don't know what the account
9  balances were, you don't have any of that information; correct?
10  MS. HEGLAND: Objection, misstates the witness'
11  prior testimony.
12  Q. (By Mr. Walraven) Or -- or is it your belief that
13  none of those requirements were met?
14  A. It's my belief that none of them were met.
15  Q. So the checks were never even written, as far as --
16  as you believe.
17  MR. BUSH: Objection --
18  A. That's not what you asked.
19  Q. (By Mr. Walraven) Well, writing a check is part of
20  the requirement; correct?
21  A. Let me read this again. "Payment will be deemed made
22  on the date that both, one, the payor directly tenders the
23  payment by mailing or otherwise delivering a draft or a check;
24  and two, the account upon which the payment is drawn contains
25  and continues to contain sufficient funds to permit the check

Page 87

1  or draft to be honored."
2  Q. (By Mr. Walraven) Were checks or drafts ever
3  prepared, is that one of the requirements?
4  A. I don't know.
5  Q. Do you know if that's one of the reasons the claim
6  was denied?
7  A. The claim was denied based on what I have stated here
8  that the checks were not tendered by mailing or otherwise
9  delivering, and the amount in account was not sufficient to
10  permit the checks or draft to be honored.
11  Q. Okay. So it's your understanding that not a single
12  portion of that paragraph was satisfied; is that what you're
13  saying?
14  A. That's my understanding.
15  MR. WALRAVEN: Thank you. We are at the end of
16  a tape, so we're going to take a break.
17  THE VIDEOGRAPHER: Off the record, 12:14 p.m.
18  (Recess from 12:14 p.m. to 12:23 p.m.)
19  THE VIDEOGRAPHER: Back on the record,
20  12:23 p.m.
21  Q. (By Mr. Walraven) Before the break we were
22  discussing how you would go about your role in addressing some
23  claims questions, and I'd like to ask it a different question,
24  and that is -- well, let's go back a step. Generally these
25  claims administration questions are the responsibility of the

Page 88

1  MOU like J. Allan Hall; correct?
2  A. Correct.
3  MS. HEGLAND: Objection, vague.
4  A. When you say claims administration?
5  Q. (By Mr. Walraven) Yes. Claims issues.
6  A. What did... You know --
7  MS. HEGLAND: Objection, vague.
8  A. You know, I would ask you, what issues are you
9  referring to?
10  Q. (By Mr. Walraven) Well, one we were talking about
11  had to do with banking arrangements. But, I mean, generally
12  claims decisions, when to pay, what to pay, how much to pay,
13  are the responsibility of the MOU; correct?
14  MS. HEGLAND: Objection, vague.
15  Q. (By Mr. Walraven) As you understand the
16  relationship?
17  MS. HEGLAND: Objection, vague; and the contract
18  speaks for itself.
19  A. I would say that the MOU agreement speaks for itself.
20  Q. (By Mr. Walraven) Do you have an understanding as to
21  who is initially responsible for making decisions concerning
22  the acceptance or denial of claims such as the denial of claims
23  in this case as between J. Allan Hall and Companion Life?
24  MS. HEGLAND: Objection, the contract speaks for
25  itself.

# Page 89

12:28 1     Q. (By Mr. Walraven) I didn't ask that, I asked if you
2   had an understanding.
3     A. Yes, J. Allan Hall.
4     Q. And with respect to executing or fulfilling that
12:29 5   responsibility, does J. Allan Hall have any discretion?
6        MR. BUSH. Objection, vague.
7     A. I'm not going to speculate on that. I mean, I'm just
8   not going to speculate on that.
9     Q. (By Mr. Walraven) Well, I'm really not asking you to
12:29 10   speculate. Does — I mean, you're familiar with what it is you
11   expect your MGUs to do; right? I mean, that's part of your
12   job, isn't it?
13     A. As contained in our MGU agreement, yes.
14     Q. And I just wondered if, in your responsibility for
12:30 15   overseeing those relationships, you believe that J. Allan Hall
16   had any response — any — I'm sorry, let me start over — you
17   believed that J. Allan Hall had any discretion with respect to
18   paying claims?
19        MR. BUSH: Objection, vague.
12:30 20     A. I don't — I really do not understand that question.
21     Q. (By Mr. Walraven) Do you know Mr. Larry Blagg?
22     A. Yes.
23     Q. Have you seen a copy of his deposition?
24     A. No.
12:30 25     Q. He gave some testimony more or less to the effect

# Page 90

12:30 1   that he criticized North Shore in their handling and processing
2   of claims as being too picky. You haven't seen it, I'm just
3   going to ask you to — to accept that he said that.
4        MR. BUSH: I'm going to object to the extent
12:30 5   that it might mischaracterize his testimony.
6     Q. (By Mr. Walraven) Which leads me to believe that
7   with respect to certain issues there is some discretion on when
8   to pay a claim and when not to pay a claim or when to
9   investigate a claim or how much information to collect before
12:31 10   paying a claim. And I just wondered if you saw it the way he
11   did.
12        MS. HEGLAND: Objection, vague, misstates —
13   misstates the evidence in this case, and calls for speculation.
14     Q. (By Mr. Walraven) I don't think any of those had
12:31 15   anything to do with my question, but go ahead and answer it.
16     A. Rephrase your question.
17     Q. Sure. Does an MGU have any discretion with respect
18   to which claims are paid and which claims are denied, in your
19   understanding of the relationship?
12:32 20        MR. BUSH: Objection, vague.
21     A. That's — that's vague. I'm not going to answer
22   that.
23     Q. (By Mr. Walraven) Okay. What about it's vague?
24     A. In the total sense of the term "vague," it's vague.
12:32 25     Q. Well, let me ask a more specific question. Does an

# Page 91

12:32 1   MGU have discretion to evaluate different banking arrangements
2   and determine whether or not they satisfy the requirements of
3   the policy?
4        MR. BUSH: Objection, calls for speculation.
12:32 5        MS. HEGLAND: And objection, vague.
6     A. The MGU is charged with the responsibility paying
7   claims based upon the stop loss contract.
8     Q. (By Mr. Walraven) Well, under the stop loss contract
9   some issues may be black and white. Are you telling me that
12:33 10   there are never any issues that are gray? There are issues
11   that sometimes are in gray areas that require some
12   interpretation; right? And I'm just trying to find out who
13   does it, whose job it is.
14     A. It would be — to answer your question, who
12:33 15   interprets gray areas?
16     Q. Yes.
17     A. I guess it's a combination of people.
18     Q. And — and combination of who?
19     A. Well, J. Allan Hall would be one, carrier would be
12:33 20   one.
21     Q. And does J. Allan Hall have authority to do that
22   without consulting Companion Life?
23     A. No.
24     Q. Are you familiar with a concept under stop loss
12:34 25   insurance known as advance funding?

# Page 92

12:34 1     A. Yes.
2     Q. Tell me your understanding of that term.
3     A. It's a procedure whereby the carrier, to aid the cash
4   flow of the insurer or policyholder, that we speed up the
12:34 5   payment of a claim.
6     Q. And is that a feature offered in connection with
7   Companion Life's stop loss insurance policies sold through
8   J. Allan Hall?
9     A. It's — it's offered on a case-by-case, it's not a
12:35 10   general thing that we offer, that everybody offers.
11     Q. Is it something — but it is something you offer.
12     A. It's something we have available.
13     Q. And it's available to any insured who otherwise
14   qualifies, meets your underwriting requirements for a policy of
12:35 15   stop loss insurance?
16     A. You know, the MGU may set certain qualifications
17   which would not — which would preclude someone from
18   qualifying. Generally it's designed for smaller employers.
19     Q. And when you say smaller, who do you mean?
12:35 20     A. Oh, 100 lives, 150 lives, 75 lives, those folks that
21   have difficulty in funding a large claim.
22     Q. And does this feature affect the premium charged?
23     A. There is a separate charge for that, yes.
24     Q. And what is that separate charge, as you understand
12:36 25   it, if you know?

Case 1:03-cv-00047   Document 27   Filed in TXSD on 09/04/2003   Page 44 of 74

Roy F. Hutchison                    Multi-Page                San Benito vs. Companion
8/13/03

## Page 93

1   A. It varies.

2   Q. From what to what?

3   A. I don't know, from a dollar to a dollar and a half to

4   two dollars to maybe 50 cents.

5   Q. And are there ever any circumstances when it's added

6   as a feature at no charge, that you're aware of?

7   A. Not that I'm aware of.

8   Q. Would that be something that would be handled by the

9   MGU?

10   MR. BUSH: Objection, vague.

11   A. What -- what's --

12   MR. BUSH: A situation where it's no charge?

13   Q. (By Mr. Walraven) Yeah, assuming that -- that there

14   is a decision to be made between zero and 50 cents and a dollar

15   or whatever it is, who decides?

16   A. Well, we have a policy that they must charge for

17   that.

18   Q. Is that policy in writing?

19   A. I believe so.

20   Q. And how long has it been in writing?

21   A. Well, are you asking me as it relates to J. Allan

22   Hall or are you asking as it relates to our other MGUs or -- I

23   mean --

24   Q. Okay. Since that seems to make a difference, I'll be

25   happy to narrow it down. I'm talking about as it applies to

## Page 94

1   J. Allan Hall.

2   A. To J. Allan -- J. Allan Hall, J. Allan Hall has

3   always been -- has not always offered the specific advance, has

4   not always been a item that he's made available to his TPAs.

5   Q. Okay. But I need to go back to my question which

6   was: Is there something in writing dealing with the pricing of

7   specific advance funding as regards J. Allan Hall?

8   A. Yes, I believe there is, I -- I believe.

9   Q. And do you know how long there has been?

10   A. It's been since he's offered advance funding.

11   Q. And do you know how long ago or for what period of

12   time he's been offering that?

13   A. I think it started, and I'm speculating, I'm not

14   absolutely sure, but sometime in 2001, 2002, somewhere in that

15   range, if I recall seeing those memos on that.

16   Q. Anything else in writing -- well, before I ask that.

17   What would the piece of paper that you're referring to be

18   called?

19   A. Oh, it would probably just be in a e-mail or a memo

20   from me. Instructing him to charge for that? Yes.

21   Q. Do you know what prompted the need for that

22   communication?

23   A. He started offering advance specific.

24   Q. Okay. Do you know if he was offering it at no charge

25   and you said, hey, you got to charge for this?

## Page 95

1   A. No.

2   Q. Do you know of any of those --

3   A. No.

4   Q. -- circumstances?

5   A. No, no.

6   Q. Do you know that you can -- whether or not you can

7   rule out such an event happening?

8   A. I can say very categorically he was not offering

9   Companion Life specific advance.

10   Q. Okay. And how can you say that?

11   A. I saw no evidence of it.

12   Q. Well, I mean, you certainly don't know what Mr. Hall

13   was telling the people orally he was dealing with, and I just

14   wondered how those issues would come to your attention.

15   A. What's your question?

16   Q. Yeah. You say you can state categorically he wasn't

17   offering it, and I just want to know how you get there.

18   A. He was not making it part of the stop loss contract,

19   he was not pricing for it, he did not have, as far as I know,

20   the authority to offer it. Other than that, I -- you know, I

21   can't go beyond that.

22   Q. And -- and other than this e-mail or memo that you

23   referred to, what other documents would there be concerning

24   pricing or authority or offering?

25   A. Well, I believe we have a -- a rider that he issues

## Page 96

1   as part of the stop loss contract.

2   Q. Do you know if any specific advance funding was

3   offered prior to the use of this rider?

4   A. By J. Allan Hall or --

5   Q. Yes.

6   A. No.

7   Q. You don't know or you don't believe it was offered?

8   A. I don't believe it was.

9   Q. If it had been offered prior to the use of this rider

10   without the use of this rider, would that be a violation of any

11   policy or agreement or anything?

12   MS. HEGLAND: Objection, calls for speculation,

13   and assumes facts not in evidence.

14   MR. WALRAVEN: Oh, that's very much in evidence.

15   MS. HEGLAND: Object to sidebar.

16   A. If -- if J. Allan had been offering it and had made

17   it a part of the contract that he -- the stop loss contract,

18   then I would have known about it. Now, are you asking me to

19   speak to J. Allan Hall's conversations globally? I can't speak

20   to that.

21   Q. (By Mr. Walraven) Counsel for J. Allan Hall

22   introduced at one of the depositions in this case a copy of a

23   Companion Life J. Allan Hall stop loss policy that provided

24   advance funding or had a reference to specific advance funding

25   and had a charge for specific advance funding but did not

Page 97

12:41 1  include the rider.
     2      A. Okay.
     3      Q. Were you aware of that?
     4      A. That J. Allan Hall had issued?
12:41 5      Q. Yes.
     6      A. Was it otherwise noted someplace in the contract?
     7      Q. There was -- there were the words "specific advance
     8  funding" contained in there. I don't want to, you know, get in
     9  an argument as to --
12:41 10     A. Well --
    11      Q. -- exactly how it was done, because I don't --
    12      A. There was a period of time that that is how it was
    13  denoted in the stop loss contract, and it was written in a
    14  specific area, and I don't -- I assume that it was written in
12:41 15  this specific area to denote specific advance.
    16      MR. WALRAVEN: Can I borrow Exhibit 8? No.
    17      MS. HEGLAND: What do you need?
    18      MR. WALRAVEN: Exhibit 8? I may need that,
    19  too. Thank you.
12:42 20     Q. (By Mr. Walraven) I show you what's been marked as
    21  Exhibit 8, which was previously referred to as the San Benito
    22  policy. Can you point to or identify the page in there where
    23  this notation you've been referring to would be found? And
    24  I -- and I don't want to make it a trick question. We have
12:42 25  another policy --

Page 98

12:42 1      MR. BUSH: Yes, you do.
     2      Q. (By Mr. Walraven) -- which --
     3      MR. WALRAVEN: Not this time, as you will see by
     4  my context.
12:43 5      Q. (By Mr. Walraven) I want to show you another
     6  agreement, which is the one I was mentioning earlier that had
     7  it on there, and I'll show you where the words are. And --
     8      MR. BUSH: Just for the record, you're --
     9      MR. WALRAVEN: Referring to --
12:43 10     MR. BUSH: -- handing the witness --
    11      MR. WALRAVEN: -- 44.
    12      MR. BUSH: -- Exhibit No. 44? Do you have the
    13  whole contract?
    14      MR. WALRAVEN: I'm going to hand him the rest of
12:43 15  it, yes.
    16      MR. BUSH: Okay.
    17      MR. WALRAVEN: I was just shuffling through
    18  trying to sort it out and make sure I didn't get it out of
    19  order.
12:43 20     MR. BUSH: Feel free to look at it before you
    21  answer any questions.
    22      A. Now, is there -- what is your question?
    23      Q. (By Mr. Walraven) My question has to do with simply
    24  the matter of the Companion Life form --
12:44 25     A. Uh-huh.

Page 99

12:44 1      Q. -- and that is, where does one look on the Companion
     2  Life form to find this notation that you referenced a moment
     3  ago?
     4      A. Okay. One of the areas would be the Special Risk
12:44 5  Limitations, which is shown here on this contract that you
     6  provided me or is currently available.
     7      Q. And -- and you're pointing to Section 9 --
     8      A. 9.
     9      Q. -- labeled Special --
12:44 10     A. Special Risk Limitations, yes.
    11      Q. On a part of Exhibit 44 that bears the number
    12  JAH002215?
    13      A. Yes.
    14      Q. Correct?
12:44 15     A. Yes.
    16      Q. And --
    17      MR. BUSH: It's page 3 of the policy.
    18      MR. WALRAVEN: Ah, it has 3 at the bottom.
    19      MR. BUSH: Yeah.
12:44 20     Q. (By Mr. Walraven) And going back to Exhibit 8, there
    21  is also a Section 9 labeled Special Risk Limitations, which on
    22  that form I think is page -- what is the page number there at
    23  the bottom?
    24      A. Page 3, Section 9, Special Risk Limitations. And
12:45 25  it --

Page 100

12:45 1      Q. And is that the place you'd go to look to find that
     2  notation you referenced?
     3      A. Yes.
     4      Q. Are there any other places you'd look?
12:45 5      A. We do have a rider from time to time that we place on
     6  there that -- which I spoke to earlier.
     7      Q. But you were describing the situation that --
     8      A. This -- this is where it would be prior to our coming
     9  up with the -- with the special rider.
12:45 10     Q. Do you know when you came up with that special rider?
    11      A. Not off the top of my head, no.
    12      Q. Do you know why you came up with that special rider?
    13      A. I really don't. I mean, there had to be some reason
    14  we did it, but I really don't know why.
12:45 15     Q. Does the section labeled Special Risk Limitations
    16  have other uses?
    17      A. Yes, it does.
    18      Q. For example, what?
    19      A. Oh, if the term -- anything that would be different
12:46 20  from -- oh, special health questions, I mean, people who have
    21  special health risks would also --
    22      Q. If you were lasering a particular --
    23      A. A Lasering, that would probably be in there also.
    24      Q. Anything else that you can think of that goes in
12:46 25  there?

Roy F. Hutchison
8/13/03
Multi-Page™
San Benito vs. Companion

---

Page 101

12:46 1    A. Not that I -- comes to mind. I'm sure there's some

2 others, but it just -- I don't know exactly

3    Q. But that's generally the primary use for that

4 section --

12:46 5    A. Right.

6    Q. -- as you understand it?

7    A. Right.

8    Q. Have there been any other changes in connection with

9 providing specific advance funding, other than the ones you've

12:46 10 mentioned?

11    A. I'm not sure I --

12    Q. You mentioned an e-mail and communication on pricing,

13 you've mentioned a special rider that came into use. I just

14 wondered if there have been any other changes in procedures in

12:46 15 connection with specific advance funding in the last five

16 years, for example.

17    A. Not that I'm aware of.

18    Q. There was some testimony at another deposition about

19 some changes in procedures that have come about in the last few

12:47 20 years. I'm not asking you to comment about that, I'm asking

21 you a narrower question, and that is, does Companion Life do

22 anything different with respect to the way it offers or handles

23 or deals with specific advance funding from the way they did

24 it, say, four years ago?

12:47 25      MR. BUSH: Objection, vague.

---

Page 102

12:47 1    A. I have -- I'm not sure really how to respond to that.

2 You know, do I know if specifically four years -- I didn't know

3 what we were doing four years ago, I'd have to look back and

4 look and see. I don't know.

12:48 5    Q. (By Mr. Walraven) I mean, are there any different

6 guidelines or forms provided for the use by the insured or a

7 TPA or --

8    A. No. No. Not that I'm aware of.

9    Q. Any additional instructions or e-mails or memos given

12:48 10 to MGUs about handling --

11    A. No.

12    Q. -- claims under --

13    A. No.

14    Q. Going back to the relationship with J. Allan Hall.

12:48 15 There's been some testimony in this case about meetings that

16 Mr. Hall himself attended and what he said about the products

17 that he was offering on behalf of Companion Life. Have you

18 heard about that?

19    A. I think I've probably read somewhere in the material,

12:49 20 yes.

21    Q. Well, let me ask it in the form of a hypothetical.

22 If Mr. Hall made certain promises or commitments about the

23 Companion Life stop loss insurance, would those oral

24 commitments be something that you would expect Companion Life

12:49 25 to honor?

---

Page 103

12:49 1    A. I'm not going to --

2      MR. BUSH: Objection --

3    A. -- speculate on that at all. I'm not going to

4 speculate on that.

12:49 5    Q. (By Mr. Walraven) So you don't have any opinion on

6 whether or not statements made by Mr. Hall on behalf of

7 Companion Life are something that Companion Life should

8 consider honoring?

9      MR. BUSH: Objection, it's vague, calls for

12:50 10 speculation.

11      MS. HEGLAND: And assumes facts not in evidence.

12    A. I'm -- I'm not going to speculate on that. I mean,

13 that -- that is broad, broad, broad.

14    Q. (By Mr. Walraven) Well, let me ask it a little

12:50 15 narrower. Suppose Mr. Hall made some commitments or promises

16 about the availability of specific advance funding on Companion

17 Life policies. Would those specific commitments be something

18 that you would expect Companion Life to honor?

19      MR. BUSH: Objection, calls for speculation.

12:50 20    A. I'm not going to speculate.

21    Q. (By Mr. Walraven) Are you aware that there's

22 testimony in this case that Mr. Hall did make such statements?

23      MS. HEGLAND: Objection --

24      MR. BUSH: Objection --

12:50 25      MS. HEGLAND: -- vague.

---

Page 104

12:50 1      MR. BUSH: And misstates previous testimony in

2 this case. Are you asking is he aware if there is testimony

3 or --

4      MR. WALRAVEN: Yes.

12:51 5      MR. BUSH: -- is he aware --

6    Q. (By Mr. Walraven) Are you aware --

7      MR. BUSH: -- that there is testimony?

8    Q. (By Mr. Walraven) Are you aware of testimony

9 concerning statements made by Mr. Hall concerning specific

12:51 10 advance funding?

11      MS. HEGLAND: Objection, vague.

12    A. I'm only aware of what I've seen, you know, in the

13 testimony or -- or allegations or whatever.

14    Q. (By Mr. Walraven) So you're aware that there's some

12:51 15 testimony on the subject; correct?

16    A. Yes, yes.

17    Q. Do you as the person responsible at Companion Life

18 feel that such statements could or should have any impact on

19 what Companion Life should do?

12:51 20    A. I'm not going to -- I'm not going to speculate on

21 that at all.

22    Q. You're just refusing to answer. You don't have an

23 opinion?

24      MR. BUSH: Objection, asked and answered. Said

12:52 25 he wasn't going to speculate.

---

| Page 105 | Page 107 |
|---|---|

**Page 105**

12:52 1  MR. WALRAVEN: Let me object as nonresponsive.

2  Q. (By Mr. Walraven) You do consider that Mr. Hall and

3  J. Allan Hall as representatives of Companion Life with respect

4  to marketing Companion Life products; correct?

12:52 5  A. That's part of Mr. Hall's responsibility, yes.

6  Q. As we touched on briefly earlier, you are aware that

7  a renewal proposal was made by Companion Life and J. Allan Hall

8  to San Benito School District for the 2001-2002 policy year?

9  A. Are you asking me in what context do I have that --

12:53 10  Q. Are you aware there was a proposal made?

11  A. I'm aware from reading the information that there was

12  a proposal made, yes.

13  Q. Do you have an understanding as to whether or not the

14  claims at issue in this case would have been paid under that

12:53 15  renewal policy, would have been reimbursed by Companion Life to

16  the school district?

17  MR. BUSH: Objection, vague.

18  A. And that really calls for speculation there.

19  Q. (By Mr. Walraven) Well, I just asked if you had an

12:53 20  understanding.

21  A. No.

22  Q. And if you don't --

23  A. No.

24  Q. -- you don't.

12:53 25  A. No, I don't. No. No.

**Page 106**

12:53 1  Q. Do you have an understanding as to what the TPA did

2  in connection with the processing of these claims?

3  A. No.

4  MR. BUSH: Objection, vague.

12:54 5  Q. (By Mr. Walraven) Are you aware of anything that --

6  that the people at MBA did wrong or that you would criticize?

7  A. Obviously the claims were not paid in accordance with

8  our contract.

9  Q. Is that something you're critical of?

12:54 10  A. Well, yes.

11  Q. And the -- and the things that you're critical of are

12  the same issues we talked about earlier, having to do with the

13  processing and mailing of the checks and the funds and that

14  sort of thing.

12:54 15  A. And the fact that they did not pay the claims in

16  accordance with the provisions in our contract, that's correct.

17  Q. I wondered if there's something else that you're

18  referring to now that we haven't already talked about.

19  A. No.

12:55 20  Q. Do you have any criticism of anything J. Allan Hall

21  has done in connection with this case or this claim?

22  A. No.

23  Q. You think they -- they did a first-rate job?

24  A. To my knowledge, yes.

12:55 25  Q. Okay. You understand that they've changed the way

**Page 107**

12:55 1  they do business as a result of this claim.

2  MR. BUSH: Objection, that mischaracterizes any

3  testimony in this case, it assumes facts not in evidence.

4  A. No.

12:55 5  Q. (By Mr. Walraven) You're not aware of that?

6  A. No.

7  Q. And if they did make changes, you wouldn't have any

8  information as to why; is that correct?

9  MS. HEGLAND: Objection, assumes facts not in

12:55 10  evidence.

11  A. I don't know where you're headed with this at all. I

12  mean, I -- I'm not aware that they made any changes

13  specifically or other related to the San Benito case.

14  Q. (By Mr. Walraven) Well, Mr. Larry Blagg we've

12:56 15  already referred to gave some testimony on this subject, and I

16  just wondered if you had any knowledge --

17  A. No.

18  Q. -- on this subject.

19  MR. BUSH: Objection --

12:56 20  A. I do not have knowledge.

21  MR. BUSH: -- that mischaracterizes Mr. Blagg's

22  testimony.

23  Q. (By Mr. Walraven) We have spoken about the appeal

24  process and your role in the appeal process and Mr. Wythe's

12:56 25  role in the appeal process. And when such an appeal happened,

**Page 108**

12:56 1  if it did happen in this case, what sort of documents are

2  generated at Companion Life?

3  A. That Companion Life generates?

4  Q. Yes.

12:56 5  A. We generally don't generate any documents.

6  Q. If an appeal of a denial comes to your attention, do

7  you have a -- set up a file on it?

8  A. Yes, we do.

9  Q. And what goes in that file?

12:57 10  A. Generally the information that we requested from the

11  MGU.

12  Q. Is there any information concerning any notes or

13  anything that you might have generated?

14  A. Only to the extent whether we advise the MGU to

12:57 15  uphold the appeal or not.

16  Q. And would that generally be in writing?

17  A. Generally so, yes.

18  Q. Would there be any written communications between you

19  and Mr. Wythe, for example?

12:57 20  A. Possibly.

21  Q. Has there been any search made for such documents in

22  connection with the San Benito claims?

23  A. Specifically as it relates to Mr. Wythe and myself?

24  Q. Or anything at Companion Life dealing with this

12:57 25  claim --

Case 1:03-cv-00047    Document 27    Filed in TXSD on 09/04/2003    Page 48 of 74

Roy F. Hutchison                    Multi-Page™              San Benito vs. Companion
8/13/03

## Page 109

1  A. The only thing I can --

2  Q. -- any internally-generated documents.

3  A. The only thing I can say, we've only provided what's

4  been asked for, so --

5  Q. Well, I'm -- I understand that, I'm just -- might be

6  something that wasn't asked for. Is there anything else

7  dealing with this claim that would have been --

8  A. Have we done -- have we torn our files apart to look

9  for things related to this claim? No, we haven't. Have we

10 discussed this claim? No, we really haven't.

11  Q. Is there a file set up specific to this claim?

12  A. Yes, there is.

13  Q. And would Mr. Wythe have a claim on it separate from

14 what you have?

15  A. No.

16  Q. If Mr. Wythe made some notes about a phone call

17 concerning this claim, where would they be?

18  A. Presumably in the file, but I can't assert that

19 that's in fact the case.

20  Q. But typically that would be where it would be filed?

21  A. Typically, yes.

22  Q. If there were e-mails -- would there be e-mails

23 concerning an issue between you and Mr. Wythe?

24  A. Possibly.

25  Q. Would there be e-mails with anyone else at Companion

## Page 110

1  Life concerning an issue like this?

2  A. Not that I'm aware of. Possibly, but I'm not aware

3  of specifically on this case, and generally there's not.

4  Q. Generally only you and Mr. Wythe --

5  A. Right, yeah.

6  Q. But do you typically communicate by e-mail on -- on

7  appeals of claim denials?

8  A. Some instances we do and some we don't.

9  Q. Do you know whether there's been any search for such

10 e-mails?

11  A. No, there has not been.

12  Q. Has there been any communication with any reinsurers

13 in connection with the San Benito claims?

14  A. Yes.

15      MR. BUSH: I'm going to object to any

16 questioning or testimony about reinsurers; it's not listed as

17 an item on the deposition notice, and further, it's

18 confidential and proprietary information.

19  Q. (By Mr. Walraven) Can you tell me generally the

20 categories of communications that have been made?

21      MR. BUSH: With?

22      MR. WALRAVEN: Reinsurers.

23      MR. BUSH: Okay. Well, I instruct the witness

24 not to answer. Unless you can show me someplace in this notice

25 that --

## Page 111

1      MR. WALRAVEN: I think it has something to do

2  with documents. Last one on there to do with documents

3  requested.

4      MR. BUSH: To be produced at the deposition.

5  There are no documents requested in this notice.

6      MR. WALRAVEN: Okay. Well, I don't think the

7  fact that I asked him about a topic is a reason to object to

8  the question. I'm going to take this up with the court. If I

9  ask --

10      MR. BUSH: That's fine.

11      MR. WALRAVEN: -- him something --

12      MR. BUSH: I mean, that's why we have 30(b)(6)

13 deposition notice.

14      MR. WALRAVEN: You're right. And if I ask this

15 witness a question that he doesn't know the answer to and I

16 haven't specified that topic, then that's my problem, but if he

17 does know the answer to and he's here and can answer it, the

18 fact that you can't fit it exactly within those I don't think

19 is a valid objection.

20      MR. BUSH: I disagree.

21      MR. WALRAVEN: Okay. That's fine.

22      MR. BUSH: The whole purpose is --

23      MR. WALRAVEN: We're not going to resolve that

24 here.

25      MR. BUSH: -- for you to give me notice of what

## Page 112

1  you're going to ask so that I can counsel my client

2  accordingly.

3      MR. WALRAVEN: Okay.

4      MR. BUSH: But I was not given notice that you

5  were going to ask anything about any documents that we produced

6  or about any reinsurers that we might do business with, so it's

7  not going to be asked.

8      MR. WALRAVEN: Well, it is going to be asked.

9  May not be --

10      MR. BUSH: Not today.

11      MR. WALRAVEN: -- answered. It may not be

12 answered, but it is going to be asked.

13      MR. BUSH: Okay.

14      MR. WALRAVEN: And my understanding of the rules

15 is somewhat different, it's to make sure we can get the right

16 person, it is not so that you can get a preview of every

17 question I'm going to ask so that you can counsel your witness.

18 I don't understand that to be the purpose.

19      MR. BUSH: It's not a preview of every question,

20 it's a preview of the subject matter of the questions. All

21 right? And there's nothing listed in here about documents we

22 were asked to produce previously. It does say documents asked

23 to be produced at this deposition, there was no document

24 request attached to this notice, and there's nothing in here

25 about reinsurers. So you can ask all the questions you want

## Page 113

13:02 1   to, but they're not --

2      MR. WALRAVEN: Thank you.

3      MR. BUSH: -- going to be answered.

4      MR. WALRAVEN: Thank you.

13:02 5      Q. (By Mr. Walraven) Now, let's be sure we have this

6   on -- on the record. Tell me the -- just the general

7   categories of communications with reinsurers that would have to

8   do with the San Benito claims.

9      MR. BUSH: And I'm objecting, I was not provided

13:02 10   notice with this subject matter of questioning, and I'll

11   instruct the witness not to answer.

12      A. And I'll follow his --

13      Q. (By Mr. Walraven) Do you have knowledge of that

14   subject?

13:02 15      MR. BUSH: Again, I will instruct the witness

16   not to answer.

17      MR. WALRAVEN: You're not going to tell me

18   whether this man even knows about the communications?

19      MR. BUSH: No.

13:02 20      Q. (By Mr. Walraven) Do you have any information about

21   a follow-up of any kind to the audit that was done on these

22   claims?

23      A. I do not.

24      Q. Do you know whether there was any follow-up done?

13:03 25      A. Such as? I'm not sure what you mean by follow-up.

## Page 114

13:03 1      Q. In the audit there were some discussions about

2   communications between the TPA and J. Allan Hall prior to

3   purchasing this policy. Are you aware of that?

4      A. I'm aware of what's in the audit, yes, I am.

13:04 5      MR. BUSH: If you'd like to see a copy of it --

6      Q. (By Mr. Walraven) And if you'd like to see a copy of

7   it --

8      MR. BUSH: -- you're entitled to.

9      Q. (By Mr. Walraven) -- that's fine, although I wasn't

13:04 10   going to ask you about what's in there. I was going to ask you

11   if there was any further action taken to learn more about any

12   of the matters addressed in the audit, or was the audit the end

13   of the process of fact-gathering --

14      MR. BUSH: Objection, vague.

13:04 15      Q. (By Mr. Walraven) -- as you understand it?

16      MR. BUSH: Objection, vague, calls for

17   speculation.

18      A. No, I'm not aware one way or the other. I mean, it

19   would be speculation on my part what was done.

13:04 20      Q. (By Mr. Walraven) Okay. Are you -- you would be

21   aware of anything that was done by somebody at Companion Life

22   with respect to follow-up.

23      A. Correct.

24      Q. If somebody at Companion Life called Mr. Hall and

13:04 25   said, hey, what about this, you'd know about it; right?

## Page 115

13:04 1      MR. BUSH: Objection, calls for speculation.

2      A. Would I know about every phone call that they made to

3   J. Allan Hall?

4      Q. (By Mr. Walraven) About this audit and the issues

13:05 5   raised by --

6      A. I --

7      Q. -- this audit.

8      A. I may or I may not.

9      Q. Who would have made such a call other than yourself?

13:05 10      A. Mr. Wythe.

11      Q. Are you aware of whether he did anything?

12      A. I'm not aware.

13      Q. Did you do anything?

14      A. Not that I'm aware of, no.

13:05 15      Q. Are you aware of whether anyone did anything after

16   the audit report was prepared to learn additional facts?

17      MR. BUSH: Objection, vague.

18      A. Such as? What do we -- you know --

19      Q. (By Mr. Walraven) Did anybody call someone up and

13:05 20   say, hey, what do you remember about this, or do you have any

21   documents about this --

22      MR. BUSH: Objection, vague.

23      Q. (By Mr. Walraven) -- or are you aware of any further

24   investigation that was done?

13:05 25      A. Basically we asked for, you know, the -- the

## Page 116

13:05 1   documentation that J. Allan Hall had on hand, and we assumed

2   that that was the documentation relating to the -- to the

3   claim.

4      Q. So after the audit came in you did ask J. Allan Hall

13:06 5   for some additional documentation?

6      A. Only as it relates to the appeal process and

7   providing us with documentation that he normally would in the

8   appeal process, not additional documentation.

9      Q. What -- what documents would you have asked for after

13:06 10   the audit?

11      A. I don't know.

12      MR. BUSH: Objection, vague.

13      A. I don't know.

14      Q. (By Mr. Walraven) Well, you said there were some

13:06 15   documents that are normally provided or normally --

16      A. I said --

17      Q. -- asked for.

18      A. -- normally provided with the appeal process, and

19   that's usually the claims file.

13:06 20      Q. And typically what's in the claims file, other than

21   the medical records and bills?

22      A. That's typically what's in the claims file.

23      Q. Okay. Anything else that you're aware of was asked

24   for in this case?

13:06 25      A. Not that I'm aware of.

## Page 117

1  MR. WALRAVEN: Mr. Hutchison, I may be at or
2  very near the end, so I'm going to thank you very much for your
3  patience, and pass the witness.
4  THE WITNESS: Thank you, sir.
5  MR. OLVERA: Let me get hooked up here.
6  THE WITNESS: I think you caught him by
7  surprise.
8  EXAMINATION
9  BY MR. OLVERA:
10  Q.  Good afternoon, Mr. Hutchison.  My name is Rolly
11  Olvera, and as I stated in the introduction, I'm here
12  representing MBA of Wyoming, Inc., and a very long name by the
13  name of Managed Administrator and Insurance Consultants, Inc.
14  And for the sake of convenience, I'll either refer to those two
15  entities as MBA or as the TPA.  Is that understood, sir?
16  A.  Yes.
17  Q.  All right.  And -- and let me -- let me advise you,
18  I'll keep this to a minimum, I don't plan on being here much
19  longer, sir.
20  Counsel for the plaintiff was asking you about
21  any complaints or criticisms that you have of MBA.  And if I'm
22  not mistaken, you mentioned that your complaint was that the
23  claims were not paid in accordance with the contract.  Is that
24  correct, sir?
25  A.  Yes, he did say -- asked me, and I said the claims

## Page 118

1  were not paid in accordance with the contract.
2  Q.  All right.  And let -- let me -- let me make sure I'm
3  sure on that line of questioning, because I wasn't clear as to
4  who that complaint was geared to.  Do you -- or I should say,
5  does Companion Life has -- have any specific complaints against
6  MBA or the TPA in this case?
7  MR. BUSH: Could I object as to I guess the --
8  how you're defining complaint.
9  MR. OLVERA: Well, once again, I'm just
10  following up on a line of questioning.  And I don't --
11  Q.  (By Mr. Olvera)  It's my understanding that counsel
12  for the plaintiff asked you if you had any complaints or
13  criticisms.  I think or the --
14  MR. BUSH: I think he did say complaints or
15  criticisms, correct.
16  Q.  (By Mr. Olvera)  And I'm not sure -- and what I'm
17  trying to do is clarify those statements.  What complaints or
18  criticisms does Companion Life have of MBA in this case?
19  MR. BUSH: I'll object to the extent that --
20  whether it mischaracterizes his testimony.  I'm not sure that
21  it was -- the testimony was that Companion Life had criticisms,
22  or the record may actually read that this witness today would
23  criticize the TPA.
24  Q.  (By Mr. Olvera)  And that's what I'm trying to
25  clarify.  I'm not sure whether you were aiming your response to

## Page 119

1  that question to school district or policyholder or to the --
2  to MBA or the TPA, and I'm trying to clarify that, sir.
3  A.  Well, I guess I was aiming my question at whoever had
4  responsibility for not paying the claims in a timely -- in
5  accordance with our contract.
6  Q.  All right.  And -- well --
7  A.  Okay.
8  Q.  And I realize you're not an attorney, but obviously
9  the insurance policy is between the school district and the
10  insured --
11  A.  Correct.
12  Q.  -- is that correct, sir?
13  A.  Correct.
14  Q.  All right.  So the ultimate responsibility to pay the
15  claims as defined therein is the policyholder vis-a-vis the
16  school district; isn't that correct, sir?
17  MR. WALRAVEN: Objection, calls for a legal
18  conclusion.
19  Q.  (By Mr. Olvera)  You can answer the question.
20  A.  The -- yes.
21  Q.  All right.  Are you aware -- well, let me -- let me
22  rephrase that.  I believe you mentioned that you had no
23  dealings or communications with MBA at any time; is that
24  correct, sir?
25  A.  That's correct.

## Page 120

1  Q.  All right.  And you also mentioned that you had no
2  dealings or communications with either of the two Merrills, Don
3  or Phyllis Merrill --
4  A.  That's correct.
5  Q.  -- is that correct?
6  A.  Yes.
7  Q.  All right.  Do you recall having any specific
8  communications or dealings with San -- San Benito School
9  District?
10  A.  No.
11  Q.  During the course of the two policies being in
12  effect, do you recall any entity in this case requesting and
13  being allowed advance funding for the payment of a claim?
14  A.  I'm not aware of any.
15  Q.  All right.  Are you aware of any practice or
16  procedure wherein that occurred during the course of the -- the
17  two policies being in effect?
18  A.  No.
19  Q.  Okay.  Aside from the statement that the claims were
20  not paid in accordance with the contract, do you have any other
21  complaints or criticisms of MBA?
22  A.  No.
23  MR. OLVERA: Thank you, sir.  Pass the witness.
24  MR. WALRAVEN: Nothing further?  I guess -- oh.
25  MS. HEGLAND: Excuse me.

## Page 121

13:12 1                        EXAMINATION

2 BY MS. HEGLAND

3        Q.  Mr. Hutchison, my name is Roberta Hegland, and I

4 represent J. Allan Hall & Associates in this matter.  I really

13:12 5 just have one question for you.  As between J. Allan Hall &

6 Associates and Companion Life Insurance Company, with respect

7 to any claims on policies issued by Companion Life, who has the

8 ultimate authority to approve or disapprove payment of claims?

9        A.  Companion Life.

13:12 10        MS. HEGLAND:  Thank you, sir.  That's all my

11 questions.

12        MR. BUSH:  I have no questions at this time.

13        MR. WALRAVEN:  I believe we're finished.

14        THE VIDEOGRAPHER:  Off the record, 1:09 p.m.

13:12 15        (Proceedings concluded at 1:09 p.m.)

16

17

18

19

20

21

22

23

24

25

## Page 122

13:12 1        I declare under penalty of perjury that the foregoing

2 is true and correct.

3

4        ROY FRANKLIN HUTCHISON

13:12 5

6

7        SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned

8 authority, by the witness, ROY FRANKLIN HUTCHISON, on this the

9        day of              ,        .

13:12 10

11        NOTARY PUBLIC IN AND FOR

12        THE STATE OF

13

14 My Commission Expires:

15

16

17

18

19

20

21

22

23

24

25

## Page 123

13:12 1  STATE OF TEXAS

2  COUNTY OF DALLAS

3

4        REPORTER'S CERTIFICATE

13:12 5        ORAL VIDEOTAPED DEPOSITION OF ROY FRANKLIN HUTCHISON

6        AUGUST 13, 2003

7

8        I, Carol R. Odle, the undersigned Certified Shorthand

9 Reporter in and for the State of Texas, certify that the facts

13:12 10 stated in the foregoing pages are true and correct.

11        I further certify that I am neither attorney or

12 counsel for, related to, nor employed by any parties to the

13 action in which this testimony is taken and, further, that I am

14 not a relative or employee of any counsel employed by the

13:12 15 parties hereto or financially interested in the action.

16        SUBSCRIBED AND SWORN TO under my hand and seal of

17 office on this the 21st day of August, 2003.

18

19        Carol R. Odle, CSR
13 12 20        Texas CSR 1045
              Expiration:  12/31/04
21        Alliance Reporting, L.L.C
              3500 Oak Lawn Avenue
22        Suite 400
              Dallas, Texas  75219
23        (214)599-0600

24

25

| | | | | |
|---|---|---|---|---|
| **-&-** | **2002** [1] 94:14 | **98** [2] 23:4 25:15 | **advise** [2] 108:14 117:17 | **annual** [2] 42:22 43:2 |

**-&-**

**&** [10] 1:7 2:4,14,16 4:7 4:22 22:1,5 121:4,5

**-'-**

**'03** [1] 16:8
**'72** [1] 13:15
**'76** [1] 15:23
**'81** [2] 13:15,21
**'86** [1] 13:19
**'91** [2] 12:6,6
**'92** [1] 10:10
**'99-2000** [1] 57:25
**'til** [1] 6:25

**-1-**

**1** [1] 10:10
**100** [7] 34:10,10,12 35:2 35:3 44:1 92:20
**1045** [1] 123:20
**105** [2] 34:15,18
**105,000** [1] 36:22
**10:03** [2] 1:17 4:2
**117** [1] 3:6
**11:00** [2] 41:11,12
**11:12** [2] 41:12,14
**12/31/04** [1] 123:20
**121** [1] 3:7
**1250** [1] 2:4
**12:14** [2] 87:17,18
**12:23** [2] 87:18,20
**13** [2] 1:12 123:6
**13th** [1] 1:17 4:2
**150** [1] 92:20
**1717** [3] 1:20 2:9 4:11
**18** [1] 23:2
**1941** [1] 6:8
**1964** [1] 15:3
**1976** [1] 15:23
**1986** [2] 12:6,15
**1988** [1] 23:4
**1991** [1] 10:10
**1992** [3] 10:10,23,24
**1998** [3] 16:13 22:6,14
**1:09** [1] 1:17 121:14,15
**1ST** [1] 2:19

**-2-**

**20** [3] 22:18 23:2,2
**2000** [12] 2:14 16:11,13 22:22 38:17 55:12 56:24 56:25 57:22 62:5 63:15 65:12
**2000-2001** [1] 58:1
**2001** [4] 57:24 58:14,24 94:14
**2001-2002** [2] 58:2 105:8

**2002** [1] 94:14
**2003** [5] 1:12,17 4:2 123:6,17
**201** [1] 2:19
**210** [1] 2:5
**212** [1] 9:7
**214** [2] 2:10 123:23
**21st** [1] 123:17
**29063** [1] 9:9
**29223** [1] 9:10

**-3-**

**3** [1] 99:17,18,24
**30** [2] 17:25 111:12
**304-0291** [1] 2:24
**3500** [1] 123:21
**361** [1] 2:16

**-4-**

**400** [1] 123:22
**410** [1] 2:4
**412-7055** [1] 2:20
**44** [3] 98:11,12 99:11
**4600** [1] 1:20 2:9 4:11

**-5-**

**50** [2] 93:4,14
**55** [6] 3:12 5:12 7:13,16 8:4,6
**599-0600** [1] 123:23

**-6-**

**6** [3] 3:5 17:25 111:12

**-7-**

**725** [1] 2:4
**743-4500** [1] 2:10
**75** [4] 18:13,22 44:3 92:20
**75201-4605** [1] 2:10
**75219** [1] 123:22
**78209** [1] 2:5
**78401-3700** [1] 2:15
**78550** [1] 2:20

**-8-**

**8** [8] 3:12 81:15,20 82:6 97:16,18,21 99:20
**80** [2] 44:3,3
**800** [1] 2:15
**822-2018** [1] 2:5
**866-7226** [1] 2:16

**-9-**

**9** [4] 99:7,8,21,24
**95** [2] 34:14,19
**95,000** [1] 36:23
**956** [1] 2:20
**972** [1] 2:24

**98** [2] 23:4 25:15

**-A-**

**a.m** [6] 1:17 4:2 41:11,12 41:12,14
**ability** [5] 26:2 59:9 65:16,19,23
**above** [2] 32:12 35:5
**above-styled** [1] 1:16
**absent** [2] 32:14 35:11
**absolute** [1] 26:20
**absolutely** [1] 94:14
**accept** [1] 90:3
**acceptance** [1] 88:22
**accepted** [1] 58:2
**accommodate** [1] 41:5
**accordance** [7] 71:15 73:15 75:24 106:7,16 117:23 118:1 119:5 120:20
**accordingly** [1] 112:2
**account** [21] 43:4,9 44:4 54:13,14 64:2,6,9 69:25 71:20 74:3 77:4,6,9 78:1 84:5 86:1,8,24 87:9
**accounts** [2] 77:24 78:4
**acquire** [1] 17:4
**acronym** [1] 20:12
**action** [5] 1:4 4:4 114:11 123:13,15
**add** [1] 18:15
**added** [2] 18:19 93:5
**adding** [1] 5:16
**addition** [3] 40:3 46:24 74:4
**additional** [7] 5:8 17:4 38:19 102:9 115:16 116:5 116:8
**address** [4] 9:3,5,7,9
**addressed** [1] 114:12
**addressing** [1] 87:22
**adequate** [1] 43:3
**adjustments** [1] 5:19
**administer** [1] 45:24
**administered** [3] 20:6,7 22:17
**administers** [1] 21:3
**administration** [6] 21:18 46:13,14 75:13 87:25 88:4
**administrator** [1] 1:6 2:21 4:6,19 45:20,22,23 117:13
**Administrators** [7] 12:3,5,8,16 13:19 49:20 50:2
**admitted** [1] 83:19
**advance** [5] 25:15 94:3 94:7,10,23 95:9 96:2,24 96:24,25 97:7,15 101:9 101:15,23 103:16 104:10 120:13
**advertise** [1] 63:11

**advise** [2] 108:14 117:17
**advising** [1] 5:17
**advisor** [1] 69:13
**affect** [2] 65:19 92:22
**affected** [1] 65:15
**affecting** [1] 15:19
**afternoon** [1] 117:10
**again** [11] 8:3 24:11 25:4 25:7 36:9 63:9 64:13 68:11 86:21 113:15 118:9
**against** [1] 118:5
**agents** [1] 54:6
**ago** [10] 8:21 16:1,17 16:18 83:7 94:11 99:3 101:24 102:3
**agreeable** [1] 5:19
**agreed** [4] 5:13,20,21,22
**agreement** [25] 5:8 23:18 25:10,11,14,16 28:19,22 29:17 30:5,20 32:9 34:10 38:22,25 39:2,3,12 52:3 78:11 81:14 88:19 89:13 96:11 98:6
**agreements** [3] 5:5 23:19 26:12
**ahead** [6] 21:11 26:15 27:11 40:23 47:7 90:15
**aid** [1] 92:3
**aiming** [2] 118:25 119:3
**Al** [1] 34:25
**Allan** [93] 1:7 2:16 4:7 4:22 22:1,5,14,17 23:18 24:18,21 25:5,10,16,18 26:5 29:5,19 31:13 35:10 37:2 38:5 39:5,11 40:16 41:16,21,24,25 43:1 44:5 44:19 45:1,5 49:9,16 51:15,17,19,24 52:4,18 53:3,17,21 54:7 58:15 59:8,9,15 61:9,24 63:15 63:19 64:3,10 65:15,23 67:23 68:6,10 70:6 88:1 88:23 89:3,5,15,17 91:19 91:21 92:8 93:21 94:1,2,2 94:2,7 96:4,16,19,21,23 97:4 102:14 105:3,7 106:20 114:2 115:3 116:1 116:4 121:4,5
**allegations** [1] 104:13
**Alliance** [2] 5:1 123:21
**allowed** [1] 120:13
**along** [2] 18:4 31:6
**alternative** [3] 59:21 80:5,10
**always** [4] 19:14 94:3,3 94:4
**American** [5] 12:3,4,7 12:16 13:19
**among** [1] 23:15
**amount** [10] 33:14 34:3 34:6,9 35:8 36:15 40:18 42:9 77:6 87:9
**amounts** [2] 18:9 34:20 38:3
**analysis** [2] 32:22 33:15

**annual** [2] 42:22 43:2
**answer** [39] 18:2 21:10 21:12,12 24:6,19,21 25:1 26:15 33:11 34:24 35:18 39:9 40:23 48:6,22,24 73:19 74:1 78:15 80:9,15 80:23 81:2 82:14 83:1,17 90:15,21 91:14 98:21 104:22 110:24 111:15,17 111:17 113:11,16 119:19
**answered** [9] 65:25 73:21 76:4 80:2,19 104:24 112:11,12 113:3
**ANTONIO** [1] 2:5
**apart** [2] 24:17 109:8
**apologies** [1] 8:1
**apologize** [1] 11:24
**appeal** [19] 31:15 32:1 66:25 67:4,13,18 68:1 71:3 78:21 82:19 107:23 107:24,25,25 108:6,15 116:6,8,18
**appeals** [6] 31:12,13,14 69:9,14 110:7
**appear** [1] 8:17
**appearances** [1] 4:12
**appearing** [4] 4:15,21 7:8 8:9
**applications** [2] 21:19 46:20
**applies** [1] 93:25
**apply** [2] 29:5 40:16
**Appreciate** [1] 41:6
**approval** [2] 52:5,11
**approve** [4] 31:21 59:21 61:25 121:8
**approved** [1] 58:20
**approving** [1] 58:19
**area** [5] 29:20 48:4,7 97:14,15
**areas** [9] 8:22,25 9:22,23 48:19 72:6 91:11,15 99:4
**argument** [1] 97:9
**arising** [1] 53:11
**arithmetic** [2] 13:18 14:7
**arose** [1] 58:23
**arrangement** [6] 23:18 38:5 39:6 40:2 79:3 83:18
**arrangements** [14] 10:5 37:21 40:16 59:21 77:10 77:15 78:8 79:20 80:7,11 82:15,20 88:11 91:1
**arrived** [1] 37:16
**Aside** [1] 120:19
**assert** [1] 109:18
**associated** [4] 12:4,24 22:4 78:2
**Associates** [8] 1:7 2:16 4:7,22 22:2,5 121:4,6
**association** [2] 42:24
**assume** [5] 27:19 50:20 51:4 62:2 97:14
**assumed** [1] 116:1

Index Page 1

assumes [11] 34 23 39:23
40:21 74.15 78:13 82:22
84.23 96.13 103:11 107 3
107:9

assuming [2] 34.19
93:13

attach [1] 81.13

attached [2] 1:23 112:24

attended [1] 102.16

attention [5] 67:20,22
71:4 95:14 108:6

attorney [4] 6:15 28:20
119:8 123:11

attorneys [1] 28:20

audit [7] 31:22 36:5,7
85:1,4,6,8 113:21 114:1,4
114:12,12 115:4,7,16
116:4,10

audit's [1] 32:2

audits [2] 31:20 43:6

August [8] 1:12,17 4:1
10.10,23,24 123:6,17

authority [9] 32:10,11
32:12 35:1 91:21 95:20
95:24 121:8 122:8

automatic [1] 78:4

availability [1] 103:16

available [2] 92:12,13
94:4 99:6

Avenue [1] 123:21

aware [80] 23:25 30:21
50:17 52:2,15,16,17,21
53:2 54:3,9 55:2 57:9
58:16,24 59:6,7,24,25
62:4 63:14,16,17,22,24
65:10,17,21 66:1,4,5,19
67:10,25 75:9,22,23 77:6
77:7,9,14,22,23 78:1,4
84:25 93:6,7 97:3 101:17
102:8 103:21 104:2,5,6,8
104:12,14 105:6,10,11
106:5 107:5,12 110:2,22
114:3,4,18,21 115:11,12
115:14,15,23 116:23,25
119:21 120:14,15

-B-

b [2] 17:25 111:12

B-03-047 [1] 1:4

B-I-T-H-Y-N-I-A [1]
9:8

B003-047 [1] 4:4

background [1] 45:17

balance [5] 42:11,15 64:9
72:1 78:1

balances [1] 86:9

bank [6] 64:2 69:25 71:25
77:16 78:9 85:6

banking [13] 77:9 78:9
78:10 79:2,20 80:5,10
82:14,20 83:18,23 88:11
91:1

banks [1] 78:5

based [9] 37:12,19 40:11
40:18 81:5 82:20 84:9

87:7 91:7

basic [1] 26 18

basis [6] 42:22,24 43.2
59.19 83:20,22

Bate [1] 81:24

bears [1] 99:11

became [2] 15:24 65:18

becoming [1] 10:7

begin [1] 5:11

beginning [1] 8:12

beginnings [1] 22:7

behalf [7] 4:16,18 8:17
48:1 56:13 102:17 103:6

belief [2] 86:12,14

believes [1] 24:5

below [1] 35:4

Benefit [7] 12:3,5,7,16
13:19 49:20 50:1

Benefits [4] 1:6 2:21 4:6
4:19

Benito [16] 1:3 4:4 57:5
57:11,18 66:18 69:16 78:7
83:24 97:21 105:8 107:13
108:22 110:13 113:8
120:8

Benito's [1] 69:20

best [3] 5:11 35:18 39:5

better [4] 16:4 17:2 39:25
41:15

between [16] 22:13 35:5
36:22 41:16 48:10 49:9
54:7 62:19 78:4 88:23
93:14 108:18 109:23
114:2 119:9 121:5

beyond [1] 95:21

big [1] 73:9

bigger [1] 60:13

bills [4] 45:10 46:1,24
116:21

birth [1] 6:7

Bithynia [1] 9:7

black [1] 91:9

Blagg [8] 89:21 107:14

Blagg's [1] 107:21

block [1] 25:13

bonuses [1] 37:18

book [1] 22:16

Born [1] 6:8

borrow [1] 97:16

bottom [6] 8:13 81:21,22
82:7 99:18,23

BOULEVARD [1]
2:15

bound [1] 47:11

BRACEWELL [1] 2:14

break [5] 41:3,8,9 87:16
87:21

briefly [3] 10:24 14:12
105:6

broad [4] 33:1 103:13,13
103:13

broader [1] 66:3

broker [1] 54:9,13,16

brokers [4] 11.5 12 19
46:20 54 6,17,19

brought [2] 67:22 71.3

Brownsville [2] 1:2
4.10

BS [1] 14:25

Burgess [2] 2:24 4:23

Bush [185] 2:8 4:16,16
5.22 7:18,21,23,25 8:2
17:12,16,23 21:10,12
22:24 23:20,23 24:4,11
24:16,22,25 25:2 26:10
26:14 27:3,5,7,10,14 28:2
28:6,8,10 31:2 33:2,17
34:22 35:13,15,23,25
38:11 39:16,18,22,24 40:6
40:9 41:9 43:25 45:6,12
47:5,18 48:3,7,11,13,15
48:18,21,25 49:13 50:16
52:20 53:19 56:7,9 57:13
57:16,20,22,24 58:25
59:18 60:1,16,21,23 61:1
62:23 63:3,20 64:16 65:2
65:13,25 66:21 67:9,12
67:15 71:12 72:12,14,25
73:3,9,21,24 74:2,9,12,14
74:25 75:2,15 76:4 77:18
77:20 78:12,17 79:5,14
79:16,22 80:1,12,25 82:21
83:3,14,16 84:1,21,23
86:17 89:6,19 90:4,20
91:4 93:10,12 98:1,8,10
98:12,16,20 99:17,19
101:25 103:2,9,19,24
104:1,5,7,24 105:17 106:4
107:2,19,21 110:15,21,23
111:4,10,12,20,22,25
112:4,10,13,19 113:3,9
113:15,19 114:5,8,14,16
115:1,17,22 116:12 118:7
118:14,19 121:12

business [19] 9:20 14:11
18:7 19:12,17 20:1,2
22:16 23:6,8 25:14 29:12
50:1 54:20 57:9 59:8 62:7
107:1 112:6

businesses [3] 11:5
12:20 49:25

-C-

C [1] 2:1

calculate [1] 63:11

calculated [1] 37:18

calculating [1] 37:6

calls [45] 22:24 26:8,13
27:6,7 34:22 35:13,15,25
39:18,24 40:22 45:4 47:5
47:18 51:18 52:1 62:23
63:20 64:4,12,17 65:2,5
66:22 72:14 77:20 78:12
79:5,14,16 80:1,25 81:5
81:21 84:24 90:13 91:4
96:12 103:9,19 105:18
114:16 115:1 119:17

cannot [2] 16:7 38:18

care [3] 44:19,22 71:11

careful [1] 40:4

Carol [4] 1.18 4:25 123:8
123 19

Carolina [4] 9:9,10 10:25
13:5

carrier [3] 47:9 91:19
92.3

case [25] 5:8 24:1 53:22
56:15 58:23 81:13 83:18
84.16 88:23 90:13 96:22
102:15 103:22 104:2
105:14 106:21 107:3,13
108:1 109:19 110:3
116:24 118:6,18 120:12

case-by-case [1] 92:9

cases [1] 21:17

cash [1] 92:3

categorically [2] 95:8
95:16

categories [3] 45:9
110:20 113:7

caught [1] 117:6

caution [2] 24:6 83:3

cents [1] 93:4,14

certain [9] 23:21 30:10
31:19 33:14 37:24 70:16
90:7 92:16 102:22

certainly [2] 74:6 95:12

certainty [1] 25:15

CERTIFICATE [1]
123:4

certifications [1] 15:12

Certified [4] 1:18 4:24
15:14 123:8

certify [2] 123:9,11

certs [1] 62:17

chance [1] 74:1

change [2] 10:13 40:25

changed [3] 16:20 19:13
106:25

changes [6] 59:25 101:8
101:14,19 107:7,12

characteristics [1]
36:17

charge [9] 92:23,24 93:6
93:12,16 94:20,24,25
96:25

charged [3] 37:13 91:6
92:22

check [16] 44:11,15 62:20
71:10 72:11,17 75:12,19
76:20,23 78:8 86:1,3,19
86:23,25

checking [2] 77:3 78:11

checks [22] 70:1 71:19
71:20,23 73:11 74:7,23
75:8 76:5 77:11,16 79:2
84:8,20 85:8,18 86:7,15
87:2,8,10 106:13

CHRISTI [1] 2:15

Cindy [1] 4:19

Circle [2] 9:7,8

circumstance [4] 31:17
32:14,21 35:20

circumstances [8]

31:18 32:17 35:12 36:10
62:13 63:17 93:5 95:4

City [6] 1:21 15:11 50.12
50:13,17,22

Civil [3] 1.4,22 4:4

CL0088 [1] 82:7

claim [74] 31:4,13,14 32:5
32.8 33:13,21 34:1,18,19
35:1 36:1,3,4,10,11,13,21
38:17 42:10 43:8 55:19
62:15,19 63:1,3,5 66:7,25
67:7,15 68:18,20 71:14
73:14 74:24 75:23 76:9
76:17,22 78:21 79:11,12
80:21 81:4 82:19,20 83:20
83:22,25 84:4,7,9,10 87:5
87:7 90:8,8,9,10 92:5,21
96:21 107:1 108:25
109:7,9,10,11,13,17 110:7
116:3 120:13

claims [79] 21:1,4,20
25:19,19 30:19 31:1 32:4
34:12 39:15,20 40:5,11
40:18 41:25 42:2,8 43:5,8
43:15 46:11 58:15,20 62:4
64:3,6,11 65:16,23 66:7
66:10 67:5,19 68:6,13,15
68:15,17 69:10,13,17,20
69:22 70:1 72:7 76:2
78:18 79:24 87:23,25 88:4
88:5,12,22,22 89:18 90:2
90:18,18 91:7 102:12
105:14 106:2,7,15 108:22
110:13 113:8,22 116:19
116:20,22 117:23,25
119:4,15 120:19 121:7,8

clarify [2] 118:17,25
119:2

Clark [1] 58:10

clear [2] 62:24 118:3

client [2] 31:13 112:1

closely [1] 17:24

CLTV [1] 2:24

CLU [2] 15:14,22

cluttering [1] 28:18

coffee [1] 41:10

collect [1] 90:9

collecting [1] 21:5

collectively [1] 50:9

Colonial [1] 10:24

Columbia [3] 9:10 10:25

combination [4] 70:7,8
91:17,18

comfortable [2] 33:24
38:13

coming [3] 41:18 50:3
100:8

commencing [1] 10:10

comment [2] 74:10
101:20

comments [2] 52:18

commission [3] 47:12
47:13 122:14

commissions [1] 43:12

commitments [4]
102:22,24 103:15,17

**common** [1] 46:21

**communicate** [1] 110:6

**communication** [3] 94:22 101:12 110:12

**communications** [8] 108:18 110:20 113:7,18 114:2 119:23 120:2,8

**Companion** [124] 1:5 2:11 4:5,17 7:9 8:16,17 8:21 9:13,16,20,24 10:8,9 10:12 16:21 17:10,15,17 18:3,7,25 19:12,16 20:1,8 20:16,25 21:8 22:4,14,17 25:25 26:25 29:2,17 30:18 30:22,25 31:10,24 32:3 32:22 33:16,20,24 34:17 35:6 35:12,22 37:5 38:6 40:11 41:16 42:16,18 43:21,24 44:1,22,24 45:1 47:22 48:1 49:5,9,10,21 51:10 52:5,10,11,22 53:7,10,12 56:14 58:18 59:21 60:18 61:13 64:10 65:11 66:15 66:16 67:1,2 68:12 70:7,9 70:21 71:4 88:23 91:22 92:7 95:9 96:23 98:24 99:1 101:21 102:17,23,24 103:7,7,16,18 104:17,19 105:3,4,7,15 108:2,3,24 109:25 114:21,24 118:5 118:18,21 121:6,7,9

**company** [15] 1:6 2:11 4:6,17 9:14 10:9,25 12:17 13:4 22:1 44:12,16 45:25 77:15 121:6

**company's** [1] 65:19

**compensate** [1] 43:7

**compensated** [3] 37:2,3 37:4

**compensation** [4] 37:10 37:12,14,15

**COMPERE** [1] 2:4

**complaint** [3] 117:22 118:4,8

**complaints** [6] 117:21 118:5,12,14,17 120:21

**complete** [1] 15:6

**compliance** [4] 69:1,2,4 70:12

**component** [1] 40:17

**compound** [4] 34:22 52:20 61:4 72:24

**computerized** [1] 1:19

**concept** [2] 40:8 91:24

**concern** [1] 82:2

**concerning** [13] 29:3 30:19 52:19 82:14,19 88:21 95:23 104:9,9 108:12 109:17,23 110:1

**concluded** [1] 121:15

**conclusion** [1] 119:18

**conducting** [1] 5:6 49:22

**conference** [1] 56:1

**confidential** [3] 23:24 24:6,9 25:3 38:12 110:18

**confusing** [2] 33:7,7

**confusing's** [1] 33:6

**connected** [1] 14:11

**connection** [27] 7:12 15:25 21:1,2,7 25:19 30:25 46:3,7 47:15 49:11 49:16 50:18 54:23 59:6 62:12 66:9 69:9,16 71:7 92:6 101:8,15 106:2,21 108:22 110:13

**consecutively** [1] 5:9

**consider** [3] 38:11 103:8 105:2

**Considerably** [1] 18:17

**considered** [1] 30:4

**consists** [2] 18:7 19:12

**Consolidated** [13] 1:3 4:4 54:9,10,12,21 55:4,5 55:16 56:17,18,21 57:7

**constitutes** [8] 80:21 81:4 84:10

**Consultants** [7] 1:7 2:22 4:7,20 49:21 50:2 117:13

**consulted** [1] 66:20

**consulting** [1] 91:22

**contact** [1] 53:13

**contain** [1] 23:24 86:2 86:25

**contained** [2] 89:13 97:8

**contains** [1] 86:2,24

**context** [6] 37:23 45:21 55:8 62:21 98:4 105:9

**continue** [1] 60:9

**continued** [1] 60:10

**continues** [1] 86:2,25

**contract** [62] 22:11,13 40:11 43:1 52:7 57:14 69:24 70:2,3 71:15,17 73:4,7,8,15,19 75:3,4,5,6 75:15,24 76:17,21 78:19 80:3,4,9,12,14,19,20,22 81:3,5,6,12 82:13 83:8,10 84:10,14,16,18 88:17,24 91:7,8 95:18 96:1,17,17 97:6,13,18 98:13 99:5 106:8 106:16 117:23 118:1 119:5 120:20

**contractor** [1] 43:16

**contractors** [1] 43:14

**contracts** [2] 21:5 62:17

**contribute** [1] 63:18

**contributed** [1] 63:18

**convenience** [1] 117:14

**conversation** [1] 56:24

**conversations** [4] 6:14 56:19,23 96:19

**copies** [1] 5:18

**copy** [8] 7:11,17 73:5 75:4 89:23 96:22 114:5,6

**Coroon** [2] 12:18 13:1

**corporate** [4] 7:9 8:9 9:4 9:9

**CORPUS** [1] 2:15

**correct** [69] 5:13 13:17

19:1,21,21 20:19 21:22 21:24 22:3 29:6,11 34:5 39:21 41:19,22,23 44:17 45:2 46:1,2 49:5 51:13,14 52:5,6,11,12,14 53:7,17 64:7 67:24 68:1,2,24 69:8 70:22 71:6,8,9,11,23 72:4,17 73:13,16 86:9,20 88:1,2,13 99:14 104:15 105:4 106:16 107:8 114:23 117:24 118:15 119:11,12,13,16,24,25 120:4,5 122:2 123:10

**counsel** [14] 2:6,11,16 2:21 4:12 5:18 41:14 96:21 112:1,17 117:20 118:11 123:12,14

**County** [1] 1:21 123:2

**couple** [6] 6:19 13:21 49:25 50:13 55:14 72:5

**course** [2] 120:11,16

**court** [8] 1:1 4:9,25 5:1,4 5:14,17 111:8

**cover** [8] 8:15 70:1 71:20

**coverage** [2] 47:2,11 72:9

**coverages** [1] 12:21

**covers** [1] 10:6

**credit** [1] 78:2

**critical** [2] 106:9,11

**criticism** [1] 106:20

**criticisms** [1] 117:21 118:13,15,18,21 120:21

**criticize** [2] 106:6 118:23

**criticized** [1] 90:1

**CSR** [2] 123:19,20

**curious** [4] 23:1,3 26:5 37:11

**current** [1] 9:3

**customer** [2] 23:16 26:23

**customers** [1] 62:21

**-D-**

**D** [1] 3:1

**Dallas** [6] 1:21,21 2:10 4:12 123:2,22

**date** [9] 6:7 16:2 71:10,23 72:17 76:21 77:5 85:24 86:22

**dates** [2] 84:8 85:8

**David** [3] 68:23 69:1 70:11

**days** [1] 34:21 63:12

**deal** [8] 25:9 59:16 60:15 61:7 68:18,19 83:7,12

**dealing** [8] 46:20 48:9 59:22 77:10 94:6 95:13 108:24 109:7

**dealings** [7] 50:5 54:21 57:1,2 119:23 120:2,8

**deals** [2] 84:18 101:23

**dealt** [1] 57:7

**decides** [1] 93:15

**deciding** [2] 31:5 32:4

**decision** [6] 70:4,6,7,10 81:5 93:14

**decisions** [2] 88:12,21

**declare** [1] 122:1

**deemed** [2] 85:24 86:21

**DEFENDANT** [2] 2:11 2:16

**DEFENDANTS** [1] 2:21

**define** [1] 49:24

**defined** [1] 119:15

**defining** [1] 118:8

**definition** [2] 76:9 81:22

**degree** [1] 15:5

**delay** [1] 65:11

**delays** [1] 63:14

**delivering** [2] 85:25 86:23 87:9

**denial** [14] 31:12 32:1 39:15 66:10,17,25 67:5 71:8 74:24 82:20 83:24 88:22,22 108:6

**denials** [1] 110:7

**denied** [11] 69:20,23 73:14 78:18 79:1 84:4,7,9 87:6,7 90:18

**denies** [1] 31:13

**denote** [1] 97:15

**denoted** [1] 97:13

**dental** [3] 10:6 13:12 18:3

**deny** [1] 70:4

**denying** [3] 40:5 83:20 83:22

**department** [6] 12:19 31:8 68:15,17 69:1,3

**depending** [3] 5:16 36:9 36:12

**deposit** [1] 45:5

**deposition** [20] 1:10,14 3:12 4:3,10 5:9,10 6:9 7:12,16,18 8:8 28:19 89:23 101:18 110:17 111:4,13 112:23 123:5

**depositions** [2] 74:17 96:22

**derive** [1] 40:1

**describe** [1] 17:9

**described** [2] 17:11 61:7

**describing** [3] 10:19 40:7 100:7

**description** [2] 3:10 13:7

**designated** [4] 7:9 8:16 8:20,25

**designation** [2] 15:22 81:21

**designed** [1] 92:18

**determine** [3] 5:14 40:1 91:2

**determining** [1] 79:11

**deviate** [1] 26:18

**differ** [1] 23:19

**difference** [5] 34:19 35:8 36:22 75:13 93:24

**differences** [2] 25:12 35:5

**different** [19] 19:5 23:22 25:20 26:6,24 54:17,18 66:16 68:9 73:18 76:14 77:15 81:24 87:23 91:1 100:19 101:22 102:5 112:15

**differently** [1] 25:6,9 34:18

**difficult** [2] 7:3 33:19

**difficulty** [1] 92:21

**direct** [1] 53:11

**directly** [2] 85:24 86:22

**director** [5] 10:9,11 16:21 68:6 69:1

**disability** [1] 18:4

**disagree** [1] 111:20

**disapprove** [1] 121:8

**disclose** [1] 24:7

**disclosing** [1] 24:5

**discretion** [7] 25:25 30:11 89:5,17 90:7,17 91:1

**discretionary** [1] 26:2

**discuss** [4] 8:24 24:13 24:16 66:6

**discussed** [1] 109:10

**discussing** [3] 36:21 68:7 87:22

**discussions** [2] 55:19 114:1

**dispute** [1] 53:10

**district** [27] 1:1,1,3 4:5,9 4:9 50:20 53:6,11,13 54:7 57:5,11,18 66:18 67:5,19 69:17 78:7 83:19,24 105:8 105:16 119:1,9,16 120:9

**district's** [1] 84:5

**divided** [1] 49:8

**division** [3] 1:2 4:10 23:14

**document** [4] 7:22 30:8 81:21 112:23

**document's** [1] 30:16

**documentation** [5] 116:1,2,5,7,8

**documents** [16] 82:17 82:18 95:23 108:1,5,21 109:2 111:2,2,5 112:5,21 112:22 115:21 116:9,15

**doesn't** [5] 14:3 24:13 25:3 52:23 111:15

**dollar** [1] 18:9 32:7,9 33:14 34:3,6,9 36:15 93:3 93:3,14

**dollars** [5] 18:23 32:19 37:17 39:19 93:4

**Don** [2] 58:5 120:2

**done** [20] 35:21 51:16,17 60:15 61:7 72:9 73:17,18 73:18 76:14 80:21 85:2 97:11 106:21 109:8

113:21,24 114:19,21
115:24
**doorstep** [1] 56:12
**Doug** [2] 55:5,7
**down** [5] 22.19 41:3
81:22 85.14 93:25
**draft** [5] 85:25 86:3,23
87:1,10
**drafts** [1] 87:2
**drawn** [1] 86:1,24
**duly** [3] 1:15 5:3 6:2
**during** [10] 10:11 14:9
38:16 62:5 63:19 65:12
65:21,23 120:11,16
**duties** [10] 10:12,14,15
10:16 12:7,9 14:15 16:20
17:4 49:4

### -E-

**E** [4] 2:1,1,3 3:1
**e-mail** [4] 94:19 95:22
101:12 110:6
**e-mails** [5] 102:9 109:22
109:22,25 110:10
**early** [1] 7:24
**earned** [1] 18:25
**East** [2] 15:1,8
**economic** [1] 41:19
**economics** [1] 14:24
**education** [3] 14:24 15:4
15:10
**effect** [3] 89:25 120:12
120:17
**efforts** [8] 47:23 49:19
49:22 51:9 52:4,10 59:16
61:9
**eight** [2] 17:7 20:10
**either** [5] 33:7 41:8 82:24
117:14 120:2
**employ** [1] 31:19
**employed** [4] 9:12 53:12
123:12,14
**employee** [2] 14:13
123:14
**employer** [1] 45:24
**employer's** [2] 46:11
46:14
**employers** [1] 92:18
**employment** [3] 10:7
14:10,21
**encompass** [1] 18:22
**end** [4] 7:2 87:15 114:12
117:2
**ensure** [2] 72:9 78:8
**enter** [1] 24:10
**entered** [1] 5:7
**entities** [5] 49:25 50:12
50:13,21 117:15
**entitled** [1] 114:8
**entity** [2] 45:23 120:12
**establish** [1] 73:6
**established** [2] 34:25

42.10
**cvaluate** [1] 91:1
**evaluating** [1] 31:4
**event** [5] 5:13 39:11 95:7
**events** [1] 16:3
**Eventually** [1] 61.20
**everybody** [1] 92:10
**everybody's** [1] 74.21
**evidence** [16] 34:23
39:23 40:22 74:15 78:14
82:23 83:18,20 84:23
90:13 95:11 96:13,14
103:11 107:3,10
**ex** [1] 49:7
**exactly** [11] 7:1 23:5
26:25 43:20 46:5,23 76:19
97:11 101:2 111:18
**Examination** [6] 3:5,6
3:7 6:3 117:8 121:1
**example** [13] 16:5 21:1
26:6 37:11 45:3 52:22
54:6 61:3 64:2 65:18
100:18 101:16 108:19
**examples** [1] 10:4
**exceed** [1] 38:2
**exceeding** [1] 36:21
**exceeds** [2] 33:14 42:15
**except** [2] 14:6 34:14
**Excuse** [1] 120:25
**executing** [1] 89:4
**exhibit** [19] 3:10 5:12
7:13,16,16 8:4,6 81:13,15
81:20,25 82:5,6 97:16,18
97:21 98:12 99:11,20
**exhibits** [3] 3:9 5:9,15
**expect** [2] 89:11 102:24
103:18
**expenses** [1] 25:8
**experience** [4] 46:22
47:16,20 63:12
**Expiration** [1] 123:20
**Expires** [1] 122:14
**explain** [6] 10:4,22 20:11
37:22 41:17 81:2
**explained** [2] 43:10 49:4
**extent** [13] 23:23 24:4
25:24 31:10 38:2 60:16
71:12 73:3 74:10 75:2
90:4 108:14 118:19
**extremely** [1] 10:4
**eye** [1] 23:5

### -F-

**fact** [11] 32:19 33:14
34:13 38:18,19 76:23 84:7
106:15 109:19 111:7,18
**fact-gathering** [1]
114:13
**facts** [13] 34:23 39:23
40:21 74:15 78:13 82:22
84:23 96:13 103:11 107:3
107:9 115:16 123:9
**failing** [1] 13:18

**fair** [1] 25:15
**fall** [2] 16:9 48.4
**falls** [2] 48.8,19
**familiar** [4] 54.20 62:7
89.10 91.24
**far** [6] 30.2 53:9 74:17
80:21 86.15 95:19
**fashion** [2] 23:16 76 6
**faster** [1] 59:8
**favors** [1] 6:19
**feature** [2] 92:6,22 93:6
**federal** [3] 1:22 5:7 28:23
**fees** [1] 37:4,7,18
**few** [2] 27:1 101.19
**fewer** [1] 39:19
**field** [4] 14:15,23 15:13
20:18
**fifth** [1] 82:6
**file** [6] 36:4 108:7,9
109:11,18 116:19,20,22
**filed** [3] 4:8 69:24 109:20
**files** [2] 36:3 109:8
**filing** [1] 69:6
**finance** [1] 14:25
**financial** [1] 39:14
**financially** [1] 123:15
**fine** [5] 51:7 77:8 111:10
111:21 114:9
**finish** [1] 11:23
**finished** [2] 7:1 121:13
**fire** [1] 60:14
**firm** [5] 2:19 4:19 31:20
54:11,13
**first** [7] 6:2,20 8:12 28:19
33:5 41:19 66:8
**first-rate** [1] 106:23
**fit** [1] 111:18
**fits** [1] 17:21
**five** [7] 16:17,18 17:7
19:2,6,13,13,19,20 21:23
22:20 101:15
**flow** [1] 92:4
**flows** [1] 41:18
**focus** [1] 34:8
**focused** [1] 47:23
**folks** [1] 92:20
**follow** [2] 49:1 113:12
**follow-up** [4] 113:21,24
113:25 114:22
**following** [1] 118:10
**follows** [1] 6:2
**foregoing** [2] 122:1
123:10
**foremost** [1] 6:20
**form** [8] 28:24 98:24 99:2
99:22 102:21
**formal** [4] 14:24 15:4,10
30:2
**forms** [1] 102:6
**formulate** [1] 31:16
**forth** [2] 29:16 33:25 34:9

43:3 84.12
**found** [2] 30:8 97:23
**four** [4] 82:6 101:24 102:2
102:3
**frame** [1] 59.1 65:22 70:2
**framework** [1] 26.17
**Franklin** [8] 1:11,14 3 3
6 1,6 122:4,8 123:5
**free** [1] 34:23 82:17 98:20
**frequency** [1] 64:24 65:1
**front** [4] 6:16 81:7 82:18
83:2
**fulfilling** [1] 89:4
**Fulia-insured** [1] 13:12
**full** [5] 6:5,6 54:11,12
84:17
**function** [1] 44:21
**functions** [4] 44:19
58:15 59:22 60:7,9
**fund** [2] 42:5,10,25 43:8
45:16
**funding** [19] 77:16 79:2
79:3 80:21 91:25 92:21
94:7,10 96:2,24,24,25
97:8 101:9,15,23 103:16
104:10 120:13
**funds** [11] 21:5 44:25
45:4 64:10 69:25 71:20
77:4,8 86:2,25 106:13
**Furman** [3] 56:19,20 57:1

### -G-

**Garcia** [2] 2:19 4:19
**geared** [1] 118:4
**general** [8] 20:12 30:20
37:9 38:24 42:5 72:6
92:10 113:6
**generally** [26] 17:9 21:13
28:25 31:21 32:9 37:8,22
39:3 45:10 46:4,13 48:17
51:24 57:16 77:14 87:24
88:11 92:18 101:3 108:5
108:10,16,17 110:3,4,19
**generate** [2] 32:21 108:5
**generated** [2] 108:2,13
**generates** [1] 108:3
**geographically** [1]
23:15
**given** [5] 6:9 20:15 37:25
102:9 112:4
**Glade** [1] 58:12
**glitches** [1] 63:23
**globally** [1] 96:19
**goes** [2] 43:9 100:24
108:9
**gone** [3] 22:19,21 23:1
**good** [10] 2:4 6:20 7:3,4,4
28:20 39:9 52:24 79:3
117:10
**grab** [1] 7:22
**graduated** [1] 14:25
**gray** [3] 91:10,11,15
**greater** [2] 39:20,20

**group** [4] 13:7,12 18:3,3
**growing** [1] 59:8
**grown** [3] 19:8 23:5,6
**guarantee** [1] 16:12
**guess** [3] 13:7 23:1
33:19 37:11 38:9 41:18
44:25 66:8 91:17 118:7
119:3 120:24
**guideline** [1] 26:19
**guidelines** [2] 26:19,22
26:19,20 29:18,23,25 30:3
30:5,6,7,17 37:9 52:17
102:6

### -H-

**half** [1] 93:3
**hall** [97] 1:7 2:16 4:7,22
22:1,5,14,17 23:19 24:18
24:21 25:5,10,16,18 26:5
29:5,19 31:13 35:10 37:2
38:5 39:5,11 40:16 41:3
41:16,21,24,25 43:1 44:5
44:19 45:1,5 49:9,17
51:16,17,19,25 52:4,18
53:3,17,21 54:7 58:15
59:9,15 61:9,24 63:15,19
64:3,10 67:23 68:6,10
70:6 88:1,23 89:3,5,15,17
91:19,21 92:8 93:22 94:1
94:2,2,7 95:12 96:4,21,23
97:4 102:14,16,22 103:16
103:15,22 104:9 105:2,3
105:7 106:20 114:2,24
115:3 116:1,4 121:4,5
**Hall's** [6] 34:25 59:8
65:16,23 96:19 105:5
**hand** [3] 98:14 116:1
123:16
**handing** [1] 98:10
**handle** [2] 16:4 60:18
**handled** [4] 53:16 73:15
75:24 93:8
**handles** [2] 46:1 101:22
**handling** [7] 32:4 54:1
58:15 72:8 76:2 90:1
102:10
**happening** [2] 27:15
95:7
**happy** [2] 41:5 93:25
**hard** [2] 33:22 36:11
**HARLINGEN** [1] 2:20
**head** [2] 38:18 39:10
100:11
**headed** [1] 107:11
**heading** [1] 24:24
**health** [4] 46:14 71:11
100:20,21
**hear** [3] 6:21 10:1 85:20
**heard** [6] 50:3 62:18
63:10,11 102:18
**Hegland** [67] 2:13 3:7
4:21,21 5:24 24:2 26:8,13
26:16 27:4,6,8 28:4,17
32:24 33:1 35:16 39:23
40:21 44:13 51:18 52:1,7
53:18,23 61:4 64:4,12

66:22 72:13,18,20,22
73:22 74:18 75:17 76:16
77:12,17,19 78:13 81:15
81:17,24 82:22 84:22,24
86:10 88:3,7,14,17,24
90:12 91:5 96:12,15 97:17
103:11,23,25 104:11
107:9 120:25 121:2,3,10
**held** [1] 4:10
**help** [4] 6:19 31:15 41:15
73:9
**helpful** [1] 56:6
**hereto** [1] 1:23 123:15
**hey** [3] 94:25 114:25
115:20
**higher** [1] 18:16
**himself** [1] 102:16
**hint** [1] 60:4
**hire** [2] 60:12,13
**hit** [1] 78:9
**hold** [2] 15:12,17
**honor** [2] 102:25 103:18
**honored** [4] 78:9 86:3
87:1,10
**honoring** [1] 103:8
**hooked** [1] 117:5
**hope** [1] 5:13
**hospital** [1] 34:20
**hour** [1] 41:1
**Huh** [1] 8:1
**Hutchison** [16] 1:11,14
3:3 4:3 6:1,6,9 24:4 41:15
49:4 117:1,10 121:3 122:4
122:8 123:5
**hypothetical** [4] 27:9
36:11 83:17 102:21
**hypotheticals** [1] 36:14

**— I —**

**I-N-T-E-G-O-N** [1]
13:5
**I-R-M-O** [1] 9:8
**idea** [2] 23:3 65:8
**identified** [2] 17:16
24:13
**identify** [2] 75:21 97:22
**impact** [2] 65:22,22
104:18
**important** [3] 62:21
63:11,13
**imposed** [2] 25:18,21
**improve** [2] 61:9,16
**inadequate** [1] 64:9
**Inc** [10] 1:7,7,8 2:21,22
4:20,20 50:2 117:12,13
**include** [2] 58:2 97:1
**Including** [1] 41:7
**incoming** [1] 64:8
**incomplete** [1] 27:8
**Incorporated** [5] 4:7,8
4:8,22 49:21
**incorrect** [1] 5:14

**increase** [1] 43:3
**Independent** [1] 1:3 4:5
**Indianapolis** [1] 22:2
**indication** [1] 5:11
**individual** [3] 14:20
56:18 57:9
**industry** [1] 14:11
**industry-wide** [1] 37:8
**information** [20] 23:24
24:6,7,9 25:3 30:7 47:8
51:6 52:18 54:8 56:6 83:1
86:9 90:9 105:11 107:8
108:10,12 110:18 113:20
**initials** [1] 45:17
**inquiry** [1] 17:17
**insolvent** [1] 65:18
**instance** [1] 1:15
**instances** [4] 21:17
23:21 49:14 110:8
**instead** [1] 34:18
**instruct** [5] 24:18,20
110:23 113:11,15
**instructing** [2] 48:23
94:20
**instructions** [3] 29:17
49:2 102:9
**insufficient** [1] 64:3
**insurance** [46] 1:5,6 2:11
2:21 4:5,6,17,20 9:13 10:9
10:25 12:21,24 14:11,20
14:21 15:13,20 26:23,24
29:21 31:1 45:21 46:4,8
46:17,20,21 47:16,17,23
49:20 50:2 57:3,10,17
62:13 65:19 68:21 91:25
92:7,15 102:23 117:13
119:9 121:6
**insured** [5] 42:3 53:6
92:13 102:6 119:10
**insurer** [1] 92:4
**Integon** [7] 13:4,8,14,16
13:20 14:8,13
**interest** [1] 39:14
**interested** [1] 123:15
**internally-generated**
[1] 109:2
**interpretation** [1] 91:12
**interprets** [1] 91:15
**interrelated** [1] 33:22
**interrupted** [1] 73:12
**introduced** [1] 96:22
**introduction** [1] 117:11
**investigate** [2] 31:5 90:9
**investigation** [6] 32:2
35:21 36:6,17,18 115:24
**investigations** [2]
31:19,20
**involve** [3] 25:3 36:2
50:7
**involved** [37] 22:7 31:14
32:4,14 38:17 43:16 46:14
46:19 47:1,10,13,16 50:14
50:14,21 51:2,11,21 53:25
54:1,6 57:10 59:16 66:7

66:11,12,15,17 67:1 69:16
70:9,15,19,22 71:1,5
77:10
**involvement** [2] 53:11
54:14
**involving** [1] 68:20
77:10
**Irmo** [1] 9:8
**irrelevant** [1] 26:14
**isolate** [1] 36:15
**issue** [18] 40:12 56:15
57:14 66:10 68:20 72:10
73:4 76:12,25 79:3,7,10
79:10,11 81:12 105:14
109:23 110:1
**issued** [3] 37:13 97:4
121:7
**issues** [17] 71:7,10 76:8
76:23 77:3,5 80:19 88:5,8
90:7 91:9,10,10 95:14,25
106:12 115:4
**issuing** [5] 21:5,20 54:1
62:16,20
**item** [3] 85:11 94:4
110:17
**items** [1] 29:16
**itself** [9] 32:20 52:8 73:8
75:16 80:13,14 88:18,19
88:25

**— J —**

**J** [95] 1:7 2:8,13,16 4:7,22
22:1,5,14,17 23:18 24:18
24:21 25:5,10,16,18 26:5
29:5,19 31:13 35:10 37:2
38:5 39:5,11 40:16 41:16
41:21,24,25 43:1 44:5,19
45:1,5 49:9,16 51:15,17
51:19,24 52:4,18 53:3,17
53:21 54:7 58:15 59:8,9
59:15 61:9,24 63:15,19
64:3,10 65:15,23 67:23
68:6,10 70:6 88:1,23 89:3
89:5,15,17 91:19,21 92:8
93:21 94:1,2,2,2,7 96:4
96:16,19,21,23 97:4
102:14 105:3,7 106:20
114:2 115:3 116:1,4 121:4
121:5
**JAH002215** [1] 99:12
**Jim** [3] 56:19,20 57:1
**job** [7] 13:7 16:20 17:1
39:25 89:12 91:13 106:23
**Johnson** [1] 15:1
**judge** [1] 6:16
**jury** [1] 6:17
**justified** [1] 34:20

**— K —**

**keep** [5] 28:18 42:9 43:24
59:11 117:18
**keeping** [1] 60:12
**kick** [1] 35:7
**kind** [6] 16:3,3,4 53:13
113:21

**knew** [1] 75:11
**knowledge** [13] 28:14
30:22 56:16 58:6 66:17
66:20 73:6 84:2,3 106:24
107:16,20 113:13
**known** [2] 22:1 50:1
91:25 96:18
**knows** [2] 60:19 113:18
**Knoxville** [1] 6:8

**— L —**

**L** [1] 2:24
**L.L.C** [1] 123:21
**L.L.P** [1] 2:14
**labeled** [2] 99:9,21
100:15
**laid** [2] 26:2 70:2
**Lake** [4] 50:12,13,17,22
**Lane** [1] 9:9
**language** [6] 81:5,6,23
82:11,13 83:2
**large** [2] 19:10,16 92:21
**Larry** [2] 89:21 107:14
**lasering** [2] 100:22,23
**last** [11] 17:6 19:2,13,18
21:23 22:19 55:14 56:24
101:15,19 111:2
**latitude** [1] 17:23
**Laurie** [2] 2:24 4:23
**Law** [2] 2:19 4:18
**Lawn** [1] 123:21
**laws** [1] 69:4
**lawsuit** [17] 17:19 48:10
49:25 50:15 57:14 66:8
66:11
**lawsuit's** [2] 16:4 85:15
**lawyer's** [1] 49:2
**leads** [2] 16:20 90:6
**learn** [2] 114:11 115:16
**least** [2] 18:13 73:6
**leave** [1] 84:13
**left** [1] 13:20
**legal** [2] 4:24 119:17
**legs** [1] 41:3
**lengthening** [1] 63:14
**less** [5] 18:17 19:3,4 40:19
89:25
**level** [4] 23:4 32:11,12
35:1
**licensed** [2] 29:9,10
**licenses** [2] 15:12,17
**licensing** [2] 29:3,14
69:6
**life** [14] 1:5 2:11 4:5,17
7:9 8:17,17,21 9:13,16,24
10:8,9,12,24 13:12 14:20
15:14 16:22 17:10,15,18
18:3,3,25 20:2,8,17,25
21:8 22:4,14,17 26:25
29:2,17 30:19,22,25 31:10
31:24 32:3,22 33:16,20
34:17 35:7,12,22 38:6
41:17 42:16,18 43:21,24

44:1 48:1 49:5,9,21 51:10
52:5,10,22 53:10,12 56:14
58:18 59:21 60:18 61:13
64:10 65:11 66:15,17 67:1
67:2 68:12 70:7,9,21 71:4
88:23 91:22 95:9 96:23
98:24 99:2 101:21 102:7
102:23,24 103:7,7,17,18
104:17,19 105:3,4,7,15
108:2,3,24 110:1 114:21
114:24 118:5,18,21 121:6
121:7
**Life's** [9] 9:20 18:7 19:12
19:16 25:25 47:22 52:11
53:7 92:7
**limit** [2] 32:20 33:14
**Limitations** [3] 99:5,10
99:21,24 100:15
**line** [3] 78:2 118:3,10
**lines** [1] 31:6
**list** [1] 53:25
**listed** [2] 110:16 112:21
**lives** [1] 92:20,20,20
**located** [2] 13:5 50:22
84:5
**locating** [1] 56:5
**locations** [1] 50:8
**long-term** [1] 18:4
**longer** [1] 117:19
**look** [18] 33:21 34:1 36:3
36:4 38:15 43:2 73:19
81:25 82:17 83:8 85:23
98:20 99:1 100:1,4 102:3
102:4 109:8
**looked** [1] 85:6
**looking** [3] 69:13 74:3
82:18
**LOOP** [1] 2:4
**loss** [9] 9:24,24 10:1,2
10:17 11:3,4,16 12:1,10
12:12,25 15:25 17:21
18:12,16 19:7,9,12 20:3,5
20:25 21:7 22:16 23:8
25:19,25 26:23,24 29:21
31:1 43:21 45:21 46:4,8
46:17,20,21 47:2,9,16,17
47:23 49:8 52:19 53:7
54:18 57:3,10,13,17 62:12
63:8 65:23 68:13,18,19
68:21 72:10 75:13 76:3
79:24 91:7,8,24 92:7,15
95:18 96:1,17,23 97:13
102:23
**low** [1] 23:4

**— M —**

**machine** [1] 1:19
**mail** [9] 71:11 72:11,17
73:11 74:23 84:8,20 85:9
85:18,19
**mailed** [14] 71:19,23 74:2
74:7,8 75:8,12,20,20 76:5
76:20,24 86:7,8
**mailing** [8] 76:8,11,15
77:5 85:25 86:23 87:8
106:13

**Main** [1] 1:20 2:9 4:11

**maintain** [1] 64.6

**maintained** [1] 42:25

**makes** [1] 7.3

**man** [2] 68:23 113:18

**Managed** [7] 1.6 2:21 4.6,19 49:20 50:1 117:13

**management** [2] 10.16 14:13

**manager** [1] 68:16

**manager's** [2] 30:20 38:24

**managing** [1] 20:12

**manner** [1] 59:10

**manuals** [1] 29:24

**marked** [9] 3:9 7:13,16 8:5 81:13,20 82:4,5 97:20

**market** [5] 12:10,22 23:14 47:24 52:24

**marketed** [3] 11:3,4,5

**marketing** [24] 9:20 10:1 10:2 11:6,10 12:19,23 13:9,10 21:19 47:22 49:5 49:7,10,17,19,22 51:9,16 51:19,25 52:4,19 105:4

**master's** [1] 15:5

**material** [1] 102:19

**materials** [5]. 30:18 49:11,17 52:4 53:2

**matter** [13] 4:3 14:3 17:17 33:13 50:3 51:2 54:24 73:6 85:2 98:24 112:20 113:10 121:4

**matters** [4] 25:12 56:15 68:7 114:12

**may** [27] 7:1 13:21 23:24 31:19 33:21,25 34:1,4 36:4,4,6,16,17 40:16,16 43:15 64:3 83:19 91:9 92:16 97:18 112:9,11 115:8,8 117:1 118:22

**MBA** [17] 1:8 2:21 4:8 4:20 49:20,25 50:9,24 106:6 117:12,15,21 118:6 118:18 119:2,23 120:21

**MBA00148** [1] 81:21

**mean** [45] 16:6 18:19 19:6 20:14,20 23:6 26:11 28:1 39:9 42:20 45:9,13 50:12 53:19 54:17 59:3,4 60:2 60:12 62:12 63:10,22 64:14,23 65:6,7 67:13 69:2 75:10 85:12 88:11 89:7,10,11 92:19 93:23 95:12 100:13,20 102:5 103:12 107:12 111:12 113:25 114:18

**means** [3] 20:15 37:22 74:6

**meant** [1] 58:2

**med** [1] 10:5

**medical** [5] 13:13 45:25 46:24 116.21

**meet** [4] 29:8 55:8 75:6 78:18

**meeting** [2] 55:22 61·17

**meetings** [3] 61.12,14 102:15

**meets** [1] 92:14

**memo** [2] 94.19 95:22

**memory** [1] 14:6 39:5

**memos** [1] 94:15 102·9

**mentioned** [1] 14:11 71:7 77:3 101:10,12,13 117:22 119:22 120:1

**mentioning** [1] 98.6

**Merrill** [4] 58:6,8,10 120:3

**Merrills** [2] 56:9 120:2

**messed** [1] 67:17

**met** [9] 55:1,7,16 56:1 58:5 86:5,6,13,14

**MGA** [6] 20:18 29:10,11 30:11,19 39:3

**MGAs** [5] 20:25 21:25 23:15,19 24:17

**MGU** [5] 11:13,17,25 12:1,2 20:6,11,12 21:3 25:24 26:2,3,19,20 29:18 30:5,11,19 31:16 32:9,10 32:15,17 33:23 36:25 37:12,13,15,25 38:1 39:11 40:4,11,18,19 43:7 47:9 49:9,10 53:21 62:25 88:1 88:13,19 89:13 90:17 91:1 91:6 92:16 93:9 108:11 108:14

**MGU's** [1] 25:13

**MGUs** [20] 20:7,8,24 21:8,21,25 24:17 25:9,12 25:17,21 26:7,18,24 29:3 37:2,9,20 49:14,15 89:11 93:22 102:10

**middle** [1] 16:3

**might** [15] 17:18 25:1 33:6,6,7 34:2 36:20 38:3 63:17 67:1 81:9 90:5 108:13 109:5 112:6

**military** [3] 14:9,12,14

**mind** [5] 56:4 60:5 80:9 80:22 101:1

**mind's** [1] 23:5

**mini** [1] 10:5

**minimum** [1] 117:18

**minute** [2] 39:5 83:7

**mis** [1] 74:14

**mischaracterize** [1] 90:5

**mischaracterizes** [7] 60:17 67:12 71:13 74:16 107:2,21 118:20

**missed** [1] 14:3,4

**missing** [1] 13:21 85:20

**misstates** [6] 28:2 40:9 86:10 90:12,13 104:1

**mistaken** [1] 83:22 117:22

**moment** [3] 10:21 70:14 99:2

**money** [4] 40:5 41:17

43 4 74.3

**monies** [1] 84:5

**month** [1] 16:5

**morning** [2] 7:24 8:18

**most** [8] 12:12 25:11,14 25:15 30:3 36:25 45:11 71:3

**moved** [1] 16:21

**Ms** [68] 2:13,24 3:7 4:21 5:20 24:2 26:8,13,16 27:4 27:6,8 28:4,17 32:24 33:1 35:16 39:23 40:21 44:13 51:18 52:1,7 53:18,23 58:8,10 61:4 64:4,12 66:22 72:13,18,20,22 73:22 74:18 75:17 76:16 77:12,17,19 78:13 81:15 81:17,24 82:22 84:22,24 86:10 88:3,7,14,17,24 90:12 91:5 96:12,15 97:17 103:11,23,25 104:11 107:9 120:25 121:2,10

**must** [2] 29:8 93:16

**—N—**

**N** [2] 2:1 3:1

**N.E** [1] 2:4

**name** [15] 4:23 6:5,6 12:2 13:4 54:11,12,25 56:19 60:6 68:23 117:10,12,13 121:3

**named** [1] 50:22

**narrow** [4] 26:17 30:10 85:14 93:25

**narrower** [3] 66:2 101:21 103:15

**Nashville** [1] 11:13

**nature** [1] 79:1

**near** [1] 117:2

**necessarily** [1] 85:11

**need** [20] 5:5,11 6:23 19:14 28:21,23 36:16 40:13 41:2,9 42:8 43:3 52:4 65:10 75:3 83:13 94:5,21 97:17,18

**needed** [4] 5:16,19 19:24 31:18

**neither** [1] 123:11

**never** [5] 58:5 75:8,12 86:15 91:10

**Never's** [1] 75:10

**next** [5] 5:12 66:6 78:9

**Nixon** [1] 58:12

**none** [3] 57:6 86:13,14

**nonpayment** [1] 66:10

**nonresponsive** [4] 40:14 75:25 76:10 105:1

**nor** [3] 83:19,19 123:12

**normal** [1] 32:13

**normally** [4] 116:7,15 116:15,18

**North** [6] 2:15,19 13:5 60:8 61:8 90:1

**NOTARY** [1] 122:11

**notation** [3] 97:23 99.2 100:2

**noted** [1] 97:6

**notes** [2] 108:12 109 16

**nothing** [1] 112:21,24 120:24

**notice** [20] 3:12 7:11,17 7:18 8:6,8,10 17:13,24,25 24:14 48:4 110:17,24 111:5,13,25 112:4,24 113:10

**notices** [1] 21:21

**now** [26] 8:5 12:18 17:9 21:25 26:15 38:7,10,19 40:23 41:7 46:23 51:8,23 53:5 58:14 70:24 74:21 77:8 78:15 83:1,1,12 96:18 98:22 106:18 113:5

**number** [10] 3:10,10 33:21 36:7,8 77:15 81:24 82:6 99:11,22

**numbered** [2] 1:16 8:13

**numbering** [1] 5:9

**—O—**

**Oak** [1] 123:21

**oath** [1] 6:16

**object** [19] 23:23 28:17 28:21,23 33:17 40:6,13 51:18 73:7 74:9,11,18 90:4 96:15 105:1 110:15 111:7 118:7,19

**objecting** [1] 113:9

**objection** [121] 17:12 21:10 22:24 23:20 26:8 26:10,13,14 27:3,4 28:2,4 28:20 31:2 32:24 33:1 34:22 35:13,15,23 39:16 39:22 40:9,21 43:25 44:13 44:14 45:6,12 47:5,18 48:3 49:13 52:1,7,20 53:18,23 58:25 59:19 60:1 60:16 61:4 62:23 63:20 64:4,12,16 65:2,25 66:21 66:22 67:9,12 71:12 72:12 72:13,18,24 73:21,22 74:25 75:2,15,17,25 76:4 76:10,16 77:12,17,18 78:12,13 79:5,14,22 80:1 80:12,25 82:21,22 84:1 84:21,22 86:10,17 88:3,7 88:14,17,24 89:6,19 90:12 90:20 91:4,5 93:10 96:12 101:25 103:2,9,19,23,24 104:11,24 105:17 106:4 107:2,9,19 111:19 114:14 116:15,17,22 116:12 119:17

**objections** [2] 27:14 28:24

**obtaining** [1] 21:19

**obviously** [7] 19:7,9 23:5 24:8 36:1 106:7 119:8

**occasion** [2] 6:13,14

**occasions** [2] 6:12 37:20

**occurred** [2] 65:12

120.16

**Odle** [4] 1 18 4.25 123 8 123:19

**off** [6] 38:17 39:10 41:11 87:17 100:11 121:14

**offer** [4] 11:25 17:18 26·6 92:10,11 95:20

**offered** [10] 12:1 17.10 26:6 92:6,9 94:3,10 96:3 96:7,9

**offering** [8] 94:12,23,24 95:8,17,24 96:18 96:7

**offers** [3] 18:3 92:10 101:22

**office** [1] 123:17

**offices** [2] 1:20 4:11

**often** [3] 20:20 47:17 71:3

**Olvera** [15] 2:18 3:6 4:18 4:18 5:11,21 117:5,9,11 118:9,11,16,24 119:19 120:23

**omissions** [1] 5:25

**once** [4] 65:6,6,7 118:9

**one** [52] 2:14 5:7,16 6:13 11:1 14:2,2,14,18,19 21:25 22:13 28:20 30:4 33:7 34:14 35:4,4 44:18 48:19 49:4 50:21 56:18 58:4 66:19 69:24 71:10 71:22,25 73:1 75:10 76:8 76:23 77:3 78:7 80:10 81:14 82:5 85:24 86:22 87:3,5 88:10 91:19,20 96:22 98:6 99:1,4 111:2 114:18 121:5

**ones** [2] 30:3 101:9

**ongoing** [1] 56:25

**opinion** [3] 34:1 103:5 104:23

**oral** [4] 1:10,14 102:23 123:5

**orally** [1] 95:13

**order** [4] 23:25 24:1,10 98:19

**otherwise** [5] 85:25 86:23 87:8 92:13 97:6

**ours** [1] 26:21

**outlined** [1] 75:24

**outside** [9] 30:5 31:20 36:5,6,7 51:25 58:19 69:24 76:2

**outsourced** [1] 58:15

**outsourcing** [1] 58:20

**overall** [1] 17:21

**overdraft** [1] 77:24

**overseeing** [1] 89:15

**—P—**

**P** [2] 2:1,1

**P.C** [2] 2:4,19

**p.m** [7] 1:17 87:17,18,18 87:20 121:14,15

**page** [11] 3:10 8:12 82:4 82:5,6,9 97:22 99:17,22

99:22,24

**pages** [1] 123:10

**paid** [26] 37:18 38:3 39:20 40:18,19 42:3 44:25 45:10 46:1 47:12 70:1 71:14 76:9,17,22 79:12 80:21 81:4,22 84:10 90:18 105:14 106:7 117:23 118:1 120:20

**paper** [1] 94:17

**paragraph** [1] 87:12

**paragraphs** [1] 8:13

**Park** [1] 9:9

**part** [34] 12:10 18:12 19:16 25:11,14,15 30:11 31:7,10 32:22 33:15 36:25 37:11,15 38:24 39:3 40:18 41:19 52:3 55:5 64:17 76:25 77:1,1 83:17 86:4 86:19 89:11 95:18 96:1 96:17 99:11 105:5 114:19

**participate** [1] 61:13

**particular** [18] 9:22 23:14 25:13 29:3,20,20 32:8,20,21 36:20 37:25 42:9 50:3 54:19 62:18 66:7 81:20 100:22

**particularly** [2] 9:23 33:24

**parties** [4] 48:10,15 123:12,15

**pass** [1] 117:3 120:23

**past** [1] 54:21

**patience** [1] 117:3

**patient** [2] 34:13,20

**PATTERSON** [1] 2:14

**pay** [21] 31:5,5 32:4,12 40:19 41:25 42:2 44:8 62:19 64:3,6,11 65:19,23 88:12,12,12 90:8,8 106:15 119:14

**paying** [5] 21:4 89:18 90:10 91:6 119:4

**payment** [17] 43:5,14 62:20 63:1,3,6,8 66:10 85:23,25 86:1,21,23,24 92:5 120:13 121:8

**payments** [4] 39:21 65:10,11 66:18

**payor** [2] 85:24 86:22

**pays** [4] 31:22 37:5 40:11 46:11

**penalty** [1] 122:1

**people** [16] 32:3,22 33:16 34:17 35:22 50:7 51:10 54:1 55:3 63:11,11 71:5 91:17 95:13 100:20 106:6

**percent** [10] 18:13,22 19:6,13 22:18 23:2,2 25:15 44:1,3

**percentage** [10] 18:18 19:11 22:19,22 27:1 37:12 37:17,19,24 44:2

**percentages** [2] 18:10 18:11

**perform** [1] 60:9

**performed** [2] 44:21 59:22

**performing** [2] 21:19 60:7

**perhaps** [6] 6:14 35:17 35:18 36:3 46:19 83:22

**period** [11] 10:11 19:7,9 43:1 60:10 63:19 65:24 69:24 76:18 94:11 97:12

**perjury** [1] 122:1

**permit** [3] 86:2,25 87:10

**person** [6] 8:16 47:22 52:9 70:12 104:17 112:16

**personal** [1] 9:4,7

**personally** [2] 66:9,12

**pertaining** [1] 25:13

**phone** [2] 109:16 115:2

**phrase** [1] 45:16

**Phyllis** [1] 58:8 120:3

**picky** [1] 40:5 90:2

**piece** [1] 73:1 94:17

**Piper** [3] 1:20 2:9 4:11

**place** [6] 6:7 29:2 35:7 55:22 100:1,5

**placed** [7] 71:11 72:17 84:8,20 85:8,18,19

**places** [1] 100:4

**plaintiff** [5] 1:15 2:6 4:15 117:20 118:12

**plan** [6] 45:24 46:15 65:13 117:18

**plans** [1] 47:15

**play** [6] 30:25 31:7,10 49:21 58:18 64:6

**PLAZA** [1] 2:14

**point** [2] 42:17 97:22

**pointing** [1] 99:7

**points** [1] 27:2

**policies** [11] 12:21 21:20 25:20 29:18 31:1 37:13 92:7 103:17 120:11,17 121:7

**policy** [24] 30:13 41:19 53:7,20 54:2 57:23 58:2 63:8 72:10,16 76:3 91:3 92:14 93:16,18 96:11,23 97:22,25 99:17 105:8,15 114:3 119:9

**policyholder** [3] 92:4 119:1,15

**poor** [1] 64:25

**portion** [9] 9:20 18:6 20:1,5 21:13,15 22:16 87:12

**position** [1] 13:9 68:10 68:12

**possibility** [3] 27:1,12 27:15

**possible** [1] 17:24 56:3

**Possibly** [3] 108:20 109:24 110:2

**practice** [2] 32:13 120:15

**precise** [1] 16:2 19:14

**precision** [1] 19:22

**preclude** [1] 92:17

**premium** [8] 18:14,22 37:17,19 41:18,21,25 42:2 42:3 43:9 92:22

**premium-wise** [2] 18:13 19:10

**premiums** [4] 37:13 38:2 44:8 64:9

**prepared** [6] 8:24 24:12 49:11 53:3 87:3 115:16

**preparing** [1] 46:19

**PRESENT** [1] 2:24

**Presumably** [1] 109:18

**pretty** [3] 32:17 34:13 37:8

**preview** [2] 112:16,19 112:20

**previous** [3] 40:10 60:17 104:1

**previously** [3] 81:20 97:21 112:22

**price** [1] 26:25

**pricing** [8] 26:1,6 30:6 30:13 94:6 95:19,24 101:12

**primarily** [1] 12:9

**primary** [1] 10:3

**problem** [6] 59:8 63:18 63:19 75:21 85:19 111:16

**problems** [10] 58:23,24 59:4,5,7 62:4 75:19,21,23 77:6

**procedure** [5] 1:22 35:6 72:8 92:3 120:16

**procedures** [7] 25:20 29:18,24 30:2 75:24 101:14,19

**proceed** [1] 41:7

**Proceedings** [1] 121:15

**process** [11] 31:15 35:14 63:23 70:25 107:24,24,25 114:13 116:6,8,18

**processing** [1] 21:20 25:19 43:15 46:24 62:5 90:1 106:2,13

**produce** [1] 112:22

**produced** [4] 1:15 111:4 112:5,23

**product** [10] 9:24 10:5,6 10:17 11:3,4,18 12:11 18:12 20:16

**production** [1] 7:23

**products** [25] 9:25 10:3 10:18,19 11:3,15,25 12:1 12:12,24 13:11,13 14:20 17:10,10,17 18:5,8,15 25:25 49:5,8 52:24 102:16 105:4

**profit** [8] 37:20 38:19 39:20,21 40:1,8,15,17

**profits** [1] 37:24

**program** [19] 15:25 17:21 19:8,9,13 20:3,5,9,25 21:2 21:4,7,18 43:22 52:19

53:16,19 75:14

**promises** [2] 102:22 103:15

**prompted** [1] 94:21

**proper** [1] 72:7

**proposal** [5] 26:24 58:1 105:7,10,12

**proposals** [1] 21:20

**proprietary** [6] 23:24 24:5,9 25:3 38:12 110:18

**protection** [1] 77:24

**protective** [3] 23:25,25 24:10

**provide** [3] 20:25 46:21 80:22

**provided** [15] 11:7,8 26:3 29:18 30:18 52:18 64:10 74:16 96:23 99:6 102:6 109:3 113:9 116:15,18

**provider** [5] 58:19,21 63:4,6 71:11,19 74:23

**providers** [2] 73:11 75:8

**provides** [1] 72:16

**providing** [2] 101:9 116:7

**provisions** [2] 1:22 106:16

**PUBLIC** [1] 122:11

**purchase** [5] 43:18,20 46:17 47:1,17

**purchased** [1] 44:4

**purchasing** [1] 114:3

**purpose** [2] 17:25 111:22 112:18

**purposes** [2] 5:8 50:8

**pursuant** [3] 1:21 8:10 26:11

**put** [1] 42:5

**putting** [2] 72:10 74:22

---**Q**---

**qualifications** [1] 92:16

**qualified** [1] 26:23

**qualifies** [1] 92:14

**qualifying** [1] 92:18

**quantify** [1] 33:20

**quarterly** [1] 42:21

**questioning** [6] 33:7 73:4 110:16 113:10 118:3 118:10

**questions** [14] 33:6 38:9 50:9 72:5 80:16 82:14 87:23,25 98:21 100:20 112:20,25 121:11,12

**quick** [2] 41:8,9

**quite** [2] 6:21 10:1

**quote** [4] 47:9,10 62:15 84:14

**quoted** [1] 47:11

---**R**---

**R** [4] 1:18 2:1 123:8,19

**raised** [1] 115:5

**Randy** [1] 68:3

**range** [1] 94:15

**ranges** [1] 30:10

**rather** [1] 60:21

**re-marked** [1] 8:4

**reach** [1] 7:2

**reaches** [2] 32:11,11

**read** [6] 84:11,15,17 86:21 102:19 118:22

**reading** [1] 105:11

**ready** [1] 5:23 41:7

**realize** [2] 36:16 119:8

**really** [24] 16:10,13 17:20 22:25 34:8 35:5 39:10 44:7 51:21 55:9,25 56:4 64:23 74:6 82:24 85:15 89:9,20 100:13,14 102:1 105:18 109:10 121:4

**reason** [6] 6:20 36:10 44:6 56:3 69:22 74:23 100:13 111:7

**reasons** [1] 69:22 87:5

**receive** [1] 40:20

**received** [1] 63:4

**receiving** [1] 62:20

**Recess** [2] 41:12 87:18

**recommend** [2] 32:18 37:1

**recommended** [1] 32:2

**record** [17] 1:23 4:1,13 6:5,20 7:4 20:11 28:18 41:11,13 82:3 87:17,19 98:8 113:6 118:22 121:14

**records** [3] 85:6 116:21

**recount** [1] 13:24

**refer** [8] 50:9,24 62:10 63:1 75:3,5 81:19 117:14

**reference** [1] 96:24

**referenced** [3] 30:7 99:2 100:2

**referred** [4] 74:19 95:23 97:21 107:15

**referring** [6] 20:2 88:9 94:17 97:23 98:9 106:18

**refusing** [1] 104:22

**regard** [1] 65:13

**regarding** [1] 25:25

**regardless** [3] 32:7 34:2 34:6

**regards** [1] 94:7

**reimbursed** [1] 105:15

**reimbursement** [2] 62:25 63:7

**reinsurance** [6] 43:18 43:20 44:4,8,12,16

**reinsure** [1] 44:3

**reinsured** [3] 43:21 44:2

**reinsurer** [1] 65:18

**reinsurers** [6] 110:12,16 110:22 112:6,25 113:7

**relate** [1] 25:12

related [9] 10:3,17 15 12
31:15 36:10 54:18 107.13
109:9 123:12
relates [5] 18:13 93:21
93:22 108:23 116:6
relating [1] 15:19,20
31:18 36:12 37:24 59:4
116:2
relations [1] 80:5
relationship [8] 22:8,10
41:16 48:10 51:15 88:16
90:19 102:14
relationships [2] 24:17
89:15
relative [1] 123:14
relatively [1] 26:17
relevance [2] 17:13
28:24
relevant [2] 17:18 27:10
remember [4] 55:9 66:23
70:17 115:20
renewal [2] 105:7,15
renumber [1] 5:15
rep [1] 13:7
repeat [1] 6:22
rephrase [2] 90:16
119:22
replaced [2] 61:19,23
reply [1] 31:16
report [1] 115:16
reported [1] 1:19
reporter [7] 1:18 4:25 5:1
5:4,15,18 123:9
REPORTER'S [1]
123:4
Reporting [2] 5:1 123:21
represent [2] 53:6 121:4
representative [2] 7:9
8:10
representatives [1]
105:3
representing [1] 117:12
request [5] 7:23 47:9
62:20,25 112:24
requested [2] 108:10
111:3,5
requesting [2] 47:10
120:12
require [1] 78:10 91:11
required [2] 29:13 52:10
79:13
requirement [2] 71:17
86:20
requirements [16] 25:18
25:20 29:3,7,8,14 69:6,6
76:2 78:11 84:12 86:4,13
87:3 91:2 92:14
requires [1] 83:16
reserved [1] 18:25
resolve [1] 111:23
respect [17] 8:21 17:19
29:21 51:25 68:13 72:10
76:14 77:16 79:24 89:4
89:17 90:7,17 101:22

105 3 114:22 121.6
respond [3] 34:17 38:13
102.1
responding [1] 38:13
response [2] 89.16
118:25
Responses [1] 7:21
responsibilities [7]
9:19 10:13,14,15,16 17:6
18:20
responsibility [13] 5:17
9:22,23 20:15 49:8 87:25
88:13 89:5,14 91:6 105:5
119:4,14
responsible [6] 17:11
18:5,8 47:22 88:21 104:17
rest [1] 98:14
restate [3] 33:2,4 61:5
restrictions [1] 30:7
result [1] 107:1
retains [1] 45:24
review [3] 32:21 36:1
73:5
reviewed [1] 42:21
reword [1] 6:22
rider [10] 95:25 96:3,9,10
97:1 100:5,9,10,12 101:13
right [42] 8:2 19:25 21:21
29:14 30:14 36:24 39:9
41:4,7 42:23 44:12 49:6
51:5 53:22 63:5 64:6 72:1
72:16 73:15 78:22,24
80:19 83:9 84:8,20 89:11
91:12 101:5,7 110:5
111:14 112:15,21 114:25
117:17 118:2 119:6,14,21
120:1,7,15
risk [9] 21:14,16 43:24
44:1 99:4,10,21,24 100:15
risks [1] 100:21
Road [1] 9:9
Roberta [3] 2:13 4:21
121:3
Rolando [2] 2:18 4:18
role [16] 16:5 30:25 46:3
46:7,10,16 47:21 49:7,21
58:18 66:9 69:9,12 87:22
107:24,25
Rolly [1] 117:10
Roth [6] 55:5,7,8,19 56:5
56:14
rough [1] 65:8
roughly [2] 19:15 38:4
Roy [9] 1:11,14 3:3 4:3
6:1,6 122:4,8 123:5
Rudnick [1] 1:20 2:9
4:11
rule [1] 95:7
rules [5] 1:22 5:7 28:23
78:10 112:14

-S-

S [1] 2:1
sake [1] 117:14

sale [2] 15 19 57.10
sales [1] 13:9
Salt [4] 50.12,13,17,22
San [19] 1:3 2:5 4:4 57:5
57:11,18 66:18 69:16,20
78:7 83:24 97:21 105:8
107:13 108:22 110:13
113:8 120:8,8
sat [1] 39:4
satisfactorily [1] 59:23
satisfactory [1] 79:20
80:11
satisfied [6] 71:18 78:10
84:12,13,16 87:12
satisfy [1] 91:2
saw [4] 7:17 33:24 90:10
95:11
says [2] 32:15 85:21
school [24] 1:3 4:5 50:20
53:6,11,13 54:7 57:5,11
57:18,22 66:18 67:5,19
69:16 78:7 83:24 84:4
105:8,16 119:1,9,16 120:8
Scott [1] 68:3
seal [1] 123:16
search [2] 108:21 110:9
season [1] 16:9
second [1] 77:4
secondly [1] 6:25
section [7] 47:24 84:17
99:7,21,24 100:15 101:4
see [13] 8:12 29:1 31:14
31:15 38:15 39:8 43:2
81:10 82:7 98:3 102:4
114:5,6
seeing [2] 54:23 94:15
self-funded [2] 45:24
47:15
sell [1] 14:19
seminars [1] 52:23
send [3] 42:7 44:11,15
47:8 52:23
sending [1] 21:21
sends [1] 42:1
sense [1] 90:24
sent [4] 7:11 42:16,17
45:1
sentence [1] 7:2
separate [5] 24:17 39:2
92:23,24 109:13
September [1] 12:6
serves [1] 69:13
service [1] 59:9
services [9] 11:6,10,11
12:19,23 20:24 112:1,2
37:3
set [9] 25:9 29:16 34:9
78:5,7 84:11 92:16 108:7
109:11
setup [1] 79:2
seven [1] 17:7
SHADDOX [1] 2:4
sharing [8] 37:21 38:3

38:19 39:21 40:2,8,15,17
Shelby [2] 2 8 4:16
Shore [3] 60:8 61.8 90.1
SHORELINE [2] 2:14
2.15
short [1] 18:4
shorter [1] 21.6
Shorthand [2] 1:18
123:8
show [4] 7:15 75:4,20
82:4 97:20 98:5,7 110:24
shown [2] 83:10 99:5
shows [1] 85:8
shuffling [1] 98:17
sidebar [4] 28:17 74:9
74:13 96:15
significant [5] 18:12
19:6 21:13 30:3 35:5
significantly [2] 16:21
19:5
signing [1] 58:18
similar [4] 34:13,13
68:10,12
simply [5] 32:19 36:15
36:20 75:5 98:23
single [2] 78:8 87:11
sit [1] 79:19
situation [14] 17:21 32:1
33:20 36:4 50:14,21 59:17
60:15 61:7,10,17 83:23
93:12 100:7
situations [2] 32:3 33:22
six [4] 17:7 19:2,20,21
slightly [4] 35:4,4 36:18
36:19
slow [2] 14:6,7
small [2] 34:19 35:7
smaller [2] 92:18,19
sold [2] 12:12 57:21,25
92:7
solve [1] 75:20
someone [4] 51:9 67:1
92:17 115:19
someplace [2] 97:6
110:24
sometime [4] 16:11
58:14 63:15 94:14
sometimes [2] 64:8
91:11
somewhat [3] 18:16
33:19 112:15
somewhere [3] 56:8
94:14 102:19
soon [2] 64:19 65:4
sorry [7] 11:20,22 12:22
15:19 20:2 68:11 89:16
sort [13] 11:21,21 12:21
12:24 13:11 29:23 30:9
32:2 35:21 69:7 98:18
106:14 108:1
South [2] 2:14 9:8,10
10:25
Southern [2] 1:1 4:9

speak [2] 96:19,19
speaking [1] 18:9
speaks [8] 52:7 73:8
75:15 80:12,14 88:18,19
88.24
special [17] 10:5 32:14
32:16,20 35:11 99:4,9,10
99:21,24 100:9,10,12,15
100:20,21 101:13
specially [1] 24:21
specialty [4] 10:17 18:4
18:7,15
specialty-related [1]
9:25
specific [32] 9:19 20:16
48:13,18 59:3,19 77:9
80:20 81:3 84:15 85:11
90:25 94:3,7,23 95:9 96:2
96:24,25 97:7,14,15,15
101:9,15,23 103:16,17
104:9 109:11 118:5 120:7
specifically [5] 61:11
102:2 107:13 108:23
110:3
specified [2] 76:21
111:16
speculate [24] 45:8 51:23
54:15 64:19,20 65:4 77:3
77:21 78:17 79:15,18 81:1
83:4,5,6 89:7,8,10 103:3
103:4,12,20 104:20,25
speculating [3] 27:16
27:19 94:13
speculation [46] 22:24
26:8,13 27:6,7,25 28:16
34:23 35:15,25 39:18,24
40:22 45:7 47:6,19 51:18
52:1 62:24 63:20 64:4,12
64:17 65:3,5 66:22 70:23
72:14 77:20 78:12 79:5
79:17 80:2,25 82:21 83:16
84:24 90:13 91:4 96:12
103:10,19 105:18 114:17
114:19 115:1
speed [2] 81:9 92:4
spelled [1] 9:8
Spent [1] 15:5
spoke [1] 100:6
spoken [1] 107:23
spring [1] 16:9
standard [2] 37:9 48:12
stands [2] 17:22 45:19
start [7] 5:12 7:2 33:12
64:25 67:16 68:11 89:16
started [3] 23:4 94:13,23
starting [5] 5:10 13:19
41:18
state [11] 1:19,21 4:12
15:1,8 29:8 69:5 95:16
122:12 123:1,9
statement [2] 60:23
120:19
statements [5] 103:6,22
104:9,18 118:17
states [7] 1:1 4:9 12:10
15:17 29:12,13 85:13

Royce Hutchison
8/13/03
Case 1:02-cv-00047    Document 27    Filed in TXSD on 09/04/2003    Page 60 of 74
Multi-Page™
stenotype - warning
San Benito vs. Companion

stenotype [1] 1:19
step [2] 53:9 87:24
Stephen [2] 2:3 4:14
steps [1] 61:16
Steve [3] 7:25 17:12
28:17
stick [1] 17:24
still [3] 56:21 74:18,19
stop [73] 9:23,24 10:1,2
10:17 11:3,4,16 12:1,10
12:12,25 15:25 17:21
18:12,16 19:7,9,12 20:3,5
20:25 21:7 22:16 23:8
25:19,25 26:23,24 29:21
31:1 43:21 45:21 46:4,7
46:17,20,21 47:2,9,15,17
47:22 49:8 52:19 53:7
54:18 57:2,10,13,17 62:12
63:8 65:23 68:13,18,19
68:20 72:10 75:13 76:3
79:24 91:7,8,24 94:7,15
95:18 96:1,17,23 97:13
102:23
straight [1] 13:16
Street [4] 1:20 2:9,19
4:11
stretch [1] 41:3
strictly [1] 12:1
styled [1] 4:4
subject [14] 17:17 22:10
30:23 38:21 48:4,7,19
73:6 104:15 107:15,18
112:20 113:10,14
subjects [2] 8:15 40:25
SUBSCRIBED [2]
122:7 123:16
substance [1] 28:24
subtracting [1] 5:16
such [36] 24:7 28:24
29:18,19 31:3,4,22 35:20
37:2 38:5 39:6,12 40:19
49:9,19 51:9 52:10 53:2
63:18,18 65:10,11 67:25
79:10,10 83:17 88:22 95:7
103:22 104:18 107:25
108:21 110:19 113:25
115:9,18
sufficient [5] 35:11
69:25 86:2,25 87:9
suggest [2] 36:5,6
suggestions [1] 52:18
Suite [5] 1:20 2:4,9 4:11
123:22
summer [2] 16:8,9
sums [1] 37:18
supplemental [6] 60:14
Suppose [1] 103:15
surplus [1] 42:16
surprise [1] 117:7
swear [1] 5:2
sworn [5] 1:16 5:3 6:2
122:7 123:16

— T —

takes [7] 44:19,22 62:11
62:14,15,16,19
tape [2] 7:4 87:16
target [2] 42:11,15
teaching [1] 56:7
telling [5] 32:25 76:20
80:24 91:9 95:13
ten [1] 65:7
tendered [1] 87:8
tenders [2] 85:25 86:22
Tennessee [5] 6:8 11:14
15:1,1,8
tennis [1] 56:7
term [11] 13:12 18:3
20:11,18 43:20 49:24 62:7
62:18 90:24 92:2 100:19
terms [9] 18:9,11 21:18
49:8 70:3 75:6,13 78:19
79:23
testified [4] 6:2 60:17
61:1 83:21
testifying [1] 6:16
testimony [29] 8:17,21
28:3 40:10 58:22 60:17
67:13 71:13 74:15,16
86:11 89:25 90:5 101:18
102:15 103:22 104:1,2,7
104:8,13,15 107:3,15,22
110:16 118:20,21 123:13
Texas [14] 1:1,19,21 2:5
2:10,15,20 4:10,12,24
123:1,9,20,22
thank [13] 7:7 9:2,11
23:13 81:18 87:15 97:19
113:2,4 117:2,4 120:23
121:10
Thanks [1] 14:5 19:24
41:6
therein [1] 119:15
they've [2] 57:25 106:25
thinking [2] 81:23 82:11
thinks [1] 75:19
third [2] 82:4,5
third-party [5] 43:14,16
45:20,22,23
thorough [1] 40:4
thought [6] 33:24 38:20
39:4,8 71:21 83:21
three [7] 9:17 10:8 13:2
13:20 16:1 7 22:2 82:6
three-quarters [1] 19:15
threshold [4] 34:9 36:19
36:19,21
threshold's [1] 35:2
through [7] 12:6,12 20:6
20:7 37:13 92:7 98:17
throughout [2] 10:13
42:25
timely [2] 76:6 119:4
times [1] 64:2
timing [3] 76:7,11,15
title [1] 17:2
today [15] 4:16 5:11 6:15
7:8,12 8:9,16 19:10 24:13

45:16 53:5 55:20 79:19
112:10 118:22
too [4] 7:24 72:23 90:2
97:19
top [3] 38:18 39:10 100:11
topic [2] 111:7,16
torn [1] 109:8
total [3] 18:14 23:8 90:24
totally [2] 50:17 74:15
touched [1] 105:6
toward [3] 8:12 15:5
TOWER [1] 2:14
TPA [32] 11:3,6,10,10
12:19,19,23 45:17 46:3,7
46:15,16,19 47:1,4,10,11
47:14,16,23 50:20 51:1,9
62:25 63:4 102:7 106:1
114:2 117:15 118:6,23
119:2
TPAs [7] 11:4,9 12:9,13
47:8 49:19 94:4
track [1] 23:6
trained [1] 14:18
trainee [2] 14:13,13
training [2] 14:15,19
transcript [2] 5:15 7:4
transfers [1] 78:4
treat [2] 35:10 36:23
treated [5] 24:21 25:6
36:12
treatment [1] 34:13
trick [1] 97:24
tried [1] 73:23
trigger [2] 33:15 36:18
triggered [1] 36:20
trouble [1] 56:5
true [6] 19:2 21:23 32:7
34:7 122:2 123:10
try [3] 8:3 17:14 25:4
trying [15] 34:8 36:15
39:8 51:21 53:25 73:1
75:18,21 77:1 85:14 91:12
98:18 118:17,24 119:2
turn [4] 62:11,14,15,16
turnaround [6] 62:8,22
63:10,12,13,15
two [27] 5:16 14:14 20:20
23:2 26:23 34:12 35:6,10
38:9 50:12,21 57:21 69:25
70:8 71:7,7,22 72:6 77:5
82:5 86:1,24 93:4 117:14
120:2,11,17
type [8] 10:17 13:9,10
14:15 23:15 31:20 59:3
83:18
types [1] 31:19
typically [18] 33:15
35:21 36:3 46:16,19 47:1
47:4,11 54:16 66:25 67:7
67:18 70:25 109:20,21
110:6 116:20,22

— U —

ultimate [2] 119:14
121:8
uncertain [1] 5:10
unclear [2] 72:20 74:19
uncommon [1] 46:21
under [17] 5:7 6:15 28:23
31:1 33:20 36:19 40:15
53:6 63:8 70:2 72:10 91:8
91:24 102:12 105:14
122:1 123:16
undersigned [2] 122:7
123:8
understand [40] 6:15,21
7:8 8:8 33:3,8,11,18 35:14
41:16 43:19 44:7 46:4
50:7,11,12 51:1,15,20
53:5,22 58:14,22 59:12
60:15 72:16 75:1,14 76:12
78:11 86:5,6 88:15 89:20
92:24 101:6 106:25 109:5
112:18 114:15
understood [1] 117:15
undertake [1] 5:17
underwriter [1] 15:14
20:13
underwriting [14] 20:16
20:24 21:4,19 26:3,4,18
29:25 30:3,6,17 39:25
40:3 92:14
underwritten [1] 53:20
United [3] 1:1 4:9 12:10
university [1] 15:1,8,9
unless [2] 32:16 110:24
unusual [2] 33:13 48:14
unwritten [1] 52:17
up [27] 22:19,21 23:2 25:9
28:18 32:10 39:9 50:3
58:18 59:11 60:12 67:17
68:8 78:5,7 79:7 81:9 92:4
100:9,10,12 108:7 109:11
111:8 115:19 117:5
118:10
uphold [1] 108:15
used [8] 20:18 42:2 43:7
43:14,18 45:16 49:17
62:18
uses [1] 43:4 45:4 100:16
usually [3] 31:14 47:13
116:19

— V —

vague [65] 21:10 23:20
27:5 31:2 33:1,17 35:16
35:23,25 40:9,21 43:25
44:14 45:6 47:5,18 49:13
52:20 53:18,23 56:3 58:25
59:18 60:1 62:23 63:21
65:2 66:21 72:13,14,18
74:19 75:2,17 76:16 77:12
77:19 79:16 80:1 84:1
88:3,7,14,17 89:6,19
90:12,20,21,23,24,24 91:5
93:10 101:25 103:9,25
104:11 105:17 106:4
114:14,16 115:17,22
116:12

valid [1] 111:19
value [2] 32:7,10
variables [1] 37:6
variance [1] 27:1
varies [1] 93:1
vendor [6] 36:5,6 58:23
59:2,6,9 60:6 61:12,17,19
vendors [1] 51:25
versus [2] 4:5 23:6
vice-president [6] 9:13
9:15,17 10:8 15:24 16:22
Video [1] 4:25
videographer [9] 2:24
4:1,23,24 41:11,13 87:17
87:19 121:14
videos [1] 52:23
videotaped [5] 1:10,14
3:12 4:3 123:5
Vietnam [1] 14:9
violation [1] 96:10
vis-a-vis [1] 119:15
vs [1] 1:7

— W —

wait [1] 6:25
Walraven [240] 2:3,4 3:5
4:14,14 5:6,23 6:4 7:15
7:19,22,24 8:1,3,5 17:14
17:20 18:6 21:11,15 23:1
23:22 24:3,8,15,20,23
25:1,4,5,23,24 26:11,15
26:22 27:11,17 28:5,7,9
28:11,13,22 29:2 31:4
32:25 33:5 34:2 35:2,4
35:20,24 36:2 38:21 39:19
40:3,7,13,15,23 41:15
44:2,5 45:9,13 47:7,21
48:3,5,9,12,14,16,20,23
49:1,16 50:19 51:20 52:3
52:9,22 53:20,24 56:8,11
56:13 57:15,17,21,23,25
59:1,20 60:3,19,22,25
61:3,6 63:2,5,8,22 64:5
64:14,18 65:6,14,15 66:2
66:4,24 67:10,14,16 71:16
72:15,19,21,23 73:1,9,10
73:23,25 74:5,11,13,21
76:19 77:14,21,23 78:15
78:20 79:7,19,23 80:4,15
81:1,12,16,18,19 82:1,13
82:25 83:6,15,21,23 84:2
85:1 86:12,19 87:21,25
88:5,10,15,20 89:1,9,21
90:6,14,23 91:8 93:13
96:14,21 97:16,18,20 98:2
98:3,5,9,11,14,17,23
99:18,20 102:5 103:5,14
103:21 104:4,6,8,14 105:1
105:2,19 106:5 107:5,14
107:23 110:19,22 111:1,6
111:11,14,21,23 112:3,8
112:11,14 113:2,4,5,13
113:17,20 114:6,9,15,20
115:4,19,23 116:14 117:1
119:17 120:24 121:13

warning [2] 18:1 41:1

**week** [1] 65:7
**welcome** [1] 75:3
**western** [1] 12:10
**whatevers** [1] 34:10
**whereby** [1] 92:3
**wherein** [1] 120:16
**white** [1] 91:9
**whole** [2] 98:13 111:22
**willing** [1] 24:9
**Willis** [5] 12:17,18 13:1 13:16,20
**Winston-Salem** [1] 13:5
**within** [7] 30:10 31:8 48:19 70:2 73:7 76:17 111:18
**without** [2] 91:22 96:10
**witness** [20] 1:15 3:3 5:2 5:3 24:12,18 73:4 83:3 98:10 110:23 111:15 112:17 113:11,15 117:3,4 117:6 118:22 120:23 122:8
**witness'** [3] 28:2 83:17 86:10
**witnesses** [1] 8:20
**wonder** [2] 16:20 35:6
**wondered** [8] 30:15 56:1 89:14 90:10 95:14 101:14 106:17 107:16
**wondering** [2] 36:20 44:18
**wording** [1] 84:9
**words** [6] 43:1 84:11,13 84:15 97:7 98:7
**worked** [5] 10:24 11:13 12:17,18 13:4
**works** [1] 42:13
**writing** [8] 5:18 30:15 86:19 93:18,20 94:6,16 108:16
**written** [13] 22:10 29:16 29:23 30:2,18 38:22 49:11 49:17 70:1 86:15 97:13 97:14 108:18
**wrong** [3] 7:19,22 106:6
**Wyoming** [7] 1:8 2:21 4:8,20 49:20 50:1 117:12
**Wythe** [13] 68:23 69:1 70:11,14 71:1,4 108:19 108:23 109:13,16,23 110:4 115:10
**Wythe's** [1] 107:24

## -X-

**X** [2] 3:1 63:12

## -Y-

**y'all** [1] 5:4
**year** [21] 11:1 14:2,2,14 14:18,19 15:2 16:11,13 16:16 22:22 38:17 55:12 57:22 58:2,23 62:5 63:15 65:6,12 105:8

**years** [21] 9:18 10:8 13:2 13:20,23 16:1,17,18 17:7 19:3,8,14,20,21 21:23 22:20 55:14 65:7 101:16 101:20,24 102:2,3
**yet** [1] 45:11
**yourself** [1] 115:9

## -Z-

**zero** [2] 78:1 93:14

## -[-

**[1]** [1] 3:3
**[2]** [1] 3:5
**[3]** [1] 3:9

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SAN BENITO CONSOLIDATED | § | |
| INDEPENDENT SCHOOL DISTRICT | § | |
| | § | |
| VS. | § | CIVIL ACTION No. B-03-047 |
| | § | |
| COMPANION LIFE INSURANCE COMPANY, | § | |
| MANAGED BENEFITS ADMINISTRATOR | § | |
| AND INSURANCE CONSULTANTS, INC., | § | |
| J. ALLAN HALL & ASSOCIATES, INC., | § | |
| and MBA OF WYOMING, INC. | § | |

### NOTICE TO TAKE VIDEOTAPED DEPOSITION

To:    COMPANION LIFE INSURANCE COMPANY
       By and Through its Attorneys of Record,
       Mr. Shelby J. Bush
       PIPER RUDNICK
       1717 Main Street, Suite 4600
       Dallas, Texas 75201-4605

Pursuant to Rule 30 of the Federal Rules of Civil Procedure, the videotaped deposition of a

designated representative(s) of **COMPANION LIFE INSURANCE COMPANY** will be taken

at the following reasonable time and place:

DATE:      **August 13, 2003**

TIME:      10:00 A.M.

PLACE:     Law Offices of Piper Rudnick, 1717 Main Street, Suite 4600, Dallas, Texas
           75201-4605.

The witness or witnesses produced should be knowledgeable and able to testify regarding

the following areas of inquiry:

1.    The relationship between Companion Life Insurance Company and
      MBA of Wyoming, Inc., and Managed Benefit Administrators and
      Insurance Consultants, Inc., (MBAICI) and the authority of MBA of
      Wyoming, Inc., and/or MBAICI to act for Companion Life Insurance
      Company.

2.    The relationship between J. Allan Hall & Associates, Inc., and
      Companion Life Insurance Company, and the authority of J. Allan
      Hall & Associates, Inc., to act for Companion Life Insurance
      Company.

3.    The purchase of stop loss insurance for San Benito Consolidated
      Independent School District for the 2001-2002 policy year.

4.    The use of audits of payment of claims under stop loss policies in
      general; and specifically, the decision to audit the San Benito claims
      payments, the reasons for the audit, the results of the audit, and all



**DEPOSITION EXHIBIT**

55

actions and decisions taken based on the results of the audit.

5.    All conversations and/or communications with any representative of MBA of Wyoming, Inc., and/or MBAICI, and/or the Consolidated Companies, regarding providing advanced funding[1] of health insurance claims under stop loss insurance to San Benito Consolidated Independent School District, and/or to the clients of MBA of Wyoming, Inc. and/or MBAICI, in general.

6.    The availability of stop loss insurance coverage with advanced funding, and the nature of stop loss policy forms providing for such benefits.

7.    The policies and procedures utilized for processing reimbursement claims under stop loss insurance which do provide for advanced funding of benefits, as well as under such stop loss insurance forms which do not provide for advanced funding of claims.

8.    An explanation of the origin and significance of all documents requested to be produced at the deposition.

A court reporter and videographer will be present for the taking of this deposition.

Respectfully submitted,

LAW OFFICES OF RENE RAMIREZ
Celeste Guerra
1906 Tesoro
Pharr, Texas 78577
Telephone: 956/783-7880
FAX # 956/783-7884
AND
SHADDOX, COMPERE, WALRAVEN
    & GOOD, P.C.
1250 N. E. Loop 410, Suite 725
San Antonio, Texas 78209
Telephone: 210/822-2018
FAX: 210/822-4068

By:_____
        Stephen E. Walraven
        State Bar No. 20796800
ATTORNEYS FOR PLAINTIFF

---

[1] "Advanced funding" means payment under a stop loss insurance program for a covered claim, funded prior to the claim having been paid to the provider.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served on counsel listed below on this 16th day of July, 2003.

ATTORNEYS FOR DEFENDANT
COMPANION LIFE INSURANCE COMPANY
Mr. Shelby J. Bush
PIPER RUDNICK
1717 Main Street, Suite 4600
Dallas, Texas 75201-4605

ATTORNEYS FOR DEFENDANT
J. ALLAN HALL & ASSOCIATES, INC.
Ms. Roberta J. Hegland
BRACEWELL & PATTERSON, L.L.P.
2000 One Shoreline Plaza, South Tower
800 North Shoreline Boulevard
Corpus Christi, Texas 78401-3700

ATTORNEYS FOR DEFENDANTS
MBA OF WYOMING, INC., AND MANAGED BENEFITS
ADMINISTRATOR AND INSURANCE CONSULTANTS, INC.
Ms. Cindy A. Garcia
THE GARCIA LAW FIRM, P.C.
201 North 1st Street
Harlingen, Texas 78550

STEPHEN E. WALRAVEN



Exhibit "2"

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SAN BENITO CONSOLIDATED | § | |
| INDEPENDENT SCHOOL DISTRICT | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-03-047 |
| | § | |
| COMPANION LIFE INSURANCE COMPANY, | § | |
| MANAGED BENEFITS ADMINISTRATOR | § | |
| AND INSURANCE CONSULTANTS, INC., | § | |
| J. ALLAN HALL & ASSOCIATES, INC., | § | |
| and MBA OF WYOMING, INC. | § | |

<div style="border:1px solid black">

**PLAINTIFF'S FIRST AMENDED
ORIGINAL COMPLAINT**

</div>

TO THE HONORABLE UNITED STATES DISTRICT COURT:

NOW COMES Plaintiff, **SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT,** and files this its First Amended Original Complaint, still complaining of **COMPANION LIFE INSURANCE COMPANY, MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS, INC., J. ALLAN HALL & ASSOCIATES, INC., and MBA OF WYOMING, INC.,** and for its claims, would respectfully show the Court as follows:

### JURISDICTION

1.      This case was removed to this Court pursuant to its diversity jurisdiction under 28 U.S.C. § 1332.

### PARTIES

2.      Plaintiff, **SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT** ("San Benito CISD" and/or the "School District") is a school district in Cameron County, Texas.

3.      Defendant, **COMPANION LIFE INSURANCE COMPANY** ("Companion Life"), of Columbia South Carolina, is an insurance company licensed to sell life, health and accident insurance in the State of Texas, and it does business in Texas. No service of citation is necessary on this Defendant because it has already answered this lawsuit.

EXHIBIT "A"

MANAGED BENEFITS ADMINISTRATOR AND

INSURANCE CONSULTANTS, INC. ("MBAICI"), is a foreign corporation, and has its principal place of business in Salt Lake City, Utah. It is not authorized to do business in the State of Texas but is doing business in this State. No service of citation is necessary on this Defendant because it has previously answered this lawsuit.

5.      Defendant, **J. ALLAN HALL & ASSOCIATES, INC.** ("J. Allan Hall"), is a foreign corporation licensed as the d/b/a of James Allan Hall, Individually, and does business in Texas. Mr. Hall has a non-resident agent's license to sell life, health and accident insurance. No service of citation is necessary on this Defendant because it has previously answered this lawsuit.

6.      Defendant, **MBA OF WYOMING, INC.** ("MBA"), is a foreign corporation authorized to do business in the State of Texas and does business in Texas. It holds a third-party administrator's license in Texas. No service of citation is necessary on this Defendant because it has previously answered this lawsuit.

## BACKGROUND FACTS

7.      Since the mid-1990s, the San Benito CISD has been self-insured with regard to the health insurance benefits which it provides to its employees, and their dependents. However, to protect the School District from large claims each year, it purchased a policy of stop-loss insurance. The stop-loss insurance was purchased by the School District for its sole benefit and the stop-loss insurance in no way affected the benefits owed or paid to the School District's employees and their dependents.

8.      During the 2000-2001 school year, the School District purchased stop-loss insurance from Companion Life. Under the terms of the stop-loss policy issued by Companion Life, the School District would pay the first $75,000 incurred by any of its employees or their dependents for covered medical expenses out of its own funds. After expending the sum of $75,000 for any one employee or that employee's dependent, any additional sums spent by the School District for additional covered medical expenses would

be reimbursed by Companion Life, up to a per person policy limit of One Million Dollars.

9.     The policy of insurance referred to above with Companion Life was procured through MBA. J. Allan Hall acted as the agent and representative of Companion Life with respect to providing this policy of stop-loss insurance to the School District.

10.     For valuable consideration, MBA further agreed to process all claims made by employees or their dependants of the School District and seek reimbursement from Companion Life for covered medical expenses that exceeded $75,000 for any one claim. Plaintiff alleges that MBA operated as a single business enterprise with MBAICI, and MBAICI is therefore jointly and severally liable for the conduct of MBA.

11.     MBA represented to the School District that if medical benefits were incurred during the policy period by an employee and/or an employee's dependent in excess of $75,000, such expenses would be reimbursed by Companion Life to the School District, even if MBA had not yet issued a check for those expenses to the appropriate health care provider.

12.     MBA has advised San Benito CISD that it processed claims in this manner because J. Allan Hall represented to MBA that Companion Life's reimbursement of sums due under its policy did not depend on first issuing a check for covered medical expenses for its employees and/or their dependents. MBA asserted that J. Allan Hall had represented that all of its stop-loss policies, including all Companion Life policies, operated in this manner.

13.     J. Allan Hall's representations to MBA, and MBA's representations to the School District, contradicted the terms of the policy issued by Companion Life to the School District. MBA never reviewed the Companion Life policy during the time it performed services for the School District, even though this policy contained terms and conditions concerning reimbursement of covered expenses from Companion Life that now forms the basis of Companion Life's denial of the claims made in this lawsuit.

14.     Contrary to these representations made by J. Allan Hall and MBA, in excess of $800,000 of payments made by the School District on behalf of its employees and their dependents were not reimbursed by Companion Life. Also contrary to these representations

of J. Allan Hall and MBA, Companion Life asserted that although the medical expenses had been incurred during the policy period, Companion Life was refusing to provide reimbursement to the School District for a sum in excess of $800,000 because MBA had not mailed the checks during the policy period.

15.     The Companion Life policy period ended on August 31, 2001. Shortly before this date, MBA undertook to place new stop-loss insurance on behalf of the School District for the 2001-2002 school year. MBA prepared the paperwork to solicit proposals for stop-loss insurance, and obtained quotations from both Companion Life, and another entity known as B.C.S. Insurance Company. The application and other appropriate documents were completed in August, 2001. The proposal from Companion Life was approximately $500,000 higher than the proposal from B.C.S., and MBA recommended that the School District accept the B.C.S. proposal.

16.     Unfortunately, the paperwork submitted to B.C.S. by MBA was inadequate and incomplete. Although MBA continued to reassure the School District that it had purchased stop-loss insurance from B.C.S., B.C.S. had in fact had not provided the stop-loss insurance. Late in the Fall of 2001, when the application paperwork had been corrected, and B.C.S. had obtained the proper disclosures, it became apparent that there were a number of claims which might have been covered by the new stop-loss policy had it already been purchased. This is true because the new policy would have provided coverage for covered medical expenses incurred over a three-month period of time prior to the expiration of the old policy, and paid during the twelve-month policy period of the new policy.  B.C.S. declined to provide the stop-loss insurance for benefits already paid by the School District and severely limited the amount it would pay for other named employees and their dependents. These sums, would have been reimbursed to the School District had the stop-loss insurance been properly and timely renewed for the 2001-2002 school year. If properly handled by MBA, this coverage would have overlapped with the Companion Life coverage, to some extent.

17.     Defendant, J. Allan Hall, on behalf of itself and its principal, Companion Life,

has taken the position in this lawsuit that the Companion Life policy was a policy of reinsurance and that Companion Life was therefore a reinsurer. Defendant, J. Allan Hall, has further taken the position that it is a reinsurance manager. Plaintiff believes and so believing alleges it to be a fact that Defendant, J. Allan Hall, has taken this position to receive the benefit of certain defenses available under the Reinsurance Act. Plaintiff would show the Court that J. Allan Hall is not licensed as a reinsurance manager in the State of Texas as is required by TEX. INS. CODE, §21.07-7.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION - VIOLATIONS OF TEX. INS. CODE ART. 21.21

18.    All Defendants have violated the provisions of TEX. INS. CODE Art. 21.21, including, but not limited to, the following:

    1.    Misrepresenting the terms of the policy issued by Companion Life.

    2.    In misrepresenting to the Plaintiff material facts and policy provisions relating to coverages at issue.

    3.    In making untrue statements of material fact.

    4.    In failing to state a material fact that is necessary to make other statements made not misleading, considering the circumstances under which the statements were made.

    5.    In making a statement in such a manner as to mislead a reasonably prudent person to a false conclusion of a material fact.

### SECOND CAUSE OF ACTION - NEGLIGENT MISREPRESENTATION

19.    MBA made negligent representations to the School District, each representation of which was a proximate cause of Plaintiff's damages, including but not limited to the following:

    1.    Representing to the School District that it was not necessary to pay covered medical expenses for its employees and/or their dependents during the policy period for covered medical expenses incurred during the policy period.

In representing to the School District that it had purchased a new stop-loss policy from BCS that would commence immediately upon the expiration of the Companion Life policy.

20. J. Allan Hall made negligent representations, each of which were a proximate cause of Plaintiff's damages, including but not limited to representing to MBA that Companion Life would provide advanced funding for covered medical expenses incurred by employees, and their dependents, of the School District, even though MBA had not paid these covered medical expenses prior to seeking reimbursement from Companion Life. Companion Life is vicariously liable for the conduct of J. Allan Hall.

### THIRD CAUSE OF ACTION - NEGLIGENCE

21. MBA and/or MBAICI committed various acts and omissions of negligence, each act or omission of which was a proximate cause of Plaintiff's damages, including but not limited to the following:

1. In failing to read the policy and verify that its terms and conditions were consistent with MBA's expectations and J. Allan Hall's representations.

2. In failing to read the Companion Life policy at issue and pay covered claims so as to obtain reimbursement from Companion Life according to the terms of its policy.

3. In failing to timely renew the stop-loss policy for the School District for the 2001-2002 school year.

4. In failing to properly prepare the applications, disclosures, and other required paperwork for the renewal of the stop-loss policy for the 2001-2002 school year.

MBAICI is jointly and severally liable for the conduct of MBA, and MBA is jointly and severally liable for the conduct of MBAICI.

### FOURTH CAUSE OF ACTION - BREACH OF CONTRACT

22. MBA breached its contract with the School District in failing to timely and properly pay covered medical expenses in accordance with the Companion Life policy and seek reimbursement from Companion Life in a timely manner. MBA and/or MBAICI also

breached their contract to timely purchase stop-loss insurance for the 2001-2002 policy period. Such breaches of contract was a proximate cause of Plaintiff's damages.

23.     MBA and Companion Life's agent, J. Allan Hall, had followed a practice and course of dealing over several years of reimbursing claims without first requiring that checks had been mailed to health care providers. Such course of dealing constitutes a modification of the written contracts, and/or estops Companion Life from asserting otherwise. Plaintiff and MBA acted in reasonable reliance on this course of dealing, in how MBA processed the claims. Companion Life's refusal to pay such claims is a breach of contract, as modified, and a breach of its obligations under promissory estoppel. Such breaches proximately caused damage to Plaintiff.

### FIFTH CAUSE OF ACTION - VIOLATIONS OF TEX. INS. CODE, ART. 21.55

24.     Companion Life has violated the provisions of TEX. INS. CODE, Art. 21.55 including but not limited to its failure to reimburse the School District for the covered claims of certain employees and/or their dependents when these claims exceeded $75,000. The School District is entitled to the statutory damages provided by Art. 21.55 as hereinafter set forth.

### DAMAGES

25.     Plaintiff's actual damages are in excess of $800,000, which represents the sum of money for which it has not been reimbursed by Companion Life.

26.     As to the First Cause of Action for violations of TEX. INS. CODE, Art. 21.21, Plaintiff is entitled to its actual damages, and to the extent that the trier of fact finds that any of the Defendants knowingly committed the acts complained of, Plaintiff seeks additional damages not to exceed three times the amount of actual damages. In addition, Plaintiff is entitled to the reasonable and necessary attorney's fees incurred in prosecuting this lawsuit.

27.     As to the Second Cause of Action for negligent misrepresentation, Plaintiff is entitled to its actual damages as set forth above.

28.     As to the Third Cause of Action for negligence, Plaintiff is entitled to its actual

damages as set forth above.

29.    As to the Fourth Cause of Action for breach of contract, Plaintiff is entitled to its actual damages as set forth above and the reasonable and necessary attorney's fees incurred in prosecuting this lawsuit.

30.    As to the Fifth Cause of Action for violations of TEX. INS. CODE, Art. 21.55, Plaintiff is entitled to 18 percent per annum on the amount of its actual damages, together with reasonable attorney's fees.

WHEREFORE, PREMISES CONSIDERED, Plaintiff, **SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT,** prays that upon final trial, Plaintiff recover its damages as set forth above, pre-judgment interest and post-judgment interest as permitted by law, attorney's fees, and for such other and further relief to which Plaintiff may be justly entitled.

Respectfully submitted,

LAW OFFICES OF RENE RAMIREZ
Celeste Guerra
1906 Tesoro
Pharr, Texas 78577
Telephone: 956/783-7880
FAX # 956/783-7884
AND
SHADDOX, COMPERE, WALRAVEN
    & GOOD, P.C.
1250 N. E. Loop 410, Suite 725
San Antonio, Texas 78209
Telephone: 210/822-2018
FAX: 210/822-4068

By:_____
        Stephen E. Walraven
        State Bar No. 20796800
        Otto S. Good
        State Bar No. 08139600
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served on counsel listed below on this ___ 2 ___ day of August, 2003.

_____
STEPHEN E. WALRAVEN
OTTO S. GOOD

**ATTORNEYS FOR DEFENDANT**
**COMPANION LIFE INSURANCE COMPANY**
Mr. Shelby J. Bush
PIPER RUDNICK
1717 Main Street, Suite 4600
Dallas, Texas 75201-4605

**ATTORNEYS FOR DEFENDANT**
**J. ALLAN HALL & ASSOCIATES, INC.**
Ms. Roberta J. Hegland
BRACEWELL & PATTERSON, L.L.P.
2000 One Shoreline Plaza, South Tower
800 North Shoreline Boulevard
Corpus Christi, Texas 78401-3700

**ATTORNEYS FOR DEFENDANTS**
**MBA OF WYOMING, INC., AND MANAGED BENEFITS**
**ADMINISTRATOR AND INSURANCE CONSULTANTS, INC.**
Ms. Cindy A. Garcia
THE GARCIA LAW FIRM, P.C.
201 North 1st Street
Harlingen, Texas 78550