IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 1 6 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT | § § § | |
| vs. | § § § | CIVIL ACTION NO. B-03-047 |
| COMPANION LIFE INSURANCE COMPANY, MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS, INC., J. ALLAN HALL & ASSOCIATES, INC., and MBA OF WYOMING, INC. | § § § § § § | |

> **PLAINTIFF'S SUR-REPLY TO DEFENDANT, J. ALLAN HALL & ASSOCIATES, INC.'S, MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

NOW COMES Plaintiff, **SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT**, and with leaving having been previously granted, files this its Sur-Reply to Defendant, J. ALLAN HALL & ASSOCIATES, INC.'s, Motion for Summary Judgment, and for such Sur-Reply, would show unto this Court as follows:

**I.**

Plaintiff has sued Defendant, J. ALLAN HALL & ASSOCIATES, INC. (hereinafter referred to as "Hall"), for misrepresentations it made in connection with the sale of the stop-loss insurance policy at issue in this case. Plaintiff has alleged causes of action based on those misrepresentations, both under Article 21.21 of the TEXAS INSURANCE CODE, and for common law negligent misrepresentation. Hall raises, in its reply brief, as additional grounds for summary judgment, that Plaintiff did not justifiably rely on those misrepresentations.

The misrepresentations at issue involve a feature of the insurance policy known as "specific advanced funding." Mr. Don Merrill testified that Mr. J. Allan Hall assured him that stop-loss policies, such as the one at issue in this case, would come with the specific advanced funding

Page -1-

feature[1]. Mr. Hall, at his deposition, did not dispute that such representations were made[2]. There is no dispute that the policy makes no reference to a specific advanced funding feature, and J. Allan Hall has certainly taken the position in its Motion for Summary Judgment that the policy did not provide such a feature. Therefore, there is certainly a fact question raised that the representations were false[3]. Nor is there any dispute that the contract was administered by MBA as if it did have the specific advanced funding feature, thus establishing reliance[4]. The only remaining issue, the one raised by Hall, is not the absence of reliance, but whether or not the reliance was "justifiable." Plaintiff would show that Hall has not established that it is entitled to summary judgment on the issue of the justifiability of the reliance.

## II.

Under the first cause of action alleged against Hall, under Article 21.21 of the TEXAS INSURANCE CODE, there is no requirement of a showing of reliance, only causation (although often proof of causation does involve proof of reliance). To establish such a cause of action, a plaintiff need not show reliance, and certainly need not show justifiable reliance. *See Hart v. Berko, Inc.*, 881 S.W.2d 502, 506-507 (Tex.App.-El Paso 1994); *Crawford & Company v. Garcia*, 817 S.W.2d 98, 101 (Tex.App.-El Paso 1991); and *First American Title Company of El Paso v. Prata*, 783 S.W.2d 697, 701 (Tex.App.-El Paso 1990). Since reliance is clearly shown, or at least a fact question as to reliance is raised by the testimony of Mr. Don Merrill and Ms. Phyllis Merrill, the causation element is established for summary judgment purposes, and nothing further is required to defeat summary judgment regarding the claims brought pursuant to Article 21.21 of the TEXAS INSURANCE CODE.

---

[1]*See* deposition of Mr. Don Merrill, at p. 64, L.2 to p.66, L.5. The deposition of Mr. Merrill, in its entirety, is attached to Plaintiff's Response to Summary Judgment. For the convenience of the Court, the specific pages referenced herein are attached as Exhibit "A."

[2]*See* deposition of Mr. J. Allan Hall, at p. 65, L.5 to p.67, L.10, attached as Exhibit "B."

[3]In testimony, Mr. Merrill has suggested that the written contract may be varied by the practices, customs and usages in the industry. *See* Merrill deposition at p. 68, L.7-17, pages attached as Exhibit "C." However, that issue is not currently before the Court.

[4]*See* the deposition of Don, Merrill, p.222, L.12-15, pages attached as Exhibit "D", and the deposition of Phyllis Merrill, p.26, L.19 to p.27, L.6, attached as Exhibit "E."

## III.

The cause of action for negligent misrepresentation does have a requirement that the reliance be justifiable. The Fifth Circuit has explained the meaning of the phrase "justifiable reliance" as follows:

> This requirement, also called the "materiality" element has two aspects: The plaintiff must in fact have relied; and this reliance must have been reasonable...Put another way, there must be a reasonable relation between the contents of defendant's misrepresentation and the action the plaintiff took in reliance."

*Geosearch, Inc. v. Howell Petroleum Corp.*, 819 F.2d 521, 526 (5th Cir. 1987). In the context of this case, it must be shown that there is a "reasonable relation" between Hall's representation that the policy had the specific advanced funding feature, and MBA's processing claims as if the policy had such a feature. Obviously, there is a direct relationship between the representation, and the conduct undertaken in reliance on the representation. Hall offers no summary judgment evidence tending to show the lack of justifiability. Instead, Hall relies entirely on Plaintiff's pleadings against MBA. Hall argues that Plaintiff's assertion that MBA was negligent in failing to read and verify the policy terms and conditions is summary judgment evidence that the reliance could not have been justifiable. However, pleadings are not summary judgment evidence.

Obviously, MBA has taken the position that it is free of fault, and that the blame lies entirely with Hall. Unsurprisingly, Hall places the blame on MBA. Plaintiff has alleged causes of action against both, and it will probably require the jury to sort out which one, or both, are to blame. The fact that a plaintiff has made alternative, or even inconsistent, allegations against the defendants is not summary judgment evidence of anything. What is in summary judgment evidence is the testimony of Mr. Don Merrill, referenced above, asserting that the reliance on Hall's representations were certainly justified.

WHEREFORE, PREMISES CONSIDERED, Plaintiff, SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, prays that J. ALLAN HALL & ASSOCIATES, INC.'s Motion for

Summary Judgment be in all things denied.

Respectfully submitted,

LAW OFFICES OF RENE RAMIREZ
Celeste Guerra
1906 Tesoro
Pharr, Texas 78577
Telephone: 956/783-7880
FAX # 956/783-7884
AND
SHADDOX, COMPERE, WALRAVEN
& GOOD, P.C.
1250 N. E. Loop 410, Suite 725
San Antonio, Texas 78209
Telephone: 210/822-2018
FAX: 210/822-4068

By: _____
Stephen E. Walraven
State Bar No. 20796800
Otto S. Good
State Bar No. 08139600
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served on counsel listed below on this _15th_ day of September, 2003.

_____
STEPHEN E. WALRAVEN
OTTO S. GOOD

**ATTORNEYS FOR DEFENDANT**
**COMPANION LIFE INSURANCE COMPANY**
Mr. Shelby J. Bush
PIPER RUDNICK
1717 Main Street, Suite 4600
Dallas, Texas 75201-4605

**ATTORNEYS FOR DEFENDANT**
**J. ALLAN HALL & ASSOCIATES, INC.**
Ms. Roberta J. Hegland
BRACEWELL & PATTERSON, L.L.P.
2000 One Shoreline Plaza, South Tower
800 North Shoreline Boulevard
Corpus Christi, Texas 78401-3700

**ATTORNEYS FOR DEFENDANTS**
**MBA OF WYOMING, INC., AND MANAGED BENEFITS**
**ADMINISTRATOR AND INSURANCE CONSULTANTS, INC.**
Ms. Cindy A. Garcia
THE GARCIA LAW FIRM, P.C.
201 North 1st Street
Harlingen, Texas 78550

## **TABLE OF CONTENTS**

<div align="right">Page</div>

Exhibits

Excerpts of Oral Deposition of Don Merrill . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit "A"
  *See* p.64, L.2 to p.66, L.5

Oral Deposition of J. Allan Hall . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit "B"
  *See* p.65, L.5 to p.67, L.10

Excerpts of Oral Deposition of Don Merrill . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit "C"
  *See* p.68, L.7-17

Excerpts of Oral Deposition of Don Merrill . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit "D"
  *See* p.222, L.12-15

Oral Deposition of Phyllis Merrill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit "E"
  *See* p.26, L.19 to p.27, L.6

# CONDENSED TRANSCRIPT

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | |
|---|---|
| SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, )<br><br>        Plaintiffs, )<br><br>    vs. )<br><br>COMPANION LIFE INSURANCE COMPANY, MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS, INC., J. ALLAN HALL & ASSOCIATES, INC., and MBA OF WYOMING, INC., )<br><br>        Defendants. ) | Deposition of:<br><br>**PHYLLIS K. MERRILL**<br><br>**VOLUME I**<br><br><br><br><br><br>Civil Action No.:  B-03-047 |

**July 21, 2003 - 5:30 p.m.**

Location:  Offices of CitiCourt Reporting
50 S. Main, Suite 830
Salt Lake City, Utah

Reporter:  Vicky McDaniel, RMR
Notary Public in and for the State of Utah



**CitiCourt**, LLC
THE REPORTING GROUP

50 South Main, Suite 830
Salt Lake City, Utah 84144

801.532.3441          TOLL FREE 877.532.3441          FAX 801.532.3414

San Benito vs. Companion Life Insurance
Phyllis K. Merrill, Volume I * July 21, 2003

SHEET 1   PAGE 1

## PAGE 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
SAN BENITO CONSOLIDATED        )
INDEPENDENT SCHOOL DISTRICT,   )  Deposition of:
                               )
        Plaintiffs,            )  PHYLLIS K. MERRILL
                               )
                               )  VOLUME I
    vs.                        )
                               )
COMPANION LIFE INSURANCE       )
COMPANY, MANAGED BENEFITS      )
ADMINISTRATOR AND INSURANCE    )
CONSULTANTS, INC., J. ALLAN    )
HALL & ASSOCIATES, INC., and   )
MBA OF WYOMING, INC.,          )
                               )  Civil Action No.:  B-03-047
        Defendants.            )
```

July 21, 2003 - 5:30 p.m.
Location:  Offices of CitiCourt Reporting
50 S. Main, Suite 830
Salt Lake City, Utah
Reporter:  Vicky McDaniel, RMR
Notary Public in and for the State of Utah

## PAGE 2

Phyllis K. Merrill, 7/21/03                2

A P P E A R A N C E S

1   FOR THE PLAINTIFF:
2       STEPHEN E. WALRAVEN, ESQ.
3       OTTO S. GOOD, ESQ.
4       SHADDOX, COMPERE, WALRAVEN & GOOD, P.C.
        The North Frost Center
5       1250 N.E. Loop 410, Suite 725
        San Antonio, TX  78209
6       (210) 822-2018
7   FOR DEFENDANTS MBA OF WYOMING, INC., AND MANAGED
    BENEFITS ADMINISTRATOR AND INSURANCE
8   CONSULTANTS, INC.:
9       FRED L. SHUCHART, ESQ.
        MASON, COPLEN, SHUCHART, HUTCHINS
10          & BANKS
        7500 San Felipe, Suite 700
11      Houston, TX  77063
        (713) 785-5595
12
13  FOR DEFENDANT COMPANION LIFE INSURANCE COMPANY:
14      SHELBY J. BUSH, ESQ.
        PIPER RUDNICK
15      1717 Main Street, Suite 4600
        Dallas, TX  75201-4605
16      (214) 743-4500
17  FOR DEFENDANT J. ALLAN HALL & ASSOCIATES:
18      ROBERTA J. HEGLAND, ESQ.
        BRACEWELL & PATTERSON L.L.P.
19      2000 One Shoreline Plaza, South Tower
        800 Shoreline Boulevard
20      Corpus Christi, TX  78401-3700
        (361) 866-7226
21      ALBERT GEORGE, ESQ.
        J. ALLAN HALL & ASSOCIATES, INC.
22      55 Monument Circle, 11th floor
        Indianapolis, IN  46204
23
    ALSO PRESENT:  Don Merrill
24
25
                CitiCourt, LLC
                (801) 532-3441

## PAGE 3

Phyllis K. Merrill, 7/21/03                3

1                  I N D E X
2   WITNESS                                    PAGE
3       PHYLLIS K. MERRILL
4   Examination by Mr. Good                       4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                CitiCourt, LLC
                (801) 532-3441

## PAGE 4

Phyllis K. Merrill, 7/21/03                4

1                P R O C E E D I N G S
2                  PHYLLIS K. MERRILL,
3   having first been duly sworn to tell the truth,
4       was examined and testified as follows:
5                    EXAMINATION
6   BY MR. GOOD:
7       Q.   Would you tell us your name, please.
8       A.   **My name is Phyllis K. Merrill.**
9       Q.   Ms. Merrill, you have been here all day
10  while your husband has been deposed.  Is that correct?
11      A.   **That's true.**
12      Q.   And I assume I don't have to explain to you
13  what a deposition is?
14      A.   **That's true.**
15      Q.   Let me ask you to do a couple things that
16  will help me and the court reporter and get us through
17  here tonight.  Most important thing I'd like you to do
18  is not answer a question until you understand it.
19  Okay?
20      A.   **Thank you.**
21      Q.   In deference to you, you ought to understand
22  what you're answering, and I'd like to rely on your
23  answers.  Okay?
24      A.   **Yes.**
25      Q.   Have you given a deposition before?
                CitiCourt, LLC
                (801) 532-3441

San Benito vs. Companion Life Insurance
Phyllis K. Merrill, Volume I * July 21, 2003

PAGE 5

Phyllis K. Merrill, 7/21/03                    5

1    A.    One time.
2    Q.    Okay.  In connection with what?
3    A.    It was an insurance claim.
4    Q.    Okay.  Were you making the claim or --
5    A.    No.  I was aiding MBA in a contract claim.
6  It was a long, long time ago.  Twelve or fifteen years,
7  twelve years ago.
8    Q.    Was MBA being sued?
9    A.    Yes.
10    Q.    Do you recall who was suing MBA?
11    A.    I don't remember their names.  Sorry.
12    Q.    Was it a stop loss claim such as this?
13    A.    No.
14    Q.    Do you recall generally what kind of claim
15  it was?
16    A.    It was some kind of a disagreement about
17  services under the administration agreement and what
18  was included and what wasn't included.
19    Q.    Okay.  Were they complaining, whoever was
20  suing you, were they complaining about something they
21  alleged MBA did or didn't do?
22    A.    I think they were trying to get out of an
23  ERISA audit, a DOL audit.  They were trying to throw
24  suspicion to us.
25    Q.    Did the case settle?

PAGE 6

Phyllis K. Merrill, 7/21/03                    6

1    A.    It did settle.
2    Q.    What is your educational background?
3    A.    I have only a high school graduation.
4    Q.    Now, my understanding -- what is your
5  current title with MBA?
6    A.    Chief operations officer.
7    Q.    Okay.  And that means different things to
8  different people.  What's that mean in terms of MBA?
9    A.    I have oversight of the operations of the
10  company, including the claims department, the group
11  administration department.
12    Q.    And for how long have you been the COO?
13    A.    Since January 1, 2001.
14    Q.    Okay.  Before that what was your position
15  with MBA, if you had one?
16    A.    I was director of operations.
17    Q.    Day to day, what did you do as director of
18  operations?
19    A.    Same thing, different company.
20    Q.    Okay.  So when you were director of
21  operations, was that for MBA of Wyoming, Inc.?
22    A.    That's correct.
23    Q.    And then when you became COO, is that when
24  MBA began to call themselves MBA/ICI?
25    A.    Yes.

PAGE 7

Phyllis K. Merrill, 7/21/03                    7

1    A.    And that would have been sometime in January
2  of 2001?
3    A.    Yes.
4    Q.    And let me tell you, I'm going to skip
5  around, because I don't want to ask all the questions
6  that your husband was asked.
7          Were you at that meeting in May of -- I
8  believe it was May of 1999 when Mr. Hall came to visit?
9    A.    I was in a meeting with Mr. Hall, and not
10  certain of the dates.
11    Q.    Okay.  You just don't remember the date?
12    A.    No.  I don't remember the year, actually.
13    Q.    Okay.  Now, you've heard your husband
14  testify to what he recalls being said in the meeting?
15    A.    Yes.
16    Q.    Do you have any other -- do you recall
17  anything else that was said in that meeting other than
18  what Mr. Merrill has already testified to?
19    A.    I remember the questions that were brought
20  with regard to are we interested in writing more
21  business with Mr. Hall's organization, and through
22  Mr. Shuchart.  We were in general just interviewing, I
23  think to find out what their turnaround time was,
24  carriers they used, what the characteristics of the
25  carriers were, what their ratings were.  And I think

PAGE 8

Phyllis K. Merrill, 7/21/03                    8

1  the reason I was included is from the operational
2  standpoint, the filing of claims, how that really --
3  they really wanted to see everyone, make sure we
4  understood their operational, you know, how we could
5  handshake with them.
6    Q.    Do you recall --
7    A.    Hand-off of claims.
8    Q.    Do you recall the conversations about
9  advance funding?
10    A.    I do.
11    Q.    And do you recall anything different from
12  what your husband said?
13    A.    I think he said it right on.
14    Q.    Now, when you say you have oversight over
15  MBA, what do you do day to day?
16    A.    I assist in and facilitate the main work of
17  MBA through employees.  I'm there to answer questions
18  or find resources to answer questions with regard to
19  gray areas of claims payment, the newer laws, the HIPAA
20  laws, COBRA, FMLA, ADA, all of that stuff, ERISA, all
21  of that, as well as to oversee the flow of documents
22  and information for that name part of our business.
23    Q.    As I recall, Mr. Merrill said that you had
24  about 20 employees.  Do you recall that?
25    A.    Yes.

San Benito vs. Companion Life Insurance
Phyllis K. Merrill, Volume I * July 21, 2003

SHEET 2    PAGE 9

Phyllis K. Merrill, 7/21/03                              9

1    Q.    Was that generally true between October of
2  2000 and the end of August of 2001?
3    A.    We may have had a few more.
4    Q.    Okay, but --
5    A.    Not too many more.
6    Q.    And as I understand it, you have -- you as
7  the chief operating officer, and then you have two
8  departments, one being administration and one being
9  claims.
10   A.    Yes.
11   Q.    Do you have two individuals -- and again I'm
12 talking about the time period between October of 2000
13 and August 31 of 2001.  Did you have two individuals
14 that were heads of those respective departments?
15   A.    We did.
16   Q.    Do you recall who they were?
17   A.    Yes, I do.
18   Q.    Would you tell us, please.
19   A.    Yes, I will.
20   Q.    Okay.
21   A.    Carolyn Sorensen is the claims manager.
22   Q.    I'm sorry.  Carolyn --
23   A.    Sorensen.
24   Q.    Sorensen, okay.
25   A.    And Carolyn Gale is the group administration

CitiCourt, LLC
(801) 532-3441

PAGE 10

Phyllis K. Merrill, 7/21/03                              10

1  manager.
2    Q.    All right.  Now, underneath those two
3  individuals during that period of time, and obviously
4  I'm referring to the period of time when the --
5    A.    I understand.
6    Q.    -- companion policy was in effect.  Did you
7  have supervisors under them or simply other employees?
8    A.    I think the employees involved with San
9  Benito were direct reports of those managers.
10   Q.    I'm sorry?
11   A.    Direct reports.
12         MR. SHUCHART:  Of those managers.
13   A.    Of those managers.  They reported directly
14 to those managers.
15   Q.    Okay.  But you didn't have, for example,
16 two?
17   A.    Intermittently.
18   Q.    You didn't have that interim -- all right.
19 Now, I know Mr. Merrill said this, but I was tired.
20 Who was Carol Frandsen?
21   A.    Carol Frandsen was the group administration
22 clerk that had the day-to-day interface with San Benito
23 ISD.
24   Q.    Were there day-to-day persons in the claims
25 department who handled San Benito claims?

CitiCourt, LLC
(801) 532-3441

PAGE 11

Phyllis K. Merrill, 7/21/03                              11

1    A.    Yes.
2    Q.    Who were they?
3    A.    In the time frame?
4    Q.    Yes, same time frame.  I'm sorry.
5    A.    In the time frame that we're talking about,
6  I believe it was Kim, Kim Nuygen or something like
7  that.
8    Q.    Okay.
9    A.    She does not work for us any more.
10   Q.    All right.  And you just had one?
11   A.    She was the primary -- what Mr. Merrill
12 talked about was we had a primary payer that had the
13 primary responsibility, and then we had cross-training
14 so that if she ever were to have more claims than she
15 would handle, there would be help.  Or if she had to go
16 on vacation.
17   Q.    Okay.  During that time period, how many
18 people, about how many people did you have working in
19 the claims department?
20   A.    Maybe eight or nine.
21   Q.    Okay.
22   A.    Ten.
23   Q.    And how about the administration department,
24 or administrative department?
25   A.    Maybe four or five.

CitiCourt, LLC
(801) 532-3441

PAGE 12

Phyllis K. Merrill, 7/21/03                              12

1    Q.    Okay.  Now, I want to ask you a little bit
2  more about Carol Frandsen.  You said she handled the
3  administrative end for the San Benito, or I'll just
4  refer to them as the District.  What did that mean on a
5  day-to-day basis?
6    A.    Her job duties entailed handling eligibility
7  and eligibility questions.  I'm hesitating because I'm
8  trying to remember if she had any input
9  responsibilities or if she merely took the questions
10 and handed input off.  And I think she handed off the
11 input.
12   Q.    So if the District wanted to add someone on
13 or determine whether a dependent was eligible, they
14 would address the questions to her?
15   A.    They would send her generally some
16 information to get that person enrolled.
17   Q.    Okay.
18   A.    She had responsibility for the balancing of
19 the accounts and the payment of premiums and fees under
20 the various entities that may have subcontracted and
21 provided services to the District through us.
22   Q.    Okay.  One question I didn't ask you is, how
23 did you -- did you receive any formal training in the
24 insurance business, or how did you learn your job?
25   A.    I did not receive any formal training.

CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Phyllis K. Merrill, Volume I * July 21, 2003

PAGE 13

Phyllis K. Merrill, 7/21/03          13

1  Q.   Okay.  And how did you --
2  A.   On-the-job training.
3  Q.   When did you first start in the business?
4  A.   In 1987.
5  Q.   And what was it called then?  I've lost
6  track.
7  A.   MBA of Wyoming, Inc.
8  Q.   So it was already MBA of Wyoming, Inc.?
9  A.   Yes.
10  Q.   And just over the years, what different jobs
11  did you perform with MBA?
12  A.   My first assignment was business manager.
13  Q.   Okay.  And what's that mean in 25 words or
14  less?
15  A.   Manage the business.
16  Q.   Okay.  What I mean, day to day, did you hire
17  and fire clerical and --
18  A.   I did, yeah.
19  Q.   Okay.  Order supplies and --
20  A.   I didn't order supplies.  I handled -- it
21  was fairly new coming from another organization I
22  helped put together.  Personnel policies, documents,
23  things that would assist and build up the company.
24  Q.   Okay.  And about how long did you do that?
25  And I'm not going to hold you to years.

CitiCourt, LLC
(801) 532-3441

PAGE 14

Phyllis K. Merrill, 7/21/03          14

1  A.   Maybe three or four years.
2  Q.   What did you start doing then?
3  A.   More.
4  Q.   More.  You kept the business manager job.
5  What else did you do?
6  A.   I began to take more responsibility for
7  oversight of the main operation of the company, the
8  business.
9  Q.   Okay.  And did you continue to do that up
10  until the time that you got your title?
11  A.   Yes.
12  Q.   We talked a little bit about Glade Nixon.
13  He apparently is in your claims department.  What is
14  his job?
15  A.   He's an adjunct to claims.  His job is to
16  handle the specific reimbursement submission and
17  tracking.
18  Q.   Okay.  And first of all, when you say he's
19  an adjunct to claims, I don't know what that means.
20  A.   I don't, either.
21  Q.   Is he in the claims department?
22  A.   I think that we have not put him under the
23  responsibility of the claims manager.  That's why I
24  used the word "adjunct."  And merely as a professional
25  courtesy to him coming from New York Life as their

CitiCourt, LLC
(801) 532-3441

PAGE 15

Phyllis K. Merrill, 7/21/03          15

1  claims manager for some 20 years, we don't hurt the
2  man's feelings too much.
3  Q.   So he's kind of a standalone person?
4  A.   He stands beside the claims manager.
5  Q.   What does he do day to day?
6  A.   He is responsible for the submission and
7  tracking of specific claims.
8  Q.   That still doesn't mean anything to me.
9  A.   I'm sorry.
10  Q.   Does he handle insurance claims?
11  A.   Those claims that would be claims under the
12  specific contract of the carrier.
13  Q.   Does he do it for a particular client?
14  A.   All.
15  Q.   All clients?
16  A.   For the Utah group.
17  Q.   Okay.  I'm sorry?
18  A.   For the Utah clients.
19  Q.   Okay.  Now, was he involved at all with the
20  District?  I mean, we're deposing him tomorrow.
21  A.   To the extent that there were claims that
22  needed to be submitted for reimbursement for the
23  carriers, yes.
24  Q.   Okay.  Just kind of a catch-all your lawyer
25  may not like, but is there anything your husband said

CitiCourt, LLC
(801) 532-3441

PAGE 16

Phyllis K. Merrill, 7/21/03          16

1  today that you went, "oh, man, he's wrong" that comes
2  to mind?
3       MR. SHUCHART:  Objection, form.
4  A.   Not that comes to mind.
5       MR. SHUCHART:  And I assume you're referring
6  only to what he said in the deposition?
7       MR. GOOD:  Yes.
8  Q.   As a result of this meeting at which you
9  attended when Mr. Hall came into town, was this
10  information about advance funding, to your knowledge,
11  passed on to the District through Mr. Sanchez or Janie
12  Gonzalez?
13  A.   I attended more than one meeting at the
14  District, and there may have been in one of the
15  meetings a discussion about this activity that we were
16  meeting with, and we were beginning now to send out
17  questionnaires to all of the intermediaries that we
18  deal with to ascertain whether they are worthy to
19  reinsure for us.
20  Q.   Okay.  But do you recall being in meetings
21  with Janie Gonzalez and Lorenzo Sanchez where they
22  understood what this advance funding was?
23  A.   At the time they seemed to, yes.  I was
24  there, and they seemed to at the time understand
25  perfectly what we were talking about.

CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

SHEET 3   PAGE 17
Phyllis K. Merrill, 7/21/03          17
1  Q.   Okay.  And do you recall -- and I'm not
2  looking for a date, but as I recall, Mr. Merrill talked
3  about a meeting, at least one meeting where you and he
4  were at the District.  And I can't recall, it was in
5  connection with the renewal.  Do you recall that?
6  A.   Which renewal?
7  Q.   That's what I don't know.
8  A.   I don't, either.
9  Q.   It was either the '99-2000 or the 2000-2001.
10 Do you recall?
11 A.   I don't remember him in any meeting in the
12 2000-2001 time frame.  I think it might have been the
13 year before, if that -- it could have been not that
14 year at all.  I really don't know.
15 Q.   I want to talk about these, I think you
16 called them or Mr. Merrill called them weekly check
17 held lists.  Are you familiar with that?
18 A.   I think we called them the held check list.
19 Q.   Held check.  And was that something that
20 Carol Frandsen was sending down to the District during
21 the October 2000 through August 31, 2001 policy?
22 A.   It was our procedure anytime there were
23 checks un -- non-released that were still to be
24 released, that a register would go down on a weekly
25 basis or a synopsis of those claims would go down on a
CitiCourt, LLC
(801) 532-3441

PAGE 18
Phyllis K. Merrill, 7/21/03          18
1  weekly basis to whatever client we were working with,
2  including San Benito.  So that was just a general
3  policy and procedure of that administration
4  requirement.
5  Q.   Okay.  So in other words, that was a policy
6  and procedure of MBA?
7  A.   Yes.
8  Q.   And would that have been done for that whole
9  year that the Companion Life policy in issue was in
10 existence?
11 A.   If claims were on the non-released list.  If
12 there were any claims in house that were not released
13 as of the Friday that we did our report, yes.
14 Q.   All right.  How -- you say if there were
15 claims on the non-released.  What would determine how
16 they got on the list or didn't get on the list?
17 A.   Part of the job of the administrative clerk
18 was to register -- let me rephrase.
19 Q.   Okay.
20 A.   To enter on a register which we called the
21 check reg -- now, there are -- this is confusing, so I
22 want to be very careful.
23 Q.   Okay.
24 A.   In order to maintain an idea of whether a
25 client has funds available in their ordinary check
CitiCourt, LLC
(801) 532-3441

PAGE 19
Phyllis K. Merrill, 7/21/03          19
1  paying, claims paying account, we kept a hand register.
2  The register was merely working tool for that
3  administrator to -- or that clerk to determine whether
4  they needed to have a call for funding.
5  Q.   Okay.
6  A.   So an example of that would be if a client
7  had $30,000 in the bank, they would register that
8  deposit.  If they had $22,000 go out in claims, they
9  would register that, put down the register number or
10 the date of the register or some identifier and the
11 amount so they could keep a running balance on behalf
12 of the client.  Our objective was to never bounce a
13 check.
14 Q.   Right.  Now, MBA learned early on that the
15 District had a lot of money in the bank, didn't they?
16 MR. SHUCHART:  Objection, vague.
17 A.   I don't know that that's true.  Early on,
18 when is early on?
19 Q.   Let's say the first year you -- they had a
20 policy.
21 A.   1995?
22 Q.   Uh-huh.
23 A.   I think we were impressed with the fact that
24 they had a very limited budget and that they were
25 protective of it.  I don't ever remember being, a lot
CitiCourt, LLC
(801) 532-3441

PAGE 20
Phyllis K. Merrill, 7/21/03          20
1  of money being a terminology used.
2  Q.   Okay.  Well, let me move on up, then, to the
3  policy year in controversy.  You knew, at least during
4  that year, that they had in excess of 10 million bucks
5  in the bank, didn't you?
6  A.   When?
7  Q.   During the policy year, October --
8  A.   How many million?
9  MR. SHUCHART:  Well --
10 Q.   Let me just -- let me hand you, and I won't
11 necessarily mark this.  I believe this is the audit
12 report.  Do you recognize that document?
13 A.   I recognize parts of this.  I don't
14 remember -- I'm not sure that I've seen this piece
15 right here, this liquidity corporate fund.
16 MR. GEORGE:  What's the exhibit number?
17 MR. WALRAVEN:  37.  But I'm not sure it has
18 the portion that he's talking about.  It does.
19 MR. SHUCHART:  It's dated 5/25.
20 MR. WALRAVEN:  Yeah, it's 37.  Hold on.
21 Yeah.  Is this the page you're looking at?
22 MR. SHUCHART:  No.  Those aren't numbered.
23 Never mind.
24 Q.   (BY MR. GOOD)  And I may mark that.  And the
25 reason I say that is --
CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Phyllis K. Merrill, Volume I * July 21, 2003

PAGE 21

Phyllis K. Merrill, 7/21/03                21

1   A.   The answer to the original question?
2   Q.   Yes.
3   A.   No.
4   Q.   When did you learn that?
5   A.   I didn't learn that. Just right now I
6   learned that when I looked at this liquidity report.
7        Q.   Had a check ever bounced on the District
8   from the time MBA started in business?
9   A.   Not on my watch.
10       Q.   Okay. I may come back to this later.
11  Did Mr. Sanchez or Janie Gonzalez ever
12  convey to MBA, to your knowledge, that they had a
13  substantial amount of money in the bank and that even
14  if there was not sufficient funds in the specific
15  account set up to pay these claims, the bank would
16  honor them anyway?
17       A.   Would you rephrase -- would you restate the
18  question?
19       Q.   All right. Did Mr. Sanchez or Janie
20  Gonzalez ever convey to MBA that regardless of what the
21  balance was in the specific account you wrote checks
22  on, that they had a substantial amount of money in that
23  bank and any check would be honored?
24  A.   No.
25       Q.   They never did?
                  CitiCourt, LLC
                  (801) 532-3441

PAGE 22

Phyllis K. Merrill, 7/21/03                22

1   A.   That they never told us that. It -- no.
2        Q.   I'm sorry. You were going to say something
3   else?
4   A.   No. I'll wait for a question.
5        Q.   Okay. Is it your testimony that either
6   Lorenzo Sanchez or Janie Gonzalez or anyone else with
7   the District specifically told MBA to hold checks?
8        A.   Will you restate the question? I didn't --
9   I'm sorry, I zoned out at the beginning of the
10  question.
11       Q.   Are you getting tired?
12  A.   I'm okay.
13       Q.   So am I.
14  A.   Tired of me already?
15       Q.   I'm tired just watching.
16           Did Lorenzo Sanchez or Janie Gonzalez or
17  anyone with the District to your knowledge ever request
18  MBA to specifically hold checks?
19  A.   Yes.
20       Q.   And I want to know who and when and how.
21  A.   I was in a meeting. I don't know exact
22  date. I think it was mid to late July in 20 -- I think
23  it was 2001. It was at the meeting where Mr. Merrill
24  was presenting the pre-renewal information.
25  Mr. Sanchez was in the meeting, Ms. Gonzalez was in the
                  CitiCourt, LLC
                  (801) 532-3441

PAGE 23

Phyllis K. Merrill, 7/21/03                23

1   meeting, and Mr. Merrill was in the meeting.
2        Q.   And where was this meeting?
3        A.   In San Benito ISD's conference room in the
4   administration building.
5        Q.   And this was in July of 2001?
6   A.   I believe that's right.
7        Q.   Okay. And what did Mr. Sanchez or
8   Ms. Gonzalez say?
9        A.   Mr. Sanchez was giving us his thinking
10  regarding the fact that claims had not been paid by J.
11  Allan Hall that had been submitted, and they were over
12  30 days. He was very upset about it. We told him that
13  Mr. Nixon had inquired and followed on those claims
14  closely and was not hearing a date when they would be
15  paid.
16           He stressed upon us that he did not want any
17  of the District's money to go out to be paid on those
18  claims because it wasn't the District's responsibility,
19  that it was the carrier's responsibility, and that he
20  wanted them to pay those claims. We told him we
21  understood that and that we were doing everything in
22  our power to get the claims paid.
23           He stressed over and over again how he
24  was -- had worked very hard to develop a reserve, and
25  he used a number, it wasn't ten million, I can assure
                  CitiCourt, LLC
                  (801) 532-3441

PAGE 24

Phyllis K. Merrill, 7/21/03                24

1   you. It might have been, I don't know, the six to
2   seven hundred thousand range. I can't remember the
3   number exactly, but it was I think over five hundred
4   thousand.
5            He said, "I've been working very hard." He
6   showed us a little report that he had done. "I want
7   these funds to stay here because the program is
8   working. This shows that the program is working."
9        Q.   Did you believe at that time and was it your
10  understanding that he was saying that in the context of
11  his understanding about this advance funding?
12           MS. HEGLAND: Object to form.
13       A.   I do not know. I don't know what he
14  understood.
15       Q.   Okay. Well, when he said that, did you or
16  Mr. Merrill say, well, now wait a minute, Mr. Sanchez;
17  if we can't pay these claims and your policy period
18  expires, you're not going to get reimbursed?
19  A.   I don't believe I said that.
20       Q.   And why didn't you say that?
21           MR. SHUCHART: Object to the extent you
22  should clarify when you say "you," who you're referring
23  to. Her personally?
24       Q.   You personally.
25       A.   First of all, I don't think I was to that
                  CitiCourt, LLC
                  (801) 532-3441

CitiCourt, LLC
801.532.3441

SHEET 4   PAGE 25

Phyllis K. Merrill, 7/21/03   25

1 part of the story. You wanted to know who, what,
2 where, what was said --
3    Q.   Oh, I'm sorry.
4    A.   -- and I think we were talking about the
5 balance in the bank.
6    Q.   Okay.
7    A.   I don't know what the question refers to.
8 Would you restate the question?
9    Q.   Well, first of all, if I cut you off, then
10 go ahead and finish telling me about the conversation,
11 then I'll get back to my question.
12    A.   All right. Mr. Sanchez was notably upset
13 and he told me he was very stressed about it. He
14 looked stressed.
15    Q.   And he stressed about --
16    A.   About the possibility of paying more claims,
17 because to that date I think we had put out in excess
18 of the stop loss deductible on a couple of individuals.
19 And we had continued to pay claims and send them out or
20 get -- request funding and send them out. He was aware
21 of that and was upset because it continued to delete --
22 deplete his reserve.
23    Q.   Okay.
24    A.   I asked him, "Mr. Sanchez, what would you
25 have us do? We can't do much about what J. Allan Hall

CitiCourt, LLC
(801) 532-3441

---

PAGE 26

Phyllis K. Merrill, 7/21/03   26

1 will or won't take care of in a timely manner. He's
2 been slowing down his claim payment. He was very good,
3 and all of a sudden it's like they're running out of
4 money up there, they are not paying claims. And this
5 was to the extent that we didn't know what else we
6 could do. What would you have us do? He said, "I
7 don't want you to send out the claims. I want you to
8 wait until they pay that."
9    Q.   Okay.
10    A.   At this point we were in July.
11    Q.   Of 2001?
12    A.   2001. Everybody thought that the
13 reimbursement was imminent.
14    Q.   For claims that had already been --
15    A.   Already been paid.
16    Q.   Been paid, all right. Okay, so now I'll
17 restate my question.
18    A.   All right.
19    Q.   At that time did either you or Mr. Merrill
20 personally say, "Well, wait a minute, now, your policy
21 is going to expire August 31 of 2001, and if we don't
22 pay those claims, you may not get reimbursed," or words
23 to that effect?
24    A.   No. I don't -- I don't think that we were
25 looking that far down the road, number one. I don't

CitiCourt, LLC
(801) 532-3441

---

PAGE 27

Phyllis K. Merrill, 7/21/03   27

1 think we were looking to August 31st. We were looking
2 at July and what was going on right now. I don't know
3 that we thought they would go on that long, number one.
4 I don't know. The other is, I think that we believed
5 that there was advance funding and they would be paid
6 anyway.
7    Q.   Okay. And that's -- all right. Has MBA
8 changed its method in terms of this advance funding
9 solely as a result of this controversy, or even in part
10 as a result of this controversy?
11    A.   I believe that Mr. Nixon is aware of the
12 situation and is being very zealous in his duties to
13 read every piece of the contract that might, you know,
14 and try to decide and have conversations with regard to
15 anything that might overlap a period end.
16    Q.   Okay. And when you say a contract, we have
17 several contracts. You're talking about stop loss
18 contracts?
19    A.   Yes.
20    Q.   Okay. So now when a client or a person for
21 whom you're a third-party administrator gets a stop
22 loss contract, it's Mr. Nixon's job to read the
23 contract?
24    A.   I didn't say that.
25    Q.   Okay. Maybe I misunderstood you. What did

CitiCourt, LLC
(801) 532-3441

---

PAGE 28

Phyllis K. Merrill, 7/21/03   28

1 you say?
2    A.   I said he was more zealous in reading part
3 of the contract that might affect the return of the
4 specific -- the reimbursement.
5    Q.   Okay. Are you saying he had read them
6 before and was more zealous now?
7    A.   I'm not saying that.
8    Q.   Are you saying he is now --
9    A.   I think he's more aware of situations that
10 can come up when we are led to believe one thing. You
11 know, first you say you will and then you won't.
12       MR. GOOD: Okay. I'll tell you what I'm
13 going to do. I have more questions but I'm fairly
14 disorganized, so I'm going to pass you along to someone
15 else and I'll get reorganized.
16       MS. HEGLAND: I think we should just recess
17 for tonight.
18       MR. WALRAVEN: I'll second the motion.
19       THE WITNESS: You can finish if you'd like.
20       (Discussion off the record.)
21       MR. SHUCHART: Let the record reflect that
22 we are ready, willing, and able to proceed.
23       MR. WALRAVEN: And we have agreed to
24 reconvene tomorrow here at nine.
25       MR. SHUCHART: Do you want to start earlier?

CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Phyllis K. Merrill, Volume I * July 21, 2003

PAGE 29

Phyllis K. Merrill, 7/21/03                    29

1  How about 8:30?
2      (Discussion off the record.)
3      (Deposition was adjourned at 6:04 p.m.)
4                    * * *
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                    CitiCourt, LLC
                    (801) 532-3441

PAGE 31

                                               31

1  Case:  San Benito v. Companion Life
   Case No.:  B-03-047
2  Reporter:  Vicky McDaniel
   Date taken:  July 21, 2003
3
                WITNESS CERTIFICATE
4
5       I, Phyllis K. Merrill, HEREBY DECLARE:
6       That I am the witness referred to in the
   foregoing testimony; that I have read the transcript
7  and know the contents thereof; that with these
   corrections I have noted, this transcript truly and
8  accurately reflects my testimony.

   PAGE-LINE        CHANGE/CORRECTION            REASON
9
10
11
12
13
14
15
16      _____  No corrections were made.
17      I, Phyllis K. Merrill, hereby declare under the
   penalties of perjury of the laws of the United States
18  of America and the laws of the State of Utah that the
   foregoing is true and correct.
19
20                    Phyllis K. Merrill
21      SUBSCRIBED and SWORN to at                    ,
           , this          day of                    ,
22  2003.
23
24
25                    Notary Public
                    CitiCourt, LLC
                    (801) 532-3441

PAGE 30

                                               30

1           REPORTER'S CERTIFICATE
2
3  State of Utah    )
                    ss.
4  County of Utah   )
5       I, Vicky McDaniel, a Registered Merit
   Reporter and Notary Public in and for the State of
6  Utah, do hereby certify:
7       That on July 21, 2003, prior to being
   examined, the witness, Phyllis K. Merrill, was duly
8  sworn by me to tell the truth, the whole truth, and
   nothing but the truth;
9
10      That the testimony of said witness was
   reported by me in stenotype and thereafter transcribed,
   and that a full, true, and correct transcription of
11  said testimony is set forth in the preceding pages.
12      I further certify that I am not of kin or
   otherwise associated with any of the parties of said
13  cause of action and that I am not interested in the
   outcome thereof.
14
15      WITNESS MY HAND and OFFICIAL SEAL at Draper,
   Utah, this 26th day of July, 2003.
16
17
18
19                    Vicky McDaniel, RMR
                    Utah License No. 87-108580
20
21
22
23
24
25
                    CitiCourt, LLC
                    (801) 532-3441

                    CitiCourt, LLC
                    801.532.3441

San Benito vs. Companion Life Insurance
Phyllis K. Merrill, Volume I * July 21, 2003

Monument [1] 2:22
Most [1] 4:17
motion [1] 28:18
move [1] 20:2
Ms [4] 4:9 22:25 23:8 24:12 28:16
much [2] 15:2 25:25

## N

N.E [1] 2:5
name [3] 4:7,8 8:22
names [1] 5:11
necessarily [1] 20:11
needed [2] 15:22 19:4
never [4] 19:12 20:23 21:25 22:1
new [2] 13:21 14:25
newer [1] 8:19
nine [2] 11:20 28:24
Nixon [3] 14:12 23:13 27:11
Nixon's [1] 27:22
non-released [3] 17:23 18:11,15
notably [1] 25:12
Notary [1] 31:25
noted [1] 31:7
number [6] 19:9 20:16 23:25 24:3
26:25 27:3
numbered [1] 20:22
Nuygen [1] 11:6

## O

Object [2] 24:12,21
Objection [2] 16:3 19:16
objective [1] 19:12
obviously [1] 10:3
October [4] 9:1,12 17:21 20:7
officer [2] 6:6 9:7
Okay [52] 4:19,23 5:2,4,19 6:7,14,
20 7:11,13 9:4,20,24 10:15 11:8,
17,21 12:1,17,22 13:1,13,16,19,24
14:9,18 15:17,19,24 16:20 17:1
18:5,19,23 19:5 20:2 21:10 22:5,
12 23:7 24:15 25:6,23 26:9,16 27:
7,16,20,25 28:5,12
On-the-job [1] 13:2
One [12] 5:1 6:15 9:8,8 11:10 12:
22 16:13,14 17:3 26:25 27:3 28:
10
only [2] 6:3 16:6
operating [1] 9:7
operation [1] 14:7
operational [2] 8:1,4
operations [5] 6:6,9,16,18,21
Order [3] 13:19,20 18:24
ordinary [1] 18:25
organization [2] 7:21 13:21
original [1] 21:1
other [5] 7:16,17 10:7 18:5 27:4
ought [1] 4:21
out [11] 5:22 7:23 16:16 19:8 22:9
23:17 25:17,19,20 26:3,7
over [6] 8:14 13:10 23:11,23,23 24:
3
overlap [1] 27:15

## P

P.C [1] 2:4
p.m [1] 29:3
PAGE [2] 3:2 20:21
pages [1] 30:11
paid [7] 23:10,15,17,22 26:15,16
27:5
part [5] 8:22 18:17 25:1 27:9 28:2
particular [1] 15:13
parts [1] 20:13
pass [1] 28:14
passed [1] 16:11
PATTERSON [1] 2:18
pay [6] 21:15 23:20 24:17 25:19 26:
8,22
payer [1] 11:12
paying [4] 19:1,1 25:16 26:4
payment [3] 8:19 12:19 26:2
penalties [1] 31:17
people [3] 6:8 11:18,18
perfectly [1] 16:25
perform [1] 13:11
period [6] 9:12 10:3,4 11:17 24:17
27:15
perjury [1] 31:17
person [3] 12:16 15:3 27:20
personally [3] 24:23,24 26:20
Personnel [1] 13:22
persons [1] 10:24
PHYLLIS [3] 3:3 4:2,8
piece [2] 20:14 27:13
PIPER [1] 2:14
PLAINTIFF [1] 2:2
please [2] 4:7 9:18
point [1] 26:10
policies [1] 13:22
policy [10] 10:6 17:21 18:3,5,9 19:
20 20:3,7 24:17 26:20
portion [1] 20:18
position [1] 6:14
possibility [1] 25:16
power [1] 23:22
pre-renewal [1] 22:24
preceding [1] 30:11
premiums [1] 12:19
presenting [1] 22:24
primary [1] 11:11,12,13
prior [1] 30:7
procedure [3] 17:22 18:3,6
proceed [1] 28:22
professional [1] 14:24
program [2] 24:7,8
protective [1] 19:25
provided [1] 12:21
Public [1] 31:25
put [4] 13:22 14:22 19:9 25:17

## Q

question [11] 4:18 12:22 21:1,18

22:4,8,10 25:7,8,11 26:17
questionnaires [1] 16:17
questions [8] 7:5,19 8:17,18 12:7,
9,14 28:13

## R

range [1] 24:2
ratings [1] 7:25
read [4] 27:13,22 28:5 31:6
reading [1] 28:2
ready [1] 28:22
really [3] 8:2,3 17:14
reason [2] 8:1 20:25
recall [15] 5:10,14 7:16 8:6,8,11,23,
24 9:16 16:20 17:1,2,4,5,10
recalls [1] 7:14
receive [2] 12:23,25
recess [1] 28:16
recognize [2] 20:12,13
reconvene [1] 28:24
record [3] 28:20,21 29:2
refer [1] 12:4
referring [3] 10:4 16:5 24:22
refers [1] 25:7
reflect [1] 28:21
reg [1] 18:21
regard [3] 7:20 8:18 27:14
regarding [1] 23:10
regardless [1] 21:20
register [9] 17:24 18:18,20 19:1,2,
7,9,9,10
Registered [1] 30:5
reimbursed [2] 24:18 26:22
reimbursement [4] 14:16 15:22
26:13 28:4
reinsure [1] 16:19
released [2] 17:24 18:12
rely [1] 4:22
remember [9] 5:11 7:11,12,19 12:
8 17:11 19:25 20:14 24:2
renewal [2] 17:5,6
reorganized [1] 28:15
rephrase [2] 18:18 21:17
report [4] 18:13 20:12 21:6 24:6
reported [2] 10:13 30:10
reporter [4] 4:16 31:2
REPORTER'S [1] 30:1
reports [2] 10:9,11
request [2] 22:17 25:20
requirement [1] 18:4
reserve [2] 23:24 25:22
resources [1] 18:18
respective [1] 9:14
responsibilities [1] 12:9
responsibility [6] 11:13 12:18 14:
6,23 23:18,19
responsible [1] 15:6
restate [4] 21:17 22:8 25:8 26:17
result [3] 16:8 27:9,10
return [1] 28:3
road [1] 26:25

## S

room [1] 23:3
RUDNICK [1] 2:14
running [2] 19:11 26:3

Same [2] 6:19 11:4
San [7] 10:8,22,25 12:3 18:2 23:3
31:1
Sanchez [12] 16:11,21 21:11,19
22:6,16,25 23:7,9 24:16 25:12,24
saying [4] 24:10 28:5,7,8
school [1] 6:3
second [1] 28:18
see [1] 8:3
seemed [2] 16:23,24
seen [1] 20:14
send [5] 12:15 16:16 25:19,20 26:
7
sending [1] 17:20
services [2] 5:17 12:21
set [2] 21:15 30:11
settle [2] 5:25 6:1
seven [1] 24:2
several [1] 27:17
SHADDOX [1] 2:4
Shoreline [1] 2:19
showed [1] 24:6
shows [1] 24:8
SHUCHART [12] 2:9 7:22 10:12
16:3,5 19:16 20:9,19,22 24:21 28:
21,25
simply [1] 10:7
Since [1] 6:13
situation [1] 27:12
situations [1] 28:9
six [1] 24:1
skip [1] 7:4
slowing [1] 26:2
solely [1] 27:9
someone [2] 12:12 28:14
sometime [1] 7:1
Sorensen [3] 9:21,23,24
Sorry [9] 5:11 9:22 10:10 11:4 15:
9,17 22:2,9 25:3
specific [6] 14:16 15:7,12 21:14,
21 28:4
specifically [2] 22:7,18
standalone [1] 15:3
standpoint [1] 8:2
stands [1] 15:4
start [3] 13:3 14:2 28:25
started [1] 21:8
State [1] 30:3
States [1] 31:17
stay [1] 24:7
stenotype [1] 30:10
STEPHEN [1] 2:3
still [2] 15:8 17:23
stop [4] 5:12 25:18 27:17,21
story [1] 25:1
stressed [5] 23:16,23 25:13,14,15

San Benito vs. Companion Life Insurance
Phyllis K. Merrill, Volume I  *  July 21, 2003

**stuff** [1] 8:20
**subcontracted** [1] 12:20
**submission** [2] 14:16 15:6
**submitted** [2] 15:22 23:11
**substantial** [2] 21:13,22
**sudden** [1] 26:3
**sued** [1] 5:8
**sufficient** [1] 21:14
**suing** [2] 5:10,20
**Suite** [2] 1:50 2:5
**supervisors** [1] 10:7
**supplies** [2] 13:19,20
**suspicion** [1] 5:24
**sworn** [2] 4:3 30:8
**synopsis** [1] 17:25

**T**

**talked** [3] 11:12 14:12 17:2
**Ten** [2] 11:22 23:25
**terminology** [1] 20:1
**terms** [2] 6:8 27:8
**testified** [2] 4:4 7:18
**testify** [1] 7:14
**testimony** [3] 22:5 30:11 31:6
**themselves** [1] 6:24
**thereafter** [1] 30:10
**thinking** [1] 23:9
**third-party** [1] 27:21
**thousand** [2] 24:2,4
**three** [1] 14:1
**throw** [1] 5:23
**timely** [1] 26:1
**tired** [4] 10:19 22:11,14,15
**title** [2] 6:5 14:10
**today** [1] 16:1
**together** [1] 13:22
**tomorrow** [2] 15:20 28:24
**tonight** [2] 4:17 28:17
**took** [1] 12:9
**tool** [1] 19:2
**town** [1] 16:9
**track** [1] 13:6
**tracking** [2] 14:17 15:7
**training** [3] 12:23,25 13:2
**transcribed** [1] 30:10
**transcript** [2] 31:6,7
**true** [5] 4:11,14 9:1 19:17 31:18
**truly** [1] 31:7
**truth** [3] 4:3 30:8,8
**try** [1] 27:14
**trying** [3] 5:22,23 12:8
**turnaround** [1] 7:23
**Twelve** [2] 5:6,7
**two** [5] 9:7,11,13 10:2,16
**TX** [2] 2:11,15

**U**

**un** [1] 17:23
**under** [5] 5:17 10:7 12:19 14:22 15:11
**underneath** [1] 10:2
**understand** [5] 4:18,21 9:6 10:5

16:24
**understanding** [3] 6:4 24:10,11
**understood** [4] 8:4 16:22 23:21 24:14
**United** [1] 31:17
**until** [3] 4:18 14:10 26:8
**up** [6] 13:23 14:9 20:2 21:15 26:4 28:10
**upset** [3] 23:12 25:12,21
**Utah** [7] 15:16,18 30:3,4,6,15,19

**V**

**vacation** [1] 11:16
**vague** [1] 19:16
**various** [1] 12:20
**Vicky** [2] 30:5 31:2
**visit** [1] 7:8

**W**

**wait** [4] 22:4 24:16 26:8,20
**WALRAVEN** [6] 2:3,4 20:17,20 28:18,23
**wanted** [4] 8:3 12:12 23:20 25:1
**watch** [1] 21:9
**watching** [1] 22:15
**weekly** [3] 17:16,24 18:1
**whatever** [1] 18:1
**whether** [4] 12:13 16:18 18:24 19:3
**whoever** [1] 5:19
**whole** [2] 18:8 30:8
**whom** [1] 27:21
**will** [5] 4:16 9:19 22:8 26:1 28:11
**willing** [1] 28:22
**WITNESS** [2] 3:2 28:19
**word** [1] 14:24
**words** [3] 13:13 18:5 26:22
**work** [2] 8:16 11:9
**worked** [1] 23:24
**working** [6] 11:18 18:1 19:2 24:5,8,8
**worthy** [1] 16:18
**writing** [1] 7:20
**wrote** [1] 21:21
**WYOMING** [4] 2:7 6:21 13:7,8

**Y**

**year** [8] 7:12 17:13,14 18:9 19:19 20:3,4,7
**years** [6] 5:6,7 13:10,25 14:1 15:1
**York** [1] 14:25

**Z**

**zealous** [3] 27:12 28:2,6
**zoned** [1] 22:9

CitiCourt, LLC
801.532.3441

Sheet 4                    stuff - zoned

San Benito vs. Companion Life Insurance
Phyllis K. Merrill, Volume I  *  July 21, 2003

## $

**$22,000** [1] 19:8
**$30,000** [1] 19:7

## 1

**1** [1] 6:13
**10** [1] 20:4
**11th** [1] 2:22
**1250** [1] 2:5
**1987** [1] 13:4
**1995** [1] 19:21
**1999** [1] 7:8

## 2

**20** [3] 8:24 15:1 22:22
**2000** [3] 9:2,12 17:21
**2000-2001** [2] 17:9,12
**2001** [10] 6:13 7:2 9:2,13 17:21 22: 23 23:5 26:11,12,21
**2003** [3] 30:7,15 31:22
**21** [1] 30:7
**210** [1] 2:6
**25** [1] 13:13
**26th** [1] 30:15

## 3

**30** [1] 23:12
**31** [3] 9:13 17:21 26:21
**31st** [1] 27:1
**361** [1] 2:20
**37** [2] 20:17,20

## 4

**4** [1] 3:4
**410** [1] 2:5

## 5

**5/25** [1] 20:19
**55** [1] 2:22

## 6

**6:04** [1] 29:3

## 7

**725** [1] 2:5
**75201-4605** [1] 2:15
**77063** [1] 2:11

## 8

**8:30** [1] 29:1
**800** [1] 2:19
**822-2018** [1] 2:6
**830** [1] 1:50
**866-7226** [1] 2:20
**87-108580** [1] 30:19

## 9

**99-2000** [1] 17:9

## A

**able** [1] 28:22
**account** [3] 19:1 21:15,21
**accounts** [1] 12:19
**action** [1] 30:13

**activity** [1] 16:15
**actually** [1] 7:12
**ADA** [1] 8:20
**add** [1] 12:12
**address** [1] 12:14
**adjourned** [1] 29:3
**adjunct** [3] 14:15,19,24
**administration** [8] 5:17 6:11 9:8, 25 10:21 11:23 18:3 23:4
**administrative** [3] 11:24 12:3 18: 17
**administrator** [2] 19:3 27:21
**advance** [6] 8:9 16:10,22 24:11 27: 5,8
**affect** [1] 28:3
**ago** [3] 5:6,7
**agreed** [1] 28:23
**agreement** [1] 15:17
**ahead** [1] 25:10
**aiding** [1] 5:5
**ALBERT** [1] 2:21
**Allan** [2] 23:11 25:25
**alleged** [1] 5:21
**already** [5] 7:18 13:8 22:14 26:14, 15
**amount** [3] 19:11 21:13,22
**another** [1] 13:21
**answer** [4] 4:18 8:17,18 21:1
**answering** [1] 4:22
**answers** [1] 4:23
**anytime** [1] 17:22
**anyway** [2] 21:16 27:6
**apparently** [1] 14:13
**areas** [1] 8:19
**aren't** [1] 20:22
**around** [1] 7:5
**ascertain** [1] 16:18
**assignment** [1] 13:12
**assist** [2] 8:16 13:23
**assume** [2] 4:12 16:5
**assure** [1] 23:25
**attended** [2] 16:9,13
**audit** [3] 5:23,23 20:11
**August** [5] 9:2,13 17:21 26:21 27: 1
**available** [1] 18:25
**aware** [3] 25:20 27:11 28:9

## B

**back** [2] 21:10 25:11
**background** [1] 6:2
**balance** [3] 19:11 21:21 25:5
**balancing** [1] 12:18
**bank** [7] 19:7,15 20:5 21:13,15,23 25:5
**BANKS** [1] 2:10
**basis** [3] 12:5 17:25 18:1
**became** [1] 6:23
**began** [2] 6:24 14:6
**beginning** [2] 16:16 22:9
**behalf** [1] 19:11

**believe** [8] 7:8 11:6 20:11 23:6 24: 9,19 27:11 28:10
**believed** [1] 27:4
**Benito** [7] 10:9,22,25 12:3 18:2 23: 3 31:1
**beside** [1] 15:4
**between** [2] 9:1,12
**bit** [2] 12:1 14:12
**Boulevard** [1] 2:19
**bounce** [1] 19:12
**bounced** [1] 21:7
**BRACEWELL** [1] 2:18
**brought** [1] 7:19
**bucks** [1] 20:4
**budget** [1] 19:24
**build** [1] 13:23
**building** [1] 23:4
**business** [9] 7:21 8:22 12:24 13:3, 12,15 14:4,8 21:8

## C

**call** [2] 6:24 19:4
**called** [5] 13:5 17:16,16,18 18:20
**came** [2] 7:8 16:9
**care** [1] 26:1
**careful** [1] 18:22
**Carol** [4] 10:20,21 12:2 17:20
**Carolyn** [3] 9:21,22,25
**carrier** [1] 15:12
**carrier's** [1] 23:19
**carriers** [3] 7:24,25 15:23
**case** [2] 5:25 31:1
**catch-all** [1] 15:24
**cause** [1] 30:13
**certain** [1] 7:10
**CERTIFICATE** [1] 30:1
**certify** [2] 30:6,12
**changed** [1] 27:8
**characteristics** [1] 7:24
**check** [8] 17:16,18,19 18:21,25 19: 13 21:7,23
**checks** [4] 17:23 21:21 22:7,18
**Chief** [2] 6:6 9:7
**Circle** [1] 2:22
**claim** [6] 5:3,4,5,12,14 26:2
**claims** [4] 6:10 8:2,7,19 9:9,21 10: 24,25 11:14,19 14:13,15,19,21,23 15:1,4,7,10,11,11,21 17:25 18:11, 12,15 19:1,8 21:15 23:10,13,18,20, 22 24:17 25:16,19 26:4,7,14,22
**clarify** [1] 24:22
**clerical** [1] 13:17
**clerk** [3] 10:22 18:17 19:3
**client** [6] 15:13 18:1,25 19:6,12 27: 20
**clients** [2] 15:15,18
**closely** [1] 23:14
**COBRA** [1] 8:20
**come** [2] 21:10 28:10
**comes** [2] 16:1,4
**coming** [2] 13:21 14:25

**companion** [3] 10:6 18:9 31:1
**company** [4] 6:10,19 13:23 14:7
**COMPERE** [1] 2:4
**complaining** [2] 5:19,20
**conference** [1] 23:3
**confusing** [1] 18:21
**connection** [2] 5:2 17:5
**CONSULTANTS** [1] 2:8
**context** [1] 24:10
**continue** [1] 14:9
**continued** [2] 25:19,21
**contract** [7] 5:5 15:12 27:13,16,22, 23 28:3
**contracts** [2] 27:17,18
**controversy** [2] 20:3 27:9,10
**conversation** [1] 25:10
**conversations** [2] 8:8 27:14
**convey** [2] 21:12,20
**COO** [2] 6:12,23
**corporate** [1] 20:15
**correct** [3] 4:10 6:22 31:18
**corrections** [1] 31:7
**County** [1] 30:4
**couple** [2] 4:15 25:18
**court** [1] 4:16
**courtesy** [1] 14:25
**cross-training** [1] 11:13
**current** [1] 6:5
**cut** [1] 25:9

## D

**Dallas** [1] 2:15
**date** [6] 7:11 17:2 19:10 22:22 23: 14 25:17
**dated** [1] 20:19
**dates** [1] 7:10
**day** [10] 4:9 6:17,17 8:15,15 13:16, 16 15:5,5 30:15
**day-to-day** [3] 10:22,24 12:5
**days** [1] 23:12
**deal** [1] 16:18
**decide** [1] 27:14
**deductible** [1] 25:18
**DEFENDANTS** [1] 2:7
**deference** [1] 4:21
**delete** [1] 25:21
**department** [6] 8:10,11 10:25 11: 19,23,24 14:13,21
**departments** [2] 9:8,14
**dependent** [1] 12:13
**deplete** [1] 25:22
**deposed** [1] 4:10
**deposing** [1] 15:20
**deposit** [1] 19:8
**deposition** [4] 4:13,25 16:6 29:3
**determine** [3] 12:13 18:15 19:3
**develop** [1] 23:24
**different** [5] 6:7,8,9 8:11 13:10
**direct** [2] 10:9,11
**directly** [1] 10:13
**director** [3] 6:16,17,20

San Benito vs. Companion Life Insurance
Phyllis K. Merrill, Volume I  *  July 21, 2003

**disagreement** [1] 5:16

**discussion** [3] 16:15 28:20 29:2

**disorganized** [1] 28:14

**District** [12] 12:4,12,21 15:20 16:11,14 17:4,20 19:15 21:7 22:7,17

**District's** [2] 23:17,18

**document** [1] 20:12

**documents** [2] 8:21 13:22

**doing** [2] 14:2 23:21

**DOL** [1] 5:23

**done** [2] 18:8 24:6

**down** [6] 17:20,24,25 19:9 26:2,25

**duly** [1] 4:3

**during** [5] 10:3 11:17 17:20 20:3,7

**duties** [2] 12:6 27:12

### E

**earlier** [1] 28:25

**early** [3] 19:14,17,18

**educational** [1] 6:2

**effect** [2] 10:6 26:23

**eight** [1] 11:20

**either** [5] 14:20 17:8,9 22:5 26:19

**eligibility** [2] 12:6,7

**eligible** [1] 12:13

**employees** [4] 8:17,24 10:7,8

**end** [3] 9:2 12:3 27:15

**enrolled** [1] 12:16

**entailed** [1] 12:6

**enter** [1] 18:20

**entities** [1] 12:20

**ERISA** [2] 5:23 8:20

**ESQ** [3] 2:3,9,21

**even** [2] 21:13 27:9

**Everybody** [1] 26:12

**everyone** [1] 8:3

**everything** [1] 23:21

**exact** [1] 22:21

**exactly** [1] 24:3

**Examination** [2] 3:4 4:5

**examined** [1] 4:4

**example** [2] 10:15 19:6

**excess** [2] 20:4 25:17

**exhibit** [1] 20:16

**existence** [1] 18:10

**expire** [1] 26:21

**expires** [1] 24:18

**explain** [1] 4:12

**extent** [3] 15:21 24:21 26:5

### F

**facilitate** [1] 8:16

**fact** [2] 19:23 23:10

**fairly** [2] 13:21 28:13

**familiar** [1] 17:17

**far** [1] 26:25

**feelings** [1] 15:2

**fees** [1] 12:19

**few** [1] 9:3

**fifteen** [1] 15:6

**filing** [1] 8:2

**find** [2] 7:23 8:18

**finish** [2] 25:10 28:19

**fire** [1] 13:17

**first** [4] 4:3 13:3,12 14:18 19:19 24:25 25:9 28:11

**five** [2] 11:25 24:3

**floor** [1] 2:22

**flow** [1] 8:21

**FMLA** [1] 8:20

**followed** [1] 23:13

**follows** [1] 4:4

**foregoing** [2] 31:6,18

**form** [2] 16:3 24:12

**formal** [2] 12:23,25

**forth** [1] 30:11

**four** [2] 11:25 14:1

**frame** [4] 11:3,4,5 17:12

**Frandsen** [4] 10:20,21 12:2 17:20

**FRED** [1] 2:9

**Friday** [1] 18:13

**fund** [1] 20:15

**funding** [8] 8:9 16:10,22 19:4 24:11 25:20 27:5,8

**funds** [3] 18:25 21:14 24:7

**further** [1] 30:12

### G

**Gale** [1] 9:25

**general** [2] 7:22 18:2

**generally** [3] 5:14 9:1 12:15

**GEORGE** [2] 2:21 20:16

**gets** [1] 27:21

**getting** [1] 22:11

**given** [1] 4:25

**giving** [1] 23:9

**Glade** [1] 14:12

**Gonzalez** [9] 16:12,21 21:11,20 22:6,16,25 23:8

**got** [2] 14:10 18:16

**graduation** [1] 6:3

**gray** [1] 8:19

**group** [4] 6:10 9:25 10:21 15:16

### H

**Hall** [5] 7:8,9 16:9 23:11 25:25

**Hall's** [1] 7:21

**hand** [2] 19:1 20:10

**Hand-off** [1] 8:7

**handed** [2] 12:10,10

**handle** [3] 11:15 14:16 15:10

**handled** [3] 10:25 12:2 13:20

**handling** [1] 12:6

**handshake** [1] 8:5

**hard** [2] 23:24 24:5

**heads** [1] 9:14

**heard** [1] 7:13

**hearing** [1] 23:14

**HEGLAND** [2] 24:12 28:16

**held** [3] 17:17,18,19

**help** [2] 4:16 11:15

**helped** [1] 13:22

**hereby** [1] 30:6

**hesitating** [1] 12:7

**high** [1] 6:3

**HIPAA** [1] 8:19

**hire** [1] 13:16

**hold** [4] 13:25 20:20 22:7,18

**honor** [1] 21:16

**honored** [1] 21:23

**house** [1] 18:12

**Houston** [1] 2:11

**hundred** [2] 24:2,3

**hurt** [1] 15:1

**husband** [5] 4:10 7:6,13 8:12 15:25

### I

**idea** [1] 18:24

**identifier** [1] 19:10

**imminent** [1] 26:13

**important** [1] 4:17

**impressed** [1] 19:23

**INC** [5] 2:7,8 6:21 13:7,8

**included** [3] 5:18,18 8:1

**including** [2] 6:10 18:2

**individuals** [4] 9:11,13 10:3 25:18

**information** [4] 8:22 12:16 16:10 22:24

**input** [3] 12:8,10,11

**inquired** [1] 23:13

**insurance** [3] 5:3 12:24 15:10

**interested** [2] 7:20 30:13

**interface** [1] 10:22

**interim** [1] 10:18

**intermediaries** [1] 16:17

**Intermittently** [1] 10:17

**interviewing** [1] 10:17

**involved** [2] 10:8 15:19

**ISD** [1] 10:23

**ISD's** [1] 23:3

**issue** [1] 18:9

### J

**Janie** [6] 16:11,21 21:11,19 22:6,16

**January** [2] 6:13 7:1

**job** [7] 12:6,24 14:4,14,15 18:17 27:22

**jobs** [1] 13:10

**July** [6] 22:22 23:5 26:10 27:2 30:7,15

### K

**keep** [1] 19:11

**kept** [1] 14:4 19:1

**Kim** [2] 11:6,6

**kin** [1] 30:12

**kind** [4] 5:14,16 15:3,24

**knowledge** [3] 16:10 21:12 22:17

### L

**L.L.P** [1] 2:18

**late** [1] 22:22

**later** [1] 21:10

**laws** [3] 8:19,20 31:17

**lawyer** [1] 15:24

**learn** [3] 12:24 21:4,5

**learned** [2] 19:14 21:6

**least** [2] 17:3 20:3

**led** [1] 28:10

**less** [1] 13:14

**License** [1] 30:19

**Life** [3] 14:25 18:9 31:1

**limited** [1] 19:24

**liquidity** [2] 20:15 21:6

**list** [4] 17:18 18:11,16,16

**lists** [1] 17:17

**little** [3] 12:1 14:12 24:6

**long** [5] 5:6,6 6:12 13:24 27:3

**looked** [2] 25:6 25:14

**looking** [5] 17:2 20:21 26:25 27:1,1

**Loop** [1] 2:5

**Lorenzo** [3] 16:21 22:6,16

**loss** [4] 5:12 25:18 27:17,22

**lost** [1] 13:5

**lot** [2] 19:15,25

### M

**Main** [3] 1:50 8:16 14:7

**maintain** [1] 18:24

**man** [1] 16:1

**man's** [1] 15:2

**Manage** [1] 13:15

**MANAGED** [1] 2:7

**manager** [7] 9:21 10:1 13:12 14:4,23 15:1,4

**managers** [4] 10:9,12,13,14

**manner** [1] 26:1

**many** [4] 9:5 11:17,18 20:8

**mark** [2] 20:11,24

**MBA** [23] 2:7 5:5,8,10,21 6:5,8,15,21,24 8:15,17 13:7,8,11 18:6 19:19,21 21:24,25 22:7,18 27:7

**MBA/ICI** [1] 6:24

**McDaniel** [2] 30:5 31:2

**mean** [6] 6:8 12:4 13:13,16 15:8,20

**means** [2] 6:7 14:19

**meeting** [10] 7:7,9,14,17 16:8,13,16 17:3,3,11 22:21,23,25 23:1,1,2

**meetings** [2] 16:15,20

**merely** [2] 12:9 14:24 19:2

**Merit** [1] 30:5

**MERRILL** [14] 3:3 4:2,8,9 7:18 8:23 10:19 11:11 17:2,16 22:23 23:1 24:16 26:19

**method** [1] 27:8

**mid** [1] 22:22

**might** [5] 17:12 24:1 27:13,15 28:3

**million** [3] 20:4,8 23:25

**mind** [3] 16:2,4 20:23

**minute** [2] 24:16 26:20

**misunderstood** [1] 27:25

**money** [6] 19:15 20:1 21:13,22 23:17 26:4

# CONDENSED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, ) ) ) | Deposition of: |
| Plaintiffs, ) ) | **DON WILLIAM MERRILL** |
| vs. ) ) ) | |
| COMPANION LIFE INSURANCE COMPANY, MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS, INC., J. ALLAN HALL & ASSOCIATES, INC., and MBA OF WYOMING, INC., ) ) ) ) ) ) ) | |
| Defendants. ) ) | Civil Action No.: B-03-047 |

**July 21, 2003 - 9:06 a.m.**

Location:  Offices of CitiCourt Reporting
50 S. Main, Suite 830
Salt Lake City, Utah

Reporter:  Vicky McDaniel, RMR
Notary Public in and for the State of Utah



**CitiCourt, LLC**
THE REPORTING GROUP

50 South Main, Suite 830
Salt Lake City, Utah 84144

801.532.3441          TOLL FREE 877.532.3441          FAX 801.532.3414

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

---

PAGE 221

Don William Merrill, 7/21/03                221

1      A.   They should have allowed us to pay the
2  claims as they came in.
3      Q.   And did anybody on behalf of MBA ever
4  explain to them that a delay in paying claims could
5  have any adverse consequences?
6      A.   I'm not sure I can answer that. That would
7  have been a normal thing to do, but I can't tell you
8  whether we did that or not.
9      Q.   Okay, that's where I'm confused.
10     A.   That's not my area.
11     Q.   Whose area would it be?
12     A.   Be the claims side, probably.
13     Q.   And in this particular case, can you tell me
14  the individual?
15     A.   Well, we continue to keep them abreast of
16  where they were with the fund and what claims were
17  coming in so that they can go ahead and pay those
18  claims.
19     Q.   Were you personally, were you, Don Merrill,
20  ever involved in conversation with any representative
21  of the school district where the school district told
22  you, don't pay the claim, hold off?
23     A.   Yes.
24     Q.   And who at the school district were you
25  personally talking to?

CitiCourt, LLC
(801) 532-3441

---

PAGE 222

Don William Merrill, 7/21/03                222

1      A.   Mr. Sanchez.
2      Q.   And in that conversation did you tell
3  Mr. Sanchez that we can't hold off on this claim
4  forever because it could have an adverse effect on the
5  ability to get it reimbursed by the stop loss carrier?
6      A.   That's possible that we did that.
7      Q.   Do you recall ever doing it, you personally?
8      A.   I think the conversation was with regard to
9  that, but I don't remember that personally.
10     Q.   You don't remember doing it or not?
11     A.   No, I don't remember.
12     Q.   And you understood that this contract was
13  being administered in such a way as there would be
14  advance funding?
15     A.   Yes.
16     Q.   So if you understood that there would be
17  advance funding regardless of whether the claim was
18  being paid by the school district, why would you tell
19  the school district they needed to go ahead and fund
20  payment of the claim?
21     A.   Two reasons. One, if they don't go ahead
22  and pay the claims, then we continue to have to handle
23  all of the objections and the providers asking us
24  what's the matter, how come the claims aren't being
25  paid. That's difficult for us as an administrator.

CitiCourt, LLC
(801) 532-3441

---

PAGE 223

Don William Merrill, 7/21/03                223

1  You just can't go on handling that that way.
2           On the other hand, to my understanding, the
3  claims had been processed and paid and showed as such
4  in our computer. And under the normal advance funding,
5  that should have been then in a simultaneous exchange
6  of information and claims so that the carrier paid the
7  claim as that information, and that went out from the
8  client. So --
9      Q.   So -- go ahead.
10     A.   No, that's it.
11     Q.   So as you understood the way the stop loss
12  agreement with J. Allan Hall and Companion Life was
13  supposed to work, it would not have mattered whether
14  there was immediate funding of those payments by the
15  school district as long as your computer showed that
16  they were paid, and that information was conveyed to J.
17  Allan Hall, correct?
18     A.   And that there was sufficient monies to pay
19  the claim.
20     Q.   And as you understand it, there always was
21  sufficient monies to pay the claim?
22     A.   Right.
23     Q.   So you would have had no need to tell
24  Mr. Sanchez to do anything else, because, as you
25  understood it, everything that needed to have been done

CitiCourt, LLC
(801) 532-3441

---

PAGE 224

Don William Merrill, 7/21/03                224

1  had been done to get reimbursement of the stop loss
2  insurance, correct?
3      A.   When that happens, that begins to affect the
4  TPA as it did us. So it's a lot easier if the claims
5  are just no way we can hold them up, that we could
6  continue to pay them as they came in.
7      Q.   But that doesn't, in your understanding of
8  the way it's supposed to work, have any adverse impact
9  on the reimbursement of stop loss claims?
10     A.   Right, because that's what the stop loss is
11  supposed to do.
12     Q.   So you would have no reason to tell
13  Mr. Sanchez that this could have an adverse affect on
14  his stop loss claims, because you didn't know of any
15  adverse effect on stop loss claims. Correct?
16     A.   We still may have said, you know, you should
17  be aware that these are the factors relative to this
18  particular situation. But you're correct in what you
19  said.
20     Q.   Okay. And can you be a little more
21  specific, had you conveyed to Mr. Sanchez, you need to
22  be aware of these factors, what factors you would have
23  told him about?
24     A.   Regardless, Mr. Sanchez trying to conserve
25  money and gain interest on the accounts may not have

CitiCourt, LLC
(801) 532-3441

---

# CONDENSED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, )<br><br>    Plaintiffs, )<br><br>  vs. )<br><br>COMPANION LIFE INSURANCE COMPANY, MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS, INC., J. ALLAN HALL & ASSOCIATES, INC., and MBA OF WYOMING, INC.,<br><br>    Defendants. ) | Deposition of:<br><br>**DON WILLIAM MERRILL**<br><br><br><br><br><br><br><br><br>Civil Action No.:   B-03-047 |

July 21, 2003 - 9:06 a.m.

Location:  Offices of CitiCourt Reporting
50 S. Main, Suite 830
Salt Lake City, Utah

Reporter:  Vicky McDaniel, RMR
Notary Public in and for the State of Utah



**CitiCourt, LLC**
THE REPORTING GROUP

50 South Main, Suite 830
Salt Lake City, Utah 84144

801.532.3441          TOLL FREE 877.532.3441          FAX 801.532.3414

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 9   PAGE 65

Don William Merrill, 7/21/03                65

1    Q.    And when was this memorandum prepared?
2    A.    In June of 1999.
3    Q.    In June of '99?
4    A.    That's what it says, To confirm our
5    discussion and questions.  We were working with Allan
6    on records.
7    Q.    And the memo reflects that the meeting was
8    in May of 1999, correct?
9    A.    That's the way it looks.
10   Q.    And based on your memory and this document,
11   are you fairly confident that the meeting did take
12   place somewhere about then?
13   A.    Most definitely.
14   Q.    And is there any question in your mind that
15   that discussion would have applied to the Companion
16   Life stop loss coverage issued to San Benito?
17   A.    There's no question in my mind that J. Allan
18   Hall's honesty in following the procedures, along with
19   Consolidated, kept them in line with all other carriers
20   that were doing the same thing.
21   Q.    Yeah.  But what I need to know is, you're
22   sure you were talking about a type of insurance that --
23   A.    Yes.
24   Q.    -- included the Companion Life policy for
25   San Benito?

CitiCourt, LLC
(801) 532-3441

PAGE 66

Don William Merrill, 7/21/03                66

1    A.    Yes.
2    Q.    There's no question that you might have --
3    A.    No.
4    Q.    -- been talking about something else?
5    A.    Heavens, no.
6    Q.    Okay.  That's what I wanted to clarify.
7    Thank you.
8         Do you recall ever discussing this concept
9    of advance funding with anyone at San Benito?
10   A.    It's possible we did.
11   Q.    Do you recall it?
12   A.    In general terms, probably had a meeting,
13   and it would have been the fall of 2000.  The fall
14   of -- I think the superintendent was in -- might have
15   been in the meeting.  The superintendent may have left,
16   and so there was only Janie Gonzalez and Mr. Sanchez in
17   the meeting.
18   Q.    Do you recall talking to anybody at the
19   school district about it more than once, or is the only
20   meeting you recall discussing it that one time?
21   A.    Well, if you're in the TPA business, you'll
22   talk about advance funding all the time because it is
23   part of the administrative procedures that is common to
24   TPA business.
25   Q.    Now, do you provide TPA services in

CitiCourt, LLC
(801) 532-3441

PAGE 67

Don William Merrill, 7/21/03                67

1    connection with stop loss insurance that does not
2    provide for this advance funding feature that you've
3    described?
4    A.    No.
5    Q.    In your experience, are there different
6    types of stop loss agreements that address the
7    situation of whether or not advance funding is included
8    in the agreement or not?
9    A.    I'm aware that there are more than -- a lot
10   of old contracts that existed clear back from the
11   property and casualty area which was a true
12   reimbursement only.  That's not what is going on at the
13   present time.
14   Q.    And have any of the contracts that were
15   administered as pure reimbursement been anything you've
16   dealt with, say, in the last ten years?
17   A.    I've seen those contracts but would always
18   fall to what we were told by the claims processing
19   entity, such as J. Allan Hall.  And if they said there
20   was advance funding by the format or the administrative
21   service agreement or administration procedures that
22   they were following, then we went on their word.  And
23   if they said that's what they were doing and we had
24   seen them doing that for multiple years, we believed
25   that their work was valid and that we would follow

CitiCourt, LLC
(801) 532-3441

PAGE 68

Don William Merrill, 7/21/03                68

1    that.
2    Q.    And you say you've been dealing, or began
3    dealing with J. Allan Hall approximately ten years ago?
4    A.    Well, I was aware of him and dealt with him
5    over a period of time.  I was aware of his name.  Not
6    with San Benito, but --
7    Q.    In '99, 2000 when you were talking to
8    Mr. Hall and when you were talking to San Benito, did
9    you have experience with the way J. Allan Hall
10   processed claims?
11   A.    Yes.
12   Q.    And did you have several years' experience
13   with the way they processed claims?
14   A.    Yes.
15   Q.    And had they always provided advanced
16   funding?
17   A.    That's correct.
18   Q.    And were you aware -- strike that.  Had J.
19   Allan Hall been providing stop loss insurance through
20   Companion Life, in your experience, prior to that time?
21   A.    I don't know that.
22   Q.    But for whomever they were processing
23   claims, they always handled them the same way with
24   respect to advance funding?
25   A.    Yes.

CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

## JAMES ALLAN HALL - CONDENSED TRANSCRIPT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, )<br>)<br>Plaintiff, )<br>)<br>-v- )<br>)<br>COMPANION LIFE INSURANCE COMPANY, )<br>et al., )<br>)<br>Defendants. ) | CIVIL ACTION NO.<br>B-03-047 |

### VIDEOTAPED DEPOSITION OF JAMES ALLAN HALL

The videotaped deposition upon oral examination of **JAMES ALLAN HALL**, a witness produced and sworn before me, Aprille Lucas, RPR, Notary Public in and for the County of Hamilton, State of Indiana, taken on behalf of the Plaintiff at the offices of Garrison & Kiefer, 8720 Castle Creek Parkway, Suite 200, Indianapolis, Indiana, on July 31, 2003, at 9:00 a.m., pursuant to the Federal Rules of Civil Procedure.

ASSOCIATED REPORTING, INC.
TWO MARKET SQUARE CENTER - SUITE 940
251 EAST OHIO STREET
INDIANAPOLIS, INDIANA 46204
(317) 631-0940

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SAN BENITO CONSOLIDATED )
INDEPENDENT SCHOOL DISTRICT, )
        )
        Plaintiff, )
        )
    -v- ) CIVIL ACTION NO.
        ) B-03-047
COMPANION LIFE INSURANCE )
COMPANY, )
et al., )
        )
        Defendants. )

VIDEOTAPED DEPOSITION OF JAMES ALLAN HALL

    The videotaped deposition upon oral examination of
JAMES ALLAN HALL, a witness produced and sworn before
me, Aprille Lucas, RPR, Notary Public in and for the
County of Hamilton, State of Indiana, taken on behalf
of the Plaintiff at the offices of Garrison & Kiefer,
8720 Castle Creek Parkway, Suite 200, Indianapolis,
Indiana, on July 31, 2003, at 9:00 a.m., pursuant to
the Federal Rules of Civil Procedure.

ASSOCIATED REPORTING, INC.
TWO MARKET SQUARE CENTER - SUITE 940
251 EAST OHIO STREET
INDIANAPOLIS, INDIANA 46204
(317) 631-0940

APPEARANCES

FOR THE PLAINTIFF:

    Stephen E. Walraven, Esq.
    Otto S. Good, Esq.
    SHADDOX COMPERE WALRAVEN & GOOD
    The North Frost Center
    1250 N.E. Loop 410
    Suite 725
    San Antonio, TX  78209

FOR THE DEFENDANT COMPANION LIFE:

    Shelby Bush, Esq.
    PIPER RUDNICK
    1717 Main Street, Suite 4600
    Dallas, TX  75201-4605

FOR THE DEFENDANTS MANAGED BENEFITS ADMINISTRATOR,
INSURANCE CONSULTANTS, INC. AND MBA OF WYOMING:

    Hon. Rolando Olvera
    THE GARCIA LAW FIRM
    201 North 1st St.
    Harlingen, TX  78550

FOR THE DEFENDANT J. ALLAN HALL & ASSOCIATES:

    Roberta J. Hegland, Esq.
    BRACEWELL & PATTERSON, LLP
    2000 One Shoreline Plaza, South Tower
    800 North Shoreline Boulevard
    Corpus Christi, TX  78401-3700

    Albert George, Esq.
    GARRISON & KIEFER, P.C.
    8720 Castle Creek Pkwy, Suite 200
    Indianapolis, IN  46250

Also present:  Michelle Bartlett, Legal Video Services
               William Larry Blagg
               J. Allan Hall & Associates

4

INDEX OF EXAMINATION

                                               Page
EXAMINATION BY MR. WALRAVEN ....................  7
EXAMINATION BY MR. OLVERA ......................  78
EXAMINATION BY MS. HEGLAND .....................  81
EXAMINATION BY MR. WALRAVEN ....................  84
EXAMINATION BY MR. OLVERA ......................  85

INDEX OF EXHIBITS
                                               Page
Deposition Exhibit No.:

37   MBA Merrill Bostrum Associated 6-7-98 ......  69
44   Stop-Loss Policy ...........................  60
48   General Managers Agreement - JAH 002163 ....  39
49   E-mail to Hall from Routh - JAH 000110 .....  76
50   J. Allan Hall & Associates, Inc. Sales and .  84
     Marketing Agreement (CGIS) - JAH 002404

1    THE VIDEOGRAPHER:  Here begins videotape
2  number one in the deposition of J. Allan Hall in
3  the matter of San Benito Consolidated Independent
4  School District, Plaintiff, versus Companion Life
5  Insurance Company, Managed Benefits Administrator,
6  and Insurance Consultants, Incorporated, J. Allan
7  Hall & Associates, Incorporated, and MBA of
8  Wyoming, Incorporated, Defendants, in the United
9  States District Court, Southern District of Texas,
10  Brownsville Division; the case number of which is
11  B-03-047.
12    Today's date is July 31st, 2003.  The time is
13  9:59.  This deposition is being taken at the law
14  offices of Garrison & Kiefer and was made at the
15  request of Steven Walraven of the law offices of
16  Shaddox Compere Walraven & Good.  The videographer
17  is Michelle Bartlett of Legal Video Services.
18    Would counsel and all present please identify
19  themselves and state whom you represent.
20    MR. WALRAVEN:  I'm Steven Walraven, and I
21  represent the plaintiff.
22    MR. OLVERA:  I'm Rolly Olvera, and I represent
23  Managed Benefits Administrator and Insurance
24  Consultants, Inc. and MBA of Wyoming, Inc.
25    MR. BUSH:  Shelby Bush.  I represent Companion

1   Life Insurance Company.
2      MS. HEGLAND: I'm Roberta Hegland. I
3   represent J. Allan Hall & Associates, Inc.
4      MR. GEORGE: Albert George, I represent J.
5   Allan Hall & Associates.
6      MR. GOOD: Otto Good, I'm one of the other
7   attorneys for the plaintiff.
8      THE VIDEOGRAPHER: Would the reporter please
9   swear in the witness.
10          JAMES ALLAN HALL,
11   having been first duly sworn to tell the truth,
12   the whole truth, and nothing but the truth in
13   the above-captioned cause of action, testified
14   as follows:
15      MS. HEGLAND: Mr. Walraven, prior to
16   beginning, I wanted to present you with written
17   objections to the document requests that accompany
18   the deposition notice in this case. I would also
19   like to make clear that we have made available to
20   the plaintiffs the complete file of J. Allan Hall &
21   Associates, Inc. I was not sure whether you had
22   actually reviewed that, however, and so in an
23   attempt to expedite matters Mr. Hall has brought
24   with him today certain documents which would be
25   responsive to your requests, which as I said have

1   been made available to you, but I wanted to make
2   sure you had them in your possession. So we wanted
3   to give those to you at this time.
4      MR. WALRAVEN: When you say, have been made
5   available to me, are you talking about the
6   documents identified in your initial disclosures,
7   or something else?
8      MS. HEGLAND: That -- no, all of the documents
9   identified in the initial disclosures.
10      MR. WALRAVEN: And I understood you provided
11   me copies of everything that was within your files
12   except medical bills, is that also true? That's
13   what I recall from your phone discussions.
14      MS. HEGLAND: No. We understood that you were
15   requesting the physical documents that were
16   forwarded to you, but there were a number of other
17   documents that have been made available.
18      MR. WALRAVEN: Other than medical bills?
19      MS. HEGLAND: Well, typi -- other than
20   strictly medical bills, yes.
21      MR. WALRAVEN: Okay, then that was not my
22   understanding, but that's not a matter to resolve
23   this morning. Do we now have before us everything
24   that you're producing today?
25      MS. HEGLAND: No, only those of which this

1   witness, Mr. Hall, personally has knowledge and has
2   custody of.
3      MR. WALRAVEN: Are there other documents that
4   have been requested that you plan on producing
5   today but are not producing right now?
6      MS. HEGLAND: That's correct. The corporate
7   representative will provide additional documents.
8      MR. WALRAVEN: And why can't we look at them
9   now?
10      MS. HEGLAND: Well, this witness will not be
11   able to address those, and they are not responsive
12   to this witness's deposition notice.
13      MR. WALRAVEN: Well, the document request for
14   this witness was the same as the document request
15   for the corporate representative.
16      MS. HEGLAND: Yes, sir, but this witness was
17   noticed individually and is not appearing today as
18   the corporate representative and does not have
19   custody of those official corporate files.
20      MR. WALRAVEN: Let's proceed.
21   EXAMINATION BY MR. WALRAVEN:
22   Q. Mr. Hall, would you please tell us your full name.
23   A. Yes, my full name is James Allan Hall.
24   Q. What is your date and place of birth?
25   A. Date of birth is February 23rd, 1943. My place of

1   birth is Fresno, California.
2   Q. Mr. Hall, have you been deposed before?
3   A. No, I have not.
4   Q. Have you had a chance to visit with counsel about
5   what we are going to be doing this morning?
6   A. Yes, I have.
7   Q. You understand you're testifying under oath much as
8   if you were in court in front of a judge and jury?
9   A. Yes, sir.
10   Q. I'd like to ask you a couple favors to help us get
11   a good record today. First and foremost, if for
12   any reason you don't quite hear or understand my of
13   my questions, would you please stop me and ask me
14   to repeat it or reword it or whatever you need.
15   Would you do that, please, sir?
16   A. Yes, I will.
17   Q. Thank you. Secondly, in normal conversation, you
18   may know what I'm asking long before I reach the
19   end of a sentence, and you would probably go ahead
20   and begin answering, but with both of us talking at
21   once, it might be difficult for other people to
22   understand. So I would appreciate it if you would
23   let me finish my question before you begin your
24   answer. And the other side of that coin is
25   sometimes you might pause for breath, and I might

1    think you've finished your answer when you haven't,
2    and I might start the next question.  If I do that,
3    I apologize in advance, and would ask you to let me
4    know that you have not had an opportunity to
5    complete your answer, and we will go ahead and
6    provide you with that opportunity.  Okay?
7    A.   Yep.
8    Q.   Thank you.  Tell me about your formal education.
9    A.   High school degree, Bachelor's of Arts from the
10   University of California.
11   Q.   What was your major?
12   A.   Economics.
13   Q.   And when did you get that degree?
14   A.   1966.
15   Q.   Do you have any other college?
16   A.   No.
17   Q.   Have you taken any other formal education?
18   A.   No, sir.
19   Q.   Have you attended any other coursework of a less
20   formal nature relating to insurance?
21   A.   I've taken a number of exams for the CPCU exam.
22   Q.   And have you obtained your CPCU designation?
23   A.   No, sir.
24   Q.   How many of the exams have you completed?
25   A.   When I did it, there was five total, and I

1    completed four.
2    Q.   And when did you do this?
3    A.   In the 1970s.
4    Q.   Any other coursework related to insurance?
5    A.   No.
6    Q.   Do you hold any licenses or certifications --
7    A.   Yes.
8    Q.   -- relating to insurance?
9    A.   (Witness nodded.)
10   Q.   Tell me about those.
11   A.   I have a compliance department whose job it is to
12   have me compliant with the various state
13   regulations of each of the states we do business
14   in.  Specifically I do not know exactly which ones
15   they are.
16        MS. HEGLAND:  Excuse me, Steve, I'm sorry to
17   interrupt, but again when you ask him, you, I
18   assume unless you say otherwise that you're
19   referring to Mr. Hall individually, is that right?
20        MR. WALRAVEN:  That's correct.
21        MS. HEGLAND:  Not to J. Allan Hall &
22   Associates, Inc.?
23        MR. WALRAVEN:  Yes.
24   Q.   I might not get this right every time, but since
25   your name and the firm's name are very similar, if

11

1    I just say you, I generally will mean you as an
2    individual.  And if I intend to refer to J. Allan
3    Hall & Associates, and if I don't use the name I
4    might just say your firm, and you would understand
5    what I'm talking about, okay?
6    A.   Okay, sure.
7    Q.   Now, in what states do you do business?
8    A.   With precision I don't know each and every state
9    that I do business in, but it is most of the states
10   that Companion is licensed and admitted to do
11   business in.
12   Q.   Does that include Texas?
13   A.   Yes, sir.
14   Q.   And do you have an understanding as to what sort of
15   licenses or credentialing you have with the State
16   of Texas?
17   A.   I don't personally, but my firm does.
18   Q.   You don't personally have a license, or you don't
19   personally know?
20   A.   I don't have knowledge of what I need to do to be
21   compliant with the various regulations of the State
22   of Texas.
23   Q.   But you understand you individually are compliant
24   with some regulations of the State of Texas?
25   A.   That's correct.

12

1    Q.   And do you know what that compliance authorizes you
2    to do with respect to insurance in the State of
3    Texas?
4    A.   With precision, no, other than do business within
5    the State of Texas and to do insurance business
6    within the State of Texas.
7    Q.   And what sort of business do you and your firm do
8    in the State of Texas?
9    A.   We are what is considered in the industry a
10   managing general underwriter or MGU.  We market and
11   underwrite a specific form of insurance in the
12   State of Texas.
13   Q.   Is it your understanding that the State of Texas
14   regulates and licenses MGUs?
15   A.   I don't know.
16   Q.   But to the extent you do, you understand that you
17   and/or your firm are in compliance with those
18   regulations?
19   A.   That would be correct.
20   Q.   Any other licenses or certifications with the State
21   of Texas that you personally have?
22   A.   Again, I'm unaware of precisely what I'm licensed
23   to do in the State of Texas.  I have a department
24   that does that.
25   Q.   Are you aware of whether or not you have any

**Page 14**

1  licenses that authorizes you or your firm to do
2  anything in Texas separate and apart from what you
3  do as a managing general underwriter?
4  A. Would you say that again?
5  Q. Yeah, other than your MGU license --
6  A. Yeah.
7  Q. -- is there anything else you do in Texas that you
8  think may involve licensing?
9  A. Probably life insurance. To the extent that life
10  insurance is sold on behalf of others, I would need
11  a license to do that.
12  Q. And do you do that?
13  A. Yes.
14  Q. Anything else?
15  A. Not that I'm aware of.
16  Q. And other than the sorts of licenses and
17  designations that we have talked about with respect
18  to Texas that you may have in other states, do you
19  have any other credentialing, licenses,
20  certifications?
21  A. Not that I can recall at this point in time.
22  Q. Tell me what you did in preparation for testifying
23  today.
24       MS. HEGLAND: Objection to the extent it calls
25  for disclosure of any attorney-client privileged

**Page 15**

1  information.
2  A. I met with our attorneys.
3  Q. For about how long?
4  A. Hours, couple of hours, three or four hours.
5  Q. What else?
6  A. Reviewed various documents.
7  Q. What documents did you review?
8  A. Documents that relate to San Benito, the
9  underwriting of San Benito, the underwriting of the
10  insurance for San Benito Independent School
11  District.
12  Q. Anything else, any other types of documents that
13  you reviewed?
14  A. No, I don't think so.
15  Q. Did you review documents from any source other than
16  you and your firm's files?
17  A. I don't think so, no.
18  Q. For example, did you review any documents from the
19  files of MBA?
20  A. We didn't have any files from MBA, so, no.
21  Q. You do know who I'm talking about when I say MBA?
22  A. Yes.
23  A. As I understand it, there are a variety of entities
24  and d/b/a's associated with an organization known
25  as MBA of Wyoming, also known as Managed Benefit

**Page 15**

1  Administrators and Insurance Consultants, Inc., and
2  MBA of Salt Lake City and Merrill Bostrum
3  Associates. Do you know who those -- just
4  generally who those various entities are?
5  A. I know of the entities. I know that they do have
6  various names. What function each one of them
7  have, I do have unclarities on, yes.
8  Q. Me, too. For the purposes today I'm going to refer
9  to that group collectively as MBA, is that all
10  right with you?
11  A. That's fine with me.
12  Q. You understand the group and the people I'm talking
13  about and what they do?
14  A. That's correct -- well, yes, I think I do.
15  Q. You have some understanding?
16  A. Yes.
17  Q. Tell me how you're currently employed.
18  A. I'm employed by J. Allan Hall & Associates, Inc.
19  Q. And what is your job title?
20  A. My job title is President and Chief Executive
21  Officer.
22  Q. How long have you had that position?
23  A. Since 1993.
24  Q. I'm sorry, tell me the date again.
25  A. 1993.

**Page 16**

1  Q. And when was J. Allan Hall & Associates formed?
2  A. 1993.
3  Q. I thought I saw something somewhere that suggested
4  it was incorporated in 1983?
5  A. It was actually incorporated in 1983, but it was
6  dormant for about ten years. It was active for a
7  number of months and then became dormant, no
8  business going in or out, no staff, no financials
9  of any sort, until 1993.
10  Q. And what is the business of J. Allan Hall &
11  Associates?
12  A. The business of J. Allan Hall & Associates
13  primarily is one of being a managing general
14  underwriter for stop-loss insurance.
15  Q. And has that been true since 1993?
16  A. That's correct.
17  Q. Just for someone unfamiliar with the term, would
18  you give us a layman's explanation of what you mean
19  by stop-loss insurance?
20  A. Stop-loss insurance is not unlike regular
21  insurance, except it's on the level whereby a
22  contract is edited to instead of between an
23  employer and employee, it's between an insurance
24  company and an employer to protect against
25  catastrophic losses that the employer incurs on

**Page 17**

1  behalf of their employees.
2  Q. And we're talking health insurance?
3  A. In terms of health insurance, yes.
4  Q. And has J. Allan Hall been in the business of
5  providing the services associated with being a
6  managing general underwriter for stop-loss
7  insurance continuously since 1993?
8  A. That's correct.
9  Q. Does your firm do anything else of any appreciable
10  amount?
11  A. Not of any appreciable amount.
12  Q. And has it done anything else of any appreciable
13  amount since 1993?
14  A. No.
15  Q. And for what insurance companies does your firm
16  provide the services as an MGU?
17  A. At this point in time we represent Companion Life
18  Insurance.
19  Q. Anyone else?
20  A. Presidential Life Insurance Company, and that's it.
21  Q. And what percentage of your efforts are devoted to
22  Companion Life?
23  A. At this point in time probably 99 percent.
24  Q. And has that been true for the last ten years?
25  A. No, it has not.

**Page 18**

1  Q. Has it been true for the last five years?
2  A. Yes, maybe not in those proportions.
3  Q. But the great majority of your efforts have been
4  devoted to Companion Life?
5  A. That's correct.
6  Q. And during the last five years have there been
7  other companies that you provided those services to
8  besides Presidential and Companion?
9  A. Yes.
10  Q. Who else?
11  A. Clarendon Insurance Company, Pan American Life
12  Insurance Company. That's all.
13  Q. And during what periods of time were you active on
14  behalf of Clarendon?
15  A. Approximately from the period 1996 to 2000.
16  Q. And for what period of time were you active on
17  behalf of Pan American Life?
18  A. 2001 to 2002.
19  Q. Now, you mentioned that you're President and Chief
20  Executive Officer of your firm, and to me that
21  suggests that you, to a greater or lesser degree,
22  are active in the supervision of every aspect of
23  your firm's business. Is that true, or are there
24  certain portions of your firm's business that you
25  really have very little to do with?

**Page 19**

1  A. To the extent that I have a chief operating
2  officer, a lot -- most of the detailed day-to-day
3  activities are handled by that position.
4  Q. And who is your chief operating officer?
5  A. His name is Larry Blagg.
6  Q. And he's the gentleman in the room here today, is
7  that correct?
8  A. That's correct.
9  Q. And tell me what you mean by detailed day-to-day
10  operations. What does that involve?
11  A. The running and operating of the claims department,
12  the premium collection department, other aspects of
13  the administration of the business that we
14  underwrite.
15  Q. And are there areas of your business that are under
16  your purview pretty much as opposed to Mr. Blagg's?
17  A. Yes. I would say that the underwriting part of the
18  business are more in my purview.
19  Q. Any other areas?
20  A. No.
21  Q. And perhaps it would be helpful to define some
22  terms. When you say underwriting, how would you
23  explain that to a layman?
24  A. I would define underwriting as the gathering of
25  demographic information of self-funded or

**Page 20**

1  potentially self-funded accounts, the analysis of
2  that information, the calculation through various
3  formulas resulting in various premium rates, terms
4  and conditions, to produce a quote for that piece
5  of business.
6  Q. So for -- what you're explaining is that
7  underwriting means evaluating the employees of a
8  particular employer, their demographic information
9  to determine what would be an appropriate amount to
10  charge in relation to what it is they're buying,
11  correct?
12  A. As part of it, yes, charging a part of it,
13  negotiations of terms and conditions of the
14  potential contract are another part of it.
15  Q. And what sorts of terms and conditions typically
16  are negotiated?
17  A. The type of contract that is desired and/or
18  available.
19  Q. What types of contracts has your firm negotiated
20  over the last five years?
21  A. I'm sorry, what types of contracts?
22  Q. Yes. You just indicated you negotiate for
23  different types of contracts, and what different
24  types of contracts are we talking about?
25  A. You want the number of contracts?

21

22

**Page 21**

1  Q. No, no, no, types.

2      MS. HEGLAND: Objection, overbroad.

3  A. That's very difficult. I mean there's a hundred

4      variables that go into negotiation of any

5      particular contract. So a type could be the length

6      of the contract. The type could be various nuances

7      within underwriting the contract in terms of

8      individual claims that we're reviewing. The type

9      of contract could be other time-related aspects of

10     it in terms of when a claim is incurred or when it

11     is paid, those sorts of things. To put a number on

12     it would be very difficult for me.

13  Q. And I guess another term in addition that you used

14     is managing general underwriter. In addition to

15     the underwriting functions that you just described,

16     what else does a managing general underwriter do?

17  A. Other aspects of the underwriter, the managing

18     general underwriter does is administer those

19     accounts that are underwritten and sold, meaning

20     collection of premium, adjudication and payment of

21     catastrophic claims, payment of commission,

22     rendering reports to the insurance companies that

23     we represent.

24  Q. And are those functions provided by your firm to

25     Companion Life?

**Page 22**

1  A. That's correct.

2  Q. And did your firm provide those functions in

3      connection with the policies of Companion Life that

4      were issued to the San Benito School District?

5  A. That's correct.

6  Q. And how is your firm compensated for those efforts?

7  A. We are compensated for those efforts by collecting

8      or retaining a percentage of the premium.

9  Q. And what percentage is that?

10  A. It varies, but most normally it's 10 percent.

11  Q. Do you know what it was in connection with the San

12     Benito contracts?

13  A. Not precisely, no.

14  Q. But generally it's 10 percent?

15  A. I would say it was 10 percent. I mean generally

16     speaking it's going to be 10 percent. To the

17     extent that during the underwriting process terms

18     and conditions are negotiated, that's one of the

19     terms that is a negotiable item.

20  Q. And is that percentage inclusive of commissions

21     paid to others, agents or brokers in connection

22     with the sale of the policies?

23  A. It does not include that.

24  Q. And are you responsible for making those payments

25     or administering those payments?

23

24

**Page 23**

1  A. To others?

2  Q. To other agents or brokers in the chain of the sale

3      of the insurance.

4  A. That's correct.

5  Q. Are there functions in connection with the sale,

6      underwriting, of the stop-loss insurance or the

7      payment of claims that Companion Life does not

8      delegate to your firm, or do you basically do

9      everything?

10  A. No, that is correct. There are certain things that

11     they do not delegate.

12  Q. What are those things?

13  A. Various relations with state departments of

14     insurance, various claims.

15  Q. What kind of claims do you not handle?

16  A. Claims in excess of $100,000 Companion does not

17     delegate to us.

18  Q. So if a medical bill comes in from a particular

19     doctor or a particular hospital for in excess of

20     $100,000, your firm does what, just sends it on?

21  A. We would not deal with a hospital bill directly.

22  Q. I mean for reimbursement of a bill in that amount?

23  A. For reimbursement to that account, then what is

24     your question?

25  Q. What would you do, if one of those came in over the

**Page 24**

1      $100,000 amount?

2  A. We would package it up. We would send it on to

3      Companion.

4  Q. And who at Companion would you send it on to?

5  A. Specifically, I don't know. I don't know who the

6      individual would be.

7  Q. And who at your firm would be responsible for

8      sending that on?

9  A. His name is Randy Scott.

10  Q. And has he held that position for the last three or

11     four years?

12  A. At least two years, three years. I'd have to check

13     with the personnel records.

14  Q. And when you're talking about a claim exceeding the

15     $100,000 threshold, is it looked at as as a single

16     bill over that threshold, or if groups of bills

17     aggregate over that amount, how do you decide when

18     that threshold is satisfied? If you had three

19     bills for $50,000 each, would your firm process

20     those, or would Mr. Scott send them on to Companion

21     Life?

22  A. If the total aggregate bills in excess of the

23     specific attachment point exceeded $100,000, they

24     would be sent on to Companion.

25  Q. If they aggregated more than that?

25

1  A.  That's correct.

2  Q.  But any one of those bills, if it came in by

3      itself, you would process?

4          MR. GEORGE:  Excuse me, Counsel, are you

5      referring to the bills on one patient?

6          MR. WALRAVEN:  Correct.

7  A.  Please say that again.

8  Q.  Sure.  If a bill came in that was over the

9      attachment point that was in the amount of $50,000,

10     your firm would, assuming it was payable under the

11     policy, your firm would process and pay it,

12     correct?

13 A.  Yes, if it were over $50,000.

14 Q.  But if two bills for the same patient came in for

15     $50,000, came in at the same time, your firm would

16     not process and pay those; you would send them on,

17     is that what you're telling me?

18         MS. HEGLAND:  Is your question two bills each

19     in the amount of $50,000?

20         MR. WALRAVEN:  Yeah, Or $50,001, over the

21     $100,000 threshold.

22 A.  I believe we would send them on, yes.

23 Q.  I thought that's what you told me, but I wasn't

24     sure.

25         Any other claims that, other than the dollar

1      threshold, that would be sent on to Companion Life

2      for processing besides the ones that exceeded the

3      dollar threshold?

4          MS. HEGLAND:  I'm going --

5  A.  I'm sure there would be, but I'm not sure exactly

6      what categories that would fit into.  There is

7      cooperation; there is communication between us as a

8      firm and Companion as a firm relative to claims.

9  Q.  Has Companion provided you with types of claims

10     that it wants to be more actively involved in

11     regardless of their dollar amount?  And by you in

12     this case I mean your firm.

13         MS. HEGLAND:  Objection to speculation here.

14     This witness has indicated he does not handle

15     claims.

16         MR. WALRAVEN:  He's president.  He may know.

17     If he knows, he can tell me, and if he doesn't, I

18     want him to tell me that.

19         MS. HEGLAND:  Object, calls for speculation.

20 A.  If we declined a claim, Companion would want to

21     know about it.

22 Q.  Do you know of any other categories of claims that

23     they want to know about?

24 A.  Not off the top of my head, no.

25 Q.  We were listing the sorts of functions that

27

1      Companion Life has not delegated to your firm, and

2      you mentioned relations with state insurance

3      departments, and you mentioned some claims, and I

4      wondered what else goes on that list that we

5      haven't yet talked about?

6  A.  Nothing else that I can think of right now.

7  Q.  About how many employees does your firm have today?

8  A.  Approximately 20.

9  Q.  Has that changed significantly over the last five

10     years?

11 A.  It's increased from -- it's increased over the last

12     five years.

13 Q.  From about how many did you have five years ago?

14 A.  Ten.  That's an estimate.  Again, I don't have the

15     records in front of me, so I don't know.

16 Q.  I just asked for an approximation.  Thank you.

17 A.  Yeah.

18 Q.  And would that reflect change in the volume of the

19     business that you've been doing over that period of

20     time?

21 A.  That would reflect the change in volume of

22     business.  That would reflect additional

23     responsibilities that we've taken on over the

24     years.

25 Q.  What responsibilities have you taken on that you

28

1      have today that you didn't have five years ago?

2  A.  Over the last five years we have transitioned from

3      outsourcing the claims, the actual adjudication of

4      claims to an outside firm, and we have taken that

5      in house, so that now 100 percent of all stop-loss

6      claims that we are responsible for are handled in

7      house.

8  Q.  At the time of the dealings between your firm with

9      the stop-loss claims in the San Benito Independent

10     School District, were those claims outsourced at

11     all?

12 A.  That's correct, yes, they were.

13 Q.  All of them?  Some of them?

14 A.  Yes.

15 Q.  Who was handling the San Benito claims?

16 A.  A firm by the name of North Shore International.

17 Q.  And where are they located?

18 A.  Salem, Massachusetts.

19 Q.  How long had you been doing business with them?

20 A.  I'd say at least five years.

21 Q.  And when did you terminate that relationship?

22 A.  Precisely, I don't know.

23 Q.  Approximately?

24         MS. HEGLAND:  Objection, calls for

25     speculation.

1  A.  Within the last four years.
2  Q.  What were the reasons for ending that relationship?
3  A.  The reasons for ending that relationship are we
4      felt we needed more control over the day-to-day
5      activities of the adjudication of claims.
6  Q.  And were you dissatisfied with anything North Shore
7      was doing?
8  A.  No, not really.
9  Q.  Were you concerned that things were slipping by
10     that shouldn't be?
11 A.  To the extent that you outsource anything, you give
12     up a certain amount of responsiveness.  We did not
13     have that responsiveness to our liking.  We had
14     grown to a level where it was important for us to
15     have that responsiveness, and so that's why we
16     decided to terminate that relationship and bring
17     those functions in house.
18 Q.  I'm not sure what you mean by responsiveness.  Is
19     that -- are you talking about turnaround time?
20 A.  Turnaround time is part of responsiveness, yes.
21 Q.  What else?
22 A.  Answering phone calls relative to third-party
23     administrators asking about claims.
24 Q.  Answering questions like why hasn't this been paid?
25 A.  What's the status of claims?

1  Q.  What's the status.  And you felt you could improve
2      your performance by taking that in house?
3  A.  That's correct.
4  Q.  Was there any concern that claims were being paid
5      by North Shore that should not have been paid?
6  A.  No concern at all.
7  Q.  Were any procedures put in place relative to the
8      processing of claims when you took them in house
9      that had not been in place or performed by North
10     Shore?
11 A.  I wasn't involved in the day-to-day activities of
12     that or setting that up, so I can't really address
13     that.
14 Q.  Who would be the best person to ask?
15 A.  Probably Larry Blagg.
16 Q.  We talked about the various entities that we have
17     referred to under the umbrella of MBA.  Are there
18     any similar related entities of J. Allan Hall &
19     Associates that perform any of the functions that
20     we've been talking about today?
21 A.  No.
22 Q.  You just use the one corporate name for everything?
23 A.  For this particular product, yes.
24 Q.  For the stop-loss insurance?
25 A.  That's correct.

1  Q.  Are you personally involved with any other
2      businesses other than J. Allan Hall & Associates?
3  A.  At this point in time on an active basis, no.
4  Q.  How about in the last five years?
5  A.  I have been involved with other firms in the last
6      five years, yes.
7  Q.  What have those other firms done?
8  A.  Insurance related products relative to health
9      insurance.
10 Q.  Have those been firms that you've had an ownership
11     interest in?
12 A.  That's correct.
13 Q.  And what other types of products have those other
14     firms been involved in?
15 A.  One called provider Excess Underwriters, Inc.,
16     provided stop-loss insurance to provider groups.
17     One called Software Associates provided software
18     relative to stop-loss insurance.
19 Q.  Anything else?
20 A.  No.
21 Q.  Have any of these businesses been in any way joint
22     ventures with or shared ownership with any of the
23     MBA businesses or principals, the individuals
24     associated with MBA?
25 A.  No.

1  Q.  Now, we mentioned another term a minute ago that I
2      think would be helpful to define.  I think you
3      referred to a TPA.  What is a TPA?
4  A.  It stands for third party administrator.
5  Q.  And what does a third party administrator do in the
6      context of what we've been talking about?
7  A.  A third party administrator is contracted by an
8      employer to adjudicate claims that are submitted by
9      the employer's employees as an insurance company
10     would.
11 Q.  And what is the role of the TPA in connection with
12     stop-loss insurance and stop-loss insurance claims?
13 A.  When claims that are submitted by employees to
14     their employer and to the TPA exceed a certain
15     predetermined amount, the TPA is responsible for
16     conveying that information through filling out
17     various forms, submitting those to the stop-loss
18     carrier, through the MGU in this case, for
19     reimbursement to the employer.
20 Q.  Is that pretty much universal in the way you do
21     business, that is virtually all of the claims that
22     come to your firm come from TPAs in the way you
23     just described?
24 A.  Yeah, yeah.
25 Q.  And with approximately how many TPAs does your firm

33

1  do business?
2  A.  I'll speculate and say a hundred.
3  Q.  And can you speculate as to what percentage of
4  business out of those a hundred TPAs comes from
5  MBA?
6  A.  At this point in time, none.
7  Q.  You don't do business with them today?
8  A.  No, sir.
9  Q.  How about three or four years ago, at the time of
10  the San Benito insurance?
11  A.  As a percentage of the whole, less than -- less
12  than 3 percent, speculating.
13  Q.  What sort of materials or services or assistance
14  does your firm provide TPAs in connection with
15  processing stop-loss claims?
16      MS. HEGLAND:  I'm sorry, Steve, I missed that.
17  Would you mind repeating it?
18  Q.  Yeah, what sorts of materials or services do you
19  provide to TPAs in connection with the processing
20  of stop-loss claims?
21  A.  We provide them with various forms that we request
22  and/or require them to complete, execute, fill out
23  and execute, for the purpose of submitting
24  stop-loss claims.
25  Q.  Anything else?

1  A.  I guess I would have to say telephone conferences
2  or telephone conversations or advising them or
3  requesting additional information that we might
4  need in order to process those stop-loss claims.
5  Q.  Do you provide any written materials, guidelines,
6  policies and procedures manuals or other
7  instructional information to TPAs on the proper way
8  to process a stop-loss claim?
9  A.  Other than that that's contained on the forms, no.
10  Q.  And do you provide any other sort of training,
11  seminars, anything else, to TPAs telling them
12  anything about how you'd like them to process
13  stop-loss claims?
14  A.  No.
15  Q.  In connection with your business for Companion
16  Life, other than providing administrative services
17  that you've described for the commission, is your
18  firm involved financially in the stop-loss
19  insurance at all?
20  A.  Yes, we are.
21  Q.  And would you explain that to me, how that is?
22  A.  I have yet another firm called JAH Re, which is an
23  insurance company.  That insurance company accepts
24  a portion of the risk that we underwrite on behalf
25  of Companion Life.

35

1  Q.  Where is JAH Re incorporated or chartered?
2  A.  It's chartered in Turks and Caicos Islands.
3  Q.  How long has JAH Re participated in the Companion
4  Life stop-loss program?
5  A.  I'll speculate on that and say three years.
6  Q.  Do you know whether JAH Re was involved in any of
7  the San Benito insurance?
8  A.  I couldn't say that it was.  I'd have to check the
9  records, but I am unsure.
10  Q.  Other than JAH Re, have you or your firm or any
11  other entities been financially involved in the
12  Companion Life Insurance?
13  A.  No.
14  Q.  When you say JAH Re participates, do they
15  participate as a reinsurer of Companion Life?
16  A.  That's correct -- in an indirect sense, yes.
17  Q.  Explain to me how that works.
18  A.  Companion Life has reinsurers that reinsure a
19  portion of the risk.  Those reinsurers in turn
20  reinsure part of their risk to others.  One of
21  those others is JAH Re.  So to the extent that your
22  question says do we reinsure Companion Life, the
23  answer would be no.  But from a business sense, we
24  are there, and we are accepting a portion of the
25  risk.

36

1  Q.  And when you sort through the various layers, can
2  you tell me what percentage of the risk JAH Re ends
3  up with?
4  A.  It depends on the year, but it will vary from
5  10 percent to 12 and a half percent.
6  Q.  And do you know how much of the risk Companion Life
7  keeps?
8  A.  It's my understanding that they keep 10 percent.
9  Q.  And does your firm have any involvement with
10  processing claims for the reinsurance benefits?
11  A.  Reinsurance benefits?  I'm unclear as to what you
12  mean.
13  Q.  When Companion Life pays a claim --
14  A.  Mm-hmm.
15  Q.  -- it then turns around and asks for 90 percent of
16  that to be repaid by its reinsurers?
17  A.  That's correct.
18  Q.  Does your firm get involved in that step of asking
19  for that reimbursement of that 90 percent?
20      MS. HEGLAND:  Objection.  I'm unclear, when
21  you say your firm, are you talking about J. Allan
22  Hall & Associates, Inc.?
23      MR. WALRAVEN:  I am.  I am talking about J.
24  Allan Hall & Associates, Inc.
25  A.  The extent of our involvement is rendering reports

that would reflect that transaction to Companion and to their reinsurers.

Q. When you say that transaction, you're talking about the claim that your firm just paid?

A. The claim that Companion would have with their reinsurers, which I think was your question.

Q. Okay. So you prepare reports for Companion Life reflecting how a certain amount of money ultimately should be divided between Companion Life and their reinsurers?

A. We prepare reports for our own behalf that are given to Companion Life and to their reinsurers.

Q. That say what generally?

A. That would distinguish the proportion of responsibility between Companion Life and their reinsurers.

Q. And do you or any -- do you individually or any firm that you're affiliated with have any ownership interest in Companion Life?

A. No, I do not.

Q. Do you know who does own it?

A. It's my understanding that Blue Cross Blue Shield of South Carolina has an ownership of Companion Life.

Q. Are you aware of any others who may have an



ownership interest in Companion Life?

A. No, I'm not.

Q. During the last four, five years, have you encountered any solvency problems with respect to Companion Life and/or its reinsurers?

*MR. BUSH:* Objection to the extent it's not relevant. It's not specific to this case. It's not likely to lead to the discovery of admissible evidence.

A. Have we had -- has J. Allan Hall & Associates had problems with solvency of Companion Life or the reinsurers? We have not had problems, no.

Q. Are you aware of any such problems over the last five years?

*MR. BUSH:* Objection, vague.

A. I'm sorry, the word problem really entails a lot of things that I may or may not know, so it's hard to address.

Q. For example, has any of the reinsurers gone broke or quit paying claims?

A. No.

Q. The reason I'm asking this is it's been suggested in another deposition in this case that during the summer of 2001 claim payments started slowing down. And one of the suggestions or concerns is that



those payments started slowing down due to some sort of cash flow problem or solvency problem, and that's the reason I'm asking it. And I'm wondering if you have any information on what happened or why?

A. No, I don't.

Q. As far as -- you're not aware of that happening?

A. No.

Q. You're not aware of any financial reason why it might have happened in 2001?

A. No, I'm not.

Q. As far as you know, for that year there's plenty of money?

A. Sure.

*THE WITNESS:* Can we take a break?

*MR. WALRAVEN:* Anytime you like, you just let us know, and we'll be happy to do so.

*THE VIDEOGRAPHER:* We are going off the record. The time is 10:51 a.m.

*(A brief recess was taken.)*

*THE VIDEOGRAPHER:* We are back on the record. The time is 11:07 a.m.

*(Deposition Exhibit 48 is marked for identification.)*

Q. Mr. Hall, resuming more or less where we left off,



I have handed you a document that's been marked as Deposition Exhibit 48, and first of all I'd like to ask you if you've ever seen that document before?

A. Yes, I have.

Q. Does it have your signature on the bottom or on the signature page, wherever it is?

A. Yes, it does.

Q. And does it have your initials on each page?

A. Yes, it does.

Q. What is that document?

A. It's a document entitled General Managers Agreement.

Q. And who are the parties to that agreement?

A. The parties are J. Allan Hall & Associates and Companion Life Insurance Company.

Q. And what is the date of that agreement?

A. The date of this agreement is October 17th, 1998.

Q. Is that agreement still in place or has it been superseded by another agreement?

A. I believe this agreement is in place at this point in time.

Q. Are there any other agreements between your firm and Companion Life?

A. Not that I'm aware of.

Q. I have just a couple of questions about it, if you

1   would let me -- I'll be happy to show this to you,
2   but I need to read it, because I can't remember it.
3       Earlier today we were talking about the
4   different types of stop-loss insurance?
5  A.  Mm-hmm.
6  Q.  And you said, well, it has to do with timing issues
7   and things like that, but in section two -- and I'm
8   going show it to you here in a minute -- it talks
9   about the term, quote, stop-loss products, plural,
10   products.  And it says, means insurers, aggregate
11   excess reinsurance agreements, specific excess
12   accident and sickness reinsurance agreements and
13   excess loss insurance policies, riders and
14   coverages?
15       MS. HEGLAND:  Where are you at, Mr. Walraven?
16  Q.  I'm on the first page of JAH 2163, section two in
17   the middle of the page.
18  A.  Gotcha.
19  Q.  Do you see where I'm reading?
20  A.  Yes, sir.
21  Q.  And do those particular terms refer to different
22   types of insurance policies?
23  A.  At least two of them do, yes.
24  Q.  Help me out.  Which ones do?
25  A.  Aggregate excess reinsurance agreement or insurance

1   agreements and specific excess reinsurance
2   agreement, or as they are stating, accident and
3   sickness reinsurance agreements.
4  Q.  Are those different products?
5  A.  Technically speaking, yes, those are different
6   products.  They interrelate with each other, but
7   they are different products.
8  Q.  And how do they differ?
9  A.  Specific excess accident and health reinsurance as
10   stated in this agreement is defined as individual
11   claims relating to an individual claim as opposed
12   to aggregate excess insurance, which relates to all
13   claims in the aggregate.
14  Q.  Are those different types of insurance often
15   offered in the same document or policy?
16  A.  Yes, they are.
17  Q.  And do those types of insurance differ from excess
18   loss insurance policies referred to later in that
19   same sentence, as you understand it?
20  A.  I would say that that's redundant to the extent
21   that individually they're termed agreements, and
22   the excess loss is termed policies; the only thing
23   I can think of from the author -- as the author
24   might think of is you take the individuals, you put
25   them together, and it makes one policy.

1  Q.  But there's not a third product out there --
2  A.  That's correct.
3  Q.  -- as you understand.  Thank you.
4       On a page that has the number at the bottom
5   JAH 2168 --
6       MS. HEGLAND:  These are double sided.
7  A.  Okay, yes, sir.
8  Q.  Do you see, above the middle labeled section six,
9   there's a paragraph talking about Indemnity and
10   Hold Harmless?
11  A.  Yes, I do.
12  Q.  My question is, has there been any request for
13   indemnity in connection with the San Benito School
14   District lawsuits or between Companion Life and
15   your firm?
16  A.  No.
17  Q.  No discussions of it, no requests for it, no
18   mention of it that you've heard of?
19  A.  You're correct.
20  Q.  Turning back to page 2176 -- this one also has a 14
21   at the bottom of it -- there is a reference in the
22   middle of the page that I guess that your firm has
23   the authority of Companion Life to pay claims up to
24   $5,000 net of reinsurance without prior approval.
25   Do you see that?

1  A.  Which section is that?
2  Q.  Section C -- well, it's section eight, subpart C.
3  A.  I'm -- yes, what about it?
4  Q.  And how does that work in connection with what
5   you've already described as the role of your firm
6   in processing stop-loss payments?  I mean here
7   we've got a cap of $5,000, and you told me
8   $100,000.  Is this talking about something else?
9  A.  I'm unsure.
10  Q.  You're not sure what this --
11  A.  If it's talking about the same thing, then there is
12   another agreement that allows us to adjudicate
13   claims up to $100,000.
14  Q.  The other thing I wanted to ask you about this
15   document on the very last page --
16  A.  Page 16?
17  Q.  Correct.  There's a reference on there of a
18   commission of 35 percent, there about a quarter way
19   down the top of the page?
20  A.  Correct.
21  Q.  Or I guess it says up to 35 percent.  Is
22   35 percent -- is there an amendment change in that,
23   I guess is my first question?
24       MS. HEGLAND:  Objection, asked and answered.
25  A.  I don't know that there's an amendment to this or

45

46

1  not.
2  Q. And you know how it's -- you said generally it's
3  10 percent, not 35 percent, correct?
4  A. We're talking about two different things.
5  Q. That's what I was concerned about, so what are the
6  two different things?
7  A. The 35 percent is the total.  You asked me what J.
8  Allan Hall & Associates as the MGU allocates, or my
9  interpretation was what we allocate to the
10  operation of my firm.
11  Q. And where does the other 25 percent go?
12  A. As it states here, it goes -- well, it may or may
13  not state here.  It goes to the issuing carrier,
14  Companion, or it goes to pay commissions to
15  brokers.
16  Q. And generally what sort of commissions are paid to
17  brokers?
18      MS. HEGLAND:  Objection, vague and overbroad.
19  Q. And I'm talking percentages.
20  A. It can vary from 0 percent to 15 percent.
21  Q. And are commissions typically paid to TPAs who are
22  involved in the purchase of stop-loss insurance?
23  A. They can be, yes.
24  Q. Do you know whether commission was paid to MBA in
25  connection with San Benito's insurance, stop-loss

1  insurance?
2  A. No, I don't know precisely whether they were or
3  were not.
4  Q. In the normal course of things, would you expect
5  that they were?
6      MS. HEGLAND:  Objection, vague.
7  A. There are certain producers, be they brokers or
8  TPAs, that receive no commission.  They are
9  compensated otherwise.  So I can't, with precision,
10  know which category MBA fits into.
11  Q. Would your firm have records that would tell us the
12  answer to that?
13  A. Yes.
14      MS. HEGLAND:  Mr. Walraven, are we done with
15  this exhibit?
16      MR. WALRAVEN:  I think so, at least for now.
17  Q. With respect to processing stop-loss claims, does
18  your firm have any written policies, procedures,
19  guidelines, instructions, outlines or anything like
20  that that the claims personnel are supposed to
21  follow?
22      MS. HEGLAND:  Objection, vague.
23  A. I believe we do.
24  Q. And can you tell me generally what sorts of issues
25  those address?

47

48

1  A. No, I can't.
2  Q. And who would be the person who could best tell me
3  about that?
4  A. That would be my chief operating officer, Larry
5  Blagg.
6  Q. And when claims were being handled by North Shore,
7  were there any similar -- or were there any policy
8  and procedures or guidelines in writing provided by
9  your firm as to how the claim should be handled?
10  A. I don't know.
11  Q. And do you know if North Shore had any internal
12  written guidelines on the subject?
13  A. I don't know that, no.
14  Q. Are you familiar with those guidelines and what
15  they say and how they're supposed to work?
16  A. No, I'm not.
17  Q. I'd better ask Mr. Blagg?
18  A. Yes, sir.
19  Q. I understand that from time to time the claims that
20  are submitted for reimbursement under stop-loss
21  insurance are audited, correct?
22  A. Yes, sir.
23  Q. And who is it that decides claims need to be
24  audited?  Who has that responsibility, what entity?
25  A. Within J. Allan Hall & Associates?

1  Q. Well, is it J. Allan Hall; is it Companion Life
2  first of all, or is it somebody else?
3  A. It can be all of the above.
4  Q. Okay, and within J. Allan Hall & Associates who is
5  it?
6  A. It would be our claims director.
7  Q. Mr. Scott?
8  A. Mr. Scott.
9  Q. And do you know what --
10  A. Excuse me, Chief Operating Officer Mr. Blagg; could
11  be me; could be Companion.
12  Q. And do you know what sort of criteria is involved
13  in deciding when to audit claims?
14  A. With any sort of precision, no, I don't.
15  Q. Do you know whether there are any written
16  guidelines that say all claims that fall in a
17  certain category should be audited or reviewed for
18  the need for audit or something along those lines?
19  A. I'm unaware of any particular document that states
20  that.
21  Q. In your experience, how often are claims audited?
22  A. In my experience rarely, rarely less than 10
23  percent.
24  Q. And 10 percent of what?
25  A. Of the number of claims that we see.

49

50

**50**

1  Q.  And, say, in a year how many audits of claims would
2      your firm be aware of or get the benefit of?
3  A.  I would be guessing to say less than five.
4  Q.  But a couple or three every year?
5  A.  Yes, I would say that. Mr. Blagg would be better
6      equipped to address that.
7  Q.  Can you tell me approximately how many insureds of
8      insureds of your firm processes stop losses for?
9  A.  One, Companion, if that's what you're talking
10     about. We process claims on behalf of Companion.
11  Q.  I'm sorry, I meant to ask about insureds -- I mean
12     clients, insureds, or employers.
13  A.  How many clients, that would be, right at this
14     point in time, that would be a guess. I'd rather
15     defer that to my chief operating officer who knows
16     those numbers.
17  Q.  Are we talking hundreds, if not over a thousand?
18  A.  Less than a thousand.
19  Q.  But several hundred?
20  A.  Yeah.
21  Q.  Out of that several hundred employers and their
22     various employees, three or four or five may be
23     audited each year?
24  A.  Mm-hmm.
25  Q.  Something like that?

1  A.  Yeah.
2  Q.  Has that been consistently true more or less for
3     the last five years?
4  A.  I would say so, yes.
5  Q.  And do you have an understanding as to why it was
6     that some of the claims of some of the employees of
7     San Benito School District were audited?
8        MR. BUSH:  Objection to the extent it
9     mischaracterizes the claims are by the School
10     District to J. Allan Hall. They're not claims by
11     employees. Those claims have been paid.
12  A.  Our contract is with the employer, so the number of
13     employees, I don't know. Would you please ask it
14     again?
15  Q.  Sure. You understand there was an audit --
16  A.  That's correct.
17  Q.  -- in connection with San Benito School District?
18  A.  Yes.
19  Q.  Do you know the reasons that an audit was decided
20     upon in connection with those claims?
21  A.  I don't know all of the reasons. I know that one
22     reason is the timing of payments.
23  Q.  And what do you mean by that?
24  A.  The timing of payments to providers by San Benito.
25  Q.  And what is it about the information that your firm

51

1     had on the timing that suggested or triggered the
2     audit?
3  A.  I don't have that information.
4  Q.  Did your firm have any information other than the
5     reports provided by the TPAs in connection with the
6     claims?
7        MS. HEGLAND:  Objection, asked and answered.
8  A.  Again, I don't have that information. I was not
9     aware of that information.
10  Q.  I'm just trying to understand what you're telling
11     me. Is it the fact that a bunch of claims were
12     reported at the very end of the policy period, is
13     that the sort of timing that would trigger an
14     audit?
15        MS. HEGLAND:  Objection, asked and answered.
16     I think he said he doesn't know.
17  A.  I really don't know, other than the timing.
18  Q.  Okay.
19  A.  One of the aspects of the stop-loss policy is the
20     time within which certain events have to happen,
21     it's my understanding that there was a question as
22     to whether that timing was adhered to or not, and
23     therefore your question relative to the audit is we
24     should audit that claim to make those
25     determinations.

52

1  Q.  Yeah, what I'm really curious about is what is it
2     that you or your firm had that raised a question
3     about timing?
4  A.  And my answer is I don't know.
5  Q.  Okay, thank you.
6        And do you know who it was in this case that
7     decided to request an audit in the San Benito case?
8  A.  Specifically, no.
9  Q.  Was it someone at your firm?
10  A.  It would have been one of the people that I
11     referred to, either the chief operating officer or
12     the director of claims or Companion.
13  Q.  And do you know whether it was someone at your firm
14     as opposed to somebody at Companion?
15  A.  I don't know.
16  Q.  Do audits cost money?
17  A.  Yes, sir.
18  Q.  Is there some sort of approval process that has
19     to -- that you have to go through before -- between
20     requesting an audit and deciding to do an audit?
21  A.  Well, I'm sure there is, yes.
22  Q.  Who is it that pays for those audits?
23  A.  I don't know, precisely.
24  Q.  You don't know whether it's Companion or whether
25     it's your firm?

**Page 54**

1 A. If we contracted for the audit, we would pay for
2 the audit.
3 Q. If Companion asked for it, would that be different?
4 A. I presume so, yes.
5 Q. Are there any reports or other paperwork generated
6 in connection with a request or proposal to do an
7 audit?
8 A. Not that I'm aware of.
9 Q. I'll change the subject on you. It's my
10 understanding that Companion Life issued stop-loss
11 insurance to the San Benito School District for two
12 policy years, the '99-2000 policy year and the
13 2000-2001 policy year. Is that your understanding?
14 A. That's my understanding.
15 Q. Let me back up a step. Had your firm, to your
16 knowledge, had any involvement with stop-loss
17 insurance for the San Benito School District prior
18 to that first policy year that you know of?
19 A. Not that I'm aware of.
20 Q. And prior to that time had your firm had any
21 business with MBA?
22 A. Yes, we did.
23 Q. And with the stop-loss insurance business?
24 A. That's correct.
25 Q. And you had been providing stop-loss insurance to

1 MBA's clients for a number of years prior to 1999?
2 A. Yes.
3 Q. And that insurance was pretty much the same sort of
4 stop-loss insurance we've been talking about today?
5 A. Correct.
6 Q. Are you aware of any efforts to renew the stop-loss
7 insurance for the school district at the end of
8 that second policy year, that would have been
9 sometime in the summer of 2001?
10 A. I'm aware of it, yes.
11 Q. And to what extent were there efforts to renew?
12 A. It's my understanding that we went through the
13 normal renewal process of again requesting
14 underwriting information, analyzing that
15 information, running that information through
16 various formulas and producing various proposals
17 for renewal.
18 Q. And those proposals were communicated to San Benito
19 School District, as you understand it?
20 A. My understanding, yes.
21 Q. And so your firm and Companion Life was again
22 bidding or proposing to renew the business,
23 correct?
24     MS. HEGLAND:  In 2001?
25 Q. For the 2001-2002 policy year.

**Page 55**

1 A. For a period of time, yes.
2 Q. What do you mean for a period of time?
3 A. It's my understanding that we put proposals on the
4 table to renew that particular account up to a
5 point in time when we withdrew our offer to renew.
6 Q. And can you tell me the timing of the withdrawal of
7 the offer?
8 A. No, I cannot.
9 Q. Can you tell me the events that led to the
10 withdrawal of the offer?
11 A. With precision, no.
12 Q. Tell me what you do understand on that subject.
13 A. I really don't understand a whole lot about it. I
14 just understand that those events happened. I
15 don't have knowledge of why we did that.
16 Q. Between the time the proposal was made and the
17 proposal was withdrawn, what sort of response did
18 you get or did your firm get from the school
19 district?
20 A. I don't know.
21 Q. I mean to your knowledge, did they ever say, we'd
22 like to renew, we don't want to renew; you never
23 accepted, rejected or anything in between, never
24 heard anything back that you know of?
25 A. I wasn't involved in the day-to-day underwriting,

1 so I don't know.
2 Q. Who would know that?
3 A. My chief operating officer.
4 Q. And were the renewal proposals on roughly the same
5 sorts of terms as the prior two policies?
6 A. Sir, I can't tell you that. I don't know.
7 Q. Do you recall whether or not there were any
8 significant changes in price?
9 A. I don't know.
10 Q. And again would Mr. Blagg know that?
11 A. That's correct.
12 Q. Do you have an understanding that it is the denial
13 of payments on four stop-loss claims that are the
14 reason we are here today?
15 A. The number four stop-loss claims?
16 Q. Yeah.
17 A. I'm unaware of that. It's my understanding that
18 there were two stop-loss claims.
19 Q. Okay, well, let's talk about those two claims a
20 little bit as you understand them. Can you tell me
21 the reason those claims were denied?
22 A. With precision, no.
23 Q. Were you involved in the decision to deny the
24 claims?
25 A. No, I was not.

57

58

1  Q.  Who was?
2  A.  The director of claims, Mr. Scott, Companion and
3      Mr. Blagg.
4  Q.  Do you know who at Companion was involved?
5  A.  No, I do not.
6  Q.  Would the ultimate decision be with your firm, with
7      Companion, or how would that work?
8  A.  The contract is between Companion and San Benito,
9      so it would have been Companion's ultimate call.
10 Q.  So you personally don't have any information as to
11     why those claims were denied?
12 A.  No, I don't.
13 Q.  But you understand that Mr. Blagg does know the
14     answer to that?
15 A.  That's correct.
16 Q.  Has it come to your attention that some of the
17     issues in this lawsuit have to do with a concept
18     sometimes referred to as advance funding?
19 A.  Your question again?
20 Q.  Yes.  Well, let me ask a different question.  In
21     connection with stop-loss insurance, are you
22     familiar with the term advance funding?
23 A.  Yes, I am.
24 Q.  And what does that term mean to someone in your
25     business?

1  A.  The definition of that term -- that term means that
2      instead of the account paying a claim and then
3      submitting it for reimbursement to the stop-loss
4      carrier, the stop-loss carrier steps in and either
5      reimburses the account or pays the providers before
6      the account pays that claim --
7  Q.  And is --
8  A.  -- in advance of submitting it to the stop-loss
9      carrier.
10 Q.  So it refers to the distinction between the
11     situation where the employer first pays the claim
12     or the -- and is reimbursed, or whether the
13     stop-loss carrier and its MGU first pay?
14 A.  That's correct.
15 Q.  Are you familiar with stop-loss contracts that
16     expressly provide for that procedure for paying
17     claims?
18 A.  Yes, I am.
19 Q.  And do you offer, on behalf of Companion Life, such
20     contracts?
21 A.  Yes, we do.
22 Q.  Can you estimate for me what percentage of the time
23     or percentage of the contracts have that particular
24     procedure?
25 A.  I would have to guess, but that guess would be less

59

60

1      than 10 percent.
2  Q.  And let me make sure I'm clear.  You're telling me
3      that less than 10 percent provide what you've
4      described as advanced funding?
5  A.  That's correct.
6  Q.  And the other 90 percent do not?
7  A.  That's correct.
8  Q.  Do you know whether or not the contracts provided
9      through you and Companion Life to the clients of
10     MBA share that same percentage, or are they
11     different?
12 A.  I would have to do a survey of all of the accounts
13     that we had with MBA, which we have not done.  I
14     know that some accounts that MBA produced with us
15     had advanced funding and some did not have advanced
16     funding.
17 Q.  But as we sit here today, you couldn't tell me
18     whether the majority of them do or the majority of
19     them do not?
20 A.  I can't say that.
21 Q.  And when you do have a contract that provides for
22     advanced funding, is there a specific section in
23     the policy that describes how it's going to work?
24 A.  Yes, there is.
25 Q.  And you're familiar with such terms?

1  A.  Yes, I am.
2          MR. WALRAVEN:  Ms. Hegland, one of the things
3      we asked for you to produce today was an example of
4      such contract, and obviously this witness does have
5      knowledge of it.  He just told me he did, so I
6      think it would have been appropriate for you to
7      provide that in connection with his deposition.
8      You got one handy?
9          MS. HEGLAND:  Counsel, I do not.  You will
10     recall that just last week at the deposition in
11     Salt Lake there was one such example produced, and
12     it's marked as an exhibit, which is present in the
13     exhibit book before you, and I saw at that time
14     that you did obtain a copy of that.  So I presumed
15     that you did have that in your possession.
16         MR. WALRAVEN:  I do have a copy of Exhibit 44.
17     As to whether or not it meets the description of
18     what the witness is referring to, I do not know,
19     but we'll find out.
20         (Deposition Exhibit 44 previously marked for
21     identification.)
22 Q.  Mr. Hall, I'm going to show you what's been marked
23     as Deposition Exhibit 44 and just ask you to take a
24     look at that, and particularly I'm curious if it is
25     the sort of stop-loss policy with the advanced

62

1 funding terms that you were just telling me about.
2 A. No.
3     MS. HEGLAND: Take a look at the whole
4 document before you answer the question.
5     THE WITNESS: I'm sorry, I thought it was just
6 this one page.
7     MS. HEGLAND: I just wanted to make sure you
8 had every page.
9 A. Would you give me the question again, please.
10 Q. Sure. A moment ago you were telling me that some
11 Companion Life policies expressly deal with the
12 subject and have terms providing for advanced
13 funding, and my question is, is this Exhibit 44 an
14 example of what you were referring to?
15 A. And my answer is I'm unsure. There is mention of
16 specific advanced funding on page three, item
17 number ten, where it states specific advanced
18 funding is included.
19 Q. You must have a different page three than I do.
20 Are you looking at the application?
21 A. Yes.
22 Q. Okay, I've found that now, and -- but you say
23 you're unsure. Why is it you're unsure?
24 A. There's normally a premium charged for it, and I
25 don't see any premium provisions on this particular

1 exhibit.
2 Q. What sort of difference in the premium does it make
3 when this feature is added to an agreement?
4 A. It can range anywhere from 1 percent to 3 percent,
5 additional premium.
6 Q. And you said it's normally charged. Are there
7 exceptions to that?
8 A. That's why I'm hesitating. No, there's usually not
9 an exception to that.
10     MS. HEGLAND: Why don't you take a look at the
11 policy itself.
12 A. Oh, I'm sorry. There was an additional charge.
13 So, yes, in looking at the schedule of excess
14 insurance, there was a charge, and there is a
15 notation of specific advancement.
16 Q. And you're looking now on what page?
17 A. I'm looking on page three.
18     MS. HEGLAND: Why don't you refer to the Bates
19 number.
20     THE WITNESS: JAH 002215.
21 Q. And it shows a figure of 3 percent?
22 A. 3 percent of premium per month, yes.
23 Q. And then there also at the bottom of the page is
24 another reference to specific advanced funding, is
25 that correct?

63

1 A. That's correct.
2 Q. Is there anything else in this policy that you're
3 aware of that explains what terms mean or how it
4 works?
5 A. Not that I can see, no.
6 Q. Are you aware of other policy forms that have such
7 language that are issued on behalf of Companion
8 Life through your firm?
9     MS. HEGLAND: Objection, vague.
10 A. I'm aware that there is a rider that is normally
11 attached to situations like this where the
12 accommodation is provided.
13 Q. And since that document's not been produced since
14 it was requested, even though it was requested,
15 would you kind of give me a general understanding
16 of what it is that document talks about?
17     MS. HEGLAND: Object to sidebar.
18     MR. WALRAVEN: Well, let me start over again.
19 Ms. Hegland, I'd like to renew my request for the
20 form that deals with what we are talking about,
21 which was clearly requested and is clearly relevant
22 to this witness.
23     MS. HEGLAND: I don't know that it is relevant
24 to this witness. Mr. Blagg will be prepared to
25 discuss that this afternoon.

64

1     MR. WALRAVEN: Well, I'd like to discuss it
2 with Mr. Hall, and he obviously knows about it.
3 Q. Anyway, Mr. Hall, tell me what it is that that form
4 provides, just in general.
5 A. I think that form would provide what I described
6 earlier, and that is how the claim would be
7 adjudicated relative to the advanced funding.
8 Q. And how long is this form?
9 A. Less than a page.
10 Q. And do you have any idea, the practice or procedure
11 for using that form as compared with doing a policy
12 such as Exhibit 44 that doesn't have it? Is this
13 an exception? Is this a mistake? Is it half the
14 time done one way or the other? What's your
15 understanding as to the use of the form?
16     MS. HEGLAND: Objection, vague, calls for
17 speculation.
18 A. The form that we are talking about?
19 Q. Right, the rider for specific advance funding.
20 A. I don't put the policies together, and that's not
21 kind of one of the things I do, so I don't know.
22 Q. You don't have any understanding at all as to when
23 the form should be used or shouldn't be used, but
24 still the policy provides advanced funding?
25 A. Well, it's my understanding that if it was provided

65

66

1  in the application and the schedule, then those
2  policy provisions would be included in the policy.
3  Q. By attaching that rider that you described?
4  A. Correct.
5  Q. Now, we have already had described to us, and I'm
6  sure you've heard about it, a meeting that took
7  place between you and Don and Phyllis Merrill in
8  1999. Do you recall such a meeting?
9  A. Vaguely --
10       MS. HEGLAND: Object to sidebar.
11 A. Vaguely, yes.
12 Q. How many meetings would you say you've had with
13 Mr. and Mrs. Merrill?
14 A. If you asked me how many meetings I've had with
15 Mr. Merrill, I would say four. I can't include
16 Mrs. Merrill, because I don't recall her being
17 there.
18 Q. At any of them?
19 A. She may have; she may have not.
20 Q. You just don't recall?
21 A. Yeah.
22 Q. And over what period of time did you have these
23 meetings?
24 A. Three years.
25 Q. And would '99 have been the first of the three, the

1  middle, the end of the three; over what three years
2  did you have these meetings?
3  A. I can't recall with precision. The meeting that
4  you're talking about in 1999 was not the first
5  meeting.
6  Q. And can you recall anything about what you
7  discussed with Mr. Merrill at that meeting?
8  A. Not with precision, no.
9  Q. Did you make any notes or otherwise have any kind
10 of written summary of items discussed?
11 A. Not in my own notes, no.
12 Q. You didn't have a follow-up letter to Mr. Merrill
13 or anyone else saying, we talked about these
14 things, or any other written document that might
15 summarize the substance of those conversations?
16 A. Not as a general rule, no. I mean there was not a
17 document that said, here are the ten items that we
18 discussed. I'm sure that there are items that we
19 discussed that I did follow up with, but I don't
20 know each and every item that we talked about.
21     Generally speaking, in those meetings it's the
22 condition of the market, how he was doing as a TPA,
23 how he was doing as a broker, how I was doing as a
24 MGU, how we could work together to produce more
25 business.

67

68

1  Q. Do you recall any conversations about the specifics
2  of the policies that you were offering?
3  A. No.
4  Q. Do you recall whether or not you talked about
5  advanced funding?
6  A. With precision, no.
7  Q. Well, do you --
8  A. I'm not saying it wasn't discussed. I'm just --
9  Q. You don't recall one way or the other?
10 A. No.
11 Q. Do you recall a discussion about a questionnaire?
12 A. Yes, I do.
13 Q. And I believe you offered, did you not, to provide
14 him with a sample questionnaire?
15 A. Yes, I did.
16 Q. And by questionnaire, we are talking about
17 questions that a TPA might submit to a stop-loss
18 carrier or its MGU concerning the stop-loss
19 insurance being offered, correct?
20 A. That's correct.
21 Q. And you did provide him with a sample?
22 A. Yes, I did.
23 Q. Did you ever fill out or answer a questionnaire for
24 Mr. Merrill?
25 A. Yes, I did.

1  Q. And would that questionnaire have described the
2  features of the stop-loss insurance being offered?
3  A. I'd have to read the questionnaire, but I presume
4  that it would.
5  Q. In this lawsuit we have been provided with a copy
6  of a questionnaire that has not been completed.
7  Would you still have a copy of the questionnaire
8  that has been completed?
9       MS. HEGLAND: Counsel, I believe it's marked
10 as an exhibit.
11     MR. WALRAVEN: The completed one? Good.
12     MS. HEGLAND: It was attached to the audit, as
13 I recall.
14     MR. WALRAVEN: Really?
15     MR. BUSH: Yes.
16     MR. GEORGE: Try 42.
17     MR. BUSH: It's behind Merrill's memo.
18     MR. WALRAVEN: May I see that book? Let's see
19 if we can find that. I must have just assumed it
20 was the one that was not completed.
21     MS. HEGLAND: Can we go off the record.
22     THE VIDEOGRAPHER: We are going off the
23 record. The time 11:54 a.m.
24     (A brief recess was taken.)
25     THE VIDEOGRAPHER: We are back on the record.

1  The time is 11:56 a.m.
2      *(Deposition Exhibit 37 previously marked for*
3  *identification.)*
4  Q. Mr. Hall, I'm showing you some of the attachments
5     to Deposition Exhibit 37, and there is a document
6     you're now looking at, starts at the top, MBA
7     Merrill Bostrum Associates, the date of August 7,
8     1998, and it's apparently addressed to Mr. Doug
9     Routh. Was that the questionnaire you were
10    referring to a moment ago?
11 A. This was a questionnaire that I was referring to
12    that I completed for MBA, yes.
13 Q. And is the handwriting on there yours?
14 A. That's correct.
15 Q. Following that is there a letter from you?
16 A. Yes.
17 Q. Proposing a different questionnaire?
18 A. There's an attachment to this letter with a form
19    called stop-loss qualification form, which is on
20    MBA letterhead. So if your question is, was this
21    attached to the letter transmitting an MGU
22    questionnaire, I can't say that, because I would
23    not have presumed to use his name on a form.
24 Q. You're skipping ahead of me a little bit. Your
25    letter, dated June 3rd of 1999, did have an

1     attachment, correct?
2  A. It says it does, so I presume it does, yes, or it
3     did, yes.
4  Q. And it was proposing a questionnaire that's
5     different from the Merrill Bostrum Associates
6     questionnaire that you testified a moment ago that
7     you completed, correct?
8  A. That's correct.
9  Q. And do you have a copy of what it was that was
10    attached to your June 3rd, 1999, letter?
11 A. No.
12 Q. Do you have a rough idea what it looked like?
13 A. I have a very rough idea of what he should have
14    asked his MGUs.
15 Q. And does your rough idea compare more or less to
16    the questionnaire that follows your letter in
17    Exhibit 37? Does that look at all familiar?
18 A. Does it look familiar? The questions that are
19    being asked look familiar, yes. The form does not
20    look familiar. The relation to this form to what I
21    am saying that I sent him, I really don't have an
22    idea, but the questions are pertinent questions
23    that one would ask an MGU, yes.
24 Q. Do you know whether or not you still have a copy of
25    the attachment to your June 3rd, 1999, letter?

1  A. I do not know.
2  Q. Would that be something normally that you would
3     keep?
4  A. Yeah, yes.
5  Q. Do you recall completing a questionnaire other than
6     the one we just looked at addressed to Mr. Routh in
7     1998?
8  A. No.
9  Q. So as best you recall, you only completed one?
10 A. That's correct.
11 Q. Do you know whether anyone on behalf of your firm
12    completed any others?
13 A. No, I do not.
14 Q. Would there be a file where that sort of thing
15    would be maintained?
16 A. Not to my knowledge.
17 Q. Now, I asked you specifically about a 1999 meeting
18    with Mr. Merrill.
19 A. Mm-hmm.
20 Q. I would like to now ask you about your other couple
21    three meetings, however many there were with
22    Mr. Merrill. Would they have had the same sort of
23    general discussions you've already described?
24 A. Yeah.
25 Q. Do you remember any of them having any other

1     different topics?
2  A. Not really, not really. I mean you just -- you
3     have a routine that you go through in terms of how
4     are you, and how are we, and how are the accounts,
5     are there any problems, what can we do to improve
6     service, what can they do to improve production and
7     service.
8  Q. Do you recall talking about advanced funding in any
9     of these other conversations?
10 A. Not specifically, no.
11 Q. And have you had any telephone contacts with anyone
12    at MBA that you recall where you talked about
13    advanced funding?
14 A. I don't recall specifically, no. To the extent
15    that we had offered and written advanced funding on
16    other MBA accounts, it must have been an issue that
17    was discussed.
18 Q. But you don't recall ever discussing it, as we sit
19    here today?
20 A. I don't personally recall talking about it. I just
21    assume that because we provided it to him on other
22    accounts, that it must have been discussed.
23 Q. And have you met in person with anyone at MBA other
24    than Mr. Merrill that you can recall?
25 A. I recall meeting with his son.

**Page 73**

1  Q.  And was his son present at one of the meetings that
2      you've already described, or was this a different
3      meeting, or both?
4  A.  I don't know whether it was this meeting or other
5      meetings.  I just know that he had a son, and he
6      was involved in the business, and he was part of
7      the meeting.
8  Q.  Do you remember what you talked about with his son?
9  A.  No, not other than what I've described before.
10 Q.  There's another business that we have basically
11     seen, a name of Mr. Doug Routh.  Do you know Mr.
12     Routh?
13 A.  Yes, I do.
14 Q.  And do you know with whom he's affiliated?
15         MS. HEGLAND:  Today?
16         THE WITNESS:  Right now?
17 Q.  That's a good question, too.  Do you --
18 A.  No, I don't.
19 Q.  Do you know with whom he was affiliated when you
20     were dealing with him?
21 A.  Yes.
22 Q.  Who was that?
23 A.  It was called CGIS, Consolidated Group -- this is
24     called Consolidated Companies, so we will just
25     leave it at that.  They went by various names,

**Page 74**

1      also.
2  Q.  That seems to be standard.  And what did they do?
3      What was their business?
4  A.  Their business was an outsourced marketing arm for
5      me and other MGUs to find third party
6      administrators and brokers for stop-loss insurance.
7  Q.  And did they play that role in connection with the
8      stop-loss insurance provided to the San Benito
9      School District?
10 A.  Yes, they did.
11 Q.  And were they compensated by a commission?
12 A.  Yes, they were.
13 Q.  Do you recall having any conversations with anybody
14     at the Consolidated Companies dealing with the
15     issue of advanced funding?
16 A.  We've talked about it, yes, I'm sure we did.
17 Q.  Do you recall talking about it with anyone at the
18     Consolidated Companies in connection with your
19     dealings with MBA?
20 A.  At any point in time, yes.
21 Q.  I mean are you just assuming you probably did talk
22     about it, or --
23 A.  No, I know I talked about it, because we asked
24     certain questions.
25 Q.  And what were the questions and what were the

**Page 75**

1      answers?
2  A.  The question we posed when this matter of San
3      Benito came up was, do you have any documentation
4      relative to the provision of advanced funding for
5      San Benito?
6  Q.  And what was the answer?
7  A.  The answer is that they had reviewed their files
8      and had no indication that it was asked for or
9      provided.
10 Q.  Normally would that be something that would be kept
11     in their files?
12 A.  Yes, to the extent they were a conduit for the
13     communication, it should have been kept in their
14     files.  They should have had a record of it.
15 Q.  Do you recall any conversations with anybody at
16     Consolidated prior to the issue with San Benito
17     coming up?
18 A.  On this particular account, no.
19 Q.  How about with any account through or with MBA as
20     the TPA?
21 A.  Same answer as I'd had with my communication with
22     MBA that is to the extent that advanced funding was
23     being negotiated for a particular account, it would
24     have been discussed.  To the extent it was not
25     negotiated, then it would not have been discussed

**Page 76**

1      necessarily.
2  Q.  And with whom were you dealing at Consolidated on
3      this matter?
4  A.  Doug Routh.
5  Q.  And where was he when you were dealing with him?
6  A.  Doug Routh was at Consolidated Companies.
7  Q.  Have you spoken with Mr. Routh since his leaving
8      Consolidated Companies?
9  A.  No, I have not.
10 Q.  Do you know if anybody at your firm has?
11 A.  No, I do not know that anybody has.
12         (Deposition Exhibit 48 is marked for
13      identification.)
14 Q.  I'd like to hand you what's been marked as
15      Deposition Exhibit 49 and ask you if that's the
16      communication you were referring to?
17 A.  Yes, it is.
18 Q.  And are you aware of any other communications with
19      Mr. Routh on this matter?
20 A.  No, I am not.
21 Q.  And are you aware of any other communications with
22      anybody at the Consolidated Companies on this
23      matter?
24 A.  No.
25 Q.  Do you know a Mr. Glade Nixon?

**77**

**78**

1 A. No, sir.
2    MR. WALRAVEN: I think now is a good time to
3 pass the witness and probably take a break.
4    THE VIDEOGRAPHER: This ends videotape number
5 one. We are going off the record. The time is
6 12:08 p.m.
7    (A brief recess was taken.)
8    THE VIDEOGRAPHER: Continuing testimony of
9 J. Allan Hall. The time is 12:19 p.m. We are on
10 the record.
11    MR. OLVERA: Mr. Hall, good afternoon, now
12 that it's 12:15. My name is Rolly Olvera, and I
13 know that I introduced myself, but for the record
14 I'm of counsel with the law firm of Cindy Garcia,
15 and we represent -- I know this is a mouthful --
16 Managed Benefits Administrator and Insurance
17 Consultants, Inc. and MBA of Wyoming, Inc. And I
18 have just a few follow-up questions, sir, if you'll
19 be patient with me, but before I get to those, I
20 just want to enter into a few basic ground rules.
21    If you don't understand any of my questions,
22 please feel free to ask me to reiterate the
23 question, and I'll be happy to do so. Is that
24 understood?
25    THE WITNESS: Yes.

1    MR. WALRAVEN: And if you do answer one of my
2 questions, sir, may I rely on your answer as having
3 understood the question?
4    THE WITNESS: That's correct.
5    MR. OLVERA: Very good, sir. And once again,
6 if you need a break at any time, please let me
7 know, and we will do that, although I don't foresee
8 this portion of the depo lasting very long.
9 EXAMINATION BY MR. OLVERA:
10 Q. Mr. Hall, let me ask you very quickly, first, about
11 your corporation. J. Allan Hall & Associates,
12 Inc., I'd like some kind of chronology or summary
13 of its litigation history, if any. Has that
14 corporate entity ever been sued?
15    MS. HEGLAND: You mean other than this
16 lawsuit?
17    MR. OLVERA: Aside from this lawsuit.
18 A. I don't think so, no.
19 Q. Yourself individually, have you ever been sued?
20 A. No.
21 Q. Has either the corporate entity and/or/or yourself
22 ever been involved in any dispute, business dispute
23 or contractual dispute, with any of your clients or
24 employers?
25 A. Employers?

**79**

**80**

1 Q. Well, let's say your clients or customers.
2 A. Would you repeat that, please.
3 Q. Aside from this lawsuit, have you ever been in any
4 type of contractual dispute with any of your
5 clients or customers?
6 A. Yes.
7 Q. Approximately how many, sir?
8 A. A dozen.
9 Q. Did any of those disputes involve the issue of some
10 kind of misrepresentation as to advanced funding?
11 A. No.
12 Q. With respect to this case, sir, specifically with
13 respect to the dealings of San Benito Consolidated
14 Independent School District, do you have any type
15 of understanding or knowledge of a practice or
16 procedure wherein advanced funding occurred on
17 behalf of the San Benito School District?
18 A. I'm sorry, would you please, again?
19 Q. Sure. San Benito's -- obviously one of the main
20 issues here is that San Benito Consolidated
21 Independent School District is alleging that
22 advanced funding was part of their policy. Do you
23 understand that?
24 A. I understand that.
25 Q. Do you know of any instances or requests or

1 scenarios wherein advanced funding was provided to
2 the School District?
3 A. No.
4 Q. So at no time during the course that these policies
5 were in effect did you ever have any kind of
6 request for advanced funding from the School
7 District, is that correct?
8 A. That is correct.
9 Q. You're not aware of any occurrence wherein that
10 occurred, is that correct?
11 A. On this particular account, no.
12 Q. If Mr. Merrill and Mr. Routh were to testify that
13 you stated in your '99 meeting that advanced
14 funding would be a part of the policy, would they
15 be incorrect?
16    MS. HEGLAND: Objection, mischaracterizes the
17 prior testimony.
18 Q. I'll rephrase that. Hypothetically, sir,
19 hypothetically, if either of those individuals were
20 to allege that you promised that advanced funding
21 would be a part of this policy, would they be
22 incorrect?
23    MS. HEGLAND: Objection, calls for
24 speculation.
25 A. Verbal discussions are -- of that nature are

82

1  normally followed by written confirmation. Because
2  there was no written confirmation of what you're
3  talking about, then I have to come to the
4  conclusion that it was never an issue.
5      MR. WALRAVEN:  Objection, non-responsive.
6      MR. OLVERA:  Same objection.
7  Q.  Once again, hypothetically, if they state you
8  stated advanced funding would be part of this
9  policy, although there was no written language in
10 the policy to that effect, would they be mistaken?
11 A.  Yes, they would be mistaken.
12     MR. OLVERA:  Pass the witness.
13     MR. BUSH:  We will reserve all questions.
14 EXAMINATION BY MS. HEGLAND:
15 Q.  Mr. Hall, I would just like to ask you about what
16 was marked as Exhibit 49.  Would you kindly give us
17 some background about what prompted this
18 communication?
19 A.  Without knowing precisely what the chronology of
20 events were, this is a response to a question I had
21 to Doug Routh and Consolidated relative to San
22 Benito, because the issue had been raised as to
23 whether or not there was advanced funding included.
24 There's a letter from Mr. Merrill saying that there
25 was, an undated letter, so we had that, and that

1  was furnished by MBA to us.
2      We searched our files, could find nothing.  We
3  called Consolidated and said, would you please
4  search your files, because we don't have anything.
5  This is a response to that question.
6  Q.  And what is it that you're holding in your hand,
7  Exhibit 49?
8  A.  It's an e-mail from Doug Routh to me.
9  Q.  And you printed out the e-mail in hard copy for
10 today?
11 A.  That is correct.
12 Q.  What's the date of the e-mail?
13 A.  It's dated the 9th of November, 2001, 3:50 p.m.
14 Q.  Prior to November of 2001, had advanced funding
15 ever been raised with respect to the San Benito
16 account, as far as you know?
17 A.  As far as I know, no, it was not an issue.
18 Q.  Sir, I'd also like to redirect your attention to
19 the form that Mr. Walraven had asked you about
20 earlier, the form dated August 7, 1998, which is a
21 part of Deposition Exhibit 37, which I believe you
22 testified earlier had been provided by MBA to Mr.
23 Routh, and you had told Mr. Walraven that you
24 filled this form out for Mr. Merrill, is that
25 correct?

83

1  A.  That's correct.
2  Q.  Does Mr. Merrill's form, which you filled out for
3  him, make any mention of advanced funding?
4      MR. WALRAVEN:  Objection, document speaks for
5  itself.
6  A.  No, it does not.
7  Q.  Mr. Hall, I do see on Mr. Merrill's form, dated
8  August 7, 1998, that there is a question about
9  aggregate monthly accommodation advances.  Do you
10 see that, sir?
11 A.  Yes, I do.
12 Q.  Could you explain what that is to me?
13 A.  Aggregate monthly accommodation is a -- somewhat of
14 a parallel as it would to aggregate stop-loss
15 coverage as specific advancement would be to
16 specific.  Aggregate stop-loss insurance contracts
17 are on an annual basis.  To the extent that claims
18 exceed a predetermined amount over the contract
19 period, a reimbursement by the stop-loss carrier to
20 the account is due.
21     Aggregate accommodation changes that period
22 from an annual basis to a monthly basis.  So any
23 particular month, on an accumulated basis, if all
24 claims exceed the attachment point or the
25 predetermined amount, at that point in time then

84

1  reimbursement is made.
2  Q.  Is that different than a specific advanced funding?
3  A.  It is different.
4  Q.  And which sort of advanced funding is at issue here
5  with respect to the San Benito account?
6  A.  The specific part of it, the part that is not
7  addressed here, the specific advancement.
8  Q.  So is there anywhere in Mr. Merrill's form, which
9  you filled out and provided to him, that addresses
10 specific advanced funding?
11 A.  No, ma'am.
12     MS. HEGLAND:  Thank you.  That's all I have.
13     MR. OLVERA:  I have a few follow-up questions.
14     MR. WALRAVEN:  I'd like to ask one, if you
15 don't mind.
16     MR. OLVERA:  Sure, go ahead.  I'm in no rush.
17     (Deposition Exhibit 50 is marked for
18 identification.)
19 EXAMINATION BY MR. WALRAVEN:
20 Q.  I would like to hand you what is marked as
21 Deposition Exhibit 50, which is a document that was
22 provided to me today, and just ask you to tell me
23 what that is.
24 A.  This is a sales and marketing agreement between J.
25 Allan Hall & Associates and Consolidated General

**85**

```
 1        Insurance Services, Inc., CGIS.
 2   Q.   And is that one of the Consolidated companies that
 3        Mr. Routh was affiliated with that we spoke about
 4        earlier?
 5   A.   That's my understanding, yes.
 6   Q.   And would that contract apply to the sale of
 7        stop-loss insurance to San Benito?
 8   A.   Yes, it would.
 9   Q.   And at the top of the second page are a couple of
10        paragraphs dealing with indemnity.  Do you see
11        those?
12   A.   Yes.
13   Q.   Has anybody called upon those obligations in
14        connection with the dispute with San Benito?
15   A.   No, sir.
16             MR. WALRAVEN:  Pass the witness.  Thank you
17        very much.
18   EXAMINATION BY MR. OLVERA:
19   Q.   Mr. Hall, if I could hand back to you Exhibit 49,
20        49.  Mr. Hall, there is some handwriting on
21        Exhibit 49.  Is that your handwriting?
22   A.   No, it is not.
23   Q.   Do you know what the writing which indicates File
24        Sold means?
25   A.   I believe I do.
```

**86**

```
 1   Q.   What does that mean, sir?
 2   A.   It's a directive to a file clerk as to where this
 3        document goes.  The document was requested and
 4        received, printed, and then a determination had to
 5        be made, where do you store this document.
 6   Q.   Fair enough.  Obviously that's an e-mail from Doug
 7        Routh to you that we have discussed.  Do you recall
 8        any specific conversations with either of the
 9        Merrills prior to this e-mail?
10   A.   I don't recall a specific conversation with them
11        relative to -- would you state that again?
12   Q.   Sure.
13   A.   I don't know how encompassing you want to be on
14        this.
15   Q.   Please remind me of the date of that e-mail, sir.
16        I don't have it in front of me.
17   A.   I'm sorry?
18   Q.   The date of that e-mail, sir.
19   A.   9th November, 2001.
20   Q.   At some time, let's say within 30 days prior to
21        that e-mail, do you recall any specific
22        conversations with the Merrills having to do with
23        advanced funding?
24   A.   I don't remember specific conversations with the
25        Merrills, no.
```

**87**

```
 1   Q.   Do you recall any complaints being received by the
 2        Merrills about lack of advanced funding?
 3   A.   I don't recall, no, I don't.
 4             MR. OLVERA:  Thank you, sir.  Pass the
 5        witness.
 6             MS. HEGLAND:  I have nothing further.
 7             THE VIDEOGRAPHER:  This concludes the
 8        deposition of J. Allan Hall.  The number of
 9        videotapes used was two.  We are going off the
10        record.  The time is 12:34 p.m.
11             MS. HEGLAND:  We will have signature.
12                       AND FURTHER THE DEPONENT SAITH NOT
13                       (Deposition concluded at 12:34 p.m.)
14
15        _____
16                  JAMES ALLAN HALL
17
18
19
20
21
22
23
24
25
```

**88**

```
 1   STATE OF INDIANA        )
 2                           )
 3                           ) SS:
 4   COUNTY OF HAMILTON      )
 5        I, Aprille Lucas, RPR, Notary Public in and for the
 6   County of Hamilton and State of Indiana, do hereby
 7   certify that the above-named deponent herein was by me
 8   first duly sworn to tell the truth, the whole truth,
 9   and nothing but the truth in the aforementioned matter;
10        That the foregoing deposition was taken on behalf
11   of the Plaintiff at the time and place heretofore
12   mentioned, with all counsel being present as duly
13   noted;
14        That the deposition was taken down by means of
15   stenograph notes, was reduced to typewriting under my
16   direction, and is a true record of the testimony given
17   by said deponent, and was thereafter presented to the
18   deponent for signature;
19        I do hereby further certify that I am a
20   disinterested person in this cause of action, that I am
21   not a relative of the attorneys for any of the parties
22   or otherwise interested in the event of this cause of
23   action.
24        IN WITNESS WHEREOF, I have hereunto set my hand and
25   have affixed my official notarial seal on this 11th day
```

1   of August, 2003.

2

3   _____

4              APRILLE LUCAS, RPR, NOTARY PUBLIC

5

6   County of Residence:  Hamilton County

7   My Commission Expires:  December 17, 2008



Stephen E. Walraven, Esq.
SHADDOX COMPERE WALRAVEN & GOOD
The North Frost Center
1250 N.E. Loop 410
Suite 725
San Antonio, TX  78209

NOTICE OF DEPOSITION FILING

IN THE US DISTRICT COURT SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVSION CAUSE NO. B-03-047

San Benito Consolidated Independent School District,
Plaintiff,
v.
Companion Life Insurance Company, et al.,
Defendants.

    In compliance with the applicable rules of
procedure, you are hereby notified of the filing with
Counsel for Plaintiff of the following deposition of
JAMES ALLAN HALL.

    DATE OF DEPOSITION:  July 31, 2003


            _____
                 (Date of Filing)

cc:  Robert J. Hegland, Esq.
     Shelby Bush, Esq.
     Hon. Rolando Olvera

        ASSOCIATED REPORTING, INC.
     TWO MARKET SQUARE CENTER - SUITE 940
            251 EAST OHIO STREET
         INDIANAPOLIS, INDIANA  46204
              (317) 631-0940

**$100**  23/16 23/20 24/1 24/15 24/23 25/21 44/8 44/13
**$5**  43/24 44/7
**$50**  24/19 25/9 25/13 25/15 25/19 25/20

**'**

**'99**  65/25 80/13
**'99-2000**  53/12

**-**

**--**  6/8 6/19 10/6 10/8 13/5 13/7 15/3 15/14 19/2 20/6 26/4 27/11 29/19 33/11 35/16 36/13 36/15 37/17 38/10 39/7 41/1 41/7 41/8 42/23 43/1 43/3 43/5 43/20 43/21 44/2 44/3 44/10 44/15 44/22 45/2 45/12 47/7 48/9 49/11 50/15 50/17 52/19 52/19 58/1 58/6 58/7 58/8 58/12 61/22 65/9 67/7 67/8 72/2 73/17 73/23 74/22 77/15 77/15 79/19 80/25 83/13 86/11
**-v-**  1/6

**0**

**00**  1/15
**000**  23/16 23/20 24/1 24/15 24/23 24/23 25/9 25/13 25/15 25/19 25/21 43/24 44/7 44/8 44/13
**000110**  3/15
**001**  25/20
**002163**  3/14
**002215**  62/20
**002404**  3/17
**07**  39/22
**08**  77/6

**1**

**10**  22/10 22/14 22/15 22/16 36/5 36/8 39/19 45/3 48/22 48/24 59/1 59/3
**100**  28/5
**11**  39/22 68/23 69/1
**11th**  88/25
**12**  36/5 77/6 77/9 77/12 87/10 87/13
**1250**  2/6 90/2
**14**  43/20
**15**  45/20 77/12
**16**  44/16
**17**  89/7
**1717**  2/10
**17th**  40/17
**19**  77/9
**1943**  7/25
**1966**  9/14
**1970s**  10/3
**1983**  16/4 16/5
**1993**  15/23 15/25 16/2 16/9 16/15 17/7 17/13
**1996**  18/15
**1998**  40/17 69/8 71/7 82/20 83/8
**1999**  54/1 65/8 66/4 69/25 70/10 70/25 71/17
**1st**  2/14

**2**

**20**  27/8

**200**  1/15 2/20
**2000**  2/17 18/15
**2000-2001**  53/13
**2001**  18/18 38/24 39/10 54/9 54/24 82/13 82/14 86/19
**2001-2002**  54/25
**2002**  18/18
**2003**  1/15 4/12 89/1 90/13
**2008**  89/7
**201**  2/14
**2163**  41/16
**2168**  43/5
**2176**  43/20
**23rd**  7/25
**25**  45/11
**251**  1/18 90/21

**3**

**30**  86/20
**31**  1/15 90/13
**317**  1/19 90/22
**31st**  4/12
**34**  87/10 87/13
**35**  44/18 44/21 44/22 45/3 45/7
**37**  69/2 69/5 70/17 82/21
**3rd**  69/25 70/10 70/25

**4**

**410**  2/6 90/2
**42**  68/16
**44**  46/16 60/20 60/23 61/13 64/12
**4600**  2/10
**46204**  1/19 90/21
**46250**  2/21
**48**  39/23 40/2 76/12
**49**  76/15 81/16 82/7 85/19 85/20 85/21

**5**

**50**  82/13 84/17 84/21
**51**  39/19
**54**  68/23
**56**  69/1
**59**  4/13

**6**

**631-0940**  1/19 90/22

**7**

**725**  2/6 90/3
**75201-4605**  2/10
**78209**  2/7 90/3
**78401-3700**  2/18
**78550**  2/14

**8**

**8-7-98**  3/12
**800**  2/18
**8720**  1/15 2/20

**9**

**90**  36/15 36/19 59/6
**940**  1/18 90/20
**99**  17/23
**9th**  82/13 86/19

**A**

**a's**  14/24
**able**  7/11
**about**  6/5 8/4 9/8 10/10 11/5 13/17 14/3 14/21 15/13 16/6 20/24 24/14 26/21 26/23 27/5 27/7 27/13 29/19 29/23 30/16 30/20 31/4 32/6 33/9 34/12 36/21 36/23 37/3 40/25 41/3 41/9 43/9 44/3 44/8 44/11 44/14 44/18 45/4 45/5 47/3 49/10 49/11 50/25 52/1 52/3 54/4 55/13 56/19 61/1 63/16 63/20 64/2 64/18 65/6 66/4 66/6 66/13 66/20 67/1 67/4 67/11 67/16 71/17 71/20 72/8 72/12 72/20 73/8 74/16 74/17 74/22 74/23 75/19 78/10 81/3 81/15 81/17 82/19 83/8 85/3 87/2
**above**  43/8 48/3
**above-captioned**  5/13
**above-named**  88/7
**accepted**  55/23
**accepting**  35/24
**accepts**  34/23
**accident**  41/12 42/2 42/9
**accommodation**  63/12 83/9 83/13 83/21
**accompany**  5/17
**account**  23/23 55/4 58/2 58/5 58/6 75/18 75/19 75/23 80/11 82/16 83/20 84/5
**accounts**  20/1 21/19 59/12 59/14 72/4 72/16 72/22
**accumulated**  83/23
**action**  1/6 5/13 88/20 88/23
**active**  16/6 18/13 18/16 18/22 31/3
**actively**  26/10
**activities**  19/3 29/5 30/11
**actual**  28/3
**actually**  5/22 16/5
**added**  62/3
**addition**  21/13 21/14
**additional**  7/7 27/22 34/3 62/5 62/12
**address**  7/11 30/12 38/18 46/25 49/6
**addressed**  69/8 71/6 84/7
**addresses**  84/9
**adhered**  51/22
**adjudicate**  32/8 44/12
**adjudicated**  64/7
**adjudication**  21/20 28/3 29/5
**administer**  21/18
**administering**  22/25
**administration**  19/13
**administrative**  34/16
**administrator**  2/11 4/5 4/23 32/4 32/5 32/7 77/16
**administrators**  15/1 29/23 74/6
**admissible**  38/8
**admitted**  11/10
**advance**  9/3 57/18 57/22 58/8 64/19
**advanced**  59/4 59/15 59/15 59/22 60/25 61/12 61/16 61/17 62/24 64/7 64/24 67/5 72/8 72/13 72/15 74/15 75/4 75/22 79/10 79/16 79/22 80/1 80/6 80/13 80/20 81/8 81/23 82/14 83/3 84/2 84/4 84/10 86/23 87/2
**advancement**  62/15 83/15 84/7
**advances**  83/9
**advising**  34/2
**affiliated**  37/18 73/14 73/19 85/3

**A**

affixed  88/25
aforementioned  88/9
afternoon  63/25 77/11
again  10/17 12/22 13/4 15/24
  25/7 27/14 50/14 51/8 54/13
  54/21 56/10 57/19 61/9 63/18
  78/5 79/18 81/7 86/11
against  16/24
agents  22/21 23/2
aggregate  24/17 24/22 41/10
  41/25 42/12 42/13 83/9 83/13
  83/14 83/16 83/21
aggregated  24/25
ago  27/13 28/1 32/1 33/9
  61/10 69/10 70/6
agreement  3/14 3/17 40/12
  40/13 40/16 40/17 40/18
  40/19 40/20 41/25 42/2 42/10
  44/2/3 62/3 84/24
agreements  40/22 41/11 41/12
  42/1 42/3 42/21
ahead  8/19 9/5 69/24 84/16
al  1/8 90/9
Albert  2/19 5/4
all  4/18 6/8 15/9 18/12 28/5
  28/11 28/13 30/6 32/21 34/19
  40/2 42/12 48/2 48/3 48/16
  50/21 59/12 64/22 70/17
  81/13 83/23 84/12 88/12
ALLAN  1/11 1/13 2/15 2/23
  3/16 4/2 4/6 5/3 5/5 5/10
  5/20 7/23 10/21 11/2 15/18
  16/1 16/10 16/12 17/4 30/18
  31/2 36/21 36/24 38/10 40/14
  45/8 47/25 48/1 48/4 50/10
  77/9 78/11 84/25 87/8 87/16
  90/12
allege  80/20
alleging  79/21
allocate  45/9
allocates  45/8
allows  44/12
along  48/18
already  44/5 65/5 71/23 73/2
also  2/22 5/18 6/12 14/25
  43/20 62/23 74/1 82/18
although  78/7 81/9
am  35/9 36/23 36/23 57/23
  58/18 60/1 70/21 76/20 88/19
  88/20
amendment  44/22 44/25
American  18/11 18/17
amount  17/10 17/11 17/13
  20/9 23/22 24/1 24/17 25/9
  25/19 26/11 29/12 32/15 37/8
  83/18 83/25
analysis  20/1
analyzing  54/14
annual  83/17 83/22
another  20/14 21/13 32/1
  34/22 38/23 40/19 44/12
  62/24 73/10
answer  8/24 9/1 9/5 35/23
  46/12 52/4 57/14 61/4 61/15
  67/23 75/6 75/7 75/21 78/1
  78/2
answered  44/24 51/7 51/15
answering  8/20 29/22 29/24
answers  75/1
Antonio  2/7 90/3
anybody  74/13 75/15 76/10
  76/11 76/22 85/13

anyone  11/19 66/13 71/9
  72/11 72/23 74/17
anything  13/2 13/7 13/14
  14/12 17/9 17/12 29/6 29/11
  31/19 33/25 34/11 34/12
  46/19 55/23 55/24 63/2 66/6
  82/4
Anytime  39/16
Anyway  64/3
anywhere  62/4 84/8
apart  13/2
apologize  9/3
apparently  69/8
APPEARANCES  2/1
appearing  7/17
applicable  90/10
application  61/20 65/1
apply  85/6
appreciable  17/9 17/11 17/12
appreciate  8/22
appropriate  20/9 60/6
approval  43/24 52/18
approximately  18/15 27/8
  28/23 32/25 49/7 79/7
approximation  27/16
Aprille  1/13 88/5 89/4
areas  19/15 19/19
arm  74/4
around  36/15
Arts  9/9
Aside  78/17 79/3
ask  8/10 8/13 9/3 10/17
  30/14 40/3 44/14 47/17 49/11
  50/13 57/20 60/23 70/23
  71/20 76/15 77/22 78/10
  81/15 84/14 84/22
asked  27/16 44/24 45/7 51/7
  51/15 53/3 60/3 65/14 70/14
  70/19 71/17 74/23 75/8 82/19
asking  8/18 29/23 36/18
  38/22 39/3
asks  36/15
aspect  18/22
aspects  19/12 21/9 21/17
  51/19
assistance  33/13
associated  1/17 3/12 14/24
  17/5 31/24 90/20
ASSOCIATES  2/15 2/23 3/16 4/7
  5/3 5/5 5/21 10/22 11/3 15/3
  15/18 16/1 16/11 16/12 30/19
  31/2 31/17 36/22 36/24 38/10
  40/14 45/8 47/25 48/4 69/7
  70/5 78/11 84/25
assume  10/18 72/21
assumed  68/19
assuming  25/10 74/21
attached  63/11 68/12 69/21
  70/10
attaching  65/3
attachment  24/23 25/9 69/18
  70/1 70/25 83/24
attachments  69/4
attempt  5/23
attended  9/19
attention  57/16 82/18
attorney-client  13/25
attorneys  5/7 14/2 88/21
audit  48/13 48/18 50/15
  50/19 51/2 51/14 51/23 51/24
  52/7 52/20 52/20 53/1 53/2
  53/7 68/12
audited  47/21 47/24 48/17
  48/21 49/23 50/7

audits  48/1 52/16 52/22
August  69/7 82/20 83/8 89/1
author  42/23 42/23
authority  43/23
authorizes  12/1 13/1
available  5/19 6/1 6/5 6/17
  20/18
aware  12/25 13/15 37/25
  38/13 39/7 39/9 40/24 49/2
  51/9 53/8 53/19 54/6 54/10
  63/3 63/6 63/10 76/18 76/21
  80/9

**B**

B-03-047  1/6 4/11 90/6
Bachelor's  9/9
back  39/21 43/20 53/15 55/24
  68/25 85/19
background  81/17
Barlett  4/17
Bartlett  2/22
basic  77/20
basically  23/8 73/10
basis  31/3 83/17 83/22 83/22
  83/23
Bates  62/18
be  5/24 7/10 8/5 8/21 11/20
  12/19 19/21 20/9 21/5 21/6
  21/9 21/12 22/16 24/6 24/7
  24/24 26/1 26/5 26/10 29/10
  30/14 32/2 35/23 36/16 37/9
  39/17 41/1 45/23 46/7 47/2
  47/4 47/9 47/23 48/3 48/6
  48/11 48/11 48/17 49/2 49/3
  49/5 49/13 49/14 49/22 53/3
  57/6 58/25 63/24 64/6 64/23
  64/23 65/2 71/2 71/14 71/15
  74/2 75/10 75/10 77/19 77/23
  80/14 80/15 80/21 80/21 81/8
  81/10 81/11 83/15 86/5 86/13
became  16/7
because  41/2 65/16 69/22
  72/21 74/23 81/1 81/22 82/4
been  5/11 6/1 6/4 6/17 7/4
  8/2 16/15 17/4 17/24 18/1
  18/3 18/6 27/19 28/19 29/24
  30/5 30/9 30/20 31/5 31/10
  31/14 31/21 32/6 35/11 38/22
  40/1 40/18 43/12 50/2 50/11
  52/10 53/25 54/4 54/8 57/9
  60/6 60/22 63/13 65/25 68/5
  68/6 68/8 72/16 72/22 75/13
  75/24 75/25 76/14 78/14
  78/19 78/22 79/3 81/22 82/15
  82/22
before  1/13 6/23 8/2 8/18
  8/23 40/3 52/19 58/5 60/13
  61/4 73/9 77/19
begin  8/20 8/23
beginning  5/16
begins  4/1
behalf  1/14 13/10 17/1 18/14
  18/17 34/24 37/11 49/10
  58/19 63/7 71/11 79/17 88/10
behind  68/17
being  4/13 16/13 17/5 30/4
  47/6 65/16 67/19 68/2 70/19
  75/23 87/1 88/12
believe  25/22 40/20 46/23
  67/13 68/9 82/21 85/25
benefit  14/25 49/2
benefits  2/11 4/5 4/23 36/10
  36/11 77/16
BENITO  1/3 4/3 14/8 14/9

**B**

Benito's 45/25 79/19
besides 18/8 26/2
best 30/14 47/2 71/9
better 47/17 49/5
between 16/22 16/23 26/7 28/8 37/9 37/15 40/22 43/14 52/19 55/16 55/23 57/8 58/10 65/7 84/24
bidding 54/22
bill 23/18 23/21 23/22 24/16 25/8
bills 6/12 6/18 6/20 24/16 24/19 24/22 25/2 25/5 25/14 25/18
birth 7/24 7/25 8/1
bit 56/20 69/24
Blagg 2/22 19/5 30/15 47/5 47/17 48/10 49/5 56/10 57/3 57/13 63/24
Blagg's 19/16
Blue 37/22 37/22
book 60/13 68/18
Bostrum 3/12 15/2 69/7 70/5
both 8/20 73/3
bottom 40/5 43/4 43/21 62/23
Boulevard 2/18
BRACEWELL 2/17
break 39/15 77/3 78/6
breath 8/25
brief 39/20 68/24 77/7
bring 29/16
broke 38/19
broker 66/23
brokers 22/21 23/2 45/15 45/17 46/7 74/6
brought 5/23
BROWNSVILLE 1/2 4/10 90/6
bunch 51/11
Bush 2/9 4/25 90/18
business 10/13 11/7 11/9 11/11 12/4 12/5 12/7 16/8 16/10 16/12 17/4 18/23 18/24 19/13 19/15 19/18 20/5 27/19 27/22 28/19 32/21 33/1 33/4 33/7 34/15 35/23 53/21 53/23 54/22 57/25 66/25 73/6 73/10 74/3 74/4 78/22
businesses 31/2 31/21 31/23
buying 20/10

**C**

Caicos 35/2
calculation 20/2
California 8/1 9/10
call 57/9
called 31/15 31/17 34/22 69/19 73/23 73/24 82/3 85/13
calls 13/24 26/19 28/24 29/22 64/16 80/23
came 23/25 25/2 25/8 25/14 25/15 75/3
can 13/21 26/17 27/6 33/3 36/1 39/15 42/23 45/20 45/23 46/24 48/3 49/7 55/6 55/9 56/20 58/22 62/4 63/5 66/6 68/19 68/21 72/5 72/6 72/24
can't 7/8 30/12 41/2 46/9 47/1 56/6 59/20 65/15 66/13 69/22
cannot 55/8
cap 44/7
Carolina 37/23

carrier 32/17 57/13 58/1 58/4 58/9 58/13 67/18 83/19
case 4/10 5/18 26/12 32/18 38/7 38/23 52/6 52/7 79/12
cash 39/2
Castle 1/15 2/20
catastrophic 16/25 21/21
categories 26/6 26/22
category 46/10 48/17
cause 5/13 88/20 88/22 90/6
cc 90/17
CENTER 1/18 2/5 90/2 90/20
certain 5/24 18/24 23/10 29/12 32/14 37/8 46/7 48/17 51/20 74/24
certifications 10/6 12/20 13/20
certify 88/7 88/19
CGIS 3/17 73/23 85/1
chain 23/2
chance 8/4
change 27/18 27/21 44/22 53/9
changed 27/9
changes 56/8 83/21
charge 20/10 62/12 62/14
charged 61/24 62/6
charging 20/12
chartered 35/1 35/2
check 24/12 35/8
chief 15/20 18/19 19/1 19/4 47/4 48/10 49/15 52/11 56/3
Christi 2/18
chronology 78/12 81/19
Cindy 77/14
City 15/2
CIVIL 1/6 1/16
claim 21/10 24/14 26/20 34/8 36/13 37/4 37/5 38/24 42/11 47/9 51/24 58/2 58/6 58/11 64/6
claims 19/11 21/8 21/21 23/7 23/14 23/15 23/16 25/25 26/8 26/9 26/15 26/22 27/3 28/3 28/4 28/6 28/9 28/10 28/15 29/5 29/23 29/25 30/4 30/8 32/8 32/12 32/13 32/21 33/15 33/20 33/24 34/4 34/13 36/10 38/20 42/11 42/13 43/23 44/13 46/17 46/20 47/6 47/19 47/23 48/6 48/13 48/16 48/21 48/25 49/1 49/10 50/6 50/9 50/10 50/11 50/20 51/6 51/11 52/12 56/13 56/15 56/18 56/19 56/21 56/24 57/2 57/11 58/17 83/17 83/24
Clarendon 18/11 18/14
clear 5/19 59/2
clearly 63/21 63/21
clerk 86/2
clients 49/12 49/13 54/1 59/9 78/23 79/1 79/5
coin 8/24
collecting 22/7
collection 19/12 21/20
collectively 15/9
college 15/2
come 32/22 32/22 57/16 81/3
comes 23/18 33/4
coming 75/17
commission 21/21 34/17 44/18 45/24 46/8 74/11 89/7
commissions 22/20 45/14 45/16 45/21

communicated 45/7 75/19
communication 26/7 75/13 75/21 76/16 81/18
communications 76/18 76/21
companies 17/15 18/7 21/22 73/24 74/14 74/18 76/6 76/8 76/22 85/2
COMPANION 1/7 2/8 4/4 4/25 11/10 17/17 17/22 18/4 18/8 21/25 22/3 23/7 23/16 24/3 24/4 24/20 24/24 26/1 26/8 26/9 26/20 27/1 34/15 34/25 35/3 35/12 35/15 35/18 35/22 36/6 36/13 37/1 37/5 37/7 37/9 37/12 37/15 37/19 37/23 38/1 38/5 38/11 40/15 40/23 43/14 43/23 45/14 48/1 48/11 49/9 49/10 52/12 52/14 52/24 53/3 53/10 54/21 57/2 57/4 57/7 57/8 58/19 59/9 61/11 63/7 90/9
Companion's 57/9
company 1/7 4/5 5/1 16/24 17/20 18/11 18/12 32/9 34/23 34/23 40/15 90/9
compare 70/15
compared 64/11
compensated 22/6 22/7 46/9 74/11
COMPERE 2/5 4/16 90/1
complaints 87/1
complete 5/20 9/5 33/22
completed 9/24 10/1 68/6 68/8 68/11 68/20 69/12 70/7 71/9 71/12
completing 71/5
compliance 10/11 12/1 12/17 90/10
compliant 10/12 11/21 11/23
concept 57/17
concern 30/4 30/6
concerned 29/9 45/5
concerning 67/18
concerns 38/25
concluded 87/13
concludes 87/7
conclusion 81/4
condition 66/22
conditions 20/4 20/13 20/15 22/18
conduit 75/12
conferences 34/1
confirmation 81/1 81/2
connection 22/3 22/11 22/21 23/5 32/11 33/14 33/19 34/15 43/13 44/4 45/25 50/17 50/20 51/5 53/6 57/21 60/7 74/7 74/18 85/14
considered 12/9
consistently 50/2
CONSOLIDATED 1/3 4/3 73/23 73/24 74/14 74/18 75/16 76/2 76/6 76/8 76/22 79/13 79/20 81/21 82/3 84/25 85/2 90/7
CONSULTANTS 2/12 4/6 4/24 15/1 77/17
contacts 72/11
contained 34/9
context 32/6
Continuing 77/8
continuously 17/7
contract 16/22 20/14 20/17 21/5 21/6 21/7 21/9 50/12 57/8 59/21 60/4 83/18 85/6

contracted 32/7 53/1
contracts 20/19 20/21 20/23
  20/24 20/25 22/12 58/15
  58/20 58/23 59/8 83/16
contractual 78/23 79/4
control 29/4
conversation 8/17 86/10
conversations 34/2 66/15 67/1
  72/9 74/13 75/15 86/8 86/22
  86/24
conveying 32/16
cooperation 26/7
copies 6/11
copy 60/14 60/16 68/5 68/7
  70/9 70/24 82/9
corporate 7/6 7/15 7/18 7/19
  30/22 78/14 78/21
corporation 78/11
Corpus 2/18
correct 7/6 10/20 11/25
  12/19 15/14 16/16 17/8 18/5
  19/7 19/8 20/11 22/1 22/5
  23/4 23/10 25/1 25/6 25/12
  28/12 30/3 30/25 31/12 35/16
  36/17 43/2 43/19 44/17 44/20
  45/3 47/21 50/16 53/24 54/5
  54/23 56/11 57/15 58/14 59/5
  59/7 62/25 63/1 65/4 67/19
  67/20 69/14 70/1 70/7 70/8
  71/10 78/4 80/7 80/8 80/10
  82/11 82/25 83/1
cost 52/16
could 21/5 21/6 21/9 30/1
  47/2 48/10 48/11 66/24 82/2
  83/12 85/19
couldn't 35/8 59/17
counsel 4/18 8/4 25/4 60/9
  68/9 77/14 88/12 90/11
County 1/14 88/3 88/6 89/6
  89/6
couple 8/10 14/4 40/25 49/4
  71/20 85/9
course 46/4 80/4
coursework 9/19 10/4
court 1/1 4/9 8/8 90/6
coverage 83/15
coverages 41/14
CPCU 9/21 9/22
credentialing 11/15 13/19
Creek 1/15 2/20
criteria 48/12
Cross 37/22
curious 52/1 60/24
currently 15/17
custody 7/2 7/19
customers 79/1 79/5

**D**

Dallas 2/10
date 4/12 7/24 7/25 15/24
  40/16 40/17 69/7 82/12 86/15
  86/18 90/13 90/16
dated 69/25 82/13 82/20 83/7
day 88/25
day-to-day 19/2 19/9 29/4
  30/11 55/25
days 86/20
deal 23/21 61/11
dealing 73/20 74/14 76/2
  76/5 85/10
dealings 28/8 74/19 79/13
deals 63/20

decide 24/17
decided 29/16 50/19 52/7
decides 47/23
deciding 48/13 52/20
decision 56/23 57/6
declined 26/20
DEFENDANT 2/8 2/15
Defendants 1/9 2/11 4/8 90/9
defer 49/15
define 19/21 19/24 32/2
defined 42/10
definition 58/1
degree 9/9 9/13 18/21
delegate 23/8 23/11 23/17
delegated 27/1
demographic 19/25 20/8
denial 56/12
denied 56/21 57/11
deny 56/23
department 10/11 12/23 19/11
  19/12
departments 23/13 27/3
depends 36/4
depo 78/8
deponent 87/12 88/7 88/17
  88/18
deposed 8/2
deposition 1/11 1/12 3/11 4/2
  4/13 5/18 7/12 38/23 39/23
  40/2 60/7 60/10 60/20 60/23
  69/2 69/5 76/12 76/15 82/21
  84/17 84/21 87/8 87/13 88/10
  88/14 90/5 90/10 90/19
described 21/15 32/23 34/17
  44/5 59/4 64/5 65/3 65/5
  68/1 71/23 73/2 73/9
describes 59/23
description 60/17
designation 9/22
designations 13/17
desired 20/17
detailed 19/2 19/9
determination 86/4
determinations 51/25
determine 20/9
devoted 17/21 18/4
did 9/13 9/25 10/2 13/22
  14/7 14/15 14/18 22/2 27/13
  28/21 29/12 51/4 53/22 55/15
  55/17 55/18 55/21 59/15 60/5
  60/14 60/15 65/22 66/2 66/9
  66/19 67/13 67/15 67/21
  67/22 67/23 67/25 69/25 70/3
  74/2 74/7 74/10 74/16 74/21
  79/9 80/5
didn't 14/20 28/1 66/12
differ 42/8 42/17
difference 62/2
different 20/23 20/23 41/4
  41/21 42/4 42/5 42/7 42/14
  45/4 45/6 53/3 57/20 59/11
  61/19 69/17 70/5 72/1 73/2
  84/2 84/3
difficult 8/21 21/3 21/12
direction 88/16
directive 86/2
directly 23/21
director 48/6 52/12 57/2
disclosure 13/25
disclosures 6/6 6/9
discovery 38/8
discuss 63/25 64/1
discussed 66/7 66/10 66/18

discussing 72/18
discussion 67/11
discussions 6/13 43/17 71/23
  80/25
disinterested 88/20
dispute 78/22 78/22 78/23
  79/4 85/14
disputes 79/9
dissatisfied 29/6
distinction 58/10
distinguish 37/14
district 1/1 1/1 1/4 4/4 4/9
  4/9 14/11 22/4 28/10 43/14
  50/7 50/10 50/17 53/11 53/17
  54/7 54/19 55/19 74/9 79/14
  79/17 79/21 80/2 80/7 90/6
  90/6 90/7
divided 37/9
DIVISION 1/2 4/10
DIVISON 90/6
doctor 23/19
document 5/17 7/13 7/14 40/1
  40/3 40/10 40/11 42/15 44/15
  48/19 61/4 63/16 66/14 66/17
  69/5 83/4 84/21 86/3 86/3
  86/5
document's 63/13
documentation 75/3
documents 5/24 6/6 6/8 6/15
  6/17 7/3 7/7 14/6 14/7 14/8
  14/12 14/15 14/18
does 7/18 11/12 11/17 12/24
  17/9 17/15 19/10 21/16 21/18
  22/23 23/7 23/16 23/20 26/14
  27/7 32/5 32/25 33/14 36/9
  36/18 37/21 40/5 40/7 40/8
  40/9 44/4 45/11 46/17 57/13
  57/24 60/4 62/2 70/2 70/2
  70/15 70/17 70/18 70/19 83/2
  83/6 86/1
doesn't 26/17 51/16 64/12
doing 8/5 27/19 28/19 29/7
  64/11 66/22 66/23 66/23
dollar 25/25 26/3 26/11
Don 65/7
don't 8/12 11/3 11/8 11/17
  11/18 11/18 11/20 12/15
  14/14 14/17 24/5 24/5 27/14
  27/15 28/22 33/7 39/6 44/25
  46/2 47/10 47/13 48/14 50/13
  50/21 51/3 51/8 51/17 52/4
  52/5 52/23 52/24 55/13
  55/15 55/20 55/22 56/1 56/6
  56/9 57/10 57/12 61/25 62/10
  62/18 63/23 64/20 64/21
  64/22 65/16 65/20 66/19 67/9
  70/21 72/14 72/18 72/20 73/4
  73/18 77/21 78/7 78/18 82/4
  84/15 86/10 86/13 86/16
  86/24 87/3 87/3
done 17/12 31/7 46/14 59/13
  64/14
dormant 16/6 16/7
double 43/6
Doug 69/8 73/11 76/4 76/6
  81/21 82/8 86/6
down 38/24 39/1 44/19 88/14
dozen 79/8
due 39/1 83/20
duly 5/11 88/8 88/12
during 18/6 18/13 22/17 38/3
  38/23 80/4

**E**

e-mail 3/15 82/8 82/9 82/12
 86/6 86/9 86/15 86/18 86/21
each 10/13 11/8 15/6 24/19
 25/18 40/8 42/6 49/23 66/20
earlier 41/3 64/6 82/20
 82/22 85/4
EAST 1/18 90/21
Economics 9/12
edited 16/22
education 9/8 9/17
effect 80/5 81/10
efforts 17/21 18/3 22/6 22/7
 54/6 54/11
eight 44/2
either 52/11 58/4 78/21
 80/19 86/8
else 6/7 13/7 13/14 14/5
 14/12 17/9 17/12 17/19 18/10
 21/16 27/4 27/6 29/21 31/19
 33/25 34/11 44/8 48/2 63/2
 66/13
employed 15/17 15/18
employee 16/23
employees 17/1 20/7 27/7
 32/9 32/13 49/22 50/6 50/11
 50/13
employer 16/23 16/24 16/25
 20/8 32/8 32/14 32/19 50/12
 58/11
employer's 32/9
employers 49/12 49/21 78/24
 78/25
encompassing 86/13
encountered 38/4
end 8/19 51/12 54/7 66/1
ending 29/2 29/3
ends 36/2 77/4
enough 86/6
entails 38/16
enter 77/20
entities 14/23 15/4 15/5
 30/16 30/18 35/11
entitled 40/11
entity 47/24 78/14 78/21
equipped 49/6
Esq 2/4 2/4 2/9 2/16 2/19
 90/1 90/17 90/18
estimate 27/14 58/22
et 1/8 90/9
evaluating 20/7
even 63/14
event 88/22
events 51/20 55/9 55/14
 81/20
ever 40/3 55/21 67/23 72/18
 78/14 78/19 78/22 79/3 80/5
 82/15
every 10/24 11/8 18/22 49/4
 61/8 66/20
everything 6/11 6/23 23/9
 30/22
evidence 38/9
exactly 10/14 26/5
exam 9/21
examination 1/12 3/1 7/21
 78/9 81/14 84/19 85/18
example 14/18 38/19 60/3
 60/11 61/14
exams 9/21 9/24
exceed 32/14 83/18 83/24
exceeded 24/23 26/2
exceeding 24/14
except 47/12 78/20
exception 62/9 64/13
exceptions 62/7
excess 23/16 23/19 24/22
 31/15 41/11 41/11 41/13
 41/25 42/1 42/9 42/12 42/17
 42/22 62/13
Excuse 10/16 25/4 48/10
execute 33/22 33/23
Executive 15/20 18/20
exhibit 3/11 39/23 40/2
 46/15 60/12 60/13 60/16
 60/20 60/23 61/13 62/1 64/12
 68/10 69/2 69/5 70/17 76/12
 76/15 81/16 82/7 82/21 84/17
 84/21 85/19 85/21
EXHIBITS 3/9
expect 46/4
expedite 5/23
experience 48/21 48/22
Expires 89/7
explain 19/23 34/21 35/17
 83/12
explaining 20/6
explains 63/3
explanation 16/18
expressly 58/16 61/11
extent 12/16 13/9 13/24 19/1
 22/17 29/11 35/21 36/25 38/6
 42/20 50/8 54/11 72/14 75/1
 75/22 75/24 83/17

**F**

fact 51/11
Fair 86/6
fall 48/16
familiar 47/14 57/22 58/15
 59/25 70/17 70/18 70/19
 70/20
far 39/7 39/12 82/16 82/17
favors 4/10
feature 62/3
features 68/2
February 7/25
Federal 1/16
feel 77/22
felt 29/4 30/1
few 77/18 77/20 84/13
figure 62/21
file 5/20 71/14 85/23 86/2
files 6/11 7/19 14/16 14/19
 14/20 75/7 75/11 75/14 82/2
 82/4
filing 90/5 90/11 90/16
fill 33/22 67/23
filled 82/24 83/2 84/9
filling 32/16
financial 39/9
financially 34/18 35/11
financials 16/8
find 60/19 68/19 74/5 82/2
fine 15/11
finish 8/23
finished 9/1
firm 2/13 11/4 11/17 12/7
 12/17 13/1 17/9 17/15 18/20
 20/19 21/24 22/2 22/6 23/8
 23/20 24/7 24/19 25/10 25/11
 25/15 26/8 26/8 26/12 27/1
 27/7 28/4 28/8 28/10 32/22
 32/25 33/14 34/18 34/22
 35/10 36/9 36/18 36/21 37/4
 37/18 40/22 43/15 43/22 44/5
 45/10 46/11 46/18 47/9 49/2
firm's 10/25 14/16 18/23
 18/24
firms 31/5 31/7 31/10 31/14
first 5/11 8/11 40/2 41/16
 44/23 48/2 53/18 58/11 58/13
 65/25 66/4 78/10 88/8
fit 26/6
fits 46/10
five 9/25 18/1 18/6 20/20
 27/9 27/12 27/13 28/1 28/2
 28/20 31/4 31/6 38/3 38/14
 49/3 49/22 50/3
flow 39/2
follow 46/21 66/19
follow-up 66/12 77/18 84/13
followed 81/1
following 69/15 90/11
follows 5/14 70/16
foregoing 88/10
foremost 8/11
foresee 78/7
form 12/11 63/20 64/3 64/5
 64/8 64/11 64/15 64/18 64/23
 69/18 69/19 69/23 70/19
 70/20 82/19 82/20 82/24 83/2
 83/7 84/8
formal 9/8 9/17 9/20
formed 16/1
forms 32/17 33/21 34/9 63/6
formulas 20/3 54/16
forwarded 6/16
found 61/22
four 10/1 14/4 24/11 29/1
 33/9 38/3 49/22 56/13 56/15
 65/15
free 77/22
Fresno 8/1
front 8/8 27/15 86/16
Frost 2/5 90/2
full 7/22 7/23
function 15/6
functions 21/15 21/24 22/2
 23/5 26/25 29/17 30/19
funding 57/18 57/22 59/4
 59/15 59/16 59/22 61/1 61/13
 61/16 61/18 62/24 64/7 64/19
 64/24 67/5 72/8 72/13 72/15
 74/15 75/4 75/22 79/10 79/16
 79/22 80/1 80/6 80/14 80/20
 81/8 81/23 82/14 83/3 84/2
 84/4 84/10 86/23 87/2
furnished 82/1
further 87/6 87/12 88/19

**G**

GARCIA 2/13 77/14
Garrison 1/14 2/20 4/14
gathering 19/24
general 1/14 12/10 13/3
 16/13 17/6 21/14 21/16 21/18
 40/11 63/15 64/4 66/16 71/23
 84/25
generally 11/1 15/4 22/14
 22/15 37/13 45/2 45/16 46/24
 66/21
generated 53/5
gentleman 19/6
George 2/19 5/4
get 8/10 9/13 10/24 36/18
 49/2 55/18 55/18 77/19

**G**

give 6/3 16/18 29/11 61/9
63/15 81/16
given 37/12 88/16
Glade 76/25
go 8/19 9/5 21/4 45/11 52/19
68/21 72/3 84/16
goes 27/4 45/12 45/13 45/14
86/3
going 8/5 15/8 16/8 22/16
26/4 39/18 41/8 59/23 60/22
68/22 77/5 87/9
gone 38/19
good 2/4 2/5 4/16 5/6 8/11
68/11 73/17 77/2 77/11 78/5
90/1
got 44/7 60/8
Gotcha 41/18
great 18/3
greater 18/21
ground 77/20
group 15/9 15/12 73/23
groups 24/16 31/16
grown 29/14
guess 21/13 34/1 43/22 44/21
44/23 49/14 58/25 58/25
guessing 49/3
guidelines 34/5 46/19 47/8
47/12 47/14 48/16

**H**

had 5/21 6/2 8/4 9/4 15/22
24/18 28/19 29/13 30/9 31/10
38/10 38/10 38/12 47/11 51/1
52/2 53/15 53/16 53/20 53/20
53/25 59/13 59/15 61/8 65/5
65/12 65/14 71/22 72/11
72/15 73/5 75/7 75/8 75/14
75/21 81/20 81/22 81/25
82/14 82/19 82/22 82/23 86/4
half 36/5 64/13
HALL 1/11 1/13 2/15 2/23
3/15 3/16 4/2 4/7 5/3 5/5
5/10 5/20 5/23 7/1 7/22 7/23
8/2 10/19 10/21 11/3 15/18
16/1 16/11 16/12 17/4 30/18
31/2 36/22 36/24 38/10 39/25
40/14 45/8 47/25 48/1 48/4
50/10 60/22 64/2 64/3 69/4
77/9 77/11 78/10 78/11 81/15
83/7 84/25 85/19 85/20 87/8
87/16 90/12
Hamilton 1/14 88/3 88/6 89/6
88/24
hand 76/14 82/6 84/20 85/19
88/24
handed 40/1
handle 23/15 26/14
handled 19/3 28/6 47/6 47/9
handling 28/15
handwriting 69/13 85/20 85/21
handy 60/8
happen 51/20
happened 39/4 39/10 55/14
happening 39/7
happy 39/17 41/1 77/23
hard 38/17 82/9
Harlingen 2/14
Harmless 43/10
has 5/23 7/1 7/1 16/15 17/4
17/12 17/24 17/25 18/1 20/19
24/10 26/9 26/14 27/1 27/9
35/3 35/18 37/23 38/10 38/19
40/18 41/6 43/4 43/12 43/20

43/22 47/24 59/3 59/10 76/13
68/6 68/8 76/10 76/11 78/13
78/21 85/13
hasn't 29/24
haven't 9/1 27/5
having 5/11 71/25 74/13 78/2
86/22
he 24/10 26/14 26/16 26/17
26/17 26/17 51/16 51/16 60/5
60/5 64/2 66/22 66/23 70/13
73/5 73/5 73/6 73/19 76/5
he's 19/6 26/16 73/14
head 26/24
health 17/13 17/3 31/8 42/9
hear 8/12
heard 43/18 55/24 65/6
Hegland 2/16 5/2 60/2 63/19
81/14 90/17
held 24/10
help 8/10 41/24
helpful 19/21 32/2
her 65/16
here 4/1 19/6 26/13 41/8
44/6 45/12 45/13 56/14 59/17
66/17 72/19 79/20 84/4 84/7
hereby 88/6 88/19 90/11
herein 88/7
heretofore 88/11
hereunto 88/24
hesitating 62/8
High 9/9
him 5/24 10/17 26/18 67/14
67/21 70/21 72/21 73/20 76/5
83/3 84/9
his 19/5 24/9 60/7 69/23
70/14 72/25 73/1 73/8 76/7
history 78/13
hold 10/6 43/10
holding 82/6
Hon 2/13 90/18
hospital 23/19 23/21
hours 14/4 14/4 14/4
house 28/5 28/7 29/17 30/2
30/8
how 9/24 14/3 15/17 15/22
19/22 22/6 24/17 27/7 27/13
28/19 31/4 32/25 33/9 34/12
34/21 35/3 35/17 36/6 37/8
42/8 44/4 45/2 47/9 47/15
48/21 49/1 49/7 49/13 57/7
59/23 63/3 64/6 64/8 65/12
65/14 66/22 66/23 66/23
66/24 72/3 72/4 72/4 75/19
79/7 86/13
however 5/22 71/21
hundred 21/3 33/2 33/4 49/19
49/21
hundreds 49/17
hypothetically 80/18 80/19
81/7

**I**

I'd 8/10 24/12 28/20 35/8
40/2 47/17 49/14 63/19 64/1
68/3 75/21 76/14 78/12 82/18
84/14
I'll 33/2 35/5 41/1 53/9
77/23 80/18
I'm 4/20 4/22 5/2 5/8 8/18
10/16 11/5 12/22 12/22 13/15
14/21 15/8 15/12 15/18 15/24
20/21 26/4 26/5 26/5 29/18
33/16 36/11 36/20 38/2 38/16
39/3 39/3 39/3 39/11 40/24

41/7 41/16 51/19 44/3 44/9
45/19 47/16 48/19 49/11
51/10 52/1 52/21 53/8 53/19
54/10 56/17 59/2 60/22 60/24
61/5 61/15 62/8 62/12 62/17
63/10 65/5 66/18 67/8 67/8
69/4 74/16 77/14 79/18 84/16
86/17
I've 9/21 61/22 65/14 73/9
idea 64/10 70/12 70/13 70/15
70/22
identification 39/24 60/21
69/3 76/13 84/18
identified 6/6 6/9
identify 4/18
important 29/14
improve 30/1 72/5 72/6
INC 1/17 2/12 3/16 4/24 4/24
5/3 5/21 10/22 15/1 15/18
31/15 36/22 36/24 77/17
77/17 78/12 85/1 90/20
include 11/12 22/23 65/15
included 61/18 65/2 81/23
inclusive 22/20
incorporated 4/6 4/7 4/8 16/4
16/5 35/1
incorrect 80/15 80/22
increased 27/1 27/11
incurred 21/10
incurs 16/25
indemnity 43/9 43/13 85/10
INDEPENDENT 1/4 4/3 14/10
28/9 79/14 79/21 90/7
INDEX 3/1 3/9
Indiana 1/14 1/15 1/19 88/1
88/6 90/21
Indianapolis 1/15 1/19 2/21
90/21
indicated 20/22 26/14
indicates 85/23
indication 75/8
indirect 35/16
individual 11/2 21/8 24/6
42/10 42/11
individually 7/17 10/19 11/23
37/17 42/21 78/19
individuals 31/23 42/24 80/19
industry 12/9
information 14/1 19/25 20/2
20/8 32/16 34/3 34/7 39/4
50/25 51/3 54/4 51/8 51/9
54/14 54/15 54/15 57/10
initial 6/6 6/9
initials 40/8
instances 79/25
instead 16/22 58/2
instructional 34/7
instructions 46/19
insurance 1/7 2/12 4/5 4/6
4/23 5/1 9/20 10/4 10/8 12/2
12/5 12/11 13/9 13/10 14/10
15/1 16/14 16/19 16/20 16/21
16/23 17/2 17/3 17/7 17/15
17/18 17/20 18/11 18/12
21/22 23/3 23/6 23/14 27/2
30/24 31/8 31/9 31/16 31/18
32/9 32/12 32/12 33/10 34/19
34/23 34/23 35/7 35/12 40/15
41/4 41/11 41/12 41/25 42/12
42/14 42/17 42/18 45/22
45/25 46/1 47/21 53/11 53/17
53/23 53/25 54/3 54/4 54/7
57/21 62/14 67/19 68/2 74/6
74/8 77/16 83/16 85/1 85/7

**I**

insureds  49/7 49/8 49/11 49/12
insurers  41/10
intend  11/2
interest  31/11 37/19 38/1
interested  88/22
internal  47/11
International  28/16
interpretation  45/9
interrelate  42/6
interrupt  10/17
introduced  77/13
involve  13/8 19/10 79/9
involved  26/10 30/11 31/1 31/5 31/14 34/18 35/6 35/11 36/18 45/22 48/12 55/25 56/23 57/4 73/6 78/22
involvement  36/9 36/25 53/16
Islands  35/2
issue  72/16 74/15 76/16 79/9 81/4 81/22 82/17 84/4
issued  22/4 53/10 63/7
issues  41/6 46/24 57/17 79/20
issuing  45/13
it's  16/21 16/23 22/10 22/14 22/16 27/11 27/11 35/2 36/8 37/22 38/6 38/7 38/7 38/17 38/22 40/11 44/2 44/11 45/2 45/2 51/21 52/24 52/25 53/9 54/12 55/3 56/17 59/23 60/12 62/6 64/25 66/21 68/9 68/17 69/8 77/12 82/8 82/13 86/2
item  22/19 61/16 66/20
items  66/10 66/17 66/18
its  36/16 38/5 58/13 67/18 78/13
itself  25/3 62/11 83/5

**J**

JAH  3/14 3/15 3/17 34/22 35/1 35/3 35/6 35/10 35/14 35/21 36/2 41/16 43/5 62/20
JAMES  1/11 1/13 5/10 7/23 87/16 90/12
job  10/11 15/19 15/20
joint  31/21
judge  8/8
July  1/15 4/12 90/13
June  69/25 70/10 70/25
jury  8/8
just  11/1 11/4 15/3 16/17 20/22 21/15 23/20 27/16 30/22 32/23 37/4 39/16 40/25 51/10 55/14 60/5 60/10 60/23 61/1 61/5 61/7 64/4 65/20 67/8 68/19 71/6 72/2 72/20 73/5 73/24 74/21 77/18 77/20 81/15 84/22

**K**

keep  36/8 71/3
keeps  36/7
kept  75/10 75/13
Kiefer  1/14 2/20 4/14
kind  23/15 63/15 64/21 66/9 78/12 79/10 80/5
kindly  81/16
know  8/18 9/4 10/14 11/8 11/19 12/1 12/15 14/21 15/3 15/5 15/5 22/11 24/5 24/5 26/16 26/22 26/23

27/15 28/22 35/6 36/6 37/21 38/17 39/12 39/17 44/25 45/2 45/24 46/2 46/10 47/10 47/11 47/13 48/9 48/12 48/15 50/13 50/19 50/21 50/21 51/16 51/17 52/4 52/6 52/13 52/15 52/23 52/24 53/18 55/20 55/24 56/1 56/2 56/6 56/9 56/10 57/4 57/13 59/8 59/14 60/18 63/23 64/21 66/20 70/24 71/1 71/11 73/4 73/5 73/11 73/14 73/19 74/23 76/10 76/11 76/25 77/13 77/15 78/7 79/25 82/16 82/17 85/23 86/13
knowing  81/19
knowledge  7/1 11/20 53/16 55/15 55/21 60/5 71/16 79/15
known  14/24 14/25
knows  26/17 49/15 64/2

**L**

labeled  43/8
lack  87/2
Lake  15/2 60/11
language  63/7 81/9
Larry  2/22 19/5 30/15 47/4
last  17/24 18/1 18/6 20/20 24/10 27/9 27/11 28/2 29/1 31/4 31/5 38/3 38/13 44/15 50/3 60/10
lasting  78/8
later  42/18
law  2/13 4/13 4/15 77/14
lawsuit  57/17 68/5 78/16 78/17 79/3
lawsuits  43/14
layers  36/1
layman  19/23
layman's  16/18
lead  38/8
least  24/12 28/20 41/23 46/16
leave  73/25
leaving  76/7
led  55/9
left  39/25
Legal  2/22 4/17
length  21/5
less  9/19 33/11 33/11 39/25 48/22 49/3 49/18 50/2 58/25 59/3 64/9 70/15
lesser  18/21
let  8/23 9/3 39/16 41/1 53/15 57/20 59/2 63/18 78/6 78/10
let's  7/20 56/19 68/18 79/1 86/20
letter  66/12 69/15 69/18 69/21 69/25 70/10 70/16 70/25 81/24 81/25
letterhead  69/20
level  16/21 29/14
license  11/18 13/5 13/11
licensed  11/10 12/22
licenses  10/6 11/15 12/14 12/20 13/1 13/16 13/19
licensing  13/8
life  1/7 2/8 4/4 5/1 13/9 13/9 17/17 17/20 17/22 18/4 18/11 18/17 21/25 22/3 23/7 24/21 26/1 27/1 34/16 34/25 35/4 35/12 35/15 35/18 35/22 36/6 36/13 37/7 37/9 37/12

37/15 37/19 37/24 38/1 38/5 38/11 41/25 42/5 42/23 43/14 43/23 48/1 53/10 54/21 58/19 59/9 61/11 63/8 90/9
like  5/19 8/10 29/24 34/12 39/16 40/2 41/7 46/19 49/25 55/22 63/11 63/19 64/1 70/12 71/20 76/14 78/12 81/15 82/18 84/14 84/20
likely  38/8
liking  29/13
lines  48/18
list  27/4
listing  26/25
litigation  78/13
little  18/25 56/20 69/24
LLP  2/17
located  28/17
long  8/18 14/3 15/22 28/19 35/3 64/8 78/8
look  7/8 60/24 61/3 62/10 70/17 70/18 70/19 70/20
looked  24/15 70/12 71/6
looking  61/20 62/13 62/16 62/17 69/6
Loop  2/6 90/2
loss  41/13 42/18 42/22
losses  16/25 49/8
lot  19/2 38/16 55/13
Lucas  1/13 88/5 89/4

**M**

ma'am  84/11
made  4/14 5/19 6/1 6/4 6/17 55/16 84/1 86/5
main  2/10 79/19
maintained  71/15
major  9/11
majority  18/3 59/18 59/18
make  5/19 6/1 51/24 59/2 61/7 62/2 66/9 83/3
makes  42/25
making  22/24
MANAGED  2/11 4/5 4/23 14/25 77/16
Managers  3/14 40/11
managing  12/10 13/3 16/13 17/6 21/14 21/16 21/17
manuals  34/6
many  9/24 27/7 27/13 32/25 49/1 49/7 49/13 65/12 65/14 71/21 79/7
marked  39/23 40/1 60/12 60/20 60/22 68/9 69/2 76/12 76/14 81/16 84/17 84/20
market  1/18 12/10 66/22 90/20
marketing  3/17 74/4 84/24
Massachusetts  28/18
materials  33/13 33/18 34/5
matter  4/3 6/22 75/2 76/3 76/19 76/23 88/9
matters  5/23
may  8/18 13/8 13/18 26/16 37/25 38/17 38/17 45/12 45/12 49/22 65/19 65/19 68/18 78/2
maybe  18/2
MBA  2/12 3/12 4/7 4/24 14/19 14/20 14/21 14/25 15/2 15/9 30/17 31/23 31/24 33/5 45/24 46/10 53/21 59/10 59/13 59/14 69/6 69/12 69/20 72/12 72/16 72/23 74/19 75/19

**MBA's** 54/1
**me** 1/13 6/5 6/11 8/13 8/13
8/23 9/3 9/8 10/10 10/12
10/16 13/22 15/8 15/11 15/17
15/24 18/20 19/9 21/12 25/4
25/17 25/23 26/17 26/18
27/15 34/21 35/17 36/2 41/1
41/24 44/7 45/7 46/24 47/2
48/10 48/11 49/7 51/11 53/15
55/6 55/9 55/12 56/20 57/20
58/22 59/2 59/2 59/17 60/5
61/1 61/9 61/10 63/15 63/18
64/3 65/14 69/24 74/5 77/19
77/22 78/6 78/10 82/8 83/12
84/22 84/22 86/15 86/16 88/7
**mean** 11/1 16/18 19/9 21/3
22/15 23/22 26/12 29/18
36/12 44/6 49/11 50/23 55/2
55/21 57/24 63/3 66/16 72/2
74/21 78/15 86/1
**meaning** 21/19
**means** 20/7 41/10 58/1 85/24
88/14
**meant** 49/11
**medical** 6/12 6/18 6/20 23/18
**meeting** 65/6 65/8 66/3 66/5
66/7 71/17 72/25 73/3 73/4
73/7 80/13
**meetings** 65/12 65/14 65/23
66/2 66/21 71/21 73/1 73/5
**meets** 60/17
**memo** 68/17
**mention** 43/18 61/15 83/3
**mentioned** 18/19 27/2 27/3
32/1 88/12
**Merrill** 3/12 15/2 65/7 65/13
65/15 65/16 66/7 66/12 67/24
69/7 70/5 71/18 71/22 72/24
80/12 81/24 82/24
**Merrill's** 68/17 83/2 83/7
84/8
**Merrills** 86/9 86/22 86/25
87/2
**met** 14/2 72/23
**MSU** 12/10 13/5 17/16 32/18
45/8 58/13 66/24 67/18 69/21
70/23
**MSUs** 12/14 70/14 74/5
**Michelle** 2/22 4/17
**middle** 41/17 43/8 43/22 66/1
**might** 8/21 8/25 8/25 9/2
10/24 11/4 34/3 39/10 42/24
66/14 67/17
**mind** 33/17 84/15
**minute** 32/1 41/8
**mischaracterizes** 50/9 80/16
**misrepresentation** 79/10
**missed** 33/16
**mistake** 64/13
**mistaken** 81/10 81/11
**Mm-hmm** 36/14 41/5 49/24
71/19
**moment** 61/10 69/10 70/6
**money** 37/8 39/13 52/16
**month** 62/22 83/23
**monthly** 83/9 83/13 83/22
**months** 16/7
**more** 19/18 24/25 26/10 29/4
39/25 50/2 66/24 70/15
**morning** 6/23 8/5
**most** 11/9 19/2 22/10
**mouthful** 77/15

**Mr** 5/15 5/23 7/13 7/21 7/22
8/2 10/19 19/16 24/20 39/25
41/15 46/14 47/17 48/7 48/8
48/10 49/5 56/10 57/2 57/3
57/13 60/22 63/24 64/2 64/3
65/13 65/15 66/7 66/12 67/24
69/4 69/8 71/6 71/18 71/22
72/24 73/11 73/11 76/7 76/19
76/25 77/11 78/9 78/10 80/12
80/12 81/15 81/24 82/19
82/22 82/23 82/24 83/2 83/7
83/7 84/8 84/19 85/3 85/18
85/19 85/20
**Mrs** 65/13 65/16
**Ms** 60/2 63/19 81/14
**much** 8/7 19/16 32/20 36/6
54/3 85/17
**must** 61/19 68/19 72/16 72/22
**my** 6/21 7/23 7/25 8/12 8/13
8/23 11/17 15/20 19/18 26/24
36/8 37/22 43/12 44/23 45/8
45/10 47/4 48/22 49/15 51/21
52/4 53/9 53/14 54/12 54/20
55/3 56/3 56/17 61/13 61/15
63/19 64/25 66/11 71/16
75/21 77/12 77/21 78/1 85/5
88/15 88/24 88/25 89/7
**myself** 77/13

## N

**name** 7/22 7/23 10/25 10/25
11/3 19/5 24/9 28/16 30/22
69/23 73/11 77/12
**names** 15/6 73/25
**nature** 9/20 80/25
**necessarily** 76/1
**need** 8/14 11/20 13/10 34/4
41/2 47/23 48/18 78/6
**needed** 29/4
**negotiable** 22/19
**negotiate** 20/22
**negotiated** 20/16 20/19 22/18
75/23 75/25
**negotiation** 21/4
**negotiations** 20/13
**net** 43/24
**never** 55/22 55/23 81/4
**next** 9/2
**Nixon** 76/25
**nodded** 10/9
**non-responsive** 81/5
**none** 33/6
**normal** 8/17 46/4 54/13
**normally** 22/10 61/24 62/6
63/10 71/2 75/10 81/1
**North** 2/5 2/14 2/18 28/16
29/6 30/5 30/9 47/6 47/11
90/2
**notarial** 88/25
**Notary** 1/13 88/5 89/4
**notation** 62/15
**noted** 88/13
**notes** 66/9 66/11 88/15
**nothing** 5/12 27/6 82/2 87/6
88/9
**notice** 5/18 7/12 90/5
**noticed** 7/17
**notified** 90/11
**November** 82/13 82/14 86/19
**now** 6/23 7/5 7/9 11/7 18/19
27/6 28/5 32/1 46/16 61/22
62/16 65/5 69/6 71/17 71/20
73/16 77/2 77/11
**nuances** 21/6

**number** 4/2 54/10 66/16 9/21
16/7 20/25 21/11 43/4 48/25
50/12 54/1 56/15 61/17 62/19
77/4 87/8
**numbers** 49/16

## O

**oath** 8/7
**Object** 26/19 63/17 65/10
**objection** 13/24 21/2 26/13
28/24 36/20 38/6 38/15 44/24
45/18 46/6 46/22 50/8 51/7
51/15 63/9 64/16 80/16 80/23
81/5 81/6 83/4
**objections** 5/17
**obligations** 85/13
**obtain** 60/14
**obtained** 9/22
**obviously** 60/4 64/2 79/19
86/6
**occurred** 79/16 80/10
**occurrence** 80/9
**October** 40/17
**off** 26/24 39/18 39/25 68/21
68/22 77/5 87/9
**offer** 55/5 55/7 55/10 58/19
**offered** 42/15 67/13 67/19
68/2 72/15
**offering** 67/2
**officer** 15/21 18/20 19/2
19/4 47/4 48/10 49/15 52/11
56/3
**offices** 1/14 4/14 4/15
**official** 7/19 88/25
**often** 42/14 48/21
**Oh** 62/12
**OHIO** 1/18 90/21
**okay** 6/21 9/6 11/5 11/6 37/7
43/7 48/4 51/18 52/5 56/19
61/22
**Olvera** 2/13 4/22 77/12 78/9
85/18 90/18
**once** 8/21 78/5 81/7
**one** 2/17 4/2 5/6 15/6 16/13
22/18 23/25 25/2 25/5 30/22
31/15 31/17 35/20 38/25
42/25 43/20 49/9 50/21 51/19
52/10 60/2 60/8 60/11 61/6
64/14 64/21 67/9 68/11 68/20
70/23 71/6 71/9 73/1 77/5
78/1 79/19 84/14 85/2
**ones** 10/14 26/2 41/24
**only** 6/25 42/22 71/9
**operating** 19/1 19/4 19/11
47/4 48/10 49/15 52/11 56/3
**operation** 45/10
**operations** 19/10
**opportunity** 9/4 9/6
**opposed** 19/16 42/11 52/14
**oral** 1/12
**order** 34/4
**organization** 14/24
**other** 5/6 6/16 6/18 6/19 7/3
8/21 8/24 9/15 9/17 9/19
10/4 12/4 12/20 13/5 13/16
13/18 13/19 14/12 14/15 18/7
19/12 19/19 21/9 21/17 23/2
25/25 25/25 26/22 31/1 31/2
31/5 31/7 31/13 31/13 34/6
34/9 34/10 34/16 35/10 35/11
40/22 42/6 44/14 45/11 51/4
51/17 53/5 59/6 63/6 64/14
66/14 67/9 71/5 71/20 71/25
72/9 72/16 72/21 72/23 73/4

others  13/10 22/21 23/1
 35/20 35/21 37/25 71/12
otherwise  10/18 46/9 66/9
 88/22
Otto  2/4 5/6
our  14/2 29/13 36/25 37/11
 48/6 50/12 55/5 82/2
out  16/8 32/16 33/4 33/22
 41/24 43/1 49/21 60/19 67/23
 82/9 82/24 83/2 84/9
outlines  46/9
outside  28/4
outsource  29/11
outsourced  28/10 74/4
outsourcing  28/3
overbroad  21/2 45/18
own  37/11 37/21 66/11
ownership  31/10 31/22 37/18
 37/23 38/1

# P

package  24/2
page  3/2 3/10 40/6 40/8
 41/16 41/17 43/4 43/20 43/22
 44/15 44/16 44/19 61/6 61/8
 61/16 61/19 62/16 62/17
 62/23 64/9 85/9
paid  21/11 22/21 29/24 30/4
 30/5 37/4 45/16 45/21 45/24
 50/11
Pan  18/11 18/17
paperwork  53/5
paragraph  43/9
paragraphs  85/10
parallel  83/14
Parkway  1/15
part  19/17 20/12 20/12 20/14
 29/20 35/20 73/6 79/22 80/14
 80/21 81/8 82/21 84/6 84/6
participate  35/15
participated  35/3
participates  35/14
particular  20/8 21/5 23/18
 23/19 30/23 41/21 48/19 55/4
 58/23 61/25 75/18 75/23
 80/11 83/23
particularly  60/24
parties  40/13 40/14 88/21
party  14/4 32/5 32/7 74/5
pass  77/3 81/12 85/16 87/4
patient  25/5 25/14 77/19
PATTERSON  2/17
pause  8/25
pay  25/11 25/16 43/23 45/14
 53/1 58/13
payable  25/10
paying  38/20 58/2 58/16
payment  21/20 21/21 23/7
payments  22/24 22/25 38/24
 39/1 44/6 50/22 50/24 56/13
pays  36/13 52/22 58/5 58/6
 58/11
people  8/21 15/12 52/10
per  62/22
percent  17/23 22/10 22/14
 22/15 22/16 28/5 33/12 36/5
 36/5 36/8 36/15 36/19 44/18
 44/21 44/22 45/3 45/3 45/7
 45/11 45/20 45/20 48/23
 48/24 59/1 59/3 59/6 62/4
 62/4 62/21 62/22
percentage  17/21 22/8 22/9

percentages  45/19
perform  30/19
performance  30/2
performed  30/9
perhaps  18/15
period  18/15 18/16 27/19
 51/12 55/1 55/2 65/22 83/19
 83/21
periods  18/13
person  30/14 47/2 72/23
 88/20
personally  7/1 11/17 11/18
 11/19 12/21 31/1 57/10 72/20
personnel  24/13 46/20
pertinent  70/22
phone  6/13 29/22
Phyllis  65/7
physical  6/15
piece  20/4
PIPER  2/9
Pkwy  2/20
place  7/24 7/25 30/7 30/9
 40/18 40/20 65/7 88/11
plaintiff  1/5 1/14 2/3 4/4
 4/21 5/7 88/11 90/8 90/11
plaintiffs  5/20
plan  7/4
play  74/7
Plaza  2/17
please  4/18 5/8 7/22 8/13
 8/15 25/7 50/13 61/9 77/22
 78/6 79/2 79/18 82/3 86/15
plenty  39/12
plural  41/9
point  13/21 17/17 17/23
 24/23 25/9 31/3 33/6 40/20
 49/14 55/5 74/20 83/24 83/25
policies  22/3 22/22 34/6
 41/13 41/22 42/18 42/22
 46/18 56/5 61/11 64/20 67/2
 80/4
policy  3/13 25/11 42/15
 42/25 47/7 51/12 51/19 53/12
 53/12 53/13 53/18 54/8 54/25
 59/23 60/25 62/11 63/2 63/6
 64/11 64/24 65/2 65/2 79/22
 80/14 80/21 81/9 81/10
portion  34/24 35/19 35/24
 78/8
portions  18/24
posed  75/2
position  15/22 19/3 24/10
possession  6/2 60/15
potential  20/1
potentially  20/1
practice  64/10 79/15
precisely  12/22 22/13 28/22
 46/2 52/23 81/19
precision  11/8 12/4 46/9
 48/14 55/11 56/22 66/3 66/8
 67/6
predetermined  32/15 83/18
 83/25
premium  19/12 20/3 21/20
 22/8 61/24 61/25 62/2 62/5
 62/22
preparation  13/22
prepare  37/7 37/11
prepared  37/7
present  2/22 4/18 5/16 60/12
 73/1 88/12
presented  88/17

Presidential  17/20 18/8
presume  53/4 68/3 70/2
presumed  60/14 69/23
pretty  19/16 32/20 54/3
previously  60/20 69/2
price  56/8
primarily  16/13
principals  31/23
printed  82/9 86/4
prior  5/15 43/24 53/17 53/20
 54/1 56/5 75/16 80/17 82/14
 86/9 86/20
privileged  13/25
probably  8/19 13/9 17/23
 30/15 74/21 77/3
problem  38/16 39/2 39/2
problems  38/4 38/11 38/12
 38/13 72/5
procedure  1/16 58/16 58/24
 64/10 79/16 90/11
procedures  30/7 34/6 46/18
 47/8
proceed  7/20
process  22/17 24/19 25/3
 25/11 25/16 34/4 34/8 34/12
 49/10 52/18 54/13
processes  49/8
processing  26/2 30/8 33/15
 33/19 36/10 44/6 46/17
produce  20/4 60/3 66/24
produced  1/13 59/14 60/11
 63/13
producers  46/7
producing  6/24 7/4 7/5 54/16
product  30/23 43/1
production  72/6
products  31/8 31/13 41/9
 41/10 42/4 42/6 42/7
program  35/4
promised  80/20
prompted  81/17
proper  34/7
proportion  37/14
proportions  18/2
proposal  53/6 55/16 55/17
proposals  54/16 54/18 55/3
 56/4
proposing  54/22 69/17 70/4
protect  16/24
provide  7/7 9/6 17/16 22/2
 33/14 33/19 33/21 34/5 34/10
 58/16 59/3 60/7 64/5 67/13
 67/21
provided  6/10 18/7 21/24
 26/9 31/16 31/17 47/8 51/5
 59/8 63/12 64/25 68/5 72/21
 74/8 75/9 80/1 82/22 84/9
 84/22
provider  31/15 31/16
providers  50/24 58/5
provides  59/21 64/4 64/24
providing  17/5 34/16 53/25
 61/12
provision  75/4
provisions  61/25 65/2
Public  1/13 88/5 89/4
purchase  45/22
purpose  33/23
purposes  15/8
pursuant  1/15
purview  19/16 19/18
put  21/11 30/7 42/24 55/3
 64/20

**Q**

qualification  69/19
quarter  44/18
question  8/23 9/2 23/24
 25/18 35/22 37/6 43/12 44/23
 51/21 51/23 52/2 57/19 57/20
 61/4 61/9 61/13 69/20 73/17
 75/2 77/23 78/3 81/20 82/5
 83/8
questionnaire  67/11 67/14
 67/16 67/23 68/1 68/3 68/6
 68/7 69/9 69/11 69/17 69/22
 70/4 70/6 70/16 71/5
questions  8/13 29/24 40/25
 67/17 70/18 70/22 70/22
 74/24 74/25 77/18 77/21 78/2
 81/13 84/13
quickly  78/10
quit  38/20
quite  8/12
quote  20/4 41/9

**R**

raised  52/2 81/22 82/15
Randy  24/9
range  62/4
rarely  48/22 48/22
rates  20/3
rather  49/14
Re  34/22 35/1 35/3 35/6
 35/10 35/14 35/21 36/2
reach  8/18
read  41/2 68/3
reading  41/19
really  18/25 29/8 30/12
 38/16 51/17 52/1 55/13 68/14
 70/21 72/2 72/2
reason  8/12 38/22 39/3 39/9
 50/22 56/14 56/21
reasons  29/2 29/3 50/19
 50/21
recall  6/13 13/21 56/7 60/10
 65/8 65/16 65/20 66/3 66/6
 67/1 67/4 67/9 67/11 68/13
 71/5 71/9 72/8 72/12 72/14
 72/18 72/20 72/24 72/25
 74/13 74/17 75/15 86/7 86/10
 86/21 87/1 87/3
receive  46/8
received  86/4 87/1
recess  39/20 68/24 77/7
record  8/11 39/19 39/21
 68/21 68/23 68/25 75/14 77/5
 77/10 77/13 87/10 88/16
records  24/13 27/15 35/9
 46/11
redirect  82/18
reduced  88/15
redundant  42/20
refer  11/2 15/8 41/21 62/18
reference  43/21 44/17 62/24
 52/11 57/18
referred  30/17 32/3 42/18
referring  10/19 25/5 60/18
 61/14 69/10 69/11 76/16
refers  58/10
reflect  27/18 27/21 27/22
 37/1
reflecting  37/8
regardless  26/11
regular  16/20
regulates  12/14
regulations  10/13 11/21 11/24

12/18
reimbursed  58/12
reimbursement  23/22 23/23
 32/19 36/19 47/20 58/3 83/19
 84/1
reimburses  58/5
reinsurance  36/10 36/11 41/11
 41/12 41/25 42/1 42/3 42/9
 43/24
reinsure  35/18 35/20 35/22
reinsurer  35/15
reinsurers  35/18 35/19 36/16
 37/2 37/6 37/10 37/12 37/16
 38/5 38/12 38/19
reiterate  77/22
rejected  55/23
relate  14/8
related  10/4 30/18 31/8
relates  42/12
relating  9/20 10/8 42/11
relation  20/10 70/20
relations  23/13 27/2
relationship  28/21 29/2 29/3
 29/16
relative  26/8 29/22 30/7
 31/8 31/18 51/23 64/7 75/4
 81/21 86/11 88/21
relevant  38/7 63/21 63/23
rely  78/2
remember  41/2 71/25 73/4
 86/24
remind  86/15
rendering  21/22 36/25
renew  54/6 54/11 54/22 55/4
 55/5 55/22 55/22 63/19
renewal  53/14 54/17 56/4
repaid  36/16
repeat  8/14 79/2
repeating  33/17
rephrase  80/18
reported  51/12
reporter  5/8
REPORTING  1/17 90/20
reports  21/22 36/25 37/7
 37/11 51/5 53/5
represent  4/19 4/21 4/22
 4/25 5/3 5/4 17/17 21/23
 77/15
representative  7/7 7/15 7/18
request  4/15 7/13 7/14 33/21
 43/12 52/7 53/6 63/19 86/10
requested  7/4 63/14 63/14
 63/21 86/3
requesting  6/15 34/3 52/20
 54/13
requests  5/17 5/25 43/17
 79/25
require  33/22
reserve  81/13
Residence  89/6
resolve  6/22
respect  12/2 13/17 38/4
 46/17 79/12 79/13 82/15 84/5
response  55/17 81/20 82/5
responsibilities  27/23 27/25
responsibility  37/15 47/24
responsible  22/24 24/7 28/6
 32/15
responsive  5/25 7/11
responsiveness  29/12 29/13
 29/15 29/18 29/20
resulting  20/3
resuming  39/25
retaining  22/8

reviewed  5/22 14/6 14/13
 48/17 75/7
reviewing  21/8
reword  8/14
rider  63/10 64/19 65/3
riders  41/13
right  7/5 10/19 10/24 15/10
 27/6 49/13 64/19 73/16
risk  34/24 35/19 35/20 35/25
 36/2 36/6
Robert  90/17
Roberta  2/16 5/2
Rolando  2/13 90/18
role  32/11 44/5 74/7
Rolly  4/22 77/12
room  19/6
rough  70/12 70/13 70/15
roughly  56/4
Routh  3/15 69/9 71/6 73/11
 73/12 76/4 76/6 76/7 76/19
 80/12 81/21 82/8 82/23 85/3
 86/7
routine  72/3
RPR  1/13 88/5 89/4
RUDNICK  2/9
rule  66/16
rules  1/16 77/20 90/10
running  19/11 54/15
rush  84/16

**S**

said  5/25 41/6 45/2 51/16
 62/6 66/17 82/3 88/17
SAITH  87/12
sale  22/22 23/2 23/5 85/6
Salem  28/18
sales  3/16 84/24
Salt  15/2 60/11
same  7/14 25/14 25/15 42/15
 42/19 44/11 54/3 56/4 59/10
 71/22 75/21 81/6
sample  67/14 67/21
SAN  1/3 2/7 4/3 14/8 14/9
 14/10 22/4 22/11 28/9 28/15
 33/10 35/7 43/13 45/25 50/7
 50/17 50/24 52/7 53/11 53/17
 54/18 57/8 74/8 75/2 75/5
 75/16 79/13 79/17 79/19
 79/20 81/21 82/15 84/5 85/7
 85/14 90/3 90/7
satisfied  24/18
saw  16/3 60/13
say  6/4 10/18 11/1 11/4 13/4
 14/21 19/17 19/22 22/15 25/7
 28/20 33/2 34/1 35/5 35/8
 35/14 36/21 37/3 37/13 42/20
 47/15 48/16 49/1 49/3 49/5
 50/4 55/11 59/20 61/22 65/12
 65/15 69/22 79/1 86/20
saying  66/13 67/8 70/21
 81/24
says  35/22 41/10 44/21 70/2
scenarios  80/1
schedule  62/13 65/1
school  1/4 4/4 9/9 14/10
 22/4 28/10 43/13 50/7 50/9
 50/17 53/11 53/17 54/7 54/19
 55/18 74/9 79/14 79/17 79/21
 80/2 80/6 90/7
Scott  24/9 24/20 48/7 48/8
 57/2
seal  88/25
search  82/4

**searched** 82/2
**second** 54/8 85/9
**Secondly** 8/17
**section** 41/7 41/16 43/8 44/1
  44/2 44/2 59/22
**see** 41/19 43/8 43/25 48/25
  61/25 63/5 68/18 68/18 83/7
  83/10 85/10
**seems** 74/2
**seen** 40/3 73/11
**self-funded** 19/25 20/1
**seminars** 34/11
**send** 24/2 24/4 24/20 25/16
  25/22
**sending** 24/8
**sends** 24/20
**sense** 35/16 35/23
**sent** 24/24 26/1 70/21
**sentence** 8/19 42/19
**separate** 13/2
**service** 72/6 72/7
**services** 2/22 4/17 17/5
  17/16 18/7 33/13 33/18 34/16
  85/1
**set** 88/24
**setting** 30/12
**several** 49/19 49/21
**SHADDOX** 2/5 4/16 90/1
**share** 59/10
**shared** 31/22
**she** 65/19 65/19
**Shelby** 2/9 4/25 90/18
**Shield** 37/22
**Shore** 28/16 29/6 30/5 30/10
  47/6 47/11
**Shoreline** 2/17 2/18
**should** 30/5 37/9 47/9 48/17
  51/24 64/23 70/13 75/13
  75/14
**shouldn't** 29/10 64/23
**show** 41/1 41/8 60/22
**showing** 69/4
**shows** 62/21
**sickness** 41/12 42/3
**side** 8/24
**sidebar** 63/17 65/10
**sided** 43/6
**signature** 40/5 40/6 87/11
  88/18
**significant** 56/8
**significantly** 27/9
**similar** 10/25 30/18 47/7
**since** 10/24 15/23 16/15 17/7
  17/13 63/13 63/13 76/7
**single** 24/15
**sir** 7/16 8/9 8/15 9/18 9/23
  11/13 33/8 41/20 43/7 47/18
  47/22 52/17 56/6 77/1 77/18
  78/2 78/5 79/7 79/12 80/18
  82/18 83/10 85/15 86/1 86/15
  86/18 87/4
**sit** 59/17 72/18
**situation** 58/11
**situations** 63/11
**six** 43/8
**skipping** 69/24
**slipping** 29/9
**slowing** 38/24 39/1
**software** 31/17 31/17
**sold** 13/10 21/19 85/24
**solvency** 38/4 38/11 39/2
**some** 11/24 15/15 19/21 27/3

**57/16** 59/14 59/15 61/10 69/4
  78/12 79/9 81/17 85/20 86/20
**somebody** 48/2 52/14
**someone** 16/17 52/9 52/13
  57/24
**something** 6/7 16/3 44/8
  48/18 49/25 71/2 75/10
**sometime** 54/9
**sometimes** 8/25 57/18
**somewhat** 83/13
**somewhere** 16/3
**son** 72/25 73/1 73/5 73/8
**sorry** 10/16 15/24 20/21
  33/16 38/16 49/11 61/5 62/12
  79/18 86/17
**sort** 11/14 12/7 16/9 33/13
  34/10 36/1 39/2 45/16 48/12
  48/14 51/13 52/18 54/3 55/17
  60/25 62/2 71/14 71/22 84/4
**sorts** 13/16 20/15 21/11
  26/25 33/18 46/24 56/5
**source** 14/15
**South** 2/17 37/23
**SOUTHERN** 1/1 4/9 90/6
**speaking** 22/16 42/5 66/21
**speaks** 83/4
**specific** 12/11 24/23 38/7
  41/11 42/1 42/9 59/22 61/16
  61/17 62/15 62/24 64/19
  83/15 83/16 84/2 84/6 84/7
  84/10 86/8 86/10 86/21 86/24
**specifically** 10/14 24/5 52/8
  71/17 72/10 72/14 79/12
**specifics** 67/1
**speculate** 33/2 33/3 35/5
**speculating** 33/12
**speculation** 26/13 26/19 28/25
  64/17 80/24
**spoke** 85/3
**spoken** 76/7
**SQUARE** 1/18 90/20
**SS** 88/2
**St** 2/14
**staff** 16/8
**standard** 74/2
**stands** 32/4
**start** 9/2 63/18
**started** 38/24 39/1
**starts** 69/6
**state** 1/14 4/19 10/12 11/8
  11/15 11/21 11/24 12/2 12/5
  12/6 12/8 12/12 12/13 12/20
  12/23 23/13 27/2 45/13 81/7
  86/11 88/1 88/6
**stated** 42/10 80/13 81/8
**states** 1/1 4/9 10/13 11/7
  11/9 13/18 45/12 48/19 61/17
**stating** 42/2
**status** 29/25 30/1
**stenograph** 88/15
**step** 36/18 53/15
**Stephen** 2/4 90/1
**steps** 58/4
**Steve** 10/16 33/16
**Steven** 4/15 4/20
**still** 40/18 64/24 68/7 70/24
**stop** 8/13 49/8
**stop-loss** 3/13 16/14 16/19
  16/20 17/6 23/6 28/5 28/9
  30/24 31/16 31/18 32/12
  32/12 32/17 33/15 33/20
  33/24 34/4 34/8 34/13 34/18
  35/4 41/4 41/9 44/6 45/22

**53/10** 53/16 53/23 53/25 54/4
  54/6 56/13 56/15 56/16 57/21
  58/3 58/4 58/8 58/13 58/15
  60/25 67/17 67/18 68/2 69/19
  74/6 74/8 83/14 83/16 83/19
  85/7
**store** 86/5
**STREET** 1/18 2/10 90/21
**strictly** 6/20
**subject** 47/12 53/9 55/12
  61/12
**submit** 67/17
**submitted** 32/8 32/13 47/20
**submitting** 32/17 33/23 58/3
  58/8
**subpart** 44/2
**substance** 66/15
**such** 38/13 58/19 59/25 60/4
  60/11 63/6 64/12 65/8
**sued** 78/14 78/19
**suggested** 16/3 38/22 51/1
**suggestions** 38/25
**suggests** 18/21
**Suite** 1/15 1/18 2/6 2/10
  2/20 90/3 90/20
**summarize** 66/15
**summary** 66/10 78/12
**summer** 38/24 54/9
**superseded** 40/19
**supervision** 18/22
**supposed** 46/20 47/15
**sure** 5/21 6/2 11/6 25/8
  25/24 26/5 26/5 29/18 39/14
  44/10 50/15 52/21 59/2 61/7
  61/10 65/6 66/18 74/16 79/19
  84/16 86/12
**survey** 59/12
**swear** 5/9
**sworn** 1/13 5/11 88/8

**T**

**table** 55/4
**take** 39/15 42/24 60/23 61/3
  62/10 77/3
**taken** 1/14 4/13 9/17 9/21
  27/23 27/25 28/4 39/20 68/24
  77/7 88/10 88/14
**taking** 30/2
**talk** 56/19 74/21
**talked** 13/17 27/5 30/16
  66/13 66/20 67/4 72/12 73/8
  74/16 74/23
**talking** 6/5 8/20 11/5 14/21
  15/12 17/2 20/24 24/14 29/19
  30/20 32/6 36/21 36/23 37/3
  41/3 43/9 44/8 44/11 45/4
  45/19 49/9 49/17 54/4 63/20
  64/18 66/4 67/16 72/8 72/20
  74/17 81/3
**talks** 41/8 63/16
**Technically** 42/5
**telephone** 34/1 34/2 72/11
**tell** 5/11 7/22 9/8 10/10
  13/22 15/17 15/24 19/9 26/17
  26/18 36/2 46/11 46/24 47/2
  49/7 55/6 55/9 55/12 56/6
  56/20 59/17 64/3 84/22 88/8
**telling** 25/17 34/11 51/10
  59/2 61/1 61/10
**ten** 16/6 17/24 27/14 61/7
  66/17
**term** 16/17 21/13 32/1 41/9
  57/22 57/24 58/1 58/1

46/2 46/5 46/7 46/8 47/15
55/21 59/10 71/22 72/6 73/25
74/2 74/7 74/10 74/11 74/12
75/7 75/12 75/14 80/14 80/21
81/7 81/10 81/11
**they're** 20/10 42/21 47/15
50/10
**thing** 42/22 44/11 44/14
71/14
**things** 21/11 23/10 23/12
29/9 38/17 41/7 45/4 45/6
46/4 60/2 64/21 66/14
**think** 9/1 13/8 14/14 14/17
15/14 27/6 32/2 32/2 37/6
42/23 42/24 46/16 51/16 60/6
64/5 77/2 78/18
**third** 32/4 32/5 32/7 43/1
74/5
**third-party** 29/22
**this** 4/13 5/18 6/3 6/23 6/25
7/10 7/12 7/14 7/16 8/5 10/2
10/24 13/21 17/17 17/23
26/12 26/14 29/24 30/23 31/3
32/18 33/6 38/7 38/22 38/23
40/17 40/20 40/20 41/1 42/10
43/20 44/8 44/10 44/14 44/25
46/15 49/13 52/6 57/17 60/4
61/6 61/13 61/25 62/3 63/2
63/11 63/22 63/24 63/25 64/8
64/12 64/13 68/5 69/11 69/18
69/20 70/20 73/2 73/4 73/23
75/2 75/18 76/3 76/19 76/22
77/4 77/15 78/8 78/15 78/17
79/3 79/12 80/11 80/21 81/8
81/17 81/20 82/5 82/24 84/24
86/2 86/5 86/9 86/14 87/7
88/20 88/22 88/25
**those** 6/3 6/25 7/11 7/19
10/10 12/17 15/3 15/4 18/2
18/7 21/11 21/18 21/24 22/2
22/6 22/7 22/24 22/25 23/12
23/25 24/20 25/2 25/16 28/10
29/17 31/7 31/10 31/13 32/17
33/4 34/4 35/19 35/21 39/1
42/4 42/5 42/14 42/17
46/25 47/14 48/18 49/16
50/11 50/20 51/24 52/22
54/18 55/14 56/19 56/21
57/11 65/1 66/15 66/21 77/19
79/9 80/19 85/11 85/13
**though** 63/14
**thought** 16/3 25/23 61/5
**thousand** 49/17 49/18
**three** 14/4 24/10 24/12 24/18
33/9 35/5 49/4 49/22 61/16
61/19 62/17 65/24 65/25 66/1
66/1 71/21
**threshold** 24/15 24/16 24/18
25/21 26/1 26/3
**through** 20/2 32/16 32/18
36/1 52/19 54/12 54/15 59/9
63/8 72/3 75/19
**time** 4/12 6/3 10/24 13/21
17/17 17/23 18/13 18/16
25/15 27/20 28/8 29/19 29/20
31/3 33/6 33/9 39/19 39/22
40/21 47/19 47/19 49/14
51/20 53/20 55/1 55/2 55/5
55/16 58/22 60/13 64/14
65/22 68/23 69/1 74/20 77/2
77/5 77/9 78/6 80/4 83/25
86/20 87/10 88/11
**time-related** 21/9
**timing** 41/6 50/22 50/24 51/1

**termed** 42/21 42/22
**terminate** 28/21 29/16
**terms** 17/3 19/22 20/3 20/13
20/15 21/7 21/10 22/17 22/19
41/21 56/5 59/25 61/1 61/12
63/3 72/3
**testified** 5/13 70/6 82/22
**testify** 80/12
**testifying** 8/7 13/22
**testimony** 77/6 80/17 88/16
**TEXAS** 1/1 4/9 11/12 11/16
11/22 11/24 12/3 12/5 12/6
12/8 12/12 12/13 12/21 12/23
13/2 13/7 13/18 90/6
**than** 6/18 6/19 12/4 13/5
13/16 14/15 24/25 25/25 31/2
33/11 33/12 34/9 34/16 35/10
48/22 49/3 49/18 51/4 51/17
59/1 59/3 61/19 64/9 71/5
72/24 73/9 78/15 84/2
**thank** 8/17 9/8 27/16 43/3
52/5 84/12 85/16 87/4
**that's** 6/12 6/22 7/6 10/20
11/25 15/11 15/14 16/16 17/8
17/20 18/5 18/12 19/8 21/3
22/1 22/5 22/18 23/4 25/1
25/23 27/14 28/12 29/15 30/3
30/25 31/12 34/9 35/16 36/17
39/3 40/1 42/20 43/2 45/5
49/9 50/16 53/14 53/24 56/11
57/15 58/14 59/5 59/7 62/8
63/1 64/20 67/20 69/14 70/4
70/8 71/10 73/17 76/15 78/4
83/1 84/12 85/5 86/6
**their** 17/1 20/8 26/11 32/14
35/20 37/2 37/5 37/9 37/12
37/15 49/21 74/3 74/4 75/7
75/11 75/13 79/22
**them** 6/2 7/8 15/6 24/20
25/16 25/22 28/13 28/13
28/19 30/8 33/7 33/21 33/22
34/2 34/11 34/12 41/23 42/25
56/20 59/18 59/19 65/18
71/25 86/10
**themselves** 4/19
**then** 6/21 16/7 23/23 36/15
44/11 56/2 62/23 65/1 75/25
81/3 83/25 86/4
**there** 6/16 7/3 9/25 13/7
14/23 18/6 18/23 19/15 23/5
23/10 26/5 26/6 26/7 30/4
30/17 35/24 40/22 43/1 43/12
43/21 44/11 44/17 44/18
44/22 46/7 47/7 47/7 48/15
50/15 51/21 52/18 52/21 53/5
54/11 56/7 56/18 59/22 59/24
60/11 61/15 62/6 62/12 62/14
62/14 62/23 63/2 63/10 65/17
66/16 66/18 69/5 69/13 69/15
71/14 71/21 72/5 81/2 81/9
81/23 81/24 83/8 84/8 85/20
**there's** 21/3 39/12 43/1 43/9
44/17 44/25 61/24 62/8 69/18
73/10 81/24
**thereafter** 88/17
**therefore** 51/23
**these** 31/21 43/6 65/22 66/2
66/13 72/9 80/4
**they** 7/11 10/15 15/5 15/13
23/11 24/23 24/25 26/23
28/12 28/17 35/14 36/8 42/2
42/6 42/7 42/8 42/16 45/23

**title** 15/19 15/20
**today** 5/24 6/24 7/5 7/17
8/11 13/23 15/8 19/6 27/7
28/1 30/20 33/7 41/3 54/4
56/14 59/17 60/3 72/19 73/15
82/10 84/22
**Today's** 4/12
**together** 42/25 64/20 66/24
**told** 25/23 44/7 60/5 82/23
**too** 15/8 73/17
**took** 30/8 65/6
**top** 26/24 44/19 69/6 85/9
**topics** 72/1
**total** 9/25 24/22 45/7
**Tower** 2/17
**TPA** 32/3 32/3 32/11 32/14
32/15 66/22 67/17 75/20
**TPAs** 32/22 32/25 33/4 33/14
33/19 34/7 34/11 45/21 46/8
51/5
**training** 34/10
**transaction** 37/1 37/3
**transitioned** 28/2
**transmitting** 69/21
**trigger** 51/13
**triggered** 51/1
**true** 6/12 16/15 17/24 18/1
18/23 50/2 86/16
**truth** 5/11 5/12 5/12 88/8
88/8 88/9
**Try** 68/16
**trying** 51/10
**Turks** 35/2
**turn** 35/19
**turnaround** 29/19 29/20
**Turning** 43/20
**turns** 35/19
**two** 1/18 24/12 25/14 25/18
41/7 41/16 41/23 45/4 45/6
53/11 56/5 56/18 56/19 87/9
90/20
**TX** 2/7 2/10 2/14 2/18 90/3
**type** 20/17 21/5 21/6 21/8
79/4 79/14
**types** 14/12 20/19 20/21
20/23 20/24 21/1 26/9 31/13
41/4 41/22 42/14 42/17
**typewriting** 88/15
**typi** 6/19
**typically** 20/15 45/21

**U**

**ultimate** 57/6 57/9
**ultimately** 37/8
**umbrella** 30/17
**unaware** 12/22 48/19 56/17
**unclarities** 15/7
**unclear** 36/11 36/20
**undated** 81/25
**under** 8/7 19/15 25/10 30/17
47/20 88/15
**understand** 8/7 8/12 8/22 11/4
11/23 12/16 14/23 15/12
42/19 43/3 47/19 50/15 51/10
54/19 55/12 55/13 55/14
56/20 57/13 77/21 79/23
79/24
**understanding** 6/22 11/14
12/13 15/13 36/8 37/22 50/5
51/21 53/13 53/13 53/14
54/12 54/20 55/3 56/12 56/17
63/15 64/15 64/22 64/25
79/15 85/5

understood  6/10 6/14 77/24
  78/3
underwrite  12/11 19/14 34/24
underwriter  12/10 13/3 16/14
  17/6 21/14 21/16 21/17 21/18
Underwriters  31/15
underwriting  14/9 14/9 19/17
  19/22 19/24 20/7 21/7 21/15
  22/17 23/6 54/14 55/25
underwritten  21/19
unfamiliar  16/17
UNITED  1/1 4/8
universal  32/20
University  9/10
unless  10/18
unlike  16/20
unsure  35/9 44/9 61/15 61/23
  61/23
until  16/9
up  24/2 29/12 30/12 36/3
  43/23 44/13 44/21 53/15 55/4
  66/19 75/3 75/17
upon  1/12 50/20 85/13
us  6/23 7/22 8/10 8/20 16/18
  23/17 26/7 29/14 39/17 44/12
  46/11 59/14 65/5 81/16 82/1
  90/6
use  11/3 30/22 64/15 69/23
used  21/13 64/23 64/23 87/9
using  64/11
usually  62/8

**V**

vague  38/15 45/18 46/6 46/22
  63/9 64/16
Vaguely  65/9 65/11
variables  21/4
varies  22/10
variety  14/23
various  10/12 11/21 14/6
  15/4 15/6 20/2 20/3 21/6
  23/13 23/14 30/16 32/17
  33/21 36/1 49/22 54/16 54/16
  73/25
vary  36/4 45/20
ventures  31/22
Verbal  80/25
versus  4/4
very  10/25 18/25 21/3 21/12
  44/15 51/12 70/13 78/5 78/8
  78/10 85/17
Video  2/22 4/17
videographer  4/16
videotape  4/1 77/4
videotaped  1/11 1/12
videotapes  87/9
virtually  32/21
visit  8/4
volume  27/18 27/21

**W**

Walraven  2/4 2/5 4/15 4/16
  4/20 5/15 7/21 41/15 46/14
  82/19 82/23 84/19 90/1 90/1
want  20/25 26/18 26/20 26/23
  55/22 77/20 86/13
wanted  5/16 6/1 6/2 44/14
  61/7
wants  26/10
wasn't  25/23 30/11 55/25
  67/8
way  31/21 32/20 32/22 34/7

we'd  55/21 64/14 67/9
we'll  39/17 60/19
we're  17/2 21/8 45/4
we've  27/23 30/20 32/6 44/7
  54/4 74/16
week  60/10
well  6/19 7/10 7/13 15/14
  41/6 44/2 45/12 48/1 52/21
  56/19 57/20 63/18 64/1 64/25
  67/7 79/1
went  54/12 73/25
were  6/14 6/15 6/16 8/8
  18/13 18/16 22/4 25/13 26/25
  28/10 28/12 29/2 29/6 29/9
  29/9 30/4 30/7 41/3 46/2
  46/3 46/5 47/6 47/7 47/7
  50/7 51/11 54/11 54/18 56/4
  56/7 56/18 56/21 56/23 57/11
  61/1 61/10 61/14 67/2 69/9
  71/21 73/20 74/11 74/12
  74/25 74/25 75/12 76/2 76/5
  76/16 80/5 80/12 80/19 81/20
what's  29/25 30/1 60/22
  64/14 76/14 82/12
whatever  8/14
when  6/4 9/1 9/13 9/25 10/2
  10/17 14/21 16/1 19/22 21/10
  21/10 24/14 24/17 28/21 30/8
  32/13 35/14 36/1 36/13 36/20
  37/3 47/6 48/13 55/5 59/21
  62/3 64/22 73/19 75/2 76/5
where  28/17 29/14 35/1 39/25
  41/15 41/19 45/11 58/11
  61/17 63/11 71/14 72/12 76/5
  86/2 86/5
whereby  16/21
wherein  79/16 80/1 80/9
WHEREOF  88/24
wherever  40/6
whether  5/21 12/25 35/6
  45/24 46/2 48/15 51/22 52/13
  52/24 52/24 56/7 58/12 59/8
  59/18 60/17 67/4 70/24 71/11
  73/4 81/23
which  4/10 5/24 5/25 6/25
  10/14 34/22 37/6 41/24 42/12
  44/1 46/10 51/20 59/13 60/12
  63/21 69/19 82/20 82/21 83/2
  84/4 84/8 84/21 85/23
who  14/21 15/3 15/4 18/10
  19/4 24/4 24/5 24/7 28/15
  30/14 37/21 37/25 40/13
  45/21 47/2 47/2 47/23 47/24
  48/4 49/15 52/6 52/22 56/2
  57/1 57/4 73/22
whole  5/12 33/11 55/13 61/3
  88/8
whom  4/19 73/14 73/19 76/2
whose  10/11
why  7/8 29/15 29/24 39/5
  39/9 50/5 55/15 57/11 61/23
  62/8 62/10 62/18
will  7/7 7/10 8/16 9/5 11/1
  36/4 60/9 63/24 73/24 78/7
  81/13 87/11
William  2/22
withdrawal  55/6 55/10
withdrawn  55/17
withdrew  55/5
within  6/11 12/4 12/6 21/7
  29/1 47/25 48/4 51/20 86/20
without  43/24 81/19
witness  1/13 5/9 7/1 7/10

7/14 7/16 10/3 26/14 60/4
  60/18 69/22 69/24 77/3 81/12
  85/16 87/5 88/24
witness's  7/12
wondered  27/4
wondering  39/3
word  38/16
work  44/4 47/15 57/7 59/23
  66/24
works  35/17 63/4
writing  47/8 85/23
written  5/16 34/5 46/18
  47/12 48/15 66/10 66/14
  72/15 81/1 81/2 81/9
WYOMING  2/12 4/8 4/24 14/25
  77/17

**Y**

yeah  13/5 13/6 25/20 27/17
  32/24 32/24 33/18 49/20 50/1
  52/1 56/16 65/21 71/4 71/24
year  36/4 39/12 49/1 49/4
  49/23 53/12 53/13 53/18 54/8
  54/25
years  16/6 17/24 18/1 18/6
  20/20 24/11 24/12 24/12
  27/10 27/12 27/13 27/24 28/1
  28/2 28/20 29/1 31/4 31/6
  33/9 35/5 38/3 38/14 50/3
  53/12 54/1 65/24 66/1
Yep  9/7
yet  27/5 34/22
you'd  34/12
you'll  77/18
you're  6/24 8/7 10/18 15/17
  18/19 20/6 24/14 25/17 37/3
  37/18 39/7 39/9 43/19 44/10
  49/9 51/10 59/2 59/25 61/23
  61/23 62/16 63/2 66/4 69/6
  69/24 80/9 81/2 82/6
you've  9/1 27/19 31/10 34/17
  40/3 43/18 44/5 59/3 65/6
  65/12 71/23 73/2
yours  69/13
yourself  78/19 78/21

# CONDENSED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

|  |  |
|---|---|
| SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, ) ) ) | Deposition of: |
| Plaintiffs, ) ) | **DON WILLIAM MERRILL** |
| vs. ) ) ) | |
| COMPANION LIFE INSURANCE COMPANY, MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS, INC., J. ALLAN HALL & ASSOCIATES, INC., and MBA OF WYOMING, INC., ) ) ) ) ) ) ) | |
| Defendants. ) ) | Civil Action No.:  B-03-047 |

**July 21, 2003 - 9:06 a.m.**

Location:  Offices of CitiCourt Reporting
50 S. Main, Suite 830
Salt Lake City, Utah

Reporter:  Vicky McDaniel, RMR
Notary Public in and for the State of Utah



**CitiCourt,** LLC
**THE REPORTING GROUP**

50 South Main, Suite 830
Salt Lake City, Utah 84144

801.532.3441          TOLL FREE 877.532.3441          FAX 801.532.3414

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 61

Don William Merrill, 7/21/03                    61

1   A.    Yes.
2   Q.    -- relationship?  Correct?
3   A.    Correct.
4   Q.    That didn't change?
5   A.    No.
6   Q.    I would like to next talk about a concept
7   that I've seen referred to in the documents as advance
8   funding under stop loss insurance.  Does that phrase
9   mean anything to you?
10  A.    It does.
11  Q.    What does it mean in your business?
12  A.    Stop loss, advance funding and stop loss
13  insurance really refers to a timing in order to not
14  adversely affect the resources of a policyholder and
15  yet allow the carrier to pay the claim without
16  releasing the checks, or concurrently with receiving --
17  with releasing the check and paying the claim, a common
18  practice, an administrative practice of MGU's and some
19  direct writing carriers.
20  Q.    Is it common for stop loss insurance to be
21  handled in this way that you've described under the
22  term "advance funding"?
23        MR. SHUCHART:  I'm sorry, I didn't hear the
24  first part of the question.
25        MR. WALRAVEN:  Is it common.

CitiCourt, LLC
(801) 532-3441

PAGE 62

Don William Merrill, 7/21/03                    62

1   A.    It's very common.
2   Q.    Is it more common than any other
3   arrangement, in your experience?
4   A.    Yes.
5   Q.    Could you estimate for me the percentage of
6   time, in your experience, that stop loss insurance is
7   provided with this advance funding arrangement?
8   A.    To be truthful, all of the time, because I
9   don't know a carrier out there that doesn't advance the
10  payments of claims and yet never go -- they never go
11  out and look at whether the claim was received by the
12  provider or not.
13  Q.    Other than the matter with Companion Life
14  that we're going to talk about in a minute, have you
15  ever encountered a situation or a discussion with a
16  broker or an MGU or a carrier about whether or not
17  advance funding was or was not going to be provided?
18  A.    Very much so.  This was always a subject
19  with every sales organization we ever talked to.
20  Consolidated continually emphasized the very fact that
21  advance funding existed.
22  Q.    And when you say Consolidated, you're
23  talking about Mr. Douglas Routh?
24  A.    Doug Routh's organization.
25  Q.    And was he specific in his discussion of

CitiCourt, LLC
(801) 532-3441

PAGE 63

Don William Merrill, 7/21/03                    63

1   this topic with you as far as the situation with J.
2   Allan Hall, Companion Life, and San Benito?
3   A.    Yes.  We actually --
4         MS. HEGLAND:  Object to form.
5   A.    J. Allan Hall actually was coming through
6   the Salt Lake area again to our office.  So we had
7   Mr. Routh in the office.  Doug felt that he should come
8   up.  Phyllis Merrill was in the meeting, Clark Merrill
9   was in the meeting, and we had a discussion relative to
10  the way in which J. Allan Hall handled advance funding.
11  Q.    And who is Clark Merrill?
12  A.    He's my son.
13  Q.    What's his position with the MBA entities?
14  A.    At the time he was in sales.
15  Q.    And --
16  A.    He's no longer with the firm.
17  Q.    But he participated in these conversations?
18  A.    Yes.
19  Q.    And Mr. Hall was here?
20  A.    Mr. Hall was in the office, yes.
21  Q.    Anyone else?
22  A.    No.
23  Q.    And this conversation was specific to
24  Companion Life stop loss coverage for San Benito?
25  A.    Specific to any carrier that J. Allan Hall

CitiCourt, LLC
(801) 532-3441

PAGE 64

Don William Merrill, 7/21/03                    64

1   handled.
2   Q.    And as best you recall, what was it that
3   Mr. Hall told you on this subject?
4   A.    Mr. Hall assured us that the advance funding
5   method, and I don't recall exactly how they were
6   handling it, would be part of their contract.  And as
7   long as they were paying claims, they would honor that
8   advance funded program.
9   Q.    And did you prepare a memorandum of that
10  conversation?
11  A.    I probably did.
12  (Exhibit 29 marked.)
13  Q.    Let me show you what's been marked as
14  Exhibit 29 to your deposition and ask you to take a
15  look at that and tell me what it is.
16  A.    It's a document that I just put in the file,
17  a memorandum to the file relative to the meeting, which
18  was May 25th, 4 p.m., and just showed who was in
19  attendance and the very fact that we were assured that
20  the checks would be processed and paid if they were
21  shown as paid by our computer, and then the specific
22  would be reimbursed.
23  Q.    So is that a memorandum of the conversation
24  you were just describing for me?
25  A.    Yes.

CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 9    PAGE 65

Don William Merrill, 7/21/03    65

1  Q.   And when was this memorandum prepared?
2  A.   **In June of 1999.**
3  Q.   In June of '99?
4  A.   **That's what it says, To confirm our**
5  **discussion and questions. We were working with Allan**
6  **on records.**
7  Q.   And the memo reflects that the meeting was
8  in May of 1999, correct?
9  A.   **That's the way it looks.**
10 Q.   And based on your memory and this document,
11 are you fairly confident that the meeting did take
12 place somewhere about then?
13 A.   **Most definitely.**
14 Q.   And is there any question in your mind that
15 that discussion would have applied to the Companion
16 Life stop loss coverage issued to San Benito?
17 A.   **There's no question in my mind that J. Allan**
18 **Hall's honesty in following the procedures, along with**
19 **Consolidated, kept them in line with all other carriers**
20 **that were doing the same thing.**
21 Q.   Yeah. But what I need to know is, you're
22 sure you were talking about a type of insurance that --
23 A.   **Yes.**
24 Q.   -- included the Companion Life policy for
25 San Benito?

CitiCourt, LLC
(801) 532-3441

PAGE 66

Don William Merrill, 7/21/03    66

1  A.   **Yes.**
2  Q.   There's no question that you might have --
3  A.   **No.**
4  Q.   -- been talking about something else?
5  A.   **Heavens, no.**
6  Q.   Okay. That's what I wanted to clarify.
7  Thank you.
8       Do you recall ever discussing this concept
9  of advance funding with anyone at San Benito?
10 A.   **It's possible we did.**
11 Q.   Do you recall it?
12 A.   **In general terms, probably had a meeting,**
13 **and it would have been the fall of 2000. The fall**
14 **of -- I think the superintendent was in -- might have**
15 **been in the meeting. The superintendent may have left,**
16 **and so there was only Janie Gonzalez and Mr. Sanchez in**
17 **the meeting.**
18 Q.   Do you recall talking to anybody at the
19 school district about it more than once, or is the only
20 meeting you recall discussing it that one time?
21 A.   **Well, if you're in the TPA business, you'll**
22 **talk about advance funding all the time because it is**
23 **part of the administrative procedures that is common to**
24 **TPA business.**
25 Q.   Now, do you provide TPA services in

CitiCourt, LLC
(801) 532-3441

PAGE 67

Don William Merrill, 7/21/03    67

1  connection with stop loss insurance that does not
2  provide for this advance funding feature that you've
3  described?
4  A.   **No.**
5  Q.   In your experience, are there different
6  types of stop loss agreements that address the
7  situation of whether or not advance funding is included
8  in the agreement or not?
9  A.   **I'm aware that there are more than -- a lot**
10 **of old contracts that existed clear back from the**
11 **property and casualty area which was a true**
12 **reimbursement only. That's not what is going on at the**
13 **present time.**
14 Q.   And have any of the contracts that were
15 administered as pure reimbursement been anything you've
16 dealt with, say, in the last ten years?
17 A.   **I've seen those contracts but would always**
18 **fall to what we were told by the claims processing**
19 **entity, such as J. Allan Hall. And if they said there**
20 **was advance funding by the format or the administrative**
21 **service agreement or administration procedures that**
22 **they were following, then we went on their word. And**
23 **if they said that's what they were doing and we had**
24 **seen them doing that for multiple years, we believed**
25 **that their work was valid and that we would follow**

CitiCourt, LLC
(801) 532-3441

PAGE 68

Don William Merrill, 7/21/03    68

1  that.
2  Q.   And you say you've been dealing, or began
3  dealing with J. Allan Hall approximately ten years ago?
4  A.   **Well, I was aware of him and dealt with him**
5  **over a period of time. I was aware of his name. Not**
6  **with San Benito, but --**
7  Q.   In '99, 2000 when you were talking to
8  Mr. Hall and when you were talking to San Benito, did
9  you have experience with the way J. Allan Hall
10 processed claims?
11 A.   **Yes.**
12 Q.   And did you have several years' experience
13 with the way they processed claims?
14 A.   **Yes.**
15 Q.   And had they always provided advanced
16 funding?
17 A.   **That's correct.**
18 Q.   And were you aware -- strike that. Had J.
19 Allan Hall been providing stop loss insurance through
20 Companion Life, in your experience, prior to that time?
21 A.   **I don't know that.**
22 Q.   But for whomever they were processing
23 claims, they always handled them the same way with
24 respect to advance funding?
25 A.   **Yes.**

CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441