

**United States District Court**
**Southern District of Texas**
**FILED**

**FEB 1 3 2004**

**Michael N. Milby**
**Clerk of Court**

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **SAN BENITO CONSOLIDATED** | § | |
| **INDEPENDENT SCHOOL DISTRICT,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. B-03-47** |
| | § | |
| **COMPANION LIFE INSURANCE** | § | |
| **COMPANY, MANAGED BENEFITS** | § | |
| **ADMINISTRATOR AND INSURANCE** | § | |
| **CONSULTANTS, INC., J. ALLAN HALL** | § | |
| **& ASSOCIATES, INC., AND MBA OF** | § | |
| **WYOMING, INC.** | § | |

**DEFENDANTS MBA OF WYOMING, INC.'S AND**
**MANAGED BENEFITS ADMINISTRATOR AND INSURANCE**
**CONSULTANTS, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Defendants MBA of Wyoming, Inc. and Managed Benefits Administrator and Insurance Consultants, Inc. (hereafter collectively "MBA"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, and respectfully moves for summary judgment as to Plaintiff San Benito Consolidated Independent School District's claims for negligent misrepresentation and violation of the Texas Insurance Code. In support of their Motion, MBA states as follows:

**I.**

**GROUNDS FOR SUMMARY JUDGMENT**

the agreement and the loss or damage sought is limited to the subject matter of the contract and therefore no negligent misrepresentation claim can exist.

2.      Assuming, without admitting, that a negligent misrepresentation claim exists, Plaintiff cannot establish all the requisite elements.  Specifically, Plaintiff cannot demonstrate that MBA failed to exercise reasonable care or competence in obtaining or communicating the information.  Plaintiff cannot establish damages as a result of the alleged representations.

3.      Local Government Code Section 172.001, *et al.* governs Texas Political Subdivisions Uniform Group Benefits Program.  Section 172.014 provides that the risk pool and hence the program is not subject to the State Board of Insurance and therefore the Texas Insurance Code.  As an agent for a benefit plan, MBA is entitled to that protection and therefore cannot be sued, as a matter of law, under the Texas Insurance Code.

## II.

## FACTUAL BACKGROUND

Plaintiff San Benito Consolidated Independent School District ("San Benito") is a political subdivision.  Local Government Code Section 172.003.  In order to provide health benefits to their employees, San Benito developed the San Benito Consolidated Independent School District Employee Benefit Plan which is a self-funded plan.  Deposition of Janie Gonzalez, page 11, lines 1 – 16, a copy of the cited deposition excerpts are attached hereto as **Exhibit "A"**; Deposition of Lorenzo Sanchez, page 42, lines 4 – 9, a copy of the Sanchez deposition excerpts are attached as **Exhibit "B."**

In order to administer the plan, San Benito entered into a contract with MBA to provide third party administration of the plan.  Exhibit 15 to Sanchez Deposition, page 55, lines 20 – 25,

page 56, lines 1 – 7. As set forth in the agreement, MBA was to provide claim paying services on behalf of San Benito.

San Benito purchased stop loss insurance to provide it protection from certain large claims. Plaintiff's First Amended Original Complaint, paragraphs 7 and 8. During the 2000-2001 policy period, $800,000.00 of payments made by San Benito were allegedly not reimbursed by the stop loss carrier. Plaintiff's First Amended Original Complaint, paragraph 14.

In the First Amended Complaint, San Benito seeks recovery against MBA under theories of negligence, breach of contract, negligent representation and violation of the Texas Insurance Code.

### III.

### ARGUMENT AND AUTHORITIES

1.    The Negligent Misrepresentations Claim Fails As A Matter Of Law.

San Benito seeks recovery under a negligent representation claim. In essence, San Benito alleges that MBA negligently represented that the claims did not have to be mailed to the provider prior to the end of the policy period in order to get reimbursed and that MBA procured a policy subsequent to the 2000-2001 policy.

Texas law has not recognized contorts. To determine whether a claim falls under contract or tort law, the substance of the claim must be examined. *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617-618 (Tex. 1986). The court must look to both the origin of the duty and the type of damages sought. In *Southwestern Bell Telephone Company v. DeLanney,* 809 S.W.2d 493 (Tex. 1991), the Texas Supreme Court stated that, generally, where there is no legal duty independent of the contractual obligations and the damage is to the subject matter of the contract, the cause of actions sounds in contract, not tort.

The Texas Supreme Court addressed of viability of a negligent misrepresentation claim in *D.S.A., Inc. v. Hillsboro Independent School District*, 973 S.W.2d 662 (Tex. 1998). In *D.S.A.*, the suit arose out of construction of an elementary school. As a result of faulty construction of the roof, the school district brought suit against the construction management firm which was required to oversee the construction project. The school district alleged claims of breach of contract, negligence, negligent misrepresentation and DTPA violations. The Texas Supreme Court determined that a claim for negligent misrepresentation did not lie. In doing so, the Court concluded that the plaintiff must establish an independent injury, separate and apart from the contractual injury in order to establish such a claim. In *D.S.A.*, the only damages sought were for repair and reconstruction of the roof and therefore were only contract damages.

The Austin Court of Appeals addressed the issue in *Agillion, Inc. v. Oliver*, 114 S.W.3d 86 (Tex.App.—Austin 2003, no pet.). In *Oliver*, the tortplaintiff sued for an alleged breach of a severance agreement and brought suit alleging breach of contract and negligent misrepresentation. The court of appeals overturned the portion of the judgment dealing with the negligent misrepresentation claim. The court concluded that there was no viable negligent misrepresentation claim because the only injury was the economic loss pursuant to the terms of the contract and therefore sounded in contract, not tort.

The Houston First Court of Appeals addressed the issued in *Farah v. Mafrige & Kormanik,* 927 S.W.2d 663 (Tex.App.—Houston [1st Dist.] 1996, no pet.). The lawsuit involved an alleged legal malpractice claim revolving around a bank's failure to keep its promise to finance a construction business. After the underlying suit was dismissed, the client brought suit against his attorneys claiming that he had a viable negligent, fraud or negligent misrepresentation claim against the bank. The Houston Court of Appeals determined that there was no viable

4

negligent misrepresentation claim. According to the court, the only duties breached were those resulting from the alleged contract between the client and the bank and the only damage was to the subject matter of the alleged contract and therefore the claim sounded in contract not tort.

The instant case falls squarely within the above-cited decisions. In essence, MBA is being sued for negligent misrepresentation as a result of its handling of claims under the agreement between San Benito and MBA. San Benito alleges that MBA breached that agreement and as a result, it was not reimbursed some $800,000.00.

Mr. Janie Gonzales, an employee of San Benito, stated it best:

> My opinion is we paid for our services with MBA to do things the way they should be done, and I don't know whether they did it right or not, but they - - we deserve our money and its - - that's - - that's part of our administrative fees, for them to do - - we trust them to do what's right for the school district.

Gonzalez deposition, page 49, lines 23 – 25; page 50, lines 1 – 17.

The only duty between MBA and San Benito arises out of the contract between the parties. The only damages sought by San Benito are the sums it claims it should have been reimbursed by the stop loss carrier and therefore there is no negligent misrepresentation claim.

Additionally, a claim for negligent misrepresentation is generally recognized in place of a breach of contract claim and is not usually available when a contract was in force between the parties. *Abbott v. Pollack*, 946 S.W.2d 513, 518 (Tex.App.—Austin 1997, writ den.). In this case, there is no dispute that there was a contract in existence as well as a stop loss policy in existence and therefore there can be no negligent misrepresentation claim.

Assuming, without admitting, that a negligent misrepresentation claim exists, MBA is still entitled to summary judgment because Plaintiff cannot establish all the requisite elements.

In order to successfully sustain a negligent misrepresentation claim, the plaintiff must establish: 1) the defendant's making a representation in the course of its business; 2) the defendant supplying "false" information for the guidance of others in their business; 3) the defendant's failure to exercise reasonable care or competence in obtaining or communicating the information; and 4) the plaintiff suffering pecuniary loss by justifiably relying on the representation. *Beal Bank v. Schleider*, 2003 WL 22053855 (Tex.App.—Houston [14th Dist.] 2003, n.p.h.).

In this case, San Benito cannot establish elements 3 and 4.

The real issue in this case is whether the 2000-2001 stop loss policy was going to be administered with "advanced funding." That is, the carrier would reimburse San Benito even if the medical providers had not yet actually received the checks. San Benito alleges that MBA informed it that the policy had advanced funding and that resulted in damages.

Mr. Don Merrill testified that he met with the MGU for the 2000-2001 policy and that the MGU confirmed that the claims would be handled on an advanced funding basis. Deposition of Don Merrill, page 62, lines 8 – 25; page 63, lines 1 – 25; page 64, lines 1 – 8. Copies of Mr. Merrill's cited deposition excerpts are attached hereto as **Exhibit "C."** Mr. Merrill further testified that in his experience, whether the actual policy of insurance contained an advanced funding provision, the carrier or MGU administratively provided advanced funding. Merrill deposition, page 67, lines 14 – 25; page 68, lines 1 – 25. In essence, Mr. Merrill testified that his experience indicated that the vast majority, if not all, of the carriers provided advanced funding and that he had been specifically told by the MGU in this case that they had advanced funding.

6

Mr. Merrill reasonably relied upon the statements by the MGU and his experience and therefore MBA did not fail to exercise reasonable care or competence in obtaining or communicating the information regarding advanced funding to San Benito.

San Benito further alleges that MBA made a misstatement with respect to the subsequent policy. San Benito has conceded that the damages it seeks with respect that claim are identical to the damages sought with respect to the predecessor policy. San Benito has presented no evidence that the claims in question would have been paid by the subsequent carrier and therefore cannot establish damages as a result of the alleged representation.

2.    The Insurance Code Claim Fails As A Matter Of Law.

Local Government Code Section 172.001 *et seq.* governs Texas Political Subdivisions Uniform Group Benefits Program. Section 172.003(3) defines "Political Subdivision" as a county, municipality, special district, school district, junior college district, housing authority or other political subdivision of the state. Accordingly, San Benito's health plan is governed by the Statute.

Section 172.014 Application of Certain Laws provides as follows:

A risk pool created under this chapter is not insurance or an insurer under the Insurance Code and other laws of this state, and the State Board of Insurance does not have jurisdiction over a pool created under this chapter.

In *Coffman v. Scott Wetzel Services, Inc.*, 908 S.W.2d 516 (Tex.App.—Fort Worth 1995, no writ), the court addressed the issue of the applicability of a claim under the Texas Insurance Code to agents of a governmental risk pool. An employee of the City of Colleyville was injured on the job and received benefits pursuant to the City's self-insured workers' compensation plan. The defendant was hired to provide adjusting services for the plan. The employee brought suit against the defendant under the Texas Deceptive Trade Practices Act. The court concluded that

7

there was no cause of action under the Deceptive Trade Practices Act or Insurance Code. The court reasoned that since the plan was not subject to the Insurance Code, the administrators of the plan, as agents of the plan, were also not subject to the Texas Insurance Code.

In this case, there is absolutely no dispute that San Benito is subject to the Act and that MBA was providing services on behalf of San Benito with respect to the health program. Accordingly, the Insurance Code does not apply to the actions of MBA and MBA is entitled to summary judgment on those claim.

WHEREFORE, PREMISES CONSIDERED, Defendant MBA of Wyoming, Inc. and Managed Benefits Administrator and Insurance Consultants, Inc. respectfully pray that their Motion be granted; that the Court enter an Order granting them a take-nothing judgment on the negligent misrepresentation and Texas Insurance Code claims; and for such other and further relief as this Court may deem just and proper.

Respectfully submitted,
**THE GARCIA LAW FIRM, P.C.**
201 North 1st Street
Harlingen, Texas 78550
Telephone: (956) 412-7055
Facsimile:  (956) 412-7105


By: _____
Cindy A. Garcia
State Bar No. 07631710
Lesslie L. Eanes
State Bar No. 24036513

**ATTORNEYS FOR DEFENDANTS**
**MANAGED BENEFITS ADMINISTRATOR**
**AND INSURANCE CONSULTANTS, INC.**
**AND MBA OF WYOMING, INC.**

8

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing, Defendants MBA of Wyoming, Inc. and Managed Benefits Administrator and Insurance Consultants, Inc.'s Motion for Partial Summary Judgment, has been served on all counsel of record, to wit:

Stephen E. Walraven
Shaddox, Compere, Walraven & Good, P.C.
1250 N.E. Loop 410, Suite 725
San Antonio, Texas 78209
**ATTORNEYS FOR PLAINTIFF SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT**

Celeste Guerra
Law Offices of Rene Ramirez
1906 Tesoro
Pharr, Texas 78577
**ATTORNEYS FOR PLAINTIFF SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT**

Shelby J. Bush
Piper Rudnick
1717 Main Street, Suite 4600
Dallas, Texas 75201-4605
**ATTORNEYS FOR DEFENDANT COMPANION LIFE INSURANCE COMPANY**

Roberta Hegland
Bracewell & Patterson, L.L.P.
2000 Once Shoreline Plaza, South Tower
800 N. Shoreline Blvd.0
Corpus Christ, Texas 78403-3700
**ATTORNEYS FOR DEFENDANT J. ALLAN HALL & ASSOCIATES, INC.**


by depositing same in the care and custody of the United States Postal Service, by regular mail, unless otherwise specifically specified herein, on February 13, 2004.

_____
CINDY A. GARCIA

# *Exhibit "A"*

77

```
THE STATE OF TEXAS    }   NO. B-003-047 - SAN BENITO C.I.S.D. v.
                      {   COMPANION LIFE INSURANCE COMPANY,
                      }   et al.; UNITED STATES DISTRICT COURT,
                      {   SOUTHERN DISTRICT OF TEXAS,
COUNTY OF  HIDALGO    }   BROWNSVILLE DIVISION
```

REPORTER'S CERTIFICATION
ORAL DEPOSITION OF JANIE GONZALEZ
JUNE 26, 2003

I, DINA RAMIREZ, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, JANIE GONZALEZ, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _7-25-03_ , to CELESTE GUERRA, Counsel for the witness, for examination, signature and return to me by _8-25-03_ ;

That the amount of time used by each party at the deposition is as follows:

        Mr. Stephen R. Walraven:      0 Hrs., 0 Min.;
        Ms. Celeste Guerra:           0 Hrs., 0 Min.;
        Mr. Shelby J. Bush:           1 Hr., 3 Min.;
        Mr. Fred L. Shuchart:         0 Hrs., 38 Min.;
        Ms. Roberta J. Hegland:       0 Hrs., 0 Min.

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

**ACTION REPORTING**
**4309 N. 10TH, STE. F**
**McALLEN, TX   78504**
**956/631-1024**

78

Attorney for Plaintiff, San Benito Consolidated
    Independent School District:

    HONORABLE STEPHEN R. WALRAVEN
    Shaddock, Compere, Walraven & Good, P.C.
    1250 N.E. Loop 410, Suite 725
    San Antonio, Texas    78209
    &
    HONORABLE CELESTE GUERRA
    Law Office of Rene Ramirez
    1906 Tesoro Blvd.
    Pharr, Texas    78577

Attorney for Defendant, Companion Life Insurance
    Company:

    HONORABLE SHELBY J. BUSH
    Piper Rudnick LLP
    1717 Main Street, Suite 4600
    Dallas, Texas    75201-4605

Attorney for Defendant, Managed Benefits Administrator
    and Insurance Consultants, Inc., and
    MBA of Wyoming, Inc.:

    HONORABLE CINDY A. GARCIA
    The Garcia Law Firm
    201 North 1st Street
    Harlingen, Texas    78550

Attorney for the Defendant, J. Allan Hall and
    Associates, Inc.:

    HONORABLE ROBERTA J. HEGLAND
    Bracewell & Patterson, L.L.P.
    2000 One Shoreline Plaza, South Tower
    800 North Shoreline Boulevard
    Corpus Christi, Texas    78403-3700

    I further certify that I am neither counsel for, related

to, nor employed by any of the parties or attorneys in the

action in which this proceeding was taken, and further that I

am not financially or otherwise interested in the outcome of the action.

Certified to by me this 23rd day of July, 2003.

DINA RAMIREZ, Texas CSR #2267
Expiration Date:  12/31/2003
Action Reporting
P.O. Box 4513
McAllen, Texas    78502
(956) 631-1024

I, JANIE GONZALEZ, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
JANIE GONZALEZ

THE STATE OF TEXAS      }

COUNTY OF ____CAMERON____  {

Before me, __MARGARET CURBELLO__, on this day personally appeared JANIE GONZALEZ, known to me (or proved to me under oath or through __PERSONAL KNOWLEDGE__) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 23RD day of __SEPTEMBER__ , 2003.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS



REPORTER'S FURTHER CERTIFICATION

The original deposition was/was not returned to the deposition officer on _9-25-03_ ; Notary page only returned

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to **SHELBY J. BUSH**, Custodial Attorney;

That $ _442.70_ is the deposition officer's charge to the Defendant, Companion Life Insurance Company, for preparing the original deposition transcript and any copies of exhibits;

That a copy of this certificate was served on all parties shown herein.

Certified to by me this _1st_ day of _October_, 2003.

DINA RAMIREZ, Texas CSR #2267
Expiration Date: 12/31/2003
Action Reporting
P.O. Box 4513
McAllen, Texas    78502
(956) 631-1024

xc:  Mr. Stephen R. Walraven
     Ms. Celeste Guerra
     Mr. Shelby J. Bush
     Ms. Cindy A. Garcia
     Ms. Roberta J. Hegland
     File

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SAN BENITO CONSOLIDATED          )
INDEPENDENT SCHOOL DISTRICT,     (
                                 )
        Plaintiff,               (
                                 )
VS.                              (
                                 )
COMPANION LIFE INSURANCE         (     NO. B-003-047
COMPANY, MANAGED BENEFITS        )
ADMINISTRATOR AND INSURANCE      (
CONSULTANTS, INC., MICHAEL M.    )
SWETNAM, JR., J. ALLAN HALL      (
& ASSOCIATES, INC., AND          (
MBA OF WYOMING, INC.,            (
                                 )
        Defendants.              (

*****************************************************

ORAL DEPOSITION OF

JANIE GONZALEZ

JUNE 26, 2003

*****************************************************

    ORAL DEPOSITION OF JANIE GONZALEZ, produced as a witness

at the instance of the Defendant, Companion Life Insurance

Company, and duly sworn, was taken in the above-styled and

numbered cause on the 26th day of June, 2003, from 2:13 p.m.

to 3:55 p.m., before DINA RAMIREZ, CSR in and for the State of

Texas, reported by oral stenography at the Law Office of Rene

Ramirez, 1906 Tesoro Boulevard, Pharr, Hidalgo County, Texas,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

11

```
 1        Q    So, from the time you began work with the district,

 2   you have overseen the San Benito Consolidated Independent

 3   School District employee benefit plan --

 4        A    Correct.

 5        Q    -- correct?

 6        A    Correct.

 7        Q    Okay.  And, during that nine-year span, has it

 8   always been self-funded?

 9        A    Yes, it has.

10        Q    And has the district been a member of a risk pool

11   during the whole nine-year span?

12        A    Rephrase that question again.

13        Q    Has the school district participated in a risk pool

14   during the whole tenure of your employment?  For the past nine

15   years, have they been a member of a risk pool?

16        A    Yes, they have.

17        Q    And what is your understanding of the need or the

18   purpose of a risk pool?

19        A    My understanding is that the -- if you're in a risk

20   pool, that I believe that means you do not have to go out for

21   bids.

22        Q    Okay.  During your time as an insurance agent, what

23   lines of coverage did you sell?

24        A    Personal lines, which was auto, watercraft,

25   homeowner's, fire policies, windstorm and hail policies, flood
```

49

1     Q     Yeah, that are the issue in the lawsuit.  I mean,

2 did --

3     A     The actual issue claim?

4     Q     Right.

5     A     Say that again.

6     Q     Did Jose ever -- you and Jose have any conversations

7 that said, "You know, it's all MBA's fault we didn't get the

8 money from the insurance company" or -- or -- I'm sorry.  Yes

9 or no.

10     A     No.

11     Q     Okay.  Did he ever say, you know, talk to you along

12 the lines of, "Well, you know, it's the insurance company's

13 fault, but it's also MBA's fault that we didn't get the

14 money"?

15     A     We didn't know whose fault it was.  We just wanted

16 our money back.

17     Q     Okay.  You don't have -- do you have an opinion as

18 to whose fault it is that you didn't get the money you're

19 looking for?

20     A     Do I have any what?

21     Q     Do you have an opinion?

22     A     Oh, an opinion.

23     Q     Yeah, as to whose fault or whose, you know, more

24 than one person's fault it is that you didn't get -- the

25 school district didn't get reimbursed the money you think it

50

1   should have.

2        A    MBA.

3        Q    And what do you base that opinion -- well, what is

4   your opinion?

5        A    My opinion is we paid for our services with MBA to

6   do things the way they should be done, and I don't know

7   whether they did it right or not, but they -- we deserve our

8   money and it's -- that's -- that's part of our administrative

9   fees, for them to do -- we trust them to do what's right for

10  the school district.

11       Q    Okay.  I'm sorry.  Go ahead.  Anything else?

12       A    I'm done.

13       Q    All right.  What in your opinion did they not do

14  right?

15       A    Obviously, as I see today, they've held checks,

16  which that never happened before.  I mean, I'd never seen that

17  ever happen before.  It was not a practice.

18       Q    Are you -- is it your testimony that all these

19  memorandums we went through, Exhibits, basically, 20 through

20  25 with the exception of one other one, that these are the

21  only times -- this is -- this is the only time that MBA held

22  checks?

23       A    That I've seen it in write- -- never, no.  We've

24  been with MBA since 1995 and I've never come across any of

25  that.

*Exhibit "B"*

98

THE STATE OF TEXAS    }    NO. B-003-047 - SAN BENITO C.I.S.D. v.
                      {    COMPANION LIFE INSURANCE COMPANY,
                      }    et al.; UNITED STATES DISTRICT COURT,
                      {    SOUTHERN DISTRICT OF TEXAS,
COUNTY OF HIDALGO     }    BROWNSVILLE DIVISION

REPORTER'S CERTIFICATION
ORAL DEPOSITION OF LORENZO SANCHEZ
JUNE 26, 2003

I, DINA RAMIREZ, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, LORENZO SANCHEZ, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _7-25-03_, to CELESTE GUERRA, Counsel for the witness, for examination, signature and return to me by _8-25-03_;

That the amount of time used by each party at the deposition is as follows:

    Mr. Stephen R. Walraven:    0 Hrs., 0 Min.;
    Ms. Celeste Guerra:         0 Hrs., 0 Min.;
    Mr. Shelby J. Bush:         1 Hr., 31 Min.;
    Mr. Fred L. Shuchart:       0 Hrs., 38 Min.;
    Ms. Roberta J. Hegland:     0 Hrs., 18 Min.

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Attorney for Plaintiff, San Benito Consolidated
    Independent School District:

    HONORABLE STEPHEN R. WALRAVEN
    Shaddock, Compere, Walraven & Good, P.C.
    1250 N.E. Loop 410, Suite 725
    San Antonio, Texas    78209
    &
    HONORABLE CELESTE GUERRA
    Law Office of Rene Ramirez
    1906 Tesoro Blvd.
    Pharr, Texas    78577

Attorney for Defendant, Companion Life Insurance
    Company:

    HONORABLE SHELBY J. BUSH
    Piper Rudnick LLP
    1717 Main Street, Suite 4600
    Dallas, Texas   75201-4605

Attorney for Defendant, Managed Benefits Administrator
    and Insurance Consultants, Inc., and
    MBA of Wyoming, Inc.:

    HONORABLE CINDY A. GARCIA
    The Garcia Law Firm
    201 North 1st Street
    Harlingen, Texas    78550

Attorney for the Defendant, J. Allan Hall and
    Associates, Inc.:

    HONORABLE ROBERTA J. HEGLAND
    Bracewell & Patterson, L.L.P.
    2000 One Shoreline Plaza, South Tower
    800 North Shoreline Boulevard
    Corpus Christi, Texas    78403-3700

    I further certify that I am neither counsel for, related

to, nor employed by any of the parties or attorneys in the

action in which this proceeding was taken, and further that I

100

am not financially or otherwise interested in the outcome of the action.

    Certified to by me this 22nd day of July, 2003.

DINA RAMIREZ, Texas CSR #2267
Expiration Date:  12/31/2003
Action Reporting
P.O. Box 4513
McAllen, Texas    78502
(956) 631-1024

### REPORTER'S FURTHER CERTIFICATION

The original deposition was/was not returned to the deposition officer on 9-25-03 ~~Errata Sheet & Notary Page only returned~~

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to **SHELBY J. BUSH**, Custodial Attorney;

That $ _593.75_ is the deposition officer's charge to the Defendant, Companion Life Insurance Company, for preparing the original deposition transcript and any copies of exhibits;

That a copy of this certificate was served on all parties shown herein.

Certified to by me this _7th_ day of _October_, 2003.

DINA RAMIREZ, Texas CSR #2267
Expiration Date: 12/31/2003
Action Reporting
P.O. Box 4513
McAllen, Texas    78502
(956) 631-1024

xc:  Mr. Stephen R. Walraven
     Ms. Celeste Guerra
     Mr. Shelby J. Bush
     Ms. Cindy A. Garcia
     Ms. Roberta J. Hegland
     File

I, LORENZO SANCHEZ, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
LORENZO SANCHEZ

THE STATE OF TEXAS    }
COUNTY OF _CAMERON_ {

Before me, _JAMIE K. ROBERTS_ on this day personally appeared LORENZO SANCHEZ, known to me (or proved to me under oath or through _TX DRIVERS LICENCE_) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _19TH_ day of _SEPT._, 2003.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

JAMIE K. ROBERTS
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
11-4-2004

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SAN BENITO CONSOLIDATED )
INDEPENDENT SCHOOL DISTRICT, (

       Plaintiff, (

VS. (

COMPANION LIFE INSURANCE (     NO. B-003-047
COMPANY, MANAGED BENEFITS (
ADMINISTRATOR AND INSURANCE (
CONSULTANTS, INC., MICHAEL M. )
SWETNAM, JR., J. ALLAN HALL (
& ASSOCIATES, INC., AND (
MBA OF WYOMING, INC., (

       Defendants. (

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

LORENZO SANCHEZ

JUNE 26, 2003

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    ORAL DEPOSITION OF LORENZO SANCHEZ, produced as a witness

at the instance of the Defendant, Companion Life Insurance

Company, and duly sworn, was taken in the above-styled and

numbered cause on the 26th day of June, 2003, from 10:21 a.m.

to 1:15 p.m., before DINA RAMIREZ, CSR in and for the State of

Texas, reported by oral stenography at the Law Office of Rene

Ramirez, 1906 Tesoro Boulevard, Pharr, Hidalgo County, Texas,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

CERTIFIED COPY

42

1    these kinds of things.  This is the reason that I -- that --

2    to my knowledge that his involvement as far as him having to

3    sign the contract.

4        Q    And the interlocal agreement, you're referring to a

5    risk pool?

6        A    Yes, sir.

7        Q    Okay.  For purposes of being able to provide your

8    employees with a self-funded plan?

9        A    Correct, sir.

10       Q    Okay.  And, in Exhibit No. 10, did you have any

11   problems with Mr. Merrill's statement that -- referring to the

12   contract that the district was getting, that it was an

13   11-month contract, and how did you interpret that statement?

14              MR. SHUCHART:  Objection.  Form.

15       A    I don't see where -- where he says ten-month (sic)

16   contract.  Oh.  You said ten?

17       Q    (Mr. Bush)  I said 11.

18       A    Oh, I'm sorry.

19       Q    That's okay.

20       A    Okay.  Uh-huh.

21       Q    Did you know what he meant when he referred to the

22   contract as an 11-month contract?

23       A    Yes, sir.

24       Q    And what does that mean?

25       A    We're getting some running coverage, and instead of

1                    (Exhibit 14 marked.)

2          Q    (Mr. Bush)  Okay.  Just two more and I'll pass the

3    witness.  Could you identify Exhibit 14, please?

4          A    (Witness reviews document.)  Correspondence from

5    Randy Scott, Director of Claims, copy to Don Merrill,

6    Roy Hutchison, Al Hall, Larry Blagg, addressed to me,

7    letterhead of J. Allan Hall and Associates.

8          Q    What's the date?

9          A    November 7, 2001.

10         Q    Do you recall receiving that letter?

11         A    I don't really recall.

12         Q    Do you have any reason to believe that it's not a

13   true and correct copy of the letter that appears to have been

14   sent to you?

15         A    No, sir.

16         Q    And does that letter in fact discuss the paid claim

17   issue that you and I just discussed?

18         A    That's correct.

19         Q    Okay.  Thank you.

20                    (Exhibit 15 marked.)

21         Q    (Mr. Bush)  And can you identify Exhibit 15, please?

22         A    It's an administrative service agreement.  Has MBA

23   at the bottom.  The pages seem to be initialled by me, signed

24   by me and Don Merrill.

25         Q    So, that is your signature at --

1    A    Yes, sir.

2    Q    -- the page that has SB-00003?

3    A    That's correct.

4    Q    Does that appear to be a true and correct copy of

5    your what I'll refer to as the third-party administrator

6    agreement with MBA?

7    A    Yes, sir.

8    Q    The agreement in many instances refers to ERISA.

9    Are you aware of ERISA?

10    A    I'm fairly familiar with it.

11    Q    And do you know whether or not ERISA has any

12    application to your agreement with MBA and/or your employee

13    benefit plan?

14    A    No, sir, I -- I don't recall that.

15            MR. BUSH:  Okay.  I will pass the witness.

16            MS. GUERRA:  Should we order lunch before you

17    start?

18            MR. SHUCHART:  Yeah, I don't have a problem

19    with that.

20            (Off the record from 12:00 noon to 12:16 p.m.)

21    BY MR. SHUCHART:

22    Q    Good afternoon, Mr. Sanchez.  My name is Fred

23    Shuchart and I'm here on behalf of MBA of Wyoming and Managed

24    Benefits Administrator and Insurance Consultants, Inc.  Do you

25    understand that we're on opposite sides of this lawsuit?

## ADMINISTRATIVE SERVICE AGREEMENT

THIS ADMINISTRATIVE SERVICE AGREEMENT, made and executed by and between San Benito Consolidated Independent School District a Texas Public Entity, hereinafter referred to as the "Plan Sponsor," and MBA of Wyoming, Inc., hereinafter referred to as the "Contract Administrator" for the provision of certain administrative and advisory services with respect to the Employee Medical Benefit Plan (the "Plan").

### RECITALS

The Contract Administrator is engaged in the business of performing services as Employee Benefit Advisors and Administrators. The Plan Sponsor hereby engages the services of the Contract Administrator to provide administration services for San Benito Consolidated Independent School District. For and in consideration of the mutual covenants and the monetary consideration herein recited, it is mutually agreed as follows:

1. ***Services to be Performed.*** The Contract Administrator shall perform for the Plan Sponsor administrative and advisory services in conjunction with the administration and operation of the Plan. The administrative services to be performed by the Contract Administrator and Advisor are set forth in Exhibit "B," attached hereto and by reference made a part hereof for all purposes. The advisory services to be performed by the Contract Administrator are set forth in Exhibit "C", attached hereto and by reference made a part hereof for all purposes.

(a) The services to be performed by the Contract Administrator shall be administerial in nature and shall be performed within the framework of policies, interpretations, rules, practices and procedures made or established by the Plan Sponsor. The Contract Administrator shall not have discretionary authority or discretionary controls respecting management or disposition of the assets of any trust fund and shall not have authority nor exercise any control respecting management or disposition of the assets of any trust fund and shall not render investment advice with respect to any money or other property of any trust fund.

(b) The Contract Administrator will process and pay benefits in accordance with the plan or policy adopted by the Plan Sponsor. It is agreed that the Contract Administrator will incorporate sound business practices and be responsible for reasonable internal audits. Where an error exists, the Contract Administrator shall use reasonable efforts for recovery of any loss resulting therefrom, but will not be required to initiate legal process for any such recovery.

2. ***Limitation of Liabilities and Obligations.*** The Contract Administrator shall have no responsibility, risk, liability or obligation for the funding of the Plan or for failure of the Plan or the Plan Sponsor to obtain or continue insurance coverage or payment of insured benefits. The responsibility and obligation for funding the Plan shall be solely and totally the responsibility of the persons or entities so provided in the Plan. Benefits under the Plan, whether or not fully or partially funded or insured, shall be provided solely by the Plan Sponsor or those persons named in the Plan. MBA shall not be liable for any damages resulting from its good faith application of Plan provisions, including those concerning eligibility, coverage, medical necessity, or benefits; or the failure of Plan participants or beneficiaries to obtain any particular health care as a result of MBA's services. MBA shall not be liable for any recommendations concerning insurance carriers or for the quality or nature of health care provided through health maintenance or preferred provider organizations, whether or not recommended, sponsored, or arranged for by MBA. Contract Administrator shall not be deemed an insurer, underwriter or guarantor with respect to any benefits under the Plan.

3. ***No Fiduciary Authority.*** MBA shall not be deemed a Plan "fiduciary" under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). MBA's services shall not include any power to make any decisions as to Plan policy, interpretations, practices or procedures, but shall be limited to the performance of ministerial functions such as those types described by the Department of Labor in its Regulation § 2509.75-8, D-2 within a framework of policies, interpretations, rules, practices and procedures made or established by the Plan Sponsor. MBA shall have no final discretionary authority or control over Plan management, including authority or control over the management or disposition of any Plan assets, nor final discretionary authority over Plan administration. MBA's services with respect to the Plan shall be subject to review, modification, or reversal by the Plan Sponsor and/or Plan Administrator. Plan Sponsor shall have final authority in determining eligibility of claims. Plan Sponsor acknowledges that excess risk insurance purchased by Plan Sponsor will not provide coverage with respect to claims not eligible under the express terms and conditions of the Plan.

4. ***Independent Contractor.*** It is understood and agreed that MBA is engaged to perform services under this agreement as an independent contractor. The Contract Administrator shall use its best efforts to implement such written instruction, if any, as to policy and procedures which may be given by the Plan Sponsor, provided that such instructions are consistent and compatible with the description of services to be performed by the Contract Administrator and Advisor and are not in violation of or contrary to any laws or regulations, including but not limited to the Employee Retirement Income Security Act of 1974, as amended.

5. ***Plan Sponsor.*** Unless specified in writing otherwise, The Plan Sponsor shall be the Plan Administrator as such term is defined in section 3 (16) of ERISA. Unless the context requires otherwise, the term "Plan Sponsor" or "Plan Administrator" as used in this agreement shall include any corporation, partnership, committee, trustees of a trust, or other

DEPOSITION
EXHIBIT
Sanchez #15
ACTION REPORTING

**MBA**

SB - 00001

DATE 10-10-0?  BY

entity or individual sponsoring or administering the Plan at the time of execution of this agreement and shall also include such additional or successor individuals or entities serving from time to time during the term of this Agreement; provided, however, that when this Agreement calls for direction or notice to be given to MBA by the Plan Sponsor or Plan Administrator, MBA shall be absolutely protected in relying upon any direction or notice received from the person executing ,his Agreement as Plan Sponsor or Plan Administrator.

   6. *Term.* The term of this Administrative Service Agreement is for the period of One year beginning October 1, 2000. At the end of the Contract, if neither party requests a change, the Contract shall be automatically renewed. The fees stated in the Fee Schedule Exhibit are subject to negotiation on the first anniversary date of the contract, or on any monthly due date after the initial one year period, providing the Contract Administrator has given timely notice of the intent to adjust the fees. The new fees would then be in force for one year from the effective date.

   (a) Either party shall have the right to terminate or re-negotiate the contract after the initial one year period by providing to the other party written notice at least thirty (30) days in advance of such termination or re-negotiation of the terms of the contract. In the event that either party gives timely notice of intent to re-negotiate the terms of the contract, the contract shall continue until re-negotiated terms are approved in writing by both parties. After the initial one year period, this contract may be terminated upon thirty (30) days written notice of termination by either party to the other. In the event the Plan account contains a balance which is insufficient to meet the Plan and Plan Sponsor's obligation, the Contract Administrator may terminate this contract upon thirty (30) days written notice. The Contract Administrator will have no further responsibility or obligation hereunder upon the termination of this contract.

   (b) At any time during the initial term or subsequent terms of this agreement that the Plan Sponsor shall fail to meet the financial requirements of the plan, the Contract Administrator may terminate this contract. Notice of intent to Terminate shall be given 30 days in advance of such termination.

   (c) In the event of termination of this contract, if claims are to be processed after the termination date, the fees for services shall be either the specified percentage of claims or dollars per claim, based on the average of fees during the last two months of the contract, as follows:

   100% of the average fees during the first month after termination, 75% the second month, 50% the third month, and 25% thereafter until no further claims are processed, or services required.

   7. *Service Fees.* The Plan Sponsor agrees to pay to the Contract Administrator for the services to be performed hereunder the fees described in the attached Fee Schedule, **Exhibit A**

   8. *Assignment.* This Contract shall not be assigned by the Contract Administrator (its duties, obligations or responsibilities hereunder delegated) to any other person or entity without the prior written approval of the Plan Sponsor.

   9. *Indemnification.* During the continuance of this Agreement, the Contract administrator agrees to indemnify and hold the Plan Sponsor harmless against any and all loss, damage and expense with respect to any acts or omissions wherein it is finally adjudged or willfully acknowledged that the Contract Administrator is guilty of gross negligence, willful misconduct or lack of good faith, but only for those acts or omissions for which MBA is not entitled to indemnification under the following sentence, provided that MBA not be required to indemnify the Plan Sponsor if the Plan Sponsor's acts or omissions contributed to its loss. The Plan Sponsor shall indemnify MBA against expense, loss, claim, or liability, including attorney's fees, arising out of or based upon (a) MBA's or the Plans alleged or actual status as an insurer of insurance company, or provider of benefits; or (b) MBA's alleged or actual status as a Plan fiduciary; (c) acts or omissions of the Plan Sponsor or Plan Administrator, as Plan fiduciaries or otherwise; (d) any acts or omissions of MBA in providing services under this Administrative Services Agreement if made in accordance with the directions of the Plan Sponsor or Plan Administrator in good faith.

   10. *Entire Agreement: Exhibits and Standard Terms and Conditions.* This agreement, the standard terms and conditions and all schedules, exhibits and amendments [sic] hereto, constitutes the entire Agreement among the parties and supersedes all prior proposals, discussions, and writings by and between the parties and related to the subject matter of this agreement. This Agreement may be modified, amended, or supplemented, but only by a written instrument executed by all parties, except that fee adjustments proposed by MBA and not objected to by either the Plan Administrator or Plan Sponsor shall also constitute a binding amendment. The parties acknowledge that the Plan or the Plan Sponsor may have entered into separate agreements with affiliates of MBA for other types of services, but such agreements shall be construed and enforced separately from this agreement.

   11. *Separability.* If any provision if this agreement is held to be illegal or unenforceable, the remaining provisions shall nevertheless remain in full force and effect. In addition, the illegal or unenforceable provision shall be modified so as to conform to the greatest extent legally permissible, to the original intent of such provision.

   12. *Governing Law; Jurisdiction and Venue.* To the extent not preempted by ERISA or other federal law, this Agreement shall be governed by and construed under the laws of the State of Utah. By entering into this Agreement, the Plan Administrator and Plan Sponsor subject themselves to personal jurisdiction in the courts of the State of Utah and agree that Utah is the Only appropriate venue for any action brought to interpret or enforce any provision of this Agreement, or which may otherwise arise under or relate to the subject matter of this Agreement.

**MBA**

DATE /0-10-0  BY

13. *Arbitration.*

(a)If the parties hereto cannot settle grievances or disputes between themselves in an informal and expeditious fashion, each party agrees, upon the motion of the other, to arbitration by the American Arbitration Association (AAA). The Arbitration proceedings shall take place in the city of the responding party. The parties agree that the decision of the arbitrator shall be final and binding with regard to each of them.

(b)The parties shall share equally the AAA administrative fee as well as the arbitrator's fee, if any, unless otherwise assessed by the arbitrator. The administrative fee shall be advanced by the initiating party subject to final apportionment by the arbitrator in his award. The arbitrator's award may be enforced in any court having jurisdiction thereof by the filling of a petition to enforce said award. Costs of filing may be recovered by the party which initiates such action to have the award enforced.

(c)Each party hereto agrees to notify the other at the time a lawsuit is initiated concerning any dispute with any third person or entity that is relevant to any rights, obligations or other responsibilities or duties provided for under this Agreement.

14. *Other Applicable Agreements.* The following agreements are, by this reference incorporated in this agreement:

| Form Number | Plan Sponsor's Initials | Title of Agreement | Date |
|---|---|---|---|
| Exhibit A | _____ | Fee Schedule | 10/01/2000 |
| Exhibit B | _____ | Admin. Services Provided by MBA | 10/01/2000 |
| Exhibit C | _____Not Included_____ | Advisory Services | 10/01/2000 |
| Exhibit D | _____ | HIPAA Administration | 10/01/2000 |

The effective date of this contract specified in Paragraph 6. "Term" shall be the effective date unless otherwise specified here by the Contract Administrator:_____

Plan Sponsor  **San Benito Consolidated Independent School District**

By _____    Title _____    Date  *10-10-00*

**MBA of Wyoming, Inc./MBA of Wyoming, Inc.**

By _____    Title _____    Date  *10-10-00*

**MBA**

MBA-ASA/1993
Page 3 of 8

DATE _____ BY _____

## Standard Terms and Conditions

1.    ***Records and Files.*** The Contract Administrator shall maintain all records in conjunction with the administrative services to be performed hereunder. The confidentiality of such records shall be maintained by the Contract Administrator and the information therein shall not be divulged or disclosed or made available to persons other than the Plan Sponsor without the prior written approval of the Plan Sponsor or a court of competent jurisdiction. In the event of the termination of this Contract, the Contract Administrator shall deliver to the Plan Sponsor, upon written request, at a time period mutually agreeable, but not to exceed six months from date of termination, the information on all claims histories for the past two years. If the claim history is requested, the Plan Sponsor will pay all costs incurred by the Contract Administrator in providing such information, (including the production of same), cost of programming, computer charges, mailing costs, etc. The Contract Administrator shall be entitled to retain copies of any such records at his own expense.

2.    ***Legal and Accounting Services.*** MBA's services shall not include the provision of legal services or the services or independent certified public accountants. MBA shall have no liability for the quality or cost of any services so provided, whether or not services provided by professional advisors were recommended, sponsored, or arranged for by MBA.

3.    ***Enforcement.*** MBA shall have no responsibility or obligation to take action, legal or otherwise, against any employer or employees or other persons to enforce provision of the Plan. In the event that the Plan Sponsor desires to engage in the services of the Contract Administrator for such purposes, such services shall be engaged and rendered only pursuant to a separate written agreement between the parties.

4.    ***Investments.*** MBA shall not be responsible or obligated for the investment of any assets or funds of the Plan. However, the Contract Administrator agrees to prepare and maintain records of the investment of the assets or fund of the Plan if the Plan Sponsor requests the Contract Administrator to do so and provides the information and documents necessary to prepare and maintain such records. MBA shall not render any investment advice with respect to Plan assets or have any authority or responsibility to do so.

5.    ***Costs and Expenses; Taxes.***
    (a) As a part of the services to be performed by the Contract Administrator, the Contract Administrator and Advisor shall maintain and operate an administrative office for such purposes and to pay all normal costs and expenses for such maintenance and operation (except as herein set forth).
    (b) The Contract Administrator shall employ a sufficient staff of employees or others to provide the administrative and advisory services to be performed by the Contract Administrator hereunder. However, the Contract Administrator will not provide or be responsible for the expenses and cost of legal counsel, actuaries, consulting physicians or dentists, certified public accountants, investment counselors, investment analysts or similar type services performed for the Plan Sponsor; the Contract Administrator shall not be authorized to engage such services or incur any expense or cost thereof.
    (c) The Plan or the Plan Sponsor shall be responsible for all other costs and expenses of Plan establishment and administration including legal, accounting and other professional fees. The Plan or the Plan Sponsor shall also be responsible for the payment or reimbursement to MBA of any and all taxes relating to the Plan, including any sales or use taxes or taxes in lieu thereof, and any related penalties, interest or expenses of MBA, imposed upon or incurred, or required to be collected by MBA.

6.    ***Tax, ERISA, and COBRA Compliance.*** MBA shall not be responsible for establishing or maintaining the Plan or the Plan Sponsor in compliance with federal or state taxing statutes, ERISA, COBRA, or other applicable state or federal laws or regulations, or for obtaining any tax benefits that may be available to the Plan Sponsor, the Plan, or the Plan participants. MBA may provide, whether or not so specified under the Description of Services Exhibit, Plan documents, summary Plan descriptions, and/or administrative forms, but makes no representations or warranties as to their legal sufficiency. The Plan Sponsor or Plan Administrator shall have the final authority and responsibility for approving the form and content of all Plan documents and forms.

7.    ***Plan and Fee Changes.*** Any changes in the Plan, found to be compatible with existing systems and procedures and approved by the Contract Administrator which requires additional programming, reports or services, will be at the expense of the Plan Sponsor. The Plan Sponsor agrees to make changes in benefits only at the beginning of the Plan Year, allowing thirty (30) days prior notice to the Contract Administrator. Exceptions must be agreed upon by the Contract Administrator.

## MBA

## EXHIBIT A

### Fee Schedule

For: San Benito Consolidated Independent School District
Effective: October 1, 2000

Administrative Fees to Cover:

| | | | |
|---|---|---|---|
| Life Insurance | [X] | Short Term Disability | [ ] |
| Medical | [X] | Pre-Cert (Critique) | [X] |
| | | Other: | |
| Dental | [X] | HIPAA | [X] |
| Vision Care | [ ] | COBRA | [X] |
| | | Document Changes (off anniversary date) | [ ] |

Fee Method and schedule:

MBA Administration Fees are $ 12.60/ee/month. HIPAA Administration Fees are $ .35/ee/month. Reinsurance Broker Fees $ 2.00/ee/month. Ethix Southwest PPO Fees are $ 3.20/ee/month. Lonestar Interlocal 2 million excess is $ 1.00/ee/month.

| **Amended** | **Date** | **Schedule** |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**MBA**

DATE _10-10-00_ BY

**SB - 00005**

## EXHIBIT B

**Administrative Services Provided By MBA**

Administrative Services For: San Benito Consolidated Independent School District
Effective: October 1, 2000

1. Provide an automated Computer System for the processing of health claims.

2. Furnish standard administrative internal forms to include:

    A. Standard Explanation of Benefits.
    B. Standard Claim Form.
    C. Standard Enrollment Forms.

3. Coordinate with the Plan Sponsor the custom design and printing of other supplies specifically for the Plan Sponsor. These will be at the Plan Sponsor's expense. Including but not limited to the following:

    A. Bank Drafts or Checks and Deposit Slips.
    B. Employee Identification Cards.
    C. Employee Plan Booklets.

4. Provide a standard monthly plan premium billing satisfactory to meet the needs of the Plan Sponsor.

5. Provide the Plan Sponsor with instructions for reporting employee eligibility.

6. Provide Customer Service for the Plan Sponsors employees.

7. Provide assistance in the preparation of Plan Document and Summary Plan Description

8. Review, coordinate and process all claims. Prepare all checks or drafts for disbursement from the fund with documentation to support these disbursements. The Plan Sponsor elects to have these disbursements _____

9. Provide standard claims analysis reports.

    Monthly Reports:_____

    A. Claims Experience Report.
    B. Monthly Fund Report.
    C. Monthly Check Register.

    Special Reports to be provided:

    | | Name of Report | Frequency |
    |---|---|---|
    | A. | Fund & Claims Report | Quarterly |
    | B. | | |
    | C. | | |

10. Provide appropriate renewal documentation and financial analysis.

11 Provide the necessary data to the Plan Sponsor for preparation of ERISA reports and filings.

12. Attend meetings with the Plan Sponsor as necessary for proper administration of the Plan.

**MBA**

DATE _____ BY _____

**SB - 00006**

# EXHIBIT C

**Advisory Services**

For: San Benito Consolidated Independent School District
Effective: October 1, 2000

1.   Advise and assist in the design of client administrative forms.

2.   Provide a review of marginal or questionable claims.

3.   Provide information relative to the Plan alternatives.

4.   Advise as to the contribution levels for the present benefits.

5.   Provide evaluation and underwriting relative to contract provisions and changes.

6.   Counsel with the Plan Sponsor concerning the financial status of the Plan to assure proper accumulation of reserves.

7.   Provide medical cost data and medical cost trends which would aid in plan benefit design.

8.   Coordinate with legal counsel and others in regards to ERISA requirements and information.

9.   Provide competitive bidding of various insured plans.

10.  Act as "Agent of Record" on the following coverage:

_____

_____

_____

_____

**MBA**

DATE _____ BY _____

**SB - 00007**

## EXHIBIT D

**HIPAA Administration**

Foᴦ:  San Benito Consolidated Independent School District
Effective: October 1, 2000

This exhibit constitutes an amendment to the Administrative Service Agreement between MBA of Wyoming, Inc. as of the date subscribed herein subject to the terms and conditions set forth in the Administrative Service Agreement in force at the date of this agreement.

**Certificate of Coverage Administration:**

Includes administrative processing, set up, preparation and mailing of Certificates of Coverage to all individuals who lose coverage under the medical plan or COBRA.

|  |  |
|---|---|
| As a fee per employee per month for HIPAA | $ .35/Ee/Mo |
| As a fee per employee per month for COBRA | $ 21.50/Certificate |

The undersigned elects to have MBA provide HIPAA Administration Services, as limited in the specifications above, and agrees to defend and hold MBA harmless from and against all claims, damages, or losses, including but not limited to all cost of defense and attorney fees, which are a result of clients' inaccuracy, delay or failure to provide all information necessary for MBA to properly administer the above.

_____          _10 – 10 – 02_____
Plan Sponsor                                              Date

_____
Authorized Signature

_____
Title

**MBA**

*Exhibit "C"*

# REPORTER'S CERTIFICATE

State of Utah    )
                 ss.
County of Utah   )

      I, Vicky McDaniel, a Registered Merit Reporter and Notary Public in and for the State of Utah, do hereby certify:

      That on **July 21, 2003**, prior to being examined, the witness, **Don William Merrill**, was duly sworn by me to tell the truth, the whole truth, and nothing but the truth;

      That the testimony of said witness was reported by me in stenotype and thereafter transcribed, and that a full, true, and correct transcription of said testimony is set forth in the preceding pages.

      I further certify that I am not of kin or otherwise associated with any of the parties of said cause of action and that I am not interested in the outcome thereof.

      WITNESS MY HAND and OFFICIAL SEAL at Draper, Utah, this 26th day of July, 2003.


_____
Vicky McDaniel, RMR
Utah License No. 87-108580

NOTARY PUBLIC
VICKY MCDANIEL
911 F PAVILION CIRCLE
SARATOGA SPRINGS, UT 84043
MY COMMISSION EXPIRES
DECEMBER 28, 2006
STATE OF UTAH

```
1   Case:  San Benito v. Companion Life
    Case No.:  B-03-047
2   Reporter:  Vicky McDaniel
    Date taken:  July 21, 2003
3
                    WITNESS CERTIFICATE
4
5       I, Don William Merrill, HEREBY DECLARE:

6           That I am the witness referred to in the
    foregoing testimony; that I have read the transcript
    and know the contents thereof; that with these
7   corrections I have noted, this transcript truly and
    accurately reflects my testimony.
8
```

| PAGE-LINE | | CHANGE/CORRECTION | REASON |
|---|---|---|---|
| 7 | 20 | "No, BYU" | Correction |
| 15 | 24 | strike "in Salt Lake" | Delete |
| 15 | 25 | strike "CSI;" add "with MBA as TPA." | Add |
| 17 | 25 | "..correct (name.) That's not..." | Insert |
| 113 | 4 | change "mass" to "MATTS" | Correction |
| 114 | 2 | change "I" to "they" | Change |
| 159 | 2 | strike "Fred S." | Delete |
| 167 | 3 | strike "or an expense" | Delete |
| 167 | 4 | strike "occasion." | Delete |

```
16      _____   No corrections were made.

17      I, Don William Merrill, hereby declare under the
    penalties of perjury of the laws of the United States
    of America and the laws of the State of Utah that the
18  foregoing is true and correct.

19                          _____
                            Don William Merrill
20
21      SUBSCRIBED and SWORN to at Granite Credit Union,
    _____, this 26 day of August,
22  2003.

23                          VALERIE A. MILLER
                            NOTARY PUBLIC • STATE OF UTAH
                            5061 South 5450 West
                            Kearns, UT 84118
                            My Comm. Exp 9-1-2004
24                          _____
25                          Notary Public
```

CitiCourt, LLC
(801) 532-3441

COPY OF TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, | ) ) Deposition of: |
| Plaintiffs, | ) ) **DON WILLIAM MERRILL** ) ) ) |
| vs. | ) ) |
| COMPANION LIFE INSURANCE COMPANY, MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS, INC., J. ALLAN HALL & ASSOCIATES, INC., and MBA OF WYOMING, INC., | ) ) ) ) ) ) |
| Defendants. | ) Civil Action No.: B-03-047 ) ) |

**July 21, 2003 - 9:06 a.m.**

Location: Offices of CitiCourt Reporting
50 S. Main, Suite 830
Salt Lake City, Utah

Reporter: Vicky McDaniel, RMR
Notary Public in and for the State of Utah


**CitiCourt,** LLC
THE REPORTING GROUP

50 South Main, Suite 830
Salt Lake City, Utah 84144

801.532.3441    TOLL FREE 877.532.3441    FAX 801.532.3414

Don William Merrill - 7/21/03

```
 1        A.    It's very common.

 2        Q.    Is it more common than any other

 3   arrangement, in your experience?

 4        A.    Yes.

 5        Q.    Could you estimate for me the percentage of

 6   time, in your experience, that stop loss insurance is

 7   provided with this advance funding arrangement?

 8        A.    To be truthful, all of the time, because I

 9   don't know a carrier out there that doesn't advance the

10   payments of claims and yet never go -- they never go

11   out and look at whether the claim was received by the

12   provider or not.

13        Q.    Other than the matter with Companion Life

14   that we're going to talk about in a minute, have you

15   ever encountered a situation or a discussion with a

16   broker or an MGU or a carrier about whether or not

17   advance funding was or was not going to be provided?

18        A.    Very much so.  This was always a subject

19   with every sales organization we ever talked to.

20   Consolidated continually emphasized the very fact that

21   advance funding existed.

22        Q.    And when you say Consolidated, you're

23   talking about Mr. Douglas Routh?

24        A.    Doug Routh's organization.

25        Q.    And was he specific in his discussion of
```

```
 1    this topic with you as far as the situation with J.

 2    Allan Hall, Companion Life, and San Benito?

 3         A.    Yes.  We actually --

 4               MS. HEGLAND:  Object to form.

 5         A.    J. Allan Hall actually was coming through

 6    the Salt Lake area again to our office.  So we had

 7    Mr. Routh in the office.  Doug felt that he should come

 8    up.  Phyllis Merrill was in the meeting, Clark Merrill

 9    was in the meeting, and we had a discussion relative to

10    the way in which J. Allan Hall handled advance funding.

11         Q.    And who is Clark Merrill?

12         A.    He's my son.

13         Q.    What's his position with the MBA entities?

14         A.    At the time he was in sales.

15         Q.    And --

16         A.    He's no longer with the firm.

17         Q.    But he participated in these conversations?

18         A.    Yes.

19         Q.    And Mr. Hall was here?

20         A.    Mr. Hall was in the office, yes.

21         Q.    Anyone else?

22         A.    No.

23         Q.    And this conversation was specific to

24    Companion Life stop loss coverage for San Benito?

25         A.    Specific to any carrier that J. Allan Hall
```

Don William Mespich 02/13/2003

```
 1    handled.
 2         Q.    And as best you recall, what was it that
 3    Mr. Hall told you on this subject?
 4         A.    Mr. Hall assured us that the advance funding
 5    method, and I don't recall exactly how they were
 6    handling it, would be part of their contract.  And as
 7    long as they were paying claims, they would honor that
 8    advance funded program.
 9         Q.    And did you prepare a memorandum of that
10    conversation?
11         A.    I probably did.
12         (Exhibit 29 marked.)
13         Q.    Let me show you what's been marked as
14    Exhibit 29 to your deposition and ask you to take a
15    look at that and tell me what it is.
16         A.    It's a document that I just put in the file,
17    a memorandum to the file relative to the meeting, which
18    was May 25th, 4 p.m., and just showed who was in
19    attendance and the very fact that we were assured that
20    the checks would be processed and paid if they were
21    shown as paid by our computer, and then the specific
22    would be reimbursed.
23         Q.    So is that a memorandum of the conversation
24    you were just describing for me?
25         A.    Yes.
```

```
 1    connection with stop loss insurance that does not
 2    provide for this advance funding feature that you've
 3    described?
 4         A.    No.
 5         Q.    In your experience, are there different
 6    types of stop loss agreements that address the
 7    situation of whether or not advance funding is included
 8    in the agreement or not?
 9         A.    I'm aware that there are more than -- a lot
10    of old contracts that existed clear back from the
11    property and casualty area which was a true
12    reimbursement only.  That's not what is going on at the
13    present time.
14         Q.    And have any of the contracts that were
15    administered as pure reimbursement been anything you've
16    dealt with, say, in the last ten years?
17         A.    I've seen those contracts but would always
18    fall to what we were told by the claims processing
19    entity, such as J. Allan Hall.  And if they said there
20    was advance funding by the format or the administrative
21    service agreement or administration procedures that
22    they were following, then we went on their word.  And
23    if they said that's what they were doing and we had
24    seen them doing that for multiple years, we believed
25    that their work was valid and that we would follow
```

```
 1   that.
 2        Q.    And you say you've been dealing, or began
 3   dealing with J. Allan Hall approximately ten years ago?
 4        A.    Well, I was aware of him and dealt with him
 5   over a period of time.  I was aware of his name.  Not
 6   with San Benito, but --
 7        Q.    In '99, 2000 when you were talking to
 8   Mr. Hall and when you were talking to San Benito, did
 9   you have experience with the way J. Allan Hall
10   processed claims?
11        A.    Yes.
12        Q.    And did you have several years' experience
13   with the way they processed claims?
14        A.    Yes.
15        Q.    And had they always provided advanced
16   funding?
17        A.    That's correct.
18        Q.    And were you aware -- strike that.  Had J.
19   Allan Hall been providing stop loss insurance through
20   Companion Life, in your experience, prior to that time?
21        A.    I don't know that.
22        Q.    But for whomever they were processing
23   claims, they always handled them the same way with
24   respect to advance funding?
25        A.    Yes.
```