IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

FEB 1 7 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT | § § § | |
| Plaintiff, | § § | |
| v. | § § | NO. B-003-047 |
| COMPANION LIFE INSURANCE COMPANY, MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS, INC., MICHAEL M. SWETNAM, JR., J. ALLAN HALL & ASSOCIATES, INC., AND MBA OF WYOMING, INC. | § § § § § § § § | |
| Defendants. | § § | |

========================================================================

**DEFENDANT COMPANION LIFE'S MOTION FOR SUMMARY JUDGMENT
AND BRIEF IN SUPPORT**

========================================================================

Respectfully submitted,

PIPER RUDNICK LLP

Shelby J. Bush
State Bar No. 03497045

1717 Main Street, Suite 4600
Dallas, Texas 75201
(214) 743-4500 (telephone)
(214) 743-4545 (facsimile)

COUNSEL FOR DEFENDANT
COMPANION LIFE INSURANCE COMPANY

TABLE OF CONTENTS

I.   SUMMARY OF ARGUMENT ...................................................................................2

II.  SUMMARY OF PLAINTIFF'S CLAIMS ...........................................................2

III. SUMMARY JUDGMENT PROOF ........................................................................5

IV.  SUMMARY JUDGMENT STANDARD...............................................................5

IV.  BACKGROUND ..................................................................................................6

   A.  The SBCISD-Companion Life Stop-Loss (Reinsurance) Contract ................................6

       1.  SBCISD is a Self-Insurer. ..................................................................................6

       2.  The Meaning of Reinsurance. ............................................................................7

       3.  The Relationship Between Self-Insurer and a Reinsurance Policy. .........................7

       4.  Examples of the Texas Insurance Code Characterizing Stop-Loss
           Contracts as Reinsurance Contracts. ...............................................................8

V.   UNDISPUTED SUMMARY JUDGMENT EVIDENCE ...................................10

VI.  ARGUMENT AND AUTHORITIES..................................................................12

   A.  Any Cause of Action is Limited to Breach of Contract..............................................12

       1.  Relationship of the Parties and Source of Duties Arises Out of Contract .............12

       2.  Nature of the Remedies Sought by SBCISD is Economic Loss............................13

       3.  DeLanney Confines this Case to a Contract Case ...............................................13

   B.  SBCISD Cannot Recover Under the Contract Because It Failed To Satisfy All
       Conditions Precedent ...............................................................................................15

       1.  Ignorance is not bliss. ....................................................................................15

       2.  No Reimbursement Is Due Because Claims Were Not Paid Prior to the
           End of the Contract Year. ...............................................................................16

   C.  Alternatively, SBCISD's Cause of Action for Negligent Misrepresentation
       Must Fail ..................................................................................................................17

       1.  No Evidence Exists That Companion Life, Or Its Agent, Ever
           Communicated With SBCISD; In Fact, It's Not Even Alleged............................17

i

D. The Texas Insurance Code Does Not Apply..............................................................18

    1. Companion Life's Contract Is A Reinsurance Contract Not An Insurance Policy Governed by the Texas Insurance Code. ......................................................18

    2. The Texas Local Government Code Expressly Precludes Application of the Texas Insurance Code Due to Plaintiff's Status As A Risk Pool......................20

E. Amendment of the Contract, Without Written Approval, Is Prohibited......................23

    1. The Contract Specifically Provides No Amendment Unless in Writing ...............23

    2. Course of Dealing Will Not Override Contract. ....................................................23

VII. CONCLUSION .........................................................................................................24

~DALLDOCS:180425

# TABLE OF AUTHORITIES

**Cases**

*Bridges v. Texas A&M. Univ. Sys.*, 790 S.W.2d 831 (Tex. App—Houston [14th Dist.] 1990) .... 23

*Cash America Pawn, L.P. v. Federal Express Corp.*, 109 F.Supp.2d 513 (N.D. Tex. 2000)....... 23

*Celotex Corp. v. Catrett*, 477 U.S. 317 325 (1986) ........................................................................ 6

*Clyde A. Wilson Int'l Investigators, Inc. v. Travelers Ins. Co.*, 959 F.Supp. 756, 763
  (S.D. Tex. 1997)............................................................................................................... 15

*Coffman v. Scott Wetzel Servs., Inc.*, 908 S.W.2d 516 (Tex. App.—Fort Worth 1995)............... 22

*Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12 (Tex. 1996) .............................................................. 14

*D.S.A., Inc. v. Hillsboro Indep. School Dist.*, 973 S.W.2d 662, 663 (Tex. 1998) ....................... 14

*DeWitt County Elec. Co-op. v. Parks*, 1 S.W.3d 96, 105 (Tex. 1999).......................................... 14

*E-Z Mart Stores, Inc. v. Hale*, 883 S.W.2d 695, 700 (Tex. App.—El Paso 1994, writ denied)..... 8

*Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991) ........................................... 17

*Formosa Plastics Corp. v. Presidio Engineers and Contractors, Inc.*,
  960 S.W.2d 41 (Tex. 1998)............................................................................................. 14

*Great Atlantic Life Ins. Co. v. Harris*, 723 S.W.2d 329, 332
  (Tex. App.—Austin 1987, writ dism'd).......................................................................... 20

*Houston Cas. v. Underwriters at Lloyd's London*, 51 F. Supp.2d 789, 796 n. 7
  (S.D. Tex. 1999).............................................................................................................. 19

*Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617 (Tex. 1986) .................................................... 13

*M Corp v. Clarke*, 755 F. Supp. 1402, 1423 (N.D. Tex. 1991) ...................................................... 6

*Ohio Government Risk Mgt. Plan v. County Risk Sharing Auth., Inc.*, 719 N.E.2d 992 (1998) .... 7

*Robles v. Consolidated Graphics, Inc.*, 965 S.W.2d 552, 560
  (Tex. App. – Houston [14th Dist.] 1997, pet. denied) ............................................... 13, 14

*Southwestern Bell v. DeLanney*, 809 S.W.2d 493 (Tex. 1991) .............................. 2, 13, 14, 15, 24

*Speaks v. Trikora Lloyd P.T.*, 838 F. 2d 1436, 1438-39 (5th Cir. 1988) ........................................ 6

~DALLDOCS:180425

*Stradley v. Southwestern Life Ins. Co.*, 341 S.W.2d 195, 198
    (Tex. Civ. App.—Dallas 1960, writ ref'd n.r.e.) ........................................................... 19

*Voluntary Hosp. of Am. v. National Union Fire Ins. Co.*, 859 F. Supp. 260, 261
    (N.D. Tex. 1993), aff'd, 24 F. 3d 239 (5th Cir. 1994) ................................................. 5

**Statutes**
Tex. Ins. Code Art. 21.21 .................................................................................... 2, 20, 21

TEX. INS. CODE art. 21.28-D ................................................................................... 9

TEX. INS. CODE art. 26.02 ...................................................................................... 9

TEX. INS. CODE art. 3.95-1.6 .................................................................................. 9

TEX. INS. CODE art. 4.11 § 2 (c) .............................................................................. 9

TEX. INS. CODE art. 5.75-1 ..................................................................................... 9

TEX. LOC. GOV'T CODE § 172 ......................................................................... 20, 21, 22

**Other Authorities**
*Appleman on Insurance*, § 2.18 (2nd ed. 1996) ................................................... 6, 7, 8

**Rules**
Fed. R. Civ. P. 56(c) ............................................................................................. 5

~DALLDOCS:180425

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SAN BENITO CONSOLIDATED | § | |
| INDEPENDENT SCHOOL DISTRICT | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | NO. B-003-047 |
| | § | |
| COMPANION LIFE INSURANCE | § | |
| COMPANY, MANAGED BENEFITS | § | |
| ADMINISTRATOR AND | § | |
| INSURANCE CONSULTANTS, INC., | § | |
| MICHAEL M. SWETNAM, JR., | § | |
| J. ALLAN HALL & ASSOCIATES, | § | |
| INC., AND MBA OF WYOMING, INC. | § | |
| | § | |
| **Defendants.** | § | |

## DEFENDANT COMPANION LIFE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Defendant Companion Life Insurance Company ("Companion Life") files this Motion for Summary Judgment and Brief in Support on San Benito Consolidated Independent School District's ("SBCISD" or "Plaintiff") claims for violations of the Texas Insurance Code, negligent misrepresentation, and breach of contract, and as grounds therefor, respectfully shows the Court as follows:

- **PLAINTIFF's position was galvanized in its response to the following question:**

> **Q.  Okay.  You don't have – do you have an opinion as to whose fault it is that you didn't get the money you're looking for?**
> > *            *            *
> **A.    MBA**

*Deposition of Janie Sanchez, Insurance Coordinator for San Benito C.I.S.D.*, pp. 49-50, June 26, 2003.  Notably, SBCISD's Insurance Coordinator does not place blame on Companion Life.

# I.
## SUMMARY OF ARGUMENT

Despite the fact that SBCISD brainstormed every conceivable cause of action (and some, inconceivable) to raise in this matter, the case remains a contract case. The relationship between the parties arises from a contract. The source of any duty owed by Companion Life to SBCISD arises from a contract. The remedies sought by SBCISD are classic contract damages. The Texas Supreme Court has emphatically refused to allow parties to turn contract cases into anything other than a contract claim. *Southwestern Bell v. DeLanney*, 809 S.W.2d 493 (Tex. 1991). Under *Southwestern Bell* and its progeny, SBCISD has only a contract claim against Companion Life. Additionally, as SBCISD has taken advantage of the Texas Local Government Code to provide its employees health insurance as a "self-insurer", it cannot seek redress under the Texas Insurance Code as an "insured". Finally, SBCISD failed to satisfy all conditions precedent, namely payment of the underlying claims, to trigger any reimbursement by Companion Life under the contract.

# II.
## SUMMARY OF PLAINTIFF'S CLAIMS

In its First Amended Complaint ("Complaint"), SBCISD asserts four causes of action against Companion Life. All causes of action must be summarily dismissed as there exists no genuine issue as to any material fact and Companion Life is entitled to summary judgment as a matter of law. Specifically, SBCISD asserts as follows:

First, SBCISD alleges that all Defendants have violated the provisions of Tex. Ins. Code Art. 21.21, including but not limited to, the following:

1.      Misrepresenting the terms of the policy issued by Companion Life.

2.   In misrepresenting to the Plaintiff material facts and policy provisions relating to coverages at issue.

3.   In making untrue statements of material fact.

4.   In failing to state a material fact that is necessary to make other statements made not misleading, considering the circumstances under which the statements are made.

5.   In making a statement in such a manner as to mislead a reasonably prudent person to a false conclusion of a material fact.

Notably, however, both Lorenzo Sanchez and Janie Gonzalez, those two individuals with SBCISD who had any dealings at all with the procurement and execution of the stop-loss contract at issue (the "Contract"), deny that Companion Life ever made any representation, much less a false one, to SBCISD. SBCISD's fallback position is that Companion Life or its managing general underwriter, J. Allan Hall & Associates ("Hall"), made such misrepresentations to SBCISD's agent, MBA of Wyoming. This cause of action, however, is not like a spawning salmon – it does not swim upstream. A communication to one's agent is not actionable if that agent does not convey that communication to its principal (thus allowing the principal to rely to his detriment), which is the case here assuming such representations were made, which Companion Life denies. Still further, the Texas Local Government Code mandates that the Texas Insurance Code does not apply in situations such as this as SBCISD is acting with an intergovernmental risk pool. Still further, separate and apart from the Texas Local Government Code, the Texas Insurance Code does not apply to this stop-loss policy. This cause of action must be dismissed.

Second, SBCISD alleges that Hall made negligent representations, each of which were a proximate cause of Plaintiff's damages, including but not limited to representing to MBA that Companion Life would provide advanced funding for covered medical expenses incurred by

SBCISD's employees, and their dependents, even though MBA had not paid these covered medical expenses prior to seeking reimbursement from Companion Life.  Plaintiff alleges that Companion Life is vicariously liable for the conduct of Hall.  The cause of action fails for the simple reason that no representation was made to SBCISD – this is not even alleged.  As discussed above, even had Companion Life's agent represented such to MBA, SBCISD's agent, MBA, never conveyed such information to SBCISD so that it could have relied upon any such representation to its detriment.  Still further, SBCISD is barred from bringing this cause of action under the "independent injury doctrine" as any and all damages originate from the Contract. This cause of action must be dismissed.

Next, SBCISD alleges that the Contract was amended.  Specifically, SBCISD alleges that MBA and Companion Life's agent, Hall, had followed a practice and course of dealing over several years of reimbursing claims without first requiring that checks had been mailed to health care providers.  SBCISD alleges that such course of dealing constitutes a modification of the written contracts and/or estops Companion Life from asserting otherwise.  SBCISD further alleges that it and MBA acted in reasonable reliance on this course of dealing, in how MBA processed the claims and that Companion Life's refusal to pay such claims is a breach of contract, as modified, and "a breach of its obligations under promissory estoppel." Unfortunately, however, neither the law nor the evidence supports this cause of action.  The Contract clearly provides that no oral representations, and anything short of a written modification, will suffice to amend the contract.  Still further, the evidence does not support any such course of dealing.

Finally, SBCISD alleges that Companion Life has violated the provisions of Tex. Ins. Code, Art. 21.55 including but not limited to the failure to reimburse the School District for the

covered claims of certain employees and/or their dependents when these claims exceeded $75,000. As indicated above, SBCISD cannot bring a claim under Art. 21.55 of the Texas Insurance Code because the Texas Local Government Code precludes such. Alternatively, art. 21.55 of the Texas Insurance Code does not apply to reimbursement claims under stop-loss contracts. This cause of action must be dismissed.

## III.
## SUMMARY JUDGMENT PROOF

This Motion for Summary Judgment is supported by the following undisputed evidence:

1.    The Deposition of Lorenzo Sanchez, relevant excerpts attached as <u>Exhibit A</u>;

2.    The Deposition of Janie Gonzalez, relevant excerpts attached as <u>Exhibit B</u>;

3.    SBCISD and Companion Life stop-loss contract attached <u>as Exhibit C</u>;

4.    Plaintiff's First Amended Complaint attached as <u>Exhibit D</u>; and

5.    Proposal for Excess Loss Coverage attached as <u>Exhibit E</u>.

## IV.
## SUMMARY JUDGMENT STANDARD

The well-known summary judgment standard found in Rule 56(c), Fed. R. Civ. P., provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Voluntary Hosp. of Am. v. National Union Fire Ins. Co.*, 859 F. Supp. 260, 261 (N.D. Tex. 1993), aff'd, 24 F. 3d 239 (5th Cir. 1994). Once the movant carries this burden, the burden shifts to the non-movant to show that summary judgment should not be granted. *Celotex Corp.*

*v. Catrett*, 477 U.S. 317 325 (1986). The district court should grant summary judgment when it appears from the record that there is no genuine issue of a material fact and the moving party is entitled to judgment as a matter of law. *Speaks v. Trikora Lloyd P.T.*, 838 F. 2d 1436, 1438-39 (5th Cir. 1988). *See also M Corp v. Clarke*, 755 F. Supp. 1402, 1423 (N.D. Tex. 1991) (summary judgment proper when facts point so strongly and overwhelmingly in favor of one party that reasonable men could not arrive at contrary verdict).

## IV.
## BACKGROUND

**A.    The SBCISD-Companion Life Stop-Loss (Reinsurance) Contract**

**1.    SBCISD is a Self-Insurer.**

SBCISD administers and sponsors an employee health benefit plan as a self-funded (as opposed to a fully insured) plan. Nevertheless, SBCISD argues that the Contract is not a reinsurance contract because SBCISD is not an insurer. *See SBCISD's Response to Hall's Motion for Summary Judgment, at p. 6.* But SBCISD's practice of self-insuring is a form of insurance. *See* 1 Eric M. Holmes & Mark S. Rhodes, *Appleman on Insurance*, § 2.18 (2nd ed. 1996)(explaining the difference between no insurance and self insurance).

"Noninsurance" is a situation where "a potential insured has a considerable number of similar risks that are small in relation to the size of the insured's business, that entity may determine that it is more convenient not to insure but simply pay losses out of its current assets." *Id.* Whereas, "self-insurance" is where the business is engaged in the practice of paying its own losses as they happen in fact and establishes reserves in accounts or has "suspense accounts" on which the business draws when the losses occur. *Id.* Although there is case authority in other jurisdictions stating that self-insurance is not technically insurance but merely "assurance", the

structure of self-insurance is analogous to principles of insurance law concerning coverage. *Id.*

n. 3 (Supp. 2000)(citing *Ohio Government Risk Mgt. Plan v. County Risk Sharing Auth., Inc.,*

719 N.E.2d 992 (1998)).   SBCISD's practice of self-insuring its Plan is clearly *de facto*

insurance.

### 2.   The Meaning of Reinsurance.

The practice of reinsurance involves the following:

> The primary insurer (the ceding company) finds that it has more
> risks than it cares to safely keep in its own portfolio.  It has
> incurred expenses in connection with agency commissions,
> ordinary overhead, and the like, in addition to the reserve for
> payment of the claim.  Consequently, it agrees to turn over to
> another insurer, usually one handling nothing but such
> reinsurances, half of such risk, or all of such risk in excess of a
> certain sum, in which the latter event it is termed excess insurance.

*See* 1 Eric M. Holmes & Mark S. Rhodes, *Appleman on Insurance*, § 2.15 (2nd ed. 1996).

"A reinsurance contract is an indemnity contract that operates to shift part of the risk of

loss under an insurance policy from the original insurer to the reinsurer; the original insurer

remains in privity with the insured." *Id.*   Two major purposes of reinsurance exist: (1) to

diversify the risk of loss to prevent catastrophic loss from falling on a single insurer; and (2) to

reduce reserve requirements which allows the ceding insurer more capital to invest or to insure

more risks. *Id.*

SBCISD and Companion Life's relationship and the contract at issue herein falls squarely

within this description of reinsurance. It is certainly not direct insurance.

### 3.   The Relationship Between Self-Insurer and a Reinsurance Policy.

The inter-relationship between a self-insurer and a reinsurance policy has been discussed

in the worker's compensation arena.  "A proposed policy to indemnify a self-insurer under a

Worker's Compensation Act against excessive or catastrophic loss up to a specified amount has been declared to be in reality a contract for reinsurance . . . ." 9 COUCH ON INSURANCE § 133:17 (3rd ed.).

In *Friend Bros., Inc. v. Seaboard Surety Co.*, the court held that a policy purporting to indemnify the self-insurer under the Workmen's Compensation Act for losses over and above a certain amount was "reinsurance". 56 N.E.2d 6, 8 (Mass. 1944). The court rejected the argument that reinsurance could exist only between two insurance companies and held that the self-insurer was actually an insurer and the policy which indemnified him was reinsurance. *Id.* In fact, Texas courts have also held that a self-insurer in the Worker's Compensation arena can be an insurer.

In *E-Z Mart Stores, Inc. v. Hale*, the court held that E-Z Mart, by its decision to self-insure its employees, placed itself under the same duty of good faith and fair dealing as that imposed upon a formal insurance company. 883 S.W.2d 695, 700 (Tex. App.—El Paso 1994, writ denied). The court noted that E-Z Mart had informed its employees that it had disposed of its insurance coverage for its employees and E-Z Mart had expressly stated that "the Company has assumed the role of your Workmen's Comp. Insurance Company." *Id.* Thus, the court held that "E-Z Mart made the unqualified decision to place itself in the position of an insurer." Just like E-Z Mart, SBCISD decided to self-insure its benefit plan. Just like E-Z Mart, SBCISD made the unqualified decision to place itself in the position of an insurer.

### 4. Examples of the Texas Insurance Code Characterizing Stop-Loss Contracts as Reinsurance Contracts.

The Texas Insurance Code contains numerous references to a stop-loss contract as a reinsurance contract and separating that business from "the business of insurance.". See TEX.

INS. CODE art. 4.11 § 2 (c); TEX. INS. CODE art. 26.02; TEX. INS. CODE art. 21.28-D; TEX. INS. CODE art. 3.95-1.6;[1] TEX. INS. CODE art. 5.75-1.

SBCISD presumably argues that because it does not fit squarely within article 5.75-1 as an "insurer", the Contract cannot be a reinsurance contract. What SBCISD ignores is that the purpose of this statute is to regulate insurers licensed to do business in Texas. Just because SBCISD may not be licensed to do the business of insurance in Texas does not mean that SBCISD is not an insurer.[2] SBCISD is taking premiums from its plan participants in exchange for the risk of providing medical coverage to its plan participants. This clearly falls within the definition of doing the business of insurance.

---

[1]    Section 101.053(b)(2) of the Texas Insurance Code specifically excludes the lawful transaction of reinsurance by insurers' from that article's definition of "doing insurance business". This provision provides that "sections 101.051 and 101.052 do not apply the lawful transaction of reinsurance by insurers." Section 101.051 defines the specific acts which constitute the business of insurance in this state. Thus, the proposition of law is still good law – reinsurance does not constitute the business of insurance.

[2]    The following acts constitute the business of insurance: (1) making or proposing to make, as an insurer, an insurance contract; . . . (3) taking or receiving an insurance application; (4) receiving or collecting any consideration for insurance including: (a) a premium, (b) a commission, (c) a membership fee, (d) an assessment, or (e) dues; (5) issuing or delivering an insurance contract to: (a) a resident of this state; or (b) a person authorized to do business in this state; (6) directly or indirectly acting as an agent for or otherwise representing or assisting an insurer or other person in: (a) soliciting, negotiating, procuring, or effectuating insurance or a renewal of insurance; (b) disseminating information relating to coverage or rates; (c) forwarding an insurance application; (d) delivering an insurance policy or contract; (e) inspecting a risk; (f) setting a rate; (g) investigating or adjusting a claim or loss; (h) transacting a matter after the effectuation of the contract that arises out of the contract; or (i) representing or assisting an insurer or other person in any other manner in the transaction of insurance with respect to a subject of insurance that is resident, located or to be performed in this state; (7) contracting to provide in this state indemnification or expense reimbursement for a medical expense by direct payment, reimbursement, or otherwise to a person domiciled in this state or for a risk located in this state, whether as an insurer, agent, administrator, trust, or funding mechanism or by another method; (8) doing any kind of insurance business specifically recognized as constituting insurance business within the meaning of statutes relating to insurance, and (9) doing or proposing to do any insurance business that is in substance equivalent to conduct described by Subdivisions (1)-(8) in a manner designed to evade statute relating to insurance; or (10) any other transaction of business in this state by an insurer.

## V.
## UNDISPUTED SUMMARY JUDGMENT EVIDENCE

As admitted, SBCISD is self-insured, as it alleges in its Complaint. *See Ex. D*, p. 3, ¶ IV. SBCISD further avers that in order to protect it from large claims each year, it purchased a contract of reinsurance. *Id.*  Indeed, for the 2000-2001 school year, SBCISD purchased reinsurance from Companion Life with the following terms: after SBCISD paid the first $75,000 in covered health insurance benefits per person to an employee or dependent, "any additional sums spent by the School District for additional medical expenses would be **reimbursed** by Companion, up to a per person policy limit of [$1 million]." *See Ex. D*, pp. 3-4, ¶ V (emphasis added); *see Ex. C* at p. 2 ¶ 7(c), p. 3 ¶ 7(f), p. 9 ¶¶ IV 1, 2, p. 10 ¶ VI. 1; and Application, p. 4 ¶ 11(i)).

Consistent with the purpose of reinsurance, the contract between SBCISD and Companion Life specifically stated that Companion Life had "neither the right nor the obligation under this Contract to directly pay any Covered Person [or provider of professional or medical services] . . . ." *See Ex. C*,  p. 10 ¶ VI. 1.) All monies were paid by Companion directly to the SBCISD Plan and not to any "covered person." *Id.*

SBCISD contends that Hall "acted as the agent and representative of Companion Life with respect to providing this [contract] of reinsurance to the School District." *See Ex. D*, Pet. p. 4 ¶ VI.  SBCISD further alleges Hall represented to its Plan that covered heath care expenses incurred above the $75,000 self-retention "would be reimbursed by Companion . . . even if the School District had not yet issued a check for the incurred expenses." *See Ex. D*, p. 4, ¶ VII. However, the very wording of the Application for reinsurance completed by SBCISD, just above the signature line, expressly provides to the contrary: "Applicant [SBCISD] acknowledges that

the Contract which is the subject of this Application is a reimbursement Contract. **Applicant must first pay claims before submitting them for reimbursement.**" *See Ex.. C*, Application, p. 4, ¶ 11(i)) (emphasis added)[3] The Application then states, in the next provision, "Oral statements not expressly incorporated herein are not part of this Contract. Only the President or Executive Officer of **the Company** [Companion] may make changes to the Contract Form or Addenda on behalf of the Company." *Id.* at ¶ 11(j)) (emphasis added)

Currently, and at the time of the execution of the Contract, Lorenzo Sanchez is the Assistant Superintendent for Finance, Human Resources for SBCISD. *See Ex. A*, P7, L13-14. SBCISD entered into an interlocal agreement for the purpose of being able to provide its employees with a self-funded employee benefit plan. *Id.*, P42, L9. Notably, Mr. Sanchez had no notice prior to his deposition of any alleged advanced funding promised under the Contract. *Id.*, P28, L23. He understands the concept of advanced funding. *Id.*, P21, L5-7. Mr. Sanchez, on behalf of SBCISD, signed the Application for the Contract and acknowledged that Exhibit C, attached hereto, is a true and correct copy of the Contract at issue in this litigation. *Id.*, P30, L22; P37, L19; P38, L3. He acknowledges that the contract does not provide advance funding. *Id.*, P33, L6. He also acknowledges that the initial proposal, attached as Exhibit E hereto, does not contain any mention of advanced funding. *Id.*, P45, L19.

---

[3] Similarly, the contract of reinsurance specifically provides, "Upon Presentation of Proof of Loss to the Company for Aggregate [or Specific] Benefits, [SBCISD] warrants that all monies necessary to pay for services and supplies **have been paid** to the respective providers of medical services or supplies to which the claim for reimbursement relates." (*See Ex. C,* at p. 9, ¶ IV.2) (emphasis added)

SBCISD has never had advance funding during Mr. Sanchez's tenure. *Id.*, P66, L6-17. MBA did not issue checks timely with respect to claims that are at issue in this lawsuit. *Id.*, P66, L25. Sanchez is not aware of any communications between Companion Life or its agent, Hall, and SBCISD personnel. *Id.* P90, L3; P90, L14. Similarly, he is not aware of any misrepresentations whether negligent or intentional. *Id.* P91, L7-25; P92, L1-8.

Currently, and at the time of the execution of the Contract, Janie Gonzalez is the Insurance Coordinator for the SBCISD. *See Ex. B*, P7, L13-16. She has twenty-three years experience in the insurance business. *Id.* P6, L16-17. She also hold multiple licenses relating to insurance. *Id.* P8, L18-19. For at least the last nine years, SBCISD's employee benefit plan has been self-funded and a participant in a risk pool. *Id.* P11, L9; P11, L16. As with Mr. Sanchez, Ms. Gonzalez never had any conversations with Companion Life or Hall. *Id.* P13, L18-22.

Also, and as with Mr. Sanchez, it was not important that SBCISD's plan purchase a stop-loss contract with advance funding. *Id.* P16, L21. In fact, she stated "That's never been brought up." *Id.* In fact, according to Ms. Sanchez, SBCISD has always had to pay claims prior to being reimbursed by its stop-loss provider. *Id.* P17, L23. Further, she was never promised by MBA, SBCISD's third party administrator, that advance funding was a component of the Contract. *Id.* P46, L21-24.

## VI.
## ARGUMENT AND AUTHORITIES

**A.    Any Cause of Action is Limited to Breach of Contract**

### 1.    Relationship of the Parties and Source of Duties Arises Out of Contract

There is no dispute that the relationship between the parties arises out of a contract and there would be no relationship between the parties but for a contract. Companion Life and

SBCISD entered into the Contract on or about October 1, 2000. A true and correct copy of the Contract is attached as <u>Exhibit C</u>. The contract was procured for SBCISD by its agent, MBA; however, SBCISD signed the contract as Plan Administrator for the SBCISD employee health benefit plan.

### 2.      Nature of the Remedies Sought by SBCISD is Economic Loss

Despite the creative and expansive pleading, SBCISD cannot avoid the fact that the substance of their causes of action is based in contract. This Court "must look to the substance of the cause of action and not necessarily the manner in which it was pleaded." *Robles*, 965 S.W.2d at 559 (*citing Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617 (Tex. 1986)). SBCISD's alleged damages are the monies it claims Companion Life failed to reimburse it under the Contract. These damages, if any, are ***benefit of the bargain***, economic damages, flowing only from Companion Life's supposed wrongful act in not reimbursing the money. Reimbursement of money is, of course, a matter dealt with in the contractual agreements.

### 3.      *DeLanney* Confines this Case to a Contract Case

One of the more settled propositions in Texas state court jurisprudence is that when the defendant's conduct "would give rise to liability only because it breaches the party's agreement, the plaintiff's claim ordinarily sounds only in contract." *DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991).

A motion for partial summary judgment based on *DeLanney* is one of the cleanest possible opportunities for the Court to grant a motion for partial summary judgment. This Court need not look at any disputes regarding what Hall might have or might not have stated to MBA. The Court need not bog down in disagreements regarding what Hall did or did not promise to MBA (recall no allegation has been made of any promise to SBCISD) during the course of their

relationship. The simple fact is that the relationship, the duties, and the alleged injuries all arise out of contract and Texas courts have emphatically held that SBCISD's only viable counterclaim should be breach of contract. This is a purely legal question. *Robles v. Consolidated Graphics, Inc.*, 965 S.W.2d 552, 560 (Tex. App. – Houston [14th Dist.] 1997, pet. denied).

Although the Texas Supreme Court struggled with the contract/tort distinction prior to *DeLanney*, analysis of this distinction has been crystal clear since *DeLanney*. Moreover, the Texas Supreme Court has continued to expand *DeLanney*.[4] *DeWitt County Elec. Co-op. v. Parks*, 1 S.W.3d 96, 105 (Tex. 1999) (under *DeLanney*, plaintiffs could not maintain negligence claim independently of their contract claim); *D.S.A., Inc. v. Hillsboro Indep. School Dist.*, 973 S.W.2d 662, 663 (Tex. 1998) (extending *DeLanney* to negligent misrepresentation claims); *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12 (Tex. 1996) (extending *DeLanney* analysis to DTPA

---

[4] The only exception to *DeLanney* was carved out in *Formosa Plastics Corp. v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41 (Tex. 1998) wherein the Supreme Court of Texas declined to extend *DeLanney* to cases involving fraudulent inducement. Other cases make clear that Formosa was an extraordinarily narrow exception. *DeWitt County Elec. Co-op. v. Parks*, 1 S.W.3d 96, 105 (Tex. 1999); *D.S.A., Inc. v. Hillsboro Indep. School Dist.*, 973 S.W.2d 662, 663 (Tex. 1998). *Formosa* is clearly limited to fraudulent inducement of a contract. In *D.S.A*, the Supreme Court rejected any attempt to expand the *Formosa* exception to the independent injury rule: "The *Formosa* opinion's rejection of the independent injury requirement in fraudulent inducement claims does not extend to claims for negligent misrepresentation or negligent inducement." 973 S.W.2d at 665. The court concluded that the damages sought by the plaintiff under the contract claim were the same as the negligent misrepresentation claim. The plaintiff could not state an independent claim for negligent misrepresentation because it sought to recover the benefit of its bargain. *Id.* More recently, the Supreme Court again recognized the limited scope of the *Formosa* exception. *DeWitt County*, 1 S.W.3d at 105. In refusing to extend the exception to a negligence claim, the court stated, "Our unremarkable holding in *Formosa* was that a contract may be induced by fraud when a party promises to perform the contract while knowing that it has no intention of carrying out that promise." *Id.* When the contract between the parties spells out the respective rights of the parties regarding the particular dispute, the contract, not common-law negligence governs the resolution of the dispute. *Id.* Although SBCISD does not plead a "fraudulent inducement" claim, the substance of its allegations and the evidence produced in discovery show that such a claim would be at best merely a fraud allegation and not the type of fraudulent inducement of a contract claim necessary to avoid the application of the independent injury rule. SBCISD cannot plead or prove that Companion Life or its agent made any promise to perform a contract while knowing at the time that it had no intention of carrying out that promise. Therefore, any claim by SBCISD's for fraudulent inducement cannot stand. The *Formosa* exception would not apply here since there has never even been an allegation of inducement of the contract.

---

claims). In general, where, as here, the party seeks to recover the benefit of their bargain, the claim sounds *only* in contract. *DeLanney*, 809 S.W.2d at 495.

## B.   SBCISD Cannot Recover Under the Contract Because It Failed To Satisfy All Conditions Precedent

Interesting, SBCISD failed to read the Contract prior to signing it. Had it bothered to do so, it would not have seen any obligation on Companion Life's part to advance fund or simultaneously reimburse any claims submitted by SBCISD for payment of medical expenses incurred by the beneficiaries of its health benefit plan. Further, SBCISD would have seen the definition of "paid" which is the requisite trigger under the contract for SBCISD to receive a reimbursement under the contract for claims it paid to medical providers on behalf of its health benefit plan's beneficiaries.

### 1.   Ignorance is not bliss.

SBCISD had a duty to learn of the contents of its written agreement with Companion Life. In *Clyde A. Wilson Int'l Investigators, Inc.*, the beneficiary argued that he did not read the application form for group insurance and someone else partially completed his application. *Clyde A. Wilson Int'l Investigators, Inc. v. Travelers Ins. Co.*, 959 F.Supp. 756, 763 (S.D. Tex. 1997). The court found Wilson's argument to be beside the point. "[U]nder established contract principles, a party who executes a contract by signing his name is bound by the substance of the agreement." *Id.* The court reasoned that to allow a party to admit he signed a contract but deny it expresses the agreement he made or allow him to admit that he did not read the contract or *know its terms* would completely destroy the value of all contracts. *Id.* (emphasis added). "'[O]ne is under a duty to learn the contents of a written contract before he signs it, and that if, without being the victim of fraud, he fails to read the contract or otherwise learn its contents, he signs the same at this peril, and is estopped to deny his obligation, will be conclusively presumed

to know the contents of the contracts, and must suffer the consequences of his own negligence.'"

*Id.* Thus, ignorance is not bliss and SBCISD is responsible for what it signs. SBCISD is equitably estoppel from hiding behind its ignorance when it ordered that checks not be sent to providers thus not fulfilling the definition of a "paid" claim.

> **2.    No Reimbursement Is Due Because Claims Were Not Paid Prior to the End of the Contract Year.**

The evidence is undisputed that the amount sought by SBCISD represents claims not paid to medical providers by the end of the contract year. By definition, these amounts are not subject to reimbursement.

The reinsurance contract at issue is a reimbursement contract. The rights set forth in this agreement are the only rights SBCISD can claim concerning this agreement. "A person does not have any rights against a reinsurer that are not specifically set forth in the contract of reinsurance or in a specific agreement between the reinsurer and the person." Tex. Ins. Code art. 5.75-1(g). Companion Life only has an obligation to pay any request for reimbursement submitted by SBCISD in the event (1) SBCISD presents a valid request under the contract and the specific claimant has reached the $75,000 specific deductible and (2) such claim (in excess of the $75,000 specific deductible) has been paid as that term is defined in the contract. Only then is SBCISD entitled to any Specific Benefit "up to the amount actually Paid by [SBCISD] over and above the Specific Deductible." *See Ex. C,* Section II(2), p. 7. "Paid means that funds are actually disbursed by [SBCISD] or his Agent" ." *Id.,* Section I (Definitions), *p. 5.* Further, "Payment will be deemed made on the date that both (1) the payor directly tendors payment by mailing (or otherwise delivering) a draft of check, and (2) the account upon which the payment is drawn contains, and continues to contain, sufficient funds to permit the check or draft to be

honored." *Id.* The undisputed evidence shows that the amounts claimed by SBCISD in this lawsuit were not paid by the end of the contract year. Thus, SBCISD has no contractual right to reimbursement.

**C.    Alternatively, SBCISD's Cause of Action for Negligent Misrepresentation Must Fail**

**1.    No Evidence Exists That Companion Life, Or Its Agent, Ever Communicated With SBCISD; In Fact, It's Not Even Alleged.**

Alternatively, assuming SBCISD has a claim for negligent misrepresentation in the face of *DeLanney*, to succeed on its negligent misrepresentation claim under Texas law, SBCISD is required to prove that: (1) without exercising reasonable care or competence in communicating information to SBCISD; (2) Companion Life supplied "false information" for the guidance of SBCISD; (3) in the course of its business; (4) which caused SBCISD to suffer a pecuniary loss by justifiably relying on the information. *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).

Both Lorenzo Sanchez and Janie Gonzalez testified that no individual from either Companion Life or Hall ever communicated, either orally or in writing, with SBCISD prior to the execution of the Contract – or at any time. See section V above. SBCISD is unable to prove even the first element in the cause of action and the cause of action for negligent misrepresentation must be dismissed.

Notably, this cause of action must be dismissed for SBCISD's failure to state a claim as its Complaint does not even allege all of the necessary elements. In its Amended Complaint, SBCISD loosely alleges that "MBA has advised SBCISD" that it processed claims in a certain manner. *See Ex. D,* p. 3, ¶ 12. The Complaint is absolutely devoid of any allegation that Companion Life or its agent, Hall, communicated at all with SBCISD prior to the execution of

the contract – or any time for that matter.   In fact, SBCISD expressly alleges that Hall represented "to MBA [not SBCISD] that Companion Life would provide advanced funding for covered medical expenses incurred by employees, and their dependents, of the School District, even though MBA had not paid these medical expenses prior to seeking reimbursement from Companion Life." *Id.*, p. 6, ¶ 20.   There is no allegation of a communication to SBCISD, that any such communication conveyed "false information" or that SBCISD relied upon such "false information" to its detriment.   An alleged communication to one's agent, if not communicated to the principal and relied upon prior to the execution of the contract, is not actionable.   SBCISD does not get to claim some sort of reverse imputed knowledge and after-the-fact reliance in an effort to recover under this theory.   This cause of action, for many reasons, must be dismissed.

**D.      The Texas Insurance Code Does Not Apply**

This case involves a stop-loss contract otherwise known as reinsurance.   It is clear that those provisions asserted by SBCISD do not apply to claims for reimbursement under such a stop-loss or reimbursement contract.

**1.      Companion Life's Contract Is A Reinsurance Contract Not An Insurance Policy Governed by the Texas Insurance Code.**

Companion Life's stop-loss contract with SBCISD should be governed by general contract law rather than the Texas Insurance Code because it is a contract between two sophisticated business people.   Companion Life is a reinsurer of a portion of SBCISD's Plan.

> Reinsurance contracts are not policies of insurance, nor contracts of insurance, as that term is generally understood.   The parties to such a contract are engaged in a kind of joint enterprise in nature of copartnership, and do not insure property, but only engage to indemnify against liability upon policies or contracts issued to owners of property.

*Stradley v. Southwestern Life Ins. Co.*, 341 S.W.2d 195, 198 (Tex. Civ. App.—Dallas 1960, writ ref'd n.r.e.). The consumer protections provided in the Texas Insurance Code are to protect a less sophisticated insured in its dealings with a more sophisticated insurance company. But in the reinsurance context, the parties are generally two sophisticated entities and thus the consumer protection purposes of the Insurance Code are less of a concern. In fact, because SBCISD's Plan is self-insured, SBCISD is the insurer – not Companion Life. "'The consumer protection purposes of the Insurance Code' are less of a concern when the insured is an insurance company." *See Houston Cas. v. Underwriters at Lloyd's London*, 51 F. Supp.2d 789, 796 n. 7 (S.D. Tex. 1999). Furthermore, article 1.14-1(b)(2) of the Texas Insurance Code specifically excludes "'the lawful transaction of reinsurance by insurers' from that article's definition of 'doing insurance business.'" *Id.* at 796; TEX. INS. CODE article 1.14-1(b)(2). Still further, the Texas Insurance Code specifically excludes the stop-loss contract from being required to pay a premium tax because "a stop-loss or excess loss insurance policy issued to a health maintenance organization . . . shall be considered reinsurance."[5] Thus, in Texas, a reinsurance contract is not a policy of insurance or a contract of insurance

---

[5]    TEX. INS. CODE art. 4.11 § 2 (c). In fact, there are numerous examples throughout the Texas Insurance Code that specifically exclude the stop-loss reinsurance contract from the Code. *See e.g.* TEX. INS. CODE art. 26.02 (excluding reinsurance contracts issued on a stop-loss basis from health insurance availability statute); TEX. INS. CODE art. 21.28-D (excluding a stop-loss group insurance plan and reinsurance contract from Life, Accident, Health, and Hospital Service Insurance Guaranty Association Act); TEX. INS. CODE art. 3.95-1.6 (excluding a reinsurance contract issued on a stop-loss basis from coverage under a health benefit plan).

Because a reinsurance contract is not a policy of insurance or a contract of insurance, statutes in the Texas Insurance Code specifically dealing with policies or contracts of insurance are inapplicable to this contract. SBCISD brought causes of action under articles 21.21 and 21.55 of the Texas Insurance Code for alleged misrepresentation and failing to promptly pay its "claim". But article 21.21 specifically speaks to persons "engaged in the business of insurance." TEX. INS. CODE art. 21.21(2)(a) (Vernon 1981). Because Companion's stop-loss contract is a reinsurance contract and not a policy of insurance or contract of insurance, article 21.21 has no bearing on the contract between Companion and SBCISD. Thus, general contract law should govern this dispute. "Reinsurance agreements are subject to the general law of contracts." *Great Atlantic Life Ins. Co. v. Harris*, 723 S.W.2d 329, 332 (Tex. App.—Austin 1987, writ dism'd).

2. **The Texas Local Government Code Expressly Precludes Application of the Texas Insurance Code Due to Plaintiff's Status As A Risk Pool.**

Pursuant to Section 172.004 of the Texas Local Government Code, school districts are permitted to provide health and accident coverage to employees through "benefits contracts." TEX. LOC. GOV'T CODE § 172. Moreover, pursuant to Section 172.005, a school district "may establish a risk pool . . . to provide health and accident coverage . . ." *Id.* § 172.005.

SBCISD set up such a pool (the "Pool") pursuant to Sections 172.004 and 172.005 of the Local Government Code. Under the Pool, SBCISD acts as a "self-insurer" for individual claims up to a maximum of $1,000,000.00. The Contract reimburses SBCISD for individual claims after such claims have been paid by SBCISD in the amount of the specific deductible of $75,000 up to the maximum benefit of $1,000,000.00. Again, SBCISD only qualifies for reimbursement under the Contract after it paid a beneficiaries claims. For any individual claims within the Pool aggregating over $1,000,000.00, the Pool then resorts to an additional excess loss policy.

SBCISD has filed a lawsuit against Companion relating to the Contract alleging, among other things, violations of Section 21.21 and 21.55 of the Texas Insurance Code.  Section 172.014 of the Local Government Code states that a "risk pool created under this chapter is not insurance or an insurer under the Insurance Code and other laws of this state, and the State Board of Insurance does not have jurisdiction over a pool created under this chapter." *Id.* § 172.014.  Moreover, Section 172.005 of the Insurance Code provides that "[n]otwithstanding any provision of the Insurance Code or any other law governing insurance in this state, an insurer authorized to do business in Texas may assume the excess of loss of the benefit contract under Section 172.004." *Id.* § 172.005.

As stated above, the substantive provision of Section 21.21 of the Insurance Code provides a cause of action against a "person" who is in the "business of insurance." *See* TEX. INS. CODE § 21.21(2)(A).

The Local Government Code permits a political subdivision to provide health and accident coverage for political subdivision officials, employees and retirees.  TEX. LOC. GOV'T CODE § 172.004; *see Id.* § 172.003 (defining "political subdivision" to include "school district").  The Local Government Code also allows a political subdivision to establish a risk pool to provide health and accident coverage to their employees.  *Id.* § 172.005.  In addition, the Local Government Code permits risk pools created under the Local Government Code to "purchase excess loss coverage or reinsurance to insure a pool against financial losses that the pool determines might place the solvency of the pool in financial jeopardy." *Id.* § 172.008.

Under this framework, a school district is permitted to provide benefits to its employees either "directly or through a risk pool." *Id.*  § 172.004.  In the event that a school district establishes such a risk pool, the Local Government Code creates a general carve-out benefiting

the risk pool by providing that such a risk pool "is not insurance or an insurer under the Insurance Code and other laws of this state, and the State Board of Insurance does not have jurisdiction over a pool created under the this chapter." *Id.* § 172.014.

In the instant case, SBCISD has filed suit against Companion Life alleging that Companion Life violated Sections 21.21 and 21.55 of the Insurance Code. Section 21.21 of the Insurance Code provides that "[n]o person shall engage in this state in . . . an unfair method of competition or an unfair or deceptive act or practice in the business of insurance." *Id.* SBCISD cannot have its cake and eat it too. It cannot create a risk pool thereby taking advantage of the Texas Local Government Code and provide health benefits to its employees but yet assert causes of action under the Texas Insurance Code claiming that Companion Life has engaged in the business of insurance, misrepresented the Contract, and failed to promptly pay its "claims". The stop-loss contract, as an excess reinsurance contract for the Pool, is not by definition and statutory mandate an insurance policy falling under the governance of the Texas Insurance Code. Rather, it is a vehicle procured by a risk pool pursuant to Section 172.008 of the Local Government Code and not considered insurance for the purposes of Sections 21.21 and 21.55 of the Insurance Code.

SBCISD claims it is not an insurer. It follows then that Companion Life, by providing stop-loss coverage under the contract at issue herein, cannot be considered to be providing insurance. Although this appears to be a case of first impression, the Fort Worth court of appeals has decided a case with analogous facts and touching upon the issue herein. *See Coffman v. Scott Wetzel Servs., Inc.*, 908 S.W.2d 516 (Tex. App.—Fort Worth 1995).

In *Coffman*, the court held that an agent of a governmental entity risk pool was not an insurer for the purposes of the Insurance Code because a governmental entity was not an insurer.

*Id.* Here, Companion, by providing the stop-loss contract to SBCISD, was merely acting as fulfilling its role under Section 172.008 of the Local Government Code. As such, Companion Life should not be considered a "person" in the "business of insurance" because it is merely an extension of the risk pool, an entity that is not in the business of insurance for the purposes of Sections 21.21 and 21.55 of the Texas Insurance Code. *See also Bridges v. Texas A&M. Univ. Sys.*, 790 S.W.2d 831 (Tex. App—Houston [14[th] Dist.] 1990).

**E.    Amendment of the Contract, Without Written Approval, Is Prohibited**

**1.    The Contract Specifically Provides No Amendment Unless in Writing**

In signing the Contract, SBCISD agreed that oral statements not expressly incorporated in the contract were not part of the contract. *See Ex. C,* Application p.4, 11(j) (application became part of contract when contract issued). Further, SBCISD agreed that "[a]ll changes to this Contract must be in writing and attached to this Contract." *Id.* SBCISD is therefore estopped from arguing or asserting that the Contract was amended by any manner other than a written amendment.

**2.    Course of Dealing Will Not Override Contract.**

SBCISD's argument was rejected in *Cash America Pawn, L.P. v. Federal Express Corp.*, 109 F.Supp.2d 513 (N.D. Tex. 2000). A shipper of refurbished jewelry attempted to side-step a contractual limitation of liability provision by claiming that the carrier's course of dealing altered the contract between the two parties. The court reasoned that the contract expressly provided that any modification or amendment must be in writing and thus any alleged course of dealing will not operate to amend the contract. *Id.* at 520.

**VII.**
**CONCLUSION**

SBCISD's testimony conflicts with is Complaint.   Advance funding was never a
consideration to SBCISD.  Checks to providers were not "paid" under the contract and SBCISD
is not entitled to reimbursement.  This Motion is thankfully not dependent on resolving any fact
issues.  This Motion merely asks this Court to follow the guidelines of the Texas Supreme Court
in existence for over ten (10) years since *DeLanney*.  This Court, recognizing this case for what it
is, should grant summary judgment as to SBCISD's claims under the Texas Insurance Code and
negligent misrepresentation.  Moreover, the contract clearly states that no amendments or other
modifications can exist unless same are in writing.  SBCISD's cause of action for breach of
contract due to some alleged course of dealing amendment must fail.

Respectfully submitted,

PIPER RUDNICK LLP

By:_____

Shelby J. Bush
State Bar No. 03497045

1717 Main Street, Suite 4600
Dallas, Texas 75201
(214) 743-4500 (telephone)
(214) 743-4545 (facsimile)

COUNSEL FOR DEFENDANT
COMPANION LIFE INSURANCE COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that this pleading was served in compliance with the Federal Rules of Civil Procedure on this 13th day of February 2004 to counsel of record:

Celeste Guerra
Law Offices of Rene Ramirez
1906 Tesoro
Pharr, Texas  78577

Stephen R. Walraven
Shaddox, Compere, Walraven & Good, P.C.
1250 N.E. Loop 410, Suite 725
San Antonio, TX  78209

Roberta Hegland
Bracewell & Patterson, L.L.P.
2000 One Shoreline Plaza, South Tower
800 North Shoreline Boulevard
Corpus Christi, TX  78403-3700

Cindy A. Garcia
The Garcia Law Firm, P.C.
201 North 1st Street
Harlingen, Texas  78550

Shelby J. Bush

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SAN BENITO CONSOLIDATED          )
INDEPENDENT SCHOOL DISTRICT,     {
                                 )
          Plaintiff,             {
                                 )
VS.                              {
                                 )
COMPANION LIFE INSURANCE         {      NO. B-003-047
COMPANY, MANAGED BENEFITS        )
ADMINISTRATOR AND INSURANCE      {
CONSULTANTS, INC., MICHAEL M.    }
SWETNAM, JR., J. ALLAN HALL      {
& ASSOCIATES, INC., AND          )
MBA OF WYOMING, INC.,            {
                                 )
          Defendants.            {

*****************************************************

ORAL DEPOSITION OF

LORENZO SANCHEZ

JUNE 26, 2003

*****************************************************

     ORAL DEPOSITION OF LORENZO SANCHEZ, produced as a witness

at the instance of the Defendant, Companion Life Insurance

Company, and duly sworn, was taken in the above-styled and

numbered cause on the 26th day of June, 2003, from 10:21 a.m.

to 1:15 p.m., before DINA RAMIREZ, CSR in and for the State of

Texas, reported by oral stenography at the Law Office of Rene

Ramirez, 1906 Tesoro Boulevard, Pharr, Hidalgo County, Texas,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

Lorenzo Sanchez
June 26, 2003
Case 1:03-cv-00047    Document 42    Multi-Page™    Filed in TXSD on 02/17/2004    Page 32 of 122
San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF, SAN BENITO CONSOLIDATED
INDEPENDENT SCHOOL DISTRICT:

    HONORABLE STEPHEN R. WALRAVEN
    Shaddock, Compere, Walraven & Good, P.C.
    1250 N.E. Loop 410, Suite 725
    San Antonio, Texas   78209
    &
    HONORABLE CELESTE GUERRA
    Law Office of Rene Ramirez
    1906 Tesoro Blvd.
    Pharr, Texas   78577

FOR THE DEFENDANT, COMPANION LIFE INSURANCE COMPANY:

    HONORABLE SHELBY J. BUSH
    Piper Rudnick LLP
    1717 Main Street, Suite 4600
    Dallas, Texas   75201-4605

FOR THE DEFENDANTS, MANAGED BENEFITS ADMINISTRATOR AND
INSURANCE CONSULTANTS, INC., AND MBA OF WYOMING, INC.:

    HONORABLE FRED L. SHUCHART
    Mason, Coplen, Shuchart, Hutchins
    & Banks, P.C.
    7500 San Felipe, Suite 700
    Houston, Texas   77063

FOR THE DEFENDANT, J. ALLAN HALL & ASSOCIATES, INC.:

    HONORABLE ROBERTA J. HEGLAND
    Bracewell & Patterson, L.L.P.
    2000 One Shoreline Plaza, South Tower
    800 North Shoreline Boulevard
    Corpus Christi, Texas   78403-3700

---

Page 4

No. 9    Plan Document effective October 1, 1995    39
    (33 pp.)

No. 10    Letter dated November 16, 2000, from Don W.    39
    Merrill, MBA, addressed to Lorenzo Sanchez
    (1 p.)

No. 11    Proposal from J. Allan Hall & Associates to    44
    San Benito C.I.S.D. dated 10/16/00 (3 pp.)

No. 12    Letter from Don W. Merrill to Lorenzo Sanchez,    45
    re:  renewal projections dated September 1,
    2001 (11 pp.)

No. 13    Letter dated February 14, 2002, from Companion    46
    Life addressed to Celeste Guerra (6 pp.)

No. 14    Letter dated November 7, 2001, from J. Allan    55
    Hall & Associates to Lorenzo Sanchez, re:
    San Benito CISD Specific Claim Requests (3 pp.)

No. 15    Administrative Service Agreement (8 pp.)    55

---

Page 3

I N D E X

                              PAGE

Appearances. . . . . . . . . . . . . . . . . . . 2

Stipulations . . . . . . . . . . . . . . . . . . 5

LORENZO SANCHEZ
    Examination by Mr. Bush. . . . . . . . . . . 6
    Examination by Mr. Shuchart. . . . . . . . .56
    Examination by Ms. Hegland . . . . . . . . .81
    Examination by Mr. Bush. . . . . . . . . . .91
    Examination by Mr. Shuchart. . . . . . . . .92
    Examination by Ms. Hegland . . . . . . . . .93

Signature and Changes. . . . . . . . . . . . . .96

Reporter's Certificate . . . . . . . . . . . . .98

E X H I B I T S

NO.  DESCRIPTION                        PAGE

No.  1    Defendant's Notice of Intention to Take Oral    6
        Deposition (2 pp.)

No.  2    Plaintiff's Original Petition (9 pp.)    17

No.  3    Bid proposal packet prepared by Insurance    23
        Associates of the Valley (46 pp.)

No.  4    Qualifications and Contingencies from    24
        J. Allan Hall & Associates (1 p.)

No.  5    Letter dated October 2, 2000, from Lorenzo    26
        Sanchez addressed to Don Merrill, MBA (3 pp.)

No.  6    Application to Companion Life from San Benito    28
        C.I.S.D. for 99-2000 year period (4 pp.)

No.  7    Application to Companion Life from San Benito    33
        C.I.S.D. for '00-01 year period (4 pp.)

No.  8    Contract between Companion Life and    37
        San Benito C.I.S.D. for excess loss benefits
        for '00-01 year period (16 pp.)

---

Page 5

1    Oral deposition and answers of LORENZO SANCHEZ, who
2 resides in Cameron County, Texas, was taken herein by the
3 Counsel for the Defendant, Companion Life Insurance Company,
4 before DINA RAMIREZ, a Certified Shorthand Reporter and a
5 Notary Public in and for the State of Texas, on the 26th day
6 of June, A.D., 2003, pursuant to Notice issued in the above
7 styled and numbered cause and pursuant to the Federal Rules of
8 Civil Procedure.
9    IT WAS AGREED that the original of this deposition shall
10 be presented to CELESTE GUERRA, Counsel for the Plaintiff, for
11 examination and signature by the witness within thirty (30)
12 days after receipt thereof, after which same will be returned
13 to the officer taking this deposition.
14
15               * * *
16
17
18
19
20
21
22
23
24
25

Lorenzo Sanchez
June 26, 2003

Case 1:03-cv-00047    Document 42    Filed in TXSD on 02/17/2004    Page 33 of 122

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 6

1      (Exhibit 1 marked.)
2          LORENZO SANCHEZ,
3  having been first duly sworn, testified as follows:
4          E X A M I N A T I O N
5  BY MR. BUSH:
6      Q  Could you state your name, please?
7      A  Lorenzo Sanchez.
8      Q  Mr. Sanchez, I'm gonna hand you what's been marked
9  as Exhibit No. 1.  Have you ever seen that document?
10     A  No, sir.
11     Q  Do you understand that you're here today to give a
12 deposition in the lawsuit of San Benito Consolidated
13 Independent School District v. Companion Life Insurance
14 Company and other Defendants?
15     A  Yes, sir.
16     Q  Do you understand that your testimony today will be
17 used as evidence in the trial and other proceedings in this
18 lawsuit?
19     A  Yes, sir.
20     Q  And do you understand that you're under oath?
21     A  Yes, sir.
22     Q  If at anytime today you need a break, you're in
23 charge.  You just let me know.  Okay?
24     A  All right.  I will.
25     Q  And, if at anytime today I ask you a question that

Page 7

1  you don't understand, feel free to ask me to rephrase it
2  because sometimes I've been known to ask some questions that
3  are incomprehensible and complicated.  It's just the way my
4  mind works sometimes.
5         If you would, allow me to finish my question

Page 8

1      A  Yes, sir, approximately.
2      Q  What did you do prior to that?
3      A  I was an accounting professor at Eastern New Mexico
4  University.
5      Q  And where is that located?
6      A  That's in Portales, New Mexico.
7      Q  How long had you held that position?
8      A  I think I went up there in '87.  From '87 to '91.
9      Q  And, prior to that time?
10     A  Now you're asking me some real historic questions.
11 I spent most of my -- my time -- well, let's see.  I was at
12 Pan American University at Brownsville as the accounting
13 coordinator for them for -- I believe I started in '81,
14 Pan American University at Brownsville.
15     Q  Accounting coordinator, is that an administrative
16 position or --
17     A  Yes, sir.
18     Q  Okay.  And what about before that?
19     A  Okay.  That takes me to -- the majority of about
20 approximately 17 years or 18 years, I was at Brownsville
21 I.S.D. in various capacities, a football coach, a teacher and
22 a track coach, basketball coach, assistant A.D. -- can't
23 remember.
24     Q  You were there 17 years?
25     A  Approximate, yes, sir.

Page 9

1      Q  So, from?
2      A  '60-something, '60- -- probably '65, '66.  I'm not
3  really sure.
4      Q  Was that your first job?
5      A  No, I had a -- it's either '65 or '66 I was in

Lorenzo Sanchez
June 26, 2003

Case 1:03-cv-00047   Document 42   Filed in TXSD on 02/17/2004   Page 34 of 122

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 10

1  had already been accepted to law school, and offered me a
2  coaching job on my way back from Denton, stopped in Alice and
3  never left, you know, until 17 years later that I quit
4  coaching and decided there was something else I could do for a
5  living and I went back to school.
6  Q  But you had planned on going to law school?
7  A  Yes, sir.
8  Q  Okay.  You might've made a wise choice.
9  MR. SHUCHART:  Object to the "might have."
10 Q  (Mr. Bush)  Was Brownsville I.S.D. the first
11 position you held in an administrative capacity, or did you --
12 did you hold an administrative position?
13 A  I was the athletic coordinator for Hanna High
14 School.  So, it's -- it's sort of an administrative position,
15 'cause I was responsible for all the coaches, on budgets and
16 things like that at -- at that level.
17 Q  Okay.  In any of these other positions that you've
18 mentioned today, whether it's at high school or college level,
19 did you have any human resource or H.R. responsibilities?
20 A  Yes, sir.
21 Q  And which one of those or which ones of those did --
22 A  In -- New Mexico, in the positions in New Mexico,
23 actually at New Mexico Highlands University.  I recommended
24 the professors and screened them, interviewed them and so
25 forth.

Page 11

1  Q  And did any of that human resource responsibility
2  entail group health benefit plans?
3  A  No, sir.
4  Q  Okay.  Was your first experience to group health
5  benefit plans when you arrived at San Benito Consolidated
6  Independent School District?
7  A  No, sir.
8  Q  From an administrative standpoint?
9  A  Yes, sir.
10 Q  Okay.  You had experience personally before that?
11 A  Yes, sir.
12 Q  Okay.  Are you on board with this lawsuit?
13 MR. WALRAVEN:  Objection.  Form.
14 Q  (Mr. Bush)  Do you support the -- the district's
15 lawsuit against Companion Life Insurance Company?
16 A  Yes, sir.
17 Q  And could you explain why?
18 A  From my understanding of the arrangement with MBA,
19 we relied on the good faith that they were our third-party
20 administrators and that they would provide us with the
21 expertise required to -- to run our self-funded plan.
22 Q  And your -- explain to me what you believe a
23 self-funded plan is.
24 A  In its simple form, it's -- and the way we have
25 established it at San Benito C.I.S.D., we have a district

Page 12

1  contribution into a plan and then we have an employee
2  contribution into the plan.  Those are the two sources of
3  revenues that come into the plan, and we do an estimate to
4  determine possibly the -- the claims that might be incurred
5  and we try to establish rates on the different plans such that
6  we have enough, sufficient revenue to cover all the claims.
7  Q  And how does stop loss coverage come into play?
8  A  We -- on the specific coverage, stop loss comes into
9  play after $75,000 of expenditures have been incurred by any
10 one particular employee of the -- of the district, and that's
11 when stop loss comes into play.
12 Q  And the $75,000 number, are you speaking of the
13 Companion Life Insurance stop loss contract?
14 A  Yes, sir.
15 Q  And that's a negotiated, specific deductible?
16 A  Yes, sir.
17 Q  Correct?
18 A  Yes, sir.
19 Q  You -- you could've had $100,000?
20 A  Yes, sir.
21 Q  Okay.  It could've been a 50?
22 A  Yes, sir.
23 Q  And the premium that is charged would vary depending
24 upon what -- what specific deductible is negotiated, correct?
25 A  That's correct.

Page 13

1  Q  And, with regard to stop loss coverage, is it your
2  understanding that that is a way to reduce the school
3  district's exposure to catastrophic health insurance claims?
4  A  Yes, sir.
5  Q  Do you recall other than the specific deductible
6  with regard to the Companion Life contract at issue in this
7  lawsuit, do you recall what the maximum benefit per employee
8  was?
9  A  I believe the lifetime benefit might be a million
10 dollars, I believe.
11 Q  Okay.  Do you recall the time period that the
12 contract at issue in this lawsuit covered?
13 A  I -- I don't recall the very specific dates, no.  I
14 do know that -- that we were working to align the -- the
15 health contract, stop loss and the fiscal period to all match
16 so we could -- so we could track it and do a cash-flow
17 analysis so that we could give the board members a better
18 picture of how well the -- the plan was doing or how well it
19 was not doing.  But, over -- over the period of time,
20 different years, different stop loss, those dates varied
21 either forward or -- or back, you know.
22 Q  Just depending on the deal that you guys were able
23 to negotiate?
24 A  And -- and the date that they were negotiated.
25 Q  What is the district's fiscal year-end?

Lorenzo Sanchez
June 26, 2003

Case 1:03-cv-00047   Document 42   Filed in TXSD on 02/17/2004   Page 35 of 122

San Benito C.I.S.D.
v. Compañía Life Insurance Company, et al.

Page 14

1   A  We -- we -- it's August 31st and September 1st,
2 September 1st through August 31st.
3   Q  Okay.  Do you recall whether the policy in question
4 in this lawsuit began coverage on October 1st, 2000?
5   A  No, I don't.
6   Q  Okay.  We'll get to that in a minute.  What do you
7 recall about the events leading up to the issuance of the stop
8 loss contract by Companion Life Insurance Company?
9 Specifically, does the district have to put out any kind of
10 competitive bid process or --
11   A  That's all handled by the third-party administrator.
12   MR. SHUCHART:  Objection.  Responsiveness.
13   Q  (Mr. Bush)  But does the district -- is the district
14 required under law to put this out for bid?
15   A  The -- what part?  Of the TPA part of it?  I really
16 don't understand your question.
17   Q  No.  When you're purchasing stop loss coverage for
18 your plan, does the district -- is the district required to
19 put that out for bid to various reinsurance companies?
20   A  No, sir, because we -- that is the duty and
21 agreement and part of the contract of the third-party
22 administrator.
23   MR. SHUCHART:  Objection to responsiveness
24 after the word, "No."
25   MS. HEGLAND:  Steve, I'm assuming -- maybe we

Page 15

1 should put on it the record.  I'm assuming that an objection
2 by one attorney is good as to all.  Is that okay?
3   MR. WALRAVEN:  I have no problem with that.
4   MR. HEGLAND:  Thank you.
5   MR. BUSH:  Okay.  And, before we go on, there's
6 something probably we should discuss on the record, in that
7 these beneficiaries' names with this new HIPAA regulation and
8 privacy issues I think we all should probably at any instance
9 not mention their names, and, to the extent we're producing
10 documents, I don't recall if we have a protective order in
11 place.
12   MR. WALRAVEN:  I don't believe we do.
13   MS. HEGLAND:  No.
14   MR. BUSH:  But we ought to get one that covers
15 all of this health insurance data --
16   MR. WALRAVEN:  Good idea.
17   MR. BUSH:  -- just to protect their privacy.
18   MR. WALRAVEN:  Good idea.
19   MR. BUSH:  And I don't mind referring to -- we
20 have a female that had a premature birth and then we had a
21 male.  I don't mind referring to them as Jane and John Doe,
22 the male being the -- I think he had a stroke.  But, as far as
23 filing things as a record, we're gonna have to figure out what
24 to do.
25   MR. WALRAVEN:  That will certainly work for

Page 16

1 today and --
2   MR. BUSH:  Okay.
3   MR. WALRAVEN:  -- we'll figure out the rest of
4 the details later, if that's all right with everybody.
5   MR. SHUCHART:  Yeah.  The only thing I'd like
6 to do at some point, at some break is we may be able to list
7 the individuals that we think are going to come up and give
8 them the designations so that everybody here knows exactly who
9 we're talking about.
10   MS. HEGLAND:  Yeah.  I agree we're gonna have
11 to find some way to -- so that they can be specifically
12 identified --
13   MR. WALRAVEN:  Well, he just proposed --
14   MS. HEGLAND:  -- just for purposes of this
15 lawsuit.
16   MR. SHUCHART:  Well, I don't know that
17 necessarily I'm in a position to be able to describe them like
18 that.
19   MR. BUSH:  And I don't think that the way this
20 has unfolded, I don't know that there is a dispute as to a
21 covered claim.  Mr. Walraven and I have had a discussion --
22   MR. WALRAVEN:  I don't think so.
23   MR. BUSH:  -- that the issue seems to be we are
24 contesting that the checks were not paid as it's defined under
25 the policy 'cause they weren't sent to the provider by the end

Page 17

1 of the policy year.  So, that issue alone went to all the
2 claims information and -- and diving into the what was paid to
3 what provider.  It's -- it's the amount of the check and when
4 it was paid.  So, I've got as part of one of these exhibits is
5 the census data, and it's part of the request for proposal,
6 but I would prefer not making it -- not making the exhibits to
7 the RFP an exhibit to this deposition because this has got all
8 the personnel, not just those two claims, but every employee
9 in the district, if that's okay with everyone else.
10   MR. WALRAVEN:  I think so.
11   MR. BUSH:  Fred?
12   MR. SHUCHART:  That'd be fine.
13   Q  (Mr. Bush)  Mr. Sanchez, have you reviewed the
14 district's lawsuit?
15   A  Not really, sir.
16   Q  I'm gonna show you Plaintiff's Original Petition,
17 and take a look at that paragraph, paragraph VII for purposes
18 of the record.
19   MR. SHUCHART:  Why don't you go ahead and mark
20 that?
21   MR. WALRAVEN:  I don't know.
22   A  (Witness reviews document.)
23   MR. BUSH:  Let's mark that as Exhibit 2.
24   (Exhibit 2 marked.)
25   Q  (Mr. Bush)  Okay.  We've marked Plaintiff's Original

Lorenzo Sanchez
June 26, 2003
:03-cv-00047    Document 42    Multi-Page™SD on 02/17/2004    Page 36 of 122    San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 18

1 Petition as Exhibit No. 2. Did you have a chance to review
2 the allegations in paragraph VII?
3    A  Yes, sir.
4    Q  And, specifically, it says, quote:  It was
5 represented to the school district by J. Allan Hall, MBAICI
6 and Swetnam that if medical benefits were incurred during the
7 policy period by an employee and/or an employee's dependent in
8 excess of the self-insured retention of $75,000, such expenses
9 would be reimbursed by Companion Life to the school district,
10 even if the school district had not yet issued a check for the
11 incurred expenses, period, end quote.
12       Do you agree with that allegation?
13    A  This is the first I know of this advance payment.
14    Q  This is the first you know of this advance payment.
15 Could you explain that statement, please?  You're talking
16 about today is the first time you've been made aware of this?
17    A  That -- that that arrangement was made, or whomever
18 those parties are, that they had agreed to this.
19    Q  So, you had no knowledge of --
20    A  No, sir.
21    Q  -- of any agreement between any party and the
22 district about advance funding?
23    A  No, sir.
24    Q  And you used the term, "advance funding."  Explain
25 to me what your -- how you're defining "advance funding."

Page 19

1    A  I can't interpret what -- what they mean here.  I'm
2 just -- I'm just saying that this is what they say here, is an
3 advance funding of benefits, that this arrangement was made by
4 Mr. Swetnam, MBA and J. Allan Hall, but I'm not aware of what
5 their intent was when they -- when they talked about this or
6 whatever commitments they made.  Certainly, they didn't relate
7 that information to me.
8    Q  Okay.  Were you the, for lack of a better term, the
9 point man between the district and MBA with regard to the
10 Companion Life application and the Companion Life stop loss
11 contract?
12    A  That's one of my duties, to oversee the risk
13 management side of it.
14    Q  And you, in fact, signed both the application and
15 the contract, correct?
16    A  I'd have to look at that.  I don't -- I don't -- I'd
17 have to look at the document itself to see if I did or not.
18 On some cases, the superintendent signed; in some cases, I
19 signed.
20    Q  And what would be the distinction between you
21 signing something and the superintendent signing something?
22    A  In -- in matters -- in matters like this, I'm the
23 superintendent's designee in -- in -- in many areas; and, so,
24 when he's not available, he authorizes me to -- to sign.
25    Q  And that authorization, is that written somewhere or

Page 20

1 is that something that he calls you and says, "Hey, I need you
2 to sign this"?
3    A  Yes.  In some cases, yes.
4    Q  Is it in writing?
5    A  Sometimes he does.  If he has to leave the district,
6 he'll -- he'll put it in writing and memo all the departments,
7 and this is sort of an agreement between as between he and I.
8    Q  Are you aware of any formal authorization by the
9 school board that would give you the authority to sign on the
10 superintendent's behalf?
11    A  No, sir.
12    Q  Okay.  Could you -- I'm not sure if you explained to
13 me how you define "advance funding."  Could you cover that,
14 please?
15    A  I -- I -- I don't -- I don't understand and I don't
16 know the intent of what Mr. Swetnam and MBA and J. Allan Hall
17 meant by advance funding, and I'm not going to even try to
18 venture to -- to find out what their intent was when they --
19 when they talked about it, you know, and what advance funding
20 is.  I -- I really can't tell you.
21    Q  Well, I -- I'm not speaking of the allegations in
22 the complaint.  I'm not sure the words, "advance funding," are
23 in the complaint, are they, specifically?
24    A  Well, that's what this says here, "advance funding
25 of benefits," the term they use.

Page 21

1    Q  Okay.  I'm sorry.  I was speaking of the sentence
2 that I read.  Do you know what advance funding is?
3    A  I probably have an idea, yes.
4    Q  Okay.  What is your idea as to advance funding?
5    A  That the district would -- would be reimbursed by
6 the stop loss carrier in a point in time even though a check
7 for a claim has not been issued.
8    Q  And, prior to Companion Life, who was the stop loss
9 carrier for the plan year prior to Companion Life Insurance
10 Company?
11    A  I'm not really sure, but I -- I -- I think it was
12 Clarendon, if I'm not mistaken.
13    Q  Do you know if that policy had an advance funding
14 component?
15    A  No, sir.
16    Q  You don't know one way or another?
17    A  No, sir.
18    Q  Do you know anything about the dismissal of
19 Michael Swetnam?
20    A  Yes, sir.
21    Q  Could you explain to me the extent of your
22 knowledge?
23    A  The board at a meeting basically thanked him for the
24 services he had rendered to the district and -- and
25 specifically said that they would -- would call him if he --

Lorenzo Sanchez v. Compania Life Insurance Company, et al.
Case 1:02-cv-00047    Document 42    Multi-Page™ Filed in TXSD on 02/17/2004    Page 37 of 122    San Benito C.I.S.D.
June 26, 2003

### Page 22

1 if they needed him. I can't recall the date or the -- of the
2 meeting or the time, you know, when this occurred, but it --
3 it did occur.
4    Q  Did he have a contract with the board?
5    A  I really don't know that. He was there -- he was
6 there before I even came on there.
7    Q  In what capacity, do you know?
8    A  Pardon?
9    Q  In what capacity?
10    A  Do I know about this?
11    Q  About Mr. Swetnam's capacity. What was his --
12    A  Oh.
13    Q  -- capacity?
14    A  I think he was a consultant to the board.
15    Q  Okay. Who was William Greer?
16    A  He represented Smith-Reagan, I believe.
17    Q  So, he's not a local resident or any kind of Texas
18 licensed --
19    A  Mr. Greer?
20    Q  Yes.
21    A  Yes. He's -- I believe he lives in San Benito or
22 Harlingen.
23    Q  Okay. Is he part of the school board or an employee
24 of the district?
25    A  No, he's -- no, sir.

### Page 23

1    Q  Okay. Is it fair to say that the district
2 terminated Mr. Swetnam's contract to be the representative of
3 the group health plan?
4    A  As I stated, at the -- at the board meeting that's
5 -- that's the extent of what was said to him. I -- I don't
6 know that there was -- he was already there before I -- I got
7 there, so I don't know. He's the one that set up the -- this
8 -- the association with MBA and Bill Greer and Smith-Reagan
9 and so forth.
10    Q  You don't recall when that board meeting was held?
11    A  No, sir, sure don't.
12        (Exhibit 3 marked.)
13    Q  (Mr. Bush) I show you what's been marked as Exhibit
14 No. 3. Have you ever seen that document?
15    A  (Witness reviews document.) I don't think so, sir.
16    Q  Could you identify it?
17    A  Sure. This is the -- this is when we go out for --
18 for bids and proposals for either a full insured or a request
19 for proposals for third-party administrators. This is --
20 appears to be a standard bid packet.
21    Q  But you've never seen that?
22    A  Not this particular one, no, sir.
23    Q  Okay. And it states at the bottom it was prepared
24 by whom?
25    A  Insurance Associates of the Valley.

### Page 24

1    Q  And do you know who owns that company?
2    A  Arnie Olivarez.
3    Q  Okay. Is Mr. Swetnam associated with that company?
4    A  I have no idea, sir.
5    Q  You don't know?
6    A  (Witness indicates no.)
7    Q  So, you don't know if that RFP was ever actually
8 sent out? You don't have any knowledge of that document?
9    A  No, sir.
10        (Exhibit 4 marked.)
11    Q  (Mr. Bush) Okay. I'll show you Sanchez Deposition
12 Exhibit No. 4. Have you ever seen this document?
13    A  (Witness reviews document.) Yes, sir. I don't
14 recall -- I don't specifically know what date or what time I
15 saw it, but, yes. It's got my initials up there.
16    Q  So, those are your initials?
17    A  Uh-huh.
18    Q  And what is this document?
19    A  Specifically making some references to something
20 being contingent and subject to change on receipt; and, to
21 look at this document, one single page without all the other
22 documents that might have been attached to it or a part of it,
23 I -- I really couldn't -- seems like I need to see all the
24 documents that were attached to it.
25    Q  Does it have -- does it have a title at the top?

### Page 25

1    A  It says J. Allan Hall and Associates.
2    Q  Okay. And who is J. Allan Hall and Associates?
3    A  To my recollection, he was a broker that was dealing
4 with MBA.
5    Q  With regard to stop loss contract?
6    A  I believe so.
7    Q  Okay. Is that a -- let me take a -- take a look.
8    A  (Witness tenders document.)
9    Q  The first sentence here references, "Our proposal."
10 Are you telling me that you recall other documents being
11 attached to that?
12    A  I'm saying I -- I really don't know. It appears to
13 me like there might have been.
14    Q  Okay. Do you think this might be either the first
15 page or a page in a packet that was a proposal to provide the
16 district with stop loss coverage?
17    A  That's a fair statement.
18    Q  The first page?
19    A  No, I said that's a fair statement.
20        MR. WALRAVEN: Fair statement.
21    A  Fair statement.
22    Q  (Mr. Bush) Chalk one up for me.
23        MR. WALRAVEN: At the top there's a fax that
24 says page 4 of 5.
25        MR. BUSH: Yeah. I'm sure -- I'm sure there

Lorenzo Sanchez
June 26, 2003

Case 1:03-cv-00047   Document 42   Filed in TXSD on 02/17/2004   Page 38 of 122

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 26

1 are others attached at some point in the file, but I'm just
2 talking about this one page.
3    Q (Mr. Bush) Could you look at this page that appears
4 to set forth the major points of a proposal and see if
5 anywhere on here is mentioned advance funding?
6    A (Witness reviews document.) No.
7    Q No? Okay. In the -- these last -- one, two, three,
8 four -- there are four points in the bottom, these bullet
9 points, the language, "Quote assumes," and then it -- it lists
10 some different variables that this quote of stop loss
11 coverage, different assumptions they are making. Do you know
12 whether or not in the stop loss industry that an advance
13 funding component would affect the premium that is charged?
14    A You want to rephrase that question?
15    Q Sure. Do you think that if you compare a premium on
16 a stop loss contract that does not have advance funding versus
17 one that does have advance funding, do you think the premium
18 on those two contracts would be different?
19    A I wouldn't know that, sir.
20        (Exhibit 5 marked.)
21    Q (Mr. Bush) Okay. I'll show you Exhibit No. 5 and
22 ask you to identify that, please.
23    A (Witness reviews document.)
24    Q Did you author that letter?
25    A Yes, sir.

Page 27

1    Q And that's your signature?
2    A Yes, sir.
3    Q And the letter is sent to whom?
4    A Don Merrill.
5    Q And Mr. Merrill is with what company?
6    A MBA.
7    Q And MBA is the district's third-party administrator?
8    A Yes, sir.
9    Q And what are you telling Mr. Merrill in this letter
10 dated October 2nd, the year 2000?
11    A That to proceed, to go with the stop loss coverage
12 with J. Allan Hall, whatever contract he's providing to him.
13    Q And is it your understanding that that contract was
14 the contract that's at dispute in this lawsuit?
15    A That I wouldn't know. I mean, I really wouldn't.
16 But that's the period covered.
17    Q Would there be any other contract that would've --
18    A Been in place?
19    Q -- been the subject of your letter to J. Allan Hall
20 on October 2nd, 2000, other than the one that was issued by
21 Companion Life Insurance Company?
22    A No.
23    Q Is there any mention in this letter or the attached
24 two pages of advance funding?
25    A No, sir.

Page 28

1    Q Do you know why, Mr. Sanchez, there may be two
2 separate applications that were signed?
3    A No, sir, I don't. The reason for why there was two?
4 Is that what --
5    Q Yes.
6    A -- you're asking? No, sir, I don't.
7    Q Do you recall that there were two?
8    A No, sir.
9        (Exhibit 6 marked.)
10    Q (Mr. Bush) Okay. I'll show you Exhibit No. 6 and
11 ask you to identify that, please.
12    A (Witness reviews document.) That is a contract with
13 Companion Life for the aggregate or excess loss. My signature
14 is on the back.
15    Q That's the contract or the application?
16    A Application. I'm sorry.
17    Q Okay.
18        MR. SHUCHART: Just for clarity of the record,
19 what year?
20    A It's -- it's signed on 11 -- I signed it on
21 11/22/99.
22        MR. BUSH: I was gonna cover that.
23        MR. SHUCHART: Oh. Sorry.
24        MR. BUSH: Here, you want my notes?
25        MR. SHUCHART: No.

Page 29

1    Q (Mr. Bush) What is the effective date, the
2 effective date of the proposed coverage in that application?
3    A Well, there's two dates. There's a date here, and I
4 don't know whose signature that is, but it's November 23rd of
5 '99, and I signed it on the 22nd of '99.
6    Q Well, specifically, I'm talking about the effective
7 date of the proposed coverage which --
8    A Right here.
9    Q -- should be --
10        MR. WALRAVEN: It's right here.
11        MR. BUSH: You got it? Okay.
12    Q (Mr. Bush) What does that say?
13    A It says incurred, employee benefit plan expenses
14 must be incurred from 7/1/99 through 9/30th of 2000.
15    Q And does it list a specific deductible, $75,000 per
16 employee?
17    A Yes, sir.
18    Q And a maximum reimbursement of $1 million per
19 employee?
20    A Yes, sir.
21    Q Does it indicate that it covers or it reimburses the
22 district for expenses paid between October 1st, '99, and
23 September 30th, 2000?
24    A Yes, sir.
25    Q If you would look at paragraph 11 which is on the

Lorenzo Sanchez
June 26, 2003
Case 1:03-cv-00047    Document 42    Filed in TXSD on 02/17/2004    Page 39 of 122
Main-Page    San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 30

1 page that has the Bates label SB-00027, which is page 3 of
2 Exhibit No. 6, the language applicant acknowledges, it states
3 the applicant must first pay claims before submitting them for
4 reimbursement. Do you see that language?
5     MR. WALRAVEN: I don't. Could you help us
6 here? I mean, if you say it's there, I'm sure it is, but --
7     MR. BUSH: Yeah. It was there last night.
8     MR. WALRAVEN: Objection. Non-responsive.
9     MR. BUSH: I'm sorry, Fred, but paragraph 11
10 continues on to page 4, which is SB-00028, and this is the
11 language I'm referring to. It's subparagraph --
12     MR. WALRAVEN: I believe that's a little letter
13 "i."
14     MR. BUSH: -- "i."
15     Q (Mr. Bush) Could you read that out loud, please?
16     A "Applicant acknowledges that the contract which is
17 subject of this application is a reimbursement contract.
18 Applicant must first pay claims before submitting them for
19 reimbursement."
20     Q And maybe two inches below that language is
21 your signature, correct?
22     A Yes, sir.
23     Q Now, is this your handwriting underneath your
24 signature?
25     A Yes, sir.

Page 31

1     Q What does that say?
2     A It says, "Administrator for Human Resources and Risk
3 Management. Authorized by superintendent to sign by telephone
4 call 11/2 -- 11/22/99, 1:30 p.m."
5     Q And where were you physically located when you
6 signed that application?
7     A Central Administration Building, 240 North Crockett,
8 San Benito.
9     Q And where was the superintendent?
10     A I have no idea.
11     Q Had he seen this document?
12     A I don't know if he had or not, sir.
13     Q Did you need to call him to get his authority to
14 sign it?
15     MR. WALRAVEN: Mr. Bush, there's not an
16 authority issue on any of these signatures. Feel free to go
17 into it if you want, but we're not questioning that they were
18 -- anything was signed by a duly authorized individual.
19     MR. BUSH: Well, if it is an issue from my
20 standpoint, there may be an authority issue. So, I'm just --
21 I'm -- I'm not -- there aren't too many of these questions,
22 but --
23     MR. WALRAVEN: Go for it.
24     Q (Mr. Bush) I'm just asking why the superintendent
25 had to --

Page 32

1     A Sometimes when he's not in the building, I -- I
2 check with him. If I can't get ahold of him, I sign.
3     Q Okay.
4     A This was an issue because of the time in place when
5 it was occurring. So, he asked me to read these things and
6 call him, and I believe we were -- you notice it's 11/22, and
7 I don't know if we were pressed for time and I think that's
8 why we needed to get it signed on a specific time or date and
9 -- I don't really recall.
10     Q And who signed this application as the licensed
11 resident agent?
12     A William R. Greer.
13     Q And is he associated with Mr. Swetnam's company?
14     A I don't know what their -- their association is.
15     Q Was he present when you signed this application?
16     A No, sir.
17     Q Okay. Did someone deliver it to you?
18     A I don't recall if it was Mr. Greer. Probably was.
19     Q And this witness, do you know whose signature that
20 is?
21     A I don't recognize that signature.
22     Q Was there someone present when you signed it?
23     A I don't recall.
24     Q Well, based upon the language that you read into the
25 record about applicant must first pay claims before submitting

Page 33

1 them for reimbursement, how does that reconcile with your
2 understanding of advance funding?
3     A Reword that, please.
4     Q Does -- does this language indicate to you that this
5 contract would have an advance funding component?
6     A No, sir.
7         (Exhibit 7 marked.)
8     Q (Mr. Bush) Okay. Do you need to take a break?
9     A Need some water.
10     Q Fine. Let's take a break.
11     MR. WALRAVEN: We've been at this for a little
12 over an hour or --
13     MR. BUSH: Sure.
14         (Off the record from 11:10 a.m. to 11:20 a.m.)
15     Q (Mr. Bush) I show you Exhibit No. 7.
16     A (Witness reviews document.)
17     Q Could you identify that, please?
18     A It's an application to Companion Life Insurance
19 Company.
20     Q And, if you could turn to the last page, is that
21 your signature?
22     A Yes, sir.
23     Q And who signed this application as the licensed
24 resident agent?
25     A Michael Swetnam, Jr.

Lorenzo Sanchez
June 26, 2003
Case No. CV-00047   Document 42   Multi-Page™ Filed in TXSD on 02/17/2004   Page San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 34

1    Q  And, if you could compare Deposition Exhibit 6 with
2  Exhibit No. 7, can you find any differences?
3    A  Yes, sir.
4    Q  And what -- just list all the differences that you
5  can find.
6    A  The witness signature is -- appears to be different.
7    Q  Do you know on Exhibit No. 7 whose witness signature
8  that is?
9    A  It appears -- I -- and I can't make it out, but it
10  appears it looks like Mr. Swetnam's signature.
11    Q  Do you recall Mr. Swetnam being in your presence
12  when you signed --
13    A  No, sir.
14    Q  -- Exhibit No. 7?
15    A  No, sir.
16    Q  Do you recall whether he was or whether he was not?
17    A  He was not.
18    Q  He was not in your presence?
19    A  Right.
20        MS. HEGLAND: I'm sorry.  What's the date on
21  Exhibit No. 7?
22        THE WITNESS: The date?
23        MS. HEGLAND: Yes, sir.
24        THE WITNESS: It says November 21st, 2000.
25        MS. HEGLAND: Thank you.

Page 35

1        MR. BUSH: Patience.
2        MR. SHUCHART: She got it from me.
3    Q  (Mr. Bush)  What date was Exhibit No. 6 signed?
4    A  November 23rd, 1999.
5    Q  And November --
6    A  November 21st of 2000.
7    Q  Exhibit No. 7 says November 21st, 2000?
8    A  Yes, sir.
9    Q  Do you know actually whether that was signed on the
10  21st?
11    A  No, sir.
12    Q  You don't?  Do you see the same language at the top
13  of page 4 of the both exhibits talking about applicant must
14  first pay --
15    A  Yes.
16    Q  -- claims --
17    A  Yes, sir.
18    Q  -- before submitting them for reimbursement; is that
19  correct?
20    A  Yes, sir.
21    Q  And, if you would look at the -- the items that you
22  were applying for, items of coverage, and compare those, both
23  exhibits have a $75,000 specific deductible, correct?
24    A  Correct.
25    Q  Is there a difference, though, in the coverage of

Page 36

1  when you would be reimbursed for paid claims?
2    A  It says --
3    Q  In other words, Exhibit 7 says that claims paid from
4  10/1/2000 to 8/31 of 2001 --
5    A  2001.
6    Q  -- right?
7    A  Right.
8    Q  And then Exhibit 6 says 10/1/99 to 9/30/2000?
9    A  It appears to cover the -- the same length of time.
10    Q  Well, that explains the difference.  This was the
11  application for the previous year; is that correct?
12    A  Yes, sir.
13    Q  Okay.  And Mr. Greer was the licensed resident agent
14  for the previous carrier, apparently?
15    A  I don't know what his real role was, but he --
16  that's -- he signed it as an agent.
17    Q  Do you know if Companion Life was the stop loss
18  carrier for the previous plan year?
19    A  Which?  I mean, you showed me two documents.  Which
20  one are you referring to?
21    Q  The previous plan year, referring to not the plan
22  year that's at issue in this litigation, in other words, from
23  '99 to 2000 versus from 2000 to 2001.
24    A  Before, we're looking at before 2000-2001, is your
25  question?

Page 37

1    A  Yes.
2    A  I don't want to guess, but I'm assuming it
3  Clarendon.  I don't -- I don't know.  I really don't.
4  Couldn't tell you.
5    Q  So, you don't know?
6    A  I really don't know.
7    Q  And you don't know whether that contract had an
8  advance funding component either?
9    A  No, sir.
10        (Exhibit 8 marked.)
11    Q  (Mr. Bush)  Okay.  I show you Exhibit 8.  See if you
12  can identify that, please.
13    A  (Witness reviews document.)  Appears to be the
14  contract for excess loss.
15    Q  Does that appear to be a true and correct copy of
16  the Companion Life Insurance contract for stop loss coverage
17  issued to San Benito Consolidated Independent School District
18  for the year 10/1/2000 through August 31st, 2001?
19    A  Yes, sir.
20    Q  And the last two pages of this exhibit for some
21  reason in the copy that was produced to us appear to be --
22  this appears to be an enlarged duplicate of that page,
23  correct?  And I just left it the way it was -- it was produced
24  by the district's attorneys.
25    A  It appears to be that, sir.

Lorenzo Sanchez
June 26, 2003

Case 1:03-cv-00047    Document 42    Filed in TXSD on 02/17/2004    Page 41 of 122

Multi-Page ™

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

**Page 38**

1  Q  Okay. And who signed the contract on behalf of the
2  school district?
3  A  I did, sir.
4  Q  You did. And is that Mr. Swetnam's signature?
5  A  It appears to be.
6  Q  And, once again, was Mr. Swetnam in your presence
7  when you signed this contract?
8  A  No, sir.
9  Q  Okay. Did you read this contract before you signed
10 it?
11 A  Not thoroughly, no, sir.
12 Q  And have you had occasion to review the definition
13 of "paid" in the contract?
14 A  I don't recall, sir, if I did or not on this one.
15 Q  Do you know whether or not that's an issue that's
16 involved in this lawsuit?
17 A  Yes, sir.
18    MR. WALRAVEN: Objection. Form.
19 Q  (Mr. Bush) You do know that?
20 A  Yes.
21 Q  Okay. You know there are a number of checks that
22 were written prior to the end of the contract year but not
23 necessarily forwarded to the providers?
24 A  I need to -- do you have that document that shows
25 all that so I can look at it?

**Page 39**

1  Q  I'm sure I do. I'm just wondering if you had any
2  independent recollection of it.
3  A  No, sir.
4  Q  Okay.
5  A  Not -- not the specifics of it.
6  Q  But generally?
7  A  Generally, yes, sir.
8  Q  Okay. Are you familiar with the San Benito
9  Consolidated Independent School District plan document?
10 A  Somewhat familiar.
11    (Exhibit 9 marked.)
12 Q  (Mr. Bush) I show you Exhibit No. 9 and ask you
13 whether that's a true and correct copy of the plan document
14 that was in place during the contract year 10/1/2000 through
15 August 31st, 2001.
16 A  (Witness reviews document.) It appears to be,
17 correct.
18 Q  Thank you.
19    (Exhibit 10 marked.)
20 Q  (Mr. Bush) I show you Exhibit No. 10 and ask you if
21 you've seen that document before.
22 A  (Witness reviews document.) Yes, sir.
23 Q  Do you recall receiving that from Mr. Merrill?
24 A  Yes, sir.
25 Q  The letter dated November 16th, 2000?

**Page 40**

1  A  Yes, sir.
2  Q  Addressed to you, referencing original stop loss
3  application, Companion Life Insurance Company; is that
4  correct?
5  A  Yes, sir.
6  Q  Would you read that first paragraph, please, out
7  loud?
8  A  "We received the final application yesterday. This
9  application should be signed immediately after you have
10 reviewed, parenthesis, reference No. 11. Note that each page
11 needs to be initialled also."
12 Q  What did you understand this language, quote,
13 parenthesis, R-E-F No. 11, end parenthesis, to mean?
14 A  Well --
15 Q  Exhibit No. 7 should be the application that's
16 referenced in this November 16th correspondence, correct?
17 A  Yes, sir. Yes, sir.
18 Q  So, as far as Mr. Merrill asking you to, "This
19 application should be signed immediately after you have
20 reviewed, parenthesis, REF No. 11, end parenthesis, period" --
21 A  Right.
22 Q  -- what do you think he meant by that?
23    MR. SHUCHART: Objection. Calls for
24 speculation.
25 A  I don't know.

**Page 41**

1  Q  (Mr. Bush) What did you interpret the language to
2  mean?
3    MR. WALRAVEN: Objection. Form.
4  A  I don't know what his intent was and I don't really
5  recall whether I actually read Reference No. 11 or not. I
6  mean, I don't recall if I did or not.
7  Q  (Mr. Bush) Did you -- okay. So, you didn't --
8  based upon your reading of this letter, you didn't go to the
9  application and look at paragraph 11 in the application?
10 A  I don't recall.
11 Q  Okay. Down further in Exhibit No. 10 Mr. Merrill
12 indicates that, quote, I have called Michael about doing this,
13 end quote.
14 A  Right.
15 Q  Do you recall the circumstances surrounding
16 Mr. Swetnam's relationship with the district and why
17 Mr. Merrill would have to call Mr. Swetnam to sign the
18 application?
19 A  I really didn't understand the tie-in between
20 Mr. Swetnam and -- but I know that there was always -- I've
21 asked several times why he was involved, and, apparently,
22 there was an interlocal agreement and that he -- it required
23 Mr. Swetnam's signature to keep this going so it could be
24 renewed, and, if you have an interlocal agreement, then you
25 don't have to go out and -- and bid the proposals and -- and

Lorenzo Sanchez
June 26, 2003    3-cv-00047    Document 42    Multi-Page    Filed in TXSD on 02/17/2004    San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

**Page 42**

1 these kinds of things. This is the reason that I -- that I --
2 to my knowledge that his involvement as far as him having to
3 sign the contract.
4     Q And the interlocal agreement, you're referring to a
5 risk pool?
6     A Yes, sir.
7     Q Okay. For purposes of being able to provide your
8 employees with a self-funded plan?
9     A Correct, sir.
10     Q Okay. And, in Exhibit No. 10, did you have any
11 problems with Mr. Merrill's statement that -- referring to the
12 contract that the district was getting, that it was an
13 11-month contract, and how did you interpret that statement?
14        MR. SHUCHART: Objection. Form.
15     A I don't see where -- where he says ten-month (sic)
16 contract. Oh. You said ten?
17     Q (Mr. Bush) I said 11.
18     A Oh, I'm sorry.
19     Q That's okay.
20     A Okay. Uh-huh.
21     Q Did you know what he meant when he referred to the
22 contract as an 11-month contract?
23     A Yes, sir.
24     Q And what does that mean?
25     A We're getting some running coverage, and instead of

**Page 43**

1 -- I believe this is the point in time where we were trying to
2 -- we attempted to have the plan contract, the stop loss, at
3 least get those two to match up, and then later on we were
4 gonna try to get the -- those two to match to the fiscal
5 period of the school year, and that, I believe, if I recall,
6 in our conversations that was the intent, why we needed to get
7 these things levelled off.
8     Q So, you seem to have accomplished that goal because
9 we've --
10     A Partially.
11     Q Partially? How -- how did you not accomplish it?
12     A Well, we didn't get to -- to -- to line it up with
13 the fiscal period.
14     Q Doesn't the fiscal period end on August 31st?
15     A Yes, but the front end of it does not -- you know,
16 we start September.
17     Q Well, I'm looking at August 31st of --
18     A The cutoff.
19     Q -- 2001.
20     A Right. The cutoff end of it would be correct,
21 but --
22     Q Right.
23     A -- the front end of it --
24     Q Right. 'Cause you're already in November by this
25 time?

**Page 44**

1     A Right, uh-huh.
2     Q But as far as in 2001, did you -- do you now have
3 your plan, your stop loss assigned with your fiscal year?
4     A No, sir.
5        (Exhibit 11 marked.)
6     Q (Mr. Bush) Okay. And now I'll show you Exhibit
7 No. 11. Do you recall receiving that correspondence?
8     A (Witness reviews document.) Yes, sir.
9     Q Could you identify that, please?
10     A This is a letter dated 10/16 of 2000 addressed to
11 us, San Benito C.I.S.D., from a Tony Wirkus, W-I-R-K-U-S,
12 Underwriter, and it was -- my signature appears at the bottom
13 of it as accepted.
14     Q Does that appear to be a true and correct copy of
15 what you signed as accepted?
16     A Yes, sir.
17     Q And behind that are two pages with an initial. Is
18 that your initial?
19     A Yes, sir.
20     Q Does this appear to be a proposal from J. Allan Hall
21 to provide the district with stop loss coverage?
22     A Could you rephrase that question, please?
23     Q Does this Exhibit No. 11 appear to be a proposal
24 from J. Allan Hall to provide the district with stop loss
25 coverage?

**Page 45**

1     A Well, the proposal went -- goes to MBA and then MBA
2 would forward it to us. After they reviewed it, they would
3 forward this to us and they would give me instructions, "Look
4 at the proposal. This is what it has in it. You know, looks
5 -- looks like that's the best deal that we can get." So --
6     Q Well, whether or not --
7        MR. SHUCHART: Objection. Responsiveness.
8     Q (Mr. Bush) Whether or not it went to MBA first, it
9 does have your --
10     A Yes, sir, it does.
11     Q -- initial and your signature, correct?
12     A Yes, sir.
13     Q Does it appear to be a proposal to provide the
14 district with stop loss coverage?
15     A It does appear.
16     Q And, if you take a minute to review it, let me know
17 if there's any advance funding component mentioned in there
18 anywhere.
19     A (Witness reviews document.) No, sir.
20        (Exhibit 12 marked.)
21     Q (Mr. Bush) I show you Exhibit No. 12 which is not
22 dated but a letter from Mr. Merrill to you. Do you recall
23 receiving this correspondence?
24     A (Witness reviews document.) I'm not really sure,
25 sir. Sometimes the literature that comes to me -- my

Lorenzo Sanchez
1:03-cv-00047    Document 42    Multi-Page™ BSD on 02/17/2004    Page 43 of 122 San Benito C.I.S.D.
June 26, 2003                                              v. Compan Life Insurance Company, et al.

Page 46

1 immediate assistant who handles the details of everyday
2 operations is -- is Janie Gonzalez. So, sometimes I -- you
3 know, I may attach a stick-'em or post-'em, "Janie, look at
4 this. Refer it, study it, come back to me."
5    Q Okay.
6    A And -- but, you know, it's hard to say -- there's so
7 many correspondence that goes back and forth -- that this
8 specific letter that I could say that I can recall with
9 100 percent assurance that I read it.
10    Q Well, that's fine. And, if you look back here, it
11 apparently involves the district's plan and projected renewal
12 reports. Do you recall seeing that report?
13    A I think I remember this, yes, sir. That would be a
14 yes, sir.
15    Q And, if you take a second to look at that, let me
16 know if there's any mention in there about advance funding.
17    A (Witness reviews document.) No, sir.
18    Q Thank you.
19       (Exhibit 13 marked.)
20    Q (Mr. Bush) I show you Exhibit No. 13. Have you
21 seen this correspondence dated February 14, 2002?
22    A (Witness reviews document.)
23       MR. SHUCHART: What you mark that as?
24       MR. BUSH: 13.
25       MR. WALRAVEN: Does this have any of the

Page 47

1 information that we talked about not marking?
2       MR. BUSH: I don't think so. Let me
3 double-check first. It's just got providers' names.
4       MR. WALRAVEN: Yeah. Just some of the
5 paragraphs, do they make reference to particular employees or
6 dependents? Anyway, go ahead and ask your question.
7       MR. BUSH: No, that's -- I'm glad you stopped
8 me, because I don't think it does. It's got claim numbers,
9 it's got providers and amounts, but I don't -- I don't see any
10 employees' or beneficiaries' names.
11       MR. WALRAVEN: Well, go ahead, and when you're
12 finished --
13       MR. BUSH: Okay.
14       MR. WALRAVEN: -- I'll take another look and
15 see if there's a reference to John Doe in some paragraph.
16    A Not -- I'm not really sure. I can't say that I --
17 'cause it's addressed to Ms. Guerra, and whether -- I really
18 couldn't say with certainty that I have.
19    Q (Mr. Bush) Okay. Are you aware that an audit was
20 conducted of the -- are you aware that this case is about two
21 claims, two specific claims?
22    A No, sir, not two. Two specific claims, no, sir.
23    Q What's your awareness about what this case involves?
24    A A lot of small claims that haven't been paid by the
25 stop loss carrier.

Page 48

1    Q And, when I refer to a claim, I mean you may have a
2 number of payments to providers on behalf of one employee --
3    A Right.
4    Q -- or dependent.
5    A Right.
6    Q And I'm referring to that as one claim.
7    A Okay.
8    Q So, just so we're on the same page, I am speaking of
9 two claims in that there is a dependent of Jane Doe and there
10 is an employee who I'll refer to as John Doe.
11    A Uh-huh.
12    Q Those two claims are the only two claims that are
13 involved in this lawsuit?
14    A I don't --
15    Q Is that not your -- is that not --
16    A I don't -- I don't know. I don't know if that is --
17    Q Well, let me know how you perceive this lawsuit has
18 evolved.
19    A Over a period of time, the claims exceeding $75,000
20 on various individuals was not reimbursed to the district, and
21 over time that accumulated to a -- a pretty large number,
22 approximately 900,000 somewhere, and that's -- that's how I
23 view that.
24    Q Would it be fair to say that two claims comprise a
25 vast majority of the amount in controversy?

Page 49

1    A Yes, sir.
2    Q Okay. This next exhibit that I was going to propose
3 does list the names of the two claimants. So, I -- I'm not
4 sure what you answered as to whether you were aware there was
5 an audit conducted. Were you aware of the audit that was
6 requested on the claims at issue in this lawsuit?
7    A Audit on who -- by whom?
8    Q Audit by J. Allan Hall and Companion Life Insurance
9 Company.
10    A Again, who's doing the audit on whom? Somebody's
11 auditing --
12    Q An entity that calls itself capital N II, capital S,
13 capital APEX. I'm not sure how it's pronounced.
14    A And it's auditing, but it -- it's auditing MBA?
15 Auditing J. Allan Hall? What is it -- what --
16    Q Auditing the specific claim that was --
17    A Oh, okay.
18    Q -- submitted for reimbursement.
19    A Right. I am -- I'm familiar with it.
20    Q You're familiar with that?
21    A Yes, sir.
22    Q Are you familiar with the finding of the audit?
23    A Yes, sir.
24    Q And what is your -- tell me your awareness of that
25 audit and the finding.

Lorenzo Sanchez
June 26, 2003

Case 1:02-cv-00047     Document 42     Multi-Page™ Filed on 02/17/2004     Page 44 of 122

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

### Page 50

1  A  One of the -- one of the -- the particulars that I
2  remember very distinctly, because I -- I provided the
3  information on that audit, was they had requested -- it was
4  concerning our ability to cover claims, and so what I did is
5  to fax their auditor -- I can't remember who the auditor was
6  -- a copy of our investments and our investment pools to
7  reflect that the district did have the wherewithal to meet any
8  claims that -- if they were processed.
9      Q  The district has an account out of which claims are
10 paid, correct?
11     A  Correct.
12     Q  Can you tell me today that as of August 31st, 2001,
13 that account contained at least $900,000?
14     A  I couldn't tell you that, no.  I couldn't tell you.
15     Q  Are you aware that the audit revealed that a large
16 amount of money comprising 13 checks were disallowed?
17     A  When you say, "disallowed," I don't understand.
18     Q  Disallowed meaning not being reimbursable.
19     A  Eventually, I found out that that's what they were
20 saying, yes.
21     Q  And do you know why they're not being reimbursed?
22     A  Yes.
23     Q  And what is your understanding of why they're not
24 being reimbursed?
25     A  That the district didn't pay -- or the -- or the --

### Page 51

1  the MBA did not issue checks on a timely basis.
2      Q  And, when you use the word, "issue," what do you
3  mean?
4      A  Well, checks being made out, issued, sent to the
5  providers.
6      Q  And would it be fair to say that you're interpreting
7  the word, "issue," as actually sent to the provider?
8      A  I -- I guess so.
9      Q  Okay.  And do you have an understanding under the
10 stop loss contract as to what is required to fit within the
11 definition of "paid claim"?
12     A  Yes, sir.
13     Q  And what is your understanding?
14     A  Checks must be issued, forwarded to providers within
15 the -- the contract term.
16     Q  And there must be sufficient money in the account to
17 cover those checks, correct?
18     A  Not necessarily at the time that they're -- they're
19 issued.  I don't -- it's not my policy and the policy of the
20 district to leave money idly in -- in the accounts.  I -- I --
21 since the third-party administrator has the authority to -- to
22 write checks and they reconcile the -- the cash accounts,
23 whenever we need to transfer money we can transfer money to
24 cover any checks.  In the meantime, those -- those -- those
25 monies are being invested in liquid funds so that I can on

### Page 52

1  demand just transfer funds as needed to cover any checks that
2  would be issued.
3      Q  So, is it the regular course of business for the
4  district to issue checks for amounts over and above an amount
5  that's in the account?
6      A  Repeat that question.
7      Q  Is it standard course of business for the district
8  to issue checks and forward them to providers for an aggregate
9  amount that exceeds the amount that's in the account?
10        MR. WALRAVEN:  Object to the form of the
11 question.  The school district doesn't issue the checks.
12     A  That is correct:  the district does not.  MBA does.
13 The third-party administrator does.
14     Q  (Mr. Bush)  Are the checks issued on the school
15 district's account?
16     A  Yes.
17     Q  Okay.  Does the school district authorize MBA to
18 issue those checks?
19     A  When we set up the accounts, yeah, they're
20 authorized from the beginning, yes, sir.
21     Q  Okay.  Is it the standard course of business for the
22 school district to allow MBA to issue checks for amounts over
23 and above the balance of the account?
24     A  On occasions they have, yes, sir.
25     Q  On occasions they have?

### Page 53

1      A  Yes, sir.
2      Q  Could you look at the paragraph within the stop loss
3  contract identified by you earlier that's Exhibit No. 8 to the
4  deposition and read the definition of what is considered a
5  paid claim?
6      A  "Paid means that the funds are actually disbursed by
7  the contract-holder or his agent.  Payment of a claim is the
8  unconditional and direct payment of a claim to a covered
9  person or their healthcare providers.  Payment will be deemed
10 made on the date that both, 1, the payor directly tenders
11 payment by mailing or otherwise delivering a draft or a check,
12 and, 2, the account upon which the payment is drawn contains
13 and continues to contain sufficient funds to permit the checks
14 to be -- to permit the check or the draft to be honored."
15     Q  So, do you interpret that language to mean that you
16 don't need to have the money in the account when you send the
17 check out?
18     A  Our -- we work with our -- with our local depository
19 and, you know, when -- whenever the accounts get low, we -- we
20 have -- we have -- we have covered checks and the bank has
21 covered checks until the time that I can wire the transfer to
22 cover.
23        MR. BUSH:  Objection.  Non-responsive.
24     Q  (Mr. Bush)  Do you interpret this language to mean
25 that you need to have money in the account when you send the

Lorenzo Sanchez
June 26, 2003

v-00047    Document 42    Multi-Page™SD on 02/17/2004    Page 45 of 122    San Benito C.I.S.D.
v. Compañ n Life Insurance Company, et al.

**Page 54**

1  check out, and I mean money in the account sufficient to cover
2  the checks that you're sending out?
3     A  That's what it says.
4     Q  And that's how you interpret it?
5     A  No, that's not what I said.  I said that's what it
6  says.  That's not how I interpret it.
7     Q  Okay.  How do you interpret it?
8     A  I interpret that we at the district has the ability
9  to work with the depository bank, place monies into the
10  account as needed, 'cause that has been the standard operating
11  procedures and that's the way we've -- we've always done it to
12  maximize our investments.
13     MR. BUSH:  Objection.  Non-responsive.
14     Q  (Mr. Bush)  Is that -- you have some accounting
15  background, don't you?
16     A  Yes, sir.
17     Q  Did you take accounting classes at NTSU?
18     A  I'm a certified public accountant, sir.
19     Q  In what State?
20     A  Texas.
21     Q  When did you receive that certification?
22     A  Oh, I believe in '86.
23     Q  And mailing checks out without sufficient money in
24  the account, is that otherwise referred to as floating checks?
25     A  Yes, sir.

**Page 55**

1     (Exhibit 14 marked.)
2     Q  (Mr. Bush)  Okay.  Just two more and I'll pass the
3  witness.  Could you identify Exhibit 14, please?
4     A  (Witness reviews document.)  Correspondence from
5  Randy Scott, Director of Claims, copy to Don Merrill,
6  Roy Hutchison, Al Hall, Larry Blagg, addressed to me,
7  letterhead of J. Allan Hall and Associates.
8     Q  What's the date?
9     A  November 7, 2001.
10     Q  Do you recall receiving that letter?
11     A  I don't really recall.
12     Q  Do you have any reason to believe that it's not a
13  true and correct copy of the letter that appears to have been
14  sent to you?
15     A  No, sir.
16     Q  And does that letter in fact discuss the paid claim
17  issue that you and I just discussed?
18     A  That's correct.
19     Q  Okay.  Thank you.
20     (Exhibit 15 marked.)
21     Q  (Mr. Bush)  And can you identify Exhibit 15, please?
22     A  It's an administrative service agreement.  Has MBA
23  at the bottom.  The pages seem to be initialled by me, signed
24  by me and Don Merrill.
25     Q  So, that is your signature at --

**Page 56**

1     A  Yes, sir.
2     Q  -- the page that has SB-00003?
3     A  That's correct.
4     Q  Does that appear to be a true and correct copy of
5  your what I'll refer to as the third-party administrator
6  agreement with MBA?
7     A  Yes, sir.
8     Q  The agreement in many instances refers to ERISA.
9  Are you aware of ERISA?
10     A  I'm fairly familiar with it.
11     Q  And do you know whether or not ERISA has any
12  application to your agreement with MBA and/or your employee
13  benefit plan?
14     A  No, sir, I -- I don't recall that.
15     MR. BUSH:  Okay.  I will pass the witness.
16     MS. GUERRA:  Should we order lunch before you
17  start?
18     MR. SHUCHART:  Yeah, I don't have a problem
19  with that.
20     (Off the record from 12:00 noon to 12:16 p.m.)
21  BY MR. SHUCHART:
22     Q  Good afternoon, Mr. Sanchez.  My name is Fred
23  Shuchart and I'm here on behalf of MBA of Wyoming and Managed
24  Benefits Administrator and Insurance Consultants, Inc.  Do you
25  understand that we're on opposite sides of this lawsuit?

**Page 57**

1     A  Yes, sir.
2     Q  If you could, could you please describe briefly the
3  decision-making hierarchy and process that the school district
4  has to go through in order to enter into a TPA contract or to
5  authorize the purchase of a stop loss or any type of insurance
6  policy?
7     A  Surely.  We go through a request for proposals, send
8  out, receive the proposals.  Generally, we have a committee to
9  review proposals, submits the proposals to a finance
10  committee.  From the finance committee, committee looks at the
11  proposals, basically directs me to either we need further
12  information, further negotiation or to place the agenda for --
13  or to place the item on the agenda for the regular board
14  meeting.  Then, the board meeting authorizes entering into the
15  contract with the TPA.
16     Q  Okay.  So, you don't have the authority as assistant
17  superintendent to enter into a contract, correct?
18     A  Right.
19     Q  And your -- the superintendent doesn't have that
20  authority either?
21     A  Basically, yes, sir.
22     Q  Okay.  So, it has to actually come through the
23  board?
24     A  Uh-huh.
25     Q  Do you have any training in insurance?

Lorenzo Sanchez
June 26, 2003

1:02-cv-00047    Document 42    Filed in TXSD on 02/17/2004    Page 46 of 122

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 58

1  A  Yes, sir.

2  Q  All right.  How so?

3  A  I serve on the SB Risk Management Board and the Risk
4  Fund at the State level.  I'm one of the board members.

5  Q  Did you receive any particular training to hold that
6  position with respect to insurance?

7  A  They do an orientation and then we have, you know,
8  quarterly meetings and we're required to have some basic
9  training that they -- they ask us to go to.

10  Q  All right.  And what kind of training is that?

11  A  It involves all aspects of different lines of
12  insurance, property, casualty, life insurance, health
13  benefits.  Basically, all the lines of the insurance and all
14  these kinds of things that the Risk Management Fund offers the
15  school districts.

16  Q  Are there any of those courses that cover or involve
17  what policies of insurance cover or don't cover?

18  A  They're not -- they're pretty broad and general.
19  They're not very specific.

20  Q  All right.  Are there any courses on legal
21  applications, like what the Texas Insurance Code is supposed
22  to do or --

23  A  No, sir.

24  Q  And you don't have any legal training, correct?

25  A  No, sir.

Page 59

1  Q  Who was your -- has the -- has the school district
2  always had a TPA for their program?

3  A  I'm not really sure.  You know, I came in in '96 and
4  this -- this arrangement was already there, MBA with the
5  school district, and up to the point in question it was
6  already there.  So, I don't know what was before that.

7  Q  Okay.  So, when you say, "MBA," what -- who -- who
8  or what are you referring to?

9  A  Well, it goes by different names:  Merrill Bostrom,
10  MBA of Wyoming -- I think there was three different names or
11  two different names.

12  Q  How many contracts has the school district entered
13  into with what you call MBA?

14  A  I really -- I really couldn't tell you.  I can tell
15  you since I've been there.

16  Q  Okay.  Since you -- since you --

17  A  Since I've been there since '96, from '96 'til the
18  time that we -- what was it?  About two years ago, I guess it
19  was, that we ended the -- the -- the contract with them.

20  Q  All right.  Was it only one contract for the whole
21  period or --

22  A  No, no.  It was -- it was several contracts, I
23  believe.

24  Q  All right.  There's been one that you've been asked
25  about today, and that's the only agreement I have seen that I

Page 60

1  believe is dated in 2000.

2  MR. BUSH:  It should be the last exhibit.

3  Q  (Mr. Shuchart)  I'm going to hand you what has been
4  marked as Sanchez Exhibit 15.  All right.  Who -- who is the
5  TPA for that agreement?

6  A  MBA of Wyoming, Inc.

7  Q  Okay.  And that's -- that's the TPA, correct?

8  A  Yes, sir.

9  Q  Do you have any idea what this Managed Benefits
10  Administrator and Insurance Consultants, Inc. is?

11  A  No, sir.

12  Q  Could you please briefly describe the funding
13  process for the health plan at the school district with
14  respect to how claims are paid?

15  A  Okay.  The -- the revenue side as I have said
16  before, the revenue side comes from district contributions.
17  We have a certain amount of dollar contribution per employee,
18  and then each employee can buy up into one of our three
19  different plans, and that employee contribution, including the
20  district contribution, goes into our pool for -- and then --

21  Q  All right.  Let me -- let me briefly interrupt you.
22  When you say it goes into a pool, does it go into the school's
23  general -- general --

24  A  Yes.

25  Q  -- revenue fund or is it earmarked?

Page 61

1  A  It's ear-- -- we have a specific account for -- well,
2  let me go back.  We have a checking account for health plans,
3  but -- and, then, prior to me taking over all the aspects of
4  it, the funds were not directly deposited into that account.
5  They would -- they would -- they would go into an investment
6  pool, draw from there to meet claims.

7  Q  Okay.  Is that the way it's still run today?

8  A  Pretty much so.

9  Q  Okay.  What happens if between any stop loss
10  insurance that the district would buy and the contributions
11  the claims -- the responsibilities of the school district
12  exceeds what the contributions are?  Do you take the shortfall
13  out of the general revenue fund or something like that?

14  A  No.  I have set up a reserve.  We have a $700,000
15  reserve specifically earmarked for -- for those kinds of
16  issues.

17  Q  All right.  And where are those funds held?

18  A  They're -- they're in -- in an investment.  I'm not
19  -- I don't -- not sure if they're with Lone Star Pool or -- I
20  really don't know the specifics of it.

21  Q  Okay.  But the school district generates revenues
22  from those funds?

23  A  Yes, and it -- the revenues are -- any revenues
24  generated from that reserve are going back into the reserve.
25  We started with 700,000.  It's about like 760 or 750.

Page 62

1    Q  And you indicated earlier in your testimony that
2  it's not the policy of the school district to leave money in
3  non-interest-bearing checking accounts, right?
4    A  Right.
5    Q  That wouldn't make a lot of sense?
6    A  Right.
7    Q  How much hands-on dealing with respect to the
8  purchase of the stop loss 2000-2001 policy and the actual
9  handling of the claims do you have -- did you have?
10   A  None.
11   Q  Did you have any conversations with Mr. Merrill or
12 Ms. Merrill or anybody from MBA of Wyoming regarding that
13 policy?
14   A  Conversations, yes, I'm sure we did.
15   Q  No, no.  You personally.
16   A  Oh.  Probably.
17   Q  All right.  Do you recall whether those
18 conversations dealt with the procurement of the stop loss
19 policy or the handling of the claims?
20   A  Probably both.
21   Q  Okay.  As you sit here today, do you recall the
22 specifics of any of those conversations?
23   A  It -- it always was a -- because of the market, the
24 reinsurance market or the stop loss market was a little tight,
25 and so they would shop around for stop loss coverage that

Page 63

1  would meet our projected needs and -- and -- and to try to
2  match up with the revenues and, you know, all the costs,
3  administrative costs, how much the premiums were gonna be and
4  so forth and so on; and, of course, also making sure that --
5  that we received the -- the most for our dollar, that the
6  aggregate amount, total aggregate was something that we could
7  maybe fund to that level so that -- so that we could have a
8  self-funded program that would sustain itself.
9    Q  Okay.  Do you recall having any conversations with
10 Mr. Merrill, Ms. Merrill or anybody else from MBA of Wyoming
11 regarding the coverage afforded by the 2000-2001 stop loss
12 policy?
13   A  We had no privy to any negotiations or -- that were
14 going on as between MBA or J. Allan Hall or whomever.  The
15 negotiations were done at that level, and then he would --
16 whatever -- whatever things were discussed and when he felt
17 like he had the best -- the best plan for us, he would then
18 send those applications and -- and contract for us to sign.
19   Q  Okay.  Did you -- do you recall having any
20 conversations from anybody from MBA regarding, and I'm talking
21 about you personally, the premium for the 2000-2001 stop loss?
22   A  I -- I don't recall, sir.
23   Q  Do you recall having any conversations with anybody
24 from MBA regarding the deductible for that, the 2000-2001
25 policy?

Page 64

1    A  "Deductible" meaning, sir?
2    Q  Your self-insured concerning the 75,000.
3    A  We probably did.
4    Q  All right.  Again, when -- you're using the word,
5  "We," and, generally, that means --
6    A  Myself and --
7    Q  -- "we, the school district," as opposed as to "We,
8  me."
9    A  Right.
10   Q  All I'm asking you about specifically is any
11 conversations you personally had.
12   A  I probably did --
13   Q  Okay.
14   A  -- have a conversation.
15   Q  As you sit here today, do you recall any of the
16 specifics?
17   A  No, sir.
18   Q  Okay.  Do you recall having any conversations with
19 anybody from MBA regarding advance funding as you used that
20 term today?
21   A  Never had.
22   Q  Okay.  All right.  Is that you never had the
23 conversations that -- in other words, you recall not having
24 any of those conversations?
25   A  That's correct.

Page 65

1    Q  Okay.  So, one way or the other, they didn't --
2  nobody from MBA told you, you personally, anything about
3  whether there was advance funding or there was not advance
4  funding?
5    A  That's correct.
6    Q  Okay.  Who is the person that was the most -- that
7  had the most responsibility on a day-to-day basis dealing with
8  stop loss coverage at the school district?
9    A  Probably Janie Gonzalez.  She's my insurance
10 coordinator.
11   Q  All right.  Now, your TPA and MBA of Wyoming, they
12 didn't fund the claims, correct?  They didn't write checks off
13 of their accounts with their own money?
14   A  No, no, no.  They -- they were -- they had a
15 signature required in which we authorized them to go ahead and
16 write checks and draw down on our -- on our account.
17   Q  And I think you testified earlier to the extent that
18 checks weren't actually cashed through your bank for claims,
19 that that did benefit the school district because you had the
20 funds in an invested account as opposed to a checking,
21 correct?
22   A  Right.
23   Q  Did you ever have -- you personally again.  Did you
24 ever have any conversations with anybody at MBA about issuing
25 checks but not mailing them out?

Lorenzo Sanchez
June 26, 2003

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

**Page 66**

1    A  No, sir.
2    Q  Okay.  Did you ever have any conversations with
3 anybody within the school district about having checks issued
4 but not mailed out?
5    A  Not to my knowledge, sir.
6    Q  To your knowledge, have you ever been involved in a
7 -- in a plan program that there was advance funding?
8    A  No, sir.
9    Q  You never have?
10    A  Never have.
11    Q  Okay.  So, to the best of your recollection, there
12 was not advance funding in '96, '97, '98?
13    A  That's correct.
14    Q  Is there anything that you're aware of that you can
15 recall today that would've given you an expectation that there
16 was advance funding for the 2000-2001?
17    A  No, sir.
18    Q  You -- you testified earlier that -- that MBA of
19 Wyoming didn't issue the checks on a timely basis.  Do you
20 recall saying that?
21    A  I don't know that I said that, no, sir.
22    Q  Okay.  Is it -- is it your position that MBA did not
23 issue checks timely with respect to the claims that are made
24 the basis of this lawsuit?
25    A  Yes.

**Page 67**

1    Q  Okay.  Could you please explain your position?  I --
2 I guess my question is, what do you mean by "issue"?
3    A  To issue to me would mean to actually write up the
4 check, issue, mail it out to the provider.
5    Q  Okay.  Do you know whether any of the checks or the
6 payments in question were not cut within the time period
7 provided by the policy?
8    A  I wouldn't know that.
9    Q  Do you --
10    A  That's no.
11    Q  I'm sorry.  You don't know one way or the other?
12    A  I -- I wouldn't have any idea of whether they did or
13 not, whether they -- they would issue, made out or any of
14 that.
15    Q  Okay.  So if the evidence later revealed and -- or
16 at least according to the audit company that all the checks
17 were cut prior to October -- sorry, August 31st, you have no
18 reason to dispute that?
19    A  Probably not, right.
20    Q  Do you have any reason to dispute that certain
21 checks were not mailed out because the account at that time
22 didn't have the funds and the funds weren't transferred?
23    A  No, because we -- again, our standard operating
24 procedure is whenever they get ready to issue checks and they
25 tell us how much in sum, you know, "We're gonna run 200,000.

**Page 68**

1 We're gonna run them.  We need money in the bank," we
2 transfer, wire the transfer, put it into the cash account and
3 let them write the checks.
4    Q  All right.  Is it your position that the school
5 district didn't request that checks be held so that, in
6 essence, the school district could play the float on some
7 substantial --
8    A  We never told anyone to hold checks.
9    Q  To your knowledge, was the school district aware
10 that checks were behind held?
11    A  To my knowledge, no.
12    Q  Okay.  You didn't -- you didn't know personally?
13    A  Right.
14    Q  Your lawyer has made certain allegations in this
15 lawsuit.  One of the claims your lawyer is making or the
16 school district is making through the lawyer against my
17 clients is that they misrepresented the terms of the policy
18 issued by Companion Life.  As you sit here today, were any of
19 the terms of the policy, the 2000-2001 policy misrepresented
20 to you?
21    A  By whom?
22    Q  By -- by my clients, MBA of Wyoming, Inc., yeah.
23    A  Repeat the question, please.
24    Q  All right.  And you're more than welcome.  Please
25 look at it.

**Page 69**

1    A  Okay.
2    Q  I think it's Exhibit --
3        MR. WALRAVEN:  2?
4    Q  (Mr. Shuchart)  -- 2.
5        MR. BUSH:  What are you looking for?
6        MR. SHUCHART:  Right, right here.
7        MR. BUSH:  Oh, this?
8    Q  (Mr. Shuchart)  On page 6, paragraph IX --
9    A  Okay.
10    Q  -- it says, "All Defendants have violated the
11 provisions of the Texas Insurance Code, Article 21.21,
12 including, but not limited to, the following:  1.
13 Misrepresenting the terms of the policy issued by Companion
14 Life."
15        Are you aware of any representations being made
16 by MBA of Wyoming, Inc. or Managed Benefits Administrator and
17 Insurance Consultants, Inc. regarding the terms of the policy
18 that were not correct?
19    A  That's a very difficult question.  I -- I really am
20 trying to -- when -- misrepresenting the terms, I mean, you
21 know, unless you're looking at the entire policy and -- and
22 knowing the specifics, I'm not an attorney and I don't know if
23 I could sit here and -- and tell you under oath that I read
24 every provision and nothing has been misrepresented either
25 written or orally to me.

Lorenzo Sanchez
June 26, 2003

Case 1:02-cv-00047    Document 42    Filed in TXSD on 02/17/2004    Page 49 of 122

Multi-Page™

San Benito C.I.S.D.
v. Compan Life Insurance Company, et al.

**Page 70**

1 Q Okay. As I understood your previous testimony, you
2 said that nobody from my clients, whether MBA of Wyoming or
3 the other long name, made any representation to you with
4 respect to advance funding; is that correct?
5 A They did not make any representations to me as to
6 advance funding.
7 Q Okay.
8 A That is correct.
9 Q All right. So, they didn't represent to you that
10 you had it and you didn't or you didn't have it and you had
11 it?
12 A Correct.
13 Q Okay. Based upon your knowledge of what this
14 lawsuit is about, am I -- is it correct that that in essence
15 is what this lawsuit is about, is about advance funding or the
16 lack of advance funding?
17 A I have no opinion on that.
18 Q Okay. The second paragraph says, "In
19 misrepresenting to Plaintiff material facts and policy
20 provisions relating to coverages at issue." Again, it's my
21 understanding of your testimony, and please correct me if I'm
22 wrong, that there were no representations made to you
23 personally by my clients with respect to provisions relating
24 to coverage in that policy; is that correct? I think I got
25 two negatives in there.

**Page 71**

1 A Right. Okay. Again, rephrase that.
2 Q Okay. Did my clients make any representations to
3 you regarding the provisions of coverage that are made the
4 basis of the lawsuit?
5 A I'm still not -- you're asking me something I
6 really --
7 Q Did you --
8 A I think I -- I think -- I think I can understand
9 your question. I just don't know how -- how I should respond
10 to it because it seems like if I say one thing it means
11 something else, and if I don't say anything it means something
12 else, as well. So --
13 Q And I -- and if that's -- that's not what the
14 question is meant by. Obviously, you -- the school district
15 sued my clients.
16 A That's correct.
17 Q And my job here today is to try to find out --
18 A I understand.
19 Q -- you know, what we did or you think we did wrong,
20 and if I'm wrong your lawyer will correct me. In essence, the
21 way I read these allegations is that you're claiming my
22 clients committed a fraud.
23 A Uh-huh.
24 Q That we either told you something that was not true
25 or we forgot to tell you something that was material to the

**Page 72**

1 decisions you made.
2 A Uh-huh.
3 Q And what I'm trying to find out from you is, did my
4 clients say anything like that to you?
5 A Example being?
6 Q Advance funding. I mean --
7 A No.
8 Q Okay. All right. Would it have made any difference
9 to the district's decision to purchase this policy if you had
10 been told there wasn't, specifically told there was no advance
11 funding?
12 A I don't think that would've. The issue with that
13 would have been the total dollar amounts and how much it was
14 gonna cost us to -- to provide the best benefits for our --
15 for our district, I believe.
16 Q In your opinion, did the school district get the
17 policy of insurance that it paid for?
18 A Right, related to the specific dollar amounts,
19 the 75,000 specific which we were looking at, and $1 million
20 total per individual, yeah, those things, yes. Now, that they
21 lived up to all the provisions is something else.
22 Q As you sit here today, is there anything that
23 you feel that my clients didn't live up to?
24 A Reimbursement of the excess over $75,000.
25 Q Okay. How are my clients responsible for

**Page 73**

1 reimbursing the school district in excess of the $75,000?
2 A They -- they're the ones who have the arrangements
3 with the stop loss carrier and they're the ones who have more
4 knowledge and expertise to expedite and file the claims on a
5 timely basis and -- and get them -- get the district
6 reimbursed. After all, the district is having to pay all the
7 claims. We -- to-date, we have always paid our claims.
8 Q What do you mean by we're the -- that my clients
9 were the ones that had the relationship with the stop loss
10 people?
11 A They're the ones who -- who negotiated with the --
12 with the stop loss carrier.
13 Q Okay. And, again, I think -- would it be fair to
14 say that from your perspective -- well, let me ask it this
15 way.
16 From your perspective, was the only thing my
17 clients did wrong is not mail those, mail the checks in
18 question?
19 A Probably.
20 Q And that if the stop loss carrier -- all right --
21 had paid the claims, then you wouldn't have any problems with
22 the way my client acted?
23 A We never had problems before.
24 Q Would you expect my client to get payment of
25 benefits that aren't provided by the policy?

Page 74

1    A  Repeat the question for me.
2    Q  Yeah.  Would you expect my client to obtain benefits
3  for you that are not provided for by the policy of insurance?
4    A  Of course not.
5    Q  Did -- when you were negotiating or at least signing
6  the proposal and application for the policy in question that's
7  signed by Mr. Swetnam, did he -- did you have any
8  conversations with him regarding what the policy covered and
9  did not cover?
10   A  Never had any conversations since he was released by
11 the district.
12   Q  Did you have any conversations with respect to the
13 previous year policy --
14   A  No, sir.
15   Q  -- with Mr. Greer who signed the application?
16   A  Mr. Greer, yes, sir.
17   Q  All right.  Did you have any discussions with him
18 with respect to what the policy would or would not cover that
19 you can recall?
20   A  No, not that I can recall.
21   Q  Do you recall having any conversation with Mr. Greer
22 with respect to whether their previous policy had advance
23 funding or not?
24   A  No, sir.
25   Q  Are you aware if advance funding is available on

Page 75

1  these type of policies?
2    A  No, sir.
3    Q  If it was available and had -- and it added to the
4  premium, is that something the school district would be
5  interested in or would they want to keep the premium as low as
6  possible?
7    A  Not if -- not anytime it adds to the premium, no,
8  sir.
9    Q  Would you say it's a good business practice that you
10 read the contracts that you execute?
11   A  Sure.
12   Q  And that's better than signing contracts without
13 reading them?
14   A  Correct.
15   Q  Do you ever recall reading the policies of insurance
16 before or after you executed the policies or the application?
17 That's a bad question.  Let me re-ask that one.
18      Did you go through and read the policy at issue
19 at anytime while it was in effect?
20   A  Probably not.
21   Q  Okay.  Do you recall whether you read the previous
22 policy, the previous year's policy?
23   A  No.
24   Q  As you sit here today, do you know how many
25 individual claims are involved in this lawsuit?

Page 76

1    A  I thought there were plenty of them and --
2    Q  No, and -- and I'm going to use the same
3  definitions.
4    A  Okay.
5    Q  And I mean employee or dependent.  How many -- how
6  many different employees or dependents are involved in -- in
7  the claims in this suit?
8    A  Probably a few months ago before all this came
9  about, I -- I -- I really looked at the details, but I know
10 that in the interim some claims have been paid, some were
11 dropped out and -- and I don't -- I really -- right now I
12 couldn't give you the -- either the very specific number, the
13 detailed dollar amount, because I -- I don't do that on a
14 daily basis.
15   Q  Would that be Janie, would she be the best one?
16   A  Janie Gonzalez would be the one who could give you
17 specific figures, and she's -- she's pretty good at that.
18   Q  Okay.  What role, if any, did you play in the
19 procurement of the 2000 --
20      MR. WALRAVEN:  '01-2002.
21   A  2000?
22   Q  (Mr. Shuchart)  Yes, 2001-2002 policy.
23   A  Since -- I don't know if I'm answering the question,
24 but since we have an interlocal agreement, you know, the issue
25 was always, "Are we gonna continue?  'Cause we have the

Page 77

1  interlocal agreement, we don't have to go out and -- and bid
2  the TPA services.  Are we gonna do that?" and that was -- that
3  was basically the question.  So, if -- if -- if the finance
4  committee with the board and the reports that were coming in
5  and everything looked favorable, then all they had to say is,
6  "You know what?  Since it does have a renewal option to
7  extend, then we would renew without having to --" -- that's
8  why -- that's why the interlocal agreement, face of it, was
9  incorporated into that arrangement, and so that's why --
10      As far as to answer your question did I have
11 anything to do with that, basically, you know, they asked me,
12 "Well, is the plan working like it should?  Are things getting
13 done like they should?  Are the claims being paid on a timely
14 basis?" and things like that.  Then, I would.  "It looks like
15 we're doing all right."
16   Q  Do you know who your carrier was for the 2001-2002
17 policy?
18   A  I'd have to look because there's so many dates in my
19 mind right now.  I'd have to look and -- and see the -- the
20 specific document.
21   Q  Do you recall a switch in carriers from the
22 2000-2001 policy to 2001-2002?
23   A  I -- I do know that we switched stop loss carriers
24 from one -- let's see.  We've been with Clarendon, Companion
25 and I think BCS, I think.

**Page 78**

1 Q Okay.
2 A That -- that sequence I think is fairly correct.
3 Q All right. I'm going to represent to you, and I
4 think it's accurate, that BCS was the carrier and that's when
5 the switch occurred for the 2001-2002 policy.
6 A I believe -- I believe that is correct.
7 Q As you sit here today, do you have -- do you recall
8 having any conversations with anybody, anybody from my clients
9 regarding the application process for the BCS insurance?
10 A No, not with MBA.
11 Q I'm sorry? I didn't hear you.
12 A Not with MBA.
13 Q Okay.
14 A Or -- was it MBA-Wyoming? I don't know who -- who's
15 -- you're MBA-Wyoming, representing MBA of Wyoming?
16 Q Correct.
17 A Okay.
18 Q And I also represent the other name.
19 A Merrill or -- Managed Benefits?
20 Q Managed Benefits --
21 A Okay.
22 Q -- and Insurance, etc. You don't have -- you don't
23 recall as we sit here of you having any conversations with
24 anybody from my clients regarding the application process?
25 A No, sir.

**Page 79**

1 Q Do you know why you guys switched carriers?
2 A No. We pretty much again, you know, we -- we left
3 it up to MBA to get us -- go out and -- and price it and
4 market it and bring us a good deal for the district.
5 Q As you sit here today, do you have any problems with
6 the way the application process was handled for the 2001-2002
7 policy?
8 A No, sir.
9 Q And when I say, "you," that's you personally.
10 A Me.
11 Q Individually.
12 A Yes, sir.
13 Q Okay. Have you reviewed any documents in
14 preparation for your deposition today?
15 A Yes.
16 Q All right. Do you recall what you reviewed?
17 A I reviewed them with my attorney.
18 Q Well, I understand that, but I'm entitled to know
19 what you reviewed. You notice I haven't asked you what he
20 said to you.
21 A No, right. A good stack of documents, I would say.
22 MR. SHUCHART: What were they? I mean, I
23 assume they were documents you --
24 MR. WALRAVEN: They're part of the initial
25 disclosure. You've got them all.

**Page 80**

1 MR. SHUCHART: I mean, he reviewed all the -- I
2 mean, I didn't --
3 MR. WALRAVEN: No. It's a selected portion.
4 Would you like to see them? There are no surprises.
5 MR. SHUCHART: If you don't mind, just briefly.
6 MR. WALRAVEN: You don't get my notes.
7 MR. SHUCHART: No. Okay. If they're anything
8 like my notes, I couldn't read them anyway. Could not read
9 them anyway. You mean, I don't get the free post-note?
10 MR. WALRAVEN: They're blank. Feel free.
11 MR. SHUCHART: Why don't we go off the record
12 for a second?
13 (Off the record from 12:51 p.m. to 12:52 p.m.)
14 Q (Mr. Shuchart) As we sit here today, what are your
15 complaints about the way that my client, MBA of Wyoming, Inc.,
16 ran the self-funded plan?
17 A What are the what?
18 Q What is your complaint about the way my client, MBA
19 of Wyoming, Inc., ran the self-funded plan?
20 A Complaints?
21 Q Yes.
22 A I don't have any complaints other than the
23 reimbursement.
24 Q I have no further questions at this time. Thank you
25 very much, Mr. Sanchez, for your time.

**Page 81**

1 (Time: 12:54 p.m.)
2 BY MS. HEGLAND:
3 Q Mr. Sanchez?
4 A Yes, ma'am.
5 Q I just have a few questions. It shouldn't take very
6 long. First, did you have any other education beyond your
7 B.A.?
8 A I have a Master's in Business Administration, M.B.A.
9 Q Where did you obtain that?
10 A At Pan American University.
11 Q Do you have any other professional licenses beyond
12 your CPA?
13 A No. Not -- not currently in place, no.
14 Q Has something lapsed? You didn't have any other --
15 A No.
16 Q -- professional licenses?
17 MR. WALRAVEN: You have a driver's license?
18 THE WITNESS: Well, yeah.
19 Q (Ms. Hegland) Professional. No?
20 A No.
21 Q Are you -- are you a native of the Valley?
22 A Yes, I am.
23 Q Where are you from originally?
24 A San Benito.
25 Q Do you -- do you have other family members here?

Page 82

1   A   In San Benito?
2   Q   In --
3   A   The Valley?
4   Q   In the Valley, yes.
5   A   Yes.
6   Q   Do you have a lot of family members in the Valley?
7   A   A few.
8   Q   I guess I'm interested in knowing what family
9   members may be in our jury pool if this trial is held in
10  Brownsville.
11  A   Oh.
12  Q   Are there any family members living in -- what would
13  that be?
14      MS. GUERRA:  Cameron.
15  Q   (Ms. Hegland)  Cameron County and --
16  A   Cameron County?
17  Q   -- Willacy?
18  A   A brother and a sister.
19  Q   What are their names?
20  A   Jimmy Sanchez and Anna Sanchez.  One's a -- Anna is
21  a retired teacher and Jimmy Sanchez is the manager for the
22  John Deere Store in Brownsville.
23  Q   You have any other family members living in Cameron
24  or Willacy counties?
25  A   Immediate family or -- I -- I have some cousins, you

Page 83

1   know, a few of them.
2   Q   What would their names be, sir?
3   A   I have April Perez, Silverio Perez, Alicia Perez --
4   this is a hard test.  I have, you know, distant relatives, not
5   -- not real close that I know of, you know.  I would say a
6   handful, maybe ten, 15 members, maybe, real close.  The rest
7   of them, I -- they may be related, but I don't really know
8   them.
9   Q   Can you give me the names of the family members that
10  you can --
11  A   Okay.
12  Q   -- recall living in Cameron County?
13  A   Okay.  Well, let's see.  Let me start with -- and
14  they would be all mine.  Let's see.  I've got -- Jimmy has
15  JoAnn Sanchez, Adam Sanchez.  My sister, Anna, has Noranne,
16  now Noranne Borrego, Amanda Flores.  I have an aunt, name is
17  Elvia Sanchez Garza, and, if you would ask me the list of my
18  cousins, I cannot tell you 'cause I haven't seen them in a
19  long time.  So, I -- I wouldn't know who they are.  I wouldn't
20  know their names.  I probably could recognize them if I saw
21  them, but I wouldn't know their names.
22  Q   And I think earlier when we were just visiting
23  before we started the deposition, you mentioned that your
24  daughter --
25  A   My daughter is --

Page 84

1   Q   You have an adult daughter also?
2   A   Yes.  She is in -- in -- in Iraq.
3   Q   She's currently in Iraq?
4   A   In Iraq, yes.
5   Q   Was she living here --
6   A   She -- she was living in San Benito, yes.
7   Q   What is her name?
8   A   Her name is Michelle, Michelle Sanchez.  I have a
9   son, but he's at UT.  So, I don't -- he's going to school and
10  I hope he stays there.
11      MR. WALRAVEN:  It's not forever.
12      MR. SHUCHART:  For only four years, though.
13  A   He's gonna go to law school.  So --
14      MR. BUSH:  Have him call us.
15  Q   (Ms. Hegland)  What's your son's name, sir?
16  A   Lorenzo Dean Sanchez.
17  Q   Mr. Sanchez, I would just like to get a little
18  better understanding of what your duties are as the assistant
19  superintendent for finance and human resources.
20  A   Okay.
21  Q   Would you just explain to me what those involve?
22  A   Okay.  On the -- on the finance side, of course, I'm
23  in charge -- let's see.  Well, let's start.  There's three
24  departments that I -- that are under my supervision, would be
25  transportation, maintenance, food services, the accounts

Page 85

1   payable department, payroll, the accounting department, the
2   finance department -- I might've missed a couple of things
3   there, but --
4       On the personnel side, of course, I'm in charge
5   of all the personnel, starting from setting salaries, hiring,
6   recruiting, retaining, staff development, trainings, all kinds
7   of little goodies.  And then, the other hat that I also wear
8   is supposed to be that I'm the head of the risk management
9   department for all the health benefit plans, property and
10  casualty, fleet insurance, worker's comp, unemployment, and a
11  few more between there.
12      So, when you ask me for details, sometimes it's
13  difficult for me to recall all these documents and specific
14  dates.
15  Q   Doesn't seem like there are enough hours in a day
16  for you to take care of all of those departments.
17  A   But I do.
18  Q   I assume, then, that you have people working under
19  you who are the hands-on people?
20  A   I do, ma'am.
21  Q   With respect to the health insurance benefits, who
22  would be the person that you look to or that who reports to
23  you regarding the specifics of that?
24  A   The risk management department is -- is -- I have --
25  I have three tiers, and it'd be, Janie is the supervisor, but

Lorenzo Sanchez
Case 1:03-cv-00047 Document 42 Filed in TXSD on 02/17/2004 Page 53 of 122
June 26, 2003
Multi-Page™
San Benito C.I.S.D.
v. Compa  n Life Insurance Company, et al.

Page 86

1 Janie's specific area of responsibility is the health
2 benefits.
3    Q  And that's Janie Gonzalez?
4    A  Janie Gonzalez that -- that you're gonna depose.
5 And then I have Lucy Garcia who basically does all my property
6 and casualty, fleet insurance, the cafeteria plans and some
7 other, and then I have Gracie Carpio who basically addresses
8 the worker's comp end of it, and what they -- I do -- I do a
9 little cross-training and send them off, you know, so that
10 they're all pretty well versed.
11    Q  Is there anyone -- and you said Janie is the
12 supervisor?
13    A  Supervisor, and, specifically, her area of
14 responsibility is the health benefits.
15    Q  Are there other personnel under Janie who would also
16 be involved in the administration of the health benefits?
17    A  No, aside from when she needs help from Lucy or
18 Gracie Carpio.
19    Q  So, Janie Gonzalez is the person probably most
20 knowledgeable with respect to the administration of the
21 San Benito School District health insurance benefits?
22    A  That is correct.
23    Q  And Janie reports to you as the head of that
24 department and assistant superintendent; is that correct?
25    A  That's correct.

Page 87

1    Q  Is there anyone else in-between that chain of
2 command?
3    A  No, ma'am.
4    Q  Okay.  And, from what you have testified previously,
5 you in your position as assistant superintendent responsible
6 for the administration of the health benefits make
7 recommendations to the superintendent; is that correct?
8    A  That's correct.
9    Q  And do you also then make recommendations to the
10 school board?
11    A  I go to the superintendent first.  Then, it -- you
12 know, we have committees of the board.  So, on insurance
13 issues, I go to the superintendent, fill him in on whatever it
14 is that we need to discuss.  Then, from there, we place an
15 agenda with the -- I mean, a discussion item on the finance
16 committee, and then from there it goes to the board if it
17 needs to go to the board.
18    Q  In making recommendations regarding -- let's just
19 talk about the -- the health insurance --
20    A  Uh-huh.
21    Q  -- benefit plan --
22    A  Right.
23    Q  -- available for San Benito Independent School
24 District.  In making recommendations regarding that, do
25 you have any -- any guidance or any consultant that you

Page 88

1 rely upon?
2    A  Well, the -- the third-party, the third-party
3 administrator, which in this case, you know, is MBA, and --
4 and they come in with the -- with the figures and the numbers
5 and -- and they do them.  I review them.  Janie and I go over
6 them.  We look at projections.  We look at setting rates and
7 -- for the different plans and tweaking the plans such that we
8 make the finances come out so that we can have a balance so we
9 can have enough money to pay claims and all those kinds of
10 projections.  So, we rely a lot on the data, the analysis that
11 is done by the third-party administrator at our request
12 because we -- we have a little format.  We do a little
13 cash-flow thing that we have tried to get our -- our board
14 members up to speed and to understand our self-funding
15 program.
16    Q  Would you mind, Mr. Sanchez, taking a look at what
17 was previously marked as Exhibit No. 7?  Did I get that -- is
18 that the application that's dated --
19    A  Yes, ma'am.
20    Q  -- November 21 of 2000?
21    A  Yeah.  Yes, ma'am.
22    Q  Okay.  Who prepared that application?
23    A  I -- I wouldn't know.  It came to us.  The person
24 that used to bring this to us, and it's kind of, I guess,
25 their -- their local runner, was Mr. Greer.  He'd get together

Page 89

1 with MBA.  He'd come over and say, "Look, I got the
2 application here.  Don has already reviewed it.  Looks like
3 this is what we're gonna do.  Look it over.  We need to
4 initial here, here, and -- and we need to get it done 'cause,
5 you know, timelines are getting near and those kinds of
6 things."  That's -- that's kind of the process that, you know,
7 each year that we went through.
8    Q  Okay.  So, the application marked as Exhibit 7 was
9 prepared before it was brought to you?
10    A  Yes, ma'am.
11    Q  But you did review it and initial each page and that
12 is your signature at the end; is that correct?
13    A  When you say, "review," if I -- you know, if you --
14 if you call this, like what I'm doing now, a review, and kind
15 of scanning through, that's pretty much what I did.  I'm
16 relying -- I'm relying that what is brought to my table was to
17 the best benefit of the district.  So -- and -- and from our
18 conversations with MBA, it appeared like, you know, they were
19 doing a good job for us and, you know, we relied on that.
20         MR. SHUCHART:  Objection.  Non-responsive.
21    Q  (Ms. Hegland)  Did you personally ever have any
22 conversations with anyone from J. Allan Hall and Associates?
23    A  No, ma'am.
24    Q  Do you know whether anyone with San Benito
25 Consolidated Independent School District ever had any

Lorenzo Sanchez
Case 1:03-cv-00047   Document 42   Filed in TXSD on 02/17/2004   Page 54 of 122
June 26, 2003
San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 90

1 conversations with a representative of J. Allan Hall and
2 Associates?
3    A  To my knowledge, no, ma'am.
4       MR. BUSH:  Throw Companion Life in there and
5 it'll save some time so we don't have to go back.
6       MR. WALRAVEN:  So it can be the same answer.
7    Q  (Ms. Hegland)  Mr. Sanchez, did you personally ever
8 have any conversations with anyone from Companion Life
9 Insurance?
10   A  No, ma'am.
11   Q  Do you know whether anyone associated with the
12 school district ever had any conversations with Companion
13 Life?
14   A  No, ma'am.
15   Q  No, you don't know?
16   A  I don't know.
17   Q  Okay.  Mr. Sanchez, what is your position with
18 respect to anything that J. Allan Hall and Associates did in
19 this lawsuit?  What are you claiming that they have done or
20 not?
21   A  That we -- that the district has not been reimbursed
22 for any claims in excess of $75,000 on the specific coverage.
23   Q  And is that the only thing that you're complaining
24 about with respect to J. Allan Hall and Associates?
25   A  I am.  Yes, ma'am.

Page 91

1    Q  Okay.  All right.  Thank you, Mr. Sanchez.
2       MR. WALRAVEN:  Mr. Bush, anything else?
3       (Time:  1:09 p.m.)
4 BY MR. BUSH:
5    Q  Just a few related to the petition, Mr. Sanchez.  I
6 don't know if I told you earlier, but I represent Companion
7 Life Insurance Company.  Do you have any knowledge of any
8 misrepresentation by Companion Life Insurance Company as to
9 the terms of the stop loss contract that was purchased by the
10 district?
11   A  Made directly to me or to -- just made?  Your
12 question is to me?
13   Q  Made by Companion Life to you or any other --
14   A  Not --
15   Q  -- person in the district.
16   A  Not to me, sir.
17   Q  Any other person in the district?
18   A  I wouldn't know that.
19   Q  And, along with Roberta's question, since you're not
20 aware of any conversations, obviously you're not aware of any
21 untrue statements of material fact --
22   A  No.
23   Q  -- made by Companion Life or J. Allan Hall?
24   A  No, sir.
25   Q  Whether they might be intentionally made or

Page 92

1 negligent, doesn't matter, correct?
2    A  Again?
3    Q  You're not aware of any statements --
4    A  No.
5    Q  -- if they were made, if they were intentionally --
6    A  No.
7    Q  -- made or negligently made?
8    A  No.
9    Q  Okay.
10   A  Okay.
11   Q  Thank you.
12       (Time:  1:11 p.m.)
13 BY MR. SHUCHART:
14   Q  Do you personally take the position that any of the
15 unclaimed benefits -- unpaid benefits should have been paid
16 through the BCS policy?
17   A  No.
18   Q  As we sit here today, do you know of any reason that
19 if the application process had been handled differently the
20 disputed claims would've been handled by the BCS policy?
21   A  No, I can't -- I can't -- I cannot go on what if or
22 if it's not gonna happen or hadn't happened.
23   Q  All right.  And -- and I think -- if I remember
24 correctly, you testified that you're not aware of any problems
25 or complaints about the application process for the BCS

Page 93

1 policy?
2    A  No, sir.
3    Q  Are you -- are you aware of any conversations that
4 took place between either Companion Life, Hall, Swetnam and my
5 clients regarding advance funding?
6    A  No, sir.
7    Q  Okay.  Thank you very much for your time.
8    A  Thank you.
9       (Time:  1:12 p.m.)
10 BY MS. HEGLAND:
11   Q  Mr. Sanchez, does the school district have any
12 written procedures for how claims are processed?
13   A  No, it's mainly -- mainly -- mainly dictated by the
14 TPA, you know, the process that we establish and how we want
15 -- how we want.  A lot of it, I guess, since -- since we -- we
16 authorize them to write checks on our account, they also do
17 the reconciliation for those checks.  So, as long as those
18 things are paid on a timely basis and I don't get any calls, I
19 guess that's okay.
20       MR. SHUCHART:  Objection.  Non-responsive after
21 the word, "No."
22   Q  (Ms. Hegland)  Are you familiar, Mr. Sanchez, with
23 the claims handling process in place at the school district
24 for the 2000-2001 school year?
25   A  We don't -- we don't handle the claims.  The

Lorenzo Sanchez
June 26, 2003

Case 1:03-cv-00047    Document 42    Filed in TXSD on 02/17/2004    Page 55 of 122

Multi-Page

San Benito C.I.S.D.
v. Compa... n Life Insurance Company, et al.

## Page 94

1 third-party administrator handles all the claims.

2     MR. SHUCHART: Objection. Non-responsive.

3     Q (Ms. Hegland) Are you familiar with the manner in
4 which the third-party administrator is put on notice of claims
5 from your employees at the school district?

6     A Yes.

7     Q Would you describe that for us? And, if you can,
8 focus on the 2000-2001 school -- I'm saying school year, but I
9 should probably be referring to the contract here.

10     A Period in question?

11     Q That's good.

12     A Yes. In -- in -- my understanding is that when one
13 of our employees is provided services, that, you know, we --
14 we issue a card. Each employee has a card. They present the
15 card. The provider then mails the claim to the third-party
16 administrator, in this case MBA. MBA, depending whether it is
17 a small claim, big claim, they have a large claims management
18 system which they review, reprice the claims and -- and at
19 that point when -- when all of that has been checked, then
20 payment is made.

21     Q So, it's your understanding that for the 2000-2001
22 policy period in question here, that the healthcare providers
23 would directly forward their bills to the TPA?

24     A Right. We don't -- we do not -- we don't handle any
25 of the -- that's correct.

## Page 95

1     Q That was my question.

2     A That's correct. That's correct.

3     Q The school district and Janie Gonzalez don't have to
4 log those and forward them on?

5     A No, ma'am.

6     Q Thanks. That's all I needed to know.

7     MR. BUSH: I have no further questions at this
8 time.

9     MR. WALRAVEN: I guess it's lunchtime. Do you?

10     MR. SHUCHART: No. No further questions at
11 this time.

12     MR. WALRAVEN: We'll reserve our questions for
13 another time.

14     (Proceedings concluded at 1:15 p.m.)

15

16

17

18

19

20

21

22

23

24

25

## Page 96

CHANGES AND SIGNATURE

PAGE    LINE    CHANGE          REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

## Page 97

I, LORENZO SANCHEZ, have read the foregoing

deposition and hereby affix my signature that same is true and

correct, except as noted above.

_____

LORENZO SANCHEZ

THE STATE OF TEXAS    )

COUNTY OF _____ (

Before me, _____, on this day personally

appeared LORENZO SANCHEZ, known to me (or proved to me under

oath or through _____) (description of

identity card or other document) to be the person whose name

is subscribed to the foregoing instrument and acknowledged to

me that they executed the same for the purposes and

consideration therein expressed.

Given under my hand and seal of office this ____ day

of _____, 2003.

_____

NOTARY PUBLIC IN AND FOR

THE STATE OF TEXAS

Case 1:03-cv-00047   Document 42   Filed in TXSD on 02/17/2004   Page 56 of 122

Lorenzo Sanchez                    Multi-Page                San Benito C.I.S.D.
June 26, 2003                                    v. Companion Life Insurance Company, et al.

Page 98

THE STATE OF TEXAS   }   NO. B-003-047 - SAN BENITO C.I.S.D. v.
                     (   COMPANION LIFE INSURANCE COMPANY,
                     )   et al.; UNITED STATES DISTRICT COURT,
                     (   SOUTHERN DISTRICT OF TEXAS,
COUNTY OF HIDALGO    }   BROWNSVILLE DIVISION

REPORTER'S CERTIFICATION
ORAL DEPOSITION OF LORENZO SANCHEZ
JUNE 26, 2003

I, DINA RAMIREZ, Certified Shorthand Reporter in and for

the State of Texas, hereby certify to the following:

That the witness, LORENZO SANCHEZ, was duly sworn by the

officer and that the transcript of the oral deposition is a

true record of the testimony given by the witness;

That the deposition transcript was submitted on

_____, to CELESTE GUERRA, Counsel for the witness,

for examination, signature and return to me by _____;

That the amount of time used by each party at the

deposition is as follows:

    Mr. Stephen R. Walraven:     0 Hrs., 0 Min.;
    Ms. Celeste Guerra:          0 Hrs., 0 Min.;
    Mr. Shelby J. Bush:          1 Hr., 31 Min.;
    Mr. Fred L. Shuchart:        0 Hrs., 38 Min.;
    Ms. Roberta J. Hegland:      0 Hrs., 18 Min.

That pursuant to information given to the deposition

officer at the time said testimony was taken, the following

includes counsel for all parties of record:

Page 99

Attorney for Plaintiff, San Benito Consolidated
    Independent School District:

HONORABLE STEPHEN R. WALRAVEN
Shaddock, Compere, Walraven & Good, P.C.
1250 N.E. Loop 410, Suite 725
San Antonio, Texas   78209
&
HONORABLE CELESTE GUERRA
Law Office of Rene Ramirez
1906 Tesoro Blvd.
Pharr, Texas   78577

Attorney for Defendant, Companion Life Insurance
    Company:

HONORABLE SHELBY J. BUSH
Piper Rudnick LLP
1717 Main Street, Suite 4600
Dallas, Texas   75201-4605

Attorney for Defendant, Managed Benefits Administrator
    and Insurance Consultants, Inc., and
    MBA of Wyoming, Inc.:

HONORABLE CINDY A. GARCIA
The Garcia Law Firm
201 North 1st Street
Harlingen, Texas   78550

Attorney for the Defendant, J. Allan Hall and
    Associates, Inc.:

HONORABLE ROBERTA J. HEGLAND
Bracewell & Patterson, L.L.P.
2000 One Shoreline Plaza, South Tower
800 North Shoreline Boulevard
Corpus Christi, Texas   78403-3700

I further certify that I am neither counsel for, related

to, nor employed by any of the parties or attorneys in the

action in which this proceeding was taken, and further that I

Page 100

am not financially or otherwise interested in the outcome of

the action.

Certified to by me this 22nd day of July, 2003.

_____

DINA RAMIREZ, Texas CSR #2267

Expiration Date:  12/31/2003

Action Reporting

P.O. Box 4513

McAllen, Texas   78502

(956) 631-1024

Page 101

REPORTER'S FURTHER CERTIFICATION

The original deposition was/was not returned to the

deposition officer on _____;

If returned, the attached Changes and Signature page

contains any changes and the reasons therefor;

If returned, the original deposition was delivered to

SHELBY J. BUSH, Custodial Attorney;

That $_____ is the deposition officer's charge to

the Defendant, Companion Life Insurance Company, for preparing

the original deposition transcript and any copies of exhibits;

That a copy of this certificate was served on all parties

shown herein.

Certified to by me this ____ day of _____, 2003.

DINA RAMIREZ, Texas CSR #2267
Expiration Date:  12/31/2003
Action Reporting
P.O. Box 4513
McAllen, Texas   78502
(956) 631-1024

xc:  Mr. Stephen R. Walraven
     Ms. Celeste Guerra
     Mr. Shelby J. Bush
     Ms. Cindy A. Garcia
     Ms. Roberta J. Hegland
     File

-$-

**$1** [2]    29:18    72:19
**$100,000** [1]    12:19
**$700,000** [1]    61:14
**$75,000** [1]    12:9
    12:12    18:8    29:15
    35:23    48:19    72:24
    73:1    90:22
**$900,000** [1]    50:13

-'-

**'01-2002** [1]    76:20
**'60** [1]    9:2
**'60-something** [1]
    9:2
**'65** [4]    9:2    9:5
    9:9    9:9
**'66** [3]    9:2    9:5
    9:9
**'81** [1]    8:13
**'86** [1]    54:22
**'87** [2]    8:8    8:8
**'91** [1]    8:8
**'96** [6]    7:16    7:25
    59:3    59:17    59:17
    66:12
**'97** [1]    66:12
**'98** [1]    66:12
**'99** [4]    29:5    29:5
    29:22    30:12
**'em** [2]    46:3    46:3
**'til** [1]    59:17

-1-

**1** [2]    53:10    69:12
**10** [4]    39:19    39:20
    41:11    42:10
**10/1/2000** [3]    36:4
    37:18    39:14
**10/1/99** [1]    36:8
**10/16** [1]    44:10
**100** [1]    46:9
**11** [28]    28:20    29:25
    30:9    40:10    40:13
    40:20    41:5    41:9
    42:17    44:5    44:7
    44:23
**11-month** [2]    42:13
    42:22
**11/2** [1]    31:4
**11/22** [1]    32:6
**11/22/99** [2]    28:21
    31:4
**11:10** [1]    33:14
**11:20** [1]    33:14
**12** [2]    45:20    45:21
**12:00** [1]    56:20
**12:16** [1]    56:20
**12:51** [1]    80:13

**12:52** [1]    80:13
**12:54** [1]    81:1
**13** [4]    46:19    46:20
    46:24    50:16
**14** [1]    46:21    55:1
    55:3
**15** [4]    55:20    55:21
    60:4    83:6
**16th** [2]    39:25    40:16
**17** [3]    8:20    8:24
    10:3
**18** [1]    8:20
**1991** [1]    7:25
**1999** [1]    35:4
**1:09** [1]    91:3
**1:11** [1]    92:12
**1:12** [1]    93:9
**1:15** [1]    95:14
**1:30** [1]    31:4
**1st** [4]    14:1    14:2
    14:4    29:22

-2-

**2** [6]    17:23    17:24
    18:1    53:12    69:3
    69:4
**200,000** [1]    67:25
**2000** [16]    14:4
    27:10    27:20    29:14
    29:23    34:24    35:6
    35:7    36:23    36:23
    39:25    44:10    60:1
    76:19    76:21    88:20
**2000-2001** [11]    36:24
    62:8    63:11    63:21
    63:24    66:16    68:19
    77:22    93:24    94:8
    94:21
**2001** [9]    36:4    36:5
    36:23    37:18    39:15
    43:19    44:2    50:12
    55:9
**2001-2002** [5]    76:22
    77:16    77:22    78:5
    79:6
**2002** [1]    46:21
**21** [1]    88:20
**21.21** [1]    69:11
**21st** [4]    34:24    35:6
    35:7    35:10
**22nd** [1]    29:5
**23rd** [2]    29:4    35:4
**240** [1]    31:7
**2nd** [2]    27:10    27:20

-3-

**3** [3]    23:12    23:14
    30:1
**30th** [1]    29:23
**31st** [4]    14:1    14:2
    37:18    39:15    43:14
    43:17    50:12    67:17

-4-

**4** [5]    24:10    24:12
    25:24    30:10    35:13

-5-

**5** [3]    25:24    26:20
    26:21
**50** [1]    12:21

-6-

**6** [7]    28:9    28:10
    30:2    34:1    35:3
    36:8    69:8
**60** [1]    7:11

-7-

**7** [12]    33:7    33:15
    34:2    34:7    34:14
    34:21    35:7    36:3
    40:15    55:9    88:17
    89:8
**7/1/99** [1]    29:14
**700,000** [1]    61:25
**75,000** [2]    64:2
    72:19
**750** [1]    61:25
**760** [1]    61:25

-8-

**8** [3]    37:10    37:11
    53:3
**8/31** [1]    36:4

-9-

**9** [2]    39:11    39:12
**9/30/2000** [1]    36:8
**9/30th** [1]    29:14
**900,000** [1]    48:22

-A-

**A.D** [1]    8:22
**a.m** [2]    33:14    33:14
**ability** [2]    50:4
    54:8
**able** [4]    13:22    16:6
    16:17    42:7
**above** [2]    52:4
    52:23
**accepted** [3]    10:1
    44:13    44:15
**accomplish** [1]    43:11
**accomplished** [1]
    43:8
**according** [1]    67:16
**account** [21]    50:9
    50:13    51:16    52:5
    52:9    52:15    52:23
    53:12    53:16    53:25
    54:1    54:10    54:24

**61:1    61:2    61:4**
**65:16    65:20    67:21**
**68:2    93:16**
**accountant** [1]    54:18
**accounting** [6]    8:3
    8:12    8:15    54:14
    54:17    85:1
**accounts** [7]    51:20
    51:22    52:19    53:19
    62:3    65:13    84:25
**accumulated** [1]
    48:21
**accurate** [1]    78:4
**acknowledges** [2]
    30:2    30:16
**acted** [1]    73:22
**actual** [1]    62:8
**Adam** [1]    83:15
**added** [1]    75:3
**addressed** [6]    40:2
    44:10    47:17    55:6
**addresses** [1]    86:7
**adds** [1]    75:7
**administration** [5]
    31:7    81:8    86:16
    86:20    87:6
**administrative** [7]
    8:15    10:11    10:12
    10:14    11:8    55:22
    63:3
**administrator** [15]
    14:11    14:22    27:7
    31:2    51:21    52:13
    56:5    56:24    60:10
    69:16    88:3    88:11
    94:1    94:4    94:16
**administrators** [2]
    11:20    23:19
**adult** [1]    84:1
**advance** [39]    18:13
    18:14    18:22    18:24
    18:25    19:3    20:13
    20:17    20:19    20:22
    20:24    21:2    21:4
    21:13    26:5    26:12
    26:16    26:17    27:24
    33:2    33:5    37:8
    45:17    46:16    64:19
    65:3    65:3    66:7
    66:12    66:16    70:4
    70:6    70:15    70:16
    72:6    72:10    74:22
    74:25    93:5
**affect** [1]    26:13
**afforded** [1]    63:11
**afternoon** [1]    56:22
**again** [10]    38:6
    49:10    64:4    65:23
    67:23    70:20    71:1
    73:13    79:2    92:2
**against** [2]    11:15
    68:16
**agenda** [3]    57:12
    57:13    87:15
**agent** [5]    32:11

**33:24    36:13    36:16**
**53:7**
**aggregate** [4]    28:13
    52:8    63:6    63:6
**ago** [2]    59:18    76:8
**agree** [2] 16:10    18:12
**agreed** [1]    18:18
**agreement** [15]    14:21
    18:21    20:7    41:22
    41:24    42:4    55:22
    56:6    56:8    56:12
    59:25    60:5    76:24
    77:1    77:8
**ahead** [4]    17:19
    47:6    47:11    65:15
**ahold** [1]    32:2
**Al** [1]    55:6
**Alice** [5]    9:6
    9:6    9:9    9:24
    10:2
**Alicia** [1]    83:3
**align** [1] 13:14
**Allan** [18]    18:5
    19:4    20:16    25:1
    25:2    27:12    27:19
    44:20    44:24    49:8
    49:15    55:7    63:14
    89:22    90:1    90:18
    90:24    91:23
**allegation** [1]    18:12
**allegations** [4]    18:2
    20:21    68:14    71:21
**allow** [2]    7:5
    52:22
**alone** [1]    17:1
**along** [1]    91:19
**always** [6]    41:20
    54:11    59:2    62:23
    73:7    76:25
**Amanda** [1]    83:16
**American** [3]    8:12
    8:14    81:10
**amount** [9]    17:3
    48:25    50:16    52:4
    52:9    52:9    60:17
    63:6    76:13
**amounts** [5]    47:9
    52:4    52:22    72:13
    72:18
**analysis** [2]    13:17
    88:10
**Anna** [3]    82:20
    82:20    83:15
**answer** [3]    7:6
    77:10    90:6
**answered** [1]    49:4
**answering** [1]    76:23
**anytime** [2]    75:7
    75:19
**anyway** [3]    47:6
    80:8    80:9
**APEX** [1]    49:13
**appear** [8]    37:15
    37:21    44:14    44:20

Case 1:03-cv-00047    Document 42    Filed in TXSD on 02/17/2004    Page 58 of 122

Lorenzo Sanchez                    Multi-Page™                    appeared - claim
June 26, 2003                                            San Benito C.I.S.D.

44:23    45:13    45:15
56:4
appeared [1]          89:18
applicant [6]          30:2
30:3    30:16    30:18
32:25    35:13
application [33]
19:10    19:14    28:15
28:16    29:2    30:17
31:6    32:10    32:15
33:18    33:23    36:11
40:3    40:8    40:9
40:15    40:19    41:9
41:9    41:18    56:12
74:6    74:15    75:16
78:9    78:24    79:6
88:18    88:22    89:2
89:8    92:19    92:25
applications [3]
28:2    58:21    63:18
applying [1]          35:22
Approximate [1]
8:25
April [1]              83:3
area [2]    86:1    86:13
areas [1] 19:23
Arnie [1]              24:2
arrangement [5]
11:18    18:17    19:3
59:4    77:9
arrangements [1]
73:2
arrived [1]            11:5
Article [1]          69:11
aside [1] 86:17
aspects [2]          58:11
61:3
assigned [1]          44:3
assistant [7]          7:13
8:22    46:1    57:16
84:18    86:24    87:5
associated [2]        24:3
32:13    90:11
Associates [8]        23:25
25:1    25:2    55:7
89:22    90:2    90:18
90:24
association [2]        23:8
32:14
assume [2]            79:23
85:18
assumes [1]          26:9
assuming [3]          14:25
15:1    37:2
assumptions [2]
26:11
assurance [1]        46:9
athletic [1]          10:13
attach [1]            46:3
attached [5]          24:22
24:24    25:11    26:1
27:23
attempted [1]        43:2
attend [1]            9:21

attended [1]          9:11
attorney [3]          15:2
69:22    79:17
attorneys [1]        37:24
audit [11]            47:19
49:5    49:5    49:7
49:8    49:10    49:22
49:25    50:3    50:15
67:16
auditing [5]          49:11
49:14    49:14    49:15
49:16
auditor [2]          50:5
50:5
August [8]          14:1
14:2    37:18    39:15
43:14    43:17    50:12
67:17
aunt [1] 83:16
author [1]          26:24
authority [7]        20:9
31:13    31:16    31:20
51:21    57:16    57:20
authorization [2]
19:25    20:8
authorize [3]        52:17
57:5    93:16
authorized [4]        31:3
31:18    52:20    65:15
authorizes [2]        19:24
57:14
available [1]        19:24
74:25    75:3    87:23
aware [18]          18:16
19:4    20:8    47:19
47:20    49:4    49:5
50:15    56:9    66:14
68:9    69:15    74:25
91:20    91:20    92:3
92:24    93:3
awareness [2]        47:23
49:24

-B-

B.A [2]    9:18    9:19
B.A. [1] 81:7
background [1] 54:15
bad [1]    75:17
balance [2]          52:23
88:8
bank [4] 53:20    54:9
65:18    68:1
based [3]            32:24
41:8    70:13
basic [1] 58:8
basis [9] 51:1    65:7
66:19    66:24    71:4
73:5    76:14    77:14
93:18
basketball [1]        8:22
Bates [1]            30:1
BCS [6]    77:25    78:4
78:9    92:16    92:20
92:25

becoming [1]          9:22
began [1]            14:4
beginning [1]        52:20
behalf [4]          20:10
38:1    48:2    56:23
behind [2]          44:17
68:10
below [1]            30:20
beneficiaries' [1]
15:7    47:10
benefit [11]          11:2
11:5    13:7    13:9
29:13    56:13    65:19
85:9    87:21    89:17
benefits [20]        18:6
19:3    20:25    56:24
58:13    60:9    69:16
72:14    73:25    74:2
78:19    78:20    85:21
86:2    86:14    86:16
86:21    87:6    92:15
92:15
Benito [14]          7:14
11:5    11:25    22:21
31:8    37:17    39:8
44:11    81:24    82:1
84:6    86:21    87:23
89:24
best [7]    45:5    63:17
63:17    66:11    72:14
76:15    89:17
better [4]          13:17
19:8    75:12    84:18
between [11]          18:21
19:9    19:20    20:7
20:7    29:22    41:19
61:9    63:14    85:11
93:4
beyond [2]          81:6
81:11
bid [6]    14:10    14:14
14:19    23:20    41:25
77:1
bids [1] 23:18
big [1] 94:17
Bill [1]    23:8
bills [1] 94:23
birth [1] 15:20
Blagg [1]            55:6
blank [1]            80:10
board [20]          11:12
13:17    20:9    21:23
22:4    22:14    22:23
23:4    23:10    57:13
57:14    57:23    58:3
58:4    77:4    87:10
87:12    87:16    87:17
88:13
Borrego [1]          83:16
Bostrom [1]          59:9
bottom [4]          23:23
26:8    44:12    55:23
break [1]            16:6
33:8    33:10
briefly [4]          57:2

60:12    60:21    80:5
bring [2]            79:4
88:24
broad [1]            58:18
broker [1]          25:3
brother [1]          82:18
brought [2]          89:9
89:16
Brownsville [7]
8:12    8:14    8:20
9:10    10:10    82:10
82:22
budgets [1]          10:15
building [2]          31:7
32:1
bullet [1]            26:8
Bush [70]            10:10
11:14    14:13    15:5
15:14    15:17    15:19
16:2    16:19    16:23
17:11    17:13    17:23
17:25    23:13    24:11
25:22    25:25    26:3
26:21    28:10    28:22
28:24    29:1    29:11
29:12    30:7    30:9
30:14    30:15    31:15
31:19    31:24    33:8
33:13    33:15    35:1
35:3    37:11    38:19
39:12    39:20    41:1
41:7    42:17    44:6
45:8    45:21    46:20
46:24    47:2    47:7
47:13    47:19    52:14
53:23    53:24    54:13
54:14    55:2    55:21
56:15    60:2    69:5
69:7    84:14    90:4
91:2    91:4    95:7
business [6]          7:19
52:3    52:7    52:21
75:9    81:8
buy [2]    60:18    61:10

-C-

C.I.S.D [2]          11:25
44:11
cafeteria [1]        86:6
calls [4] 20:1    40:23
49:12    93:18
Cameron [5]          82:14
82:15    82:16    82:23
83:12
cannot [2]          83:18
92:21
capacities [1]        8:21
capacity [5]        10:11
22:7    22:9    22:11
22:13
capital [3]          49:12
49:12    49:13
card [3] 94:14    94:14
94:15
care [1] 85:16

Carpio [2]          86:7
86:18
carrier [10]          21:6
21:9    36:14    36:18
47:25    73:3    73:12
73:20    77:16    78:4
carriers [1]          77:21
77:23    79:1
case [4] 47:20    47:23
88:3    94:16
cases [3]            19:18
19:18    20:3
cash [2] 51:22    68:2
cash-flow [2]        13:16
88:13
cashed [1]          65:18
casualty [1]          58:12
85:10    86:6
catastrophic [1]
13:3
census [1]          17:5
Central [1]          31:7
certain [3]          60:17
67:20    68:14
certainly [2]        15:25
19:6
certainty [1]        47:18
certification [1]
54:21
certified [1]        54:18
chain [1]            87:1
Chalk [1]            25:22
chance [1]          18:1
change [1]          24:20
charge [1]          84:23
85:4
charged [2]          12:23
26:13
check [9]            17:3
18:10    21:6    32:2
53:11    53:14    53:17
54:1    67:4
checked [1]          94:19
checking [1]          61:2
62:3    65:20
checks [40]          16:24
38:21    50:16    51:1
51:4    51:14    51:17
51:22    51:24    52:1
52:4    52:8    52:11
52:14    52:18    52:22
53:13    53:20    53:21
54:2    54:23    54:24
65:12    65:16    65:18
65:25    66:3    66:19
66:23    67:5    67:16
67:21    67:24    68:3
68:5    68:8    68:10
73:17    93:16    93:17
choice [1]            10:8
circumstances [1]
41:15
claim [14]          16:21
21:7    47:8    48:1

Lorenzo Sanchez
June 26, 2003

Case 1:03-cv-00047   Document 42   Filed in TXSD on 02/17/2004   Page 59 of 122

Multi-Page

claimants - disallowed
San Benito C.I.S.D.

| | | | |
|---|---|---|---|
| 48:6 49:16 51:11 | 36:17 37:16 40:3 | **contract-holder** [1] | **cover** [15] 12:6 |
| 53:5 53:7 | 49:8 68:18 69:13 | 53:7 | 20:13 28:22 36:9 |
| 55:16 94:15 94:17 | 77:24 90:4 90:8 | **contracts** [5] 26:18 | 50:4 51:17 51:24 |
| 94:17 | 90:12 91:6 91:8 | 59:12 59:22 75:10 | 52:1 53:22 54:1 |
| **claimants** [1] 49:3 | 91:13 91:23 93:4 | 75:12 | 58:16 58:17 58:17 |
| **claiming** [2] 71:21 | **company** [14] 11:15 | **contribution** [5] | 74:9 74:18 |
| 90:19 | 14:8 21:10 24:1 | 12:1 12:12 60:17 | **coverage** [23] 12:7 |
| **claims** [52] 12:4 | 24:3 27:5 27:21 | 60:19 60:20 | 12:8 13:1 14:4 |
| 12:6 13:3 17:2 | 32:13 33:19 40:3 | **contributions** [3] | 14:17 25:16 26:11 |
| 17:8 30:3 30:18 | 49:9 67:16 91:7 | 60:16 61:10 61:12 | 27:11 29:2 29:7 |
| 32:25 35:16 36:1 | 91:8 | **controversy** [1] 48:25 | 35:22 35:25 37:16 |
| 36:3 47:21 47:21 | **compare** [3] 26:15 | **conversation** [2] | 42:25 44:21 44:25 |
| 47:22 47:24 48:9 | 34:1 35:22 | 64:14 74:21 | 45:14 62:25 63:11 |
| 48:12 48:12 48:19 | **competitive** [1] 14:10 | **conversations** [26] | 65:8 70:24 71:3 |
| 48:24 49:6 50:4 | **complaining** [1] | 43:6 62:11 62:14 | 90:22 |
| 50:8 50:9 55:5 | 90:23 | 62:18 62:22 63:9 | **coverages** [1] 70:20 |
| 60:14 61:6 61:11 | **complaint** [3] 20:22 | 63:20 63:23 64:11 | **covered** [7] 13:12 |
| 62:9 62:19 65:12 | 20:23 80:18 | 64:18 64:23 64:24 | 16:21 27:16 53:8 |
| 65:18 66:23 68:15 | **complaints** [4] 80:15 | 65:24 66:2 74:8 | 53:20 53:21 74:8 |
| 73:4 73:7 73:7 | 80:20 80:22 92:25 | 74:10 74:12 78:8 | **covers** [2] 15:14 |
| 73:21 75:25 76:7 | **complicated** [1] | 78:23 89:18 89:22 | 29:21 |
| 76:10 77:13 88:9 | 7:3 | 90:1 90:8 90:12 | **CPA** [1] 81:12 |
| 90:22 92:20 93:12 | **component** [5] 21:14 | 91:20 93:3 | **Crockett** [1] 31:7 |
| 93:23 93:25 94:1 | 26:13 33:5 37:8 | **coordinator** [4] 8:13 | **cross-training** [1] |
| 94:4 94:17 94:18 | 45:17 | 8:15 10:13 65:10 | 86:9 |
| **Clarendon** [3] 21:12 | **comprise** [1] 48:24 | **copy** [8] 57:15 57:21 | **current** [1] 7:12 |
| 37:3 77:24 | **comprising** [1] 50:16 | 39:13 44:14 50:6 | **cut** [2] 67:6 67:17 |
| **clarity** [1] 28:18 | **concerning** [1] 50:4 | 55:5 55:13 56:4 | **cutoff** [1] 43:18 |
| **classes** [1] 54:17 | 64:2 | **correct** [58] 12:17 | 43:20 |
| **clearer** [1] 7:7 | **concluded** [1] 95:14 | 12:24 12:25 19:15 | |
| **client** [5] 73:22 | **conducted** [2] 47:20 | 30:21 35:19 35:23 | **-D-** |
| 73:24 74:2 80:15 | 49:5 | 35:24 36:11 37:15 | |
| 80:18 | **considered** [1] 53:4 | 37:23 39:13 39:17 | **daily** [1] 76:14 |
| **clients** [15] 68:17 | **Consolidated** [4] | 40:4 40:16 42:9 | **data** [3] 15:15 17:5 |
| 68:22 70:2 70:23 | 11:5 37:17 39:9 | 43:20 44:14 45:11 | 88:10 |
| 71:2 71:15 71:22 | 89:25 | 50:10 50:11 51:17 | **date** [13] 13:24 22:1 |
| 72:4 72:23 72:25 | **consultant** [2] 22:14 | 52:12 55:13 55:18 | 24:14 29:1 29:2 |
| 73:8 73:17 78:8 | 87:25 | 56:3 56:4 57:17 | 29:3 29:7 32:8 |
| 78:24 93:5 | **Consultants** [3] 56:24 | 58:24 60:7 64:25 | 34:20 34:22 35:3 |
| **close** [2] 83:5 83:6 | 60:10 69:17 | 65:5 65:12 65:21 | 53:10 55:8 |
| **coach** [6] 8:21 | **contain** [1] 53:13 | 66:13 69:18 70:4 | **dated** [7] 27:10 |
| 8:22 8:22 9:6 | **contained** [1] 50:13 | 70:8 70:12 70:14 | 39:25 44:10 45:22 |
| 9:22 9:25 | **contains** [1] 53:12 | 70:21 70:24 71:16 | 46:21 60:1 88:18 |
| **coaches** [1] 10:15 | **contesting** [1] 16:24 | 71:20 75:14 78:2 | **dates** [5] 13:13 13:20 |
| **coaching** [3] 9:24 | **contingent** [1] 14:20 | 78:6 78:16 86:22 | 29:3 77:18 85:14 |
| 10:2 10:4 | **continue** [1] 76:25 | 86:24 86:25 87:7 | **daughter** [3] 83:24 |
| **Code** [2] 58:21 69:11 | **continues** [2] 30:10 | 87:8 89:12 92:1 | 83:25 84:1 |
| **college** [1] 9:11 | 53:13 | 94:25 95:2 95:2 | **day-to-day** [1] 65:7 |
| 9:21 10:18 | **contract** [48] 12:13 | **correctly** [1] 92:24 | **deal** [3] 13:22 45:5 |
| **coming** [1] 77:4 | 13:6 13:12 13:15 | **correspondence** [6] | 79:4 |
| **command** [1] 87:2 | 14:8 14:21 19:11 | 40:16 44:7 45:23 | **dealing** [3] 25:3 |
| **commitments** [1] | 19:15 22:4 23:2 | 46:7 46:21 55:4 | 62:7 65:7 |
| 19:6 | 25:5 26:16 27:12 | **cost** [1] 72:14 | **dealt** [1] 62:18 |
| **committed** [1] 71:22 | 27:13 27:14 27:17 | **costs** [2] 63:2 63:3 | **Dean** [1] 84:16 |
| **committee** [6] 57:8 | 28:12 28:15 30:16 | **could've** [2] 12:19 | **decided** [1] 10:4 |
| 57:10 57:10 57:10 | 30:17 33:5 37:7 | 12:21 | **decision** [1] 82:15 |
| 77:4 87:17 | 37:14 37:16 38:1 | **counties** [1] 82:24 | **decision-making** [1] |
| **committees** [1] 87:12 | 38:7 38:9 38:13 | **County** [3] 82:15 | 57:3 |
| **comp** [2] 85:10 | 38:22 39:14 42:3 | 82:16 83:12 | **decisions** [1] 72:1 |
| 86:8 | 42:12 42:13 42:16 | **couple** [1] 85:2 | **deductible** [7] 12:15 |
| **companies** [1] 14:19 | 42:22 42:22 43:2 | **course** [7] 52:3 | 12:24 13:5 29:15 |
| **Companion** [27] | 51:10 51:15 53:3 | 52:7 52:21 63:4 | 35:23 63:24 64:1 |
| 11:15 12:13 13:6 | 57:4 57:15 57:17 | 74:4 84:22 85:4 | **deemed** [1] 53:9 |
| 14:8 18:9 19:10 | 59:19 59:20 63:18 | **courses** [1] 58:16 | **Deere** [1] 82:22 |
| 19:10 21:8 21:9 | 91:9 94:9 | 58:20 | **Defendants** [1] 69:10 |
| 27:21 28:13 33:18 | | **cousins** [1] 82:25 | |
| | | 83:18 | |

| | |
|---|---|
| **define** [1] 20:13 | |
| **defined** [1] 16:24 | |
| **defining** [1] 18:25 | |
| **definition** [3] 38:12 | |
| 51:11 53:4 | |
| **definitions** [1] 76:3 | |
| **degree** [1] 9:17 | |
| **deliver** [1] 32:17 | |
| **delivering** [1] 53:11 | |
| **demand** [1] 52:1 | |
| **Denton** [2] 9:14 | |
| 10:2 | |
| **department** [6] 85:1 | |
| 85:1 85:2 85:9 | |
| 85:24 86:24 | |
| **departments** [3] | |
| 20:6 84:24 85:16 | |
| **dependent** [4] 18:7 | |
| 48:4 48:9 76:5 | |
| **dependents** [1] 47:6 | |
| 76:6 | |
| **depending** [3] 12:23 | |
| 13:22 94:16 | |
| **depose** [1] 86:4 | |
| **deposited** [1] 61:4 | |
| **deposition** [6] 17:7 | |
| 24:11 34:1 53:4 | |
| 79:14 83:23 | |
| **depository** [2] 53:18 | |
| 54:9 | |
| **describe** [1] 16:17 | |
| 57:2 60:12 94:7 | |
| **designations** [1] | |
| 16:8 | |
| **designee** [1] 19:23 | |
| **detailed** [1] 76:13 | |
| **details** [4] 16:4 | |
| 46:1 76:9 85:12 | |
| **determine** [1] 12:4 | |
| **development** [1] | |
| 85:6 | |
| **dictated** [1] 93:13 | |
| **difference** [3] 35:25 | |
| 36:10 72:8 | |
| **differences** [2] 34:2 | |
| 34:4 | |
| **different** [14] 12:5 | |
| 13:20 13:20 26:10 | |
| 26:11 26:18 34:6 | |
| 58:11 59:9 59:10 | |
| 59:11 60:19 76:6 | |
| 88:7 | |
| **differently** [1] 92:19 | |
| **difficult** [2] 69:19 | |
| 85:13 | |
| **direct** [1] 53:8 | |
| **directly** [4] 53:10 | |
| 61:4 91:11 94:23 | |
| **Director** [2] 7:18 | |
| 55:5 | |
| **directs** [1] 57:11 | |
| **disallowed** [2] 50:16 | |
| 50:17 50:18 | |

Case 1:03-cv-00047    Document 42    Filed in TXSD on 02/17/2004    Page 60 of 122

Lorenzo Sanchez                                   Multi-Page                                   disbursed - funds
June 26, 2003                                                                             San Benito C.I.S.D.

disbursed [1]      53:6
disclosure [1]     79:25
discuss [3]        15:6
  55:16    87:14
discussed [2]      55:17
  63:16
discussion [2]     16:21
  87:15
discussions [1]    74:17
dismissal [1]      21:18
dispute [1]        16:20
  27:14   67:18   67:20
disputed [1]       92:20
distant [1]        83:4
distinction [1]    19:20
distinctly [1]     50:2
district [33]      7:14
  11:6     11:25   12:10
  14:9     14:13   14:13
  14:18    14:18   17:9
  18:5     18:9    18:10
  18:22    19:9    20:5
  21:5     21:24   22:24
  23:1     25:16   29:22
  37:17    38:2    39:9
  41:16    42:12   44:21
  44:24    45:14   48:20
  50:7     50:9    50:25
  51:20    52:4    52:7
  52:11    52:12   52:17
  52:22    54:8    57:3
  59:1     59:5    59:12
  60:13    60:16   60:20
  61:10    61:11   61:21
  62:2     64:7    65:8
  65:19    66:3    68:5
  68:6     68:9    68:16
  71:14    72:15   72:16
  73:1     73:5    73:6
  74:11    75:4    79:4
  86:21    87:24   89:17
  89:25    90:12   90:21
  91:10    91:15   91:17
  93:11    93:23   94:5
  95:3
district's [9]     11:14
  13:3     13:25   17:14
  27:7     37:24   46:11
  52:15    72:9
districts [1]      58:15
diving [1]         17:2
document [29]      17:22
  19:17    23:14   23:15
  24:8     24:12   24:13
  24:18    24:21   25:8
  26:6     26:23   28:12
  31:11    33:16   37:13
  38:24    39:9    39:13
  39:16    39:21   39:22
  44:8     45:19   45:24
  46:17    46:22   55:4
  77:20
documents [9]      15:10
  24:22    24:24   25:10
  36:19    79:13   79:21
  79:23    85:13
Doc [4]     15:21    47:15

48:9     48:10
doesn't [5]        43:14
  52:11    57:19   85:15
  92:1
dollar [5]         60:17
  63:5     72:13   72:18
  76:13
dollars [1]        13:10
Don [4]     27:4    55:5
  55:24    89:2
done [6]    54:11   63:15
  77:13    88:11   89:4
  90:19
double-check [1]
  47:3
down [2]           41:11
  65:16
draft [2]   53:11   53:14
draw [2]    61:6    65:16
drawn [1]          53:12
driver's [1]       81:17
dropped [1]        76:11
duly [1]    31:18
duplicate [1]      37:22
during [2]         18:6
  39:14
duties [2]         19:12
  84:18
duty [1]    14:20

          -E-

ear [1]     61:1
earmarked [2]      60:25
  61:15
Eastern [1]        8:3
education [1]      81:6
effect [1]         75:19
effective [3]      29:1
  29:2     29:6
either [11]        9:5
  13:21    23:18   25:14
  37:8     57:11   57:20
  69:24    71:24   76:12
  93:4
Elvia [1]          83:17
employee [17]      12:1
  12:10    13:7    17:8
  18:7     22:23   29:13
  29:16    29:19   48:2
  48:10    56:12   60:17
  60:18    60:19   76:5
  94:14
employee's [1]     18:7
employees [5]      42:8
  47:5     76:6    94:5
  94:13
employees' [1]     47:10
end [13]    9:24    16:25
  18:11    38:22   40:13
  40:20    41:13   43:14
  43:15    43:20   43:23
  86:8     89:12
ended [1]          59:19

enlarged [1]       37:22
entail [1]         11:2
enter [2]   57:4    57:17
entered [1]        59:12
entering [1]       57:14
entire [1]         69:21
entitled [1]       79:18
entity [1]         49:12
ERISA [3]          56:8
  56:9     56:11
essence [3]        68:6
  70:14    71:20
establish [2]      12:5
  93:14
established [1]    11:25
estimate [1]       12:3
etc [1]     78:22
events [1]         14:7
Eventually [1]     50:19
everybody [2]      16:4
  16:8
everyday [1]       46:1
evidence [1]       67:15
evolved [1]        48:18
exactly [1]        16:8
Example [1]        72:5
exceeding [1]      48:19
exceeds [2]        52:9
  61:12
excess [6]         18:8
  28:13    37:14   72:24
  73:1     90:22
execute [1]        75:10
executed [1]       75:16
exhibit [52]       17:7
  17:23    17:24   18:1
  23:12    23:13   24:10
  24:12    26:20   26:21
  28:9     28:10   30:2
  33:7     33:15   34:1
  34:2     34:7    34:14
  34:21    35:3    35:7
  36:3     36:8    37:10
  37:11    37:20   39:11
  39:12    39:19   39:20
  40:15    41:11   42:10
  44:5     44:6    44:23
  45:20    45:21   46:19
  46:20    49:2    53:3
  55:1     55:3    55:20
  55:21    60:2    60:4
  69:2     88:17   89:8
exhibits [4]       17:4
  17:6     35:13   35:23
expect [2]         73:24
  74:2
expectation [1]    66:15
expedite [1]       73:4
expenditures [1]
  12:9
expenses [2]       18:8
  18:11    29:13   29:22
experience [2]     11:4

11:10
expertise [2]      11:21
  73:4
explain [7]        11:17
  11:22    18:15   18:24
  21:21    67:1    84:21
explained [1]      20:12
explains [1]       36:10
exposure [1]       13:3
extend [1]         77:7
extent [4]         15:9
  21:21    23:5    65:17

          -F-

face [1]    77:8
fact [3]    19:14   55:16
  91:21
facts [1]   70:19
fair [8]    23:1    25:17
  25:19    25:20   25:21
  48:24    51:6    73:13
fairly [2]         56:10
  78:2
faith [1]   11:19
familiar [8]       39:8
  39:10    49:19   49:20
  49:22    56:10   93:22
  94:3
family [7]         81:25
  82:6     82:8    82:12
  82:23    82:25   83:9
far [5]     15:22   40:18
  42:2     44:2    77:10
favorable [1]      77:5
fax [2]     25:23   50:5
February [1]       46:21
felt [2]    63:16
female [1]         15:20
few [6]     76:8    81:5
  82:7     83:1    85:11
  91:5
figure [2]         15:23
  16:3
figures [2]        76:17
  88:4
file [2]    26:1    73:4
filing [1]         15:23
fill [1]    87:13
final [1]   40:8
finance [3]        7:13
  57:9     57:10   77:3
  84:19    84:22   85:2
  87:15
finances [1]       88:8
finding [2]        49:22
  49:25
fine [3]    17:12   33:10
  46:10
finish [1]         7:5
finished [1]       47:12
first [18]  9:4    10:10
  11:4     18:13   18:14

18:16    25:9    25:14
  25:18    30:3    30:18
  32:25    35:14   40:6
  45:8     47:3    81:6
  87:11
fiscal [6]         13:15
  13:25    43:4    43:13
  43:14    44:3
fit [1]     51:10
five [1]    7:24
fleet [2]   85:10   86:6
float [1]   68:6
floating [1]       54:24
Flores [1]         83:16
focus [1]          94:8
following [1]      69:12
food [1]    84:25
football [1]       8:21
forever [1]        84:11
forgot [1]         71:25
form [6]    11:13   11:24
  38:18    41:3    42:14
  52:10
formal [1]         20:8
format [1]         88:12
forth [5]   10:25   23:9
  26:4     46:7    63:4
forward [6]        13:21
  45:2     45:3    52:8
  94:23    95:4
forwarded [2]      38:23
  51:14
found [1]          50:19
four [3]    26:8    26:8
  84:12
fraud [1]          71:22
Fred [3]    17:11   30:9
  56:22
free [4]    7:1    31:16
  80:9     80:10
front [2]   43:15   43:23
full [1]    23:18
fund [6]    58:4    58:14
  60:25    61:13   63:7
funding [38]       18:22
  18:24    18:25   19:3
  20:13    20:17   20:19
  20:22    20:24   21:2
  21:4     21:13   26:5
  26:13    26:16   26:17
  27:24    33:2    33:5
  37:8     45:17   46:16
  60:12    64:19   65:3
  65:4     66:7    66:12
  66:16    70:4    70:6
  70:15    70:16   72:6
  72:11    74:23   74:25
  93:5
funds [10]         51:25
  52:1     53:6    53:13
  61:4     61:17   61:22
  65:20    67:22   67:22

Case 1:03-cv-00047   Document 42   Filed in TXSD on 02/17/2004   Page 61 of 122

Lorenzo Sanchez                    Multi-Page™                    Garcia - language
June 26, 2003                                                  San Benito C.I.S.D.

**-G-**

Garcia [1]               86:5
Garza [1]               83:17
general [4]             58:18
60:23   60:23   61:13
generally [4]           39:6
39:7    57:8    64:5
generated [1]           61:24
generates [1]           61:21
given [1]               66:15
glad [1]    47:7
goal [1]    43:8
goes [6]   45:1    46:7
59:9    60:20   60:22
87:16
gonna [15]             15:23
16:10   17:16   28:22
43:4    63:3    67:25
68:1    72:14   76:25
77:2    84:13   86:4
89:3    92:22
Gonzalez [7]           46:2
65:9    76:16   86:3
86:4    86:19   95:3
good [11]              11:19
15:2    15:16   15:18
56:22   75:9    76:17
79:4    79:21   89:19
94:11
goodies [1]            85:7
Gracie [2]             86:7
86:18
graduated [1]          9:8
graduating [1]         9:25
green [2]              9:15
9:16
Greer [10]             22:15
22:19   23:8    32:12
32:18   36:13   74:15
74:16   74:21   88:25
group [3]              11:2
11:4    23:3
Guerra [1]             47:17
56:16   82:14
guess [11]             7:16
9:9     37:2    51:8
59:18   67:2    82:8
88:24   93:15   93:19
95:9
guidance [1]           87:25
guys [2] 13:22   79:1

**-H-**

H.R [1]   10:19
Hall [20] 18:5    19:4
20:16   25:1    25:2
27:12   27:19   44:20
44:24   49:8    49:15
55:6    55:7    63:14
89:22   90:1    90:18
90:24   91:23   93:4
hand [1] 60:3

handful [1]            83:6
handle [2]             93:25
94:24
handled [4]            14:11
79:6    92:19   92:20
handles [1]            46:1
94:1
handling [3]           62:9
62:19   93:23
hands-on [2]           62:7
85:19
handwriting [1]
30:23
Hanna [1]              10:13
hard [2]  46:6    83:4
Harlingen [1]          22:22
hat [1]   85:7
He'd [2] 88:25   89:1
head [2] 85:8    86:23
health [17]            11:2
11:4    13:3    13:15
15:15   23:3    58:12
60:13   61:2    85:9
85:21   86:1    86:14
86:16   86:21   87:6
87:19
healthcare [2]         53:9
94:22
hear [1] 78:11
heard [1]              9:25
Hegland [17]           14:25
15:4    15:13   16:10
16:14   24:20   34:23
34:25   81:2    81:19
82:15   84:15   89:21
90:7    93:10   93:22
94:3
held [9]   7:15    7:23
8:7     10:11   23:10
61:17   68:5    68:10
82:9
help [2] 30:5    86:17
Hey [1]  20:1
hierarchy [1]          57:3
high [3] 9:25    10:13
10:18
Highlands [2]          7:19
10:23
HIPAA [1]              15:7
hiring [1]             85:5
historic [1]           8:10
hold [3] 10:12   58:5
68:8
honored [1]            53:14
hope [1] 84:10
hour [1] 33:12
hours [1]              85:15
human [5]              7:13
10:19   11:1    31:2
84:19
Hutchison [1]   55:6

**-I-**

I.S.D [2]              8:21
10:10
idea [1]  15:16   15:18
21:3    21:4    24:4
31:10   60:9    67:12
identified [1]         16:12
53:3
identify [8]           23:16
26:22   28:11   33:17
37:12   44:9    55:3
55:21
idly [1]  51:20
immediate [2]          46:1
82:25
immediately [2]
40:9    40:19
in-between [1]   87:1
Inc [8]   56:24   60:6
60:10   68:22   69:16
69:17   80:15   80:19
inches [1]             30:20
including [1]          60:19
69:12
incomprehensible [1]
7:3
incorporated [1]
77:9
incurred [6]           12:4
12:9    18:6    18:11
29:13   29:14
independent [6]
11:6    37:17   39:2
39:9    87:23   89:25
indicate [2]           29:21
33:4
indicated [1]          62:1
indicates [2]          24:6
41:12
individual [3]   31:18
72:20   75:25
Individually [1]
79:11
individuals [2] 16:7
48:20
industry [1]           26:12
information [5] 17:2
19:7    47:1    50:3
57:12
initial [6]            44:17
44:18   45:11   79:24
89:4    89:11
initialled [2]         40:11
55:23
initials [2]           24:15
24:16
instance [1]           15:8
instances [1]          56:8
instead [1]            42:25
instructions [1]45:3
insurance [40]         11:15
12:13   13:3    14:8
15:15   21:9    23:25
27:21   33:18   37:16
40:3    49:8    56:24

issuing [1]            65:24
it'd [1]               85:25
it'll [1]              90:5
item [2]  57:13   87:15
items [2]              35:21
35:22
itself [3]19:17   49:12
63:8
IX [1]    69:8

**-J-**

J [18]    18:5    19:4
20:16   25:1    25:2
27:12   27:19   44:20
44:24   49:8    49:15
55:7    63:14   89:22
90:1    90:18   90:24
91:23
Jane [2] 15:21   48:9
Janie [14]             46:2
46:3    65:9    76:15
76:16   85:25   86:3
86:4    86:11   86:15
86:19   86:23   88:5
95:3
Janie's [1]            86:1
Jimmy [1]              82:20
82:21   83:14
JoAnn [1]              83:15
job [4]   9:4     10:2
71:17   89:19
John [4] 15:21   47:15
48:10   82:22
Jr [1]    33:25
jury [1]  82:9

**-K-**

keep [2] 41:23   75:5
kind [6] 14:9    22:17
58:10   88:24   89:6
89:14
kinds [6]              42:1
58:14   61:15   85:6
88:9    89:5
knowing [1]            69:22
82:8
knowledge [12] 18:19
21:22   24:8    42:2
66:5    66:6    68:9
68:11   70:13   73:4
90:3    91:7
knowledgeable [1]
86:20
known [1]              7:2
knows [1]              16:8

**-L-**

label [1] 30:1
lack [2] 19:8    70:16
language [12]   26:9
30:2    30:4    30:11
30:20   32:24   33:4
35:12   40:12   41:1

57:5    57:25   58:6
58:12   58:12   58:13
58:17   58:21   60:10
61:10   65:9    69:11
69:17   72:17   74:3
75:15   78:9    78:22
85:10   85:21   86:6
86:21   87:12   87:19
90:9    91:7    91:8
insured [1]            23:18
intent [5]             19:5
20:16   20:18   41:4
43:6
intention [1]          9:21
intentionally [2]
91:25   92:5
interested [2]         75:5
82:8
interim [1]            76:10
interlocal [1]         41:22
41:24   42:4    76:24
77:1    77:8
interpret [9]          19:1
41:1    42:13   53:15
53:24   54:4    54:6
54:7    54:8
interpreting [1] 51:6
interrupt [1]          60:21
interviewed [1] 10:24
invested [2]           51:25
65:20
investment [3] 50:6
61:5    61:18
investments [2]50:6
54:12
involve [2]            58:16
84:21
involved [7]           38:16
41:21   48:13   66:6
75:25   76:6    86:16
involvement [1]
42:2
involves [3]           46:11
47:23   58:11
Iraq [3] 84:2    84:3
84:4
issuance [1]           14:7
issue [32]             13:6
13:12   16:23   17:1
31:16   31:19   31:20
32:4    36:22   38:15
49:6    51:1    51:2
51:7    52:4    52:8
52:11   52:18   52:22
55:17   66:19   66:23
67:2    67:3    67:4
67:13   67:24   70:20
72:12   75:18   76:24
94:14
issued [12]            18:10
21:7    27:20   37:17
51:4    51:14   51:19
52:2    52:14   66:3
68:18   69:13
issues [3]             15:8
61:16   87:13

Case 1:03-cv-00047    Document 42    Filed in TXSD on 02/17/2004    Page 62 of 122

Lorenzo Sanchez                  Multi-Page™                        lapsed – new
June 26, 2003                                               San Benito C.I.S.D.

53:15    53:24
lapsed [1]              81:14
large [3] 48:21        50:15
94:17
Larry [1]              55:6
Las [2]   7:21         7:21
last [5]  26:7         30:7
33:20    37:20         60:2
law [4]   10:1         10:6
14:14    84:13
lawsuit [20]          11:12
11:15    13:7          13:12
14:4    16:15         17:14
27:14    38:16        48:13
48:17    49:6         56:25
66:24    68:15        70:14
70:15    71:4         75:25
90:19
lawyer [4]            68:14
68:15    68:16        71:20
leading [1]           14:7
least [4] 43:3        50:13
67:16    74:5
leave [3] 20:5        51:20
62:2
left [3]   10:3       37:23
79:2
legal [2] 58:20       58:24
length [1]            36:9
letter [14]           26:24
27:3    27:9         27:19
27:23    30:12        39:25
41:8    44:10         45:22
46:8    55:10         55:13
55:16
letterhead [1]        55:7
level [5] 10:16       10:18
58:4    63:7          63:15
levelled [1]          43:7
license [1]           81:17
licensed [4]          22:18
32:10    33:23        36:13
licenses [2]          81:11
81:16
life [27] 11:15       12:13
13:6    14:8          18:9
19:10    19:10        21:8
21:9    27:21         28:13
33:18    36:17        37:16
40:3    49:8          58:12
68:18    69:14        90:4
90:8    90:13         91:7
91:8    91:13         91:23
93:4
lifetime [1]          13:9
limited [1]           69:12
line [1]   43:12
lines [2] 58:11       58:13
liquid [1]            51:25
list [5]   16:6       29:15
34:4    49:3          83:17
lists [1] 26:9
literature [1]        45:25
litigation [1]        36:22

live [1]  72:23
lived [1] 72:21
lives [1] 22:21
living [6]            10:5
82:12    82:23        83:12
84:5    84:6
local [2] 22:17       53:18
88:25
located [3]           7:20
8:5    31:5
log [1]   95:4
Lone [1] 61:19
look [25] 17:17       19:16
19:17    24:21        25:7
26:3    29:25         35:21
38:25    41:9         45:3
46:3    46:10         46:15
47:14    53:2         68:25
77:18    77:19        85:22
88:6    88:6          88:16
89:1    89:3
looked [2]            76:9
77:5
looking [5]           36:24
43:17    69:5         69:21
72:19
looks [6]             34:10
45:4    45:5          57:10
77:14    89:2
Lorenzo [1]           84:16
loss [46] 12:7        12:8
12:11    12:13        13:1
13:15    13:20        14:8
14:17    19:10        21:6
21:8    25:5          25:16
26:10    26:12        26:16
27:11    28:13        36:17
37:14    37:16        40:2
43:2    44:3          44:21
44:24    45:14        47:25
51:10    53:2         57:5
61:9    62:8          62:18
62:24    62:25        63:11
63:21    65:8         73:3
73:9    73:12         73:20
77:23    91:9
loud [2] 30:15        40:7
low [2]   53:19       75:5
Lucy [2] 86:5         86:17
lunch [1]             56:16
lunchtime [1]         95:9

────── -M- ──────

M.B.A [1]             81:8
ma'am [12]            81:4
85:20    87:3         88:19
88:21    89:10        89:23
90:3    90:10         90:14
90:25    95:5
mail [4] 67:4         73:17
73:17
mailed [2]            66:4
67:21
mailing [3]           53:11
54:23    65:25

mails [1]             94:15
maintenance [1]
84:25
major [1]             26:4
majority [2]          8:19
48:25
male [2] 15:21        15:22
man [1]   19:9
Managed [5]           56:23
60:9    69:16         78:19
78:20
management [7]
19:13    31:3         58:3
58:14    85:8         85:24
94:17
manager [1]          82:21
manner [1]            94:3
mark [3] 17:19        17:23
46:23
marked [19]           17:24
17:25    23:12        23:13
24:10    26:20        28:9
33:7    37:10         39:11
39:19    44:5         45:20
46:19    55:1         55:20
60:4    88:17         89:8
market [4]            62:23
62:24    62:24        79:4
marking [1]           47:1
Master's [1]          81:8
match [4]             13:15
43:3    43:4          63:2
material [3]          70:19
71:25    91:21
matter [1]            92:1
matters [2]           19:22
19:22
maximize [1]          54:12
maximum [2]           13:7
29:18
may [7]   16:6        28:1
31:20    46:3         48:1
82:9    83:7
MBA [50]              11:18
19:4    19:9          20:16
23:8    25:4          27:6
27:7    45:1          45:1
45:8    49:14         51:1
52:12    52:17        52:22
55:22    56:6         56:12
56:23    59:4         59:7
59:10    59:13        60:6
62:12    63:10        63:14
63:20    63:24        64:19
65:2    65:11         65:24
66:18    66:22        68:22
69:16    70:2         78:10
78:12    78:15        79:3
80:15    80:18        88:3
89:1    89:18         94:16
94:16
MBA-Wyoming [2]
78:14    78:15
MBAICI [1]            18:5
mean [26]             9:15

9:16    19:1          27:15
30:6    36:19         40:13
41:2    41:6          42:24
48:1    51:3          53:15
53:24    54:1         67:2
67:3    69:20         72:6
73:8    76:5          79:22
80:1    80:2          80:9
87:15
meaning [2]           50:18
64:1
means [4]             53:6
64:5    71:10         71:11
meant [4]             20:17
40:22    42:21        71:14
meantime [1]          51:24
medical [1]           18:6
meet [3] 50:7         61:6
63:1
meeting [6]           21:23
22:2    23:4          23:10
57:14    57:14
meetings [1]          58:8
members [10]          13:17
58:4    81:25         82:6
82:9    82:12         82:23
83:6    83:9          88:14
memo [1]              20:6
mention [3]           15:9
27:23    46:16
mentioned [4]         10:18
26:5    45:17         83:23
Merrill [16]          27:4
27:5    27:9          39:23
40:18    41:11        41:17
45:22    55:5         55:24
59:9    62:11         62:12
63:10    63:10        78:19
Merrill's [1]         42:11
Mexico [7]            7:19
7:21    8:3          8:6
10:22    10:22        10:23
Michael [3]           21:19
33:25    41:12
Michelle [2]          84:8
84:8
might [7]             10:9
12:4    13:9          24:22
25:13    25:14        91:25
might've [1]          10:8
85:2
million [3]           13:9
29:18    72:19
mind [6] 7:4          15:19
15:21    77:19        80:5
88:16
mine [1] 83:14
minute [2]            14:6
45:16
misrepresentation [1]
91:8
misrepresented [3]
68:17    68:19        69:24
misrepresenting [3]
69:13    69:20        70:19

missed [1]            85:2
mistaken [1]          21:12
money [13]            50:16
51:16    51:20        51:23
51:23    53:16        53:25
54:1    54:23         62:2
65:13    68:1         88:9
monies [2]            51:25
54:9
months [1]            76:8
most [5] 8:11         63:5
65:6    65:7          86:19
Ms [21]   14:25       15:13
16:10    16:14        34:20
34:23    34:25        47:17
56:16    62:12        63:10
81:2    81:19         82:14
82:15    84:15        89:21
90:7    93:10         93:22
94:3
must [7] 29:14        30:3
30:18    32:25        35:13
51:14    51:16

────── -N- ──────

name [7]              56:22
70:3    78:18         83:16
84:7    84:8          84:15
names [13]            15:7
15:9    47:3          47:10
49:3    59:9          59:10
59:11    82:19        83:2
83:9    83:20         83:21
native [1]            81:21
near [1]  89:5
necessarily [3]       16:17
38:23    51:18
need [14]             20:1
24:23    31:13        33:8
33:9    38:24         51:23
53:16    53:25        57:11
68:1    87:14         89:3
89:4
needed [6]            22:1
32:8    43:6          52:1
54:10    95:6
needs [4]             40:11
63:1    86:17         87:17
negatives [1]         70:25
negligent [1]         92:1
negligently [1]       92:7
negotiate [1]         13:23
negotiated [2]        12:15
12:24    13:24        73:11
negotiating [1]       74:5
negotiation [1]       57:12
negotiations [2]
63:13    63:15
never [9]             10:3
23:21    64:21        64:22
66:9    66:10         68:8
73:23    74:10
new [8]   7:19        7:21
8:3    8:6            10:22
10:22    10:23        15:7

Case 1:03-cv-00047   Document 42   Filed in TXSD on 02/17/2004   Page 63 of 122

Lorenzo Sanchez                    Multi-Page™                      next - producing
June 26, 2003                                                       San Benito C.I.S.D.

next [1] 49:2
night [1] 30:7
NII [1] 49:12
nobody [2]    65:2
70:2
non-interest-bearing
[1]        62:3
Non-responsive [6]
30:8    53:23   54:13
89:20   93:20   94:2
None [1]      62:10
noon [1] 56:20
Noranne [2]     83:15
83:16
North [2]      9:14
31:7
Note [1] 40:10
notes [3]       28:24
80:6   80:8
nothing [1]     69:24
notice [3]      32:6
79:19   94:4
November [11]   29:4
34:24   35:4    35:5
35:6    35:7    39:25
40:16   43:24   55:9
88:20
now [10] 8:10    30:23
44:2    44:6    65:11
72:20   76:11   77:19
83:16   89:14
NTSU [1]       54:17
number [5]      12:12
38:21   48:2    48:21
76:12
numbers [2]     47:8
88:4

-O-

oath [1] 69:23
Object [2]      10:9
52:10
objection [15]  11:13
14:12   14:23   15:1
30:8    38:18   40:23
41:3    42:14   45:7
53:23   54:13   89:20
93:20   94:2
obtain [3]      9:17
74:2    81:9
obviously [2]   71:14
91:20
occasion [1]    38:12
occasions [1]   52:24
52:25
occupation [1]  7:12
occur [1]       22:3
occurred [1]    22:2
78:5
occurring [1]   32:5
October [5]     14:4
27:10   27:20   29:22
67:17

off [7]    33:14   43:7
56:20   65:12   80:11
80:13   86:9
offered [1]      10:1
offers [1]      58:14
old [1]   7:10
Olivarez [1]    24:2
once [1] 38:6
one [34] 10:21   12:10
15:2    15:14   17:4
19:12   21:16   23:7
23:22   24:21   25:22
26:2    26:7    26:17
27:20   36:20   38:14
48:2    48:6    50:1
50:1    58:4    59:20
59:24   60:18   65:1
67:11   68:15   71:10
75:17   76:15   76:16
77:24   94:12
One's [1]       82:20
ones [5] 10:21   73:2
73:3    73:9    73:11
operating [1]   54:10
67:23
operations [1]  46:2
opinion [2]     70:17
72:16
opposed [2]     64:7
65:20
opposite [1]    56:25
option [1]      77:6
orally [1]      69:25
order [3] 15:10  56:16
57:4
orientation [1] 58:7
original [4]    7:21
17:16   17:25   40:2
originally [1]  81:23
otherwise [2]   53:11
54:24
ought [1]       15:14
oversee [1]     19:12
own [1] 65:13
owns [1] 24:1

-P-

p.m [9]   31:4    56:20
80:13   80:13   81:1
91:3    92:12   93:9
95:14
packet [2]      23:20
25:15
page [18]       24:21
25:15   25:15   25:18
25:24   26:2    26:3
30:1    30:1    30:10
33:20   35:13   37:22
40:10   48:8    56:2
69:8    89:11
pages [4]       27:24
37:20   44:17   55:23
paid [21] 16:24  17:2
17:4    29:22   36:1

36:3    38:13   47:24
50:10   51:11   53:5
53:6    55:16   60:14
72:17   73:7    73:21
76:10   77:13   92:15
93:18
Pan [3]   8:12    8:14
81:10
paragraph [11]  17:17
17:17   18:2    29:25
30:9    40:6    41:9
47:15   53:2    69:8
70:18
paragraphs [1]  47:5
Pardon [1]      17:8
parenthesis [5] 40:10
40:13   40:13   40:20
40:20
part [8]  14:15   14:15
14:21   17:4    17:5
22:23   24:22   79:24
Partially [2]   43:10
43:11
participate [1] 9:19
particular [4]  12:10
23:22   47:5    58:5
particulars [1] 50:1
parties [1]     18:18
party [1] 18:21
pass [2] 55:2    56:15
Patience [1]    35:1
pay [7]   30:3    30:18
32:25   33:14   50:25
73:6    88:9
payable [1]     85:1
payment [9]     18:13
18:14   53:7    53:8
53:9    53:11   53:12
73:24   94:20
payments [2]    48:2
67:6
payor [1]       53:10
payroll [1]     85:1
people [3]      73:10
85:18   85:19
per [5]   13:7    29:15
29:18   60:17   72:20
perceive [1]    48:17
percent [1]     46:9
Perez [3]       83:3
83:3    83:3
period [16]     9:10
13:11   13:15   13:19
18:7    18:11   27:16
40:20   43:5    43:13
43:14   48:19   59:21
67:6    94:10   94:22
permit [2]      53:13
53:14
person [7]      53:9
65:6    85:22   86:19
88:23   91:15   91:17
personally [12] 11:10
62:15   63:21   64:11

65:2    65:23   68:12
70:23   79:9    89:21
90:7    92:14
personnel [4]   17:8
85:4    85:5    86:15
perspective [2] 73:14
73:16
petition [3]    17:16
18:1    91:5
physically [1]  31:5
picture [1]     13:18
place [11]      15:11
27:18   32:4    39:14
54:9    57:12   57:13
81:13   87:14   93:4
93:23
Plaintiff [1]   70:19
Plaintiff's [2] 17:16
17:25
plan [27] 11:21  11:23
12:1    12:2    12:3
13:18   14:18   21:9
23:3    29:13   36:18
36:21   36:21   39:9
39:13   42:8    43:2
44:3    46:11   56:13
60:13   63:17   66:7
77:12   80:16   80:19
87:21
planned [1]     10:6
plans [9]       11:2
11:5    12:5    60:19
61:2    85:9    86:6
88:7    88:7
play [5]  12:7    12:9
12:11   68:6    76:18
plenty [1]      76:1
point [7] 16:6   19:9
21:6    26:1    43:1
59:5    94:19
points [3]      26:4
26:8    26:9
policies [4]    58:17
75:1    75:15   75:16
policy [44]     14:3
16:25   17:1    18:7
21:13   51:19   51:19
57:6    62:2    62:8
62:13   62:19   63:12
63:25   67:7    68:17
68:19   68:19   69:13
69:17   69:21   70:19
70:24   72:9    72:17
73:25   74:3    74:6
74:8    74:13   74:18
74:22   75:18   75:22
75:22   76:22   77:17
77:22   78:5    79:7
92:16   92:20   93:1
94:22
pool [6] 42:5    60:20
60:22   61:6    61:19
82:9
pools [1]       50:6
Portales [1]    8:6
portion [1]     80:3

position [15]   7:15
7:23    8:7     8:16
10:11   10:12   10:14
16:17   58:6    66:22
67:1    68:4    87:5
90:17   92:14
positions [2]   10:17
10:22
possible [1]    75:6
possibly [1]    12:4
post [1] 46:3
post-note [1]   80:9
practice [1]    75:9
prefer [1]      17:6
premature [1]   15:20
premium [1]     12:23
26:13   26:15   26:17
63:21   75:4    75:5
75:7
premiums [1]    63:3
preparation [1] 79:14
prepared [3]    23:23
88:22   89:9
presence [1]    34:11
34:18   38:6
present [3]     32:15
32:22   94:14
pressed [1]     32:7
pretty [7]      48:21
58:18   61:8    76:17
79:2    86:10   89:15
previous [9]    36:11
36:14   36:18   36:21
70:1    74:13   74:22
75:21   75:22
previously [2]  87:4
88:17
price [1] 79:3
privacy [2]     15:8
15:17
privy [1]       63:13
problem [1]     15:3
56:18
problems [5]    42:11
73:21   73:23   79:5
92:24
procedure [1]   67:24
procedures [1]  54:11
93:12
proceed [1]     27:11
Proceedings [1]
95:14
process [11]    14:10
57:3    60:13   78:9
78:24   79:6    89:6
92:19   92:25   93:14
93:23
processed [2]   50:8
93:12
procurement [2]
62:18   76:19
produced [1]    37:21
37:23
producing [1]   15:9

Case 1:03-cv-00047   Document 42   Filed in TXSD on 02/17/2004   Page 64 of 122

Lorenzo Sanchez
June 26, 2003

Multi-Page

professional - saw
San Benito C.I.S.D.

professional [3]
  81:11   81:16   81:19
professor [1]      8:3
professors [1]    10:24
program [4]       59:2
  63:8   66:7   88:15
projected [1]    46:11
  63:1
projections [2] 88:6
  88:10
pronounced [1] 49:13
property [3]      58:12
  85:9   86:5
proposal [10]     17:5
  25:9   25:15   26:4
  44:20   44:23   45:1
  45:4   45:13   74:6
proposals [8]    23:18
  23:19   41:25   57:7
  57:8   57:9   57:9
  57:11
propose [1]      49:2
proposed [3]     16:13
  29:2   29:7
protect [1]      15:17
protective [1]   15:10
provide [8]       7:6
  11:20   25:15   42:7
  44:21   44:24   45:13
  72:14
provided [5]     50:2
  67:7   73:25   74:3
  94:13
provider [5]     16:25
  17:3   51:7   67:4
  94:15
providers [8]    38:23
  47:9   48:2   51:5
  51:14   52:8   53:9
  94:22
providers' [1]   47:3
providing [1]    27:12
provision [1]    69:24
provisions [5]   69:11
  70:20   70:23   71:3
  72:21
public [1]       54:18
purchase [2]     57:5
  62:8   72:9
purchased [1]    91:9
purchasing [1]   14:17
purposes [3]     16:14
  17:17   42:7
put [7]   14:9   14:14
  14:19   15:1   20:6
  68:2   94:4

          -Q-

quarterly [1]    58:8
questioning [1] 31:17
questions [9]     7:2
  8:10   31:21   80:24
  81:5   95:7   95:10

95:12
quit [1]   10:3
quote [7]         18:4
  18:11   26:9   26:10
  40:12   41:12   41:13

          -R-

R [1]    32:12
R-E-F [1]        40:13
ran [2]   80:16   80:19
Randy [1]        55:5
rates [2] 12:5   88:6
re-ask [1]       75:17
read [16] 21:2   30:15
  32:5   32:24   38:9
  40:6   41:5   46:9
  53:4   69:23   71:21
  75:10   75:18   75:21
  80:8   80:9
reading [3]      41:8
  75:13   75:15
ready [1]        67:24
real [4]  8:10   36:15
  83:5   83:6
really [28]       9:3
  9:8   14:15   17:15
  20:20   21:11   22:5
  24:23   25:12   27:15
  32:9   37:3   37:6
  41:4   41:19   45:24
  47:16   47:17   55:11
  59:3   59:14   59:14
  61:20   69:19   71:6
  76:9   76:11   83:7
reason [7]       28:3
  37:21   42:1   55:12
  67:18   67:20   92:18
receipt [1]      14:20
receive [1]      54:21
  57:8   58:5
received [2]     40:8
  63:5
receiving [4]    39:23
  44:7   45:23   55:10
recognize [2]    32:21
  83:20
recollection [3] 25:3
  39:2   66:11
recommendations [4]
  87:7   87:9   87:18
  87:24
recommended [1]
  10:23
reconcile [1]    33:1
  51:22
reconciliation [1]
  93:17
record [10]      15:1
  15:6   15:23   17:18
  28:18   32:25   33:14
  56:20   80:11   80:13
recruiting [1]   85:6
reduce [1]       13:2
REF [1] 40:20

refer [4] 46:4   48:1
  48:10   56:5
reference [4]    40:10
  41:5   47:5   47:15
referenced [1]   40:16
references [2]   24:19
  25:9
referencing [1] 40:2
referred [4]     42:21
  54:24
referring [10]   15:19
  15:21   30:11   36:20
  36:21   42:4   42:11
  48:6   59:8   94:9
refers [1]       56:8
reflect [1]      50:7
regard [4]       13:1
  13:6   19:9   25:5
regarding [14]   62:12
  63:11   63:20   63:24
  64:19   69:17   71:3
  74:8   78:9   78:24
  85:23   87:18   87:24
  93:5
regular [2]      52:3
  57:13
regulation [1]   15:7
reimbursable [1]
  50:18
reimbursed [8] 18:9
  21:5   36:1   48:20
  50:21   50:24   73:6
  90:21
reimbursement [9]
  29:18   30:4   30:17
  30:19   33:1   35:18
  49:18   72:24   80:23
reimburses [1] 29:21
reimbursing [1]
  73:1
reinsurance [2] 14:19
  62:24
relate [1]       19:6
related [3]      72:18
  83:7   91:5
relating [1]     70:20
  70:23
relationship [2]41:16
  73:9
relatives [1]    83:4
released [1]     74:10
relied [1]       11:19
  89:19
rely [2] 88:1   88:10
relying [1]      89:16
  89:16
remember [5]     8:23
  46:13   50:2   50:5
  92:23
rendered [1]     21:24
renew [1]        77:7
renewal [1]      46:11
  77:6
renewed [1]      41:24

Repeat [3]       52:6
  68:23   74:1
rephrase [1]      7:1
  26:14   44:22   71:1
report [1]       46:12
reports [4]      46:12
  77:4   85:22   86:23
represent [1]    70:9
  78:3   78:18   91:6
representation [1]
  70:3
representations [4]
  69:15   70:5   70:22
  71:2
representative [2]
  23:2   90:1
represented [2] 18:5
  22:16
representing [1]
  78:15
reprice [1]      94:18
request [5]      17:5
  23:18   57:7   68:5
  88:11
requested [2]    49:6
  50:3
required [7]     11:21
  14:14   14:18   41:22
  51:10   58:8   65:15
reserve [5]      61:14
  61:15   61:24   61:24
  95:12
resident [4]     22:17
  32:11   33:24   36:13
resource [2]     10:19
  11:1
resources [3]    7:14
  31:2   84:19
respect [13]     58:6
  60:14   62:7   66:23
  70:4   70:23   74:12
  74:18   74:22   85:21
  86:20   90:18   90:24
respond [1]      71:9
responsibilities [2]
  10:19   61:11
responsibility [4]
  11:1   65:7   86:1
  86:14
responsible [3] 10:15
  72:25   87:5
responsiveness [3]
  14:12   14:23   45:7
rest [2]  16:3   83:6
retaining [1]    85:6
retention [1]    18:8
retired [1]      82:21
revealed [2]     50:15
  67:15
revenue [1]      12:6
  60:15   60:16   60:25
  61:13
revenues [5]     12:3
  61:21   61:23   61:23

63:2
review [9]         18:1
  38:12   45:16   57:9
  88:5   89:11   89:13
  89:14   94:18
reviewed [10]    17:13
  40:10   40:20   45:2
  79:13   79:16   79:17
  79:19   80:1   89:2
reviews [16]     17:22
  23:15   24:13   26:6
  26:23   28:12   33:16
  37:13   39:16   39:22
  44:8   45:19   45:24
  46:17   46:22   55:4
Reword [1]       33:3
RFP [1] 17:7     24:7
right [55]       16:4
  29:8   29:10   34:19
  36:6   36:7   40:21
  41:14   43:20   43:22
  43:24   44:1   48:3
  48:5   49:19   57:18
  58:2   58:10   58:20
  59:20   59:24   60:4
  60:21   61:17   62:3
  62:4   62:6   62:17
  64:4   64:9   64:22
  65:11   65:22   67:19
  68:4   68:13   68:24
  69:6   69:6   70:9
  71:1   72:8   72:18
  73:20   74:17   76:11
  77:15   77:19   78:3
  79:16   79:21   87:22
  91:1   92:23   94:24
risk [8]  19:12   31:2
  42:5   58:3   58:3
  58:14   85:8   85:24
Roberta's [1]    91:19
role [2]  36:15   76:18
Roy [1]  55:5
run [4]   11:21   61:7
  67:25   68:1
runner [1]       88:25
running [1]      42:25

          -S-

S [1]     49:12
salaries [1]     85:5
San [14] 7:14   11:5
  11:25   22:21   31:8
  37:17   39:8   44:11
  81:24   82:1   84:6
  86:21   87:23   89:24
Sanchez [24]     7:10
  17:13   24:11   28:1
  56:22   60:4   80:25
  81:3   82:20   82:20
  82:21   83:15   83:15
  83:17   84:8   84:16
  84:17   88:16   90:7
  90:17   91:1   91:5
  93:11   93:22
save [1]         90:5
saw [2]   24:15   83:20

Lorenzo Sanchez
June 26, 2003

Multi-Page

says - through
San Benito C.I.S.D.

**says** [17] 18:4    20:1
20:24    25:1    25:24
29:13    31:2    34:24
35:7    36:2    36:3
36:8    42:15    54:3
54:6    69:10    70:18
**SB** [1] 58:3
**SB-00003** [1]    56:2
**SB-00027** [1]    30:1
**SB-00028** [1]    30:10
**scanning** [1]    89:15
**school** [58]    7:14
7:18    9:25    10:1
10:5    10:6    10:14
10:18    11:6    13:2
18:5    18:9    18:10
20:9    22:23    37:17
38:2    39:9    43:5
52:11    52:14    52:17
52:22    57:3    58:15
59:1    59:5    59:12
60:13    61:11    61:21
62:2    64:7    65:8
65:19    66:3    68:4
68:6    68:9    68:16
71:14    72:16    73:1
75:4    84:9    84:13
86:21    87:10    87:23
89:25    90:12    93:11
93:23    93:24    94:5
94:8    94:8    95:3
**school's** [1]    60:22
**Scott** [1] 55:5
**screened** [1]    10:24
**second** [3]    46:15
70:18    80:12
**see** [16]    8:11    19:17
24:23    26:4    30:4
35:12    37:11    42:15
47:9    47:15    77:19
77:24    80:4    83:13
83:14    84:23
**seeing** [1]    46:12
**seem** [3] 43:8    55:23
85:15
**selected** [1]    80:3
**self-funded** [6] 11:21
11:23    42:8    63:8
80:16    80:19
**self-funding** [1]
88:14
**self-insured** [2] 18:8
64:2
**send** [5] 53:16    53:25
57:7    63:18    86:9
**sending** [1]    54:2
**sense** [1]    62:5
**sent** [6]    16:25    24:8
27:3    51:4    51:7
55:14
**sentence** [2]    21:1
25:9
**separate** [1]    28:2
**September** [4]    14:1
14:2    29:23    43:16

**sequence** [1]    78:2
**serve** [1] 58:3
**service** [1]    55:22
**services** [4]    21:24
77:2    84:25    94:13
**set** [4]    21:7    26:4
52:19    61:14
**setting** [2]    85:5
88:6
**several** [1]    41:21
59:22
**shop** [1] 62:25
**shortfall** [1]    61:12
**show** [12]    17:16
23:13    24:11    26:21
28:10    33:15    37:11
39:12    39:20    44:6
45:21    46:20
**showed** [1]    36:19
**shows** [1]    38:24
**Shuchart** [35]    10:9
14:12    14:23    16:5
16:16    17:12    17:19
28:18    28:23    28:25
35:2    40:23    42:14
45:7    46:23    56:18
56:21    56:23    60:3
69:4    69:6    69:8
76:22    79:22    80:1
80:5    80:7    80:11
80:14    84:12    89:20
92:13    93:20    94:2
95:10
**sic** [1]    42:15
**side** [5]    19:13    60:15
60:16    84:22    85:4
**sides** [1] 56:25
**sign** [9]    19:24    20:2
20:9    31:3    31:14
32:2    41:17    42:3
63:18
**signature** [18]    27:1
28:13    29:4    30:21
30:24    32:19    32:21
33:21    34:6    34:7
34:10    38:4    41:23
44:12    45:11    55:25
65:15    89:12
**signatures** [1] 31:16
**signed** [27]    19:14
19:18    19:19    28:2
28:20    28:20    29:5
31:6    31:18    32:8
32:10    32:15    32:22
33:23    34:12    35:3
35:9    36:16    38:1
38:7    38:9    40:9
40:19    44:15    55:23
74:7    74:15
**signing** [4]    19:21
19:21    74:5    75:12
**Silverio** [1]    83:3
**simple** [1]    11:24
**single** [1]    24:21
**sister** [2]    82:18
83:15

**sit** [11]    62:21    64:15
68:18    69:23    72:22
75:24    78:7    78:23
79:5    80:14    92:18
**small** [1]    47:24
94:17
**Smith-Reagan** [2]
22:16    23:8
**someone** [2]    32:17
32:22
**sometimes** [7]    7:2
7:4    20:5    32:1
45:25    46:2    85:12
**Somewhat** [1]    39:10
**somewhere** [1] 19:25
48:22
**son** [1]    84:9
**son's** [1]    84:15
**sorry** [9] 21:1    28:16
28:23    30:9    34:20
42:18    67:11    67:17
78:11
**sort** [2]    10:14    20:7
**sources** [1]    12:2
**speaking** [1]    12:12
20:21    21:1    48:8
**specific** [22]    12:8
12:15    12:24    13:5
13:13    29:15    32:8
35:23    46:8    47:21
47:22    49:16    58:19
61:1    72:18    72:19
76:12    76:17    77:20
85:13    86:1    90:22
**specifically** [12]
14:9    16:11    18:4
20:23    21:25    24:14
24:19    29:6    61:15
64:10    72:10    86:13
**specifics** [6]    39:5
61:20    62:22    64:16
69:22    85:23
**speculation** [1] 40:24
**speed** [1]    88:14
**spent** [1]    8:11
**sports** [1]    9:19
**stack** [1] 79:21
**staff** [1] 85:6
**standard** [5]    23:20
52:7    52:21    54:10
67:23
**standpoint** [1]    11:8
31:20
**Star** [1]    61:19
**start** [4]    43:16    56:17
83:13    84:23
**started** [1]    8:13
61:25    83:23
**starting** [1]    85:5
**State** [3] 9:14    54:19
58:4
**statement** [7]    18:15
25:17    25:19    25:20
25:21    42:11    42:13

**statements** [1]    91:21
92:3
**states** [2]    23:23
30:2
**stays** [1] 84:10
**Steve** [1]    14:25
**stick** [1] 46:3
**still** [2]    61:7    71:5
**stop** [44] 12:7    12:8
12:11    12:13    13:1
13:15    13:20    14:7
14:17    19:10    21:6
21:8    25:5    25:16
26:10    26:12    26:16
27:11    36:17    37:16
40:2    43:2    44:3
44:21    44:24    45:14
47:25    51:10    53:2
57:5    61:9    62:8
62:18    62:24    62:25
63:11    63:21    65:8
73:3    73:9    73:12
73:20    77:23    91:9
**stopped** [2]    10:2
47:7
**stroke** [1]    15:22
**study** [1]    46:4
**subject** [2]    24:20
27:19    30:17
**submits** [1]    57:9
**submitted** [1]    49:18
**submitting** [1]    30:3
30:18    32:25    35:18
**subparagraph** [1]
30:11
**substantial** [1]    68:7
**such** [3] 12:5    68:7
88:7
**sued** [1] 71:15
**sufficient** [5]    12:6
51:16    53:13    54:1
54:23
**suit** [1]    76:7
**sum** [1] 67:25
**superintendent** [14]
7:13    19:18    19:21
31:3    31:9    31:24
57:17    57:19    84:19
86:24    87:5    87:7
87:11    87:13
**superintendent's** [2]
19:23    20:10
**supervision** [1] 84:24
**supervisor** [3]    85:25
86:12    86:13
**support** [1]    11:14
**supposed** [2]    58:21
85:8
**Surely** [1]    57:7
**surprises** [1]    80:4
**surrounding** [1]
41:15
**sustain** [1]    63:8

**Swetnam** [12]    18:6
19:4    20:16    21:19
24:3    33:25    34:11
38:6    41:17    41:20
74:7    93:4
**Swetnam's** [7]    22:11
23:2    32:13    34:10
38:4    41:16    41:23
**switch** [1]    77:21
78:5
**switched** [2]    77:23
79:1
**system** [1]    94:18

**- T -**

**table** [1] 89:16
**takes** [1] 8:19
**taking** [2]    61:3
88:16
**teacher** [2]    8:21
82:21
**telephone** [1]    31:3
**telling** [2]    25:10
27:9
**ten** [2]    42:16    83:6
**ten-month** [1]    42:15
**tenders** [1]    25:8
53:10
**term** [5] 18:24    19:8
20:25    51:15    64:20
**terminated** [1]    23:2
**terms** [6]    68:17
68:19    69:13    69:17
69:20    91:9
**test** [1]    83:4
**testified** [4]    65:17
66:18    87:4    92:24
**testimony** [3]    62:1
70:1    70:21
**Texas** [1]    9:6
9:14    22:17    54:20
58:21    69:11
**Thank** [10]    15:4
34:25    39:18    46:18
55:19    80:24    91:1
92:11    93:7    93:8
**thanked** [1]    21:23
**Thanks** [1]    95:6
**That'd** [1]    17:12
**third-party** [14] 11:19
14:11    14:21    23:19
27:7    51:21    52:13
56:5    88:2    88:2
88:11    94:1    94:4
94:15
**thoroughly** [1]    38:11
**thought** [1]    76:1
**three** [5] 26:7    59:10
60:18    84:23    85:25
**through** [13]    14:2
29:14    37:18    39:14
57:4    57:7    57:22
65:18    68:16    75:18
89:7    89:15    92:16

Case 1:03-cv-00047   Document 42   Filed in TXSD on 02/17/2004   Page 66 of 122
azo Sanchez                          Multi-Page                        Throw - yet
26, 2003                                                               San Benito C.I.S.D.

**row** [1]   90:4
**ce-in** [1]   41:19
**tiers** [1]   85:25
**tight** [1]   62:24
**timelines** [1]   89:5
**timely** [6]   51:1
  66:19   66:23   73:5
  77:13   93:18
**times** [1]   41:21
**title** [1]   24:25
**to-date** [1]   73:7
**today** [19]   10:18
  16:1   18:16   50:12
  59:25   61:7   62:21
  64:15   64:20   66:15
  68:18   71:17   72:22
  75:24   78:7   79:5
  79:14   80:14   92:18
**together** [1]   88:25
**Tony** [1] 44:11
**too** [1]   31:21
**took** [1]   93:4
**top** [3]   24:25   25:23
  35:12
**total** [3] 63:6   72:13
  72:20
**TPA** [10]   14:15
  57:4   57:15   59:2
  60:5   60:7   65:11
  77:2   93:14   94:23
**track** [2] 8:22   13:16
**training** [5]   57:25
  58:5   58:9   58:10
  58:24
**trainings** [1]   85:6
**transcript** [1]   7:6
**transfer** [6]   51:23
  51:23   52:1   53:21
  68:2   68:2
**transferred** [1]   67:22
**transportation** [1]
  84:25
**trial** [1] 82:9
**tried** [1] 88:13
**true** [6]   37:15   39:13
  44:14   55:13   56:4
  71:24
**try** [5]   12:5   20:17
  43:4   63:1   71:17
**trying** [3]   43:1
  69:20   72:3
**turn** [1]   33:20
**tweaking** [1]   88:7
**two** [28] 12:2   17:8
  26:7   26:18   27:24
  28:1   28:3   28:7
  29:3   30:20   36:19
  37:20   43:3   43:4
  44:17   47:20   47:21
  47:22   47:22   48:9
  48:12   48:12   48:24
  49:3   55:2   59:11
  59:18   70:25
**type** [2] 57:5   75:1

**-U-**

**unclaimed** [1]   92:15
**unconditional** [1]
  53:8
**under** [7]   14:14
  16:24   51:9   69:23
  84:24   85:18   86:15
**underneath** [1]   30:23
**understand** [11] 7:1
  14:16   20:15   40:12
  41:19   50:17   56:25
  71:8   71:18   79:18
  88:14
**understood** [1] 70:1
**Underwriter** [1]
  44:12
**unemployment** [1]
  85:10
**unfolded** [1]   16:20
**University** [7]   7:19
  8:4   8:12   8:14
  9:14   10:23   81:10
**unless** [1]   69:21
**unpaid** [1]   92:15
**untrue** [1]   91:21
**up** [19]   8:8   9:24
  14:7   16:7   23:7
  24:15   25:22   43:3
  43:12   52:19   59:5
  60:18   61:14   63:2
  67:3   72:21   72:23
  79:3   88:14
**used** [3] 18:24   64:19
  88:24
**using** [1]   64:4
**UT** [1]   84:9

**-V-**

**Valley** [5]   23:25
  81:21   82:3   82:4
  82:6
**variables** [1]   26:10
**varied** [1]   13:20
**various** [3]   8:21
  14:19   48:20
**vary** [1] 12:23
**vast** [1] 48:25
**Vegas** [2]   7:21
  7:21
**venture** [1]   20:18
**versed** [1]   86:10
**versus** [2]   26:16
  36:23
**view** [1] 48:23
**VII** [2]   17:17   18:2
**violated** [1]   69:10
**visiting** [1]   83:22

**-W-**

**W-I-R-K-U-S** [1]
  44:11

**Walraven** [40]   11:13
  15:3   15:12   15:16
  15:18   15:25   16:3
  16:13   16:21   16:22
  17:10   17:21   25:20
  25:23   29:10   30:5
  30:8   30:12   31:15
  31:23   33:11   38:18
  41:3   46:25   47:4
  47:11   47:14   52:10
  69:3   76:20   79:24
  80:3   80:6   80:10
  81:17   84:11   90:6
  91:2   95:9   95:12
**water** [1]   33:9
**wear** [1] 85:7
**welcome** [1]   68:24
**wherewithal** [1]
  50:7
**whole** [1]   59:20
**Willacy** [2]   82:17
  82:24
**William** [2]   22:15
  32:12
**wire** [2] 53:21   68:2
**Wirkus** [1]   44:11
**wise** [1]   10:8
**within** [5]   51:10
  51:14   53:2   66:3
  67:6
**without** [4]   24:21
  54:23   75:12   77:7
**witness** [26]   17:22
  23:15   24:6   24:13
  25:8   26:6   26:23
  28:12   32:19   33:16
  34:6   34:7   34:22
  34:24   37:13   39:16
  39:22   44:8   45:19
  45:24   46:17   46:22
  55:3   55:4   56:15
  81:18
**wondering** [1]   39:1
**word** [5] 14:24   51:2
  51:7   64:4   93:21
**words** [4]   20:22
  36:3   36:22   64:23
**worker's** [2]   85:10
  86:8
**works** [1]   7:4
**would've** [4]   27:17
  66:15   72:12   92:20
**write** [6] 51:22   65:12
  65:16   67:3   68:3
  93:16
**writing** [2]   20:4
  20:6
**written** [4]   19:25
  38:22   69:25   93:12
**wrong** [4]   70:22
  71:19   71:20   73:17
**Wyoming** [13]   56:23
  59:10   60:6   62:12
  63:10   65:11   66:19
  68:22   69:16   70:2
  78:15   80:15   80:19

**-Y-**

**year** [17] 17:1   21:9
  27:10   28:19   36:11
  36:18   36:21   36:22
  37:18   38:22   39:14
  43:5   44:3   74:13
  89:7   93:24   94:8
**year's** [1]   75:22
**year-end** [1]   13:25
**years** [8]   7:24
  8:20   8:20   8:24
  10:3   13:20   59:18
  84:12
**yesterday** [1]   40:8
**yet** [1]   18:10

Case 1:03-cv-00047    Document 42    Filed in TXSD on 02/17/2004    Page 67 of 122

Janie Sanchez                          Multi-Page™                    San Benito C.I.S.D.
June 26, 2003                                          v. Companion Life Insurance Company, et al.

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SAN BENITO CONSOLIDATED          }
INDEPENDENT SCHOOL DISTRICT,     {
                                 }
        Plaintiff,               {
                                 }
VS.                              {
                                 }
COMPANION LIFE INSURANCE         {    NO. B-003-047
COMPANY, MANAGED BENEFITS        }
ADMINISTRATOR AND INSURANCE      {
CONSULTANTS, INC., MICHAEL M.    }
SWETNAM, JR., J. ALLAN HALL      {
& ASSOCIATES, INC., AND          }
MBA OF WYOMING, INC.,            {
                                 }
        Defendants.              {

*****************************************************

ORAL DEPOSITION OF

JANIE GONZALEZ,

JUNE 26, 2003

*****************************************************


    ORAL DEPOSITION OF JANIE GONZALEZ, produced as a witness

at the instance of the Defendant, Companion Life Insurance

Company, and duly sworn, was taken in the above-styled and

numbered cause on the 26th day of June, 2003, from 2:13 p.m.

to 3:55 p.m., before DINA RAMIREZ, CSR in and for the State of

Texas, reported by oral stenography at the Law Office of Rene

Ramirez, 1906 Tesoro Boulevard, Pharr, Hidalgo County, Texas,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

Janie Sanchez
June 26, 2003

Multi-Page™

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF, SAN BENITO CONSOLIDATED
INDEPENDENT SCHOOL DISTRICT:

    HONORABLE STEPHEN R. WALRAVEN
    Shaddock, Compere, Walraven & Good, P.C.
    1250 N.E. Loop 410, Suite 725
    San Antonio, Texas  78209
    &
    HONORABLE CELESTE GUERRA
    Law Office of Rene Ramirez
    1906 Tesoro Blvd.
    Pharr, Texas  78577

FOR THE DEFENDANT, COMPANION LIFE INSURANCE COMPANY:

    HONORABLE SHELBY J. BUSH
    Piper Rudnick LLP
    1717 Main Street, Suite 4600
    Dallas, Texas  75201-4605

FOR THE DEFENDANTS, MANAGED BENEFITS ADMINISTRATOR AND
  INSURANCE CONSULTANTS, INC., AND MBA OF WYOMING, INC.:

    HONORABLE FRED L. SHUCHART
    Mason, Coplen, Shuchart, Hutchins
     & Banks, P.C.
    7500 San Felipe, Suite 700
    Houston, Texas  77063

FOR THE DEFENDANT, J. ALLAN HALL & ASSOCIATES, INC.:

    HONORABLE ROBERTA J. HEGLAND
    Bracewell & Patterson, L.L.P.
    2000 One Shoreline Plaza, South Tower
    800 North Shoreline Boulevard
    Corpus Christi, Texas  78403-3700

Page 3

I N D E X

PAGE

Appearances. . . . . . . . . . . . . . . . . . . . 2

Stipulations . . . . . . . . . . . . . . . . . . . 5

JANIE GONZALEZ
    Examination by Mr. Bush. . . . . . . . . . . . 6
    Examination by Mr. Shuchart. . . . . . . . . .44

Signature and Changes. . . . . . . . . . . . . . .75

Reporter's Certificate . . . . . . . . . . . . . .77

E X H I B I T S

NO.  DESCRIPTION                                  PAGE

No. 16   Signature page of Plan Document (1 p.)    18

No. 17   Letter dated January 31, 2001, from Carolyn  19
    Gale addressed to Jani Gonzales (sic) (2 pp.)

No. 18   Fax to Celeste Guerra with list of claims for  21
    which reimbursement is being sought (2 pp.)

No. 19   Letter dated May 17, 2001, from Marianne  24
    Miceli, J. Allan Hall and Associates, to
    Don Merrill, Managed Benefits Administrators
    re:  Lone Star Intergovernmental Risk Pool
    (32 pp.)

No. 20   Memo/fax transmittal dated October 15, 2001,  26
    from Managed Benefits Administrator to Janie
    (2 pp.)

No. 21   Memo/fax transmittal dated October 19, 2001,  31
    from Managed Benefits Administrator to Janie
    (2 pp.)

No. 22   Memo/fax transmittal dated October 26, 2001,  32
    from Managed Benefits Administrator to Janie
    (2 pp.)

No. 23   Memo/fax transmittal dated November 5, 2001,  33
    from Managed Benefits Administrator to Janie
    (1 p.)

Page 4

No. 24   Memo/fax transmittal dated November 9, 2001,  37
    from Managed Benefits Administrator to Janie
    (1 p.)

No. 25   Memo/fax transmittal dated November 15, 2001,  38
    from Managed Benefits Administrator to Janie
    (2 pp.)

No. 26   Memo/fax transmittal dated October 1, 2001,  60
    from Managed Benefits Administrator to Janie
    (1 p.)

Page 5

1    Oral deposition and answers of JANIE GONZALEZ, who
2 resides in Cameron County, Texas, was taken herein by the
3 Counsel for the Defendant, Companion Life Insurance Company,
4 before DINA RAMIREZ, a Certified Shorthand Reporter and a
5 Notary Public in and for the State of Texas, on the 26th day
6 of June, A.D., 2003, pursuant to Notice issued in the above
7 styled and numbered cause and pursuant to the Federal Rules of
8 Civil Procedure.
9    IT WAS AGREED that the original of this deposition shall
10 be presented to CELESTE GUERRA, Counsel for the Plaintiff, for
11 examination and signature by the witness within thirty (30)
12 days after receipt thereof, after which same will be returned
13 to the officer taking this deposition.
14
15       * * *
16
17
18
19
20
21
22
23
24
25

Janie Sanchez
June 26, 2003

Multi-Page

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

—————— Page 6

1    JANIE GONZALEZ,
2  having been first duly sworn, testified as follows:
3        E X A M I N A T I O N
4  BY MR. BUSH:
5    Q  Would you state your name, please?
6    A  Janie Gonzalez.
7    Q  Ms. Gonzalez, my name is Shelby Bush and I represent
8  Companion Life Insurance Company. Have you ever given a
9  deposition before?
10   A  Yes, I have.
11   Q  And, so, you're aware that your testimony will be
12  used in the trial of this case?
13   A  Yes.
14   Q  What other instances were you called to give a
15  deposition?
16   A  I was working for an insurance agency. I've been in
17  the insurance business for 23 years, and we had a client --
18  actually, a producer in our agency that left the agency and
19  took all of our client files, actually information with him,
20  and I was a witness to that.
21   Q  So, you were a fact witness?
22   A  Correct.
23   Q  And was that the only time that you've given a
24  deposition prior to today?
25   A  Yes.

Page 7

1    Q  If you need to take a break at anytime, just let us
2  know and we'll gladly do so.
3    A  Okay.
4    Q  If you need to ask me to rephrase a question, then
5  I'll gladly do so if it's confusing to you.
6    A  Okay.
7    Q  And, if you'll let me finish my question before you
8  give your answer, it will make the transcript much more clear.
9    A  Okay.
10   Q  Is that -- is that a deal?
11   A  Yes.
12   Q  What is your current occupation?
13   A  I'm the insurance coordinator for the San Benito
14  C.I.S.D.
15   Q  And how long have you held that position?
16   A  Nine years.
17   Q  And you said you've been in the insurance business
18  23 years. What did you do -- do you remember the year you
19  were hired by the district? Was it '94?
20   A  '94, I believe.
21   Q  What you do prior to that?
22   A  I was an insurance agent for an insurance agency.
23   Q  For how long?
24   A  Fourteen years.
25   Q  Same agency?

Page 8

1    A  Same agency.
2    Q  Which one?
3    A  May and Associates in Harlingen, Texas.
4    Q  Did you say "May"?
5    A  May, M-A-Y.
6    Q  Okay.
7    A  They've changed their name now to Texas Insurance
8  Managers.
9    Q  I drove right by their building. That on Harrison
10  Street?
11   A  That's correct, 410 East Harrison. I still
12  remember.
13   Q  And did you hold a license or licenses?
14   A  Yes, I did.
15   Q  What'all licenses? Do you have any licenses now?
16   A  Yes.
17   Q  Okay. What licenses do you currently hold?
18   A  I have a group life and health license, a
19  solicitor's license, a worker's comp adjuster's license.
20   Q  For what purpose do you hold these licenses?
21   A  Well, the worker's comp license is really, really
22  good for me to have right now because I do run the risk
23  management department which has to do with worker's comp,
24  health insurance employee benefits, cafeteria plan. The other
25  licenses I've just kept for a rainy day.

Page 9

1    Q  Do you have to put in a certain number of hours a
2  year of continuing education to maintain those licenses?
3    A  Yes, I do.
4    Q  Okay. And is that something the district pays for?
5    A  Actually, when I got my licenses, I am
6  grandfathered. Therefor, for some of my renewals I don't have
7  to pay for -- for a renewal. Therefor, all I do is just go to
8  the classes and I just attend the eight-hour class and it's
9  free.
10   Q  The class is free?
11   A  Uh-huh.
12   Q  Okay.
13   A  Other than the worker's comp. The worker's comp,
14  since it does pertain to my job description, the school does
15  pay for my -- my ethics. I have to take an ethics course for
16  that, along with some -- I believe it's a 30-hour -- what is
17  it -- like a 30-hour session for two years or so. I have to
18  have 30 hours.
19   Q  Now, it pertains to your job, but is it required by
20  your job?
21   A  No, sir, it's not.
22   Q  Okay. Do you earn any income outside of your income
23  from the school district by holding these licenses?
24   A  No, I do not.
25   Q  Okay. Had you held any other licenses other than

Page 10

those you currently hold?
A No.
Q Have you always -- since you became the insurance coordinator for San Benito Consolidated Independent School District, have you always had basically the same job duties?
A No.
Q Okay. How -- compared to what you do now, do you have more responsibility than you used to have?
A I need you to rephrase that first question again.
Q Has your job description changed throughout the course of your nine years of employment with the district?
A Yes, it has.
Q Okay. When you first started work with the district, what were you working on? What were you in charge of?
A I was hired as the group life and health insurance coordinator back in 1994, and in 1997 I was -- I kept that title and I was made -- made in charge -- I was put in charge of the risk management department which handles all of our cafeteria plans along with all our worker's comp claims and all other insurance.
Q So, as far as being in charge of group life and health insurance, the employee benefit plan, is that covered under the auspices of group life and health insurance?
A Yes, sir, it is.

Page 11

Q So, from the time you began work with the district, you have overseen the San Benito Consolidated Independent School District employee benefit plan --
A Correct.
Q -- correct?
A Correct.
Q Okay. And, during that nine-year span, has it always been self-funded?
A Yes, it has.
Q And has the district been a member of a risk pool during the whole nine-year span?
A Rephrase that question again.
Q Has the school district participated in a risk pool during the whole tenure of your employment? For the past nine years, have they been a member of a risk pool?
A Yes, they have.
Q And what is your understanding of the need or the purpose of a risk pool?
A My understanding is that the -- if you're in a risk pool, that I believe that means you do not have to go out for bids.
Q Okay. During your time as an insurance agent, what lines of coverage did you sell?
A Personal lines, which was auto, watercraft, homeowner's, fire policies, windstorm and hail policies, flood

Page 12

policies. In those days, it was -- what was that called? They've changed everything now. Commercial lines, as well, which were business policies. TCPP's I believe is what -- I don't know. They've changed so much. I haven't really kept up with the names anymore.
Q CGL policies?
A Yeah, the commercial general liability policies, professional liability policies. Just about everything that falls under personal/commercial lines.
Q Did you deal with any group health coverage?
A Never did.
Q Okay. So, your first experience with group life and health was when you were hired by the district?
A That's correct.
Q And, at that time, were you aware of a mechanism called advance funding?
A No.
Q No? When did you first become familiar, or are you familiar with the phrase, "advance funding"?
A I'm not familiar with it.
Q Okay. What involvement did you have in the procurement of the Companion Life Insurance Company stop loss contract that began on October 1st, 2000, through August 31st, 2001?
A Well -- hmm. What involvement? None.

Page 13

Q Did you coordinate communications between Mr. Sanchez and MBA?
MR. WALRAVEN: You're talking about at that time on that subject?
MR. BUSH: Yes.
A Wait. Explain that again. Say that again.
Q (Mr. Bush) Well, were you the intermediary or an intermediary between MBA and the district as it pertained to Mr. Sanchez?
A As far as just giving him the paper. That's about it.
Q In any manner, yeah.
A Uh-huh.
Q That's -- that was the extent of it?
A That was it.
Q Okay.
A That was the extent of it.
Q Did you at anytime have any conversations with Companion Life Insurance Company?
A Never have.
Q How about J. Allan Hall and Associates?
A Never have.
Q Did you ever correspond in writing with Companion Life Insurance Company or J. Allan Hall and Associates?
A I don't remember.

Janie Sanchez
June 26, 2003

Case 1:03-cv-00047    Document 42    Filed in TXSD on 02/17/2004    Page 71 of 122

San Benito C.I.S.D.
v. Compan. Life Insurance Company, et al.

Page 14

1  Q  Okay.  Did any -- did Companion Life -- well, is it
2  fair to say that Companion Life Insurance Company never
3  represented anything to you about the stop loss contract
4  that's at issue in this litigation?
5  A  Is it fair to say --
6  Q  -- that Companion Life Insurance Company never
7  represented anything to you, orally or in writing, about the
8  stop loss contract that's at issue in this litigation?
9  A  I really don't understand the question.
10  Q  Well, you testified earlier that you never had any
11  conversations with Companion Life Insurance Company.
12  A  Right.
13  Q  Do you recall any representation, whether oral or in
14  writing, about the policy that's at issue in this litigation?
15  A  Not that I remember.
16  Q  Okay.  What is the procedure for paying claims -- or
17  let's just go back to the time frame between October 1st of
18  2000 and August 31st, 2001, which is the contract period under
19  this stop loss contract.  Do you agree with that?
20  A  Correct, I do.
21  Q  At that time, what was the procedure for paying a
22  claim that was submitted by an employee or a dependent or
23  other beneficiary under the -- under the contract or under the
24  district's plan?  What was the procedure for -- for paying
25  those claims?

Page 15

1  A  Actually, I never got involved with paying, you
2  know, as far as paying claims.  Everything -- the providers
3  would file claims directly to our TPA.
4  Q  Okay.  What was your involvement in the claims
5  paying process at all?
6  A  None.
7  Q  No involvement?
8  A  No involvement.
9  Q  You didn't have any responsibility to make sure that
10  there was money on the account if they were gonna release some
11  checks, that there was money in the account to pay those
12  checks?
13  A  No.
14  Q  Do you recall having communications with your
15  third-party administrator about held checks?
16  A  I recall receiving some faxes.
17  Q  Okay.  And were you aware that there were checks
18  that had been produced or cut and not forwarded to providers?
19    MR. WALRAVEN:  I need to object to the form of
20  the question since it --
21  Q  (Mr. Bush)  At anytime.
22    MR. WALRAVEN:  Does she now know about it?
23  A  Right.
24    MR. WALRAVEN:  Did she know about it --
25    MR. BUSH:  Yeah.

Page 16

1    MR. WALRAVEN:  -- at the time?  Okay.
2  A  I know -- I know about it.
3  Q  (Mr. Bush)  You know about it now?
4  A  Uh-huh, yes, I do.
5  Q  Okay.  When did you first discover that?
6  A  Hmm.  Probably November.
7  Q  Of which year?
8  A  Of 2001 or -- late -- the latter part of the -- of
9  2001.
10  Q  Okay.  Is it your understanding that this lawsuit
11  that the district has brought against my client and other
12  parties involves an issue otherwise known as advance funding?
13  A  I don't know what that means.  So, I need you to
14  rephrase that.
15  Q  Well, let me ask you.  Do you know what advance
16  funding is?
17  A  No.
18  Q  So, it was not important from your standpoint
19  that any stop loss policy that the district purchased had an
20  advance funding component?
21  A  That's never been brought up.
22  Q  Okay.  What do you understand is the district's
23  basis for this lawsuit?
24  A  To collect our money.
25  Q  Okay.  That might be your --

Page 17

1  A  We want our money.
2  Q  -- purpose.
3    MR. WALRAVEN:  That's her understanding.
4  A  Yes.  I want my money.
5  Q  (Mr. Bush)  Do you -- have you reviewed the stop
6  loss contract at issue in this litigation?
7  A  Entirely?
8  Q  Uh-huh.
9  A  No.
10  Q  Do you understand that it has a component that
11  defines what is considered a paid claim?
12  A  You're talking about the definition of a paid claim?
13  Q  Yes.
14  A  Do I understand the component?
15  Q  Do you understand that the contract defines what is
16  a paid claim?
17  A  No.  Like I said, I really didn't go through the
18  entire -- I didn't read every -- every -- everything on the
19  contract.
20  Q  Okay.  Do you -- is it your understanding that the
21  district had to pay a claim before it could be reimbursed by
22  Companion Life for that claim?
23  A  That's the way it's always been.
24  Q  Okay.  I'm just gonna go through some documents that
25  you either signed or received and have you tell me whether

Case 1:03-cv-00047   Document 42   Filed in TXSD on 02/17/2004   Page 72 of 122

Janie Sanchez                                    San Benito C.I.S.D.
June 26, 2003                    Multi-Page™   v. Companion Life Insurance Company, et al.

**Page 18**

1  it's your signature and if you can recognize this.
2      MR. BUSH:  What is this?  16?
3      (Exhibit 16 marked.)
4   Q  (Mr. Bush)  This is Exhibit No. 16.  Is that your
5  signature?
6   A  That's correct.
7   Q  Do you know exactly what you were signing at that
8  point?  It's obviously a page that's been taken from something
9  else.
10  A  At this point, yes, I know what I was signing.  This
11 was supposed to be our plan document.  Should've been the last
12 page of our plan document.
13  Q  Great.  And you were -- you were in charge as the
14 insurance coordinator to sign the plan document?
15  A  Actually, at that time I believe Mr. Sanchez was out
16 of town --
17  Q  Okay.
18  A  -- and I had to sign it because we needed to get it
19 printed.
20  Q  And --
21  A  And these initials here were our agent's.
22  Q  What agent?
23  A  Those are Bill Greer's.
24  Q  Bill Greer.  And the date you signed that was what?
25  A  '98.

**Page 19**

1   Q  November what?
2   A  November 19th.
3   Q  19th?  Okay.
4   A  I still remember that.
5   Q  I'll show you Exhibit No. 9.  Is that the plan
6  document?  And it's been copied in kind of --
7   A  Okay.
8   Q  -- funny pages.  So --
9   A  Seems that way.  '95, yes, revised in '99.
10  Q  So, this -- if that was revised in '99, this
11 signature page would probably not be to that copy?
12  A  Probably not.
13  Q  Did you sign a new plan document every year?
14  A  No.
15  Q  No?
16  A  No.
17  Q  Okay.
18  A  No.
19      (Exhibit 17 marked.)
20  Q  (Mr. Bush)  Exhibit 17 is a letter to you from --
21 from whom?
22  A  Carolyn Gale.
23  Q  Carolyn Gale with MBA?
24  A  MBA.
25  Q  And dated January 23rd, 2001.  This letter

**Page 20**

1  apparently is transmitting the Companion Life stop loss
2  contract; is that correct?
3   A  That's what it states.  It doesn't have the contract
4  year, though, but that's what it states.
5   Q  Okay.  And there's a letter attached to that
6  dated January 21st, 2001, from Douglas Routh to Don Merrill,
7  and that apparently is transmitting the Companion Life stop
8  loss contract from Mr. Routh to Mr. Merrill.  That's dated
9  January 21st, and, apparently, Mr. Merrill turned around on
10 the 23rd --
11  A  This is the 12th, January 12th.
12  Q  Yeah.  I'm sorry.  I'm reading it upside down.
13 Mr. Merrill turned around and forwarded it to you on the 23rd?
14  A  Seems that way.
15  Q  Now, in both instances it in bold says, "Please read
16 carefully -- or please review the contract carefully."  Do you
17 see that?
18  A  Yes, I do.
19  Q  Now, when you got that from MBA, did you review the
20 contract carefully?
21  A  I reviewed the fees carefully.
22  Q  Okay.  Is that the most important aspect of the
23 negotiation, was the -- the premium involved?
24  A  That's one of the important issues.
25  Q  Would it -- would it be the most crucial issue from

**Page 21**

1  the district's standpoint?
2   A  Premium-wise?  Not necessarily.
3   Q  Okay.  What else would be important?
4   A  Different stipulations that are on the contract.
5   Q  Such as what?
6   A  Venues, anything that -- you know, anything that
7  comes up, contacts, claims filing, what things are handled.
8  As long as it promises what they tell us, as long as what's in
9  writing is what they told us.
10  Q  Okay.
11  A  Those -- those are the things I look at.
12  Q  Great.
13      (Exhibit 18 marked.)
14  Q  (Mr. Bush)  And Exhibit 18, can you identify that
15 document, please?
16  A  Can I identify it?
17  Q  Yes.  What is it?
18  A  Obviously, a list of reimbursements being sought,
19 which is money that is owed to the school district --
20  Q  Okay.  Is that --
21  A  -- from the stop loss carrier.
22  Q  Is it a fax?
23  A  It's a fax that I -- I faxed to Celeste.
24  Q  Okay.  On what date?
25  A  On November the 14th of 2001.

Janie Sanchez
June 26, 2003

Multi-Page

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

## Page 22

1  Q  And you're listing out four different claimants that
2  we were referring to as Joan Doe, John Doe, Jane Doe and Jack
3  Doe; is that correct?
4  A  Correct.
5  Q  Whose -- is this your handwriting?
6  A  No, sir, this is not my fax.  This did not come from
7  me.  This --
8  Q  So, that handwriting was on there when you received
9  it?
10  A  When I received the fax, that's correct.
11  Q  Do you know whose handwriting it is?
12  A  I do not.
13  Q  Do you know whether these amounts that are listed as
14  owing are correct?
15  A  No, I do not.
16  Q  Do you know whether these amounts that are listed on
17  this sheet involve checks that were cut but not forwarded to
18  providers prior to the end of the contract period?
19  A  Say that again.
20  Q  Do you know whether these amounts on the second page
21  of Exhibit 18 represent checks that were cut but not forwarded
22  to providers prior to the end of the contract year, therefor
23  denied by Companion Life because they didn't fit within a paid
24  claim?
25  A  Do I know they were held?  Can you repeat that

## Page 23

1  again?  I'm sorry.
2  Q  Well, let's just answer that one.  Do you know if
3  those amounts represent --
4  A  No.
5  Q  -- held checks?
6  A  No, I don't.
7  Q  Do you know if those amounts represent checks that
8  were cut before August 31st, 2001?
9  A  I'm not sure.
10  Q  The -- on the front page it says, "Mr. Sanchez asked
11  me to fax you the list of claims for which reimbursement is
12  being sought."  Did you at that time have any knowledge of the
13  second page of this exhibit and no longer remember or did you
14  just take this document and pass it on?
15  A  I received this fax.  Actually, what I'm really
16  looking at is the money that we need to collect, and that's
17  why I sent -- I brought it to Mr. Sanchez's attention and he
18  told me to fax it to Celeste.
19  Q  Is the money you need to collect different from the
20  money listed on this exhibit?
21  A  I'm not sure if it's -- if it's up-to-date or not.
22  So, I really can't answer that.
23  Q  Do you have any knowledge of the basis for these
24  claims being on this exhibit, in other words, for which
25  reimbursement is sought?  Why -- why do you pass this on to

## Page 24

1  your attorney with these names and amounts?  Why do you think
2  you're due this money?
3  A  Because they're over our stop loss amount.
4  Q  Right.  Were they paid before the end of the
5  contract period?
6  A  I don't pay claims in our office.  So, they --
7  they're paid from our third-party administrator.  So, I'm
8  assuming they were.
9  Q  You're assuming they were.  You don't have any
10  independent knowledge of whether they were or not?
11  A  No.
12  Q  Does the district have a separate stop loss
13  aggregate policy under the intergovernmental risk pool?
14  A  You lost me.  I don't understand the question.
15  Q  Do you know what the intergovernmental risk pool is?
16  A  I believe that's what we had previously discussed,
17  that that is as long as you're satisfied with your prior
18  carrier, premium, service, that we do not have to go out for
19  bid.
20  Q  Does the district have a separate stop loss policy
21  under that pool?
22  A  No, sir, not that I'm aware of.
23       (Exhibit 19 marked.)
24  Q  (Mr. Bush)  Have you ever seen what's been marked as
25  Exhibit 19?

## Page 25

1  A  Have I ever seen this?
2  Q  Uh-huh.
3  A  No.
4  Q  The first page being --
5  A  Well --
6  Q  -- a May 17th letter from -- to Don Merrill from --
7  A  First time I see that.
8  Q  What's the name there?
9  A  Marianne Miceli.
10  Q  Okay.  And the reference line says, "Lone Star
11  Intergovernmental Risk Pool, effective date April 1st, 2001."
12  A  Uh-huh.
13  Q  And I'm just trying to figure out how this -- if
14  this policy somehow covers any of the risk involved in this
15  litigation or how it might affect any of the risk involved.
16  A  (No response.)
17  Q  And, if you don't know, that's fine.  I'm just --
18  A  No, I don't know.  I really don't know.
19  Q  So, have you ever seen this policy?
20  A  It looks a little familiar, but -- I don't believe I
21  really looked at it or whatever.  It looks like he sent it to
22  me and I just sent it to the purchasing department.  I don't
23  know.
24  Q  But you don't know how it --
25  A  How it works?

Janie Sanchez
June 26, 2003

Multi-Page™

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 26

1   Q  -- how it works?

2   A  No, I do not.

3   Q  Okay.

4   A  I do not.

5       (Exhibit 20 marked.)

6   Q  (Mr. Bush) I show you Exhibit No. 20. Do you

7 recall receiving this memo?

8   A  Yes.

9   Q  October 15th, 2001, to you from Carol --

10   A  Frandsen.

11   Q  Frandsen?

12   A  Uh-huh.

13   Q  F-R-A-N-D-S-E-N. And she's with MBA?

14   A  (Witness indicates yes.)

15   Q  What is the purpose of that communication to you?

16       MR. WALRAVEN: Object to form.

17   Q  (Mr. Bush) Why did -- why would she send that to

18 you?

19       MR. WALRAVEN: Same objection. Calls for

20 speculation.

21   Q  (Mr. Bush) What does she say to you? Could you

22 read that out loud, please?

23   A  Certainly. "Here are the check registers for the

24 week. According to my records, the account has about

25 $141,400. I'm not releasing large spec checks because this

Page 27

1 amount is for the normal daily check activities. Now, if you

2 want me to release large spec checks, please fax me an

3 authorization or release; otherwise, I will just wait for the

4 carrier's reimbursements -- hmm -- or a confirmation of

5 additional deposits from your -- or from you."

6   Q  So, was she sending that to you because you were in

7 charge of making sure the account had money in it?

8   A  No. She would send me check registers every week

9 just to give me an idea as to what our accounts looked like,

10 as far as what our claims were like, not necessarily in

11 particular, like individual amounts. Just -- just to give me

12 an idea what our projections would be and stuff like that, but

13 nothing to do with the funding part as far as our checking

14 account, no.

15   Q  Okay. Who's responsible for making sure that the

16 account out of which claims checks are drawn has sufficient

17 funds to cover those checks?

18   A  MBA would do our reconciliation. So, they would

19 talk to our accountant.

20   Q  Who was your accountant?

21   A  Well, actually, we had two. We had Emma McCall, and

22 we now have Jose Koepke. So, I don't know who was here at

23 that time.

24   Q  And you had nothing to do with it?

25   A  Oh, no.

Page 28

1   Q  Okay.

2   A  I don't handle the money.

3   Q  This from page 466 through 478, that's SB-466

4 through SB-478, is replete with --

5       MR. SHUCHART: Information?

6   Q  (Mr. Bush) -- information that we don't need to

7 disclose, and the -- the gist of what I'm trying to get is,

8 what I'm saying on the record is, Exhibit 20, there has been

9 some private HIPAA related information that has been excluded

10 from Exhibit 20. So, it is not a complete document as it came

11 to me in the file. What I want you to do, though, is look at

12 the second page, and you have a list of checks under the

13 column, "Check run amount," and then the next column over says

14 what?

15   A  "Subtotal per month."

16   Q  Okay. And that's how much money?

17   A  Right here? You're talking about this column?

18   Q  Yes, that column.

19   A  Well, there isn't anything here unless you're

20 talking about this.

21   Q  There's a subtotal right there, right?

22   A  This says "Total spec check held lis (sic)," is what

23 it says.

24   Q  And it's how much?

25   A  Four hundred and sixty-three thousand, three

Page 29

1 seventy-five point eighty-five.

2   Q  Okay. And what do the words, "Total spec check held

3 lis" mean?

4   A  Lis? I really don't know. Like I said, I didn't --

5 all I was interested in was that page.

6   Q  The page I tore off?

7   A  Right.

8   Q  Why would you be interested in these pages?

9   A  I just like to keep track of our accounts, our

10 employees and see what's happening with our employees. That

11 was really -- that was all -- the only information I would

12 receive from our TPA, 'cause I never received diagnosis or

13 prognosis or anything like that.

14   Q  Right.

15   A  So, I just wanted to know what the money amount was.

16   Q  Okay. Well, that's what we talked about earlier.

17 And what did you do when you received this and saw that it

18 said checks were being held in the amount of $463,375.85?

19   A  Was that attached to this? Yeah, 'cause it was the

20 14. I really don't know what I did with this, honestly.

21   Q  So, at the time you received this on October 15th,

22 2001, were you or were you not interested in the list that's

23 attached to Exhibit 18? In other words, did you at the time

24 realize that these amounts listed on the second page of

25 Exhibit 20 related to the amounts listed on the second page of

Janie Sánchez          Case 1:03-cv-00047     Document 42     Filed in TXSD on 02/17/2004     Page 75 of 122     San Benito C.I.S.D.
June 26, 2003                                        Multi-Page™
v. Compani     Life Insurance Company, et al.

Page 30

1  Exhibit 18?
2      A  What are the dates on this?  I just wanted my money
3  on this list.
4      Q  I'm sorry?
5      A  I just wanted my money back from my stop loss
6  carrier.  That was my concern on this list.
7      Q  Right.
8      A  That was one of the reasons --
9      Q  And did you know that that -- or did you realize at
10  the time that this, these amounts related to these claims?
11  I'm talking about the amounts listed on Exhibit 20 and the
12  claims listed in Exhibit 18.
13      A  Yes, I did.
14      Q  Okay.  What was your understanding of why these
15  checks were being held?
16      A  Whatever she stated here.
17      Q  Which is what?
18      A  That we had a bank balance of $141,400.
19      Q  And that would tell you what?
20      A  That she was holding the checks 'cause we didn't
21  have any -- enough money, but we -- we did.  We -- that was
22  never an issue with me.  I don't know about that.  I never had
23  to do with the money or as far as whether there's any money in
24  the bank or not.  That was not one of my duties, really.  I
25  had nothing to do with the money part.

Page 31

1      Q  That was between MBA and your accountant?
2      A  And our accountant.
3      Q  Is that right?
4      A  That's correct.  I don't have anything -- as -- as
5  we speak, I don't have anything to do with the money --
6      Q  Okay.
7      A  -- that's in the account.
8      Q  There was no other recipient of this memo, is there?
9      A  No.  No.
10         (Exhibit 21 marked.)
11         MR. BUSH:  Those are providers' names, but they
12  don't need to be disclosed either; and, as with Exhibit 20, I
13  am removing some pages of Exhibit 21 that contain confidential
14  information.  So, pages 459 through 462 have been removed from
15  the exhibit as it was produced to me.
16      Q  (Mr. Bush)  And I'll ask you to identify Exhibit
17  No. 21.  Same form memo as the last exhibit which was dated
18  October 15th.  This one's dated October 19th, also from Carol
19  to you --
20      A  Uh-huh.
21      Q  -- as the sole recipient.  This one has subject
22  matter being stop payment on checks, correct?
23      A  Yeah, that's -- that's what they're asking.
24      Q  And it actually makes you look like you're more
25  involved in the payment of things than what you're saying.

Page 32

1  Why would she send that to you?
2      A  I just receive it.  I've -- I've got an easy fax.
3  She faxed -- she would fax everything to my -- to me, send
4  everything to me.  All I would do with -- actually, this in
5  particular would go directly to Jose or Emma, whoever our
6  accountant was at that time.
7      Q  Okay.  And this also had the same list of held
8  checks, correct?
9      A  Correct.  I believe so, yeah, 'cause I don't deal
10  directly with the bank.  I don't have authorization to deal
11  with the bank.  So --
12      Q  Okay.  Do you know whether any of these held checks
13  relate to the monies that are being sought in this lawsuit?
14      A  To the what?
15      Q  To the monies that are being sought in this lawsuit.
16      A  I'm not sure.
17      Q  Okay.
18      A  I wouldn't be able to tell you.
19         (Exhibit 22 marked.)
20         MR. BUSH:  And, as with the previous two
21  exhibits, I am removing documents SB-444 through SB-457 from
22  this exhibit that's containing confidential information.
23      Q  (Mr. Bush)  Could you identify Exhibit 22, please?
24      A  (Witness reviews document.)
25      Q  Do you recall receiving that?

Page 33

1      A  Yes.
2      Q  That's the same memo format from the same lady,
3  correct --
4      A  Uh-huh.
5      Q  -- to you as the sole recipient?  The reference line
6  -- it's dated October 26, 2001.  Reference line reads what?
7      A  "Weekly check registers and updated held check
8  list."
9      Q  Okay.  And it contains a held check list reflecting
10  what amount?
11      A  Three hundred and eighty-one thousand, two-fifty
12  point fifty-nine.
13      Q  And were you aware -- or are you aware now whether
14  any of those listed items are related to monies being sought
15  in this litigation?
16      A  No, I'm not sure.
17         (Exhibit 23 marked.)
18      Q  (Mr. Bush)  I show you Exhibit 23, November 5th,
19  2001, memo from Carol to you.  Do you recall receiving that
20  fax?
21      A  I don't recall, but I'm sure I did.
22      Q  Do you have any reason to believe that you did not
23  receive it?
24      A  No.
25      Q  And what does -- this one actually is forwarded to

Page 34

1  you only, but then in the comment section it's got Jose's name
2  besides yours, correct?
3     A. Uh-huh.
4     Q. What does Carol say? Could you read that out loud,
5  please?
6     A. Certainly. "Phyllis told me she talked to you guys
7  and it was OK to release all the large remaining speck checks.
8  They are gone. Now, I have no idea how much money the account
9  really has. Thus, I am going to release all the checks on a
10  daily basis and fax the registers to you every Friday. If the
11  check is larger than 50,000, I will call you -- I will give
12  you a call to see if the check can go. Other than that, all
13  the checks are going to be released on a daily basis. If you
14  would like to change anything on this notice, please let me
15  know because I am open for suggestions. If I don't hear from
16  you, I will take it as if you accepted the idea of this
17  letter. Thanks. Carol."
18     Q. Now, was there a set amount of checks or an average
19  amount of checks that the MBA would pay every month and if it
20  got above that amount they would call you --
21     A. Never.
22     Q. -- to get some money and deposit it?
23     A. Never.
24     Q. Never?
25     A. Huh-uh.

Page 35

1     Q. Is it disturbing to you that Carol says she has no
2  idea how much money is in the account?
3     A. Well, it is disturbing because they did our
4  reconciliation. They should know what we have in our account.
5  We expect that from them, to know.
6     Q. You can do a reconciliation if you know how much
7  money is deposited in an account or if you don't know how much
8  money is deposited in an account?
9     A. That would be between her and our accountant.
10     Q. Right. What knowledge do you have about the audit
11  that was conducted on the specific claims that are the subject
12  of this lawsuit?
13     A. I know there was an audit that MBA or Companion
14  requested with MBA or something like that. That's about,
15  really, all I know.
16     Q. You don't know the results?
17     A. I don't know. I don't know the -- the outcome of
18  it. I -- I never -- I don't think we ever received the actual
19  outcome of it.
20     Q. Did you have to do anything to coordinate for the
21  audit?
22     A. Is that your question?
23     Q. Did you have to do anything to coordinate for the
24  audit?
25     A. Yes. I believe I received a call from

Page 36

1  Phyllis Merrill.
2     Q. Phyllis is with what company?
3     A. With MBA.
4     Q. Okay.
5     A. And I believe she wanted -- she faxed a list to our
6  accountant on some checks to find out whether they had cleared
7  because the auditor needed to know that.
8     Q. And you weren't involved enough to need to know the
9  results of the audit?
10     A. No.
11     Q. And whose responsibility would that have been?
12  Would that have been Mr. Sanchez's responsibility?
13     A. That's correct.
14     Q. Did you have any communications with the auditor?
15     A. No.
16     Q. Were you at a -- do you attend board meetings?
17     A. Yes, I do.
18     Q. And have you attended a board meeting where this
19  lawsuit was discussed?
20     A. No.
21     Q. Okay. Do you attend all the board meetings?
22     A. No.
23     Q. No? And do you -- has our discussion here today
24  refreshed your recollection about what this lawsuit is all
25  about other than you want to get your money?

Page 37

1     A. Uh-huh.
2     Q. It has?
3     A. Say that again.
4     Q. Why -- why do you think you're owed money by
5  Companion Life Insurance Company?
6     A. 'Cause we had a contract with them.
7     Q. Right. And what did that contract say?
8     A. Once we reached our $75,000, you would pay the
9  difference to us.
10     Q. Okay. Did it have any qualifications about that
11  payment being made before the end of the contract period?
12     A. I'm not sure.
13     Q. Okay. Well, what if it did, would that change your
14  mind, if a payment wasn't made before the end of the contract
15  period?
16     A. I'd still want my money.
17     Q. You might want your money, but do you think you're
18  due your money?
19     A. From someone.
20        MR. WALRAVEN: See, that's the problem with our
21  society these days.
22        MR. SHUCHART: Object to the sidebar.
23        MR. BUSH: Mine or hers? What was that last
24  date? The 5th?
25        (Exhibit 24 marked.)

Janie Sanchez 03-cv-00047    Document 42    Multi-Page™ Filed in TXSD on 02/17/2004    Page 2 of 2
June 26, 2003                                          v. Compani    Life Insurance Company, et al.
                                                       San Benito C.I.S.D.

---

**Page 38**

1    Q (Mr. Bush) And here we are again on November 9th
2  following the November 5th memo. We've marked the
3  November 9th memo as Exhibit No. 24, memo to you from Carol
4  transmitting check registers, and she says again, quote:
5  Again I don't know how much --
6    A Funds.
7    Q -- how much funds the account has.
8        And when you received that -- or did you
9  receive this? Do you recall receiving it?
10   A I believe so.
11   Q Okay. Did that alarm you?
12   A I just go straight to the accountant, "Take care of
13  it."
14   Q Okay.
15   A "Make sure everything's okay or talk to her. I
16  don't know."
17       (Exhibit 25 marked.)
18   Q (Mr. Bush) We're almost -- almost finished with
19  these things. And what's been marked as Exhibit 25 is a
20  November 15th memo, same format from Carol regarding check
21  registers to you and also Jose. And what does she say in this
22  memo?
23   A "I received a copy of the confirmation of a $450,000
24  deposit. After that, according to my records, the account
25  only has about 7,000 which is not enough to release

---

**Page 39**

1  yesterday's and today's check registers 'cause they total up
2  to 50,000. Again, I don't know if there were any other
3  deposits made, and, according to my notice, I am assuming that
4  the account has enough funds to release all these checks even
5  if my records tell me differently. Thus, I am releasing these
6  checks as well as tomorrow's checks. All the registers will
7  be faxed to you guys tomorrow, Friday the 16th."
8    Q Did you know anything about the reserve that the
9  district set up sometime ago?
10   A Yes.
11   Q Okay. And what do you know about that? How much
12  money was put in a reserve account?
13   A Oh, I don't have an exact amount, but I believe it
14  was 700,000.
15   Q Okay. And had that reserve been depleted by claims
16  that were not reimbursed?
17   A All I know is that they had a reserve. I don't --
18  after that, I don't know whether it was --
19   Q And --
20   A -- or not.
21   Q Okay. This exhibit has a held check list also, and
22  it appears --
23   A Uh-huh.
24   Q -- in the same amount --
25   A It's got the names on there.

---

**Page 40**

1    Q Oh. It's in the same amount as the previous one --
2    A Okay.
3    Q -- dated October 26 which is Exhibit 22,
4  $381,250.59, except this one has the claimant's name which
5  will identify that these checks most likely -- well, they are
6  because they have the date that they were allegedly paid.
7  These checks are directly related to the lawsuit in question
8  on this. You'll have to go with me on that one.
9    A Uh-huh.
10   Q Three of them have a date paid of August 24th, and
11  the last two August 31st. This is a held check list, total
12  held checks, correct?
13   A That's what it states.
14   Q Okay. Is it your understanding that even though
15  this says "date paid" it wouldn't be on this list if it hadn't
16  actually been paid?
17   A I see "date paid," I assume date paid, yes.
18   Q Okay. What do you think "held checks" are?
19   A I've never run into that before.
20   Q Well, you --
21   A I wouldn't know.
22   Q You haven't -- you haven't seen that before today?
23   A No, no, no. I've seen -- yeah, I've seen it. I've
24  seen this --
25   Q Okay.

---

**Page 41**

1    A -- back in October, whenever it was first faxed,
2  yes. But we've never had that before.
3    Q Okay. Well, what -- what was your understanding
4  back in October and November of 2001 when you started seeing
5  this attached to memos?
6    A I go straight to our accountant.
7    Q You didn't think about whether checks were actually
8  being cut but not mailed to providers?
9    A No, I never did 'cause it's never happened before.
10   Q Did you become aware of that at some point after the
11  fact?
12   A After the fact.
13   Q Okay. So, sitting here today you know what this is?
14   A Oh, yes.
15   Q Sitting here today --
16   A I am very aware of that now.
17   Q Sitting here today, you can tell me that those
18  checks were not paid on these dates, correct?
19       MR. SHUCHART: Objection. Form.
20       MR. WALRAVEN: To the extent you learned any
21  information from conversations with attorneys, you need to
22  leave that out of your answer. If you have any information on
23  this or any of his other questions that you learned from me or
24  from Ms. Guerra, you're not gonna provide that and you're
25  gonna tell him you're not gonna provide it. But if you

---

Janie Sanchez
June 26, 2003

Case 1:03-cv-00047    Document 42    Filed in TXSD on 02/17/2004    Page 78 of 122

Multi-Page™

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 42

1 learned it somewhere else --
2  Q (Mr. Bush ) I don't -- I don't want you to provide
3 it if you learned it from your lawyer.
4         MR. WALRAVEN: If you learned it somewhere
5 else, of course, tell him, and by now you probably forgot the
6 question.
7  A I'm -- I'm -- I'm lost. You lost me here.
8         MR. WALRAVEN: Let's start over with the
9 question.
10  A Yeah.
11  Q (Mr. Bush ) Okay. Are you aware today that these
12 checks totalling $381-some-odd-thousand that are under a
13 column entitled, "date paid," were not paid on those dates?
14         MR. SHUCHART: Objection. Form.
15  A Does that mean I can't answer?
16  Q (Mr. Bush ) You can answer, yeah. He's just trying
17 to muck up the record.
18         MR. SHUCHART: Objection. Sidebar.
19  A Today I am aware that -- today I am aware that these
20 checks were held or not paid.
21  Q (Mr. Bush ) Did you have a conversation about that
22 with Carol?
23  A I did not.
24  Q You did not?
25  A No.

Page 43

1  Q Are you aware of anyone within the district who has?
2  A I've referred all of this information to Jose and I
3 did tell him to call her to get --
4  Q Okay. You --
5  A -- get that straightened out. I am not really sure
6 whether that was ever handled. Whether he ever actually
7 called her or spoke to her, I don't know.
8  Q So, you didn't follow-up with Jose about it?
9  A No, sir.
10  Q Okay. Have you ever spoken to anyone other than
11 your lawyer about this held checks issue?
12  A Which lawyer?
13  Q Any lawyer.
14         MR. WALRAVEN: Any lawyer, all lawyers.
15  Q (Mr. Bush) Any lawyer.
16  A No.
17  Q How many lawyers do you have?
18  A They're right here.
19  Q Are you aware of any instance where the district had
20 a contract, a stop loss contract and did not get what it was
21 entitled to?
22  A No.
23  Q And you don't know what advance funding is?
24  A No, sir.
25  Q And, since you don't know what it is, you don't know

Page 44

1 whether it was ever in place in this contract at issue in this
2 lawsuit or any other contract that the district has been
3 involved in in the stop loss context?
4  A No.
5         MR. BUSH: Okay. Pass the witness.
6              (Time: 3:16 p.m.)
7 BY MR. SHUCHART:
8  Q Ms. Gonzalez, my name is Fred Shuchart and I
9 represent MBA of Wyoming, Inc. and Managed Benefits
10 Administrator and Insurance Consultants, Inc. Who was your
11 TPA?
12  A MBA.
13  Q MBA of Wyoming, Inc. or --
14  A MBA.
15  Q Do you know who signed the contract, the TPA
16 contract?
17  A Do I know who signed the contract?
18  Q Yes, who the TPA contract was with. This isn't a
19 trick question.
20  A It's -- I believe it's with MBA of Wyoming, is what
21 it states -- on there.
22  Q Okay. And, so, wouldn't that be your TPA?
23  A I just -- I believe so.
24  Q Okay. But it's just easier to refer to them as MBA
25 as opposed to saying MBA of Wyoming, right?

Page 45

1  A Yeah, 'cause we always dealt with them in Utah.
2  Q Do you have any idea who Managed Benefits
3 Administrator and Insurance Consultants, Inc. is?
4  A No.
5  Q Did you have any conversations, and what I mean,
6 "you," I mean you personally, not "you" as in the school
7 district, with anybody from MBA regarding the coverage under
8 the 2000-2001 stop loss policy or contract?
9  A No.
10  Q Okay. Did you have any conversations with MBA where
11 they said to you what would or would not be covered by the
12 stop loss contact? And when I say "the stop loss contract,"
13 I'm referring to the 2000-2001.
14  A You're referring to the 2000-2001?
15  Q Right.
16  A Which was with Companion?
17  Q Yes.
18  A No.
19  Q I would assume it's safe to say that as you sit here
20 today you don't recall being told -- you don't recall any
21 conversation with MBA regarding advance funding under the
22 2000-2001?
23  A No, sir.
24  Q Are you saying that no such conversation took place
25 or that you just can't recall one?

Janie Sanchez
June 26, 2003

Case 1:03-cv-00047    Document 42    Multi-Page™    Filed in TXSD on 02/17/2004    Page 79 of 122

San Benito C.I.S.D.
v. Company ~ Life Insurance Company, et al.

Page 46

1    A   No conversation took place.
2    Q   All right.  If I were going to define the term of
3   "advance funding" as a company reimbursing the school district
4   for a claim that the check has been cut but has not been
5   tendered to the provider, can we agree on that as a definition
6   of "advance funding"?
7        MR. BUSH:  Objection.  Form.
8    Q   (Mr. Shuchart)  Are you okay with that?  I mean, do
9   you understand that definition?
10   A   I don't know the definition of it.
11   Q   I understand that.  Were you ever promised by
12  anybody from MBA that the school district would be reimbursed
13  if checks were cut but not sent out to the provider during the
14  policy period?
15   A   I'm trying to go through all these different --
16  okay.  The checks were cut?
17   Q   Right.
18   A   But not sent to the provider?
19   Q   Correct, that the -- that --
20   A   No.
21   Q   You were never promised that?
22   A   That's never been an issue.
23   Q   Were you --
24   A   Never been discussed.
25   Q   All right.  Was there anybody else in your office

Page 47

1   that would've had communications with MBA regarding the
2   payment of claims or the stop loss contracts?
3    A   Myself.
4    Q   Other than yourself.
5    A   Other than myself.  And Mr. Sanchez.
6    Q   Okay.  Anybody else?
7    A   And the superintendent, but --
8    Q   All right.  Other than Jose -- and what's Jose's
9   last name?
10   A   Koepke.
11   Q   Is he still with the school district?
12   A   Yes, he is.
13   Q   Okay.  Is there anybody else at MBA that you know
14  you would've talked to?
15   A   In reference to the stop loss policy?
16   Q   Or payment of claims.
17   A   Or payment?  No.
18   Q   Okay.  Are you aware of what conversations took
19  place between MBA and Jose regarding holding checks?
20   A   No, I'm not aware of anything.
21   Q   Okay.  Are you aware of any -- are you aware of the
22  content of any conversations that may have taken place between
23  Jose and MBA regarding the funding of the account?
24   A   Am I aware?
25   Q   In other words, did Jose say, "Hey, I just talked to

Page 48

1   MBA and we talked about this"?
2    A   Oh, okay.  That's easier.
3    Q   Sorry.
4        MR. WALRAVEN:  Why didn't you say so?
5    A   Oh.  No, I -- I would just, like I told Mr. Bush, I
6   would just give the information to Jose and I would assume he
7   took care of it.
8    Q   (Mr. Shuchart)  Okay.  Did you and Jose have any
9   subsequent conversations regarding getting money back that's
10  the subject of this lawsuit?
11   A   After the fact?
12   Q   Yes.
13   A   Yes.
14   Q   Did he ever tell you why he thought the school
15  district deserved to get its money back?
16   A   Why we deserved to get --
17   Q   Yes.
18   A   -- our money back?  Because we paid our $75,000
19  deductible first.
20   Q   And did Jose have any complaints about MBA's
21  handling of the claims?
22   A   Jose never really -- you're talking about the -- the
23  -- what kind of claims are you talking about?
24   Q   I'm talking about the claims --
25   A   Individual claims or --

Page 49

1    Q   Yeah, that are the issue in the lawsuit.  I mean,
2   did --
3    A   The actual issue claim?
4    Q   Right.
5    A   Say that again.
6    Q   Did Jose ever -- you and Jose have any conversations
7   that said, "You know, it's all MBA's fault we didn't get the
8   money from the insurance company" or -- or -- I'm sorry.  Yes
9   or no.
10   A   No.
11   Q   Okay.  Did he ever say, you know, talk to you along
12  the lines of, "Well, you know, it's the insurance company's
13  fault, but it's also MBA's fault that we didn't get the
14  money"?
15   A   We didn't know whose fault it was.  We just wanted
16  our money back.
17   Q   Okay.  You don't have -- do you have an opinion as
18  to whose fault it is that you didn't get the money you're
19  looking for?
20   A   Do I have any what?
21   Q   Do you have an opinion?
22   A   Oh, an opinion.
23   Q   Yeah, as to whose fault or whose, you know, more
24  than one person's fault it is that you didn't get -- the
25  school district didn't get reimbursed the money you think it

Janie Sanchez
June 26, 2003

Case 1:03-cv-00047   Document 42   Filed in TXSD on 02/17/2004   Page 80 of 122

Multi-Page

San Benito C.I.S.D.
v. Compan.   Life Insurance Company, et al.

**Page 50**

1 should have.
2     A   MBA.
3     Q   And what do you base that opinion -- well, what is
4 your opinion?
5     A   My opinion is we paid for our services with MBA to
6 do things the way they should be done, and I don't know
7 whether they did it right or not, but they -- we deserve our
8 money and it's -- that's -- that's part of our administrative
9 fees, for them to do -- we trust them to do what's right for
10 the school district.
11     Q   Okay. I'm sorry. Go ahead. Anything else?
12     A   I'm done.
13     Q   All right. What in your opinion did they not do
14 right?
15     A   Obviously, as I see today, they've held checks,
16 which that never happened before. I mean, I'd never seen that
17 ever happen before. It was not a practice.
18     Q   Are you -- is it your testimony that all these
19 memorandums we went through, Exhibits, basically, 20 through
20 25 with the exception of one other one, that these are the
21 only times -- this is -- this is the only time that MBA held
22 checks?
23     A   That I've seen it in write- -- never, no. We've
24 been with MBA since 1995 and I've never come across any of
25 that.

**Page 51**

1     Q   Okay. That doesn't mean it didn't happen, does it?
2     A   I'm not aware of it.
3         MR. SHUCHART:   Objection. Non-responsive.
4     Q   (Mr. Shuchart) Just because you haven't come across
5 it doesn't mean it didn't happen, correct? In other words,
6 Jose could've been aware of it and you may not have been aware
7 of it?
8     A   I'm the first one to be made -- I'm the first one to
9 receive all of this information.
10     Q   Well, Jose told --
11     A   And I would've given it to Jose or whoever our
12 accountant was at that time.
13     Q   If Jose told Carol to hold checks because he wanted
14 to get more investment money on the funds that were invested
15 and as opposed to a checking account that gets no benefit to
16 the school district, that could've happened and you would not
17 have known about that, correct?
18     A   I'm not sure.
19     Q   You're not sure it couldn't happen or --
20     A   I don't know what could happen.
21     Q   Okay. So, it could've happened?
22     A   Impossible for it to happen.
23     Q   I'm sorry?
24     A   I don't believe so.
25     Q   So, you think -- what you're telling and you want

**Page 52**

1 the jury to believe is that MBA out of the blue just started
2 holding checks for no good reason on their own?
3     A   Without no one's authority. No one ever gave them
4 the authority to do anything.
5     Q   All right.
6     A   That -- that -- that's not the way we do business.
7     Q   So, you would want MBA to bounce checks off the
8 school district's account since there weren't funds in it?
9         MR. WALRAVEN:   Objection. Assumes all sorts of
10 facts not in obvious.
11     Q   (Mr. Shuchart ) Okay. You can answer. You can
12 answer the question.
13         MR. WALRAVEN:   Not in evidence. It's obvious
14 it's not in evidence.
15     Q   (Mr. Shuchart ) You can still answer the question if
16 you can remember it.
17     A   Our checks won't bounce.
18     Q   You have overdraft protection on the account?
19     A   I don't know there's overdraft protection, but our
20 checks don't bounce. We have an agreement.
21     Q   Right. But you have to fund them, then, somehow and
22 transfer funds, did you, right?
23     A   I believe that's what they do.
24     Q   Did you ever tell MBA that your checks won't bounce?
25     A   No, I don't discuss that with them.

**Page 53**

1     Q   Okay. So, as far as they're concerned, they thought
2 that it would be reasonable for them to think it was like any
3 other checking account, that if you had $7,000 in the account
4 you can't write a $14,000 check?
5         MR. WALRAVEN:   Objection. Calls for
6 speculation.
7     Q   (Mr. Shuchart) You can answer the question.
8     A   What was that again? If they --
9     Q   If you know -- and you testified you never told MBA
10 that you had some type of overdraft protection that --
11     A   Right.
12     Q   -- you would never bounce a check? Wouldn't it be
13 reasonable for them to assume, then, that since you didn't
14 tell them that, that it was like any other checking account,
15 that a check could be overdrawn if you'd write it for in
16 excess of what the balance was?
17     A   No.
18         MR. WALRAVEN:   Same objection.
19     Q   (Mr. Shuchart ) Why, why is that not reasonable?
20     A   No. 'Cause we've been in business -- we've been
21 with them since '95. They -- they knew how we worked. They
22 how that -- how it worked.
23     Q   So, you're saying that they knew that you had
24 overdraft protection or some kind of protection?
25     A   I don't know. I don't know about the overdraft

Page 54

1 protection. I have no idea about that. I don't -- like I
2 said, I don't have anything to do with the bank. But that was
3 -- that was never a question. Should've never have been an
4 issue.
5     Q  Well, apparently, it was if you read these memos,
6 that it was a problem with --
7     A  Obviously, after --
8     Q  -- funds?
9     A  Seven years later.
10    Q  Well, I mean, these memos are in 2001. So, some --
11    A  2001.
12    Q  Some years.
13    A  Six years.
14    Q  Maybe six years after the relationship. But,
15 apparently, at some point there was a concern that there was
16 insufficient funds in the account to cover all the claims that
17 were being paid; that's fair, correct?
18    A  It could have something to do with a new employee.
19       MR. SHUCHART: Objection. Non-responsive.
20    Q  (Mr. Shuchart) Well, would it concern you if your
21 TPA was concerned that there may not be sufficient funds in
22 the account to pay claims? I mean, is that something you're
23 worried about, that they're concerned about that?
24    A  Would it concern me? Well, of course, it would
25 concern me.

Page 55

1     Q  All right. So, then, it's rational for them to be
2 concerned that there's sufficient funds in the account to
3 write the check off of? Are you --
4     A  I really don't know what -- what relationship they
5 had with -- with Jose and -- and how that worked together. It
6 was just two different departments, really.
7     Q  Okay. All right. So, you don't know what went on.
8 So, if Jose told them to hold the check, you wouldn't
9 necessarily know about that?
10    A  I don't believe Jose would say that.
11       MR. SHUCHART: Objection. Non-responsive.
12    Q  (Mr. Shuchart) If Jose told them not to write a
13 check, you wouldn't know about that; isn't that correct?
14    A  That's correct.
15    Q  And if Jose knew they were holding checks, you
16 wouldn't necessarily know about that either?
17    A  If Jose knew that they were holding checks?
18    Q  Yes.
19    A  Yes, he would tell me.
20    Q  Well, I thought you earlier testified that you guys
21 had no conversations about all these memos about held checks?
22    A  No, he would tell me if they were holding
23 checks. That's what you're saying, right?
24    Q  I'm -- I'm asking -- I'm asking that question, that
25 if there were checks being held, Jose would've told you about

Page 56

1 them?
2     A  No, 'cause I told Jose about the checks once I got
3 the fax. Once I received that fax, I took it to him.
4     Q  Well, because it was obviously addressed to you?
5     A  Yeah, for him to take care of it, make sure that,
6 you know --
7     Q  And what was his response when you gave him the fax?
8     A  "Well, okay. No problem. I'll take care of it."
9     Q  So, it wasn't like he was utterly surprised at the
10 information that was contained on the fax, correct?
11    A  I wouldn't know.
12    Q  Well, he didn't jump up and down and say, "Oh, my
13 God. What is this?" did he?
14    A  He never does that.
15    Q  He didn't die of a heart attack at the desk when he
16 read them, right; he's still with you?
17    A  Still with us.
18    Q  Okay. Would you agree with me that keeping the
19 lowest balance available in that account is in the best
20 interest of the school district?
21    A  I wouldn't know.
22    Q  Okay. You don't know whether that account, the
23 payment account was an interest-bearing account or not?
24    A  I -- I have no idea.
25    Q  Okay. Well, Mr. Sanchez testified earlier that it

Page 57

1 -- it was much better for the school district to have them in
2 other places than that account.
3     A  Oh.
4     Q  Do you disagree with that, have any reason to
5 disagree with what he said?
6     A  I'm not an accountant. I wouldn't know.
7     Q  Did you respond in any manner to these memorandums,
8 the fax transmittals that you got from Carol?
9     A  Fax? The fax?
10    Q  Yes.
11    A  Did I respond in a memo?
12    Q  Did you respond in writing in any way to those?
13    A  I don't remember.
14    Q  Okay. Do you specifically recall make calling --
15 specific -- do you recall responding verbally to the
16 memorandum or the --
17    A  Yes.
18    Q  Do you remember calling Carol?
19    A  Speaking to her on the phone.
20    Q  Okay. What were those conversations?
21    A  "Why are you holding checks? You need to -- you
22 know, I'm gonna go ahead and have you -- switch you with Jose.
23 I'm gonna pass this phone call to Jose, but go ahead and do
24 whatever you -- you've usually been doing." She was a new
25 employee, though.

Janie Sanchez
June 26, 2003

Multi-Page

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 58

1  Q  Well, do you know whether Carol's the only one that
2  allegedly held checks?
3  A  That I'm aware of.
4  Q  Okay.  But that doesn't mean somebody else didn't do
5  it?
6  A  I believe I would've been told --
7  Q  Well, then, I'm confused.
8  A  -- if they did that.
9  Q  You didn't handle the checking, but somebody
10  would've told you?
11  A  Well, if she would've responded like Carol did on
12  the faxing.
13  Q  But wouldn't it also have been just as --
14  A  'Cause I receive a -- like I said, I received those
15  check registers every -- every week, or she was sending them
16  every Friday, I believe.
17  Q  And had you received those the entire time that MBA
18  was doing your account?
19  A  Oh, you better believe it.  I've got them since '95.
20  Q  But it's possible that whoever was there before
21  Carol could've been communicating directly with Jose with
22  respect to holding checks and making sure that the funds are
23  in the account, correct?
24  A  Incorrect, because --
25  Q  I'm sorry?

Page 59

1  A  That's not correct.
2  Q  Okay.
3  A  Because prior to Carol we had a different
4  accountant, who was Emma.  I'm sorry.
5  Q  No.
6  A  I'm just trying to be -- I'm trying to be precise
7  here.
8  Q  That's fine.  Does -- it's very possible that
9  Carol's predecessor was talking directly with Emma with
10  respect to held checks?
11  A  That's correct.
12  Q  Okay.
13  A  I mean -- yes.
14  Q  Did you play any role in the procurement of the
15  successor policy to this one for 2001-2002 by BCS?
16  A  Hmm.
17  Q  I'm sorry?
18  A  I'm thinking.
19  Q  Oh, okay.
20  A  I'm thinking.  I did.
21  Q  What role did you play?
22  A  I don't recall.  The only thing I -- the -- the only
23  thing they sent me was a disclosure form for BCS to be signed,
24  and it stated some names on there with large cases and I sent
25  it back to them signed, along with a fax stating that they had

Page 60

1  to my knowledge left out some names.  I didn't want to be -- I
2  didn't want to not disclose information that I was aware of.
3  Therefor, I wanted them to disclose that, as well, and they
4  should've known this prior to me knowing this because I had
5  never received claims, but when you work for a school district
6  you hear of friends or of cases of people that are ill.  So,
7  you know more or less what's going on.
8  MR. SHUCHART:  Object to non-responsive after
9  "they should've known this," or starting with "they should've
10  known this."
11  Q  (Mr. Shuchart)  Other than providing them with a
12  disclosure and a list of individuals that weren't typed out on
13  the disclosure, did you have any other involvement?
14  A  No, that was it.
15  Q  Did anything physically prohibit you from writing on
16  those -- those names on the disclosure?
17  A  No.
18  (Exhibit 26 marked.)
19  Q  (Mr. Shuchart)  Okay.  I'm going to hand you what
20  has been marked as Exhibit No. 26.  The name of the family
21  that reached the maximum has been redacted.  Can you identify
22  that document?
23  A  Yes.
24  Q  Okay.  What's the date on the document?
25  A  October 1st.

Page 61

1  Q  And what does the document purport to be?  And
2  that's 2001, I see?
3  A  Uh-huh.  It's just a fax transmittal.
4  Q  From Carol to?
5  A  From Carol Frandsen to me.
6  Q  Okay.  Do you recall receiving that?
7  A  Yes, I do.
8  Q  Do you recall what you did with that piece of paper?
9  A  I do.
10  Q  And you did what with it?
11  A  Made a copy for Jose.
12  Q  And what did you do when you gave it to him?
13  A  It was filed.
14  Q  Did you make a copy of all the other ones and
15  give --
16  A  Oh, yes.
17  Q  And give them to Jose also?
18  A  Uh-huh.  I'm very good at documenting.
19  MR. SHUCHART:  Off the record for a second.
20  (Off the record from 3:39 p.m. to 3:40 p.m.)
21  Q  (Mr. Shuchart)  Other than your providing the
22  disclosures and an indication on a cover letter or a fax cover
23  sheet that maybe some things were missing, did you have any
24  other involvement in the procurement of the BCS policy?
25  A  Hmm.  That's a tough one.  After --

Janie Sanchez                                    Multi-Page                      San Benito C.I.S.D.
June 26, 2003                                                          v. Compania Life Insurance Company, et al.

Page 62

1  Q  I'm not trying to.
2  A  After -- the first initial?  I need -- I just --
3  Q  Yeah.  I asked the question what involvement did you
4  have.
5  A  Okay.  The full involvement.
6  Q  Right, and then your --
7  A  Any involvement.
8  Q  Right, and your first answer before we got to
9  talking was --
10 A  Was the disclosure.
11 Q  -- was the disclosure.
12 A  Okay.
13 Q  What involvement did you have next?
14 A  After that?  Okay.  I sent that information.  Then,
15 they -- they agreed with the info that I told them about.  So,
16 I believe they -- they disclosed all that information.  Then,
17 I received a -- we received a letter from Don.  I'm not sure
18 -- I'm not certain on the dates, actually.  But I got a letter
19 from Don stating that the policy was not going to be in effect
20 according to what we were told.
21 Q  Okay.  You --
22 A  Because of --
23 Q  I'm sorry.
24 A  I believe because of some disclosures that were not
25 disclosed or something to that effect.  I'm not too sure.

Page 63

1  Q  Do you have any idea, roughly, when that
2  conversation occurred?
3  A  Oh.  In the fall.
4  Q  Which year?
5  A  Year?
6  Q  Yeah.  What year?
7  A  Oh, year?  2000- -- oh, boy.
8  Q  2001?
9  A  '01.
10 Q  Okay.  You had a conversation with Don that the
11 policy --
12 A  Actually, I did not have a conversation with him.
13 He wrote us a letter.
14 Q  Okay.  I'm sorry.  I thought you said you talked to
15 him.  All right.
16 A  Well, I probably did say that, but, no, it really --
17 it was we received something in writing.
18 Q  Okay.  What other involvement did you have after
19 that?
20 A  Then, we had to re-file an application with BCS.
21 Q  Did you have any involvement in re-filing it?
22 A  No.
23 Q  Okay.
24 A  They should've had that information by then.
25 Q  Okay.  Any other involvement that you personally had

Page 64

1  other than being the recipient of the policy subsequently down
2  the road?
3  A  No.
4  Q  Okay.  Were you ever asked to sign additional
5  disclosures or provide any additional information for
6  disclosures?  Do you recall that?
7  A  After the second time?
8  Q  No, after the first one.
9  A  I believe so, in December.
10 Q  Okay.  Did you sign the disclosures or did
11 Mr. Sanchez?
12 A  No, he signed.  Mr. Sanchez signed them.
13 Q  Okay.  Any other involvement that you can recall you
14 had?
15 A  No, that was it.
16 Q  Okay.  In this lawsuit your lawyer has made certain
17 -- or not your lawyer, the school district's lawyer has made
18 certain allegations against my client, and I'm gonna try to do
19 this in an easy way.  In essence, in paragraph IX of the
20 original petition your lawyer has alleged that my client
21 either told you something that wasn't true or forgot to tell
22 you something that was critically important with respect to
23 the 2000-2001 contract.  Based upon -- do you know of any
24 statements that my client said that was false or that any
25 statements my client forgot to tell you regarding that

Page 65

1  contract?
2  A  According to -- as far as what we've talked about
3  today, this advance placement?
4  Q  No, at all.
5  A  Payment?
6  Q  I mean regarding anything.
7  A  I've never heard of that.  So, that's something that
8  was never discussed with us.
9  Q  Okay.  But, at least according to the carrier or the
10 contract-holder, this doesn't have advance placement.  So --
11 A  Oh.
12 Q  -- my client couldn't have misrepresented anything
13 if it doesn't have it.  Is there anything that my client said
14 to you that was wrong about that contract, about the benefits
15 under the contract that you can recall?
16 A  (No response.)
17 Q  I think it's easier than you're making it, because
18 didn't you testify you never talked to my client about it?
19 A  I never have.
20 Q  So, would the answer be --
21 A  Yeah.  No.
22 Q  Nothing?
23 A  No.
24 Q  Okay.  Is there anything they didn't tell you that
25 would've changed the school board's position with respect to

Janie Sanchez                          Multi-Page™                    San Benito C.I.S.D.
June 26, 2003                                                          v. Companion Life Insurance Company, et al.

---

Page 66

1 buying or purchasing or entering into the stop loss contract
2 that --
3     A  No.
4     Q  -- you're aware of?  No?
5     A  No.
6     Q  Okay.  If somebody had told MBA that there was an
7 advance payment, either provision or advance payments would be
8 made, do you have any reason to dispute that that statement
9 was made to MBA?
10         MS. HEGLAND:  Objection.  Calls for
11 speculation.
12     A  Rephrase that.
13     Q  (Mr. Shuchart)  Okay.  Your lawyer has alleged --
14 okay.  I can't find it at this point.  As you sit here, and I
15 mean "you" as Janie Gonzalez, the individual --
16     A  Uh-huh.
17     Q  -- is there any -- is it your position or your
18 opinion that the application process with respect to the BCS
19 policy caused the school district -- causes the school
20 district to not get reimbursed for any claims that it should
21 have been reimbursed for?
22     A  Wow.  Can you make that a little easier?
23     Q  I hope so.  Your lawyers, the school district's
24 lawyers --
25     A  Uh-huh.

---

Page 67

1     Q  -- allege that there was a problem with the BCS
2 application process, and, as a result of that problem, certain
3 claims were not reimbursed that should've been reimbursed, and
4 what I'm trying to find out is, is that your opinion; and, if
5 it is, what claims are we talking about?
6     A  I wouldn't know if it has to do with that policy or
7 not.
8     Q  So, as you sit here, you personally don't have the
9 opinion that anything to do with the 2000- -- the BCS policy,
10 BCS contract/policy -- let's try that again.
11         As we sit here today, is it your opinion that
12 had the application been filled out properly for the BCS
13 contract/policy, that any of the claims that are the basis of
14 this lawsuit, which are the four things we talked about
15 earlier, would've been paid or should've been paid under the
16 BCS policy?
17     A  BCS policy effective date was 9/1?
18     Q  Oh, man.  I think so.
19         MS. HEGLAND:  Yes.
20     Q  (Mr. Shuchart)  Yes.  Yes.
21         MR. WALRAVEN:  I think so.  It is a marked
22 exhibit.
23     A  9/1?  It's a 9/1?
24         MR. BUSH:  I don't think it is.
25         MR. SHUCHART:  No, the BCS isn't marked.

---

Page 68

1     A  So, the BCS policy is 9/1 and we're talking about a
2 claim that was on 8/31?
3     Q  (Mr. Shuchart)  Depending upon how you define the
4 term, "claim," yes.
5     A  Claim paid?
6     Q  Well, I guess that's -- I guess that's part of my
7 question, is --
8     A  You're talking about claim paid or claim incurred or
9 policy period?
10     Q  You guys are suing us.  That's what I'm trying to
11 figure out.
12     A  You know -- yeah.
13         MR. BUSH:  If it'll help you any, Plaintiff's
14 counsel stipulated at the initial scheduling conference that
15 Mr. Walraven was not at that the $800,000 in that part of the
16 petition is the same $800,000 in our part of the petition.
17 So, it's the same money being sought.
18         MR. SHUCHART:  Okay.
19         MR. WALRAVEN:  I'm gonna run this down, and if
20 there's a glitch somewhere, I will let you know.  If there is
21 a glitch, I don't think the amounts are significant.  But --
22         MR. SHUCHART:  Well -- oh, I'm not hold- -- and
23 I understand that.
24         MR. WALRAVEN:  I've looked at it a long time,
25 and so I'm not prepared to --

---

Page 69

1         MR. SHUCHART:  And I'm not asking --
2         MR. WALRAVEN:  -- supplement the stipulation
3 today.
4         MR. SHUCHART:  Yeah.  I'm not asking --
5         MR. WALRAVEN:  But we'll get you all that.
6     Q  (Mr. Shuchart)  My question to you is, why do you
7 think that anything my client did with respect to the BCS
8 policy you're entitled to get the money that you claim
9 should've been paid under the Companion policy?  And that may
10 be the easiest way to ask that.
11     A  Those were part of their services to us.
12     Q  But how are you tying or how do you tie something
13 that you claim should've been paid on the Companion policy to
14 something they did with the BCS policy?  That's where I'm
15 confused.  That's where I'm looking for guidance.
16     A  I don't know whether you're trying to ask for -- for
17 BCS.  Like I said, that makes a big difference on the policy
18 period and if, -- you know, if we're talking about two
19 different companies, the policy periods and the date that the
20 claim was paid, makes a big difference as to who --
21     Q  Right.
22     A  -- who we're talking about.  But are we talking
23 about the TPA in particular?
24     Q  No, I'm trying to figure --
25     A  See, we've got different policies --

---

Action Reporting                                          Page 66 - Page 69
(956)631-1024 (Toll Free:  1-800-884-1024)

Page 70

1   Q  Do you want to rephrase that question?
2   A  I don't understand.
3        MR. WALRAVEN:  Why don't we let him ask the
4  questions?
5   Q  (Mr. Shuchart)  Can you rephrase that question?
6  There are two policies that are involved in this lawsuit.
7   A  Correct.
8   Q  In this lawsuit.
9   A  Oh.
10   Q  And that may be where you are confused.  There are
11  actually two policies, the way the lawsuit is phrased, that
12  are involved:  the Companion policy --
13   A  And the BCS?
14   Q  -- and the BCS policy.  I was as perplexed, as
15  apparently you are, as to trying to figure out how if the
16  claim wasn't paid or shouldn't be paid under the Companion,
17  how and why it should be paid under the BCS, and that's what
18  I'm trying to figure out.  If you can, help me.
19   A  So, if it's not paid by Companion, you want to know
20  why it should be paid by BCS?
21   Q  Why does the school district think it should've been
22  paid by BCS and then wasn't because of the application
23  process?
24   A  Hmm.
25   Q  And if you don't know --

Page 71

1   A  I --
2   Q  -- you can say, "I don't know."
3   A  I -- I don't know.
4   Q  Okay.  Is there anybody you can think at the school
5  district that would know the answer to that question?
6   A  No.
7   Q  Okay.  If I understood your testimony earlier, you
8  hold a group health and life --
9   A  Uh-huh.
10   Q  -- license?
11   A  Uh-huh.
12   Q  When did you get that license?  I mean, was it
13  before you joined the school district?
14   A  No, in '96.
15   Q  Oh, okay.  I'm sorry.  I did misunderstand your
16  previous testimony.  So, you didn't have any dealings with
17  group health --
18   A  No, never did.
19   Q  -- life when you were an agent?
20   A  Never did.  We didn't do that in the agency, at the
21  agency at that time.
22   Q  As an agent, when you placed the policy did you
23  actually read the policy?
24   A  As an agent?
25   Q  Yeah.

Page 72

1   A  At times.
2   Q  Did you make sure all the endorsements were properly
3  attached?
4   A  You bet.
5   Q  And I'm not asking if you knew every word of the
6  policy because if you agents did --
7   A  I did.
8   Q  -- people like me would be out of a job.  But --
9   A  I did.
10   Q  And I'm not saying you didn't, you know, you read
11  every CGL form because they were the same.
12   A  No, they're all different.
13   Q  But you definitely -- but you read the CGL form?
14   A  As -- as long as -- depending on what it pertained
15  to, yes, I did.
16   Q  Did you recommend to your clients that they read the
17  policy that --
18   A  Oh, you bet.
19   Q  -- was issued?  But you didn't read the policy when
20  you were at the school?
21   A  I did.
22   Q  Well --
23   A  I didn't completely go through every single word,
24  but I did go through the --
25   Q  But you were looking at the financial end of it, the

Page 73

1  premium --
2   A  Sure, financials plus --
3   Q  -- aggregate, the -- the loss, not the terms and
4  conditions, were you?
5   A  Some terms and some conditions, not all of them.
6  Dates.
7   Q  And you don't know whether Mr. Sanchez read the
8  policies or not, do you?
9   A  I'm not sure.
10   Q  Do you know whether the reserves were held in the,
11  quote, unquote, checking account that paid or were they in a
12  separate account?  I'm talking about the $700,000 reserve.
13   A  Oh, I believe that's -- that's a different account
14  that they've got.  I'm not sure.
15   Q  Okay.  Ms. Gonzalez, thank you very much for your
16  time.
17   A  Thank you.
18        (Time:  3:55 p.m.)
19  BY MS. HEGLAND:
20   Q  Ms. Gonzalez?
21        MR. WALRAVEN:  Do you have more than two
22  minutes?
23   Q  (Ms. Hegland)  I don't think I have any questions.
24  It was nice to meet you.
25   A  Oh, thank you.  Thank you.

Janie Sanchez
June 26, 2003

Multi-Page™

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

---

**Page 74**

1    MR. WALRAVEN:  Wonderful.

2    MR. BUSH:  We'll reserve any remaining

3 questions.

4    MR. SHUCHART:  Same here.

5    MR. WALRAVEN:  We'll reserve our questions for

6 next time.

7    (Proceedings concluded at 3:55 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**Page 76**

I, JANIE GONZALEZ, have read the foregoing

deposition and hereby affix my signature that same is true and

correct, except as noted above.

_____
JANIE GONZALEZ

THE STATE OF TEXAS    }

COUNTY OF _____  (

        Before me, _____, on this day personally

appeared JANIE GONZALEZ, known to me (or proved to me under

oath or through _____) (description of

identity card or other document) to be the person whose name

is subscribed to the foregoing instrument and acknowledged to

me that they executed the same for the purposes and

consideration therein expressed.

        Given under my hand and seal of office this ____ day

of _____, 2003.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

---

**Page 75**

CHANGES AND SIGNATURE

PAGE    LINE    CHANGE                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

---

**Page 77**

THE STATE OF TEXAS    }  NO. B-003-047 - SAN BENITO C.I.S.D. v.
                      (  COMPANION LIFE INSURANCE COMPANY,
                      }  et al.; UNITED STATES DISTRICT COURT,
                      (  SOUTHERN DISTRICT OF TEXAS,
COUNTY OF  HIDALGO    }  BROWNSVILLE DIVISION

REPORTER'S CERTIFICATION
ORAL DEPOSITION OF JANIE GONZALEZ
JUNE 26, 2003

        I, DINA RAMIREZ, Certified Shorthand Reporter in and for

the State of Texas, hereby certify to the following:

        That the witness, JANIE GONZALEZ, was duly sworn by the

officer and that the transcript of the oral deposition is a

true record of the testimony given by the witness;

        That the deposition transcript was submitted on

_____, to CELESTE GUERRA, Counsel for the witness,

for examination, signature and return to me by _____;

        That the amount of time used by each party at the

deposition is as follows:

Mr. Stephen R. Walraven:    0 Hrs., 0 Min.;
Ms. Celeste Guerra:         0 Hrs., 0 Min.;
Mr. Shelby J. Bush:         1 Hr., 3 Min.;
Mr. Fred L. Shuchart:       0 Hrs., 38 Min.;
Ms. Roberta J. Hegland:     0 Hrs., 0 Min.

        That pursuant to information given to the deposition

officer at the time said testimony was taken, the following

includes counsel for all parties of record:

---

Case 1:03-cv-00047    Document 42    Filed in TXSD on 02/17/2004    Page 87 of 122

Janie Sanchez                                    Multi-Page                    San Benito C.I.S.D.
June 26, 2003                                                      v. Companion Life Insurance Company, et al.

Page 78

Attorney for Plaintiff, San Benito Consolidated
Independent School District:

HONORABLE STEPHEN R. WALRAVEN
Shaddock, Compere, Walraven & Good, P.C.
1250 N.E. Loop 410, Suite 725
San Antonio, Texas    78209
&
HONORABLE CELESTE GUERRA
Law Office of Rene Ramirez
1906 Tesoro Blvd.
Pharr, Texas    78577

Attorney for Defendant, Companion Life Insurance
Company:

HONORABLE SHELBY J. BUSH
Piper Rudnick LLP
1717 Main Street, Suite 4600
Dallas, Texas    75201-4605

Attorney for Defendant, Managed Benefits Administrator
and Insurance Consultants, Inc., and
MBA of Wyoming, Inc.:

HONORABLE CINDY A. GARCIA
The Garcia Law Firm
201 North 1st Street
Harlingen, Texas    78550

Attorney for the Defendant, J. Allan Hall and
Associates, Inc.:

HONORABLE ROBERTA J. HEGLAND
Bracewell & Patterson, L.L.P.
2000 One Shoreline Plaza, South Tower
800 North Shoreline Boulevard
Corpus Christi, Texas    78403-3700

    I further certify that I am neither counsel for, related

to, nor employed by any of the parties or attorneys in the

action in which this proceeding was taken, and further that I

---

Page 79

am not financially or otherwise interested in the outcome of

the action.

    Certified to by me this 23rd day of July, 2003.

                    _____

                    DINA RAMIREZ, Texas CSR #2267

                    Expiration Date:  12/31/2003

                    Action Reporting

                    P.O. Box 4513

                    McAllen, Texas    78502

                    (956) 631-1024

---

Page 80

REPORTER'S FURTHER CERTIFICATION

    The original deposition was/was not returned to the

deposition officer on _____;

    If returned, the attached Changes and Signature page

contains any changes and the reasons therefor;

    If returned, the original deposition was delivered to

SHELBY J. BUSH, Custodial Attorney;

    That $_____ is the deposition officer's charge to

the Defendant, Companion Life Insurance Company, for preparing

the original deposition transcript and any copies of exhibits;

    That a copy of this certificate was served on all parties

shown herein.

    Certified to by me this ____ day of _____, 2003.

                    _____
                    DINA RAMIREZ, Texas CSR #2267
                    Expiration Date:  12/31/2003
                    Action Reporting
                    P.O. Box 4513
                    McAllen, Texas    78502
                    (956) 631-1024

xc:  Mr. Stephen R. Walraven
     Ms. Celeste Guerra
     Mr. Shelby J. Bush
     Ms. Cindy A. Garcia
     Ms. Roberta J. Hegland
     File

## -$-

**$14,000** [1] 53:4
**$141,400** [2] 26:25
30:18
**$381,250.59** [1]
40:4
**$381-some-odd-thousand**
[1] 42:12
**$450,000** [1] 38:23
**$463,375.85** [1]
29:18
**$7,000** [1] 53:3
**$700,000** [1] 73:12
**$75,000** [2] 37:8
48:18
**$800,000** [2] 68:15
68:16

## -'-

**'01** [1] 63:9
**'94** [2] 7:19 7:20
**'95** [3] 19:9 53:21
58:19
**'96** [1] 71:14
**'98** [1] 18:25
**'99** [2] 19:9 19:10

## -1-

**12th** [2] 20:11 20:11
**14** [1] 29:20
**14th** [1] 21:25
**15th** [4] 26:9 29:21
31:18 38:20
**16** [3] 18:2 18:3
18:4
**16th** [1] 39:7
**17** [2] 19:19 19:20
**17th** [1] 25:6
**18** [6] 21:13 21:14
22:21 29:23 30:1
30:12
**19** [2] 24:23 24:25
**1994** [1] 10:17
**1995** [1] 50:24
**1997** [1] 10:17
**19th** [2] 19:2 19:3
31:18
**1st** [4] 12:23 14:17
25:11 60:25

## -2-

**20** [8] 26:5 26:6
28:8 28:10 29:25
30:11 31:12 50:19
**2000** [4] 12:23 14:18
63:7 67:9
**2000-2001** [5] 45:8
45:13 45:14 45:22
64:23

**2001** [18] 12:24
14:18 16:8 16:9
19:25 20:6 21:25
23:8 25:11 26:9
29:22 33:6 33:19
41:4 54:10 54:11
61:2 63:8
**2001-2002** [1] 59:15
**21** [3] 31:10 31:13
31:17
**21st** [2] 20:6 20:9
**22** [3] 32:19 32:23
40:3
**23** [3] 7:18 33:17
33:18
**23rd** [3] 19:25 20:10
20:13
**24** [3] 37:25 38:3
**24th** [1] 40:10
**25** [3] 38:17 38:19
50:20
**26** [4] 33:6 40:3
60:18 60:20

## -3-

**30** [1] 9:18
**30-hour** [2] 9:16
9:17
**31st** [4] 12:23 14:18
23:8 40:11
**3:16** [1] 44:6
**3:39** [1] 61:20
**3:40** [1] 61:20
**3:55** [2] 73:18 74:7

## -4-

**410** [1] 8:11
**459** [1] 31:14
**462** [1] 31:14
**466** [1] 28:3
**478** [1] 28:3

## -5-

**50,000** [2] 34:11
39:2
**5th** [3] 33:18 37:24
38:2

## -7-

**7,000** [1] 38:25
**700,000** [1] 39:14

## -8-

**8/31** [1] 68:2

## -9-

**9** [1] 19:5
**9/1** [4] 67:17 67:23
67:23 68:1
**9th** [2] 38:1 38:3

## -A-

**able** [1] 32:18
**above** [1] 34:20
**accepted** [1] 34:16
**according** [6] 26:24
38:24 39:3 62:20
65:2 65:9
**account** [36] 15:10
15:11 26:24 27:7
27:14 27:16 31:7
34:8 35:2 35:4
35:7 35:8 38:7
38:24 39:4 39:12
47:23 51:15 52:8
52:18 53:3 53:3
53:14 54:16 54:22
55:2 56:19 56:22
56:23 56:23 57:2
58:18 58:23 73:11
73:12 73:13
**accountant** [12] 27:19
27:20 31:1 31:2
32:6 35:9 36:6
38:12 41:6 51:12
57:6 59:4
**accounts** [2] 27:9
29:9
**activities** [1] 27:1
**actual** [2] 35:18
49:3
**additional** [3] 27:5
64:4 64:5
**addressed** [1] 56:4
**adjuster's** [1] 8:19
**administrative** [1]
50:8
**administrator** [4]
15:15 24:7 44:10
45:3
**advance** [13] 12:16
12:19 16:12 16:15
16:20 43:23 45:21
46:3 46:6 65:3
65:10 66:7 66:7
**affect** [1] 25:15
**again** [14] 10:9
11:12 13:6 13:6
22:19 23:1 37:3
38:1 38:4 38:5
39:2 49:5 53:8
67:10
**against** [2] 16:11
64:18
**agency** [5] 7:22
7:25 8:1 71:20
71:21
**agent** [6] 7:22
11:22 18:22 71:19
71:22 71:24
**agent's** [1] 18:21
**agents** [1] 72:6
**aggregate** [2] 24:13
73:3
**ago** [1] 39:9

**agree** [3] 14:19 46:5
56:18
**agreed** [1] 62:15
**agreement** [1] 52:20
**ahead** [3] 50:11
57:22 57:23
**alarm** [1] 38:11
**Allan** [2] 13:21
13:24
**allegations** [1] 64:18
**allege** [1] 67:1
**alleged** [2] 64:20
66:13
**allegedly** [2] 40:6
58:2
**almost** [2] 38:18
38:18
**along** [4] 9:16
10:20 49:11 59:25
**always** [3] 10:3
10:5 11:8 17:23
45:1
**amount** [12] 24:3
27:1 28:13 29:15
29:18 33:10 34:18
34:19 34:20 39:13
39:24 40:1
**amounts** [12] 22:13
22:16 22:20 23:3
23:7 24:1 27:11
29:24 29:25 30:10
30:11 68:21
**answer** [13] 7:8
23:2 23:22 41:22
42:15 42:16 52:11
52:12 52:15 53:7
62:8 65:20 71:5
**anytime** [3] 7:1
13:18 15:21
**application** [5] 63:20
66:18 67:2 67:12
70:22
**April** [1] 25:11
**aspect** [1] 20:22
**Associates** [3] 8:3
13:21 13:24
**assume** [4] 40:17
45:19 48:6 53:13
**Assumes** [1] 52:9
**assuming** [3] 24:8
24:9 39:3
**attached** [5] 20:5
29:19 29:23 41:5
72:3
**attack** [1] 56:15
**attend** [1] 9:8
36:16 36:21
**attended** [1] 36:18
**attention** [1] 23:17
**attorney** [1] 24:1
**attorneys** [1] 41:21
**audit** [5] 35:10 35:13
35:21 35:24 36:9
**auditor** [2] 36:7

**36:14**
**August** [5] 12:23
14:18 23:8 40:10
40:11
**auspices** [1] 10:24
**authority** [2] 52:3
52:4
**authorization** [2]
27:3 32:10
**auto** [1] 11:24
**available** [1] 56:19
**average** [1] 34:18
**aware** [23] 12:15
15:17 24:22 33:13
33:13 41:10 41:16
42:11 42:19 42:23
43:1 43:19 47:18
47:20 47:21 47:21
47:24 51:2 51:6
51:6 58:3 60:2
66:4

## -B-

**balance** [2] 30:18
53:16 56:19
**bank** [5] 30:18 30:24
32:10 32:11 54:2
**base** [1] 50:3
**Based** [1] 64:23
**basis** [5] 16:23 23:23
34:10 34:13 67:13
**BCS** [21] 59:15
59:23 61:24 63:10
66:18 67:1 67:9
67:10 67:12 67:16
67:17 67:25 68:1
69:7 69:14 69:17
70:13 70:14 70:17
70:20 70:22
**became** [1] 10:3
**become** [2] 12:18
41:10
**began** [2] 11:1
12:23
**beneficiary** [1] 14:23
**benefit** [3] 10:23
11:3 51:15
**benefits** [4] 8:24
44:9 45:2 65:14
**Benito** [3] 7:13
10:4 11:2
**best** [1] 56:19
**bet** [2] 72:4 72:18
**better** [2] 57:1
58:19
**between** [7] 13:1
13:8 14:17 31:1
35:9 47:19 47:22
**bid** [1] 24:19
**bids** [1] 11:21
**big** [2] 69:17 69:20
**Bill** [2] 18:23 18:24
**blue** [1] 52:1

Case 1:03-cv-00047   Document 42   Filed in TXSD on 02/17/2004   Page 89 of 122

Janie Sanchez
June 26, 2003
Multi-Page™
board - different
San Benito C.I.S.D.

board [3]                36:16
  36:18    36:21
board's [1]              65:25
bold [1]    20:15
bounce [3]               52:7
  52:17    52:20    52:24
  53:12
boy [1]   63:7
break [1]                7:1
brought [3]              16:11
  16:21    23:17
building [1]             8:9
Bush [34]                13:5
  13:7    15:21    15:25
  16:3    17:5    18:2
  18:4    19:20    21:14
  24:24    26:6    26:17
  26:21    28:6    31:11
  31:16    32:20    32:23
  33:18    37:23    38:1
  38:18    42:2    42:11
  42:16    42:21    43:15
  44:5    46:7    48:5
  67:24    68:13    74:2
business [4]             7:17
  12:3    52:6    53:20
buying [1]               66:1

-C-

C.I.S.D [1]              7:14
cafeteria [2]            8:24
  10:20
Calls [3] 26:19    53:5
  66:10
care [4]   38:12    48:7
  56:5    56:8
carefully [4]            20:16
  20:16    20:20    20:21
Carol [17]               26:9
  31:18    33:19    34:4
  34:17    35:1    38:3
  38:20    42:22    51:13
  57:8    57:18    58:11
  58:21    59:3    61:4
  61:5
Carol's [2]              58:1
  59:9
Carolyn [2]              19:22
  19:23
carrier [4]              21:21
  24:18    30:6    65:9
carrier's [1]            27:4
cases [2]                59:24
  60:6
caused [1]               66:19
causes [1]               66:19
Celeste [2]              21:23
  23:18
certain [5]              9:1
  62:18    64:16    64:18
  67:2
Certainly [2]            26:23
  34:6
CGL [3] 12:6    72:11

change [2]               34:14
  37:13
changed [5]              8:7
  10:10    12:2    12:4
  65:25
charge [6]               10:14
  10:18    10:18    10:22
  18:13    27:7
check [24]               26:23
  27:1    27:8    28:13
  28:22    29:2    33:7
  33:7    33:9    34:11
  34:12    38:4    38:20
  39:1    39:21    40:11
  46:4    53:4    53:12
  53:15    55:3    55:8
  55:13    58:15
checking [6]             27:13
  51:15    53:3    53:14
  58:9    73:11
checks [58]              15:11
  15:12    15:15    15:17
  22:17    22:21    23:5
  23:7    26:25    27:2
  27:16    27:17    28:12
  29:18    30:15    30:20
  31:22    32:8    32:12
  34:7    34:9    34:13
  34:18    34:19    36:6
  39:4    39:6    39:6
  40:5    40:7    40:12
  40:18    41:7    41:18
  42:12    42:20    43:11
  46:13    46:16    47:19
  50:15    50:22    51:13
  52:2    52:7    52:17
  52:20    52:24    55:15
  55:17    55:21    55:23
  55:25    56:2    57:21
  58:2    58:22    59:10
claim [18]               14:22
  17:11    17:12    17:16
  17:21    17:22    22:24
  46:4    49:3    68:2
  68:4    68:5    68:8
  68:8    69:8    69:13
  69:20    70:16
claimant's [1]           40:4
claimants [1]            22:1
claims [29]              10:20
  14:16    14:25    15:2
  15:3    15:4    21:7
  23:11    23:24    24:6
  27:10    27:16    30:10
  30:12    35:11    39:15
  47:2    47:16    48:21
  48:23    48:24    48:25
  54:16    54:22    60:5
  66:20    67:3    67:5
  67:13
class [2] 9:8    9:10
classes [1]              9:8
clear [1] 7:8
cleared [1]              10:11
client [9]               16:11
  64:18    64:20    64:24
  64:25    65:12    65:13

clients [1]              72:16
collect [3]              16:24
  23:16    23:19
column [5]               28:13
  28:13    28:17    28:18
  42:13
comment [1]              34:1
commercial [2] 12:2
  12:7
communicating [1]
  58:21
communication [1]
  26:15
communications [4]
  13:1    15:14    36:14
  47:1
comp [6]                 8:19
  8:21    8:23    9:13
  9:13    10:20
companies [1] 69:19
Companion [19]
  12:22    13:19    13:23
  14:1    14:2    14:6
  14:11    17:22    20:1
  20:7    22:3    35:13
  37:5    45:16    69:9
  69:13    70:12    70:16
  70:19
company [10]             12:22
  13:19    13:24    14:2
  14:6    14:11    36:2
  37:5    46:3    49:8
company's [1]            49:12
compared [1]             10:7
complaints [1]           48:20
complete [1]             28:10
completely [1]           72:23
component [3]            16:20
  17:10    17:14
concern [5]              30:6
  54:15    54:20    54:24
  54:25
concerned [4]            53:1
  54:21    54:23    55:2
concluded [1]            74:7
conditions [2]           73:4
  73:5
conducted [1]            35:11
conference [1] 68:14
confidential [2]
  31:13    32:22
confirmation [2]
  27:4    38:23
confused [3]             58:7
  69:15    70:10
confusing [1]            7:5
considered [1]           17:11
Consolidated [2]
  10:4    11:2
Consultants [2] 44:10
  45:3
contact [1]              45:12

contacts [1]             21:7
contain [1]              31:13
contained [1]            56:10
containing [1]           22:12
contains [1]             33:9
content [1]              47:22
context [1]              44:3
continuing [1]           9:2
contract [37]            12:23
  14:3    14:8    14:18
  14:19    14:23    17:6
  17:15    17:19    20:2
  20:3    20:8    20:16
  20:20    21:4    22:18
  22:22    24:5    37:6
  37:7    37:11    37:14
  43:20    43:20    44:1
  44:2    44:15    44:16
  44:17    44:18    45:5
  45:12    64:23    65:1
  65:4    65:15    66:1
contract-holder [1]
  65:10
contract/policy [2]
  67:10    67:13
contracts [1]            47:2
conversation [7]
  42:21    45:21    45:24
  46:1    63:2    63:10
  63:12
conversations [11]
  13:18    14:11    41:21
  45:5    45:10    45:11
  47:22    48:9    49:6
  55:21    57:20
coordinate [3]           13:1
  35:20    35:23
coordinator [4] 7:13
  10:4    10:17    18:14
copied [1]               19:6
copy [4] 19:11    38:23
  61:11    61:14
correct [32]             8:11
  11:4    11:5    11:6
  12:14    14:20    18:6
  20:2    22:3    22:4
  22:10    22:14    31:4
  31:22    32:8    32:9
  33:3    34:2    36:13
  40:12    41:18    46:19
  51:5    51:17    54:17
  55:13    55:14    56:10
  58:23    59:1    59:11
  70:7
correspond [1]   13:23
could've [1]             51:6
  51:16    51:21    58:3
counsel [1]              68:14
course [1]               9:15
  10:11    42:5    54:24
cover [4]                27:17
  54:16    61:22    61:22
coverage [3]             11:23
  12:10    45:7
covered [2]              10:23

45:11
covers [1]               25:14
critically [1]           64:22
crucial [1]              20:25
current [1]              7:12
cut [8]    15:18    22:17
  22:21    23:8    41:8
  46:4    46:13    46:16

-D-

daily [3] 27:1    34:10
  34:13
date [13] 18:24    21:24
  25:11    37:24    40:6
  40:10    40:15    40:17
  40:17    42:13    60:24
  67:17    69:19
dated [7]                19:25
  20:6    20:8    31:17
  31:18    33:6    40:3
dates [5] 30:2    41:18
  42:13    62:18    73:6
days [2] 12:1    37:21
deal [4]  7:10    12:10
  32:9    32:10
dealings [1]             71:16
dealt [1] 45:1
December [1]             64:9
deductible [1]           48:19
define [2]               46:2
  68:3
defines [2]              17:11
  17:15
definitely [1]           72:13
definition [1]           17:12
  46:5    46:9    46:10
denied [1]               22:23
department [2] 8:23
  10:19    25:22
departments [1]
  55:6
dependent [1]            14:22
depending [2]            68:3
  72:14
depleted [1]             39:15
deposit [1]              34:22
  38:24
deposited [2]            35:7
  35:8
deposits [2]             27:5
  39:3
description [2] 9:14
  10:10
deserve [1]              50:7
deserved [1]             48:15
  48:16
desk [1] 56:15
diagnosis [1]            29:12
die [1]   56:15
difference [3]           37:9
  69:17    69:20
different [10]           21:4

Case 1:03-cv-00047     Document 42     Filed in TXSD on 02/17/2004     Page 90 of 122

Janie Sanchez                    Multi-Page™                    differently - HIPAA
June 26, 2003                                                   San Benito C.I.S.D.

| | | |
|---|---|---|
| 22:1 23:19 46:15 | drove [1] 8:9 | 22:21 23:13 23:20 | fine [2] 25:17 59:8 | gonna [1] 15:10 |

22:1  23:19  46:15
55:6  59:3  69:19
69:25  72:12  73:13
**differently** [1]  39:5
**directly** [6]  15:3
32:5  32:10  40:7
58:21  59:9
**disagree** [2]  57:4
57:5
**disclose** [3]  28:7
60:2  60:3
**disclosed** [3]  31:12
62:16  62:25
**disclosure** [6]  59:23
60:12  60:13  60:16
62:10  62:11
**disclosures** [5]  61:22
62:24  64:5  64:6
64:10
**discover** [1]  16:5
**discuss** [1]  52:25
**discussed** [4]  24:16
36:19  46:24  65:8
**discussion** [1]  36:23
**dispute** [1]  66:8
**district** [38]  7:19
9:4  9:23  10:5
10:11  10:14  11:1
11:3  11:10  11:13
12:13  13:8  16:11
16:19  17:21  21:19
24:12  24:20  39:9
43:1  43:19  44:2
45:7  46:3  46:12
47:11  48:15  49:25
50:10  51:16  56:20
57:1  60:5  66:19
66:20  70:21  71:5
71:13
**district's** [6]  14:24
16:22  21:1  52:8
64:17  66:23
**disturbing** [2]  35:1
35:3
**document** [12]  18:11
18:12  18:14  19:6
19:13  21:15  23:14
28:10  32:24  60:22
60:24  61:1
**documenting** [1]
61:18
**documents** [2]  17:24
32:21
**Doe** [4]  22:2  22:2
22:2  22:3
**doesn't** [6]  20:3
51:1  51:5  58:4
65:10  65:13
**Don** [3]  20:6  25:6
62:17  62:19  63:10
**done** [2]  50:6  50:12
**Douglas** [1]  20:6
**down** [4]  20:12
56:12  64:1  68:19
**drawn** [1]  27:16

**drove** [1]  8:9
**due** [2]  24:2  37:18
**during** [5]  11:7
11:11  11:14  11:22
46:13
**duties** [1]  10:5
30:24

**-E-**

**earn** [1]  9:22
**easier** [4]  44:24
48:2  65:17  66:22
**easiest** [1]  69:10
**East** [1]  8:11
**easy** [2]  32:2  64:19
**education** [1]  9:2
**effect** [2]  62:19
62:25
**effective** [2]  25:11
67:17
**eight-hour** [1]  9:8
**eighty-five** [1]  29:1
**eighty-one** [1]  33:11
**either** [5]  17:25
31:12  55:16  64:21
66:7
**Emma** [4]  27:21
32:5  59:4  59:9
**employee** [6]  8:24
10:23  11:3  14:22
54:18  57:25
**employees** [2]  29:10
29:10
**employment** [2]
10:11  11:14
**end** [6]  22:18  22:22
24:4  37:11  37:14
72:25
**endorsements** [1]
72:2
**entering** [1]  66:1
**entire** [2]  17:18
58:17
**Entirely** [1]  17:7
**entitled** [3]  42:13
43:21  69:8
**essence** [1]  64:19
**ethics** [2]  9:15
9:15
**everything's** [1]
38:15
**evidence** [2]  52:13
52:14
**exact** [1]  39:13
**exactly** [1]  18:7
**except** [1]  40:4
**exception** [1]  50:20
**excess** [1]  53:16
**excluded** [1]  28:9
**exhibit** [42]  18:3
18:4  19:5  19:19
19:20  21:13  21:14

22:21  23:13  23:20
23:24  24:23  24:25
26:5  26:6  28:8
28:10  29:23  29:25
30:1  30:11  30:12
31:10  31:12  31:13
31:15  31:16  31:17
32:19  32:22  32:23
33:17  33:18  37:25
38:3  38:17  38:19
39:21  40:3  60:18
60:20  67:22
**exhibits** [2]  32:21
50:19
**expect** [1]  35:5
**experience** [1]  12:12
**Explain** [1]  13:6
**extent** [3]  13:14
13:17  41:20

**-F-**

**F-R-A-N-D-S-E-N**
[1]  26:13
**fact** [2]  41:11  41:12
48:11
**facts** [1]  52:10
**fair** [3]  14:2  14:5
54:17
**fall** [1]  63:3
**falls** [1]  12:9
**false** [1]  64:24
**familiar** [4]  12:18
12:19  12:20  25:20
**family** [1]  60:20
**far** [8]  10:22  13:10
15:2  27:10  27:13
30:23  53:1  65:2
**fault** [7]  49:7  49:13
49:13  49:15  49:18
49:23  49:24
**fax** [22]  21:22  21:23
22:6  22:10  23:11
23:15  23:18  27:2
32:2  32:3  33:20
34:10  56:3  56:3
56:7  56:10  57:8
57:9  57:9  59:25
61:3  61:22
**faxed** [5]  21:23
32:3  36:5  39:7
41:1
**faxes** [1]  15:16
**faxing** [1]  58:12
**fees** [2]  20:21  50:9
**fifty-nine** [1]  33:12
**figure** [5]  25:13
68:11  69:24  70:15
70:18
**file** [2]  15:3  28:11
**filed** [1]  61:13
**filing** [1]  21:7
**filled** [1]  67:12
**financial** [1]  72:25
**financials** [1]  73:2

**fine** [2]  25:17  59:8
**finish** [1]  7:7
**finished** [1]  38:18
**fire** [1]  11:25
**first** [14]  10:9  10:13
12:12  12:18  16:5
25:4  25:7  41:1
48:19  51:8  51:8
62:2  62:8  64:8
**fit** [1]  22:23
**flood** [1]  11:25
**follow-up** [1]  11:25
**following** [1]  38:2
**forgot** [3]  42:5
64:21  64:25
**form** [9]  15:19  26:16
31:17  41:19  42:14
46:7  59:23  72:11
72:13
**format** [1]  33:2
38:20
**forwarded** [5]  15:18
20:13  22:17  22:21
33:25
**four** [3]  22:1  28:25
67:14
**Fourteen** [1]  7:24
**frame** [1]  14:17
**Frandsen** [3]  26:10
26:11  61:5
**Fred** [1]  44:8
**free** [1]  9:9  9:10
**Friday** [3]  34:10
39:7  58:16
**friends** [1]  60:6
**front** [1]  23:10
**full** [1]  62:5
**fund** [1]  52:21
**funding** [1]  12:16
12:19  16:12  16:16
16:20  27:13  43:23
45:21  46:3  46:6
47:23
**funds** [12]  27:17
38:6  38:7  39:4
51:14  52:8  52:22
54:8  54:16  54:21
55:2  58:22
**funny** [1]  19:8

**-G-**

**Gale** [2]  19:22  19:23
**general** [1]  12:7
**gist** [1]  28:7
**given** [1]  51:11
**giving** [1]  13:10
**gladly** [2]  7:2
7:5
**glitch** [2]  68:20
68:21
**God** [1]  56:13
**gone** [1]  34:8

**gonna** [1]  15:10
17:24  41:24  41:25
41:25  57:22  57:23
64:18  68:19
**Gonzalez** [4]  44:8
66:15  73:15  73:20
**good** [3]  8:22  52:2
61:18
**grandfathered** [1]
9:6
**Great** [2]  18:13
21:12
**Greer** [1]  18:24
**Greer's** [1]  18:23
**group** [8]  8:18
10:16  10:22  10:24
12:10  12:12  71:8
71:17
**Guerra** [1]  41:24
**guess** [2]  68:6
68:6
**guidance** [1]  69:15
**guys** [4]  34:6  39:7
55:20  68:10

**-H-**

**hail** [1]  11:25
**Hall** [2]  13:21  13:24
**hand** [1]  60:19
**handle** [2]  28:2
58:9
**handled** [1]  21:7
43:6
**handles** [1]  10:19
**handling** [1]  48:21
**handwriting** [3]
22:5  22:8  22:11
**happening** [1]  29:10
**Harlingen** [1]  8:3
**Harrison** [2]  8:9
8:11
**health** [9]  8:18
8:24  10:16  10:23
10:24  12:10  12:13
71:8  71:17
**hear** [2]  34:15  60:6
**heard** [1]  65:7
**heart** [1]  56:15
**Hegland** [4]  66:10
67:19  73:19  73:23
**held** [24]  7:15  9:25
15:15  22:25  23:5
28:22  29:2  29:18
30:15  32:7  32:12
33:7  33:9  39:21
40:11  40:12  40:18
42:20  43:11  50:15
50:21  55:21  55:25
58:2  59:10  73:10
**help** [2]  68:13  70:18
**hers** [1]  37:23
**Hey** [1]  47:25
**HIPAA** [1]  28:9

Case 1:03-cv-00047    Document 42    Filed in TXSD on 02/17/2004    Page 91 of 122

Janie Sanchez                          Multi-Page™                          hired - Merrill
June 26, 2003                                                      San Benito C.I.S.D.

| | | |
|---|---|---|
| **hired** [3] 7:19 | 10:16 |
| 12:13 | | |
| **hmm** [6] 12:25 | 16:6 |
| 27:4 59:16 | 61:25 |
| 70:24 | | |
| **hold** [8] 8:13 | 8:17 |
| 8:20 10:1 | 51:13 |
| 55:8 68:22 | 71:8 |
| **holding** [9] | 9:23 |
| 30:20 47:19 | 52:2 |
| 55:15 55:17 | 55:22 |
| 57:21 58:22 | |
| **homeowner's** [1] | |
| 11:25 | | |
| **honestly** [1] | 29:20 |
| **hope** [1] 66:23 | |
| **hours** [2] | 9:1 |
| 9:18 | | |
| **Huh-uh** [1] | 34:25 |
| **hundred** [2] | 28:25 |
| 33:11 | | |

**-I-**

| | | |
|---|---|---|
| **idea** [9] 27:9 | 27:12 |
| 34:8 34:16 | 35:2 |
| 45:2 54:1 | 56:24 |
| 63:1 | | |
| **identify** [6] | 21:14 |
| 21:16 31:16 | 32:23 |
| 40:5 60:21 | |
| **ill** [1] 60:6 | |
| **important** [5] | 16:18 |
| 20:22 20:24 | 21:3 |
| 64:22 | | |
| **Impossible** [1] 51:22 | |
| **Inc** [4] 44:9 | 44:10 |
| 44:13 45:3 | |
| **income** [2] | 9:22 |
| 9:22 | | |
| **Incorrect** [1] | 58:24 |
| **incurred** [1] | 68:8 |
| **independent** [3] | |
| 10:4 11:2 | 24:10 |
| **indicates** [1] | 26:14 |
| **indication** [1] | 61:22 |
| **individual** [3] | 27:11 |
| 48:25 66:15 | |
| **individuals** [1] 60:12 | |
| **info** [1] 62:15 | |
| **information** [17] | |
| 28:5 28:6 | 28:9 |
| 29:11 31:14 | 32:22 |
| 41:21 41:22 | 43:2 |
| 48:6 51:9 | 56:10 |
| 60:2 62:14 | 62:16 |
| 63:24 64:5 | |
| **initial** [1] | 62:2 |
| 68:14 | | |
| **initials** [1] | 18:21 |
| **instance** [1] | 43:19 |
| **instances** [1] 20:15 | |
| **insufficient** [1] 54:16 | |
| **insurance** [24] 7:13 | |

| | | |
|---|---|---|
| 7:17 7:22 | 7:22 |
| 8:7 8:24 | 10:3 |
| 10:16 10:21 | 10:23 |
| 10:24 11:22 | 12:22 |
| 13:19 13:24 | 14:2 |
| 14:6 14:11 | 18:14 |
| 37:5 44:10 | 45:3 |
| 49:8 49:12 | |
| **interest** [1] | 56:20 |
| **interest-bearing** [1] | |
| 56:23 | | |
| **interested** [3] | 29:5 |
| 29:8 29:22 | |
| **intergovernmental** [3] | |
| 24:13 24:15 | 25:11 |
| **intermediary** [2] | |
| 13:7 13:8 | |
| **invested** [1] | 51:14 |
| **investment** [1] | 51:14 |
| **involve** [1] | 22:17 |
| **involved** [9] | 15:1 |
| 20:23 25:14 | 25:15 |
| 31:25 36:8 | 44:3 |
| 70:6 70:12 | |
| **involvement** [15] | |
| 12:21 12:25 | 15:4 |
| 15:7 15:8 | 60:13 |
| 61:24 62:3 | 62:5 |
| 62:7 62:13 | 63:18 |
| 63:21 63:25 | 64:13 |
| **involves** [1] | 16:12 |
| **issue** [13] | 14:4 |
| 14:8 14:14 | 16:12 |
| 17:6 20:25 | 30:22 |
| 43:11 44:1 | 46:22 |
| 49:1 49:3 | 54:4 |
| **issued** [1] | 72:19 |
| **issues** [1] | 20:24 |
| **it'll** [1] 68:13 | |
| **items** [1] | 33:14 |
| **IX** [1] 64:19 | |

**-J-**

| | | |
|---|---|---|
| **J** [2] 13:21 | 13:24 |
| **Jack** [1] 22:2 | |
| **Jane** [1] 22:2 | |
| **Janie** [1] 66:15 | |
| **January** [4] | 19:25 |
| 20:6 20:9 | 20:11 |
| **Joan** [1] 22:2 | |
| **job** [6] 9:14 | 9:19 |
| 9:20 10:5 | 10:10 |
| 72:8 | | |
| **John** [1] 22:2 | |
| **joined** [1] | 71:13 |
| **Jose** [32] 27:22 | 32:5 |
| 38:21 43:2 | 43:8 |
| 47:8 47:19 | 47:23 |
| 47:25 48:6 | 48:8 |
| 48:20 48:22 | 49:6 |
| 49:6 51:6 | 51:10 |
| 51:11 51:13 | 55:5 |
| 55:8 55:10 | 55:12 |
| 55:15 55:17 | 55:25 |

| | | |
|---|---|---|
| 56:2 57:22 | 57:23 |
| 58:21 61:11 | 61:17 |
| **Jose's** [2] | 34:1 |
| 47:8 | | |
| **jump** [1] 56:12 | |
| **jury** [1] 52:1 | |

**-K-**

| | | |
|---|---|---|
| **keep** [1] 29:9 | |
| **keeping** [1] | 56:18 |
| **kept** [3] 8:25 | 10:17 |
| 12:4 | | |
| **kind** [3] 19:6 | 48:23 |
| 53:24 | | |
| **knew** [5] | 53:21 |
| 53:23 55:15 | 55:17 |
| 72:5 | | |
| **knowing** [1] | 60:4 |
| **knowledge** [5] | 23:12 |
| 22:23 24:10 | 35:10 |
| 60:1 | | |
| **known** [5] | 16:12 |
| 51:17 60:4 | 60:7 |
| 60:10 | | |
| **Koepke** [2] | 27:22 |
| 47:10 | | |

**-L-**

| | | |
|---|---|---|
| **lady** [1] 33:2 | |
| **large** [4] 26:25 | 27:2 |
| 34:7 59:24 | |
| **larger** [1] | 34:11 |
| **last** [5] 18:11 | 31:17 |
| 37:23 40:11 | 47:9 |
| **late** [1] 16:8 | |
| **latter** [1] | 16:8 |
| **lawsuit** [16] | 16:10 |
| 16:23 32:13 | 32:15 |
| 35:12 36:19 | 36:24 |
| 40:7 44:2 | 48:10 |
| 49:1 64:16 | 67:14 |
| 70:6 70:8 | 70:11 |
| **lawyer** [11] | 42:3 |
| 43:11 43:12 | 43:13 |
| 43:14 43:15 | 64:16 |
| 64:17 64:17 | 64:20 |
| 66:13 | | |
| **lawyers** [4] | 43:14 |
| 43:17 66:23 | 66:24 |
| **learned** [5] | 41:20 |
| 41:23 42:1 | 42:3 |
| 42:4 | | |
| **least** [1] 65:9 | |
| **leave** [1] 41:22 | |
| **left** [1] 60:1 | |
| **less** [1] 60:7 | |
| **letter** [9] 19:20 | 19:25 |
| 20:5 25:6 | 34:17 |
| 61:22 62:17 | 62:18 |
| 63:13 | | |
| **liability** [2] | 12:7 |
| 12:8 | | |
| **license** [7] | 8:13 |

| | | |
|---|---|---|
| 8:18 8:19 | 8:19 |
| 8:21 71:10 | 71:12 |
| **licenses** [10] | 8:13 |
| 8:15 8:15 | 8:17 |
| 8:20 8:25 | 9:2 |
| 9:5 9:23 | 9:25 |
| **life** [19] 8:18 | 10:16 |
| 10:22 10:24 | 12:17 |
| 12:22 13:19 | 13:24 |
| 14:1 14:2 | 14:6 |
| 14:11 17:22 | 20:1 |
| 20:7 22:23 | 37:5 |
| 71:8 71:19 | |
| **likely** [1] | 40:5 |
| **line** [1] 25:10 | 33:5 |
| 33:6 | | |
| **lines** [5] 11:23 | 11:24 |
| 12:2 12:9 | 49:12 |
| **lis** [3] 28:22 | 29:3 |
| 29:4 | | |
| **list** [14] 21:18 | 23:11 |
| 28:12 29:22 | 30:3 |
| 30:6 32:7 | 33:8 |
| 33:9 36:5 | 39:21 |
| 40:11 40:15 | 60:12 |
| **listed** [8] | 22:13 |
| 12:16 23:20 | 29:24 |
| 29:25 30:11 | 30:12 |
| 33:14 | | |
| **listing** [1] | 22:1 |
| **litigation** [6] | 14:4 |
| 14:8 14:14 | 17:6 |
| 25:15 33:15 | |
| **Lone** [1] 25:10 | |
| **longer** [1] | 23:13 |
| **look** [3] 21:11 | 28:11 |
| 31:24 | | |
| **looked** [3] | 25:21 |
| 27:9 68:24 | |
| **looking** [4] | 23:16 |
| 49:19 69:15 | 72:25 |
| **looks** [2] | 25:20 |
| 25:21 | | |
| **loss** [22] 12:22 | 14:3 |
| 14:8 14:19 | 16:19 |
| 17:6 20:1 | 20:8 |
| 21:21 24:3 | 24:12 |
| 24:20 30:5 | 43:20 |
| 44:3 45:8 | 45:12 |
| 45:12 47:2 | 47:15 |
| 66:1 73:3 | |
| **lost** [3] 24:14 | 42:7 |
| 42:7 | | |
| **loud** [2] 26:22 | 34:4 |
| **lowest** [1] | 56:19 |

**-M-**

| | | |
|---|---|---|
| **M-A-Y** [1] | 8:5 |
| **mailed** [1] | 41:8 |
| **maintain** [1] | 9:2 |
| **makes** [3] | 31:24 |
| 69:17 69:20 | |
| **man** [1] 67:18 | |
| **Managed** [2] | 44:9 |

| | | |
|---|---|---|
| 45:2 | | |
| **management** [2] | |
| 8:23 10:19 | |
| **Managers** [1] | 8:8 |
| **manner** [1] | 13:12 |
| 57:7 | | |
| **Marianne** [1] | 25:9 |
| **marked** [17] | 18:3 |
| 19:19 21:13 | 24:23 |
| 24:24 26:5 | 31:10 |
| 32:19 33:17 | 37:25 |
| 38:2 38:17 | 38:19 |
| 60:18 60:20 | 67:21 |
| 67:25 | | |
| **matter** [1] | 31:22 |
| **maximum** [1] | 60:21 |
| **may** [9] 8:3 | 8:4 |
| 8:5 25:6 | 47:22 |
| 51:6 54:21 | 69:9 |
| 70:10 | | |
| **MBA** [39] | 13:2 |
| 13:8 19:23 | 19:24 |
| 20:19 26:13 | 27:18 |
| 31:1 34:19 | 35:13 |
| 35:14 36:3 | 44:9 |
| 44:12 44:13 | 44:14 |
| 44:20 44:24 | 44:25 |
| 45:7 45:10 | 45:21 |
| 46:12 47:1 | 47:13 |
| 47:19 47:23 | 48:1 |
| 50:2 50:5 | 50:21 |
| 50:24 52:1 | 52:7 |
| 52:24 53:9 | 58:17 |
| 66:6 66:9 | |
| **MBA's** [3] | 48:20 |
| 49:7 49:13 | |
| **McCall** [1] | 27:21 |
| **mean** [16] | 29:3 |
| 42:15 45:5 | 45:6 |
| 46:8 49:1 | 50:16 |
| 51:1 51:5 | 54:10 |
| 54:22 58:4 | 59:13 |
| 65:6 66:15 | 71:12 |
| **means** [2] | 11:20 |
| 16:13 | | |
| **mechanism** [1] 12:15 | |
| **meet** [1] 73:24 | |
| **meeting** [1] | 36:18 |
| **meetings** [2] | 36:16 |
| 36:21 | | |
| **member** [2] | 11:10 |
| 11:15 | | |
| **memo** [11] | 26:7 |
| 31:8 31:17 | 33:2 |
| 33:19 38:2 | 38:3 |
| 38:3 38:20 | 38:22 |
| 57:11 | | |
| **memorandum** [1] | |
| 57:16 | | |
| **memorandums** [2] | |
| 50:19 57:7 | |
| **memos** [4] | 41:5 |
| 54:5 54:10 | 55:21 |
| **Merrill** [2] | 20:6 |
| 20:8 20:9 | 20:13 |
| 25:6 36:1 | |

Janie Sanchez　　　　　　　　Multi-Page™　　　　　　　Miceli - protection
June 26, 2003　　　　　　　　　　　　　　　　　　　San Benito C.I.S.D.

Miceli [1]　25:9
might [3]　16:25
　25:15　37:17
mind [1] 37:14
Mine [1] 37:23
minutes [1]　73:22
misrepresented [1]
　65:12
missing [1]　61:23
misunderstand [1]
　71:15
money [44]　15:10
　15:11　16:24　17:1
　17:4　21:19　23:16
　23:19　23:20　24:2
　27:7　28:2　28:16
　29:15　30:2　30:5
　30:21　30:23　30:23
　30:25　31:5　34:8
　34:22　35:2　35:7
　35:8　36:25　37:4
　37:16　37:17　37:18
　39:12　48:9　48:15
　48:18　49:8　49:14
　49:16　49:18　49:25
　50:8　51:14　68:17
　69:8
monies [3]　32:13
　32:15　33:14
month [2]　28:15
　34:19
most [3] 20:22　20:25
　40:5
Ms [8]　41:24　44:8
　66:10　67:19　73:15
　73:19　73:20　73:23
muck [1]　42:17

　　　-N-

name [7]　8:7
　25:8　34:1　40:4
　44:8　47:9　60:20
names [7]　12:5
　24:1　31:11　39:25
　59:24　60:1　60:16
necessarily [4] 21:2
　27:10　55:9　55:16
need [14]　7:1
　7:4　10:9　11:17
　15:19　16:13　23:16
　23:19　28:6　31:12
　36:8　41:21　57:21
　62:2
needed [2]　18:18
　36:7
negotiation [1] 20:23
never [39]　12:11
　13:20　13:22　14:2
　14:6　14:10　15:1
　16:21　29:12　30:22
　30:22　34:21　34:23
　34:24　35:18　40:19
　41:2　41:9　41:9
　46:21　46:22　46:24
　48:22　50:16　50:16
　50:23　50:24　51:9

53:12　54:3　54:3
56:14　60:5　65:7
65:8　65:18　65:19
71:18　71:20
new [1]　19:13　54:18
　57:24
next [3]　28:13　62:13
　74:6
nice [1]　73:24
nine [3]　7:16　10:11
　11:14
nine-year [2]　11:7
　11:11
non-responsive [4]
　51:3　54:19　55:11
　60:8
None [1]　12:25
　15:6
normal [1]　27:1
nothing [4]　27:13
　27:24　30:25　65:22
notice [2]　34:14
　39:3
November [10]　16:6
　19:1　19:2　21:25
　33:18　38:1　38:2
　38:3　38:20　41:4
now [17] 8:7　8:15
　8:22　9:19　10:7
　12:2　15:22　16:3
　20:15　20:19　27:1
　27:22　33:13　34:8
　34:18　41:16　42:5
number [1]　9:1

　　　-O-

object [4]　15:19
　26:16　37:22　60:8
objection [12]　26:19
　41:19　42:14　42:18
　46:7　51:3　52:9
　53:5　53:18　54:19
　55:11　66:10
obvious [2]　52:10
　52:13
obviously [5]　18:8
　21:18　50:15　54:7
　56:4
occupation [1] 7:12
occurred [1]　63:2
October [11]　12:23
　14:17　26:9　29:21
　31:18　31:18　33:6
　40:3　41:1　41:4
　60:25
off [5]　29:6　52:7
　55:3　61:19　61:20
office [1]　24:6
　46:25
once [3] 37:8　56:2
　56:3
one [21] 8:2　20:24
　23:2　30:8　30:24
　31:21　33:25　40:1
　40:4　40:8　45:25

49:24　50:20　50:20
51:8　51:8　52:3
58:1　59:15　61:25
64:8
one's [2]　31:18
　52:3
ones [1] 61:14
open [1] 34:15
opinion [11]　49:17
　49:21　49:22　50:3
　50:4　50:5　50:13
　66:18　67:4　67:9
　67:11
opposed [2]　44:25
　51:15
oral [1]　14:13
orally [1]　14:7
original [1]　64:20
otherwise [2]　16:12
　27:3
outcome [2]　35:17
　35:19
outside [1]　9:22
overdraft [1]　52:18
　52:19　53:10　53:24
　53:25
overdrawn [1]　53:15
overseen [1]　11:2
owed [2]　21:19
　37:4
owing [1]　22:14
own [1]　52:2

　　　-P-

p.m [5]　44:6　61:20
　61:20　73:18　74:7
page [13]　18:8
　18:12　19:11　22:20
　23:10　23:13　25:4
　28:3　28:12　29:5
　29:6　29:24　29:25
pages [1]　19:8
　29:8　31:13　31:14
paid [32] 17:11　17:12
　17:16　22:23　24:4
　24:7　40:6　40:10
　40:15　40:16　40:17
　40:17　41:18　42:13
　42:13　42:20　48:18
　50:5　54:17　67:15
　67:15　68:5　68:8
　69:9　69:20　70:16
　70:16　70:17　70:19
　70:20　70:22　73:11
pain [1] 69:13
paper [2]　13:10
　61:8
paragraph [1] 64:19
part [8]　16:8　27:13
　30:25　50:8　68:6
　68:15　68:16　69:11
participated [1] 11:13
particular [3]　27:11
　32:5　69:23

parties [1]　16:12
pass [4] 23:14　23:25
　44:5　57:23
past [1]　11:14
pay [8]　9:7　9:15
　15:11　17:21　24:6
　34:19　37:8　54:22
paying [6]　14:16
　14:21　14:24　15:1
　15:2　15:5
payment [1]　31:22
　31:25　37:11　37:14
　47:2　47:16　47:17
　56:23　65:5　66:7
payments [1]　66:7
pays [1] 9:4
people [1]　60:6
　72:8
per [1]　28:15
period [8]　14:18
　22:18　24:5　37:11
　37:15　46:14　68:9
　69:18
periods [1]　69:19
perplexed [1]　70:14
person's [1]　49:24
Personal [1]　11:24
personal/commercial
　[1]　12:9
personally [3]　45:6
　63:25　67:8
pertain [1]　9:14
pertained [2]　13:8
　72:14
pertains [1]　9:19
petition [3]　64:20
　68:16　68:16
phone [2]　57:19
　57:23
phrase [1]　12:19
phrased [1]　70:11
Phyllis [3]　34:6
　36:1　36:2
physically [1]　60:15
piece [1] 61:8
place [5]　44:1
　45:24　46:1　47:19
　47:22
placed [1]　71:22
placement [2]　65:3
　65:10
places [1]　57:2
Plaintiff's [1]　68:13
plan [9]　8:24　10:23
　11:3　14:24　18:11
　18:12　18:14　19:5
　19:13
plans [1]　10:20
play [2] 59:14　59:21
plus [1]　73:2
point [7] 18:8　18:10
　29:1　33:12　41:10
　54:15　66:14

policies [11]　11:25
　11:25　12:1　12:3
　12:6　12:7　12:8
　69:25　70:6　70:11
　73:8
policy [34]　14:14
　16:19　24:13　24:20
　25:14　25:19　45:8
　46:14　47:15　59:15
　61:24　62:19　63:11
　64:1　66:19　67:6
　67:9　67:16　67:17
　68:1　68:9　69:8
　69:9　69:13　69:14
　69:17　69:19　70:12
　70:14　71:22　71:23
　72:6　72:17　72:19
pool [11]　11:10　11:13
　11:15　11:18　11:20
　24:13　24:15　24:21
　25:11
position [3]　7:15
　65:25　66:17
possible [2]　58:20
　59:8
practice [1]　50:17
precise [1]　59:6
predecessor [1] 59:9
premium [1]　20:23
　24:18　73:1
Premium-wise [1]
　21:2
prepared [1]　68:25
previous [1]　32:20
　40:1　71:16
previously [1]　24:16
printed [1]　18:19
private [1]　28:9
problem [5]　37:20
　54:6　56:8　67:1
　67:2
procedure [2]　14:16
　14:21　14:24
Proceedings [1]
　74:7
process [4]　15:5
　66:18　67:2　70:23
procurement [1]
　12:22　59:14　61:24
produced [2]　15:18
　31:15
professional [1]
　12:8
prognosis [1]　29:13
prohibit [1]　60:15
projections [1] 27:12
promised [2]　46:11
　46:21
promises [1]　21:8
properly [1]　67:12
　72:2
protection [6]　52:18
　52:19　53:10　53:24
　53:24　54:1

Janie Sanchez
June 26, 2003

Multi-Page™

provide - speak
San Benito C.I.S.D.

provide [4]        41:24
41:25   42:2   64:5
provider [3]       46:5
46:13   46:18
providers [5]      15:2
15:18   22:18   22:22
41:8
providers' [1]     31:11
providing [2]      60:11
61:21
provision [1]      66:7
purchased [1]      16:19
purchasing [2]     25:22
66:1
purport [1]        61:1
purpose [4]        8:20
11:18   17:2   26:15
put [3]    9:1    10:18
39:12

-Q-

qualifications [1]
37:10
questions [5]      41:23
70:4   73:23   74:3
74:5
quote [2]          38:4
73:11

-R-

rainy [1]18:25
rational [1]       55:1
re-file [1]        63:20
re-filing [1]      63:21
reached [2]        37:8
60:21
read [12] 17:18    20:15
26:22   34:4   54:5
56:16   71:23   72:10
72:13   72:16   72:19
73:7
reading [1]        20:12
reads [1]          3:6
realize [2]        29:24
30:9
really [20]        8:21
8:21   12:4   14:9
17:17   23:15   23:22
25:18   25:21   29:4
29:11   29:20   30:24
34:9   35:15   43:5
48:22   55:4   55:6
63:16
reason [4]         33:22
52:2   57:4   66:8
reasonable [3]     53:2
53:13   53:19
reasons [1]        30:8
receive [6]        29:12
32:2   33:23   38:9
51:9   58:14
received [18]      17:25
22:8   22:10   23:15

29:12   29:17   29:21
35:18   35:25   38:8
38:23   56:3   58:14
58:17   60:5   62:17
62:17   63:17
receiving [6]      15:16
26:7   32:25   33:19
38:9   61:6
recipient [4]      31:8
31:21   33:5   64:11
recognize [1]      18:1
recollection [1] 36:24
recommend [1] 72:16
reconciliation [1]
27:18   35:4   35:6
record [4]         28:8
42:17   61:19   61:20
records [3]        26:24
38:24   39:5
redacted [1]       60:21
refer [1] 44:24
reference [4]      25:10
33:5   33:6   47:15
referred [1]       43:2
referring [3]      22:2
45:13   45:14
reflecting [1]     33:9
refreshed [1]      36:24
regarding [9]      38:20
45:7   45:25   47:1
47:19   47:23   48:9
64:25   65:6
registers [1]      26:23
27:8   33:7   34:10
38:4   38:21   39:1
39:6   58:15
reimbursed [8] 17:21
39:16   46:12   49:25
66:20   66:21   67:3
67:3
reimbursement [2]
23:11   23:25
reimbursements [1]
21:18   27:4
reimbursing [1]
46:3
relate [1]         32:13
related [5]        28:9
29:25   30:10   33:14
40:7
relationship [2] 54:14
55:4
release [7]        15:10
27:2   27:3   34:7
34:9   38:25   39:4
released [1]       34:13
releasing [2]      26:25
39:5
remaining [2]      34:7
74:2
remember [9]       7:18
8:12   13:25   14:15
19:4   23:13   52:16
57:13   57:18

removed [1]        31:14
removing [2]       31:13
32:21
renewal [1]        9:7
renewals [1]       9:6
repeat [1]         22:25
rephrase [7]       7:4
10:9   11:12   16:14
16:22   70:1   70:5
replete [1]        28:4
represent [2]      23:7
23:3   23:7   44:9
representation [1]
14:13
represented [1] 14:3
14:7
requested [1]      35:14
required [1]       9:19
reserve [7]        39:8
39:12   39:15   39:17
73:12   74:2   74:5
reserves [1]       73:10
respect [6]        58:22
59:10   64:22   65:25
66:18   69:7
respond [3]        57:7
57:11   57:12
responded [1]      58:11
responding [1] 57:15
response [3]       25:16
56:7   65:16
responsibility [4]
10:8   15:9   36:11
36:12
responsible [1] 27:15
result [1]         67:2
results [2]        35:16
36:9
review [2]         20:16
20:19
reviewed [2]       17:5
20:21
reviews [1]        32:24
revised [2]        19:9
19:10
right [38]         8:9
8:22   14:12   15:23
24:4   28:17   28:21
28:21   29:7   29:14
30:7   31:3   35:10
37:7   43:18   44:25
45:15   46:2   46:17
46:25   47:8   49:4
50:7   50:9   50:13
50:14   52:5   52:21
52:22   53:11   55:1
55:7   55:23   56:16
62:6   62:8   63:15
69:21
risk [12] 8:22     10:19
11:10   11:13   11:15
11:18   11:19   24:13
24:15   25:11   25:14
25:15

road [1] 64:2
role [2]   59:14   59:21
roughly [1]        63:1
Routh [2]          20:6
20:8
run [4]    8:22   28:13
40:19   68:19

-S-

safe [1]   45:19
San [3]    7:13   10:4
11:2
Sanchez [9]        13:2
13:9   18:15   23:10
47:5   56:25   64:11
64:12   73:7
Sanchez's [2]      23:17
36:12
satisfied [1]      24:17
saw [1]   29:17
says [9]   20:15   23:10
25:10   28:13   28:22
28:23   35:1   38:4
40:15
SB-444 [1]         32:21
SB-457 [1]         32:21
SB-466 [1]         28:3
SB-478 [1]         28:4
scheduling [1]   68:14
school [27]        9:14
9:23   10:4   11:3
11:13   21:19   45:6
46:3   46:12   47:10
48:14   49:25   50:10
51:16   52:8   56:20
57:1   60:5   64:17
65:25   66:19   66:19
66:23   70:21   71:4
71:13   72:20
second [7]         22:20
23:13   28:12   29:22
29:25   61:19   64:7
section [1]        34:1
see [7]    20:17   25:7
29:10   34:12   37:20
40:17   50:15   61:2
69:25
seeing [1]         41:4
self-funded [1] 11:8
sell [1]   11:23
send [4] 26:17     27:8
32:1   32:3
sending [2]        27:6
58:15
sent [8]   23:17   25:21
25:22   46:13   46:18
59:23   59:24   62:14
separate [3]       24:12
24:20   73:12
service [1]        24:18
services [2]       50:5
69:11
session [1]        9:17

set [2]    34:18   39:9
Seven [1]          54:9
seventy-five [1]
29:1
sheet [2] 22:17    61:23
should've [11]   18:11
54:3   60:4   60:9
60:9   63:24   67:3
67:15   69:9   69:13
70:21
show [3] 19:5      26:6
33:18
Shuchart [35]      28:5
37:22   41:19   42:14
42:18   44:7   44:8
46:8   48:8   51:3
51:4   52:11   52:15
53:7   53:19   54:19
54:20   55:11   55:12
60:8   60:11   60:19
61:19   61:21   66:13
67:20   67:25   68:3
68:18   68:22   69:1
69:4   69:6   70:5
74:4
sic [1]   38:22
sidebar [2]        37:22
42:18
sign [5] 18:14     18:15
19:13   64:4   64:10
signature [1]      18:1
18:5   19:11
signed [8]         17:25
18:24   44:15   44:17
59:23   59:25   64:12
64:12
significant [1]  68:21
signing [2]        18:7
18:10
single [1]         72:23
sit [4]   45:19   66:14
67:8   67:11
sitting [3]        41:13
41:15   41:17
six [4]   54:13   54:14
sixty-three [1]  28:25
society [1]        37:21
sole [2]   31:21   33:5
solicitor's [1]  8:19
someone [1]        37:19
sometime [1]       39:9
somewhere [3] 42:1
42:4   68:20
sorry [13]         20:12
23:1   30:4   48:3
49:8   50:11   51:23
58:25   59:4   59:17
62:23   63:14   71:15
sorts [1] 52:9
sought [7]         21:18
23:12   23:25   32:13
32:15   33:14   68:17
span [2] 11:7      11:11
speak [1]          31:5

Action Reporting
(956)631-1024 (Toll Free:  1-800-884-1024)

Case 1:03-cv-00047   Document 42   Filed in TXSD on 02/17/2004   Page 94 of 122

Janie Sanchez
June 26, 2003

Multi-Page™

Speaking yourself
San Benito C.I.S.D.

Speaking [1] 57:19
spec [4] 26:25 27:2
  28:22 29:2
specific [2] 35:11
  57:15
specifically [1] 57:14
speck [1] 34:7
speculation [3] 26:20
  53:6 66:11
spoke [1] 43:7
spoken [1] 43:10
standpoint [2] 16:18
  21:1
Star [1] 25:10
start [1] 42:8
started [3] 10:13
  41:4 52:1
starting [1] 60:9
statement [1] 66:8
statements [2] 64:24
  64:25
states [4] 20:3
  20:4 40:13 44:21
stating [2] 59:25
  62:19
still [7] 8:11 19:4
  37:16 47:11 52:15
  56:16 56:17
stipulated [1] 68:14
stipulation [1] 69:2
stipulations [1] 21:4
stop [22] 12:22 14:3
  14:8 14:19 16:19
  17:5 20:1 20:7
  21:21 24:3 24:12
  24:20 30:5 31:22
  43:20 44:3 45:8
  45:12 45:12 47:2
  47:15 66:1
straight [2] 38:12
  41:6
straightened [1]
  43:5
Street [1] 8:10
stuff [1] 27:12
subject [4] 13:4
  31:21 35:11 48:10
submitted [1] 14:22
subsequent [1] 48:9
subsequently [1]
  64:1
subtotal [2] 28:15
  28:21
successor [1] 59:15
such [2] 21:5 45:24
sufficient [3] 27:16
  54:21 55:2
suggestions [1] 34:15
suing [1] 68:10
superintendent [1]
  47:7
supplement [1] 69:2

supposed [1] 18:11
surprised [1] 56:9
switch [1] 57:22

-T-

TCPP's [1] 12:3
telling [1] 51:25
tendered [1] 46:5
tenure [1] 11:14
term [2] 46:2 68:4
terms [2] 73:3
  73:5
testified [4] 14:10
  53:9 55:20 56:25
testify [1] 50:18
testimony [3] 50:18
  71:7 71:16
Texas [2] 8:3
  8:7
thank [4] 73:15
  73:17 73:25 73:25
Thanks [1] 34:17
therefor [4] 9:6
  9:7 22:22 60:3
they've [5] 9:7
  12:2 12:4 50:15
  73:14
thinking [2] 59:18
  59:20
third-party [1] 15:15
  24:7
thought [4] 48:14
  53:1 55:20 63:14
thousand [2] 28:25
  33:11
three [3] 28:25 33:11
  40:10
through [12] 12:23
  17:17 17:24 28:3
  28:4 31:14 32:21
  46:15 50:19 50:19
  72:23 72:24
throughout [1] 10:10
tie [1] 69:12
times [2] 50:21
  72:1
title [1] 10:18
today [13] 36:23
  40:22 41:13 41:15
  41:17 42:11 42:19
  42:19 45:20 50:15
  65:3 67:11 69:3
today's [1] 39:1
together [1] 55:5
tomorrow [1] 39:7
tomorrow's [1] 39:6
too [1] 62:25
took [5] 45:24 46:1
  47:18 48:7 56:3
tore [1] 29:6
total [4] 28:22 29:2
  39:1 40:11

totalling [1] 42:12
tough [1] 61:25
town [1] 18:16
TPA [8] 15:3 29:12
  44:11 44:15 44:18
  44:22 54:21 69:23
track [1] 29:9
transcript [1] 7:8
transfer [1] 52:22
transmittal [1] 61:3
transmittals [1] 57:8
transmitting [3]
  20:1 20:7 38:4
trick [1] 44:19
true [1] 64:21
trust [1] 50:9
try [2] 64:18 67:10
trying [13] 25:13
  28:7 42:16 46:15
  59:6 59:6 62:1
  67:4 68:10 69:16
  69:24 70:15 70:18
turned [2] 20:9
  20:13
two [9] 9:17 27:21
  32:20 40:11 55:6
  69:18 70:6 70:11
  73:21
two-fifty [1] 33:11
tying [1] 69:12
type [1] 53:10
typed [1] 60:12

-U-

under [17] 10:24
  12:9 14:18 14:23
  14:23 14:23 14:13
  24:21 28:12 42:12
  45:7 45:21 65:15
  67:15 69:9 70:16
  70:17
understand [10] 14:9
  16:22 17:10 17:14
  17:15 24:14 46:9
  46:11 68:23 70:2
understood [1] 71:7
unless [1] 28:19
unquote [1] 73:11
up [7] 12:5 16:21
  21:7 39:1 39:9
  42:17 56:12
up-to-date [1] 23:21
updated [1] 33:7
upside [1] 20:12
used [1] 10:8
usually [1] 57:24
Utah [1] 45:1
utterly [1] 56:9

-V-

Venues [1] 21:6

verbally [1] 57:15

-W-

wait [1] 13:6 27:3
Walraven [28] 13:3
  15:19 15:22 15:24
  16:1 17:3 26:16
  26:19 37:20 41:20
  42:4 42:8 43:14
  48:4 52:9 52:13
  53:5 53:18 67:21
  68:15 68:19 68:24
  69:2 69:5 70:3
  73:21 74:1 74:5
watercraft [1] 11:24
week [3] 26:24 27:8
  58:15
Weekly [1] 33:7
What'all [1] 8:15
whole [2] 11:11
  11:14
windstorm [1] 11:25
within [2] 22:23
  43:1
Without [2] 52:3
witness [3] 26:14
  32:24 44:5
Wonderful [1] 74:1
word [2] 72:5 72:23
words [5] 23:24
  29:2 29:23 47:25
  51:5
worked [1] 53:21
  53:22 55:5
worker's [6] 8:19
  8:21 8:23 9:13
  9:13 10:20
works [2] 25:25
  26:1
worried [1] 54:23
would've [9] 47:12
  47:14 51:11 55:25
  58:6 58:10 58:11
  65:25 67:15
Wow [1] 66:22
write [5] 50:23 53:4
  53:15 55:3 55:12
writing [7] 13:23
  14:7 14:14 21:9
  57:12 60:15 63:17
wrong [1] 65:14
wrote [1] 63:13
Wyoming [4] 44:9
  44:13 44:20 44:25

-Y-

year [10] 7:18 9:2
  16:7 19:13 20:4
  22:22 63:4 63:5
  63:6 63:7
years [10] 7:16
  7:18 7:24 9:17
  10:11 11:15 54:9

54:12 54:13 54:14
yesterday's [1] 39:1
yourself [1] 47:4

## COMPANION LIFE INSURANCE

Companion Life Insurance Company, Columbia, South Carolina agrees to pay Excess Loss Insurance benefits under the provisions of this Contract to the Contractholder listed in the Schedule of Excess Loss Insurance.

## READ YOUR CONTRACT CAREFULLY

This Contract is legally binding between the Contractholder and Companion Life Insurance Company ("Company"). The consideration for this Contract includes, but is not limited to, the Application and the payment of premiums as provided hereinafter.

The Company will pay the [Aggregate and Specific Benefits] provided in this Contract. Payment is subject to the conditions, limitations and exceptions of this Contract. The Contractholder agrees to pay premiums when due and to comply with Contract provisions. The Contractholder understands the liability assumed under the portion of the employee benefit plan which he is self-insuring and further understands that he is exempted from Article 1.14-1 of the Texas Insurance Code only if a qualified employee benefits plan has been filed and meets the requirements of the Employees Retirement Income Security Act.

This is not a policy of workers' compensation insurance. The Contractholder does not become a subscriber to the workers' compensation system by purchasing this policy, and if the Contractholder is a non-subscriber, the Contractholder loses those benefits which would otherwise accrue under the workers' compensation laws. The Contractholder must comply with the workers' compensation law as it pertains to non-subscribers and the required notification that must be filed and posted.

This Contract takes effect on the Effective Date shown in the Schedule, which will be the date of issue, and terminates on the end of the Contract Period shown in the Schedule unless it is renewed. All periods indicated in the Contract begin and end at 12:01 A.M. standard time at the Contractholder's office.

This Contract Form is governed by the laws of the state of Texas.

The sections set forth on the following pages are a part of this Contract and take effect on the Effective Date.

IN WITNESS WHEREOF Companion Life Insurance Company has caused this Contract to be executed by its President and Secretary at Columbia, South Carolina.

*M. Edward Sellers*

President

Policy Providing Excess Loss Insurance
Nonparticipating

COMPANION LIFE INSURANCE
51 CLEMSON ROAD, SUITE C
Columbia, SC 29223

DEPOSITION
EXHIBIT
Sanchez #8
ACTION REPORTING

## COMPANION LIFE INSURANCE COMPANY
## SCHEDULE OF EXCESS LOSS INSURANCE

1.  Contract Number: _____ San Benito Consolidated ISD _____

2.  Contractholder: _____ CLI-3044-100100 _____

3.  Address: ___ 240 North Crockett _____

    City: __ San Benito _____     State: __ TX ___     Zip Code: 78586 ___

4.  Subsidiary or affiliated companies (companies under common control through stock ownership, contract, or otherwise) to be included (list legal name and addresses):
    ___ N/A _____
    _____

5.  **Name and address of Designated Third Party Administrator**
    **MBA of Wyoming, Inc. 3625 S. West Temple, Salt Lake City, UT 84115** _____

6.  Effective Date: _____ October 1, 2000 _____

7.  **GENERAL SCHEDULE OPTIONS:**

    (a)   Contract Period _ 10/01/00 _____   to   ___ 10/01/00 ____

    (b)   Disabled Persons          [ X ] are          [  ] are not covered.
          Retired Employees      [ X ] are          [  ] are not covered.

    (c)   Aggregate Benefit        [ X ] Yes        [  ] No

          Aggregate   __ 07/01/00 _ through _ 08/31/01 ___ , and
          Paid from __ 10/01/00 ____ through __ 08/31/01 _____ .
          Claims Incurred prior to the Contract Effective Date are limited to $ _ N/A ____ .

          Aggregate eligible expenses include:
          [ X ] Medical                    [ X ] Prescription Card Service
          [ X ] Dental Care              [  ] Weekly (Disability) Income
          [  ] Vision Care                [  ] Other

|                                                              | Med /Dental /Drug |
| ------------------------------------------------------------ | ----------------- |
| Aggregate Monthly Factor per single Employee:                | $ _____ |
| Family:                                                      | $ _____ |
| Composite:                                                   | $ 295.65/11.54/39.06 |
| Aggregate Payable Percentage (excess of Deductible):         | 100        % |
| Maximum Eligible Claim Expense Per Covered Person:           | $ 75,000 |
| Minimum Aggregate Deductible:                                | $ 4,253,870 |
| Maximum Aggregate Benefit (excess of Deductible):            | $ 1,000,000 |

7.   **GENERAL SCHEDULE OPTIONS: (Continued)**

(d)   Monthly Aggregate Accommodation          [  ] Yes     [ X ] No

(e)   Terminal Liability                                     [  ] Yes     [ X ] No

(f)   Specific Benefit                                       [ X ] Yes    [  ] No
      Specific Contract Basis: Employee Benefit Plan expenses must be
              Incurred from __07/01/00__    through    __08/31/01__ .
              Paid from __10/01/00__    through__  8/31/01__ .
      Claims Incurred prior to the Contract Effective Date are
      limited to:                                                      $   N/A
      Specific Eligible Expense: Medical Only
      Specific Deductible (per person):                                $  75,000 *
      *   **Major human organ transplants subject to plan max. of $150K per individual.
          Lung cancer limited to $50,000 LTM if smoking for 5 years or more at time
          of diagnosis**

      Specific Payable Percentage (excess of Deductible):                  100        %

      Maximum Specific Benefit (per person in excess of
                      Specific Deductible):                         $ 925,000


8.   **PREMIUMS:**

(a)   Aggregate Premium
      Premium Per Month Per Unit:                          $   1.70
      Minimum Annual Aggregate Premium                     $   N/A
      Monthly Aggregate Accommodation
      Premium Per Month Per Unit:                          $   N/A
              Annual Premium in Advance:                   $   N/A
      Terminal Liability
              Premium Per Month Per Unit:                  $   N/A
              Annual Premium in Advance:                   $   N/A

(b)   Specific Premium
              Premium Per Month Per Single Employee:       $   18.45
              Family:                                      $   44.06
              Composite:                                   $
              Minimum Monthly Specific Premium:            $   N/A

9.   **SPECIAL RISK LIMITATIONS:**

Contract will be based upon the current employee benefits as defined in the Employee Benefit
Plan by reference or by attachment, except as noted below:

Specific:        N/A

Aggregate:      N/A

## I.    DEFINITIONS

As used in this Contract, the following definitions shall be applicable:

**Agent,** when referring to the Contractholder, means the Contractholder's representative, including but not limited to its Designated Agent, Broker, or Third Party Administrator.

**Aggregate Benefit** means the amount that the Company agrees to pay the Contractholder after the end of the Contract Period for eligible claims Paid by the Contractholder as set forth in the Schedule and pursuant to the terms, conditions and limitations of the Contract.

**Aggregate Contract Basis** identifies the dates during which Employee Benefit Plan expenses must be incurred and must be paid to be considered eligible for reimbursement as Aggregate Benefits.

**Aggregate Deductible Per Month** means the Aggregate Monthly Factor shown in the Schedule multiplied by the Number of Covered Units.

**Aggregate Deductible** means the sum of each Aggregate Deductible Per Month for each month during the Contract Period or fraction thereof.

**Minimum Aggregate Deductible** means the lowest possible Aggregate Deductible applicable to the Contract Period or fraction thereof.  This amount is set forth in the Schedule.

**Continuation Beneficiary** is a Covered Unit which elects to extend its group health coverage under the Employee Benefit Plan entitled under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA).

**Contract** means the entire agreement between the Contractholder and the Company, specifically including the Contract Application, the Contract Form, the Contract Addenda (if any), and a copy of the Contractholder's Employee Benefit Plan.

**Contract Month** means a period measured from the Effective Date of this Contract, while this Contract is in force.  Each new Contract Month will begin on a day which corresponds to the Effective Date.  If there is no such day in any applicable month, then the last day of the month will be used.

**Contract Period** is stated in the Schedule.

**Contractholder** is named in the Schedule.

**Covered Person** refers to each person, individually, who is a Covered Unit, or, in the case of a dependent, a member of a Covered Unit.  In no event will coverage for a dependent become effective before the Effective Date of Coverage of the plan participant under the EmployeeBenefit Plan.

**Covered Unit**, for purposes of calculation of the premiums and the Aggregate Deductible Per Month, means a plan participant, a plan participant with dependents, or such other defined unit as agreed upon between the Company and the Contractholder, provided such plan participant, dependents or such other defined unit is covered under the Employee Benefit Plan.

I.  **DEFINITIONS (Continued)**

**Dependent** means a person who is defined as a dependent under the Employee Benefit Plan.

**Disabled Person** is a plan participant not actively at work or, in the case of a dependent or Continuation Beneficiary, is by disability unable to perform his or her normal functions of a person of like sex and age on the Effective Date of this Contract or the date such person becomes eligible for coverage under the Employee Benefit Plan.

**Eligible Claims Payments** means expenses of the Employee Benefit Plan qualifying for coverage under the terms and conditions of this Contract.

**Employee** means a person who is defined as an employee under the Employee Benefit Plan.

**Employee Benefit Plan** means the master plan document of the Contractholder to provide medical expense benefits to the Contractholder's covered plan participants and dependents of such plan participants in effect on the Effective Date of this Contract, a copy of which is attached to and made a part of this Contract.

**Incurred** refers to the date on which a covered medical service was rendered, the date disability benefit payments become due, or a covered medical purchase was made for a Covered Person under the Employee Benefit Plan.

**Maximum Aggregate Benefit** means the amount set forth in the Schedule as the maximum total Aggregate Benefit payable under the terms, conditions and limitations of this Contract during the Contract Period.

**Maximum Eligible Claim Expense Per Person,** as it relates to aggregate coverage, means the maximum dollar value of claims Paid on any one Covered Person that can apply toward satisfaction of an Aggregate Deductible, or that can apply toward the calculation of the Aggregate Benefit for a Contract Period.

**Maximum Specific Benefit** means the amount set forth in the Schedule that is the maximum total Specific Benefit payable under the terms, conditions and limitations of this Contract during the period an individual is a Covered Person under the Employee Benefit Plan, regardless of the number of years the Covered Person is eligible under the Employee Benefit Plan and regardless of whether expenses for this Covered Person were Incurred and/or Paid during this Contract Period. In the context of the definition of Maximum Specific Benefit, references to "Employee Benefit Plan" include all predecessors and successors of the particular plan in effect on the Contract's Effective Date.

**Number of Covered Units** means the total number of Covered Units existing in any Contract Month.

**Paid** means that funds are actually disbursed by the Contractholder or his Agent. Payment of a claim is the unconditional and direct payment of a claim to a Covered Person or their health care providers. Payment will be deemed made on the date that both (1) the payor directly tenders payment by mailing (or otherwise delivering) a draft or check, and (2) the account upon which the payment is drawn contains, and continues to contain, sufficient funds to permit the check or draft to be honored.

CLXLPOL(TX)                               -5-                              **CL0088**

## I.   DEFINITIONS (Continued)

Should the account upon which payment is drawn not contain sufficient funds to cover all outstanding checks and drafts on the account, then the Company may consider, in its sole discretion, any particular checks or drafts as not having been paid, but only to the total amount representing the difference between the funds in the account and the total of outstanding checks and drafts.

**Payable Percentage** means the percentage payable as shown in the Schedule. The calculation of Specific Benefits may be subject to a different Payable Percentage than the calculation of Aggregate Benefits.

**Plan Participant** means an employee, a dependent or any other person who is eligible and who is covered under the Employee Benefit Plan. No plan participant may be covered by this contract prior to the date his or her coverage is effective under the Employee Benefit Plan or after the date his or her coverage under the Employee Benefit Plan Ends.

**Proof of Loss** is the form authorized by the Company to be used for the submission of claims as well as the supporting documentation reasonably necessary for the Company's independent evaluation of the legitimacy and extent of the claim. Claims for expenses not specifically identified in previously submitted Proofs of Loss must be accompanied by separate Proofs of Loss.

**Schedule** means the Schedule of Excess Loss Insurance.

**Specific Benefit** means the amount the Company will pay to the Contractholder for eligible claims Paid by the Contractholder over and above the Contractholder's Specific Deductible Per Person, and pursuant to the terms, conditions and limitations of the Contract.

**Specific Contract Basis** identifies the dates during which Employee Benefit Plan expenses must be Incurred and must be Paid to be considered eligible for reimbursement as Specific Benefits.

**Specific Deductible** means the per Covered Person deductible as shown in the Schedule.]

## II.   BENEFITS

The Company will pay, subject to the terms, conditions and limitations of the Contract, the following benefits, if shown in the Schedule, to the Contractholder within a reasonable time upon receipt of a fully executed Proof of Loss:

### 1.   Aggregate

The Aggregate Benefit for the Contract Period, or fraction thereof, is the total of the Eligible Claim Payments, on an Incurred and/or Paid basis as shown in the Aggregate Contract Basis of the Schedule:

    a.   less the Aggregate Deductible or Minimum Aggregate Deductible, whichever is greater; and

    b.   less the amount of the claims Paid by the Contractholder in excess of the Maximum Eligible Claim Expense Per Person as shown in the Schedule; and

    c.   less amounts recovered from other sources;

    d.   multiplied by the Aggregate Payable Percentage.

II.    **BENEFITS (Continued)**

Aggregate Benefits are not payable until after the end of the Paid basis shown in the Aggregate Contract Basis of the Schedule. If this Contract should terminate prior to the end of the Contract Period, the Company shall not be liable for Aggregate Benefits for expenses Incurred or Paid by the Contractholder after the termination date.

In no event will the Aggregate Benefit exceed the Maximum Aggregate Benefit shown in the Schedule.

2.    **Specific**

The Specific Benefit with regard to each Covered Person, is the total of the Eligible Claim Payments, on a Incurred and/or Paid basis as shown in the Specific Contract Basis of the Schedule;

a.    less the Specific Deductible; and
b.    less amounts recovered from other sources;
c.    multiplied by the Specific Payable Percentage.

The Contractholder shall not be entitled to any Specific Benefit unless and until the Contractholder has actually Paid the full amount of the Specific Deductible as set forth in the Schedule for the Covered Person(s) for which the Specific Benefit is sought. The Contractholder shall only be entitled to a Specific Benefit up to the amount actually Paid by Contractholder over and above the Specific Deductible.

If this Contract should terminate prior to the end of the Contract Period, the Company shall not be liable for Specific Benefits for expenses Incurred or Paid by the Contractholder after the termination date.

In no event will the Specific Benefit with regard to any Covered Person exceed the Maximum Specific Benefit shown in the Schedule.

III.    **LIMITATIONS**

1.    This Contract will not pay the Contractholder for any loss or expense caused by or resulting from any of the following:

a.    Expenses incurred while the Employee Benefit Plan is not in force with respect to the Covered Person.

b.    Expenses resulting from weekly (disability) income, dental, vision or any prescription card service, unless shown in the Schedule.

c.    Liability assumed by the Contractholder under any contract or service agreement other than the Employee Benefit Plan.

d.    Expenses as the result of extra-contractual damages; compensatory damages; or punitive damages.

**III.   LIMITATIONS (Continued)**

   e.   Expenses resulting from services which are billed in excess of the general level of charges being made by other providers of services in the locality where the service is rendered.

   f.   Expenses for benefits for accidental bodily injury or sickness arising out of or in the course of any occupation for wage or profit, or for which the Covered Person would be entitled to benefits under any Worker's Compensation, U. S. Longshoremen and Harbor Worker's or other occupational disease legislation or policy, whether or not such policy is actually in force.

   g.   Expenses which (1) are not accepted as standard medical treatment for the illness, disease or injury being treated by physicians practicing the suitable medical specialty; (2) are the subject of scientific or medical research or study to determine the item's effectiveness and safety; (3) have not been granted, at the time services were rendered, any required approval by a federal or state governmental agency, including without limitation, the Federal Department of Health and Human Services, Food and Drug Administration, or any comparable state governmental agency, and the Federal Health Care Finance Administration as approved for reimbursement under Medicare Title XVIII; or (4) are performed subject to the Covered Person's informed consent under a treatment protocol that explains the treatment or procedure as being conducted under a human subject study or experiment.

   h.   Cost of the administration of claim payments or expense of litigation with individual claimants.

   i.   Expenses for benefits to any Covered Person with coverage under any other plan, including Medicare, which, when combined with the benefits payable by such other plan, would cause the total to exceed 100% of the Covered Person's actual expenses.

   j.   Payments under the Employee Benefit Plan arising out of or caused by or contributed to or in consequence of war, hostilities (whether war be declared or not), invasion or civil war.

2.   If the Schedule shows disabled persons are not covered, no benefits will be paid under the Contract for expenses Incurred or Paid under the Employee Benefit Plan for a Disabled Person until:

   a.   if a plan participant, he or she returns to active, full-time employment for at least one (1) full working day; or

   b.   if a dependent or Continuation Beneficiary, he or she is able to perform the normal functions of a person of like sex and age.

**III.     LIMITATIONS (Continued)**

3.  Newborn children of plan participants who have previously enrolled and continue to cover their eligible dependents under the Employee Benefit Plan will be eligible under the Contract on the date of the child's birth.  Employees who have not previously enrolled for dependent coverage will be eligible for newborn child coverage as defined within the Employee Benefit Plan.

4.  Retired plan participants and their dependents, who are eligible under the Employee Benefit Plan, will be eligible for coverage under the Contract only if so indicated in the Schedule.

**IV.     CLAIMS PROVISIONS**

1.  **Payment of Claim:**  All benefits as they become payable under this Contract will be paid to the Contractholder.  All expenses as they become payable under the Employee Benefit Plan shall be Paid by the Contractholder.  The Company shall pay claim within a reasonable time after receiving fully executed Proofs of Loss and the documentation reasonably necessary to evaluate the eligibility and extent of the claim.

2.  **Warranty:**  Upon presentation of Proof of Loss to the Company for Aggregate[ or Specific] Benefits, the Contractholder warrants that all monies necessary to pay for services and supplies have been paid to the respective providers of medical services or supplies to which the claim for reimbursement relates.

3.  **Notice of Claim:**  The Contractholder shall give written notice of claims to the Company on the Company's customary notice (Proof of Loss form), within thirty (30) days of the date the Contractholder becomes aware of the existence of facts which would reasonably suggest the possibility that benefits will be incurred which are covered by this Contract and which are equal to or exceed fifty percent (50%) of the Specific Deductible.

In addition, the Contractholder shall notify the Company immediately of the expenses of any Covered Person which meet any of the following criteria:

a.  continuous hospitalization for more than one month, or
b.  a claim for any one of the following disabilities: mental disorder requiring hospitalization, brain injury, spinal injury resulting in real or suspected paralysis of the limbs, serious burns involving ten percent (10%) or more of the body with third degree burns or thirty percent (30%) or more of the body with second degree burns, multiple or serious fractures, crushing or massive internal injuries, premature births, Acquired Immune Deficiency Syndrome (AIDS).

The Contractholder shall submit on a timely basis proofs, reports, and supporting documents including, but not limited to, a monthly summary of all Eligible Claims Payments processed by the Contractholder.

## V.    CONTRACT TERMINATION

The Contract and all benefits hereunder will terminate upon the earliest of the following dates:

1.  The termination date specified in writing by the Contractholder provided that the Company is notified not less than 31 days in advance of the termination date.

2.  The end of any period for which premiums were paid and subsequent premiums are not paid.

3.  The end of the Contract Period.

4.  The date of termination of the Employee Benefit Plan.

5.  The date of cancellation of the administrative agreement between the Contractholder and the Designated Third Party Administrator, unless the Company has, prior to such cancellation, consented in writing to the Contractholder's designation of a successor Third Party Administrator.

6.  This Contract will automatically terminate if the Contractholder does not pay claims or make available funds to pay claims as required by the Contract.

## VI.    MISCELLANEOUS PROVISIONS

1.  **Liability:**  The Company will have neither the right nor the obligation under this Contract to directly pay any Covered Person [or provider of professional or medical services] for any benefit which the Contractholder has agreed to provide under the terms of the Employee Benefit Plan.  The Company's sole liability hereunder is to the Contractholder, subject to the terms, conditions and limitations of this Contract.  Nothing in this Contract shall be construed to permit a Covered Person to have a direct right of action against the Company.

2.  **Payment of Premiums:**  Each Premium for this Contract is payable on or before its due date as set forth in the Schedule to the Company or to this authorized representative. Payment of a premium will not maintain this Contract in force beyond the period for which such premium is paid, except as otherwise stated in the Grace Period.

    If the Effective Date of this Contract is other than the first day of a calendar month, premiums payable under this Contract are due and payable on the first of each calendar month.

3.  **Grace Period:**  A Grace Period of thirty (30) days will be allowed for the payment of each premium after the first premium.  Should a premium otherwise due not be paid during the Grace Period, this Contract will terminate without further notice retroactive to the date for which premiums were last paid.  The liability of the Company will be limited to claims Paid by the Contractholder prior to the date of termination.  There will be no refund of any premium shown in the Schedule.

CL0093

CLXLPOL(TX)                                    -10-

## VI.   MISCELLANEOUS PROVISIONS   (Continued)

4.   **Entire Contract:**  This Contract Form as issued to the Contractholder, together with the Contractholder's Application, Contract Addenda (if any), and a copy of the Contractholder's Employee Benefit Plan, constitute the entire contract.  The Company has relied upon the underwriting information provided by the Contractholder or the Contractholder's Agent, in the issuance of this Contract.  Should subsequent information become known which, if known prior to issuance of this Contract, would affect the rates, deductibles, terms or conditions for coverage hereunder, the Company will have the right to revise the rates, deductibles, terms or conditions as of the Effective Date of issuance, by providing written notice to the Contractholder.

5.   **Concealment, Fraud:**  This entire Contract will be void if, whether before or after a claim or loss, the Contractholder or its Agent has concealed or misrepresented any material fact or circumstance concerning this Contract or the subject thereof, including any claim thereunder or in any case of fraud by the Contractholder or its Agent relating thereto.

6.   **Clerical Error:**  Clerical error, whether by the Contractholder or by the Company, in keeping any records pertaining to the coverage, will not invalidate coverage otherwise validly in force nor continue coverage otherwise validly terminated.

7.   **Audits:**  The Company will have the right: (1) to inspect and audit all records and procedures of the Contractholder and Designated Third Party Administrator; and (2) to require, upon request, proof of records satisfactory to the Company that payment has been made to the Covered Person or the provider of such services or benefits which are the basis for any claim by the Contractholder hereunder.

8.   **Notice of Appeal:**  Any objection, notice of legal action, or complaint received on a claim process by the Contractholder or the Third Party Administrator, and on which it reasonably appears a benefit will be payable to the Contractholder under this Contract shall be brought to the immediate attention of the claims department of the Company.

9.   **Changes:**  Only the President or Executive Officer of the Company have the authority to alter this Contract, or to waive any of the Company's rights and then only in writing.  No such alteration of this Contract shall be valid unless endorsed on or attached to this Contract.  No Agent, Broker, or Third Party Administrator has the authority to alter this Contract or to waive any of its provisions.

10.  **Notice:**  For the purpose of any notice required from the Company under the provisions of this Contract, notice to the Contractholder's Designated Third Party Administrator shall be considered notice to the Contractholder.

## VI.    MISCELLANEOUS PROVISIONS (Continued)

11. **Amendments to the Employee Benefit Plan:** The Employee Benefit Plan shall not be changed while this Contract is in force without the prior written consent of the Company. Notice of any amendment to the Employee Benefit Plan must be given to the Company or its authorized representative at least thirty (30) days prior to the Effective Date of the amendment. The Company will have the sole option to accept the amendment to the Employee Benefit Plan, and if accepted, the Company reserves the right to revise the rates, deductibles, terms or conditions of the Contract as of the Effective Date of the amendment. If such amendment is not agreed to in writing, the Company will be liable to pay benefits as if the Employee Benefit Plan was not changed.

12. **Responsibilities of the Contractholder's Designated Third Party Administrator:** Without waiving any of its rights under this Contract, and without making the Designated Third Party Administrator a party to this Contract, the Company agrees to recognize the Designated Third Party Administrator as respects the normal administration of the Contractholder's Plan subject to:

    a. The Third Party Administrator being responsible on behalf of the Contractholder for auditing, calculating and processing all claims eligible under the Employee Benefit Plan within a reasonable period of time, preparing periodic reports as required by the Company and maintaining and making available to the Company at all times such information as the Company may reasonably require for proof of payment of the claims(s) by the Contractholder;

    b. The Third Party Administrator performing such other duties as may be reasonably required by the Company, including but not limited to, maintaining an accurate record of eligible Covered Persons of the Contractholder;

    c. The Company will not be responsible for any compensation due the Designated Third Party Administrator for functions performed in relation to this Contract; and

    d. This Contract will not be deemed to make the Company a party to any agreement between the Contractholder and the Designated Third Party Administrator.

13. **Hold Harmless:**

    a. The Contractholder agrees to indemnify and hold the Company harmless for any legal expenses incurred, reasonable settlements made, or judgment(s) awarded, arising out of any dispute involving a plan participant or former plan participant of the Contractholder's Employee Benefit Plan provided such legal expenses, settlements, or judgments were not incurred as a result of the sole negligence or intentional wrongful acts of the Company.

    The Company, following any notification of its being, or likely to be, named as a defendant on any action concerning the aforementioned dispute will, within a reasonable time, in writing, notify the Contractholder of the dispute. The Company will cooperate with the Contractholder in matters pertaining to the dispute, however, such cooperation with the Contractholder will not waive the right of the Company to solely defend or settle any action in a manner it deems prudent.

CL0095

## VI.    MISCELLANEOUS PROVISIONS (Continued)

      b.    The Contractholder shall be responsible for any State premium taxes incurred with respect to funds paid to or by the Contractholder under the Employee Benefit Plan. Taxes incurred with respect to premiums paid for the Contract will be the responsibility of the Company.

14.  **Offset:**  The Company will be entitled to offset claim reimbursements to the Contractholder against premiums due and unpaid by the Contractholder.

15.  **Assignments:**  The Contractholder shall not assign any of its rights under this Contract without the prior written consent of the Company, and any assignment without prior written consent shall be void.

16.  **Subrogation:**   The Contractholder shall prosecute any and all valid claims that the Contractholder may have against third parties arising out of any occurrence resulting in a loss payment by the Contractholder and to account for any amounts recovered.  Should the Contractholder fail to prosecute any valid claims against third parties and the Company thereupon becomes liable to make payments to the Contractholder under the terms and conditions of this Contract, then the Company shall assume all the Contractholder's rights to prosecute any valid claims against third parties, and the Contractholder will be responsible for any reasonable legal expenses incurred in the course of the prosecution.

17.  **Recoveries:**   The Company shall be entitled to recover first up to its full share of reimbursed claims before the Contractholder shares in any amount so recovered whether by way of subrogation or otherwise.

18.  **Arbitration:**  Any controversy or claim arising out of or relating to this Contract, or the breach thereof, shall be settled by Arbitration in accordance with the rules of the American Arbitration Association, with the express stipulation that the arbitrator(s) shall strictly abide by the terms of this Contract and shall strictly apply rules of law applicable thereto.  All matters shall be decided by a panel of three (3) arbitrators.  Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction.  This provision shall survive the termination or expiration of this Contract.  The parties hereto may alter any of the terms of this provision only by express written agreement, although such alteration may be before or after any rights or obligations arise under this provision.

19.  **Insolvency:**  The insolvency, bankruptcy, financial impairment, receivership, voluntary plan of arrangement with creditors, or dissolution of the Contractholder or the Contractholder's Designated Third Party Administrator shall not impose upon the Company any liability other than the liability defined in this Contract.  In particular, the insolvency of the Contractholder shall not make the Company liable to the creditors of the Contractholder, including Covered Persons.

20.  **Severability Clause:**    Any clause deemed void, voidable, invalid, or otherwise unenforceable, whether or not such a provision is contrary to public policy, shall not render any of the remaining provisions of the Contract invalid.

21. **Renewal:**  Renewal is not automatic but is available if permitted by the Company.  Renewal may be subject to new premium rates, new underwriting terms, and new Contract terms.

## VI.    MISCELLANEOUS PROVISIONS (Continued)

22. **Group Specifications - Changes:**    The Company reserves the right to revise rates, deductibles, terms or conditions of the Contract on any of the following dates:

1.    When the Contractholder adds or deletes a subsidiary or affiliate;

2.    When there is a change in the geographical area in which the Contractholder is located;

3.    When there is a change in the nature of business in which the Contractholder is engaged;

4.    When there is an increase or decrease in the number of Covered Units which exceeds 10% in any one month or 20% over any period of three consecutive months.

ssly incorporated h   n are not part of this Contract.   y the President
Company may m   e changes to the Contract Form   Addenda on behalf
ges to this Contract must be in writing and attached to this Contract.

TION NOR THE TERMS OF THIS APPLICATION MAY BE ALTERED.

represents that, to the best of its knowledge and belief, such information
t the undersigned has authority to bind the Applicant to the proposed
vill be a part of the Contract if accepted by the Company or its authorized

   [   .day of **NOVEMBER**   , 20 **00**   .

ated ISD _____

_____ By _____
                              (Officer/Partner)

                Title: **ASST. SUPT. FOR FINANCE & HUMAN RESOURC**

_____
              (Type or Print)

_____
__ Zip: 78586
61456

is 8th        day of   January        , :200~~1~~

_____

_____

__ Effective Date: _____ October 1, 2000 _____

                                                    **CL0098**

**11.  IT IS UNDERSTOOD AND AGREED, AS CONDITIONS PRECEDENT TO THE APPROVAL OF THIS APPLICATION, THAT: (Continued)**

(i)     Applicant acknowledges that the Contract which is the subject of this Application is a reimbursement Contract.  Applicant must first pay claims before submitting them for reimbursement.

(j)     Oral Statements not expressly incorporated herein are not part of this Contract.  Only the President or Executive Officer of the Company may make changes to the Contract Form or Addenda on behalf of the Company.  All changes to this Contract must be in writing and attached to this Contract.

(k)     NEITHER THIS APPLICATION NOR THE TERMS OF THIS APPLICATION MAY BE ALTERED.

In making this Application, the Applicant represents that, to the best of its knowledge and belief, such information accurately reflects the true facts and that the undersigned has authority to bind the Applicant to the proposed Contract.  Accordingly, this Application will be a part of the Contract if accepted by the Company or its authorized representative.

Dated at_____ this  21ST  day of NOVEMBER , 20 00   .

Applicant:_____San Benito Consolidated ISD_____
                            Tax ID #_____

Witness:_____    By_____
            Signature of Licensed                                    (Officer/Partner)
            Resident Agent

                                                        Title: ASST.SUPT. FOR FINANCE & HUMAN RESOURCE

Licensed Resident Agent:____Michael M. Sweetman Jr._____
                                                    (Type or Print)

Address: Box 1008_____

City: San Benito  State: TX  Zip: 78586

Social Security or Tax ID # 450061456

**ACCEPTANCE**

Accepted on behalf of the Company, this 8th   day of  January     ,200⅟

By:_____

Title:_____President_____

Contract No.: CLI-3044-100100_____    Effective Date:_____October 1, 2000_____

CLXLAPP (TX)                                       -4-                          Applicant Initials

CL0099

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SAN BENITO CONSOLIDATED          §
INDEPENDENT SCHOOL DISTRICT      §
                                 §
VS.                              §          CIVIL ACTION NO. B-03-047
                                 §
COMPANION LIFE INSURANCE COMPANY, §
MANAGED BENEFITS ADMINISTRATOR   §
AND INSURANCE CONSULTANTS, INC., §
J. ALLAN HALL & ASSOCIATES, INC., §
and MBA OF WYOMING, INC.         §

```
┌─────────────────────────────────────────┐
│        PLAINTIFF'S FIRST AMENDED          │
│          ORIGINAL COMPLAINT               │
└─────────────────────────────────────────┘
```

TO THE HONORABLE UNITED STATES DISTRICT COURT:

NOW COMES Plaintiff, **SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT,** and files this its First Amended Original Complaint, still complaining of **COMPANION LIFE INSURANCE COMPANY, MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS, INC., J. ALLAN HALL & ASSOCIATES, INC., and MBA OF WYOMING, INC.,** and for its claims, would respectfully show the Court as follows:

### JURISDICTION

1.      This case was removed to this Court pursuant to its diversity jurisdiction under 28 U.S.C. § 1332.

### PARTIES

2.      Plaintiff, **SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT** ("San Benito CISD" and/or the "School District") is a school district in Cameron County, Texas.

3.      Defendant, **COMPANION LIFE INSURANCE COMPANY** ("Companion Life"), of Columbia South Carolina, is an insurance company licensed to sell life, health and accident insurance in the State of Texas, and it does business in Texas. No service of citation is necessary on this Defendant because it has already answered this lawsuit.

4. Defendant, MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS, INC. ("MBAICI"), is a foreign corporation, and has its principal place of business in Salt Lake City, Utah. It is not authorized to do business in the State of Texas but is doing business in this State. No service of citation is necessary on this Defendant because it has previously answered this lawsuit.

5. Defendant, J. ALLAN HALL & ASSOCIATES, INC. ("J. Allan Hall"), is a foreign corporation licensed as the d/b/a of James Allan Hall, Individually, and does business in Texas. Mr. Hall has a non-resident agent's license to sell life, health and accident insurance. No service of citation is necessary on this Defendant because it has previously answered this lawsuit.

6. Defendant, MBA OF WYOMING, INC. ("MBA"), is a foreign corporation authorized to do business in the State of Texas and does business in Texas. It holds a third-party administrator's license in Texas. No service of citation is necessary on this Defendant because it has previously answered this lawsuit.

### BACKGROUND FACTS

7. Since the mid-1990s, the San Benito CISD has been self-insured with regard to the health insurance benefits which it provides to its employees, and their dependents. However, to protect the School District from large claims each year, it purchased a policy of stop-loss insurance. The stop-loss insurance was purchased by the School District for its sole benefit and the stop-loss insurance in no way affected the benefits owed or paid to the School District's employees and their dependents.

8. During the 2000-2001 school year, the School District purchased stop-loss insurance from Companion Life. Under the terms of the stop-loss policy issued by Companion Life, the School District would pay the first $75,000 incurred by any of its employees or their dependents for covered medical expenses out of its own funds. After expending the sum of $75,000 for any one employee or that employee's dependent, any additional sums spent by the School District for additional covered medical expenses would

Be reimbursed by Compa:.  :n Life, up to a per person policy lim:. :f One Million Dollars.

9.     The policy of insurance referred to above with Companion Life was procured through MBA. J. Allan Hall acted as the agent and representative of Companion Life with respect to providing this policy of stop-loss insurance to the School District.

10.     For valuable consideration, MBA further agreed to process all claims made by

employees or their dependants of the School District and seek reimbursement from Companion Life for covered medical expenses that exceeded $75,000 for any one claim. Plaintiff alleges that MBA operated as a single business enterprise with MBAICI, and MBAICI is therefore jointly and severally liable for the conduct of MBA.

11.     MBA represented to the School District that if medical benefits were incurred during the policy period by an employee and/or an employee's dependent in excess of $75,000, such expenses would be reimbursed by Companion Life to the School District, even if MBA had not yet issued a check for those expenses to the appropriate health care provider.

12.     MBA has advised San Benito CISD that it processed claims in this manner

of J. Allan Hall and MBA, Companion Life asserted that although the medical expenses had been incurred during the policy period, Companion Life was refusing to provide reimbursement to the School District for a sum in excess of $800,000 because MBA had not mailed the checks during the policy period.

15.     The Companion Life policy period ended on August 31, 2001. Shortly before this date, MBA undertook to place new stop-loss insurance on behalf of the School District for the 2001-2002 school year. MBA prepared the paperwork to solicit proposals for stop-loss insurance, and obtained quotations from both Companion Life, and another entity known as B.C.S. Insurance Company. The application and other appropriate documents were completed in August, 2001. The proposal from Companion Life was approximately $500,000 higher than the proposal from B.C.S., and MBA recommended that the School District accept the B.C.S. proposal.

16.     Unfortunately, the paperwork submitted to B.C.S. by MBA was inadequate and incomplete. Although MBA continued to reassure the School District that it had purchased stop-loss insurance from B.C.S., B.C.S. had in fact had not provided the stop-loss insurance. Late in the Fall of 2001, when the application paperwork had been corrected, and B.C.S. had obtained the proper disclosures, it became apparent that there were a number of claims which might have been covered by the new stop-loss policy had it already been purchased. This is true because the new policy would have provided coverage for covered medical expenses incurred over a three-month period of time prior to the expiration of the old policy, and paid during the twelve-month policy period of the new policy. B.C.S. declined to provide the stop-loss insurance for benefits already paid by the School District and severely limited the amount it would pay for other named employees and their dependents. These sums, would have been reimbursed to the School District had the stop-loss insurance been properly and timely renewed for the 2001-2002 school year. If properly handled by MBA, this coverage would have overlapped with the Companion Life coverage, to some extent.

17.     Defendant, J. Allan Hall, on behalf of itself and its principal, Companion Life,

has taken the position in this lawsuit that the Companion Life policy was a policy of reinsurance and that Companion Life was therefore a reinsurer. Defendant, J. Allan Hall, has further taken the position that it is a reinsurance manager. Plaintiff believes and so believing alleges it to be a fact that Defendant, J. Allan Hall, has taken this position to receive the benefit of certain defenses available under the Reinsurance Act. Plaintiff would show the Court that J. Allan Hall is not licensed as a reinsurance manager in the State of Texas as is required by TEX. INS. CODE, §21.07-7.

### CAUSES OF ACTION

### FIRST CAUSE OF ACTION - VIOLATIONS OF TEX. INS. CODE ART. 21.21

18.    All Defendants have violated the provisions of TEX. INS. CODE Art. 21.21, including, but not limited to, the following:

   1.   Misrepresenting the terms of the policy issued by Companion Life.

   2.   In misrepresenting to the Plaintiff material facts and policy provisions relating to coverages at issue.

   3.   In making untrue statements of material fact.

   4.   In failing to state a material fact that is necessary to make other statements made not misleading, considering the circumstances under which the statements were made.

   5.   In making a statement in such a manner as to mislead a reasonably prudent person to a false conclusion of a material fact.

### SECOND CAUSE OF ACTION - NEGLIGENT MISREPRESENTATION

19.    MBA made negligent representations to the School District, each representation of which was a proximate cause of Plaintiff's damages, including but not limited to the following:

   1.   Representing to the School District that it was not necessary to pay covered medical expenses for its employees and/or their dependents during the policy period for covered medical expenses incurred during the policy period.

2.  In representing to the School District that it had purchased a new stop-loss policy from BCS that would commence immediately upon the expiration of the Companion Life policy.

20.  J. Allan Hall made negligent representations, each of which were a proximate cause of Plaintiff's damages, including but not limited to representing to MBA that Companion Life would provide advanced funding for covered medical expenses incurred by employees, and their dependents, of the School District, even though MBA had not paid these covered medical expenses prior to seeking reimbursement from Companion Life. Companion Life is vicariously liable for the conduct of J. Allan Hall.

### THIRD CAUSE OF ACTION - NEGLIGENCE

21.  MBA and/or MBAICI committed various acts and omissions of negligence, each act or omission of which was a proximate cause of Plaintiff's damages, including but not limited to the following:

1.  In failing to read the policy and verify that its terms and conditions were consistent with MBA's expectations and J. Allan Hall's representations.

2.  In failing to read the Companion Life policy at issue and pay covered claims so as to obtain reimbursement from Companion Life according to the terms of its policy.

3.  In failing to timely renew the stop-loss policy for the School District for the 2001-2002 school year.

4.  In failing to properly prepare the applications, disclosures, and other required paperwork for the renewal of the stop-loss policy for the 2001-2002 school year.

MBAICI is jointly and severally liable for the conduct of MBA, and MBA is jointly and severally liable for the conduct of MBAICI.

### FOURTH CAUSE OF ACTION - BREACH OF CONTRACT

22.  MBA breached its contract with the School District in failing to timely and properly pay covered medical expenses in accordance with the Companion Life policy and seek reimbursement from Companion Life in a timely manner. MBA and/or MBAICI also

breached their contract to timely purchase stop-loss insurance for the 2001-2002 policy period. Such breaches of contract was a proximate cause of Plaintiff's damages.

23.    MBA and Companion Life's agent, J. Allan Hall, had followed a practice and course of dealing over several years of reimbursing claims without first requiring that checks had been mailed to health care providers. Such course of dealing constitutes a modification of the written contracts, and/or estops Companion Life from asserting otherwise. Plaintiff and MBA acted in reasonable reliance on this course of dealing, in how MBA processed the claims. Companion Life's refusal to pay such claims is a breach of contract, as modified, and a breach of its obligations under promissory estoppel. Such breaches proximately caused damage to Plaintiff.

### FIFTH CAUSE OF ACTION - VIOLATIONS OF TEX. INS. CODE, ART. 21.55

24.    Companion Life has violated the provisions of TEX. INS. CODE, Art. 21.55 including but not limited to its failure to reimburse the School District for the covered claims of certain employees and/or their dependents when these claims exceeded $75,000. The School District is entitled to the statutory damages provided by Art. 21.55 as hereinafter set forth.

### DAMAGES

25.    Plaintiff's actual damages are in excess of $800,000, which represents the sum of money for which it has not been reimbursed by Companion Life.

26.    As to the First Cause of Action for violations of TEX. INS. CODE, Art. 21.21, Plaintiff is entitled to its actual damages, and to the extent that the trier of fact finds that any of the Defendants knowingly committed the acts complained of, Plaintiff seeks additional damages not to exceed three times the amount of actual damages. In addition, Plaintiff is entitled to the reasonable and necessary attorney's fees incurred in prosecuting this lawsuit.

27.    As to the Second Cause of Action for negligent misrepresentation, Plaintiff is entitled to its actual damages as set forth above.

28.    As to the Third Cause of Action for negligence, Plaintiff is entitled to its actual

damages as set forth above.

29.    As to the Fourth Cause of Action for breach of contract, Plaintiff is entitled to its actual damages as set forth above and the reasonable and necessary attorney's fees incurred in prosecuting this lawsuit.

30.    As to the Fifth Cause of Action for violations of TEX. INS. CODE, Art. 21.55, Plaintiff is entitled to 18 percent per annum on the amount of its actual damages, together with reasonable attorney's fees.

WHEREFORE, PREMISES CONSIDERED, Plaintiff, **SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT,** prays that upon final trial, Plaintiff recover its damages as set forth above, pre-judgment interest and post-judgment interest as permitted by law, attorney's fees, and for such other and further relief to which Plaintiff may be justly entitled.

Respectfully submitted,

LAW OFFICES OF RENE RAMIREZ
Celeste Guerra
1906 Tesoro
Pharr, Texas 78577
Telephone: 956/783-7880
FAX # 956/783-7884
AND
SHADDOX, COMPERE, WALRAVEN
    & GOOD, P.C.
1250 N. E. Loop 410, Suite 725
San Antonio, Texas 78209
Telephone: 210/822-2018
FAX: 210/822-4068

By:_____
    Stephen E. Walraven
    State Bar No. 20796800
    Otto S. Good
    State Bar No. 08139600
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served on counsel listed below on this ___7 2___ day of August, 200X.

_____
STEPHEN E. WALRAVEN
OTTO S. GOOD

**ATTORNEYS FOR DEFENDANT**
**COMPANION LIFE INSURANCE COMPANY**
Mr. Shelby J. Bush
PIPER RUDNICK
1717 Main Street, Suite 4600
Dallas, Texas 75201-4605

**ATTORNEYS FOR DEFENDANT**
**J. ALLAN HALL & ASSOCIATES, INC.**
Ms. Roberta J. Hegland
BRACEWELL & PATTERSON, L.L.P.
2000 One Shoreline Plaza, South Tower
800 North Shoreline Boulevard
Corpus Christi, Texas 78401-3700

**ATTORNEYS FOR DEFENDANTS**
**MBA OF WYOMING, INC., AND MANAGED BENEFITS**
**ADMINISTRATOR AND INSURANCE CONSULTANTS, INC.**
Ms. Cindy A. Garcia
THE GARCIA LAW FIRM, P.C.
201 North 1st Street
Harlingen, Texas 78550



J. ATLAS HAHL & ASSOCIATES, INC.
55 MONUMENT CIRCLE, SUITE 1115
INDIANAPOLIS, INDIANA 46204-5910
(317) 264-0020 (VOICE)
(317) 264-9038 (FAX)

10/16/00

THE CONSOLIDATED COMPANIES
2835 TOWNSGATE DRIVE, #200
WESTGATE VILL., CA. 91361-

Fax #: (805) 497-0077

RECEIVED
OCT 19 2000
SAN BENITO CISD
INSURANCE COORDINATOR

RE: SAN BENITO CONS INDEP. SCHOOLS
Proposed Effective Date: 10/01/00.

Dear ,

We are pleased to present you with the attached proposal(s) for Excess Loss
Coverage provided by COMPANION LIFE.
We reserve the right to modify factors and/or premium rates quoted after our
review of the information requested on the following pages.

*  THIS IS FOR 11 MONTH CONTRACT.
   MAJOR HUMAN ORGAN TRANSPLTS SUBJ. TO PLAN MAX. OF $150K PER INDIVIDUAL.
   LUNG CANCER LIMITED TO $50,000 LIM IF SMOKING FOR 5 YEARS OR MORE AT TIME
   OF DIAGNOSIS.

Our rates include - 0 - commission, unless noted otherwise, and the
quote is valid for 60 days from the data of this quote.

We thank you for providing us with the opportunity to serve you.
Please let us know of any questions or comments.
IF THIS OFFER IS ACCEPTED BY THE ACCOUNT, PLEASE HAVE AN OFFICER SIGN THE
ACCEPTANCE LINE BELOW, CIRCLE THE OPTION DESIRED ON PAGE 2 (EXCESS LOSS
PROPOSAL) AND INITIAL PAGE 2 AND PAGE 3 (CONTINGENCIES AND QUALIFICATIONS),
AND RETURN IT TO US WITH A DEPOSIT PREMIUM (ONE MONTH'S PREMIUM).

Sincerely,                              ACCEPTED

TONY WIRKUS
Underwriter



DEPOSITION
EXHIBIT
Sanchez #11
ACTION REPORTING

SB - 00095

J. ALLAN HALL & ASSOCIATES, INC.
55 MONUMENT CIRCLE, SUITE 1115
INDIANAPOLIS, INDIANA 46204-5910
(317) 264-0020 (VOICE)
(317) 264-9038 (FAX)

EXCESS LOSS PROPOSAL

INITIAL

GROUP NAME: SAN BENITO CONS INDEP. SCHOOLS

ADMINISTRATOR: THE CONSOLIDATED COMPANIES

DATE PREPARED: 10/16/00              EFFECTIVE DATE: 10/01/00

Specific:
                Option1
Retention       $  75,000
Contract           15/11
L/T Maximum    1,000,000

Rates:
        Single    $  18.45
        Family    $  44.06
        Composite $  24.18

Annual Premium  349,499

Aggregate Factor(s):
        Medical   $  295.65
        Dental    $   11.54
        Drug      $   39.06

MAAP*           5,004,553
Contract           15/11
Employee Rate   $   1.70

Annual Premium   24,572


Reinsurance provided by: COMPANION LIFE

Underwriting assumptions:
    This proposal is based on the following enrollment:
                Medical      Single: 1,020   Family:  294
                Dental       Single: 1,020   Family:  294
        Prescription Drugs   Single: 1,020   Family:  294

SB - 00096

J. ALLAN HALL & ASSOCIATES, INC.
55 MONUMENT CIRCLE, SUITE 1115
INDIANAPOLIS, INDIANA 46204-5910
(317) 264-0020 (VOICE)
(317) 264-9038 (FAX)

INITIAL

## QUALIFICATIONS AND CONTINGENCIES

Our proposal is contingent and subject to change upon receipt and review
of the following information:
  ACTIVELY AT WORK PROVISIONS HAVE BEEN WAIVED.

* COVERAGE EXCLUDES PROCEDURES CONSIDERED TO BE EXPERIMENTAL, INVESTIGATIONAL
  OR NOT CONSIDERED TO BE REASONABLE OR NECESSARY ACCORDING TO THE HEALTH
  CARE FINANCING ADMINISTRATION (HCFA).

* THE MINIMUM AGGREGATE ATTACHMENT POINT IS 85% OF THE AMOUNT SHOWN ON THE
  PREVIOUS PAGE.

* MENTAL & NERVOUS, ALCOHOLISM & DRUG ADDICTION TREATMENT ARE LIMITED TO THE
  LESSER OF THE PLAN BENEFITS OR 10,000. STATE OR FEDERAL STATUTES MAY
  SUPERCEDE THIS LIMITATION.

* IN ADDITION TO THE RATES SHOWN, YOU MUST ADD THE APPROPRIATE STATE SURPLUS
  LINES TAX IF THE COVERAGE IS WRITTEN BY A NON-ADMITTED CARRIER.

* QUOTE ASSUMES THAT LARGE CASE MANAGEMENT WILL BE USED. THE LCM FIRM MUST BE
  APPROVED BY ALL PARTIES.

* QUOTE ASSUMES THAT PREADMISSION CERTIFICATION WILL BE USED AND PENALTIES
  WILL BE IMPOSED FOR FAILURE TO USE.

* QUOTE ASSUMES THE USE OF CONCURRENT HOSPITAL REVIEW.

* QUOTE ASSUMES THE USE OF DISCHARGE PLANNING.

* QUOTE IS BASED ON THE FULL UTILIZATION OF A PPO WHICH HAS BEEN APPROVED BY
  ALL PARTIES.

Please submit the above information within 60 days from the effective date
of coverage, if sold. Please make the premium check payable to J. Allan Hall
& Associates, Inc. or the carrier.

*** THIS IS NOT A CONTRACT OR BINDER OF INSURANCE ***

The persons presenting this proposal to the client are agents of the
client and not of the insurer, reinsurer, or J. Allan Hall & Assoc.
This proposal is non-occupational and the Excess Reinsurance Agreement
will be issued when all the required information has been submitted to
J. ALLAN HALL & ASSOCIATES.

TOTAL P.83

SB - 00097