45

United States District Court
Southern District of Texas
FILED

MAR 0 9 2004

Michael N. Milby
Clerk of Court

CIVIL ACTION No. 003-047

---

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

---

**San Benito Consolidated Independent School District**
*Plaintiff*

**v.**

**Companion Life Insurance Company,**
**Managed Benefits Administrator and Insurance Consultants, Inc.,**
**J. Allan Hall & Associates, Inc.,**
**And MBA of Wyoming, Inc.**
*Defendants*

---

### PLAINTIFF SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT'S RESPONSE TO DEFENDANT, COMPANION LIFE INSURANCE COMPANY'S, MOTION FOR SUMMARY JUDGMENT

---

Stephen E. Walraven
State Bar No. 20796800
SHADDOX, COMPERE, WALRAVEN & GOOD, P.C.
1250 N.E. Loop 410, Suite 725
San Antonio, Texas 78209
Telephone: 210/822-2018
FAX: 210/822-4068
ATTORNEYS FOR PLAINTIFF

## IDENTITY OF PARTIES AND COUNSEL

PLAINTIFF:
San Benito Consolidated
    Independent School District

ATTORNEYS FOR PLAINTIFF:
Stephen E. Walraven
Otto S. Good
SHADDOX, COMPERE, WALRAVEN &
    GOOD, P.C.

Celeste Guerra
LAW OFFICES OF RENE RAMIREZ

DEFENDANTS:
Companion Life Insurance Co.

ATTORNEYS FOR DEFENDANTS:
Shelby J. Bush
PIPER RUDNICK, L.L.P.

Managed Benefits Administrator
    and Insurance Consultants, Inc.

Cindy A. Garcia
THE GARCIA LAW FIRM, P.C.

J. Allan Hall & Associates, Inc.

Roberta J. Hegland
Joseph A. Stallone
BRACEWELL & PATTERSON, L.L.P.

MBA of Wyoming, Inc.

Cindy A. Garcia
THE GARCIA LAW FIRM, P.C.

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   SUMMARY JUDGMENT EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   ARGUMENTS AND AUTHORITIES

      Companion Life is Not a Reinsurer, and There is No Tort Immunity for Reinsurers . . . . 4

      The Companion Life Policy is Not Reinsurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      Reinsurers are Not Immune From Tort Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      No Government Code Exemption for Companion Life . . . . . . . . . . . . . . . . . . . . . . . . . 12

      Existence of An Insurance Contract Does not Immunize the Insurer From Liability
      For its Statutory and Common Law Torts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      Conditions Precedent Have Been Satisfied and/or Waived . . . . . . . . . . . . . . . . . . . . . . 16

      Misrepresenations Through Agents is Actionable Under Texas Law . . . . . . . . . . . . . . . 18

V.    SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

VI.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

VII.  CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF CITATIONS

*American Standard Life Insurance Co. v. Denwitty*
    256 S.W.2d 864, 869 (Tex.Civ.App.-Dallas 1953, writ dism'd.) . . . . . . . . . . . . . . . . . . 18

*Aranda v. Insurance Company of North America*
    748 S.W.2d 210, 212 (Tex. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Arnold v. National County Mutual Fire Insurance Company*
    725 S.W.2d 165, 167 (Tex. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Bekins Moving & Storage Company v. Williams*
    947 S.W.2d 568 (Tex. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Blanton v. John Hancock Mutual Life Insurance Company*
    345 F.Supp. 168, 170-71 (N.D. Tex. 1971)
    *affirmed pro curium*, 463 F.2d 421 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Celotex Corp. v. Catrett*
    477 U.S. 317, 322 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Celtic Life Insurance Company v. Coats*
    885 S.W.2d 96 (Tex. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Coffman v. Scott Wetzel Services, Inc.*
    908 S.W.2d 516 (Tex.App.-Ft. Worth 1995, n.r.h.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Crawford v. Ace Sign, Inc.*
    917 S.W.2d 12 (Tex.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 385 (Tex. 2000) . . . . . . . . . . . . . . . . . . . . . . . 11

*Crown Life Insurance Company v. Reliable Machine & Supply Co.*
    427 S.W.2d 145, 149 (Tex.Civ.App.-Austin 1968, n.r.e.) . . . . . . . . . . . . . . . . . . . . . . . . 18

*Dagley v. Haag engineering Co.*
    18 S.W.3d 787, 793 (Tex.App.-Houston [14th District] 2000 . . . . . . . . . . . . . . . . . . . . . 10

*Dairyland County Mutual Insurance Company of Texas v. Mason*
    460 S.W.2d 481, 484-85 (Tex.Civ.App.-Beaumonth 1970, n.r.e.) . . . . . . . . . . . . . . . . . 18

*Evans v. City of Houston*
    246 F.3d 344, 348 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*G.A. Stowers Furniture Co. v. American Indemnity Co.*
    15 S.W.2d 544 (Tex.Comm.App. 1929) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Great American Ins. Co. v. North Austin Municipal Utility District No. 1*
    908 S.W.2d 415, 424 (Tex. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Great American Life Insurance Company v. Rodriguez*
    641 S.W.2d 264, 269 (Tex.App.-Houston [14th District] 1982, n.w.h.) . . . . . . . . . . . . . 17

*Jackson v. National Flood Insurers Association*
    398 F.Supp.1383, 1388 (S.D.Tex. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Kennedy v. Sale*
    689 S.W.2d 890, 892-93 (Tex. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Leeper v. Beltrami*
    53 Cal.2d 195, 347 P.2d 12, 1 Cal.Rptr.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Liberty National Bank & rust Company v. Gruenberger*
    477 S.W.2d 503, 505 (Ky.App. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Rocor International v. National Union Fire Insurance Co.*
    77 S.W.2d 253, 263-264 (Tex. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Royal Globe Insurance Co. v. Bar Consultants, Inc.*
    577 S.W.2d 688 (Tex. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Southland Life Insurance Co. v. Lawson*
    153 S.W.2d 953, 956-57 (Tex. 1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Southwestern Bell Telephone v. DeLanney*
    809 S.W.2d 493 (Tex. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,14,15,16

*State and County Mutual Fire Insurance Company v. Miller*
    52 S.W.3d 693, 697 (Tex. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Stonewall Insurance Company v. Modern Exploration, Inc.*
    757 S.W.2d 432, 435 (Tex.App.-Dallas 1988, n.w.h.) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*TIG Insurance Co. v. Sedgwick James of Washington*
    276 F.3d 754, 763 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Vail v. Texas Farm Bureau Mutual Insurance Co.*
    754 S.W.2d 129 (Tex. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14,15

*Viles v. Security National Insurance Co.*
    788 S.W.2d 566, 567 (Tex. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Walters v. Century Lloyds Insurance Company*
    273 S.W.2d 66, 69 (Tex. 1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Statutes**

TEX. GOV. CODE Chapter 172 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,8

TEX. GOV. CODE Chapter 172, Section 172.004(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

TEX. GOV. CODE Chapter 172, Section 172.005(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,9

TEX. GOV. CODE Chapter 172, Section 172.005(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,7

TEX. GOV. CODE Chapter 172, Section 172.008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

TEX. GOV. CODE Chapter 172, Section 172.014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,12

TEX. GOV. CODE Chapter 791 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

TEX. INS. CODE Art. 1.14-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,10

TEX. INS. CODE Art. 3.95-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

TEX. INS. CODE Art. 4.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

TEX. INS. CODE Art. 411, Section 2(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

TEX. INS. CODE Art. 5.75 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

TEX. INS. CODE Art. 5.75-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,8,10

TEX. INS. CODE Art. 5.75-1(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

TEX. INS. CODE Art. 21.07-7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

TEX. INS. CODE Art. 21.21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,8,9,10,11,14,15

TEX. INS. CODE Art. 21.21, Section 3(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

TEX. INS. CODE Art. 21.21, Section 3(c)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

TEX. INS. CODE Art. 21.21-D . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

TEX. INS. CODE Art. 21.55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,8

TEX. INS. CODE Art. 21.58 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

TEX. INS. CODE Art. 26.02(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

TEX. INS. CODE Chapter 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

TEX. INS. CODE Chapter 5, Subchapter A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

TEX. INS. CODE Chapter 5, Subchapter B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

TEX. INS. CODE Chapter 5, Subchapter C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

TEX. INS. CODE Chapter 5, Subchapter D . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

TEX. INS. CODE Chapter 5, Subchapter F . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,8

TEX. INS. CODE Chapter 28A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

TEX. INS. CODE Chapter 101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

TEX. INS. CODE Chapter 101, Section 101.051 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

TEX. INS. CODE Chapter 101, Section 101.052 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

TEX. INS. CODE Chapter 101, Section 101.053(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . 9

TEX. INS. CODE Chapter 101, Section 101.053(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . 9

TEX. INS. CODE Chapter 101, Section 101.053(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . 9

TEX. INS. CODE Chapter 101, Section 101.102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

TEX. INS. CODE Chapter 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

TEX. INS. CODE Chapter 842 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

TEX. INS. CODE Chapter 843 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

TEX. INS. CODE Chapter 845 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

TEX. INS. CODE Chapter 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,8,9

-vii-

TEX. INS. CODE Chapter 846, Section 846.001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

TEX. INS. CODE Chapter 846, Section 846.(001)(3)(m) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

TEX. INS. CODE Chapter 846, Section 846.003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

TEX. INS. CODE Chapter 846, Section 846.053(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

TEX. INS. CODE Chapter 846, Section 846.053(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

TEX. INS. CODE Chapter 846, Section 846.153(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

TEX. INS. CODE Chapter 846, Section 846.156 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Secondary Authority**

BLACK'S LAW DICTIONARY 1290-91 (7th ed. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,5

13A John A. Appleman & Jean Appleman,
    *Insurance Law and Practice* §7681 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,5

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SAN BENITO CONSOLIDATED | § | |
| INDEPENDENT SCHOOL DISTRICT | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-03-047 |
| | § | |
| COMPANION LIFE INSURANCE COMPANY, | § | |
| MANAGED BENEFITS ADMINISTRATOR | § | |
| AND INSURANCE CONSULTANTS, INC., | § | |
| J. ALLAN HALL & ASSOCIATES, INC., | § | |
| and MBA OF WYOMING, INC. | § | |

### PLAINTIFF SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT'S RESPONSE TO DEFENDANT, COMPANION LIFE INSURANCE COMPANY'S, MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

NOW COMES SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, Plaintiff in the above-styled cause, (hereinafter sometimes referred to as the "SCHOOL DISTRICT" or "SAN BENITO,") and files this its Response to Defendant, COMPANION LIFE INSURANCE COMPANY'S, Motion for Summary Judgment and for such Response, would show unto the Court as follows:

### I.

### INTRODUCTION

SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT purchased stop-loss insurance which should have reimbursed it for approximately $900,000 in health care benefits it paid for its employees in 2001. COMPANION LIFE, the insurance company, and J. ALLAN HALL, the managing agent for COMPANION LIFE, say they can escape payment because MBA (the third-party administrator for the SCHOOL DISTRICT) did not properly handle the claims, placing checks in the mail too late. MBA says it handled the claims the way it should have, the way it always had, and the

way J. ALLAN HALL had told it to, suggesting that COMPANION LIFE and J. ALLAN HALL must have decided to change the rules when faced with this large claim. Despite the general agreement that one or more of the Defendants mishandled the matter and injured the SCHOOL DISTRICT, all Defendants now contend in Motions for Summary Judgment that they are entitled, under Texas law, to dodge all responsibility for any wrongful conduct. The Defendants are in error; Texas law is not nearly as lenient with wrongdoers as the Defendants' wishful thinking would have us believe. Defendants' efforts to escape such responsibility, including their Motions for Summary Judgment, should be in all things denied.

## II.

### SUMMARY JUDGMENT EVIDENCE

SAN BENITO relies on all of the summary judgment evidence attached to all of the Summary Judgment Motions filed by the Defendants in this case, the Responses of the SCHOOL DISTRICT to all of those Motions, and the following documents attached hereto:

1.    Excerpts from the oral deposition of Lorenzo Sanchez attached as Exhibit "A."

2.    Excerpts from the oral deposition of Janie Gonzalez attached as Exhibit "B."

3.    Excerpts from the oral deposition of Don Merrill attached as Exhibit "C."

4.    Excerpts from the oral deposition of Phyllis Merrill attached as Exhibit "D."

5.    Excerpts from the oral deposition of Glade Nixon attached as Exhibit "E."

6.    Excerpts from the oral deposition of Douglas Routh attached as Exhibit "F."

7.    Excerpts from the oral deposition of William Larry Blagg attached as

Exhibit "G."

8.      Excerpts from the oral deposition of James Allan Hall attached as
        Exhibit "H."

### III.

#### SUMMARY OF ARGUMENT

COMPANION LIFE, in its Motion for Summary Judgment, (hereinafter referred to as the

"Motion"), asserts a variety of grounds for partial or complete summary judgment:

1.      The COMPANION LIFE policy is really reinsurance, and under the TEXAS
        INSURANCE CODE reinsurance is immune from all tort liability.

2.      The TEXAS GOVERNMENT CODE immunizes COMPANION LIFE from
        liability it would otherwise have under the TEXAS INSURANCE CODE.

3.      COMPANION LIFE had a contract with the SCHOOL DISTRICT, and when
        the parties to a dispute have a contract, a wrongdoer is immune from
        tort liability.

4.      COMPANION LIFE has no liability under its contract, because the
        SCHOOL DISTRICT failed to satisfy a condition precedent.

5.      COMPANION LIFE has no liability for misrepresentations, because it
        communicated with the SCHOOL DISTRICT through agents, rather than
        directly.

None of these positions have merit. The stop-loss insurance policy is not reinsurance under

Texas law, and Texas law does not provide immunity from tort liability for reinsurers, in any event.

The GOVERNMENT CODE provision has no applicability to COMPANION LIFE and its conduct.  In the

field of insurance, contract remedies are not exclusive, and an insurance company is not immune

from tort liability to its insured simply because it issued a policy. Compliance with the condition

precedent is excused under the facts of this case by the Defendants' conduct. Under Texas law,

communication through agents is as actionable as direct communication.

## IV.

## ARGUMENT AND AUTHORITIES

### COMPANION LIFE IS NOT A REINSURER, AND THERE IS NO TORT IMMUNITY FOR REINSURERS

COMPANION LIFE argues, citing out-of-State authority and a worker's compensation case, that stop-loss insurance for a school district's self-insured health benefit program is really reinsurance under the TEXAS INSURANCE CODE, and that all reinsurance is immune from all tort liability. There is neither factual nor legal authority supporting either of these propositions.

### THE COMPANION LIFE POLICY IS NOT REINSURANCE

BLACK'S LAW DICTIONARY defines "reinsurance" as follows:

Insurance of all or part of one insurer's risk by a second insurer, who accepts the risk

in exchange for a percentage of the original premium.

BLACK'S LAW DICTIONARY 1290-91 (7th ed. 1999). In its explanation, BLACK'S LAW DICTIONARY quotes from an authority repeatedly relied on by COMPANION LIFE, APPLEMAN'S, *Insurance Law and Practice,* for further explanation. That quoted language notes that "the term 'reinsurance' has been used by courts, attorneys and text writers with so little discrimination that much confusion has arisen as to what the term actually connotes." However, among insurance professionals, APPLEMAN'S suggests that there is a clear understanding:

> Reinsurance, to an insurance lawyer, means only one thing - the ceding by one insurance company to another of all or a portion of its risk for a stipulated portion of the premium, in which the liability of the reinsurer is solely to the reinsured, which is the ceding company, and in which contract the ceding company retains all contact with the original insured, and handles all matters prior to and subsequent to loss.

13A JOHN ALLEN APPLEMAN AND JEAN APPLEMAN, *Insurance Law Practice* §7681 at 479-80 (1976).

Page -4-

That clear understanding is virtually identical to the understanding of the Texas Legislature, as set forth in the TEXAS INSURANCE CODE, Art. 21.07-7; which provides the following definitions:

> "'Reinsurance' means a written contract that transfers for consideration an insurance risk of loss between insurers and indemnifies the ceding insurer against all or part of the loss that the latter may sustain under an insurance policy issued or assumed, but does not mean a contract for the bulk sale, transfer, and assumption of direct insurance policy liability to the insureds.
>
> 'Insurer' means a commercially domiciled insurer or other person legally organized in this State to do business as an insurance company,..."

BLACK'S LAW DICTIONARY, APPLEMAN'S, and most importantly the Texas Legislature, all agree that reinsurance is a transfer of risk between two insurance companies. Since the SCHOOL DISTRICT is not an insurance company, the contract with COMPANION LIFE cannot be reinsurance.

Despite the express guidance by the Texas Legislature, set forth above, that a self-insured school district is not an insurer, COMPANION LIFE argues to the contrary. Although its references to the summary judgment record show that the SCHOOL DISTRICT is self-insuring these risks (*see* the Motion, at p.10),with no supporting evidence COMPANION LIFE also tries to contend that the SCHOOL DISTRICT is a traditional insurance company, charging premiums for providing health care benefits, and should be considered sophisticated in the ways of insurance. (*See* the Motion, at p. 19). Unsurprisingly, COMPANION LIFE is unable to provide either legal or factual support for these assertions. The Legislature is very specific: self-insuring health care claims is not insurance, and the SCHOOL DISTRICT is not an insurer. (TEX.GOV.CODE, §172.014.) Since the SCHOOL DISTRICT is not an insurer, legally or practically, its agreement with COMPANION LIFE cannot be reinsurance, as that term is defined by the INSURANCE CODE.

The Texas Legislature has enacted a number of statutes establishing a comprehensive program regulating the business of insurance and other similar activities. In the field of health

insurance and health care benefits, Texas statutes regulate not only traditional health insurance companies (*see* Chapters 3 and 841 of the TEXAS INSURANCE CODE), but also health maintenance organizations (TEXAS INSURANCE CODE, Chapters 28A and 843); group hospital service corporations (TEXAS INSURANCE CODE, Chapter 842); the Statewide Rural Health Care System (TEXAS INSURANCE CODE, Chapter 845); and multiple employer welfare arrangements (TEXAS INSURANCE CODE, Chapter 846). (Multiple employer welfare arrangements are the private sector equivalent of self-funded health care risk pools among governmental entities, the latter being authorized pursuant to Chapter 172 of the TEXAS GOVERNMENT CODE.)

Pursuant to Chapter 172 of the TEXAS GOVERNMENT CODE, a school district may self-insure its health care benefit program (Section 172.004(a)), may establish a risk pool to provide such benefits (Section 172.005(a)), may join with other governmental entities under the Interlocal Cooperation Act (TEXAS GOVERNMENT CODE, Chapter 791), and "may purchase insurance coverage...from an insurance company authorized to do business in this State." (TEXAS GOVERNMENT CODE, Section 172.005(c)). This statute allows such purchase of insurance only from an "authorized" insurance company; that is, an insurance company whose activities are regulated by the TEXAS INSURANCE CODE. *(Id.)* A risk pool may also "purchase excess loss coverage or reinsurance." (TEXAS GOVERNMENT CODE, Section 172.008.) (This latter statute clearly implies that, in this context, excess of loss coverage is something distinct from reinsurance, contrary to COMPANION LIFE's argument that they both should all be treated the same. To hold otherwise would render the words "or reinsurance" meaningless.)

The TEXAS GOVERNMENT CODE also clearly states (contrary to COMPANION LIFE's assertion on page 9 of its Motion), that the health care benefits being provided by the risk pool are not insurance, and that the risk pool is not subject to the INSURANCE CODE or the State Board of

Insurance. (TEXAS GOVERNMENT CODE, Section 172.014.) However, nowhere does the GOVERNMENT CODE, or any other statute, say that when a risk pool buys insurance from an authorized and regulated insurance company (as provided in TEXAS GOVERNMENT CODE, Section 172.005(c)), that the seller of this authorized insurance is not an insurance company, and/or is not providing insurance. On the contrary, the seller is specifically referred to, in this statute, as an "insurance company," and the services being provided are specifically referred to as "insurance coverage." *(Id.)* The statute makes a clear distinction between benefits being provided by a risk pool, which are not insurance, from benefits being purchased by a risk pool, which can be insurance.

## REINSURERS ARE NOT IMMUNE FROM TORT LIABILITY

In seeking an exemption from the INSURANCE CODE, COMPANION LIFE purports to cite statutory authority for the proposition that all reinsurance is exempt from Art. 21.21 and Art. 21.55 of the TEXAS INSURANCE CODE. The statutory language and case authority does not support this proposition. COMPANION LIFE relies on TEXAS INSURANCE CODE, Art. 5.75-1(g) to assert that reinsurers are immune from all tort liability. On the contrary, that language, as explained by the Supreme Court of Texas, means only that a reinsurer's contractual liability is limited to the contract language.

> Under general reinsurance law, a policyholder may not bring any direct claim against a reinsuring company. Absent an agreement creating direct liability in the reinsurer, all claims under the policy must be asserted against the original insurance company.

*See State and County Mutual Fire Insurance Company v. Miller*, 52 S.W.3d 693, 697 (Tex. 2001), explaining the import of Art. 5.75-1.

That statute, relied on by Defendants, is part of Subchapter F of Chapter 5 of the TEXAS INSURANCE CODE. Art. 5.75 of the INSURANCE CODE expressly limits the application of that subchapter, providing:

> This subchapter applies to the kinds of insurance and insurers subject to Subchapter
> A, B, C, and D of Chapter 5 of this Code.

(*See* TEXAS INSURANCE CODE, Art. 5.75.) Subchapter A of Chapter 5 applies to motor vehicle or automobile insurance; Subchapter B applies to casualty insurance and fidelity, guaranty and surety bonds; Subchapter C applies to Fire Insurance and allied lines, and Subchapter D applies to worker's compensation insurance. By the specific terms of the statute, it has no applicability to health care insurance, or other health care benefit plans. One wonders how COMPANION LIFE, in relying on Art. 5.75-1, could have overlooked those limitations set forth in Art. 5.75. With Art. 5.75-1 not applicable, COMPANION LIFE has no basis for arguing that reinsurance is exempted from Art. 21.21 or Art. 21.55.

Equally unsupported is COMPANION LIFE's assertion that stop-loss insurance and reinsurance are identical under the TEXAS INSURANCE CODE. Art. 26.02(11) of the Code defines a "health benefit plan" as not including:

> (o)   Reinsurance contracts issued on a stop-loss, quota share, or similar
>        basis.

While the statute clearly indicates that some reinsurance contracts may be issued on a "stop-loss" basis, it nowhere says that all stop-loss contracts must always be reinsurance. Similar language is also found in Art. 3.95-1, cited by COMPANION LIFE. (This statute was repealed effective June 1, 2003.)

Art. 3.95-1, et seq., has been recodified as Chapter 846 of the TEXAS INSURANCE CODE, and regulates multiple employer welfare arrangements, plans which are very similar to risk pools of multiple governmental subdivisions regulated by Chapter 172 of the TEXAS GOVERNMENT CODE. Chapter 846 of the INSURANCE CODE contains a reference to reinsurance issued on a stop-loss basis (Section 846(001)(3)(m)), but also contains a number of references to stop-loss insurance without

any mention of reinsurance. *See* Section 846.053(h) and (i), requiring stop-loss insurance[1]; Section 846.153(c)(3), requiring audits of multiple employer welfare arrangements to verify the presence of adequate stop-loss insurance; and Section 846.156 allowing the Commissioner of Insurance to waive or reduce the amount of stop-loss insurance being required. Far from providing any immunity of such plans from statutory torts applying to the business of insurance, such as Art. 21.21 of the INSURANCE CODE, Chapter 846 expressly provides that Art. 21.21 does apply to these types of plans. (*See* Section 846.003).

Another repealed part of the INSURANCE CODE cited by COMPANION LIFE is Art. 1.14-1, entitled Unauthorized Insurance. (This provision was repealed effective September 1, 1999.) As discussed above, governmental entities such as school districts are only authorized to purchase stop-loss insurance from authorized carriers, not unauthorized insurance, as discussed above. (TEXAS GOVERNMENT CODE Section 172.005(a).)   Portions of that article have been recodified as Chapter 101 of the INSURANCE CODE, also titled Unauthorized Insurance, prohibiting certain activities by unauthorized insurers. Section 101.102, provides that prohibited activities do not include the lawful transaction of surplus lines insurance (Section 101.053(b)(1)); the lawful transaction of reinsurance (Section 101.053(b)(2)); and certain group life, health and accident insurance (Section 101.053(b)(5)), among others.[2]   These limitations do not state, as asserted by COMPANION LIFE in

_____

[1]If Chapter 846.001, et seq., of the INSURANCE CODE applied to SAN BENITO SCHOOL DISTRICT'S employee health care benefit plan, as COMPANION LIFE seems to imply, Section 846.053(i) has a specific requirement that a 90-day grace period be allowed, after the policy period, for the payment of incurred health care claims. Since, in this case, COMPANION LIFE asserts that its contract requires that all covered claims be both incurred and paid prior to the end of the policy period, COMPANION LIFE's program would be in violation of this statute, if it applied.

[2]COMPANION LIFE's reliance on Sec. 101, formerly Sec. 1.14-1, for defining the scope and applicability of Art. 21.21 has also been rejected by Texas courts. *Great American Ins. Co. v.*

its Motion (at p.9, fn. 1), that reinsurance is not the business of insurance; the statute provides merely that the lawful transaction of reinsurance is not subject to the chapter on unauthorized insurance, as defined in Sections 101.051 and 101.052.

Two other statutes cited by COMPANION·LIFE not only fail to support its proposed immunity for its wrongful conduct, but actually contradict its propositions.[3]  Article 4.11 of the TEXAS INSURANCE CODE, providing for the taxing of gross premiums for life and health insurance carriers, states that the premiums paid for stop-loss or excess-loss insurance should be treated like reinsurance in calculating the tax. (Article 4.11, Sec. 2(c)). If stop-loss insurance or an excess-loss insurance were the same as reinsurance, they would be no need for this sentence in that paragraph. Here, in connection with health insurance taxes, stop-loss insurance must be distinct from reinsurance

Article 21.21-D of the TEXAS INSURANCE CODE, creating the Life, Accident, Health and Hospital Service Insurance Guaranty Association, exempts reinsurance from coverage in Section 3(c)(2), and stop-loss insurance related to self-funded employer health benefit plans in Section 3(c)(4). This statute also treats stop-loss insurance as distinct from reinsurance. Clearly, there is no statutory authority, relating to health insurance, for the proposition that the Texas Legislature believes that stop-loss insurance and reinsurance are the same thing.

Summarizing the insurance statutes referenced by COMPANION LIFE (both repealed and

health care insurance, and employer health care plans are subject to tort statutes, such as Art. 21.21.

COMPANION LIFE's entire argument for exemption from Art. 21.21 and Art. 21.58 of the TEXAS INSURANCE CODE is based on the conflicting notions that a school district, in agreeing to pay its employees' medical bills up to a certain amount, both is an insurance company (see COMPANION LIFE's Motion at p. 9), and at the same time is not an insurance company (see COMPANION LIFE's Motion at p. 21). On the one hand, COMPANION LIFE argues, without any supporting summary judgment evidence, that SAN BENITO is an insurance company, charging its employees premiums for health insurance (rather than self-funding those programs, with perhaps a small contribution from employees, and should be treated as a sophisticated insurance company who does not need the protections of the INSURANCE CODE when dealing deceitful insurance companies. *(See* COMPANION LIFE's Motion at p. 19). COMPANION LIFE cites no authority for its argument that the smallest school district in Texas should be treated as a sophisticated insurance company, nor that even people sophisticated in the field of insurance have no rights under Art. 21.21 of the INSURANCE CODE. On the contrary, insurance agents can bring claims under Art. 21.21 of the INSURANCE CODE. *(See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 385 (Tex. 2000); noting that any "person" can bring such a claim, and that the term "person" is to be construed broadly.)[4]

### NO GOVERNMENT CODE EXEMPTION FOR COMPANION LIFE

Contradicting itself, COMPANION LIFE also argues that since the relationship between SAN

---

[4]Art. 21.21 is a companion statute to the TEXAS DECEPTIVE TRADE PRACTICES ACT, TEX.BUS.COMM.C. §17.41, et seq. Each statute references and incorporates the other. (Art. 21.21, Sec. 16(a) and Sec. 17.50(a)(4).) In 1977, the DTPA was amended to include "subdivisions or agencies of this State" in the definition of consumers entitled to bring a claim. Unquestionably, the intent of the Texas Legislature is that governmental entities such as school districts can bring DTPA and Art. 21.21 claims.

BENITO and its employees, in its self-funded health care benefit program, is not insurance (pursuant to GOVERNMENT CODE Art. 172.014), that the relationship between the SCHOOL DISTRICT and COMPANION LIFE cannot be insurance either. COMPANION LIFE cites no authority for this proposition, either.

Ft.Worth 1995, n.r.h.). Coffman, an employee of the City of Collyville, brought a worker's compensation claim. The City of Collyville provided worker's compensation benefits through a governmental trust, called the Texas Municipal League Intergovernmental Risk Pool (the "Pool.")

of the existence of a contract between COMPANION LIFE and SAN BENITO. This immunity claim is purportedly based on the holding in *Southwestern Bell Telephone v. DeLanney*, 809 S.W.2d 493 (Tex. 1991). COMPANION LIFE asserts that when a contract exists between the two parties, particularly when reference to the contract is made in calculating damages, that no tort liability can exist. The Texas Supreme Court's holding in that case is much narrower, and has no applicability to this case.

In *DeLanney*, the Court held that a simple breach of contract, without more does not give rise to tort liability. *(Id.* at 495.) SAN BENITO's case has considerably more.

In *DeLanney*, the Court recognized one exception, for professional malpractice, in which tort liability can also arise from a contractual relationship. *(Id.* at 494.) The concurring opinion in *DeLanney* also noted that the field of insurance is another exception to *DeLanney*, citing *Viles v. Security National Insurance Co.*, 788 S.W.2d 566, 567 (Tex. 1990). (*DeLanney* at 500.) It has long been recognized that, like a lawyer-client relationship or a doctor-patient relationship, an insurance relationship is a special relationship involving not only contractual obligations, but also common law duties. In *Aranda v. Insurance Company of North America*, 748 S.W.2d 210, 212 (Tex. 1988), and *Arnold v. National County Mutual Fire Insurance Company*, 725 S.W.2d 165, 167 (Tex. 1987), the Texas Supreme Court recognized the duty of good faith and fair dealing, in addition to any contractual duties owed under the insurance contract. In *G. A. Stowers Furniture Co. v. American Indemnity Co.*, 15 S.W.2d 544 (Tex.Comm.App. 1929, holding approved), the Court recognized the duty to exercise ordinary care in settling a liability case, violations of which give rise to liability for negligence. The case of *Rocor International v. National Union Fire Insurance Co.*, 77 S.W.3d 253, 263-264 (Tex. 2002), expanded the Stowers Doctrine to apply to excess carriers, and the failure to settle timely. All of these cases illustrate that the insurance context is an exception to the holding in

Page -13-

*DeLanney* and that insureds can have remedies both in contract and in tort.

In another case, the Supreme Court of Texas expressly rejected the *DeLanney* argument as applicable to the insurance context. That case is *Vail v. Texas Farm Bureau Mutual Insurance Co.*, 754 S.W.2d 129 (Tex. 1988). In *Vail,* the insurer made the identical argument that COMPANION LIFE makes here: That the insured should be limited to its contract claim. *(Id.* at 136.) The Supreme Court of Texas expressly rejected that argument, finding that:

> The fact that the Vails have a breach of contract action against Texas Farm does not preclude a cause of action under the DTPA and Article 21.21 of the Insurance Code. Both the DTPA and the Insurance Code provide that the statutory remedies are cumulative of other remedies.

*(Id.)* As to damages under those statutes, the Court said:

> We hold that insurer's unfair refusal to pay the insured's claim causes damages as a matter of law in at least the amount of policy benefits wrongfully withheld.

*(Id.)* Under the express holding in *Vail*, even if a party's only damages are the breach of contract damages, the insured still has a claim against the insurance company under the DTPA and the INSURANCE CODE.

The *DeLanney* argument also fails, in this case, for a different reason. SAN BENITO is suing COMPANION LIFE not only for breach of contract, but also for misrepresenting that the insurance contract had characteristics, uses, benefits, rights or obligations which it did not have. If COMPANION LIFE's *DeLanney* argument were accepted, those provisions of the DECEPTIVE TRADE PRACTICES ACT and the INSURANCE CODE, expressly dealing with misrepresenting the terms of a contract, would, in effect, be written out of the statute. COMPANION LIFE has cited no authority that Texas courts have amended those statutes by eliminating those provisions.

On the contrary, Texas courts clearly recognize that misrepresenting that an insurance contract has rights or benefits which it does not have, can constitute a tort actionable under the

DTPA and the INSURANCE CODE. In *Vail v. Texas Farm Bureau, supra* at 136, the Texas Supreme Court said:

> It is well settled that persons without insurance are allowed to recover based on false representations of coverage.

*Citing Kennedy v. Sale*, 689 S.W.2d 890, 892-93 (Tex. 1985). In *Royal Globe Insurance Co. v. Bar Consultants, Inc.*, 577 S.W.2d 688 (Tex. 1979), the insurance company issuing a property policy was sued for representations by its agent that the policy covered vandalism, when it did not. The insurance company was held liable for those representations of policy benefits under both the DTPA and Article 21.21 of the INSURANCE CODE. (*Id.* at 694.)[5] The measure of damages was found by the Court in the policy provisions for covered claims, directly contradicting COMPANION LIFE's *DeLanney* argument. *(Id.)*

Another decision by the Supreme Court of Texas also held the insurance company liable for its agent's misrepresentations of the amount of psychiatric benefits provided under a health care policy. *See Celtic Life Insurance Company v. Coats*, 885 S.W.2d 96 (Tex. 1994). Despite the existence of a contract between the parties, the misrepresentations of the amount of psychiatric benefits were held actionable, with the measure of damages based on the policy benefits which would have been available had the policy been as represented. *(Id.* at 98.) Under Texas law, when an insurer or its agent, or any other party offering a contract, misrepresents the terms and benefits of that contract, Texas courts will hold that party responsible for any damages produced.[6]

---

[5]Contrary to COMPANION LIFE's glib comment about spawning salmon, liability did "swim upstream" from the agent's misrepresentation to the insurance company's liability.

[6]COMPANION LIFE also cites the case of *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12 (Tex. 1996), claiming that the court extended the *DeLanney* argument to DTPA claims. All the court held in *Crawford v. Ace Sign* is that when the only alleged misrepresentation is that a party would perform his contract, when he did not, is not a misrepresentation that the contract itself has

Page -15-

### CONDITIONS PRECEDENT HAVE BEEN SATISFIED AND/OR WAIVED

COMPANION LIFE next argues that it is relieved from having to perform under its stop-loss contract, because checks were not "paid" before the end of the contract period, and because the SCHOOL DISTRICT "ordered that checks not be sent to providers." (The Motion at p.16.) COMPANION LIFE offers no summary judgment evidence to support either of these assertions. Both of the depositions attached to COMPANION LIFE's Motion confirm that SCHOOL DISTRICT did not request that checks be delayed past the end of the policy period. *(See* the depositions of Lorenzo Sanchez, at p. 65, L. 23 to p.66, L.5; p.68, L.4-8; and Janey Gonzales at p. 49, L.23 to p.50, L.25; p.51, L.13 to p.52, L.6.)

Even if COMPANION LIFE could show, by proper summary judgment evidence, that no fact question existed but that the "mailing" of the check began after the end of the policy period, summary judgment should still be denied. It is well established under Texas law that a party to a contract may not rely on a condition precedent to its performance, when it has shown by its own actions that it does not intend to rely or require such a condition. This concept has been discussed under Texas law under the labels of waiver, estoppel, custom and usage in the industry, the course of dealing of the parties, and waiver by custom. All of these overlapping doctrines hold that when a party to a contract indicates that it will not require compliance with a condition precedent, or acts inconsistently with requiring such compliance, that the condition will not be enforced so as to deny the other party the benefits of the contract.

---

rights or benefits which it does not have. Under that limited circumstance, not applicable to SAN BENITO's claims, the court found there to be no cause of action other than for breach of contract. SAN BENITO brings both contract claims, seeking contract remedies, and claims that the contract was misrepresented. Those two types of claims are not mutually exclusive, as the Texas Supreme Court has recognized.

The summary judgment evidence clearly shows that COMPANION LIFE had never required compliance with such a condition prior to this policy period, and that its agents had unequivocally represented that it would not require such compliance. (*See* depositions of Don Merrill, p.63, L.23 to p.64, L.8; p.65, L.1 to p.66, L.7; p.187, L.20 to p.188, L.11; Phyllis Merrill, p.7, L.16 to p.8, L.13; p.47, L.17-21 and p.52, L.11-16; Glade Nixon, p.47, L.17-21; and Doug Routh, p.35, L.4 to p.36, L.16 and p.38, L.24 to p.39, L.15.) The summary judgment evidence shows that it was only after this policy period was issued that COMPANION LIFE's agent, J. ALLAN HALL, undertook for the first time to revise its policies, procedures, and forms, so as to begin insisting on compliance with this condition. (*See* deposition of Larry Blagg, p.25, L.2 to p.27, L.3; p.30, L.4-12.)

Texas case law has long recognized that an insurance company in particular can waive compliance with a condition precedent. *See, for example, Jackson v. National Flood Insurers Association*, 398 F.Supp.1383, 1388 (S.D.Tex. 1974); *Walters v. Century Lloyds Insurance Company*, 273 S.W.2d 66, 69 (Tex. 1954); *Stonewall Insurance Company v. Modern Exploration, Inc.*, 757 S.W.2d 432, 435 (Tex.App.-Dallas 1988, n.w.h.); and *Great American Life Insurance Company v. Rodriguez*, 641 S.W.2d 264, 269 (Tex.App.-Houston [14th District] 1982, n.w.h).

Perhaps the most analogous fact pattern is found in the case of *Bekins Moving & Storage Company v. Williams*, 947 S.W.2d 568 (Tex. 1997). Among other issues, that case involved a claim for property insurance applicable to property being moved by Bekins. Bekins asserted a condition precedent, that the bill of lading must first have been paid prior to there being any obligations under the insurance. The Supreme Court of Texas found that condition precedent to have been waived, under the facts of that case. (*Id.* at 576.)

A similar concept also recognized in Texas law is generally referred to as "waiver by custom." When it is shown that the insurance company's long-standing practice is inconsistent with

the enforcement of a condition precedent, the insurance company will be found to have waived compliance with that condition. *See Blanton v. John Hancock Mutual Life Insurance Company,* 345 F.Supp. 168, 170-71 (N.D.Tex. 1971), *affirmed pro curium,* 463 F.2d 421; *Southland Life Insurance Co. v. Lawson,* 153 S.W.2d 953, 956-57 (Tex. 1941); *Dairyland County Mutual Insurance Company of Texas v. Mason,* 460 S.W.2d 481, 484-85 (Tex.Civ.App.-Beaumont 1970, n.r.e.); *Crown Life Insurance Company v. Reliable Machine & Supply Co.,* 427 S.W.2d 145, 149 (Tex.Civ.App.-Austin 1968, n.r.e.); *and American Standard Life Insurance Co. v. Denwitty,* 256 S.W.2d 864, 869 (Tex.Civ.App.-Dallas 1953, writ dism'd.). Under the facts of this case, COMPANION LIFE has clearly waived, by its custom and practice, compliance with any requirement that the "mailing" of checks begin before the end of the policy period.

### MISREPRESENTATIONS THROUGH AGENTS IS ACTIONABLE UNDER TEXAS LAW

Incredibly, COMPANION LIFE takes the position that because no individual from either J. ALLAN HALL or COMPANION LIFE ever communicated orally or in writing with anyone employed by the SCHOOL DISTRICT in San Benito, Plaintiff's cause of action for negligent misrepresentation must be dismissed. Citing no authority, COMPANION LIFE makes the bald statement that "an alleged communication to one's agent, if not communicated with the principal and relied upon prior to the execution of the contract, is not actionable." (*See* page 18 of the Motion.) Plaintiff would show the Court that such is not the case.

"The elements of negligent misrepresentation are (1) a representation made by the Defendant in the course of the Defendant's business or in a transaction in which the Defendant has a proprietary interest; (2) the Defendant supplied false information for the guidance of others in their business; (3) the Defendant did not exercise reasonable care or competence in obtaining or communicating the opinion; and (4) the Plaintiff suffered pecuniary loss by justifiably relying on the representation." *TIG*

Page -18-

*Insurance Co. vs. Sedgwick James of Washington,* 276 Fed. 3d 754, 763 (5ᵗʰ Cir., 2002).

Lorenzo Sanchez has been the assistant superintendent for finance and human resources for the SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT since 1996. (*See* Sanchez deposition, p.7, L.12-16.) He testified that the school district relied on the fact that MBA was the SCHOOL DISTRICT's third-party administrator and would provide expertise to run the self-funded plan. (*See* Sanchez, p.11, L.14-21.) The SCHOOL DISTRICT authorized MBA to issue checks to providers on the SCHOOL DISTRICT's bank accounts. (*See* Sanchez deposition, p.52, L. 7-20.) The SCHOOL DISTRICT did not have any written procedures for how claims are processed. The procedures were dictated by its third-party administrator. (*See* Sanchez deposition, p.93, L.11-19.) On October 10, 2000, the SCHOOL DISTRICT entered into an administrative service agreement with MBA whereby MBA agreed to provide certain services to the SCHOOL DISTRICT which included the review, coordination, and processing of all claims and the preparation of all checks for disbursement. (*See* Sanchez deposition, p.55, L.21 to p.56, L.7 and Exhibit 15 to the deposition.) It should be clear that the only way that the SCHOOL DISTRICT can operate is through its agents, servants, and employees. And it is clear from the summary judgment evidence that with regard to operating the SCHOOL DISTRICT's partially self-funded insurance plan, MBA was the agent of the SCHOOL DISTRICT. And what were the representations made to MBA by COMPANION through its agent, J. ALLEN HALL & ASSOCIATES, INC.?

Don Merrill has been the executive vice-president of MBA OF WYOMING since 1987. (*See* deposition of Don Merrill, p.9, L.11-17.) Mr. Merrill testified that J. ALLAN HALL came to MBA's office in 1999 and assured MBA that advance funding would be part of their contracts, and as long as they were paying claims, they would honor that advanced funded program. (*See* Don Merrill deposition, p.63, L.23 to p.64, L.8; p.187, L 20 to p.188, L.11.) Mr. Merrill further testified that J.

Page -19-

ALLAN HALL's comments included COMPANION LIFE's policy for the SCHOOL DISTRICT. (*See* Don Merrill deposition, p. 65, L.1 to p.66, L.7.) After Mr. Merrill's meeting with J. ALLAN HALL, Mr. Merrill prepared a memorandum pertaining to the advance funding. (*See* Don Merrill deposition, p.64, L. 9 to p.65, L.13 and Exhibit 29.) Phyllis Merrill, the chief operations officer of MBA, was present at the 1999 meeting with J. ALLAN HALL and recalls the same discussions as did her husband, Don Merrill, about advance funding. (*See* Phyllis Merrill deposition, p.6, L. 4 to p.7, L.25; p.7, L.16 to p.8, L.13.) Don Merrill would not do business with any carrier who did not provide advance funding. (*See* Exhibit 37 to Don Merrill deposition, at p.4, Paragraph 9.) Don Merrill always listened to what he was told by a claims processing entity such as J. ALLAN HALL. And if they said there was advance funding by the format or administrative service agreement or administrative procedures that they were following, then MBA went on their word. And if they said that was what they were doing and MBA had seen them doing it for multiple years, MBA believed that their work was valid and MBA would follow that. (*See* Don Merrill deposition, p.67, L. 14 to p.68, L.1.) The failure to pay these particular claims (made the basis of this lawsuit) would be directly contrary to what Mr. Hall told Mr. Merrill with respect to the funding of these types of claims under the stop loss insurance. (*See* Don Merrill deposition, p.70, L.22 to p.71, L.8.)

J. Allan Hall has been president and chief executive officer of J. ALLAN HALL & ASSOCIATES since 1993. (See Hall deposition, p.15, L.17-25.) Since 1993, the business of J. ALLAN HALL & ASSOCIATES has been being a managing general underwriter for stop loss insurance. (*See* Hall deposition, p.16, L.10-16.) The great majority of efforts of J. Allan Hall has been devoted to COMPANION LIFE for the past five years. (*See* Hall deposition, p.17, L.21 to p.18, L.9.) In addition to underwriting functions, J. ALLAN HALL & ASSOCIATES, INC. administers those accounts that are underwritten and sold which means collection of premiums, adjudication and payment of

Page -20-

catastrophic claims, payment of commissions, and the rendering of reports. (*See* Hall deposition, p.21, L.13 to p.22, L.5.) There has been a general manager's agreement between J. ALLAN HALL & ASSOCIATES and COMPANION LIFE INSURANCE COMPANY since October 17, 1998. (*See* Hall deposition, p.39, L. 25 to p.40, L.24 and Exhibit 48.)

When Mr. Hall met with the Merrills in 1999, he cannot recall anything he discussed with the Merrills with precision. He does not recall one way or the other whether advance funding was discussed. (*See* Hall deposition, p.65, L.52 to p.67, L.10.)

MBA OF WYOMING, INC. was clearly the designated agent of the SCHOOL DISTRICT for purposes of administering their partially self-funded health insurance program and for processing claims. MBA even had the right and obligation to prepare the checks that would be sent to the healthcare providers after the claims were processed. J. ALLAN HALL & ASSOCIATES, the undisputed agent for COMPANION LIFE, made representations to MBA that J. ALLAN HALL operated on the basis of advance funding for the purpose of reimbursing the school district's claims. This representation has subsequently proven to be false, and MBA detrimentally relied on this representation. As a result, the SCHOOL DISTRICT has suffered damages in excess of $900,000. When a fraud is worked upon an agent, the fraud is considered as worked upon his principle who is damaged thereby. See *Leeper vs. Beltrami*, 53 Cal. 2d 195, 347 P. 2d 12, 1 Cal. Rptr. 12; *Liberty National Bank & Trust Company vs. Gruenberger*, 477 S.W.2d 503, 505 (Ky. App. - 1972).

## V.

### SUMMARY JUDGMENT STANDARD

Summary Judgment is only warranted when the evidence reveals that no genuine dispute

Page -21-

exists regarding any material fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When considering the evidence, all doubts are to be resolved in favor of the non-moving party, and any reasonable inferences are to be drawn in favor of that party. *Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001). One need not look any further than COMPANION LIFE's own motion to find disputed facts which are materials to its arguments. COMPANION LIFE cannot even agree with itself as to whether or not the SCHOOL DISTRICT is an insurance company or not. COMPANION LIFE cannot agree with itself whether the SCHOOL DISTRICT is self-insuring its employees' health care benefits, or is charging its employees "premiums" to pay for such benefits. Several of its references to the depositions are contrary to what the witness actually said.

The summary judgment evidence attached to the Motion contradicts the facts claimed in the Motion. In its Motion, COMPANION LIFE asserts the SCHOOL DISTRICT, in the person of Mr. Lorenzo Sanchez, testified that the dealings between MBA and J. ALLAN HALL "never had advanced funding," and that "MBA did not issue checks timely." (*See* COMPANION LIFE's Motion, p.12.) The attached deposition testimony of Mr. Sanchez reveals that he had no knowledge at all as to the dealings between MBA and J. ALLAN HALL, and his actual answer was "I wouldn't know that" (p. 67, L.8), and that "I wouldn't have any idea of whether they did or not, whether they - they would issue made out or any of that" (p. 67, L.12-14). In contrast, the person who actually processed these claims for MBA, with J. ALLAN HALL, testified to the exact opposite. That person, Mr. Glade Nixon, testified that J. ALLAN HALL had always processed claims on the basis of advanced funding. (*See* Nixon deposition, p.47, L.17-21). The summary judgment evidence not only raises fact questions, but contradicts COMPANION LIFE's assertions concerning the facts. COMPANION LIFE's factual assertions are as reliable as its descriptions of Texas law.

Page -22-

## VI.

### CONCLUSION

The evidence in this case shows that the long-standing practice in the industry, which was expressly represented by COMPANION LIFE's agent to the SCHOOL DISTRICT's claim processor, MBA, involved a practice called advanced funding. However, when faced with the large claim involved in this case, J. ALLAN HALL and COMPANION LIFE abandoned that practice, and searched for a way out of having to pay it. Texas law tolerates neither breaches of agreements, nor misrepresentations of agreements. Unless and until COMPANION LIFE has shown that it is contractually obligated to pay these claims, summary judgment for misrepresenting the policy cannot be shown. On the other hand, unless and until it can be shown as a matter of law that COMPANION LIFE is not contractually obligated to pay these claims under its policy, then summary judgment must be denied on the

misrepresentation claims. Neither the facts nor the law support the requested relief.

Respectfully submitted,

LAW OFFICES OF RENE RAMIREZ
Celeste Guerra
1906 Tesoro
Pharr, Texas 78577
Telephone: 956/783-7880
FAX # 956/783-7884
AND
SHADDOX, COMPERE, WALRAVEN & GOOD, P.C.
   & GOOD, P.C.
1250 N. E. Loop 410, Suite 725
San Antonio, Texas 78209
Telephone: 210/822-2018
FAX: 210/822-4068

By:_____
     Stephen E. Walraven
     State Bar No. 20796800
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served on counsel listed below on this _____ day of March, 2004.

**ATTORNEYS FOR DEFENDANT**
**COMPANION LIFE INSURANCE COMPANY**
Mr. Shelby J. Bush
PIPER RUDNICK
1717 Main Street, Suite 4600
Dallas, Texas 75201-4605

**ATTORNEYS FOR DEFENDANT**
**J. ALLAN HALL & ASSOCIATES, INC.**
Ms. Roberta J. Hegland
BRACEWELL & PATTERSON, L.L.P.
2000 One Shoreline Plaza, South Tower
800 North Shoreline Boulevard
Corpus Christi, Texas 78401-3700

**ATTORNEYS FOR DEFENDANTS**
**MBA OF WYOMING, INC., AND MANAGED BENEFITS**
**ADMINISTRATOR AND INSURANCE CONSULTANTS, INC.**
Ms. Cindy A. Garcia
THE GARCIA LAW FIRM, P.C.
201 North 1st Street
Harlingen, Texas 78550

STEPHEN E. WALRAVEN

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SAN BENITO CONSOLIDATED              )
INDEPENDENT SCHOOL DISTRICT,         {

        Plaintiff,                   {

VS.                                  {

COMPANION LIFE INSURANCE             {        NO. B-003-047
COMPANY, MANAGED BENEFITS            )
ADMINISTRATOR AND INSURANCE          {
CONSULTANTS, INC., MICHAEL M.        )
SWETNAM, JR., J. ALLAN HALL          {
& ASSOCIATES, INC., AND              )
MBA OF WYOMING, INC.,                {

        Defendants.                  {

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

LORENZO SANCHEZ

JUNE 26, 2003

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF LORENZO SANCHEZ, produced as a witness

at the instance of the Defendant, Companion Life Insurance

Company, and duly sworn, was taken in the above-styled and

numbered cause on the 26th day of June, 2003, from 10:21 a.m.

to 1:15 p.m., before DINA RAMIREZ, CSR in and for the State of

Texas, reported by oral stenography at the Law Office of Rene

Ramirez, 1906 Tesoro Boulevard, Pharr, Hidalgo County, Texas,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

**EXHIBIT** "A"

ACTION REPORTING
4309 N. 10TH, STE. F
McALLEN, TX   78504
956/631-1024

A P P E A R A N C E S

FOR THE PLAINTIFF, SAN BENITO CONSOLIDATED
      INDEPENDENT SCHOOL DISTRICT:

            HONORABLE STEPHEN R. WALRAVEN
            Shaddock, Compere, Walraven & Good, P.C.
            1250 N.E. Loop 410, Suite 725
            San Antonio, Texas   78209
            &
            HONORABLE CELESTE GUERRA
            Law Office of Rene Ramirez
            1906 Tesoro Blvd.
            Pharr, Texas   78577


FOR THE DEFENDANT, COMPANION LIFE INSURANCE COMPANY:

            HONORABLE SHELBY J. BUSH
            Piper Rudnick LLP
            1717 Main Street, Suite 4600
            Dallas, Texas   75201-4605


FOR THE DEFENDANTS, MANAGED BENEFITS ADMINISTRATOR AND
      INSURANCE CONSULTANTS, INC., AND MBA OF WYOMING, INC.:

            HONORABLE FRED L. SHUCHART
            Mason, Coplen, Shuchart, Hutchins
                  & Banks, P.C.
            7500 San Felipe, Suite 700
            Houston, Texas   77063


FOR THE DEFENDANT, J. ALLAN HALL & ASSOCIATES, INC.:

            HONORABLE ROBERTA J. HEGLAND
            Bracewell & Patterson, L.L.P.
            2000 One Shoreline Plaza, South Tower
            800 North Shoreline Boulevard
            Corpus Christi, Texas   78403-3700

1   you don't understand, feel free to ask me to rephrase it

2   because sometimes I've been known to ask some questions that

3   are incomprehensible and complicated.  It's just the way my

4   mind works sometimes.

5            If you would, allow me to finish my question

6   before you provide your answer.  It will make the transcript

7   clearer, and so we're not talking over each other.  Is that

8   okay?

9       A    Sure.

10      Q    Could you -- how old are you, Mr. Sanchez?

11      A    I'm 60.

12      Q    And what is your current occupation?

13      A    I am the Assistant Superintendent for Finance, Human

14  Resources for the school district, San Benito.

15      Q    How long have you held that position?

16      A    Since -- I guess '96.

17      Q    What did you do prior to that time?

18      A    Prior to that, I was the Director of the School of

19  Business at New Mexico Highlands University.

20      Q    Where is that located?

21      A    Las Vegas, New Mexico, the original Las Vegas.

22      Q    I've been there.  I've been there.  And how long had

23  you held that position?

24      A    I was there five years.

25      Q    So, from 1991 to '96?

1    Q    And did any of that human resource responsibility

2    entail group health benefit plans?

3    A    No, sir.

4    Q    Okay.  Was your first experience to group health

5    benefit plans when you arrived at San Benito Consolidated

6    Independent School District?

7    A    No, sir.

8    Q    From an administrative standpoint?

9    A    Yes, sir.

10   Q    Okay.  You had experience personally before that?

11   A    Yes, sir.

12   Q    Okay.  Are you on board with this lawsuit?

13              MR. WALRAVEN:  Objection.  Form.

14   Q    (Mr. Bush)  Do you support the -- the district's

15   lawsuit against Companion Life Insurance Company?

16   A    Yes, sir.

17   Q    And could you explain why?

18   A    From my understanding of the arrangement with MBA,

19   we relied on the good faith that they were our third-party

20   administrators and that they would provide us with the

21   expertise required to -- to run our self-funded plan.

22   Q    And your -- explain to me what you believe a

23   self-funded plan is.

24   A    In its simple form, it's -- and the way we have

25   established it at San Benito C.I.S.D., we have a district

52

1  demand just transfer funds as needed to cover any checks that

2  would be issued.

3      Q    So, is it the regular course of business for the

4  district to issue checks for amounts over and above an amount

5  that's in the account?

6      A    Repeat that question.

7      Q    Is it standard course of business for the district

8  to issue checks and forward them to providers for an aggregate

9  amount that exceeds the amount that's in the account?

10          MR. WALRAVEN:  Object to the form of the

11  question.  The school district doesn't issue the checks.

12     A    That is correct:  the district does not.  MBA does.

13  The third-party administrator does.

14     Q    (Mr. Bush)  Are the checks issued on the school

15  district's account?

16     A    Yes.

17     Q    Okay.  Does the school district authorize MBA to

18  issue those checks?

19     A    When we set up the accounts, yeah, they're

20  authorized from the beginning, yes, sir.

21     Q    Okay.  Is it the standard course of business for the

22  school district to allow MBA to issue checks for amounts over

23  and above the balance of the account?

24     A    On occasions they have, yes, sir.

25     Q    On occasions they have?

55

```
 1              (Exhibit 14 marked.)
 2      Q    (Mr. Bush)  Okay.  Just two more and I'll pass the
 3 witness.  Could you identify Exhibit 14, please?
 4      A    (Witness reviews document.)  Correspondence from
 5 Randy Scott, Director of Claims, copy to Don Merrill,
 6 Roy Hutchison, Al Hall, Larry Blagg, addressed to me,
 7 letterhead of J. Allan Hall and Associates.
 8      Q    What's the date?
 9      A    November 7, 2001.
10      Q    Do you recall receiving that letter?
11      A    I don't really recall.
12      Q    Do you have any reason to believe that it's not a
13 true and correct copy of the letter that appears to have been
14 sent to you?
15      A    No, sir.
16      Q    And does that letter in fact discuss the paid claim
17 issue that you and I just discussed?
18      A    That's correct.
19      Q    Okay.  Thank you.
20              (Exhibit 15 marked.)
21      Q    (Mr. Bush)  And can you identify Exhibit 15, please?
22      A    It's an administrative service agreement.  Has MBA
23 at the bottom.  The pages seem to be initialled by me, signed
24 by me and Don Merrill.
25      Q    So, that is your signature at --
```

56

1     A     Yes, sir.

2     Q     -- the page that has SB-00003?

3     A     That's correct.

4     Q     Does that appear to be a true and correct copy of

5  your what I'll refer to as the third-party administrator

6  agreement with MBA?

7     A     Yes, sir.

8     Q     The agreement in many instances refers to ERISA.

9  Are you aware of ERISA?

10    A     I'm fairly familiar with it.

11    Q     And do you know whether or not ERISA has any

12  application to your agreement with MBA and/or your employee

13  benefit plan?

14    A     No, sir, I -- I don't recall that.

15             MR. BUSH:   Okay.   I will pass the witness.

16             MS. GUERRA:   Should we order lunch before you

17  start?

18             MR. SHUCHART:   Yeah, I don't have a problem

19  with that.

20             (Off the record from 12:00 noon to 12:16 p.m.)

21  BY MR. SHUCHART:

22    Q     Good afternoon, Mr. Sanchez.   My name is Fred

23  Shuchart and I'm here on behalf of MBA of Wyoming and Managed

24  Benefits Administrator and Insurance Consultants, Inc.   Do you

25  understand that we're on opposite sides of this lawsuit?

65

1      Q    Okay.  So, one way or the other, they didn't --

2  nobody from MBA told you, you personally, anything about

3  whether there was advance funding or there was not advance

4  funding?

5      A    That's correct.

6      Q    Okay.  Who is the person that was the most -- that

7  had the most responsibility on a day-to-day basis dealing with

8  stop loss coverage at the school district?

9      A    Probably Janie Gonzalez.  She's my insurance

10  coordinator.

11      Q    All right.  Now, your TPA and MBA of Wyoming, they

12  didn't fund the claims, correct?  They didn't write checks off

13  of their accounts with their own money?

14      A    No, no, no.  They -- they were -- they had a

15  signature required in which we authorized them to go ahead and

16  write checks and draw down on our -- on our account.

17      Q    And I think you testified earlier to the extent that

18  checks weren't actually cashed through your bank for claims,

19  that that did benefit the school district because you had the

20  funds in an invested account as opposed to a checking,

21  correct?

22      A    Right.

23      Q    Did you ever have -- you personally again.  Did you

24  ever have any conversations with anybody at MBA about issuing

25  checks but not mailing them out?

1      A      No, sir.

2      Q      Okay.  Did you ever have any conversations with

3  anybody within the school district about having checks issued

4  but not mailed out?

5      A      Not to my knowledge, sir.

6      Q      To your knowledge, have you ever been involved in a

7  -- in a plan program that there was advance funding?

8      A      No, sir.

9      Q      You never have?

10     A      Never have.

11     Q      Okay.  So, to the best of your recollection, there

12  was not advance funding in '96, '97, '98?

13     A      That's correct.

14     Q      Is there anything that you're aware of that you can

15  recall today that would've given you an expectation that there

16  was advance funding for the 2000-2001?

17     A      No, sir.

18     Q      You -- you testified earlier that -- that MBA of

19  Wyoming didn't issue the checks on a timely basis.  Do you

20  recall saying that?

21     A      I don't know that I said that, no, sir.

22     Q      Okay.  Is it -- is it your position that MBA did not

23  issue checks timely with respect to the claims that are made

24  the basis of this lawsuit?

25     A      Yes.

1  We're gonna run them.  We need money in the bank," we

2  transfer, wire the transfer, put it into the cash account and

3  let them write the checks.

4       Q     All right.  Is it your position that the school

5  district didn't request that checks be held so that, in

6  essence, the school district could play the float on some

7  substantial --

8       A     We never told anyone to hold checks.

9       Q     To your knowledge, was the school district aware

10  that checks were behind held?

11      A     To my knowledge, no.

12      Q     Okay.  You didn't -- you didn't know personally?

13      A     Right.

14      Q     Your lawyer has made certain allegations in this

15  lawsuit.  One of the claims your lawyer is making or the

16  school district is making through the lawyer against my

17  clients is that they misrepresented the terms of the policy

18  issued by Companion Life.  As you sit here today, were any of

19  the terms of the policy, the 2000-2001 policy misrepresented

20  to you?

21      A     By whom?

22      Q     By -- by my clients, MBA of Wyoming, Inc., yeah.

23      A     Repeat the question, please.

24      Q     All right.  And you're more than welcome.  Please

25  look at it.

93

1  policy?

2      A    No, sir.

3      Q    Are you -- are you aware of any conversations that

4  took place between either Companion Life, Hall, Swetnam and my

5  clients regarding advance funding?

6      A    No, sir.

7      Q    Okay.  Thank you very much for your time.

8      A    Thank you.

9                                      (Time:  1:12 p.m.)

10  BY MS. HEGLAND:

11      Q    Mr. Sanchez, does the school district have any

12  written procedures for how claims are processed?

13      A    No, it's mainly -- mainly -- mainly dictated by the

14  TPA, you know, the process that we establish and how we want

15  -- how we want.  A lot of it, I guess, since -- since we -- we

16  authorize them to write checks on our account, they also do

17  the reconciliation for those checks.  So, as long as those

18  things are paid on a timely basis and I don't get any calls, I

19  guess that's okay.

20              MR. SHUCHART:  Objection.  Non-responsive after

21  the word, "No."

22      Q    (Ms. Hegland)  Are you familiar, Mr. Sanchez, with

23  the claims handling process in place at the school district

24  for the 2000-2001 school year?

25      A    We don't -- we don't handle the claims.  The

## ADMINISTRATIVE SERVICE AGREEMENT

THIS ADMINISTRATIVE SERVICE AGREEMENT, made and executed by and between San Benito Consolidated Independent School District a Texas Public Entity, hereinafter referred to as the "Plan Sponsor," and MBA of Wyoming, Inc., hereinafter referred to as the "Contract Administrator" for the provision of certain administrative and advisory services with respect to the Employee Medical Benefit Plan (the "Plan").

### RECITALS

The Contract Administrator is engaged in the business of performing services as Employee Benefit Advisors and Administrators. The Plan Sponsor hereby engages the services of the Contract Administrator to provide administration services for San Benito Consolidated Independent School District. For and in consideration of the mutual covenants and the monetary consideration herein recited, it is mutually agreed as follows:

1. *Services to be Performed.* The Contract Administrator shall perform for the Plan Sponsor administrative and advisory services in conjunction with the administration and operation of the Plan. The administrative services to be performed by the Contract Administrator and Advisor are set forth in Exhibit "B", attached hereto and by reference made a part hereof for all purposes. The advisory services to be performed by the Contract Administrator are set forth in Exhibit "C", attached hereto and by reference made a part hereof for all purposes.

(a) The services to be performed by the Contract Administrator shall be administerial in nature and shall be performed within the framework of policies, interpretations, rules, practices and procedures made or established by the Plan Sponsor. The Contract Administrator shall not have discretionary authority or discretionary controls respecting management or disposition of the assets of any trust fund and shall not have authority nor exercise any control respecting management or disposition of the assets of any trust fund and shall not render investment advice with respect to any money or other property of any trust fund.

(b) The Contract Administrator will process and pay benefits in accordance with the plan or policy adopted by the Plan Sponsor. It is agreed that the Contract Administrator will incorporate sound business practices and be responsible for reasonable internal audits. Where an error exists, the Contract Administrator shall use reasonable efforts for recovery of any loss resulting therefrom, but will not be required to initiate legal process for any such recovery.

2. *Limitation of Liabilities and Obligations.* The Contract Administrator shall have no responsibility, risk, liability or obligation for the funding of the Plan or for failure of the Plan or the Plan Sponsor to obtain or continue insurance coverage or payment of insured benefits. The responsibility and obligation for funding the Plan shall be solely and totally the responsibility of the persons or entities so provided in the Plan. Benefits under the Plan, whether or not fully or partially funded or insured, shall be provided solely by the Plan Sponsor or those persons named in the Plan. MBA shall not be liable for any damages resulting from its good faith application of Plan provisions, including those concerning eligibility, coverage, medical necessity, or benefits; or the failure of Plan participants or beneficiaries to obtain any particular health care as a result of MBA's services. MBA shall not be liable for any recommendations concerning insurance carriers or for the quality or nature of health care provided through health maintenance or preferred provider organizations, whether or not recommended, sponsored, or arranged for by MBA. Contract Administrator shall not be deemed an insurer, underwriter or guarantor with respect to any benefits under the Plan.

3. *No Fiduciary Authority.* MBA shall not be deemed a Plan "fiduciary" under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). MBA's services shall not include any power to make any decisions as to Plan policy, interpretations, practices or procedures, but shall be limited to the performance of ministerial functions such as those types described by the Department of Labor in its Regulation § 2509.75-8, D-2 within a framework of policies, interpretations, rules, practices and procedures made or established by the Plan Sponsor. MBA shall have no final discretionary authority or control over Plan management, including authority or control over the management or disposition of any Plan assets, nor final discretionary authority over Plan administration. MBA's services with respect to the Plan shall be subject to review, modification, or reversal by the Plan Sponsor and/or Plan Administrator. Plan Sponsor shall have final authority in determining eligibility of claims. Plan Sponsor acknowledges that excess risk insurance purchased by Plan Sponsor will not provide coverage with respect to claims not eligible under the express terms and conditions of the Plan.

4. *Independent Contractor.* It is understood and agreed that MBA is engaged to perform services under this agreement as an independent contractor. The Contract Administrator shall use its best efforts to implement such written instruction, if any, as to policy and procedures which may be given by the Plan Sponsor, provided that such instructions are consistent and compatible with the description of services to be performed by the Contract Administrator and Advisor and are not in violation of or contrary to any laws or regulations, including but not limited to the Employee Retirement Income Security Act of 1974, as amended.

5. *Plan Sponsor.* Unless specified in writing otherwise, The Plan Sponsor shall be the Plan Administrator as such term is defined in section 3 (16) of ERISA. Unless the context requires otherwise, the term "Plan Sponsor" or "Plan Administrator" as used in this agreement shall include any corporation, partnership, committee, trustees of a trust, or other

MBA-ASA/1993
Page 1 of 8

DEPOSITION
EXHIBIT
Sanchez #15
ACTION REPORTING

MBA

DATE 4/10-10-07 BY

SB - 00001

entity or individual sponsoring or administering the Plan at the time of execution of this agreement and shall also include such additional or successor individuals or entities serving from time to time during the term of this Agreement; provided, however, that when this Agreement calls for direction or notice to be given to MBA by the Plan Sponsor or Plan Administrator, MBA shall be absolutely protected in relying upon any direction or notice received from the person executing this Agreement as Plan Sponsor or Plan Administrator.

6. **Term.** The term of this Administrative Service Agreement is for the period of One year beginning October 1, 2000. At the end of the Contract, If neither party requests a change, the Contract shall be automatically renewed. The fees stated in the Fee Schedule Exhibit are subject to negotiation on the first anniversary date of the contract, or on any monthly due date after the initial one year period, providing the Contract Administrator has given timely notice of the intent to adjust the fees. The new fees would then be in force for one year from the effective date.

(a) Either party shall have the right to terminate or re-negotiate the contract after the initial one year period by providing to the other party written notice at least thirty (30) days in advance of such termination or re-negotiation of the terms of the contract. In the event that either party gives timely notice of intent to re-negotiate the terms of the contract, the contract shall continue until re-negotiated terms are approved in writing by both parties. After the initial one year period, this contract may be terminated upon thirty (30) days written notice of termination by either party to the other. In the event the Plan account contains a balance which is insufficient to meet the Plan and Plan Sponsor's obligation, the Contract Administrator may terminate this contract upon thirty (30) days written notice. The Contract Administrator will have no further responsibility or obligation hereunder upon the termination of this contract.

(b) At any time during the initial term or subsequent terms of this agreement that the Plan Sponsor shall fail to meet the financial requirements of the plan, the Contract Administrator may terminate this contract. Notice of intent to Terminate shall be given 30 days in advance of such termination.

(c) In the event of termination of this contract, if claims are to be processed after the termination date, the fees for services shall be either the specified percentage of claims or dollars per claim, based on the average of fees during the last two months of the contract, as follows:

100% of the average fees during the first month after termination, 75% the second month, 50% the third month, and 25% thereafter until no further claims are processed, or services required.

7. **Service Fees.** The Plan Sponsor agrees to pay to the Contract Administrator for the services to be performed hereunder the fees described in the attached Fee Schedule, **Exhibit A**

8. **Assignment.** This Contract shall not be assigned by the Contract Administrator (its duties, obligations or responsibilities hereunder delegated) to any other person or entity without the prior written approval of the Plan Sponsor.

9. **Indemnification.** During the continuance of this Agreement, the Contract administrator agrees to indemnify and hold the Plan Sponsor harmless against any and all loss, damage and expense with respect to any acts or omissions wherein it is finally adjudged or willfully acknowledged that the Contract Administrator is guilty of gross negligence, willful misconduct or lack of good faith, but only for those acts or omissions for which MBA is not entitled to indemnification under the following sentence, provided that MBA not be required to indemnify the Plan Sponsor if the Plan Sponsor's acts or omissions contributed to its loss. The Plan Sponsor shall indemnify MBA against expense, loss, claim, or liability, including attorney's fees, arising out of or based upon (a) MBA's or the Plans alleged or actual status as an insurer or insurance company, or provider of benefits; or (b) MBA's alleged or actual status as a Plan fiduciary; (c) acts or omissions of the Plan Sponsor or Plan Administrator, as Plan fiduciaries or otherwise; (d) any acts or omissions of MBA in providing services under this Administrative Services Agreement if made in accordance with the directions of the Plan Sponsor or Plan Administrator in good faith.

10. **Entire Agreement: Exhibits and Standard Terms and Conditions.** This agreement, the standard terms and conditions and all schedules, exhibits and amendments [sic] hereto, constitutes the entire Agreement among the parties and supersedes all prior proposals, discussions, and writings by and between the parties and related to the subject matter of this agreement. This Agreement may be modified, amended, or supplemented, but only by a written instrument executed by all parties, except that fee adjustments proposed by MBA and not objected to by either the Plan Administrator or Plan Sponsor shall also constitute a binding amendment. The parties acknowledge that the Plan or the Plan Sponsor may have entered into separate agreements with affiliates of MBA for other types of services, but such agreements shall be construed and enforced separately from this agreement.

11. **Separability.** If any provision if this agreement is held to be illegal or unenforceable, the remaining provisions shall nevertheless remain in full force and effect. In addition, the illegal or unenforceable provision shall be modified so as to conform to the greatest extent legally permissible, to the original intent of such provision.

12. **Governing Law; Jurisdiction and Venue.** To the extent not preempted by ERISA or other federal law, this Agreement shall be governed by and construed under the laws of the State of Utah. By entering into this Agreement, the Plan Administrator and Plan Sponsor subject themselves to personal jurisdiction in the courts of the State of Utah and agree that Utah is the Only appropriate venue for any action brought to interpret or enforce any provision of this Agreement, or which may otherwise arise under or relate to the subject matter of this Agreement.

# MBA

DATE 10-10-0    BY

SB - 00002

13. *Arbitration.*

(a)If the parties hereto cannot settle grievances or disputes between themselves in an informal and expeditious fashion, each party agrees, upon the motion of the other, to arbitration by the American Arbitration Association (AAA). The Arbitration proceedings shall take place in the city of the responding party. The parties agree that the decision of the arbitrator shall be final and binding with regard to each of them.

(b)The parties shall share equally the AAA administrative fee as well as the arbitrator's fee, if any, unless otherwise assessed by the arbitrator. The administrative fee shall be advanced by the initiating party subject to final apportionment by the arbitrator in his award. The arbitrator's award may be enforced in any court having jurisdiction thereof by the filing of a petition to enforce said award. Costs of filing may be recovered by the party which initiates such action to have the award enforced.

(c)Each party hereto agrees to notify the other at the time a lawsuit is initiated concerning any dispute with any third person or entity that is relevant to any rights, obligations or other responsibilities or duties provided for under this Agreement.

14. *Other Applicable Agreements.* The following agreements are, by this reference incorporated in this agreement:

| Form Number | Plan Sponsor's Initials | Title of Agreement | Date |
|---|---|---|---|
| Exhibit A | _____ | Fee Schedule | 10/01/2000 |
| Exhibit B | _____ | Admin. Services Provided by MBA | 10/01/2000 |
| Exhibit C | Not Included | Advisory Services | 10/01/2000 |
| Exhibit D | _____ | HIPAA Administration | 10/01/2000 |

The effective date of this contract specified in Paragraph 6. "Term" shall be the effective date unless otherwise specified here by the Contract Administrator:_____

Plan Sponsor  San Benito Consolidated Independent School District

By _____  Title _____  Date  10-10-00

**MBA of Wyoming, Inc./MBA of Wyoming, Inc.**

By _____  Title _____  Date  10-10-00

MBA-ASA/1993
Page 3 of 8

**MBA**

DATE _____  BY _____

SB - 00003

## Standard Terms and Conditions

1.    *Records and Files.* The Contract Administrator shall maintain all records in conjunction with the administrative services to be performed hereunder. The confidentiality of such records shall be maintained by the Contract Administrator and the information therein shall not be divulged or disclosed or made available to persons other than the Plan Sponsor without the prior written approval of the Plan Sponsor or a court of competent jurisdiction. In the event of the termination of this Contract, the Contract Administrator shall deliver to the Plan Sponsor, upon written request, at a time period mutually agreeable, but not to exceed six months from date of termination, the information on all claims histories for the past two years. If the claim history is requested, the Plan Sponsor will pay all costs incurred by the Contract Administrator in providing such information, (including the production of same), cost of programming, computer charges, mailing costs, etc. The Contract Administrator shall be entitled to retain copies of any such records at his own expense.

2.    *Legal and Accounting Services.* MBA's services shall not include the provision of legal services or the services or independent certified public accountants. MBA shall have no liability for the quality or cost of any services so provided, whether or not services provided by professional advisors were recommended, sponsored, or arranged for by MBA.

3.    *Enforcement.* MBA shall have no responsibility or obligation to take action, legal or otherwise, against any employer or employees or other persons to enforce provision of the Plan. In the event that the Plan Sponsor desires to engage in the services of the Contract Administrator for such purposes, such services shall be engaged and rendered only pursuant to a separate written agreement between the parties.

4.    *Investments.* MBA shall not be responsible or obligated for the investment of any assets or funds of the Plan. However, the Contract Administrator agrees to prepare and maintain records of the investment of the assets or fund of the Plan if the Plan Sponsor requests the Contract Administrator to do so and provides the information and documents necessary to prepare and maintain such records. MBA shall not render any investment advice with respect to Plan assets or have any authority or responsibility to do so.

5.    *Costs and Expenses; Taxes.*
(a) As a part of the services to be performed by the Contract Administrator, the Contract Administrator and Advisor shall maintain and operate an administrative office for such purposes and to pay all normal costs and expenses for such maintenance and operation (except as herein set forth).
(b) The Contract Administrator shall employ a sufficient staff of employees or others to provide the administrative and advisory services to be performed by the Contract Administrator hereunder. However, the Contract Administrator will not provide or be responsible for the expenses and cost of legal counsel, actuaries, consulting physicians or dentists, certified public accountants, investment counselors, investment analysts or similar type services performed for the Plan Sponsor; the Contract Administrator shall not be authorized to engage such services or incur any expense or cost thereof.
(c) The Plan or the Plan Sponsor shall be responsible for all other costs and expenses of Plan establishment and administration including legal, accounting and other professional fees. The Plan or the Plan Sponsor shall also be responsible for the payment or reimbursement to MBA of any and all taxes relating to the Plan, including any sales or use taxes or taxes in lieu thereof, and any related penalties, interest or expenses of MBA, imposed upon or incurred, or required to be collected by MBA.

6.    *Tax, ERISA, and COBRA Compliance.* MBA shall not be responsible for establishing or maintaining the Plan or the Plan Sponsor in compliance with federal or state taxing statutes, ERISA, COBRA, or other applicable state or federal laws or regulations, or for obtaining any tax benefits that may be available to the Plan Sponsor, the Plan, or the Plan participants. MBA may provide, whether or not so specified under the Description of Services Exhibit, Plan documents, summary Plan descriptions, and/or administrative forms, but makes no representations or warranties as to their legal sufficiency. The Plan Sponsor or Plan Administrator shall have the final authority and responsibility for approving the form and content of all Plan documents and forms.

7.    *Plan and Fee Changes.* Any changes in the Plan, found to be compatible with existing systems and procedures and approved by the Contract Administrator which requires additional programming, reports or services, will be at the expense of the Plan Sponsor. The Plan Sponsor agrees to make changes in benefits only at the beginning of the Plan Year, allowing thirty (30) days prior notice to the Contract Administrator. Exceptions must be agreed upon by the Contract Administrator.

**MBA**

DATE _10 - 11 - 00_   BY _AA_

SB - 00004

**EXHIBIT A**

**Fee Schedule**

For:  San Benito Consolidated Independent School District
Effective:  October 1, 2000

Administrative Fees to Cover:

| | | | |
|---|---|---|---|
| Life Insurance | [X] | Short Term Disability | [ ] |
| Medical | [X] | Pre-Cert (Critique) | [X] |
| | | Other: | |
| Dental | [X] | HIPAA | [X] |
| Vision Care | [ ] | COBRA | [X] |
| | | Document Changes (off anniversary date) | [ ] |

Fee Method and schedule:

MBA Administration Fees are $ 12.60/ee/month.  HIPAA Administration Fees are $ .35/ee/month. Reinsurance Broker Fees $ 2.00/ee/month.  Ethix Southwest PPO Fees are $ 3.20/ee/month.  Lonestar Interlocal 2 million excess is $ 1.00/ee/month.

| Amended | Date | Schedule |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**MBA**

DATE _/6.;0-0_ BY _____

**SB - 00005**

## ·EXHIBIT B

### Administrative Services  Provided By MBA

Administrative Services For:  San Benito Consolidated Independent School District
Effective:  October 1, 2000

1. Provide an automated Computer System for the processing of health claims.

2. Furnish standard administrative internal forms to include:

   A.    Standard Explanation of Benefits.
   B.    Standard Claim Form.
   C.    Standard Enrollment Forms.

3. Coordinate with the Plan Sponsor the custom design and printing of other supplies specifically for the Plan Sponsor. These will be at the Plan Sponsor's expense.  Including but not limited to the following:

   A.    Bank Drafts or Checks and Deposit Slips.
   B.    Employee Identification Cards.
   C.    Employee Plan Booklets.

4. Provide a standard monthly plan premium billing satisfactory to meet the needs of the Plan Sponsor.

5. Provide the Plan Sponsor with instructions for reporting employee eligibility.

6. Provide Customer Service for the Plan Sponsors employees.

7. Provide assistance in the preparation of Plan Document and Summary Plan Description

8. Review, coordinate and process all claims.  Prepare all checks or drafts for disbursement from the fund with documentation to support these disbursements.  The Plan Sponsor elects to have these disbursements _____

9. Provide standard claims analysis reports.

   Monthly Reports:_____

   A.    Claims Experience Report.
   B.    Monthly Fund Report.
   C.    Monthly Check Register.

   Special Reports to be provided:

| | Name of Report | Frequency |
|---|---|---|
| A. | Fund & Claims Report_____ | Quarterly_____ |
| B. | _____ | _____ |
| C. | _____ | _____ |

10. Provide appropriate renewal documentation and financial analysis.

11. Provide the necessary data to the Plan Sponsor for preparation of ERISA reports and filings

12. Attend meetings with the Plan Sponsor as necessary for proper administration of the Plan.

## MBA

**EXHIBIT C**

**Advisory Services**

For: San Benito Consolidated Independent School District
Effective: October 1, 2000

1.   Advise and assist in the design of client administrative forms.

2.   Provide a review of marginal or questionable claims.

3.   Provide information relative to the Plan alternatives.

4.   Advise as to the contribution levels for the present benefits.

5.   Provide evaluation and underwriting relative to contract provisions and changes.

6.   Counsel with the Plan Sponsor concerning the financial status of the Plan to assure proper accumulation of reserves.

7.   Provide medical cost data and medical cost trends which would aid in plan benefit design.

8.   Coordinate with legal counsel and others in regards to ERISA requirements and information.

9.   Provide competitive bidding of various insured plans.

10.  Act as "Agent of Record" on the following coverage:

_____

_____

_____

_____

**MBA**

DATE _____ BY _____

SB - 00007

## EXHIBIT D

### HIPAA Administration

For: San Benito Consolidated Independent School District
Effective: October 1, 2000

This exhibit constitutes an amendment to the Administrative Service Agreement between MBA of Wyoming, Inc. as of the date subscribed herein subject to the terms and conditions set forth in the Administrative Service Agreement in force at the date of this agreement.

**Certificate of Coverage Administration:**

Includes administrative processing, set up, preparation and mailing of Certificates of Coverage to all individuals who lose coverage under the medical plan or COBRA.

|  |  |
|---|---|
| As a fee per employee per month for HIPAA | $ .35/Ee/Mo |
| As a fee per employee per month for COBRA | $ 21.50/Certificate |

The undersigned elects to have MBA provide HIPAA Administration Services, as limited in the specifications above, and agrees to defend and hold MBA harmless from and against all claims, damages, or losses, including but not limited to all cost of defense and attorney fees, which are a result of clients' inaccuracy, delay or failure to provide all information necessary for MBA to properly administer the above.

_____     _10 - 10 - 02_
Plan Sponsor                                                Date

_____
Authorized Signature

_____
Title

**MBA**

1



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SAN BENITO CONSOLIDATED        )
INDEPENDENT SCHOOL DISTRICT,   )
                               )
          Plaintiff,           )
                               )
VS.                            )
                               )
COMPANION LIFE INSURANCE       )    NO. B-003-047
COMPANY, MANAGED BENEFITS      )
ADMINISTRATOR AND INSURANCE    )
CONSULTANTS, INC., MICHAEL M.  )
SWETNAM, JR., J. ALLAN HALL    )
& ASSOCIATES, INC., AND        )
MBA OF WYOMING, INC.,          )
                               )
          Defendants.          )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

JANIE GONZALEZ

JUNE 26, 2003

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF JANIE GONZALEZ, produced as a witness

at the instance of the Defendant, Companion Life Insurance

Company, and duly sworn, was taken in the above-styled and

numbered cause on the 26th day of June, 2003, from 2:13 p.m.

to 3:55 p.m., before DINA RAMIREZ, CSR in and for the State of

Texas, reported by oral stenography at the Law Office of Rene

Ramirez, 1906 Tesoro Boulevard, Pharr, Hidalgo County, Texas,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

EXHIBIT "B"



ACTION REPORTING
4309 N. 10TH, STE. F
McALLEN, TX   78504
956/631-1024

2

## A P P E A R A N C E S

FOR THE PLAINTIFF, SAN BENITO CONSOLIDATED
     INDEPENDENT SCHOOL DISTRICT:

        HONORABLE STEPHEN R. WALRAVEN
        Shaddock, Compere, Walraven & Good, P.C.
        1250 N.E. Loop 410, Suite 725
        San Antonio, Texas    78209
        &
        HONORABLE CELESTE GUERRA
        Law Office of Rene Ramirez
        1906 Tesoro Blvd.
        Pharr, Texas    78577

FOR THE DEFENDANT, COMPANION LIFE INSURANCE COMPANY:

        HONORABLE SHELBY J. BUSH
        Piper Rudnick LLP
        1717 Main Street, Suite 4600
        Dallas, Texas    75201-4605

FOR THE DEFENDANTS, MANAGED BENEFITS ADMINISTRATOR AND
     INSURANCE CONSULTANTS, INC., AND MBA OF WYOMING, INC.:

        HONORABLE FRED L. SHUCHART
        Mason, Coplen, Shuchart, Hutchins
           & Banks, P.C.
        7500 San Felipe, Suite 700
        Houston, Texas    77063

FOR THE DEFENDANT, J. ALLAN HALL & ASSOCIATES, INC.:

        HONORABLE ROBERTA J. HEGLAND
        Bracewell & Patterson, L.L.P.
        2000 One Shoreline Plaza, South Tower
        800 North Shoreline Boulevard
        Corpus Christi, Texas    78403-3700

49

1      Q      Yeah, that are the issue in the lawsuit.   I mean,

2 did --

3      A      The actual issue claim?

4      Q      Right.

5      A      Say that again.

6      Q      Did Jose ever -- you and Jose have any conversations

7 that said, "You know, it's all MBA's fault we didn't get the

8 money from the insurance company" or -- or -- I'm sorry.   Yes

9 or no.

10     A      No.

11     Q      Okay.   Did he ever say, you know, talk to you along

12 the lines of, "Well, you know, it's the insurance company's

13 fault, but it's also MBA's fault that we didn't get the

14 money"?

15     A      We didn't know whose fault it was.   We just wanted

16 our money back.

17     Q      Okay.   You don't have -- do you have an opinion as

18 to whose fault it is that you didn't get the money you're

19 looking for?

20     A      Do I have any what?

21     Q      Do you have an opinion?

22     A      Oh, an opinion.

23     Q      Yeah, as to whose fault or whose, you know, more

24 than one person's fault it is that you didn't get -- the

25 school district didn't get reimbursed the money you think it

50

1   should have.

2       A    MBA.

3       Q    And what do you base that opinion -- well, what is

4   your opinion?

5       A    My opinion is we paid for our services with MBA to

6   do things the way they should be done, and I don't know

7   whether they did it right or not, but they -- we deserve our

8   money and it's -- that's -- that's part of our administrative

9   fees, for them to do -- we trust them to do what's right for

10  the school district.

11      Q    Okay.  I'm sorry.  Go ahead.  Anything else?

12      A    I'm done.

13      Q    All right.  What in your opinion did they not do

14  right?

15      A    Obviously, as I see today, they've held checks,

16  which that never happened before.  I mean, I'd never seen that

17  ever happen before.  It was not a practice.

18      Q    Are you -- is it your testimony that all these

19  memorandums we went through, Exhibits, basically, 20 through

20  25 with the exception of one other one, that these are the

21  only times -- this is -- this is the only time that MBA held

22  checks?

23      A    That I've seen it in write- -- never, no.  We've

24  been with MBA since 1995 and I've never come across any of

25  that.

51

1    Q    Okay.  That doesn't mean it didn't happen, does it?

2    A    I'm not aware of it.

3              MR. SHUCHART:  Objection.  Non-responsive.

4    Q    (Mr. Shuchart)  Just because you haven't come across

5    it doesn't mean it didn't happen, correct?  In other words,

6    Jose could've been aware of it and you may not have been aware

7    of it?

8    A    I'm the first one to be made -- I'm the first one to

9    receive all of this information.

10   Q    Well, Jose told --

11   A    And I would've given it to Jose or whoever our

12   accountant was at that time.

13   Q    If Jose told Carol to hold checks because he wanted

14   to get more investment money on the funds that were invested

15   and as opposed to a checking account that gets no benefit to

16   the school district, that could've happened and you would not

17   have known about that, correct?

18   A    I'm not sure.

19   Q    You're not sure it couldn't happen or --

20   A    I don't know what could happen.

21   Q    Okay.  So, it could've happened?

22   A    Impossible for it to happen.

23   Q    I'm sorry?

24   A    I don't believe so.

25   Q    So, you think -- what you're telling and you want

52

1   the jury to believe is that MBA out of the blue just started

2   holding checks for no good reason on their own?

3       A    Without no one's authority.  No one ever gave them

4   the authority to do anything.

5       Q    All right.

6       A    That -- that -- that's not the way we do business.

7       Q    So, you would want MBA to bounce checks off the

8   school district's account since there weren't funds in it?

9               MR. WALRAVEN:  Objection.  Assumes all sorts of

10  facts not in obvious.

11      Q    (Mr. Shuchart)  Okay.  You can answer.  You can

12  answer the question.

13              MR. WALRAVEN:  Not in evidence.  It's obvious

14  it's not in evidence.

15      Q    (Mr. Shuchart)  You can still answer the question if

16  you can remember it.

17      A    Our checks won't bounce.

18      Q    You have overdraft protection on the account?

19      A    I don't know there's overdraft protection, but our

20  checks don't bounce.  We have an agreement.

21      Q    Right.  But you have to fund them, then, somehow and

22  transfer funds, did you, right?

23      A    I believe that's what they do.

24      Q    Did you ever tell MBA that your checks won't bounce?

25      A    No, I don't discuss that with them.

# CONDENSED TRANSCRIPT

### IN THE UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | |
|---|---|
| SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT,    ) ) )| Deposition of: |
| Plaintiffs,    ) )| **DON WILLIAM MERRILL** |
| vs.    ) ) )| |
| COMPANION LIFE INSURANCE COMPANY, MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS, INC., J. ALLAN HALL & ASSOCIATES, INC., and MBA OF WYOMING, INC.,    ) ) ) ) ) ) )| |
| Defendants.    ) ) )| Civil Action No.:  B-03-047 |

**July 21, 2003 - 9:06 a.m.**

Location:  Offices of CitiCourt Reporting
50 S. Main, Suite 830
Salt Lake City, Utah

Reporter:  Vicky McDaniel, RMR
Notary Public in and for the State of Utah

# EXHIBIT "C"



**CitiCourt,** LLC
THE REPORTING GROUP

50 South Main, Suite 830
Salt Lake City, Utah 84144

801.532.3441    TOLL FREE 877.532.3441    FAX 801.532.3414

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 1    PAGE 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SAN BENITO CONSOLIDATED            )  Deposition of:
INDEPENDENT SCHOOL DISTRICT,       )
                                   )  DON WILLIAM MERRILL
        Plaintiffs,                )
                                   )
vs.                                )
                                   )
COMPANION LIFE INSURANCE           )
COMPANY, MANAGED BENEFITS          )
ADMINISTRATOR AND INSURANCE        )
CONSULTANTS, INC., J. ALLAN        )
HALL & ASSOCIATES, INC., and       )
MBA OF WYOMING, INC.,              )
                                   )  Civil Action No.:  B-03-047
        Defendants.                )

July 21, 2003 - 9:06 a.m.
Location:  Offices of CitiCourt Reporting
           50 S. Main, Suite 830
           Salt Lake City, Utah
Reporter:  Vicky McDaniel, RMR
Notary Public in and for the State of Utah

---

PAGE 2

                 Don William Merrill, 7/21/03        2
1                A P P E A R A N C E S
2  FOR THE PLAINTIFF:
3      STEPHEN E. WALRAVEN, ESQ.
       OTTO S. GOOD, ESQ.
4      SHADDOX, COMPERE, WALRAVEN & GOOD, P.C.
       The North Frost Center
5      1250 N.E. Loop 410, Suite 725
       San Antonio, TX  78209
6      (210) 822-2018
7  FOR DEFENDANTS MBA OF WYOMING, INC., AND MANAGED
   BENEFITS ADMINISTRATOR AND INSURANCE
8  CONSULTANTS, INC.:
9      FRED L. SHUCHART, ESQ.
       MASON, COPLEN, SHUCHART, HUTCHINS
10       & BANKS
       7500 San Felipe, Suite 700
11     Houston, TX  77063
       (713) 785-5595
12
   FOR DEFENDANT COMPANION LIFE INSURANCE COMPANY:
13
       SHELBY J. BUSH, ESQ.
14     PIPER RUDNICK
       1717 Main Street, Suite 4600
15     Dallas, TX  75201-4605
       (214) 743-4500
16
   FOR DEFENDANT J. ALLAN HALL & ASSOCIATES:
17
       ROBERTA J. HEGLAND, ESQ.
18     BRACEWELL & PATTERSON L.L.P.
       2000 One Shoreline Plaza, South Tower
19     800 Shoreline Boulevard
       Corpus Christi, TX  78401-3700
20     (361) 866-7226
21     ALBERT GEORGE, ESQ.
       J. ALLAN HALL & ASSOCIATES, INC.
22     55 Monument Circle, 11th floor
       Indianapolis, IN  46204
23
24 ALSO PRESENT:  Phyllis K. Merrill
25
           CitiCourt, LLC
           (801) 532-3441

---

PAGE 3

                 Don William Merrill, 7/21/03        3
1                I N D E X
2  WITNESS                                          PAGE
3    DON WILLIAM MERRILL
4  Examination by Mr. Walraven                         5
5  Examination by Mr. Bush                            95
6  Examination by Ms. Hegland                        153
7  Further Examination by Mr. Walraven               219
8  Further Examination by Mr. Bush                   226
9  Further Examination by Ms. Hegland                233
10
11               E X H I B I T S
12 NUMBER                                            PAGE
13  27  Administrative Service Agreement
        signed 10/95                                  32
14
    28  Administrative Service Agreement
        signed 10/00                                  37
15
16  29  Memo to file from Don Merrill                 64
17  30  Plan Document                                115
18  31  Group Administration Manual                  116
19  32  Application to Companion Life for
        Aggregate and Specific Excess Loss
20      Insurance                                    121
21  33  Companion Life Insurance contract            126
22  34  9/27/99 letter to Lorenzo Sanchez from
        Mr. Merrill with attachments                 128
23
24  35  12/12/01 letter to Don Merrill from
        Mr. Routh with attachments                   137
25
           CitiCourt, LLC
           (801) 532-3441

---

PAGE 4

                 Don William Merrill, 7/21/03        4
1                E X H I B I T S  (Continued)
2  NUMBER                                            PAGE
3   36  11/16/00 letter to Lorenzo Sanchez from
        Mr. Merrill                                  138
4
5   37  11/15/01 letter to Randy Scott from
        Gloria Boyce and other documents             141
6
7   38  1/23/01 letter to Janie Gonzalez from
        Carolyn Gale                                 182
8   39  6/3/99 letter to Don Merrill from
        J. Allan Hall with attachment                192
9
10  40  6/3/99 letter to Don Merrill from
        J. Allan Hall with attachments               196
11  41  9/28/01 letter to Don Merrill from
        Sunbmo Adebayo and other documents           207
12
13  42  Revised copies of an application and
        schedule to Janie Gonzalez from BCS          211
14  43  Letter to Joe Gonzalez from Steve
        Rogers, received Dec 17                      213
15
16  44  Pre-Existing Conditions Rider               233
17
18
19
20
21
22
23
24
25
           CitiCourt, LLC
           (801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 2  PAGE 9

Don William Merrill, 7/21/03                                    9

1   A.   No.
2   Q.   Do you hold any other certifications or
3 licenses?
4   A.   No.
5   Q.   Have you ever held any licenses or
6 certifications related to the insurance field?
7   A.   No.
8   Q.   But you've taken courses in connection with
9 those classes --
10  A.   Yes.
11  Q.   -- licensing? Tell me how you're currently
12 employed.
13  A.   I'm self-employed, MBA of Wyoming, Inc. as
14 executive vice president.
15  Q.   And how long have you been executive vice
16 president of the business MBA of Wyoming?
17  A.   Since 1987.
18  Q.   And do you hold any positions with any other
19 entities, business entities related to insurance?
20  A.   A related corporation I do, yes.
21  Q.   And what is this related corporation?
22  A.   In 2001, in order to split the business
23 between my partner and I, we formed another corporation
24 called Managed Benefit Administrators and held that for
25 the group accounts, while my partner's business was

CitiCourt, LLC
(801) 532-3441

PAGE 10

Don William Merrill, 7/21/03                                   10

1 held under Mountain Benefit Administrators. But both
2 of us still retained MBA of Wyoming, Inc. for licensing
3 and E&O insurance. And we retained CDO as an entity
4 for the computer hardware and software, controlling
5 that together.
6   Q.   So prior to 2001, you had a partner whose
7 name was --
8   A.   No, I still have a partner, David Bostrom.
9   Q.   And you and Mr. Bostrom together owned prior
10 to 2001 the business known as MBA of Wyoming?
11  A.   We still own that business together and CDO
12 together.
13  Q.   And who are the other shareholders or -- is
14 it a corporation, MBA?
15  A.   Yes.
16  Q.   Who are the other shareholders of MBA of
17 Wyoming?
18  A.   There are none.
19  Q.   Just the two of you?
20  A.   Yes.
21  Q.   And is Mr. Bostrom the president, then --
22  A.   Yes.
23  Q.   -- of MBA of Wyoming? Now, in 2001 you were
24 going to split portions of that business, correct?
25  A.   Well, we just elected to split the accounts

CitiCourt, LLC
(801) 532-3441

PAGE 11

Don William Merrill, 7/21/03                                   11

1 themselves so that at any other time we would have more
2 flexibility.
3   Q.   And after that split, did MBA of Wyoming
4 still have any accounts?
5   A.   Yes. Well, excuse me. No. MBA of Wyoming
6 did not have the accounts, only held the licensing for
7 those accounts.
8   Q.   And some of the accounts went to an entity
9 known as Managed Benefit Administrators and Insurance
10 Consultants, Inc., and others of them went to Mountain
11 Benefits?
12  A.   Under Mr. Bostrom.
13  Q.   Is that right?
14  A.   That's right.
15  Q.   Your nod of the head didn't pick up on the
16 machine too well. If you'd answer out loud, please,
17 sir.
18       MR. GEORGE:   And at this end of the table
19 you're a little soft.
20  A.   All right.
21  Q.   Was there some basis for dividing the
22 accounts? Do one type of accounts go one place?
23  A.   No.
24  Q.   Or was it based on -- what?
25  A.   Location. It was based on location. The

CitiCourt, LLC
(801) 532-3441

PAGE 12

Don William Merrill, 7/21/03                                   12

1 other office is in Worland, Wyoming.
2   Q.   And is that where Mr. Bostrom's located?
3   A.   Yes.
4   Q.   And so Mountain Benefits kept all the
5 accounts that were basically being handled out of
6 Worland, Wyoming, whereas Managed Benefit
7 Administrators and Insurance Consultants, Inc. kept all
8 the accounts being handled out of Salt Lake, correct?
9   A.   Correct.
10  Q.   And for how long have you been located in
11 Salt Lake City?
12  A.   Basically all my life.
13  Q.   Now, you mentioned that you kept MBA of
14 Wyoming for the purposes of certain licenses. What
15 licenses were those?
16  A.   All insurance licenses, and we retained the
17 business together so that we can use our resources
18 together.
19  Q.   What do you mean by that? What do you mean
20 using your resources together?
21  A.   David's expertise in certain areas and the
22 information that I've had and my background just makes
23 it easier for us to work on that basis. It also made
24 it easier for us to look at eventually a sale if that
25 became a possibility.

CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill  *  July 21, 2003

PAGE 61

Don William Merrill, 7/21/03                    61

1  A.  Yes.
2  Q.  -- relationship?  Correct?
3  A.  Correct.
4  Q.  That didn't change?
5  A.  No.
6  Q.  I would like to next talk about a concept
7  that I've seen referred to in the documents as advance
8  funding under stop loss insurance.  Does that phrase
9  mean anything to you?
10  A.  **It does.**
11  Q.  What does it mean in your business?
12  A.  **Stop loss, advance funding and stop loss**
13  **insurance really refers to a timing in order to not**
14  **adversely affect the resources of a policyholder and**
15  **yet allow the carrier to pay the claim without**
16  **releasing the checks, or concurrently with receiving --**
17  **with releasing the check and paying the claim, a common**
18  **practice, an administrative practice of MGU's and some**
19  **direct writing carriers.**
20  Q.  Is it common for stop loss insurance to be
21  handled in this way that you've described under the
22  term "advance funding"?
23  MR. SHUCHART:  I'm sorry, I didn't hear the
24  first part of the question.
25  MR. WALRAVEN:  Is it common.

CitiCourt, LLC
(801) 532-3441

PAGE 62

Don William Merrill, 7/21/03                    62

1  A.  **It's very common.**
2  Q.  Is it more common than any other
3  arrangement, in your experience?
4  A.  **Yes.**
5  Q.  Could you estimate for me the percentage of
6  time, in your experience, that stop loss insurance is
7  provided with this advance funding arrangement?
8  A.  **To be truthful, all of the time, because I**
9  **don't know a carrier out there that doesn't advance the**
10  **payments of claims and yet never go -- they never go**
11  **out and look at whether the claim was received by the**
12  **provider or not.**
13  Q.  Other than the matter with Companion Life
14  that we're going to talk about in a minute, have you
15  ever encountered a situation or a discussion with a
16  broker or an MGU or a carrier about whether or not
17  advance funding was or was not going to be provided?
18  A.  **Very much so.  This was always a subject**
19  **with every sales organization we ever talked to.**
20  **Consolidated continually emphasized the very fact that**
21  **advance funding existed.**
22  Q.  And when you say Consolidated, you're
23  talking about Mr. Douglas Routh?
24  A.  **Doug Routh's organization.**
25  Q.  And was he specific in his discussion of

CitiCourt, LLC
(801) 532-3441

PAGE 63

Don William Merrill, 7/21/03                    63

1  this topic with you as far as the situation with J.
2  Allan Hall, Companion Life, and San Benito?
3  A.  **Yes.  We actually --**
4  MS. HEGLAND:  Object to form.
5  A.  **J. Allan Hall actually was coming through**
6  **the Salt Lake area again to our office.  So we had**
7  **Mr. Routh in the office.  Doug felt that he should come**
8  **up.  Phyllis Merrill was in the meeting, Clark Merrill**
9  **was in the meeting, and we had a discussion relative to**
10  **the way in which J. Allan Hall handled advance funding.**
11  Q.  And who is Clark Merrill?
12  A.  **He's my son.**
13  Q.  What's his position with the MBA entities?
14  A.  **At the time he was in sales.**
15  Q.  And --
16  A.  **He's no longer with the firm.**
17  Q.  But he participated in these conversations?
18  A.  **Yes.**
19  Q.  And Mr. Hall was here?
20  A.  **Mr. Hall was in the office, yes.**
21  Q.  Anyone else?
22  A.  **No.**
23  Q.  And this conversation was specific to
24  Companion Life stop loss coverage for San Benito?
25  A.  **Specific to any carrier that J. Allan Hall**

CitiCourt, LLC
(801) 532-3441

PAGE 64

Don William Merrill, 7/21/03                    64

1  handled.
2  Q.  And as best you recall, what was it that
3  Mr. Hall told you on this subject?
4  A.  **Mr. Hall assured us that the advance funding**
5  **method, and I don't recall exactly how they were**
6  **handling it, would be part of their contract.  And as**
7  **long as they were paying claims, they would honor that**
8  **advance funded program.**
9  Q.  And did you prepare a memorandum of that
10  conversation?
11  A.  **I probably did.**
12  **(Exhibit 29 marked.)**
13  Q.  Let me show you what's been marked as
14  Exhibit 29 to your deposition and ask you to take a
15  look at that and tell me what it is.
16  A.  **It's a document that I just put in the file,**
17  **a memorandum to the file relative to the meeting, which**
18  **was May 25th, 4 p.m., and just showed who was in**
19  **attendance and the very fact that we were assured that**
20  **the checks would be processed and paid if they were**
21  **shown as paid by our computer, and then the specific**
22  **would be reimbursed.**
23  Q.  So is that a memorandum of the conversation
24  you were just describing for me?
25  A.  **Yes.**

CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

**SHEET 9   PAGE 65**

Don William Merrill, 7/21/03   65

1 Q. And when was this memorandum prepared?
2 A. In June of 1999.
3 Q. In June of '99?
4 A. That's what it says, To confirm our
5 discussion and questions. We were working with Allan
6 on records.
7 Q. And the memo reflects that the meeting was
8 in May of 1999, correct?
9 A. That's the way it looks.
10 Q. And based on your memory and this document,
11 are you fairly confident that the meeting did take
12 place somewhere about then?
13 A. Most definitely.
14 Q. And is there any question in your mind that
15 that discussion would have applied to the Companion
16 Life stop loss coverage issued to San Benito?
17 A. There's no question in my mind that J. Allan
18 Hall's honesty in following the procedures, along with
19 Consolidated, kept them in line with all other carriers
20 that were doing the same thing.
21 Q. Yeah. But what I need to know is, you're
22 sure you were talking about a type of insurance that --
23 A. Yes.
24 Q. -- included the Companion Life policy for
25 San Benito?

CitiCourt, LLC
(801) 532-3441

**PAGE 66**

Don William Merrill, 7/21/03   66

1 A. Yes.
2 Q. There's no question that you might have --
3 A. No.
4 Q. -- been talking about something else?
5 A. Heavens, no.
6 Q. Okay. That's what I wanted to clarify.
7 Thank you.
8 Do you recall ever discussing this concept
9 of advance funding with anyone at San Benito?
10 A. It's possible we did.
11 Q. Do you recall it?
12 A. In general terms, probably had a meeting,
13 and it would have been the fall of 2000. The fall
14 of -- I think the superintendent was in -- might have
15 been in the meeting. The superintendent may have left,
16 and so there was only Janie Gonzalez and Mr. Sanchez in
17 the meeting.
18 Q. Do you recall talking to anybody at the
19 school district about it more than once, or is the only
20 meeting you recall discussing it that one time?
21 A. Well, if you're in the TPA business, you'll
22 talk about advance funding all the time because it is
23 part of the administrative procedures that is common to
24 TPA business.
25 Q. Now, do you provide TPA services in

CitiCourt, LLC
(801) 532-3441

**PAGE 67**

Don William Merrill, 7/21/03   67

1 connection with stop loss insurance that does not
2 provide for this advance funding feature that you've
3 described?
4 A. No.
5 Q. In your experience, are there different
6 types of stop loss agreements that address the
7 situation of whether or not advance funding is included
8 in the agreement or not?
9 A. I'm aware that there are more than -- a lot
10 of old contracts that existed clear back from the
11 property and casualty area which was a true
12 reimbursement only. That's not what is going on at the
13 present time.
14 Q. And have any of the contracts that were
15 administered as pure reimbursement been anything you've
16 dealt with, say, in the last ten years?
17 A. I've seen those contracts but would always
18 fall to what we were told by the claims processing
19 entity, such as J. Allan Hall. And if they said there
20 was advance funding by the format or the administrative
21 service agreement or administration procedures that
22 they were following, then we went on their word. And
23 if they said that's what they were doing and we had
24 seen them doing that for multiple years, we believed
25 that their work was valid and that we would follow

CitiCourt, LLC
(801) 532-3441

**PAGE 68**

Don William Merrill, 7/21/03   68

1 that.
2 Q. And you say you've been dealing, or began
3 dealing with J. Allan Hall approximately ten years ago?
4 A. Well, I was aware of him and dealt with him
5 over a period of time. I was aware of his name. Not
6 with San Benito, but --
7 Q. In '99, 2000 when you were talking to
8 Mr. Hall and when you were talking to San Benito, did
9 you have experience with the way J. Allan Hall
10 processed claims?
11 A. Yes.
12 Q. And did you have several years' experience
13 with the way they processed claims?
14 A. Yes.
15 Q. And had they always provided advanced
16 funding?
17 A. That's correct.
18 Q. And were you aware -- strike that. Had J.
19 Allan Hall been providing stop loss insurance through
20 Companion Life, in your experience, prior to that time?
21 A. I don't know that.
22 Q. But for whomever they were processing
23 claims, they always handled them the same way with
24 respect to advance funding?
25 A. Yes.

CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

**PAGE 69**

Don William Merrill, 7/21/03          69

1   Q.   And that was for more than one carrier?
2   A.   Yes.
3   Q.   And it may or may not have been Companion
4 Life?
5   A.   Correct.
6   Q.   And the problems involved in this lawsuit
7 came up somewhere about the fall of 2001.
8   A.   Right.
9   Q.   Prior to that, did you have experience with
10 J. Allan Hall processing claims for Companion Life and
11 providing advance funding before this problem came up?
12   A.   Well, you've included two things. Advance
13 funding, yes. As regard to Companion Life, I don't
14 know.
15   Q.   It's my understanding that from the
16 agreements there was a stop loss policy with Companion
17 Life for the 2000-2001 --
18   A.   2001.
19   Q.   -- policy year, but I think there was also
20 one for the '99-2000 policy year.
21   A.   I don't know if that was with Companion Life
22 or not.
23   Q.   I think it was.
24   MR. BUSH:  Objection to the extent it
25 assumes facts not in evidence.

CitiCourt, LLC
(801) 532-3441

**PAGE 70**

Don William Merrill, 7/21/03          70

1   Q.   Do you know whether or not for the '99-2000
2 school year J. Allan Hall was providing or was paying
3 claims that included advance funding benefits?
4   A.   Yes. He verified that he was doing advance
5 funding.
6   Q.   And you say -- by "he," you mean Mr. Hall?
7   A.   Mr. Hall.
8   MR. WALRAVEN:  Mr. Merrill, we've been at
9 this a while.  I'd like to take another break.
10   THE WITNESS:  All right
11   (Recess from 10:59 to 11:18 p.m.)
12   Q.   (BY MR. WALRAVEN)  Back on the record.
13 Mr. Merrill, you understand that this is, this
14 lawsuit's over some $900,000 in claims that weren't
15 paid under the Companion Life stop loss policy,
16 correct?
17   A.   Correct.
18   Q.   And do you have an understanding as to what
19 Companion Life's position is as to why those claims
20 weren't paid?
21   A.   In general.
22   Q.   And what is that understanding?
23   A.   To my recollection, it's two, I think. One,
24 that there weren't sufficient funds; and the other one
25 is to the claims were not sent to the providers.

CitiCourt, LLC
(801) 532-3441

**PAGE 71**

Don William Merrill, 7/21/03          71

1   Q.   Would the disallowance or the failure to pay
2 these particular claims be directly contrary to what
3 Mr. Paul told you could be expected with respect to the
4 funding of these types of claims under the stop loss
5 insurance?
6   A.   To the second one, yes. To the first one,
7 there just has to be an understanding that the funds
8 were available at San Benito.
9   Q.   Well, let's talk about the funding issue,
10 then, for a second. You're familiar with a number of
11 different ways that insureds fund health insurance
12 payments, correct?
13   A.   Yes.
14   Q.   And in fact, in your policy and procedure
15 manual you talk about different programs, and I believe
16 you even mentioned zero balance checking accounts. You
17 know what that is, don't you?
18   A.   I know what that is.
19   Q.   And if the insured has money available
20 somewhere, whether it's through a credit line or
21 overdraft protection or however, a zero balance
22 checking account associated with a funding, a lending
23 arrangement, are all of those used, in your experience,
24 to pay health insurance claims?
25   A.   They may be.

CitiCourt, LLC
(801) 532-3441

**PAGE 72**

Don William Merrill, 7/21/03          72

1   Q.   Has the use of one or more of those
2 different forms of having the money available ever been
3 a problem in connection with --
4   A.   They could be.
5   Q.   -- administering claims?
6   A.   It could be, I suspect.
7   Q.   Have you ever encountered a problem as a TPA
8 with the way an insured funded their plans, as long as
9 the checks always cleared?
10   A.   Well, that's really a -- I'll have you
11 restate that, because you've mixed up a lot of
12 information of which we believe there are certain
13 methods in which clients should put things together so
14 that payment can be made, and on that basis San Benito
15 did that.
16   Q.   Are you familiar with how San Benito did
17 that?
18   A.   Yes.
19   Q.   Anything wrong with the way they did it?
20   A.   I don't think so.
21   Q.   As far as you know, the checks always
22 cleared?
23   A.   Yes.
24   Q.   And as far as you were concerned, the
25 arrangements San Benito made to fund those checks were

CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

SHEET 24    PAGE 185

Don William Merrill, 7/21/03                185

1  speculation.
2      A.    Yeah, I don't know if it's complete. I
3  assume it is.
4      Q.    Please take a look at it.
5      A.    That still wouldn't tell me whether it's
6  total or not.
7      Q.    What else would you need?
8      A.    Well, there's no cover letter to it. It
9  doesn't say that it's the complete contract. It just
10 gives me the pages that are there. So I'm just
11 assuming that it is based upon the fact that you've
12 said it is.
13     Q.    Well, is the cover letter part of the
14 contract?
15         MR. SHUCHART: Objection. Calls for a legal
16 conclusion.
17     A.    No, it's not.
18     Q.    All right, take a look at Exhibit 33 -- or
19 Exhibit 35, which has a cover letter.
20     A.    How do you know it came with this?
21     Q.    Tell me if Exhibit 35 contains the complete
22 contract.
23     A.    I don't know. It might. I am not here to
24 determine whether it is or not. I don't know.
25     Q.    Can you point me to any provision in Exhibit

CitiCourt, LLC
(801) 532-3441

PAGE 186

Don William Merrill, 7/21/03                186

1  35 which provides for advance funding?
2      A.    There's nothing in there. That's been
3  pointed out earlier.
4      Q.    There's no provision providing advance
5  funding?
6      A.    No.
7          MR. SHUCHART: Objection, asked and
8  answered.
9      Q.    Now, in the 1999-2000 contract year in which
10 you were the TPA for San Benito, correct?
11     A.    Yes.
12     Q.    Did you review the contract governing the
13 employee benefit plan for that year, sir?
14         MR. SHUCHART: Objection.
15     A.    I don't know whether I did or not for the
16 1999-2000. I don't know that.
17     Q.    You told us about your meeting with J. Allan
18 Hall and Mr. Routh?
19         MR. SHUCHART: I believe it's "Roth."
20     Q.    I don't know. It's spelled "Routh," so...
21 Do you pronounce it "Roth"?
22     A.    R-o-u-t-h, Routh.
23     Q.    That was marked -- you marked your memo.
24         MR. SHUCHART: I think 29.
25     Q.    On the memo which is marked as Exhibit 29,

CitiCourt, LLC
(801) 532-3441

PAGE 187

Don William Merrill, 7/21/03                187

1  you have a parenthetical about it being recorded in
2  your schedule calendar.
3      A.    Right.
4      Q.    Do you typically keep a schedule calendar
5  for your business?
6      A.    Yes.
7      Q.    And do you maintain that calendar after the
8  calendar year?
9      A.    Most of the time, yes.
10     Q.    How far back do you maintain those
11 documents?
12     A.    I might have two years or so.
13     Q.    Do you know whether you would still have --
14     A.    I don't know that.
15     Q.    I guess this is the '99 year?
16     A.    Yeah, I may not have that. I don't know.
17     Q.    Do you keep those documents at your place of
18 business?
19     A.    Yes.
20     Q.    Can you tell me what all was discussed at
21 this meeting with you and Mr. Routh, Mr. --
22     A.    I can't tell you everything that was
23 discussed.
24     Q.    Well, what else was discussed?
25         MR. SHUCHART: Objection, vague.

CitiCourt, LLC
(801) 532-3441

PAGE 188

Don William Merrill, 7/21/03                188

1      A.    How's your mustache growing. You know,
2  basically we talked about things that I remember is
3  that advance funding and what their administrative
4  procedure was of handling claims. Because we had
5  confidence from and information from the Consolidated
6  Companies that the organization was processing claims
7  on a basis of advance funding. And since our
8  experience with the other carriers had always been that
9  advance funding was included, that that needed to be on
10 that basis, and we were assured that that was -- that
11 they were administering the contract on that basis.
12     Q.    Object to responsiveness. Can you remember
13 anything else that was discussed at this --
14     A.    No, I can't.
15     Q.    -- meeting in 1999?
16     A.    No.
17     Q.    Other than advance funding?
18     A.    Information relative to the value of other
19 things that we might use to do comparisons with besides
20 rates.
21     Q.    Can you give me an example?
22     A.    No, I can't.
23     Q.    How long did this meeting last?
24     A.    Could have lasted a good hour, hour and a
25 half or more.

CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

# MEMORANDUM

TO:       File

FROM:     Don Merrill

SUBJECT:  J. Allan Hall's visit to MBA (3900 South 1100 East)

======================================================

Tuesday, May 25 at 4 p.m. (as recorded in my monthly schedule calendar).

During that visit we discussed the advance funding of specific claim funding on an advance basis and we were assured that that was J. Allan Hall's position that as long as the checks were processed and paid per computer that they could be held awaiting specific reimbursement - the specific deductible amount must be available for payment.

In attendance: Doug Routh, J. Allan Hall, Don, Clark and Phyllis Merrill

To confirm our discussion and the questionnaire we were working with Allan responded in his letter of June 3, 1999.



EXHIBIT
₿29
D. Merrill

MBA 00050





November 15, 2001

Mr. Randy Scott
Claims Manager
J. Allan Hall & Associates, Inc.
55 Monument Circle, Suite 1116
Indianapolis, Indiana 46204

RE:    Specific Claims Review
       Third Party Administrator: Managed Benefits Administrator & Insurance Consultants, Inc.
       Insured: San Benito Consolidated ISD
       Carrier: Companion Life Insurance
       Policy Period: October 1, 2000, through August 31, 2001 (14/11)
       Our Reference: I-01-539-340

---

### EXECUTIVE SUMMARY

Dear Mr. Scott:

        The captioned review went forward at the Salt Lake City, Utah, offices of Managed
Benefits Administrator & Insurance Consultants, Inc. ["MBA"], formerly MBA of Wyoming.
Pursuant to your instructions in telephone discussions October 25 and November 6, 2001, we
reviewed the funding, correspondence and eligibility records for certain specific excess claimants
submitted to Consolidated Companies ["Consolidated"], the MGU, by MBA on behalf of San
Benito Consolidated Independent School District ["San Benito"]. As indicated in our telephone
conference of Thursday, November 8, 2001, with you, Allan Hall and Larry Blagg, we are
presenting our findings in the form of an Executive Summary Report in order that you may have
the information as quickly as possible. Our findings are summarized as follows.

A.    **EXHIBITS:**

        Exhibit I    -    November 8, 2001, Memo and Supporting Attachments from Don
                          Merrill to Gloria H. Boyce relative to advance funding and specific
                          claims incurred by San Benito;

        Exhibit II   -    San Benito Liquidity Corporate Fund Statement at September 28,
                          2001;



---

NiiS/APEX GROUP HOLDINGS, INC.   76 Lafayette Street, Salem, Massachusetts 01970   978-745-6655   FAX 978-741-1642

Mr. Randy Scott
RE: San Benito Consolidated ISD
November 15, 2001
Page 2

| | | |
|---|---|---|
| Exhibit III | - | San Benito Bank Statements Showing Account Balances at August 16-October 31, 2001; |
| Exhibit IV | - | Listing of Specific Claim Payments Reviewed per MGU Request; and |
| Exhibit V | - | MBA Correspondence to San Benito Relative to Account Funding. |

**B**  **COVERAGE:**

Companion Life Insurance provides specific excess loss insurance coverage to San Benito, effective October 1, 2000, through August 31, 2001, for covered medical expenses incurred within the period of July 1, 2000, through August 31, 2001 and paid October 1, 2000, through August 31, 2001 (14/11). Lifetime benefits of up to $925,000 per covered person excess an individual deductible of $75,000 apply to the excess policy. Reimbursement for major human organ transplants is limited to $150,000 per individual and reimbursement for lung cancer claims is limited to a $50,000 lifetime maximum if the claimant was smoking for 5 years or more at the time of the diagnosis.

The policy definition of paid claims in Section 1, page 5 of the issued policy is as follows:

> Paid means that funds are actually disbursed by the Contractholder or his Agent. Payment of a claim is the unconditional and direct payment of a claim to a Covered Person or their health care providers. Payment will be deemed made on the date that both (1) the payor directly tenders payment by mailing (or otherwise delivering) a draft or check, and (2) the account upon which the payment is drawn contains, and continues to contain, sufficient funds to permit the check or draft to be honored.

> Should the account upon which payment is drawn not contain sufficient funds to cover all outstanding checks and drafts on the account, then the Company may consider, in its sole discretion, any particular checks or drafts as not having been paid, but only to the total amount representing the difference between funds in the account and the total of outstanding checks and drafts.

San Benito provides a choice of three major medical benefit plans for its eligible participating employees. The only difference between plans is the amount of out of pocket expense the employee elects per plan year. All plans are PPO based, with office visit copays of $30 per visit, PPO benefit payments of 80 percent and non-PPO benefit payments of 60 percent until the out of pocket maximum per person or family per selected plan is met for the calendar year.

Mr. Randy Scott
RE: San Benito Consolidated ISD
November 15, 2001
Page 3

San Benito also offers dental, vision and prescription drug card plans to its employees;
however, these plans are not covered under the terms of the specific excess loss insurance
policy.

Both the excess policy and the Insured's benefit plans contain limitations and restrictions
which may apply to our assessment of claims reviewed, and we will discuss these as they
apply.

C.   FINDINGS:

1.   We met with Don Merrill, President; Phyllis Merrill, Chief Operating Officer; and
Carolyn Sorensen, Claims Manager, all of MBA, to discuss the management and
administration of claims by MBA on behalf of San Benito.  In particular, we
discussed the claims funding arrangements, excess loss policy and certain claims
submitted by MBA for specific funding which do not appear to have been issued
within the excess policy period.

2.   MBA scans all claims received as well as correspondence and eligibility records.
The specific files contain copies of a claim payment detail and reimbursement
request for each claim submitted to Consolidated.  Although copies of eligibility
records, claims and medical records are submitted with each reimbursement
request, the claim copies are not maintained in the specific files.  Claims are filed
in batches by processed date and stored, as all claims may be viewed on-line.
Once a claim reaches the specific deductible, the system prompts the examiner
that it is a specific claim every time a new claim is processed.  The examiner
attaches a "specific claim hold routing sheet" to each claim processed after the
deductible is met.  This is a bright pink form used to identify claims which the
claims assistants are to copy and route to Glade Nixon of MBA, who is charged
with filing all specific claims.  Once the claim has been copied, the assistant
checks the form to show it was copied and files it in the proper batch.  This form
also serves as a reminder to the assistant to identify additional claims on the
claimant, as all claims thus marked are subject to internal audit.

3.   We reviewed the MBA files and on-line records on
                       ⌐nd                          to determine if claim amounts shown on
these participants matched records submitted to the carrier.  The amounts shown
on claim detail reports in the files matched the claims processed on-line.

NiiS/APEX GROUP HOLDINGS. INC.

Mr. Randy Scott
RE: San Benito Consolidated ISD
November 15, 2001
Page 4

4.    The claim files reviewed contain copies of facsimiles from MBA to Consolidated
relative to requests for reimbursement of $1,157,531.25 in final claims processed
for these claimants for the policy year, and submitted September 4-14, 2001.
Facsimiles reviewed indicate MBA began following up on the reimbursement
requests the following week. On October 3, 2001, Mr. Nixon stated in a facsimile
"Client in need of reimbursement on the following claims....Please advise status
and when we can expect to receive payment." October 15, 2001, Mr. Nixon sent a
follow up facsimile stating "Client and providers anxious to receive
reimbursement on the following claims....Please expedite payment."

5.    Consolidated forwards its large specific claims to NiiS/APEX for review on your
behalf. During the course of the review of claims on                and          .
        the NiiS/APEX auditor made inquiries of the providers to ascertain if the
large checks shown as issued August 24 and 31, 2001, had been received by the
providers. The providers indicated they had not received payment of claims shown
as paid per the reimbursement requests.

6.    We discussed with Ms. Sorensen the MBA procedures for issuing claim checks
for the account. Ms. Sorensen said that MBA processes claims as required to
maintain a 6-7 day turn around time. Checks are cut for each day claims are
processed; the check register is forwarded to San Benito via facsimile; and checks
are routinely mailed the same day.

7.    Although we were first told that the checks under review were issued when they
were created, we questioned this, as we had been informed that the providers had
not received all checks at the time of this review. We discussed this with Mr and
Mrs. Merrill, inquiring if the checks were held or released.

8.    Mr. Merrill was noticeably upset over the time elapsed from the claim filings in
September to the present with no resolution or reimbursement for the claims,
particularly the $425,704 requested for                and the $697,585 requested
on            . We informed Mr. Merrill that the providers had indicated the
checks dated August 24-31, 2001, had not been received; hence the request that
we review the claims to determine if they were funded and issued within the
policy period.

9.    We asked why claim checks would be held, pointing out that unless an excess
policy has advance funding, all claims must be paid by the employer group; that
is, mailed. Mr. Merrill told us that the policy has advance funding, that he does
not do business with any carrier who does not provide this. We pointed out to Mr.

Mr. Randy Scott
RE: San Benito Consolidated ISD
November 15, 2001
Page 5

Merrill that we could not find wording in the excess loss policy regarding advance funding, nor did we find any form or request for advance funding for claims submitted. We asked if an advance funding request form existed; Mr. Merrill said it did not, that MBA has never been asked to provide one and that it was his understanding that all policies issued by Consolidated contained specific advance funding and that it was routinely provided.

Mr. Merrill told us that in 1999 he had met with Mr. Hall to discuss business, and informed Mr. Hall that he would not place business with any carrier who did not provide advance funding and was assured by Mr. Hall that it would be provided. Mr. Merrill said that he requested Mr. Hall's assistance in development of an MGU questionnaire. Mr. Merrill indicated that he had notes in his files relative to this meeting. We requested copies of any records pertaining to these discussions and, after researching his records, on November 8, 2001, Mr. Merrill provided the memorandum and documentation relative to the MGU questionnaire attached as Exhibit I.

10.    Mr. Merrill said that San Benito has never had a problem funding its claims because in 1995 when he first got this account, San Benito deposited $700,000 into its employee group health insurance account as a reserve for claims funding should the need arise. Since that time, San Benito has consistently funded all claims as checks are created, replacing the check register amounts monthly in order to maintain the $700,000 reserve.

11.    We had requested that Mrs. Merrill obtain copies of bank statements for August through October 2001 as well as copies of the front and back of certain checks dated August 24-31, 2001. San Benito furnished this information as well as a Liquidity Corporate Fund statement (please refer to Exhibit II) showing that Account 5090102227-1, the Employee Group Health Insurance Account, had a $738,806.04 balance at September 28, 2001.

12.    Copies of bank statements submitted show that the reserve was maintained throughout August but was reduced in September and October (please refer to Exhibit III).

13.    Mr. Merrill said that he and Mrs. Merrill met with San Benito at the end of July to discuss their renewal with MBA and the large claims anticipated on two claimants,                    and                    . The San Benito finance administrator inquired about the time required for specific reimbursements and advance funding at that time. Mr. Merrill said that San Benito indicated that it

Mr. Randy Scott
RE: San Benito Consolidated ISD
November 15, 2001
Page 6

was its understanding that specific advance funding was in place as a routine part
of the excess policy and that it wanted to utilize this feature in order to protect its
reserves.

14.     Mrs. Merrill said that, at that time, the large bills for Mr.           and
        were just starting to arrive.  Because the amounts due after discounts for the
        hospital and primary physicians were so large, San Benito instructed MBA to hold
        the checks for amounts due after satisfaction of the specific deductibles for
        advance funding. Ms. Merrill said that MBA processed all charges received after
        negotiating for additional discounts with the providers.  Mr. Merrill said that
        MBA continued to negotiate with providers after the checks were cut and awaiting
        funding from Consolidated in the hope that the claims could be further reduced.

15.     Mrs. Merrill said that Carol Frundsen, Accounting Manager, runs a weekly report
        showing specific claims held.  Because San Benito deposits in excess of $300,000
        per month into the account, the MBA accountant monitors the claims paid weekly
        and if claims paid are less than the funds on hand, based on the $300,000 average,
        she releases checks held for advance funding.

16.     We reviewed bank statements and check copies for the selected checks as well as
        the specific claims held reports to determine when checks were actually mailed,
        deposited and cleared the bank.  Exhibit IV provides this information for the
        checks reviewed.  We found that the specific claims held report was inaccurate for
        some weeks, as checks shown as held had cleared the bank the prior week.  Based
        upon deposit dates and correspondence to San Benito (please refer to Exhibit V),
        we were able to trace the checks in question.

17.     Mr. Merrill said that the San Benito finance officer was under pressure from
        providers waiting for reimbursement and from the school board relative to poor
        service of its account from the carrier. Because of the delays in receiving funding,
        San Benito ultimately decided to use the reserve to pay the claims, the last of
        which were mailed November 5, 2001.  Bank records for September and October
        2001 reflect a reduction in the reserve funds with a balance of less than $700,000
        at the end of each month.  Again, please refer to Exhibit III.

## D.   REMARKS AND RECOMMENDATIONS:

1.      We pointed out to Mr. Merrill that the checks were held past the policy period and
        that they should have been paid within the policy period.  Mr. Merrill said that it
        was his and San Benito's clear understanding that advance funding was available
        and would be forthcoming and that at no time was any indication given that this
        was not to be.

Mr. Randy Scott
RE: San Benito Consolidated ISD
November 15, 2001
Page 7

2.   Mr. Merrill said that the attorneys representing San Benito are now involved and threatening to file suit against MBA, Consolidated and the carrier. Further, Mr. Merrill said that San Benito clearly had funds sufficient to clear all checks every day of the policy period and that the only reason the checks in question were held was in order to take advantage of the advance funding arrangement.

3.   We recommended to Mrs. Merrill that MBA develop a specific advance funding form to attach to all claims for which advance funding is requested. Mrs. Merrill indicated she would do this; however, she stated that MBA has never received instructions from Consolidated relative to requesting advance funding, that it has just always been there.

4.   Based on materials reviewed, it is clear that many of the checks reviewed were mailed after the end of the policy period. It is also clear that the Merrills believe that all policies issued by Consolidated have specific advance funding, that claims have been funded in this manner previously, and that the claims should be honored.

5.   We note that although the excess policy is silent as to specific advance funding, if in fact claims have been funded previously in this manner, a precedent may have been established.

6.   Upon conclusion of our review we met, with Mr. and Mrs. Merrill to discuss our findings and observations and provided a copy of our draft Exhibit IV for their records. We informed them that we would submit to you our findings and that the decision as to coverage of the claims in question can only be determined by Consolidated.

We appreciate the opportunity to be of service in this interesting assignment and look forward to serving you in the future. Our service fee billing is enclosed for your consideration. Naturally, should you have questions relative to items discussed, we would be pleased to respond.

Very truly yours,

Gloria H. Boyce

GHB/br/mh2
cc:   Mark E. Scerra, CPCU



A FULL SERVICE EMPLOYEE BENEFIT ADMINISTRATOR

# MEMO

**To:**  Gloria H. Boyce, Vice President
       Niis/Apex

**From:** Don W. Merrill, President
       MBA

**Re:**   Advance Funding

Deliver:
3625 So. West Temple
Salt Lake City, UT 84115
Mail:
P.O. Box 651109
Salt Lake City, UT 84165-1109
800-877-3727
Fax: (801) 266-2581
www.mba.to

On August 7, 1998 MBA had a brief carrier evaluation form completed by Consolidated Companies, the MGU for J. Allan Hall & Associates with regard to claims turn around, audit and claims paying information. (See attached.)

In late May or early June, 1999, Consolidated and J. Allan Hall met with myself and staff in our offices to discuss business, current and future. In this meeting MBA asked pointedly about auditors, claims turn around and whether J. Allan Hall would advance fund specific claims for MBA. We indicated this is the only type of arrangement which MBA found acceptable for its clients. J. Allan Hall at that time pledged his support of the advance funding of claims submitted to his office.

As a result of that meeting, MBA put together a questionnaire (see attached) which required each of the carriers with which MBA did business to affirm the way they did business and handled contracts and claims. As you can see, the form has specific questions relating to the funding of claims.

In our recent conversations with Doug Routh of Consolidated Companies, he indicated that he understood that J. Allan Hall & Associates handles claims in an advance funding format as do all the carriers with which he associates.

During the time between the initial filing of the claim on the Cruz baby and others, many contacts have been made with the office of J. Allan Hall & Associates to affirm our desire and expectation that this claim be paid in advance of sending out checks. The client has, at this time, funded all of the claims associated with the specific claims in question to avoid political pressures from providers and to preserve discounts under the contracts.

They now await prompt payment of the claims which now instead of the expected advance funding becomes a reimbursement of the claim.

MANAGED BENEFITS ADMINISTRATOR & INSURANCE CONSULTANTS, INC.

AUG 12 '98  01:36PM CONSOLIDATED CO. 415 8830675                    P.2/3



**MERRILL BOSTROM ASSOCIATES**

August 7, 1998

Doug Routh
Consolidated Companies
250 Belmann Keyes Blvd., Suite F200
Novato, California  94949

Dear Doug :

Based on our past years experience with claim departments, managers and their interface
with auditing firms used for specific and aggregate audits by Stop Loss carriers, MBA is re-
evaluating where we are placing our business.

Would you please consider this important request and list for us the following information?

●Claims Supervisor & Managers MBA will be working with:

_Ann Havers_
_@ J. Alan Hale & Assoc._

Address _____

Telephone _____

●Auditing Firms used by your organization and those that may be assigned on MBA cases:

| Name | Location | Phone # |
|---|---|---|
| Northshore Int'l | Salem Mass |  |
|  |  |  |
|  |  |  |

●Your average turn around for:
Specific Claims  _4-6 weeks on Clean Claims_
Aggregate Claims  _6-8 weeks_
Aggregate monthly accommodation advances  _NA_

●Your objectives and intent as to the way you will be addressing filed specific and aggregate
claims.  _____

EXECUTIVE/EMPLOYEE BENEFITS · ADMINISTRATIVE/ADVISORY SERVICES
MERRILL BOSTROM ASSOCIATES · 1121 EAST 3900 SOUTH · PO101/PO. BOX 651100 · SALT LAKE CITY, UTAH 84165-1100
TELEPHONE (801) 268-3834 · FAX (801) 266-9998
MBA OF WYOMING, INC. · 111 SOUTH 8TH ST. · WORLAND, WYOMING 82401 · (307) 347-6131

●Who it is that your claims manager and supervisor report to:

Name _____ *T·Allan Hall* _____

Title _____ *Pres.* _____

Telephone Number _____ *3/2 264-0020* _____

●Any other pertinent information which would help us evaluate placing business with you.

_____   _____

_____   _____

_____   _____

Thank you very much for your help.

Sincerely,

*[signature]*

Don W. Merrill
Executive Vice-President

# J. ALLAN HALL & ASSOCIATES, INC.

June 3, 1999

Mr. Don Merrill
Merrill Bostrom Associates
1121 East 3900 South, Suite C-101
Salt Lake City, UT 84124

Re:  MGU Questionnaire

Dear Don:

It was a pleasure to meet with you and your staff last week at your office.  Enclosed you will find a questionnaire that one of my associates has developed.  Hopefully, you can incorporate some of the questions on the enclosed into your final document.

If you have any questions, please do not hesitate to contact me.

Sincerely,

J. Allan Hall
President

JAH/aah

Enclosure

Circle Tower • 55 Monument Circle • Suite 1115
Indianapolis, IN 46204
(317) 264-0020 • (317) 264-9038 Fax

# MBA

## Stop Loss Qualification Form

*It is important for you to complete and return this form with your quote.*

We will evaluate all quotes based on your answers to this questionnaire along with the stop loss plan and numbers. Effective administration, speedy turnaround and contract provisions have become an important aspect which we will communicate to the client.

We have learned that all contracts are not the same and some carriers and claims processing organizations can overburden us with an additional workload. It is important for us to make wise decisions with the carriers selection, therefore, your answers are important.

Group:_____

Proposing MGU or Co._____

Stop Loss Insurance Carrier:_____

Carriers Rating: Best_____ Moody_____ Standard & Poors_____

What percent of the risk is the primary carrier holding?_____

Who is carrying the balance of the risk?_____

Is there a third organization? ☐ Yes ☐No

What percent of risk do they have?_____

List the ratings of number 2 carriers? Best___ Moody___ Standard & Poors____

List the ratings of number 3 carriers? Best___ Moody___ Standard & Poors____

Claims are paid by:_____

Claims Managers Name:_____

The auditing firms to be used when necessary are:_____
_____
_____

If MBA disputes using a particular auditing firm can another be used    ☐Yes ☐No

Once all requirements are met the contract that will be issued will include:

- **Advance Funding Provisions**                    ☐Yes ☐No

- **A provision that a claim is considered as a paid claim once so indicated by the TPA's automated computer system**    ☐Yes ☐No

Stop Loss Qualification Form

**The number of group lives single, family etc. enrolled the first contract month will establish the minimum attachment point based on:**
- **100% of that month times 12**                                    ☐Yes    ☐No
- **or based on _____% of the first months enrollment times 12**    ☐Yes    ☐No
- **or other; Explain:**_____

- **The carriers contract includes an established time frame when Specific stop loss completed claims will be processed**                           ☐Yes    ☐No

Outline your present turn around time and explain claim process if unable to answer yes. State of Utah Insurance rule requires response within 30 days (R590-89-12)

- **Does the carriers stop loss contract contain any benefit limitations which would not be determined by the master plan document:**                  ☐Yes    ☐No

    **If yes, identify benefit limitations**_____
    _____
    _____

- **All large case management utilization review expenses are considered as a covered charge under the claims contract as considered in the MBA's plan document**
                                                                     ☐Yes    ☐No

- **Are all PPO's listed in the plan booklet eligible as a PPO benefit and so considered:**
                                                                     ☐Yes    ☐No

- **Are PPO access fees considered part of the claims expense**       ☐Yes    ☐No
    **Please explain:**_____
    _____
    _____
    _____

**Are there any additional advantages your contract provides that would allow us to improve your sales position?**_____
_____
_____
_____
_____

Underwriter's Signature_____    Date_____

Name_____

2

**RISK MANAGEMENT DEPARTMENT**

**SAN BENITO CISD**

240 North Crockett, San Benito, Texas 78586

# FAX

| | |
|---|---|
| Date: | **11/6/01** |
| Number of pages including cover sheet: | **2** |

**To:**

MBA        PHYLLIS MERRILL

Phone:     1-800-877-3727
Fax phone:  (801) 266-2581
CC:

**From:**

*SAN BENITO CISD*     *Janie Gonzalez*
                      *Insurance Coordinator*

Phone:     210-361-6186
Fax phone:  210-361-6187

**REMARKS:**     ☒ Urgent        ☐ For your review    ☐ Reply ASAP    ☐ Please comment

Phyllis,

Please find a copy of the report that you and Mr. Sanchez discussed.

Thanks,

Janie

EXHIBIT II

| | |
|---|---|
| Provided by: | NiiS/APEX Group Holdings, Inc. |
| Date: | November 15, 2001 |



P.O. Box 400
Austin, Texas 78767-0400
800-758-3827

## Liquidity Corporate Fund
Monthly Report - Month Ending September 2001

### San Benito CISD - 31912

**Account No.: 5090102227-1**
**Title.: Employee Group Health Ins. Acc**

| | Transaction | Balance |
|---|---|---|
| Beginning balance | 736,570.52 | 736,570.52 |
| 2001-09-28:  Interest | 2,235.52 | 738,806.04 |
| Ending balance | 738,806.04 | |

**Account No.: 5090102179-2**
**Title.: General Fund**

| | Transaction | Balance |
|---|---|---|
| Beginning balance | 10,265,824.40 | 10,265,824.40 |
| 2001-09-28:  Interest | 31,157.17 | 10,296,981.57 |
| Ending balance | 10,296,981.57 | |

**Account No.: 5090102218-3**
**Title.: Debt Service**

| | Transaction | Balance |
|---|---|---|
| Beginning balance | 1,340,125.16 | 1,340,125.16 |
| 2001-09-28:  Interest | 4,067.33 | 1,344,192.49 |
| Ending balance | 1,344,192.49 | |

RECEIVED



Sponsored by the
Texas Association
of School Boards

San Benito CISD

EXHIBIT III

Provided by:     NiiS/APEX Group Holdings, Inc.
Date:            November 15, 2001



**Coastal Banc** ssb.

Coastal Banc Plaza
5718 Westheimer, Suite 600
Houston, TX 77057
(713) 435-5500
1-800-964-CBSA

Post-it® Fax Note 7671 | Date 8/16/01 | # of pages ▸ 84/8
To (Carol Franklin) | From SBCISD
Co./Dept. MBA | Co.
Phone # | Phone (956) 361-6170
Fax # (801) 266-2581 | Fax #

ACCOUNT: 50 901 02227
PAGE: 1
-- STATEMENT PERIOD --
FROM:        08/01/01
THROUGH:     08/16/01
BRANCH:      0090
ENCLOSURES:  636

0090
SAN BENITO CONSOLIDATED ISD
GROUP HEALTH MBA
HOLD MAIL SEND TO BR 90
240 N CROCKETT ST
SAN BENITO      TX 78586

------- PUBLIC FUNDS DDA ----------

| | | | |
|---|---|---|---|
| ACCOUNT NBR DD | 50 901 02227 | BEGINNING BALANCE | $ 631,300.56 |
| AVG. BALANCE | $ 697,812.49 | DEPOSITS/CREDITS | $ 325,870.00 |
| YTD INTEREST | $ 19,647.93 | INTEREST PAID | $ 1,223.56 |
| YTD WITHHOLDING | $ 0.00 | CHECKS/DEBITS | $-219,070.12 |
| | | SERVICE FEES | $ 0.00 |
| | | ENDING BALANCE | $ 739,324.00 |
| | | # DEPOSITS/CREDITS | 3 |
| | | # CHECKS/DEBITS | 635 |

### DAILY BALANCE SUMMARY

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 08/01 | 565,213.92 | 08/07 | 829,492.66 | 08/13 | 768,376.81 |
| 08/02 | 550,096.09 | 08/08 | 823,815.73 | 08/14 | 766,764.95 |
| 08/03 | 547,513.72 | 08/09 | 804,077.89 | 08/15 | 751,131.74 |
| 08/06 | 509,065.73 | 08/10 | 805,441.12 | 08/16 | 739,324.00 |

### DEPOSITS AND OTHER ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 08/07 | DEPOSIT-ACH | 322,250.00 |
| | SAN BENITO CONSO-JULY 2001 | |
| 08/10 | DEPOSIT- | 3,620.00 |
| 08/16 | CREDIT-INTEREST | 1,223.56 |

### CHECK REGISTER

| CHECK NUMBER | DATE PAID | AMOUNT | CHECK NUMBER | DATE PAID | AMOUNT | CHECK NUMBER | DATE PAID | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 65570 | 08/01 | 4,727.70 | *67224 | 08/06 | 59.44 | 67248 | 08/03 | 8.00 |
| 65571 | 08/01 | 4,727.70 | 67225 | 08/06 | 27.87 | *67402 | 08/03 | 210.40 |
| *67000 | 08/03 | 140.00 | *67234 | 08/06 | 130.78 | *67418 | 08/01 | 164.56 |
| *67092 | 08/01 | 4,727.70 | *67236 | 08/09 | 84.80 | 67419 | 08/01 | 1.05 |
| *67105 | 08/07 | 35.71 | 67237 | 08/09 | 28.80 | *67421 | 08/01 | 38.08 |
| *67174 | 08/01 | 30.00 | *67247 | 08/02 | 31.62 | 67422 | 08/01 | 17.68 |


FDIC

901 CB0060 (09/01)



**SEE REVERSE SIDE FOR IMPORTANT INFORMATION**

09/27/2001 12:01 FAX                  @001



Coastal Banc Plaza
5718 Westheimer, Suite 600
Houston, TX 77057
(713) 435-5500
1-800-964-CBSA

**Coastal Banc** ssb•

Post-It® Fax Note 7671 | Date 9/18/01 | # of pages ►
To Carol Franklin | From S.S.C.I.S.D
Co./Dept. MBA | Co.
Phone # | Phone (956) 361-6170
Fax # (801) 266-2581 | Fax #

| | 1078 | | 0820 601 | | 5090102227 |
| SAN BENITO CONSOLIDATED ISD | | | | PAGE | 1 |
| GROUP HEALTH MBA | | HM | | |
| HOLD MAIL SEND TO BR 90 | | | | |
| 240 N CROCKETT ST | | | | |
| SAN BENITO TX 78586 | | | | |

42        1078        AUG 31 01

DIRECT INQUIRIES TO CUSTOMER SERVICE      800-964-2272

---------------- PUBLIC FND - 3 ACCOUNT SUMMARY FOR 5090102227 ----------------

| | | |
|---|---|---|
| PREVIOUS STATEMENT WAS DATED 08/16/01 | BALANCE WAS | 739,324.00 |
| DEPOSITS AND OTHER CREDITS 3 TRANSACTIONS, | TOTALING | 360,788.63 |
| CHECKS AND OTHER DEBITS 1,077 TRANSACTIONS, | TOTALING | 362,675.70 |
| BALANCE ON STATEMENT DATE 08/31/01 | | 737,436.93 |

OPEN AN ENTERPRISE CHECKING ACCOUNT & GET 2 FREE AIRLINE TICKETS TO ONE OF 10
CITIES! YOU'LL ALSO GET ONE YEAR FREE ENTERPRISE CHECKING! CALL FOR DETAILS.

INTEREST EARNED IS 1,160.80 BASED ON THE STATEMENT PERIOD OF 15 DAYS
WITH AN ANNUAL PERCENTAGE YIELD EARNED OF 4.08.
INTEREST PAID YTD 20,808.73

-------------------------------- CHECKS PAID --------------------------------

| NUMBER | AMOUNT | DATE | | NUMBER | AMOUNT | DATE |
|---|---|---|---|---|---|---|
| 64842 | 240.00 | 08/23 | – | 68359 | 118.86 | 08/21 |
| 67576* | 74.23 | 08/21 | – | 68377* | 189.04 | 08/21 |
| 67652* | 199.50 | 08/21 | – | 68391* | 4,230.32 | 08/17 |
| 67727* | 301.50 | 08/21 | – | 68392 | 3,534.62 | 08/17 |
| 68244* | 80.00 | 08/21 | – | 68393 | 3,574.94 | 08/17 |
| 68246* | 67.20 | 08/21 | – | 68394 | 125.56 | 08/17 |
| 68248* | 64.00 | 08/21 | – | 68395 | 60.81 | 08/17 |
| 68272* | 35.00 | 08/17 | – | 68396 | 4,727.70 | 08/21 |
| 68287* | 33.60 | 08/17 | – | 68397 | 4,727.70 | 08/21 |
| 68296* | 33.60 | 08/17 | – | 68398 | 3,939.75 | 08/21 |
| 68304* | 2,931.75 | 08/22 | – | 68400* | 981.60 | 08/17 |
| 68352* | 118.86 | 08/21 | – | 68403* | 83.20 | 08/23 |
| 68353 | 118.86 | 08/21 | – | 68428* | 43.12 | 08/20 |
| 68354 | 118.86 | 08/21 | – | 68429 | 36.80 | 08/17 |
| 68355 | 118.86 | 08/21 | – | 68433* | 8.00 | 08/20 |
| 68356 | 118.86 | 08/21 | – | 68434 | 106.76 | 08/17 |
| 68357 | 118.86 | 08/21 | – | 68435 | 14.40 | 08/29 |
| 68358 | 118.86 | 08/21 | – | 68436 | 298.97 | 08/21 |

* INDICATES A SKIP IN CHECK SEQUENCE ON THIS STATEMENT

CONTINUED ON PAGE 2

MEMBER DIC

EQUAL HOUSING LENDER

901 CB0060 (06/01)

SEE REVERSE SIDE FOR IMPORTANT INFORMATION



**Coastal Banc**

Coastal Banc Plaza
5718 Westheimer, Suite 600
Houston, TX 77057
(713) 435-5500
1-800-964-CBSA

```
                    1295                0820 601              5090102227
     SAN BENITO CONSOLIDATED ISD                             PAGE    1
     GROUP HEALTH MBA              HM
     HOLD MAIL SEND TO BR 90
     240 N CROCKETT ST
     SAN BENITO TX 78586

                              42        1295              SEPT 28 01
```

DIRECT INQUIRIES TO CUSTOMER SERVICE              800-964-2272

```
--------------- PUBLIC FND - 3 ACCOUNT SUMMARY FOR  5090102227 ------------------
     PREVIOUS STATEMENT WAS DATED 08/31/01     BALANCE WAS        737,436.93
     DEPOSITS AND OTHER CREDITS     4   TRANSACTIONS,  TOTALING   467,334.29
     CHECKS AND OTHER DEBITS    1,292   TRANSACTIONS,  TOTALING   742,811.73
     BALANCE ON STATEMENT DATE   09/28/01                         461,959.49

     COASTAL BANC OFFERS HOME EQUITY, HOME IMPROVEMENT AND AUTO LOANS AT
     DOG-EAT-DOG RATES.  APPLY TODAY!  CALL FOR DETAILS.

     INTEREST EARNED IS    1,450.70 BASED ON THE STATEMENT PERIOD OF  28 DAYS
        WITH AN ANNUAL PERCENTAGE YIELD EARNED OF   3.78.
     INTEREST PAID YTD      22,259.43
---------------------------------- CHECKS PAID -----------------------------------
```

| NUMBER | AMOUNT | DATE | NUMBER | AMOUNT | DATE |
|---|---|---|---|---|---|
| 69839 | 30.26 | 09/06 | 69357* | 182.33 | 09/06 |
| 65899* | 38.40 | 09/10 | 69366* | 1,177.55 | 09/06 |
| 68452* | 657.11 | 09/06 | 69407* | 15.20 | 09/06 |
| 68559* | 50.75 | 09/28 | 69408 | 29.60 | 09/06 |
| 68639* | 327.30 | 09/06 | 69409 | 54.40 | 09/06 |
| 68754* | 154.40 | 09/04 | 69418* | 156.00 | 09/04 |
| 68763* | 60.00 | 09/04 | 69419 | 68.00 | 09/04 |
| 68817* | 335.86 | 09/04 | 69437* | 38.00 | 09/04 |
| 68818 | 2,380.00 | 09/04 | 69452* | 37.50 | 09/10 |
| 69014* | 51.99 | 09/04 | 69453 | 37.50 | 09/10 |
| 69016* | 51.99 | 09/04 | 69464* | 105.25 | 09/04 |
| 69118* | 2.40 | 09/04 | 69470* | 66.00 | 09/04 |
| 69137* | 12.02 | 09/28 | 69486* | 1,775.73 | 09/04 |
| 69249* | 51.99 | 09/04 | 69516* | 53.40 | 09/10 |
| 69283* | 173.40 | 09/04 | 69521* | 14.40 | 09/06 |
| 69312* | 45.50 | 09/26 | 69526* | 38.00 | 09/04 |
| 69313 | 10.00 | 09/26 | 69554* | 790.50 | 09/04 |
| 69332* | 15.05 | 09/04 | 69557* | 15.83 | 09/06 |

```
*  INDICATES A SKIP IN CHECK SEQUENCE ON THIS STATEMENT
                           CONTINUED ON PAGE    2
```



SEE REVERSE SIDE FOR IMPORTANT INFORMATION



Coastal Banc Plaza
5718 Westheimer, Suite 600
Houston, TX 77057
(713) 435-5500
1-800-864-CBSA

```
                    1232              0820 601            5090102227
     SAN BENITO CONSOLIDATED ISD                         PAGE    1
     GROUP HEALTH MBA              HM
     HOLD MAIL SEND TO BR 90
     240 N CROCKETT ST
     SAN BENITO TX 78586

                             42        1232            OCT 31 01
```

DIRECT INQUIRIES TO CUSTOMER SERVICE          800-964-2272

---------------- PUBLIC FND - 3 ACCOUNT SUMMARY FOR  5090102227 -------------------

```
PREVIOUS STATEMENT WAS DATED 09/28/01      BALANCE WAS      461,959.49
DEPOSITS AND OTHER CREDITS    9   TRANSACTIONS,  TOTALING   827,542.38
CHECKS AND OTHER DEBITS   1,224   TRANSACTIONS,  TOTALING   924,749.42
BALANCE ON STATEMENT DATE    10/31/01                       364,752.45
```

LOOK INSIDE FOR YOUR VISA REWARD COUPONS.  TAKE ADVANTAGE OF SAVINGS FROM
AMAZON.COM, TARGET, RED LOBSTER, TGI FRIDAYS, OLIVE GARDEN & RAMADA.

```
          INTEREST EARNED IS   1,105.26 BASED ON THE STATEMENT PERIOD OF  33 DAYS
          WITH AN ANNUAL PERCENTAGE YIELD EARNED OF    3.56.
          INTEREST PAID YTD     23,364.69
```

------------------------------ CHECKS PAID -------------------------------------

| NUMBER | AMOUNT | DATE | | NUMBER | AMOUNT | DATE |
|--------|--------|------|---|--------|--------|------|
| 71056 | $48.80 | 10/12 | – | 70560* | 12.45 | 10/01 |
| 51962* | 38.40 | 10/22 | – | 70564* | 19.00 | 10/01 |
| 69244* | 36.00 | 10/02 | – | 70601* | 219.30 | 10/01 |
| 69520* | 347.67 | 10/03 | – | 70794* | 119.00 | 10/15 |
| 69714* Garza | 72,057.33 | 10/03 | ~ | 70795 | 119.00 | 10/15 |
| 69716* Garza | 93,749.93 | 10/03 | – | 70827* | 219.30 | 10/01 |
| 69717 Garza | 85,111.64 | 10/03 | – | 70834* | 80.00 | 10/01 |
| 69771* Cruz | 99,308.00 | 10/05 | – | 70835 | 14.40 | 10/01 |
| 69772 Cruz | 44,179.60 | 10/11 | – | 70836 | 245.21 | 10/01 |
| 70321* | 690.00 | 10/01 | – | 70837 | 1,091.35 | 10/01 |
| 70365* Garza | 8,100.00 | 10/12 | – | 70838 | 284.36 | 10/01 |
| 70366 | 720.00 | 10/01 | – | 70839 | 14.40 | 10/01 |
| 70367 | 570.00 | 10/01 | – | 70840 | 15.83 | 10/01 |
| 70368 Rabarga | 10,080.28 | 10/12 | – | 70841 | 15.83 | 10/01 |
| 70370* Washington | 8,808.31 | 10/12 | – | 70870* | 1,688.30 | 10/01 |
| 70490* | 290.00 | 10/01 | – | 70874* | 65.06 | 10/01 |
| 70491 Ryal | 240.00 | 10/01 | – | 70893* | 120.00 | 10/01 |
| 70549* | 86.92 | 10/04 | – | 70904* | 39.36 | 10/01 |

* INDICATES A SKIP IN CHECK SEQUENCE ON THIS STATEMENT

CONTINUED ON PAGE    2





MEMBER FDIC

971 CB0080 (08/01)

SEE REVERSE SIDE FOR IMPORTANT INFORMATION

3IT IV

Specific Claims Reviewed
San Benito Consolidated ISD
Policy Period: October 1, 2000, through August 31, 2001 (14/11)

| Employee | Social Security Number | Dependent | Claim Number | Payee | Check Number | Check Dated | Check Amount | Date Mailed | Check Deposit Date | Date Check Cleared Bank |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1205780-01 | Valley Baptist Medical Center | 69771 | 08/24/01 | $99,308.00 | 09/28/01 | 10/04/01 | 10/05/01 |
| | | | 1205780-02 | Valley Baptist Medical Center | 69772 | 08/24/01 | 44,179.60 | 10/04/01 | 10/10/01 | 10/11/01 |
| | | | 1205870-03 | Valley Baptist Medical Center | 69773 | 08/24/01 | 82,125.26 | 10/26/01 | 11/01/01 | 11/05/01 |
| | | | 1205870-04 | Valley Baptist Medical Center | 69774 | 08/24/01 | 48,649.84 | 11/05/01 | 11/06/01 | 11/07/01 |
| | | | 1205799-01 | Driscoll Children's Hosp. | 69775 | 08/24/01 | 84,018.66 | 11/05/01 | 11/06/01 | 11/07/01 |
| | | | 1205799-02 | Driscoll Children's Hosp | 69776 | 08/24/01 | 93,233.95 | 11/05/01 | | |
| | | | 357599-03 | Driscoll Children's Hosp | 69777 | 08/24/01 | 7,895.22 | 10/26/01 | 10/29/01 | 11/05/01 |
| | | | 1205859-01 | Driscoll Children's Hosp | 70251 | 08/30/01 | 1,345.00 | 08/31/01 | 09/06/01 | 09/07/01 |
| | | | 2057615-01 | Central Air Medicine, Inc. | 70292 | 08/30/01 | 8,247.00 | 08/31/01 | 09/07/01 | 09/10/01 |
| | | | 1205751-01 | Driscoll Children's Hosp | 70294 | 08/30/01 | 62,637.57 | 08/31/01 | 09/04/01 | 09/05/01 |
| | | | 1205751-02 | Driscoll Children's Hosp | 70295 | 08/30/01 | 28,889.58 | 08/31/01 | 09/04/01 | 09/05/01 |
| | | | 1205749-01 | Rudolpo Saca, M.D. | 70296 | 08/30/01 | 5,121.25 | 08/31/01 | 09/12/01 | 09/14/01 |
| | | | 1205383-01 | Valley Baptist Medical Center | 70297 | 08/30/01 | 27,662.49 | 08/31/01 | 09/06/01 | 09/10/01 |
| | | | 1205391-01 | Emil Miland, M.D. | 70299 | 08/30/01 | 1,849.97 | 08/31/01 | 09/17/01 | 09/18/01 |
| | | | 1205392-01 | Emil Miland, M.D. | 70300 | 08/30/01 | 957.16 | 08/31/01 | 09/17/01 | 09/18/01 |
| | | | 1205394-01 | Emil Miland, M.D. | 70301 | 08/30/01 | 1,824.64 | 08/31/01 | 09/17/01 | 09/18/01 |

Prepared by: NiiS/APEX Group Holdings, Inc.
November 15, 2001

BIT IV

Specific Claims Reviewed
San Benito Consolidated ISD
Policy Period: October 1, 2000, through August 31, 2001 (14/11)

| Employee | Social Security Number | Dependent | Claim Number | Payee | Check Number | Check Dated | Check Amount | Date Mailed | Check Deposit Date | Date Check Cleared Bank |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 12059395-01 | Emil Miland, M.D. | 70302 | 08/30/01 | 912.32 | 08/31/01 | 09/17/01 | 09/18/01 |
| | | | 12059398-01 | Emil Miland, M.D. | 70303 | 08/30/01 | 1,847.06 | 08/31/01 | 09/17/01 | 09/18/01 |
| | | | 12059399-01 | Emil Miland, M.D. | 70304 | 08/30/01 | 1,852.88 | 08/31/01 | 09/17/01 | 09/18/01 |
| | | | 12059400-01 | Emil Miland, M.D. | 70305 | 08/30/01 | 2,294.92 | 08/31/01 | 09/17/01 | 09/18/01 |
| | | | 12059401-02 | Emil Miland, M.D. | 70306 | 08/30/01 | 2,736.96 | 08/31/01 | 09/17/01 | 09/18/01 |
| | | | 12059402-01 | Emil Miland, M.D. | 70307 | 08/30/01 | 1,403.08 | 08/31/01 | 09/17/01 | 09/18/01 |
| | | | 12059423-01 | Dale Reynolds, M.D. | 70310 | 08/30/01 | 2,331.64 | 08/31/01 | 09/04/01 | 09/06/01 |
| | | | 12059433-01 | Dale Reynolds, M.D. | 70313 | 08/30/01 | 3,764.36 | 08/31/01 | 09/04/01 | 09/06/01 |
| | | | 12059948-01 | Driscoll Children's Hospital | 70493 | 08/31/01 | 5,374.28 | 09/03/01 | 09/10/01 | 09/11/01 |
| | | | 12057268-01 | Brownville Medical Center | 69714 | 08/23/01 | 72,057.33 | 09/21/01 | 10/01/01 | 10/03/01 |
| | | | 12057268-02 | Brownville Medical Center | 69715 | 08/23/01 | 74,999.93 | 08/24/01 | 08/31/01 | 09/04/01 |
| | | | 12057268-03 | Brownville Medical Center | 69716 | 08/23/01 | 93,749.93 | 09/21/01 | 10/01/01 | 10/03/01 |
| | | | 12057268-04 | Brownville Medical Center | 69717 | 08/23/01 | 85,111.64 | 09/21/01 | 10/01/01 | 10/03/01 |
| | | | 12059484-01 | Cardiovascular Care Prov. | 70362 | 08/31/01 | 2,750.00 | 09/03/01 | 09/10/01 | 09/11/01 |
| | | | 12059484-01 | Howard Frazier | 70365 | 08/31/01 | 8,100.00 | 09/14/01 | 10/11/01 | 10/12/01 |
| | | | 12060091-01 | St. Luke's Episcopal Hospital | 70497 | 08/31/01 | 40,647.50 | 11/05/01 | 11/06/01 | 11/07/01 |
| | | | 12060091-02 | St. Luke's Episcopal Hospital | 70498 | 08/31/01 | 114,700.64 | 11/05/01 | | |
| | | | 12057407-01 | Valley Baptist Medical Center | 69765 | 08/24/01 | 68,068.35 | 08/27/01 | 09/05/01 | 09/07/01 |

Page 2 of 7

.BIT IV

Specific Claims Reviewed
San Benito Consolidated ISD
Policy Period: October 1, 2000, through August 31, 2001 (14/11)

| Dependent | Claim Number | Payee | Check Number | Check Dated | Check Amount | Date Mailed | Check Deposit Date | Date Check Cleared Bank |
|---|---|---|---|---|---|---|---|---|
| | 12059892-01 | Marion Lawler | 70489 | 08/31/01 | 2,240.56 | 09/03/01 | 09/12/01 | 09/14/01 |
| | 12059898-01 | Critique | 70491 | 08/31/01 | 240.00 | 09/03/01 | 09/28/01 | 10/01/01 |
| | 12057404-01 | Valley Baptist Medical Center | 70141 | 08/31/01 | 2,227.94 | 08/30/01 | 09/05/01 | 09/07/01 |
| | 12059502-01 | Critique | 70261 | 08/31/01 | 943.74 | 08/31/01 | 09/07/01 | 09/10/01 |
| | 12059495-01 | Harlingen Dialysis Ltd. | 70368 | 08/31/01 | 10,080.28 | 09/14/01 | 10/11/01 | 10/12/01 |
| | 12059499-01 | Harlingen Dialysis Ltd. | 70369 | 08/31/01 | 3,855.88 | 09/03/01 | 09/12/01 | 09/14/01 |
| | 12059501-01 | Harlingen Dialysis Ltd. | 70370 | 08/31/01 | 8,808.31 | 09/14/01 | 10/11/01 | 10/12/01 |

EXHIBIT V

Provided by:        NiiS/APEX Group Holdings, Inc.
Date:               November 15, 2001

M BA - Managed Benefits Administrator
P.O. Box 651109 ● Salt Lake City, UT 84165-1109
3625 South West Temple Ste 200● Salt Lake City,  UT  84115
Phone: (801) 268-3334 ● Fax: (801) 266-2581

## F A X   T R A N S M I T T A L

Date:                          November 5, 2001

To:                            Janie

Company:                       San Benito C.I.S.D.

Fax #:                         956-361-6187

Regarding:                     check registers

Number of Pages:               1

Senders Name:                  Carol Frandsen

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

### IMPORTANT NOTICE

Janie/Jose:

   Phyllis told me she talked to you guys and it was ok to release all the large remaining speck checks. They are gone! Now, I have no idea how much money the account really has. Thus, I am going to release all the checks on a daily basis and fax the registers to you every Friday. If the check is larger than $50,000 I will give you call to see if the check can go, other than that, all the checks are going to be released on a daily basis. If you would like to change anything on this notice, please let me know because I am open for suggestions. If I don't hear from you, I will take it as if you accepted the idea of this letter.
Thanks
Carol Frandsen

M BA - Managed Benefits Administrator
P.O. Box 651109 ● Salt Lake City, UT 84165-1109
3625 South West Temple Ste 200● Salt Lake City, UT 84115
Phone: (801) 268-3334 ● Fax: (801) 266-2581

## F A X   T R A N S M I T T A L

| | |
|---|---|
| Date: | October 15, 2001 |
| To: | Janie |
| Company: | San Benito C.I.S.D. |
| Fax #: | 956-361-6187 |
| Regarding: | July's statement |
| Number of Pages: | 14 |
| Senders Name: | Carol Frandsen |

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

Here are the check registers for the week. According to my records, the account has about $141,400.00 and I am not releasing large spec checks because this amount is for the normal daily check activities. Now, if you want me to release large spec checks please fax me an authorization of release otherwise I will just wait for the carrier's reimbursements or a confirmation of additional deposits from your.

M BA - Managed Benefits Administrator
P.O. Box 651109 ● Salt Lake City, UT 84165-1109
3625 South West Temple Ste 200● Salt Lake City,  UT  84115
Phone: (801) 268-3334 ● Fax: (801) 266-2581

### F A X  T R A N S M I T T A L

Date:                    October 1, 2001

To:                      Janie

Company:                 San Benito C.I.S.D.

Fax #:                   956-361-6187

Regarding:               check registers

Number of Pages:         1

Senders Name:            Carol Frandsen

● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ●

Yes, ... have met the 1 million dollars amount.
Also, I need you to fax me the confirmation of deposit as soon as possible. Today's checks total up to $55,755.64 and Friday's check total up to 47,551.56 and these are not spec. They are being released today so please fax me the confirmation of deposit. I have also requested a letter from Jose authorizing me to release all the large spec checks and I have not received anything from him yet. Thus, I am not releasing any of the large spec checks unless I receive that confirmationn from him or a confirmation of deposit.
Thanks
Carol Frandsen

# COPY OF TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, ) | Deposition of: |
| ) | **PHYLLIS K. MERRILL** |
| Plaintiffs, ) | **VOLUME I** |
| vs. ) | |
| COMPANION LIFE INSURANCE COMPANY, MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS, INC., J. ALLAN HALL & ASSOCIATES, INC., and MBA OF WYOMING, INC., ) | |
| Defendants. ) | Civil Action No.: B-03-047 |

July 21, 2003 - 5:30 p.m.

Location:  Offices of CitiCourt Reporting
50 S. Main, Suite 830
Salt Lake City, Utah

Reporter:  Vicky McDaniel, RMR
Notary Public in and for the State of Utah

EXHIBIT "D"



CitiCourt, LLC
THE REPORTING GROUP

50 South Main, Suite 830
Salt Lake City, Utah 84144

801.532.3441          TOLL FREE 877.532.3441          FAX 801.532.3414

```
1              A P P E A R A N C E S

2   FOR THE PLAINTIFF:

3           STEPHEN E. WALRAVEN, ESQ.
            OTTO S. GOOD, ESQ.
4           SHADDOX, COMPERE, WALRAVEN & GOOD, P.C.
            The North Frost Center
5           1250 N.E. Loop 410, Suite 725
            San Antonio, TX  78209
6           (210) 822-2018

7   FOR DEFENDANTS MBA OF WYOMING, INC., AND MANAGED
    BENEFITS ADMINISTRATOR AND INSURANCE
8   CONSULTANTS, INC.:

9           FRED L. SHUCHART, ESQ.
            MASON, COPLEN, SHUCHART, HUTCHINS
10             & BANKS
            7500 San Felipe, Suite 700
11          Houston, TX  77063
            (713) 785-5595
12
    FOR DEFENDANT COMPANION LIFE INSURANCE COMPANY:
13
            SHELBY J. BUSH, ESQ.
14          PIPER RUDNICK
            1717 Main Street, Suite 4600
15          Dallas, TX  75201-4605
            (214) 743-4500
16
    FOR DEFENDANT J. ALLAN HALL & ASSOCIATES:
17
            ROBERTA J. HEGLAND, ESQ.
18          BRACEWELL & PATTERSON L.L.P.
            2000 One Shoreline Plaza, South Tower
19          800 Shoreline Boulevard
            Corpus Christi, TX  78401-3700
20          (361) 866-7226

21          ALBERT GEORGE, ESQ.
            J. ALLAN HALL & ASSOCIATES, INC.
22          55 Monument Circle, 11th floor
            Indianapolis, IN  46204
23
    ALSO PRESENT:  Don Merrill
24

25
```

Phyllis K. Merrill, 7/21/03                    6

```
 1        A.     It did settle.

 2        Q.     What is your educational background?

 3        A.     I have only a high school graduation.

 4        Q.     Now, my understanding -- what is your

 5   current title with MBA?

 6        A.     Chief operations officer.

 7        Q.     Okay.  And that means different things to

 8   different people.  What's that mean in terms of MBA?

 9        A.     I have oversight of the operations of the

10   company, including the claims department, the group

11   administration department.

12        Q.     And for how long have you been the COO?

13        A.     Since January 1, 2001.

14        Q.     Okay.  Before that what was your position

15   with MBA, if you had one?

16        A.     I was director of operations.

17        Q.     Day to day, what did you do as director of

18   operations?

19        A.     Same thing, different company.

20        Q.     Okay.  So when you were director of

21   operations, was that for MBA of Wyoming, Inc.?

22        A.     That's correct.

23        Q.     And then when you became COO, is that when

24   MBA began to call themselves MBA/ICI?

25        A.     Yes.
```

Phyllis K. Merrill, 7/21/03                    7

1      Q.    And that would have been sometime in January

2   of 2001?

3      A.    Yes.

4      Q.    And let me tell you, I'm going to skip

5   around, because I don't want to ask all the questions

6   that your husband was asked.

7           Were you at that meeting in May of -- I

8   believe it was May of 1999 when Mr. Hall came to visit?

9      A.    I was in a meeting with Mr. Hall, and not

10  certain of the dates.

11     Q.    Okay.  You just don't remember the date?

12     A.    No.  I don't remember the year, actually.

13     Q.    Okay.  Now, you've heard your husband

14  testify to what he recalls being said in the meeting?

15     A.    Yes.

16     Q.    Do you have any other -- do you recall

17  anything else that was said in that meeting other than

18  what Mr. Merrill has already testified to?

19     A.    I remember the questions that were brought

20  with regard to are we interested in writing more

21  business with Mr. Hall's organization, and through

22  Mr. Shuchart.  We were in general just interviewing, I

23  think to find out what their turnaround time was,

24  carriers they used, what the characteristics of the

25  carriers were, what their ratings were.  And I think

1   the reason I was included is from the operational

2   standpoint, the filing of claims, how that really --

3   they really wanted to see everyone, make sure we

4   understood their operational, you know, how we could

5   handshake with them.

6       Q.   Do you recall --

7       A.   Hand-off of claims.

8       Q.   Do you recall the conversations about

9   advance funding?

10      A.   I do.

11      Q.   And do you recall anything different from

12  what your husband said?

13      A.   I think he said it right on.

14      Q.   Now, when you say you have oversight over

15  MBA, what do you do day to day?

16      A.   I assist in and facilitate the main work of

17  MBA through employees.  I'm there to answer questions

18  or find resources to answer questions with regard to

19  gray areas of claims payment, the newer laws, the HIPAA

20  laws, COBRA, FMLA, ADA, all of that stuff, ERISA, all

21  of that, as well as to oversee the flow of documents

22  and information for that name part of our business.

23      Q.   As I recall, Mr. Merrill said that you had

24  about 20 employees.  Do you recall that?

25      A.   Yes.

San Benito vs. Companion Life Insurance
Phyllis K. Merrill, Volume II * July 21, 2003

PAGE 44

Phyllis K. Merrill, 7/22/03                44

1  to the claims manager.  It has to do with his former
2  status.  So that is why it's organized that way.  The
3  difference is he has nothing to do with the group
4  administration.
5       Q.    Which entails what?
6       A.    Which entails the eligibility functions, the
7  balancing of the funds, and the payment of the premiums
8  and fees that might be associated with subcontracting
9  organizations or other, including MBA that provides
10 services to the District for the plan.
11      Q.    And I think yesterday also it was discussed
12 that Mr. Nixon now pays more attention to stop loss
13 contracts with regard to specific advance funding.  Why
14 would that be?
15      A.    I think that he's more acutely aware that
16 there are things that have been told to us that may not
17 be accurate as to how claims are handled by the claims
18 paying organization.
19      Q.    Mr. Nixon I think you said had 20 years
20 experience with -- was it New York Life?
21      A.    You know, I don't know.  I know
22 approximates, but I don't know if it was 20 years or
23 more or less.  Roughly 20 years with New York Life.
24      Q.    And do you know what job duties he held,
25 what --

CitiCourt, LLC
(801) 532-3441

PAGE 45

Phyllis K. Merrill, 7/22/03                45

1       A.    I only know his title, and it was the claims
2  manager of group health.
3       Q.    At New York Life?
4       A.    Uh-huh.
5       Q.    Was that here locally?
6       A.    I believe he was at least for the last part
7  of his career in Salt Lake City.  I don't know about --
8       Q.    Okay.  Do you know if he dealt with stop
9  loss contracts?
10      A.    I do not.
11      Q.    I show you what was marked yesterday as
12 Exhibit 37.  Have you ever seen that document?
13      A.    I do recognize the first part of this
14 document.  I don't know what this is doing in it.  I
15 don't think that was there.  This handwritten piece to
16 Doug Routh, I don't think that was in the original
17 document that I saw, nor this part.  I don't recall
18 this being in the document that I saw originally from
19 NiiS.  That's been combined into there.
20            You know, last night when I looked through
21 this I could not remember seeing it.  But if it were
22 there I probably saw it, but I just don't remember.
23      Q.    And just for the record, you're referring to
24 a liquidity, what's called a Liquidity Corporate Fund,
25 and it's Exhibit 2 to the audit that's Exhibit 37 to

CitiCourt, LLC
(801) 532-3441

PAGE 46

Phyllis K. Merrill, 7/22/03                46

1  the deposition.
2       A.    I recognize this statement.
3       Q.    You do?
4       A.    I had requested that from the District.
5       Q.    And I have whited out the names of the
6  claimants and the dependents.
7       A.    Some of this document seems to be correct.
8       Q.    And the part that you think is maybe not in
9  the original document was a questionnaire that in this
10 document appears to have been attached to Mr. Merrill's
11 memo to Gloria Boyce undated but discusses advance
12 funding?
13      A.    In other words, she supplied us with -- this
14 may have been a by-product of the exit interview, this
15 piece here.  The piece that I saw that she gave to us
16 at her exit were the other pieces.
17      Q.    But this front part with all the narrative,
18 you've seen that before?
19      A.    I have.
20      Q.    Let's go back to --
21      A.    I don't remember all of it, but I've seen
22 it.
23      Q.    -- this listing of checks for the dependents
24 and beneficiaries that have been whited out along with
25 social security numbers.  Do you have any reason, and I

CitiCourt, LLC
(801) 532-3441

PAGE 47

Phyllis K. Merrill, 7/22/03                47

1  asked your husband yesterday, do you have any reason to
2  dispute these dates that the auditor listed as dates on
3  which the checks were actually mailed?  In other words,
4  do you understand that this case involves approximately
5  $900,000 in claims that have been denied for
6  reimbursement because the checks were not paid prior to
7  the end of the contract period?
8       A.    I think I'm aware that that's the subject.
9       Q.    Okay.  And to reach that conclusion, the
10 auditor discovered in this document and listed all
11 these checks as to the date of the check when it was
12 actually written, the amount, the date it was mailed,
13 and then the date it might have cleared the bank.  Do
14 you have any reason to dispute the date any of those
15 checks were mailed?
16      A.    I do in that I don't believe there is a
17 method to determine the actual date that they were
18 mailed, unless someone had held an envelope at the
19 provider's office.  I don't think that we would have
20 the exact date of mailing.  She may have found
21 something that I'm not aware of, but I would dispute
22 that she actually would be able to tell which dates
23 they were mailed.
24      Q.    Well, from held check lists, maybe.  Do you
25 think that could give an auditor indication as to when

CitiCourt, LLC
(801) 532-3441

CitiCourt, LLC
801.532.3441

SHEET 3   PAGE 48
Phyllis K. Merrill, 7/22/03          48
1  a check at least had not been mailed?  In other words,
2  do you have any reason to dispute that those checks,
3  whether you dispute the actual date upon which they
4  were mailed, do you have any reason to dispute that
5  those checks were not mailed by August 31st, 2001?
6      A.    The answer would be the same answer.  I
7  would not -- I would dispute that these dates could be
8  accurate, totally accurate, because she would not have
9  the tools, I don't believe, to determine when they were
10 actually mailed.  And if a day makes a difference, then
11 I would say I would dispute it until I had a chance
12 myself to go back and really do even as much as she had
13 to look at the dates they were -- or tried to determine
14 the dates they were mailed.
15     Q.    Have you not gone back --
16     A.    No, I have not.
17     Q.    -- and looked at these $900,000 worth of
18 claims that have not been reimbursed?  You haven't
19 since the time that these claims were denied gone back
20 and verified --
21     A.    No, I have not.
22     Q.    Oh, okay.  Do you put a check in an envelope
23 without a cover letter when you send a check to a
24 provider?
25     A.    Claims typically do not have covering
CitiCourt, LLC
(801) 532-3441

PAGE 49
Phyllis K. Merrill, 7/22/03          49
1  letters.  They have an EOB or -- I mean, we don't write
2  a letter to every provider that was using a check.  It
3  has its EOB or it has its explanation of benefits.
4      Q.    When do you create the EOB?
5      A.    It runs off the computer probably the same
6  time as the check.
7      Q.    So you're telling me there's no document in
8  your file that would allow this auditor the ability to
9  find out when a check was actually mailed to a
10 provider?
11     A.    I don't think there is.
12     Q.    And can you explain to the jury what EOB
13 means?
14     A.    Explanation of benefits.
15     Q.    And you're telling me that that's generated
16 at the time that a check is created in the system?
17     A.    Yes.
18     Q.    And when you -- well, let me just ask, were
19 checks generated in the system with regard to the
20 District's claims and not immediately forwarded to
21 providers?
22     A.    In some instances, yes.
23     Q.    In some instances or in many instances?
24     A.    In some instances.
25     Q.    When did this practice begin?
CitiCourt, LLC
(801) 532-3441

PAGE 50
Phyllis K. Merrill, 7/22/03          50
1      A.    For San Benito School District?
2      Q.    For the District, yes.
3      A.    Sometime between the middle and the end of
4  July 2001.
5      Q.    And why do you think it began at that time?
6      A.    If you're calling it a practice, I would
7  stay with those dates.  I think that it began at that
8  time because when we went to San Benito to --
9  Mr. Merrill was presenting the prerenewal numbers, we
10 were instructed by the District to hold the checks in
11 anticipation of the refund, the reimbursement from
12 J. Allan Hall on already submitted claims that were
13 indeed paid and sent at the same time frame as the
14 printed.
15     Q.    So did it involve -- who told you that?
16 Mr. Sanchez?
17     A.    Told me what?
18     Q.    Was it Mr. Sanchez?  Yeah, Mr. Sanchez.
19     A.    Told me what?
20     Q.    Who told you to hold checks?
21     A.    Mr. Sanchez.
22     Q.    Okay.  Was it more from the standpoint of
23 hold these checks until these other paid claims have
24 been reimbursed?
25     A.    It was -- as close as I can recall, it was
CitiCourt, LLC
(801) 532-3441

PAGE 51
Phyllis K. Merrill, 7/22/03          51
1  an instruction to not send out any more of the large
2  claims and wait for the reimbursement.
3      Q.    Of paid claims?
4      A.    Reimbursement from the carrier of the
5  submitted claims.
6      Q.    Of paid claims or submitted claims?
7      A.    I don't know it got that detailed in the
8  discussion.
9      Q.    You referenced paid claims earlier.  Were
10 they paid or not?
11     MR. SHUCHART:  Objection, vague.  Define
12 definition of paid.
13     A.    I'm not sure that the actual discussion went
14 into the terminologies that you're talking about.
15     Q.    Okay.  What terminologies are you having
16 problems with?
17     A.    Your reference to were they paid -- did you
18 say they were paid or did he instruct you to send them
19 if they were paid or not paid?  I'd like you to
20 rephrase the question, repeat the question so that I
21 can understand what you want me to answer.
22     Q.    What do you consider a paid claim?
23     A.    A claim that's been paid off the system.
24     Q.    Paid off the system, what does that mean?
25     A.    It's completed in the system and a draft is
CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Phyllis K. Merrill, Volume II * July 21, 2003

PAGE 52

Phyllis K. Merrill, 7/22/03          52

1  produced.
2      Q.   A draft meaning a check?
3      A.   Uh-huh.
4      Q.   So you don't consider the provider receiving
5  the money, or the money even being sent to the provider
6  as a paid claim?
7      A.   Not under the concept that we were working
8  under with advance funding in place.
9      Q.   And again, what can you show me that
10 indicated you had advance funding in place from the
11 standpoint of my client, Companion Life Insurance
12 Company?  Where did they ever agree to provide specific
13 advance funding?
14         MR. SHUCHART:  Objection, asked and
15 answered.
16     A.   I'm not sure that I can point you to the
17 document.
18     Q.   Have you ever seen a document?
19     A.   I don't remember.
20     Q.   Is it your understanding that stop loss,
21 that this is a reimbursement contract?
22         MR. SHUCHART:  You're referring to the
23 policy?
24     Q.   I'm referring to the stop loss contract.
25     A.   Am I aware that it's a reimbursement
CitiCourt, LLC
(801) 532-3441

PAGE 53

Phyllis K. Merrill, 7/22/03          53

1  contract?
2      Q.   Is it your understanding?
3      A.   Is it my understanding.  I heard the
4  depositions yesterday, and I heard the questions and
5  answers.  And based upon the questions and answers, I
6  would say that you have a specific definition for the
7  term "reimbursement," and that under your definition,
8  which may be different than what I'm aware of, yes, it
9  is a reimbursement contract that you have.
10     Q.   Okay.  And how do you -- what's your
11 understanding of what reimbursement means?
12     A.   It means that if the insurance company is
13 insuring the claim that they will pay the claim, either
14 in advance of the funds being sent to the providers or
15 in a simultaneous manner.
16     Q.   And that's your definition of reimbursement?
17     A.   Yes.
18     Q.   When you say insuring the claim, have you
19 ever heard the terminology "reinsurance"?
20     A.   Repeat the question.
21     Q.   Have you ever heard of the terminology
22 "reinsurance"?
23     A.   I have heard it.
24     Q.   What do you think reinsurance means?
25     A.   It's insurance on insurance.
CitiCourt, LLC
(801) 532-3441

PAGE 54

Phyllis K. Merrill, 7/22/03          54

1      Q.   Okay.  Would you agree with me that the
2  District is acting as an insurance company?
3      A.   No.
4      Q.   And why not?
5      A.   It is a medical benefit plan, not insurance.
6      Q.   Have you ever heard the terminology
7  "self-insurer"?
8      A.   I have.
9      Q.   And what do you think that means?
10     A.   I think it's a term that's used loosely, and
11 I think that it refers generally to clients who run
12 plans such as San Benito ran.  Most of them are ERISA
13 plans.
14     Q.   Do you think the self-insured plan bears any
15 risk?
16         MR. SHUCHART:  Objection, vague.
17     A.   The ERISA plans and the plans that the
18 District ran?
19     Q.   Yes.
20     A.   Certainly bears risk.
21     Q.   And in the situation where you have a number
22 of, an inordinate number of large claims, that might
23 tend to put a crimp in the District's formula, as you
24 will.  In other words, Mr. Sanchez did not want to use
25 his reserve to pay these large claims because it was
CitiCourt, LLC
(801) 532-3441

PAGE 55

Phyllis K. Merrill, 7/22/03          55

1  going to mess up his reserve, it was going to mess up
2  his formula.  Do you recall any discussion along these
3  lines?
4          MR. GOOD:  Objection, form.  Multifarious.
5      A.   I recall in the discussion at that meeting
6  that he was disturbed and distressed that J. Allan Hall
7  had not reimbursed claims that had already been sent in
8  that were getting quite old.  And he wanted them to do
9  their duty under the contract which would then of
10 course replace funds that had already been depleted
11 from his reserve.
12     Q.   Okay.  When you say claims that had already
13 been sent in, are you talking about paid to the
14 provider or are you talking about sent in to the MGU,
15 or both?
16     A.   I'm talking about claims that had been
17 submitted for payment from the MGU.
18     Q.   Had those claims been -- had payment of
19 those claims been sent to the provider?
20     A.   Yes.
21     Q.   Do you know what specific claims was the
22 subject of that conversation?  In other words, what
23 claims was Mr. Sanchez discussing that had been
24 submitted to J. Allan Hall and had not been reimbursed?
25     A.   Claims that had maxed the specific
CitiCourt, LLC
(801) 532-3441

# COPY OF TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, | ) ) ) | Deposition of: |
| Plaintiffs, | ) ) | **GLADE C. NIXON** |
| vs. | ) ) ) | |
| COMPANION LIFE INSURANCE COMPANY, MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS, INC., J. ALLAN HALL & ASSOCIATES, INC., and MBA OF WYOMING, INC., | ) ) ) ) ) ) | |
| Defendants. | ) ) | Civil Action No.:   B-03-047 |

**October 30, 2003 - 9:28 a.m.**

Location:  Offices of MBA
3625 South West Temple
Salt Lake City, Utah

Reporter:  Vicky McDaniel, RMR
Notary Public in and for the State of Utah

# EXHIBIT "E"



**CitiCourt, LLC**
THE REPORTING GROUP

50 South Main, Suite 830
Salt Lake City, Utah 84144

801.532.3441          TOLL FREE 877.532.3441          FAX 801.532.3414

```
 1                  A P P E A R A N C E S

 2   FOR THE PLAINTIFF:

 3           STEPHEN E. WALRAVEN, ESQ.
             SHADDOX, COMPERE, WALRAVEN & GOOD, P.C.
 4           The North Frost Center
             1250 N.E. Loop 410, Suite 725
 5           San Antonio, TX  78209
             (210) 822-2018
 6
     FOR DEFENDANTS MBA OF WYOMING, INC., AND MANAGED
 7   BENEFITS ADMINISTRATOR AND INSURANCE
     CONSULTANTS, INC.:
 8
             FRED L. SHUCHART, ESQ.
 9           MASON, COPLEN, SHUCHART, HUTCHINS
               & BANKS
10           7500 San Felipe, Suite 700
             Houston, TX  77063
11           (713) 785-5595

12   FOR DEFENDANT COMPANION LIFE INSURANCE COMPANY:

13           SHELBY J. BUSH, ESQ.
             PIPER RUDNICK
14           1717 Main Street, Suite 4600
             Dallas, TX  75201-4605
15           (214) 743-4500

16   FOR DEFENDANT J. ALLAN HALL & ASSOCIATES:

17           ROBERTA J. HEGLAND, ESQ.
             BRACEWELL & PATTERSON L.L.P.
18           2000 One Shoreline Plaza, South Tower
             800 Shoreline Boulevard
19           Corpus Christi, TX  78401-3700
             (361) 866-7226
20

21

22

23

24

25
```

Glade C. Nixon, 10/30/03                                          47

1      A.      I am.

2      Q.      What does that term mean to you?

3      A.      Advanced funding is a value-added program

4  that provides advanced funding for a client who may

5  incur large claims that would tax their cash flow,

6  allows the client to request an advanced funding of

7  claims that were processed, receive the reimbursement

8  from the carrier and release the claims to the

9  providers upon receipt of that reimbursement.

10     Q.      In your work at New York Life you never

11 dealt with stop loss insurance and advance funding,

12 correct?

13     A.      I did not.

14     Q.      So the first time you ever dealt with that

15 would be at MBA, correct?

16     A.      That is correct.

17     Q.      And can you estimate for me the proportion

18 of contracts that you dealt with that had this advanced

19 funding feature?

20     A.      To the best of my knowledge, 100 percent of

21 the carriers that we dealt with had advanced funding.

22     Q.      And not only 100 percent of the carriers,

23 but would that be true of 100 percent of the contracts?

24 That is, not just J. Allan Hall offered it, but every

25 J. Allan Hall contract that you dealt with, did that

Glade C. Nixon, 10/30/03                    52

1      Q.     Did any stop loss carrier ever say to you,
2  are you sure these checks have been paid, they need to
3  have been put in the mail?  Did that issue ever come up
4  in any of your claim paying?
5             MR. SHUCHART:  Other than --
6      Q.     Before the San Benito mess.
7      A.     You're asking me to go back for --
8      Q.     If you remember.
9      A.     -- seven years.  You know, I don't
10  specifically recall any.
11     Q.     Let me ask a narrower question.  Think just
12  about J. Allan Hall.  Until the audit by J. Allan Hall
13  in the fall of 2001, had J. Allan Hall ever said
14  anything about advanced funding or claims being paid or
15  checks being put in the mail or anything like that?
16     A.     Not to my knowledge.
17     Q.     In talking about J. Allan Hall, did you
18  encounter any other problems, difficulties, slow
19  payment when dealing with J. Allan Hall?
20     A.     At some point in time we had difficulties,
21  but I don't recall whether it was J. Allan Hall or
22  other carriers or -- specifically I don't recall.
23     Q.     Do you recall anything different about
24  J. Allan Hall in the way they processed claims, were
25  they more difficult to deal with, pickier on dealing



IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

SAN BENITO CONSOLIDATED
INDEPENDENT SCHOOL DISTRICT,

                    Plaintiff,              Case No. B-03-47

        v.

COMPANION LIFE INSURANCE           **CERTIFIED COPY**
COMPANY, MANAGED BENEFITS
ADMINISTRATOR AND INSURANCE
CONSULTANTS, INC., J. ALLAN
HALL & ASSOCIATES, INC., AND
MBA OF WYOMING, INC.,

                    Defendants.
_____/


                    DEPOSITION OF:

                 DOUGLAS C. ROUTH

              Tuesday, February 3, 2004




Reported by:      Suzanne A. Quan
                  C.S.R No. 5157




            SUZANNE A. QUAN & ASSOCIATES
            Certified Shorthand Reporters
                   1490 Acton Street
            Berkeley, California  94702
                   (510) 528-1920




EXHIBIT "F"

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

Deposition of DOUGLAS C. ROUTH
Tuesday, February 3, 2004

PAGE

EXAMINATION BY MR. SHUCHART            5

EXAMINATION BY MR. GOOD               31

EXAMINATION BY MS. HEGLAND            40

FURTHER EXAMINATION BY MR. GOOD       51

---oOo---

(No exhibits were marked.)

2

Deposition of DOUGLAS C. ROUTH

1      A.   No, not to my knowledge.

2      Q.   Okay.  I think you cleared this up; I want to

3   make sure.

4           You made a statement, I wrote it word for

5   word.  You said some companies didn't have advance

6   funding.  They processed claims because they knew they

7   were going to have to pay this.  And that confused me.

8           Did you mean by that that they didn't

9   specifically say in the policy there was advance

10  funding, but administratively, they actually paid the

11  claims as if there was advance funding?

12     A.   That is correct.

13          MS. HEGLAND:  Objection.  Calls for

14  speculation.

15  BY MR. GOOD:

16     Q.   Do you have to guess about this, what I just

17  asked you?

18     A.   No, sir.

19     Q.   You -- based on your experience, you know

20  this?

21     A.   Yes, sir.

22     Q.   And was that -- how prevalent was that in the

23  industry of stop loss carriers to administratively do it

24  even though the policy didn't say they had to?

25          MS. HEGLAND:  Objection.  Calls for

SUZANNE A. QUAN, CSR    (510) 528-1920

35

Deposition of DOUGLAS C. ROUTH

1  speculation.

2  BY MR. GOOD:

3      Q.   Is that something you have to speculate about

4  before you answer the question?

5      A.   No, sir.

6      Q.   All right.

7      A.   Most companies did it because it's a way of

8  getting business.  It's like you're buying a used car.

9  You wash them; you make them look clean.  It was a

10  little, you know, yeah, we are going to help you with

11  the claims because we're a good company and you'll use

12  us and use us more often.

13      Q.   And was this true in 2000?

14      A.   Yes, sir.

15      Q.   Was this true in 2001?

16      A.   Yes, sir.

17      MS. HEGLAND:  Objection.  Speculation.

18  BY MR. GOOD:

19      Q.   Is this something you have to speculate about,

20  Mr. Routh?

21      A.   No.

22      MS. HEGLAND:  About every stop loss carrier in

23  the universe?

24      Objection.  Calls for speculation.

25      MR. GOOD:  No.

36

SUZANNE A. QUAN, CSR   (510) 528-1920

Deposition of DOUGLAS C. ROUTH

1    have companies that are stable, that are going to pay

2    claims, and --

3        Q.    Okay.  Now, can you tell the jury, if you

4    know, why advance funding, whether it's something that's

5    actually endorsed on the policy or whether it's

6    something that is done administratively by a company,

7    why that would be a benefit to an employer who has a

8    self-funded plan?

9            MS. HEGLAND:   Objection.  Vague.

10           THE WITNESS:   I believe that an employer wants

11   to have it so he doesn't have to front the money

12   himself.

13   BY MR. GOOD:

14       Q.    In other words, he wouldn't have to maintain X

15   dollars in the bank account?

16       A.    Right.

17       Q.    In effect, the stop loss carrier was going to

18   pay the provider rather than the employer having to

19   first pay and then seek reimbursement?

20       A.    Yeah, yeah.

21       Q.    Now, you said you didn't believe J. Allan Hall

22   provided advance funding.  Do you recall that?

23       A.    Yes, sir.

24       Q.    Now, when you said that, did you mean they

25   didn't provide it in terms of actually endorsing it on

Deposition of DOUGLAS C. ROUTH

1   to the policy, they didn't do it administratively or

2   both?

3        A.    I believe that it is in the endorsement in the

4   policy.

5        Q.    You didn't think they did that?

6        A.    I did not think they did it.

7        Q.    Do you know if they did it, as you would term,

8   administratively?

9              MS. HEGLAND:   Calls for speculation.

10  Objection.

11             THE WITNESS:   I believe they did it as a

12  courtesy.

13  BY MR. GOOD:

14       Q.    Courtesy?

15       A.    Courtesy.

16             MS. HEGLAND:   Objection.   Calls for

17  speculation.

18  BY MR. GOOD:

19       Q.    How do you know that?   So we don't have to

20  deal with this speculation objection.

21       A.    How do I know that?

22       Q.    Yes, sir.

23       A.    I believe in dealing with J. Allan Hall, and

24  claims were processed, and the number of claims that

25  were sent in.   And did I see all of them?   No.   But we



## WILLIAM LARRY BLAGG - CONDENSED TRANSCRIPT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SAN BENITO CONSOLIDATED   )
INDEPENDENT SCHOOL DISTRICT,)
                       )
       Plaintiff,  )
                       )
      -v-         ) CIVIL ACTION NO.
                       ) B-03-047
COMPANION LIFE INSURANCE   )
COMPANY,                 )
et al.,                 )
                       )
      Defendants.  )

### VIDEOTAPED DEPOSITION OF WILLIAM LARRY BLAGG

The videotaped deposition upon oral examination of **WILLIAM LARRY BLAGG,** a witness produced and sworn before me, Aprille Lucas, RPR, Notary Public in and for the County of Hamilton, State of Indiana, taken on behalf of the Plaintiff at the offices of Garrison & Kiefer, 8720 Castle Creek Parkway, Suite 200, Indianapolis, Indiana, on July 31, 2003, at 1:44 p.m., pursuant to the Federal Rules of Civil Procedure.

**ASSOCIATED REPORTING, INC.**
**TWO MARKET SQUARE CENTER - SUITE 940**
**251 EAST OHIO STREET**
**INDIANAPOLIS, INDIANA 46204**
**(317) 631-0940**

# EXHIBIT "G"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SAN BENITO CONSOLIDATED )
INDEPENDENT SCHOOL DISTRICT, )
              Plaintiff, )
                       )
      -v-              ) CIVIL ACTION NO.
                       ) B-03-047
COMPANION LIFE INSURANCE )
COMPANY,               )
et al.,                )
              Defendants. )

VIDEOTAPED DEPOSITION OF WILLIAM LARRY BLAGG

The videotaped deposition upon oral examination of
WILLIAM LARRY BLAGG, a witness produced and sworn
before me, Aprille Lucas, RPR, Notary Public in and for
the County of Hamilton, State of Indiana, taken on
behalf of the Plaintiff at the offices of Garrison &
Kiefer, 8720 Castle Creek Parkway, Suite 200,
Indianapolis, Indiana, on July 31, 2003, at 1:44 p.m.,
pursuant to the Federal Rules of Civil Procedure.

ASSOCIATED REPORTING, INC.
TWO MARKET SQUARE CENTER - SUITE 940
251 EAST OHIO STREET
INDIANAPOLIS, INDIANA 46204
(317) 631-0940

APPEARANCES

FOR THE PLAINTIFF:

Stephen E. Walraven, Esq.
Otto S. Good, Esq.
SHADDOX COMPERE WALRAVEN & GOOD
The North Frost Center
1250 N.E. Loop 410
Suite 725
San Antonio, TX  78209

FOR THE DEFENDANT COMPANION LIFE:

Shelby Bush, Esq.
PIPER RUDNICK
1717 Main Street, Suite 4600
Dallas, TX  75201-4605

FOR THE DEFENDANTS MANAGED BENEFITS ADMINISTRATOR,
INSURANCE CONSULTANTS, INC. AND MBA OF WYOMING:

Hon. Rolando Olvera
THE GARCIA LAW FIRM
201 North 1st St.
Harlingen, TX  78550

FOR THE DEFENDANT J. ALLAN HALL & ASSOCIATES:

Roberta J. Hegland, Esq.
BRACEWELL & PATTERSON, LLP
2000 One Shoreline Plaza, South Tower
800 North Shoreline Boulevard
Corpus Christi, TX  78401-3700

Albert George, Esq.
GARRISON & KIEFER, P.C.
8720 Castle Creek Pkwy, Suite 200
Indianapolis, IN  46250

Also present:  Michelle Bartlett, Legal Video Services
               James Allan Hall
               J. Allan Hall & Associates

INDEX OF EXAMINATION

                                          Page
EXAMINATION BY MR. WALRAVEN ....................    5
EXAMINATION BY MR. OLVERA ......................   63
EXAMINATION BY MR. BUSH ........................   64
EXAMINATION BY MS. HEGLAND .....................   65
EXAMINATION BY MR. WALRAVEN ....................   69
EXAMINATION BY MR. OLVERA ......................   76

INDEX OF EXHIBITS

                                          Page
Deposition Exhibit No.:
44   Stop-Loss Policy ...........................   29
51   Amended Notice to Take Videotaped ..........    6
     Deposition
53   Specific Advancement Rider - JAH 002407 ....   55
54   Documents evidencing the commission ........   62
     payments to MBA

1  THE VIDEOGRAPHER:  Good afternoon.  Here
2  begins videotape number one in the deposition of
3  William Blagg in the matter of San Benito
4  Consolidated Independent School District,
5  Plaintiff, versus Companion Life Insurance Company
6  Managed Benefits Administrator and Insurance
7  Consultants, Incorporated, J. Allan Hall &
8  Associates, Incorporated, and MBA of Wyoming,
9  Incorporated, Defendants in the United States
10  District Court, Southern District of Texas,
11  Brownsville Division, the case number of which is
12  B-03-047.
13      Today's date is July 31st, 2003.  The time is
14  1:44 p.m.  This deposition is being taken at the
15  law offices of Garrison & Kiefer and was made at
16  the request of Steve Walraven of the law offices of
17  Shaddox Compere Walraven & Good.  The videographer
18  is Michelle Bartlett of Legal Video Services.
19      Would counsel and all present please identify
20  yourselves and state whom you represent.
21      MR. WALRAVEN:  I'm Steve Walraven, and I
22  represent the plaintiff.
23      MR. GOOD:  Otto Good, also one of the
24  attorneys for the plaintiff.
25      MR. OLVERA:  Rolando Olvera.  I represent

25

1   A.   I didn't -- say that again.
2   Q.   You were here when we talked about advanced
3        funding?
4   A.   Oh, yes.
5   Q.   You heard Mr. Hall define it for us?
6   A.   Yes.
7   Q.   Do you use that term in a different way?
8   A.   Well, we don't call it advanced funding, no.  We
9        don't, or I don't.
10  Q.   What do you call it?
11  A.   We call it simultaneous reimbursement or specific
12       advance.
13  Q.   You call it specific advance or simultaneous
14       reimbursement?
15  A.   Yes.
16  Q.   But when I asked you a question a second ago about
17       advanced funding, you knew what I was talking
18       about?
19  A.   Yes, sir.
20  Q.   Same thing as specific advance?
21  A.   Yes.
22  Q.   So the claims kit and the claims instruction and
23       the claims forms that are sent to the TPA are
24       exactly the same in connection with policies that
25       do provide for simultaneous reimbursement or

1        advanced funding as the policies that do not,
2        correct?
3   A.   That was correct at that time.  It's different no
4   Q.   Tell me how it's changed.
5   A.   In June of 2001 Companion Life developed or
6        created, however you want to say it, a rider whic
7        would cover specific or simultaneous reimbursemen
8        We worked very closely with them, and we revised
9        two more times.  The rider pretty well sets out h
10       advanced funding would work, or specific advance
11       whatever you want to call it.  I don't know that
12       can add any more than that.
13  Q.   So sometime in June of 2001 you received some
14       written documents from Companion Life about a new
15       form, correct?
16  A.   Mm-hmm.
17  Q.   And then you started --
18            MS. HEGLAND:  Larry, you have to answer yes
19       no.
20  Q.   It would be helpful if you would say yes or no.
21  A.   Yes.
22  Q.   Thank you, I'm sorry --
23  A.   Thank you.
24  Q.   -- I shouldn't have let you go.  And at that time
25       you began working with them on the -- I'm sorry,

27

1        the form, correct?
2   A.   Well, we actually worked with them before they
3        released that one in June.
4   Q.   Okay, well, that's what I was trying to find out --
5   A.   Yeah, we were looking for some specific provisions
6        in it.  You don't want to have a specific advance
7        or simultaneous reimbursement for a very small
8        amount.  So we were talking about a threshold
9        amount before we would allow it.
10            The other thing was a discussion as to whether
11       it would be allowed in the last month of a contract
12       year, and we went one way, and we turned around and
13       went the other way at the end of the process,
14       but --
15  Q.   What was the first way, and what was the second
16       way?
17  A.   The first way, no specific advance in the final
18       month, and there was like a $5,000 threshold before
19       you could do it.  We increased the threshold, and
20       we took off the 12th month not qualifying.
21  Q.   So you could get advanced funding in the 12th month
22       of a policy?
23  A.   That's correct.
24  Q.   Or at the last month?
25  A.   I believe that was the final, yeah, that was the

1        final version.
2   Q.   And when did you start using these documents?
3   A.   June of 2001.
4   Q.   So in policies issued in June of 2000, some of th
5   A.   I doubt if it was June 1 effectives.  Most likely
6        it would have been July 1 effectives, because it
7        was late June before we actually finalized that
8        rider.  I suspect the very earliest would have be
9        July 1 effective dates for 2001.
10  Q.   Was there some sort of phase-in period before the
11       were used in connection with all contracts, or wa
12       it pretty much used universally in all contracts
13       that had that benefit?
14  A.   It was not universal.  It still came back to
15       specific reimbursement or advanced specific
16       reimbursement had to be requested.  The carrier h
17       instructed us to make certain that at least
18       1 percent of premium was added for that
19       accommodation.
20  Q.   And prior to June of 2001, what sort of paperworl
21       was used, if any, in connection with policies th
22       provided this advanced funding or simultaneous
23       reimbursement feature?
24  A.   There was no separate document.  It was included



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SAN BENITO CONSOLIDATED      )
INDEPENDENT SCHOOL DISTRICT, )
                             )
            Plaintiff,       )
                             )
            -v-              ) CIVIL ACTION NO.
                             ) B-03-047
COMPANION LIFE INSURANCE     )
COMPANY,                     )
et al.,                      )
                             )
            Defendants.      )

### VIDEOTAPED DEPOSITION OF JAMES ALLAN HALL

The videotaped deposition upon oral examination of **JAMES ALLAN HALL**, a witness produced and sworn before me, Aprille Lucas, RPR, Notary Public in and for the County of Hamilton, State of Indiana, taken on behalf of the Plaintiff at the offices of Garrison & Kiefer, 8720 Castle Creek Parkway, Suite 200, Indianapolis, Indiana, on July 31, 2003, at 9:00 a.m., pursuant to the Federal Rules of Civil Procedure.

**ASSOCIATED REPORTING, INC.**
**TWO MARKET SQUARE CENTER - SUITE 940**
**251 EAST OHIO STREET**
**INDIANAPOLIS, INDIANA 46204**
**(317) 631-0940**

**EXHIBIT "H"**

**APPEARANCES**


FOR THE PLAINTIFF:

    Stephen E. Walraven, Esq.
    Otto S. Good, Esq.
    *SHADDOX COMPERE WALRAVEN & GOOD*
    The North Frost Center
    1250 N.E. Loop 410
    Suite 725
    San Antonio, TX  78209

FOR THE DEFENDANT COMPANION LIFE:

    Shelby Bush, Esq.
    PIPER RUDNICK
    1717 Main Street, Suite 4600
    Dallas, TX  75201-4605

FOR THE DEFENDANTS MANAGED BENEFITS ADMINISTRATOR,
INSURANCE CONSULTANTS, INC. AND MBA OF WYOMING:

    Hon. Rolando Olvera
    THE GARCIA LAW FIRM
    201 North 1st St.
    Harlingen, TX  78550

FOR THE DEFENDANT J. ALLAN HALL & ASSOCIATES:

    Roberta J. Hegland, Esq.
    BRACEWELL & PATTERSON, LLP
    2000 One Shoreline Plaza, South Tower
    800 North Shoreline Boulevard
    Corpus Christi, TX  78401-3700

    Albert George, Esq.
    GARRISON & KIEFER, P.C.
    8720 Castle Creek Pkwy, Suite 200
    Indianapolis, IN  46250

Also present:  Michelle Bartlett, Legal Video Services
               William Larry Blagg
               J. Allan Hall & Associates

1    Administrators and Insurance Consultants, Inc., and

2    MBA of Salt Lake City and Merrill Bostrum

3    Associates.  Do you know who those -- just

4    generally who those various entities are?

5  A.  I know of the entities.  I know that they do have

6    various names.  What function each one of them

7    have, I do have unclarities on, yes.

8  Q.  Me, too.  For the purposes today I'm going to refer

9    to that group collectively as MBA, is that all

10   right with you?

11 A.  That's fine with me.

12 Q.  You understand the group and the people I'm talking

13   about and what they do?

14 A.  That's correct -- well, yes, I think I do.

15 Q.  You have some understanding?

16 A.  Yes.

17 Q.  Tell me how you're currently employed.

18 A.  I'm employed by J. Allan Hall & Associates, Inc.

19 Q.  And what is your job title?

20 A.  My job title is President and Chief Executive

21   Officer.

22 Q.  How long have you had that position?

23 A.  Since 1993.

24 Q.  I'm sorry, tell me the date again.

25 A.  1993.

1   Q.  And when was J. Allan Hall & Associates formed?

2   A.  1993.

3   Q.  I thought I saw something somewhere that suggested

4       it was incorporated in 1983?

5   A.  It was actually incorporated in 1983, but it was

6       dormant for about ten years.  It was active for a

7       number of months and then became dormant, no

8       business going in or out, no staff, no financials

9       of any sort, until 1993.

10  Q.  And what is the business of J. Allan Hall &

11      Associates?

12  A.  The business of J. Allan Hall & Associates

13      primarily is one of being a managing general

14      underwriter for stop-loss insurance.

15  Q.  And has that been true since 1993?

16  A.  That's correct.

17  Q.  Just for someone unfamiliar with the term, would

18      you give us a layman's explanation of what you mean

19      by stop-loss insurance?

20  A.  Stop-loss insurance is not unlike regular

21      insurance, except it's on the level whereby a

22      contract is edited to instead of between an

23      employer and employee, it's between an insurance

24      company and an employer to protect against

25      catastrophic losses that the employer incurs on

1      behalf of their employees.

2   Q.  And we're talking health insurance?

3   A.  In terms of health insurance, yes.

4   Q.  And has J. Allan Hall been in the business of

5       providing the services associated with being a

6       managing general underwriter for stop-loss

7       insurance continuously since 1993?

8   A.  That's correct.

9   Q.  Does your firm do anything else of any appreciable

10      amount?

11  A.  Not of any appreciable amount.

12  Q.  And has it done anything else of any appreciable

13      amount since 1993?

14  A.  No.

15  Q.  And for what insurance companies does your firm

16      provide the services as an MGU?

17  A.  At this point in time we represent Companion Life

18      Insurance.

19  Q.  Anyone else?

20  A.  Presidential Life Insurance Company, and that's it.

21  Q.  And what percentage of your efforts are devoted to

22      Companion Life?

23  A.  At this point in time probably 99 percent.

24  Q.  And has that been true for the last ten years?

25  A.  No, it has not.

1    Q.   Has it been true for the last five years?

2    A.   Yes, maybe not in those proportions.

3    Q.   But the great majority of your efforts have been

4         devoted to Companion Life?

5    A.   That's correct.

6    Q.   And during the last five years have there been

7         other companies that you provided those services to

8         besides Presidential and Companion?

9    A.   Yes.

10   Q.   Who else?

11   A.   Clarendon Insurance Company, Pan American Life

12        Insurance Company.  That's all.

13   Q.   And during what periods of time were you active on

14        behalf of Clarendon?

15   A.   Approximately from the period 1996 to 2000.

16   Q.   And for what period of time were you active on

17        behalf of Pan American Life?

18   A.   2001 to 2002.

19   Q.   Now, you mentioned that you're President and Chief

20        Executive Officer of your firm, and to me that

21        suggests that you, to a greater or lesser degree,

22        are active in the supervision of every aspect of

23        your firm's business.  Is that true, or are there

24        certain portions of your firm's business that you

25        really have very little to do with?

1  Q.  No, no, no, types.

2         MS. HEGLAND:  Objection, overbroad.

3  A.  That's very difficult.  I mean there's a hundred

4      variables that go into negotiation of any

5      particular contract.  So a type could be the length

6      of the contract.  The type could be various nuances

7      within underwriting the contract in terms of

8      individual claims that we're reviewing.  The type

9      of contract could be other time-related aspects of

10     it in terms of when a claim is incurred or when it

11     is paid, those sorts of things.  To put a number on

12     it would be very difficult for me.

13  Q.  And I guess another term in addition that you used

14     is managing general underwriter.  In addition to

15     the underwriting functions that you just described,

16     what else does a managing general underwriter do?

17  A.  Other aspects of the underwriter, the managing

18     general underwriter does is administer those

19     accounts that are underwritten and sold, meaning

20     collection of premium, adjudication and payment of

21     catastrophic claims, payment of commission,

22     rendering reports to the insurance companies that

23     we represent.

24  Q.  And are those functions provided by your firm to

25     Companion Life?

1  A.  That's correct.

2  Q.  And did your firm provide those functions in

3      connection with the policies of Companion Life that

4      were issued to the San Benito School District?

5  A.  That's correct.

6  Q.  And how is your firm compensated for those efforts?

7  A.  We are compensated for those efforts by collecting

8      or retaining a percentage of the premium.

9  Q.  And what percentage is that?

10 A.  It varies, but most normally it's 10 percent.

11 Q.  Do you know what it was in connection with the San

12     Benito contracts?

13 A.  Not precisely, no.

14 Q.  But generally it's 10 percent?

15 A.  I would say it was 10 percent.  I mean generally

16     speaking it's going to be 10 percent.  To the

17     extent that during the underwriting process terms

18     and conditions are negotiated, that's one of the

19     terms that is a negotiable item.

20 Q.  And is that percentage inclusive of commissions

21     paid to others, agents or brokers in connection

22     with the sale of the policies?

23 A.  It does not include that.

24 Q.  And are you responsible for making those payments

25     or administering those payments?

1    those payments started slowing down due to some

2    sort of cash flow problem or solvency problem, and

3    that's the reason I'm asking it.  And I'm wondering

4    if you have any information on what happened or

5    why?

6  *A.*  No, I don't.

7  *Q.*  As far as -- you're not aware of that happening?

8  *A.*  No.

9  *Q.*  You're not aware of any financial reason why it

10    might have happened in 2001?

11  *A.*  No, I'm not.

12  *Q.*  As far as you know, for that year there's plenty of

13    money?

14  *A.*  Sure.

15        *THE WITNESS:*  Can we take a break?

16        *MR. WALRAVEN:*  Anytime you like, you just let

17    us know, and we'll be happy to do so.

18        *THE VIDEOGRAPHER:*  We are going off the

19    record.  The time is 10:51 a.m.

20       (*A brief recess was taken.*)

21        *THE VIDEOGRAPHER:*  We are back on the record.

22    The time is 11:07 a.m.

23        (*Deposition Exhibit 48 is marked for*

24    *identification.*)

25  *Q.*  Mr. Hall, resuming more or less where we left off,

```
 1        I have handed you a document that's been marked as
 2        Deposition Exhibit 48, and first of all I'd like to
 3        ask you if you've ever seen that document before?
 4   A.   Yes, I have.
 5   Q.   Does it have your signature on the bottom or on the
 6        signature page, wherever it is?
 7   A.   Yes, it does.
 8   Q.   And does it have your initials on each page?
 9   A.   Yes, it does.
10   Q.   What is that document?
11   A.   It's a document entitled General Managers
12        Agreement.
13   Q.   And who are the parties to that agreement?
14   A.   The parties are J. Allan Hall & Associates and
15        Companion Life Insurance Company.
16   Q.   And what is the date of that agreement?
17   A.   The date of this agreement is October 17th, 1998.
18   Q.   Is that agreement still in place or has it been
19        superseded by another agreement?
20   A.   I believe this agreement is in place at this point
21        in time.
22   Q.   Are there any other agreements between your firm
23        and Companion Life?
24   A.   Not that I'm aware of.
25   Q.   I have just a couple of questions about it, if you
```

```
 1        in the application and the schedule, then those
 2        policy provisions would be included in the policy.
 3   Q.   By attaching that rider that you described?
 4   A.   Correct.
 5   Q.   Now, we have already had described to us, and I'm
 6        sure you've heard about it, a meeting that took
 7        place between you and Don and Phyllis Merrill in
 8        1999.  Do you recall such a meeting?
 9   A.   Vaguely --
10             MS. HEGLAND:   Object to sidebar.
11   A.   Vaguely, yes.
12   Q.   How many meetings would you say you've had with
13        Mr. and Mrs. Merrill?
14   A.   If you asked me how many meetings I've had with
15        Mr. Merrill, I would say four.  I can't include
16        Mrs. Merrill, because I don't recall her being
17        there.
18   Q.   At any of them?
19   A.   She may have; she may have not.
20   Q.   You just don't recall?
21   A.   Yeah.
22   Q.   And over what period of time did you have these
23        meetings?
24   A.   Three years.
25   Q.   And would '99 have been the first of the three, the
```

1      middle, the end of the three; over what three years

2      did you have these meetings?

3   A.  I can't recall with precision.  The meeting that

4      you're talking about in 1999 was not the first

5      meeting.

6   Q.  And can you recall anything about what you

7      discussed with Mr. Merrill at that meeting?

8   A.  Not with precision, no.

9   Q.  Did you make any notes or otherwise have any kind

10     of written summary of items discussed?

11  A.  Not in my own notes, no.

12  Q.  You didn't have a follow-up letter to Mr. Merrill

13     or anyone else saying, we talked about these

14     things, or any other written document that might

15     summarize the substance of those conversations?

16  A.  Not as a general rule, no.  I mean there was not a

17     document that said, here are the ten items that we

18     discussed.  I'm sure that there are items that we

19     discussed that I did follow up with, but I don't

20     know each and every item that we talked about.

21        Generally speaking, in those meetings it's the

22     condition of the market, how he was doing as a TPA,

23     how he was doing as a broker, how I was doing as a

24     MGU, how we could work together to produce more

25     business.

1   Q.   Do you recall any conversations about the specifics

2        of the policies that you were offering?

3   A.   No.

4   Q.   Do you recall whether or not you talked about

5        advanced funding?

6   A.   With precision, no.

7   Q.   Well, do you --

8   A.   I'm not saying it wasn't discussed.  I'm just --

9   Q.   You don't recall one way or the other?

10  A.   No.

11  Q.   Do you recall a discussion about a questionnaire?

12  A.   Yes, I do.

13  Q.   And I believe you offered, did you not, to provide

14       him with a sample questionnaire?

15  A.   Yes, I did.

16  Q.   And by questionnaire, we are talking about

17       questions that a TPA might submit to a stop-loss

18       carrier or its MGU concerning the stop-loss

19       insurance being offered, correct?

20  A.   That's correct.

21  Q.   And you did provide him with a sample?

22  A.   Yes, I did.

23  Q.   Did you ever fill out or answer a questionnaire for

24       Mr. Merrill?

25  A.   Yes, I did.

## GENERAL MANAGER'S AGREEMENT

This Agreement made this 17th day of October, 1998, by and between Companion Life Insurance Company (hereinafter referred to as "Insurer) & J. Allan Hall & Associates, (hereinafter referred to as "Manager").

### ARTICLE I

### PURPOSES

The purpose of this Agreement is to define and delineate the rights, duties and responsibilities of Insurer and Manager with respect to a policy or group of policies (hereinafter described as the Subject Policy or Policies) issued by Insurer and managed by Manager.

### ARTICLE II

### SUBJECT POLICIES

Section 1. Subject Policy or Policies as defined in this Agreement shall mean any and all policies of insurance providing insurance protection for life, accidental death or dismemberment, disability, dental, medical, stop loss products, or policies of insurance produced and underwritten by the insurer shall be covered by the terms of this Agreement.

SECTION 2. The term "Stop Loss Products" means Insurer's aggregate excess reinsurance agreements, specific excess accident and sickness reinsurance agreements and its excess loss insurance policies, riders and coverages generally offered to employers who establish self-funded health and welfare plans for employees or other participants.

### ARTICLE III

### PREMIUMS

SECTION 1. Manager shall collect all insurance premiums and other charges payable to Insurer or return premiums received from Insurer with respect to the Subject Policy or Policies for and on behalf of the Insurer. All such funds shall be held by the Manager in trust for the benefit of Insurer and shall be deposited promptly in a bank trust account (the "Fiduciary Account") established and maintained by the Manager for the benefit of the Insurer. All insurance premiums shall be remitted to Insurer by the 20th of the month following collection.

Initials:



EXHIBIT
48-Hall
7/31/03    al

San Benito v. Companion
JAH 002163

**SECTION 2.** There shall be no commingling in the Fiduciary Account of funds of Manager or other persons. The Fiduciary Account shall at all times be established and maintained in a bank which is a member of the Federal Reserve System and subject to terms and conditions satisfactory to and approved in writing by the Insurer. The Manager may retain in the Fiduciary Account no more than ninety days estimated claims payments and allocated loss adjustment expenses.

**SECTION 3.** The Manager shall retain copies of all bank account records relating to the Fiduciary Account and shall furnish the Insurer, upon request, with copies thereof.

**SECTION 4.** Withdrawals from the Fiduciary Account shall be made solely for:

A.    Remittance to Insurer;

B.    Deposit in an account maintained by and in the name of Insurer;

C.    Payment to a group policyholder for remittance to the insured entitled thereto, or remittance of return or excess premiums to the person or persons entitled thereto;

D.    Payment to Manager of its compensation as provided herein, and interest earnings on the Fiduciary Account; or

E.    Transfer to an interest bearing account or investment instrument, provided that:

(1)    Such account or instrument is established as a Fiduciary Account or instrument for the benefit of Insurer;

(2)    Such account is short-term and is approved in writing or is fully insured by insurance approved in writing by Insurer; or

(3)    Any such investment instrument is a short-term U.S. Treasury security, and is approved in writing by Insurer.

F.    Remittance to Reinsurer per Insurer's order.

G.    Transfer to the claims account.

Insurer may at any time, and from time to time, require that Insurer (or its designee) be added as an additional signatory to the Fiduciary Account in order to authorize withdrawals from said account.

Initials:

2

SECTION 5.  Where Manager collects funds, Manager must identify and state separately in writing to the persons paying to the Manager any charge or premium for insurance coverage, the amount of any such charge or premium specified by Insurer for such insurance coverage.

SECTION 6.  Manager agrees that all insurance premium charges collected by Manager shall be at the current rates proposed by Insurer or Reinsurer that the rates quoted by Manager shall have the prior written approval of the Insurer or Reinsurer; and further that Manager shall make adjustments to premium rates from time to time as instructed by Insurer or Reinsurer.

## ARTICLE IV

## CLAIMS

SECTION 1.  Manager is authorized to adjust and settle all specific and aggregate medical claims arising out of insurance policies issued under this Agreement in the amount of $100,000.00 or less per person per calendar year; provided, however, that all claims in excess of that amount shall be furnished to Insurer along with all available information on said claim or claims and Manager shall cooperate with Insurer in the adjustment and settlement thereof.

SECTION 2.  All claims paid by the Manager from funds collected on behalf of Insurer shall be paid only on drafts of manager as authorized in writing by Insurer.

SECTION 3.  Manager shall adjust claims only in accordance with the terms of the various insurance policies issued and in accordance with standards set forth by the Insurer.

SECTION 4.  The parties agree that Manager shall have no authority to make any settlement or agreement regarding settlement of any claim or claims that may be made against Insurer unless specifically so authorized in writing; nor shall the Manager or any person appointed by the Manager have any authority to incur any expense or obligations of any kind or nature in the name or on behalf of Insurer without express written authority in each instance; nor shall the Manager or any person appointed by the Manager have any authority to alter or discharge any policy contract or waive any policy provision or condition.

SECTION 5.  Manager shall comply with the following provisions regarding claims:

    (a)    All claims must be reported to the Insurer in a timely manner.

Initials:

3

San Benito v. Companion
JAH 002165

(b)   A copy of the claim file must be sent to the Insurer at its request or as soon as it becomes known that the claim:

(i)    has the potential to exceed five thousand dollars or exceeds the limit set by the Insurer, whichever is less;

(ii)   involves a coverage dispute;

(iii)  may exceed the Manager's claims settlement authority;

(iv)   is open for more than six months; or

(v)    is closed by payment of five thousand dollars or an amount set by the Insurer, whichever is less.

(c)   All claim files are the property of the Insurer. However, upon an order of liquidation of the Insurer, the Manager must have reasonable access to and the right to copy the files on a timely basis.

(d)   Settlement authority granted to the Manager may be terminated for cause upon the Insurer's written notice to the Manager or upon the termination of the contract. The Insurer may suspend the settlement authority during the pendency of a dispute regarding the cause for termination. If this contract is terminated or the Manager's settlement authority is suspended, notification must be given by the Manager, at the Insurer's direction within thirty days of the action to agents or brokers who have placed business with the Manager within the last twelve months.

SECTION 6.  Manager shall provide claims work up on all Life and Accidental Death and Dismemberment claims for payment by Insurer. Insurer is responsible for the settlement and payment of all Life and Accelerated Death and Dismemberment claims.

## ARTICLE V

## UNDERWRITING

SECTION 1. All underwriting and other standards pertaining to the Subject Policies by the Insurer shall conform to such standards as are from time to time set forth in writing by the Insurer or Reinsurer, and such adjustments as may be made in writing to such standards from time to time by Insurer, which shall be promptly delivered in writing to Manager in accordance with the notice provisions of this Agreement.

Initials:

4

San Benito v. Companion
JAH 002166

SECTION 2. Manager shall have authority to issue proposals and rate quotations on behalf of Insurer in accordance with the underwriting guidelines and rates in the Manuals, as most recently amended. In applying the underwriting guidelines and rates expressed in the Manuals, Manager shall have authority to exercise underwriting judgment and experience regarding deviations therefrom consistent with Insurer's and Reinsurer's generally accepted underwriting practices as conveyed to Manager. Manager shall not deviate as to those rates or guidelines where Insurer has prohibited deviations.

SECTION 3. Manager shall retain copies of all quotations or proposals made on behalf of Insurer and furnish the same to Insurer on request. Quotations or proposals which have expired and have not been accepted may be destroyed at Manager's discretion. Manager shall have authority to bind applications for insurance submitted, provided the same shall substantially comply with the Manuals. Manager will furnish such reports regarding new and renewal business as Insurer may reasonably request.

SECTION 4. Manager acknowledges that all classes of business and states where policies can be written require prior written approval by Insurer.

SECTION 5. The total gross premium that may be written under this Agreement is $50,000,000.00.

## ARTICLE VI

## DUTIES OF MANAGER

SECTION 1. Manager shall maintain all licenses required by applicable state insurance and other statutes and regulations and shall in all other respects comply with same and cause its officers, employees, agents and subagents to so comply. Manager shall, where appropriate, pay commissions to and handle correspondence with officers, employees, agents and subagents of Manager.

SECTION 2. The Manager shall file annually with the Insurer not later than May 1 an audited annual financial statement prepared by an independent certified public accountant in a form acceptable to the Insurer.

Initials:

5

San Benito v. Companion
JAH 002167

SECTION 3.  Manager shall handle on behalf of Insurer all correspondence and general clerical and administrative functions necessary to the satisfactory administration of the Subject Policies and shall maintain files relative thereto. Provided, however, Manager shall promptly forward to Insurer all insurance department complaints and inquiries received by it with regard to the Subject Policies, and shall provide all information from its records which will assist Insurer in its response to such complaints or inquiries, and otherwise cooperate fully with Insurer in connection with any such complaints or inquiries.

SECTION 4.  Manager shall prepare and mail premium notices to insureds reasonably in advance of the premium due dates; shall collect and receipt for all premiums on all policies covered hereunder; and all earned premiums collected (excluding compensation to Manager) shall be remitted to Insurer by the 20th of the month following such collection.

SECTION 5.  Manager shall underwrite and issue the Subject Policies for and on behalf of Insurer upon receipt of an appropriate application and such other information as may reasonably be required by Insurer or Manager prior to issuance of policies.

SECTION 6.  Manager agrees to indemnify and hold Insurer harmless from and against any and all losses, claims, demands, liabilities, costs (including attorney's fees) and damages which Insurer may incur by reason of any error or omission by Manager.

SECTION 7.  Manager, at its sole expense, shall be responsible for all marketing, printing and billing for all classes of business authorized by this Agreement. Provided, however, that any and all marketing materials, and miscellaneous documents which are made in Insurer's name shall not be disseminated or printed without the prior written approval of the Insurer.

SECTION 8.  From time to time Manager may desire to and is hereby authorized to work with Third Party Administrators to perform some of the duties of Manager with respect to the billing and collection of premiums of the Subject Policies as described in this Agreement. In such event:

(a)    The Third Party Administrator shall mail premium notices and collect premiums on behalf of Manager and/or Insurer.

(b)    Manager shall inspect and examine such Third Party Administrators' records which pertain to premiums billed or collected on behalf of Insurer;

Initials:

6

San Benito v. Companion
JAH 002168

(c)    Third Party Administrators shall agree to permit Insurer to examine such Third Party Administrators' books and records which pertain to it; and

(d)    Working with Third Party Administrators shall not terminate or limit Manager's duties and responsibilities under the terms and conditions of this Agreement.

SECTION 9.  Manager will, when required, develop and submit to Insurer proposed policy or reinsurance agreement language for Stop Loss Products covered by this Agreement. Insurer will be responsible for policy and contract revision and filing, where required, for insurance department approval. Manager will use only policy and reinsurance agreements approved and authorized for issue by Insurer.

## ARTICLE VII

### DUTIES OF INSURER

SECTION 1.  Insurer agrees to indemnify and hold Manager harmless from and against any and all losses, claims, demands, liabilities, costs, damages and expenses (including attorney's fees) which Manager may incur by reason of any error or omission by Insurer.

SECTION 2.  Any and all correspondence with or notices given to any Insured concerning the Subject Policies shall be effected solely by Manager, unless otherwise directed in writing by Insurer to Manager.

SECTION 3.  Insurer shall notify Manager of the Insurer's desire to cancel or non-renew the Subject Policies at least 180 days prior to such cancellation or non-renewal.  In such event, notification to insureds under the Subject Policies of such cancellation or non-renewal shall be made by Manager. The Insurer shall cooperate fully with Manager in placing the Subject Policy with another insurance company or insurance companies so as to assure the preservation of Manager's agency relationships and continuity of coverage to the Insureds.

SECTION 4.  Insurer shall use its best efforts to comply with Section 3 immediately above. However, the Insurer retains the right to cancel or not renew a policy of insurance subject to the policy provisions, applicable laws and regulations.

SECTION 5.  Insurer shall pay all fees for obtaining agents' licenses and/or appointments when and where applicable and where permitted by applicable law.

Initials:

7

San Benito v. Companion
JAH 002169

## ARTICLE VIII

## MAINTENANCE OF RECORDS

**SECTION 1.** The Manager shall maintain for the duration of this Agreement and six years thereafter, adequate books and records of all transactions between itself, the various policyholders, Insurer and individual insureds. These books and records shall be maintained in accordance with prudent standards of insurance record keeping.

**SECTION 2.** Insurer and its representatives may inspect, examine, make copies of and extracts from and/or audit all of the books and records of Manager pertaining to the Subject Policies upon prior written notice to Manager during regular business hours as often as Insurer may deem reasonable, necessary or appropriate, and Manager shall cooperate fully with the Insurer or its representatives in connection therewith. Such audits shall be conducted solely at Insurer's expense.

**SECTION 3.** The commissioner or director of insurance for a given state shall have access to books and records maintained by Manager with respect to the Subject Policies for the purpose of examination, audit and inspection.

**SECTION 4.** Manager shall provide Insurer with all such reports as it might reasonably require, including but not limited to monthly premium reports and quarterly allocations of premiums by state.

**SECTION 5.** It is understood and agreed that all operational materials, books, plans and other records developed or prepared by Manager in any form, including film or electronic media, pertaining to its Subject Policies hereunder including, but not limited to, all individual applications, files and correspondence relating thereto, and all printed material (excluding certificates of coverage and advertising material), are proprietary in nature and are the sole property of Manager.

## ARTICLE IX

## ADVERTISEMENTS

**SECTION 1.** Manager shall prepare, print and properly mail or otherwise distribute descriptive brochures and other advertising and promotional materials relating to the Subject Policies. All costs of printing and mailing of such materials shall be borne by Manager.

**SECTION 2.** For the purpose of this Agreement "advertising material" shall include:

Initials:

8

San Benito v. Companion
JAH 002170

(a)     Printed and published material, audiovisual material, and descriptive literature used in direct mail, newspapers, magazines, radio scripts, television scripts, billboards and similar displays; and

(b)     descriptive literature and sales aids of all kinds issued by the Insurer, the Manager or by any agent or broker for presentation to members of the insurance buying public, including but not limited to circulars, leaflets, booklets, depictions, illustrations, and form letters; and

(c)     prepared sales talks, presentations and materials for use by agents, brokers and solicitors.

SECTION 3.  No such advertising material will be disseminated by the Manager or by anyone acting under the Manager's instructions or with the Manager's knowledge unless such advertising material has been approved in writing by Insurer, and Manager shall make no changes in advertising which has received the Insurer's approval without the Insurer's approval of such change.

SECTION 4.  In those jurisdictions where prior approval of advertising material by an insurance department is required by statute or regulation or by the exercise of an insurance department's discretionary authority, the Manager shall not distribute or permit others to distribute such advertising material until it has received the required insurance department approval. The Insurer shall use its best efforts to obtain prompt approval of such advertising material.

## ARTICLE X

## DELIVERY OF WRITTEN COMMUNICATIONS

Any policies certificates, booklets, cancellation or non-renewal notices or other written communications with the Insured with respect to the Subject Policies, whether produced by the Insurer or by the Manager upon Insurer's direction, shall be delivered by Manager to policyholders promptly after receipt of written instructions from the Insurer. Insurer shall bear the cost of printing such materials.

Initials: _[signature]_

9

San Benito v. Companion
JAH 002171

## ARTICLE XI

### MANAGER'S INSURANCE

**SECTION 1.** Manager agrees to obtain and maintain in full force and effect, at its own expense, throughout the term of this Agreement, blanket fidelity insurance and errors and omissions insurance, satisfactory to and approved by Insurer in writing, providing coverage of not less than $500,000.00. Manager shall provide Insurer with at least 15 days written notice prior to cancellation of such coverage or any material change in such coverage. Insurer shall have the right to require Manager to increase the amount of insurance coverage as justified by increases in the amount of premium received by Manager.

**SECTION 2.** Manager agrees to furnish copies of such insurance policies to Insurer and thereby warrants that such copies are true and accurate copies of the policies which they represent.

## ARTICLE XII

### COMPENSATION

**SECTION 1.** In consideration of the performance of the services rendered herein in connection with the Subject Policies, Manager shall be compensated in accordance with the schedule of compensation attached to this Agreement and incorporated herein by this reference.

**SECTION 2.** The Insurer shall have and is hereby given a valid first lien on, and security interest in, to the fullest extent permitted by the Uniform Commercial Code, all compensation payable under this Agreement as security for the payment of any and all debts or claims due or to become due from Manager. In the event of default of any debt or claim due or to become due to the Insurer from Manager, the Insurer is authorized without notice and without any judicial action to credit any and all of such compensation accrued or to accrue towards the reduction of the debt or claim. The lien created hereby shall not be extinguished by termination of this Agreement.

**SECTION 3.** Manager hereby grants Insurer security interest, to the fullest extent permitted by the Uniform Commercial Code, in all funds from time to time held by Manager for the benefit of the Insurer.

**SECTION 4.** Manager hereby agrees, upon request from Insurer, to take any and all actions and to execute such further documents as may be requested by Insurer in order to perfect more fully the security interests granted by Manager to Insurer hereunder.

Initials:

10

San Benito v. Companion
JAH.002172

## ARTICLE XIII

## TERMINATION

**SECTION 1.** This Agreement shall terminate upon notice of termination given by Insurer or Manager in accordance with the notice provisions of this Agreement at least 180 days before the date of termination fixed in such notice.

**SECTION 2.** The Agreement may be terminated by the Insurer or Manager, at any time, if one or the other becomes unable or incapable of performing its obligations hereunder in substantial respects or commits a material breach hereof, and such is not cured or rectified within 60 days or is not capable of being so cured or rectified within 60 days after the complaining party shall have given notice thereof to the other party; provided, however, that such notice to terminate shall be given in accordance with this Agreement and shall reference this section and set forth the specific nature of the breach or inability to perform of the defaulting party.

**SECTION 3.** Notwithstanding any other provision of this Agreement to the contrary, this Agreement may be terminated immediately upon written notice given in accordance with this Agreement upon the happening of one of more of the following events;

(1)    Bankruptcy, receivership or insolvency of Manager or Insurer;

(2)    Fraud or embezzlement on the part of Manager, its employees, officers, agents or other representatives;

(3)    Insurer's or Manager's failure to comply with an applicable state's licensing requirements;

(4)    Termination of the reinsurance agreement applicable to the Subject Policies under this Agreement for any reason whatsoever;

(5)    If Manager shall make any assignment for the benefit of creditors without the prior written consent of Insurer;

(6)    If the assets or business of Manager shall be at any time seized or taken in execution or in attachment by a creditor of Manager.

Initials:

11

San Benito v. Companion
JAH 002173

SECTION 4. The termination of this Agreement shall not affect the validity, provisions or term of any policies issued under this Agreement, in force or coverage bound at the time of such termination, as such policies and binders shall continue to be effective as written and previously approved until the renewal date thereof.

SECTION 5. The termination of this Agreement shall not affect the continued operation of the indemnity provisions contained in Article VI, Section 6 and in Article VII, Section 1 of this Agreement, which shall remain in full force and effect.

SECTION 6. Upon any termination of this Agreement, Manager will cooperate with and assist Insurer in making available to Insurer records or copies of all records, and in notifying insureds, producing agents, regulators and other interested parties where such notification is necessary or appropriate.

SECTION 7. The termination of this agreement shall not affect the compensation provisions contained in Article XII, Section 1 and those provisions shall remain in full force and effect for the duration of the policies written under this agreement.

## ARTICLE XIV

## NOTICES

SECTION 1. Notices or demands required or permitted pursuant to this Agreement shall be in writing and shall be delivered by commercial courier providing overnight service and written proof of delivery, if to the Insurer, addressed to Scott Hinton, Vice President Finance, Companion Life Insurance Company, 51 Clemson Rd., Suite C, Columbia, SC 29223; if to Manager addressed to J. Allen Hall, President, J. Allen Hall & Associates, Circle Tower, 55 Monument Circle, Suite 1115, Indianapolis, IN 46204. Each party may change the place of notice to it by delivering appropriate notice to such effect pursuant to this section.

SECTION 2. Insurer and Manager shall promptly give notice to the other of any fact, event or circumstance of which it becomes aware that is material to the subject matter of this Agreement.

Initials:

12

San Benito v. Companion
JAH 002174

## ARTICLE XV

### MISCELLANEOUS PROVISIONS

**SECTION 1.** Manager's relationship with Insurer shall be that of independent contractor and nothing in this Agreement shall be construed as creating the relationship of employer and employee between Insurer and officers, employees or agents of Manager or the relationship of a partnership or joint venture between the parties. Manager's power or authority shall extend no further than is expressly stated in this Agreement and no power or authority shall be implied from the granting or denial of powers specifically mentioned herein. The Insurer shall exercise no control whatsoever over the hours, office location, rentals, staff or employees or manner of performance of duties hereunder except insofar as herein provided. It is expressly understood that no obligation, duty or right of the Manager under this contract may be assigned to any other firm or person without the written authorization of the insurer.

**SECTION 2.** This Agreement, including the schedules of compensation, attached hereto, constitute the entire Agreement of the parties with respect to the Subject Policies. No amendment or modification hereof shall be binding unless the same is identified as an amendment to this Agreement and is in writing and signed by the parties hereto. Notwithstanding the foregoing, the parties agree at all times to cooperate fully with and act reasonably and in good faith toward one another in connection with the subject matter of this Agreement, and this Agreement shall be construed and enforced in accordance with the foregoing understandings.

**SECTION 3.** The rights of either party hereto to enforce any provision hereof shall not be affected by its prior failure to require performance of that provision or any other provision by the other party, nor shall any right be deemed to have been waived unless the waiver thereof be in writing and signed by the party making such waiver.

**SECTION 4.** In the event of any litigation to enforce or to interpret the provisions of this Agreement, the prevailing party in such action shall be entitled to its reasonable attorney's fees and costs.

**SECTION 5.** This Agreement shall be governed in all respects and be interpreted by and under the laws of the State of South Carolina. If any provision hereof is found to be invalid by any court of competent jurisdiction, the invalidity of such provision shall not effect the validity of the remaining provisions hereof.

Initials:

13

San Benito v. Companion
JAH 002175

SECTION 6.  Communications and transmittals between Manager and the Insurer shall, when necessary or appropriate for the proper performance of this Agreement, be made by a commercial courier providing overnight service, or by facsimile transmission or similar electronic means to the addresses specified in Article XIV or to such other location as may be designated by any of the parties from time to time.

SECTION 7.  This is not an exclusive General Manager's Agreement, and Manager has no exclusive territory.

SECTION 8.  The Manager may not:

(a)  bind assumed reinsurance or retrocession on behalf of the Insurer, except the MGA may bind facultative reinsurance contracts pursuant to obligatory facultative agreements if the contract with the Insurer contains reinsurance underwriting guidelines, including, for reinsurance assumed and ceded, a list of reinsurers with which the automatic agreements are in effect, the coverages and amounts or percentages that may be reinsured, the commission schedules;

(b)  commit the Insurer to participate in insurance or reinsurance syndicates;

(c)  without prior approval of the Insurer, pay or commit the Insurer to pay a claim over five thousand dollars, net of reinsurance, or one percent of the insurer's policyholder's surplus as of December 31 of the last completed calendar year, whichever is less;

(d)  collect payment from a reinsurer or commit the Insurer to a claim settlement with a reinsurer, without prior approval of the Insurer. If prior approval is given, a report must be forward promptly to the Insurer;

(e)  permit its agent to serve on the Insurer's board of directors;

(f)  jointly employ an individual who is employed with the insurer;

(g)  appoint a sub-manager.

Initials:

14

San Benito v. Companion
JAH 002176

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers.

WITNESS: _Ann C. Baum_

J. Allan Hall & Associates

BY: _J. Allan Hall_
J. Allan Hall

TITLE: PRESIDENT

DATE: Dec. 14, 1998

WITNESS:

_Trudy M. Moore_

COMPANION LIFE INSURANCE COMPANY

BY: _Donald H. Dashiell_
DONALD H. DASHIELL

TITLE: EXECUTIVE VICE PRESIDENT

DATE: 12/28/98

San Benito v. Companion
JAH 002177

<u>Schedule of Compensation</u>

This Schedule, effective <u>June 1, 1998</u>, is to be attached to and form a part of the General Manager's Agreement between J. Allan Hall & Associates and Companion Life Insurance Company.

Schedule - Insurer agrees to pay to Manager on the earned premium in each 12 month period commencing <u>June 1, 1998</u>, the following fees from the sale of Subject Policy or Policies through TPA's, agents, brokers and/or other producers appointed and/or contracted with Insurer through the direct efforts of Manager under this Agreement (the "producers"):

> Specific and Aggregate Medical up to <u>35%</u> of gross premium.  This fee allowance shall cover the following:
>
> | | |
> |---|---|
> | Issuing Fee | 5% |
> | Premium Tax | 2 ½% |
> | Manager's Fees and Expenses | 27 ½% |
>
> Group Life and Accidental Death and Dismemberment up to <u>25%</u> of gross premium.

Except as stated herein, nothing contained herein shall be construed to alter or affect any of the provisions of the Agreement to which it is attached.

WITNESS:

_Ana A. Stevens_

J. Allan Hall & Associates

BY: _[signature]_
     J. Allan Hall

TITLE  PRESIDENT

DATE: _Dec. 1st, 1998_

WITNESS:

_Teedy M. Moore_

COMPANION LIFE INSURANCE COMPANY

BY: _[signature]_
     Donald H. Dashiell

TITLE: EXECUTIVE VICE PRESIDENT

DATE: _12/28/98_

16

Word/Adktg/Rsp/NGMA.TIU

San Benito v. Companion
JAH 002178