United States District Court
Southern District of Texas
FILED

MAR 0 9 2004

Michael N. Milby
Clerk of Court

CIVIL ACTION NO. 003-047

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

**San Benito Consolidated Independent School District**
*Plaintiff*

**v.**

**Companion Life Insurance Company,**
**Managed Benefits Administrator and Insurance Consultants, Inc.,**
**J. Allan Hall & Associates, Inc.,**
**And MBA of Wyoming, Inc.**
*Defendants*

### PLAINTIFF SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT'S RESPONSE TO DEFENDANTS, MBA OF WYOMING, INC., AND MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS', MOTION FOR PARTIAL SUMMARY JUDGMENT

Stephen E. Walraven
State Bar No. 20796800
SHADDOX, COMPERE, WALRAVEN & GOOD, P.C.
1250 N.E. Loop 410, Suite 725
San Antonio, Texas 78209
Telephone: 210/822-2018
FAX: 210/822-4068
ATTORNEYS FOR PLAINTIFF

## <u>IDENTITY OF PARTIES AND COUNSEL</u>

**PLAINTIFF:**
San Benito Consolidated
    Independent School District

**ATTORNEYS FOR PLAINTIFF:**
Steven E. Walraven
Otto S. Good
SHADDOX, COMPERE, WALRAVEN &
    GOOD, P.C.

Celeste Guerra
LAW OFFICES OF RENE RAMIREZ

**DEFENDANTS:**
Companion Life Insurance Co.

**ATTORNEYS FOR DEFENDANTS:**
Shelby J. Bush
PIPER RUDNICK, L.L.P.

Managed Benefits Administrator
    and Insurance Consultants, Inc.

Cindy A. Garcia
THE GARCIA LAW FIRM, P.C.

J. Allan Hall & Associates, Inc.

Roberta J. Hegland
Joseph A. Stallone
BRACEWELL & PATTERSON, L.L.P.

MBA of Wyoming, Inc.

Cindy A. Garcia
THE GARCIA LAW FIRM, P.C.

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................. 1

II.   SUMMARY OF ARGUMENT ................................................... 2

III.  SUMMARY JUDMENT EVIDENCE ............................................ 3

IV.   FACTUAL BACKGROUND ..................................................... 3

V.    TORT LIABILITY ............................................................. 5

VI.   EVIDENCE OF MBA'S NEGLIGENCE ......................................... 9

VII.  THE INSURANCE CODE AND THE GOVERNMENT CODE .................... 10

VIII. CONCLUSION ................................................................ 11

IX.   CERTIFICATE OF SERVICE ................................................. 13

## TABLE OF CITATIONS

*Aranda v. Insurance Company of North America*
    748 S.W.2d 210, 212 (Tex. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Arnold v. National County Mutual Fire Insuarnce Company*
    725 S.W.2d 165, 167 (Tex. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Celtic Life Insurance Company v. Coats*
    885 S.W.2d 96 (Tex. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
*Coffman v. Scott Wetzel Services, Inc.*
    908 S.W.2d 516 (Tex.App.-Ft. Worth 1995, n.w.h.) . . . . . . . . . . . . . . . . . . . . . . . . . 10
*Kennedy v. Sale*
    689 S.W.2d 890, 892-93 (Tex. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*G. A. Stowers Furniture Co. v. American Indemnity Co.*
    15 S.W.2d 544 (Tex.Comm.App. 1929, holding approved) . . . . . . . . . . . . . . . . . . . . . 6

*Rocor International v. National Union Fire Insurance Co.*
    77 S.W.3d 253, 263-264 (Tex. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Royal Globe Insurance Co. v. Bar Consultants, Inc.*
    577 S.W.2d 688 (Tex. 1979 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Southwestern Bell Telephone Co. V. DeLanney,*
    809 S.W.2d 493 (Tex. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,6,7

*Vail v. Texas Farm Bureau Mutual Insurance Co.*
    754 S.W.2d 129 (Tex. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,8

*Viles v. Security National Insurance Co.*
    788 S.W.2d 566, 567 (Tex. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Statutes**

TEX.BUS.COMM.CODE, Section 17.45(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

TEX.BUS.COMM.CODE, Section 17.46(12) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

TEX.BUS.COMM. CODE, Section 17.50(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

TEX.GOV.CODE, Section 172.005(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

TEX.GOV.CODE, Section 172.014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

TEX. INS.CODE, Art. 21.21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,8,11

TEX.INS.CODE, Chapter 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

TEX.INS.CODE, Chapter 846.003(b)(22) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

TEX.INS.CODE, Chapter 846.153(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

TEX.INS.CODE, Section 841.101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SAN BENITO CONSOLIDATED | § | |
| INDEPENDENT SCHOOL DISTRICT | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-03-047 |
| | § | |
| COMPANION LIFE INSURANCE COMPANY, | § | |
| MANAGED BENEFITS ADMINISTRATOR | § | |
| AND INSURANCE CONSULTANTS, INC., | § | |
| J. ALLAN HALL & ASSOCIATES, INC., | § | |
| and MBA OF WYOMING, INC. | § | |

**PLAINTIFF SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT'S
RESPONSE TO DEFENDANTS, MBA OF WYOMING, INC., AND MANAGED BENEFITS
ADMINISTRATOR AND INSURANCE CONSULTANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

NOW COMES SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, Plaintiff in the above-styled cause, (hereinafter sometimes referred to as the "SCHOOL DISTRICT" or "SAN BENITO," and files this its Response to Defendants, MBA OF WYOMING, INC., AND MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS' Motion for Partial Summary Judgment and for such Response, would show unto the Court as follows:

**I.**

**INTRODUCTION**

The SCHOOL DISTRICT has brought four different types of causes of action against MBA: For negligence, breach of contract, negligent misrepresentations, and violations of Art. 21.21 of the TEXAS INSURANCE CODE. MBA's Motion addresses only part of the third and the fourth of those four causes of action. The SCHOOL DISTRICT's claim for negligent misrepresentation against MBA involves two different transactions. The SCHOOL DISTRICT complains that MBA misrepresented the

Page -1-

characteristics, terms and benefits available under the 2000-2001 stop-loss policy issued by COMPANION LIFE, and it also complains that MBA negligently misrepresented the terms, uses and benefits available under the subsequent policy issued by BCS for the 2001-2002 policy year. MBA's Motion addresses only the first of those two allegations, concerning the COMPANION LIFE policy, and requests no relief concerning misrepresentations of the BCS policy.  The relief requested by MBA, even though limited, should be in all things denied.

## II.

### SUMMARY OF ARGUMENT

**MBA OF WYOMING, INC.**, hereinafter sometimes referred to as "MBAW," and **MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS**, hereinafter sometimes referred to as "MBAICI" (and MBAW and MBAICI may sometimes hereinafter be referred to collectively as "MBA"), have asserted two grounds for summary judgment with respect to the first claim for negligent misrepresentation. The first summary judgment ground asserts that when a party is liable in contract, negligent misrepresentations of the contract cannot be actionable. While this argument may be available in another context, Texas courts have held it inapplicable with respect to insurance disputes. The second argument asserts that there is no evidence to support the claim, and SAN BENITO will show that there is ample evidence to support that claim of negligent misrepresentation.

MBA's Motion for Summary Judgment also asserts that the TEXAS GOVERNMENT CODE grants it immunity from the INSURANCE CODE for its misconduct in this case. This assertion is in error.  The immunity granted by the INSURANCE CODE applies only to dealings by and between the SCHOOL DISTRICT and its employees and their health care claims, and has no applicability to dealings between the SCHOOL DISTRICT and its stop-loss insurance carrier or third-party administrator. MBA did have a role in both of those transactions, but this dispute arises from the latter type of transaction,

Page -2-

for which no immunity is provided. Summary Judgment should be in all things denied.

## III.

### SUMMARY JUDGMENT EVIDENCE

SAN BENITO relies on all of the summary judgment evidence attached to all of the Summary Judgment Motions filed by the Defendants in this case, the Responses of the SCHOOL DISTRICT to all of those Motions, and the following documents attached hereto:

1.    Excerpts from the oral deposition of Don Merrill, attached as Exhibit "A."

2.    Excerpts from the oral deposition of William Larry Blagg, attached as Exhibit "B."

3.    Excerpts from the oral deposition of Glade Nixon, attached as Exhibit "C."

4.    The Administrative Service Agreement between the SCHOOL DISTRICT and MBAW, attached as Exhibit "D."

5.    Excerpts from the oral deposition of Phyllis Merrill, attached as Exhibit "E."

6.    Excerpts from the oral deposition of Roy Hutchison, attached as Exhibit "F."

7.    Excerpts from the oral deposition of Lorenzo Sanchez, attached as Exhibit "G."

## IV.

### FACTUAL BACKGROUND

The SCHOOL DISTRICT entered into a contract with MBAW to act as a third-party administrator, paying the health insurance claims of the SCHOOL DISTRICT's employees and their dependents, pursuant to a self-insured plan. MBAW was the nominal party to the contract, since it

was licensed to act as a third-party administrator by the State of Texas. All of the actual functions were performed by MBAICI, which had no such license. (*See* deposition testimony of Don Merrill, p.11, L.3-14; p.19, L.10 to p.21, L.8.) The SCHOOL DISTRICT paid for employee health care claims covered by its plan up to $75,000 per employee per year from its own funds. For claims over the $75,000 figure, the SCHOOL DISTRICT purchased excess or stop-loss insurance. MBA acted as the insurance agent in the purchase of stop-loss insurance, and received a commission for its services, from the insurance company.[1] (*See* Larry Blagg deposition, p.62, L.11-23 and Exhibit 54.)  With respect to the stop-loss insurance, the SCHOOL DISTRICT was acting as the insured, not as an insurer nor as a self-insurer. Like any typical commercial insurance transaction, the SCHOOL DISTRICT went to an insurance agent or broker, MBA. The SCHOOL DISTRICT relied on the agent or broker to assist it in purchasing the proper insurance desired, paid its premium and received its policy. The SCHOOL DISTRICT also relied on its insurance agent, MBA, to assist with the filing of its claims under the stop-loss policy. MBA employs a person who has the sole responsibility to process such claims on behalf of its clients, Mr. Glade Nixon. (*See* Nixon deposition, p.9, L.13-18, p.11, L.10-14.) The lawsuit does not arise from the SCHOOL DISTRICT's role as a self-insurer.  On the contrary, this dispute arises from the SCHOOL DISTRICT's complaint as an insured, that approximately $900,000 in stop-loss insurance benefits owed to the SCHOOL DISTRICT on its stop-loss policy were improperly denied, because MBA mishandled those claims, or because MBA was the victim of misrepresentations by J. ALLAN HALL concerning how to properly process claims under the stop-loss policy. For its mishandling, MBA is liable not only in contract, but also in tort and under the TEXAS INSURANCE CODE.

---

[1]It is unclear if it was MBAW or MBAICI performing this role. MBAW had the necessary licenses, MBAICI had the employees who did the work.

## V.

### TORT LIABILITY

Although MBA admits that it may be liable for breach of contract, it argues that it cannot be liable in tort for two reasons. First, it argues that when a written contract exists between the parties, and when the injured party's remedy has to do with sums owing under that contract, then breach of contract is the exclusive remedy. Secondly, MBA argues that it is entitled to summary judgment for negligently misrepresenting the terms of the COMPANION LIFE policy, because "MBA did not fail to exercise reasonable care or competence in obtaining or communicating the information regarding advanced funding to SAN BENITO." (MBA's Motion, p. 2.)

Texas has long recognized, in the insurance context, that a defendant can be liable both in contract and in tort, even when the damages are calculated pursuant to amounts due and owing under the contract between those parties. Secondly, the contract between MBA and SAN BENITO does not provide the remedy or basis for calculating damage, a premise upon which MBA's argument rests.

MBA's argument is based on the decision in *Southwestern Bell Telephone Co. v. DeLanney*, 809 S.W.2d 493 (Tex. 1991), that when a party's only damages are for breach of contract, that its exclusive remedy to recover for those damages between the parties to that contract is to sue for breach of contract. However, this argument confuses the SCHOOL DISTRICT contract with MBAW, with the COMPANION LIFE contract. The contract with MBA (attached hereto as Exhibit "D") provides that in return for $12.60 per employee per month, MBA will administer the payment of self-insured claims by the SCHOOL DISTRICT to its employees and their health care providers. It is perhaps revealing that this contract is not a part of the summary judgment evidence relied on or referenced by MBA. This agreement makes no reference to the processing of claims under the stop-loss policy entered into between the SCHOOL DISTRICT and COMPANION LIFE. (Exhibits "B" and "C"

to that contract with MBAW, and made a part of it, specifically itemize the services provided by MBA.) No mention is made of processing claims under the stop-loss insurance, and it in no way provides any measure of the damages owed to the SCHOOL DISTRICT. Nowhere does this contract provide for the payment of stop-loss claims, or provide a measure for the SCHOOL DISTRICT's damages. The contract referenced by MBA is the COMPANION LIFE stop-loss contract. MBA is not a party to that contract, and the SCHOOL DISTRICT would not have a suit for breach of that contract against MBA.

In addition, the Texas Supreme Court has long recognized that in the field of insurance, tort remedies and contract remedies can coexist even with the same measure of damages.

In *DeLanney*, the Court recognized one exception, for professional malpractice, in which tort liability can arise from a contractual relationship. *(Id.* at 494.) The concurring opinion in *DeLanney* also noted that the field of insurance is another exception to *DeLanney* citing *Viles v. Security National Insurance Co.*, 788 S.W.2d 566, 567 (Tex. 1990). (*DeLanney* at 500.) It has long been recognized that, like a lawyer-client relationship or a doctor-patient relationship, an insurance relationship is a special relationship involving not only contractual obligations, but also common law duties. In *Aranda v. Insurance Company of North America*, 748 S.W.2d 210, 212 (Tex. 1988), and *Arnold v. National County Mutual Fire Insurance Company*, 725 S.W.2d 165, 167 (Tex. 1987), the Texas Supreme Court recognized the duty of good faith and fair dealing, in additional to any contractual duties owed under the insurance contract. In *G. A. Stowers Furniture Co. v. American Indemnity Co.*, 15 S.W.2d 544 (Tex.Comm.App. 1929, holding approved), the Court recognized the duty to exercise ordinary care in settling liability case, violations of which give rise to liability for negligence. The case of *Rocor International v. National Union Fire Insurance Co.*, 77 S.W.3d 253, 263-264 (Tex. 2002), expanded the Stowers Doctrine to apply to excess carriers, and the failure to

settle timely. All of these cases illustrate that the insurance context is an exception to the holding in *DeLanney* limiting the remedy to breach of contract. In another case, the Supreme Court of Texas expressly rejected the *DeLanney* argument as inapplicable to the insurance context. That case is *Vail v. Texas Farm Bureau Mutual Insurance Co.*, 754 S.W.2d 129 (Tex. 1988). In that case the insured made the identical argument that MBA makes here: That the insured should be limited to its contract claim. *(Id.* at 136.) The Supreme Court of Texas expressly rejected that argument, finding that:

> The fact that the Vails have a breach of contract action against Texas Farm does not preclude a cause of action under the DTPA and Article 21.21 of the Insurance Code. Both the DTPA and the Insurance Code provide that the statutory remedies are cumulative of other remedies.

*(Id.)* As to damages under those statutes, the Court said:

> We hold that the insurer's unfair refusal to pay the insured's claim causes damages as a matter of law in at least the amount of policy benefits wrongfully withheld.

*(Id.)* Under the express holding in *Vail*, even if a party's only damages are the breach of contract damages, the insured still has a claim against the insurance company under the DTPA and the INSURANCE CODE.

The *DeLanney* argument also fails, in this case, for a different reason. SAN BENITO is suing MBA not only for breach of contract, but also for misrepresenting that the insurance contract had characteristics, uses, benefits, rights or obligations which it did not have. If MBA/*DeLanney* argument were accepted, those provisions of the DECEPTIVE TRADE PRACTICES ACT and the INSURANCE CODE, expressly dealing with wrongful breaches of contract, would, in effect, be written out of the statute. *(See, for example,* TEX.BUS.COMM.C, §17.46(12), which prohibits "representing that an agreement confers or involves rights, remedies or obligations which it does not have or involve..."). COMPANION LIFE has cited no authority that Texas courts have amended those statutes by eliminating those provisions prohibiting such conduct.

Page -7-

On the contrary, Texas courts clearly recognize that misrepresenting that a contract, including an insurance contract, has rights or benefits which it does not have, constitutes a tort actionable under the DTPA and the INSURANCE CODE. In *Vail v. Texas Farm Bureau, supra* at 136, the Texas Supreme Court said:

> It is well settled that persons without insurance are allowed to recover based on false representations of coverage.

*Citing Kennedy v. Sale*, 689 S.W.2d 890, 892-93 (Tex. 1985). In *Royal Globe Insurance Co. v. Bar Consultants, Inc.*, 577 S.W.2d 688 (Tex. 1979), the insurance company issuing a property policy was sued for representations by its agent that the policy covered vandalism, when it did not. The insurance company was held liable for those representations of policy benefits under both the DTPA and Article 21.21 of the INSURANCE CODE. (*Id.* at 694.) The measure of damages was found by the Court in the policy provisions for covered claims, directly contradicting COMPANION LIFE/*DeLanney*'s argument. *(Id.)*

Another decision by the Supreme Court of Texas also held the insurance company liable for its agent's misrepresentations of the amount of psychiatric benefits provided under a health care policy. *See Celtic Life Insurance Company v. Coats*, 885 S.W.2d 96 (Tex. 1994). Despite the existence of a contract between the parties, the misrepresentations of the amount of psychiatric benefits were held actionable, with a measure of damages based on the policy benefits available had the policy been as represented. *(Id.* at 98.) Under Texas law, when an insurer or its agent, or any other party offering a contract, misrepresents the terms and benefits of that contract, Texas courts will hold that party responsible for any damages produced.

## VI.

### EVIDENCE OF MBA'S NEGLIGENCE

MBA also seeks summary judgment on one of the negligent misrepresentation claims, asserting a lack of evidence. There is ample summary judgment evidence of MBA's negligence in misrepresenting the COMPANION LIFE stop-loss policy. Lorenzo Sanchez is the Assistant Superintendent for Finance and Human Resources at the SCHOOL DISTRICT. (*See* Sanchez deposition, p.7, L.12-16.) Mr. Sanchez had conversations with Don and Phyllis Merrill of MBA dealing with both the procurement of the stop-loss policy and the handling of claims. (*See* Sanchez deposition, p.62, L.7-20.) The SCHOOL DISTRICT relied on the fact that MBA was the SCHOOL DISTRICT's third-party administrator and would provide the expertise to run the SCHOOL DISTRICT's self-funded plan. (*See* Sanchez deposition, p.11, L. 14-21.). MBA was authorized to write checks on the SCHOOL DISTRICT's account. (*See* Sanchez deposition, p.52, L.7-20.) The SCHOOL DISTRICT did not have any written procedures for how claims are processed. The procedures were dictated by a third-party administrator. (*See* Sanchez deposition, p.93, L.11-19.) On the other hand, every MBA witness testified that no one at MBA ever bothered to read the COMPANION LIFE insurance policy, and particularly with regard to how claims should be paid. (*See* Don Merrill deposition, p.93, L14 to p.94, L.4; p.125, L.8-22; p.184, L.2-20; *see* Phyllis Merrill deposition, p. 62, L.25 to p.64, L.23; *see* Glade Nixon deposition, p.72, L.17-19.) Glade Nixon, the MBA claims handler responsible for processing stop-loss claims had never looked at the contract at issue in this litigation. (*See* Nixon deposition, p.72, L.17-19.) The testimony of the representatives of J. ALLAN HALL and COMPANION LIFE confirm that such acts and omissions on the part of MBA were the proximate cause of J. ALLAN HALL and COMPANION LIFE's failure to pay the claims at issue in this lawsuit. (*See* Blagg deposition, p.47, L.9 to p.49, L.5 and Roy Hutchison deposition, p. 69, L.19 to p.70, L.3.)

## VII.

### THE INSURANCE CODE AND THE GOVERNMENT CODE

Again focusing on the wrong relationship, MBA argues that the GOVERNMENT CODE provides an immunity for its misconduct from any liability under the INSURANCE CODE. While the SCHOOL DISTRICT may have some immunity in its relationship with its employees, that immunity does not apply to the relationship between the SCHOOL DISTRICT and its insurers. Section 172.014 of the TEXAS GOVERNMENT CODE provides that the conduct of the SCHOOL DISTRICT, in acting as a self-insurer, is not subject to the INSURANCE CODE, and that it should not be treated as an insurer. That immunity from the INSURANCE CODE can apply not only to the SCHOOL DISTRICT, but also to any agents the SCHOOL DISTRICT may employ to administer the payment of claims to its employees and their health care providers. In the case of *Coffman v. Scott Wetzel Services, Inc.*, 908 S.W.2d 516 (Tex.App.-Ft. Worth 1995, n.w.h.), the administrator for the claims was sued by the employee for the way it handled its claims, and was found by the Court to be immune, as the agent for a risk pool or self-insured, pursuant to Section 172.014. However, immunity from the INSURANCE CODE relating to claims between the SCHOOL DISTRICT and its employees has nothing to do with this case.

It is not the SCHOOL DISTRICT's role as an insurer, but its role as an <u>insured</u> that is relevant here. While Section 172.014 provides that the SCHOOL DISTRICT will not be considered an insurer, it does not say that the SCHOOL DISTRICT cannot be considered an insured. MBA not only had a role in connection with administering claims between the SCHOOL DISTRICT and its employees, but also had a role in filing stop-loss claims with J. ALLAN HALL and COMPANION LIFE. MBA cites no authority for the proposition that the relationship between the SCHOOL DISTRICT and its stop-loss insurance is similarly immune from the INSURANCE CODE. On the contrary, the Texas statutes expressly recognize that a school district "may purchase insurance...from an insurance company

Page -10-

authorized to do business in this State." (GOV.C. Section 172.005(c)). An "authorized" insurance company means to be regulated by the TEXAS INSURANCE CODE. In particular, *see* TEXAS INSURANCE CODE, Section 841.101. Contrary to MBA's assertion, a school district may be both self-insured with respect to health care benefits for its employees, and at the same time be an insured under a policy of insurance, with that insurance relationship, and the parties to that relationship, subject to the TEXAS INSURANCE CODE. Chapter 846 of the TEXAS INSURANCE CODE, applicable to multiple employer welfare arrangements, both contemplates the purchase of stop-loss insurance (*see* Section 846.153(c)(3)), and expressly provides for the applicability of Article 21.21 of the INSURANCE CODE. (*See* Section 846.003(b)(22).)   The TEXAS DECEPTIVE TRADE PRACTICES ACT, which incorporates Article 21.21 of the INSURANCE CODE (TEX.BUS.COMM.C. §17.50(a)(4)), provides that governmental entities are to be included in the definition of consumers entitled to bring such misrepresentation claims. (TEX.BUS.COMM.C. §17.45(4).) There is no authority that insurance tortfeasors have a special license to victimize school districts.

## VIII.

### CONCLUSION

The consistent theme of MBA's Motion for Summary Judgment is misdirection: MBA hopes to escape tort liability by misdirecting attention away from its contract with the SCHOOL DISTRICT by pointing to the SCHOOL DISTRICT's contract with COMPANION LIFE. MBA misdirects attention from its negligence in representing the insurance being provided, and misdirects attention from its INSURANCE CODE violations in connection with processing stop-loss claims, focusing instead its processing of employee benefit claims. It is clear, by simply focusing on the matters actually at issue in this case, that all of MBA's arguments fail. MBA is not only liable in contract, it is also liable for its negligent misrepresentations, as well as for its violations of TEXAS INSURANCE CODE. SAN BENITO

Page -11-

CONSOLIDATED INDEPENDENT SCHOOL DISTRICT prays that MBA's Motion for Summary Judgment be denied in all things.

Respectfully submitted,

LAW OFFICES OF RENE RAMIREZ
Celeste Guerra
1906 Tesoro
Pharr, Texas 78577
Telephone: 956/783-7880
FAX # 956/783-7884
AND
SHADDOX, COMPERE, WALRAVEN & GOOD, P.C.
  & GOOD, P.C.
1250 N. E. Loop 410, Suite 725
San Antonio, Texas 78209
Telephone: 210/822-2018
FAX: 210/822-4068
By: _____
    Stephen E. Walraven
    State Bar No. 20796800
ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument has been served on counsel listed below on this _____ day of March, 2004.

**ATTORNEYS FOR DEFENDANT**
**COMPANION LIFE INSURANCE COMPANY**
Mr. Shelby J. Bush
PIPER RUDNICK
1717 Main Street, Suite 4600
Dallas, Texas 75201-4605

**ATTORNEYS FOR DEFENDANT**
**J. ALLAN HALL & ASSOCIATES, INC.**
Ms. Roberta J. Hegland
BRACEWELL & PATTERSON, L.L.P.
2000 One Shoreline Plaza, South Tower
800 North Shoreline Boulevard
Corpus Christi, Texas 78401-3700

**ATTORNEYS FOR DEFENDANTS**
**MBA OF WYOMING, INC., AND MANAGED BENEFITS**
**ADMINISTRATOR AND INSURANCE CONSULTANTS, INC.**
Ms. Cindy A. Garcia
THE GARCIA LAW FIRM, P.C.
201 North 1st Street
Harlingen, Texas 78550

STEPHEN E. WALRAVEN

Page -13-

# CONDENSED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT,<br><br>Plaintiffs,<br><br>vs.<br><br>COMPANION LIFE INSURANCE COMPANY, MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS, INC., J. ALLAN HALL & ASSOCIATES, INC., and MBA OF WYOMING, INC.,<br><br>Defendants. | Deposition of:<br><br>**DON WILLIAM MERRILL**<br><br><br><br><br><br><br><br>Civil Action No.: B-03-047 |

**July 21, 2003 - 9:06 a.m.**

Location:  Offices of CitiCourt Reporting
50 S. Main, Suite 830
Salt Lake City, Utah

Reporter:  Vicky McDaniel, RMR
Notary Public in and for the State of Utah

# EXHIBIT "A"



**CitiCourt, LLC**
THE REPORTING GROUP

50 South Main, Suite 830
Salt Lake City, Utah 84144

801.532.3441          TOLL FREE 877.532.3441          FAX 801.532.3414

**SHEET 1  PAGE 1**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SAN BENITO CONSOLIDATED          )  Deposition of:
INDEPENDENT SCHOOL DISTRICT,     )
                                 )  DON WILLIAM MERRILL
        Plaintiffs,              )
                                 )
    vs.                          )
                                 )
COMPANION LIFE INSURANCE         )
COMPANY, MANAGED BENEFITS        )
ADMINISTRATOR AND INSURANCE      )
CONSULTANTS, INC., J. ALLAN      )
HALL & ASSOCIATES, INC., and     )
MBA OF WYOMING, INC.,            )
                                 )  Civil Action No.:  B-03-047
        Defendants.              )

July 21, 2003 - 9:06 a.m.
Location: Offices of CitiCourt Reporting
50 S. Main, Suite 830
Salt Lake City, Utah
Reporter: Vicky McDaniel, RMR
Notary Public in and for the State of Utah

---

**PAGE 2**

Don William Merrill, 7/21/03                    2

A P P E A R A N C E S

1
2  FOR THE PLAINTIFF:
3          STEPHEN E. WALRAVEN, ESQ.
           OTTO S. GOOD, ESQ.
4          SHADDOX, COMPERE, WALRAVEN & GOOD, P.C.
           The North Frost Center
5          1250 N.E. Loop 410, Suite 725
           San Antonio, TX  78209
6          (210) 822-2018
7  FOR DEFENDANTS MBA OF WYOMING, INC., AND MANAGED
   BENEFITS ADMINISTRATOR AND INSURANCE
8  CONSULTANTS, INC.:
9          FRED L. SHUCHART, ESQ.
           MASON, COPLEN, SHUCHART, HUTCHINS
10             & BANKS
           7500 San Felipe, Suite 700
11         Houston, TX  77063
           (713) 785-5595
12
   FOR DEFENDANT COMPANION LIFE INSURANCE COMPANY:
13
           SHELBY J. BUSH, ESQ.
14         PIPER RUDNICK
           1717 Main Street, Suite 4600
15         Dallas, TX  75201-4605
           (214) 743-4500
16
   FOR DEFENDANT J. ALLAN HALL & ASSOCIATES:
17
           ROBERTA J. HEGLAND, ESQ.
18         BRACEWELL & PATTERSON L.L.P.
           2000 One Shoreline Plaza, South Tower
19         800 Shoreline Boulevard
           Corpus Christi, TX  78401-3700
20         (361) 866-7226
21         ALBERT GEORGE, ESQ.
           J. ALLAN HALL & ASSOCIATES, INC.
22         55 Monument Circle, 11th floor
           Indianapolis, IN  46204
23
24  ALSO PRESENT:  Phyllis K. Merrill
25

CitiCourt, LLC
(801) 532-3441

---

**PAGE 3**

Don William Merrill, 7/21/03                    3

I N D E X

| WITNESS | PAGE |
|---|---|
| DON WILLIAM MERRILL | |
| Examination by Mr. Walraven | 5 |
| Examination by Mr. Bush | 95 |
| Examination by Ms. Hegland | 153 |
| Further Examination by Mr. Walraven | 219 |
| Further Examination by Mr. Bush | 226 |
| Further Examination by Ms. Hegland | 233 |

E X H I B I T S

| NUMBER | | PAGE |
|---|---|---|
| 27 | Administrative Service Agreement signed 10/95 | 32 |
| 28 | Administrative Service Agreement signed 10/00 | 37 |
| 29 | Memo to file from Don Merrill | 64 |
| 30 | Plan Document | 115 |
| 31 | Group Administration Manual | 116 |
| 32 | Application to Companion Life for Aggregate and Specific Excess Loss Insurance | 121 |
| 33 | Companion Life Insurance contract | 126 |
| 34 | 9/27/99 letter to Lorenzo Sanchez from Mr. Merrill with attachments | 128 |
| 35 | 12/12/01 letter to Don Merrill from Mr. Routh with attachments | 137 |

CitiCourt, LLC
(801) 532-3441

---

**PAGE 4**

Don William Merrill, 7/21/03                    4

E X H I B I T S  (Continued)

| NUMBER | | PAGE |
|---|---|---|
| 36 | 11/16/00 letter to Lorenzo Sanchez from Mr. Merrill | 138 |
| 37 | 11/15/01 letter to Randy Scott from Gloria Boyce and other documents | 141 |
| 38 | 1/23/01 letter to Janie Gonzalez from Carolyn Gale | 182 |
| 39 | 6/3/99 letter to Don Merrill from J. Allan Hall with attachment | 192 |
| 40 | 6/3/99 letter to Don Merrill from J. Allan Hall with attachments | 196 |
| 41 | 9/28/01 letter to Don Merrill from Sunmbo Adebayo and other documents | 207 |
| 42 | Revised copies of an application and schedule to Janie Gonzalez from BCS | 211 |
| 43 | Letter to Joe Gonzalez from Steve Rogers, received Dec 17 | 213 |
| 44 | Pre-Existing Conditions Rider | 233 |

CitiCourt, LLC
(801) 532-3441

Case 1:03-cv-00047    Document 46    San Benito vs. Companion Life Insurance    Filed in TXSD on 03/09/2004    Page 21 of 80

Don William Merrill * July 21, 2003

SHEET 2 PAGE 9

Don William Merrill, 7/21/03                    9

1    A.   No.
2    Q.   Do you hold any other certifications or
3  licenses?
4    A.   No.
5    Q.   Have you ever held any licenses or
6  certifications related to the insurance field?
7    A.   No.
8    Q.   But you've taken courses in connection with
9  those classes --
10   A.   Yes.
11   Q.   -- licensing? Tell me how you're currently
12 employed.
13   A.   I'm self-employed, MBA of Wyoming, Inc. as
14 executive vice president.
15   Q.   And how long have you been executive vice
16 president of the business MBA of Wyoming?
17   A.   Since 1987.
18   Q.   And do you hold any positions with any other
19 entities, business entities related to insurance?
20   A.   A related corporation I do, yes.
21   Q.   And what is this related corporation?
22   A.   In 2001, in order to split the business
23 between my partner and I, we formed another corporation
24 called Managed Benefit Administrators and held that for
25 the group accounts, while my partner's business was

CitiCourt, LLC
(801) 532-3441

PAGE 10

Don William Merrill, 7/21/03                   10

1  held under Mountain Benefit Administrators. But both
2  of us still retained MBA of Wyoming, Inc. for licensing
3  and E&O insurance. And we retained CDO as an entity
4  for the computer hardware and software, controlling
5  that together.
6    Q.   So prior to 2001, you had a partner whose
7  name was --
8    A.   No, I still have a partner, David Bostrom.
9    Q.   And you and Mr. Bostrom together owned prior
10 to 2001 the business known as MBA of Wyoming?
11   A.   We still own that business together and CDO
12 together.
13   Q.   And who are the other shareholders or -- is
14 it a corporation, MBA?
15   A.   Yes.
16   Q.   Who are the other shareholders of MBA of
17 Wyoming?
18   A.   There are none.
19   Q.   Just the two of you?
20   A.   Yes.
21   Q.   And is Mr. Bostrom the president, then --
22   A.   Yes.
23   Q.   -- of MBA of Wyoming? Now, in 2001 you were
24 going to split portions of that business, correct?
25   A.   Well, we just elected to split the accounts

CitiCourt, LLC
(801) 532-3441

PAGE 11

Don William Merrill, 7/21/03                   11

1  themselves so that at any other time we would have more
2  flexibility.
3    Q.   And after that split, did MBA of Wyoming
4  still have any accounts?
5    A.   Yes. Well, excuse me. No. MBA of Wyoming
6  did not have the accounts, only held the licensing for
7  those accounts.
8    Q.   And some of the accounts went to an entity
9  known as Managed Benefit Administrators and Insurance
10 Consultants, Inc., and others of them went to Mountain
11 Benefits?
12   A.   Under Mr. Bostrom.
13   Q.   Is that right?
14   A.   That's right.
15   Q.   Your nod of the head didn't pick up on the
16 machine too well. If you'd answer out loud, please,
17 sir.
18     MR. GEORGE: And at this end of the table
19 you're a little soft.
20   A.   All right.
21   Q.   Was there some basis for dividing the
22 accounts? Do one type of accounts go one place?
23   A.   No.
24   Q.   Or was it based on -- what?
25   A.   Location. It was based on location. The

CitiCourt, LLC
(801) 532-3441

PAGE 12

Don William Merrill, 7/21/03                   12

1  other office is in Worland, Wyoming.
2    Q.   And is that where Mr. Bostrom's located?
3    A.   Yes.
4    Q.   And so Mountain Benefits kept all the
5  accounts that were basically being handled out of
6  Worland, Wyoming, whereas Managed Benefit
7  Administrators and Insurance Consultants, Inc. kept all
8  the accounts being handled out of Salt Lake, correct?
9    A.   Correct.
10   Q.   And for how long have you been located in
11 Salt Lake City?
12   A.   Basically all my life.
13   Q.   Now, you mentioned that you kept MBA of
14 Wyoming for the purposes of certain licenses. What
15 licenses were those?
16   A.   All insurance licenses, and we retained the
17 business together so that we can use our resources
18 together.
19   Q.   What do you mean by that? What do you mean
20 using your resources together?
21   A.   David's expertise in certain areas and the
22 information that I've had and my background just makes
23 it easier for us to work on that basis. It also made
24 it easier for us to look at eventually a sale if that
25 became a possibility.

CitiCourt, LLC
(801) 532-3441

SHEET 3   PAGE 17

Don William Merrill, 7/21/03          17

1     A.     Yes, that's the only one at the present
2 time.
3     Q.     Other than the four clients you've
4 mentioned, have you had any other clients, you or any
5 business you're affiliated with?
6     A.     In Texas?
7     Q.     In Texas, say in the last five years?
8     A.     No.
9     Q.     I'd like to talk a little more about some of
10 these business entities.  I have seen the name in some
11 of the documents of Merrill Bostrom & Associates.  Are
12 you familiar with that business?
13     A.     Yes.  That's a d/b/a name.
14     Q.     And a d/b/a for one of the ones we've
15 already talked about?
16     A.     MBA of Wyoming, Inc. d/b/a Merrill Bostrom
17 Associates.  And originally doing business here in Salt
18 Lake under the Merrill Bostrom Associates.
19     Q.     So Merrill Bostrom never was anything other
20 than a d/b/a of MBA of Wyoming?
21     A.     That's correct.
22     Q.     Another name I have seen in the file is MBA
23 of Salt Lake City, Inc.  Are you familiar with that
24 entity?
25     A.     No.  That isn't a correct -- that's not

CitiCourt, LLC
(801) 532-3441

PAGE 18

Don William Merrill, 7/21/03          18

1 correct at all as an Inc.
2     Q.     Okay.
3     A.     I think MBA was referred to MBA at Salt Lake
4 and MBA of Wyoming, but it is not a corporation nor an
5 LLC.
6     Q.     So it would be just a misnomer?
7     A.     That's correct.
8     Q.     But is it a name under which you or any of
9 your entities have done business?
10     A.     No.
11     Q.     Are there any other businesses, business
12 names, entities or d/b/a's that you or your affiliated
13 businesses have used over the last five years, say?
14     A.     Not for third-party administration, no.
15     Q.     How about any businesses in any way
16 connected to insurance?
17     A.     Yes.
18     Q.     And what are those?
19     A.     We own a company called Critique.
20     Q.     What does it do?
21     A.     It's a hospital utilization review company.
22     Q.     Anything else?
23     A.     No.
24     Q.     And you mentioned the software company
25 earlier today.  Right?

CitiCourt, LLC
(801) 532-3441

PAGE 19

Don William Merrill, 7/21/03          19

1     A.     CDO Technology, yes.
2     Q.     And is that technology also in connection
3 with providing --
4     A.     Yes.
5     Q.     -- benefits for health insurance-related
6 matters?
7     A.     The purpose of that organization, that LLC,
8 is to handle the software and hardware for both the
9 Wyoming location and the Salt Lake location.
10     Q.     Now, as I understand it, the MBA/ICI has
11 basically succeeded to the business clients and
12 functions of the Salt Lake City branch of MBA of
13 Wyoming.  Correct?
14         MR. SHUCHART:  Objection.  Misstates his
15 previous testimony.
16         You can answer.
17     A.     Restate that.
18     Q.     Sure.  As I understand the history you've
19 provided me, there once was a business called MBA of
20 Wyoming that had a Wyoming branch and a Salt Lake City
21 branch.  Correct?
22     A.     Correct.
23     Q.     And at some point, except for the licenses
24 held by MBA of Wyoming, the rest of the business of the
25 Salt Lake branch has been transferred to this new

CitiCourt, LLC
(801) 532-3441

PAGE 20

Don William Merrill, 7/21/03          20

1 entity.  Is that right?
2     A.     No, not specifically like that.
3     Q.     Okay, help me out here.
4     A.     MBA of Wyoming still operates as a business,
5 but the entities were moved -- or the clients from our
6 standpoint and in-house administration were separated
7 into the two entities.
8     Q.     Okay.  What about the employees at Salt
9 Lake?  Do they get a different paycheck from a
10 different entity?  I mean --
11     A.     Up until recently they all received a
12 paycheck under MBA of Wyoming, Inc., and then recently
13 we changed that so that they received a paycheck under
14 Managed Benefit Administrators.
15     Q.     But --
16         MR. SHUCHART:  Excuse me.  Sorry.
17         MR. GEORGE:  I didn't hear the last answer.
18         MS. HEGLAND:  We can't hear down here.
19         MR. BUSH:  I'm not complaining.
20         MR. SHUCHART:  You want to go ahead and read
21 that back?
22         (The record was read as follows: "Up until
23 recently they all received a paycheck under MBA of
24 Wyoming, Inc., and then recently we changed that so
25 that they received a paycheck under Managed Benefit

CitiCourt, LLC
(801) 532-3441

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

PAGE 21

Don William Merrill, 7/21/03            21

1  Administrators.")
2      Q.    (BY MR. WALRAVEN)  And Insurance
3  Consultants, Inc.?
4      A.    Correct.
5      Q.    And I referred to that a minute ago as
6  MBA/ICI, and you understood what I was referring to,
7  correct?
8      A.    I did.
9      Q.    You've got MBA of Wyoming, MBA Salt Lake.
10  I'm getting confused here, so I threw in the ICI.
11  You'll understand what I mean if I do that again,
12  correct?
13      A.    I'll try to, yes.
14      Q.    And if you don't, let me know.
15            Now, what I was trying to clarify in my mind
16  is, the Salt Lake City branch of MBA of Wyoming has for
17  some purposes changed its name, but it's the same
18  people doing the same thing at the same location in the
19  same way, pretty much.  Correct?
20      A.    Yes.
21      Q.    And that the only change other than the name
22  is that -- well, I may be wrong there.  Do you and
23  Mr. Bostrom both, are you both shareholders of MBA/ICI?
24      A.    No.  Of MBA of Wyoming, Inc.
25      Q.    And who are the shareholders of MBA/ICI?

CitiCourt, LLC
(801) 532-3441

PAGE 22

Don William Merrill, 7/21/03            22

1      A.    That's myself and -- I guess it's myself, I
2  think.
3      Q.    Okay.  So you're the only shareholder.  But
4  in any event, the Salt Lake City operation operates
5  pretty much the same way it always has, same people,
6  same bank accounts as before?
7            MR. SHUCHART:  Objection, overly broad.
8            THE WITNESS:  Am I supposed to answer that?
9            MR. SHUCHART:  You can ask for
10  clarification.
11      Q.    (BY MR. WALRAVEN)  Yeah, I mean, if you

PAGE 23

Don William Merrill, 7/21/03            23

1  answer your questions, you're right.  They're basically
2  the same.
3      Q.    Can you be a little more specific as to when
4  in 2001 this transfer took place or this name change
5  or --
6      A.    It made it easy for us in the first part of
7  2001 to change the accounting procedures and the way
8  that was being handled.  Up to that point, all of MBA
9  of Wyoming, Inc., the corporate accounting was handled
10  totally in Salt Lake for both locations.  And this
11  allowed us to divide that up, and they handled the
12  accounting and so on thereafter for Wyoming, and we
13  handled that for Utah.
14      Q.    And can you tell me when in 2001 this
15  happened?
16      A.    I can't.
17      Q.    First quarter?
18      A.    I'd say the first quarter.
19      Q.    I apologize if I already asked you this.  Do
20  you have a position, a title with MBA/ICI?
21      A.    Yes.
22      Q.    And what is that?
23      A.    President.
24      Q.    And has that been true since it was formed?
25      A.    Yes.

CitiCourt, LLC
(801) 532-3441

PAGE 24

Don William Merrill, 7/21/03            24

1      Q.    Are you familiar with a business that goes
2  by the name of J. Allan Hall?
3      A.    I am.
4      Q.    And how long have you been familiar with
5  that business?
6      A.    Somewhere in the neighborhood of ten years,
7  plus or minus.
8      Q.    And have you been doing business with them
9  off and on for ten years?
10            MR. SHUCHART:  Objection.  Can you clarify
11  with who again?

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

---

Don William Merrill, 7/21/03          93

1    Q.    Do you recall ever looking at the -- I'm
2  sorry.  Did you recall something?
3    A.    Yes.
4    Q.    What did you recall?
5    A.    That we probably have a document that says
6  that.
7    Q.    Okay.  And if we were going to talk about
8  that document, what would it be called or what would it
9  say?  Would it be a letter?  A form?
10   A.    It would be a letter at our request just
11 clarifying their format.
12   Q.    And you believe you do have such a letter?
13   A.    I think so.
14   Q.    Do you recall ever looking at the insurance
15 policy, either BCS or Companion Life, concerning this
16 issue of advance funding?
17            MR. SHUCHART:  Can you clarify the time
18 frame?
19            MR. WALRAVEN:  Anytime.
20            MR. SHUCHART:  Objection, overly broad.
21   A.    It's possible that I reviewed over the
22 contract to look at it, but like I said previously, I
23 believe advance funding is an administrative procedure
24 followed by the paying entity and may not at times be
25 included as part of a contract.

CitiCourt, LLC
(801) 532-3441

---

Don William Merrill, 7/21/03          94

1    Q.    But as we sit here today, do you actually
2  remember ever sitting down and looking at one of the
3  San Benito policies with respect to this issue?
4    A.    No.
5    Q.    Has your firm been involved in any other
6  litigation in Texas?
7            MR. SHUCHART:  Objection, overly broad.
8    A.    I don't think so.  Oh, yes, I recall
9  something, and I don't know what it is but it's a very
10 minor thing and I don't know what that is.
11   Q.    Was it in Texas?
12   A.    There was a Texas law firm involved, so
13 there was something.  May have been a complaint by a
14 participant.  I don't know what it was.
15   Q.    You don't remember any of the details?
16   A.    I do not remember the details.
17   Q.    Mr. Merrill, I think I've reached the end of
18 my outline.  I'm going to pass the witness and let
19 somebody else ask you questions, if anybody else wants
20 to.
21   A.    Thank you.
22            MR. WALRAVEN:  Thank you very much.
23 Appreciate your patience this morning.
24            MR. BUSH:  How about lunch?
25            MR. SHUCHART:  No, let's finish the witness.

CitiCourt, LLC
(801) 532-3441

---

Don William Merrill, 7/21/03          95

1            MS. HEGLAND:  We're not going to finish.
2            MR. BUSH:  It's going to be at least
3  probably two hours with me.
4            MR. SHUCHART:  Just for you?
5            MR. BUSH:  Uh-huh.
6            MR. SHUCHART:  And how long how long for
7  you?  When you say two hours, are you talking about a
8  combination or individually?
9            MS. HEGLAND:  Individually.
10           MR. WALRAVEN:  Let's go off the record.
11     (Recess from 11:54 a.m. to 1:03 p.m.)
12                    EXAMINATION
13 BY MR. BUSH:
14   Q.    Mr. Merrill, my name is Shelby Bush.  We met
15 before we started today, and I represent Companion Life
16 Insurance Company.
17           Did I understand your testimony correctly
18 earlier when you said that advance funding is very
19 common in the stop loss industry?
20   A.    Correct.
21   Q.    But you still needed to have a meeting with
22 J. Allan Hall here in your office to see if it would be
23 offered on these --
24   A.    No.
25   Q.    -- plans?

CitiCourt, LLC
(801) 532-3441

---

Don William Merrill, 7/21/03          96

1            MR. SHUCHART:  Objection.  Mischaracterizes
2  testimony.
3    Q.    What was the purpose of the meeting with
4  Mr. Hall, if you remember?
5    A.    Mr. Hall was coming through the area and so
6  we thought it would be an ideal time to visit with him
7  about our relationship and how it was going.  And Doug
8  Roth flew in, so we met with him.  And that's part of
9  the discussion we had relative to that.
10   Q.    Why the need to have that discussion?
11   A.    Why the need?
12   Q.    Yes.
13   A.    Because that's just an important part of
14 being a third-party administrator.
15   Q.    Would you be surprised if Mr. Sanchez and
16 Ms. Gonzalez indicated that advance funding was not a
17 major issue in their decision to enter into a stop loss
18 contract?
19           MR. SHUCHART:  Objection.  Mischaracterizes
20 his previous testimony.
21   A.    I don't know how their feelings are.
22   Q.    Would that surprise you, though?
23           MR. SHUCHART:  Same objection.
24   A.    I don't know.
25   Q.    Did you discuss advance funding with San

CitiCourt, LLC
(801) 532-3441

---

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

---

PAGE 125

Don William Merrill, 7/21/03    125

1 plan document and was an eligible claim, it should be
2 reimbursed for payment of that.
3    Q.    Reimbursed -- you would get reimbursed for
4 what? After payment, correct?
5    A.    It doesn't say after payment.
6    Q.    It does, if you'll look at the language.
7    A.    Okay. Show it to me.
8    Q.    Okay. "Applicant must first pay claims
9 before submitting them for reimbursement."
10    A.    What does that mean?
11    Q.    You tell me.
12    A.    The contract as we understood it is that the
13 plan or the claim was paid and showed as paid, and then
14 we sent all of the information to the carrier and then
15 they would reimburse it.
16    Q.    Did you read the contract where it defined
17 what paid meant?
18    A.    I don't have that in front of me, no.
19    Q.    Well, I'll get it in front of you in a
20 minute. But did you read it at the time, do you
21 recall?
22    A.    I don't recall that I did.
23    Q.    Okay. Would you expect the contract to
24 define what paid means?
25    A.    Yes, it should.

CitiCourt, LLC
(801) 532-3441

---

PAGE 126

Don William Merrill, 7/21/03    126

1    (Exhibit 33 marked.)
2    Q.    This is Exhibit 33. Can you identify that
3 contract, please?
4    A.    It says at the top it's a Companion Life
5 insurance.
6    Q.    Take a minute to look at that and let me
7 know whether that's the contract that is at issue in
8 this litigation.
9    A.    Looks like it's the contract that was at
10 issue and signed by San Benito and Mr. Swetnam as the
11 resident agent.
12    MR. SHUCHART: Just for the sake of the
13 record: I think that document contains both contract
14 and the application. So I don't know that he can
15 answer whether you guys consider the application part
16 of the contract or not.
17    MS. HEGLAND: Well, the document speaks for
18 itself.
19    MR. BUSH: It states in there that it is
20 part of the contract.
21    MR. GOOD: While I find this intellectually
22 stimulating, all these documents speak for themselves.
23    Q.    (BY MR. BUSH) When is the last time you
24 reviewed that contract?
25    A.    Five years ago, if I even reviewed it then.

CitiCourt, LLC
(801) 532-3441

---

PAGE 127

Don William Merrill, 7/21/03    127

1    Q.    Five years ago?
2    A.    Yeah. I have not reviewed that.
3    Q.    If you could look at page 5. At the very
4 bottom there's a definition of what paid is. It refers
5 to checks being forwarded, actually sent out of the
6 office to the provider and enough money in the account
7 to cover them.
8    MR. SHUCHART: Is there a question?
9    MR. BUSH: He's reviewing it.
10    THE WITNESS: Yeah, I've read it.
11    Q.    (BY MR. BUSH) Okay. Is that something
12 you've read before today?
13    A.    I don't know. I suspect I did or I suspect
14 I didn't. I don't remember. It was a long time ago.
15    Q.    Is it your understanding that that issue is
16 central to the denial of the reimbursement request that
17 is at issue in this lawsuit?
18    A.    Yes.
19    Q.    In the amount of approximately $900,000?
20    A.    Yes.
21    Q.    And you told me earlier today that you
22 believed the District had enough money on August 31st,
23 2001 to cover all the claims at issue in this lawsuit.
24 Correct?
25    A.    Correct.

CitiCourt, LLC
(801) 532-3441

---

PAGE 128

Don William Merrill, 7/21/03    128

1    Q.    And had those checks been physically
2 forwarded to the provider and had money been in the
3 account sufficient to cover those checks, we wouldn't
4 be here today, correct?
5    MR. SHUCHART: Objection, calls for
6 speculation.
7    A.    Yeah, it does.
8    Q.    It does what?
9    A.    It calls for speculation. Because I don't
10 know that that would have been paid on the basis of --
11 you're just giving me the assumptions of what would
12 occur, and I don't know whether it would have occurred
13 or not.
14    Q.    Would that situation be apparent if the
15 checks were mailed and money was in the account to
16 cover the checks?
17    A.    The claims would have been paid.
18    Q.    Right. That's my point.
19    (Exhibit 34 marked.)
20    I show you Exhibit No. 34. Do you recognize
21 that letter?
22    A.    Yes.
23    Q.    And could you identify it for the record,
24 please?
25    A.    It's a letter to Mr. Lorenzo Sanchez, who's

CitiCourt, LLC
(801) 532-3441

---

San Benito vs. Companion Life Insurance
Don William Merrill * July 21, 2003

---

PAGE 181
Don William Merrill, 7/21/03    181

1  sir?
2      MR. SHUCHART: Same objections.
3  A.  Yes, I understand it.
4  Q.  Now, did I understand you earlier to say
5  that although you forwarded Exhibit 33, which is the
6  complete contract for the 2000-2001 year on behalf of
7  San Benito, you forwarded this to your client, correct?
8  You have to answer loud, sir.
9  A.  Did I forward it to them?
10  Q.  Yes.
11  A.  Yes. There's a covering letter.
12  Q.  But you yourself did not review it for
13  accuracy?
14      MR. SHUCHART: Objection. Mischaracterizes
15  testimony.
16      MS. HEGLAND: I'm asking him.
17      THE WITNESS: You don't have a covering
18  letter to this going to San Benito?  That's the
19  application for the policy.
20  Q.  (BY MS. HEGLAND)  I believe this is it.
21  It's marked as Exhibit 35 and contains yet another copy
22  of the contract involved.
23      MS. SHUCHART: Well, that's not MBA's
24  letter, which is what he asked for.
25      MR. GEORGE: Excuse me.  What number is that
                CitiCourt, LLC
                (801) 532-3441

---

PAGE 182
Don William Merrill, 7/21/03    182

1  exhibit?
2      MS. HEGLAND: Nine.
3      THE WITNESS: Nine is a letter from
4  Consolidated sending it to MBA.
5      MR. BUSH: That's an exhibit of --
6      MR. SHUCHART: I think that's an exhibit --
7      MR. BUSH: That's an exhibit in one of the
8  other ones.
9      MR. GEORGE: Go off the record for a second.
10  (Discussion off the record.)
11  (Exhibit 38 marked.)
12  Q.  (BY MS. HEGLAND)  Mr. Merrill, we've marked
13  as Exhibit 38 a cover letter dated January 23, 2001
14  from MBA to Janie Gonzalez at the San Benito
15  Independent School District.
16  A.  That's correct.
17  Q.  Is that the cover letter you were thinking
18  about earlier?
19  A.  Yes.
20  Q.  And in that cover letter did you enclose the
21  same contract that we've discussed which has been
22  marked as Exhibit 35 and Exhibit 33?
23      MR. SHUCHART: Only if you know.
24  A.  I don't know, but I assume it is.
25  Q.  And in Exhibit 38, the letter to Janie, you
                CitiCourt, LLC
                (801) 532-3441

---

PAGE 183
Don William Merrill, 7/21/03    183

1  did instruct her to review the contract carefully?
2      MR. SHUCHART: Objection. Who's "you"?
3  Excuse me.  You can't ask the question since the letter
4  is not drafted by him, if "you" means him personally.
5  So who is "you"?
6  Q.  Did MBA --
7      MR. SHUCHART: Thank you.
8  Q.  -- instruct Ms. Gonzalez --
9  A.  Yes.
10  Q.  -- to review the contract carefully, sir?
11  A.  Correct.
12  Q.  And did you as the TPA for MBA, you,
13  Mr. Merrill, also review the contract carefully on
14  behalf of your client?
15      MR. SHUCHART: Objection, asked and
16  answered.
17  A.  I don't recall if I did or not.
18  Q.  Do you ordinarily in the course of your
19  business as a TPA take pains to review the contracts
20  for your clients?
21      MR. SHUCHART: Objection. Again, just for
22  the sake of the record, everybody's been using "you"
23  differently.  Are we talking about MBA or him
24  personally?  Put the question one way or the other.
25      MR. GEORGE: I think she qualified it that
                CitiCourt, LLC
                (801) 532-3441

---

PAGE 184
Don William Merrill, 7/21/03    184

1  time.
2  Q.  (BY HEGLAND)  Mr. Merrill, do you personally
3  in the course of your work as a TPA review the
4  contracts on behalf of your clients?
5  A.  No.
6  Q.  And does your company, MBA, as a certified
7  TPA review the contracts on behalf of its clients?
8  A.  We review all of the rate structure and the
9  factors and the rates and the premium rates. Whether
10  we read it word for word, I don't know.
11  Q.  Is it important as a TPA to be familiar with
12  the contract that you are involved in administering?
13  A.  That is sent to us by Consolidated, yes, it
14  would be.
15  Q.  It would be important because in the course
16  of administering the contract on behalf of your client,
17  TPA would need to know what is covered by the contract.
18  Isn't that true?
19      MR. SHUCHART: Objection, form.
20  A.  Yes.
21  Q.  Just so that we're clear: the contract that
22  has been marked as Exhibit 33 is the entire contract
23  between San Benito and Companion Life for the 2000-2001
24  year, correct?
25      MR. SHUCHART: Objection.  It requires
                CitiCourt, LLC
                (801) 532-3441

---

CitiCourt, LLC
801.532.3441

**WILLIAM LARRY BLAGG - CONDENSED TRANSCRIPT**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, | ) ) ) |
| Plaintiff, | ) ) |
| -v- | ) CIVIL ACTION NO. ) B-03-047 |
| COMPANION LIFE INSURANCE COMPANY, et al., | ) ) ) |
| | ) |
| Defendants. | ) |

**VIDEOTAPED DEPOSITION OF WILLIAM LARRY BLAGG**

The videotaped deposition upon oral examination of **WILLIAM LARRY BLAGG,** a witness produced and sworn before me, Aprille Lucas, RPR, Notary Public in and for the County of Hamilton, State of Indiana, taken on behalf of the Plaintiff at the offices of Garrison & Kiefer, 8720 Castle Creek Parkway, Suite 200, Indianapolis, Indiana, on July 31, 2003, at 1:44 p.m., pursuant to the Federal Rules of Civil Procedure.

**ASSOCIATED REPORTING, INC.**
**TWO MARKET SQUARE CENTER - SUITE 940**
**251 EAST OHIO STREET**
**INDIANAPOLIS, INDIANA 46204**
**(317) 631-0940**

**EXHIBIT "B"**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SAN BENITO CONSOLIDATED )
INDEPENDENT SCHOOL DISTRICT,)
                            )
        Plaintiff,          )
                            )
        -v-                 ) CIVIL ACTION NO.
                            ) B-03-047
COMPANION LIFE INSURANCE    )
COMPANY,                    )
et al.,                     )
                            )
        Defendants.         )

VIDEOTAPED DEPOSITION OF WILLIAM LARRY BLAGG

    The videotaped deposition upon oral examination of
WILLIAM LARRY BLAGG, a witness produced and sworn
before me, Aprille Lucas, RPR, Notary Public in and for
the County of Hamilton, State of Indiana, taken on
behalf of the Plaintiff at the offices of Garrison &
Kiefer, 8720 Castle Creek Parkway, Suite 200,
Indianapolis, Indiana, on July 31, 2003, at 1:44 p.m.,
pursuant to the Federal Rules of Civil Procedure.

ASSOCIATED REPORTING, INC.
TWO MARKET SQUARE CENTER - SUITE 940
251 EAST OHIO STREET
INDIANAPOLIS, INDIANA 46204
(317) 631-0940

APPEARANCES

FOR THE PLAINTIFF:

    Stephen E. Walraven, Esq.
    Otto S. Good, Esq.
    SHADDOX COMPERE WALRAVEN & GOOD
    The North Frost Center
    1250 N.E. Loop 410
    Suite 725
    San Antonio, TX  78209

FOR THE DEFENDANT COMPANION LIFE:

    Shelby Bush, Esq.
    PIPER RUDNICK
    1717 Main Street, Suite 4600
    Dallas, TX  75201-4605

FOR THE DEFENDANTS MANAGED BENEFITS ADMINISTRATOR,
INSURANCE CONSULTANTS, INC. AND MBA OF WYOMING:

    Hon. Rolando Olvera
    THE GARCIA LAW FIRM
    201 North 1st St.
    Harlingen, TX  78550

FOR THE DEFENDANT J. ALLAN HALL & ASSOCIATES:

    Roberta J. Hegland, Esq.
    BRACEWELL & PATTERSON, LLP
    2000 One Shoreline Plaza, South Tower
    800 North Shoreline Boulevard
    Corpus Christi, TX  78401-3700

    Albert George, Esq.
    GARRISON & KIEFER, P.C.
    8720 Castle Creek Pkwy, Suite 200
    Indianapolis, IN  46250

Also present: Michelle Bartlett, Legal Video Services
              James Allan Hall
              J. Allan Hall & Associates

---

INDEX OF EXAMINATION

                                              Page

EXAMINATION BY MR. WALRAVEN ....................... 5

EXAMINATION BY MR. OLVERA .......................... 63

EXAMINATION BY MR. BUSH ............................ 64

EXAMINATION BY MS. HEGLAND ......................... 65

EXAMINATION BY MR. WALRAVEN ....................... 69

EXAMINATION BY MR. OLVERA ......................... 76


INDEX OF EXHIBITS

                                              Page

Deposition Exhibit No.:

44    Stop-Loss Policy ........................... 29

51    Amended Notice to Take Videotaped .......... 6
      Deposition

53    Specific Advancement Rider - JAH 002407 .... 55

54    Documents evidencing the commission ........ 62
      payments to MBA

1    THE VIDEOGRAPHER:  Good afternoon.  Here
2  begins videotape number one in the deposition of
3  William Blagg in the matter of San Benito
4  Consolidated Independent School District,
5  Plaintiff, versus Companion Life Insurance Company
6  Managed Benefits Administrator and Insurance
7  Consultants, Incorporated, J. Allan Hall &
8  Associates, Incorporated, and MBA of Wyoming,
9  Incorporated, Defendants in the United States
10  District Court, Southern District of Texas,
11  Brownsville Division, the case number of which is
12  B-03-047.
13    Today's date is July 31st, 2003.  The time is
14  1:44 p.m.  This deposition is being taken at the
15  law offices of Garrison & Kiefer and was made at
16  the request of Steve Walraven of the law offices o
17  Shaddox Compere Walraven & Good.  The videographer
18  is Michelle Bartlett of Legal Video Services.
19    Would counsel and all present please identify
20  yourselves and state whom you represent.
21    MR. WALRAVEN:  I'm Steve Walraven, and I
22  represent the plaintiff.
23    MR. GOOD:  Otto Good, also one of the
24  attorneys for the plaintiff.
25    MR. OLVERA:  Rolando Olvera.  I represent

45

1  The definition of paid in the Companion policy
2  is very clear.  I believe it's noted on pages five
3  and six, and it's very clear it must be paid, it
4  must be funded within the contract period, and
5  North Shore knows that.  They understand the
6  different terms of contracts, and it's natural for
7  them to bring that to our attention.  They have on
8  other cases.
9  Q. And normally if it comes to your attention that a
10  provider says they haven't been paid, what is
11  typically the next step?
12  A. We try to go and confirm that with possibly another
13  large provider and not simply take one in the case
14  that it might be a clerical error.  And on our own
15  independent investigation, we determine another
16  provider has not been paid yet, then we feel like
17  that's grounds to move to discussing an audit.
18  Q. And at some point in the procedure do you undertake
19  to discuss it with the TPA, or is that left to the
20  auditors?
21  A. Well, it's discussed with the TPA in the sense that
22  we advise them we are requesting an audit of the
23  records for an account or for a claim, and if they
24  would make their records available and when that
25  would be, when that would be possible.  We then

1  have the audit firm we have selected -- in this
2  case it was North Shore -- contact the TPA and make
3  arrangements for visiting their office and going
4  through the records and having those available to
5  them.
6  Q. So there's no effort to just get MBA on the phone
7  and try and resolve it first, typically?
8  A. Well, no.  We rely on the representations made by
9  TPAs, because they've set themselves up in business
10  to be experts in handling these types of processes,
11  both the claims, the eligibility and the premium,
12  and we rely on their representations.  When they
13  come in question as to when things were actually
14  paid and checks released, it starts to put that
15  representation in our mind in question, and it's
16  not something that a reinsurer or carrier would
17  expect us to mediate.  They would expect us to
18  fully investigate it, determine if it was paid
19  within the terms of the contract and reinsurance
20  agreements, and deny those claims that are not
21  valid.
22  Q. And would you explain why the claims at issue in
23  this case were not paid?
24      MS. HEGLAND:  Objection, calls for
25  speculation.

47

1  A. Could you state that again?  I didn't quite catch
2  all of it, and what did you say?
3      MS. HEGLAND:  I object.  It calls for
4  speculation.  Paid by whom?
5  Q. Well, that's -- we can start there.
6      MR. BUSH:  That's back to where I was
7  objecting to before about which claims you're
8  talking about.
9  Q. You understand that we are here today because
10  certain claims were not paid by J. Allan Hall and
11  Companion Life?
12  A. Were not reimbursed by J. Allan Hall and Companion
13  Life, yes.
14  Q. And were you involved in the decision on whether or
15  not those claims should or should not be paid?
16  A. Yes.
17  Q. Who else was involved in that decision?
18  A. Mr. Scott and Mr. Hutchison.
19  Q. Who is Mr. Hutchison?
20  A. He's a vice president of, I believe -- I'm not
21  certain what his title is.  He's a vice president
22  at Companion Life.
23  Q. What's his first name?
24  A. Roy.
25  Q. And where is he located?

1  A. Columbia, South Carolina.
2  Q. And do you have an understanding as to the reason
3  these claims were not paid?
4  A. Based on the audit results presented in the report
5  from North Shore indicating that checks that had
6  clearly not been paid in a timely manner after
7  August 31, had not been released, not cleared the
8  bank, that those portions of those claims were
9  denied as not being paid within the contract term.
10  Q. As you understand it, the claims were denied
11  because the claim did not satisfy the definition
12  paid, correct?
13  A. That is correct.
14  Q. And the definition of paid has two components?
15  A. That's correct.
16  Q. And one component has to do with putting the check
17  in the mail or otherwise getting it to the
18  healthcare provider, correct?
19  A. Yes.
20  Q. And the other component has to do with sufficient
21  funds being available to satisfy the check,
22  correct?
23  A. That's correct.
24  Q. Now, were these claims denied because one of those
25  two requirements weren't met, the other one, or

1 both?

2 A. Because the checks weren't mailed and released to

3 the providers was the primary reason for denial.

4 Q. By the end of the policy period?

5 A. That is correct.

6 Q. Had these checks, hypothetically, been put in the

7 mail before the end of the policy period, would

8 that have made a difference in your decision

9 regarding reimbursing those?

10 A. Well, let me speculate in this fashion --

11 MS. HEGLAND: I'll object to you speculating.

12 Can you answer that question or --

13 THE WITNESS: Yes, I can.

14 MS. HEGLAND: Okay.

15 A. The question of whether the providers were paid in

16 a timely manner would probably never have come up;

17 the question that led to the audit probably would

18 have never happened. We probably, in other words,

19 would have never denied the claim.

20 The fact that it did come to our attention

21 that a provider was not paid in a timely manner at

22 or near the end of the contract period led to this

23 entire process that we went through with the

24 further examination, the audit and the subsequent

25 denial for not paying the providers within the

1 contract period.

2 Q. You just mentioned two components of the definit:

3 of paid, or for short form I'd like to refer to t

4 first one as getting the check in the mail, and t

5 second one was having money to cover the check,

6 okay?

7 A. (Witness nodded.)

8 Q. You have told me, as I understand it, that these

9 claims were denied on the first one; that is

10 getting the check in the mail, right?

11 A. Yes.

12 Q. And it was not denied on the basis of the

13 availability of funds?

14 A. I didn't say that.

15 Q. Well, that's what I was trying to find out.

16 A. I did not say that.

17 Q. Well, then tell me, was that a basis for denial?

18 A. My concern is whether the auditor had sufficient

19 evidence in front of her at the time she did the

20 audit to determine there was not some special ban

21 arrangement for funding that account. The

22 appearance was that the checking account that the

23 checks were drawn on was not adequately funded. I

24 have learned there was another account. I don't

25 know what the banking arrangements was. I don't

51

1 believe the auditor adequately dug that part out to

2 determine if there was some special funding

3 arrangement. But if you look at the absolute

4 evidence provided by the auditor that that account

5 did not have enough money to cover the checks that

6 had been written, it would suggest that the funding

7 issue would be the second reason for denial.

8 Q. Well, let me ask you, if there was some sort of

9 special funding arrangement or zero balance

10 checking account or other banking arrangement that

11 saw to it that those checks, all of them,

12 100 percent of the time, would clear, would that

13 satisfy your way of doing business in terms of

14 meeting the definition of paid?

15 A. No --

16 MS. HEGLAND: Objection, calls for

17 speculation.

18 A. No.

19 Q. So if you had one of these special funding

20 relations, and if all the checks always cleared the

21 bank, what would it take to satisfy the definition

22 of paid?

23 A. Provider has to be paid by the end of the contract

24 period.

25 Q. Well, we know that. The question is, what does

1 paid mean? And paid has two parts, and one of the

2 parts is putting the check in the mail, and anothe

3 part is having enough money in the bank. And if

4 you put the check in the mail, and if there's

5 enough money in the bank, then the provider is

6 considered paid, correct?

7 A. If you do both, that's correct.

8 Q. And if one happens before the other, then it's not

9 considered paid until the second one happens,

10 correct?

11 A. I'm not certain I understood that question.

12 Q. If the check is put in the mail a week before the

13 end of the policy, and it hits the bank two days

14 before the end of the policy, and funds are

15 transferred into the account one day before the en

16 of the policy, has that provider been paid by the

17 end of the policy?

18 A. Yes.

19 Q. So in this case, if the check's been put in the

20 mail, and the money had been transferred to the

21 account for all these checks before the end of the

22 policy, you would consider them paid --

23 MS. HEGLAND: Objection.

24 Q. -- is that right?

25 MS. HEGLAND: Misstates the evidence in this

1  with the sales and marketing agreement we had with
2  them.  It called for either 3 percent or 5 percent
3  to be paid to them.  Typically the commissions paid
4  to an agent, a broker or a TPA is negotiated at the
5  time of underwriting, and it's just another form of
6  fee to them.
7  Q.  And are they expected to provide any services in
8  connection with that fee to earn that fee?
9  A.  Well, I'm not certain I understand what services
10  you might be referring to.
11  Q.  Well, that was going to be my next question.
12  Normally, as I understand it, a commission is paid
13  on an insurance policy to people involved in the
14  initial sale of the policy, rather than any
15  services that might be provided in connection with
16  processing claims as a TPA.  And I was wondering if
17  that distinction applied here or not.
18  A.  Well, I believe the request for proposal was
19  presented to us by MBA, and they may have felt that
20  was appropriate to collect a commission.  What we
21  find is that TPAs have different arrangements with
22  their clients.  They may have a per head fee.  They
23  may also have commission, and there's any number of
24  ways that they get their revenues based on each
25  account.

63

1  We see several different -- we'd like to get
2  them all to net, in other words, no commission, but
3  a lot of TPAs want commission.
4  Q.  But in your understanding there's no specific
5  services that you had in mind that were going to be
6  involved that you were paying that commission to
7  MBA for, correct?
8  A.  Correct.
9      (Deposition Exhibit 54 is marked for
10  identification.)
11  Q.  I'm going to hand you what we have marked as
12  Exhibit 54 to your deposition, which consists of
13  Bates numbered pages JAH 2413 consecutive through
14  2421, and ask you if those are the documents
15  evidencing the commission payments to MBA --
16  A.  Yes, sir.
17  Q.  -- in connection with the San Benito business?
18  A.  That is correct.  This is only for -- I believe
19  this was probably the '01 checks, yeah, 2001
20  checks.  And any checks prior to January 1 of 2001
21  would have been off site.  We can certainly make
22  those available, but this would indicate what we
23  were doing, yes.
24  Q.  So there will be some other documents of some other
25  payments, correct?

64

1  A.  If you request them, we indicated we would make
2  them available to you.  They're just off site.
3  Q.  Thank you.  We'll take that up later.
4      Mr. Blagg, I really appreciate your patience
5  with me.  I'm going to look over my notes and in
6  the meantime pass the witness, let somebody else
7  ask you the questions.
8      MR. OLVERA:  Mr. Blagg, once again my name is
9  Rolando Olvera for Managed Benefits Administrator
10  and Insurance Companies, Inc. and MBA of Wyoming,
11  just a few very quick questions.
12  EXAMINATION BY MR. OLVERA:
13  Q.  Are you aware of any incident or occurrence during
14  the time frame at issue with San Benito ISD where
15  an advance payment was made on behalf of JAH?
16  A.  I'm not aware of any.
17  Q.  Are you aware of any request and denial during the
18  time period that the policies were in place?
19  A.  Not during the period of the contracts, no.
20  Q.  So aside from the claims that were eventually
21  denied, which we have already discussed, you're
22  aware of no other incident with respect to the
23  issue of advanced funding coming up, is that
24  correct?
25  A.  That is correct.

1      MR. OLVERA:  Thank you, sir.  I'll pass the
2  witness.
3      MR. BUSH:  And I am Shelby Bush on behalf of
4  Companion Life, just a few items.
5  EXAMINATION BY MR. BUSH:
6  Q.  Would you be surprised if there had been a specific
7  advance or simultaneous reimbursement rider
8  utilized by Companion Life prior to your even
9  coming to work at --
10  A.  I wouldn't be surprised, but I wasn't aware of one.
11  Q.  And earlier you made the statement, when you were
12  speaking of mentioning in your renewal letter that
13  TPAs needed to get their claims in at the end of
14  the contract year, you made the statement that you
15  thought it was necessary, and I want to clarify
16  that; are you aware of anything in the stop-loss
17  contract that requires you as the MGU to notify a
18  TPA or a plan that they have to comply with the
19  contract?
20  A.  There's --
21      MR. WALRAVEN:  Objection, calls for a legal
22  conclusion.
23  A.  There's nothing in the MGU agreement that I'm aware
24  of that requires us to do that.  We would like it
25  to be a business practice to do it.



# J. Allan Hall & Associates, Inc.

February 5, 2001

Managed Benefits Administrator
& Insurance Consultants, Inc.                38
3625 South West Temple
Salt Lake City, UT  84115

| Account | Prem. Mo. | Spec/Agg | Premium | Commission |
|---|---|---|---|---|
| **Companion Life:** | | | | |
| San Benito Cons Indep. Schools | Jan-01 | Spec | $ 31,942.82 | $  638.86 |
| | Jan-01 | Agg | 2,254.20 | 45.08 |
| | | Total: | $34,197.02 | $683.94 |

Check Number:  4106

J. ALLAN HALL & ASSOCIATES, INC.                                    **4106**

Managed Benefit Administrator          Check Number:  4106
                                       Check Date:  Feb 5, 2001

                                       Check Amount:  $683.94
Item to be Paid - Description          Discount Taken        Amount Paid
013101                                                       683.94



EXHIBIT
54-Blagg
7/31/03 ail

San Benito v. Companion
JAH 002413

PRODUCT # L-MP40

51N321 (10'00) 150491



# J. Allan Hall & Associates, Inc.

March 2, 2001

Managed Benefits Administrator
& Insurance Consultants, Inc.                    38
3625 South West Temple
Salt Lake City, UT  84115

| Account | Prem. Mo. | Spec/Agg | Premium | Commission |
|---|---|---|---|---|
| **Companion Life:** | | | | |
| San Benito Cons Indep. Schools | Feb-01 | Spec | $ 31,726.65 | $  634.53 |
| | Feb-01 | Agg | 2,250.80 | 45.02 |
| | | Total: | $33,977.45 | $679.55 |

Check Number: 4178

J. ALLAN HALL & ASSOCIATES, INC.                                              **4178**

| Managed Benefit Administrator | Check Number: | 4178 |
|---|---|---|
| 38 | Check Date: | Mar 2, 2001 |
| | Check Amount: | $679.55 |

| Item to be Paid - Description | Discount Taken | Amount Paid |
|---|---|---|
| Companion | | 679.55 |

San Benito v. Companion
JAH 002414

PRODUCT # L-MP40

51N321 (10.00) 150491

March 5, 2001

Managed Benefits Administrator
& Insurance Consultants, Inc.                    38
3625 South West Temple
Salt Lake City, UT  84115

| Account | Prem. Mo. | Spec/Agg | Premium | Commission |
|---------|-----------|----------|---------|------------|
| **Companion Life:** | | | | |
| San Benito Cons Indep. Schools | Feb-01 | Spec | $ 31,726.65 | $   634.53 |
| | Feb-01 | Agg | 2,250.80 | 45.02 |
| | | Total: | $33,977.45 | $679.55 |

POSTED

Check Number:

San Benito v. Companie
JAH  002415

April 3, 2001

Managed Benefits Administrator
& Insurance Consultants, Inc.                    38
3625 South West Temple
Salt Lake City, UT 84115

| Account | Prem. Mo. | Spec/Agg | Premium | Commission |
|---------|-----------|----------|---------|------------|
| **Companion Life:** | | | | |
| San Benito Cons Indep. Schools | Mar-01 | Spec | $ 32,171.38 | $ 643.43 |
| | Mar-01 | Agg | 2,272.90 | 45.46 |
| | | Total: | $34,444.28 | $688.89 |

POSTED

Check Number:

J. ALLAN HALL & ASSOCIATES, INC.                                      **4268**

Managed Benefit Administrator          Check Number:  4268
                38                     Check Date:  Apr 4, 2001

                                       Check Amount:  $688.89

Item to be Paid - Description          Discount Taken      Amount Paid
033101                                                     688.89

San Benito v. Companion
JAH 002416

PRODUCT # L-MP40

51N321 (10.00) 150491

May 2, 2001

Managed Benefit Administrator
& Insurance Consultants, Inc.                    38
3625 South West Temple
Salt Lake City, UT  84115

| Account | Prem. Mo. | Spec/Agg | Premium | Commission |
|---------|-----------|----------|---------|------------|
| **Companion Life:** | | | | |
| San Benito Cons Indep. Schools | Apr-01 | Spec | $ 31,910.05 | $  638.20 |
| | Apr-01 | Agg | 2,255.90 | 45.12 |
| | | Total: | $34,165.95 | $683.32 |



Check Number:

---

J. ALLAN HALL & ASSOCIATES, INC.                                **4365**

Managed Benefit Administrator          Check Number:  4365
          38                           Check Date:  May 1, 2001

                                       Check Amount:  $683.32

| Item to be Paid - Description | Discount Taken | Amount Paid |
|-------------------------------|----------------|-------------|
| 4/30/01 | | 683.32 |

San Benito v. Companion
JAH 002417

PRODUCT # L-MP40

51N321 (10-00) 150491

June 4, 2001

Managed Benefit Administrator
& Insurance Consultants, Inc.                    38
3625 South West Temple
Salt Lake City, UT  84115

| Account | Prem. Mo. | Spec/Agg | Premium | Commission |
|---|---|---|---|---|
| **Companion Life:** | | | | |
| San Benito Cons Indep. Schools | May-01 | Spec | $ 32,019.65 | $ 640.39 |
| | May-01 | Agg | 2,254.20 | 45.08 |
| | | Total: | $ 34,273.85 | $ 685.47 |

POSTED

Check Number:

J. ALLAN HALL & ASSOCIATES, INC.                                              4456

Managed Benefit Administrator              Check Number:  4456
            38                              Check Date:  Jun 4, 2001

                                           Check Amount:  $685.47
Item to be Paid – Description              Discount Taken      Amount Paid
5/31/01                                                           685.47

San Benito v. Companion
JAH 002418

PRODUCT # L-MP40                                              51N321 (10/00) 150491

July 3, 2001

Managed Benefit Administrator
& Insurance Consultants, Inc.                    38
3625 South West Temple
Salt Lake City, UT 84115

| Account | Prem. Mo. | Spec/Agg | Premium | Commission |
|---------|-----------|----------|---------|------------|
| **Companion Life:** | | | | |
| San Benito Cons Indep. Schools | Jun-01 | Spec | $ 31,201.79 | $ 624.04 |
| | Jun-01 | Agg | 2,193.00 | 43.86 |
| | | Total: | $ 33,394.79 | $ 667.90 |

POSTED

Check Number:

J. ALLAN HALL & ASSOCIATES, INC.                                              4532

'Managed Benefit Administrator              Check Number:  4532
                                            Check Date:  Jul 2, 2001
            38
                                            Check Amount:  $667.90
 Item to be Paid - Description              Discount Taken        Amount Paid
06/30/01                                                           667.90

San Benito v. Companion
JAH 002419

PRODUCT # L-MP40

51N321 (4/01) 159153



August 3, 2001

Managed Benefit Administrator
& Insurance Consultants, Inc.                    38
3625 South West Temple
Salt Lake City, UT  84115

| Account | Prem. Mo. | Spec/Agg | Premium | Commission |
|---|---|---|---|---|
| **Companion Life:** | | | | |
| San Benito Cons Indep. Schools | Jul-01 | Spec | $  31,297.07 | $  625.94 |
| | Jul-01 | Agg | 2,194.70 | 43.89 |
| | | Total: | $  33,491.77 | $  669.83 |

Check Number:

J. ALLAN HALL & ASSOCIATES, INC.

**4632**

Managed Benefit Administrator                    Check Number:  4632
                38                                Check Date:  Aug 3, 2001

                                                 Check Amount:  $669.83

| Item to be Paid - Description | Discount Taken | Amount Paid |
|---|---|---|
| 073101 | | 669.83 |

San Benito v. Companion
JAH 002420

PRODUCT # L-MP40

51N321 (4/01) 159153

September 5, 2001

Managed Benefit Administrator
& Insurance Consultants, Inc.                    38
3625 South West Temple
Salt Lake City, UT  84115

| Account | Prem. Mo. | Spec/Agg | Premium | Commission |
|---------|-----------|----------|---------|------------|
| **Companion Life:** | | | | |
| San Benito Cons Indep. Schools | Aug-01 | Spec | $ 31,441.64 | $ 628.83 |
| | Aug-01 | Agg | 2,215.10 | 44.30 |
| | | Total: | $ 33,656.74 | $ 673.13 |

Check Number:

**J. ALLAN HALL & ASSOCIATES, INC.**                                                          **4740**

  Managed Benefit Administrator                     Check Number:  4740
             38                                     Check Date:  Sep 5, 2001

                                                    Check Amount:  $673.13
 Item to be Paid - Description                      Discount Taken      Amount Paid
08/31/01                                                                  673.13

San Benito v. Companion
JAH 002421

PRODUCT # L-MP40

51N321 (4/01) 159153

# COPY OF TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, | Deposition of: |
| Plaintiffs, | **GLADE C. NIXON** |
| vs. | |
| COMPANION LIFE INSURANCE COMPANY, MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS, INC., J. ALLAN HALL & ASSOCIATES, INC., and MBA OF WYOMING, INC., | |
| Defendants. | Civil Action No.: B-03-047 |

**October 30, 2003 - 9:28 a.m.**

Location:  Offices of MBA
3625 South West Temple
Salt Lake City, Utah

Reporter:  Vicky McDaniel, RMR
Notary Public in and for the State of Utah

# EXHIBIT "C"



**CitiCourt, LLC**
THE REPORTING GROUP

50 South Main, Suite 830
Salt Lake City, Utah 84144

801.532.3441          TOLL FREE 877.532.3441          FAX 801.532.3414

1                      **A P P E A R A N C E S**

2    **FOR THE PLAINTIFF:**

3              **STEPHEN E. WALRAVEN, ESQ.**
              **SHADDOX, COMPERE, WALRAVEN & GOOD, P.C.**
4             The North Frost Center
              1250 N.E. Loop 410, Suite 725
5             San Antonio, TX  78209
              (210) 822-2018

6

7    **FOR DEFENDANTS MBA OF WYOMING, INC., AND MANAGED**
     **BENEFITS ADMINISTRATOR AND INSURANCE**
     **CONSULTANTS, INC.:**

8

              **FRED L. SHUCHART, ESQ.**
9             **MASON, COPLEN, SHUCHART, HUTCHINS**
                **& BANKS**
10            7500 San Felipe, Suite 700
              Houston, TX  77063
11            (713) 785-5595

12   **FOR DEFENDANT COMPANION LIFE INSURANCE COMPANY:**

13            **SHELBY J. BUSH, ESQ.**
              **PIPER RUDNICK**
14            1717 Main Street, Suite 4600
              Dallas, TX  75201-4605
15            (214) 743-4500

16   **FOR DEFENDANT J. ALLAN HALL & ASSOCIATES:**

17            **ROBERTA J. HEGLAND, ESQ.**
              **BRACEWELL & PATTERSON L.L.P.**
18            2000 One Shoreline Plaza, South Tower
              800 Shoreline Boulevard
19            Corpus Christi, TX  78401-3700
              (361) 866-7226

20

21

22

23

24

25

1    Q.    And I was trying to have you tell me whether

2  you were working in one of those areas or both of them

3  when you first came over here part time.

4    A.    Not initially.

5    Q.    Which were you working on initially?

6    A.    Mostly just various and sundry projects, not

7  necessarily anything specifically to do with any filing

8  of stop loss claims.  That came a little bit later.

9    Q.    And when you started part time, about how

10  many hours a week did that consist of?

11    A.    Probably about ten or twelve.

12    Q.    And when did that change?

13    A.    Probably about a year later.  I was asked to

14  kind of take over and file the stop loss claims for

15  MBA, and it became a function that the claims manager

16  did not have time for, so they asked me if I would take

17  over that function.  And at that time my hours

18  increased probably to maybe 20, 25 hours a week.

19    Q.    And who was the claims manager that you were

20  dealing with when you were working that first year?

21    A.    At that time I believe it was a lady by the

22  name of Chris Dyer.

23    Q.    And during that time period, who was

24  responsible for filing stop loss claims?

25    A.    I became responsible for filing of the stop

Glade C. Nixon, 10/30/03

1    we'd discuss those and try to come to a conclusion on

2    those, the answers.

3         Q.    If a question came up what was covered or

4    how it should be covered or those sorts of things --

5         A.    Yes, that's correct.

6         Q.    -- they'd get out the insurance policies and

7    you'd read them and look at the plans and give some

8    guidance on what they should be doing?

9         A.    That's correct.

10        Q.    All right.  Can you tell us what you did

11   starting in about 1996, your second year at MBA?  Has

12   that changed up through today, or is that still what

13   you're doing?

14        A.    Pretty much the same thing.

15        Q.    Have the hours gone up or down at any time

16   since 1996 significantly?

17        A.    Might have gone up to maybe 30 hours on

18   occasion.

19        Q.    And your job duties, have they been about

20   the same as you described?

21        A.    Pretty much.

22        Q.    And during the periods from 1996 through

23   today, has anybody else been responsible for the filing

24   of stop loss claims?

25        A.    No.

1    at issue in this litigation were not paid by the end of

2    that 11th month?

3         MR. SHUCHART:  Objection, vague.

4         A.    No, because of the provision that we were

5    dealing with the advanced funding.

6         Q.    What provision is that, sir?

7         A.    The advanced funding.

8         Q.    Would that be in the contract?

9         A.    That I couldn't tell you.  I don't know.

10        Q.    You don't know if it's in the contract?

11        MR. SHUCHART:  That's what he said.

12        A.    No, I don't.

13        Q.    And would you think, based upon your

14   definition that it is a, quote, value-added item, would

15   you think it would be in the contract?

16        A.    Based on my experience with MBA, yes.

17        Q.    Have you ever looked at the contract at

18   issue in this litigation?

19        A.    No, I have not.

20        Q.    Have you ever discussed with anyone other

21   than your lawyer how the contract defines what is

22   considered paid?

23        A.    Yes, with my bosses internally.

24        Q.    And in what circumstances did that

25   discussion come up?

## ADMINISTRATIVE SERVICE AGREEMENT

THIS ADMINISTRATIVE SERVICE AGREEMENT, made and executed by and between San Benito Consolidated Independent School District a Texas Public Entity, hereinafter referred to as the "Plan Sponsor," and MBA of Wyoming, Inc., hereinafter referred to as the "Contract Administrator" for the provision of certain administrative and advisory services with respect to the Employee Medical Benefit Plan (the "Plan").

### RECITALS

The Contract Administrator is engaged in the business of performing services as Employee Benefit Advisors and Administrators. The Plan Sponsor hereby engages the services of the Contract Administrator to provide administration services for San Benito Consolidated Independent School District. For and in consideration of the mutual covenants and the monetary consideration herein recited, it is mutually agreed as follows:

    1. *Services to be Performed.* The Contract Administrator shall perform for the Plan Sponsor administrative and advisory services in conjunction with the administration and operation of the Plan. The administrative services to be performed by the Contract Administrator and Advisor are set forth in Exhibit "B," attached hereto and by reference made a part hereof for all purposes. The advisory services to be performed by the Contract Administrator are set forth in Exhibit "C", attached hereto and by reference made a part hereof for all purposes.

    (a) The services to be performed by the Contract Administrator shall be administerial in nature and shall be performed within the framework of policies, interpretations, rules, practices and procedures made or established by the Plan Sponsor. The Contract Administrator shall not have discretionary authority or discretionary controls respecting management or disposition of the assets of any trust fund and shall not have authority nor exercise any control respecting management or disposition of the assets of any trust fund and shall not render investment advice with respect to any money or other property of any trust fund.

    (b) The Contract Administrator will process and pay benefits in accordance with the plan or policy adopted by the Plan Sponsor. It is agreed that the Contract Administrator will incorporate sound business practices and be responsible for reasonable internal audits. Where an error exists, the Contract Administrator shall use reasonable efforts for recovery of any loss resulting therefrom, but will not be required to initiate legal process for any such recovery.

    2. *Limitation of Liabilities and Obligations.* The Contract Administrator shall have no responsibility, risk, liability or obligation for the funding of the Plan or for failure of the Plan or the Plan Sponsor to obtain or continue insurance coverage or payment of insured benefits. The responsibility and obligation for funding the Plan shall be solely and totally the responsibility of the persons or entities so provided in the Plan. Benefits under the Plan, whether or not fully or partially funded or insured, shall be provided solely by the Plan Sponsor or those persons named in the Plan. MBA shall not be liable for any damages resulting from its good faith application of Plan provisions, including those concerning eligibility, coverage, medical necessity, or benefits; or the failure of Plan participants or beneficiaries to obtain any particular health care as a result of MBA's services. MBA shall not be liable for any recommendations concerning insurance carriers or for the quality or nature of health care provided through health maintenance or preferred provider organizations, whether or not recommended, sponsored, or arranged for by MBA. Contract Administrator shall not be deemed an insurer, underwriter or guarantor with respect to any benefits under the Plan.

    3. *No Fiduciary Authority.* MBA shall not be deemed a Plan "fiduciary" under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). MBA's services shall not include any power to make any decisions as to Plan policy, interpretations, practices or procedures, but shall be limited to the performance of ministerial functions such as those types described by the Department of Labor in its Regulation § 2509.75-8, D-2 within a framework of policies, interpretations, rules, practices and procedures made or established by the Plan Sponsor. MBA shall have no final discretionary authority or control over Plan management, including authority or control over the management or disposition of any Plan assets, nor final discretionary authority over Plan administration. MBA's services with respect to the Plan shall be subject to review, modification, or reversal by the Plan Sponsor and/or Plan Administrator. Plan Sponsor shall have final authority in determining eligibility of claims. Plan Sponsor acknowledges that excess risk insurance purchased by Plan Sponsor will not provide coverage with respect to claims not eligible under the express terms and conditions of the Plan.

    4. *Independent Contractor.* It is understood and agreed that MBA is engaged to perform services under this

agreement as an independent contractor. The Contract Administrator shall use its best efforts to implement such written instruction, if any, as to policy and procedures which may be given by the Plan Sponsor, provided that such instructions are consistent and compatible with the description of services to be performed by the Contract Administrator and Advisor and are not in violation of or contrary to any laws or regulations, including but not limited to the Employee Retirement Income Security Act of 1974, as amended.

    5. *Plan Sponsor.* Unless specified in writing otherwise, The Plan Sponsor shall be the Plan Sponsor as such term is defined in section 3 (16) of ERISA. Unless the context requires otherwise, the term "Plan Sponsor" or "Plan Administrator" as used in this agreement shall include any corporation, partnership, committee, trustees of a trust, or other

entity or individual sponsoring or administering the Plan at the time of execution of this agreement and shall also include such additional or successor individuals or entities serving from time to time during the term of this Agreement; provided, however, that when this Agreement calls for direction or notice to be given to MBA by the Plan Sponsor or Plan Administrator, MBA shall be absolutely protected in relying upon any direction or notice received from the person executing this Agreement as Plan Sponsor or Plan Administrator.

6. *Term.* The term of this Administrative Service Agreement is for the period of One year beginning October 1, 2000. At the end of the Contract, if neither party requests a change, the Contract shall be automatically renewed. The fees stated in the Fee Schedule Exhibit are subject to negotiation on the first anniversary date of the contract, or on any monthly due date after the initial one year period, providing the Contract Administrator has given timely notice of the intent to adjust the fees. The new fees would then be in force for one year from the effective date.

(a) Either party shall have the right to terminate or re-negotiate the contract after the initial one year period by providing to the other party written notice at least thirty (30) days in advance of such termination or re-negotiation of the terms of the contract. In the event that either party gives timely notice of intent to re-negotiate the terms of the contract, the contract shall continue until re-negotiated terms are approved in writing by both parties. After the initial one year period, this contract may be terminated upon thirty (30) days written notice of termination by either party to the other. In the event the Plan account contains a balance which is insufficient to meet the Plan and Plan Sponsor's obligation, the Contract Administrator may terminate this contract upon thirty (30) days written notice. The Contract Administrator will have no further responsibility or obligation hereunder upon the termination of this contract.

(b) At any time during the initial term or subsequent terms of this agreement that the Plan Sponsor shall fail to meet the financial requirements of the plan, the Contract Administrator may terminate this contract. Notice of intent to Terminate shall be given 30 days in advance of such termination.

(c) In the event of termination of this contract, if claims are to be processed after the termination date, the fees for services shall be either the specified percentage of claims or dollars per claim, based on the average of fees during the last two months of the contract, as follows:

100% of the average fees during the first month after termination, 75% the second month, 50% the third month, and 25% thereafter until no further claims are processed, or services required.

7. *Service Fees.* The Plan Sponsor agrees to pay to the Contract Administrator for the services to be performed hereunder the fees described in the attached Fee Schedule, **Exhibit A**

8. *Assignment.* This Contract shall not be assigned by the Contract Administrator (its duties, obligations or responsibilities hereunder delegated) to any other person or entity without the prior written approval of the Plan Sponsor.

9. *Indemnification.* During the continuance of this Agreement, the Contract administrator agrees to indemnify and hold the Plan Sponsor harmless against any and all loss, damage and expense with respect to any acts or omissions wherein it is finally adjudged or willfully acknowledged that the Contract Administrator is guilty of gross negligence, willful misconduct or lack of good faith, but only for those acts or omissions for which MBA is not entitled to indemnification under the following sentence, provided that MBA not be required to indemnify the Plan Sponsor if the Plan Sponsor's acts or omissions contributed to its loss. The Plan Sponsor shall indemnify MBA against expense, loss, claim, or liability, including attorney's fees, arising out of or based upon (a) MBA's or the Plans alleged or actual status as an insurer or insurance company, or provider of benefits; or (b) MBA's alleged or actual status as a Plan fiduciary; (c) acts or omissions of the Plan Sponsor or Plan Administrator, as Plan fiduciaries or otherwise; (d) any acts or omissions of MBA in providing services under this Administrative Services Agreement if made in accordance with the directions of the Plan Sponsor or Plan Administrator in good faith.

10. *Entire Agreement: Exhibits and Standard Terms and Conditions.* This agreement, the standard terms and conditions and all schedules, exhibits and amendments [sic] hereto, constitutes the entire Agreement among the parties and supersedes all prior proposals, discussions, and writings by and between the parties and related to the subject matter of this agreement. This agreement may be modified, amended, or supplemented, but only by a written instrument executed by all parties, except that fee adjustments proposed by MBA and not objected to by either the Plan Administrator or Plan Sponsor shall also constitute a binding amendment. The parties acknowledge that the Plan or the Plan Sponsor may have entered into separate agreements with affiliates of MBA for other types of services, but such agreements shall be construed and enforced separately from this agreement.

11. *Separability.* If any provision if this agreement is held to be illegal or unenforceable, the remaining provisions shall nevertheless remain in full force and effect. In addition, the illegal or unenforceable provision shall be modified so as to conform to the greatest extent legally permissible, to the original intent of such provision.

12. *Governing Law; Jurisdiction and Venue.* To the extent not preempted by ERISA or other federal law, this Agreement shall be governed by and construed under the laws of the State of Utah. By entering into this Agreement, the Plan Administrator and Plan Sponsor subject themselves to personal jurisdiction in the courts of the State of Utah and agree that Utah is the Only appropriate venue for any action brought to interpret or enforce any provision of this Agreement, or which may otherwise arise under or relate to the subject matter of this Agreement.

**MBA**

DATE _16-10-01_  BY _____

**SB - 00002**

13. *Arbitration.*

(a) If the parties hereto cannot settle grievances or disputes between themselves in an informal and expeditious fashion, each party agrees, upon the motion of the other, to arbitration by the American Arbitration Association (AAA). The Arbitration proceedings shall take place in the city of the responding party. The parties agree that the decision of the arbitrator shall be final and binding with regard to each of them.

(b) The parties shall share equally the AAA administrative fee as well as the arbitrator's fee, if any, unless otherwise assessed by the arbitrator. The administrative fee shall be advanced by the initiating party subject to final apportionment by the arbitrator in his award. The arbitrator's award may be enforced in any court having jurisdiction thereof by the filling of a petition to enforce said award. Costs of filing may be recovered by the party which initiates such action to have the award enforced.

(c) Each party hereto agrees to notify the other at the time a lawsuit is initiated concerning any dispute with any third person or entity that is relevant to any rights, obligations or other responsibilities or duties provided for under this Agreement.

14. *Other Applicable Agreements.* The following agreements are, by this reference incorporated in this agreement:

| Form Number | Plan Sponsor's Initials | Title of Agreement | Date |
|---|---|---|---|
| Exhibit A | _____ | Fee Schedule | 10/01/2000 |
| Exhibit B | _____ | Admin. Services Provided by MBA | 10/01/2000 |
| Exhibit C | Not Included | Advisory Services | 10/01/2000 |
| Exhibit D | _____ | HIPAA Administration | 10/01/2000 |

The effective date of this contract specified in Paragraph 6 "Term" shall be the effective date unless otherwise specified here by the Contract Administrator:_____

Plan Sponsor _San Benito Consolidated Independent School District_____

By _____  Title _____  Date  *10-10-00*

**MBA of Wyoming, Inc./MBA of Wyoming, Inc.**

By _____  Title _____  Date  *10-10-00*

**MBA**

## Standard Terms and Conditions

1.    *Records and Files.* The Contract Administrator shall maintain all records in conjunction with the administrative services to be performed hereunder. The confidentiality of such records shall be maintained by the Contract Administrator and the information therein shall not be divulged or disclosed or made available to persons other than the Plan Sponsor without the prior written approval of the Plan Sponsor or a court of competent jurisdiction. In the event of the termination of this Contract, the Contract Administrator shall deliver to the Plan Sponsor, upon written request, at a time period mutually agreeable, but not to exceed six months from date of termination, the information on all claims histories for the past two years. If the claim history is requested, the Plan Sponsor will pay all costs incurred by the Contract Administrator in providing such information, (including the production of same), cost of programming, computer charges, mailing costs, etc. The Contract Administrator shall be entitled to retain copies of any such records at his own expense.

2.    *Legal and Accounting Services.* MBA's services shall not include the provision of legal services or the services or independent certified public accountants. MBA shall have no liability for the quality or cost of any services so provided, whether or not services provided by professional advisors were recommended, sponsored, or arranged for by MBA.

3.    *Enforcement.* MBA shall have no responsibility or obligation to take action, legal or otherwise, against any employer or employees or other persons to enforce provision of the Plan. In the event that the Plan Sponsor desires to engage in the services of the Contract Administrator for such purposes, such services shall be engaged and rendered only pursuant to a separate written agreement between the parties.

4.    *Investments.* MBA shall not be responsible or obligated for the investment of any assets or funds of the Plan. However, the Contract Administrator agrees to prepare and maintain records of the investment of the assets or fund of the Plan if the Plan Sponsor requests the Contract Administrator to do so and provides the information and documents necessary to prepare and maintain such records. MBA shall not render any investment advice with respect to Plan assets or have any authority or responsibility to do so.

5.    *Costs and Expenses; Taxes.*
     (a) As a part of the services to be performed by the Contract Administrator, the Contract Administrator and Advisor shall maintain and operate an administrative office for such purposes and to pay all normal costs and expenses for such maintenance and operation (except as herein set forth).
     (b) The Contract Administrator shall employ a sufficient staff of employees or others to provide the administrative and advisory services to be performed by the Contract Administrator hereunder. However, the Contract Administrator will not provide or be responsible for the expenses and cost of legal counsel, actuaries, consulting physicians or dentists, certified public accountants, investment counselors, investment analysts or similar type services performed for the Plan Sponsor; the Contract Administrator shall not be authorized to engage such services or incur any expense or cost thereof.
     (c) The Plan or the Plan Sponsor shall be responsible for all other costs and expenses of Plan establishment and administration including legal, accounting and other professional fees. The Plan or the Plan Sponsor shall also be responsible for the payment or reimbursement to MBA of any and all taxes relating to the Plan, including any sales or use taxes or taxes in lieu thereof, and any related penalties, interest or expenses of MBA, imposed upon or incurred, or required to be collected by MBA.

6.    *Tax, ERISA, and COBRA Compliance.* MBA shall not be responsible for establishing or maintaining the Plan or the Plan Sponsor in compliance with federal or state taxing statutes, ERISA, COBRA, or other applicable state or federal laws or regulations, or for obtaining any tax benefits that may be available to the Plan Sponsor, the Plan, or the Plan participants. MBA may provide, whether or not so specified under the Description of Services Exhibit, Plan documents, summary Plan descriptions, and/or administrative forms, but makes no representations or warranties as to their legal sufficiency. The Plan Sponsor or Plan Administrator shall have the final authority and responsibility for approving the form and content of all Plan documents and forms.

7.    *Plan and Fee Changes.* Any changes in the Plan, found to be compatible with existing systems and procedures and approved by the Contract Administrator which requires additional programming, reports or services, will be at the expense of the Plan Sponsor. The Plan Sponsor agrees to make changes in benefits only at the beginning of the Plan Year, allowing thirty (30) days prior notice to the Contract Administrator. Exceptions must be agreed upon by the Contract Administrator.

**MBA**

DATE _10-10-02_   BY _____

SB - 00004

## EXHIBIT A

### Fee Schedule

For: San Benito Consolidated Independent School District
Effective: October 1, 2000

Administrative Fees to Cover:

| | | | | |
|---|---|---|---|---|
| Life Insurance | [X] | Short Term Disability | [] | |
| Medical | [X] | Pre-Cert (Critique) | [X] | |
| | | Other: | | |
| Dental | [X] | HIPAA | [X] | |
| Vision Care | [] | COBRA | [X] | |
| | | Document Changes (off anniversary date) | [] | |

Fee Method and schedule:

MBA Administration Fees are $ 12.60/ee/month. HIPAA Administration Fees are $ .35/ee/month. Reinsurance Broker Fees $ 2.00/ee/month. Ethix Southwest PPO Fees are $ 3.20/ee/month. Lonestar Interlocal 2 million excess is $ 1.00/ee/month.

| Amended | Date | Schedule |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**MBA**

DATE /6·10·00 BY

SB - 00005

## EXHIBIT B

### Administrative Services Provided By MBA

Administrative Services For:  San Benito Consolidated Independent School District
Effective:  October 1, 2000

1.   Provide an automated Computer System for the processing of health claims.

2.   Furnish standard administrative internal forms to include:

   A.   Standard Explanation of Benefits.
   B.   Standard Claim Form.
   C.   Standard Enrollment Forms.

3.   Coordinate with the Plan Sponsor the custom design and printing of other supplies specifically for the Plan Sponsor. These will be at the Plan Sponsor's expense.  Including but not limited to the following:

   A.   Bank Drafts or Checks and Deposit Slips.
   B.   Employee Identification Cards.
   C.   Employee Plan Booklets.

4.   Provide a standard monthly plan premium billing satisfactory to meet the needs of the Plan Sponsor.

5.   Provide the Plan Sponsor with instructions for reporting employee eligibility.

6.   Provide Customer Service for the Plan Sponsors employees.

7.   Provide assistance in the preparation of Plan Document and Summary Plan Description

8.   Review, coordinate and process all claims.  Prepare all checks or drafts for disbursement from the fund with documentation to support these disbursements.  The Plan Sponsor elects to have these disbursements _____

9.   Provide standard claims analysis reports.

   Monthly Reports:_____

   A.   Claims Experience Report.
   B.   Monthly Fund Report.
   C.   Monthly Check Register.

   Special Reports to be provided:

   | Name of Report | Frequency |
   | --- | --- |
   | A.   Fund & Claims Report | Quarterly |
   | B. | |
   | C. | |

10.  Provide appropriate renewal documentation and financial analysis.

11.  Provide the necessary data to the Plan Sponsor for preparation of ERISA reports and filings

12.  Attend meetings with the Plan Sponsor as necessary for proper administration of the Plan.

**MBA**

DATE _____ BY _____

SB - 00006

**EXHIBIT C**

**Advisory Services**

For: San Benito Consolidated Independent School District
Effective: October 1, 2000

1.  Advise and assist in the design of client administrative forms.

2.  Provide a review of marginal or questionable claims.

3.  Provide information relative to the Plan alternatives.

4.  Advise as to the contribution levels for the present benefits.

5.  Provide evaluation and underwriting relative to contract provisions and changes.

6.  Counsel with the Plan Sponsor concerning the financial status of the Plan to assure proper accumulation of reserves.

7.  Provide medical cost data and medical cost trends which would aid in plan benefit design.

8.  Coordinate with legal counsel and others in regards to ERISA requirements and information.

9.  Provide competitive bidding of various insured plans.

10. Act as "Agent of Record" on the following coverage:

_____

_____

_____

_____

**MBA**

**EXHIBIT D**

**HIPAA Administration**

For: San Benito Consolidated Independent School District
Effective: October 1, 2000

This exhibit constitutes an amendment to the Administrative Service Agreement between MBA of Wyoming, Inc. as of the date subscribed herein subject to the terms and conditions set forth in the Administrative Service Agreement in force at the date of this agreement.

**Certificate of Coverage Administration:**

Includes administrative processing, set up, preparation and mailing of Certificates of Coverage to all individuals who lose coverage under the medical plan or COBRA.

| | |
|---|---|
| As a fee per employee per month for HIPAA | $ .35/Ee/Mo |
| As a fee per employee per month for COBRA | $ 21.50/Certificate |

The undersigned elects to have MBA provide HIPAA Administration Services, as limited in the specifications above, and agrees to defend and hold MBA harmless from and against all claims, damages, or losses, including but not limited to all cost of defense and attorney fees, which are a result of clients' inaccuracy, delay or failure to provide all information necessary for MBA to properly administer the above.

_____          _____
Plan Sponsor                                                      Date

_____
Authorized Signature

_____
Title

**MBA**

DATE _____ BY _____

# COPY OF TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT,<br><br>      Plaintiffs,<br><br>  vs.<br><br>COMPANION LIFE INSURANCE COMPANY, MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS, INC., J. ALLAN HALL & ASSOCIATES, INC., and MBA OF WYOMING, INC.,<br><br>      Defendants. | Deposition of:<br><br>**PHYLLIS K. MERRILL**<br><br>**VOLUME II**<br><br><br><br><br>Civil Action No.:  B-03-047 |

July 22, 2003 - 8:45 a.m.

Location:  Offices of CitiCourt Reporting
50 S. Main, Suite 830
Salt Lake City, Utah

Reporter:  Vicky McDaniel, RMR
Notary Public in and for the State of Utah

## EXHIBIT "E"



**CitiCourt**, LLC
THE REPORTING GROUP

50 South Main, Suite 830
Salt Lake City, Utah 84144

801.532.3441          TOLL FREE 877.532.3441          FAX 801.532.3414

```
 1                    A P P E A R A N C E S

 2    FOR THE PLAINTIFF:

 3                    STEPHEN E. WALRAVEN, ESQ.
                      OTTO S. GOOD, ESQ.
 4                    SHADDOX, COMPERE, WALRAVEN & GOOD, P.C.
                      The North Frost Center
 5                    1250 N.E. Loop 410, Suite 725
                      San Antonio, TX  78209
 6                    (210) 822-2018

 7    FOR DEFENDANTS MBA OF WYOMING, INC., AND MANAGED
      BENEFITS ADMINISTRATOR AND INSURANCE
 8    CONSULTANTS, INC.:

 9                    FRED L. SHUCHART, ESQ.
                      MASON, COPLEN, SHUCHART, HUTCHINS
10                      & BANKS
                      7500 San Felipe, Suite 700
11                    Houston, TX  77063
                      (713) 785-5595
12
      FOR DEFENDANT COMPANION LIFE INSURANCE COMPANY:
13
                      SHELBY J. BUSH, ESQ.
14                    PIPER RUDNICK
                      1717 Main Street, Suite 4600
15                    Dallas, TX  75201-4605
                      (214) 743-4500
16
      FOR DEFENDANT J. ALLAN HALL & ASSOCIATES:
17
                      ROBERTA J. HEGLAND, ESQ.
18                    BRACEWELL & PATTERSON L.L.P.
                      2000 One Shoreline Plaza, South Tower
19                    800 Shoreline Boulevard
                      Corpus Christi, TX  78401-3700
20                    (361) 866-7226

21                    ALBERT GEORGE, ESQ.
                      J. ALLAN HALL & ASSOCIATES, INC.
22                    55 Monument Circle, 11th floor
                      Indianapolis, IN  46204
23
      ALSO PRESENT:  Don Merrill
24

25
```

1    contract which reimburses or is meant to reimburse

2    claims eligible under the benefit plan that are above a

3    set deductible point or attachment point or whatever

4    you'd want to call it.   There are many terms.

5            Second one would be an aggregate

6    reimbursement plan or a contract which would handle all

7    claims that fall below the specific attachment point of

8    a specific deductible for all participants under the

9    plan up to the maximum established by the factors.

10   Factors are multiplied times the number of participants

11   times the number of months in the contract year.

12           The third contract would be, typical

13   contract would be a cash flow insurance.   It's called

14   by many names.   This type of contract piece is for the

15   aggregate portion of the contract and gives an advance

16   of funds which are typically paid back.   If the

17   attachment point is maxed at any point during the year,

18   it will be paid, and then if it does not, the funding

19   level requirement does not stay above the attachment

20   point on the aggregate contract, the monies will be

21   paid back.   It's really just a cash flow insurance.

22           There are other contracts and policies that

23   can be purchased to guard the liability, such as

24   carve-outs for different types of diseases.

25       Q.      So what type of contract is the Companion

1  Life contract with the District?  Do you need to see

2  it?

3       A.     Probably.  This is the schedule of excess

4  loss insurance from Companion Life.  It lists an

5  aggregate contract.  It makes available a monthly

6  accommodation for the aggregate, and that is marked no.

7  And there is a specific benefit.

8       Q.     What does monthly aggregate accommodation

9  mean?

10      A.     That's another name for the cash flow

11 protection policy I talked about.

12      Q.     Would cash flow be another name for advance

13 funding?

14      A.     No.

15      Q.     No?  What's the difference in advance

16 funding and how you describe cash flow insurance once

17 the specific deductible or the attachment point is met?

18      A.     The aggregate accommodation or the cash flow

19 policy really is just a piece of insurance for cash

20 flow of the client for claims that are underneath or

21 below the specific attachment or specific deductible.

22      Q.     And the first contract you mentioned was a

23 specific reimbursement contract.  Does this contract

24 meet that category?

25      A.     A portion of it.  It looks like it does.

```
 1        Q.    Meaning what?

 2        A.    I'm sorry?

 3        Q.    Meaning what?  What does it mean?

 4        A.    What does what mean?

 5        Q.    How does it meet the definition of a

 6   specific reimbursement contract?

 7        A.    I'm not sure I understand the question.

 8        Q.    Does it have a specific deductible per

 9   person?

10        A.    Yes, it does.

11        Q.    Of what amount?

12        A.    $75,000.

13        Q.    And that means that once the plan has paid

14   $75,000 in claims, then what?  What's Companion Life's

15   obligation beyond that?

16        A.    It says 100 percent.

17        Q.    100 percent of what?

18        A.    Specific payable percentage excess of

19   deductible, 100 percent.  That's what it reads.

20        Q.    But payable when?

21        A.    Doesn't say that.

22        Q.    Have you ever looked at this contract?

23        A.    No.

24        Q.    Okay.  Do you want to look at page 5?

25        A.    What part of page 5?
```

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE SOUTHERN DISTRICT OF TEXAS

2              BROWNSVILLE DIVISION

3  SAN BENITO CONSOLIDATED     )

    INDEPENDENT SCHOOL DISTRICT  )

4                      )

    vs.                  )CIVIL ACTION NO. B-03-047

5                      )

    COMPANION LIFE INSURANCE    )

6  COMPANY, MANAGED BENEFITS    )

    ADMINISTRATOR AND INSURANCE  )

7  CONSULTANTS, INC., J. ALLAN   )

    HALL & ASSOCIATES, INC., and )

8  MBA OF WYOMING, INC.       )

9             --------------------------

10            **ORAL VIDEOTAPED DEPOSITION**

11            **ROY FRANKLIN HUTCHISON**

12              **AUGUST 13, 2003**

13             --------------------------

14       ORAL VIDEOTAPED DEPOSITION OF ROY FRANKLIN HUTCHISON,

15  produced as a witness at the instance of the Plaintiff and duly

16  sworn, was taken in the above-styled and numbered cause on the

17  13th day of August, 2003, from 10:03 a.m. to 1:09 p.m., before

18  Carol R. Odle, Certified Shorthand Reporter in and for the

19  State of Texas, reported by computerized stenotype machine at

20  the offices of Piper Rudnick, 1717 Main Street, Suite 4600,

21  City of Dallas, County of Dallas, State of Texas , pursuant to

22  the Federal Rules of Civil Procedure and the provisions stated

23  on the record or attached hereto.

24

25                **EXHIBIT "F"**

Roy Franklin Hutchison  8/13/03

1                    A P P E A R A N C E S

2

3    MR. STEPHEN E. WALRAVEN

4              SHADDOX, COMPERE, WALRAVEN & GOOD, P.C.
               1250 N.E. LOOP 410, SUITE 725
5              SAN ANTONIO, TEXAS  78209
               (210)822-2018
6              COUNSEL FOR THE PLAINTIFF

7

8    MR. SHELBY J. BUSH

9              PIPER RUDNICK
               1717 MAIN STREET, SUITE 4600
10             DALLAS, TEXAS  75201-4605
               (214)743-4500
11             COUNSEL FOR THE DEFENDANT COMPANION LIFE
               INSURANCE COMPANY
12

13   MS. ROBERTA J. HEGLAND

14             BRACEWELL & PATTERSON, L.L.P.
               2000 ONE SHORELINE PLAZA, SOUTH TOWER
15             800 NORTH SHORELINE BOULEVARD
               CORPUS CHRISTI, TEXAS  78401-3700
16             (361)866-7226
               COUNSEL FOR THE DEFENDANT J. ALLAN HALL & ASSOCIATES
17

18   MR. ROLANDO OLVERA

19             THE GARCIA LAW FIRM, P.C.
               201 NORTH 1ST STREET
20             HARLINGEN, TEXAS  78550
               (956)412-7055
21             COUNSEL FOR THE DEFENDANTS MBA OF WYOMING, INC.,
               AND MANAGED BENEFITS ADMINISTRATOR AND INSURANCE
22             CONSULTANTS, INC.

23

24   ALSO PRESENT:  MS. LAURIE L. BURGESS, VIDEOGRAPHER
                     CLTV (972)304-0291
25

Roy Franklin Hutchison  8/13/03

Q.   -- does a TPA typically get involved in the purchase of stop loss coverage?

A.   Yes.

Q.   And typically, what does a TPA do?

MR. BUSH:  Objection, vague, calls for speculation.

Q.   (By Mr. Walraven)  Go ahead.

A.   Some TPAs, not all, will actually send information to the carrier or the MGU to request a quote for stop loss.

Q.   When a TPA is involved in requesting a quote and the coverage quoted is -- is actually bound, is the TPA typically paid a commission?

A.   There is -- yes, there is commission usually involved in -- in -- for the TPA.

Q.   And in connection with self-funded plans and stop loss insurance, in your experience is a TPA involved in the purchase of the stop loss insurance more often than not?

MR. BUSH:  Objection, vague, calls for speculation.

A.   In my experience, yes, it has been.

Q.   (By Mr. Walraven)  So in -- in your role as -- as a person responsible for the marketing of Companion Life's stop loss insurance, do you have any efforts focused on the TPA section of the market?

A.   No.

Roy Franklin Hutchison   8/13/03

1      Q.   Does anyone on behalf of Companion Life do that, that

2  you know of?

3              MR. BUSH:  Objection.  Mr. Walraven, where in

4  this notice would that question fall, what subject area?

5              MR. WALRAVEN:  I don't know, I'm asking the

6  question.  If he has an answer, he can tell me.

7              MR. BUSH:  Do you have any subject area in which

8  that question falls?  Because if you don't --

9              MR. WALRAVEN:  Well, we're dealing with the

10  relationship between the parties to this lawsuit.

11              MR. BUSH:  Okay.  Are you asking --

12              MR. WALRAVEN:  And whether it's standard --

13              MR. BUSH:  -- the question specific --

14              MR. WALRAVEN:  -- or unusual --

15              MR. BUSH:  -- to these parties?

16              MR. WALRAVEN:  Well, I'm asking the question

17  generally, yes.

18              MR. BUSH:  Well, would you ask a specific

19  question that falls within one of these subject areas?

20              MR. WALRAVEN:  I have.

21              MR. BUSH:  No, you have not, and he will not

22  answer it.

23              MR. WALRAVEN:  Are you instructing him not to

24  answer?

25              MR. BUSH:  Yes, I am.

1   Q.   (By Mr. Walraven)  Are you going to follow your

2  lawyer's instructions?

3   A.   Yes.

4   Q.   Mr. Hutchison, one of your duties, you explained to

5  us, is the marketing of Companion Life products; correct?

6   A.   Right.

7   Q.   And in that role, to what ex -- how is the marketing

8  of stop loss products divided in terms of responsibility

9  between Companion Life and an MGU such as J. Allan Hall?

10   A.   Basically, the MGU does the marketing for Companion.

11   Q.   Are written materials prepared in connection with

12  that?

13          MR. BUSH:  Objection, vague.

14   A.   In some instances, in some -- with some MGUs, yes,

15  and some MGUs, no.

16   Q.   (By Mr. Walraven)  And in connection with J. Allan

17  Hall, are there written materials used for marketing?

18   A.   I don't think so.

19   Q.   When it comes to marketing efforts to TPAs such as

20  MBA of Wyoming or Managed Benefit Administrators and Insurance

21  Consultants, Incorporated, does Companion Life play any role in

22  conducting those marketing efforts?

23   A.   No.

24   Q.   So in a -- well, let me define a term for you.  There

25  are a couple of -- of entities, businesses in this lawsuit, MBA

Roy Franklin Hutchison  8/13/03

1     A.   David Wythe is director of our compliance department.

2     Q.   And what does that mean, what does the compliance

3  department do?

4     A.   Make sure that we're in compliance with the laws of

5  the state.

6     Q.   Licensing requirements and filing requirements and

7  that sort of thing?

8     A.   That's correct.

9     Q.   Does he have any role in connection with appeals of

10  claims?

11     A.   Yes, he does.

12     Q.   And what is his role?

13     A.   He serves as a advisor to myself in looking at claims

14  appeals.

15     Q.   And do you have any understanding as to whether he --

16  he was involved in connection with the San Benito School

17  District claims?

18     A.   I do not know.

19     Q.   Do you have an understanding as to why the

20  San Benito's claims were denied?

21     A.   Yes.

22     Q.   And why, what is the reason or reasons claims were

23  denied?

24     A.   One, they were filed outside of the contract period;

25  and two, there was not sufficient funds in the bank account to

Roy Franklin Hutchison  8/13/03

1  cover the checks written.  Basically, the claims were not paid

2  within the time frame laid out in the contract and under the

3  terms of the contract.

4      Q.   And do you know who made the decision to deny?

5      A.   Well --

6      Q.   Was it J. Allan Hall who made the decision, was it

7  Companion Life who made the decision, some combination of --

8      A.   I would say it was a combination of the two.

9      Q.   And who at Companion Life was involved in this

10  decision?

11      A.   It could very well have been David Wythe, the

12  compliance person, it could have been me.

13      Q.   Okay.  Well, I don't want you to speculate at this

14  moment.  Do you -- do you know whether or not Mr. Wythe was

15  involved?

16      A.   I do not know for certain, no.

17      Q.   Do you remember whether or not you were --

18      A.   No.

19      Q.   -- involved?

20      A.   No, I do not.

21      Q.   So you don't know whether anyone at Companion Life

22  was involved or not; correct?

23      A.   I'd have -- it is only speculation.

24      Q.   Okay.  Now let me ask you the -- that other question,

25  and that is, typically how would that process work, who would

Alliance Reporting, L.L.C. - Dallas, Texas - (214)599-0600
Carol R. Odle, CSR

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SAN BENITO CONSOLIDATED          )
INDEPENDENT SCHOOL DISTRICT,     )
                                 )
          Plaintiff,             )
                                 )
VS.                              )
                                 )
COMPANION LIFE INSURANCE         )    NO. B-003-047
COMPANY, MANAGED BENEFITS        )
ADMINISTRATOR AND INSURANCE      )
CONSULTANTS, INC., MICHAEL M.    )
SWETNAM, JR., J. ALLAN HALL      )
& ASSOCIATES, INC., AND          )
MBA OF WYOMING, INC.,            )
                                 )
          Defendants.            )

************************************************

ORAL DEPOSITION OF

LORENZO SANCHEZ

JUNE 26, 2003

************************************************

     ORAL DEPOSITION OF LORENZO SANCHEZ, produced as a witness

at the instance of the Defendant, Companion Life Insurance

Company, and duly sworn, was taken in the above-styled and

numbered cause on the 26th day of June, 2003, from 10:21 a.m.

to 1:15 p.m., before DINA RAMIREZ, CSR in and for the State of

Texas, reported by oral stenography at the Law Office of Rene

Ramirez, 1906 Tesoro Boulevard, Pharr, Hidalgo County, Texas,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

**EXHIBIT "G"**          CERTIFIED COPY

ACTION REPORTING
4309 N. 10TH, STE. F
McALLEN, TX   78504
956/631-1024

2

A P P E A R A N C E S

FOR THE PLAINTIFF, SAN BENITO CONSOLIDATED
     INDEPENDENT SCHOOL DISTRICT:

        HONORABLE STEPHEN R. WALRAVEN
        Shaddock, Compere, Walraven & Good, P.C.
        1250 N.E. Loop 410, Suite 725
        San Antonio, Texas   78209
        &
        HONORABLE CELESTE GUERRA
        Law Office of Rene Ramirez
        1906 Tesoro Blvd.
        Pharr, Texas   78577


FOR THE DEFENDANT, COMPANION LIFE INSURANCE COMPANY:

        HONORABLE SHELBY J. BUSH
        Piper Rudnick LLP
        1717 Main Street, Suite 4600
        Dallas, Texas   75201-4605


FOR THE DEFENDANTS, MANAGED BENEFITS ADMINISTRATOR AND
     INSURANCE CONSULTANTS, INC., AND MBA OF WYOMING, INC.:

        HONORABLE FRED L. SHUCHART
        Mason, Coplen, Shuchart, Hutchins
          & Banks, P.C.
        7500 San Felipe, Suite 700
        Houston, Texas   77063


FOR THE DEFENDANT, J. ALLAN HALL & ASSOCIATES, INC.:

        HONORABLE ROBERTA J. HEGLAND
        Bracewell & Patterson, L.L.P.
        2000 One Shoreline Plaza, South Tower
        800 North Shoreline Boulevard
        Corpus Christi, Texas   78403-3700

1   you don't understand, feel free to ask me to rephrase it

2   because sometimes I've been known to ask some questions that

3   are incomprehensible and complicated.  It's just the way my

4   mind works sometimes.

5           If you would, allow me to finish my question

6   before you provide your answer.  It will make the transcript

7   clearer, and so we're not talking over each other.  Is that

8   okay?

9       A    Sure.

10      Q    Could you -- how old are you, Mr. Sanchez?

11      A    I'm 60.

12      Q    And what is your current occupation?

13      A    I am the Assistant Superintendent for Finance, Human

14  Resources for the school district, San Benito.

15      Q    How long have you held that position?

16      A    Since -- I guess '96.

17      Q    What did you do prior to that time?

18      A    Prior to that, I was the Director of the School of

19  Business at New Mexico Highlands University.

20      Q    Where is that located?

21      A    Las Vegas, New Mexico, the original Las Vegas.

22      Q    I've been there.  I've been there.  And how long had

23  you held that position?

24      A    I was there five years.

25      Q    So, from 1991 to '96?

11

```
 1      Q    And did any of that human resource responsibility
 2  entail group health benefit plans?
 3      A    No, sir.
 4      Q    Okay.  Was your first experience to group health
 5  benefit plans when you arrived at San Benito Consolidated
 6  Independent School District?
 7      A    No, sir.
 8      Q    From an administrative standpoint?
 9      A    Yes, sir.
10      Q    Okay.  You had experience personally before that?
11      A    Yes, sir.
12      Q    Okay.  Are you on board with this lawsuit?
13              MR. WALRAVEN:  Objection.  Form.
14      Q    (Mr. Bush)  Do you support the -- the district's
15  lawsuit against Companion Life Insurance Company?
16      A    Yes, sir.
17      Q    And could you explain why?
18      A    From my understanding of the arrangement with MBA,
19  we relied on the good faith that they were our third-party
20  administrators and that they would provide us with the
21  expertise required to -- to run our self-funded plan.
22      Q    And your -- explain to me what you believe a
23  self-funded plan is.
24      A    In its simple form, it's -- and the way we have
25  established it at San Benito C.I.S.D., we have a district
```

52

1   demand just transfer funds as needed to cover any checks that

2   would be issued.

3       Q    So, is it the regular course of business for the

4   district to issue checks for amounts over and above an amount

5   that's in the account?

6       A    Repeat that question.

7       Q    Is it standard course of business for the district

8   to issue checks and forward them to providers for an aggregate

9   amount that exceeds the amount that's in the account?

10          MR. WALRAVEN:  Object to the form of the

11  question.  The school district doesn't issue the checks.

12      A    That is correct:  the district does not.  MBA does.

13  The third-party administrator does.

14      Q    (Mr. Bush)  Are the checks issued on the school

15  district's account?

16      A    Yes.

17      Q    Okay.  Does the school district authorize MBA to

18  issue those checks?

19      A    When we set up the accounts, yeah, they're

20  authorized from the beginning, yes, sir.

21      Q    Okay.  Is it the standard course of business for the

22  school district to allow MBA to issue checks for amounts over

23  and above the balance of the account?

24      A    On occasions they have, yes, sir.

25      Q    On occasions they have?

62

1    Q    And you indicated earlier in your testimony that
2    it's not the policy of the school district to leave money in
3    non-interest-bearing checking accounts, right?

4    A    Right.

5    Q    That wouldn't make a lot of sense?

6    A    Right.

7    Q    How much hands-on dealing with respect to the
8    purchase of the stop loss 2000-2001 policy and the actual
9    handling of the claims do you have -- did you have?

10   A    None.

11   Q    Did you have any conversations with Mr. Merrill or
12   Ms. Merrill or anybody from MBA of Wyoming regarding that
13   policy?

14   A    Conversations, yes, I'm sure we did.

15   Q    No, no.  You personally.

16   A    Oh.  Probably.

17   Q    All right.  Do you recall whether those
18   conversations dealt with the procurement of the stop loss
19   policy or the handling of the claims?

20   A    Probably both.

21   Q    Okay.  As you sit here today, do you recall the
22   specifics of any of those conversations?

23   A    It -- it always was a -- because of the market, the
24   reinsurance market or the stop loss market was a little tight,
25   and so they would shop around for stop loss coverage that

1  policy?

2       A    No, sir.

3       Q    Are you -- are you aware of any conversations that

4  took place between either Companion Life, Hall, Swetnam and my

5  clients regarding advance funding?

6       A    No, sir.

7       Q    Okay.  Thank you very much for your time.

8       A    Thank you.

9                                      (Time:  1:12 p.m.)

10 BY MS. HEGLAND:

11      Q    Mr. Sanchez, does the school district have any

12 written procedures for how claims are processed?

13      A    No, it's mainly -- mainly -- mainly dictated by the

14 TPA, you know, the process that we establish and how we want

15 -- how we want.  A lot of it, I guess, since -- since we -- we

16 authorize them to write checks on our account, they also do

17 the reconciliation for those checks.  So, as long as those

18 things are paid on a timely basis and I don't get any calls, I

19 guess that's okay.

20              MR. SHUCHART:  Objection.  Non-responsive after

21 the word, "No."

22      Q    (Ms. Hegland)  Are you familiar, Mr. Sanchez, with

23 the claims handling process in place at the school district

24 for the 2000-2001 school year?

25      A    We don't -- we don't handle the claims.  The

## ADMINISTRATIVE SERVICE AGREEMENT

THIS ADMINISTRATIVE SERVICE AGREEMENT, made and executed by and between San Benito Consolidated Independent School District a Texas Public Entity, hereinafter referred to as the "Plan Sponsor," and MBA of Wyoming, Inc., hereinafter referred to as the "Contract Administrator" for the provision of certain administrative and advisory services with respect to the Employee Medical Benefit Plan (the "Plan").

### RECITALS

The Contract Administrator is engaged in the business of performing services as Employee Benefit Advisors and Administrators. The Plan Sponsor hereby engages the services of the Contract Administrator to provide administration services for San Benito Consolidated Independent School District. For and in consideration of the mutual covenants and the monetary consideration herein recited, it is mutually agreed as follows:

1. *Services to be Performed.* The Contract Administrator shall perform for the Plan Sponsor administrative and advisory services in conjunction with the administration and operation of the Plan. The administrative services to be performed by the Contract Administrator and Advisor are set forth in Exhibit "B," attached hereto and by reference made a part hereof for all purposes. The advisory services to be performed by the Contract Administrator are set forth in Exhibit "C", attached hereto and by reference made a part hereof for all purposes.

(a) The services to be performed by the Contract Administrator shall be administerial in nature and shall be performed within the framework of policies, interpretations, rules, practices and procedures made or established by the Plan Sponsor. The Contract Administrator shall not have discretionary authority or discretionary controls respecting management or disposition of the assets of any trust fund and shall not have authority nor exercise any control respecting management or disposition of the assets of any trust fund and shall not render investment advice with respect to any money or other property of any trust fund.

(b) The Contract Administrator will process and pay benefits in accordance with the plan or policy adopted by the Plan Sponsor. It is agreed that the Contract Administrator will incorporate sound business practices and be responsible for reasonable internal audits. Where an error exists, the Contract Administrator shall use reasonable efforts for recovery of any loss resulting therefrom, but will not be required to initiate legal process for any such recovery.

2. *Limitation of Liabilities and Obligations.* The Contract Administrator shall have no responsibility, risk, liability or obligation for the funding of the Plan or for failure of the Plan or the Plan Sponsor to obtain or continue insurance coverage or payment of insured benefits. The responsibility and obligation for funding the Plan shall be solely and totally the responsibility of the persons or entities so provided in the Plan. Benefits under the Plan, whether or not fully or partially funded or insured, shall be provided solely by the Plan Sponsor or those persons named in the Plan. MBA shall not be liable for any damages resulting from its good faith application of Plan provisions, including those concerning eligibility, coverage, medical necessity, or benefits; or the failure of Plan participants or beneficiaries to obtain any particular health care as a result of MBA's services. MBA shall not be liable for any recommendations concerning insurance carriers or for the quality or nature of health care provided through health maintenance or preferred provider organizations, whether or not recommended, sponsored, or arranged for by MBA. Contract Administrator shall not be deemed an insurer, underwriter or guarantor with respect to any benefits under the Plan.

3. *No Fiduciary Authority.* MBA shall not be deemed a Plan "fiduciary" under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). MBA's services shall not include any power to make any decisions as to Plan policy, interpretations, practices or procedures, but shall be limited to the performance of ministerial functions such as those types described by the Department of Labor in its Regulation § 2509.75-8, D-2 within a framework of policies, interpretations, rules, practices and procedures made or established by the Plan Sponsor. MBA shall have no final discretionary authority or control over Plan management, including authority or control over the management or disposition

of any Plan assets, nor final discretionary authority over Plan administration. MBA's services with respect to the Plan shall be subject to review, modification, or reversal by the Plan Sponsor and/or Plan Administrator. Plan Sponsor shall have final authority in determining eligibility of claims. Plan Sponsor acknowledges that excess risk insurance purchased by Plan Sponsor will not provide coverage with respect to claims not eligible under the express terms and conditions of the Plan.

4. *Independent Contractor.* It is understood and agreed that MBA is engaged to perform services under this

entity or individual sponsoring or administering the Plan at the time of execution of this agreement and shall also include such additional or successor individuals or entities serving from time to time during the term of this Agreement; provided, however, that when this Agreement calls for direction or notice to be given to MBA by the Plan Sponsor or Plan Administrator, MBA shall be absolutely protected in relying upon any direction or notice received from the person executing this Agreement as Plan Sponsor or Plan Administrator.

6. *Term.*  The term of this Administrative Service Agreement is for the period of One year beginning October 1, 2000. At the end of the Contract, if neither party requests a change, the Contract shall be automatically renewed.  The fees stated in the Fee Schedule Exhibit are subject to negotiation on the first anniversary date of the contract, or on any monthly due date after the initial one year period, providing the Contract Administrator has given timely notice of the intent to adjust the fees.  The new fees would then be in force for one year from the effective date.

(a) Either party shall have the right to terminate or re-negotiate the contract after the initial one year period by providing to the other party written notice at least thirty (30) days in advance of such termination or re-negotiation of the terms of the contract.  In the event that either party gives timely notice of intent to re-negotiate the terms of the contract, the contract shall continue until re-negotiated terms are approved in writing by both parties.  After the initial one year period, this contract may be terminated upon thirty (30) days written notice of termination by either party to the other.  In the event the Plan account contains a balance which is insufficient to meet the Plan and Plan Sponsor's obligation, the Contract Administrator may terminate this contract upon thirty (30) days written notice. The Contract Administrator will have no further responsibility or obligation hereunder upon the termination of this contract.

(b) At any time during the initial term or subsequent terms of this agreement that the Plan Sponsor shall fail to meet the financial requirements of the plan, the Contract Administrator may terminate this contract.  Notice of intent to Terminate shall be given 30 days in advance of such termination.

(c) In the event of termination of this contract, if claims are to be processed after the termination date, the fees for services shall be either the specified percentage of claims or dollars per claim, based on the average of fees during the last two months of the contract, as follows:

100% of the average fees during the first month after termination, 75% the second month, 50% the third month, and 25% thereafter until no further claims are processed, or services required.

7. *Service Fees.*  The Plan Sponsor agrees to pay to the Contract Administrator for the  services to be performed hereunder the fees described in the attached Fee Schedule, **Exhibit A**

8. *Assignment.*  This Contract shall not be assigned by the Contract Administrator (its duties, obligations or responsibilities hereunder delegated) to any other person or entity without the prior written approval of the Plan Sponsor.

9. *Indemnification.*  During the continuance of this Agreement, the Contract administrator agrees to indemnify and hold the Plan Sponsor harmless against any and all loss, damage and expense with respect to any acts or omissions wherein it is finally adjudged or willfully acknowledged that the Contract Administrator is guilty of gross negligence, willful misconduct or lack of good faith, but only for those acts or omissions for which MBA is not entitled to indemnification under the following sentence, provided that MBA not be required to indemnify the Plan Sponsor if the Plan Sponsor's acts or omissions contributed to its loss. The Plan Sponsor shall indemnify MBA against expense, loss, claim, or liability, including attorney's fees, arising out of or based upon (a) MBA's or the Plans alleged or actual status as an insurer or insurance company, or provider of benefits; or (b) MBA's alleged or actual status as a Plan fiduciary; (c) acts or omissions of the Plan Sponsor or Plan Administrator, as Plan fiduciaries or otherwise; (d) any acts or omissions of MBA in providing services under this Administrative Services Agreement if made in accordance with the directions of the Plan Sponsor or Plan Administrator in good faith.

10. *Entire Agreement: Exhibits and Standard Terms and Conditions.*  This agreement, the standard terms and conditions and all schedules, exhibits and amendments [sic] hereto, constitutes the entire Agreement among the parties and supersedes all prior proposals, discussions, and writings by and between the parties and related to the subject matter of this agreement.  This Agreement may be modified, amended, or supplemented, but only by a written instrument executed by all parties, except that fee adjustments proposed by MBA and not objected to by either the Plan Administrator or Plan Sponsor shall also constitute a binding amendment.  The parties acknowledge that the Plan or the Plan Sponsor may have entered into separate agreements with affiliates of MBA for other types of services, but such agreements shall be construed and enforced separately from this agreement.

11. *Separability.*  If any provision if this agreement is held to be illegal or unenforceable, the remaining provisions shall nevertheless remain in full force and effect.  In addition, the illegal or unenforceable provision shall be modified so as to conform to the greatest extent legally permissible, to the original intent of such provision.

12. *Governing Law; Jurisdiction and Venue.*  To the extent not preempted by ERISA or other federal law, this Agreement shall be governed by and construed under the laws of the State of Utah.  By entering into this Agreement, the Plan Administrator and Plan Sponsor subject themselves to personal jurisdiction in the courts of the State of Utah and agree that Utah is the Only appropriate venue for any action brought to interpret or enforce any provision of this Agreement, or which may otherwise arise under or relate to the subject matter of this Agreement.

**MBA**

DATE _10-10-00_ BY _____

**SB - 00002**

13. *Arbitration.*

(a) If the parties hereto cannot settle grievances or disputes between themselves in an informal and expeditious fashion, each party agrees, upon the motion of the other, to arbitration by the American Arbitration Association (AAA). The Arbitration proceedings shall take place in the city of the responding party. The parties agree that the decision of the arbitrator shall be final and binding with regard to each of them.

(b) The parties shall share equally the AAA administrative fee as well as the arbitrator's fee, if any, unless otherwise assessed by the arbitrator. The administrative fee shall be advanced by the initiating party subject to final apportionment by the arbitrator in his award. The arbitrator's award may be enforced in any court having jurisdiction thereof by the filling of a petition to enforce said award. Costs of filing may be recovered by the party which initiates such action to have the award enforced.

(c) Each party hereto agrees to notify the other at the time a lawsuit is initiated concerning any dispute with any third person or entity that is relevant to any rights, obligations or other responsibilities or duties provided for under this Agreement.

14. *Other Applicable Agreements.* The following agreements are, by this reference incorporated in this agreement:

| Form Number | Plan Sponsor's Initials | Title of Agreement | Date |
|---|---|---|---|
| Exhibit A | _____ | Fee Schedule | 10/01/2000 |
| Exhibit B | _____ | Admin. Services Provided by MBA | 10/01/2000 |
| Exhibit C | _____ Not Included | Advisory Services | 10/01/2000 |
| Exhibit D | _____ | HIPAA Administration | 10/01/2000 |

The effective date of this contract specified in Paragraph 6. "Term" shall be the effective date unless otherwise specified here by the Contract Administrator:_____

Plan Sponsor   San Benito Consolidated Independent School District _____

By _____  Title _____   Date   10-10-00

**MBA of Wyoming, Inc./MBA of Wyoming, Inc.**

By _____  Title _____   Date   10-10-00

**MBA**

DATE _____ BY _____

SB - 00003

## Standard Terms and Conditions

1.  **Records and Files.** The Contract Administrator shall maintain all records in conjunction with the administrative services to be performed hereunder. The confidentiality of such records shall be maintained by the Contract Administrator and the information therein shall not be divulged or disclosed or made available to persons other than the Plan Sponsor without the prior written approval of the Plan Sponsor or a court of competent jurisdiction. In the event of the termination of this Contract, the Contract Administrator shall deliver to the Plan Sponsor, upon written request, at a time period mutually agreeable, but not to exceed six months from date of termination, the information on all claims histories for the past two years. If the claim history is requested, the Plan Sponsor will pay all costs incurred by the Contract Administrator in providing such information, (including the production of same), cost of programming, computer charges, mailing costs, etc. The Contract Administrator shall be entitled to retain copies of any such records at his own expense.

2.  **Legal and Accounting Services.** MBA's services shall not include the provision of legal services or the services or independent certified public accountants. MBA shall have no liability for the quality or cost of any services so provided, whether or not services provided by professional advisors were recommended, sponsored, or arranged for by MBA.

3.  **Enforcement.** MBA shall have no responsibility or obligation to take action, legal or otherwise, against any employer or employees or other persons to enforce provision of the Plan. In the event that the Plan Sponsor desires to engage in the services of the Contract Administrator for such purposes, such services shall be engaged and rendered only pursuant to a separate written agreement between the parties.

4.  **Investments.** MBA shall not be responsible or obligated for the investment of any assets or funds of the Plan. However, the Contract Administrator agrees to prepare and maintain records of the investment of the assets or fund of the Plan if the Plan Sponsor requests the Contract Administrator to do so and provides the information and documents necessary to prepare and maintain such records. MBA shall not render any investment advice with respect to Plan assets or have any authority or responsibility to do so.

5.  **Costs and Expenses; Taxes.**
    (a) As a part of the services to be performed by the Contract Administrator, the Contract Administrator and Advisor shall maintain and operate an administrative office for such purposes and to pay all normal costs and expenses for such maintenance and operation (except as herein set forth).
    (b) The Contract Administrator shall employ a sufficient staff of employees or others to provide the administrative and advisory services to be performed by the Contract Administrator hereunder. However, the Contract Administrator will not provide or be responsible for the expenses and cost of legal counsel, actuaries, consulting physicians or dentists, certified public accountants, investment counselors, investment analysts or similar type services performed for the Plan Sponsor; the Contract Administrator shall not be authorized to engage such services or incur any expense or cost thereof.
    (c) The Plan or the Plan Sponsor shall be responsible for all other costs and expenses of Plan establishment and administration including legal, accounting and other professional fees. The Plan or the Plan Sponsor shall also be responsible for the payment or reimbursement to MBA of any and all taxes relating to the Plan, including any sales or use taxes or taxes in lieu thereof, and any related penalties, interest or expenses of MBA, imposed upon or incurred, or required to be collected by MBA.

6.  **Tax, ERISA, and COBRA Compliance.** MBA shall not be responsible for establishing or maintaining the Plan or the Plan Sponsor in compliance with federal or state taxing statutes, ERISA, COBRA, or other applicable state or federal laws or regulations, or for obtaining any tax benefits that may be available to the Plan Sponsor, the Plan, or the Plan participants. MBA may provide, whether or not so specified under the Description of Services Exhibit, Plan documents, summary Plan descriptions, and/or administrative forms, but makes no representations or warranties as to their legal sufficiency. The Plan Sponsor or Plan Administrator shall have the final authority and responsibility for approving the form and content of all Plan documents and forms.

7.  **Plan and Fee Changes.** Any changes in the Plan. found to be compatible with existing systems and procedures and approved by the Contract Administrator which requires additional programming, reports or services, will be at the expense of the Plan Sponsor. The Plan Sponsor agrees to make changes in benefits only at the beginning of the Plan Year, allowing thirty (30) days prior notice to the Contract Administrator. Exceptions must be agreed upon by the Contract Administrator.

=**MBA**=

DATE *10-10-02*     BY

SB - 00004

# EXHIBIT A

## Fee Schedule

For: San Benito Consolidated Independent School District
Effective: October 1, 2000

Administrative Fees to Cover:

| | | | | |
|---|---|---|---|---|
| Life Insurance | [X] | Short Term Disability | [ ] |
| Medical | [X] | Pre-Cert (Critique) | [X] |
| | | Other: | |
| Dental | [X] | HIPAA | [X] |
| Vision Care | [ ] | COBRA | [X] |
| | | Document Changes (off anniversary date) | [ ] |

Fee Method and schedule:

MBA Administration Fees are $ 12.60/ee/month. HIPAA Administration Fees are $ .35/ee/month. Reinsurance Broker Fees $ 2.00/ee/month. Ethix Southwest PPO Fees are $ 3.20/ee/month. Lonestar Interlocal 2 million excess is $ 1.00/ee/month.

| Amended | Date | Schedule |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**MBA**

DATE _l·-/υ-ιℓ_ BY

SB - 00005

## EXHIBIT B

### Administrative Services Provided By MBA

Administrative Services For: San Benito Consolidated Independent School District
Effective: October 1, 2000

1.    Provide an automated Computer System for the processing of health claims.

2.    Furnish standard administrative internal forms to include:

    A.    Standard Explanation of Benefits.
    B.    Standard Claim Form.
    C.    Standard Enrollment Forms.

3.    Coordinate with the Plan Sponsor the custom design and printing of other supplies specifically for the Plan Sponsor. These will be at the Plan Sponsor's expense. Including but not limited to the following:

    A.    Bank Drafts or Checks and Deposit Slips.
    B.    Employee Identification Cards.
    C.    Employee Plan Booklets.

4.    Provide a standard monthly plan premium billing satisfactory to meet the needs of the Plan Sponsor.

5.    Provide the Plan Sponsor with instructions for reporting employee eligibility.

6.    Provide Customer Service for the Plan Sponsors employees.

7.    Provide assistance in the preparation of Plan Document and Summary Plan Description

8.    Review, coordinate and process all claims. Prepare all checks or drafts for disbursement from the fund with documentation to support these disbursements. The Plan Sponsor elects to have these disbursements _____

9.    Provide standard claims analysis reports.

Monthly Reports:_____

    A.    Claims Experience Report.
    B.    Monthly Fund Report.
    C.    Monthly Check Register.

Special Reports to be provided:

| | Name of Report | Frequency |
|---|---|---|
| A. | Fund & Claims Report | Quarterly |
| B. | | |
| C. | | |

10.    Provide appropriate renewal documentation and financial analysis.

11.    Provide the necessary data to the Plan Sponsor for preparation of ERISA reports and filings

12.    Attend meetings with the Plan Sponsor as necessary for proper administration of the Plan.

**MBA**

**EXHIBIT C**

**Advisory Services**

For: San Benito Consolidated Independent School District
Effective: October 1, 2000

1.    Advise and assist in the design of client administrative forms.

2.    Provide a review of marginal or questionable claims.

3.    Provide information relative to the Plan alternatives.

4.    Advise as to the contribution levels for the present benefits.

5.    Provide evaluation and underwriting relative to contract provisions and changes.

6.    Counsel with the Plan Sponsor concerning the financial status of the Plan to assure proper accumulation of reserves.

7.    Provide medical cost data and medical cost trends which would aid in plan benefit design.

8.    Coordinate with legal counsel and others in regards to ERISA requirements and information.

9.    Provide competitive bidding of various insured plans.

10.   Act as "Agent of Record" on the following coverage:

_____

_____

_____

_____

**MBA**

DATE _____    BY _____

SB - 00007

## EXHIBIT D

### HIPAA Administration

For: San Benito Consolidated Independent School District
Effective: October 1, 2000

This exhibit constitutes an amendment to the Administrative Service Agreement between MBA of Wyoming, Inc. as of the date subscribed herein subject to the terms and conditions set forth in the Administrative Service Agreement in force at the date of this agreement.

**Certificate of Coverage Administration:**

Includes administrative processing, set up, preparation and mailing of Certificates of Coverage to all individuals who lose coverage under the medical plan or COBRA.

As a fee per employee per month for HIPAA          $ .35/Ee/Mo

As a fee per employee per month for COBRA          $ 21.50/Certificate

The undersigned elects to have MBA provide HIPAA Administration Services, as limited in the specifications above, and agrees to defend and hold MBA harmless from and against all claims, damages, or losses, including but not limited to all cost of defense and attorney fees, which are a result of clients' inaccuracy, delay or failure to provide all information necessary for MBA to properly administer the above.

_____          10-10-02
Plan Sponsor                               Date

_____
Authorized Signature

_____
Title

**MBA**

MBA-ASA/1993
Page 8 of 8

DATE _____ BY _____

**SB - 00008**