## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

| | | |
|---|---|---|
| SAN BENITO CONSOLIDATED | § | APR 2 2 2004 |
| INDEPENDENT SCHOOL DISTRICT | § | |
| | § | Michael N. Milby |
| VS. | § | Clerk of Court |
| | § | CIVIL ACTION NO. 003-047 |
| COMPANION LIFE INSURANCE | § | |
| COMPANY, MANAGED BENEFITS | § | |
| ADMINISTRATOR AND | § | |
| INSURANCE CONSULTANTS, INC., | § | |
| J. ALLAN HALL & ASSOCIATES, | § | |
| INC., AND MBA OF WYOMING, INC. | § | |

## MOTION TO RECONSIDER, OR IN THE ALTERNATIVE, MOTION FOR 28 U.S.C. § 1292(B) CERTIFICATION

COMES NOW J. Allan Hall & Associates, Inc. ("Hall"), one of the Defendants in this cause, and files this its Motion to Reconsider, or in the Alternative, Motion for 28 U.S.C. § 1292(b) Certification, and in support would show:

### I.
### MOTION TO RECONSIDER ORDER DENYING
### MOTION FOR SUMMARY JUDGMENT

**A.**     **Summary of the Argument Regarding Motion to Reconsider**

A political subdivision such as San Benito Consolidated Independent School District ("SBCISD") is permitted under the Texas Local Government Code to create a self-insured health benefit Plan for its employees and their dependents, and to create a risk pool for that purpose. TEX. LOCAL GOV'T CODE §§ 172.004, 172.005 (Vernon Supp.

2004).[1]  The Local Government Code expressly contemplates that the risk pool "may purchase excess loss coverage or reinsurance" to insure against financial losses. TEX. LOCAL GOV'T CODE § 172.008 (Vernon 1999).  Reinsurance, excess loss, and stop loss are synonymous.  SBCISD, with its self-created risk pool, has contracted with Companion Life Insurance Company ("Companion") for precisely this benefit, through its agent Hall.  The relationship between SBCISD and Companion being a reinsurance/excess loss/stop loss arrangement, under the Texas Insurance Code, the reinsurance/excess loss/stop loss company's agent is not liable for acts or omissions related to the contract of reinsurance.  All claims are limited to contract claims, and can only be asserted against the reinsurance/excess loss/stop loss company.  SBCISD has sued Companion for breach of contract.  SBCISD's claim against Hall must fail.

SBCISD has also lodged a negligent misrepresentation claim against Hall, asserting that Hall misrepresented to SBCISD's third party administrator, Managed Benefits Administrator and Insurance Consultants, Inc. ("MBA"), that this reinsurance/excess loss/stop loss contract provided for advance funding when it did not. For several reasons this claim too must fail.  First, neither SBCISD nor MBA justifiably relied on any alleged representation of Hall.  No communications ever took place between SBCISD and Hall.  Any alleged representation to MBA about the existence of advance funding is immediately refuted by the express terms of the reinsurance contract, which MBA procured for SBCISD, and which is a **reimbursement** contract only.

---

[1] Hall does not here concede that SBCISD created a risk pool; for purposes of these motions, however, Hall addresses SBCISD's assertion that a risk pool has been created.

Second, SBCISD has stated unequivocally that it **never contemplated having advance funding and it would not have paid for it if it were offered.** SBCISD has specifically negated any finding of proximate cause of damages as a matter of law.

For these reasons, Hall respectfully requests this Court to grant its motion to reconsider this Court's Order denying Hall's Motion for Summary Judgment, and to grant that motion, in whole or in part. Judgment should be entered that SBCISD take nothing by its Insurance Code and negligent misrepresentation claims.

**B.**    **Arguments in Support of Motion for Reconsideration**

1.    **SBCISD obtained "excess loss coverage or reinsurance" under Local Government Code Chapter 172**

SBCISD is self-insured with respect to the health insurance benefits it provides to its employees and their dependents. SBCISD is, pursuant to the Texas Local Government Code, a political subdivision that has created a risk pool under TEX. LOCAL GOV'T CODE § 172.004 (Vernon Supp. 2004) ("A political subdivision . . . directly or through a risk pool may provide health or accident coverage for political subdivision officials, employees, and retirees, or any class of officials, employees, or retirees, and employees of affiliated service contractors."); TEX. LOCAL GOV'T CODE § 172.005 (Vernon Supp. 2004) ("A political subdivision may establish a risk pool . . . .")

> A risk pool organized under this section is a legal entity that may contract with an insurer licensed to do business in Texas to assume any excess of loss of a benefit contract authorized under Section 172.004. Notwithstanding any provision of the Insurance Code or any other law governing insurance in this state, an insurer authorized to do business in Texas may assume the excess of loss of the benefit contract under Section 172.004.

TEX. LOCAL GOV'T CODE § 172.005(e) (Vernon Supp. 2004) (emphasis added).

The Local Government Code expressly provides that a risk pool may purchase excess loss coverage "or reinsurance" "to insure a pool against financial losses that the pool determines might place the pool in financial jeopardy." TEX. LOCAL GOV'T CODE § 172.008 (Vernon 1999). **This is true despite the fact that a risk pool is not insurance or an insurer** under the Insurance Code, as this Court held in its Order denying Hall's Motion for Summary Judgment. The Texas Local Government and Insurance Codes do indeed contemplate the very excess loss or reinsurance provided by Companion Life to SBCISD here.

As Hall advanced in its Motion for Summary Judgment, reinsurance, excess loss insurance, and stop loss are synonymous. Reinsurance "indemnif[ies] against liability"[2] – it insures against financial loss.[3] Reinsurance is stop loss; it provides to the original insurer reimbursement for excess liability. ***Board of Ins. Commissioners v. Texas Employees Ass'n***, 189 S.W.2d 47, 54 (Tex.Civ.App. 1945), *aff'd*, 192 S.W.2d 149 (Tex. 1946). This is what Companion provided to SBCISD's self-insured health benefits Plan – protection against financial loss, and reimbursement for excess liability. SBCISD, as a political subdivision, was authorized to create a risk pool for its self insurance Plan, and excess loss or reinsurance could be obtained for that risk pool, "notwithstanding any provision of the Insurance Code or any other law governing insurance in this state." TEX. LOCAL GOV'T CODE § 172.005(e). Companion, an insurer authorized to do business in

---

[2] ***Stradley v. Southwestern Life Ins. Co.***, 341 S.W.2d 195, 198 (Tex.Civ.App.—Dallas 1960, writ ref'd n.r.e.).
[3] TEX. LOCAL GOV'T CODE § 172.008.

Texas, was permitted to, and did, assume the excess loss of SBCISD's health benefit Plan.

Accordingly, reinsurance is contemplated in the risk pool context. The fact that a school district – a political subdivision – is not an insurer does not preclude the creation of a reinsurance/excess loss/stop loss contract inuring to the benefit of the School District. Hall, the reinsurance/excess loss/stop loss carrier's agent, should thus be permitted to invoke the defenses provided to it under the Insurance Code. The agent of the reinsurer cannot be held independently liable for any alleged act or omission performed in the course of the agent's representation of the reinsurer. TEX. INS. CODE Art. 21.07-7 § 6(p)(Vernon Supp. 2003).[4]

### 2.  As a Matter of Law, Several Critical Elements of a Negligent Misrepresentation Claim are Missing Here

There can be no negligent misrepresentation asserted against Hall for any alleged representation made to MBA that advance funding was available to SBCISD. First, a critical element of a negligent representation claim remains that the **plaintiff** must **justifiably** rely on the representation alleged. RESTATEMENT (SECOND) TORTS § 552(1), (2)(b). There is no dispute that Hall and SBCISD had no direct communication at any time during the acquisition of, or performance of, the reinsurance/excess loss/stop loss contract at issue in this case. SBCISD witness Janie Gonzalez testified:

---

[4] Note that in SBCISD's Amended Petition on file in this cause, SBCISD specifically asserts, with respect to its negligent representation claim, that "Companion Life is vicariously liable for the conduct of J. Allan Hall." (Am. Pet. at p.6) SBCISD clearly acknowledges the relationship between the parties, albeit selectively.

"Q:  When did you first become familiar, or are you familiar, with the phrase "advance funding?"

A:    I am not familiar with it.

Q:    Okay.    What involvement did you have in the procurement of the Companion Life Insurance Company stop loss contract that began on October 1, 2000, through August 31, 2001?

A:    Well – hmm.  What involvement?  None."[5]

\*\*\*

"Q:    Did you at any time have any conversations with Companion Life Insurance Company?

A:    Never have.

Q:    How about J. Allan Hall & Associates?

A:    Never have."[6]

All communications were between Hall and SBCISD's third party administrator MBA.

SBCISD could not have **relied** on any representation made by Hall, if any.

Further, neither SBCISD nor MBA **justifiably** relied on any alleged misrepresentation by Hall.    The reinsurance/excess loss/stop loss contract was unequivocally a reimbursement policy.[7]  Payment must have been made to the medical provider by the SBCISD self-insured health benefit plan, and proof of payment tendered to Companion, before reimbursement could occur.    (*Id.*)  Nothing in the contract contemplated advance funding.  The contract was all-encompassing and superceded all

---

[5] See Exh. 1 attached hereto and incorporated by reference, a true and correct copy of the Deposition of Janie Gonzalez, SBCISD Risk Management Department head in charge of the SBCISD employee benefit Plan, at p. 12, lns. 21-25.

[6] See Exh. 1 at p. 13, lns. 18-22; p. 14, lns. 10-15.

[7] See Exh. B to Motion for Summary Judgment, excess loss contract, at pp. 3, ¶7(f); 5, last definition; p. 6, definitions 3, 6; p. 7, ¶2; p. 9, ¶IV. 1, 2.

alleged representations and agreements outside its four corners.[8]  Reliance on a statement

that advance funding was a term of this contract, when the contract expressly provided

that the contract was for reimbursement only, **was not reasonable** as a matter of law.

Additionally, causation is a key element of a negligent misrepresentation

claim, as with any tort claim.  RESTATEMENT (SECOND) TORTS § 552(1), (2)(b).  There

must be evidence that the alleged representation – and reliance upon it – proximately

caused damage to the plaintiff.  *Id.*  Here, the evidence is clear and uncontraverted that

SBCISD did not request advance funding of Companion or Hall.  SBCISD witness Janie

Gonzalez testified:

> "Q:    Well, let me ask you.  Do you know what advance
> funding is?
>
> A:    No.
>
> Q:    Okay.  So, it was not important from your standpoint
> that any stop loss policy that the district purchased had an
> advance funding component?
>
> A:    That's never been brought up."

(See Exh. 1 at p. 16, lns. 15-21).  SBCISD did not discuss advance funding with MBA, as

Ms. Gonzalez testified:

> "Q:    I would assume it's safe to say that as you sit here
> today you don't recall being told – you don't recall any
> conversation with MBA regarding advance funding under the
> 2000-2001?
>
> A:    No, sir.

---

[8] See Exh. C to Motion for Summary Judgment, application for excess loss contract made
part of the contract [Exh. B at p. 4, definition 8], at p. 4, ¶11(j).

Q:    Are you saying that no such conversation took place or that you just can't recall one?

A:    No conversation took place."

(Exh. 1 at p. 45, ln. 19 to p. 46, ln. 24).  The School District had never had advance funding in the past, according to SBCISD witness Lorenzo Sanchez:

"Q:    To your knowledge, have you ever been involved in a – in a plan program that there was advance funding?

A:    No, sir.

Q:    You never have?

A:    Never have.

Q:    Okay.  So, to the best of your recollection, there was not advance funding in '96, '97, '98?

A:    That's correct.

Q:    Is there anything that you are aware of that you can recall today that would have given you an expectation that there was advance funding for the 2000-2001?

A:    No, sir."[9]

In fact, SBCISD has stated unequivocally, through Ms. Gonzalez, that it **never contemplated** that it would have advance funding:

"Q:  Is it your understanding that the district had to pay a claim before it could be reimbursed by Companion Life for that claim?

A:  That's the way it's always been."[10]

---

[9] See Exh. 2 attached hereto and incorporated by reference, a true and correct copy of the Deposition of Lorenzo Sanchez, SBCISD's Assistant Superintendent for Finance and Human Services, at p. 66, lns. 6-17.

[10] See Exh. 1 at p. 17, lns. 20-23.

Equally critical, Mr. Sanchez testified that the cost associated with advance funding was not paid by SBCISD and **would not have been paid**:

> "Q:    Are you aware if advance funding is available on these type of policies?
>
> A:    No, sir.
>
> Q:    If it was available and had − and it added to the premium, is that something the school district would be interested in or would they want to keep the premium as low as possible?
>
> A:    Not if − not anytime it adds to the premium, no, sir."

(See Exh. 2 at p. 74, ln. 25 to p. 75, ln. 8).

Thus, any alleged statement made by Hall to SBCISD's third party administrator regarding the availability of advance funding did not, as a matter of law, cause harm to SBCISD. A necessary step in the chain is missing: without approval of and payment for this service, which SBCISD states it did not give and would not pay, any statement made to SBCISD's third party administrator that such service was available caused no harm to SBCISD.

### 3.    Conclusion

The Local Government Code expressly provides that SBCISD could create a risk pool and obtain reinsurance/excess loss/stop loss benefits. It obtained those benefits from Companion, through Companion's agent Hall. Only Companion can be sued, and only on the contract − a claim that SBCISD has lodged. The damages SBCISD seeks are contract damages, that is, the benefits for which it purportedly contracted but did not receive. Suing the agent of the principal on the contract does not increase

damages, or otherwise add an avenue for relief. SBCISD's cause of action regarding the benefits available under this reinsurance/excess loss/stop loss agreement sounds in contract only; that contract is with Companion.

Further, because several key elements of a negligent misrepresentation claim are not present here, SBCISD cannot prevail on its claim against Hall. SBCISD did not rely on the alleged statement at all. Its third party administrator cannot have justifiably relied on the statement, given: (1) the clear terms of the contract and (2) the fact that SBCISD had to approve and pay for the very contractual service (advance funding) to which it now claims it is entitled. But SBCISD has made clear that it never contemplated having advance funding, and would not have paid for it if it were offered. Any alleged statement made by Hall that advance funding was available cannot have proximately caused damage to SBCISD. SBCISD did not seek advance funding.

Accordingly, Hall respectfully prays the Court to grant its Motion to Reconsider its Order Denying Hall's Motion for Summary Judgment, to grant Hall's Motion for Summary Judgment in whole or in part, and to enter Judgment that SBCISD take nothing by its Insurance Code and/or negligent representation claims.

## II.
### *MOTION FOR 28 U.S.C. § 1292(B) CERTIFICATION*

**A.    Summary of the Argument**

In the alternative, and without waiving the foregoing, if this Court is not inclined to grant Hall's motion to reconsider and grant its motion for summary judgment, Hall prays the Court to enter a 28 U.S.C. § 1292(b) Certification of the following:

1.    The case involves controlling questions of law

    a.    Whether the contract between SBCISD, a political subdivision that has created a risk pool for its self insured health benefit plan, and Companion is one for reinsurance;

    b.    Whether Hall, as Companion's agent, can invoke the privileges and defenses afforded a reinsurer's agent under the Texas Insurance Code;

    c.    Whether Hall can be held liable on a negligent misrepresentation claim arising from an alleged representation made not to the plaintiff SBCISD, but to its third party administrator, which representation was not justifiably relied upon by SBCISD or its third party administrator, and when SBCISD has expressly disavowed any harm from such alleged representation.

2.    About these controlling questions of law, there is substantial ground for difference of opinion

    a.    While Hall is convinced of the propriety of its arguments that the SBCISD/Companion contract is a reinsurance/excess loss/stop loss contract, this Court has recently held otherwise. The case authorities cited in Hall's Motion for Summary Judgment and in its Reply to Plaintiff's Response to Hall's Summary Judgment Motion, and the authorities cited herein, establish a substantial ground for difference of opinion.

3.    An immediate appeal from the Court's Order denying Hall's motion for summary judgment may materially advance the ultimate termination of the litigation.

    a.    Hall is one of four defendants named in this lawsuit. All of the defendants are alleged to have contributed to SBCISD's alleged loss. If this case proceeds to jury verdict, and judgment is entered against Hall, because Hall is not properly a party to the case, a second trial may be imminent following appeal. The immediate appeal of the legal issues raised by Hall's motion for summary judgment would indeed materially advance the termination of this litigation by reducing the case to those parties properly before the court and defining those issues that a jury should properly decide.

**B.**   **Argument**

Hall recognizes that this Court has discretion when determining whether to issue a 28 U.S.C. § 1292(b) Certification and respectfully prays the Court to enter such Certification in this cause for the following reasons.

This litigation stems from the mismanagement of SBCISD's self-insured health benefit Plan by the School District's third party administrator MBA. MBA failed to ensure that all medical providers who provided services to the Plan's participants were paid and that proof of payment was tendered to Companion during the contractual reimbursement period of September 1, 2000 to August 31, 2001.[11] These prerequisites were mandatory before SBCISD could be reimbursed for the excess losses incurred under the Plan. (*Id.*) Because MBA failed to pay the medical providers and submit proof of loss prior to August 31, 2001, the excess losses sustained by SBCISD's Plan could not be reimbursed under the terms of the Companion reimbursement contract. (*Id.*)

SBCISD looked first to MBA for answers. MBA could only conjure an allegation that Hall represented that advance funding was available under the terms of the Companion/SBCISD contract – again, a contract for **reimbursement only.** Not only was no such representation made, but SBCISD has made it plain that it would have refused advance funding if it were offered, because **it did not want to pay for it.** (See Exh. 1 attached hereto at p. 16, lns. 15-21; p. 17, lns. 20-23; p. 45, ln. 19 to p. 46, ln. 24; See Exh. 2 attached hereto at p. 74, ln. 24 to p. 75, ln. 8).

---

[11] Exh. B. to Motion for Summary Judgment, excess loss contract, at p. 3, ¶7(f); p. 5, last definition; p. 6, definitions 3,6; p. 7, ¶2; p. 9, ¶IV. 1, 2).

And yet, SBCISD has not limited its suit to the party truly at fault for its harm -- its third party administrator MBA. Companion and Hall are named as well. But Hall is the agent of Companion, and Companion has provided to SBCISD, in accordance with the Texas Local Government Code, a reinsurance/excess loss/stop loss contract. TEX. LOCAL GOV'T CODE § 172.005(e). Under the Texas Insurance Code, the agent of a reinsurance provider is not liable for its alleged acts or omissions performed on behalf of its principal. TEX. INS. CODE § 21.07-7 § 6(p). The Texas Insurance Code limits the cause of action that can be asserted under a reinsurance/excess loss/stop loss agreement to one sounding in contract only. TEX. INS. CODE Arts. 3.01(h), 5.75-1(g). SBCISD has filed a contract claim against its reinsurance/excess loss/ stop loss provider for the contractual benefits it has allegedly lost. This is SBCISD's remedy under the Texas Insurance Code. TEX. INS. CODE Art. 3.01(h), Art. 5.75-1(g).

Further, because SBCISD and its third party administrator did not justifiably rely on any alleged representation by Hall that advance funding was a term of this reinsurance/excess loss/stop loss contract, Hall cannot be liable to SBCISD. RESTATEMENT (SECOND) OF TORTS § 552(1), (2)(b). And, when proximate cause of damage has been expressly debunked, for this additional reason no cause of action can lie. *Id.*

The parties submitted their "Joint" Pretrial Order in this cause on April 12, 2004, one week ago. Attendant to that Order, SBCISD submitted its Proposed Jury Charge. SBCISD has now made clear the claims it is asserting and against whom, and the damages it is seeking. Two (2) liability questions target Hall. Two (2) damage questions

are currently submitted as against Hall. In the end, SBCISD seeks recovery for one injury -- under any theory, against any party: the reinsurance contract benefits it has allegedly lost. This damage arises from the contract claim with Companion and/or the tort claims against MBA for failure to properly manage SBCISD's self insured Plan. This damage cannot have been proximately caused by Hall as a matter of law.

An immediate appeal of the controlling questions of law presented by Hall in this case, about which there is a substantial ground for difference of opinion, will fundamentally materially advance the ultimate termination of this litigation. SBCISD's allegations against Hall are red herrings and nothing more. They derive from MBA's conjured attempt to deflect responsibility for its botched administration of SBCISD's self insured health benefit Plan and risk pool. Hall should not be a party to this case. An immediate appeal of the legal issues presented will establish this, and will aid in the ultimate, simplified termination of this litigation. A jury verdict and resulting judgment that apportions liability to Hall, when Hall is legally absolved of liability, may result in an appeal and a second trial. To dissect Hall from the litigation sooner rather than later will indeed materially advance a more efficient end to this dispute.

**C.     Conclusion Regarding 28 U.S.C. § 1292(b) Certification**

For the reasons set forth in this motion, Hall asks this Court to certify that (1) this case involves several controlling questions of law (2) about which there is a substantial ground for difference of opinion, and (3) an immediate appeal from the Order denying Hall's motion for summary judgment may materially advance the ultimate termination of the litigation. As one of three defendants from whom plaintiff SBCISD seeks all or part

of its damages, Hall's viable defenses which prevent the imposition of liability as a matter of law should be reviewed immediately. This will prevent multifarious litigation, including, potentially, an appeal and second trial.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant J. Allan Hall prays the Court to Grant its Motion for reconsideration in whole or in part, grant its motion for summary judgment in whole or in part, and enter judgment that SBCISD take nothing by its Insurance Code and/or negligent misrepresentation claims. In the alternative, Hall prays the Court to issue a 28 U.S.C. § 1292(b) Certification that (1) this case involves several controlling questions of law (2) about which there is a substantial ground for difference of opinion, and (3) an immediate appeal from the Order denying Hall's motion for summary judgment may materially advance the ultimate termination of the litigation. Hall further prays for all other and further relief to which it is justly entitled.

Dated:  April 21, 2004

Respectfully submitted,


BRACEWELL & PATTERSON,
L.L.P.

Roberta J. Hegland
State Bar No. 09375000
Federal I.D. No. 6842
Joseph A. Stallone
State Bar No. 00797485
Federal I.D. No. 22343
2000 One Shoreline Plaza - South Tower
800 North Shoreline Blvd.
Corpus Christi, Texas  78401-3700
Telephone No.:  (361) 882-6644
Telecopier No.:  (361) 903-7000
**ATTORNEYS FOR DEFENDANT
J. ALLAN HALL & ASSOCIATES, INC.**

OF COUNSEL:

Albert George
55 Monument Circle, Suite 1115
Indianapolis, IN  46204
Telephone No.:  (317) 264-0020
Facsimile No.:  (317) 264-9038



Exhibit "1"

Janie Sanchez
June 26, 2003    Case 1:03-cv-00047    Document 62    Multi-Page™ Filed in TXSD on 04/22/2004    Page 18 of 53    San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

1



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, | } { } |
| Plaintiff, | { } { } |
| VS. | { } |
| COMPANION LIFE INSURANCE COMPANY, MANAGED BENEFITS ADMINISTRATOR AND INSURANCE CONSULTANTS, INC., MICHAEL M. SWETNAM, JR., J. ALLAN HALL & ASSOCIATES, INC., AND MBA OF WYOMING, INC., | { NO. B-003-047 } { } { } { } { } { } |
| Defendants. | { |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

JANIE GONZALEZ

JUNE 26, 2003

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF JANIE GONZALEZ, produced as a witness

at the instance of the Defendant, Companion Life Insurance

Company, and duly sworn, was taken in the above-styled and

numbered cause on the 26th day of June, 2003, from 2:13 p.m.

to 3:55 p.m., before DINA RAMIREZ, CSR in and for the State of

Texas, reported by oral stenography at the Law Office of Rene

Ramirez, 1906 Tesoro Boulevard, Pharr, Hidalgo County, Texas,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

Janie Sanchez
June 26, 2003

Case 1:02-cv-00047    Document 62    Filed in TXSD on 04/22/2004    Page 19 of 53

Multi-Page™

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

**Page 6**

1          JANIE GONZALEZ,
2 having been first duly sworn, testified as follows:
3          E X A M I N A T I O N
4 BY MR. BUSH:
5     Q  Would you state your name, please?
6     A  Janie Gonzalez.
7     Q  Ms. Gonzalez, my name is Shelby Bush and I represent
8 Companion Life Insurance Company. Have you ever given a
9 deposition before?
10    A  Yes, I have.
11    Q  And, so, you're aware that your testimony will be
12 used in the trial of this case?
13    A  Yes.
14    Q  What other instances were you called to give a
15 deposition?
16    A  I was working for an insurance agency. I've been in
17 the insurance business for 23 years, and we had a client --
18 actually, a producer in our agency that left the agency and
19 took all of our client files, actually information with him,
20 and I was a witness to that.
21    Q  So, you were a fact witness?
22    A  Correct.
23    Q  And was that the only time that you've given a
24 deposition prior to today?
25    A  Yes.

**Page 7**

1     Q  If you need to take a break at anytime, just let us
2 know and we'll gladly do so.
3     A  Okay.
4     Q  If you need to ask me to rephrase a question, then
5 I'll gladly do so if it's confusing to you.
6     A  Okay.
7     Q  And, if you'll let me finish my question before you
8 give your answer, it will make the transcript much more clear.
9     A  Okay.
10    Q  Is that -- is that a deal?
11    A  Yes.
12    Q  What is your current occupation?
13    A  I'm the insurance coordinator for the San Benito
14 C.I.S.D.
15    Q  And how long have you held that position?
16    A  Nine years.
17    Q  And you said you've been in the insurance business
18 23 years. What did you do -- do you remember the year you
19 were hired by the district? Was it '94?
20    A  '94, I believe.
21    Q  What you do prior to that?
22    A  I was an insurance agent for an insurance agency.
23    Q  For how long?
24    A  Fourteen years.
25    Q  Same agency?

**Page 8**

1     A  Same agency.
2     Q  Which one?
3     A  May and Associates in Harlingen, Texas.
4     Q  Did you say "May"?
5     A  May, M-A-Y.
6     Q  Okay.
7     A  They've changed their name now to Texas Insurance
8 Managers.
9     Q  I drove right by their building. That on Harrison
10 Street?
11    A  That's correct, 410 East Harrison. I still
12 remember.
13    Q  And did you hold a license or licenses?
14    A  Yes, I did.
15    Q  What'all licenses? Do you have any licenses now?
16    A  Yes.
17    Q  Okay. What licenses do you currently hold?
18    A  I have a group life and health license, a
19 solicitor's license, a worker's comp adjuster's license.
20    Q  For what purpose do you hold these licenses?
21    A  Well, the worker's comp license is really, really
22 good for me to have right now because I do run the risk
23 management department which has to do with worker's comp,
24 health insurance employee benefits, cafeteria plan. The other
25 licenses I've just kept for a rainy day.

**Page 9**

1     Q  Do you have to put in a certain number of hours a
2 year of continuing education to maintain those licenses?
3     A  Yes, I do.
4     Q  Okay. And is that something the district pays for?
5     A  Actually, when I got my licenses, I am
6 grandfathered. Therefor, for some of my renewals I don't have
7 to pay for -- for a renewal. Therefor, all I do is just go to
8 the classes and I just attend the eight-hour class and it's
9 free.
10    Q  The class is free?
11    A  Uh-huh.
12    Q  Okay.
13    A  Other than the worker's comp. The worker's comp,
14 since it does pertain to my job description, the school does
15 pay for my -- my ethics. I have to take an ethics course for
16 that, along with some -- I believe it's a 30-hour -- what is
17 it -- like a 30-hour session for two years or so. I have to
18 have 30 hours.
19    Q  Now, it pertains to your job, but is it required by
20 your job?
21    A  No, sir, it's not.
22    Q  Okay. Do you earn any income outside of your income
23 from the school district by holding these licenses?
24    A  No, I do not.
25    Q  Okay. Had you held any other licenses other than

Janie Sanchez
June 26, 2003

Case 1:00-cv-00047    Document 62    Filed in TXSD on 04/22/2004    Page 20 of 53

Multi-Page ™

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

**Page 14**

1    Q Okay. Did any -- did Companion Life -- well, is it
2 fair to say that Companion Life Insurance Company never
3 represented anything to you about the stop loss contract
4 that's at issue in this litigation?
5    A Is it fair to say --
6    Q -- that Companion Life Insurance Company never
7 represented anything to you, orally or in writing, about the
8 stop loss contract that's at issue in this litigation?
9    A I really don't understand the question.
10    Q Well, you testified earlier that you never had any
11 conversations with Companion Life Insurance Company.
12    A Right.
13    Q Do you recall any representation, whether oral or in
14 writing, about the policy that's at issue in this litigation?
15    A Not that I remember.
16    Q Okay. What is the procedure for paying claims -- or
17 let's just go back to the time frame between October 1st of
18 2000 and August 31st, 2001, which is the contract period under
19 this stop loss contract. Do you agree with that?
20    A Correct, I do.
21    Q At that time, what was the procedure for paying a
22 claim that was submitted by an employee or a dependent or
23 other beneficiary under the -- under the contract or under the
24 district's plan? What was the procedure for -- for paying
25 those claims?

**Page 15**

1    A Actually, I never got involved with paying, you
2 know, as far as paying claims. Everything -- the providers
3 would file claims directly to our TPA.
4    Q Okay. What was your involvement in the claims
5 paying process at all?
6    A None.
7    Q No involvement?
8    A No involvement.
9    Q You didn't have any responsibility to make sure that
10 there was money on the account if they were gonna release some
11 checks, that there was money in the account to pay those
12 checks?
13    A No.
14    Q Do you recall having communications with your
15 third-party administrator about held checks?
16    A I recall receiving some faxes.
17    Q Okay. And were you aware that there were checks
18 that had been produced or cut and not forwarded to providers?
19      MR. WALRAVEN: I need to object to the form of
20 the question since it --
21    Q (Mr. Bush) At anytime.
22      MR. WALRAVEN: Does she now know about it?
23    A Right.
24      MR. WALRAVEN: Did she know about it --
25      MR. BUSH: Yeah.

**Page 16**

1      MR. WALRAVEN: -- at the time? Okay.
2    A I know -- I know about it.
3    Q (Mr. Bush) You know about it now?
4    A Uh-huh, yes, I do.
5    Q Okay. When did you first discover that?
6    A Hmm. Probably November.
7    Q Of which year?
8    A Of 2001 or -- late -- the latter part of the -- of
9 2001.
10    Q Okay. Is it your understanding that this lawsuit
11 that the district has brought against my client and other
12 parties involves an issue otherwise known as advance funding?
13    A I don't know what that means. So, I need you to
14 rephrase that.
15    Q Well, let me ask you. Do you know what advance
16 funding is?
17    A No.
18    Q Okay. So, it was not important from your standpoint
19 that any stop loss policy that the district purchased had an
20 advance funding component?
21    A That's never been brought up.
22    Q Okay. What do you understand is the district's
23 basis for this lawsuit?
24    A To collect our money.
25    Q Okay. That might be your --

**Page 17**

1    A We want our money.
2    Q -- purpose.
3      MR. WALRAVEN: That's her understanding.
4    A Yes. I want my money.
5    Q (Mr. Bush) Do you -- have you reviewed the stop
6 loss contract at issue in this litigation?
7    A Entirely?
8    Q Uh-huh.
9    A No.
10    Q Do you understand that it has a component that
11 defines what is considered a paid claim?
12    A You're talking about the definition of a paid claim?
13    Q Yes.
14    A Do I understand the component?
15    Q Do you understand that the contract defines what is
16 a paid claim?
17    A No. Like I said, I really didn't go through the
18 entire -- I didn't read every -- every -- everything on the
19 contract.
20    Q Okay. Do you -- is it your understanding that the
21 district had to pay a claim before it could be reimbursed by
22 Companion Life for that claim?
23    A That's the way it's always been.
24    Q Okay. I'm just gonna go through some documents that
25 you either signed or received and have you tell me whether

Janie Sanchez
June 26, 2003

Case 1:01-cv-00047    Document 62    Filed in TXSD on 04/22/2004    Page 2 of 22

Multi-Page™

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

## Page 22

1    Q And you're listing out four different claimants that
2 we were referring to as Joan Doe, John Doe, Jane Doe and Jack
3 Doe; is that correct?
4    A Correct.
5    Q Whose -- is this your handwriting?
6    A No, sir, this is not my fax. This did not come from
7 me. This --
8    Q So, that handwriting was on there when you received
9 it?
10   A When I received the fax, that's correct.
11   Q Do you know whose handwriting it is?
12   A I do not.
13   Q Do you know whether these amounts that are listed as
14 owing are correct?
15   A No, I do not.
16   Q Do you know whether these amounts that are listed on
17 this sheet involve checks that were cut but not forwarded to
18 providers prior to the end of the contract period?
19   A Say that again.
20   Q Do you know whether these amounts on the second page
21 of Exhibit 18 represent checks that were cut but not forwarded
22 to providers prior to the end of the contract year, therefor
23 denied by Companion Life because they didn't fit within a paid
24 claim?
25   A Do I know they were held? Can you repeat that

## Page 23

1 again? I'm sorry.
2    Q Well, let's just answer that one. Do you know if
3 those amounts represent --
4   A No.
5   Q -- held checks?
6   A No, I don't.
7   Q Do you know if those amounts represent checks that
8 were cut before August 31st, 2001?
9   A I'm not sure.
10   Q The -- on the front page it says, "Mr. Sanchez asked
11 me to fax you the list of claims for which reimbursement is
12 being sought." Did you at that time have any knowledge of the
13 second page of this exhibit and no longer remember or did you
14 just take this document and pass it on?
15   A I received this fax. Actually, what I'm really
16 looking at is the money that we need to collect, and that's
17 why I sent -- I brought it to Mr. Sanchez's attention and he
18 told me to fax it to Celeste.
19   Q Is the money you need to collect different from the
20 money listed on this exhibit?
21   A I'm not sure if it's -- if it's up-to-date or not.
22 So, I really can't answer that.
23   Q Do you have any knowledge of the basis for these
24 claims being on this exhibit, in other words, for which
25 reimbursement is sought? Why -- why do you pass this on to

## Page 24

1 your attorney with these names and amounts? Why do you think
2 you're due this money?
3   A Because they're over our stop loss amount.
4   Q Right. Were they paid before the end of the
5 contract period?
6   A I don't pay claims in our office. So, they --
7 they're paid from our third-party administrator. So, I'm
8 assuming they were.
9   Q You're assuming they were. You don't have any
10 independent knowledge of whether they were or not?
11   A No.
12   Q Does the district have a separate stop loss
13 aggregate policy under the intergovernmental risk pool?
14   A You lost me. I don't understand the question.
15   Q Do you know what the intergovernmental risk pool is?
16   A I believe that's what we had previously discussed,
17 that that is as long as you're satisfied with your prior
18 carrier, premium, service, that we do not have to go out for
19 bid.
20   Q Does the district have a separate stop loss policy
21 under that pool?
22   A No, sir, not that I'm aware of.
23     (Exhibit 19 marked.)
24   Q (Mr. Bush) Have you ever seen what's been marked as
25 Exhibit 19?

## Page 25

1   A Have I ever seen this?
2   Q Uh-huh.
3   A No.
4   Q The first page being --
5   A Well --
6   Q -- a May 17th letter from -- to Don Merrill from --
7   A First time I see that.
8   Q What's the name there?
9   A Marianne Miceli.
10   Q Okay. And the reference line says, "Lone Star
11 Intergovernmental Risk Pool, effective date April 1st, 2001."
12   A Uh-huh.
13   Q And I'm just trying to figure out how this -- if
14 this policy somehow covers any of the risk involved in this
15 litigation or how it might affect any of the risk involved.
16   A (No response.)
17   Q And, if you don't know, that's fine. I'm just --
18   A No, I don't know. I really don't know.
19   Q So, have you ever seen this policy?
20   A It looks a little familiar, but -- I don't believe I
21 really looked at it or whatever. It looks like he sent it to
22 me and I just sent it to the purchasing department. I don't
23 know.
24   Q But you don't know how it --
25   A How it works?

Janie Sanchez
June 26, 2003
Case 1:02-cv-00047    Document 62    Filed in TXSD on 04/22/2004    Page 23 of 53
Multi-Page™
San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

**Page 22**

1 Q And you're listing out four different claimants that
2 we were referring to as Joan Doe, John Doe, Jane Doe and Jack
3 Doe; is that correct?
4 A Correct.
5 Q Whose -- is this your handwriting?
6 A No, sir, this is not my fax. This did not come from
7 me. This --
8 Q So, that handwriting was on there when you received
9 it?
10 A When I received the fax, that's correct.
11 Q Do you know whose handwriting it is?
12 A I do not.
13 Q Do you know whether these amounts that are listed as
14 owing are correct?
15 A No, I do not.
16 Q Do you know whether these amounts that are listed on
17 this sheet involve checks that were cut but not forwarded to
18 providers prior to the end of the contract period?
19 A Say that again.
20 Q Do you know whether these amounts on the second page
21 of Exhibit 18 represent checks that were cut but not forwarded
22 to providers prior to the end of the contract year, therefor
23 denied by Companion Life because they didn't fit within a paid
24 claim?
25 A Do I know they were held? Can you repeat that

**Page 23**

1 again? I'm sorry.
2 Q Well, let's just answer that one. Do you know if
3 those amounts represent --
4 A No.
5 Q -- held checks?
6 A No, I don't.
7 Q Do you know if those amounts represent checks that
8 were cut before August 31st, 2001?
9 A I'm not sure.
10 Q The -- on the front page it says, "Mr. Sanchez asked
11 me to fax you the list of claims for which reimbursement is
12 being sought." Did you at that time have any knowledge of the
13 second page of this exhibit and no longer remember or did you
14 just take this document and pass it on?
15 A I received this fax. Actually, what I'm really
16 looking at is the money that we need to collect, and that's
17 why I sent -- I brought it to Mr. Sanchez's attention and he
18 told me to fax it to Celeste.
19 Q Is the money you need to collect different from the
20 money listed on this exhibit?
21 A I'm not sure if it's -- if it's up-to-date or not.
22 So, I really can't answer that.
23 Q Do you have any knowledge of the basis for these
24 claims being on this exhibit, in other words, for which
25 reimbursement is sought? Why -- why do you pass this on to

**Page 24**

1 your attorney with these names and amounts? Why do you think
2 you're due this money?
3 A Because they're over our stop loss amount.
4 Q Right. Were they paid before the end of the
5 contract period?
6 A I don't pay claims in our office. So, they --
7 they're paid from our third-party administrator. So, I'm
8 assuming they were.
9 Q You're assuming they were. You don't have any
10 independent knowledge of whether they were or not?
11 A No.
12 Q Does the district have a separate stop loss
13 aggregate policy under the intergovernmental risk pool?
14 A You lost me. I don't understand the question.
15 Q Do you know what the intergovernmental risk pool is?
16 A I believe that's what we had previously discussed,
17 that that is as long as you're satisfied with your prior
18 carrier, premium, service, that we do not have to go out for
19 bid.
20 Q Does the district have a separate stop loss policy
21 under that pool?
22 A No, sir, not that I'm aware of.
23      (Exhibit 19 marked.)
24 Q (Mr. Bush) Have you ever seen what's been marked as
25 Exhibit 19?

**Page 25**

1 A Have I ever seen this?
2 Q Uh-huh.
3 A No.
4 Q The first page being --
5 A Well --
6 Q -- a May 17th letter from -- to Don Merrill from --
7 A First time I see that.
8 Q What's the name there?
9 A Marianne Miceli.
10 Q Okay. And the reference line says, "Lone Star
11 Intergovernmental Risk Pool, effective date April 1st, 2001."
12 A Uh-huh.
13 Q And I'm just trying to figure out how this -- if
14 this policy somehow covers any of the risk involved in this
15 litigation or how it might affect any of the risk involved.
16 A (No response.)
17 Q And, if you don't know, that's fine. I'm just --
18 A No, I don't know. I really don't know.
19 Q So, have you ever seen this policy?
20 A It looks a little familiar, but -- I don't believe I
21 really looked at it or whatever. It looks like he sent it to
22 me and I just sent it to the purchasing department. I don't
23 know.
24 Q But you don't know how it --
25 A How it works?

Janie Sanchez
June 26, 2003

Case 1:02-cv-00047    Document 62    Filed in TXSD on 04/22/2004.    Page 24 of 53

Multi-Page™

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 38

1  Q  (Mr. Bush) And here we are again on November 9th
2  following the November 5th memo. We've marked the
3  November 9th memo as Exhibit No. 24, memo to you from Carol
4  transmitting check registers, and she says again, quote:
5  Again I don't know how much --
6  A  Funds.
7  Q  -- how much funds the account has.
8      And when you received that -- or did you
9  receive this? Do you recall receiving it?
10  A  I believe so.
11  Q  Okay. Did that alarm you?
12  A  I just go straight to the accountant, "Take care of
13  it."
14  Q  Okay.
15  A  "Make sure everything's okay or talk to her. I
16  don't know."
17      (Exhibit 25 marked.)
18  Q  (Mr. Bush) We're almost -- almost finished with
19  these things. And what's been marked as Exhibit 25 is a
20  November 15th memo, same format from Carol regarding check
21  registers to you and also Jose. And what does she say in this
22  memo?
23  A  "I received a copy of the confirmation of a $450,000
24  deposit. After that, according to my records, the account
25  only has about 7,000 which is not enough to release

Page 39

1  yesterday's and today's check registers 'cause they total up
2  to 50,000. Again, I don't know if there were any other
3  deposits made, and, according to my notice, I am assuming that
4  the account has enough funds to release all these checks even
5  if my records tell me differently. Thus, I am releasing these
6  checks as well as tomorrow's checks. All the registers will
7  be faxed to you guys tomorrow, Friday the 16th."
8  Q  Did you know anything about the reserve that the
9  district set up sometime ago?
10  A  Yes.
11  Q  Okay. And what do you know about that? How much
12  money was put in a reserve account?
13  A  Oh, I don't have an exact amount, but I believe it
14  was 700,000.
15  Q  Okay. And had that reserve been depleted by claims
16  that were not reimbursed?
17  A  All I know is that they had a reserve. I don't --
18  after that, I don't know whether it was --
19  Q  And --
20  A  -- or not.
21  Q  Okay. This exhibit has a held check list also, and
22  it appears --
23  A  Uh-huh.
24  Q  -- in the same amount --
25  A  It's got the names on there.

Page 40

1  Q  Oh. It's in the same amount as the previous one --
2  A  Okay.
3  Q  -- dated October 26 which is Exhibit 22,
4  $381,250.59, except this one has the claimant's name which
5  will identify that these checks most likely -- well, they are
6  because they have the date that they were allegedly paid.
7  These checks are directly related to the lawsuit in question
8  on this. You'll have to go with me on that one.
9  A  Uh-huh.
10  Q  Three of them have a date paid of August 24th, and
11  the last two August 31st. This is a held check list, total
12  held checks, correct?
13  A  That's what it states.
14  Q  Okay. Is it your understanding that even though
15  this says "date paid" it wouldn't be on this list if it hadn't
16  actually been paid?
17  A  I see "date paid," I assume date paid, yes.
18  Q  Okay. What do you think "held checks" are?
19  A  I've never run into that before.
20  Q  Well, you --
21  A  I wouldn't know.
22  Q  You haven't -- you haven't seen that before today?
23  A  No, no, no. I've seen -- yeah, I've seen it. I've
24  seen this --
25  Q  Okay.

Page 41

1  A  -- back in October, whenever it was first faxed,
2  yes. But we've never had that before.
3  Q  Okay. Well, what -- what was your understanding
4  back in October and November of 2001 when you started seeing
5  this attached to memos?
6  A  I go straight to our accountant.
7  Q  You didn't think about whether checks were actually
8  being cut but not mailed to providers?
9  A  No, I never did 'cause it's never happened before.
10  Q  Did you become aware of that at some point after the
11  fact?
12  A  After the fact.
13  Q  Okay. So, sitting here today you know what this is?
14  A  Oh, yes.
15  Q  Sitting here today --
16  A  I am very aware of that now.
17  Q  Sitting here today, you can tell me that those
18  checks were not paid on these dates, correct?
19      MR. SHUCHART: Objection. Form.
20      MR. WALRAVEN: To the extent you learned any
21  information from conversations with attorneys, you need to
22  leave that out of your answer. If you have any information on
23  this or any of his other questions that you learned from me or
24  from Ms. Guerra, you're not gonna provide that and you're
25  gonna tell him you're not gonna provide it. But if you

Janie Sanchez
June 26, 2003
Case 1:01-cv-00047    Document 62    Multi-Page™    Filed in TXSD on 04/22/2004    Page 25 of 53
San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 46

1    A   No conversation took place.
2    Q   All right.  If I were going to define the term of
3   "advance funding" as a company reimbursing the school district
4   for a claim that the check has been cut but has not been
5   tendered to the provider, can we agree on that as a definition
6   of "advance funding"?
7        MR. BUSH:  Objection.  Form.
8    Q   (Mr. Shuchart)  Are you okay with that?  I mean, do
9   you understand that definition?
10   A   I don't know the definition of it.
11   Q   I understand that.  Were you ever promised by
12  anybody from MBA that the school district would be reimbursed
13  if checks were cut but not sent out to the provider during the
14  policy period?
15   A   I'm trying to go through all these different --
16  okay.  The checks were cut?
17   Q   Right.
18   A   But not sent to the provider?
19   Q   Correct, that the -- that --
20   A   No.
21   Q   You were never promised that?
22   A   That's never been an issue.
23   Q   Were you --
24   A   Never been discussed.
25   Q   All right.  Was there anybody else in your office

Page 47

1   that would've had communications with MBA regarding the
2   payment of claims or the stop loss contracts?
3    A   Myself.
4    Q   Other than yourself.
5    A   Other than myself.  And Mr. Sanchez.
6    Q   Okay.  Anybody else?
7    A   And the superintendent, but --
8    Q   All right.  Other than Jose -- and what's Jose's
9   last name?
10   A   Koepke.
11   Q   Is he still with the school district?
12   A   Yes, he is.
13   Q   Okay.  Is there anybody else at MBA that you know
14  you would've talked to?
15   A   In reference to the stop loss policy?
16   Q   Or payment of claims.
17   A   Or payment?  No.
18   Q   Okay.  Are you aware of what conversations took
19  place between MBA and Jose regarding holding checks?
20   A   No, I'm not aware of anything.
21   Q   Okay.  Are you aware of any -- are you aware of the
22  content of any conversations that may have taken place between
23  Jose and MBA regarding the funding of the account?
24   A   Am I aware?
25   Q   In other words, did Jose say, "Hey, I just talked to

Page 48

1   MBA and we talked about this"?
2    A   Oh, okay.  That's easier.
3    Q   Sorry.
4        MR. WALRAVEN:  Why didn't you say so?
5    A   Oh.  No, I -- I would just, like I told Mr. Bush, I
6   would just give the information to Jose and I would assume he
7   took care of it.
8    Q   (Mr. Shuchart)  Okay.  Did you and Jose have any
9   subsequent conversations regarding getting money back that's
10  the subject of this lawsuit?
11   A   After the fact?
12   Q   Yes.
13   A   Yes.
14   Q   Did he ever tell you why he thought the school
15  district deserved to get its money back?
16   A   Why we deserved to get --
17   Q   Yes.
18   A   -- our money back?  Because we paid our $75,000
19  deductible first.
20   Q   And did Jose have any complaints about MBA's
21  handling of the claims?
22   A   Jose never really -- you're talking about the -- the
23  -- what kind of claims are you talking about?
24   Q   I'm talking about the claims --
25   A   Individual claims or --

Page 49

1    Q   Yeah, that are the issue in the lawsuit.  I mean,
2   did --
3    A   The actual issue claim?
4    Q   Right.
5    A   Say that again.
6    Q   Did Jose ever -- you and Jose have any conversations
7   that said, "You know, it's all MBA's fault we didn't get the
8   money from the insurance company" or -- or -- I'm sorry.  Yes
9   or no.
10   A   No.
11   Q   Okay.  Did he ever say, you know, talk to you along
12  the lines of, "Well, you know, it's the insurance company's
13  fault, but it's also MBA's fault that we didn't get the
14  money"?
15   A   We didn't know whose fault it was.  We just wanted
16  our money back.
17   Q   Okay.  You don't have -- do you have an opinion as
18  to whose fault it is that you didn't get the money you're
19  looking for?
20   A   Do I have any what?
21   Q   Do you have an opinion?
22   A   Oh, an opinion.
23   Q   Yeah, as to whose fault or whose, you know, more
24  than one person's fault it is that you didn't get -- the
25  school district didn't get reimbursed the money you think it

Janie Sanchez                                                      San Benito C.I.S.D.
June 26, 2003   Case 1:02-cv-00047   Document 62   Filed in TXSD on 04/22/2004   Page 26 of 53
                                    Multi-Page™
                                    v. Com' ion Life Insurance Company, et al.

---

Page 54

1 protection. I have no idea about that. I don't -- like I
2 said, I don't have anything to do with the bank. But that was
3 -- that was never a question. Should've never have been an
4 issue.
5    Q  Well, apparently, it was if you read these memos,
6 that it was a problem with --
7    A  Obviously, after --
8    Q  -- funds?
9    A  Seven years later.
10   '}  Well, I mean, these memos are in 2001. So, some --
11   '.  2001.
12   Q  Some years.
13   A  Six years.
14   Q  Maybe six years after the relationship. But,
15 apparently, at some point there was a concern that there was
16 insufficient funds in the account to cover all the claims that
17 were being paid; that's fair, correct?
18   A  It could have something to do with a new employee.
19       MR. SHUCHART:  Objection. Non-responsive.
20   Q  (Mr. Shuchart)  Well, would it concern you if your
21 TPA was concerned that there may not be sufficient funds in
22 the account to pay claims? I mean, is that something you're
23 worried about, that they're concerned about that?
24   A  Would it concern me? Well, of course, it would
25 concern me.

Page 55

1    Q  All right. So, then, it's rational for them to be
2 concerned that there's sufficient funds in the account to
3 write the check off of? Are you --
4    A  I really don't know what -- what relationship they
5 had with -- with Jose and -- and how that worked together. It
6 was just two different departments, really.
7    Q  Okay. All right. So, you don't know what went on.
8 So, if Jose told them to hold the check, you wouldn't
9 necessarily know about that?
10   A  I don't believe Jose would say that.
11       MR. SHUCHART:  Objection. Non-responsive.
12   Q  (Mr. Shuchart)  If Jose told them not to write a
13 check, you wouldn't know about that; isn't that correct?
14   A  That's correct.
15   Q  And if Jose knew they were holding checks, you
16 wouldn't necessarily know about that either?
17   A  If Jose knew that they were holding checks?
18   Q  Yes.
19   A  Yes, he would tell me.
20   Q  Well, I thought you earlier testified that you guys
21 had no conversations about all these memos about held checks?
22   A  No, he would tell me if they were holding the
23 checks. That's what you're saying, right?
24   Q  I'm -- I'm asking -- I'm asking that question, that
25 if there were checks being held, Jose would've told you about

Page 56

1 them?
2    A  No, 'cause I told Jose about the checks once I got
3 the fax. Once I received that fax, I took it to him.
4    Q  Well, because it was obviously addressed to you?
5    A  Yeah, for him to take care of it, make sure that,
6 you know --
7    Q  And what was his response when you gave him the fax?
8    A  "Well, okay. No problem. I'll take care of it."
9    Q  So, it wasn't like he was utterly surprised at the
10 information that was contained on the fax, correct?
11   A  I wouldn't know.
12   Q  Well, he didn't jump up and down and say, "Oh, my
13 God. What is this?" did he?
14   A  He never does that.
15   Q  He didn't die of a heart attack at the desk when he
16 read them, right; he's still with you?
17   A  Still with us.
18   Q  Okay. Would you agree with me that keeping the
19 lowest balance available in that account is in the best
20 interest of the school district?
21   A  I wouldn't know.
22   Q  Okay. You don't know whether that account, the
23 payment account was an interest-bearing account or not?
24   A  I -- I have no idea.
25   Q  Okay. Well, Mr. Sanchez testified earlier that it

Page 57

1 -- it was much better for the school district to have them in
2 other places than that account.
3    A  Oh.
4    Q  Do you disagree with that, have any reason to
5 disagree with what he said?
6    A  I'm not an accountant. I wouldn't know.
7    Q  Did you respond in any manner to these memorandums,
8 the fax transmittals that you got from Carol?
9    A  Fax? The fax?
10   Q  Yes.
11   A  Did I respond in a memo?
12   Q  Did you respond in writing in any way to those?
13   A  I don't remember.
14   Q  Okay. Do you specifically recall make calling --
15 specific -- do you recall responding verbally to the
16 memorandum or the --
17   A  Yes.
18   Q  Do you remember calling Carol?
19   A  Speaking to her on the phone.
20   Q  Okay. What were those conversations?
21   A  "Why are you holding checks? You need to -- you
22 know, I'm gonna go ahead and have you -- switch you with Jose.
23 I'm gonna pass this phone call to Jose, but go ahead and do
24 whatever you -- you've usually been doing." She was a new
25 employee, though.

Janie Sanchez
June 26, 2003

Case 1:02-cv-00047   Document 62   Filed in TXSD on 04/22/2004   Page 2 of 53

Multi-Page™
v. Com   ion Life Insurance Company, et al.

San Benito C.I.S.D.

---

**Page 62**

1  Q  I'm not trying to.
2  A  After -- the first initial? I need -- I just --
3  Q  Yeah. I asked the question what involvement did you
4 have.
5  A  Okay. The full involvement.
6  Q  Right, and then your --
7  A  Any involvement.
8  Q  Right, and your first answer before we got to
9 talking was --
10  A  Was the disclosure.
11  Q  -- was the disclosure.
12  A  Okay.
13  Q  What involvement did you have next?
14  A  After that? Okay. I sent that information. Then,
15 they -- they agreed with the info that I told them about. So,
16 I believe they -- they disclosed all that information. Then,
17 I received a -- we received a letter from Don. I'm not sure
18 -- I'm not certain on the dates, actually. But I got a letter
19 from Don stating that the policy was not going to be in effect
20 according to what we were told.
21  Q  Okay. You --
22  A  Because of --
23  Q  I'm sorry.
24  A  I believe because of some disclosures that were not
25 disclosed or something to that effect. I'm not too sure.

---

**Page 63**

1  Q  Do you have any idea, roughly, when that
2 conversation occurred?
3  A  Oh. In the fall.
4  Q  Which year?
5  A  Year?
6  Q  Yeah. What year?
7  A  Oh, year? 2000- -- oh, boy.
8  Q  2001?
9  A  '01.
10  Q  Okay. You had a conversation with Don that the
11 policy --
12  A  Actually, I did not have a conversation with him.
13 He wrote us a letter.
14  Q  Okay. I'm sorry. I thought you said you talked to
15 him. All right.
16  A  Well, I probably did say that, but, no, it really --
17 it was we received something in writing.
18  Q  Okay. What other involvement did you have after
19 that?
20  A  Then, we had to re-file an application with BCS.
21  Q  Did you have any involvement in re-filing it?
22  A  No.
23  Q  Okay.
24  A  They should've had that information by then.
25  Q  Okay. Any other involvement that you personally had

---

**Page 64**

1 other than being the recipient of the policy subsequently down
2 the road?
3  A  No.
4  Q  Okay. Were you ever asked to sign additional
5 disclosures or provide any additional information for
6 disclosures? Do you recall that?
7  A  After the second time?
8  Q  No, after the first one.
9  A  I believe so, in December.
10  Q  Okay. Did you sign the disclosures or did
11 Mr. Sanchez?
12  A  No, he signed. Mr. Sanchez signed them.
13  Q  Okay. Any other involvement that you can recall you
14 had?
15  A  No, that was it.
16  Q  Okay. In this lawsuit your lawyer has made certain
17 -- or not your lawyer, the school district's lawyer has made
18 certain allegations against my client, and I'm gonna try to do
19 this in an easy way. In essence, in paragraph IX of the
20 original petition your lawyer has alleged that my client
21 either told you something that wasn't true or forgot to tell
22 you something that was critically important with respect to
23 the 2000-2001 contract. Based upon -- do you know of any
24 statements that my client said that was false or that any
25 statements my client forgot to tell you regarding that

---

**Page 65**

1 contract?
2  A  According to -- as far as what we've talked about
3 today, this advance placement?
4  Q  No, at all.
5  A  Payment?
6  Q  I mean regarding anything.
7  A  I've never heard of that. So, that's something that
8 was never discussed with us.
9  Q  Okay. But, at least according to the carrier or the
10 contract-holder, this doesn't have advance placement. So --
11  A  Oh.
12  Q  -- my client couldn't have misrepresented anything
13 if it doesn't have it. Is there anything that my client said
14 to you that was wrong about that contract, about the benefits
15 under the contract that you can recall?
16  A  (No response.)
17  Q  I think it's easier than you're making it, because
18 didn't you testify you never talked to my client about it?
19  A  I never have.
20  Q  So, would the answer be --
21  A  Yeah. No.
22  Q  Nothing?
23  A  No.
24  Q  Okay. Is there anything they didn't tell you that
25 would've changed the school board's position with respect to

---

Janie Sanchez
June 26, 2003

Case 1:cv-00047    Document 62    Filed in TXSD on 04/22/2004    Page 28 of 53

Multi-Page™

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 70

1  Q  Do you want to rephrase that question?
2  A  I don't understand.
3      MR. WALRAVEN: Why don't we let him ask the
4  questions?
5  Q  (Mr. Shuchart) Can you rephrase that question?
6  There are two policies that are involved in this lawsuit.
7  A  Correct.
8  Q  In this lawsuit.
9  A  Oh.
10  Q  And that may be where you are confused. There are
11  actually two policies, the way the lawsuit is phrased, that
12  are involved:  the Companion policy --
13  A  And the BCS?
14  Q  -- and the BCS policy. I was as perplexed, as
15  apparently you are, as to trying to figure out how if the
16  claim wasn't paid or shouldn't be paid under the Companion,
17  how and why it should be paid under the BCS, and that's what
18  I'm trying to figure out. If you can, help me.
19  A  So, if it's not paid by Companion, you want to know
20  why it should be paid by BCS?
21  Q  Why does the school district think it should've been
22  paid by BCS and then wasn't because of the application
23  process?
24  A  Hmm.
25  Q  And if you don't know --

Page 71

1  A  I --
2  Q  -- you can say, "I don't know."
3  A  I -- I don't know.
4  Q  Okay. Is there anybody you can think at the school
5  district that would know the answer to that question?
6  A  No.
7  Q  Okay. If I understood your testimony earlier, you
8  hold a group health and life --
9  A  Uh-huh.
10  Q  -- license?
11  A  Uh-huh.
12  Q  When did you get that license? I mean, was it
13  before you joined the school district?
14  A  No, in '96.
15  Q  Oh, okay. I'm sorry. I did misunderstand your
16  previous testimony. So, you didn't have any dealings with
17  group health --
18  A  No, never did.
19  Q  -- life when you were an agent?
20  A  Never did. We didn't do that in the agency, at the
21  agency at that time.
22  Q  As an agent, when you placed the policy did you
23  actually read the policy?
24  A  As an agent?
25  Q  Yeah.

Page 72

1  A  At times.
2  Q  Did you make sure all the endorsements were properly
3  attached?
4  A  You bet.
5  Q  And I'm not asking if you knew every word of the
6  policy because if you agents did --
7  A  I did.
8  Q  -- people like me would be out of a job. But --
9  A  I did.
10  Q  And I'm not saying you didn't, you know, you read
11  every CGL form because they were the same.
12  A  No, they're all different.
13  Q  But you definitely -- but you read the CGL form?
14  A  As -- as long as -- depending on what it pertained
15  to, yes, I did.
16  Q  Did you recommend to your clients that they read the
17  policy that --
18  A  Oh, you bet.
19  Q  -- was issued? But you didn't read the policy when
20  you were at the school?
21  A  I did.
22  Q  Well --
23  A  I didn't completely go through every single word,
24  but I did go through the --
25  Q  But you were looking at the financial end of it, the

Page 73

1  premium --
2  A  Sure, financials plus --
3  Q  -- aggregate, the -- the loss, not the terms and
4  conditions, were you?
5  A  Some terms and some conditions, not all of them.
6  Dates.
7  Q  And you don't know whether Mr. Sanchez read the
8  policies or not, do you?
9  A  I'm not sure.
10  Q  Do you know whether the reserves were held in the,
11  quote, unquote, checking account that paid or were they in a
12  separate account? I'm talking about the $700,000 reserve.
13  A  Oh, I believe that's -- that's a different account
14  that they've got. I'm not sure.
15  Q  Okay. Ms. Gonzalez, thank you very much for your
16  time.
17  A  Thank you.
18      (Time: 3:55 p.m.)
19  BY MS. HEGLAND:
20  Q  Ms. Gonzalez?
21      MR. WALRAVEN: Do you have more than two
22  minutes?
23  Q  (Ms. Hegland) I don't think I have any questions.
24  It was nice to meet you.
25  A  Oh, thank you. Thank you.

**Janie Sanchez**
**June 26, 2003**
Case 1:02-cv-00047    Document 62    **Multi-Page**™    Filed in TXSD on 04/22/2004    Page 29 of 53
**San Benito C.I.S.D.**
**v. Companion Life Insurance Company, et al.**

Page 78

Attorney for Plaintiff, San Benito Consolidated
Independent School District:

HONORABLE STEPHEN R. WALRAVEN
Shaddock, Compere, Walraven & Good, P.C.
1250 N.E. Loop 410, Suite 725
San Antonio, Texas   78209
&
HONORABLE CELESTE GUERRA
Law Office of Rene Ramirez
1906 Tesoro Blvd.
Pharr, Texas   78577

Attorney for Defendant, Companion Life Insurance
Company:

HONORABLE SHELBY J. BUSH
Piper Rudnick LLP
1717 Main Street, Suite 4600
Dallas, Texas   75201-4605

Attorney for Defendant, Managed Benefits Administrator
and Insurance Consultants, Inc., and
MBA of Wyoming, Inc.:

HONORABLE CINDY A. GARCIA
The Garcia Law Firm
201 North 1st Street
Harlingen, Texas   78550

Attorney for the Defendant, J. Allan Hall and
Associates, Inc.:

HONORABLE ROBERTA J. HEGLAND
Bracewell & Patterson, L.L.P.
2000 One Shoreline Plaza, South Tower
800 North Shoreline Boulevard
Corpus Christi, Texas   78403-3700

I further certify that I am neither counsel for, related

to, nor employed by any of the parties or attorneys in the

action in which this proceeding was taken, and further that I

Page 79

am not financially or otherwise interested in the outcome of

the action.

    Certified to by me this 23rd day of July, 2003.

                    _____

                    DINA RAMIREZ, Texas CSR #2267

                    Expiration Date:  12/31/2003

                    Action Reporting

                    P.O. Box 4513

                    McAllen, Texas   78502

                    (956) 631-1024

Page 80

REPORTER'S FURTHER CERTIFICATION

    The original deposition was/was not returned to the

deposition officer on _____;

    If returned, the attached Changes and Signature page

contains any changes and the reasons therefor;

    If returned, the original deposition was delivered to

SHELBY J. BUSH, Custodial Attorney;

    That $_____ is the deposition officer's charge to

the Defendant, Companion Life Insurance Company, for preparing

the original deposition transcript and any copies of exhibits;

    That a copy of this certificate was served on all parties

shown herein.

    Certified to by me this _____ day of _____, 2003.

                    _____
                    DINA RAMIREZ, Texas CSR #2267
                    Expiration Date:  12/31/2003
                    Action Reporting
                    P.O. Box 4513
                    McAllen, Texas   78502
                    (956) 631-1024

xc:  Mr. Stephen R. Walraven
     Ms. Celeste Guerra
     Mr. Shelby J. Bush
     Ms. Cindy A. Garcia
     Ms. Roberta J. Hegland
     File

**board** [3]          36:16
36:18    36:21
**board's** [1]          65:25
**bold** [1] 20:15
**bounce** [5]          52:7
52:17    52:20    52:24
53:12
**boy** [1]  63:7
**break** [1]          7:1
**brought** [3]          16:11
16:21    23:17
**building** [1]          8:9
**Bush** [34]          13:5
13:7    15:21    15:25
16:3    17:5    18:2
18:4    19:20    21:14
24:24    26:6    26:17
26:21    28:6    31:11
31:16    32:20    32:23
33:18    37:23    38:1
38:18    42:2    42:11
42:16    42:21    43:15
44:5    46:7    48:5
67:24    68:13    74:2
**business** [1]          7:17
12:3    52:6    53:20
**buying** [1]          66:1

**-C-**

**C.I.S.D** [1]          7:14
**cafeteria** [2]          8:24
10:20
**Calls** [3] 26:19    53:5
66:10
**care** [4] 38:12    48:7
56:5    56:8
**carefully** [4]          20:16
20:16    20:20    20:21
**Carol** [17]          26:9
31:18    33:19    34:4
34:17    35:1    38:3
38:20    42:22    51:13
57:8    57:18    58:11
58:21    59:3    61:4
61:5
**Carol's** [2]          58:1
59:9
**Carolyn** [2]          19:22
19:23
**carrier** [4]          21:21
24:18    30:6    65:9
**carrier's** [1]          27:4
**cases** [1]          59:24
60:6
**caused** [1]          66:19
**causes** [1]          66:19
**Celeste** [2]          21:23
23:18
**certain** [5]          9:1
62:18    64:16    64:18
67:2
**Certainly** [2]          26:23
34:6
**CGL** [3] 12:6          72:11

**change** [2]          34:14
37:13
**changed** [5]          8:7
10:10    12:2    12:4
65:25
**charge** [6]          10:14
10:18    10:18    10:22
18:13    27:7
**check** [24]          26:23
27:1    27:8    28:13
28:22    29:2    33:7
33:7    33:9    34:11
34:12    38:4    38:20
39:1    39:21    40:11
46:4    53:4    53:12
53:15    55:3    55:8
55:13    58:15
**checking** [6]          27:13
51:15    53:3    53:14
58:9    73:11
**checks** [58]          15:11
15:12    15:15    15:17
22:17    22:21    23:5
23:7    26:25    27:2
27:16    27:17    28:12
29:18    30:15    30:20
31:22    32:8    32:12
34:7    34:9    34:13
34:18    34:19    36:6
39:4    39:6    39:6
40:5    40:7    40:12
40:18    41:7    41:18
42:12    42:20    43:11
46:13    46:16    47:19
50:15    50:22    51:13
52:2    52:7    52:17
52:20    52:24    55:15
55:17    55:21    55:23
55:25    56:2    57:21
58:2    58:22    59:10
**claim** [18]          14:22
17:11    17:12    17:16
17:21    17:22    22:24
46:4    49:3    68:2
68:4    68:5    68:8
68:8    69:8    69:13
69:20    70:16
**claimant's** [1]  40:4
**claimants** [1]          22:1
**claims** [29]          10:20
14:16    14:25    15:2
15:3    15:4    21:7
23:11    23:24    24:6
27:10    27:16    30:10
30:12    35:11    39:15
47:2    47:16    48:21
48:23    48:24    48:25
54:16    54:22    60:5
66:20    67:3    67:5
67:13
**class** [2] 9:8          9:10
**classes** [1]          9:8
**clear** [1] 7:8
**cleared** [1]          36:6
**client** [9]          16:11
64:18    64:20    64:24
64:25    65:12    65:13

**clients** [1]          72:16
**collect** [3]          16:24
23:16    23:19
**column** [5]          28:13
28:13    28:17    28:18
42:13
**comment** [1]          34:1
**commercial** [2] 12:2
12:7
**communicating** [1]
58:21
**communication** [1]
26:15
**communications** [4]
13:1    15:14    36:14
47:1
**comp** [6]          8:19
8:21    8:23    9:13
9:13    10:20
**companies** [1] 69:19
**Companion** [19]
12:22    13:19    13:23
14:1    14:2    14:6
14:11    17:22    20:1
20:7    22:23    35:13
37:5    45:16    69:9
69:13    70:12    70:16
70:19
**company** [10]          12:22
13:19    13:24    14:2
14:6    14:11    36:2
37:5    46:3    49:8
**company's** [1] 49:12
**compared** [1]          10:7
**complaints** [1] 48:20
**complete** [1]          28:10
**completely** [1] 72:23
**component** [3] 16:20
17:10    17:14
**concern** [5]          30:6
54:15    54:20    54:24
54:25
**concerned** [4]          53:1
54:21    54:23    55:2
**concluded** [1] 74:7
**conditions** [2] 73:4
73:5
**conducted** [1] 35:11
**conference** [1] 68:14
**confidential** [2]
31:13    32:22
**confirmation** [2]
27:4    38:23
**confused** [3]          58:7
69:15    70:10
**confusing** [1]          7:5
**considered** [1] 17:11
**Consolidated** [2]
10:4    11:2
**Consultants** [2] 44:10
45:3
**contact** [1]          45:12

**contacts** [1]          21:7
**contain** [1]          31:13
**contained** [1]          56:10
**containing** [1]          32:22
**contains** [1]          33:9
**content** [1]          47:22
**context** [1]          44:3
**continuing** [1]  9:2
**contract** [37]          12:23
14:3    14:8    14:18
14:19    14:23    17:6
17:15    17:19    20:2
20:3    20:8    20:16
20:20    21:4    22:18
22:22    24:5    37:6
37:7    37:11    37:14
43:20    43:20    44:1
44:2    44:15    44:16
44:17    44:18    45:8
45:12    64:23    65:1
65:14    65:15    66:1
**contract-holder** [1]
65:10
**contract/policy** [1]
67:10    67:13
**contracts** [1]          47:2
**conversation** [7]
42:21    45:21    45:24
46:1    63:2    63:10
63:12
**conversations** [11]
13:18    14:11    41:21
45:5    45:10    47:18
47:22    48:9    49:6
55:21    57:20
**coordinate** [2]          13:1
35:20    35:23
**coordinator** [4] 7:13
10:4    10:17    18:14
**copied** [1]          19:6
**copy** [4] 19:11    38:23
61:11    61:14
**correct** [32]          8:11
11:4    11:5    11:6
12:14    14:20    18:6
20:2    22:3    22:4
22:10    22:14    31:4
31:22    32:8    32:9
33:3    34:2    36:13
40:12    41:18    46:19
51:5    51:17    54:17
55:13    55:14    56:10
58:23    59:1    59:11
70:7
**correspond** [1] 13:23
**could've** [4]          51:6
51:16    51:21    58:21
**counsel** [1]          68:14
**course** [4]          9:15
10:11    42:5    54:24
**cover** [4]          27:17
54:16    61:22    61:22
**coverage** [3]          11:23
12:10    45:7
**covered** [2]          10:23

**contacts** right col
45:11
**covers** [1]          25:14
**critically** [1]          64:22
**crucial** [1]          20:25
**current** [1]          7:12
**cut** [8]     15:18    22:17
22:21    23:8    41:8
46:4    46:13    46:16

**-D-**

**daily** [3] 27:1          34:10
34:13
**date** [13] 18:24    21:24
25:11    37:24    40:6
40:10    40:15    40:17
40:17    42:13    60:24
67:17    69:19
**dated** [7]          19:25
20:6    20:8    31:17
31:18    33:6    40:3
**dates** [5] 30:2          41:18
42:13    62:18    73:6
**days** [2] 12:1          37:21
**deal** [4] 7:10          12:10
32:9    32:10
**dealings** [1]          71:16
**dealt** [1] 45:1
**December** [1]          64:9
**deductible** [1] 48:19
**define** [2]          46:2
68:3
**defines** [1]          17:11
17:15
**definitely** [1] 72:13
**definition** [4] 17:12
46:5    46:9    46:10
**denied** [1]          22:23
**department** [3] 8:23
10:19    25:22
**departments** [1]
55:6
**dependent** [1] 14:22
**depending** [2] 68:3
72:14
**depleted** [1]          39:15
**deposit** [2]          34:22
38:24
**deposited** [2]          35:7
35:8
**deposits** [2]          27:5
39:3
**description** [1] 9:14
10:10
**deserve** [1]          50:7
**deserved** [2]          48:15
48:16
**desk** [1] 56:15
**diagnosis** [1]          29:12
**die** [1]   56:15
**difference** [3]          37:9
69:17    69:20
**different** [1]          21:4

hired [3] 7:19    10:16
12:13
hmm [6] 12:25    16:6
27:4    59:16    61:25
70:24
hold [8] 8:13    8:17
8:20    10:1    51:13
55:8    68:22    71:8
holding [9] 9:23
30:20    47:19    52:2
55:15    55:17    55:22
57:21    58:22
homeowner's [1]
11:25
honestly [1]    29:20
hope [1] 66:23
hours [2]    9:1
9:18
Huh-uh [1]    34:25
hundred [2] 28:25
33:11

-I-

idea [9] 27:9    27:12
34:8    34:16    35:2
45:2    54:1    56:24
63:1
identify [6]    21:14
21:16    31:16    32:23
40:5    60:21
ill [1]    60:6
important [5]    16:18
20:22    20:24    21:3
64:22
Impossible [1] 51:22
Inc [4]    44:9    44:10
44:13    45:3
income [2]    9:22
9:22
Incorrect [1]    58:24
incurred [1] 68:8
independent [3]
10:4    11:2    24:10
indicates [1]    26:14
indication [1] 61:22
individual [3]    27:11
48:25    66:15
individuals [1] 60:12
info [1] 62:15
information [17]
28:5    28:6    28:9
29:11    31:14    32:22
41:21    41:22    43:2
48:6    51:9    56:10
60:2    62:14    62:16
63:24    64:5
initial [2]    62:2
68:14
initials [1]    18:21
instance [1] 43:19
instances [1] 20:15
insufficient [1] 54:16
insurance [24]    7:13

7:17    7:22    7:22
8:7    8:24    10:3
10:16    10:21    10:23
10:24    11:22    12:22
13:19    13:24    14:2
14:6    14:11    18:14
37:5    44:10    45:3
49:8    49:12
interest [1]    56:20
interest-bearing [1]
56:23
interested [3]    29:5
29:8    29:22
intergovernmental [3]
24:13    24:15    25:11
intermediary [2]
13:7    13:8
invested [1]    51:14
investment [1] 51:14
involve [1]    22:17
involved [9]    15:1
20:23    25:14    25:15
31:25    36:8    44:3
70:6    70:12
involvement [15]
12:21    12:25    15:4
15:7    15:8    60:13
61:24    62:3    62:5
62:7    62:13    63:18
63:21    63:25    64:13
involves [1]    16:12
issue [13]    14:4
14:8    14:14    16:12
17:6    20:25    30:22
43:11    44:1    46:22
49:1    49:3    54:4
issued [1]    72:19
issues [1]    20:24
it'll [1] 68:13
items [1]    33:14
IX [1]    64:19

-J-

J [2]    13:21    13:24
Jack [1] 22:2
Jane [1] 22:2
Janie [1] 66:15
January [4]    19:25
20:6    20:9    20:11
Joan [1] 22:2
job [6]    9:14    9:19
9:20    10:5    10:10
72:8
John [1] 22:2
joined [1]    71:13
Jose [32] 27:22    32:5
38:21    43:2    43:8
47:8    47:19    47:23
47:25    48:6    48:8
48:20    48:22    49:6
49:6    51:6    51:10
51:11    51:13    55:5
55:8    55:10    55:12
55:15    55:17    55:25

56:2    57:22    57:23
58:21    61:11    61:17
Jose's [2]    34:1
47:8
jump [1] 56:12
jury [1]    52:1

-K-

keep [1] 29:9
keeping [1]    56:18
kept [3] 8:25    10:17
12:4
kind [3] 19:6    48:23
53:24
knew [5]    53:21
53:23    55:15    55:17
72:5
knowing [1]    60:4
knowledge [5] 23:12
23:23    24:10    35:10
60:1
known [5]    16:12
51:17    60:4    60:9
60:10
Koepke [2]    27:22
47:10

-L-

lady [1] 33:2
large [4] 26:25    27:2
34:7    59:24
larger [1]    34:11
last [5]    18:11    31:17
37:23    40:11    47:9
late [1]    16:8
latter [1]    16:8
lawsuit [16]    16:10
16:23    32:13    32:15
35:12    36:19    36:24
40:7    44:2    48:10
49:1    64:16    67:14
70:6    70:8    70:11
lawyer [11]    42:3
43:11    43:12    43:13
43:14    43:15    64:16
64:17    64:17    64:20
66:13
lawyers [4]    43:14
43:17    66:23    66:24
learned [5]    41:20
41:23    42:1    42:3
42:4
least [1] 65:9
leave [1] 41:22
left [1]    60:1
less [1]    60:7
letter [9] 19:20    19:25
20:5    25:6    34:17
61:22    62:17    62:18
63:13
liability [2]    12:7
12:8
license [7]    8:13

8:18    8:19    8:19
8:21    71:10    71:12
licenses [10]    8:13
8:15    8:15    8:17
8:20    8:25    9:2
9:5    9:23    9:25
life [19]    8:18    10:16
10:22    10:24    12:12
12:22    13:19    13:24
14:1    14:2    14:6
14:11    17:22    20:1
20:7    22:23    37:5
71:8    71:19
likely [1]    40:5
line [3] 25:10    33:5
33:6
lines [5] 11:23    11:24
12:2    12:9    49:12
lis [3]    28:22    29:3
29:4
list [14]    21:18    23:11
28:12    29:22    30:3
30:6    32:7    33:8
33:9    36:5    39:21
40:11    40:15    60:12
listed [8]    22:13
22:16    23:20    29:24
29:25    30:11    30:12
33:14
listing [1]    22:1
litigation [6]    14:4
14:8    14:14    17:6
25:15    33:15
Lone [1] 25:10
longer [1]    23:13
look [3] 21:11    28:11
31:24
looked [1]    25:21
27:9    68:24
looking [4]    23:16
49:19    69:15    72:25
looks [2]    25:20
25:21
loss [22] 12:22    14:3
14:8    14:19    16:19
17:6    20:1    20:8
21:21    24:3    24:12
24:20    30:5    43:20
44:3    45:8    45:12
45:12    47:2    47:15
66:1    73:3
lost [2] 24:14    42:7
42:7
loud [2] 26:22    34:4
lowest [1]    56:19

-M-

M-A-Y [1]    8:5
mailed [1]    41:8
maintain [1]    9:2
makes [3]    31:24
69:17    69:20
man [1] 67:18
Managed [2]    44:9

45:2
management [2]
8:23    10:19
Managers [1]    8:8
manner [2]    13:12
57:7
Marianne [1]    25:9
marked [17]    18:3
19:19    21:13    24:23
24:24    26:5    31:10
32:19    33:17    37:25
38:2    38:17    38:19
60:18    60:20    67:21
67:25
matter [1]    31:22
maximum [1]    60:21
may [9]    8:3    8:4
8:5    25:6    47:22
51:6    54:21    69:9
70:10
MBA [39]    13:2
13:8    19:23    19:24
20:19    26:13    27:18
31:1    34:19    35:13
35:14    36:3    44:9
44:12    44:13    44:14
44:20    44:24    44:25
45:7    45:10    45:21
46:12    47:1    47:13
47:19    47:23    48:1
50:2    50:5    50:21
50:24    52:1    52:7
52:24    53:9    58:17
66:6    66:9
MBA's [3]    48:20
49:7    49:13
McCall [1]    27:21
mean [16]    29:3
42:15    45:5    45:6
46:8    49:1    50:16
51:1    51:5    54:10
54:22    58:4    59:13
65:6    66:15    71:12
means [2]    11:20
16:13
mechanism [1]    12:15
meet [1] 73:24
meeting [1]    36:18
meetings [2]    36:16
36:21
member [1]    11:10
11:15
memo [11]    26:7
31:8    31:17    33:2
33:19    38:2    38:3
38:3    38:20    38:22
57:11
memorandum [1]
57:16
memorandums [1]
50:19    57:7
memos [4]    41:5
54:5    54:10    55:21
Merrill [6]    20:6
20:8    20:9    20:13
25:6    36:1

Janie Sanchez
June 26, 2003
Multi-Page™
:cv-00047    Document 62    Filed in TXSD on 04/22/2004    Page 32 of 53
provide - speak
San Benito C.I.S.D.

provide [4]         41:24
41:25    42:2    64:5
provider [2]        46:5
46:13    46:18
providers [5]       15:2
15:18    22:18    22:22
41:8
providers' [1]      31:11
providing [2]       60:11
61:21
provision [1]       66:7
purchased [1]       16:19
purchasing [2] 25:22
66:1
purport [1]         61:1
purpose [4]         8:20
11:18    17:2    26:15
put [3]    9:1    10:18
39:12

-Q-

qualifications [1]
37:10
questions [5]       41:23
70:4    73:23    74:3
74:5
quote [2]           38:4
73:11

-R-

rainy [1]8:25
rational [1]        55:1
re-file [1]         63:20
re-filing [1]       63:21
reached [2]         37:8
60:21
read [12] 17:18    20:15
26:22    34:4    54:5
56:16    71:23    72:10
72:13    72:16    72:19
73:7
reading [1]         20:12
reads [1]           33:6
realize [2]         29:24
30:9
really [20]         8:21
8:21    12:4    14:9
17:17    23:15    23:22
25:18    25:21    29:4
29:11    29:20    30:24
34:9    35:15    43:5
48:22    55:4    55:6
63:16
reason [4]          33:22
52:2    57:4    66:8
reasonable [3]      53:2
53:13    53:19
reasons [1]         30:8
receive [6]         29:12
32:2    33:23    38:9
51:9    58:14
received [18]       17:25
22:8    22:10    23:15

29:12    29:17    29:21
35:18    35:25    38:8
38:23    56:3    58:14
58:17    60:5    62:17
62:17    63:17
receiving [6]       15:16
26:7    32:25    33:19
38:9    61:6
recipient [4]       31:8
31:21    33:5    64:1
recognize [1]       18:1
recollection [1] 36:24
recommend [1] 72:16
reconciliation [3]
27:18    35:4    35:6
record [4]          28:8
42:17    61:19    61:20
records [1]         26:24
38:24    39:5
redacted [1]        60:21
refer [1] 44:24
reference [4]       25:10
33:5    33:6    47:15
referred [1]        43:2
referring [1]       22:2
45:13    45:14
reflecting [1]      33:9
refreshed [1]       36:24
regarding [9]       38:20
45:7    45:21    47:1
47:19    47:23    48:9
64:25    65:6
registers [9]       26:23
27:8    33:7    34:10
38:4    38:21    39:1
39:6    58:15
reimbursed [8] 17:21
39:16    46:12    49:25
66:20    66:21    67:3
67:3
reimbursement [2]
23:11    23:25
reimbursements [1]
21:18    27:4
reimbursing [1]
46:3
relate [1]          32:13
related [5]         28:9
29:25    30:10    33:14
40:7
relationship [2] 54:14
55:4
release [7]         15:10
27:2    27:3    34:7
34:9    38:25    39:4
released [1]        34:13
releasing [2]       26:25
39:5
remaining [2]       34:7
74:2
remember [9]        7:18
8:12    13:25    14:15
19:4    23:13    52:16
57:13    57:18

removed [1]         31:14
removing [2]        31:13
32:21
renewal [1]         9:7
renewals [1]        9:6
repeat [1]          22:25
rephrase [7]        7:4
10:9    11:12    16:14
66:12    70:1    70:5
replete [1]         28:4
represent [4]       22:21
23:3    23:7    44:9
representation [1]
14:13
represented [2] 14:3
14:7
requested [1]       35:14
required [1]        9:19
reserve [7]         9:8
39:12    39:15    39:17
73:12    74:2    74:5
reserves [1]        73:10
respect [6]         58:22
59:10    64:22    65:25
66:18    69:7
respond [1]         57:7
57:11    57:12
responded [1] 58:11
responding [1] 57:15
response [2]        25:16
56:7    65:16
responsibility [4]
10:8    15:9    36:11
36:12
responsible [1] 27:15
result [1]          67:2
results [1]         35:16
36:9
review [2]          20:16
20:19
reviewed [2]        17:5
20:21
reviews [1]         32:24
revised [1]         19:9
16:10
right [38]          8:9
8:22    14:12    15:23
24:4    28:17    28:21
28:21    29:7    29:14
30:7    31:3    35:10
37:7    43:18    44:25
45:15    46:2    46:17
46:25    47:8    49:4
50:7    50:9    50:13
50:14    52:5    52:21
52:22    53:11    55:1
55:7    55:23    56:16
62:6    62:8    63:15
69:21
risk [12] 8:22     10:19
11:10    11:13    11:15
11:18    11:19    24:13
24:15    25:11    25:14
25:15

road [1]   64:2
role [2]   59:14    59:21
roughly [1]         63:1
Routh [2]           20:6
20:8
run [4]    8:22    28:13
40:19    68:19

-S-

safe [1]   45:19
San [3]    7:13    10:4
11:2
Sanchez [9]         13:2
13:9    18:15    23:10
47:5    56:25    64:11
64:12    73:7
Sanchez's [2]       23:17
36:12
satisfied [1]       24:17
saw [1]    29:17
says [9]   20:15    23:10
25:10    28:13    28:22
28:23    35:1    38:4
40:15
sic [1]    28:22
SB-444 [1]          32:21
SB-457 [1]          32:21
SB-466 [1]          28:3
SB-478 [1]          28:4
scheduling [1] 68:14
school [27]         9:14
9:23    10:4    11:3
11:13    21:19    45:6
46:3    46:12    47:11
48:14    49:25    50:10
51:6    52:8    56:20
57:1    60:5    64:17
65:25    66:19    66:19
66:23    70:21    71:4
71:13    72:20
second [2]          22:20
23:13    28:12    29:24
29:25    61:19    64:7
section [1]         34:1
see [9]    20:17    25:7
29:10    34:12    37:20
40:17    50:15    61:2
69:25
seeing [1]          41:4
self-funded [1] 11:8
sell [1]   11:23
send [4]   26:17    27:8
32:1    32:3
sending [2]         27:6
58:15
sent [8]   23:17    25:21
25:22    46:13    46:18
59:23    59:24    62:14
separate [3]        24:12
24:20    73:12
service [1]         24:18
services [2]        50:5
69:11
session [1]         9:17

set [2]    34:18    39:9
Seven [1]           34:9
seventy-five [1]
29:1
sheet [2] 22:17    61:23
should've [11]      18:11
54:3    60:4    60:9
60:9    63:24    67:3
67:15    69:9    69:13
70:21
show [3] 19:5       26:6
33:18
Shuchart [35]       28:5
37:22    41:19    42:14
42:18    44:7    44:8
46:8    48:8    51:3
51:4    52:11    52:15
53:7    53:19    54:19
54:20    55:11    55:12
60:8    60:11    60:19
61:19    61:21    66:13
67:20    67:25    68:3
68:18    68:22    69:1
69:4    69:6    70:5
74:4
sidebar [2]         37:22
42:18
sign [5] 18:14      18:18
19:13    64:4    64:10
signature [3]       18:1
18:5    19:11
signed [8]          17:25
18:24    44:15    44:17
59:23    59:25    64:12
64:12
significant [1] 68:21
signing [2]         18:7
18:10
single [1]          72:23
sit [4]    45:19    66:14
67:8    67:11
sitting [3]         41:13
41:15    41:17
six [2]    54:13    54:14
sixty-three [1] 28:25
society [1]         37:21
sole [2]   31:21    33:5
solicitor's [1]     8:19
someone [1]         37:19
sometime [1]        39:9
somewhere [3] 42:1
42:4    68:20
sorry [13]          20:12
23:1    30:4    48:3
49:8    50:11    51:23
58:25    59:4    59:17
62:23    63:14    71:15
sorts [1] 52:9
sought [7]          21:18
23:12    23:25    32:13
32:15    33:14    68:17
span [2] 11:7       11:11
speak [1]           31:5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SAN BENITO CONSOLIDATED            )
INDEPENDENT SCHOOL DISTRICT,       {
                                   )
          Plaintiff,               {
                                   )
VS.                                {
                                   )
COMPANION LIFE INSURANCE           {     NO. B-003-047
COMPANY, MANAGED BENEFITS          )
ADMINISTRATOR AND INSURANCE        {
CONSULTANTS, INC., MICHAEL M.      )
SWETNAM, JR., J. ALLAN HALL        )
& ASSOCIATES, INC., AND            )
MBA OF WYOMING, INC.,              }
                                   )
          Defendants.              {

*****************************************************

ORAL DEPOSITION OF JANIE GONZALEZ

JUNE 26, 2003

*****************************************************

E X H I B I T   I N D E X

| Exhibit Number | Description | Page Marked |
|---|---|---|
| No. 16 | Signature page of Plan Document (1 p.) | 18 |
| No. 17 | Letter dated January 31, 2001, from Carolyn Gale addressed to Jani Gonzales (sic) (2 pp.) | 19 |
| No. 18 | Fax to Celeste Guerra with list of claims for which reimbursement is being sought (2 pp.) | 21 |
| No. 19 | Letter dated May 17, 2001, from Marianne Miceli, J. Allan Hall and Associates, to Don Merrill, Managed Benefits Administrators re:  Lone Star Intergovernmental Risk Pool (32 pp.) | 24 |
| No. 20 | Memo/fax transmittal dated October 15, 2001, from Managed Benefits Administrator to Janie (2 pp.) | 26 |



# Exhibit "2"

Lorenzo Sanchez
June 26, 2003

Case 1:03-cv-00047     Document 62     Filed in TXSD on 04/22/2004     Page 35 of 53

Multi-Page™

San Benito C.I.S.D.
v. Com          ion Life Insurance Company, et al.



1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
SAN BENITO CONSOLIDATED      }
INDEPENDENT SCHOOL DISTRICT, {
                             }
          Plaintiff,         {
                             }
VS.                          {
                             }
COMPANION LIFE INSURANCE     {    NO. B-003-047
COMPANY, MANAGED BENEFITS    }
ADMINISTRATOR AND INSURANCE  {
CONSULTANTS, INC., MICHAEL M. }
SWETNAM, JR., J. ALLAN HALL  {
& ASSOCIATES, INC., AND      }
MBA OF WYOMING, INC.,        {
                             }
          Defendants.        {
```

*****************************************************

ORAL DEPOSITION OF

LORENZO SANCHEZ

JUNE 26, 2003

*****************************************************


     ORAL DEPOSITION OF LORENZO SANCHEZ, produced as a witness

at the instance of the Defendant, Companion Life Insurance

Company, and duly sworn, was taken in the above-styled and

numbered cause on the 26th day of June, 2003, from 10:21 a.m.

to 1:15 p.m., before DINA RAMIREZ, CSR in and for the State of

Texas, reported by oral stenography at the Law Office of Rene

Ramirez, 1906 Tesoro Boulevard, Pharr, Hidalgo County, Texas,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

Lorenzo Sanchez
June 26, 2003

Case 1:03cv-00047    Document 62    Filed in TXSD on 04/22/2004    Page 36 of 53

Multi-Page™

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 6

1    (Exhibit 1 marked.)
2        LORENZO SANCHEZ,
3  having been first duly sworn, testified as follows:
4        E X A M I N A T I O N
5  BY MR. BUSH:
6    Q  Could you state your name, please?
7    A  Lorenzo Sanchez.
8    Q  Mr. Sanchez, I'm gonna hand you what's been marked
9  as Exhibit No. 1. Have you ever seen that document?
10   A  No, sir.
11   Q  Do you understand that you're here today to give a
12 deposition in the lawsuit of San Benito Consolidated
13 Independent School District v. Companion Life Insurance
14 Company and other Defendants?
15   A  Yes, sir.
16   Q  Do you understand that your testimony today will be
17 used as evidence in the trial and other proceedings in this
18 lawsuit?
19   A  Yes, sir.
20   Q  And do you understand that you're under oath?
21   A  Yes, sir.
22   Q  If at anytime today you need a break, you're in
23 charge. You just let me know. Okay?
24   A  All right. I will.
25   Q  And, if at anytime today I ask you a question that

Page 7

1  you don't understand, feel free to ask me to rephrase it
2  because sometimes I've been known to ask some questions that
3  are incomprehensible and complicated. It's just the way my
4  mind works sometimes.
5        If you would, allow me to finish my question
6  before you provide your answer. It will make the transcript
7  clearer, and so we're not talking over each other. Is that
8  okay?
9    A  Sure.
10   Q  Could you -- how old are you, Mr. Sanchez?
11   A  I'm 60.
12   Q  And what is your current occupation?
13   A  I am the Assistant Superintendent for Finance, Human
14 Resources for the school district, San Benito.
15   Q  How long have you held that position?
16   A  Since -- I guess '96.
17   Q  What did you do prior to that time?
18   A  Prior to that, I was the Director of the School of
19 Business at New Mexico Highlands University.
20   Q  Where is that located?
21   A  Las Vegas, New Mexico, the original Las Vegas.
22   Q  I've been there. I've been there. And how long had
23 you held that position?
24   A  I was there five years.
25   Q  So, from 1991 to '96?

Page 8

1    A  Yes, sir, approximately.
2    Q  What did you do prior to that?
3    A  I was an accounting professor at Eastern New Mexico
4  University.
5    Q  And where is that located?
6    A  That's in Portales, New Mexico.
7    Q  How long had you held that position?
8    A  I think I went up there in '87. From '87 to '91.
9    Q  And, prior to that time?
10   A  Now you're asking me some real historic questions.
11 I spent most of my -- my time -- well, let's see. I was at
12 Pan American University at Brownsville as the accounting
13 coordinator for them for -- I believe I started in '81,
14 Pan American University at Brownsville.
15   Q  Accounting coordinator, is that an administrative
16 position or --
17   A  Yes, sir.
18   Q  Okay. And what about before that?
19   A  Okay. That takes me to -- the majority of about
20 approximately 17 years or 18 years, I was at Brownsville
21 I.S.D. in various capacities, a football coach, a teacher and
22 a track coach, basketball coach, assistant A.D. -- can't
23 remember.
24   Q  You were there 17 years?
25   A  Approximate, yes, sir.

Page 9

1    Q  So, from?
2    A  '60-something, '60- -- probably '65, '66. I'm not
3  really sure.
4    Q  Was that your first job?
5    A  No, I had a -- it's either '65 or '66 I was in
6  Alice, Alice, Texas, as a -- as a coach also.
7    Q  Okay.
8    A  So, I -- I'm really not -- not -- I graduated in
9  '65. So, I guess '65-'66 was in -- in Alice, and then I think
10 I came to Brownsville for -- for that period of time.
11   Q  And you attended college?
12   A  Yes, sir.
13   Q  Where?
14   A  North Texas State University in Denton.
15   Q  Were they the Mean Green at that time?
16   A  Yes, sir, very mean and very green.
17   Q  What degree did you obtain?
18   A  It was a B.A.
19   Q  B.A. Did you participate in sports?
20   A  No, sir.
21   Q  And did you attend college with the intention of
22 becoming a coach?
23   A  No.
24   Q  Okay. And how did you end up coaching at Alice?
25   A  My high school coach heard that I was graduating, I

Lorenzo Sanchez
June 26, 2003

Case 1:02-cv-00047    Document 62    Filed in TXSD on 04/22/2004    Page 37 of 53

Multi-Page™

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 14

1    A   We -- we -- it's August 31st and September 1st,
2  September 1st through August 31st.
3    Q   Okay.  Do you recall whether the policy in question
4  in this lawsuit began coverage on October 1st, 2000?
5    A   No, I don't.
6    Q   Okay.  We'll get to that in a minute.  What do you
7  recall about the events leading up to the issuance of the stop
8  loss contract by Companion Life Insurance Company?
9  Specifically, does the district have to put out any kind of
10  competitive bid process or --
11    A   That's all handled by the third-party administrator.
12    MR. SHUCHART:  Objection.  Responsiveness.
13    Q   (Mr. Bush)  But does the district -- is the district
14  required under law to put this out for bid?
15    A   The -- what part?  Of the TPA part of it?  I really
16  don't understand your question.
17    Q   No.  When you're purchasing stop loss coverage for
18  your plan, does the district -- is the district required to
19  put that out for bid to various reinsurance companies?
20    A   No, sir, because we -- that is the duty and
21  agreement and part of the contract of the third-party
22  administrator.
23    MR. SHUCHART:  Objection to responsiveness
24  after the word, "No."
25    MS. HEGLAND:  Steve, I'm assuming -- maybe we

Page 15

1  should put on it the record.  I'm assuming that an objection
2  by one attorney is good as to all.  Is that okay?
3    MR. WALRAVEN:  I have no problem with that.
4    MR. HEGLAND:  Thank you.
5    MR. BUSH:  Okay.  And, before we go on, there's
6  something probably we should discuss on the record, in that
7  these beneficiaries' names with this new HIPAA regulation and
8  privacy issues I think we all should probably at any instance
9  not mention their names, and, to the extent we're producing
10  documents, I don't recall if we have a protective order in
11  place.
12    MR. WALRAVEN:  I don't believe we do.
13    MS. HEGLAND:  No.
14    MR. BUSH:  But we ought to get one that covers
15  all of this health insurance data --
16    MR. WALRAVEN:  Good idea.
17    MR. BUSH:  -- just to protect their privacy.
18    MR. WALRAVEN:  Good idea.
19    MR. BUSH:  And I don't mind referring to -- we
20  have a female that had a premature birth and then we had a
21  male.  I don't mind referring to them as Jane and John Doe,
22  the male being the -- I think he had a stroke.  But, as far as
23  filing things as a record, we're gonna have to figure out what
24  to do.
25    MR. WALRAVEN:  That will certainly work for

Page 16

1  today and --
2    MR. BUSH:  Okay.
3    MR. WALRAVEN:  -- we'll figure out the rest of
4  the details later, if that's all right with everybody.
5    MR. SHUCHART:  Yeah.  The only thing I'd like
6  to do at some point, at some break is we may be able to list
7  the individuals that we think are going to come up and give
8  them the designations so that everybody here knows exactly who
9  we're talking about.
10    MS. HEGLAND:  Yeah.  I agree we're gonna have
11  to find some way to -- so that they can be specifically
12  identified --
13    MR. WALRAVEN:  Well, he just proposed --
14    MS. HEGLAND:  -- just for purposes of this
15  lawsuit.
16    MR. SHUCHART:  Well, I don't know that
17  necessarily I'm in a position to be able to describe them like
18  that.
19    MR. BUSH:  And I don't think that the way this
20  has unfolded, I don't know that there is a dispute as to a
21  covered claim.  Mr. Walraven and I have had a discussion --
22    MR. WALRAVEN:  I don't think so.
23    MR. BUSH:  -- that the issue seems to be we are
24  contesting that the checks were not paid as it's defined under
25  the policy 'cause they weren't sent to the provider by the end

Page 17

1  of the policy year.  So, that issue alone went to all the
2  claims information and -- and diving into the what was paid to
3  what provider.  It's -- it's the amount of the check and when
4  it was paid.  So, I've got as part of one of these exhibits is
5  the census data, and it's part of the request for proposal,
6  but I would prefer not making it -- not making the exhibits to
7  the RFP an exhibit to this deposition because this has got all
8  the personnel, not just those two claims, but every employee
9  in the district, if that's okay with everyone else.
10    MR. WALRAVEN:  I think so.
11    MR. BUSH:  Fred?
12    MR. SHUCHART:  That'd be fine.
13    Q   (Mr. Bush)  Mr. Sanchez, have you reviewed the
14  district's lawsuit?
15    A   Not really, sir.
16    Q   I'm gonna show you Plaintiff's Original Petition,
17  and take a look at that paragraph, paragraph VII for purposes
18  of the record.
19    MR. SHUCHART:  Why don't you go ahead and mark
20  that?
21    MR. WALRAVEN:  I don't know.
22    A   (Witness reviews document.)
23    MR. BUSH:  Let's mark that as Exhibit 2.
24    (Exhibit 2 marked.)
25    Q   (Mr. Bush)  Okay.  We've marked Plaintiff's Original

Lorenzo Sanchez
June 26, 2003

Case 1:02-cv-00047   Document 62   Filed in TXSD on 04/22/2004   Page 38 of 53

Multi-Page™

San Benito C.I.S.D.
v. Comp[     ]ion Life Insurance Company, et al.

**Page 22**

1 if they needed him. I can't recall the date or the -- of the
2 meeting or the time, you know, when this occurred, but it --
3 it did occur.
4    Q  Did he have a contract with the board?
5    A  I really don't know that. He was there -- he was
6 there before I even came on there.
7    Q  In what capacity, do you know?
8    A  Pardon?
9    Q  In what capacity?
10    A  Do I know about this?
11    Q  About Mr. Swetnam's capacity. What was his --
12    A  Oh.
13    Q  -- capacity?
14    A  I think he was a consultant to the board.
15    Q  Okay. Who was William Greer?
16    A  He represented Smith-Reagan, I believe.
17    Q  So, he's not a local resident or any kind of Texas
18 licensed --
19    A  Mr. Greer?
20    Q  Yes.
21    A  Yes. He's -- I believe he lives in San Benito or
22 Harlingen.
23    Q  Okay. Is he part of the school board or an employee
24 of the district?
25    A  No, he's -- no, sir.

**Page 23**

1    Q  Okay. Is it fair to say that the district
2 terminated Mr. Swetnam's contract to be the representative of
3 the group health plan?
4    A  As I stated, at the -- at the board meeting that's
5 -- that's the extent of what was said to him. I -- I don't
6 know that there was -- he was already there before I -- I got
7 there, so I don't know. He's the one that set up the -- this
8 -- the association with MBA and Bill Greer and Smith-Reagan
9 and so forth.
10    Q  You don't recall when that board meeting was held?
11    A  No, sir, sure don't.
12         (Exhibit 3 marked.)
13    Q  (Mr. Bush)  I show you what's been marked as Exhibit
14 No. 3. Have you ever seen that document?
15    A  (Witness reviews document.) I don't think so, sir.
16    Q  Could you identify it?
17    A  Sure. This is the -- this is when we go out for --
18 for bids and proposals for either a full insured or a request
19 for proposals for third-party administrators. This is --
20 appears to be a standard bid packet.
21    Q  But you've never seen that?
22    A  Not this particular one, no, sir.
23    Q  Okay. And it states at the bottom it was prepared
24 by whom?
25    A  Insurance Associates of the Valley.

**Page 24**

1    Q  And do you know who owns that company?
2    A  Arnie Olivarez.
3    Q  Okay. Is Mr. Swetnam associated with that company?
4    A  I have no idea, sir.
5    Q  You don't know?
6    A  (Witness indicates no.)
7    Q  So, you don't know if that RFP was ever actually
8 sent out? You don't have any knowledge of that document?
9    A  No, sir.
10         (Exhibit 4 marked.)
11    Q  (Mr. Bush)  Okay. I'll show you Sanchez Deposition
12 Exhibit No. 4. Have you ever seen this document?
13    A  (Witness reviews document.) Yes, sir. I don't
14 recall -- I don't specifically know what date or what time I
15 saw it, but, yes. It's got my initials up there.
16    Q  So, those are your initials?
17    A  Uh-huh.
18    Q  And what is this document?
19    A  Specifically making some references to something
20 being contingent and subject to change on receipt; and, to
21 look at this document, one single page without all the other
22 documents that might have been attached to it or a part of it,
23 I -- I really couldn't -- seems like I need to see all the
24 documents that were attached to it.
25    Q  Does it have -- does it have a title at the top?

**Page 25**

1    A  It says J. Allan Hall and Associates.
2    Q  Okay. And who is J. Allan Hall and Associates?
3    A  To my recollection, he was a broker that was dealing
4 with MBA.
5    Q  With regard to stop loss contract?
6    A  I believe so.
7    Q  Okay. Is that a -- let me take a -- take a look.
8    A  (Witness tenders document.)
9    Q  The first sentence here references, "Our proposal."
10 Are you telling me that you recall other documents being
11 attached to that?
12    A  I'm saying I -- I really don't know. It appears to
13 me like there might have been.
14    Q  Okay. Do you think this might be either the first
15 page or a page in a packet that was a proposal to provide the
16 district with stop loss coverage?
17    A  That's a fair statement.
18    Q  The first page?
19    A  No, I said that's a fair statement.
20         MR. WALRAVEN:  Fair statement.
21    A  Fair statement.
22    Q  (Mr. Bush)  Chalk one up for me.
23         MR. WALRAVEN:  At the top there's a fax that
24 says page 4 of 5.
25         MR. BUSH:  Yeah. I'm sure -- I'm sure there

Lorenzo Sanchez
June 26, 2003

Case 1:03-cv-00047   Document 62   Filed in TXSD on 04/22/2004   Page 39 of 53

Multi-Page™

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 30

1 page that has the Bates label SB-00027, which is page 3 of
2 Exhibit No. 6, the language applicant acknowledges, it states
3 the applicant must first pay claims before submitting them for
4 reimbursement. Do you see that language?
5     MR. WALRAVEN: I don't. Could you help us
6 here? I mean, if you say it's there, I'm sure it is, but --
7     MR. BUSH: Yeah. It was there last night.
8     MR. WALRAVEN: Objection. Non-responsive.
9     MR. BUSH: I'm sorry, Fred, but paragraph 11
10 continues on to page 4, which is SB-00028, and this is the
11 language I'm referring to. It's subparagraph --
12     MR. WALRAVEN: I believe that's a little letter
13 "i."
14     MR. BUSH: -- "i."
15     Q (Mr. Bush) Could you read that out loud, please?
16     A "Applicant acknowledges that the contract which is
17 subject of this application is a reimbursement contract.
18 Applicant must first pay claims before submitting them for
19 reimbursement."
20     Q And just maybe two inches below that language is
21 your signature, correct?
22     A Yes, sir.
23     Q Now, is this your handwriting underneath your
24 signature?
25     A Yes, sir.

Page 31

1     Q What does that say?
2     A It says, "Administrator for Human Resources and Risk
3 Management. Authorized by superintendent to sign by telephone
4 call 11/2 -- 11/22/99, 1:30 p.m."
5     Q And where were you physically located when you
6 signed that application?
7     A Central Administration Building, 240 North Crockett,
8 San Benito.
9     Q And where was the superintendent?
10     A I have no idea.
11     Q Had he seen this document?
12     A I don't know if he had or not, sir.
13     Q Did you need to call him to get his authority to
14 sign it?
15     MR. WALRAVEN: Mr. Bush, there's not an
16 authority issue on any of these signatures. Feel free to go
17 into it if you want, but we're not questioning that they were
18 -- anything was signed by a duly authorized individual.
19     MR. BUSH: Well, if it is an issue from my
20 standpoint, there may be an authority issue. So, I'm just --
21 I'm -- I'm not -- there aren't too many of these questions,
22 but --
23     MR. WALRAVEN: Go for it.
24     Q (Mr. Bush) I'm just asking why the superintendent
25 had to --

Page 32

1     A Sometimes when he's not in the building, I -- I
2 check with him. If I can't get ahold of him, I sign.
3     Q Okay.
4     A This was an issue because of the time in place when
5 it was occurring. So, he asked me to read these things and
6 call him, and I believe we were -- you notice it's 11/22, and
7 I don't know if we were pressed for time and I think that's
8 why we needed to get it signed on a specific time or date and
9 -- I don't really recall.
10     Q And who signed this application as the licensed
11 resident agent?
12     A William R. Greer.
13     Q And is he associated with Mr. Swetnam's company?
14     A I don't know what their -- their association is.
15     Q Was he present when you signed this application?
16     A No, sir.
17     Q Okay. Did someone deliver it to you?
18     A I don't recall if it was Mr. Greer. Probably was.
19     Q And this witness, do you know whose signature that
20 is?
21     A I don't recognize that signature.
22     Q Was there someone present when you signed it?
23     A I don't recall.
24     Q Well, based upon the language that you read into the
25 record about applicant must first pay claims before submitting

Page 33

1 them for reimbursement, how does that reconcile with your
2 understanding of advance funding?
3     A Reword that, please.
4     Q Does -- does this language indicate to you that this
5 contract would have an advance funding component?
6     A No, sir.
7     (Exhibit 7 marked.)
8     Q (Mr. Bush) Okay. Do you need to take a break?
9     A Need some water.
10     Q Fine. Let's take a break.
11     MR. WALRAVEN: We've been at this for a little
12 over an hour or --
13     MR. BUSH: Sure.
14     (Off the record from 11:10 a.m. to 11:20 a.m.)
15     Q (Mr. Bush) I show you Exhibit No. 7.
16     A (Witness reviews document.)
17     Q Could you identify that, please?
18     A It's an application to Companion Life Insurance
19 Company.
20     Q And, if you could turn to the last page, is that
21 your signature?
22     A Yes, sir.
23     Q And who signed this application as the licensed
24 resident agent?
25     A Michael Swetnam, Jr.

Lorenzo Sanchez
June 26, 2003

Case 1:01-cv-00047     Document 62     Filed in TXSD on 04/22/2004     Page 40 of 53

Multi-Page™

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 38

1  Q  Okay. And who signed the contract on behalf of the
2  school district?
3  A  I did, sir.
4  Q  You did. And is that Mr. Swetnam's signature?
5  A  It appears to be.
6  Q  And, once again, was Mr. Swetnam in your presence
7  when you signed this contract?
8  A  No, sir.
9  Q  Okay. Did you read this contract before you signed
10  it?
11  A  Not thoroughly, no, sir.
12  Q  And have you had occasion to review the definition
13  of "paid" in the contract?
14  A  I don't recall, sir, if I did or not on this one.
15  Q  Do you know whether or not that's an issue that's
16  involved in this lawsuit?
17  A  Yes, sir.
18     MR. WALRAVEN: Objection. Form.
19  Q  (Mr. Bush) You do know that?
20  A  Yes.
21  Q  Okay. You know there are a number of checks that
22  were written prior to the end of the contract year but not
23  necessarily forwarded to the providers?
24  A  I need to -- do you have that document that shows
25  all that so I can look at it?

Page 39

1  Q  I'm sure I do. I'm just wondering if you had any
2  independent recollection of it.
3  A  No, sir.
4  Q  Okay.
5  A  Not -- not the specifics of it.
6  Q  But generally?
7  A  Generally, yes, sir.
8  Q  Okay. Are you familiar with the San Benito
9  Consolidated Independent School District plan document?
10  A  Somewhat familiar.
11     (Exhibit 9 marked.)
12  Q  (Mr. Bush) I show you Exhibit No. 9 and ask you
13  whether that's a true and correct copy of the plan document
14  that was in place during the contract year 10/1/2000 through
15  August 31st, 2001.
16  A  (Witness reviews document.) It appears to be,
17  correct.
18  Q  Thank you.
19     (Exhibit 10 marked.)
20  Q  (Mr. Bush) I show you Exhibit No. 10 and ask you if
21  you've seen that document before.
22  A  (Witness reviews document.) Yes, sir.
23  Q  Do you recall receiving that from Mr. Merrill?
24  A  Yes, sir.
25  Q  The letter dated November 16th, 2000?

Page 40

1  A  Yes, sir.
2  Q  Addressed to you, referencing original stop loss
3  application, Companion Life Insurance Company; is that
4  correct?
5  A  Yes, sir.
6  Q  Would you read that first paragraph, please, out
7  loud?
8  A  "We received the final application yesterday. This
9  application should be signed immediately after you have
10  reviewed, parenthes s, reference No. 11. Note that each page
11  needs to be initialled also."
12  Q  What did you understand this language, quote,
13  parenthesis, R-E-F No. 11, end parenthesis, to mean?
14  A  Well --
15  Q  Exhibit No. 7 should be the application that's
16  referenced in this November 16th correspondence, correct?
17  A  Yes, sir. Yes, sir.
18  Q  So, as far as Mr. Merrill asking you to, "This
19  application should be signed immediately after you have
20  reviewed, parenthesis, REF No. 11, end parenthesis, period" --
21  A  Right.
22  Q  -- what do you think he meant by that?
23     MR. SHUCHART: Objection. Calls for
24  speculation.
25  A  I don't know.

Page 41

1  Q  (Mr. Bush ) What did you interpret the language to
2  mean?
3     MR. WALRAVEN: Objection. Form.
4  A  I don't know what his intent was and I don't really
5  recall whether I actually read Reference No. 11 or not. I
6  mean, I don't recall if I did or not.
7  Q  (Mr. Bush) Did you -- okay. So, you didn't --
8  based upon your reading of this letter, you didn't go to the
9  application and look at paragraph 11 in the application?
10  A  I don't recall.
11  Q  Okay. Down further in Exhibit No. 10 Mr. Merrill
12  indicates that, quote, I have called Michael about doing this,
13  end quote.
14  A  Right.
15  Q  Do you recall the circumstances surrounding
16  Mr. Swetnam's relationship with the district and why
17  Mr. Merrill would have to call Mr. Swetnam to sign the
18  application?
19  A  I really didn't understand the tie-in between
20  Mr. Swetnam and -- but I know that there was always -- I've
21  asked several times why he was involved, and, apparently,
22  there was an interlocal agreement and that he -- it required
23  Mr. Swetnam's signature to keep this going so it could be
24  renewed, and, if you have an interlocal agreement, then you
25  don't have to go out and -- and bid the proposals and -- and

Lorenzo Sanchez
June 26, 2003

Multi-Page™

Case 1:03-cv-00047    Document 62    Filed in TXSD on 04/22/2004    Page 41 of 53

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 46

1 immediate assistant who handles the details of everyday
2 operations is -- is Janie Gonzalez. So, sometimes I -- you
3 know, I may attach a stick-'em or post-'em, "Janie, look at
4 this. Refer it, study it, come back to me."
5    Q Okay.
6    A And -- but, you know, it's hard to say -- there's so
7 many correspondence that goes back and forth -- that this
8 specific letter that I could say that I can recall with
9 100 percent assurance that I read it.
10    Q Well, that's fine. And, if you look back here, it
11 apparently involves the district's plan and projected renewal
12 reports. Do you recall seeing that report?
13    A I think I remember this, yes, sir. That would be a
14 yes, sir.
15    Q And, if you take a second to look at that, let me
16 know if there's any mention in there about advance funding.
17    A (Witness reviews document.) No, sir.
18    Q Thank you.
19       (Exhibit 13 marked.)
20    Q (Mr. Bush) I show you Exhibit No. 13. Have you
21 seen this correspondence dated February 14, 2002?
22    A (Witness reviews document.)
23       MR. SHUCHART: What you mark that as?
24       MR. BUSH: 13.
25       MR. WALRAVEN: Does this have any of the

Page 47

1 information that we talked about not marking?
2       MR. BUSH: I don't think so. Let me
3 double-check first. It's just got providers' names.
4       MR. WALRAVEN: Yeah. Just some of the
5 paragraphs, do they make reference to particular employees or
6 dependents? Anyway, go ahead and ask your question.
7       MR. BUSH: No, that's -- I'm glad you stopped
8 me, because I don't think it does. It's got claim numbers,
9 it's got providers and amounts, but I don't -- I don't see any
10 employees' or beneficiaries' names.
11       MR. WALRAVEN: Well, go ahead, and when you're
12 finished --
13       MR. BUSH: Okay.
14       MR. WALRAVEN: -- I'll take another look and
15 see if there's a reference to John Doe in some paragraph.
16    A Not -- I'm not really sure. I can't say that I --
17 'cause it's addressed to Ms. Guerra, and whether -- I really
18 couldn't say with certainty that I have.
19    Q (Mr. Bush) Okay. Are you aware that an audit was
20 conducted of the -- are you aware that this case is about two
21 claims, two specific claims?
22    A No, sir, not two. Two specific claims, no, sir.
23    Q What's your awareness about what this case involves?
24    A A lot of small claims that haven't been paid by the
25 stop loss carrier.

Page 48

1    Q And, when I refer to a claim, I mean you may have a
2 number of payments to providers on behalf of one employee --
3    A Right.
4    Q -- or dependent.
5    A Right.
6    Q And I'm referring to that as one claim.
7    A Okay.
8    Q So, just so we're on the same page, I am speaking of
9 two claims in that there is a dependent of Jane Doe and there
10 is an employee who I'll refer to as John Doe.
11    A Uh-huh.
12    Q Those two claims are the only two claims that are
13 involved in this lawsuit?
14    A I don't --
15    Q Is that not your -- is that not --
16    A I don't -- I don't know. I don't know if that is --
17    Q Well, let me know how you perceive this lawsuit has
18 evolved.
19    A Over a period of time, the claims exceeding $75,000
20 on various individuals was not reimbursed to the district, and
21 over time that accumulated to a -- a pretty large number,
22 approximately 900,000 somewhere, and that's -- that's how I
23 view that.
24    Q Would it be fair to say that two claims comprise a
25 vast majority of the amount in controversy?

Page 49

1    A Yes, sir.
2    Q Okay. This next exhibit that I was going to propose
3 does list the names of the two claimants. So, I -- I'm not
4 sure what you answered as to whether you were aware there was
5 an audit conducted. Were you aware of the audit that was
6 requested on the claims at issue in this lawsuit?
7    A Audit on who -- by whom?
8    Q Audit by J. Allan Hall and Companion Life Insurance
9 Company.
10    A Again, who's doing the audit on whom? Somebody's
11 auditing --
12    Q An entity that calls itself capital NII, capital S,
13 capital APEX. I'm not sure how it's pronounced.
14    A And it's auditing, but it -- it's auditing MBA?
15 Auditing J. Allan Hall? What is it -- what --
16    Q Auditing the specific claim that was --
17    A Oh, okay.
18    Q -- submitted for reimbursement.
19    A Right. I am -- I'm familiar with it.
20    Q You're familiar with that?
21    A Yes, sir.
22    Q Are you familiar with the finding of the audit?
23    A Yes, sir.
24    Q And what is your -- tell me your awareness of that
25 audit and the finding.

Lorenzo Sanchez
June 26, 2003

Case 1:01-cv-00047    Document 62    Filed in TXSD on 04/22/2004    Page 42 of 53

Multi-Page™

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

<table>
<tr><td>

**Page 54**

1 check out, and I mean money in the account sufficient to cover
2 the checks that you're sending out?
3    A That's what it says.
4    Q And that's how you interpret it?
5    A No, that's not what I said. I said that's what it
6 says. That's not how I interpret it.
7    Q Okay. How do you interpret it?
8    A I interpret that we at the district has the ability
9 to work with the depository bank, place monies into the
10 account as needed, 'cause that has been the standard operating
11 procedures and that's the way we've -- we've always done it to
12 maximize our investments.
13      MR. BUSH: Objection. Non-responsive.
14    Q (Mr. Bush) Is that -- you have some accounting
15 background, don't you?
16    A Yes, sir.
17    Q Did you take accounting classes at NTSU?
18    A I'm a certified public accountant, sir.
19    Q In what State?
20    A Texas.
21    Q When did you receive that certification?
22    A Oh, I believe in '86.
23    Q And mailing checks out without sufficient money in
24 the account, is that otherwise referred to as floating checks?
25    A Yes, sir.

</td><td>

**Page 56**

1    A Yes, sir.
2    Q -- the page that has SB-00003?
3    A That's correct.
4    Q Does that appear to be a true and correct copy of
5 your what I'll refer to as the third-party administrator
6 agreement with MBA?
7    A Yes, sir.
8    Q The agreement in many instances refers to ERISA.
9 Are you aware of ERISA?
10    A I'm fairly familiar with it.
11    Q And do you know whether or not ERISA has any
12 application to your agreement with MBA and/or your employee
13 benefit plan?
14    A No, sir, I -- I don't recall that.
15      MR. BUSH: Okay. I will pass the witness.
16      MS. GUERRA: Should we order lunch before you
17 start?
18      MR. SHUCHART: Yeah, I don't have a problem
19 with that.
20      (Off the record from 12:00 noon to 12:16 p.m.)
21 BY MR. SHUCHART:
22    Q Good afternoon, Mr. Sanchez. My name is Fred
23 Shuchart and I'm here on behalf of MBA of Wyoming and Managed
24 Benefits Administrator and Insurance Consultants, Inc. Do you
25 understand that we're on opposite sides of this lawsuit?

</td></tr>
<tr><td>

**Page 55**

1      (Exhibit 14 marked.)
2    Q (Mr. Bush) Okay. Just two more and I'll pass the
3 witness. Could you identify Exhibit 14, please?
4    A (Witness reviews document.) Correspondence from
5 Randy Scott, Director of Claims, copy to Don Merrill,
6 Roy Hutchison, Al Hall, Larry Blagg, addressed to me,
7 letterhead of J. Allan Hall and Associates.
8    Q What's the date?
9    A November 7, 2001.
10    Q Do you recall receiving that letter?
11    A I don't really recall.
12    Q Do you have any reason to believe that it's not a
13 true and correct copy of the letter that appears to have been
14 sent to you?
15    A No, sir.
16    Q And does that letter in fact discuss the paid claim
17 issue that you and I just discussed?
18    A That's correct.
19    Q Okay. Thank you.
20      (Exhibit 15 marked.)
21    Q (Mr. Bush) And can you identify Exhibit 15, please?
22    A It's an administrative service agreement. Has MBA
23 at the bottom. The pages seem to be initialled by me, signed
24 by me and Don Merrill.
25    Q So, that is your signature at --

</td><td>

**Page 57**

1    A Yes, sir.
2    Q If you could, could you please describe briefly the
3 decision-making hierarchy and process that the school district
4 has to go through in order to enter into a TPA contract or to
5 authorize the purchase of a stop loss or any type of insurance
6 policy?
7    A Surely. We go through a request for proposals, send
8 out, receive the proposals. Generally, we have a committee to
9 review proposals, submits the proposals to a finance
10 committee. From the finance committee, committee looks at the
11 proposals, basically directs me to either we need further
12 information, further negotiation or to place the agenda for --
13 or to place the item on the agenda for the regular board
14 meeting. Then, the board meeting authorizes entering into the
15 contract with the TPA.
16    Q Okay. So, you don't have the authority as assistant
17 superintendent to enter into a contract, correct?
18    A Right.
19    Q And your -- the superintendent doesn't have that
20 authority either?
21    A Basically, yes, sir.
22    Q Okay. So, it has to actually come through the
23 board?
24    A Uh-huh.
25    Q Do you have any training in insurance?

</td></tr>
</table>

Lorenzo Sanchez
June 26, 2003
Case 1:01-cv-00047    Document 62    Multi-Page™    Filed in TXSD on 04/22/2004.    Page 43 of 53
San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

| Page 62 | Page 64 |
|---|---|

**Page 62**

1   Q And you indicated earlier in your testimony that
2 it's not the policy of the school district to leave money in
3 non-interest-bearing checking accounts, right?
4   A Right.
5   Q That wouldn't make a lot of sense?
6   A Right.
7   Q How much hands-on dealing with respect to the
8 purchase of the stop loss 2000-2001 policy and the actual
9 handling of the claims do you have -- did you have?
10   A None.
11   Q Did you have any conversations with Mr. Merrill or
12 Ms. Merrill or anybody from MBA of Wyoming regarding that
13 policy?
14   A Conversations, yes, I'm sure we did.
15   Q No, no. You personally.
16   A Oh. Probably.
17   Q All right. Do you recall whether those
18 conversations dealt with the procurement of the stop loss
19 policy or the handling of the claims?
20   A Probably both.
21   Q Okay. As you sit here today, do you recall the
22 specifics of any of those conversations?
23   A It -- it always was a -- because of the market, the
24 reinsurance market or the stop loss market was a little tight,
25 and so they would shop around for stop loss coverage that

**Page 63**

1 would meet our projected needs and -- and -- and to try to
2 match up with the revenues and, you know, all the costs,
3 administrative costs, how much the premiums was gonna be and
4 so forth and so on; and, of course, also making sure that --
5 that we received the -- the most for our dollar, that the
6 aggregate amount, total aggregate was something that we could
7 maybe fund to that level so that -- so that we could have a
8 self-funded program that would sustain itself.
9   Q Okay. Do you recall having any conversations with
10 Mr. Merrill, Ms. Merrill or anybody else from MBA of Wyoming
11 regarding the coverage afforded by the 2000-2001 stop loss
12 policy?
13   A We had no privy to any negotiations or -- that were
14 going on as between MBA or J. Allan Hall or whomever. The
15 negotiations were done at that level, and then he would --
16 whatever -- whatever things were discussed and when he felt
17 like he had the best -- the best plan for us, he would then
18 send those applications and -- and contract for us to sign.
19   Q Okay. Did you -- do you recall having any
20 conversations from anybody with MBA regarding, and I'm talking
21 about you personally, the premium for the 2000-2001 stop loss?
22   A I -- I don't recall, sir.
23   Q Do you recall having any conversations with anybody
24 from MBA regarding the deductible for that, the 2000-2001
25

**Page 64**

1   A "Deductible" meaning, sir?
2   Q Your self-insured concerning the 75,000.
3   A We probably did.
4   Q All right. Again, when -- you're using the word,
5 "We," and, generally, that means --
6   A Myself and --
7   Q -- "we, the school district," as opposed as to "We,
8 me."
9   A Right.
10   Q All I'm asking you about specifically is any
11 conversations you personally had.
12   A I probably did --
13   Q Okay.
14   A -- have a conversation.
15   Q As you sit here today, do you recall any of the
16 specifics?
17   A No, sir.
18   Q Okay. Do you recall having any conversations with
19 anybody from MBA regarding advance funding as you used that
20 term today?
21   A Never had.
22   Q Okay. All right. Is that you never had the
23 conversations that -- in other words, you recall not having
24 any of those conversations?
25   A That's correct.

**Page 65**

1   Q Okay. So, one way or the other, they didn't --
2 nobody from MBA told you, you personally, anything about
3 whether there was advance funding or there was not advance
4 funding?
5   A That's correct.
6   Q Okay. Who is the person that was the most -- that
7 had the most responsibility on a day-to-day basis dealing with
8 stop loss coverage at the school district?
9   A Probably Janie Gonzalez. She's my insurance
10 coordinator.
11   Q All right. Now, your TPA and MBA of Wyoming, they
12 didn't fund the claims, correct? They didn't write checks off
13 of their accounts with their own money?
14   A No, no, no. They -- they were -- they had a
15 signature required in which we authorized them to go ahead and
16 write checks and draw down on our -- on our account.
17   Q And I think you testified earlier to the extent that
18 checks weren't actually cashed through your bank for claims,
19 that that did benefit the school district because you had the
20 funds in an invested account as opposed to a checking,
21 correct?
22   A Right.
23   Q Did you ever have -- you personally again. Did you
24 ever have any conversations with anybody at MBA about issuing
25 checks but not mailing them out?

Lorenzo Sanchez
June 26, 2003

Case 1:01-cv-00047   Document 62   Multi-Page™   Filed in TXSD on 04/22/2004   Page 44 of 53

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

**Page 70**

1  Q  Okay. As I understood your previous testimony, you
2  said that nobody from my clients, whether MBA of Wyoming or
3  the other long name, made any representation to you with
4  respect to advance funding; is that correct?
5  A  They did not make any representations to me as to
6  advance funding.
7  Q  Okay.
8  A  That is correct.
9  Q  All right. So, they didn't represent to you that
10  you had it and you didn't or you didn't have it and you had
11  it?
12  A  Correct.
13  Q  Okay. Based upon your knowledge of what this
14  lawsuit is about, am I -- is it correct that that in essence
15  is what this lawsuit is about, is about advance funding or the
16  lack of advance funding?
17  A  I have no opinion on that.
18  Q  Okay. The second paragraph says, "In
19  misrepresenting to Plaintiff material facts and policy
20  provisions relating to coverages at issue." Again, it's my
21  understanding of your testimony, and please correct me if I'm
22  wrong, that there were no representations made to you
23  personally by my clients with respect to provisions relating
24  to coverage in that policy; is that correct? I think I got
25  two negatives in there.

**Page 71**

1  A  Right. Okay. Again, rephrase that.
2  Q  Okay. Did my clients make any representations to
3  you regarding the provisions of coverage that are made the
4  basis of the lawsuit?
5  A  I'm still not -- you're asking me something I
6  really --
7  Q  Did you --
8  A  I think I -- I think -- I think I can understand
9  your question. I just don't know how -- how I should respond
10  to it because it seems like if I say one thing it means
11  something else, and if I don't say anything it means something
12  else, as well. So --
13  Q  And I -- and if that's -- that's not what the
14  question is meant by. Obviously, you -- the school district
15  sued my clients.
16  A  That's correct.
17  Q  And my job here today is to try to find out --
18  A  I understand.
19  Q  -- you know, what we did or you think we did wrong,
20  and if I'm wrong your lawyer will correct me. In essence, the
21  way I read these allegations is that you're claiming my
22  clients committed a fraud.
23  A  Uh-huh.
24  Q  That we either told you something that was not true
25  or we forgot to tell you something that was material to the

**Page 72**

1  decisions you made.
2  A  Uh-huh.
3  Q  And what I'm trying to find out from you is, did my
4  clients say anything like that to you?
5  A  Example being?
6  Q  Advance funding. I mean --
7  A  No.
8  Q  Okay. All right. Would it have made any difference
9  to the district's decision to purchase this policy if you had
10  been told there wasn't, specifically told there was no advance
11  funding?
12  A  I don't think that would've. The issue with that
13  would have been the total dollar amounts and how much it was
14  gonna cost us to -- to provide the best benefits for our --
15  for our district, I believe.
16  Q  In your opinion, did the school district get the
17  policy of insurance that it paid for?
18  A  Right, related it to the specific dollar amounts,
19  the 75,000 specific which we were looking at, and $1 million
20  total per individual, yeah, those things, yes. Now, that they
21  lived up to all the provisions is something else.
22  Q  Okay. As you sit here today, is there anything that
23  you feel that my clients didn't live up to?
24  A  Reimbursement of the excess over $75,000.
25  Q  Okay. How are my clients responsible for

**Page 73**

1  reimbursing the school district in excess of the $75,000?
2  A  They -- they're the ones who have the arrangements
3  with the stop loss carrier and they're the ones who have more
4  knowledge and expertise to expedite and file the claims on a
5  timely basis and -- and get them -- get the district
6  reimbursed. After all, the district is having to pay all the
7  claims. We -- to-date, we have always paid our claims.
8  Q  What do you mean by we're the -- that my clients
9  were the ones that had the relationship with the stop loss
10  people?
11  A  They're the ones who -- who negotiated with the --
12  with the stop loss carrier.
13  Q  Okay. And, again, I think -- would it be fair to
14  say that from your perspective -- well, let me ask it this
15  way.
16  From your perspective, was the only thing my
17  clients did wrong is not mail those, mail the checks in
18  question?
19  A  Probably.
20  Q  And that if the stop loss carrier -- all right --
21  had paid the claims, then you wouldn't have any problems with
22  the way my client acted?
23  A  We never had problems before.
24  Q  Would you expect my client to get payment of
25  benefits that aren't provided by the policy?

Lorenzo Sanchez                    Multi-Page™                San Benito C.I.S.D.
June 26, 2003   Case 1:03-CV-00047   Document 62   Filed in TXSD on 04/22/2004   Page 45 of 53
                                                    v. Com...   ion Life Insurance Company, et al.

| Page 78 | Page 80 |
|---|---|

**Page 78**

1  Q  Okay.

2  A  That -- that sequence I think is fairly correct.

3  Q  All right.  I'm going to represent to you, and I

4  think it's accurate, that BCS was the carrier and that's when

5  the switch occurred for the 2001-2002 policy.

6  A  I believe -- I believe that is correct.

7  Q  As you sit here today, do you have -- do you recall

8  having any conversations with anybody, anybody from my clients

9  regarding the application process for the BCS insurance?

10  A  No, not with MBA.

11  Q  I'm sorry?  I didn't hear you.

12  A  Not with MBA.

13  Q  Okay.

14  A  Or -- was it MBA-Wyoming?  I don't know who -- who's

15  -- you're MBA-Wyoming, representing MBA of Wyoming?

16  Q  Correct.

17  A  Okay.

18  Q  And I also represent the other name.

19  A  Merrill or -- Managed Benefits?

20  Q  Managed Benefits --

21  A  Okay.

22  Q  -- and Insurance, etc.  You don't have -- you don't

23  recall as we sit here of you having any conversations with

24  anybody from my clients regarding the application process?

25  A  No, sir.

**Page 79**

1  Q  Do you know why you guys switched carriers?

2  A  No.  We pretty much again, you know, we -- we left

3  it up to MBA to get us -- go out and -- and price it and

4  market it and bring us a good deal for the district.

5  Q  As you sit here today, do you have any problems with

6  the way the application process was handled for the 2001-2002

7  policy?

8  A  No, sir.

9  Q  And when I say, "you," that's you personally.

10  A  Me.

11  Q  Individually.

12  A  Yes, sir.

13  Q  Okay.  Have you reviewed any documents in

14  preparation for your deposition today?

15  A  Yes.

16  Q  All right.  Do you recall what you reviewed?

17  A  I reviewed them with my attorney.

18  Q  Well, I understand that, but I'm entitled to know

19  what you reviewed.  You notice I haven't asked you what he

20  said to you.

21  A  No, right.  A good stack of documents, I would say.

22        MR. SHUCHART:  What were they?  I mean, I

23  assume they were documents you --

24        MR. WALRAVEN:  They're part of the initial

25  disclosure.  You've got them all.

**Page 80**

1        MR. SHUCHART:  I mean, he reviewed all the -- I

2  mean, I didn't --

3        MR. WALRAVEN:  No.  It's a selected portion.

4  Would you like to see them?  There are no surprises.

5        MR. SHUCHART:  If you don't mind, just briefly.

6        MR. WALRAVEN:  You don't get my notes.

7        MR. SHUCHART:  No.  Okay.  If they're anything

8  like my notes, I couldn't read them anyway.  Could not read

9  them anyway.  You mean, I don't get the free post-note?

10        MR. WALRAVEN:  They're blank.  Feel free.

11        MR. SHUCHART:  Why don't we go off the record

12  for a second?

13        (Off the record from 12:51 p.m. to 12:52 p.m.)

14  Q  (Mr. Shuchart)  As we sit here today, what are your

15  complaints about the way that my client, MBA of Wyoming, Inc.,

16  ran the self-funded plan?

17  A  What are the what?

18  Q  What is your complaint about the way my client, MBA

19  of Wyoming, Inc., ran the self-funded plan?

20  A  Complaints?

21  Q  Yes.

22  A  I don't have any complaints other than the

23  reimbursement.

24  Q  I have no further questions at this time.  Thank you

25  very much, Mr. Sanchez, for your time.

**Page 81**

1        (Time:  12:54 p.m.)

2  BY MS. HEGLAND:

3  Q  Mr. Sanchez?

4  A  Yes, ma'am.

5  Q  I just have a few questions.  It shouldn't take very

6  long.  First, did you have any other education beyond your

7  B.A.?

8  A  I have a Master's in Business Administration, M.B.A.

9  Q  Where did you obtain that?

10  A  At Pan American University.

11  Q  Do you have any other professional licenses beyond

12  your CPA?

13  A  No.  Not -- not currently in place, no.

14  Q  Has something lapsed?  You didn't have any other --

15  A  No.

16  Q  -- professional licenses?

17        MR. WALRAVEN:  You have a driver's license?

18        THE WITNESS:  Well, yeah.

19  Q  (Ms. Hegland)  Professional.  No?

20  A  No.

21  Q  Are you -- are you a native of the Valley?

22  A  Yes, I am.

23  Q  Where are you from originally?

24  A  San Benito.

25  Q  Do you -- do you have other family members here?

Lorenzo Sanchez
June 26, 2003

Case 1:03-cv-00047    Document 62    Filed in TXSD on 04/22/2004    Page 46 of 53

Multi-Page™

San Benito C.I.S.D.
v. Companion Life Insurance Company, et al.

Page 86

1 Janie's specific area of responsibility is the health
2 benefits.
3    Q  And that's Janie Gonzalez?
4    A  Janie Gonzalez that -- that you're gonna depose.
5 And then I have Lucy Garcia who basically does all my property
6 and casualty, fleet insurance, the cafeteria plans and some
7 other, and then I have Gracie Carpio who basically addresses
8 the worker's comp end of it, and what they -- I do -- I do a
9 little cross-training and send them off, you know, so that
10 they're all pretty well versed.
11    Q  Is there anyone -- and you said Janie is the
12 supervisor?
13    A  Supervisor, and, specifically, her area of
14 responsibility is the health benefits.
15    Q  Are there other personnel under Janie who would also
16 be involved in the administration of the health benefits?
17    A  No, aside from when she needs help from Lucy or
18 Gracie Carpio.
19    Q  So, Janie Gonzalez is the person probably most
20 knowledgeable with respect to the administration of the
21 San Benito School District health insurance benefits?
22    A  That is correct.
23    Q  And Janie reports to you as the head of that
24 department and assistant superintendent; is that correct?
25    A  That's correct.

Page 87

1    Q  Is there anyone else in-between that chain of
2 command?
3    A  No, ma'am.
4    Q  Okay.  And, from what you have testified previously,
5 you in your position as assistant superintendent responsible
6 for the administration of the health benefits make
7 recommendations to the superintendent; is that correct?
8    A  That's correct.
9    Q  And do you also then make recommendations to the
10 school board?
11    A  I go to the superintendent first.  Then, it -- you
12 know, we have committees of the board.  So, on insurance
13 issues, I go to the superintendent, fill him in on whatever it
14 is that we need to discuss.  Then, from there, we place an
15 agenda with the -- I mean, a discussion item on the finance
16 committee, and then from there it goes to the board if it
17 needs to go to the board.
18    Q  In making recommendations regarding -- let's just
19 talk about the -- the health insurance --
20    A  Uh-huh.
21    Q  -- benefit plan --
22    A  Right.
23    Q  -- available for San Benito Independent School
24 District.  In making recommendations regarding that, do
25 you have any -- any guidance or any consultant that you

Page 88

1 rely upon?
2    A  Well, the -- the third-party, the third-party
3 administrator, which in this case, you know, is MBA, and --
4 and they come in with the -- with the figures and the numbers
5 and -- and they do them.  I review them.  Janie and I go over
6 them.  We look at projections.  We look at setting rates and
7 -- for the different plans and tweaking the plans such that we
8 make the finances come out so that we can have a balance so we
9 can have enough money to pay claims and all those kinds of
10 projections  So, we rely a lot on the data, the analysis that
11 is done by the third-party administrator at our request
12 because we -- we have a little format.  We do a little
13 cash-flow thing that we have tried to get our -- our board
14 members up to speed and to understand our self-funding
15 program.
16    Q  Would you mind, Mr. Sanchez, taking a look at what
17 was previously marked as Exhibit No. 7?  Did I get that -- is
18 that the application that's dated --
19    A  Yes, ma'am.
20    Q  -- November 21 of 2000?
21    A  Yeah.  Yes, ma'am.
22    Q  Okay.  Who prepared that application?
23    A  I -- I wouldn't know.  It came to us.  The person
24 that used to bring this to us, and it's kind of, I guess,
25 their -- their local runner, was Mr. Greer.  He'd get together

Page 89

1 with MBA.  He'd come over and say, "Look, I got the
2 application here.  Don has already reviewed it.  Looks like
3 this is what we're gonna do.  Look it over.  We need to
4 initial here, here, and -- and we need to get it done 'cause,
5 you know, timelines are getting near and those kinds of
6 things."  That's -- that's kind of the process that, you know,
7 each year that we went through.
8    Q  Okay.  So, the application marked as Exhibit 7 was
9 prepared before it was brought to you?
10    A  Yes, ma'am.
11    Q  But you did review it and initial each page and that
12 is your signature at the end; is that correct?
13    A  When you say, "review," if I -- you know, if you --
14 if you call this, like what I'm doing now, a review, and kind
15 of scanning through, that's pretty much what I did.  I'm
16 relying -- I'm relying that what is brought to my table was to
17 the best benefit of the district.  So -- and -- and from our
18 conversations with MBA, it appeared like, you know, they were
19 doing a good job for us and, you know, we relied on that.
20       MR. SHUCHART:  Objection.  Non-responsive.
21    Q  (Ms. Hegland)  Did you personally ever have any
22 conversations with anyone from J. Allan Hall and Associates?
23    A  No, ma'am.
24    Q  Do you know whether anyone with San Benito
25 Consolidated Independent School District ever had any

Lorenzo Sanchez
June 26, 2003

Case 1:02-cv-00047    Document 62    Filed in TXSD on 04/22/2004    Page 47 of 53

Multi-Page™

San Benito C.I.S.D.
v. Comp__ion Life Insurance Company, et al.

Page 94

1 third-party administrator handles all the claims.

2     MR. SHUCHART: Objection. Non-responsive.

3   Q (Ms. Hegland) Are you familiar with the manner in
4 which the third-party administrator is put on notice of claims
5 from your employees at the school district?

6   A Yes.

7   Q Would you describe that for us? And, if you can,
8 focus on the 2000-2001 school -- I'm saying school year, but I
9 should probably be referring to the contract here.

10   A Period in question?

11   Q That's good.

12   A Yes. In -- in -- my understanding is that when one
13 of our employees is provided services, that, you know, we --
14 we issue a card. Each employee has a card. They present the
15 card. The provider then mails the claim to the third-party
16 administrator, in this case MBA. MBA, depending whether it is
17 a small claim, big claim, they have a large claims management
18 system which they review, reprice the claims and -- and at
19 that point when -- when all of that has been checked, then
20 payment is made.

21   Q So, it's your understanding that for the 2000-2001
22 policy period in question here, that the healthcare providers
23 would directly forward their bills to the TPA?

24   A Right. We don't -- we do not -- we don't handle any
25 of the -- that's correct.

Page 95

1   Q That was my question.

2   A That's correct. That's correct.

3   Q The school district and Janie Gonzalez don't have to
4 log those and forward them on?

5   A No, ma'am.

6   Q Thanks. That's all I needed to know.

7     MR. BUSH: I have no further questions at this
8 time.

9     MR. WALRAVEN: I guess it's lunchtime. Do you?

10     MR. SHUCHART: No. No further questions at
11 this time.

12     MR. WALRAVEN: We'll reserve our questions for
13 another time.

14     (Proceedings concluded at 1:15 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Page 96

CHANGES AND SIGNATURE

PAGE     LINE     CHANGE         REASON

Page 97

I, LORENZO SANCHEZ, have read the foregoing

deposition and hereby affix my signature that same is true and

correct, except as noted above.

_____

LORENZO SANCHEZ

THE STATE OF TEXAS    )

COUNTY OF _____    (

    Before me, _____, on this day personally

appeared LORENZO SANCHEZ, known to me (or proved to me under

oath or through _____) (description of

identity card or other document) to be the person whose name

is subscribed to the foregoing instrument and acknowledged to

me that they executed the same for the purposes and

consideration therein expressed.

    Given under my hand and seal of office this ____ day

of _____, 2003.

_____

NOTARY PUBLIC IN AND FOR

THE STATE OF TEXAS

Lorenzo Sanchez
June 26, 2003
Case 1:02-cv-00047    Document 62    Filed in TXSD on 04/22/2004    Page 48 of 53
Multi-Page™
$1 – appear
San Benito C.I.S.D.

### -$-

$1 [2]        29:18    72:19
$100,000 [1]   12:9
$700,000 [1]   61:14
$75,000 [9]    12:9
  12:12   18:8    29:15
  35:23   48:19   72:24
  73:1    90:22
$900,000 [1]   50:13

### -'-

'01-2002 [1]   76:20
'60 [1]   9:2
'60-something [1]
  9:2
'65 [4]   9:2    9:5
  9:9    9:9
'66 [3]   9:2    9:5
  9:9
'81 [1]   8:13
'86 [1]   54:22
'87 [2]   8:8    8:8
'91 [1]   8:8
'96 [6]   7:16    7:25
  59:3   59:17   59:17
  66:12
'97 [1]   66:12
'98 [1]   66:12
'99 [4]   29:5    29:5
  29:22   36:23
'em [2]   46:3    46:3
'til [1]   59:17

### -1-

1 [2]   53:10   69:12
10 [4]   39:19   39:20
  41:11   42:10
10/1/2000 [3]   36:4
  37:18   39:14
10/1/99 [1]   36:8
10/16 [1]   44:10
100 [1]   46:9
11 [12]   28:20   29:25
  30:9   40:10   40:13
  40:20   41:5   41:9
  42:17   44:5   44:7
  44:23
11-month [2]   42:13
  42:22
11/2 [1]   31:4
11/22 [1]   32:6
11/22/99 [2]   28:21
  31:4
11:10 [1]   33:14
11:20 [1]   33:14
12 [2]   45:20   45:21
12:00 [1]   56:20
12:16 [1]   56:20
12:51 [1]   80:13

12:52 [1]   80:13
12:54 [1]   81:1
13 [4]   46:19   46:20
  46:24   50:16
14 [3]   46:21   55:1
  55:3
15 [4]   55:20   55:21
  60:4   83:6
16th [1]   39:25   40:16
17 [3]   8:20   8:24
  10:3
18 [1]   8:20
1991 [1] 7:25
1999 [1] 35:4
1:09 [1]   91:3
1:11 [1]   92:12
1:12 [1]   93:9
1:15 [1]   95:14
1:30 [1]   31:4
1st [4]   14:1    14:2
  14:4   29:22

### -2-

2 [6]   17:23   17:24
  18:1   53:12   69:3
  69:4
200,000 [1]   67:25
2000 [16]   14:4
  27:10   27:20   29:14
  29:23   34:24   35:6
  35:7   36:23   36:23
  39:25   44:10   60:1
  76:19   76:21   88:20
2000-2001 [11] 36:24
  62:8   63:11   63:21
  63:24   66:16   68:19
  77:22   93:24   94:8
  94:21
2001 [9] 36:4   36:5
  36:23   37:18   39:15
  43:19   44:2   50:12
  55:9
2001-2002 [5] 76:22
  77:16   77:22   78:5
  79:6
2002 [1] 46:21
21 [1]   88:20
21.21 [1]   69:11
21st [4]   34:24   35:6
  35:7   35:10
22nd [1] 29:5
23rd [2]   29:4   35:4
240 [1]   31:7
2nd [2]   27:10   27:20

### -3-

3 [3]   23:12   23:14
  30:1
30th [1]   29:23
31st [8]   14:1   14:2
  37:18   39:15   43:14
  43:17   50:12   67:17

### -4-

4 [5]   24:10   24:12
  25:24   30:10   35:13

### -5-

5 [3]   25:24   26:20
  26:21
50 [1]   12:21

### -6-

6 [7]   28:9   28:10
  30:2   34:1   35:3
  36:8   69:8
60 [1]   7:11

### -7-

7 [12]   33:7   33:15
  34:2   34:7   34:14
  34:21   35:7   36:3
  40:15   55:9   88:17
  89:8
7/1/99 [1]   29:14
700,000 [1]   61:25
75,000 [2]   64:2
  72:19
750 [1]   61:25
760 [1]   61:25

### -8-

8 [3]   37:10   37:11
  53:3
8/31 [1]   36:4

### -9-

9 [2]   39:11   39:12
9/30/2000 [1]   36:8
9/30th [1]   29:14
900,000 [1]   48:22

### -A-

A.D [1]   8:22
a.m [2]   33:14   33:14
ability [1]   50:4
  54:8
able [4]   13:22   16:6
  16:17   42:7
above [2]   52:4
  52:23
accepted [3]   10:1
  44:13   44:15
accomplish [1]   43:11
accomplished [1]
  43:8
according [1]   67:16
account [21]   50:9
  50:13   51:16   52:5
  52:9   52:15   52:23
  53:12   53:16   53:25
  54:1   54:10   54:24

61:1   61:2   61:4
65:16   65:20   67:21
68:2   93:16
accountant [1]   54:18
accounting [6]   8:3
  8:12   8:15   54:14
  54:17   85:1
accounts [7]   51:20
  51:22   52:19   53:19
  62:3   65:13   84:25
accumulated [1]
  48:21
accurate [1]   78:4
acknowledges [2]
  30:2   30:16
acted [1]   73:22
actual [1]   62:8
Adam [1]   83:15
added [1]   75:3
addressed [4]   40:2
  44:10   47:17   55:6
addresses [1]   86:7
adds [1]   75:7
administration [5]
  31:7   81:8   86:16
  86:20   87:6
administrative [7]
  8:15   10:11   10:12
  10:14   11:8   55:22
  63:3
administrator [15]
  14:11   14:22   27:7
  31:2   51:21   52:13
  56:5   56:24   60:10
  69:16   88:3   88:11
  94:1   94:4   94:16
administrators [2]
  11:20   23:19
adult [1] 84:1
advance [39]   18:13
  18:14   18:22   18:24
  18:25   19:3   20:13
  20:17   20:19   20:22
  20:24   21:2   21:4
  21:13   26:5   26:12
  26:16   26:17   27:24
  33:2   33:5   37:8
  45:17   46:16   64:19
  65:3   65:3   66:7
  66:12   66:16   70:4
  70:6   70:15   70:16
  72:6   72:10   74:22
  74:25   93:5
affect [1]   26:13
afforded [1]   63:11
afternoon [1]   56:22
again [10]   38:6
  49:10   64:4   65:23
  67:23   70:20   71:1
  73:13   79:2   92:2
against [2]   11:15
  68:16
agenda [3]   57:12
  57:13   87:15
agent [5]   32:11

33:24   36:13   36:16
53:7
aggregate [2]   28:13
  52:8   63:6   63:6
ago [2]   59:18   76:8
agree [2] 16:10   18:12
agreed [1]   18:18
agreement [15]   14:21
  18:21   20:7   41:22
  41:24   42:4   55:22
  56:6   56:8   56:12
  59:25   60:5   76:24
  77:1   77:8
ahead [4]   17:19
  47:6   47:11   65:15
ahold [1]   32:2
Al [1]   55:6
Alice [5]   9:6
  9:6   9:9   9:24
  10:2
Alicia [1]   83:3
align [1] 13:14
Allan [18]   18:5
  19:4   20:16   25:1
  25:2   27:12   27:19
  44:20   44:24   49:8
  49:15   55:7   63:14
  89:22   90:1   90:18
  90:24   91:23
allegation [1]   18:12
allegations [4]   18:2
  20:21   68:14   71:21
allow [2]   7:5
  52:22
alone [1]   17:1
along [1]   91:19
always [6]   41:20
  54:11   59:2   62:23
  73:7   76:25
Amanda [1]   83:16
American [3]   8:12
  8:14   81:10
amount [9]   17:3
  48:25   50:16   52:4
  52:9   52:9   60:17
  63:6   76:13
amounts [1]   47:9
  52:4   52:22   72:13
  72:18
analysis [2]   13:17
  88:10
Anna [3]   82:20
  82:20   83:15
answer [3]   7:6
  77:10   90:6
answered [1]   49:4
answering [1]   76:23
anytime [2]   75:7
  75:19
anyway [3]   47:6
  80:8   80:9
APEX [1]   49:13
appear [8]   37:15
  37:21   44:14   44:24

| | | |
|---|---|---|
| 48:6 | 49:16 | 51:11 |
| 53:5 | 53:7 | 53:8 |
| 55:16 | 94:15 | 94:17 |
| 94:17 | | |

**claimants** [1]  49:3

**claiming** [2]  71:21
90:19

**claims** [52]  12:4
| 12:6 | 13:3 | 17:2 |
| 17:8 | 30:3 | 30:18 |
| 32:25 | 35:16 | 36:1 |
| 36:3 | 47:21 | 47:21 |
| 47:22 | 47:24 | 48:9 |
| 48:12 | 48:12 | 48:19 |
| 48:24 | 49:6 | 50:4 |
| 50:8 | 50:9 | 55:5 |
| 60:14 | 61:6 | 61:11 |
| 62:9 | 62:19 | 65:12 |
| 65:18 | 66:23 | 68:15 |
| 73:4 | 73:7 | 73:7 |
| 73:21 | 75:25 | 76:7 |
| 76:10 | 77:13 | 88:9 |
| 90:22 | 92:20 | 93:12 |
| 93:23 | 93:25 | 94:1 |
| 94:4 | 94:17 | 94:18 |

**Clarendon** [3]  21:12
| 37:3 | 77:24 |

**clarity** [1]  28:18

**classes** [1]  54:17

**clearer** [1]  7:7

**client** [5]  73:22
| 73:24 | 74:2 | 80:15 |
| 80:18 | | |

**clients** [15]  68:17
| 68:22 | 70:2 | 70:23 |
| 71:2 | 71:15 | 71:22 |
| 72:4 | 72:23 | 72:25 |
| 73:8 | 73:17 | 78:8 |
| 78:24 | 93:5 | |

**close** [2] 83:5  83:6

**coach** [6]  8:21
| 8:22 | 8:22 | 9:6 |
| 9:22 | 9:25 | |

**coaches** [1]  10:15

**coaching** [3]  9:24
| 10:2 | 10:4 |

**Code** [2] 58:21  69:11

**college** [3]  9:11
| 9:21 | 10:18 |

**coming** [1]  77:4

**command** [1]  87:2

**commitments** [1]
19:6

**committed** [1]  71:22

**committee** [6]  57:8
| 57:10 | 57:10 | 57:10 |
| 77:4 | 87:16 | |

**committees** [1]  57:4

**comp** [2]  85:10
86:8

**companies** [1]  14:19

**Companion** [27]
| 11:5 | 12:13 | 13:6 |
| 14:8 | 18:9 | 19:10 |
| 19:10 | 21:8 | 21:9 |
| 27:21 | 28:13 | 33:18 |

| | | |
|---|---|---|
| 36:17 | 37:16 | 40:3 |
| 49:8 | 68:18 | 69:13 |
| 77:24 | 90:4 | 90:8 |
| 90:12 | 91:6 | 91:8 |
| 91:13 | 91:23 | 93:4 |

**company** [14]  11:15
| 14:8 | 21:10 | 24:1 |
| 24:3 | 27:5 | 27:21 |
| 32:13 | 33:19 | 40:3 |
| 49:9 | 67:16 | 91:7 |
| 91:8 | | |

**compare** [3]  26:15
| 34:1 | 35:22 |

**competitive** [1] 14:10

**complaining** [1]
90:23

**complaint** [1]  20:22
| 20:23 | 80:18 |

**complaints** [4]  80:15
| 80:20 | 80:22 | 92:25 |

**complicated** [1]
7:3

**component** [5]  21:14
| 26:13 | 33:5 | 37:8 |
| 45:17 | | |

**comprise** [1]  48:24

**comprising** [1]  50:16

**concerning** [1]  50:4
64:2

**concluded** [1]  95:14

**conducted** [2]  47:20
49:5

**considered** [1]  53:4

**Consolidated** [4]
| 11:5 | 37:17 | 39:9 |
| 89:25 | | |

**consultant** [2]  22:14
87:25

**Consultants** [3] 56:24
| 60:10 | 69:17 |

**contain** [1]  53:13

**contained** [1]  50:13

**contains** [1]  53:12

**contesting** [1]  16:24

**contingent** [1]  24:20

**continue** [1]  76:25

**continues** [2]  30:10
53:13

**contract** [48]  12:13
| 13:6 | 13:12 | 13:15 |
| 14:8 | 14:21 | 19:11 |
| 19:15 | 22:4 | 23:2 |
| 25:5 | 26:16 | 27:12 |
| 27:13 | 27:14 | 27:17 |
| 28:12 | 28:15 | 30:16 |
| 30:17 | 33:5 | 37:7 |
| 37:14 | 37:16 | 38:1 |
| 38:7 | 38:9 | 38:13 |
| 38:22 | 39:14 | 42:3 |
| 42:12 | 42:13 | 42:16 |
| 42:22 | 42:22 | 43:2 |
| 51:10 | 51:15 | 53:3 |
| 57:4 | 57:15 | 57:17 |
| 59:19 | 59:20 | 63:18 |
| 91:9 | 94:9 | |

| | | |
|---|---|---|
| **contract-holder** [1] | | |
| 53:7 | | |

**contracts** [5]  26:18
| 59:12 | 59:22 | 75:10 |
| 75:12 | | |

**contribution** [5]
| 12:1 | 12:2 | 60:17 |
| 60:19 | 60:20 | |

**contributions** [3]
| 60:16 | 61:10 | 61:12 |

**controversy** [1] 48:25

**conversation** [2]
| 64:14 | 74:21 |

**conversations** [26]
| 43:6 | 62:11 | 62:14 |
| 62:18 | 62:22 | 63:9 |
| 63:20 | 63:23 | 64:11 |
| 64:18 | 64:23 | 64:24 |
| 65:24 | 66:2 | 74:8 |
| 74:10 | 74:12 | 78:8 |
| 78:23 | 89:18 | 89:22 |
| 90:1 | 90:8 | 90:12 |
| 91:20 | 93:3 | |

**coordinator** [4] 8:13
| 8:15 | 10:13 | 65:10 |

**copy** [8] 37:15  37:21
| 39:13 | 44:14 | 50:6 |
| 55:5 | 55:13 | 56:4 |

**correct** [58]  12:17
| 12:24 | 12:25 | 19:15 |
| 30:21 | 35:19 | 35:23 |
| 35:24 | 36:11 | 37:15 |
| 37:23 | 39:13 | 39:17 |
| 40:4 | 40:16 | 42:9 |
| 43:20 | 44:14 | 45:11 |
| 50:10 | 50:11 | 51:17 |
| 52:12 | 55:13 | 55:18 |
| 56:3 | 56:4 | 57:17 |
| 58:24 | 60:7 | 64:25 |
| 65:5 | 65:12 | 65:21 |
| 66:13 | 69:18 | 70:4 |
| 70:8 | 70:12 | 70:14 |
| 70:21 | 70:24 | 71:16 |
| 71:20 | 75:14 | 78:2 |
| 78:6 | 78:16 | 86:22 |
| 86:24 | 86:25 | 87:7 |
| 87:8 | 89:12 | 92:1 |
| 94:25 | 95:2 | 95:2 |

**correctly** [1]  92:24

**correspondence** [6]
| 40:16 | 44:7 | 45:23 |
| 46:7 | 46:21 | 55:4 |

**cost** [1]  72:14

**costs** [2] 63:2  63:3

**could've** [2]  12:19
12:21

**counties** [1]  82:24

**County** [3]  82:15
| 82:16 | 83:12 |

**couple** [1]  85:2

**course** [7]  52:3
| 52:7 | 52:21 | 63:4 |
| 74:4 | 84:22 | 85:4 |

**courses** [1]  58:16
58:20

**cousins** [2]  82:25
83:18

| | | |
|---|---|---|
| **cover** [15] | | 12:6 |
| 20:13 | 28:22 | 36:9 |
| 50:4 | 51:17 | 51:24 |
| 52:1 | 53:22 | 54:1 |
| 58:16 | 58:17 | 58:17 |
| 74:9 | 74:18 | |

**coverage** [23]  12:7
| 12:8 | 13:1 | 14:4 |
| 14:17 | 25:16 | 26:11 |
| 27:11 | 29:2 | 29:7 |
| 35:22 | 35:25 | 37:16 |
| 42:25 | 44:21 | 44:25 |
| 45:14 | 62:25 | 63:11 |
| 65:8 | 70:24 | 71:3 |
| 90:22 | | |

**coverages** [1]  70:20

**covered** [7]  13:12
| 16:21 | 27:16 | 53:8 |
| 53:20 | 53:21 | 74:8 |

**covers** [2]  15:14
29:21

**CPA** [1]  81:12

**Crockett** [1]  31:7

**cross-training** [1]
86:9

**current** [1]  7:12

**cut** [2] 67:6  67:17

**cutoff** [2]  43:18
43:20

-D-

**daily** [1] 76:14

**data** [3] 15:15  17:5
88:10

**date** [13] 13:24  22:1
| 24:14 | 29:1 | 29:2 |
| 29:3 | 29:7 | 32:8 |
| 34:20 | 34:22 | 35:3 |
| 53:10 | 55:8 | |

**dated** [7]  27:10
| 39:25 | 44:10 | 45:22 |
| 46:21 | 60:1 | 88:18 |

**dates** [5] 13:13  13:20
| 29:3 | 77:18 | 85:14 |

**daughter** [1]  83:24
| 83:25 | 84:1 |

**day-to-day** [1]  65:7

**deal** [3] 13:22  45:5
79:4

**dealing** [3]  25:3
| 62:7 | 65:7 |

**dealt** [1] 62:18

**Dean** [1] 84:16

**decided** [1]  10:4

**decision** [1]  72:9

**decision-making** [1]
57:3

**decisions** [1]  72:1

**deductible** [7]  12:15
| 12:24 | 13:5 | 29:15 |
| 35:23 | 63:24 | 64:1 |

**deemed** [1]  53:9

**Deere** [1]  82:22

**Defendants** [1] 69:10

| | | |
|---|---|---|
| **define** [1] | | 20:13 |

**defined** [1]  16:24

**defining** [1]  18:25

**definition** [3]  38:12
| 51:11 | 53:4 |

**definitions** [1]  76:3

**degree** [1]  9:17

**deliver** [1]  32:17

**delivering** [1]  53:11

**demand** [1]  52:1

**Denton** [2]  9:14
10:2

**department** [6]  85:1
| 85:1 | 85:2 | 85:9 |
| 85:24 | 86:24 | |

**departments** [3]
| 20:6 | 84:24 | 85:16 |

**dependent** [1]  18:7
| 48:4 | 48:9 | 76:5 |

**dependents** [2]  47:6
76:6

**depending** [2]  12:23
| 13:22 | 94:16 |

**depose** [1]  86:4

**deposited** [1]  61:4

**deposition** [6]  17:7
| 24:11 | 34:1 | 53:4 |
| 79:14 | 83:23 | |

**depository** [1]  53:18
54:9

**describe** [4]  16:17
| 57:2 | 60:12 | 94:7 |

**designations** [1]
16:8

**designee** [1]  19:23

**detailed** [1]  76:13

**details** [4]  16:4
| 46:1 | 76:9 | 85:12 |

**determine** [1]  12:4

**development** [1]
85:6

**dictated** [1]  93:13

**difference** [1]  35:25
| 36:10 | 72:8 |

**differences** [2]  34:2
34:4

**different** [14]  12:5
| 13:20 | 13:20 | 26:10 |
| 26:11 | 26:18 | 34:6 |
| 58:11 | 59:9 | 59:10 |
| 59:11 | 60:19 | 76:6 |
| 88:7 | | |

**differently** [1]  92:19

**difficult** [2]  69:19
85:13

**direct** [1]  53:8

**directly** [4]  53:10
| 61:4 | 91:11 | 94:23 |

**Director** [1]  7:18
55:5

**directs** [1]  57:11

**disallowed** [3]  50:16
| 50:17 | 50:18 |

**-G-**

Garcia [1] 86:5
Garza [1] 83:17
general [4] 58:18
60:23  60:23  61:13
generally [3] 39:6
39:7  57:8  64:5
generated [1] 61:24
generates [1] 61:21
given [1] 66:15
glad [1] 47:7
goal [1] 43:8
goes [6] 45:1  46:7
59:9  60:20  60:22
87:16
gonna [15] 15:23
16:10  17:16  28:22
43:4  63:3  67:25
68:1  72:14  76:25
77:2  84:13  86:4
89:3  92:22
Gonzalez [7] 46:2
65:9  76:16  86:3
86:4  86:19  95:3
good [11] 11:19
15:2  15:16  15:18
56:22  75:9  76:17
79:4  79:21  89:19
94:11
goodies [1] 85:7
Gracie [2] 86:7
86:18
graduated [1] 9:8
graduating [1] 9:25
green [2] 9:15
9:16
Greer [10] 22:15
22:19  23:8  32:12
32:18  36:13  74:15
74:16  74:21  88:25
group [3] 11:2
11:4  23:3
Guerra [3] 47:17
56:16  82:14
guess [11] 7:16
9:9  37:2  51:8
59:18  67:2  82:8
88:24  93:15  93:19
95:9
guidance [1] 87:25
guys [2] 13:22  79:1

**-H-**

H.R [1] 10:19
Hall [20] 18:5  19:4
20:16  25:1  25:2
27:12  27:19  44:20
44:24  49:8  49:15
55:6  55:7  63:14
89:22  90:1  90:18
90:24  91:23  93:4
hand [1] 60:3

handful [1] 83:6
handle [2] 93:25
94:24
handled [4] 14:11
79:6  92:19  92:20
handles [1] 46:1
94:1
handling [3] 62:9
62:19  93:23
hands-on [2] 62:7
85:19
handwriting [1]
30:23
Hanna [1] 10:13
hard [2] 46:6  83:4
Harlingen [1] 22:22
hat [1] 85:7
He'd [2] 88:25  89:1
head [2] 85:8  86:23
health [17] 11:2
11:4  13:3  13:15
15:15  23:5  58:12
60:13  61:2  85:9
85:21  86:1  86:14
86:16  86:21  87:6
87:19
healthcare [2] 53:9
94:22
hear [1] 78:11
heard [1] 9:25
Hegland [17] 14:25
15:4  15:13  16:10
16:14  34:20  34:23
34:25  81:2  81:19
82:15  84:15  89:21
90:7  93:10  93:22
94:3
held [9] 7:15  7:23
8:7  10:11  23:10
61:17  68:5  68:10
82:9
help [2] 30:5  86:17
Hey [1] 20:1
hierarchy [1] 57:3
high [3] 9:25  10:13
10:18
Highlands [2] 7:19
10:23
HIPAA [1] 15:7
hiring [1] 85:5
historic [1] 8:10
hold [2] 10:12  58:5
68:8
honored [1] 53:14
hope [1] 84:10
hour [1] 33:12
hours [1] 85:15
human [5] 7:13
10:19  11:1  31:2
84:19
Hutchison [1] 55:6

**-I-**

I.S.D [2] 8:21
10:10
idea [3] 15:16  15:18
21:3  21:4  24:4
31:10  60:9  67:12
identified [1] 16:12
53:3
identify [8] 23:16
26:22  28:11  33:17
37:12  44:9  55:3
55:21
idly [1] 51:20
immediate [2] 46:1
82:25
immediately [2]
40:9  40:19
in-between [1] 87:1
Inc [8] 56:24  60:6
60:10  68:22  69:16
69:17  80:15  80:19
inches [1] 30:20
including [2] 60:19
69:12
incomprehensible [1]
7:3
incorporated [1]
77:9
incurred [6] 12:4
12:9  18:6  18:11
29:13  29:14
independent [6]
11:6  37:17  39:2
39:9  87:23  89:25
indicate [2] 29:21
33:4
indicated [1] 62:1
indicates [1] 24:6
41:12
individual [3] 31:18
72:20  75:25
Individually [1]
79:11
individuals [2] 16:7
48:20
industry [1] 26:12
information [5] 17:2
19:7  47:1  50:3
57:12
initial [6] 44:17
44:18  45:11  79:24
89:4  89:11
initialled [2] 40:11
55:23
initials [2] 24:15
24:16
instance [1] 15:8
instances [1] 56:8
instead [1] 42:25
instructions [1] 45:3
insurance [40] 11:15
12:13  13:3  14:8
15:15  21:9  23:25
27:21  33:18  37:16
40:3  49:8  56:24

57:5  57:25  58:6
58:12  58:12  58:13
58:17  58:21  60:10
61:10  65:9  69:11
69:17  72:17  74:3
75:15  78:9  78:22
85:10  85:21  86:6
86:21  87:12  87:19
90:9  91:7  91:8
insured [1] 23:18
intent [5] 19:5
20:16  20:18  41:4
43:6
intention [1] 9:21
intentionally [2]
91:25  92:5
interested [2] 75:5
82:8
interim [1] 76:10
interlocal [6] 41:22
41:24  42:4  76:24
77:1  77:8
interpret [1] 19:1
41:1  42:13  53:15
53:24  54:4  54:6
54:7  54:8
interpreting [1] 51:6
interrupt [1] 60:21
interviewed [1] 10:24
invested [2] 51:25
65:20
investment [3] 50:6
61:5  61:18
investments [2] 50:6
54:12
involve [2] 58:16
84:21
involved [7] 38:16
41:21  48:13  66:6
75:25  76:6  86:16
involvement [1]
42:2
involves [3] 46:1
47:23  58:11
Iraq [2] 84:2  84:3
84:4
issuance [1] 14:7
issue [32] 13:6
13:12  16:23  17:1
31:16  31:19  31:20
32:4  36:22  38:15
49:6  51:1  51:2
51:7  52:4  52:8
52:11  52:18  52:22
55:17  66:19  66:23
67:2  67:3  67:4
67:13  67:24  70:20
72:12  75:18  76:24
94:14
issued [12] 18:10
21:7  27:20  37:17
51:4  51:14  51:19
52:2  52:14  66:3
68:18  69:13
issues [3] 15:8
61:16  87:13

issuing [1] 65:24
it'd [1] 85:25
it'll [1] 90:5
item [2] 57:13  87:15
items [2] 35:21
35:22
itself [3] 19:17  49:12
63:8
IX [1] 69:8

**-J-**

J [18] 18:5  19:4
20:16  25:1  25:2
27:12  27:19  44:20
44:24  49:8  49:15
55:7  63:14  89:22
90:1  90:18  90:24
91:23
Jane [2] 15:21  48:9
Janie [14] 46:2
46:3  65:9  76:15
76:16  85:25  86:3
86:4  86:11  86:15
86:19  86:23  88:5
95:3
Janie's [1] 86:1
Jimmy [3] 82:20
82:21  83:14
JoAnn [1] 83:15
job [4] 9:4  10:2
71:17  89:19
John [4] 15:21  47:15
48:10  82:22
Jr [1] 33:25
jury [1] 82:9

**-K-**

keep [2] 41:23  75:5
kind [6] 14:9  22:17
58:10  88:24  89:6
89:14
kinds [6] 42:1
58:14  61:15  85:6
88:9  89:5
knowing [2] 69:22
82:8
knowledge [12] 18:19
21:22  24:8  42:2
66:5  66:6  68:9
68:11  70:13  73:4
90:3  91:7
knowledgeable [1]
86:20
known [1] 7:2
knows [1] 16:8

**-L-**

label [1] 30:1
lack [2] 19:8  70:16
language [12] 26:9
30:2  30:4  30:11
30:20  32:24  33:4
35:12  40:12  41:1

next [1] 49:2
night [1] 30:7
NII [1] 49:12
nobody [2]    65:2
70:2
non-interest-bearing
[1]    62:3
Non-responsive [6]
30:8    53:23    54:13
89:20    93:20    94:2
None [1]    62:10
noon [1] 56:20
Noranne [2]    83:15
83:16
North [2]    9:14
31:7
Note [1] 40:10
notes [3]    28:24
80:6    80:8
nothing [1]    69:24
notice [3]    32:6
79:19    94:4
November [11] 29:4
34:24    35:4    35:5
35:6    35:7    39:25
40:16    43:24    55:9
88:20
now [10] 8:10    30:23
44:2    44:6    65:11
72:20    76:11    77:19
83:16    89:14
NTSU [1]    54:17
number [5]    12:12
38:21    48:2    48:21
76:12
numbers [2]    47:8
88:4

-O-

oath [1] 69:23
Object [2]    10:9
52:10
objection [15]    11:13
14:12    14:23    15:1
30:8    38:18    40:23
41:3    42:14    45:7
53:23    54:13    89:20
93:20    94:2
obtain [3]    9:17
74:2    81:9
obviously [2]    71:14
91:20
occasion [1]    38:12
occasions [2]    52:24
52:25
occupation [1]    7:12
occur [1]    22:3
occurred [2]    22:2
78:5
occurring [1]    32:5
October [5]    14:4
27:10    27:20    29:22
67:17

off [7]    55:14    43:7
56:20    65:12    80:11
80:13    86:9
offered [1]    10:1
offers [1]    58:14
old [1]    7:10
Olivarez [1]    24:2
once [1] 38:6
one [34] 10:21    12:10
15:2    15:14    17:4
19:12    21:16    23:7
23:22    24:21    25:22
26:2    76:7    26:17
27:20    6:20    38:14
48:2    48:6    50:1
50:1    58:4    59:20
59:24    60:18    65:1
67:11    68:15    71:10
75:17    76:15    76:16
77:24    94:12
One's [1]    82:20
ones [5] 10:21    73:2
73:3    73:9    73:11
operating [2]    54:10
67:23
operations [1]    46:2
opinion [2]    70:17
72:16
opposed [2]    64:7
65:20
opposite [1]    56:25
option [1]    77:6
orally [1]    69:25
order [3]15:10    56:16
57:4
orientation [1] 58:7
original [4]    7:21
17:16    17:25    40:2
originally [1]    81:23
otherwise [2]    53:11
54:24
ought [1]    15:14
oversee [1]    19:12
own [1] 65:13
owns [1]24:1

-P-

p.m [9]    31:4    56:20
80:13    80:13    81:1
91:3    92:12    93:9
95:14
packet [2]    23:20
25:15
page [18]    24:21
25:15    25:15    25:18
25:24    26:2    26:3
30:1    30:1    30:10
33:20    35:13    37:22
40:10    48:8    56:2
69:8    89:11
pages [4]    27:24
37:20    44:17    55:23
paid [21]16:24    17:2
17:4    29:22    36:1

36:3    38:13    47:24
50:10    51:11    53:5
53:6    55:16    60:14
72:17    73:7    73:21
76:10    77:13    92:15
93:18
Pan [3]    8:12    8:14
81:10
paragraph [11]    17:17
17:17    18:2    29:25
30:9    40:6    41:9
47:15    53:2    69:8
70:18
paragraphs [1] 47:5
Pardon [1]    22:8
parenthesis [5] 40:10
40:13    40:13    40:20
40:20
part [8]    14:15    14:15
14:21    17:4    17:5
22:23    24:22    79:24
Partially [2]    43:10
43:11
participate [1] 9:19
particular [4]    12:10
23:22    47:15    58:5
particulars [1] 50:1
parties [1]    18:18
party [1]18:21
pass [2] 55:2    56:15
Patience [1]    35:1
pay [7]    30:3    30:18
32:25    35:14    50:25
73:6    88:9
payable [1]    85:1
payment [9]    18:13
18:14    53:7    53:8
53:9    53:11    53:12
73:24    94:20
payments [2]    48:2
67:6
payor [1]    53:10
payroll [1]    85:1
people [3]    73:10
85:18    85:19
per [5]    13:7    29:15
29:18    60:17    72:20
perceive [1]    48:17
percent [1]    46:9
Perez [3]    83:3
91:3    83:3
period [16]    9:10
13:11    13:15    13:19
18:7    18:11    27:16
40:20    43:5    43:13
43:14    48:19    59:21
67:6    94:10    94:22
permit [1]    53:13
53:14
person [7]    53:9
65:6    85:22    86:19
88:23    91:15    91:17
personally [12]    11:10
62:15    63:21    64:11

65:2    65:23    68:12
70:23    79:9    89:21
90:7    92:14
personnel [4]    17:8
85:4    85:5    86:15
perspective [2] 73:14
73:16
petition [3]    17:16
18:1    91:5
physically [1]    31:5
picture [1]    13:18
place [11]    15:11
27:18    32:4    39:14
54:9    57:12    57:13
81:13    87:14    93:4
93:23
plan [27]11:21    11:23
12:1    12:2    12:3
13:18    14:18    21:9
23:3    29:13    36:18
36:21    36:21    39:9
39:13    42:8    43:2
44:3    46:11    56:13
60:13    63:17    66:7
77:12    80:16    80:19
87:21
planned [1]    10:6
plans [9]    11:2
11:5    12:5    60:19
61:2    85:9    86:6
88:7    88:7
play [5]    12:7    12:9
12:11    68:6    76:18
plenty [1]    76:1
point [7]16:6    19:9
21:6    26:1    43:1
59:5    94:19
points [3]    26:4
26:8    26:9
policies [4]    58:17
75:1    75:15    75:16
policy [44]    14:3
16:25    17:1    18:7
21:13    51:19    51:19
57:6    62:2    62:8
62:13    62:19    63:12
63:25    67:7    68:17
68:19    68:19    69:13
69:17    69:21    70:19
70:24    72:9    72:17
73:25    74:3    74:6
74:8    74:13    74:18
74:22    75:18    75:22
75:22    76:22    77:17
77:22    78:5    79:2
92:16    92:20    93:1
pool [6] 42:5    60:20
60:22    61:6    61:19
82:9
pools [1]    50:6
Portales [1]    8:6
portion [1]    80:3

position [15]    7:15
7:23    8:7    8:16
10:11    10:12    10:14
16:17    58:6    66:22
67:1    68:4    87:5
90:17    92:14
positions [2]    10:17
10:22
possible [1]    75:6
possibly [1]    12:4
post [1] 46:3
post-note [1]    80:9
practice [1]    75:9
prefer [1]    17:6
premature [1]    15:20
premium [8]    12:23
26:13    26:15    26:17
63:21    75:4    75:5
75:7
premiums [1]    63:3
preparation [1] 79:14
prepared [3]    23:23
88:22    89:9
presence [1]    34:11
34:18    38:6
present [3]    32:15
32:22    94:14
pressed [1]    32:7
pretty [7]    48:21
58:18    61:8    76:17
79:2    86:10    89:15
previous [9]    36:11
36:14    36:18    36:21
70:1    74:13    74:22
75:21    75:22
previously [2]    87:4
88:17
price [1] 79:3
privacy [2]    15:8
15:17
privy [1]    63:13
problem [1]    15:3
56:18
problems [5]    42:11
73:21    73:23    79:5
92:24
procedure [1]    67:24
procedures [2]    54:11
93:12
proceed [1]    27:11
Proceedings [1]
95:14
process [11]    14:10
57:3    60:13    78:9
78:24    79:6    89:6
92:19    92:25    93:14
93:23
processed [2]    50:8
93:12
procurement [2]
62:18    76:19
produced [2]    37:21
37:23
producing [1]    15:9

says [17] 18:4
20:24 25:1 20:1
29:13 31:2 25:24
35:7 36:2 34:24
36:8 42:15 36:3
54:6 69:10 54:3
10:18

SB [1] 58:3
SB-00003 [1] 56:2
SB-00027 [1] 30:1
SB-00028 [1] 30:10
scanning [1] 89:15
school [58] 7:14
7:18 9:25 10:1
10:5 10:6 10:14
10:18 11:6 13:2
18:5 18:9 18:10
20:9 22:23 37:17
38:2 39:9 43:5
52:11 52:14 52:17
52:22 57:3 58:15
59:1 59:5 59:12
60:13 61:11 61:21
62:2 64:7 65:8
65:19 66:3 68:4
68:6 68:9 68:16
71:14 72:16 73:1
75:4 84:9 84:13
86:21 87:10 87:23
89:25 90:12 93:11
93:23 93:24 94:5
94:8 94:8 95:3
school's [1] 60:22
Scott [1] 55:5
screened [1] 10:24
second [3] 46:15
70:18 80:12
see [16] 8:11 19:17
24:23 26:4 30:4
35:12 37:11 42:15
47:9 47:15 77:19
77:24 80:4 83:13
83:14 84:23
seeing [1] 46:12
seem [3] 43:8 55:23
85:15
selected [1] 80:3
self-funded [6] 11:21
11:23 42:8 63:8
80:16 80:19
self-funding [1]
88:14
self-insured [2] 18:8
64:2
send [5] 53:16 53:25
57:7 63:18 86:9
sending [1] 54:2
sense [1] 62:5
sent [6] 16:25 24:8
27:3 51:4 51:7
55:14
sentence [2] 21:1
25:9
separate [1] 28:2
September [4] 14:1
14:2 29:23 43:16

sequence [1] 78:2
serve [1] 58:3
service [1] 55:22
services [4] 21:24
77:2 84:25 94:13
set [4] 23:7 26:4
52:19 61:14
setting [2] 85:5
88:6
several [1] 41:21
59:22
shop [1] 62:25
shortfall [1] 61:12
show [12] 17:16
23:13 24:11 26:21
28:10 33:15 37:11
39:12 39:20 44:6
45:21 46:20
showed [1] 36:19
shows [1] 38:24
Shuchart [35] 10:9
14:12 14:23 16:5
16:16 17:12 17:19
28:18 28:23 28:25
35:2 40:23 42:14
45:7 46:23 56:18
56:21 56:23 60:3
69:4 69:6 69:8
76:22 79:22 80:1
80:5 80:7 80:11
80:14 84:12 89:20
92:13 93:20 94:2
95:10
sic [1] 42:15
side [5] 19:13 60:15
60:16 84:22 85:4
sides [1] 56:25
sign [9] 19:24 20:2
20:9 31:3 31:14
32:2 41:17 42:3
63:18
signature [18] 27:1
28:13 29:4 30:21
30:24 32:19 32:21
33:21 34:6 34:7
34:10 38:4 41:23
44:12 45:11 55:25
65:15 89:12
signatures [1] 31:16
signed [27] 19:14
19:18 19:19 28:2
28:20 28:20 29:5
31:6 31:18 32:8
32:10 32:15 32:22
33:23 34:12 35:3
35:9 36:16 38:1
38:7 38:9 40:9
40:19 44:15 55:23
74:7 74:15
signing [4] 19:21
19:21 74:5 75:12
Silverio [1] 83:3
simple [1] 11:24
single [1] 24:21
sister [2] 82:18
83:15

sit [11] 62:21 64:15
68:18 69:23 72:22
75:24 78:7 78:23
79:5 80:14 92:18
small [2] 47:24
94:17
Smith-Reagan [2]
22:16 23:8
someone [1] 32:17
32:22
sometimes [7] 7:2
7:4 20:5 32:1
45:25 46:2 85:12
Somewhat [1] 39:0
somewhere [1] 19:25
48:22
son [1] 84:9
son's [1] 84:15
sorry [9] 21:1 28:16
28:23 30:9 34:20
42:18 67:11 67:17
78:11
sort [2] 10:14 20:7
sources [1] 12:2
speaking [4] 12:12
20:21 21:1 48:8
specific [22] 12:12
12:15 12:24 13:5
13:13 29:15 32:8
35:23 46:8 47:21
47:22 49:16 58:19
61:1 72:18 72:19
76:12 76:17 77:20
85:13 86:1 90:22
specifically [12]
14:9 16:11 18:4
20:23 21:25 24:14
24:19 29:6 61:15
64:10 72:10 86:13
specifics [6] 39:5
61:20 62:22 64:16
69:22 85:23
speculation [1] 40:24
speed [1] 88:14
spent [1] 8:11
sports [1] 9:19
stack [1] 79:21
staff [1] 85:6
standard [5] 23:20
52:7 52:21 54:10
67:23
standpoint [2] 11:8
31:20
Star [1] 61:19
start [4] 43:16 56:17
83:13 84:23
started [3] 8:13
61:25 83:23
starting [1] 85:5
State [3] 9:14 54:19
58:4
statement [7] 18:15
25:17 25:19 25:20
25:21 42:11 42:13

statements [2] 91:21
92:3
states [2] 23:23
30:2
stays [1] 84:10
Steve [1] 14:25
stick [1] 46:3
still [2] 61:7 71:5
stop [44] 12:7 12:8
12:11 12:13 13:1
13:15 13:20 14:7
14:17 19:10 21:6
21:8 25:5 25:16
26:10 26:12 26:16
27:11 36:17 37:16
40:2 43:2 44:3
44:21 44:24 45:14
47:25 51:10 53:2
57:5 61:9 62:8
62:18 62:24 62:25
63:11 63:21 65:8
73:3 73:9 73:12
73:20 77:23 91:9
stopped [2] 10:2
47:7
Store [1] 82:22
stroke [1] 15:22
study [1] 46:4
subject [3] 24:20
27:19 30:17
submits [1] 57:9
submitted [1] 49:18
submitting [4] 30:3
30:18 32:25 35:18
subparagraph [1]
30:11
substantial [1] 68:7
such [3] 12:5 18:8
88:7
sued [1] 71:15
sufficient [2] 12:6
51:16 53:13 54:1
54:23
suit [1] 76:7
sum [1] 67:25
superintendent [14]
7:13 19:18 19:21
31:3 31:9 31:24
57:17 57:19 84:19
86:24 87:5 87:7
87:11 87:13
superintendent's [2]
19:23 20:10
supervision [1] 84:24
supervisor [3] 85:25
86:12 86:13
support [1] 11:14
supposed [2] 58:21
85:8
Surely [1] 57:7
surprises [1] 80:4
surrounding [1]
41:15
sustain [1] 63:8

Swetnam [12] 18:6
19:4 20:16 21:19
24:3 33:25 34:11
38:6 41:17 41:20
74:7 93:4
Swetnam's [7] 22:11
23:2 32:13 34:10
38:4 41:16 41:23
switch [1] 77:21
78:5
switched [2] 77:23
79:1
system [1] 94:18

-T-

table [1] 89:16
takes [1] 8:19
taking [2] 61:3
88:16
teacher [2] 8:21
82:21
telephone [1] 31:3
telling [2] 25:10
27:9
ten [2] 42:16 83:6
ten-month [1] 42:15
tenders [2] 25:8
53:10
term [5] 18:24 19:8
20:25 51:15 64:20
terminated [1] 23:2
terms [6] 68:17
68:19 69:13 69:17
69:20 91:9
test [1] 83:4
testified [4] 65:17
66:18 87:4 92:24
testimony [2] 62:1
70:1 70:21
Texas [6] 9:6
9:14 22:17 54:20
58:21 69:11
Thank [10] 15:4
34:25 39:18 46:18
55:19 80:24 91:2
92:11 93:7 93:8
thanked [1] 21:23
Thanks [1] 95:6
That'd [1] 17:12
third-party [14] 11:19
14:11 14:21 23:19
27:7 51:21 52:13
56:5 88:2 88:2
88:11 94:1 94:4
94:15
thoroughly [1] 38:11
thought [1] 76:1
three [5] 26:7 59:10
60:18 84:23 85:25
through [13] 14:2
29:14 37:18 39:14
57:4 57:7 57:22
65:18 68:16 75:18
89:7 89:15 92:16

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SAN BENITO CONSOLIDATED ) 
INDEPENDENT SCHOOL DISTRICT, )
                                     )
              Plaintiff,             )
                                     )
VS.                                  )
                                     )
COMPANION LIFE INSURANCE             )    NO. B-003-047
COMPANY, MANAGED BENEFITS            )
ADMINISTRATOR AND INSURANCE          )
CONSULTANTS, INC., MICHAEL M.        )
SWETNAM, JR., J. ALLAN HALL          )
& ASSOCIATES, INC., AND              )
MBA OF WYOMING, INC.,                )
                                     )
              Defendants.            )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF LORENZO SANCHEZ

JUNE 26, 2003

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### E X H I B I T   I N D E X

| Exhibit Number | Description | Page Marked |
|---|---|---|
| No. 1 | Defendant's Notice of Intention to Take Oral Deposition (2 pp.) | 6 |
| No. 2 | Plaintiff's Original Petition (9 pp.) | 17 |
| No. 3 | Bid proposal packet prepared by Insurance Associates of the Valley (46 pp.) | 23 |
| No. 4 | Qualifications and Contingencies from J. Allan Hall & Associates (1 p.) | 24 |
| No. 5 | Letter dated October 2, 2000, from Lorenzo Sanchez addressed to Don Merrill, MBA (3 pp.) | 26 |
| No. 6 | Application to Companion Life from San Benito C.I.S.D. for 99-2000 year period (4 pp.) | 28 |

